## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PROGENY,                                                )
a program of Destination Innovations Inc.,              )
CHRISTOPHER COOPER,                                     )
ELBERT COSTELLO,                                        )
MARTEL COSTELLO, and                                    )
JEREMY LEVY, JR.,                                       )
on behalf of themselves                                 )
and others similarly situated,                          )
                                                        )
      Plaintiffs,                                    )
                                                        )
v.                                                      )      Case No. 6:21-cv-01100-EFM-ADM
                                                        )
CITY OF WICHITA, KANSAS,                                )
CHIEF GORDON RAMSAY, in his                             )
official capacity as Chief of the Wichita               )
Police Department, and                                  )
LIEUTENANT CHAD BEARD, in his                           )
official capacity as Supervisor of the Gang             )
Unit of the Wichita Police Department,                  )
                                                        )
      Defendants.

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Defendants' Motion to Dismiss (ECF No. 14) (hereinafter "Defs. Br.") rests on several fatal errors, including a misunderstanding of Plaintiffs' burden at the complaint stage, a misinterpretation of the legal standards governing Plaintiffs' claims, and a willful ignorance of the vast majority of the facts Plaintiffs alleged in their Complaint. For these and the additional reasons as set forth more fully below, Defendants' Motion should be denied.

### I.   NATURE OF THE CASE

This is a class action brought under the U.S. Constitution and 42 U.S.C. § 1983. Plaintiffs challenge the constitutionality of K.S.A. 21-6313 and the City of Wichita's maintenance and use of a discriminatory, harmful, and unconstitutional Gang List. Plaintiffs, on behalf of themselves

and others similarly situated, allege that Defendants use the Gang List to unlawfully track, surveil, prosecute, and punish Wichita residents—predominately those from Black and Latinx communities—in violation of their constitutional rights under the First and Fourteenth Amendments. Plaintiffs seek declaratory and injunctive relief.

## II.  QUESTIONS PRESENTED

1. Do Organizational Plaintiff Progeny and Individually Named Plaintiffs Christopher Cooper, Elbert Costello, Martel Costello, and Jeremy Levy, Jr. (collectively, "Plaintiffs") have standing to pursue their claims?

2. Have Plaintiffs stated a claim for which relief may be granted for various violations of the First and Fourteenth Amendments?

3. Are Chief Ramsay and Lieutenant Beard proper defendants in this action?

4. Have Plaintiffs sufficiently pled that the constitutional violations alleged are part of a custom, policy, or practice, such that their claims may proceed against the City of Wichita under *Monell* liability?

## III. STATEMENT OF FACTS

Plaintiffs incorporate herein the facts as alleged in their Complaint (ECF 1) (hereinafter "Compl."), and summarize those facts as follows:

The Wichita Police Department (the "WPD"), maintains and operates a Gang List that disproportionately targets and harms individuals and communities of color under the guise of "public safety." Compl. ¶¶ 1-2. Plaintiffs bring all of their claims on behalf of themselves and a proposed class, including all persons included in the WPD Gang List as an Active or Inactive Gang Member or Gang Associate. *See generally id.* at ¶¶ 170-87.

Specifically, K.S.A. 21-6313 and WPD Policy No. 527 allow the WPD to place individuals on the Gang List without adequate notice. Compl. ¶¶ 5, 20-28, 75-84. The WPD places individuals on the List regardless of whether the individuals have been involved in criminal activity, and with the purpose of surveilling and targeting those individuals for increased enforcement activities. *Id.* at ¶ 4. The statutory criteria that allow the WPD to designate someone a "member of a criminal street gang" are so broad that the criteria encompass a host of innocent, non-criminal activities. *Id.* at ¶ 10. Additionally, the criteria are unconstitutionally vague and do not allow people to understand how to conform their conduct to avoid being placed on the List. *See generally id.* at ¶¶ 189-93. WPD officers place people on the Gang List based on these vague and broad criteria without notice, without an opportunity to contest the gang designation, and without any meaningful opportunity to petition the WPD to have their name removed. *See generally id.* at ¶¶ 204-13. These are not mere abstractions but have concrete impacts on Plaintiffs and putative class members.

The WPD's policy and practices regarding the Gang List specifically target Progeny members and prevent Progeny, an organizational plaintiff, from carrying out its stated mission of preventing incarceration of young people by providing services and support to community-based alternatives. Compl. ¶¶ 106-12. Progeny has had to divert resources away from its central mission to assist members facing repercussions associated with their inclusion in the Gang List. *Id.* at ¶ 113.

Individual Plaintiffs Christopher Cooper, Elbert Costello, Martel Costello, and Jeremey Levy, Jr. are all Black men whom Defendants placed on the Gang List without due process and who have suffered personal and professional injuries as a result. *See generally* Compl. ¶¶ 115-69; 215-24. In particular, WPD officers have subjected Plaintiffs to harassment, surveillance, and punitive policing simply because they are on the Gang List. *Id.* at ¶¶ 115-69. Plaintiffs also have

suffered a host of consequences, including increased bail, probation violations for what would normally be deemed innocent conduct, and adverse employment actions. *Id.* at ¶¶ 215-24.

Further, being named on the Gang List has forced Plaintiffs to stop associating with certain people and has altered how Plaintiffs dress and the businesses they frequent. Compl. ¶¶ 249-62. Plaintiffs have been punished for associating with particular people or wearing certain clothing merely because they are on the Gang List, in violation of the First Amendment. *Id.* at ¶¶ 238-47.

Finally, Individual Plaintiffs allege that the WPD implements, enforces, encourages, and sanctions discriminatory policing tactics that target individuals of color for inclusion on the Gang List based solely on their race or national origin, in violation of the Fourteenth Amendment. Compl. ¶¶ 226-36.

## IV. LEGAL STANDARD

"[I]t is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation

marks omitted). "Thus, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Ashaheed v. Currington*, No. 17-cv-3002-WJM-SKC, 2019 WL 1953357, at *3 (D. Colo. May 2, 2019) (internal quotation marks omitted).

## V. ARGUMENT

Defendants move to dismiss Plaintiffs' Complaint on two grounds: (1) that Plaintiffs all lack standing to assert their claims; and (2) that Plaintiffs fail to state any claim upon which relief may be granted. As is made clear in the discussions of the individual claims, *supra*, and in a plain reading of the facts set forth in the Complaint, Plaintiffs have standing for each of their claims and have pled sufficient facts.[1] For these reasons, as explained more fully below, Defendants' motion should be denied.

### A. Progeny has standing to seek equitable relief both on behalf of itself and on behalf of its impacted members.

An organization may assert standing to bring a lawsuit on behalf of itself, on behalf of its members, or on behalf of both. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) *superseded on other grounds by statute*, Fair Housing Act, 42 U.S.C. § 3613(a)(1)(A); *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 341-46 (1977). Progeny's well-pleaded

---

[1] While it appears that Defendants are attempting to bring a factual attack in their motion to dismiss as to Plaintiff Progeny, Defs. Br. at 11-12, it is not clear what factual challenges they are actually proposing. In order to bring a factual challenge to jurisdiction on a motion to dismiss the proponent must adduce evidence to challenge Plaintiffs' pleaded facts. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). Although Defendants' brief contains citations to all kinds of materials extraneous to the Complaint, none of those materials contains evidence that contradicts the facts pleaded by Plaintiffs. Thus, all are irrelevant, and the Court should disregard them. For instance, Defendants cite two ten and twelve year-old national reports about gangs, Defs. Br. at 3-6, that have no bearing on the Kansas statute or the WPD policies at issue in this case. Elsewhere, Defendants make unsubstantiated and non-evidentiary statements that amount to little more than a general denial of the facts pleaded by Plaintiffs. *See, e.g.*, Defs. Br. at 9-11. None of these extraneous materials adduces any evidence that would be relevant or admissible; thus, these and the other extraneous materials should be ignored by the Court in ruling on the motion to dismiss.

factual allegations establish its right to seek prospective relief under both organizational and associational theories of standing.

> ### 1. Progeny has standing to sue on behalf of its members who are personally impacted by the Wichita Police Department's gang policies.

Progeny brings suit on behalf of its members for the same types of harms suffered by the Named Plaintiffs. An organization has associational standing when (1) its members would have standing to sue in their own right, (2) the interests in the claim are germane to the organization's purpose, and (3) neither the claim asserted, nor the relief requested, requires individual members' participation in the lawsuit. *Wash. State Apple Adver. Comm'n*, 432 U.S. at 343. Progeny has adequately pled each of those elements.

> #### a. Progeny's claims regarding the Gang List itself are sufficient to show that its individual members have standing, and Elbert Costello's affiliation independently gives Progeny standing.

Defendants cite only to *Summers v. Earth Island Institute*, 555 U.S. 488, 497-99 (2009), to argue that Progeny has failed to meet the first prong. Defs. Br. at 13-14. This reliance is misplaced because *Summers* was an environmental case, which other circuits have found distinct from civil rights claims, as alleged here. *See Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) ("We are not convinced that *Summers*, an environmental case brought under the National Environmental Policy Act, stands for the proposition that an injured member of an organization must always be specifically identified in order to establish Article III standing for the organization."); *Massachusetts v. United States Dep't of Health & Human Servs.*, 923 F.3d 209, 223-27 (1st Cir. 2019) (finding that the showing of substantial risk of harm to an unidentified woman, who would undoubtedly be harmed by an employer's use of an exemption to a requirement that the employer provide contraceptive coverage, was sufficient to show standing). Additionally, *Summers* acknowledged that no individual member needed to be named when all members are

impacted by the challenged activity. 555 U.S. at 498-99 (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958)). This is exactly what Progeny has alleged: all of Progeny's members face a real and immediate threat of punishment for associating with a designated gang member.  Compl. ¶¶ 110-11. And even if the court determined that *Summers* applied and the Gang List was not a policy that impacted all of Progeny's members, Progeny would still satisfy this standard because Elbert Costello is a member of Progeny who has been placed on the Gang List and named as an individual plaintiff. *Cf. Summers*, 555 U.S. at 499 (finding that the plaintiffs had failed to show even one member of their organization had actually been harmed or faced imminent harm); Compl. ¶ 109.

> b. The interests advanced in the Complaint are germane to Progeny's purposes of reimaging the juvenile justice system and reinvesting in community-based alternatives to incarceration.

The second prong of the organizational standing analysis is also satisfied because the relief Progeny seeks would further the organization's mission and purpose. Defendants fail to address the numerous allegations in the Complaint in this regard, choosing instead to either dismiss or ignore these facts.

First, Defendants cite no authority in their conclusory statements that Progeny has failed to allege that this case advances interests germane to its organizational purposes. Defs. Br. at 14. Defendants simply brush past the concern raised about negative stigma brought to Progeny that may dissuade community members from attending its events. Compl. ¶ 106. But at the motion to dismiss stage, this allegation is treated as true. Defendants do highlight, however, the arbitrary nature of the WPD's enforcement of their gang policies by noting that the court services department in Sedgwick County is at risk of gang affiliation just as much as Progeny. Defs. Br. at 14.

Additionally, having fewer people be designated as gang members is closely related to the goals that Progeny has with respect to the criminal justice system. Similar alignment with the central issue of the case has been found to satisfy this prong for standing. *See, e.g.*, *Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 286 (1986) (finding that "there is little question that the interests that the UAW seeks to protect in this suit are 'germane to the organization's purpose'" because one of UAW's goals was to secure unemployment benefits for its workers, and the suit was statutory availability of unemployment benefits); *see also Nat'l Rifle Ass'n of Am., Inc. v. City of Evanston*, No. 08 C 3693, 2009 WL 1139130, at *6 (N.D. Ill. Apr. 27, 2009) (holding that the NRA's complaint identified interests germane to the lawsuit's issues regarding possession and transportation of handguns where it stated that the organizations purposes included "the protection of the right of citizens to acquire, possess, collect, transport and carry firearms for . . . lawful purposes," "the promotion of 'public safety and law and order;' and 'hunting and hunter safety,'" and "the 'fostering of shooting sports'"). The second prong is therefore satisfied.

        c.   <u>Participation of individual members of Progeny and the relief requested is not necessary for Progeny to have standing.</u>

Defendants assert without any authority that Progeny's claims depend on participation of its individual members, and that individual members do not have standing. Defs. Br. at 13-14. This argument is flawed in several respects.

First, this argument is inaccurate because the claims in this case are for injunctive relief, and individual participation of each member of Progeny is therefore unnecessary. *See, e.g.*, *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (holding that "individual participation is not normally necessary when an association seeks prospective or injunctive relief for its members"); *Colo. Cross-Disability Coal. v. Abercrombie &*

*Fitch Co.*, No. 09-cv-02757-WYD-KMT, 2011 WL 2173713, at *6 (D. Colo. June 2, 2011) ("[T]he third prong of Hunt is more plausibly read as dealing with situations in which it is necessary to establish 'individualized proof' . . . for litigants not before the court in order to support the cause of action." (internal citation omitted)). The impacts of WPD's gang policies go beyond individual encounters with law enforcement, as qualifying criteria for gang membership include frequenting unspecified areas, wearing normal clothes such as sports team apparel or anything that contains common colors like red or blue, and association, however innocent, within the presence of another person who is designated a gang member. Compl. ¶¶ 46, 73. Each of those qualifying criteria merely requires an observation by a law enforcement officer, not an actual direct interaction with the impacted individual. *Id.* at ¶¶ 9-13, 26. Identification of an individual by informants, parents, and guardians is also considered in designating individuals as gang members, and no one in those groups is necessarily a law enforcement officer. *Id.* at ¶ 46. Additionally, the claim that the overbroad nature of the criteria used to document gang membership, as detailed elsewhere in this response, violates *all* of the Plaintiffs' constitutional rights, can be made without the participation of individual members of Progeny. *Id.* at ¶¶ 106-14. For those reasons, this case is distinguishable from *Kansas Health Care Association v. Kansas. Department of Social & Rehab. Services*, 958 F.2d 1018, 1023 (10th Cir. 1992), where the court determined that individual member participation was necessary because the claims could not be properly evaluated without evaluation of facts relating to them.

