# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| PROGENY, a program of Destination Innovations, Inc., *et al.*, <br><br> *Plaintiffs,* <br><br> vs. <br><br><br> CITY OF WICHITA, KANSAS, *et al.*, <br><br> *Defendants.* | Case No. 6:21-CV-01100-EFM-ADM |

## MEMORANDUM AND ORDER

Organizational Plaintiff Progeny, along with individual Plaintiffs Christopher Cooper, Elbert Costello, Martel Costello and Jeremy Levy, Jr., bring this putative class action on behalf of themselves and others similarly situated. Broadly speaking, they seek relief from Defendant City of Wichita's "Gang List," along with the statutes and local policies that enable it. The Gang List is purportedly a list of persons, created and maintained by the Wichita Police Department ("WPD"), whom WPD personnel have determined meet the definition of a "criminal street gang member" under the criteria set out in K.S.A. § 21-6313(b). The individual Plaintiffs allege they were wrongfully designated as "criminal street gang member[s]" and added to the Gang List, which has negatively affected their lives in a host of ways. Plaintiffs seek (1) certification as a class under Federal Rule of Civil Procedure 23(b)(2); (2) a declaration that K.S.A. § 21-6313 is

unconstitutional under the First and Fourteenth Amendments; (3) a declaration that Defendants City of Wichita, Chief Gordan Ramsey in his official capacity as Chief of the WPD, and Lieutenant Chad Beard in his official capacity as supervisor of the Gang Unit of the WPD, violated their First and Fourteenth Amendment rights through their policies, practices, and conduct related to the Gang List; and (4) both preliminary and permanent injunctive relief effectively dismantling the Gang List.  Defendants now move to dismiss this action, alleging that Plaintiffs do not have standing to seek this relief under Article III of the United States Constitution, and that Plaintiffs fail to state plausible claims for relief.  The Court finds that Plaintiffs do have standing, but because some of the proposed legal theories rest on constitutionally infirm ground, the Court grants in part and denies in part Defendants' Motion to Dismiss (Doc. 14).

## I.        Factual and Procedural Background[1]

At the heart of this constitutional quagmire is a relatively brief definitional statute.  K.S.A. § 21-6313 defines several terms relevant to criminal gangs, including a definition of a "criminal street gang"[2] and "criminal street gang activity."[3]  But for present purposes, the most important part of § 21-6313 are its definitions of "criminal street gang member" and "criminal street gang associate."[4]  A "criminal street gang member" is a person who either admits to their membership

---

[1] The following facts, assumed to be true for the purposes of this Order, are taken from Plaintiffs' Complaint and Exhibit A attached thereto.  Though normally the Court only considers the plaintiff's complaint in ruling on a motion to dismiss, the Court may consider documents of undisputed authenticity that are "central to the complaint." *Dunmars v. Ford Cnty., Kan. Bd. of Comm'rs*, 2019 WL 3817958, at *3 (D. Kan. 2019) (citations omitted).  The authenticity of Exhibit A is not disputed by the parties and it is central to Plaintiffs' claims, as it represents at least part of the challenged policy on which Plaintiffs' claims rest.

[2] K.S.A. § 21-6313(a).

[3] *Id.* § 21-6313(c).

[4] *Id.* § 21-6313(b), (d).

in a gang or meets three of the following statutory criteria, while a "criminal street gang associate" need only meet two:

> (A) Is identified as a criminal street gang member by a parent or guardian;
> (B) is identified as a criminal street gang member by a state, county or city law enforcement officer or correctional officer or documented reliable informant;
> (C) is identified as a criminal street gang member by an informant of previously untested reliability and such identification is corroborated by independent information;
> (D) frequents a particular criminal street gang's area;
> (E) adopts such gang's style of dress, color, use of hand signs or tattoos;
> (F) associates with known criminal street gang members;
> (G) has been arrested more than once in the company of identified criminal street gang members for offenses which are consistent with usual criminal street gang activity;
> (H) is identified as a criminal street gang member by physical evidence including, but not limited to, photographs or other documentation;
> (I) has been stopped in the company of known criminal street gang members two or more times; or
> (J) has participated in or undergone activities self-identified or identified by a reliable informant as a criminal street gang initiation ritual;[5]

The various definitions of § 21-6313 are relevant internally to that statute, as several of the criteria laid out above rely on those definitions, but they are also relevant to subsequent statutory sections. For example, K.S.A. § 21-6316 sets a minimum bail of $50,000 for "criminal street gang members" arrested for a person felony, subject to a few exceptions.[6]

WPD policy puts § 21-6313 into practice on the streets of Wichita. Specifically, Policy 527 defines the procedures for an individual's inclusion on the Gang List. "Any state, county, or city law enforcement officer or correctional officer may nominate" an individual for inclusion on the Gang List.[7] After this nomination, the individual will be added to the Gang List if they meet

---

[5] *Id.* §21-6313(b)(2)(A)–(J).

[6] K.S.A. § 21-6316.

[7] Pls.' Compl. Ex. A., Doc. 1-1, at 1.

the criteria of § 21-6313.  Once on the Gang List, Policy 527 provides that the individual will remain on either "active" or "associate" status for a minimum of three years.[8]  If, after three years, the individual has not engaged in documented criminal street gang activity, the individual will be designated "inactive" in the Gang List.[9]  But this three-year period starts over if an officer documents that the individual either meets the criteria set out in § 21-6313(b) or that the individual has been involved in criminal street gang activity or a gang-related incident, as defined by the statute.  Officers of the WPD monitor members of the Gang List for any violations of probation conditions, bond, and pretrial restrictions.  Policy 527 further specifies that the Gang List is confidential and will only be released to commissioned law enforcement or correctional officers, along with those persons or entities authorized to receive Gang List information by various high-level supervisors within the WPD.

Plaintiffs allege that both § 21-6313 and Policy 527 are problematic by their own terms. For instance, Plaintiffs complain that § 21-6313 and Policy 527 largely have no requirements that an individual receive notice that their name has been added to the Gang List, and even if they are aware of it, the WPD provides no procedures by which the individual could challenge such designation.[10]  Further, Plaintiffs believe that the criteria laid out in § 21-6313(b), on which Policy 527 relies, can lead to persons being labeled as criminal gang members for otherwise innocuous conduct such as what they wear, the places they visit, and for associating with family and friends. Indeed, Plaintiffs go on to say that because of these expansive criteria, "the majority of Wichita citizens, including most judges, lawyers, clergy, union members, and other professional and social

---

[8] *Id.* at 3.

[9] *Id.*

[10] Plaintiffs concede that Policy 527 does provide for notice when the individual in question is a juvenile.

services providers, could be discretionally designated as a gang member or associate and added to the Gang List."[11]   Once on the Gang List, Policy 527 does not provide an opportunity for an individual to leave the Gang List entirely.  Rather, the individual simply may be labeled "inactive" with no clear definition of what this designation means.[12]  And though Policy 527 provides that the Gang List should remain confidential, it allows certain high-level members of the WPD to share the list at their discretion, which Plaintiffs allege occurs with some frequency. Plaintiffs believe the list is shared with other local, state, and federal law enforcement agencies, as well as potential employers, landlords, and licensing agents of those persons on the Gang List.

Even beyond the explicit terms of § 21-6313 and Policy 527, Plaintiffs believe that each permits conduct by police officers that is largely unchecked and extends beyond the pale in a variety of ways.  According to Plaintiffs, WPD officers have nearly unlimited discretion in determining whether an individual meets the criteria of § 21-6313(b), and thus whether to add that individual to the Gang List.  Plaintiffs believe that the WPD has a practice of falsely reporting that an individual admitted to criminal street gang membership and will perform hostile and intrusive traffic stops with individuals on the Gang List, in-person and online surveillance of such individuals, and searches of the individual's person and property.  Plaintiffs allege that all of these WPD actions affect persons of color on the Gang List more so than white persons, as WPD officers make less of an effort to surveil or stop white persons on the Gang List.  Plaintiffs further suggest that the demographic make-up of the Gang List is itself indicative of unchecked officer discretion and discrimination.  Citing a 2008 study, Plaintiffs state that while Black residents comprise only

---

[11] Pls.' Compl., Doc. 1, at ¶ 13.

