# EXHIBIT 3
## Filed Under Seal



# PohlmanUSA®
## Court Reporting and Litigation Services

Sage Hemmert

December 7, 2022

Progeny, et al.
vs.
City Of Wichita, Kansas

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


PROGENY, et al.,                    )
                                    )
          Plaintiffs,               )
                                    )
vs.                                 ) Case No. 6:21-cv-01100-EFM-ADM
                                    )
CITY OF WICHITA, KANSAS,            )
                                    )
          Defendant.                )




VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF SAGE HEMMERT
TAKEN ON BEHALF OF THE PLAINTIFF
DECEMBER 7, 2022
VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF SAGE

HEMMERT, produced, sworn, and examined on the 7th day

of December 2022, between the hours of nine o'clock in

the forenoon and six o'clock in the evening of that

date, before KARA D. INCE, a Certified Court Reporter

within and for the State of Kansas, in a certain cause

now pending IN THE UNITED STATES DISTRICT COURT, FOR

THE DISTRICT OF KANSAS, wherein PROGENY, et al., are

the Plaintiffs and CITY OF WICHITA, KANSAS, is the

Defendant.

 1    day.

 2        Q.    Okay.  But you -- but sometimes you filled

 3    out multiple TOPS cards in a day; correct?

 4        A.    Yes.

 5        Q.    And who was your -- who was your primary

 6    FTO?

 7        A.    Jeremy Miller.

 8        Q.    And then you said you had two other folks.

 9    Who were they?

10        A.    Chris Marceau and Stacy Woodson.  Stacy

11    Woodson's deceased, but Miller and Marceau both

12    still work at WPD.

13        Q.    Okay.  When you -- and when you filled out

14    these TOPS cards, would -- would that be based on

15    your observations of a person?  Is that pretty much

16    what it was?

17        A.    Observations and conversation that I had

18    with the person, yes.

19        Q.    Okay.  And there's some -- some -- one of

20    the criteria for being put on the list is -- is

21    somebody self-identifies as a gang member; right?

22        A.    Self-admits, yes.

23        Q.    And what's that mean?

24        A.    A person tells you they're a gang member

25    -- claims --

```
 1        Q.   Go ahead.  I'm sorry.
 2        A.   Claims to be a gang member.
 3        Q.   And then -- and they actually say that,
 4   I'm a member of such and such gang?
 5        A.   Well, the verbiage that they use is not
 6   identical to what you just said.  Typically they
 7   won't say I'm a member of the Bloods gang.  They'll
 8   say something like, I'm a Blood; you know, I'm a
 9   Blood; you know, I'm with Bloods.  But, yes.
10        Q.   Okay.  And there's no other way that you
11   can self-admit?  It has to be by telling you that?
12   It's not just something that you observed and you
13   decide they've admitted it because of what they're
14   wearing or how they're acting?
15        A.   Yes.  That -- I mean, yes.  They have --
16   they have to admit it to you.
17        Q.   Okay.  And if you do that, there's a box
18   that you check that says, oh, they admit it; right?
19        A.   There's a box that you check, and then
20   there's a -- there's a space where you can write
21   down what they actually said as close to verbatim as
22   you -- as possible.
23        Q.   And what were the other criteria that you
24   applied when you were filling out the TOPS cards?
25   Do you recall that?
```

1    someone via a TOPS card.  That was the four gang

2    officers.

3         Q.   So give me a typical day for you as one of

4    the four gang intelligence officers.

5         A.   Man, that's tough because no -- no day

6    would necessarily be typical.

7              But I would say we get to work at 4:30 in

8    the afternoon so we'd have some crossover with the

9    gang felony assault detectives.  They -- if they

10   have something that they want us to do, you know,

11   and that could be anything from, hey, we need you to

12   serve this subpoena tonight; we need you to find

13   this witness and interview them, do a recorded

14   interview; we have a felony pickup for this person,

15   or, you know, whatever -- whatever the detectives

16   have for the task list, and that could vary.  Also

17   the lieutenant could have something on the task list

18   for us.

19             And then we would usually go to our

20   office, check our email.  There's -- I called it the

21   daily gang report.  I don't know what the official

22   name for it was, but there -- e-Justice generated a

23   report every day that every -- every person that was

24   documented in e-Justice as a gang member that had a

25   new police case in e-Justice that showed up on a new

 1    police case, they would generate that report so that

 2    you could review that and you can keep up to speed

 3    on what had happened in the last 24 hours.  I would

 4    review that.

 5          And then we would hit the streets, and,

 6    you know, whatever was on the agenda for the night.

 7    It could be find a witness; it could be there's a

 8    concert going on at this place; it could be we know

 9    there's going to be a house party or a venue party

10    at this and there's going to be a lot of gang

11    members there; or this person is wanted for this

12    that we need to go find.

