# EXHIBIT 6

**Filed Under Seal**



**Pohlman**USA®

Court Reporting and
Litigation Services

Chad Beard

December 19, 2022

Progeny, et al.

vs.

City Of Wichita, Kansas

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PROGENY, A PROGRAM OF      )
DESTINATION INNOVATION     )
INC., CHRISTOPHER          )
COOPER, ELBERT             )
COSTELLO, MARTEL           )   Case No.
COSTELLO, AND JEREMY       )   6:21-cv-01100-EFM-ADM
LEVY, JR., ON BEHALF       )
OF THEMSELVES AND          )
OTHERS SIMILARLY           )
SITUATED,                  )
                           )
            Plaintiffs,    )
                           )
    vs.                    )
                           )
CITY OF WICHITA,           )
KANSAS,                    )
                           )
            Defendant.     )
_____)


VIDEO DEPOSITION OF CHAD BEARD


The video deposition of CHAD BEARD, taken before
Nancy L. Rambo, RPR, CSR, at the law office of
Joseph, Hollander & Craft, Wichita, Kansas, on
the 19th day of December, 2022, commencing at
8:35 a.m.

1    A    **Most commonly, I mean, that's -- I would be**
2         **speaking with them.**
3    Q    Okay.  And when you say most commonly, would
4         they ever self-identify in a way that -- where
5         they didn't say I'm a gang member, I'm a member
6         of such and such?
7    A    **No, I mean, that -- if we're specifically**
8         **talking about this time, that's what they would**
9         **do, they would talk to me verbally.**
10   Q    Okay.  And would you ask them if they were
11        members of a gang?
12   A    **Yeah.**
13   Q    And --
14   A    **Yes.**
15   Q    -- and some of them would say yes?
16   A    **Yes.**
17   Q    Did any of them ever volunteer it without you
18        asking?
19   A    **Yes.**
20   Q    And under what circumstances would they do that?
21   A    **Sometimes it would be when they were upset,**
22        **angry at somebody else, they were actually**
23        **arguing or fighting with another person and they**
24        **were identifying what gang they were a part of.**
25   Q    So that wouldn't be a direct statement to you

```
 1        but --
 2   A    Correct.
 3   Q    -- you would hear them say that?
 4   A    Yes.
 5   Q    And you would mark that down as a
 6        self-admission?
 7   A    Yes.
 8   Q    Okay.  What if they didn't self-admit but you
 9        thought they met some of the criteria, what
10        would you do?
11   A    I would mark that criteria that I observed.
12   Q    What was the most frequent criteria that you --
13        that you noticed when you were a patrol officer?
14   A    Colors and associating with other known gang
15        members.
16   Q    So those were the two most often?
17   A    Yeah.  Yes.
18   Q    Okay.
19   A    You would see hand signs occasionally as well.
20   Q    Okay.  And once you turned those TOPS cards in,
21        did anything happen after that?
22   A    I don't know 'cause I would just submit them
23        with my paperwork, and I don't know what they
24        would do with them after I submitted them.
25   Q    Okay.  Did anybody ever call you up about a TOPS
```

```
 1   Q    Okay.  When you say you disseminated
 2        information, what did you -- what did you do to
 3        disseminate information, what kind of
 4        information were you disseminating?
 5   A    Again, mostly it was reference to the feuds that
 6        were going on between rival gangs.  So whether
 7        it be a bulletin that was sent out by an email
 8        or we would maintain a PowerPoint or, you know,
 9        kind of an ongoing this feud happened, this was
10        the next incident, this is -- you know, that
11        kind of thing, a running total, or tally, I
12        guess, of the incidents.  If we -- sometimes we
13        would go to squads and -- and verbally tell the
14        officers what's going on.  But most of the time
15        it was bulletins and keeping that information so
16        that we could provide it to the detectives when
17        a major incident happened.
18   Q    And who would get those bulletins?
19   A    Off -- anybody within the department, mostly
20        commissioned personnel.
21   Q    So anybody with -- police officers, all the
22        police officers in the WPD?
23   A    Correct.
24   Q    Okay.  As -- as a gang officer, did you still
25        fill out TOPS cards?
```

1         drawer.

2    Q    Okay.  At some point they were scanned

3         electronically?

4    A    Yes.

5    Q    Do you remember when that was?

6    A    I was on -- I was the night sergeant, and I know

7         Donnie Moore was the one that did it because he

8         was injured.

9    Q    Okay.

10   A    And so it had to be somewhere in that period

11        between 2015, 2018, I want to say, you know,

12        maybe 2016.

13   Q    Okay.

14   A    Somewhere in there.

15   Q    Okay.  And with respect to the locations, the

16        gang locations, is that just something that kind

17        of went around word of mouth, or was there,

18        like, somewhere I could go look and say, oh,

19        this is a gang hangout and this is a gang

20        hangout?

