IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

PROGENY, et al,             )    Case No.

vs                         )    6:21-CV-01100-EFM-ADM

                            )

CITY OF WICHITA, KANSAS, )

Defendant.             )

VIDEO-RECORDED ZOOM DEPOSITION OF

JEFF EASTER

VOLUME I

May 18, 2023

10:42 a.m.

Taken at:

Stinson Law Firm

1625 North Waterfront Parkway, Suite 300

Wichita, Kansas

Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR

PohlmanUSA Court Reporting

(877) 421-0099    PohlmanUSA.com

Page 18

1  East on 3rd shift; is that correct?
2       A. That is correct.
3       Q. And then you were a lieutenant over the
4  Felony Gang/Felony Gang Unit; is that right?
5       A. The Gang/Felony Assault Unit; yes,
6  ma'am.
7       Q. When did you become in charge of the
8  Gang/Felony Assault Unit?
9       A. 2005, I believe.
10      Q. All right, and how long were you in
11 that position?
12      A. Until 2008.
13      Q. And then you were a captain at Patrol
14 North for four years before you became Sheriff; is
15 that correct?
16      A. That is correct. I would have to look
17 at my resume to get you exact dates to be real
18 honest with you but that's what I recall is that
19 time frame.
20      Q. Okay. Back when you were with the TOPS
21 Unit you said that you were housed with the Gang
22 Unit; is that correct?
23      A. That is correct.
24      Q. What time frame was that?
25      A. 1996 to 1998.

Page 19

1       Q. What was the Gang Unit back in
2  1996-'98? Was it the same as it is today with Gang
3  Intelligence officers or --
4       A. It was Gang Intelligence officers and
5  at that point they pretty much worked first shift.
6       Q. Okay. Just explain what first shift is
7  for us.
8       A. Somewhat eight to five hours. They did
9  periodically ride different shifts on 2nd and 3rd
10 shift but their main hours were 8 to 5.
11      Q. Just tell us what second shift is and
12 what 3rd shift is as well.
13      A. Second shift is generally 2:30 p.m. to
14 10:30 p.m.. Third shift is 10:30 p.m. to 7:00 a.m.
15      Q. What were the responsibilities of the
16 Gang Unit back in 1996?
17      A. Again, I didn't work in the unit but
18 their main responsibilities were to insure that
19 individuals that were being placed on the list, we
20 had what was called TOPS cards that officers would
21 send in with their belief of individuals that were
22 gang members. The Gang Intelligence section would
23 do all the backgrounds on those particular people
24 and then see if they fit at that point the WPD
25 criteria to be on the gang list. They would also

Page 20

1  research those individuals once a year and see if
2  those individuals would no longer fit the criteria
3  and they would pull them from the list. They would
4  also go out and do gang enforcement with the SCAT
5  teams, which back then most of the gang members
6  were selling narcotics and so that was generally
7  the enforcement along with the violent crime that
8  involved the gang members at the time.
9       Q. Okay. You say that the WPD had
10 criteria then with respect to the TOPS cards.
11      A. Correct.
12      Q. What criteria was the WPD using back in
13 the 1996-'98 time frame?
14      A. It was very similar to what the state
15 law is now. For me to be able to go through each
16 one of those criteria I'm not going to be able to
17 do that for you. I haven't done that business for
18 14 years and we're talking 1997 for that. So I
19 know you had to fit three of the criteria to be put
20 on the list as a gang member. Some of that
21 criteria that I recall is that they self-admitted
22 that they were gang members; that they committed
23 violent crimes that were gang-related and that they
24 wore similar colors. It was a criteria of the gang
25 was three or more people that are involved. That's

Page 21

1  just generally -- there was more to it but I don't
2  remember what all of that is without somebody
3  putting a paper in front of me and saying yes,
4  those are it.
5       Q. When you joined the WPD was there a
6  Gang Unit at that point in time?
7       A. Yes, there was.
8       Q. Who was in the Gang Unit?
9       A. It was an Officer Baughman and Officer
10 Carey.
11      Q. Just those two? Were they the complete
12 Gang Unit?
13      A. Yes, ma'am.
14      Q. And what did they do?
15      A. A lot of times if we were out on
16 violent crimes such as drive-by shootings,
17 homicides, those type of things, they would come by
18 if it appeared that there were gang members
19 involved. At that point I don't believe there was
20 any type of criteria and it was a very loosely put
21 together type unit along with criteria to actually
22 say people were gang members.
23      Q. When you say criteria, you mean the
24 criteria was loose as well?
25      A. Yes. I don't believe there was any

Page 22

```
 1  criteria at that point.
 2       Q.  Do you know how those individuals then
 3  decided that people were members of gangs?
 4       A.  I do not.
 5       Q.  Do you know when the criteria came into
 6  effect?
 7       A.  I know when I was assigned to the TOPS
 8  Unit in '97 there was a criteria that had been
 9  created and it was being followed.
10       Q.  Do you know who created it?
11       A.  I do not.
12       Q.  Was John Spear involved in creating it?
13       A.  I do not know if he was involved at
14  that point at all.
15       Q.  Do you have any idea of anyone who was
16  involved in developing the criteria?
17       A.  Again, I wasn't part of the Gang Unit
18  at that point. I was out on the streets. You
19  know, I can give you the names of the folks that
20  were in the Gang Unit at the time. Maybe they can
21  tell you how that was created but I would be
22  guessing because I do not know.
23       Q.  Sure. Why don't you give me their
24  names.
25       A.  That would be Lance Darling, Tracey
```

Page 23

```
 1  Repp.
 2            MR. COOPER: Can you spell that?
 3       A.  Tracey, T-R-A-C-E-Y; R-E-P-P; Carlton
 4  Rogers.  There was a 4th one but I do not remember
 5  who that was at this point.
 6       Q.  (By Ms. Woody) So by the time you were
 7  there in 1996 they were already using some criteria
 8  and I think you said that at the time you think it
 9  was similar to what the criteria is being used
10  today; is that right?
11       A.  That is correct.
12       Q.  But you don't know exactly how that
13  criteria was arrived at?
14       A.  No, I do not.
15       Q.  Do you know at the time you were -- at
16  the time you joined the police force was there
17  anything such as a gang list or a gang database?
18       A.  At the time that I joined it no, there
19  was not.
20       Q.  At some point in time after you joined
21  did there become a gang list or a gang database?
22       A.  Yes, there did.
23       Q.  When was that?
24       A.  I know that I believe it was in
25  1998-'99 time frame there was a grant that was
```