Progeny need only show that one or more of its members are on the Gang List, an allegation Plaintiffs already made with respect to Elbert Costello, since he is a member of Progeny. Compl. ¶ 9. Plaintiffs can expand upon this claim following discovery once Plaintiffs' counsel has been able to review the entire Gang List alongside a list of Progeny members.

Defendants further claim that Progeny would need to show that the gang member designation of a member of Progeny is inaccurate to show a constitutional harm to the organization. Defs. Br. at 14. This misconstrues the nature of these claims in two important respects. First, Plaintiffs have claims regarding both the harm to people who are improperly on the Gang List without any procedural protections and to all individuals whose associational and assembly rights are limited because people they would otherwise interact with have been improperly designated as gang members or associates. Second, for the claims regarding associational rights, the infringement on those freedoms is not limited to instances where the other individuals were improperly designated as gang members or associates. Merely interacting with someone who is gang-affiliated is neither a crime nor evidence of gang-affiliation. Plaintiffs' claims on this issue are focused on how the WPD is improperly limiting the ability of Plaintiffs to exercise their rights of assembly and association. Because those claims are not dependent on the accuracy of the underlying gang designations, it does not require participation of particular individuals. And, because Progeny meets all of the requirements for associational standing, it is also a proper plaintiff on behalf of its impacted members.

> ## 2. Progeny has standing to sue for the injuries it has incurred directly due to the Wichita Police Department's gang policies.

An organization, like an individual plaintiff, has to show that it has (1) suffered an injury in fact, (2) which is casually connected to the challenged conduct, and (3) which is likely to be redressed by a favorable court decision to have standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). When an enforceable law is challenged, the plaintiff does not need to show that any law enforcement action has actually begun against them, only that they plan to engage in constitutionally protected conduct that would be barred by the law in question and that they would credibly be punished for doing so. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59

(2014). An organization's diversion of resources from a core purpose in order to address the unlawful conduct will suffice to show cognizable injury. *Havens Realty*, 455 U.S. at 379 (finding that if a non-profit's allegations of diversion of resources from normal counseling and referral services proved true, then there would be no question that it had suffered an injury in fact).

Progeny satisfies the Article III standing requirements under *Havens Realty.* It sufficiently alleges that the WPD's unconstitutional use of its Gang List forced Progeny to expend time and money addressing the enforcement of those policies. Compl. ¶¶ 110-13. Additionally, Progeny has made a sufficient showing that the Gang List deterred the organization from engaging in activities protected by the freedoms of association and assembly, given the legal consequences that members like Elbert Costello (who have been designated as gang members or associates) would face if they engaged in those activities. *Id.* at ¶¶ 109-11.

Defendants do not address the *Havens Realty* standard; instead, all of their cited cases with respect to direct organizational standing address only the ability of individuals to pursue claims on behalf of close family members. *See* Defs. Br. at 12. Plaintiffs make no such claims.

Defendants attempt to undermine Progeny's standing by stating that the only direct injuries are its inability to "successfully [carry] out its work helping juveniles involved in the criminal justice system" and that it "has had to divert resources away from other projects and direct individual assistance." Defs. Br. at 12. While those were among Progeny's allegations of organizational harm, they were not the only ones. Progeny also has claims regarding its town halls being stigmatized, members being harassed by WPD officers and asked about gang activity, members being surveilled by the WPD, Progeny being discouraged from holding meetings due to the gang designation that some of its members already have, and Progeny not being able to help certain people in Wichita because they are on the Gang List. Compl. ¶¶ 106-12. Defendants made

no challenge to the factual sufficiency of any of those harms, which are also relevant to the standing analysis. These allegations are sufficient to demonstrate standing.

Defendants further challenge the specificity of Progeny's harm regarding diverted funds, and conclude that claim must be dismissed given its lack of detail. Defs. Br. at 13. While Plaintiffs deny that additional specificity is needed, even if it were, lack of specificity is not grounds for dismissal at this time. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975) (stating that a trial court should allow a plaintiff to amend its complaint where "further particularized allegations of fact deemed supportive of plaintiff's standing" are needed).

Defendants alternatively argue that addressing issues posed by gang activities is an activity Progeny already does. Defs. Br. at 12-13. This focus is misplaced. The question posed in *Havens Realty* was whether the plaintiff organization was unable to provide its normal services due to its need to respond to the defendant's policies. 455 U.S. at 379. Using this standard, the relevant questions are whether Progeny would ordinarily spend the time and money it currently spends dealing with gang-related issues because of the Gang List, and whether Progeny has been able to continue to provide its normal services for other matters. The Complaint sufficiently pleads both these issues. Compl. ¶¶ 112-13, 202. Progeny therefore has standing to pursue claims under a theory of organizational standing.

**B.   The Individual Plaintiffs have standing to seek equitable relief for the injuries they sustained as a result of being on Defendants' Gang List.**

Article III standing requires the plaintiff to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560-61). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or

imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). A concrete injury "must actually exist." *Id.* A "particularized" injury "must affect the plaintiff in a personal and individual way." *Id.* (quoting *Lujan,* 504 U.S. at 560 n.1). An "imminent" injury "must be 'certainly impending.'" *COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1222 (10th Cir. 2016) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). The well-pleaded factual allegations by each of the Individual Plaintiffs establish their right to seek injunctive relief for each of their claims.

> ### 1. Contrary to Defendants' assertions, Plaintiffs' injuries are traceable to Defendants' actions, therefore demonstrating standing.

Defendants claim that Mr. Cooper, Mr. Elbert Costello, Mr. Martel Costello, and Mr. Jeremy Levy, Jr. all lack standing because their respective injuries are not fairly traceable to Defendants' actions. Defs. Br. at 8-11. Standing exists where the injury is "fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. In the present case, all Individual Plaintiffs have suffered actual, concrete injuries as the direct result of being listed on the WPD's Gang List. Compl. ¶¶ 37-40. Once an individual is added to the Gang List, the WPD is procedurally required to monitor and intimately surveil their daily lives, including reviewing their social media accounts and running a "Google Search" on the individual. *Id.* at ¶ 18. This surveillance has led to the prejudicial treatment of each individual plaintiff, both in the courtroom and in everyday life. *Id.* at ¶¶ 19, 25-27. The high bond amount, incessant harassment, and prejudicial treatment that each individual plaintiff has faced are therefore directly and fairly traceable to the WPD's creation and maintenance of the Gang List, and their inclusion on it.[2] *Id.*

---

[2] Defendants' assertion that Plaintiffs' inclusion on the unlawful Gang List is not actually the cause of Plaintiffs' harms, *see* Defs. Br. at 15, is an unsubstantiated and direct dispute of the facts asserted in the Complaint, and therefore not appropriate to consider in a motion to dismiss.

Accordingly, each Individual Plaintiff possesses standing under *Lujan*.

### 2.  Plaintiffs' injuries are ongoing and therefore distinguishable from *Lyons*.

Defendants rely on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), to argue that Plaintiffs do not have standing because they cannot be certain that they would be subject to the same actions by the WPD in the future. Defs. Br. at 15. This case is distinguishable from *Lyons* because the harms suffered by Plaintiffs are ongoing, and the WPD's unconstitutional actions with respect to its gang policies are widespread. *See, e.g.*, *Walters v. Reno,* 145 F.3d 1032, 1048 (9th Cir. 1998) (injunctive relief is appropriate for challenges to government policies that result in a pattern of constitutional violations)*; Ghandi v. Police Dep't of the City of Detroit*, 747 F.2d 338, 343-44 (6th Cir. 1984) (showing of persistent pattern of police misconduct and a substantial risk that future violations will occur justifies injunctive relief); *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 752 (N.D. Ill. 2015) (holding plaintiffs had standing to seek prospective relief as they sufficiently alleged ongoing violations pursuant to a municipal policy or practice and they were engaging in lawful conduct prior to being subject to the pretextual stops); *Floyd v. City of New York,* 959 F. Supp. 2d 668, 674 (S.D.N.Y. 2013) (finding injunctive relief was appropriate given the persistent pattern of police misconduct); *Lopez v. City of Rogers*, No. 01-cv-05061, 2003 U.S. Dist. LEXIS 14570 at *9 (W.D. Ark. Aug. 8, 2003) (citing *Allee v. Medrano*, 416 U.S. 802, 815 (1974) favorably for the principle that persistent misconduct would warrant injunctive relief while also applying *Lyons*). The harms that Plaintiffs challenge are not "one-off instances"; instead, their gang designations, inability to fully exercise their expressive and associative rights, and harassment by the WPD are ongoing harms and patterns Plaintiffs have shown are substantially likely to continue. Compl. ¶¶ 24, 81, 242-45. For those reasons, *Lyons* does not undermine the individual standing of any Plaintiff.

### 3. Plaintiff Christopher Cooper has standing.

Plaintiff Christopher Cooper is a 26-year-old Black man residing in Wichita. Compl. ¶ 37. He is currently listed as an "active" gang member in the WPD Gang List, and has been on the Gang List since at least 2015 when he was eighteen years old. *Id.* Mr. Cooper has suffered disproportionate and disparate injuries as a result of being on the Gang List. *Id.* at ¶¶ 119-24.

Defendants contend that Mr. Cooper lacks standing because his injuries are not "directly relatable to his inclusion in the Gang List." Defs. Br. at 9. However, Mr. Cooper would not be subjected to the mandatory probation conditions, harassment by police officers, or the restrictions of free association were it not for the WPD's continuous inclusion of him on the Gang List. Mr. Cooper first learned of his inclusion on the Gang List when he was charged with First Degree Murder in 2014 after he was arrested while leaving a party with an individual involved in a shooting at the party. Compl. ¶¶ 116-17. Because of the statutory requirements, Mr. Cooper's bail was set at $50,000 and he sat in jail for a year before his charges were reduced to obstruction of justice. *Id.* at ¶ 119. He then was placed on strict probation with gang conditions, despite his lack of a criminal record and lack of actual gang affiliation. *Id.* at ¶¶ 117-20. The strict probation conditions prohibited Mr. Cooper from associating with or being near his family because some of them were also on the Gang List. *Id.* at ¶ 120. Considering his age, lack of criminal history, and involvement in the case, Mr. Cooper would not have received such excessive bail or stringent probation conditions were it not for his placement on the Gang List. *Id.* at ¶ 126.

Defendants assert, without any factual evidence, that because Mr. Cooper had a bond hearing, he did not suffer any due process violation. Defs. Br. at 9. That disputed assertion may be an argument Defendants make regarding the merits of his due process claim for that element of the WPD's gang policies, but it does not undermine Mr. Cooper's standing. Defendants also imply

that the bond being set at $50,000 was because of the crime for which Mr. Cooper was charged, and not because of any WPD policy. *Id.* This statement disputes, again with no evidence, the facts alleged, *see* Compl. ¶ 119, and should not be considered. Defendants further ignore that K.S.A. 21-6316 sets forth a virtually mandatory bond amount of $50,000, which would not be applied if Mr. Cooper had not been falsely identified as a gang member. Plaintiffs will be able to prove that the $50,000 bond is routinely applied to those on the Gang List when others not on the List receive lesser bond amounts or are released on their own recognizance for similarly charged crimes, and discovery on this issue is warranted.

The reach of the Gang List also extends beyond the courtroom. Mr. Cooper has also been subjected to frequent and continued harassment by police officers. Mr. Cooper has been repeatedly stopped for minor or imaginary traffic infractions, whereupon the officers refer to him by name and treat him like a criminal. Compl. ¶ 123. This harassment is the result of Mr. Cooper's continued presence on the list, evidenced by the cessation of harassment since Mr. Cooper began driving a car that is registered in the name of a family member. *Id.* Contrary to Defendants' assertions, Defs. Br. at 9, this claim is focused on the continual harassment that Mr. Cooper has faced from WPD officers, and other continuing injuries from his continued inclusion on the Gang List, which is not dependent on a challenge to any particular stop.[3]

Defendants have caused Mr. Cooper to suffer numerous injuries in fact. These injuries are directly traceable to Defendants' actions of unlawfully and inaccurately including him on their

---

[3] Moreover as a result of being placed on the Gang List, Mr. Cooper lost his scholarship to K-State and has not since been able to return to college. Compl. ¶ 121. He has also been denied employment of his choice because of his placement on the Gang List and Defendants' sharing of the Gang List with other entities. *Id.* at ¶ 124. Defendants again dispute these underlying facts and claim that they have not been sufficiently pled. Defs. Br. at 9. However, Defendants clearly understand the allegations and can offer no evidence to the contrary. In resolving a motion to dismiss, the allegations regarding Mr. Cooper's loss of employment and scholarship because of his gang designation are treated as true, and the underlying records that will prove these allegations are discoverable materials.