[12] Pls.' Compl. Ex. A., Doc. 1-1, at 3.

10.9% of Wichita's population and Latinx residents account for only 17.2%, these groups make up 60% and 25% of the Gang List, respectively.[13]

Each named individual Plaintiff offers his own personal experiences to buttress these more general allegations.  Plaintiff Christopher Cooper first learned he was on the Gang List in 2014 when he was arrested for first degree murder, though he denies he was a gang member at that or any other time.  His bail was set at $50,000, which he attributes to the requirements of § 21-6316.[14] Cooper accepted a plea deal and at sentencing was placed on probation with special gang-related conditions.  He alleges these conditions forced him to live away from his family because some of them were on the Gang List.  Cooper states that though he has not had any criminal charges or offenses since 2014, he has repeatedly been stopped for minor traffic infractions and harassed by WPD officers, who know his name and treat him like a criminal during these interactions.  These interactions ceased when Cooper began driving a car registered in the name of a family member.  Recently, Cooper applied for a new job, but after a background check, was rejected.  Cooper believes he was rejected because the background check identified him as an active gang member.

Plaintiff Elbert Costello first learned he was on the Gang List in 1997, when he was arrested in connection with a shooting.  He states that, though he had relatives involved with gangs, he has never been a gang member.  Elbert was convicted of voluntary manslaughter and sentenced to a period of imprisonment, which he served in a "higher-level custodial setting" because, he alleges,

---

[13] Pls.' Compl., Doc. 1, at ¶ 7 (citing Gregg W. Etter Sr & Warren G. Swymeler, *Examining the Demographics of Street Gangs in Wichita, Kansas*, 16 J. of Gang Rsch. at 7–8 (2008)).

[14] K.S.A. § 21-6316 specifies that "[w]hen a criminal street gang member is arrested for a person felony, bail shall be at least $50,000 cash or surety, and such person shall not be released upon the person's own recognizance . . . unless the court determines on the record that the defendant is not likely to reoffend, an appropriate intensive pre-trial supervision program is available and the defendant agrees to comply with the mandate of such pre-trial supervision."

his name was on the Gang List.[15]   After his incarceration, Elbert was subject to three years of supervised release with gang-related conditions.  Both during and following his supervised release, Elbert alleges he has been subject to increased surveillance and traffic stops by WPD officers, which were often for minor traffic violations but led to invasive questioning.  Elbert alleges he has avoided spending time with lifelong friends because they may also be on the Gang List and associating with each other can lead "inactive" designations to become "active" or can renew the three-year clock for already "active" Gang List designations.  He further alleges he has avoided certain businesses because he believes the WPD has identified them as "gang hideouts."[16]   Still, these precautions have apparently not been enough, as Elbert has repeatedly been renewed as "active" on the Gang List, often for photos or other instances of him associating with others on the Gang List.  Most recently, Elbert was renewed because he appeared in a social media photo wearing a red "Philadelphia Phillies" baseball cap, and because the color red is associated with a gang.

Plaintiff Martel Costello believes he was first added to the Gang List in 2016 because of his association with relatives, presumably also members of the Gang List, rather than any conduct on his part.  Around that time, Martel was arrested for drug and firearm offenses.  He was released pending trial after posting bond, which he believes was set high because of his Gang List designation.  During his pretrial release, Martel alleges he was stopped and harassed numerous times by WPD officers for minor traffic infractions.  Martel ultimately pled guilty and received a sentence of 18 months' probation, subject to a condition that he not associate with anyone else on

---

[15] Pls.' Compl., Doc. 1, at ¶ 128.

[16] *Id.* at ¶ 136.

the Gang List.  This condition proved troublesome for Martel.  On two separate occasions, Martel was attending funeral services for a family member when he was found to have violated his parole because also in attendance were family members on the Gang List.  Martel is incarcerated for these violations until at least 2023.

Plaintiff Jeremy Levy, Jr., believes he was added to the Gang List at 13 years old when he was pulled over by the WPD while riding in a car with one of his cousins, who was already on the Gang List.  Levy states that he was not a gang member at that or any other time.  Five years later, Levy was charged with first-degree felony murder.  During his trial, the prosecutor was allowed to introduce evidence of Levy's gang membership, based on the Gang List, and other gang-related incidents that Levy believes were irrelevant and extremely prejudicial.  Levy was convicted and is currently incarcerated until at least 2042.

Rounding out the named Plaintiffs, Progeny joins this case from a position distinct from the individuals discussed above.  Progeny is nonprofit organization in Wichita, Kansas, that operates "as a youth/adult partnership focused on reimagining the juvenile justice system and reinventing in community-based alternatives."[17]  Its goals are to "prevent the incarceration of young people, break the school-to-prison pipeline, and direct state funds into community-based programs that provide alternatives to incarceration."[18]  As an organization, obviously Progeny is not an active gang member on the Gang List.  But Progeny still alleges that the Gang List has caused it direct harm and has harmed its members.  Progeny alleges that some of its members are on the Gang List, and that the Gang List has caused it to divert resources away from its other work

---

[17] *Id.* at ¶ 32.

[18] *Id.* at ¶ 33.

to provide services to those on the Gang List.  Progeny states that, because § 21-6313 and Policy 527 list "associat[ing] with known criminal street gang members" as one of the criteria for being designated or renewed as a "criminal street gang member," it is strongly discouraged from hosting town halls or meetings of any kind, as it might result in even more people being added to the Gang List.  When an individual's Gang List designation is known, Progeny believes § 21-6313 and Policy 527 effectively prohibit it from providing services to those individuals, as doing so may result in Gang List designations for those Progeny members working with that afflicted individual.

Together, these named Plaintiffs bring a putative class action against the City of Wichita, WPD Chief Gordon Ramsey, and WPD Gang Unit Supervisor, Lieutenant Chad Beard, both in their official capacities.  Plaintiffs allege that § 21-6313 and Defendants' policies and practices have violated their rights under the First and Fourteenth Amendments to the United States Constitution.  They seek certification as a class under Fed. R. Civ. P. 23(b)(2), and injunctive and declaratory relief.  Defendants move to dismiss, under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), on the grounds that (1) Plaintiffs do not have standing to seek the relief requested, and (2) Plaintiffs fail to state a plausible claim for relief.

## II.     Legal Standard

### A.     Lack of Subject-Matter Jurisdiction

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."[19]  A standing challenge is an attack on the Court's subject matter

---

[19] *Henry v. Off. of Thrift Supervision*, 43 F.3d 507, 511 (10th Cir. 1994) (citations omitted).

jurisdiction and is analyzed under Rule (12)(b)(1).[20]  Rule 12(b)(1) motions come in two types: (1) a facial attack on the sufficiency of complaint's allegations as to the court's jurisdiction or (2) a factual attack on the facts upon which subject matter is based.[21]  This case involves a facial attack,[22] and therefore, the Court must view the factual allegations in the Complaint as true but viewed through the *Iqbal/Twombly* plausibility standard, cited below.[23]  The burden of proof is on the party asserting the Court has jurisdiction.[24]

## B.     Failure to State a Claim

Under Rule 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[25]  Upon such motion, the court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.' "[26]  A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct.[27]  The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of

---

[20] *Hill v. Vanderbilt Cap. Advisors, LLC*, 702 F.3d 1220, 1224 (10th Cir. 2012) ("Our court has repeatedly characterized standing as an element of subject matter jurisdiction.").