13          And then as you're out on the street as,

14    you know, you'd have all four bureaus now.  The

15    whole city is your responsibility.  So as shootings

16    happen, you respond.  Gang unit works all the

17    homicides.  It's -- you know, there's a lot of

18    different tasks that go into the gang unit.

19       Q.   When you -- so you would come in and

20    either the detectives or the lieutenant could give

21    you a list of things to do; correct?

22       A.   Yes.  And I didn't mention this, but also

23    the sergeant.  So we had a sergeant that our direct

24    supervisor.

25       Q.   Okay.

1           So if gang evidence is going to be

2    admitted, one of the gang officers or Beard is going

3    to do the testimony; at least at the time, was how

4    it was.  And so one of the -- kind of the overriding

5    principle for anything that's done in the database,

6    documenting a new person, starting somebody's time,

7    you know, restarting somebody's time was if this

8    goes to a motion to admit gang evidence, this needs

9    to be defensible, that -- you know, that this person

10   was documented and that -- or that this criteria was

11   used.  We need to have documentation of the

12   criteria, because the gang unit handled all of the

13   testimony at the time.

14       Q.   And I want to -- excuse me -- go back to

15   something you said about e-Justice.

16           I think you said every day you would get a

17   list of all the -- activity by all the gang members

18   in e-Justice, or did I misunderstand that?

19       A.   So, yeah -- no, you didn't misunderstand.

20           The way that worked was e-Justice would

21   generate a report.  It was called the daily -- I

22   don't know what it was called.  I know what I called

23   it, the daily gang report.  And it -- it got

24   automatically like a --  I don't know how they --

25   the technical term for it, but it automatically got

1    generated and it was in a folder.

2            Now, the folder didn't have -- you had to

3    have access to it, and that was one of the things

4    you got when you went to the gang unit.  But you

5    could click on this, and it was a pdf document, and

6    it would open and it would just show case number,

7    date, the name of the person, and the classification

8    of the report.  That's all it would show.

9            Now, if you wanted to go read the report,

10   then you had to open e-Justice and look that up and

11   read it.  But so, you know, I could come in on a --

12   our week started on Wednesday.  We had Sunday,

13   Monday, Tuesday off.  So I could come in on a

14   Wednesday -- and I would every Wednesday come in on

15   a Wednesday -- and then I would look at the -- this

16   report that I'm referring to for Sunday, Monday, and

17   Tuesday.

18      Q.   And what information would be in the

19   report?

20      A.   Just the case number, the name of the gang

21   member, the -- I think the location that the -- that

22   the report was documented at, and then

23   classification of report.

24      Q.   What kind of classifications of reports

25   would you have?

1    worked opposite ends of the week so that we had

2    every day covered except for Sunday.  And we

3    attempted to address, and did address, the violence

4    and particularly the -- you know, the group of

5    people that were perpetrating the violence.

6         Q.   And what was the name of that task force?

7         A.   I'm not sure it had a formal name.  We

8    just referred to it as the 2017 Task Force.

9         Q.   So how did you -- how did you go about

10   trying to stop the violence with that task force?

11        A.   So the first thing was that that task

12   force, the activities of that task force were

13   directed by our intelligence.

14             So we knew who was involved in -- in these

15   feuds.  And, you know, the unique thing about gang

16   crimes, I guess -- maybe it's not only unique to

17   gang crimes, but it certainly is a thing in gang

18   crimes, is that you can know who is committing the

19   crimes and still not get prosecution because a lot

20   of times you have uncooperative victims.

21             So you -- the tactic that was used by the

22   task force was to use a targeted enforcement

23   approach towards the people that we knew were

24   perpetrating this violence, and primarily it was the

25   use of pretextual car stops.  We had undercover

```
 1    unmarked vehicles that summer that were rental cars

 2    that we could switch out on a daily basis, and we

 3    used those cars to get -- to do surveillance of gang

 4    members, and oftentimes when they were in vehicles,

 5    get traffic violations on them and then marked cars

 6    would stop that car.

 7             And -- and we knew also that because

 8    the -- Wichita was kind of in a state of -- you

 9    know, kind of like open warfare almost between these

10    groups that -- these guys were all armed and they

11    were -- they were armed pretty much all the time.

12    Because if they ran into each other on the street it

13    was going to be -- we would call it on sight, but

14    they're going -- they're going to start -- they're

15    going to engage in a gun battle.  And we knew that

16    because it was happening over and over and over

17    again in public, you know.

18             And so the idea is stop the car -- and a

19    lot of these guys are prohibited persons; they're

20    felons.  They can't have firearms.  Stop the car,

21    pretextual car stop, and then if there is a legal

22    way to search the car and seize the firearm, then

23    that will be the idea.  That was -- that was kind of

24    the basic game plan to how to deal with this.  And

25    we seized 101 firearms in 90 days utilizing this
```

1    coming and going and identifying them, because I

2    know -- you know, I know the people that I'm looking

3    for that are -- you know, I can recognize -- you

4    know, hundreds of gang members in Wichita I can

5    recognize when I see them and know who they are.