21   A    Yeah, for the gang intelligence officers, again,

22        it was only the four of -- are you talking

23        about -- I guess let me clarify.  Are you

24        talking about when I was a gang intelligence

25        officer or --

```
 1   Q    Let's start with that, yeah.
 2   A    Okay.  Yes, it was more of our experience, our
 3        knowledge, we recognized based on our experience
 4        that this was a gang-associated location.
 5   Q    Okay.  But there wasn't, like, someplace where
 6        you could go, like, look it up?
 7   A    No.
 8   Q    Okay.  So that was just based on your judgment
 9        and experience that you believed that area was
10        associated with gangs?
11   A    Yes.
12   Q    Why don't we kind of -- you've been -- you've
13        been in the gang unit for quite sometime, let's
14        see, how long, 2002 up to -- 20 years?
15   A    Yes.
16   Q    Almost 21?
17   A    Yes.
18   Q    Why don't you kind of walk me through how the
19        gang unit has changed over the years since you
20        were in it.
21   A    So when I got to the gang unit in 2002, it was,
22        again, four officers and there was a night
23        lieutenant.  I -- I can't remember what his name
24        is.  But -- and at the time, there was also
25        detectives that were on nights, and so that --
```

Page 215

```
 1   A    Yeah.  Unless they made it -- a notation on
 2        their list --
 3   Q    Okay.
 4   A    -- that we added this guy back.  But, again,
 5        we're -- when you -- when you have the list,
 6        we're only -- we're leaving the inactives out
 7        'cause we're not dealing with them.
 8   Q    So once you're made an active, how would you be
 9        reactivated?
10   A    You would have to meet all new criteria, whether
11        that's all three or you self-admit.
12   Q    Okay.  When you look at the criteria there in --
13        in Policy 527, are you comfortable with all
14        those, or do you think that there's some that
15        need to be modified?
16   A    On the -- from Policy 527 or from the state
17        statute?
18   Q    From Policy 527?
19   A    There's -- there's no criteria listed in Policy
20        527, I guess I don't -- I'm not --
21   Q    Okay.  I'm sorry then, take a look at the --
22   A    Okay.
23   Q    -- state statute, it just makes reference to it,
24        right?  Are there any criteria there that's in
25        Exhibit 5 that you -- that you think needs to be
```

```
 1        modified, or are you happy with all of them?
 2    A   The one personal thing that I -- I would like to
 3        have seen was if instead of just saying gang
 4        members it would -- I would like to have it
 5        clarified more as to a particular set, because
 6        right now it's just -- it's very general, like,
 7        has been stopped in the company of known
 8        criminal street gang members.  I have always
 9        made it a point to -- to, in my personal
10        opinion, that it should be of the same set if
11        you're going to document somebody.  Just because
12        they're hanging out with some -- another gang
13        member by chance doesn't necessarily mean that
14        that's -- but if they're regularly hanging out
15        with members of the Crips over and over and
16        over, then, yes, then that -- that gives me
17        reason to believe that they're associating with
18        the Crips.
19    Q   So other -- because otherwise you could have a
20        bunch of kids playing basketball and some of
21        them are on the -- you know, designated as Crips
22        and some are designated Bloods or one of them --
23        one each and they can be -- they can meet that
24        criteria of associating?
25    A   That is a specific example.  Again, I always
```

```
 1          talk common sense.  A basketball game, I'm not

 2          going to use that as -- as them associating

 3          with -- with criminal street gang members.  If

 4          it's on a car stop or, you know, hanging out at

 5          a club or -- or something, you know, that's a

 6          little bit more intimate.  I mean, I -- playing

 7          in a basketball game is not my consideration

 8          of -- of criminal street gang activity, unless

 9          there's -- they're throwing up hand signs and

10          all that stuff while they're doing it, but,

11          again, I wouldn't use that necessarily as -- as

12          criteria met.

13     Q    But if two -- if two -- two people from a

14          separate gang are hanging out at a club, that

15          could be associating with gang members?

16     A    It could, but, again, I always -- my preference

17          or my -- what I did with the database, I always

18          preferred it to be members of the same gang set,

19          especially the known members that they're known

20          to associate with.

21     Q    And that was your -- your way of handling it,

22          correct?

23     A    Yes, and I tried to pass that on as much as I

24          could to the other officers.

25     Q    But the way the statute's written you could --
```

```
 1        you could do it if it were just two different --
 2        two members of different gangs?
 3   A    Correct.
 4   Q    And -- and you think there were times that it
 5        actually happened, that somebody was -- met a
 6        criteria because of that?
 7   A    I think so, yes.
 8   Q    Okay.  Any -- anything else that you would --
 9        you would like to see modified in the statute?
10   A    The -- I wish they would have had, you know,
11        some type of -- oh, we have the -- the
12        expiration date, you know, if they would have
13        put in there that there -- you know, you will be
14        documented for two years --
15   Q    Uh-huh.
16   A    -- or whatever, make it kind of standard.
17        Looking back on some -- you know, having some
18        type of process to be notified or appeal, I
19        think, should be in the state statute so make it
20        standardized across the state.
21   Q    Because right now in the state statute, there's
22        no requirement for notification, correct?
23   A    Correct, yes --
24   Q    Okay.
25   A    -- there is no notification, there's no
```

```
 1          expiration date.
 2    Q     There's no way to get -- there's no way to get
 3          off?
 4    A     Right, and that's why the Wichita Police
 5          Department has an opportunity to get off the
 6          list.
 7    Q     Or become inactive at least?
 8    A     Yes.  I guess the other, you know, the
 9          associates one, I mean, again, try to narrow or,
10          you know, explain that a little bit better as to
11          what you're talking about, is it with a specific
12          gang, you know, I mean, or are you -- I guess I
13          would like some verbiage of some sort of, you
14          know, through my professional opinion or from,
15          you know, from other verifying information or
16          corroboration that I've -- I've been able to
17          or this is why this is this.
18    Q     Again, that's -- that's not required by the
19          statute?
20    A     It's not required but I know we -- we try to put
21          it in the database a lot.
22    Q     Sometimes you didn't?
23    A     Correct.
24    Q     Were there ever times when through the audit
25          process that -- that somebody was actually --
```