Page 24

```
 1  given and so I know that there was a list created
 2  already but it was a paper list and then there was
 3  a grant that was received to place computers in
 4  each one of the bureaus and the gang database you
 5  could access it from those computers.  I'm thinking
 6  that time frame was '98-'99.
 7       Q.  And you say prior to there being a
 8  computerized gang list that you could access
 9  through the computers there was already a paper
10  list; correct?
11       A.  That is correct.
12       Q.  And who was in charge of that paper
13  list; do you know?
14       A.  I have no idea.
15       Q.  Do you know how the paper list was
16  created?
17       A.  No, I do not.
18       Q.  Was there -- did you ever have any
19  interactions with an individual named Bob Bachman?
20       A.  He was a beat officer with the Wichita
21  Police Department at the same time frame that I was
22  with the police department.
23       Q.  At least some people have said that Mr.
24  Bachman may have been the source of the original
25  list because he kept cards on people in his patrol
```

Page 25

```
 1  car.  Do you know anything about that?
 2       A.  I know he had an extensive, in his
 3  trunk, mug photos of individuals, not just gang
 4  members and, in fact, we emulated that process as
 5  beat officers of individuals that we were dealing
 6  with, not just gang members, but individuals we
 7  were dealing with on a consistent basis that we
 8  kept mug photos in a storage kind of bin in our
 9  vehicles.
10       Q.  Was that something that you emulated --
11  Mr. Bachman was the first one you were aware of
12  doing that and then other officers started doing it
13  as well?
14       A.  That is correct, ma'am.
15       Q.  And you said it wasn't specifically
16  related to gang members at that time?
17       A.  No.  I know I had mug photos that
18  consisted of people that were burglars, people that
19  were committing robberies, people that were
20  committing violent crime.  Most of mine consisted
21  of individuals -- I rode 42-Beat.  Most of mine
22  consisted of individuals that lived on the 42-Beat
23  that were known burglars, known people to commit
24  drive-by's, known people that committed violent
25  crimes.
```

7 (Pages 22 to 25)

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com

Page 26

1  Q. At some point in time was there a
2  decision to divide some of those people out into
3  who were gang members were and who were not?
4  A. I did not do that with what I had, no.
5  Q. Do you know if there was a department
6  decision to do that?
7  A. Well, at some point the department made
8  the decision to actually have the criteria that I
9  talked to you about before and to have a gang
10 database.
11 Q. Do you when that was?
12 A. No, ma'am, I do not.
13 Q. But it would have been prior, you
14 think, to 1998?
15 A. Yes. I know that -- again, 1996 I was
16 assigned to the TOPS Unit and the gang database was
17 already in existence then.
18 Q. Okay. So you had been with the WPD at
19 that point in time about what?
20 A. Seven years.
21 Q. Seven or eight years? Seven years, and
22 you said it wasn't there when you joined the WPD
23 but it was there by the time you were in the TOPS
24 department in 1998; correct?
25 A. In 1996, yes, ma'am.

Page 27

1  Q. 1996. Excuse me, 1996. So at some
2  point during those seven years a gang list was
3  developed?
4  A. A gang database, yes, ma'am.
5  Q. Okay. Did you ever hear of anybody who
6  was involved in developing that list?
7  MR. COOPER: Object to form.
8  Q. (By Ms. Woody) You can answer.
9  A. I mean, it was -- there was numerous
10 people that went through the Gang Unit. There was
11 different supervisors. To tell you who actually
12 created that I wouldn't know that.
13 Q. Okay. So during the time from the time
14 that you joined the WPD up until 1996, who would
15 have been the folks in charge of the Gang Unit?
16 A. I don't remember, ma'am.
17 Q. Was John Spear one of those people?
18 A. He was at one point in charge of the
19 Gang Unit. For me to be able to tell you what
20 those dates are, you would have to ask him because
21 I don't remember when he became in charge of the
22 Gang Unit.
23 Q. So in 1996 there were already criteria
24 and there was already a gang list. Was there
25 criteria memorialized anyplace? Was it written

Page 28

1  down anywhere?
2  MR. COOPER: Object to form.
3  A. So there was -- computers were just
4  being introduced and I know the gang officers had
5  the gang database in their computers, their desktop
6  computers. They would print the list from there to
7  be able to provide that to different officers in
8  the field or different units.
9  Q. (By Ms. Woody) So they could print that
10 out and give it to anybody, any officer they
11 thought needed it or should have it; is that right?
12 A. That is correct.
13 Q. Was there any way at that point in time
14 when that was on the desktop, was there any other
15 way for any officers to access that list?
16 A. Not at that time.
17 Q. At some point in time other officers
18 did become able to access the database; is that
19 correct?
20 A. That is correct.
21 Q. When was that?
22 A. That part I know John Spear -- I don't
23 know if he was the sergeant or the lieutenant in
24 the Gang Unit. I don't remember that, but the
25 grant that I talked about previously that they were

Page 29

1  able to get laptop computers to each bureau so that
2  the gang database could be accessed by the
3  computer. So that would have been 1997 or 1998.
4  Q. Okay. So in 1997 or 1998 they were able
5  to fund some laptops and I think Mr. Spear
6  testified that he got a grant in order to be able
7  to do that. Do you recall anything about that?
8  A. Yes. I'm aware that they were able to
9  get a grant to be able to get those computers.
10 Q. Okay, and were the computers in every
11 patrol car?
12 A. No. It was one per bureau and then
13 they also gave one to the Sheriff's Office.
14 Q. Okay. So anybody in the bureau could
15 use the laptop computer to access the database; is
16 that accurate?
17 A. So the way that it worked, because I
18 was in charge of the SCAT team in south Wichita
19 when that happened, that computer was with the SCAT
20 team because again, they did the field work on low
21 level narcotics and gang crimes and so they are the
22 ones that kept the computer. If people or people,
23 if officers were wanting to know hey, is this
24 person in the gang database, one of those SCAT
25 officers would look it up and let them know.

Page 30

1   Q.  Okay. So again, it was so you could
2   request it -- there was more people you could
3   request it of at that point in time; is that right?
4   A.  That would be right.
5   Q.  And at some point in time did it become
6   even more accessible to officers in the WPD
7   and employees in the WPD?
8   A.  Yes, it did.
9   Q.  When was that?
10  A.  That part I don't know when that
11  occurred actually. Again, I left the SCAT Unit and
12  went to Night Investigations. I know that there
13  was more accessibility. I don't remember how that
14  happened; if it was -- there became more
15  accessibility when MCTs came on and that would have
16  been about 1998 or '99 that you could access the
17  gang database from your MCT, but how all that
18  happened I don't know. When I took over the Gang
19  Unit in 2000 and again in 2003, 2004, those things
20  were set in place already.
21  Q.  When you say MCT, can you explain what
22  you mean.
23  A.  Mobile Computer Terminal. So it's the
24  laptops that are in the squad cars.
25  Q.  Okay. So at that point in time any

Page 31

1   officer could access from the squad car -- could
2   access the gang database from the squad car; is
3   that correct?
4   A.  That is correct.
5   Q.  And at some point it was becoming even
6   more available to employees of the police
7   department.
8   A.  I know when I was in the Gang Unit
9   that's how everybody was accessing it, including
10  our detectives. They would have the gang database
11  on their desktops and so it was very accessible to
12  pretty much every member of the Wichita Police
13  Department at that point for Read Only.
14  Q.  Right, meaning they could look at it
15  but they couldn't make changes to it on their own;
16  correct?
17  A.  They could not make any changes to it;
18  that is correct, ma'am.
19  Q.  At some point in time did the
20  department decide to formalize the gang database
21  into some kind of a formal policy?
22  A.  Yeah. I do recall that there was a
23  policy on it. I don't remember when that actually
24  happened, though.
25  Q.  Do you know who was involved in