Gang List, and can be directly addressed and prevented by this Court's action. Accordingly, Mr. Cooper has proper standing to bring all of his claims in the present case.

### 4. Plaintiff Elbert Costello has standing.

Plaintiff Elbert Costello is a 45-year-old Black man residing in Wichita, Kansas. Compl. ¶ 38. He is currently listed as an "active" gang member on the WPD Gang List, and has been on the Gang List since at least 1997 when he was twenty-two years old. *Id.* at ¶ 38. Mr. Elbert Costello has been continuously reported as "active" on the Gang List because he still gathers with friends his age who are also on the Gang List. *Id.* While Mr. Costello admits that he had relatives who were involved with gangs, he has never been a member or associate of a criminal street gang in Wichita or anywhere else. *Id.* at ¶ 131.

As a result of being placed on the Gang List, Mr. Costello was subjected to a higher level of custodial incarceration and mandatorily placed on stringent parole conditions. *Id.* at ¶¶ 128-29, 132-33. Defendants likewise argue that Mr. Costello lacks standing because he should have expected "a higher level of classification for incarceration and parole" because of the nature of his conviction and that these decisions were made by the Kansas Department of Corrections, entirely unrelated to the WPD. Defs. Br. at 9. This argument completely ignores the assertion in the Complaint that the custodial setting was worse than it would have been for someone convicted of that offense without a gang member designation. Compl. ¶ 128. The Kansas Department of Corrections clearly uses purported "gang involvement" in determining the level of custody for incarcerated persons. *See generally* Kan. Dep't of Corr., "Custody Classification," available at https://www.doc.ks.gov/facilities/faq/custody (last modified on July 14, 2021). The unsupported statement that the WPD may not have any relation to the Kansas Department of Corrections is irrelevant to his claims. Defendants' conduct is fairly traceable to this harm because the

Department of Corrections directly relied on Defendants' erroneous designation in setting Mr. Costello's custodial classification and determining the conditions of his parole. Mr. Costello's placement on the Gang List, *before* his charge or conviction, contributed to his custody level and the strict parole conditions imposed. Compl. ¶ 128.

The harms are also ongoing. Mr. Costello faces frequent harassment by the WPD, similar to that of Mr. Cooper. WPD officers routinely stop him for alleged minor traffic infractions and subject him to invasive questioning in excess of the authorization of K.S.A. 22-3717(k)(3). Compl. ¶ 132. While Defendants are correct that "parolees and persons on postrelease supervision" are subject to "searches based on reasonable suspicion," Defs. Br. at 9-10,[4] Mr. Costello completed his parole period years ago, and is not currently on parole. But the harassment Mr. Costello faces continues. This continued harassment is the direct cause of Mr. Costello's daily fear and anxiety because he knows that the WPD is surveilling him and will pull him over for any minor rule violation so that they can intimidate and harass him. Compl. ¶ 134. Contrary to Defendants' assertions, this claim is not dependent on a challenge to any particular stop.

The WPD's maintenance of the Gang List has additionally prevented Mr. Costello from exercising his most basic associative rights. For instance, he can no longer meet with many of his lifelong friends because they are also on the Gang List, he can no longer visit certain businesses or establishments in his community because the WPD can secretly determine them to be "gang hideouts," and he has been subjected to public embarrassment and humiliation when a story appeared in the *Wichita Eagle* identifying Mr. Costello as a "known gang member" despite him having nothing to do with the story. Compl. ¶¶ 134-39. Though Defendants contend that Mr.

---

[4] Defendants apparently misread Compl. ¶ 139 and assume that the individual who identified Mr. Costello as a "known gang member" was his parole officer. That is inaccurate. The individual was a parole officer who had no connection to Mr. Costello, once again proving that the WPD shares the Gang List and gang designation broadly.

Costello lacks standing because such actions are "a voluntary choice" and the WPD cannot control the comments made to the *Wichita Eagle*, Defs. Br. at 10, Mr. Costello would not experience any of these continuing injuries were it not for the WPD's continued inclusion of him on the Gang List. Mr. Cooper's decision not to participate in innocent, everyday activities is based on the credible fear of being designated an active gang member and facing other adverse consequences from WPD officers. In fact, the WPD recently extended Mr. Costello's "active" status until 2024 because, on January 16, 2021, an officer noted a social media post in which Mr. Costello was wearing a red "Philadelphia Phillies" Major League Baseball cap. Compl. ¶ 138.

As set forth above, Defendants have caused Mr. Costello to suffer numerous injuries in fact that are directly traceable to his continued unlawful inclusion on Defendants' Gang List, and can be directly redressed by this Court's action. Accordingly, Mr. Costello has proper standing to bring all of his claims in the present case.

### 5. Plaintiff Martell Costello has standing.

Plaintiff Martel Costello is a 25-year-old Black man from Wichita. Compl. ¶ 39. Mr. Martel Costello is incarcerated until 2025, currently in the Ellsworth Correctional Facility, because of a probation violation. *Id.* Mr. Martel Costello learned he was on the Gang List for the first time when he was charged and convicted of a marijuana offense and possession of firearms. *Id.* He was released pre-trial and eventually sentenced to probation. *Id.* While on probation, Mr. Martel Costello was forced to abide by special conditions of probation due to his designation as a gang member on the WPD's Gang List. Those conditions included not having any contact with other known gang members, abiding by a strict curfew, and other stringent conditions. *Id.*

Defendants contend that Mr. Martel Costello lacks both a cognizable injury and legal standing because of his unrelated criminal activity. Defs. Br. at 10. However, Mr. Martel Costello

has faced the same unreasonable and excessive harassment by the WPD as Mr. Cooper and Mr. Elbert Costello, Compl. ¶ 142, as well as restrictions on his ability to freely associate with his friends and family as a result of being placed on the Gang List, *id.* at ¶¶ 142-50. Despite the frequent searches and queries after numerous traffic stops, the WPD has never issued him a ticket for any alleged traffic infraction, other than a ticket for a bad tag. *Id.* at 154. This implies that the motivation behind these stops, as with Mr. Cooper and Mr. Elbert Costello, is simply due to his name and information being present on the Gang List.

Additionally, Mr. Martel Costello would not have been subjected to the stringent probation requirements were it not mandated for individuals on the Gang List. Defendants' identical arguments on these claims should be rejected for the reasons discussed above. These mandatory conditions led to various probation violations simply because he attended funeral services for his niece and his brother in the presence of other individuals also on the Gang List. *Id.* at ¶¶ 146, 148-50. His presence at those memorial services was only considered violative of his probation conditions because of his inclusion on the WPD's Gang List, and thereby directly injured him. Defendants assert that these First Amendment violations are justified because those relatives are "members of a Criminal Street Gang." Defs. Br. at 10. This is an alleged, disputed, and unsupported substantive defense of those restrictions as applied to Mr. Martel Costello, which goes beyond the pleadings and is therefore not appropriate to consider with respect to the motion to dismiss.

As set forth above, Defendants have caused Mr. Martel Costello to suffer numerous injuries that are directly traceable to his unlawful inclusion on Defendants' Gang List, and can be directly addressed by this Court's action. Accordingly, Mr. Martel Costello has proper standing to bring all of his claims in the present case.

### 6.   **Plaintiff Jeremey Levy, Jr. has standing.**

Plaintiff Jeremy Levy, Jr. is a 22-year-old Black man from Wichita. He is incarcerated until at least 2042, currently in the Hutchinson Correctional Facility, because of a conviction for first-degree felony murder in 2017 when he was eighteen years old. Compl. ¶ 40. Prior to being charged in that case, Mr. Levy was listed on the WPD's Gang List. *Id.* Because of the listing, the prosecutor at his trial was allowed to introduce to the jury Mr. Levy's alleged gang status and multiple alleged "gang incidents" (not involving Mr. Levy), and used an alleged "gang feud" as the "motive" for the incident in which Mr. Levy was charged. *Id.* There was no evidence that Mr. Levy had participated in those alleged gang feud events, nor any evidence that the incident with which Mr. Levy was charged—which involved him and another individual—was gang-related. *Id.* Mr. Levy is one of many individuals whose presence on the Gang List allows the prosecution to introduce irrelevant and prejudicial information at trial. *Id.*

Defendants contend that Mr. Levy lacks standing because he similarly lacks any injury in fact. Defs. Br. at 11. This contention ignores the prejudicial effect that the Gang List played in Mr. Levy's trial. Despite never having been a member or associate of a criminal street gang, the prosecution moved to allow the entry of Mr. Levy's gang status to further the alleged theory that the altercation for which he was charged was of a gang-related nature. Compl. ¶¶ 162-66. Mr. Levy's presence on the Gang List is neither indicative nor dispositive of Mr. Levy's actual participation in gang activity, yet it was still allowed to be entered as evidence to paint Mr. Levy as an ardent gang member. *Id.* Were it not for his unlawful inclusion on the WPD's Gang List, such evidence would not have been prejudicially entered against Mr. Levy, and he would not have been mandatorily foreclosed the option of a lower bail, shorter sentences in lower security prisons,

or more reasonable probation and parole conditions when he is released. *Id.* at ¶ 168. Accordingly, the harms faced by Mr. Levy are directly attributable to Defendants' Gang List.

As set forth above, Defendants have caused Mr. Levy to suffer injuries in fact which are directly traceable to his unlawful inclusion on Defendants' Gang List and can be directly addressed by this Court's action. Accordingly, Mr. Levy has proper standing to bring all of his claims in the present case.

### C. Defendants' assertion that K.S.A. 21-6313 is constitutional is premature and not grounds for dismissal under Rule 12(b) because Plaintiffs have properly alleged that the statute is unconstitutionally broad and vague.

Defendants argue that K.S.A. 21-6313 is constitutional because the statutes that follow it— K.S.A. 21-6314 and 21-6315—are sufficiently definite for ordinary people to conform their conduct and to discourage arbitrary or discriminatory enforcement. *See* Defs. Br. at 16. Defendants further reject, without basis, Plaintiffs' allegations regarding the constitutionality of K.S.A. 21-6313.[5] *See* Defs. Br. at 16-25. Both of these arguments must fail.

#### 1. Defendants' arguments are premature.

Defendants' arguments that K.S.A. 21-6313 is constitutional are flawed. First, Defendants do not cite Rule 12(b)—or any of the grounds for dismissal enumerated therein—in connection with their argument that K.S.A. 21-6313 is constitutional. *See* Defs. Br. at 16-25. Further,

---

[5] In particular, Plaintiffs allege that K.S.A. 21-6313 is unconstitutionally broad and vague because (among other reasons) it "allows individuals to be designated as criminal street gang members based on innocent, non-criminal activities, such as what they wear, where they live, and whom they are related to." Compl. ¶ 190, *see also, e.g., id.* at ¶ 10 ("The criteria to qualify as a gang member or associate are vague and broad, and encompass a wide range of innocuous, innocent, and constitutionally protected behavior."); ¶ 56 ("The statutory criteria included in K.S.A. 21-6313 are so broad and vague that they are incapable of putting people on notice that their conduct or style of dress may result in them being labeled a gang member."); ¶ 109 ("Given the broad and vague criteria of K.S.A. 21-6313, many other members of Progeny likely meet the criteria for being labeled as gang members or associates, yet do not know whether or not they are included on the Gang List."); ¶ 184 ("Plaintiffs and the class also seek a declaration (1) that K.S.A. 21-6313 is unconstitutionally vague and overbroad.").

Defendants' substantive arguments on the constitutionality of K.S.A. 21-6313 rest on numerous factual claims that are not appropriate for consideration at the motion to dismiss stage.

In addition to these flaws, Defendants' arguments invite the Court to adjudicate Plaintiffs' claims on their merits without the benefit of discovery or any evidentiary record. No Rule or authority permits such an approach, and the Court should decline the invitation. *See, e.g., Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135 (10th Cir. 2014) ("The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's [] complaint alone is legally sufficient to state a claim for which relief may be granted.").