[21] *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001) (citations omitted).

[22] The Court notes that Defendants are not explicitly clear about which type of attack they intend to bring. But after reviewing their arguments on standing, the Court finds they do not challenge the factual basis of Plaintiff's standing.  This case thus necessarily involves a facial attack.

[23] *See Stuart*, 271 F.3d at 1225 ("In reviewing a facial attack, the district court must accept the allegations in the complaint as true.") (citation omitted).

[24] *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citation omitted).

[25] Fed. R. Civ. P. 12(b)(6).

[26] *Ridge at Red Hawk, LLC. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[27] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

the nature of claims as well the grounds on which each claim rests.[28]   Under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint, but need not afford such a presumption to legal conclusions.[29]   Viewing the complaint in this manner, the court must decide whether the plaintiff's allegations give rise to more than speculative possibilities.[30]

### III.   Analysis

Plaintiffs challenge § 21-6313 and Defendants' policies and practices on a number of constitutional grounds.   Under the Fourteenth Amendment, Plaintiffs contend that (1) § 21-6313 is void for vagueness, (2) Defendants have failed to provide Plaintiffs with procedural due process, (3) Defendants have failed to provide Plaintiffs with substantive due process, and (4) Defendants have violated Plaintiffs' rights to equal protection under the law.   Under the First Amendment, Plaintiffs contend that § 21-6313 and Policy 527 violate Plaintiffs' rights of freedom of expression and association, both by a direct prohibition and a chilling effect on the same.   Defendants move to dismiss on the grounds that (1) no named Plaintiff has Article III standing to bring the aforementioned claims, (2) Plaintiffs' constitutional claims fail to state a plausible claim for relief, (3) the claims against Chief Ramsey and Lieutenant Beard are redundant, and (4) the City of Wichita may not be held liable under *Monell v. New York City Department of Social Services*.[31] The Court examines each line of argument in turn.

---

[28] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

[29] *Iqbal*, 556 U.S. at 678.

[30] *See id.* ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.") (citation omitted).

[31] 436 U.S. 658 (1978).

At the outset, the Court notes that Plaintiffs bring their constitutional claims under 42 U.S.C. § 1983.  That statute permits persons to sue those who violate their constitutional rights while acting "under color of" state law.[32]  At this stage, other than its argument under *Monell*, Defendants do not dispute the propriety of § 1983 as a vehicle for Plaintiffs' constitutional claims against them. The Court thus focuses on the constitutional standards underlying each claim.

## A.     Article III Standing

### 1.     Individual Plaintiffs' Standing

The doctrine of standing follows from the clear language of Article III of the United States Constitution, which states that the "judicial power of the United States" extends only to "Cases" and "Controversies."[33]  The Supreme Court has interpreted this to require an "irreducible constitutional minimum" of three elements before a plaintiff's suit can proceed in federal court.[34] "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[35] Defendants focus somewhat interchangeably on the first and second elements in their motion to dismiss, but the Court believes it is first necessary to discuss Plaintiffs' alleged injury in fact with precision.

To demonstrate an injury in fact, a plaintiff must establish he or she "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not

---

[32] 42 U.S.C. § 1983. *See also SECSYS, LLC v. Vigil*, 666 F.3d 678, 683–84 (10th Cir. 2012).

[33] U.S. Const. art. III, § 2.

[34] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

[35] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted).

conjectural or hypothetical.' "[36]  A "concrete" injury "must actually exist," while a particularized injury "must affect the plaintiff in a personal and individual way."[37]  At this stage, Defendants contend that Plaintiffs' alleged injuries are either merely hypothetical or are insufficient to confer standing for the prospective relief sought.

Crucially for this case, the injury in fact required is different when the plaintiff seeks purely prospective relief.  While a plaintiff's "standing for retrospective relief may be based on past injuries . . . claims for prospective relief require a *continuing* injury" or a credible threat of imminent future harm.[38]  This is because "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."[39]  Similarly, a plaintiff seeking relief from the alleged chilling effect of a statute or policy must allege more than mere subjective chill;[40] rather, they must "show[] a credible threat of prosecution or other consequences following from the statute's enforcement."[41]  Plaintiffs solely seek injunctive and declaratory relief: in other words, prospective relief.  Thus, to establish standing to seek this relief, Plaintiffs must show a continuing injury or that they are under a credible threat of future harm.

Plaintiffs plausibly allege they suffer from continuing injuries.  Plaintiffs allege that their designation as "criminal street gang members" on WPD's Gang List is itself an ongoing injury because of the constitutional deprivations that, in their view, inevitably follow from such

---

[36] *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560).

[37] *Id.* at 339–40 (citations omitted).

[38] *PeTA v. Rasmussen*, 298 F.3d 1198, 1202 (10th Cir.2002) (citation omitted) (emphasis added).

[39] *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).

[40] *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).

[41] *D.L.S. v. Utah,* 374 F.3d 971, 975 (10th Cir. 2004) (citation omitted).

designation.[42]  Plaintiffs allege that Defendants have failed to provide procedural due process by not giving notice or an opportunity to challenge their inclusion on the Gang List, and thus the stigmatizing designation of "criminal street gang member" attaches to each of them on a continuing or ongoing basis.  They further allege that their First Amendment rights are being violated, again on a continuing basis, because § 21-6313 and Policy 527 directly restrict their freedoms of expression and association in that they cannot engage in expressive conduct or associate with family and close friends without the risk that their designation as a gang member will be extended or that their family and friends will be similarly designated.  These restrictions extend as long as the Gang List and § 21-6313 endure.

Plaintiffs also allege that they, in choosing to engage in certain types of expression or associate with certain persons, face a credible threat of real and immediate consequences from § 21-6313 and the Gang List.  A person can be added to the Gang List based, at least in part, on their "style of dress, color [of clothes], use of hand signs or tattoos" as well as their associations with family and friends who happen to be on the Gang List.  Plaintiffs further allege a number of consequences that flow directly from being on the Gang List, such as those described above.  Thus, a person by his choices in the way he dresses, or his associations with family and friends, faces a credible threat that he may be added to the Gang List and then must confront the real, immediate consequences of that designation.

These allegations alone are sufficient to distinguish this case from *City of Los Angeles v. Lyons*,[43] on which Defendants rely.  In *Lyons*, the Supreme Court concluded the plaintiff, who had

---

[42] Importantly, "[f]or purposes of the standing inquiry, the question is not whether the alleged injury rises to the level of a constitutional violation. That is the issue on the merits."  *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006).

[43] 461 U.S. 95 (1983).

in the past had been subjected to a police chokehold during a traffic stop, did not have standing to seek an injunction against the City preventing the use of such chokeholds.[44]   The Court stated that the plaintiff's "standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers," and found that there was no real and immediate threat of such injury.[45]   Based on this, Defendants attack Plaintiffs' allegations of what they view as "past injuries," such as restrictive probation conditions and high bonds in past criminal cases, and past stops by law enforcement viewed as harassing by Plaintiffs.

While it is true that these past injuries, standing alone, cannot support a request for purely prospective relief, Plaintiffs do not solely allege past injuries.   Rather, as discussed, Plaintiffs allege a number of continuing injuries and credible future injuries as a direct result of § 21-6313 and Gang List.   Plaintiffs allege continuing restrictions to their speech and expression and stigmatizing designations as gang members that will continue so long as do § 21-6313 and the Gang List.   They also allege a credible threat of consequences if they engage in certain types of expression or association.   For that reason, Plaintiffs have properly alleged injuries in fact sufficient to seek prospective and declaratory relief.

Moving to the second element of standing, Defendant contends that a number of Plaintiffs' alleged injuries are not fairly traceable to its conduct.   These include bond decisions, employment rejections, designation of custodial facilities, and other decisions that lie with parties not before this Court.   This would be a relevant and even persuasive argument if those were the challenged injuries in this action.   But as this Court discussed above, Plaintiffs allege their injury is the

---

[44] *Id.* at 98, 105.