6              And I'm also looking for, you know,

7    fights, people fighting, people flashing guns,

8    people, you know, that are obviously armed, getting

9    guns out of trunks, putting guns in waistbands.

10   These are things that you see all the time.  And --

11   but primarily, you know, I'm looking for those

12   people that we talked about that are engaged in

13   these feuds.

14             And if you see them, you know, if you

15   catch them -- you see them going into the club, then

16   maybe you wait till -- you make note of what vehicle

17   they arrived in and you get in a position where you

18   can observe them when they leave.  And then when

19   they leave, you know, let's say three or four gang

20   members get into a vehicle and they leave, they pull

21   out onto 21st Street, you're going to pull out with

22   them and you're going to observe them until they

23   commit a traffic violation.  Assuming they do commit

24   a traffic violation, you're going to get on the

25   radio and communicate to the marked units, who are

```
 1    in the area but out of sight, and you're going to

 2    say, failed to maintain lane.

 3             You're going to be giving your location,

 4    first of all.  So you're going to say, westbound on

 5    21st.  Okay, got a fail to maintain lane.  And then

 6    they come up and they stop the car and you keep

 7    driving.

 8        Q.    And when they stop the car, they're

 9    looking for an opportunity to search the car;

10    correct?

11        A.    Yes.

12        Q.    Do they fill out any kind of TOPS reports

13    or cards or any kind of police reports at that

14    point?

15        A.    Well, they do police reports if there's --

16    you know, if it's -- if police action is taken,

17    yeah, they're doing police reports.

18             We didn't do TOPS cards that summer

19    because we were just having -- I mean, too many gang

20    contacts.  We'd -- I mean, I don't know the actual

21    stats on how many gang contacts we had that summer,

22    but I would estimate it's over 500.

23        Q.    And that lasted for 90 days you say?

24        A.    Yes.

25        Q.    Is there anything like that since then?
```

```
 1    put into the gang database.

 2              MR. BRANSON:  So you're specifically

 3    asking if whether the criteria -- simply reviewing

 4    the criteria for addition on to the database?

 5              MS. WOODY:  Yes.

 6              MR. BRANSON:  Okay.

 7         A.   And, I'm sorry, ma'am, can you repeat the

 8    question?

 9    BY MS. WOODY:

10         Q.   Sure.  Sure.

11              If a person's wearing gang colors, would

12    that be sufficient to meet one of the criterion?

13         A.   No.  And I say no because there has to be

14    context.

15         Q.   And where is that written in any policy

16    that there -- that that -- the color alone is not

17    sufficient?  Is that in any written policy?

18         A.   Well, I think the statute, along with

19    color it says, adopts a particular gang's dress,

20    color, hand signs, and tattoos.  So that has a

21    different meaning than if the criteria was stated,

22    for instance.

23              MR. BRANSON:  Cooper, you're still sharing

24    your screen.

25         A.   That will have a -- that -- if the statute
```

1    read that, and it doesn't, that would have -- I'm

2    sorry -- if the statute reads what I just said -- if

3    the statute read, and it doesn't, for instance,

4    wears a gang color, then, you know, those two things

5    mean two different things.  That's -- that's the

6    context or that's -- I guess that's the -- how I'm

7    interpreting it.

8    BY MS. WOODY:

9        Q.    That's how you're interpreting it?

10   Correct?

11       A.    Yeah.

12       Q.    You think -- is it possible that other

13   people would interpret it differently, other people

14   in the gang unit?

15            MR. BRANSON:  Object to form.

16       A.    It's possible.  I think there's continuity

17   of training to safeguard against that, but it is

18   possible.

19   BY MS. WOODY:

20       Q.    So what -- when you -- when you were

21   looking at those criterion with an eye toward

22   whether or not somebody would be on the gang list,

23   what would you require to satisfy that criterion?

24       A.    The overall theme that governed everything

25   that I did in terms of managing the database,

1    **thinking that kind of that glorified outlaw criminal**

2    **persona, you know, they don't look at those people**

3    **as bad and dangerous people.  That's just -- that's**

4    **my life experience, that's my opinion.**

5        Q.   Okay.  Thank you.

6            We're going to take a quick break so I can

7    get those criterion in front of you and then -- and

8    then we'll be pretty close to being done.