 1  BY MS. WOODY:

 2  Q    Go ahead, you can answer.

 3  **A    That appears to be the issue.  That sounds like**

 4  **a mistake from Sedgwick County.**

 5  Q    And so you routine -- you communicated with

 6       Sedgwick County and the parole and probation

 7       office to identify people who were on the gang

 8       list so that they could have these enhanced

 9       conditions, correct?

10  **A    Yes.**

11  Q    What other -- what other ramifications would

12       there be for somebody being listed on the gang

13       list?

14  **A    Again, the only other thing would be is we --**

15              MR. BRANSON:  Yeah, I'm going to

16          object to form, to being listed on the gang

17          list, if you'll clarify that.

18  BY MS. WOODY:

19  Q    Well, you were going to answer.  You -- if you

20       understand it, you can go ahead and answer.

21  **A    Well, the only other place I could see that they**

22  **have any type of extra enhancements, or**

23  **whatever, would be, again, back through KDOC and**

24  **if they're documented within the prison system**

25  **or, again, parole/probation is really the -- the**

```
 1           only -- besides the bond enhancement on the
 2           $50,000.
 3      Q    So when you say documented in the KDOC, when
 4           they were going to -- if somebody was going off
 5           to be incarcerated in the system, did you flag
 6           them as gang members?
 7      A    If KDOC requested our intelligence, then, yes,
 8           we would send that to them.
 9      Q    Did they do that routinely?
10      A    Yes.
11      Q    So was it -- would I say usually when somebody
12           was going to be incarcerated from Sedgwick
13           County, they would ask you about their status as
14           a gang member?
15      A    They often would, yes.
16      Q    Okay.  And so what would happen, would that --
17           would that person then be subjected to maybe
18           a -- a different facility or stricter scrutiny,
19           restrictions, do you know?
20      A    I --
21                    MR. BRANSON:  Object to form.
22      A    I don't know what happens within KDOC.
23      BY MS. WOODY:
24      Q    Okay.  So you don't know if that had any -- if
25           that had any effects on where the person would
```

```
 1   BY MS. WOODY:

 2   Q    Okay.  Did you have any -- was there any kind of

 3        extra monitoring or surveillance because

 4        somebody was on the gang list?

 5   A    That -- that would be fair to say.

 6   Q    And -- and -- and would that differ from --

 7        well, strike that.  So the fact that they were

 8        on the gang list would make you more likely to

 9        surveil them or monitor their -- their behavior?

10   A    Yes.

11   Q    Okay.  I'm going to switch topics here a little

12        bit, are you -- are you familiar with the term

13        mapping?

14   A    Yes.

15   Q    And what does mapping mean to you?

16   A    It's keeping certain individuals out of an area.

17        The -- the reason I know that is 'cause there's

18        the prostitution mapping that -- that the City

19        does, and we also had -- there's a drug mapping

20        program and -- and a gang mapping program.

21   Q    So explain to me generally how the mapping

22        programs work.

23   A    Again, this is set up through probation and

24        parole, not through us or the -- the Wichita

25        Police Department or the -- the gang unit
```

```
1          specifically.  So as part of their conditions
2          for probation, they are to stay out of certain
3          areas that have been identified by the probation
4          or parole area as being either high drug, high
5          crime, violence area without having a legitimate
6          reason to be there.
7   Q    And what would be a legitimate reason to be
8          there?
9   A    I think some of the things that I remember, like
10         visiting a parent or going to work, school.
11         I -- I know those off the top of my head.
12  Q    Okay.
13                   MS. WOODY:  Let's mark these two.
14                      (Deposition Exhibit Numbers 29 and
15                      30 Marked for Identification.)
16                   THE REPORTER:  29 and 30.
17  BY MS. WOODY:
18  Q    Okay.  Take a look at -- at Deposition
19         Exhibit 29, which is Wichita 079679 through 681.
20         You see that?
21  A    Yep.  Yes, sorry.
22  Q    And so have you seen a document like this
23         before?
24  A    Yes.
25  Q    And what is this?
```

```
 1   A    Well, he started the drug program before then,