Page 32

1   creating that policy?
2   A.  No, I do not recall at this point.
3   Q.  And that was a policy, a written policy
4   that somebody could look at and say okay, here's
5   what the criteria are; correct?
6   A.  Correct.
7   Q.  Was it always called Policy 527 or was
8   it referred to by some other name earlier on?
9   A.  I'm sorry, ma'am, I have been gone from
10  there for so long I couldn't tell you.
11  Q.  Okay. How has that written policy
12  distributed and when do you recall it being
13  distributed? When did you become aware of it as a
14  written policy?
15  A.  Well, to answer your second question, I
16  don't remember. To answer the first question,
17  generally over at the police department the way
18  that would work is they would create a new policy.
19  In squads they would pass it out to you. We had
20  what was called a Blue Book and you were required
21  to read the policy and then place it into your Blue
22  Book which contained all of our policies. That
23  Blue Book had to be with you inside your squad car
24  while you were working.
25  Q.  When you were with the TOPS department

Page 33

1   was that policy in the Blue Book?
2   A.  Ma'am, I don't remember when it was
3   created.
4   Q.  Okay, and you don't know who was
5   involved in creating it?
6   A.  No, ma'am.
7   Q.  At any time were you involved in
8   reviewing the policy with respect to the gang
9   database?
10  A.  Yes, I was.
11  Q.  When was that?
12  A.  It's when I took over the Gang/Felony
13  Assault Unit is when I was responsible for making
14  sure that all policies related to the Gang/Felony
15  Assault Unit and the Gang Unit, which this policy
16  would have fell underneath it, were reviewed yearly
17  and any updates that were made to it was my
18  responsibility.
19  Q.  Okay. So that would have started
20  sometime around 2003, 2004 when you became
21  lieutenant over the Gang Unit; is that right?
22  A.  That would be correct.
23  Q.  And at that time you do recall that
24  there was a written policy; correct?
25  A.  Yes, ma'am, there was.

9 (Pages 30 to 33)

Page 34

1  Q. Was it called -- was it Policy No. 527
2  at that time?
3  A. Ma'am, I don't remember the policy
4  number on it.
5  Q. Okay. So after you became the
6  lieutenant over the Gang/Felony Assault Unit, did
7  you make any changes to that policy regarding the
8  gang database?
9  A. Well, I would have had to make policy
10 changes because I'm the one that authored at the
11 authority of the mayor, which was Carl Brewer, and
12 the police chief, which was Norman Williams, the
13 state statute on gang laws and so once that state
14 statute, what I wrote and submitted was there was
15 changes made going through the legislative process
16 and then when they passed that legislation then I
17 updated that policy to reflect exactly what was in
18 the state statute.
19 Q. Okay. So you are the individual who
20 actually drafted the policy that then went to
21 legislation and became state law; is that right?
22 A. I drafted the state law proposal.
23 Q. Okay, and when you say the state law
24 proposal, did that include criteria and those kind
25 of things?

Page 35

1  A. Yes, ma'am, it did.
2  Q. And I think you said you drafted the
3  state law proposal at the request of Mayor Brewer
4  and Chief Williams; is that right?
5  A. Mayor Brewer and yes, ma'am.
6  Q. Brewer, excuse me, and Chief Williams?
7  A. Yes, ma'am.
8  Q. And then so roughly when was that?
9  A. 2007.
10 Q. Do you recall as it went through the
11 legislative process any changes that were made to
12 your proposal?
13 A. I don't recall what the changes were.
14 However, there was changes made by the legislative
15 committees on the original proposal.
16 Q. Do you recall what -- did you have any
17 concern about any of those changes that were made?
18 A. No, ma'am, I did not.
19 Q. Did you think they were significant
20 changes from what you had proposed?
21 A. No, they were not.
22 Q. So it mostly followed the proposal that
23 you had drafted; is that correct?
24 A. Yes, ma'am.
25 Q. And how did you go about drafting that

Page 36

1  proposal? What did you use to come up with that
2  proposal for the state law?
3  A. So there were several things that
4  happened there. During that time frame and prior
5  to that time frame we were having a lot of violent
6  crimes mainly perpetrated by gang members. We had
7  a lot of narcotics trafficking that was being
8  perpetrated by gang members as well and so the
9  mayor had tasked us, even when I was a sergeant, so
10 this started when I was a sergeant, that we meet
11 with the community; mainly the northeast Wichita
12 community, which is predominantly African American,
13 to come up with a gang plan on how to address the
14 issues taking place with the gangs here in Wichita.
15 We had numerous meetings with the groups of
16 citizens from the NAACP to different church groups
17 that had members in it to other neighborhood
18 association presidents, some of their members and
19 those meetings were taking place for almost a year.
20 So we came up with a gang plan. We also -- there
21 was questions about the gang criteria that we were
22 using. There was questions about why it doesn't --
23 Hutchinson and Salina and other people have that
24 kind or other departments have that kind of
25 criteria in amongst their departments because a lot

Page 37

1  of those departments had nothing, but they were
2  saying that these people were gang members in their
3  community. So through those meetings and through
4  the guidance of Chief Williams, Lieutenant Spear at
5  the time and Captain Coy Lee and Colonel Tom
6  Stoltz, they were all involved in those meetings as
7  well. When I became the Gang/Felony Assault
8  lieutenant we had the gang plan in place and then
9  the discussions started more so with the different
10 groups in reference to the criteria. So I reached
11 out to different departments around the state of
12 Kansas. I know that Kansas City, Kansas had a very
13 similar gang policy and very similar type of gang
14 criteria and it was very obvious that there was no
15 set standard in the state of Kansas. So I
16 researched several states, including Florida,
17 Kentucky and Georgia where they had state laws in
18 place. A lot of their criteria was similar to what
19 we had already and so I drafted the state law
20 change to create state law for gang criteria in the
21 state of Kansas based upon some other states laws.
22 I submitted that. The process over there is I had
23 to submit it to the Law Department who made some
24 minor changes, who then submitted it to the
25 Legislature for them to put into a committee,

Page 38

1  debate it and then take a vote on it.
2      Q. And you say you started working on this
3  when you were as a sergeant; is that right?
4      A. The gang plan was as a sergeant. As a
5  lieutenant I was asked -- during the gang plan
6  discussions the criteria came up and so once I
7  became a lieutenant because of the research I had
8  done already as a sergeant on the criteria, I was
9  asked by the Chief and the Mayor to put together a
10  state law proposal for the criteria itself.
11      Q. Okay. When you talk about the gang
12  plan, explain what that was.
13      A. We, several years prior when I was a
14  beat officer, when we had a lot of violent crime, a
15  lot of shootings, a lot of drive-by's in the early
16  '90s, there was no plan. So what happened is, is
17  individuals or officers from different bureaus were
18  placed in the North Bureau to crack down on the
19  violent crime. We learned from our mistakes on
20  that because pretty much the gang members would go
21  under because they knew there were no more cops so
22  the only people that were really being stopped and
23  ticketed were citizens that had nothing to do with
24  gang crime; they just lived there and there was
25  quite the amount of frustration from the community