### 2. Plaintiffs have properly alleged that K.S.A. 21-6313 is unconstitutionally broad and vague.

Plaintiffs' complaint sets forth sufficient concrete facts to support the claim that K.S.A. 21-6313 is constitutionally flawed.[6] Defendants' motion does not address these allegations, but

---

[6] *See, e.g.*, Compl. ¶¶ 10, 416-24 (setting forth the criteria for street gang membership or associateship under K.S.A. 21-6313 and the number of criteria that must be met to be designated as a street gang member or associate by law enforcement); ¶¶ 12, 48-51 (describing the lack of definitions, parameters, standards, or exceptions for key terms used in K.S.A. 21-6313's gang membership criteria, including street gang's "area," "color," associations, or corroborating information); ¶¶ 13, 53, 56 (describing at length how the criteria for gang membership and associateship under K.S.A. 21-6313 are overbroad and vague, including the facts that "the majority of Wichita citizens . . . could be discretionally designated as a gang member or associate," the fact that "most WPD officers themselves qualify as gang members," the fact that "the criteria could encompass entire schools, neighborhoods, and communities where the WPD claim gang presence," and the fact that the criteria referencing gang "colors" implicates any individual wearing clothing with such common colors as red, orange, yellow, green, blue, and purple); ¶¶ 7-9, 54-55 (describing how the broad and vague criteria permit and result in racial discrimination), ¶ 14, 52, 63, 67 (describing how in practice, the "self-identification" criteria for gang membership under K.S.A. 21-6313 "vests plenary authority to designate and brand 'gang members' under Kansas law in the hands of individual police officers and departments like the WPD"). Furthermore, Plaintiffs' Complaint sets forth how these flaws have been specifically applied to infringe their constitutional rights. *See, e.g., Id.* at ¶¶ 110-14 (describing how K.S.A. 21-6313's vagueness and overbreadth impede Plaintiff Progeny and its members from meeting and operating); ¶¶ 131, 135-140 (describing Plaintiff Elbert Costello's continual designation and "renewal" as a criminal street gang member by law enforcement pursuant to the unconstitutionally vague and broad criteria set forth in K.S.A. 21-6313, despite the fact that he has never been a member of any criminal street gang); ¶¶ 151-153 (describing Plaintiff Martel Costello's designation as a criminal street gang member by law enforcement pursuant to the unconstitutionally vague and broad criteria set forth in K.S.A. 21-6313, despite the fact that he has never been a member of any criminal street gang); ¶¶ 161-162 (describing Plaintiff Jeremy Levy, Jr.'s designation as a criminal street gang member at age 13 by law enforcement pursuant to the unconstitutionally vague and broad criteria set forth in K.S.A. 21-6313, despite the fact that he has never been a member of any criminal street gang).

instead seems to take the position that K.S.A. 21-6313 is constitutional because Defendants believe other statutes relating to gangs are constitutional. *See, e.g.*, Defs. Br, at 19–20 (arguing that K.S.A. 21-6314, K.S.A. 21-6315, and K.S.A. 21-6316 are constitutionally sufficient, without addressing or even citing the gang membership criteria set forth in K.S.A. 21-6313).

This logic is flawed. That several *other* statutes incorporating K.S.A. 21-6313's definitions of criminal street gangs and gang membership contain additional requirements that Defendants insist are constitutionally sufficient would not make K.S.A. 21-6313 constitutional, even if it were true. K.S.A. 21-6313 contains no requirement that a person be convicted or even suspected of criminal activity, nor possess any form of criminal scienter, to be designated as a criminal street gang member. *See* Compl. ¶¶ 4, 10–14, 46–67. Under the statute's broad and vague criteria, designation as a gang member by law enforcement may mean nothing more than that the person once rode in a car with a designated gang member, *see* Compl. 161-162, or has been seen wearing a red ball cap within the last three years, *see id.* at ¶ 138. That such a person may be subjected to enhanced bail or other consequences only if arrested for a person felony does not remedy the constitutional (and practical) defects in the underlying designation. Quite the contrary: enhancing bail for a person based in practice on the color of clothes they wear, or the family members they have contact with, or what part of town they live in is itself constitutionally flawed, regardless of any additional preconditions for being subjected to bail in the first place.[7]

---

[7] In their Complaint, Plaintiffs seek, *inter alia*, "a declaration that K.S.A. 21-6313 is unconstitutionally vague and overbroad." Compl. ¶ 184. While Plaintiffs' Prayer for Relief does include a request for judgment declaring that K.S.A. 21-6313, *et seq.*, violates Plaintiffs' and class members' constitutional rights, Plaintiffs challenge the constitutionality of K.S.A. 21-6314, K.S.A. 21-6315, and/or K.S.A. 21-6316 only to the extent that they impose or enhance criminal consequences based upon the unconstitutionally broad and vague criminal street gang membership criteria set forth in K.S.A. 21-6313. *See, e.g.*, *id.* at ¶ 97 (citing K.S.A. 21-6316's mandate of minimum bail for criminal street gang members accused of person felonies); K.S.A. 21-6316 ("When a criminal street gang member is arrested for a person felony, bail shall be at least $50,000 cash or surety, and such person shall not be released upon the person's own recognizance" except under certain strenuously limited exceptions.).

In fact, Defendants' emphasis on the scienter and criminality aspects of K.S.A. 21-6314 and 21-6315 as the hallmarks of their constitutionality only underscores the utter lack of any such requirement in K.S.A. 21-6313's underlying criminal street gang membership criteria. The upshot is that Defendants' arguments based on K.S.A. 21-6314 through 21-6316 are nonresponsive to Plaintiffs' allegations that K.S.A. 21-6313's gang membership criteria are unconstitutionally broad and vague, *see, e.g.*, Compl. ¶¶ 184; 188-93, and should be disregarded.

        a.   <u>K.S.A. 21-6313 is unconstitutionally broad.</u>

Plaintiffs allege that K.S.A. 21-6313 is unconstitutionally broad and vague, *inter alia*, "in that it allows individuals to be designated as criminal street gang members based on innocent, non-criminal activities, such as what they wear, where they live, and whom they are related to." Compl. ¶ 190, *see also, e.g.*, *id.* at ¶¶ 4, 10-14, 46-67, 109, 184, 188-193.

Nevertheless, Defendants' purported defense of the constitutionality of K.S.A. 21-6313 *makes no mention* of the criminal street gang membership criteria set forth in K.S.A. 21-6313. *See* Defs. Br. at 16–25. For example, Defendants concede that to regulate expressive behavior without being unconstitutionally overbroad, statutes like K.S.A. 21-6313 must "reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." *See id.* at 16 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). Yet Defendants identify no "legitimate state interest" in permanently labeling large swaths of Wichita (or Kansas) residents as criminal street gang members based on the color of clothes they wear or in what parts of town they live, work, or shop. Likewise, Defendants do not (and cannot) identify any criterion for criminal street gang membership under K.S.A. 21-6313 that constitutes "harmful" conduct or "true threats." *Cf. id.*; *Virginia v. Black*, 538 U.S. 343, 359 (2003) (noting, in upholding Virginia's anti-cross burning statute, that "[t]rue threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful

violence to a particular individual or group of individuals" (internal quotations omitted)). The criteria under which WPD members can and do designate Wichita residents as criminal street gang members pursuant to K.S.A. 21-6313—including a person's "style of dress," travel to a criminal street gang's "area," and associations (whether voluntary or not) with designated gang members— do not include any element of unlawful or violent intent or expression, or any requirement of scienter at all. The thoroughly misguided comparison of such conduct to cross burning belies the infirmity of Defendants' arguments. In the end, Defendants' Motion suggests only that statutes *could* exist which permissibly limit harmful or threatening expressive conduct—and says nothing of the state-sanctioned censure of innocuous conduct authorized by K.S.A. 21-6313 and carried out by the WPD. The Court should not accept this argument, and should deny Defendants' motion on this ground.

### b. K.S.A. 21-6313 is unconstitutionally vague.

Similarly, Defendants suggest that the requirements of "intentional conduct" in K.S.A. 21-6314 and 21-6315 render K.S.A. 21-6313 constitutional. *See* Defs. Br. at 19-20. Defendants admit that under the constitutional void-for-vagueness doctrine, legislatures must "establish minimal guidelines to govern law enforcement," or they risk authorizing "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Id.* at 18 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983)) (internal quotes omitted). As set forth in Plaintiffs' Complaint, this is precisely the circumstance created by K.S.A. 21-3163. *See* Compl. ¶¶ 4, 10-14, 46-67, 109, 184, 188-93. Defendants make no argument that the criminal street gang membership criteria set forth in K.S.A. 21-6313—and alleged by Plaintiffs to be unconstitutional—establish such "minimal guidelines." *See* Defs. Br. at 19-25. Instead, Defendants maintain that the void-for-vagueness doctrine does not apply to all criminal statutes, but only applies to "those that <u>define</u> criminal offenses and laws that <u>fix the permissible sentences</u>

for criminal offenses." Defs. Br. at 17 (emphasis in original). Defendants suggest that K.S.A. 21-6313 and the WPD's implementing policies and practices are exempt from any vagueness challenge because "K.S.A. 21-6313, *et seq.* does not criminalize membership in a criminal street gang." *Id.* at 20. This argument is incorrect.

First, Defendants cite *Beckles v. United States*, 137 S. Ct. 886 (2017), for the proposition that a vagueness challenge may only be brought against statutes that define or fix sentencing for criminal offenses. *See* Defs. Br. at 17, 20, 23. This is an incorrect reading of *Beckles*. In *Beckles*, the Supreme Court noted that it had previously invalidated "two kinds of criminal laws as 'void for vagueness': laws that define criminal offenses and laws that fix the permissible sentences for criminal offenses." 137 S. Ct. at 892. The Court did not, however, hold that these were the *only* types of criminal statutes subject to vagueness challenges, nor that only criminal statutes could be void for vagueness. *Id.*; *see also id.* at 899 (Sotomayor, J., concurring) (noting that in reviewing sentencing guidelines under the vagueness doctrine, "[w]e spent little time on whether the vagueness doctrine applied to such provisions").

Moreover, *Beckles* concerned a challenge to the U.S. Sentencing Guidelines, which guide the decisions of Federal District Judges who—unlike police officers enforcing a criminal code such as Chapter 21 of the Kansas Statutes—are constitutionally imbued with discretion to determine criminal sentences. In declining to strike down the Guidelines as void for vagueness, the Court expressly invoked this unique backdrop of constitutional discretion. *Id.* at 894. ("If a system of unfettered discretion is not unconstitutionally vague, then it is difficult to see how the present system of guided discretion could be."). The Constitution does not grant or afford police officers such discretion in executing statutes like K.S.A. 21-3613, giving *Beckles* little weight in this context.

A more instructive case—and one that refutes Defendants' narrow construction of the void-for-vagueness doctrine—is *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). There, the Supreme Court struck down the *definition* of "crime of violence" found in the federal criminal code as incorporated into the Immigration and Nationality Act ("INA") as unconstitutionally vague. 138 S. Ct. at 1223. Neither the criminal code definition nor the INA incorporation defines the elements of a criminal offense, proscribes specific conduct, or imposes a specific punishment or sentence. *See* 18 U.S.C. § 16 ("Crime of violence defined");[8] 8 U.S.C. § 1101(a)(43)(F) (INA definitions).[9] Moreover, the INA is a civil statute, and the Court took pains to recount its long history of applying the vagueness doctrine in non-criminal contexts. *See Dimaya*, 138 S. Ct. at 1212 (plurality); *id.* at 1226-31 (Gorsuch, J., concurring) (citing applications of the vagueness doctrine in civil cases as early as 1833, and concluding "the happenstance that a law is found in the civil or criminal part of the statute books cannot be dispositive"); *see also Jordan v. De George*, 341 U.S. 223, 231 (1951) ("Despite the fact that this is not a criminal statute, we shall nevertheless examine the application of the vagueness doctrine to this case."); *Giaccio v. State of Pa.*, 382 U.S. 399, 402 (1966) ("[T]his state Act whether labeled 'penal' or not must meet the challenge that it is unconstitutionally vague."); *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) (reviewing a city ordinance with civil penalties, and noting that "[if] . . . the law interferes with the right of free speech or of association, a more stringent vagueness test should apply").[10]

---

[8] 18 U.S.C. § 16 states in its entirety: "The term "crime of violence" means—(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

[9] 8 U.S.C. § 1101(a)(43)(F) provides: "The term "aggravated felony" means—[....] a crime of violence (as defined in section 16 of Title 18, but not including a purely political offense) for which the term of imprisonment [is] at least one year."

[10] Defendants do not dispute that, as a provision of the Kansas Criminal Code under Chapter 21 of the Kansas Statutes, "Crimes and Punishments," K.S.A. 21-6313 is in fact a criminal statute. Nevertheless, the U.S. Supreme Court's

*Dimaya* supports Plaintiffs' allegations. The statutory structure, and doctrinal implications, of the challenged laws are strikingly similar. K.S.A. 21-6313, like 18 U.S.C. § 16, is a provision of criminal code that defines terms used in other statutes. 18 U.S.C. § 16, like K.S.A. 21-6313, does not directly define or fix sentences for any criminal offense, but refers to offenses defined elsewhere and is, in turn, referred to elsewhere in statutes prescribing punishment. As a result, the definitions provided in both statutes subject individuals to an array of civil and criminal consequences, and both do so without providing "minimal guidelines to govern law enforcement" on the one hand, or giving "ordinary people fair notice of the conduct [the law] punishes" on the other. *See Kolender*, 461 U.S. at 358; *Johnson v. United States*, 576 U.S. 591, 595 (2015). Accordingly, Plaintiffs' Complaint properly presents a constitutional vagueness challenge to K.S.A. 21-6313, and like 18 U.S.C. § 16, the statute is impermissibly vague under the Fourteenth Amendment.

### 3. Neither 18 U.S.C. § 521 nor 18 U.S.C. § 1961 through § 1968 are analogous to K.S.A. 21-6313.

Much like their assertions regarding K.S.A. 21-6314 through 21-6316, Defendants' arguments regarding 18 U.S.C. § 521 (part of the Violent Crime Control and Law Enforcement Act of 1994) and 18 U.S.C. § 1961 through § 1968 (part of the Racketeer Influenced and Corrupt Organizations or "RICO" Act) completely ignore Plaintiffs' properly pled challenges to the criteria for criminal street gang membership and associateship under K.S.A. 21-6313. *See* Defs. Br. at 22-25. The statutes are not analogous. Neither 18 U.S.C. § 521 nor 18 U.S.C. § 1961 (the definitional section of RICO) contain enumerated criteria for membership in a criminal street gang or racketeering organization. RICO's definitions contain no reference to membership whatsoever.

jurisprudence makes clear that application of the vagueness doctrine is not limited to criminal statues, much less to those criminal statutes that define or fix sentences for criminal offenses.