[45] *Id.* at 105

designation itself as gang members in the Gang List, not solely the past criminal consequences of that designation.  Looking at the Gang List designation as each Plaintiff's injury in fact, along with the continuing constitutional violations that Plaintiffs allege as a result of that designation, it is clear these are fairly traceable to Defendants, who maintain and control the Gang List.

Finally, it is immediately clear that the third element of standing is also met for the individual, named Plaintiffs.  Their injuries can be redressed by a favorable decision here, as injunctive and declaratory relief could remove them from the Gang List and dismantle it, along with the statutes and policies that give life to the list.  Accordingly, Plaintiffs have standing to seek the prospective relief requested.

### 2.    *Progeny's Standing*

Progeny contends it has standing both directly to seek redress for an injury in fact it has suffered as a result of the Gang List, as well as standing as an association to seek relief on behalf of its members.  The Court examines each in turn.

An organization must meet the same three-part test applicable to individuals to have standing to sue on its own behalf.[46]  That is, the organization "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[47]  Defendants dispute only the first of these elements, contending that Progeny has not suffered an injury in fact sufficient to give it a "personal stake in the outcome"[48] of this litigation.

---

[46] *Colo. Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394, 1396 (10th Cir. 1992) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982)).

[47] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted).

[48] *Romer*, 963 F.2d at 1396 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977).

Progeny responds that it has been injured by Defendants' conduct because it has had to "divert resources away from its other work to provide assistance and resources to those who are suffering from the consequences of being on the WPD's Gang List."[49]  An organization may suffer an injury in fact when it is forced devote significant resources to counteract the allegedly unlawful conduct or policies of a defendant, such that its core activities are "perceptibly impaired" by this "concrete and demonstrable" drain of resources.[50]  This must go beyond "a mere setback to abstract social interests."[51]  However, "ordinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing."[52]

Progeny here alleges no more than ordinary expenditures in line with its purpose as an organization.  Progeny itself states that one of its goals is to "empower young people who have come into contact with the criminal justice system and provide these young people with counseling and support."[53]  Providing assistance and resources to individuals beleaguered by the criminal justice system is then part of Progeny's ordinary operations.  It does not matter that these problems within the criminal justice system are amplified, at least in part, by the person's designation as a gang member.  Spending resources to assist these individuals remains within the ordinary purpose of Progeny, and thus such expenditures are ordinary as well.  This is not an injury in fact sufficient to confer standing.

---

[49] Pls.' Compl., Doc. 1, at ¶ 36.

[50] *Havens Realty Corp.*, 455 U.S. at 379.

[51] *Animal Legal Def. Fund v. Kelly*, 434 F. Supp. 3d 974, 996 (D. Kan. 2020) (citing *Havens Realty Corp.*, 455 U.S. at 379), *aff'd*, 9 F.4th 1219 (10th Cir. 2021).

[52] *Plotkin v. Ryan*, 239 F.3d 882, 886 (7th Cir. 2001).

[53] Pls.' Compl., Doc. 1, at ¶ 35.

But this is not the only injury in fact Progeny alleges it has suffered.  Like the individual Plaintiffs, Progeny alleges its First Amendment rights have been violated by § 21-6313 and Defendants' related policies.   Nonprofit organizations are also protected by the First Amendment,[54]  but at this stage the Court does not ask whether Progeny's alleged injury rises to the level of a constitutional violation.[55]  Rather, the Court asks, as before, whether Progeny has sufficiently alleged a continuing injury that is concrete, particularized, and actual or imminent.

Progeny's alleged First Amendment injuries fit that bill.  Progeny suggests a clear and plausible injury to its right of association owing to the statutory criteria, and attendant WPD policy, that a person may be added to the Gang List simply by associating with the other persons already on the list.  Because of this, Progeny alleges it is effectively prohibited from hosting town halls or other large-scale meetings because of the risk that persons already on the Gang List will be in attendance and cause other attendees to either be added to the Gang List or have their designation extended, and thus face the consequences of being on the list.  This injury is continuing and actual, rather than hypothetical, and affects Progeny in an individual way as it is prevented from undertaking certain activities as an organization.   This injury in fact is fairly traceable to Defendants' conduct in creating and maintaining the Gang List and may be redressed by favorable injunctive relief dismantling the Gang List.  Progeny, therefore, has standing to seek relief on its own behalf.

Progeny also contends it has standing to bring suit on behalf of its members for the same types of harm alleged by the named Plaintiffs.  An association may bring suit on behalf of its

---

[54] *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 343 (2010).

[55] *See Walker*, 450 F.3d at 1088.

-18-

members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[56]

The first two elements do not present much of a hurdle for Progeny. The Court determined above that at least one of its members, Elbert Costello, has standing to sue on his own behalf, and the interests Progeny seeks to protect by fighting the Gang List are germane to its overall purpose of extricating its members from involvement in the criminal justice system. But Progeny's claim for associational standing runs into difficulties because many of the claims asserted require the participation of its individual members.

Legal claims generally require individual participation when they rely on elements of "individualized proof."[57] Progeny asserts that claims for injunctive relief typically do not require individual participation,[58] and thus this prong is satisfied. This may be true, but the third prong of associational standing requires not only consideration of whether the relief requested requires individual participation, but also whether the claims asserted so require. The claims at issue here will require, at least in part, elements of "individualized proof." For instance, the procedural due process claim will require each individual member to assert that they are improperly on the Gang List because they are not gang members. The as-applied vagueness and First Amendment challenges require consideration of the particular circumstances in which an individual was added or renewed on the Gang List, because as-applied challenges must be tethered to the factual context of the alleged violation. And the substantive due process claim requires consideration of how the

---

[56] *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

[57] *Id.* at 344.

[58] *See, e.g.*, *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996).

specific conduct of Defendants with respect to each individual member violated a fundamental right of that member. Some claims, such as First Amendment overbreadth and facial vagueness, will not require individualized proof, and Progeny may assert those claims on behalf of its members. But Progeny does not have associational standing for those claims that require individualized proof. Because in Count II, Progeny relies entirely on associational standing to bring its procedural due process claim on behalf of its members, and that claim will require individualized proof, that Count is dismissed.

In conclusion, all named individual Plaintiffs have standing to bring their various claims for prospective relief. Progeny has standing to sue for direct injuries it has allegedly suffered as a result of the Gang List but does not have standing to sue as an association on behalf of its members. With the introductory issue of Plaintiffs' standing now resolved, the Court turns to the issue of whether the substantive claims properly state a claim for relief.

**B.      Fourteenth Amendment Claims**

*1.      Void for Vagueness – Count I*

A basic feature of Due Process under the Fourteenth Amendment is that a law must clearly define what it prohibits, or otherwise be held "void for vagueness."[59] "Where a law deals with areas of First Amendment import, there is the additional concern that the uncertain terms will inhibit those First Amendment freedoms, as 'citizens will steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.' "[60] As such, stricter standards may

---

[59] *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

[60] *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (quoting *Grayned*, 408 U.S. at 109) (alteration omitted).

be applied where vagueness concerns overlap with the First Amendment.[61]   At base, though, a statute is unconstitutionally vague in two circumstances: either (1) "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or (2) "it authorizes or even encourages arbitrary and discriminatory enforcement."[62]

Void for vagueness challenges come in two species.   First, a plaintiff may challenge the statute as vague as applied to his particular circumstances.[63]   The analysis of an as-applied claim is tethered to the factual context in which the statute was applied to the plaintiff.[64]   Of course, at the motion to dismiss stage, the plaintiff's plausible factual allegations are presumed true.[65]   Second, a plaintiff may allege that a statute is facially vague.[66]   Such a claim is "strong medicine," and requires a plaintiff to show "the challenged law would be vague in the vast majority of its applications."[67]   Plaintiffs do not explicitly state whether they bring an as-applied or facial challenge, but it appears from the Complaint that they bring both.