9        **A.   Okay.**

10       Q.   Thanks.

11           THE VIDEOGRAPHER:  All right.  The time is

12   now 1:16 p.m.  We are now off the record.

13           (Off the record.)

14           THE VIDEOGRAPHER:  The time now is

15   1:21 p.m.  We are now on the record.

16   BY MS. WOODY:

17       Q.   Okay.  Mr. Hemmert, I'm showing you what's

18   previously been marked Deposition Exhibit 5, and

19   this is the Kansas Statute 21-6313.

20           Is this the statute you were referring to

21   when you said that has the criteria in it?

22       **A.   Yes.**

23           **(Deposition Exhibit No. 5 was marked for**

24   **identification.)**

25   BY MS. WOODY:

```
 1        Q.    And that's something that you're familiar

 2   with?

 3        A.    Yes.

 4        Q.    Okay.  If you look down there where it

 5   says B2.  Do you see that there?

 6        A.    Yes.

 7        Q.    And under the -- underneath that is a list

 8   of -- of criterion.  Is that the criteria that you

 9   applied what you were in the gang unit?

10        A.    Yes.

11        Q.    Okay.  So we were talking about if

12   there -- if a -- how they would satisfy this and

13   which ones of them might be subjective -- have some

14   subjectivity to them; right?

15        A.    Yes.

16        Q.    And it's identified by a -- as a street --

17   a criminal street gang member by a parent or

18   guardian.  That's probably not subjective; correct?

19        A.    So what I would say is it's -- it would

20   still need to be vetted, and that -- that's what

21   I -- I guess my answer about subjectivity would

22   be -- so just because a parent would identify a kid,

23   you know, you would want to vet that in some way,

24   how does that parent know to identify that kid.  So

25   it's subjective in terms of it's as subjective as
```

1    any other statute that needs to be investigated and

2    vetted.

3        Q.   Okay.  And would you say that all of

4    these, you would need to investigate and vet each

5    one of these criteria that's listed here?

6        A.   Yes.  And some of the -- as a gang

7    officer, some of these are your own, you know,

8    observations that you're relying on, which I think

9    is what we were talking about.

10            But certainly, you know, if a state,

11   county, or city law enforcement officer identifies a

12   person as a criminal street gang member, okay, well,

13   you would want -- if you -- you would want to know

14   how do you know what a gang member is and why do

15   you -- why are you identifying this person as a gang

16   member?

17            So, yes, everything -- there's going to be

18   context in everything.

19       Q.   Okay.  And each of these criteria is going

20   to require some context other than just what you see

21   written down in the statute?

22       A.   Yes.

23       Q.   Okay.  And I think we talked about -- and

24   if you look at 2E, it says, "Adopt such gang style

25   of dress, color, use of hand signs, or tattoos."

```
 1              Do you see that?
 2        A.    Yes.
 3        Q.    Okay.  So could any one of those things --
 4    meeting any one of those things satisfy that
 5    criterion in E?
 6        A.    Yes.
 7        Q.    But you said you wouldn't apply it that
 8    way; correct?
 9        A.    Well, again, with context.
10              So if -- if we'll do a hypothetical.  That
11    if you're looking at a person's booking photos,
12    okay, you're updating a person and there's -- they
13    were booked 10 times in that 12-month period that
14    you're reviewing, and in that ten times they are
15    wearing a blue shirt nine of those 10 times, and
16    five of those nine times it's a blue North Carolina
17    shirt and they are -- they're a neighborhood Crip.
18              Would I use that as adopt such gang style
19    of dress?  Yes, I would, in that instance.
20              If the same 10 booking photos and he's got
21    five in a red shirt, three in an orange, one in a
22    black and one in a blue, am I going to use that one
23    time that he was pictured in a booking photo in a
24    blue shirt to start his time over?  No.
25              So that's just one example, but, yeah, the
```

1   **context matters.**

2        Q.   Okay.  And again, because the context

3   matters, different gang officers could do that

4   different; correct?

5        **A.   Yes.**

6        Q.   Okay.  I don't think I have any further

7   questions.  Thank you very much for your time.  I

8   appreciate it.

9        **A.   Thank you.**

10                  **CROSS-EXAMINATION**

11   BY MR. BRANSON:

12        Q.   I just have a couple few to follow-up.

13            You were testifying earlier about

14   pretextual stops in regard to the task force.

15            When you were discussing pretextual stops,

16   does that mean that you could stop a person for any

17   reason that you wanted or did the stop have to

18   require a valid lawful reason?

19        **A.   It had to require a valid lawful reason.**

20        Q.   You also testified earlier about these two

21   individuals trespassing in the apartment parking lot

22   that had been a recent scene of a crime.  Do you

23   remember that?

24        **A.   I do.**

25        Q.   Okay.  Is trespassing a crime in the state