 2        but I think it was sometime in 2019, 2020.

 3   Q    Okay.  And is it still in effect?

 4   A    No.

 5   Q    You said -- so it was in effect for a while and

 6        then it --

 7   A    Yes.

 8   Q    -- stopped?

 9   A    Yeah.

10   Q    Okay.  Let's take a quick break.

11             THE VIDEOGRAPHER:  Go off the record

12        at 2:43 p.m.

13                 (Thereupon, a recess was taken;

14                 whereupon, the following was had.)

15             THE VIDEOGRAPHER:  Okay.  We're back

16        on the record at 2:51 p.m.

17   BY MS. WOODY:

18   Q    Lieutenant Beard, I want to talk about another

19        area where -- where you have some experience,

20        and that is in gang-related testimony, okay?

21   A    Yes.

22   Q    So can you explain to me what gang-related

23        testimony is?

24   A    So often gang testimony comes in because of --

25        to explain the inexplicable is one of the -- to
```

```
 1          explain motive as to why an individual would --

 2          most of my experience is from -- is from

 3          homicides or shootings, why somebody would do

 4          the -- commit the crime because of it's gang

 5          motivated, gang related based on ongoing feuds

 6          between rival gangs.

 7     Q    So you would have an instance where a crime had

 8          been committed and there didn't appear to your

 9          average juror, for instance, to be a reason why

10          that happened, correct?

11     A    Correct.

12     Q    So gang-related testimony would be allowed in

13          that case to say, well, there was an ongoing

14          feud between, say, the Crips and the Bloods and

15          this guy's a Blood and the guy who got shot was

16          a Crip and that's because of all these other

17          things that have been going on, correct?

18     A    Yes.

19     Q    And in that gang-related testimony, are you

20          allowed to introduce historical information

21          about the gangs?

22     A    Yes.

23     Q    And are you allowed to introduce instances of

24          violence where the defendant was not involved?

25     A    Yes.
```

```
 1   Q    And then using your -- your expertise, I think
 2        you said you're allowed to some degree to
 3        speculate; is that correct?
 4   A    I'm allowed to give my opinion.
 5   Q    Okay.  And -- and -- and your opinion is based
 6        oftentimes on this historical information that
 7        you've testified to; is that right?
 8   A    That's part of it, the historical information,
 9        and then usually whatever occurred with that
10        specific incident.
11   Q    Okay.  And so you give your opinion that the --
12        that the motive for the shooting was because of
13        a gang feud, for instance; is that right?
14   A    Yes.
15   Q    And that is evidence that if the person were not
16        on the gang list would not ever be admissible;
17        is that right?
18             MR. BRANSON:  Object to form.
19   A    I'm sorry, could you -- could you say that
20        again?
21   BY MS. WOODY:
22   Q    Sure.  That's evidence that if the person wasn't
23        on a gang list would not be admissible?
24             MR. BRANSON:  Object to form.
25   A    If they weren't on the gang list?  I wouldn't
```

```
 1          say that that's not possible; just because

 2          they're not on the list doesn't mean that it

 3          could be a gang-related, motivated incident.

 4     BY MS. WOODY:

 5     Q    Okay.  But if you have two instances where

 6          there's been a homicide and in one instance you

 7          have somebody who was designated as a gang

 8          member and in the other instance neither party's

 9          designated as a gang member, the first instance

10          you can -- you're allowed to introduce evidence

11          of a lot of other violent acts and so forth in

12          that case, correct?

13                    MR. BRANSON:  Object to form.

14     A    If it's a gang-motivated incident, yes.

15     BY MS. WOODY:

16     Q    And in the second case, none of that testimony

17          would be allowable?

18                    MR. BRANSON:  Object to form.

19     A    If it's not a gang-motivated incident, yes.

20     BY MS. WOODY:

21     Q    And the -- the -- the person who is testifying

22          that it is a gang-related incident or

23          gang-motivated incident is you, correct?

24     A    I'm -- I have been one of the persons, yes.

25     Q    Okay.  And so how do -- how is it determined
```