Page 39

1  about that and so when we had a resurgence in gang
2  crime and violent crime the decision was made to
3  sit down with citizens and map out a gang plan that
4  was put into writing.
5      Q. What was in that gang plan?
6      A. How we were going to target specific
7  individuals that were committing the crimes; how we
8  would go about enforcing those type of different
9  type of enforcement tools that we were doing
10  specific to the individuals that were perpetrating
11  those crimes; how we would communicate at
12  neighborhood associations with the amount of crime
13  that was taking place in their neighborhoods. We
14  would update them on cases that were taking place
15  and we would involve them more in Wichita Police
16  Department operations.
17      Q. When you say you were going to target
18  the individuals, what do you mean by that and how
19  was that going to be accomplished?
20      A. Individuals that were suspects in
21  cases, that we would conduct surveillance on them
22  and any type of crime that they committed, that we
23  would hold them responsible for that by arresting
24  them, sticking charges on them and hopefully
25  convictions. Also, once they were convicted --

Page 40

1  also, once they were convicted we monitored, along
2  with Parole and Probation, their -- that's what the
3  TOPS Unit did. We monitored if they were abiding
4  by the rules that their probation or parole officer
5  put on them because there's not enough parole or
6  probation officers to monitor them to make sure
7  that they are not drinking, to make sure that they
8  were within curfew and they were not committing new
9  crimes. So we supplemented that and we
10  communicated that information in our gang plan with
11  the citizens of Wichita.
12      Q. Did the gang plan have anything to do
13  with the specific probation or parole conditions
14  that would be imposed on somebody who was
15  designated a gang member?
16      A. The gang plan did not. However, state
17  statute did.
18      Q. And when you say that what do you mean?
19      A. Part of the state statute was if you
20  were a known gang member and committed a violent
21  crime your bond was automatically set at $50,000.
22      Q. Was that something that you drafted?
23      A. It is.
24      Q. What did you base that on?
25      A. Other laws and the fact that a lot of

Page 41

1  individuals that were committing violent crime were
2  immediately getting out of jail, were harassing and
3  intimidating witnesses and then the case would no
4  longer go forward or were committing other violent
5  crimes against witnesses and other people such as
6  drive-by shootings and murders. So that was
7  proposed and the Legislature agreed with that
8  proposed and passed it into state law.
9      Q. And that proposal was specific to
10  people who had been designated by some local entity
11  as a gang member; correct?
12          MR. COOPER: Object to form.
13      Q. (By Ms. Woody) Go ahead. I'm sorry, I
14  didn't understand you.
15      A. Following our criteria, if they reached
16  the level that they were a known gang member based
17  on our criteria, so yes.
18      Q. So people who were -- other folks who
19  weren't designated as gang members who engaged in
20  person felonies were not subject to the minimum
21  $50,000 bond?
22      A. By state statute, no, they were not.
23      Q. By Wichita policy were they?
24          MR. COOPER: Object to form.
25      A. We do not have a policy on what bonds

Page 42

1  would be. That was set by state statute. Bonds
2  are also set by judges.
3      Q. (By Ms. Woody) And so you are the
4  person who drafted the mandatory, the $50,000
5  minimum for gang members and that's in the state
6  statute; correct?
7      A. That is correct.
8      Q. And it wasn't meant to apply to
9  individuals accused of the violent crimes or person
10 crimes who weren't gang members; correct?
11     A. No, it was not because what we were
12 seeing was those folks weren't the ones that were
13 going back out and re-victimizing people
14 immediately, nor were they the ones harassing
15 and/or intimidating witnesses to the point where
16 they would not testify.
17     Q. Did you work with the District
18 Attorney's Office in Wichita on any of these state
19 proposals that you made?
20     A. Yes, I did.
21     Q. Who at the District Attorney's Office
22 did you work with?
23     A. So they had a specific unit over there
24 that dealt with nothing but the gang crime. I
25 would have to get back with you -- she's gone from

Page 43

1  there now. I would have to get back with you on
2  her name. She was in charge of the Gang Unit over
3  there and I cannot remember her name.
4      Q. Okay. When would this have been, like,
5  time frame?
6      A. It would have been around -- well, when
7  I was in the Gang Unit, the 2004 to 2007 time
8  frame.
9      Q. So there was an individual over at the
10 D.A.'s Office who was responsible for gang crime or
11 oversaw the gang crime and you think that
12 individual, you think it's a woman, was involved in
13 the state proposal; is that right?
14     A. She is the one I worked with at the
15 D.A.'s Office and also on all crimes that we were
16 dealing with and then also that I had spoken to and
17 worked with to find out the DA's opinion on the
18 $50,000 set bond on folks that commit violent
19 crimes that were gang members. CJ Riggs is her
20 name; CJ Rigg.
21     Q. Okay. So you worked with Ms. Rigg to
22 see how the D.A.'s Office felt about the $50,000
23 minimum bond; is that right?
24     A. That is correct.
25     Q. Did she have to get -- did she have to

Page 44

1  get sign off from somebody else in the D.A.'s
2  Office for that?
3      A. I don't know the answer to that.
4      Q. Do you happen to recall her having any
5  discussions with you about who or about what
6  discussions were from the D.A.'s Office about that
7  bond number?
8      A. So her boss would have been Kim Parker.
9  The DA at the point was Nola Foulston. I do know
10 that she didn't make the decision on her own but
11 she would have to speak with them. I wasn't privy
12 to those discussions and she relayed back to me
13 that they were fine with that proposal.
14     Q. Okay. So then that went on to the
15 State, went into the state proposal and went on to
16 become law under statute; is that correct?
17     A. That is correct.
18     Q. And I guess my initial question was a
19 little bit different than that so I kind of want to
20 circle back to that. In Wichita, people who are
21 designated as gang members get more restrictive
22 parole and probation conditions and I wanted to
23 know if part of the gang plan involved beefing up
24 and making more restrictive those conditions of
25 probation and parole.