*See* 18 U.S.C. § 1961. Similarly, 18 U.S.C. § 521 only references members in the context of defining "criminal street gang," but contains no separate definition for members. Critically, neither statute—nor any provision of law that Defendants identify—classifies individuals as criminal street gang members based on non-criminal and constitutionally protected behavior such as style of dress, presence in a community or neighborhood, or social associations. In this regard, K.S.A. 21-6313's gang membership criteria are not only unconstitutional, but are also exceptional in their stark separation from any criminal conduct or legitimate state interest. Defendants have certainly not identified any such interest, and their arguments that K.S.A. 21-6313 is constitutional must fail.

**D. Plaintiffs allege sufficient facts to state a claim that Defendants violated their Procedural Due Process rights.**

Defendants seek dismissal of Counts II and III of the Complaint, contending Plaintiffs have failed to state procedural Due Process claims. Defs. Br. at 26-31. Defendants' argument is unavailing because it fails to account for Plaintiffs' actual theory of liability.

**1. Defendants deprived Plaintiffs of a protected liberty interest by damaging their reputations.**

Plaintiffs have clearly stated a claim for deprivation of a protected liberty interest without adequate due process. The Due Process Clause of the Fifth and Fourteenth Amendment protects against the deprivation of property and liberty interests without due process of law. One liberty interest sufficient to trigger the Due Process Clause is when "a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," plus the alteration or extinguishment of rights or status recognized by state law. *See Wisconsin v. Constantineau*, 400 U.S. 433, 436-37 (1971); *Paul v. Davis*, 424 U.S. 693, 708 (1976). This combination of government-imposed stigma plus the alteration of a legal right is known as the "stigma-plus" doctrine. Procedural due process rights are implicated under the stigma-plus doctrine when (1)

"the government made a false statement . . . that was sufficiently derogatory to injure [the plaintiff's] reputation," *Brown v. Montoya*, 662 F.3d 1152, 1168 (10th Cir. 2011), and (2) "the plaintiff experienced some governmentally imposed burden that significantly altered her status as a matter of state law." *Gwinn v. Awmiller*, 354 F.3d 1211, 1216 (10th Cir. 2004) (quotations removed).

Plaintiffs sufficiently pled both elements of the stigma-plus claim. *See e.g.*, Compl. ¶¶ 63, 106-69 (detailing the WPD's false practice of indicating individuals self-admitted gang membership and describing harms suffered as a result).

        a.   Defendants impose a stigmatizing gang designation on Plaintiffs and publicized that stigma.

Under the first prong of the stigma-plus doctrine, the plaintiff must show that "the government made a false statement . . . that was sufficiently derogatory to injure [the plaintiff's] reputation." *Brown*, 662 F.3d at 1168. Plaintiffs easily met their pleading burden on this prong because Defendants gave Plaintiffs an erroneous, stigmatic label, which they then publicized.

Being labelled a gang member is undoubtedly stigmatizing because it implies criminal conduct. *See, e.g., Paul*, 424 U.S. at 697 ("Imputing criminal behavior to an individual is generally considered defamatory Per se, and actionable without proof of special damages."); *Pedrote-Salinas v. Johnson*, No. 17-CV-5093, 2018 WL 2320934, at *5 (N.D. Ill. May 22, 2018) ("There is no question that being labeled a gang member harms one's reputation."); *Medrano v. Salazar*, No. 5:19-CV-00549-JKP, 2020 WL 589537, at *6 (W.D. Tex. Feb. 5, 2020) (same); *see also Alston v. City of Madison*, 853 F.3d 901, 909 (7th Cir. 2017) ("Without question, being classified as a 'repeat violent offender' harms one's reputation."); *Latif v. Holder*, 28 F. Supp. 3d 1134, 1150 (D. Or. 2014) ("[P]lacement on the No-Fly List satisfies the 'stigma' prong because it carries with it the stigma of being a suspected terrorist."). Indeed, courts have found a plaintiff's reputation can be

damaged in much less stigmatizing circumstances. *See, e.g., Wisconsin*, 400 U.S. at 436-37 (being listed as an excessive drinker on a notice in retail liquor outlets could produce a "stigma or badge of disgrace"); *Manos v. Bd. of Educ. of Villa Grove Cmty. Unit Sch. District #302*, No. 2:15-CV-2220, 2017 WL 6371299, at *11 (C.D. Ill. Dec. 13, 2017) ("The statement that Plaintiff 'threatened, intimidated, and coerced staff members,' . . . could be sufficiently stigmatizing to someone in the education administration profession."); *Endicott v. Huddleston*, 644 F.2d 1208, 1212, 1215 (7th Cir. 1980) (finding that allegations of conflicts of interest, deceptive practices, and failure to disclose tax increases sufficiently stigmatized a County Board member).

Defendants publicized Plaintiffs' stigmatizing labels by regularly sharing the Gang List with (1) other local, state, and national law enforcement agencies, including the Kansas Bureau of Investigation, (2) federal and local government agencies, including courts and prosecutors' offices through arrest warrants and public testimony, (3) letters sent to the parents of juveniles on the Gang List, and (4) potential employers, landlords, or licensing agents.[11] Compl. ¶¶ 25, 76-80, 83-84, 163–67, 217.

Courts routinely hold that intra-government sharing of information satisfies the public disclosure requirement of the stigma-plus doctrine. *See, e.g.*, *Larry v. Lawler*, 605 F.2d 954, 959 (7th Cir. 1978) (finding sufficiently public the Civil Service Commission's sharing of plaintiff's stigmatizing label with federal agencies on a need to know basis); *Latif*, 28 F. Supp. 3d at 1150 (finding the plaintiffs' "No-Fly" status was made sufficiently public when it was only disclosed to airline employees and travelers that may be in earshot of the ticket counter); *Castillo v. Cty. of Los Angeles*, 959 F. Supp. 2d 1255, 1261 (C.D. Cal. 2013) (finding plaintiff's inclusion in Child

---

[11] Plaintiffs also allege that Mr. Costello's presence on the Gang List was known by a reporter at the *Wichita Eagle*, suggesting that the list is publicized more broadly than Defendants claim. Compl. ¶ 139.

Welfare Services Case Management System sufficiently public where information in the database was not publicly available but was available to governmental entities and agencies).

Numerous courts have specifically held the information in gang databases is sufficiently public to satisfy the stigma-plus doctrine when, like here, it was shared with other law enforcement agencies. *See, e.g. Medrano v. Salazar*, 2020 WL 589537, at *6 (W.D. Tex. Feb. 5, 2020); *Pedrote-Salinas*, 2018 WL 2320934, at *5 (holding defendant sufficiently publicized plaintiffs' inclusion in a gang database when they shared the information with immigration officials).

Plaintiffs have therefore adequately alleged numerous communications to third parties sufficient to satisfy the publicity requirement of the stigma-plus doctrine.

> b. Defendants deprived Plaintiffs of liberty interests that satisfy the "plus" prong of the stigma-plus doctrine.

Plaintiffs have also sufficiently pleaded facts to satisfy the second prong of the stigma-plus doctrine. In considering the "plus" prong of the stigma-plus doctrine, courts have found deprivations of liberty interests in a wide range of contexts, including employment, licensure, education, and travel. *See, e.g.*, *Goss v. Lopez*, 419 U.S. 565, 574-76 (1975) (holding students facing temporary suspension from public school for up to ten days based on charges of misconduct were entitled to protection under the due process clause); *Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005) (finding that where "child care workers effectively are barred from future employment in the child care field once an indicated finding of child abuse or neglect against them is disclosed to, and used by, licensing agencies and present or prospective employers . . . [s]uch circumstances squarely implicate a protected liberty interest"); *Larry*, 605 F.2d at 956-58 (finding a liberty interest in employment where plaintiff was barred from "obtaining employment in any capacity with the federal government for a period of up to three years"); *Latif*, 28 F. Supp. 3d at 1150 (finding plaintiffs "satisfied the 'plus' prong because being on the No-Fly List means

Plaintiffs are legally barred from traveling by air at least to and from the United States and over United States airspace, which they would be able to do but for their inclusion on the No-Fly List"); *Castillo*, 959 F. Supp. 2d at 1261-62 (holding the "plus" prong was met where plaintiff's inclusion in the Child Welfare Services database had "serious implications" for his ability to adopt his half-brother, get licensures, and volunteer with children).

Plaintiffs have alleged a number of harms suffered by them because of their erroneous inclusion on the Gang List, each of which satisfies the plus prong. *See* Compl. ¶¶ 106-69.

Plaintiff Christopher Cooper, following an arrest, had the presumptive $50,000 bond set and was forced to remain in jail because his family could not afford the amount. *Id.* at ¶ 119. His subsequent sentence included strict probations with gang conditions, including a 6 p.m. curfew and being forced to live away from his family for fear they were on the Gang List. *Id.* at ¶ 120. He lost his scholarship to K-State, has not been able to return to college, was turned down for a job opportunity duty to a background check, and has been surveilled and harassed by the Wichita Police Department, including being repeatedly stopped for alleged traffic infractions. *Id.* at ¶¶ 121, 123-24.

Plaintiff Elbert Costello has also been subjected to increased surveillance and harassment by Wichita Police Department officers and is routinely stopped for minor traffic violations. Compl. ¶ 132. Because of his erroneous inclusion on the Gang List, he was recently misidentified as a "known gang member" in a story in *The Wichita Eagle* about a shooting that did not involve him at all. *Id.* at ¶ 139. His inclusion on the Gang List has also prevented him from maintaining meaningful relationships, prevented him from frequenting businesses, and has subjected him to unrelenting and unconstitutional surveillance and enforcement activity by the Wichita Police Department, which causes him significant anxiety and fear. *Id.* at ¶ 140.

Plaintiff Martello Costello, following an arrest, had a high bond set due to his status on the Gang List, which forced his mother to place her home as collateral to bond him out of jail. *Id.* at ¶ 143. At sentencing, the judge imposed a number of special probation conditions due to his inclusion in the Gang List, including a restrictive curfew and prohibition on associating with anyone else listed on the Gang List. *Id.* at ¶ 144. He has subsequently been sentenced to prison for probation violation charges due to being at locations—including his own brother's funeral and a family gathering following the death of his niece—because other people on the Gang List were also present. *Id.* at ¶¶ 146, 148-50, 152. He has also been subjected to consistent harassment by the WPD, including multiple traffic stops and searches. *Id.* at ¶ 154.

Plaintiff Jeremy Levy, Jr. was tried for felony murder following charges in 2017 when he was eighteen years old. *Id.* at ¶ 157. During trial, the prosecutor moved the court to allow the entry of Mr. Levy's alleged "gang status" on the theory that the shooting was part of a gang feud. *Id.* at ¶ 163. Over Mr. Levy's objections, the prosecution introduced evidence of at least thirteen different "gang related incidents." *Id.* at ¶ 165. These alleged incidents included several shootings and other serious criminal offenses. *Id.* It was not, however, alleged that Mr. Levy was present or involved during any of these events except one event in which Mr. Levy was himself injured, which was not related to any gang activity. *Id.* The introduction of the gang-related incidents was thus extremely prejudicial to Mr. Levy, and it guaranteed that he could not receive a fair trial for the one incident with which he was charged. *Id.* at ¶ 166.

As exemplified by the experiences of the named Plaintiffs, inclusion on the Gang List subjects an individual to a wide range of severe civil and criminal consequences. These include enhanced bail and probation and parole terms, limited plea opportunities, extreme prejudice at criminal trials, widespread reputational harm, denial of associative and assembly rights, and

discrimination in housing, licensing, and employment. *Id.* at ¶¶ 6, 25, 57, 95-101. These are not merely speculative, but concrete harms sufficient to satisfy the "plus"-prong of the stigma-plus doctrine. *See, e.g., Gwinn*, 354 F.3d at 1223-24 (registration as a sex offender altered a legal right because it imposed extra parole and probation restrictions); *Brown*, 662 F.3d at 1168 (same); *Castillo*, 959 F. Supp. 2d at 1261–62 (holding that the "plus" prong was met where plaintiff's inclusion in the Child Welfare Services database had "serious implications" for his ability to get licensures); *Hall v. Marshall*, 479 F. Supp. 2d 304, 314 (E.D.N.Y. 2007) (finding that plaintiff met requirements of stigma plus doctrine where he alleged that his pre-sentence report "contained a description of his offense that was factually false and damaging to his reputation" and that "he was denied parole based on an inaccurate PSR").

### 2.  Defendants must provide basic procedural protections prior to publicizing stigmatizing designations.

Because Plaintiffs have a constitutionally-protected liberty interest in their reputations, Defendants must provide basic procedural protections before sharing their gang designations with third parties. *See Wisconsin*, 400 U.S. at 510 ("Where a person's good name, honor, and reputation are at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). When evaluating the sufficiency of procedural protections, courts generally balance three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's

interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

The first factor clearly weighs in Plaintiffs' favor because, as discussed in detail above, Plaintiffs have liberty interests that were and are threatened by the stigmatizing effect of their gang labels. *See Castillo*, 959 F. Supp. 2d at 1263 ("Castillo's argument in support of his private interest at stake is analogous to his argument in support of his liberty interest" and thus the first *Mathews* factor "clearly weighs in favor of Castillo").