 Defendants, instead of discussing the legal standards for as-applied or facial challenges to purportedly vague statutes, base their motion to dismiss on two grounds.   First, Defendants believe that the Supreme Court has limited vagueness challenges to statutes which define a crime or fix a sentence.   They base this argument on *Beckles v. United States*,[68]  but Defendants misread *Beckles*. In *Beckles*, the Court identified "two kinds of criminal laws" that it had previously invalidated

---

[61] *Id.* (quotation omitted).

[62] *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)).

[63] *See Galbreath v. City of Oklahoma City*, 568 F. App'x 534, 539 (10th Cir. 2014).

[64] *Id.* (citing *United States v. Franklin–El*, 554 F.3d 903, 910 (10th Cir. 2009)).

[65] *Iqbal*, 556 U.S. at 678.

[66] *See Dr. John's, Inc.*, 465 F.3d at 1157.

[67] *Id.* (quotation and citation omitted).

[68] 137 S. Ct. 886 (2017).

under the void for vagueness doctrine: "laws that define criminal offenses and laws that fix the permissible sentences for criminal offenses."[69]  But the Court did not say these are the *only* two kinds of laws that could be invalidated under the doctrine.  Rather, the Court has previously held that, whether or not it is labeled as penal, a statute "must meet the challenge that it is unconstitutionally vague."[70]  Further, laws that impinge on First Amendment freedoms, as Plaintiffs allege K.S.A 21-6313 does, are subject to stringent standards in vagueness challenges.[71]  Thus, the fact that this statue does not define a criminal offense or fix permissible criminal sentences does not mean it is immune from a vagueness challenge.

Defendants' second argument essentially asks this Court to analogize § 21-6313 to other statutes that have survived void for vagueness challenges, such as the federal RICO statute and the Violent Crime Control and Law Enforcement Act of 1994. But Defendants draw no parallels between the challenged criteria of § 21-6313(b) and these statutes. For instance, under § 21-6313, a person can be designated a "criminal street gang member" if he or she "(D) frequents a particular criminal street gang's area; (E) adopts such gang's style of dress, color, use of hand signs or tattoos; [or] (F) associates with known criminal street gang members," just to name a few.[72]  These provisions are at the heart of Plaintiffs' vagueness challenge, but Defendants fail to suggest how either statute parallels these particular provisions, and thus why the Court should dismiss the vagueness claim out of hand.

---

[69] *Id.* at 892 (emphasis removed).

[70] *Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966). *See also Sessions v. Dimaya*, 138 S. Ct. 1204, 1229 (2018) (Gorsuch, J., concurring) ("So the happenstance that a law is found in the civil or criminal part of the statute books cannot be dispositive.").

[71] *Dr. John's, Inc.*, 465 F.3d 1157.

[72] K.S.A. § 21-6313(b)(2)(D)–(F).

The closest Defendants come to discussing the particular criteria of § 21-6313(b) is in citation to several cases that have upheld probation restrictions on associating with members of criminal street gangs against vagueness challenges.[73]  These cases present language that is roughly analogous to subsection (F) here, which provides that someone who "associates with known criminal street gang members" may be designated a gang member or associate, assuming they meet other criteria as well.[74]  But these cases are immediately distinguishable.  For instance, in *United States v. Vega*,[75] the Ninth Circuit upheld the probation condition prohibiting the defendant from associating "with any member of any criminal street gang as directed by the Probation Officer, specifically, any member of the Harpys street gang" against a vagueness challenge."[76]  The court there relied on precedent specific to the probation context, in which the Supreme Court reasoned that the word "association" in parole restrictions did not apply to "incidental contacts."[77]  By contrast, there is no such limiting construction yet applied to "associates" under § 21-6313.  And Plaintiffs allege that they have been put on the Gang List *precisely* for incidental contacts with friends and family members.  The court in *Vega* further relied on the fact that the probation restriction was limited by reference to a particular gang.[78]  This also is not present in the language of subsection (F). The cases cited by Defendants are thus inapposite.

---

[73] *See, e.g.*, *United States v. Green*, 618 F.3d 120 (2d Cir. 2010); *United States v. Vega*, 545 F.3d 743 (9th Cir. 2007).

[74] K.S.A. § 21-6313(b)(2)(F).

[75] 545 F.3d 743 (9th Cir. 2008).

[76] *Id.* at 749–50.

[77] *Id.* at 749.  *See also Arciniega v. Freeman*, 404 U.S. 4, 4 (1971) ("We do not believe that the parole condition restricting association was intended to apply to incidental contacts between ex-convicts in the course of work on a legitimate job for a common employer.").

[78] *Vega*, 545 F.3d at 749–50.

In short, no theory urged by Defendants supports the dismissal of Plaintiffs' vagueness challenge to § 21-6313 at this stage.  Their motion as to that Count is denied.

### 2.     Procedural Due Process – Count III

The Fourteenth Amendment states that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."[79]  The Supreme Court has identified two unique due process rights under this Amendment: procedural due process and substantive due process.[80] A plaintiff's claim that he or she has been denied procedural due process requires a two-step inquiry: "(1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process."[81]

The three interests explicitly protected by the Due Process Clause are "life, liberty, [and] property."[82]  Individual Plaintiffs make no claim that their interests in life or property are at stake. Rather, each individual Plaintiff believes his liberty interest in his "good name, reputation, honor, or integrity" is in the crosshairs because of a "badge of infamy" pinned on him by Defendants' inclusion of his name on the Gang List.[83]   In so arguing, Plaintiffs invoke doctrine commonly referred to as "stigma plus."[84]  To show an affected liberty interest under the stigma plus doctrine, a Plaintiff must show that: "(1) the government made a statement about him or her that is sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and

---

[79] U.S. Const. amend. XIV, § 1.

[80] *United States v. Salerno*, 481 U.S. 739, 746 (1987) (citations omitted).

[81] *Merrifield v. Bd. of Cnty. Comm'rs*, 654 F.3d 1073, 1078 (10th Cir. 2011) (quoting *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009)).

[82] U.S. Const. amend. XIV, § 1.

[83] *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) (quotation omitted).

[84] *Gwinn v. Awmiller*, 354 F.3d 1211, 1216 (10th Cir. 2004).

that he or she asserts is false, and (2) the plaintiff experienced some governmentally imposed burden that 'significantly altered [his or] her status as a matter of state law.' "[85]  Put simply, the test requires both government defamation and a significant change in the plaintiff's legal status.

As to the first element, Plaintiffs challenge the government's statement, made by the act of placing them on the Gang List, that they are gang members.  This statement is clearly capable of being proved false, and each Plaintiff assets that it is false.  The question, then, is whether the statement that a person is a gang member is "sufficiently derogatory to injure his or her reputation."[86]  The Court is inclined to agree with the several other courts who have considered this question and answered it in the affirmative.[87]  In particular, the Court is persuaded that designation as a gang member inescapably implies that a person is involved, at least in some capacity, with criminal activity,[88] which is generally recognized as defamatory *per se* under relevant state law.[89]  Further, Plaintiffs plausibly allege that the Gang List is made sufficiently public to injure their reputations.  They allege not only that the list was shared within various local, state, and federal law enforcement agencies, but that it was also distributed to other parts of the local and federal government, as well as to potential employers, landlords, and licensing agents of Plaintiffs.  Thus, Plaintiffs plausibly allege the government defamation element of stigma plus.

---

[85] *Id.* (quoting *Paul v. Davis*, 424 U.S. 693, 710–11 (1976)) (alteration in original).