Page 45

1      MR. COOPER: Object to form.
2      A. So the reason the TOPS Unit was created
3  was specifically for that because we, when you have
4  more drive-by shootings than there are days in the
5  week, our homicides were a lot higher, most of
6  which was gang-related. The Chief and at the time
7  the colonel and those types of folks were like what
8  are we going to do to curb some of this because we
9  have -- we were hearing from the citizens, mainly
10 in northeast Wichita, that they were scared to
11 death to even be outside and so that's the time
12 that we started meeting with them, started talking
13 about additional type of -- I'm trying to search
14 for the word here, probation type items,
15 restrictions placed upon known gang members that
16 they couldn't affiliate at certain places; that
17 they couldn't affiliate with other gang members;
18 they couldn't wear colors, those types of things.
19 Were those placed onto known gang members as
20 restrictions by Probation and Parole, yes, they
21 were.
22     Q. And was it the TOPS unit that suggested
23 those restrictions or formulated them?
24     MR. COOPER: Object to form; foundation.
25     A. I know when I was in the TOPS Unit with

Page 54

1  A. Early on when we talked about the
2  original two gang officers, absolutely that was a
3  concern. A lot of us questioned how people were
4  even -- because there was no criteria, and how
5  people were being placed onto the gang database.
6  At a certain point somebody made the decision, I
7  can't tell you who that is, to create the criteria
8  and to start utilizing that criteria to put people
9  into the gang database. I know that in the
10 beginning of that that whole database was scrubbed
11 so everybody that was on there that was placed on
12 there by the original two officers were deleted
13 because it was very questionable on how that
14 started. That's why we or the police department at
15 the time decided we have got to have criteria, we
16 have to set by that criteria. We have to also
17 audit those individuals because someone might be a
18 gang member when they are 17 or 18 doesn't mean
19 they are a gang member for life. So that's how
20 that occurred and kind of the maturation of how the
21 gang database created into this criteria and then
22 the criteria was put into state law.
23  Q. Do you remember the time when the
24 original gang database that was put together by the
25 two was scrubbed?

Page 55

1  A. No. I just know that that occurred.
2  Q. And how do you know that that occurred?
3  A. Because when I went up to the TOPS Unit
4  two of the officers up there were involved in that
5  process prior to me coming up there.
6  Q. Who were those officers?
7  A. I believe it was Lance Darling and
8  Tracey Repp.
9  Q. Did they tell you when they were
10 involved in that process?
11 A. No, they did not.
12 Q. Do you have a sense of right before you
13 joined the TOPS Unit or earlier?
14 A. Well, I believe it was earlier but I
15 couldn't -- I don't know when. I just know that
16 they had told me that that -- we all had concerns
17 about the original gang officers. We're not hiding
18 that. I'm not hiding that fact, and how people
19 were put on there didn't agree with because I can
20 tell you there was folks that they were telling me
21 were gang members that I was telling them, no, they
22 are not and there was -- they were using well, they
23 got arrested for minor offenses such as drinking
24 and those type of things. That's not a gang
25 related offense, and so a lot of us questioned that

Page 56

1  process back in the early '90s. Obviously somebody
2  within the police department questioned that
3  process, too. That's why the new criteria was
4  developed and those type of things, and I know
5  Lance and Tracey were involved with scrubbing that
6  particular list. When that occurred, I can't tell
7  you for sure. I know it was done when I came there
8  in '96.
9  Q. Okay, and so sometime you think in the
10 early '90s that the criteria probably came into
11 place and became a new standard for putting people
12 in the gang database; correct?
13 A. Correct.
14 Q. After that did you ever have -- after
15 the criteria were in place did you ever have -- did
16 anyone ever have concerns about whether those
17 criteria were correct or whether they were
18 sufficiently objective; I mean, anything like that?
19 A. No, and actually, the state legislature
20 confirmed that they were okay with it as well.
21 Q. So you don't recall within the WPD ever
22 having any discussions about a need to change the
23 criteria during the time that you were with the
24 WPD?
25 A. I'm trying to think back in -- well,

Page 57

1  other than in the early '90s, yes, those
2  discussions took place in the early '90s.
3  Q. But after the criteria was put into
4  place, after the initial scrubbing and you had the
5  criteria put in place, were you aware of anybody
6  within the WPD who had concerns about any of the
7  criteria being appropriate or overinclusive or
8  anything like that?
9  A. Within the WPD -- so I'm trying to
10 think here is, I'm trying to remember if after the
11 TOPS Unit and when I left there to become a
12 detective if there were some changes in the
13 criteria because I know when I got back to the Gang
14 Unit as a sergeant that is pretty much the same
15 criteria other than what I drafted for state law
16 and there were some changes made by the Law
17 Department and the legislation, there was some
18 changes to the criteria that was made that was set
19 into state law than what I proposed.
20 Q. During our discussions do you now have
21 any recollection of what those changes were?
22 A. I'm sorry, I do not -- yeah, I do not
23 remember what those were.
24 Q. But I think you said it was not really
25 significant and were minor changes. Is that still

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PROGENY, a program of Destination      )
Innovation, Inc., CHRISTOPHER           )
COOPER, ELBERT COSTELLO, MARTEL         )
COSTELLO, and JEREMY LEVY, JR.,         )
on behalf of themselves and others      ) Case No.
similarly situated,                     ) 6:21-CV-01100
   Plaintiffs,                          ) EFM-ADM
vs                                      )
CITY OF WICHITA, KANSAS,                )
   Defendant.                           )
_____)

VIDEO-RECORDED ZOOM DEPOSITION OF
JEFF EASTER
VOLUME II
May 26, 2023
2:35 p.m.

Taken at:
Sedgwick County City Building
455 North Main
Wichita, Kansas 67202
Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR

APPEARANCES:
   On behalf of the Plaintiffs:
      Ms. Teresa A. Woody
      Kansas Appleseed Center for Law & Justice
      211 East 8th Street, Suite D
      Lawrence, Kansas 66044
      (785)251-8160
      twoody@kansasappleseed.org

      Mr. Paul M. Vogel (Appearing through Zoom)
      Shook, Hardy & Bacon, LLP
      2555 Grand Boulevard
      Kansas City, Missouri 64108
      (816)474-6550
      pvogel@shb.com

   On behalf of the Defendant, City of Wichita:
      Mr. David R. Cooper
      Fisher, Patterson, Sayler & Smith
      3550 SW 5th Street
      Topeka, Kansas 66606
      (785)232-7761
      Fax: (785)232-6604
      dcooper@fpsslaw.com

TRANSCRIPT INDEX
APPEARANCES..................................

EXAMINATION OF JEFF EASTER - VOLUME II
BY MS. WOODY.................................
BY MR. COOPER................................

REPORTER'S CERTIFICATE.......................

VIDEOGRAPHER: We are now on the record. This is the continued videotaped deposition of Jeff Easter. Today's date is May 26, 2023, and the time is 2:35 p.m. Central time. My name is Jackie Jones, the videographer. The court reporter is Kathy Bonfiglio, also with PohlmanUSA Court Reporting. All counsel will be reflected on the stenographic record. Will counsel remind the witness he is still under oath.