The second factor also weighs heavily in Plaintiffs' favor as Defendants have *no* procedural protections in place before designating Plaintiffs or anyone else a gang member in the Gang List. As the Tenth Circuit explained in an analogous setting, before being listed as a sex offender, due process required "notice of the charges, an opportunity to present witnesses and evidence in defense of those charges, and a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Gwinn*, 354 F.3d at 1219. Defendants, however, provide none of these required protections: adult individuals placed on the Gang List are provided no notice of their inclusion on the list or what prompted that inclusion, nor do they have the opportunity to challenge such designation either under the terms of the statute or as it is applied in practice. Compl. ¶¶ 5, 20, 22, 28, 75-82, 199, 207. None of the named Plaintiffs here received notice of their designation for inclusion on the Gang Database or an opportunity to challenge this inclusion. *Id.* at ¶¶ 208-11. Because there are no provisions within the statute or Defendants' policies allowing anyone to challenge or petition for removal from the Gang List, anyone branded as a gang member is shackled with that designation for the rest of their life, even if they never come into contact with the criminal justice system.

Defendants fail to address the third factor in their motion, and never identify any "fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *See Mathews*, 424 U.S. at 335. Instead, they appear to argue (relying on materials beyond the complaint and thus inappropriate for a motion to dismiss) that dismantling the Gang List would "cripple [its] ability to gather information it deems important to public safety, and its efforts to combat violent crime." Defs. Br. at 5. Plaintiffs are not requesting Defendants stop gathering information about *actual gang violence,* or cease combating gang violence. But due process demands that before an individual is placed on in a Gang List that individual be provided notice and an opportunity to challenge inclusion, as well as a mechanism to later petition for removal.

There is simply no legitimate law enforcement interest in maintaining or conveying false information about people who are allegedly gang-affiliated. The Gang List is filled with errors and is both over-inclusive—many people, like Plaintiffs, are included in the List who are not in fact gang members—and under-inclusive—it is likely people who are actually gang members are not in the Gang List. Due process demands more. Defendants are required by law to create a process to ensure that people have notice and an opportunity to correct false information before Defendants share information that could place liberty interests in jeopardy. *See Mathews*, 424 U.S. at 348; *Wisconsin*, 400 U.S. at 510. And implementing basic procedural protections, including notice and an opportunity to be heard, are unlikely to overburden Defendants. The cost to Defendants of implementing notice and some type of hearing would be minimal, particularly because of the flexibility of the due process requirements. *See Castillo*, 959 F. Supp. 2d at 1263 ("Granting individuals listed in CWS/CMS an additional procedure by which they can challenge their listing will no doubt impose additional administrative and fiscal burdens on California, but these burdens

are generally 'the sort of administrative costs that we expect our government to shoulder.'"
(citation omitted)).

Moreover, research shows that gang databases nationwide are not effective law enforcement tools—partly because of their unreliability—and offer little to no benefit in reducing crime. *See, e.g.*, Rebecca R. Brown, *The Gang's All Here: Evaluating the Need for National Gang Database*, 42 COLUM. J.L. & SOC. PROBS. 293, 300-02 (2009) (discussing the lack of value in gang databases as a tool for crime suppression, in part because "it is not clear that documented gang members commit more crimes, or more serious crimes, than their non-documented counterparts"); Joshua D. Wright, *The Constitutional Failure of Gang Databases*, 2 STAN. J.C.R. & C.L. 115, 119-20 (2005) (discussing the unreliability of gang databases, stating that "research suggests gang databases are of little incremental value in reducing gang crime," and arguing that procedural protections would further the State's interest by increasing accuracy). Thus, the current, flawed iteration of the WPD's Gang List has little, if any, value in preventing gang-related crime. *See Castillo*, 959 F. Supp. 2d at 1263 ("But if this system contains either incorrect or outright false information, the system's effectiveness and accuracy are lessened, and California's interest in maintaining the system is severely diminished.").

Defendant's interest would not be harmed by implementing a system that seeks to clear those falsely accused of being a gang member from the Gang List. Therefore, the third *Mathews* factors also weighs in Plaintiffs' favor. Because all three factors support Plaintiffs, Plaintiffs are entitled to basic due process protections. *See Castillo*, 959 F. Supp. 2d at 1264 ("Under the totality of the circumstances, the risk of including false positives in the CWS/CMS database and distributing that information to other agencies (even if not the public) is too great for the County

to deny the individuals included in the database their constitutional right to due process.").
Plaintiffs have sufficiently stated a claim that Defendants' procedural Due Process rights.

### E. Plaintiffs allege sufficient facts to state a claim that Defendants violated their Substantive Due Process rights.

Defendants seek dismissal of Count IV of the Complaint, contending that Plaintiffs have failed to state substantive Due Process claims. Defs. Br. at 25-26, 31-36. Defendants' argument is ineffective because Plaintiffs have pled facts that show Defendants have indeed violated their substantive Due Process rights.

The Supreme Court has interpreted the Fourteenth Amendment to include substantive Due Process rights that protect an individual from certain deprivations without sufficient justification. *Browder v. City of Albuquerque*, 787 F.3d 1076, 1078 (10th Cir. 2015) (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). In assessing a substantive Due Process claim, a court must first determine which rights were violated, and then ask whether those rights are "fundamental rights"—i.e., those rights that are "objectively, deeply rooted in this Nation's history and tradition." *Id.* (quoting *Glucksberg*, 521 U.S. at 720-21). The next question is whether the government's infringement was "direct and substantial." *Id.* (quoting *Zablocki v. Redhail*, 434 U.S. 374, 387 (1978)) (internal quotation marks omitted).

After finding the government directly and substantially violated a fundamental right, like Plaintiffs allege here, the burden shifts to the government to show sufficient justification for its actions. *Id.* If legislative activity led to the infringement, the court must inquire whether the legislation is "narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)) (internal quotation marks omitted).[12] If the

---

[12] Even if legislation does not implicate a fundamental right, it must still have a rational relationship to a legitimate government interest. *Glucksberg*, 521 U.S. at 728.

infringement results from executive action—that is, actions taken by a government official—courts ask whether there is a "reasonable justification in the service of a legitimate governmental objective" or whether the action is "arbitrary, or conscience shocking." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840, 846-47 (1998). Plaintiffs have sufficiently alleged claims of substantive due process violation.

### 1. Defendants concede Plaintiffs have alleged legislative violations of fundamental rights.

Defendants incorrectly contend that Plaintiffs have not pled a violation of fundamental rights sufficient to state a claim for a violation of substantive Due Process. Defs. Br. at 34-36. Indeed, both K.S.A. 21-6313 and Policy 527 implicate Plaintiffs' fundamental rights of association and assembly protected by substantive Due Process.

Tellingly, Defendants admit the Complaint alleges a violation of the fundamental rights of association and assembly. *Id.* at 34 (As stated in Defendants' motion, Plaintiffs "explicitly identified in the complaint . . . the 'fundamental rights of association and assembly.'") For this reason alone, Defendants' motion fails. *See Browder*, 787 F.3d at 1078 (citing *Glucksberg*, 521 U.S. at 720-21) ("[O]ur first job in assessing a substantive due process claim is to make a careful description of the allegedly violated right. Then we must ask whether that right counts as a fundamental one." (internal quotation marks omitted)). When legislative activity leads to the infringement, as Defendants concede here, the next step is to determine whether the legislation is "narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721 (quoting *Reno*, 507 U.S. at 302). K.S.A. 21-6313—which animates Policy 527 and instructs officers on when to add people to the Gang List—is a Kansas statute. *See* Compl. ¶¶ 46, 68. As such, the burden shifts to the Defendants to justify the policy under strict scrutiny. *Glucksberg*, 521 U.S. at 721. However, Defendants' motion fails to address this part of the analysis.

Since Plaintiffs have pled a violation of their fundamental rights, as admitted by the Defendants, and Defendants do not attempt to defend K.S.A. 21-6313 or Policy 527 under the strict scrutiny standard, Defendants' motion to dismiss must fail. *See Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008) ("By satisfying . . . the 'fundamental right' . . . standard[], a plaintiff states a valid substantive due process claim under the Fourteenth Amendment.").

### 2. Plaintiffs have also alleged executive violations of fundamental rights.

Defendants also incorrectly assert that their actions do not implicate Plaintiffs' substantive Due Process rights. *See* Defs. Br. at 35. Defendants argue that their alleged actions do not trigger substantive Due Process protections under the Fourteenth Amendment because the actions instead infringe other Constitutional rights, including those under the Fourth Amendment. *Id.* at 35-36. Defendants' arguments fail because Plaintiffs allegations show that Defendants have acted to deprive Plaintiffs of their fundamental rights.

The Complaint provides a bulleted list of deprivations of life, liberty, and property that are reflective of those generally experienced by the Plaintiffs. *See* Compl. ¶ 216. Additionally, the Complaint details deprivations that are specific to each individual Plaintiff. *Id.* at ¶¶ 218-22. Defendants' motion overlooks these specific details related to individual plaintiffs. *See* Defs. Br. at 35-36. Defendants argue that the more general allegations do not implicate substantive Due Process because the general allegations can be categorically analyzed under different legal theories. *Id.* At the same time, Defendants completely ignore the more specific harm suffered by individual plaintiffs that are detailed in the Complaint. *See* Compl. ¶¶ 218-22.

Defendants summarily categorize Plaintiffs' harms in an attempt to argue that the harms do not support a claim for substantive Due Process. Defs. Br. at 31. Here, Defendants attempt to group their actions into high-level generalities in an attempt to write off these harms as anything

other than Due Process violations. *Id.* However, by overgeneralizing the harms, Defendants fail to acknowledge that courts have identified harms similar to those suffered by Plaintiffs as squarely protected by substantive Due Process.

For instance, Defendants assert that "frequent, prolonged, intrusive and hostile encounters with law enforcement," "unreasonable searches of property," and "unjustified arrests" "clearly fall within the explicit text of the Fourth Amendment." *Id.* at 34-35. But Defendants ignore binding Tenth Circuit case law and fail to appreciate that courts routinely hold that invasive actions by law enforcement can, and do, trigger substantive Due Process. *See, e.g., Browder*, 787 F.3d at 1083 ("[T]he Court also expressly noted when a private person suffers a serious physical injury due to a police officer's intentional misuse of his vehicle[,] a viable due process claim can arise." (citing *Lewis*, 523 U.S. at 854 n.13) (internal quotations omitted)); *Lemery v. Beckner*, 323 F. App'x 644, 648 (10th Cir. 2009) (while "'all' claims of excessive force in seizure cases 'must' be analyzed under the Fourth Amendment[,] . . . '*at some point after arrest . . . constitutional analysis shifts to the Due Process Clause*." (quoting *Pierce v. Gilchrist,* 359 F.3d 1279, 1285-86 (10th Cir. 2004)) (emphasis added)).

Defendants further improperly suggest that "unwarranted online and in-person surveillance" and "identification by and increased attention from WPD officers using 'Signal 33'" are Fourth-Amendment-only issues. Defs. Br. at 34-35. This too does not appreciate that police invasion of a person's privacy gives rise to substantive Due Process claims. *Griswold v. Connecticut*, 381 U.S. 479, 481, 483 (1965) (when determining what rights implicate the Due Process Clause of the Fourteenth Amendment, the Court stated that "the First Amendment has a penumbra where privacy is protected from governmental intrusion").

Defendants next improperly assert that "allegations of gang membership in arrest affidavits and news media," "representation of gang membership to other public and private entities, leading to misidentification of Plaintiffs as gang members in background checks and news articles or other public sources," and "loss of educational, employment, and housing opportunities" do not infringe substantive Due Process rights. Defs. Br. at 35. In support, Defendants argue that "allegations of gang membership in arrest affidavits" is covered within the explicit text of the Fourth Amendment. *Id.* Defendants then conclusorily assert that everything else is simply precluded by *Paul v. Davis*, 424 U.S. 693, 711–12 (1976), without any further explanation. Defs. Br. at 35.

Defendants' reliance on *Paul* is unpersuasive. In *Paul*, the Court held that defamatory publications did not deprive the plaintiff of a liberty or property interest because he did not have a liberty or property interest. 424 U.S. at 711-12. Defendants misinterpret *Paul* as precluding *any* defamatory statement from a substantive Due Process analysis. Defs. Br. at 35. *Paul*, however, does not address the issue of whether a defamatory statement would give rise to substantive Due Process if the court found that the defamatory statement actually caused a loss of a fundamental right, since the plaintiff in *Paul*, unlike Plaintiffs here, had no fundamental right to lose. *Id.* at 711-12.

In contrast, Plaintiffs here plead that Defendants violated multiple fundamental rights, including those of privacy, assembly, expression, and association—the last of which Defendants concede. *See* Section F, *infra*. Thus, the analysis proceeds to whether Defendants' executive action violates substantive Due Process by being arbitrary or conscience shocking. *See Lewis*, 523 U.S. at 847. Indeed, it is plausible that statements of a government official improperly alleging gang membership in arrest affidavits and news media, and statements representing gang membership to

other public and private entities could rise to the level that shocks the conscious, thus infringing Plaintiffs' substantive Due Process rights.

Regarding Plaintiffs' allegations that they have lost educational, employment, and housing opportunities, *Paul* does not address this issue, and neither do the Defendants beyond attempting to batch this in with defamatory statements.