[86] *Id.*

[87] *See, e.g.*, *Pedrote-Salinas v. Johnson*, 2018 WL 2320934, at *5 (N.D. Ill. 2018) ("There is no question that being labeled a gang member harms one's reputation."); *Medrano v. Salazar*, 2020 WL 589537, at *6 (W.D. Tex. 2020) ("[B]eing improperly included in a 'gang database carries with it the stigma of being a gang member, which is tied to a host of unfortunate implications such as involvement in criminal conduct. There is no question that being labeled a gang member harms one's reputation.' " (quoting *Pedrote-Salinas*, 2018 WL 230934, at *5)).

[88] "Criminal street gang[s]," under K.S.A 21-6313(a)(4), engage in lawbreaking by definition.  It requires no great logical leap to conclude that their members would be associated with such lawbreaking.

[89] *See Paul v. Davis*, 424 U.S. 693, 697 (1976) ("Imputing criminal behavior to an individual is generally considered defamatory Per se.").

The second element of stigma plus, the "plus" element, requires the plaintiff to show that the government's defamation significantly altered his or her status as a matter of state law. There is no clear definition of what "status" is relevant for this inquiry, but the Court discerns that it often boils down to a question of whether the plaintiff is restricted from doing something significant, because of the government's defamation, that he or she could otherwise do "in common with the rest of the citizenry."[90]   Damage to the plaintiff's reputation alone, by contrast, will not constitute a significant change of status under state law.[91]  Nor will impairment of prospective employment opportunities.[92]

Inclusion in the Gang list does not, by its explicit terms, create an absolute legal bar preventing Plaintiffs from doing some things.   In theory, Plaintiffs can still choose to visit businesses, associate with their friends and families, and choose their wardrobe without government decrees imposing an explicit legal bar on their choices.   But Plaintiffs allege that in practice, they are prohibited from doing these things. They allege they cannot visit certain businesses for fear that they have been designated as "gang hideouts" and will subject them to renewal on the List or increased surveillance and unwanted interaction with law enforcement officers.   They allege they cannot associate with friends and family for fear of causing these

---

[90] *Paul*, 424 U.S. at 708; *see also Constantineau*, 400 U.S. at 435–39 (finding a protected liberty interest when the plaintiff, by a posting of the police chief, was forbidden from purchasing or receiving liquor within her hometown for a year); *Larry v. Lawler*, 605 F.2d 954, 958 (7th Cir. 1978) (finding the "plus" prong satisfied when the plaintiff was "totally debarred from all federal employment for up to three years.").

[91] *See, e.g.*, *Paul*, 424 U.S. at 711 ("[T]he interest in reputation alone which respondent seeks to vindicate in this action in federal court is quite different from the 'liberty' or 'property' [right protected by the Fourteenth Amendment.]"); *Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161, 1184 (10th Cir. 2016) ("Damage to reputation alone, however, is not sufficient.") (citation omitted).

[92] *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1559 (10th Cir. 1993) ("Damage to prospective employment opportunities is too intangible to constitute deprivation of a liberty interest.") (citation omitted).

persons to be included on the Gang List because of such association with Plaintiffs. And they allege they cannot wear certain clothes or colors because of feared renewal on the Gang List and increased surveillance from law enforcement. Assuming these allegations are true, the Gang List designation has the effect of restricting Plaintiffs' ability to do significant things that they otherwise have the right to do freely. These tangible consequences of being on the Gang List refute Defendants' contention that Plaintiffs only suffer "reputational harm" under *Paul* because of their inclusion on the list. Plaintiffs thus satisfy the "stigma plus" test and have plausibly alleged that they have been deprived of a protected liberty interest by Defendants' actions.

Moving to the second part of the procedural due process inquiry, the Court is required to consider whether the government provided the appropriate level of process for the deprivation of the plaintiff's protected interest.[93] Process due is typically some form of notice and an opportunity to be heard, though the level of each depends on the demands of a particular situation.[94] The balance of certain enumerated factors aids in making this determination,[95] but the Court need not engage in such an inquiry at this time. Plaintiffs allege that they were provided with *no* procedures, no notice or opportunity to be heard, before or after being added to the Gang List. Under *Constantineau*, "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are *essential*."[96]

---

[93] *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1220 (10th Cir. 2006).

[94] *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty or property be preceded by notice and opportunity for hearing appropriate to the nature of the case.") (internal quotation marks and citation omitted); *Matthews v. Eldridge*, 424 U.S. 319, 334 ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.").

[95] *See Matthews*, 424 U.S. at 335 (setting forth three factors that courts may consider).

[96] 400 U.S. at 437 (emphasis added).

Plaintiffs thus plausibly allege they were not provided with appropriate process, and properly state a claim for violation of their rights to procedural due process.

### 3.  *Substantive Due Process – Count IV*

Substantive due process under the Fourteenth Amendment guarantees that "certain deprivations won't take place without a sufficient justification."[97]  The Supreme Court has cautioned against nonchalant application and expansion of this area of law, often called "murky" by courts attempting to apply it,[98] "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."[99] Still, precedent instructs that this Court begin analysis of a substantive due process claim by making a " 'careful description' of the allegedly violated right."[100]

Plaintiffs helpfully offer a laundry list of what they call "significant deprivations of life, liberty, and property" visited upon them because of Defendants' policies and conduct.[101]  These are:

1.  frequent, prolonged, intrusive, and hostile encounters with law enforcement;
2.  unreasonable searches of property;
3.  unjustified arrests;
4.  unwarranted online and in-person surveillance;
5.  identification by and increased attention from WPD officers using "Signal 33";
6.  allegations of gang membership in arrest affidavits and news media;
7.  increased bail leading to prolonged imprisonment and financial hardship;
8.  severely restrictive probation, pretrial release, and parole conditions;
9.  re-arrest, detention, and incarceration for violations of restrictive release conditions;
10. diminished plea offers in connection with criminal charges;

---

[97] *Browder v. City of Albuquerque*, 787 F.3d 1076, 1078 (10th Cir. 2015).

[98] *Id.* at 1080.

[99] *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)).

[100] *Browder*, 787 F.3d at 1078 (quoting *Washington*, 521 U.S. at 721).

[101] Pls.' Compl., Doc. 1, at ¶ 216.

11. introduction of gang membership as evidence in criminal proceedings, leading to extreme prejudice, conviction, and incarceration;

12. representation of gang membership to other public and private entities, leading to misidentification of Plaintiffs as gang members in background checks and news articles or other public sources; and

13. loss of educational, employment, and housing opportunities.[102]

Each individual Plaintiff alleges some combination of these deprivations have afflicted him, along with deprivation of the ability to associate with family and friends.  After this careful determination of the rights at play, the Court must determine whether these rights count as "fundamental," or "objectively, deeply rooted in this Nation's history and tradition."[103]  Even with fundamental rights though, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.' "[104]

It is here that Plaintiffs' substantive due process claim falls short.  Working down Plaintiffs' list in numerical order, it becomes clear that it is made up by either nonfundamental rights or rights that are more properly analyzed under a different constitutional amendment rather that the "generalized notion of substantive due process."

The first, second, and third items on the list are undoubtedly considered more appropriately under the Fourth Amendment.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and further states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be

---

[102] *Id.*

[103] *Browder*, 787 F.3d at 1078 (quoting *Glucksberg*, 521 U.S. at 720–21).

[104] *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

seized."[105]  Encounters with law enforcement, searches of property, and arrests all fall within the explicit terms of the this amendment,[106] and Plaintiffs' claims relating to these alleged violations must therefore be considered under a Fourth Amendment framework, rather than the more general standards of substantive due process.