CONTINUED DIRECT EXAMINATION
BY MS. WOODY:
Q.  Good afternoon, Sheriff Easter. Between the time we had the first part of your deposition and today, have you done anything to prepare for this second part of your deposition?
A.  No, I have not.
Q.  Have you reviewed any transcript of your prior deposition?
A.  No, I have not.
Q.  Have you reviewed any documents?
A.  No, I have not.
Q.  Okay. When we were talking last week we talked a little bit about the RICO case that was brought and can you tell me -- the RICO case involving the gangs, and can you tell me again what

not had gang activity before and we were receiving a lot of phone calls from citizens in reference to their angst and their safety and how fearful they were. So I was again tasked by the Chief to educate citizens on not only what to look for but what they should do as a citizen and that's by calling 9-1-1 or calling the gang office to report suspicious activity that they believe was drug-related or gang-related.

Q. Okay. Why did those end -- well, let me rephrase my question. You said you made those presentations between 2004 and 2007. After 2007 did those presentations stop?

A. Ma'am, the first part of your question was all scratchy and I got the last part, something about did they stop after 2007.

Q. Yes.

A. Okay. So I don't know what the first part of the question was but the second part, when I was promoted to the rank of captain in 2008 all that information was turned over to my replacement which I believe was Lieutenant Ojile. I still was asked by the Chief to do some of those presentations as the captain in the Northeast Bureau. I didn't do as many, but there was some

13

neighborhood associations that would call me and say that they wanted the presentation.

Q. Did you make any changes to the presentation over time?

A. Well, statistical numbers; year-to-year date on homicide counts, drive-by counts, those type of things would have been changed. The majority of the information stayed the same.

Q. While you were -- and while you were the head of the Gang Unit did you keep any demographic information on the gang database?

A. Not on the gang database, I did not. I was tasked to keep a demographic information for -- I was asked by the Chief and Deputy Chief Stolt to put together some demographic information that was not based on the gang database.

Q. What demographic information were you asked to put together?

A. The amount on black-on-black crime that was perpetrated by gang members so homicides, ag assaults and drive-by shootings of all gang-related crime, whether it was black, white, Hispanic, Asian.

Q. Okay. So those statistics had more to do with the crime itself than the racial makeup of

14

the crimes?

A. Correct.

Q. Did you ever -- did you ever undertake any study of whether there were disparities on the gang list based on race?

A. No, ma'am, I did not.

Q. Are you familiar with the term "mapping"?

A. Yes. That's something the Wichita Police Department did several years ago. Mainly that was the South Broadway corridor when it came to prostitution.

Q. Are you aware of any mapping having to do with gangs or gang members?

A. There was some mapping done when it came to the gangs. I don't remember the specifics of that mapping or the mapping of the prostitution stuff either. I know it was done but I don't remember the specifics of it.

Q. So you weren't heavily involved in that, is that what you're saying?

A. I didn't create it; no, ma'am.

Q. What was the purpose of it as you understand it?

A. I'm trying to remember that many years

15

ago. I'm not -- I can't answer that without maybe some other information on what the mapping -- where it was at, those type of things. I recall that there was mapping done but I don't recall -- I just can't remember what it was done for.

Q. Okay. Was there a joint mapping program between WPD and the Sedgwick County Sheriff's Office?

A. I'm sorry, the question was, was there a joint mapping between the WPD and the Sheriff's Office; is that correct?

Q. Yes.

A. I don't remember, ma'am.

Q. Okay.

A. I really didn't have much contact with the Sheriff's Office when I was a Gang/Felony Assault lieutenant.

Q. During the time that you were with the Wichita Police Department were there changes in gang activity during that time?

A. There had been changes through the '90s and there was a drive-by task force that was put together in '96 because of the amount of violent crime that was taking place so we saw a dip in the gang-related violent crime. When I took over the

16

4 (Pages 13 to 16)

## Page 17

Gang Unit, I can't remember if it was 2003, 2004, we seen a significant spike again. We saw that spike take place for a little over two years. There was other things that I put in place to respond to that violent crime. After the RICO case took place in 2007 we saw a significant reduction in violent crime specifically related to gangs.

Q.  How long did that reduction last or does it last through today?

A.  Well, I can't tell you about today because I'm not over there. I will tell you that -- so it would have been 2000 -- probably '9, the Wichita Police Department that year, I believe, only experienced 13 homicides. The very first homicide in northeast Wichita that year was in August and so that was a significant decrease. We saw the numbers decrease in '10 and '11 as well compared to early on in '04, '05 and '06 and then I left in 2012.

Q.  As the Sedgwick County Sheriff did you have anything to do with the gangs?

A.  Nothing. In fact, when I came over to the Sedgwick County Sheriff's Office we had a two-member gang unit. Our gang-related activities out in the county was virtually nothing, and so all

## Page 18

our folks were doing was working with the police department inside of Wichita. I thought that was a waste of resources for the Sedgwick County Sheriff's Office and I disbanded the gang unit at that point for the Sedgwick County Sheriff's Office.

Q.  That would have been in 2012 when you became the Sheriff?

A.  The first part of your question broke up but I think what you were asking was did that happen in 2012.

Q.  Yes.

A.  No. I took office in December of 2012 so that would have happened at the end of 2013.

Q.  And since that time, since you disbanded the Sheriff's Office gang unit or members, have you had any other -- anybody else in the Sheriff's Office dedicated to gangs?

A.  No, we do not.

Q.  Does the Sheriff's Office coordinate with the Wichita Police Department with respect to gangs?

A.  We do. We have gang-related incidents out in the county, including shootings and homicides and we do coordinate with the Gang Unit

## Page 19

when we know it is gang-related.

Q.  Explain to me how that coordination takes place.

A.  A lot of times it's communication with the detective section, with our detective section, with the Felony Assault/Gang Unit over at the Wichita Police Department. A lot of times the only names that we get are nicknames or monikers and so we ask for them to run both in their RMS system and within the Gang Unit what type of monikers that we're looking for and/or sometimes all we have is certain tattoos so we ask the Gang Unit to run that information through their computer databases to see if anything comes out of there that could be useful in our investigation.

Q.  How about the other way around; does Wichita Police Department ever ask you for assistance on some of their matters regarding gangs or gang members?

A.  We do have somewhat of a gang population and really the only incorporated area that we patrol, which is the Oaklawn area which is just adjacent to Plainview. So if they have something and they believe it is an individual that lives in Oaklawn, they'll call over and ask for the

## Page 20

information that we have on that particular information within our RMS system.

Q.  When you say RMS system, explain what you mean.

A.  It's our Records Management System.

Q.  And does Sedgwick County Sheriff's Office maintain any kind of gang database or gang list?

A.  No, we do that.

Q.  Do you have access in the Sheriff's Department to the WPD gang database?

A.  I know when I was with the police department the Sedgwick County Sheriff's Office did. At this point in time I don't know. I don't know if they -- I would say no because we don't have gang deputies that have a computer that has that system on it any longer and so I believe most of our communication with the police department on gang stuff is asking them questions and they provide us the information out of the gang database.

Q.  Okay, and you say when you were with the WPD there was some coordination with the Sheriff's Office with respect to the gang database; is that correct?

A. Yes. As we discussed before, there was a grant that was received when I was a sergeant that provided computers, laptop computers to each bureau and to the Sheriff's Office that maintained the gang database so they could have direct access to it.