Defendants also assert that "increased bail," "prolonged imprisonment," "severely restrictive probation [and] parole conditions," "diminished plea offers," and "introduction of gang membership as evidenced in criminal proceedings" are governed only by procedural Due Process, and not substantive Due Process. Once again, this too broadly categorizes Plaintiffs' allegations in an attempt to lump them into a single category outside of substantive Due Process. Contrary to Defendants' arguments, courts routinely hold that government officers violate substantive Due Process protections with respect to criminal proceedings and imprisonment. *See, e.g., Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) ("[C]onsequences visited on the prisoner that are qualitatively different from the punishment characteristically suffered by a person convicted of crime may invoke the protections of the Due Process Clause even in the absence of a state-created right."); *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 n.8 (1989) ("Of course, the protections of the Due Process Clause, both substantive and procedural, may be triggered when the State, by the affirmative acts of its agents, subjects an involuntarily confined individual to deprivations of liberty which are not among those generally authorized by his confinement."). As such, it is plausible that Defendants' actions effecting these harms violate Plaintiffs' substantive Due Process rights.

Finally, Defendants' allegation that Plaintiffs' stigma allegations are speculative are addressed above. *See* Section D, *supra*.

In sum, Plaintiffs have alleged facts that plausibly give rise to relief under the substantive

Due Process arm of the Fourteenth Amendment, and Defendants' motion should be denied.

**F. Plaintiffs allege sufficient facts to state a claim that Defendants violated Plaintiffs' First Amendment rights by directly prohibiting certain associational and expressive conduct.**

Plaintiffs allege that Policy 527 and K.S.A. 21-6313 violate the First Amendment in two

ways: by directly proscribing expressive and associative activity and by unconstitutionally chilling

Plaintiffs' engagement in those activities. *See generally* Compl., Counts VI-VII. With regard to

Count VI, Plaintiffs allege that Policy 527 and K.S.A. 21-6313 directly prohibit a number of

protected expressive and associational activities.[13]

Despite these pleadings, Defendants now move to dismiss, arguing that Plaintiffs failed to

state their First Amendment claims. With regard to Plaintiffs' claims contained in Count VI (Right

of Association and Expression – Direct Prohibition), Defendants state that the challenged policy

and statute are "content neutral," thus meriting only a "narrowly tailored" intermediate scrutiny

review. Defs. Br. at 41. Defendants further argue that the application of this policy and statute does

not directly prohibit protected First Amendment activity. This argument is disingenuous and

ignores the context of how WPD applies Policy 527 and K.S.A. 21-6313 against the people of

---

[13] Those prohibitions include frequenting certain areas, wearing certain colors, and associating with certain people. Compl. ¶ 10. Notably, the criteria for inclusion on the WPG Gang List "include, but are not limited to: contact with family members, friends, and others; residence in, or travel to, certain neighborhoods, participation in political, religious, and other social groups; and display of colors and symbols on one's person or clothing." *Id.* at ¶ 239. Although Defendants argue that Policy 527 and K.S.A. 21-6313 are not direct prohibitions and do not criminalize, penalize, or proscribe any speech or expressive activity, Defs. Br. at 42-43, this ignores the plain reality of these harmful regulations. Doing any of the things listed in Policy 527 or K.S.A. 21-6313—vague as they are—puts members of the Wichita community at risk of being labeled a criminal street gang member. And, as explained throughout the Complaint and this brief, being labeled as such as significant punitive consequences. *See, e.g.* Compl. ¶¶ 6, 18-19, 240-45. The effect of the challenged policy and statute is essentially a direct prohibition of anything contained therein, *lest you be labeled a member of a criminal street gang* and subjected to the myriad consequences that flow from such a label.

Wichita. Moreover, Defendants ignore key facts as set forth in Plaintiffs' Complaint. Defendants' motion with regard to Count VI should therefore be denied.

### 1. Plaintiffs pled sufficient facts to demonstrate that the challenged statute and policy are content-based, and when applying strict scrutiny, Defendants' motion must fail.

Defendants argue that the First Amendment claims should be dismissed because they are content-neutral regulations and therefore subject to intermediate scrutiny. Defendants are incorrect. Plaintiffs have alleged facts demonstrating that Policy 527 and K.S.A. 21-6313 are content-based and therefore subject to strict-scrutiny. And, under that analysis, Plaintiffs have clearly stated a claim.

A regulation affecting speech is subject to strict scrutiny if the regulation is content-based. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641-42 (1994). Content-based laws are "those that target speech based on its communicative content" and are "presumptively unconstitutional." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Such limitations "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* "The commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* (citing *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 564 (2011)). But a neutrally written ordinance may still be content-based on two other grounds: (1) if the government "cannot justify it without referencing the content of the speech involved" or (2) if the government adopted the regulation because it "disagreed with a message being conveyed." *Harmon v. City of Norman, Okla.*, 981 F.3d 1141, 1148 (10th Cir. 2020).

Policy 527 and K.S.A. 21-6313 are content-based because they allow WPD officers to label someone a "criminal street gang member" if that person meets particular criteria that include particular styles of dress or the association with particular individuals—i.e., other people on the

Gang List.[14] K.S.A. 21-6313(b); Compl. ¶ 10. The challenged statute and policy state that to be labeled a criminal street gang member a person must meet three of ten criteria listed in the statute; if they meet only two criteria, the person may be labeled an "associate."[15] K.S.A. 21-6313(b), (d); Compl. ¶ 10. The specifics of the criteria are left to the discretion of the WPD. For example, the WPD has chosen to label certain colors indicative of gang involvement. *E.g.* Compl. ¶¶ 73, 138, 243 (wearing a red Philadelphia Phillies baseball hat considered evidence of being a member of a criminal street gang); *see also id.* at ¶ 62 ("According to the WPD Gang Unit Supervisor, certain colors and symbols are associated with gangs.").

Because Policy 527 and K.S.A 21-6313 are content-based, they are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. As a result, Defendants' motion to dismiss should fail. Accepting the pleaded facts as true, both Policy 527 and K.S.A. 21-6313 cannot withstand strict scrutiny.

First, Defendants argue that they have a "compelling interest in ensuring public order and the safety of persons and property." Defs. Br. at 41. But the allegations in the Complaint, accepted as true when ruling on a motion to dismiss, demonstrate that Defendants only selectively enforce their regulations. Rather than work to "ensure public order and the safety of persons and property,"

---

[14] Although Defendants argue that the restrictions are justified because the City has an interest in "ensuring public order and the safety of persons and property," Defs. Br. at 41, "[a] law that is content-based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus towards the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165. "[I]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117 (1991). Worse still, as discussed more fully above, the statute is unconstitutionally vague. So while K.S.A. 21-6313(b) generally targets certain styles of dress, colors, hand signs, or tattoos, the specific expressions or speech that the statute targets are left to the discretion of law enforcement. *See* Compl. ¶ 12. The statute empowers law enforcement to label people as gang members based on specific styles of dress, colors, hand gestures, or tattoos themselves—without due process, without the opportunity to contest the designation, and without a meaningful understanding of how to prevent that continued designation in the future.

[15] There is no meaningful distinction between the labels. Compl. ¶ 10.

Defendants instead discriminatorily target "primarily Black and Brown individuals: the overwhelming majority of those [on the Gang List] are Black or Latinx," Compl. ¶ 7. In addition, WPD officers do not make the same efforts to surveil or categorize white gang members as they do others. *Id.* at ¶ 8. As a result, Defendants cannot claim that the Policy and Statute serve compelling State interests.[16]

Even if the Court discerns a compelling state interest here, Defendants cannot establish that such restrictions are narrowly tailored to accomplish their goals. As written, K.S.A. 21-6313 and Policy 527 punish expressive activity, like wearing certain colors, in general. Neither the statute nor Policy 527 requires more than for someone to merely engage in the expressive activity listed. As alleged in the Complaint, K.S.A. 21-6313 "does not define or limit what a police department can define as a gang's 'area' or 'color,' contains no parameters or exceptions regarding associating with gang members, . . . and does not establish any standards or grounds for identification of gang members by law enforcement or others, or for corroborating such identification." Compl. ¶ 12, *see also id.* at ¶ 243 (wearing Phillies baseball hat used as justification for renewing active status of Mr. Costello on the Gang List), ¶ 244 (attending commemorations of family deaths used as justification for violation special conditions of supervised release, due to inclusion on the Gang List). In addition, the criteria of the statue is so expansive "that the majority of Wichita citizens, including most judges, lawyers, clergy, union members, and other professional and social service provides, could be discretionally designated as a gang member or associate and added to the Gang List." *Id.* at ¶ 13. Policy 527 and K.S.A. 21-6313 are thus not "narrowly tailored" and cannot survive strict scrutiny.

---

[16] Notably, Defendants do not argue strict scrutiny applies at all and therefore do not say explicitly what they believe the compelling state interest would be.

> **2.  Even if the Court were to find that the challenged policy and statute are content-neutral, Plaintiffs have pled sufficient facts to state a claim under intermediate scrutiny.**

Even if intermediate scrutiny applies, Plaintiffs' Complaint states a claim. "[A] content-neutral statute 'will be sustained . . . if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests.'" *Golan v. Holder*, 609 F.3d 1076, 1083 (10th Cir. 2010) (citing *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997)); *McCraw v. City of Okla. City*, 973 F.3d 1057, 1071 (10th Cir. 2020) (applying intermediate scrutiny, regulations "must not burden substantially more speech than necessary to further the government's legitimate interests").

Here, the restrictions are sweeping in their application. As Plaintiffs note, the majority of Wichita residents likely meet the criteria for inclusion on the Gang List. Compl. ¶ 13. In addition, law enforcement has nearly unlimited discretion to determine the parameters of many of the criteria. What colors are "gang related" and what locations are "gang areas" are unregulated by Policy 527 and K.S.A. 21-6313.

Finally, the restrictions burden substantially more speech than necessary because neither Policy 527 nor K.S.A. provide a mechanism for notice of removal from the list except in limited circumstances. Compl. ¶¶ 20-23. Thus, the restrictions burden "substantially more speech than necessary" to further the government's interests. *Golan*, 609 F.3d at 1083.

**G.  Plaintiffs allege sufficient facts to state a claim that Defendants violated Plaintiffs' First Amendment rights by unconstitutionally chilling expressive and associational conduct.**

Finally, Defendants' motion attacks Count VII's allegations regarding the chilling effect of Policy 527 and K.S.A. 21-6313. Defendants appear to make two arguments. First, that the restrictions do not proscribe constitutionally protected conduct, so "plaintiffs do not plausibly allege they are chilled from engaging in constitutionally protected conduct." Defs. Br. at 43.

Second, Defendants also write, "As the plaintiffs do not allege any desire or intention to engage in the intentional conduct required for prosecution under K.S.A. 21-6314 and/or 21-6315, there is no credible threat of prosecution thereunder." *Id.* at 43-44.

Defendants' first argument is incorrect. For all the reasons described above, *see* Section F, *supra*, Plaintiffs did allege that Policy 527 and K.S.A. 21-6313 proscribe particular conduct. Plaintiffs allege that Policy 527 and K.S.A. 21-6313 chill intimate associations among private individuals, Compl. ¶ 250, that Plaintiffs avoid certain social situations, such as contact with family members, friends, and others, *id.* at ¶ 251, and that the restrictions chill expressive associations among members of non-gang social and political groups, *id.* at ¶ 252. Plaintiff Elbert Costello has refrained from buying gas from certain gas stations, *id.* at ¶ 258, and "Progeny and its members have refrained from organizing, conducting, and attending peaceable assemblies where those included on the WPD's Gang List are likely to be present." *Id.* at ¶ 256. Overall, "Plaintiffs avoid engaging in such activities as contact with family members, friends, and others; residence in, or travel to, certain neighborhoods; participate in political, religious, and other social groups; and display of colors and symbols on one's persons or clothing in order to avoid being place on the WPD's Gang List." *Id.* at ¶ 251. All of this states a claim under the First Amendment. *See id.* at Count VII (Right of Association and Expression – Chilling Effect).

Defendants' second argument is also misplaced. Although "chilling effect cases most often involve speech deterred by the threat of criminal or civil liability . . . neither [the Tenth Circuit] nor the Supreme Court has held that plaintiffs always lack standing when the challenged statute allegedly chills speech in some other way." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1095 (10th Cir. 2006). Here, Plaintiffs alleged that "[i]nclusion on the WPD's Gang List leads to financial and physical harms including denial and loss of employment, discrimination in

housing, stigmatization and exclusion from social groups, and harmed personal relationships." Compl. ¶ 255. In sum, Policy 527 and K.S.A. 21-6313 proscribe constitutionally protected activity and, as a result, they chill Plaintiffs' expressive and associational freedoms.

### H. Plaintiffs allege sufficient facts to state a claim that Defendants violated the Equal Protection Clause of the Fourteenth Amendment.

Defendants likewise assert that Plaintiffs fail to state a claim under the Equal Protection Clause of the Fourteenth Amendment. Defendants' arguments both misunderstand the pleading standard for an Equal Protection Clause claim and ignore the vast majority of the allegations contained in the Complaint.