Plaintiffs contend the fourth and fifth items, regarding law enforcement surveillance and "attention," is appropriately analyzed under substantive due process standards relating to "privacy."[107]  Not so.  The Supreme Court has recognized a few narrowly defined fundamental rights under the rubric of privacy, such as "those relating to marriage, family life, child rearing, and reproductive choices."[108]  But police surveillance and attention are poles apart from the aforementioned rights, and the Court would be straying far from the basic guideposts in this area by recognizing a fundamental right to be free from unwanted police surveillance and attention. And to the extent such surveillance and attention is believed to implicate a search under the meaning of the Fourth Amendment, naturally it should be examined under the framework of that amendment rather than the more generalized notion of substantive due process.

The sixth, twelfth and thirteenth items on Plaintiffs' list do not implicate a fundamental right that is "objectively, deeply rooted in this Nation's history and tradition."[109]  Those items concern the publication of Plaintiffs' status as gang members to various entities, which Plaintiffs believe resulted in losses of employment, educational, and licensing opportunities.  Plaintiffs offer

---

[105] U.S. Const. amend. IV.

[106] *See United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996) (identifying three kinds of law enforcement encounters and their relationship to Fourth Amendment jurisprudence).

[107] Pls.' Br., Doc. 26, at 43.

[108] *Seegmiller v. LaVerkin City*, 528 F.3d 762, 770 (10th Cir. 2008); *see also Heublein v. Wefald*, 784 F. Supp. 2d 1186, 1196 (D. Kan. 2011).

[109] *Browder*, 787 F.3d at 1078 (quoting *Glucksberg*, 521 U.S. at 720–21).

no reason or authority for concluding that any of these have either been recognized as fundamental rights or meet the stringent test required for such recognition.

The remaining items on the list either do not implicate a fundamental right or are more appropriately analyzed under the framework of a different amendment. Plaintiffs' complaints about restrictive pretrial release and probation conditions, as well as diminished plea offers and prejudicial introduction of evidence of their membership on the Gang List, do not implicate a fundamental right. While Plaintiffs urge the Court to conclude that Due Process is implicated in these contexts, the only support they offer for this position are two cases in which prisoners were subjected to "deprivations of liberty which are not among those generally authorized by [their] confinement."[110] The Court does not fathom how Plaintiffs' situation is at all similar to that present in those cases. Further, Plaintiffs' claim that they suffered "increased bail" seems to fit more appropriately under the Eighth Amendment's prohibition on "excessive bail," if in fact Plaintiffs claim the bail set in their individual cases was excessive.[111] Finally, Plaintiffs' claims regarding their ability to associate with whom they want and express themselves in the way they choose are more appropriately analyzed under the First Amendment, as Plaintiffs seem to recognize, having raised these claims separately.

In sum, Plaintiffs ask this Court, throughout their substantive due process claim, to leave behind the "guideposts for responsible decisionmaking"[112] staked out by the Supreme Court and

---

[110] *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 n.8 (1989). *See also Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (" '[C]onsequences visited on the prisoner that are qualitatively different from the punishment characteristically suffered by a person convicted of crime' may invoke the protections of the Due Process Clause.") (citation omitted).

[111] U.S. Const. amend. VIII.

[112] *Glucksberg*, 521 U.S. at 720 (quoting *Collins*, 503 U.S. at 125).

venture into uncharted territory far afield, casually recognizing dozens of fundamental rights as it goes.  Plaintiffs do so without even an inkling of discussion of *why* these purported rights are deeply rooted in our Nation's history and tradition, nor why the Court should not be hesitant to expansively recognize fundamental rights when the Supreme Court itself has been extremely cautious in doing so.[113]  Plaintiffs also prefer to vindicate their allegedly violated rights through the rubric of substantive due process rather than the more specific standards applicable to those rights.  The Court declines to join Plaintiffs on this ill-thought-out journey.  Count IV is dismissed.

4.    *Equal Protection – Count V*

Plaintiffs' Equal Protection claim alleges that the Gang List and Defendants implementation thereof constitute discrimination because of each Plaintiff's race and national origin.  The Equal Protection Clause under the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."[114]  This is "essentially a direction that all persons similarly situated should be treated alike,"[115] whether by legislation or the conduct of state actors.[116]  An equal protection claim proceeds in two steps.  First, the Court asks "whether the challenged state action intentionally discriminates between groups of

---

[113] *See Does v. Munoz*, 507 F.3d 961, 964 (6th Cir .2007) ("[I]dentifying a new fundamental right subject to the protections of substantive due process is often an 'uphill battle,' as the list of fundamental rights 'is short.' ") (internal citation omitted).

[114] U.S. Const. amend. XIV, § 1.

[115] *A.M. ex rel. F.M. v. Holmes*, 830 F.3d 1123, 1166 (10th Cir. 2016) (quoting *Kitchen v. Herbert*, 755 F.3d 1193, 1222 (10th Cir. 2014).

[116] *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021) (citations omitted).

persons."[117]  This intentional discrimination must cause an "adverse effect."[118]  Second, the Court must review the challenged government action under the proper level of scrutiny.[119]

Plaintiffs' claim cannot pass over the first hurdle.  Discriminatory intent requires that "that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."[120]  Though this intent may be proved circumstantially based on an inference from the relevant facts,[121] evidence of the racially disproportionate impact of a particular government policy or course of conduct will not, standing alone, satisfy the requirement that the official action was taken with a discriminatory intent.[122]  "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution."[123]

Plaintiffs contend they have plausibly alleged Defendants' discriminatory intent with respect to the Gang List.  The Complaint alleges that Defendants created the Gang List "to track and surveil Black and Latinx neighborhoods," that Defendants' policing focuses on communities of color, and that persons of color on the list are subject to more severe surveillance and punishment than white persons on the list.[124]  These allegations, however, do not plausibly allege

---

[117] *SECSYS, LLC*, 666 F.3d at 685 (citations omitted).

[118] *Ashaheed*, 7 F.4th at 1250 (citations omitted).

[119] *See Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 799 (10th Cir. 2019) (citations omitted).

[120] *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

[121] *Ashaheed*, 7 F.4th at 1250 (citations omitted).

[122] *See Washington v. Davis*, 426 U.S. 229, 239 (1976) ("But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional Solely because it has a racially disproportionate impact.").

[123] *Id.* at 242.

[124] Pls.' Compl., Doc. 1, at ¶ 228, ¶ 232.

discriminatory intent because they are no more than a conclusory recitation of that element under *Iqbal* and *Twombly*.  Because these allegations are not entitled to the presumption of truth, the Court disregards them and examines Plaintiffs' remaining factual allegations to determine if they plausibly state an equal protection claim.

Plaintiffs' remaining allegations solely concern the alleged discriminatory impact of the Gang List.  In particular, they cite a 2008 study finding that Black and Latinx persons formed an outsized proportion of the Gang List as compared to their respective shares of the general population of Wichita.[125]  Even assuming this is true, allegations of the discriminatory impact of a particular policy are not enough, standing alone, to state an equal protection claim.  Because Plaintiff fails to plausibly allege a discriminatory intent behind the Gang List, the Court need not test it against one of the tiers of scrutiny.  Count V is dismissed for failure to state a claim.

**C.    First Amendment Claims**

*1.    Freedom of Expression – Counts VI & VII*

Plaintiffs bring a variety of claims that their right to freedom of speech under the First Amendment has been restricted by § 21-6313 and Defendants' policies with respect to the Gang List.  Plaintiffs believe § 21-6313(b)(2)(E) directly prohibits expressive conduct because a person can be added or renewed on the Gang List, at least in part, because he or she "adopts such gang's style of dress, color, use of hand signs or tattoos."  This, Plaintiffs allege, directly prohibits and chills speech, and is facially overbroad to boot, as evidenced by Plaintiff Elbert Costello's renewal on the Gang List simply because he was wearing a red Philadelphia Phillies hat.

---

[125] *Id.* at ¶ 7 (citing Gregg W. Etter Sr & Warren G. Swymeler, *Examining the Demographics of Street Gangs in Wichita, Kansas*, 16 J. of Gang Rsch, at 7–8 (2008)).