Q. So the Sheriff's Office had direct access to the gang list just like the WPD did?

MR. COOPER: Object to form.

A. Years ago they did, yes.

Q. (By Ms. Woody) Do you know when that stopped?

A. I assume it stopped when I did do away with our gang unit over here but I can't give you an exact answer.

Q. So when you took over as the Sheriff did certain people in the Sheriff's Office still have direct access to the gang database?

A. No.

Q. Okay. So that happened before you were the Sheriff?

A. No. It happened after I was the Sheriff.

Q. Okay.

A. But I can actually say that we did not

21

have access. Again, I don't know what kind of access the two gang officers had that were assigned to the Gang Unit at the Sheriff's Office. I didn't look into that. I looked into resources. I looked into statistical information and it did not -- from the standpoint of our resources it did not make any sense for us to have a gang unit that spent most of their time, almost 100 percent of their time in the city of Wichita.

Q. So that's the reason that you disbanded the Gang Unit and if they still had access at that point in time you would have -- that would have stopped then?

A. Yes.

Q. You have mentioned that if you have questions in the Sheriff's Office about somebody in the county that you think may be a gang member that you can contact the WPD and ask them questions about that person and they look things up in their gang database; is that correct?

A. That is correct.

Q. Do they ever -- how does that happen? Does it happen in some written form?

A. Ma'am, the first part of your question was -- I couldn't hear it all.

22

Q. Let me --

A. Are you talking about in written form?

Q. Yeah. The way you transmit those questions to the WPD from the Sheriff's Office, is that in writing, in e-mail; how is that done?

A. I can't answer that because I've never done it.

Q. Who in your office does do it?

A. Can't answer that either because they do their own investigations. I could make assumptions but to answer it as this is the way we do it, however detectives contact them over there, whether it's by e-mail, by phone. I would assume that it's by both.

Q. Have you ever seen any responses to the questions that someone from the Sheriff's Office has asked the WPD about gang members?

A. No, I have not.

Q. That's left to the individual detectives?

A. Individual detectives that are working cases, they garner information in many different ways, and so I'm assuming that when they are working gang-related cases that that is how that's done. The reason I say that is because when I was

23

the Gang sergeant and Gang lieutenant when the Sheriff's Office detectives would call over, they get ahold of our detectives and I know our detectives would run information for them.

Q. Do you know at that point in time how the communications were made? Were they made -- was there a written report prepared, for instance, that was transmitted to the Sheriff's Department?

A. Well again, those were detectives that they were contacting, not me personally and so if you are asking if there was like a report completely generated, typed up and supplied to them, maybe in some cases there were. I think most of the time when detectives would -- from the police department would tell me that hey, they called over asking about Smoochy. We ran Smoochy in the gang database and it came up to these three names and we did provided them those three names and that was generally over either e-mail or by phone.

Q. Okay. So they come up with say a nickname or a tattoo and say, is this gang-related, for instance, and then the WPD would run those and tell them if there was any relationship that they found in the gang list with either the nickname or

24

6 (Pages 21 to 24)

**Page 45**

Q. Were any of the individuals charged that you testified and gave gang testimony about, were any of them white?

A. Yes.

Q. How many?

A. Two.

Q. So two out of 15 to 20 times?

A. Uh-huh.

Q. Okay, and I take it the rest of the time they were black or people of color; is that correct?

A. They were either Hispanic, Asian or African American.

Q. How did you get involved with the gang testimony in a given case? Is that something that the DA's Office would come to you about or would the WPD say hey, this person is a gang member. How did that happen?

A. No. It would be through the Districtc Attorney's Office. They were the ones that want the witnesses. WPD has nothing to do with that and if they wanted some -- a lot of those cases I was personally involved in as a supervisor so I was a witness on it already.

Q. When somebody was charged and they were

**Page 46**

identified as a gang member in the gang database, was there any special communication that you would make to the DA's Office?

A. Well, they did have a gang unit within -- that we discussed the last time within the DA's Office. We were aware of Gang Unit with the Wichita Police Department so there was communication all the time with CJ Rigg and I believe she had two other attorneys assigned to her in that unit.

Q. What kind of information was exchanged between the DA's Office and the WPD?

A. Discovery on the case, information on the case, the affidavits on the cases and I mean just the general stuff that has to take place between a police agency and a District Attorney's Office to charge a case.

Q. So if you saw that a case, if there was a case being considered to be charged, how would you let the DA's Office know that this person was a gang member?

A. Well, the detectives would do that. I was never a detective in the Gang Unit; I was a supervisor so generally I didn't work the cases; the detectives did. So they would write up in

**Page 47**

their affidavits any information that if they were a gang members and we worked tons of cases where people weren't gang members in the Felony Assault Unit so it would be the same information except the fact that they would put in their affidavit the information out of the gang database or some of the information out of the gang database as identifying them as gang members and that's why it was assigned to the Gang Unit to prosecute.

Q. So if they put in their affidavit that this person was identified as a gang member in the database, they would include what information they had and that would cause that charge to go to the DA's Gang Unit?

MR. COOPER: Object to form.

A. Yes. I mean, so anything that was gang member related or gang-related was assigned to the DA's Gang Unit to prosecution.

Q. (By Ms. Woody) During your time at the WPD were there ever any studies that you were aware of that broke down the gang database by racial demographics?

A. Studies done on it? Not of the gang database. I was tasked with doing a look at demographics of the violent crime we were having.

**Page 48**

Q. And that involved more than gang members; is that correct?

A. No. It was very gang specific; ag assaults, ag batteries, drive-by shootings, homicides that were perpetrated by gang members.

Q. Did that break down by race?

A. Yes, it did.

Q. What do you recall the demographics being?

A. The highest demographic was African American. They were right around 70 percent. The next demographic was white or Caucasian. The 3rd was Hispanic and the 4th was Asian.

Q. Did the white group include people who were Hispanic or Latino?

A. No. White was just Caucasian and so if they were Hispanic that was a separate category.

Q. Okay. What did you do with this information once you had done this study?

A. I was asked to do that by Chief Williams and Deputy Chief Stoltz. Once I broke down that information that information was provided back to Deputy Chief Stoltz and Chief Norman Williams.

Q. Do you know what they did with it?

Baco Loco Boys were tatooed up in VLBs and had their own colors. The Sorenos and Nortenos; same thing. The Asians and Back Killers and there was a couple of other Asian gangs; the white gangs, the white supremacist gangs that we had. The 8-Ball Crips were specifically white. They would be tatooed up with 8-balls and those type of things so every gang set had their specific tattoos.

Q. How did you learn about those tattoos so that you were able to affiliate them with specific gangs?

A. A lot of times from the gang members themselves. Back in the '90s they liked to brag about it.

Q. In the '90s they would show you a tattoo and tell you what it meant; is that right?

A. A lot of times they would tell us exactly what it meant and the colors they affiliate with.

Q. And other than that, did you have any other ways of categorizing tattoos as being affiliated with specific gangs?

A. A lot of times it was from the individuals telling us and then through different cases that we had where we would seize evidence

53

that this stuff would be listed out in paperwork or it would be listed out who they affiliate with, those type of things through search warrants.