To state a claim that Defendants' policing policies and practices with regard to the Gang List violate the Equal Protection Clause, the Complaint must allege facts that, if true, would demonstrate that WPD's actions discriminated against Named Plaintiffs and putative class members. There are several ways that Plaintiffs can demonstrate WPD intentionally discriminated, two of which are at play in the instant case.[17] First, Plaintiffs could show that the WPD applied its Gang List policy against a racial minority group with a greater degree of severity than against other

---

[17] Defendants inexplicably base this section of their brief on an argument that Plaintiffs cannot meet their burden for a claim of selective prosecution. But Plaintiffs did not plead such a claim; rather, Plaintiffs pled a claim for an equal protection violation based on facts that allege that Defendants use discriminatory policing tactics motivated by Plaintiffs' race and national origin. This is different from a selective prosecution claim, which requires a showing that a "racial or ethnic group is prosecuted more than another group" and "that a similarly situated individual in another group was not prosecuted for the same offense." *United States v. Mesa-Roche*, 288 F. Supp. 2d 1172, 1184-87 (D. Kan. 2003). Selective prosecution claims also have a heightened standard. The plaintiff must show "that he has been singled out for prosecution while others similarly situated generally have not been proceeded against for the type of conduct forming the basis of charge against him" and that his prosecution "was invidious or in bad faith and was based on impermissible considerations such as race, religion, or the desire to prevent the exercise of constitutional rights." *United States v. Salazar*, 720 F.2d 1482, 1487 (10th Cir. 1983). The Supreme Court has stated that the selective prosecution standard "is a demanding one" because prosecutors "retain 'broad discretion' to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

In contrast, this Court has recognized that selective enforcement claims require a lesser showing than selective prosecution claims. *See Mesa-Roche*, 288 F. Supp. 2d at 1184-87. Claims for selective enforcement merely require a showing that "the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003). Furthermore, "the discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision." *Id.*

groups. *Yick Wo v. Hopkins*, 118 U.S. 356, 373-75 (1886) ("Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is . . . within the prohibition of the Constitution."); *Jennings v. City of Stillwater*, 383 F.3d 1199, 1213 (10th Cir. 2004) (citing *Yick Wo*). Alternatively, Plaintiffs can demonstrate that the WPD's actions had a discriminatory intent or purpose and resulted in a discriminatory effect. *See generally Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."); *Marshall*, 345 F.3d 1157 (10th Cir. 2003).

When proceeding under the second method, Plaintiffs need not allege that the WPD's discriminatory intent was the only justification for their actions; nor do they need to prove it was the dominant or primary motivator. *See Arlington Heights*, 429 U.S. at 265. Rather, they only need to allege facts to show that the targeting of racial minorities for enforcement activities was "a motivating factor." *Watson v. Kansas City, Kan.*, 857 F.2d 690, 694 (10th Cir. 1988). Moreover, "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976).

Plaintiffs' Complaint lays out numerous allegations that satisfy the pleading requirement for their Equal Protection Clause claim. The crux of Plaintiffs' Complaint is that Defendants use the Gang List to target minority communities and individuals for surveillance and increased traffic enforcement. Compl. ¶¶ 15-19. Plaintiffs allege that Defendants created the Gang List specifically "to track and surveil Black and Latinx neighborhoods as part of an anti-gang enforcement strategy," *id.* at ¶ 52; that the WPD's increased policing regarding the Gang List is particularly

focused on communities of color in Wichita, *id.* at ¶ 105; and that Defendants target them for minor traffic violations and subject them to harassment, invasive questioning and searches, and increased punishment merely because they are on the List, *id.* at ¶¶ 123, 132-34, 142, 151. Plaintiffs further allege that the WPD heavily polices communities of color for the purposes of monitoring those on the Gang List. *Id.* at ¶¶ 15-19. Moreover, Plaintiffs allege that the Gang List results in officers escalating police encounters and routinely monitoring the social media accounts of persons of color. *Id.* at ¶¶ 17-18, 85-94. As a result, the vast majority of those on the Gang List are racial minorities, and the percentage of minorities on the Gang List far outweighs their demographic presence in the community at large. *Id.* at ¶¶ 102-04. According to the most recent census data, only 10.9% of the greater Wichita community is Black, but roughly 60% of those listed in the Gang List are Black. *Id.* at ¶¶ 103-04.

Notably, Plaintiffs allege that the WPD does not systematically target white communities for inclusion on the Gang List; indeed, the List includes only a small number of "biker groups" and "white supremacists" as compared to the number of Black and Latinx people on the List. *Id.* at ¶ 8. Plaintiffs note that the WPD does "not make the same efforts to surveil those individuals, nor to categorize the individuals they associate with as gang members or gang associates." *Id.* Plaintiffs also allege that the WPD does not "monitor multiple facets of [a] person's daily life" for white gang members and associates, but rather focuses those efforts on Black members of the Gang List. *Id.* at ¶ 18. Overall, Plaintiffs allege that WPD uses K.S.A. 21-6313 and WPD Policy 527 to target racial minorities. *Id.* at ¶¶ 226-36.

Courts have held that a complaint that includes specific allegations concerning law enforcements' targeting of racial minorities for enforcement activities, coupled with data regarding the discriminatory effect of those activities on racial minorities, is sufficient to state an Equal

Protection Clause claim. *See Chavez v. Ill. State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001); *Bradley v. United* States, 299 F.3d 197, 206 n.11 (3d Cir. 2002) ("In profiling cases . . . statistical evidence of discrimination may be the only means of proving a discriminatory effect."); *Marshall*, 345 F.3d at 1170; *Casimir v. City of Chicago*, No. 15 C 3771, 2018 WL 1695362, at *7-8 (N.D. Ill. Apr. 6, 2018); *Floyd*, 959 F. Supp. 2d at 667 (statistical evidence of racial and ethnic disparities in police stop and frisk practices proved adverse impact under the Equal Protection Clause); *Md. NAACP v. Md. State Police*, 454 F. Supp. 2d 339, 349 (D. Md. 2006) (racial disparities in enforcement constituted "power circumstantial evidence of racial profiling"); *Rodriguez v. Cal. Highway Patrol*, 89 F. Supp. 2d 1131, 1141 (N.D. Cal. 2000) (statistical evidence can be used to support an inference of discriminatory intent).

Here, Plaintiffs have done just that. Plaintiffs' Complaint includes specific allegations about the WPD's targeting of racial minorities. The Complaint also couples those allegations with data regarding the discriminatory effect of WPD's policies and practices. First, Plaintiffs made allegations about the discriminatory impact of WPD's policies—an appropriate starting point for assessing discriminatory intent. *Arlington Heights*, 429 U.S. at 266. But far from resting their case on a clear statistical disparity, Plaintiffs pled specific facts related to Defendants' discriminatory conduct. Compl. ¶¶ 226-36. The Court may appropriately draw inferences about Defendants' intent from the discriminatory impact of Defendants' policies and practices. Put simply, Plaintiffs pled statistics demonstrating disparate impact and specific allegations regarding discriminatory policing. *See, e.g.*, *id.* at ¶ 7. The Complaint also includes allegations of specific discriminatory policing tactics used against putative class representatives, all of whom are Black men. *See, e.g.*, *id.* at ¶¶ 54-55, 226-27, 235. Doing so pleads a Fourteenth Amendment claim.

Defendants make two further arguments that are without merit. First, Defendants make an unsupported statement that inclusion of the Gang List does not cause any injury. But inclusion on the Gang List *does*, in and of itself, cause injury, as alleged throughout Plaintiffs' Complaint: inclusion on the list subjects people to increased surveillance and monitoring by law enforcement. *Id.* at ¶¶ 15-19. It also prevents Plaintiffs from engaging in protected First Amendment activity, *id.* at ¶¶ 85-94, and interferes with their ability to gain employment or secure housing, *id.* at ¶ 84. The Complaint also sets forth specific facts demonstrating how these injuries are acutely felt by racial minorities and how non-racial minorities are not targeted in the same way. *See generally Id.* at ¶¶ 17-18, 85-94, 226-36.

Second, despite Defendants' insistence otherwise, Plaintiffs do not need to state a "prima facie case" in the Complaint. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) ("[T]he 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her complaint." (citing *Swierkiewicz v. Sorema N.A.,* 534 U.S 506, 515 (2002))); *see also Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) ("The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's Complaint alone is legally sufficient to state a claim for which relief may be granted."). Plaintiffs merely need to plead that a discriminatory purpose was a "motivating factor" for the Defendants' actions and that the actions had a discriminatory effect. *See Smith*, 143 F. Supp. 3d at 755 (complaints need not make out a prima facie case of discrimination).

Plaintiffs have met their limited pleading burden on this claim. Defendants' motion to dismiss Plaintiffs' Equal Protection Clause claim should therefore be denied.

**I. Plaintiffs' claims against Chief Ramsay and Lt. Beard in their official capacities are not redundant.**

Defendants argue that Plaintiffs' claims against Chief Ramsay in his official capacity as the Chief of the WPD and Lt. Beard in his official capacity as the Supervisor of the WPD Gang Unit are redundant of the claims against the City of Wichita because they are city officials. Def. Br. at 44-45. However, Defendants ignore that fact that in addition to challenging the policies of the WPD, Plaintiffs also have challenged the constitutionality of the state statute that authorizes the unlawful identification and maintenance of information regarding alleged criminal street gang members.

The Supreme Court has said that *Ex parte Young*, 209 U.S. 123 (1908) permits suits against state officers in their "official" capacities to enjoin action that would violate federal law. *See, e.g.*, *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) ("Verizon may proceed against the individual commissioners in their official capacities, pursuant to the doctrine of *Ex parte Young*."); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (recognizing that *Ex parte Young* permits "official-capacity actions for prospective relief" against state officers).

Here, Defendants Chief Ramsay and Lieutenant Beard, in their official capacities, establish the policies to follow the unconstitutional state statute. Compl. ¶¶ 44-45. A municipal official may create policy where the municipal official "possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Plaintiffs' allegations in the instant case are distinguishable from those in *Quintero v. City of Wichita*, No. 15-1326-EFM-GEB, 2016 WL 5871883 (D. Kan. Oct. 7, 2016). In *Quintero,* the police officer sued in both her individual and official capacity was not an alleged policy maker for the police department and was not enforcing a state statute. Here, where Chief Ramsay and Lieutenant Beard are responsible for the policies enforcing an unconstitutional state statute, they should be considered state actors, especially at the pleading stage. *See, e.g.*, *Minn. RFL Republican*

*Farmer Labor Caucus v. Freeman*, No. 19-cv-1949 (ECT/DTS), 2020 WL 1333154 (D. Minn. Mar. 23, 2020). Thus, Plaintiffs have not pleaded redundant claims against the individual Defendants, and they should remain parties to this action.

**J.   Plaintiffs have properly pled *Monell* liability against the City.**

Finally, Defendants offer a one paragraph argument at the end of their brief made up of a handful of case citations and parentheticals, and one sentence: that Plaintiffs "do not state any underlying constitutional violation by any City officer" and therefore there is no basis for *Monell* liability. Defs. Br. at 45. In *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978) the Supreme Court held that "when execution of a government's policy or custom . . . inflicts the injury [then] the government as an entity is responsible under [42 U.S.C. § 1983]." 436 U.S. at 694-95; *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283-84 (10th Cir. 2019). It is unclear whether Defendants' one-sentence argument means that Plaintiffs failed to state a claim for *any* constitutional violation—*i.e.*, the crux of the second half of their brief—so *Monell* liability cannot attach, or that Plaintiffs failed to properly allege *Monell* liability on those claims. Either way, Defendants' argument must fail.

As demonstrated above, Plaintiffs have clearly stated a claim for relief for multiple constitutional violations under the First and Fourteenth Amendments. And, in doing so, Plaintiffs have repeatedly alleged that the First and Fourteenth Amendment violations carried out by WPD officers, along with Chief Ramsey, as the chief of police, and Lieutenant Chad Beard, as the head of the Gang Intelligence Unit, are the direct result of Defendants' official policies and customs. *See, e.g.* Compl. ¶¶ 2-5; 11; 15; 20-22; 25-28; 41-45; 58-94; 182; 199; 207; 224; 226; 238-40; 249-54.

The City of Wichita is therefore a proper Defendant, and Defendants' argument that "there is no basis for a *Monell* claim," Defs. Br. at 45, is without merit.

## VI. CONCLUSION

Defendants' Motion for Dismiss does not put forth a single plausible ground for dismissing Plaintiffs' Complaint. For all the reasons explained above, Plaintiffs have demonstrated that they have standing to pursue their claims, and they have adequately pled the claims asserted in their Complaint. Defendants' motion should therefore be denied.

Dated this 30th day of July, 2021.

Respectfully submitted,

KANSAS APPLESEED CENTER FOR LAW AND JUSTICE, INC.

/s/ Teresa A. Woody
Teresa A. Woody KS #16949
Nicolas Shump (admitted *pro hac vice*)
211 E. 8th Street, Suite D
Lawrence, KS 66044
Phone: (785) 251-8160
twoody@kansasappleseed.org

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF KANSAS

/s/ Sharon Brett
Sharon Brett KS #28696
Joshua Pierson KS #29095
6701 W. 64th St, Suite 210
Overland Park, KS 66202
Phone: (913) 490-4100
sbrett@aclukansas.org

SHOOK, HARDY & BACON LLP

/s/ Thomas J. Sullivan
Thomas J. Sullivan (admitted *pro hac vice*)
Mitchell F. Engel KS #78766
Jordan C. Baehr KS #27213

2555 Grand Boulevard
Kansas City, MO 64108
Phone: (816) 474-6550
tsullivan@shb.com
mengel@shb.com
jbaehr@shb.com


ATTORNEYS FOR PLAINTIFFS,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED

## **CERTIFICATE OF SERVICE**

I certify that on July 30, 2021, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which will send notifications of such filing to the e-mail

addresses of all counsel of record.

/s/ Sharon Brett

Attorney for Plaintiffs