Before diving into these related claims, the Court must address a threshold issue in First Amendment cases involving expressive conduct or "symbolic speech," rather than written or verbal expression.[126]  Namely, does the plaintiff's conduct actually constitute protected speech under the First Amendment? A necessary element to transform conduct into protected speech is that the plaintiff had the "intent to convey a particularized message."[127]  It is in addressing this element that the Court concludes this issue, though framed under the First Amendment, is actually a different species of the procedural due process claim discussed above.

In theory, there are two possible messages Elbert could have been intending to convey by wearing his Phillies hat.  He could have been trying to communicate "I like the Philadelphia Phillies and think they are an excellent baseball team."  And if this is the case, Defendants' decision to renew his Gang List designation on this basis was not a punishment based on his communicated message.  There is no allegation that Defendants intend to place persons on the Gang List simply because they are Phillies fans.  Rather, if this was Elbert's message in wearing the Phillies cap, Defendants made a *mistake* about his message, and Elbert's grievance centers around the lack of opportunity to challenge the grounds underlying the renewal of his designation as a gang member.  This, of course, is a feature of procedural due process.

The second possible message Elbert may have been trying to convey by wearing the hat is "I am a gang member."  This is certainly the message Defendants understood Elbert to convey.  But this is foreclosed by Elbert's own statements, accepted as true at this stage, that he is not, and

---

[126] *See, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (wearing armband for purpose of expressing certain political view constitutes symbolic speech protected under the First Amendment).

[127] *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 410–411 (1974)).

has never been, a gang member.  Accordingly, this cause of action, though brought under the First Amendment, is merely a facet of Plaintiffs' procedural due process claim.

       *2.*      *Freedom of Association – Counts VI & VII*

The First Amendment does not explicitly enumerate the right to freedom of association, but the Supreme Court has held that it protects such a right in certain circumstances.[128]  Among these are the right to "enter into and maintain certain intimate human relationships,"[129] including "family relationships, which by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one's life."[130] The First Amendment also protects the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion."[131]  Government action that restricts a person's ability to associate in these ways must face strict judicial scrutiny.[132]  Even beyond direct restrictions of these associational rights, First Amendment protections are triggered by "[t]he risk of a chilling effect on association 'because First Amendment freedoms need breathing space to survive.' "[133]

Plaintiffs allege that both of the above associational rights are directly restricted and chilled by § 21-6313 and Defendants' policies.  To be clear, Plaintiffs do not allege that statutes and

---

[128] *City of Dallas v. Stanglin*, 490 U.S. 19, 23 (1989).

[129] *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984).

[130] *Trujillo v. Bd. of Cnty. Comm'rs of Santa Fe Cnty.*, 768 F.2d 1186, 1188 (10th Cir. 1985) (quoting *Roberts*, 468 U.S. at 620).

[131] *Roberts*, 468 U.S. at 618.

[132] *See Stranglin*, 490 U.S. at 23 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40 (1973)).

[133] *Am. for Prosperity Found. v. Bonta*, --- U.S. ---, 141 S. Ct. 2373, 2389 (2021) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

Defendants' policies, by their terms, create a legal bar preventing Plaintiffs from exercising their associational rights.  Rather, they contend that the unavoidable effect of the statute and policies is to keep them from exercising their associational rights.  Several criteria allowing designation as a "criminal street gang member" under § 21-6313 involve associations with other known criminal street gang members.[134]  The individual Plaintiffs each allege that these criteria have kept them from associating with family, or resulted in their punishment if they have, because either they feared having their own designation as a gang member renewed because their family members were already on the Gang List, or because they did not want their family members to end up on the List because they associated with Plaintiffs.  Further, Progeny alleges it is restricted from holding town halls for the purpose of getting community members involved with its mission of advocating for change in the juvenile criminal justice system because the criteria of § 21-6313, and Defendants application thereof, will create the risk that such a gathering will cause attendees to either be designated as gang members or have an already existing designation renewed.

Defendants contend that these are restrictions are self-imposed choices and do not automatically follow from the application of § 21-6313.  The individual Plaintiffs choose not to associate with their family members, and Progeny chooses not to host town halls.  This, they believe, does not implicate the First Amendment.  But contrary to Defendants' description, the situation alleged by Plaintiffs does not present Plaintiffs with much of a choice.  That choice is between seeing their family members and subjecting those individuals and themselves to the consequences of being on the Gang List or foregoing such association and sparing themselves and their families the consequences.  The First Amendment protects individuals from being forced by

---

[134] *See* K.S.A. § 21-6313(b)(2)(F), (I).

the government to make choices such as this.[135]   Thus, Plaintiffs state a plausible claim for relief

that that their associational rights are restricted by § 21-6313 and Defendants' related policies.

### D.     Claims Against Chief Ramsay and Lieutenant Beard in Their Official Capacities

Defendants ask the Court to dismiss the suits against Chief Ramsay and Lieutenant Beard

in their official capacities.   Official capacity suits "generally represent only another way of

pleading an action against an entity of which an officer is an agent."[136]   If the government entity

receives notice and an opportunity to respond, the suit is essentially treated as one against the

entity.[137]   This Court has previously dismissed official capacity suits as redundant when the

government entity is itself a party.[138]   Plaintiffs urge the Court not to do so here, citing the doctrine

of *Ex parte Young*, which permits suits against state officers in their official capacities to enjoin

action violative of federal law.[139]   So it does.   But it does not *require* official capacity suits to be

heard alongside suits against the government entity itself.   Following its past practice of dismissing

individual defendants sued in their official capacity when the relevant government entity is itself

a party, the Court dismisses Chief Ramsay and Lieutenant Beard.

---

[135] *Cf. Koontz v. Watson*, 283 F. Supp. 3d 1007, 1026 (D. Kan. 2018) ("Plaintiff's harm stems not from her decision to refuse to sign the certification, but rather from the plainly unconstitutional choice the Kansas Law forces plaintiff to make: She either can contract with the state or she can support a boycott of Israel. Her harm is ongoing because the Kansas Law is currently chilling plaintiff's and other putative state contractors' speech rights.")

[136] *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. N.Y.C. Dep't. of Soc. Servs.*, 436 U.S. 658, 690, n.55 (1978)).

[137] *Id.*

[138] *See, e.g.*, *Sims v. Unified Gov't of Wyandotte Cty.*, 120 F. Supp. 2d 938, 945 (D. Kan. 2000); *Burns v. Bd. of Comm'rs of Cnty. of Jackson, Kan.*, 197 F. Supp. 2d 1278, 1297 (D. Kan. 2002), *aff'd*, 330 F.3d 1275 (10th Cir. 2003); *Rubio v. Turner Unified Sch. Dist. No. 202*, 453 F. Supp. 2d 1295, 1300 (D. Kan. 2006).

[139] *See generally Ex parte Young*, 209 U.S. 123, 159–60 (1908).

E.      **Municipal Liability**

Defendant City of Wichita contends that it may not be held liable under *Monell v. New York City Department of Social Services*.[140]  In that case, the Supreme Court held:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.[141]

Plaintiffs do not allege they were injured solely by the employees or agents of the City.  Rather, they allege its official policy creating and maintaining the Gang List causes them ongoing injury. The City is therefore a proper defendant under *Monell* and § 1983.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss (Doc. 14) is **GRANTED IN PART and DENIED IN PART.**

**IT IS SO ORDERED.**

Counts II, IV, and V are dismissed. All Counts as to Defendants Chief Gordon Ramsay and Lieutenant Chad Beard are dismissed and these two defendants are terminated from the case.

Dated this 10th day of January, 2022.

ERIC F. MELGREN
CHIEF JUDGE UNITED STATES DISTRICT COURT

---

[140] 436 U.S. 658 (1978).

[141] *Id.* at 694.