Q. Did you ever look to other jurisdictions or other areas of the country to compare tattoos that were affiliated with gangs?

A. Yes. We had an influx of individuals coming in from the Englewood, California area or area during the 1990s and also Tulsa and Oklahoma City. So some of the 18th Street folks that were Hispanic; some of the Hoover Crips, those type of things. The issue in Wichita was that they would affiliate with them but they would come up with their own kind of click. A lot of our gangs here neighborhood related. They grew up in the neighborhoods, they were related and they would adopt their own type of gang signs and colors.

Q. Were there certain areas that you categorized as gang-related areas? Categorized?

A. I'm sorry, what was that again?

Q. Were there certain geographic areas of Wichita that you designated as gang-related areas?

A. So I think you are kind of getting back to your question of mapping. What I recall on that is if individuals were on probation, parole or out

54

on bond, there were certain bars that catered to the gang members and so they would be mapped around those particular bars. That's what I recall on the gang-related stuff. So to answer your question now, yes, there were some bars that were absolutely infiltrated, attended. We would always have fights or shootings at those bars that were known for gang activity.

Q. When you say they were mapped with respect to these bars, that means they weren't supposed to go there; is that correct?

A. That was part of the restrictions, yes, ma'am.

Q. So the mapping would be here's where you can't go; is that right?

A. Correct.

Q. That was specific to an individual who was on probation or parole as part of their restrictions; is that correct?

A. Correct, or out on bond.

Q. With respect to -- were there any areas of the city that generally were considered gang areas without regard to a specific person's probation or parole restrictions?

A. You had neighborhoods throughout the

55

city that was -- I mean, yeah, they had a lot of gang members, particular gang houses that were in those neighborhoods. You had them in west Wichita, not as much but you had them in north, south and east Wichita.

Q. And how would that information be shared within the department that these were gang-related areas?

A. I wouldn't say we ever said there was any particular gang-related areas. There was particular houses or neighborhoods that had several gang members that lived in those homes or multiple gang members living in one home. To be honest with you most beat officers knew that. We knew it from neighborhood members who wanted us to do something about them in their neighborhood and that's generally how we got the information.

Q. And was that information ever disseminated to the public? Like when you did these presentation did you ever say these areas are gang-related?

A. No, because there was no really gang-related designated areas in the city of Wichita. You had some neighborhoods that were more problematic because of the amount of gang members,

56

```
 1    the amount of shooting, the amount of drug activity
 2    that was taking place in those neighborhoods.
 3        Q.  But they weren't specifically
 4    designated as gang-related areas or gang areas?
 5        A.  I've never heard that term; no, ma'am.
 6        Q.  Why don't you give me about ten minutes
 7    and then I'll come back and we'll finish up.  Okay?
 8        A.  Okay, ma'am.
 9            VIDEOGRAPHER: Time is now 3:53 p.m..
10    We are now off the record.
11            (Whereupon a recess was taken from 3:53
12    p.m. to 4:02 p.m.)
13            VIDEOGRAPHER: The time is now is 4:02
14    p.m..  We are now on the record.
15        Q.  Sheriff Easter, at any time when you
16    were with the WPD, were they using social media to
17    identify gang members?
18        A.  Not while I was -- there really wasn't
19    social media per se when I was a lieutenant.
20    Towards the end there I think Facebook was really
21    starting to take off.  I know there were some cases
22    that we did based off of Facebook where they would
23    post pictures of themselves with guns and money and
24    we would violate them on their probation or parole
25    and some of those folks were gang members.
                                                      57
```

```
 1        Q.  So you recall it being used to catch
 2    violations of probation and parole and Facebook
 3    specifically, activities on Facebook?
 4        A.  Yes.  Facebook was really the -- I'm
 5    trying to think when I was a gang lieutenant.
 6    Facebook was really the only one.  Now, when I was
 7    captain there was other social media type stuff
 8    that I know as officers would use to try to locate
 9    stolen property, those types of things but I'm not
10    aware of anybody just being identified oh, you are
11    a gang member of something you put on social media.
12    First off, that wouldn't fit the three criteria.
13        Q.  What if this there was a Facebook post
14    where the person was wearing a color that is
15    affiliated with a gang and had a tattoo that looked
16    like it was affiliated with a gang and they were
17    standing next to an individual who was already on
18    the gang database.  Would that be sufficient to
19    flag them as a gang member and enter them into the
20    gang database?
21        A.  No, it would not.
22        Q.  Why not?
23        A.  Just them standing there next to a gang
24    member and maybe wearing the colors, that would
25    only fit two criteria, not three.
                                                      58
```

```
 1        Q.  Well, what if they had a tattoo?
 2        A.  But that's -- again, I haven't dealt
 3    with the criteria in a long time, but that would
 4    still be in one of the criteria that we're talking
 5    about along with gang colors.  That would be --
 6        Q.  Okay.  So it's your position that those
 7    aren't two separate things.  If you have a tattoo
 8    that's affiliated with a gang and you are wearing a
 9    gang color, that's just one criteria.  Is that what
10    I hear you saying?
11        A.  Yes.
12        Q.  And was that something that the Gang
13    Intelligence officers understood as well?
14        A.  I'm sorry, ma'am, you broke up.
15        Q.  Did the Gang Unit officers understand
16    that that could only be counted as one criteria?
17        A.  They did when I was there; yes, ma'am.
18        Q.  Do you know when the Gang Unit started
19    using social media to keep track of gang members or
20    their probation or parole violations and things
21    like that?
22        A.  No, ma'am, I don't.  No, ma'am.
23        Q.  Were they doing that when you were a
24    lieutenant on the Gang Unit?
25        A.  With the social media?
                                                      59
```

```
 1        Q.  Yes.
 2        A.  It was really pretty new.  We really
 3    didn't have a whole lot of interaction with social
 4    media during my time frame there.
 5        Q.  Okay.  Did you yourself ever use any
 6    form of social media to either identify people for
 7    the gang database or to look for parole or
 8    probation violations?
 9        A.  Me myself?
10        Q.  Yes.
11        A.  No, ma'am.
12        Q.  Sheriff Easter, I don't have any
13    further questions.  Unless Mr. Branson does we are
14    done.
15            MR. COOPER: I have some -- can you hear
16    me okay, Teresa?
17            MS. WOODY: Yes.
18            MR. COOPER: How about you, Ms. Court
19    Reporter, you are the more important person?
20            REPORTER: Yes. I can hear you fine.
21                  CROSS EXAMINATION
22    BY MR. COOPER:
23        Q.  With respect, Sheriff, to times that
24    you have testified in District Court while a
25    Wichita Police Department officer, sergeant or
                                                      60
```

15 (Pages 57 to 60)