IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PROGENY, A PROGRAM OF            )
DESTINATION INNOVATION           )
INC., CHRISTOPHER                )
COOPER, ELBERT                   )
COSTELLO, MARTEL                 )   Case No.
COSTELLO, AND JEREMY             )   6:21-cv-01100-EFM-ADM
LEVY, JR., ON BEHALF             )
OF THEMSELVES AND                )
OTHERS SIMILARLY                 )
SITUATED,                        )
                                 )
            Plaintiffs,          )
                                 )
    vs.                          )
                                 )
CITY OF WICHITA,                 )
KANSAS,                          )
                                 )
            Defendant.           )
_____)

VIDEO DEPOSITION OF JOSE SALCIDO

The video deposition of JOSE SALCIDO, taken before
Nancy L. Rambo, RPR, CSR, at the law office of
Joseph, Hollander & Craft, Wichita, Kansas, on
the 15th day of December, 2022, commencing at
8:33 a.m.

Page 130

```
 1     process that -- that the lieutenant writes out,
 2     they're like, hey -- they have to -- they have
 3     to okay the -- the questions with HR, I mean,
 4     it's a whole process. And so based on that
 5     list, then, you can select the next audit. And
 6     it could be somebody from the NET team or
 7     somebody from the field that is on a specialty
 8     team that wants to be there as a gang officer.
 9  Q  Uh-huh. Do -- in your experience, do the
10     officers want to do the audits?
11  A  It's probably not their favorite thing, but --
12     but they do it well when they do it.
13  Q  Why do you think it's not their favorite thing?
14  A  'Cause it takes a long time to do them.
15  Q  So do they usually prefer to be in a -- have
16     another position?
17  A  They prefer -- no, they prefer that position,
18     but they want time to be out driving around, you
19     know, doing some enforcement. That's what they
20     prefer.
21  Q  And you can't do that if you're doing the audit?
22  A  Of course, it's a very rigorous, involved
23     process.
24  Q  You say it's a rigorous and involved process,
25     where are the documents kept relating to the
```

Page 131

```
 1     audits?
 2  A  So, typically, as -- they have to read all the
 3     reports, right, they -- they go in -- so we keep
 4     them in Laserfiche, and they're police reports.
 5  Q  You keep them what?
 6  A  We keep them in, it's called Laserfiche.
 7  Q  Okay.
 8  A  And so they have to literally bring up, like, a
 9     specific case and read; that's why it's so
10     involved, they have to read the case, the many
11     cases, and then make notes, or whatever.
12  Q  And where is --
13  A  It's been a long time since I -- I did the audit
14     'cause I did them myself, but it's been ...
15  Q  No, I understand. And where do they keep --
16     where are the notes that they make, where are
17     those kept?
18  A  They're in the -- they should be in -- I can't
19     remember the -- the name of the program, but
20     they had a program; I don't know if they
21     migrated everything to -- to our new RMS, but
22     there was a, like, FileMaker Pro that's been the
23     program for a long time, they make little notes
24     in -- in -- in there.
25  Q  So it would be your expectation if they were
```

Page 132

```
 1     going to do a rigorous -- do this rigorously
 2     that they would be keeping some kind of document
 3     about their impressions, their notes, things
 4     they're seeing?
 5            (Reporter requests clarification
 6            of the witness.)
 7  A  FileMaker Pro they would.
 8  BY MR. SULLIVAN:
 9  Q  Is that -- that's one of the programs on the
10     department system?
11  A  That used to be the -- the -- I think it still
12     is, I don't know if they migrated to the new RMS
13     or not, I still think it's FileMaker Pro, but
14     that -- that's -- that's where you make your
15     notes in FileMaker Pro, which is what -- what
16     generates the gang list.
17  Q  The gang list is actually generated in
18     FileMaker Pro?
19  A  Yes.
20  Q  But there are -- and are there notes about the
21     audit that reflect their review? Strike that.
22     Are there --
23  A  No.
24  Q  So they're just -- they're just making changes
25     in the gang list as they're reviewing the file?
```

Page 133

```
 1  A  So I guess to explain to you how I -- I remember
 2     doing it - and it's been many years ago, so
 3     memory can fail me - but what would happen is
 4     let's say you were in a gang, right, I bring you
 5     up in our records management system and look
 6     through your records. I look, okay, he was
 7     arrested for, I don't know, shooting at a house.
 8     So I would go to the case actually and read --
 9     read the whole thing, and then based on what I
10     found there, I can make a note in FileMaker Pro
11     saying on this date, he identified himself as a
12     member of the Folk Nation, you know, to Officer
13     So-and-So, 'cause it's in the report. And then
14     I would make the note there, and I -- I'd move
15     on. There are no notes as far as on this date
16     I -- I did an audit, found this, nothing --
17     nothing of that.
18  Q  So maybe I'm just not following very well, but
19     what are you auditing? I mean, there's a gang
20     list, right?
21  A  We want to make sure that the -- that the member
22     who you're putting on the list meets the state
23     criteria. If not ...
24  Q  But there's -- there's al -- maybe I'm -- so
25     there's already a list, though, right, there's a
```

**Page 182**

1    A    Maybe.
2         MR. BRANSON: Object to form.
3    BY MR. SULLIVAN:
4    Q    You say maybe, why?
5    A    You know, they -- they would have to -- they
6         would have to identify me and see if I was doing
7         more than just hanging out there in my
8         neighborhood.
9    Q    But I'm just talking this -- this particular
10        subsection, right, (2)(D), frequents a
11        particular criminal street gang's area, right?
12   A    Uh-huh.
13   Q    If you were walking through there daily on your
14        way from the field and -- is that -- would that
15        be enough?
16        MR. BRANSON: Object to form.
17   A    Again, a lot of this in itself, it's not -- it's
18        not this is a gang member, you know what I mean,
19        you have to -- you have to have more than that.
20   BY MR. SULLIVAN:
21   Q    You have to have more than the fact that
22        somebody's just in a particular street?
23   A    Hanging out in the area, yeah.
24   Q    So this criteria is not -- whether somebody's
25        hanging out in a particular area is not a useful

**Page 183**

1         criteria for determining whether somebody's a
2         gang member, right?
3    A    Not --
4         MR. BRANSON: Object to form.
5    A    -- not -- not in today's time. You know, maybe
6         in the past, yes, not in today's time.
7    BY MR. SULLIVAN:
8    Q    Okay. Roman (E), adopt such gang's style of
9         dress, color, or use of hand signs or tattoos?
10   A    Yes.
11   Q    Do you see that one?
12   A    I do.
13   Q    And what are -- those are identifiers, right?
14   A    Correct.
15   Q    And those are intended to signal identification
16        with a particular gang or affiliation?
17   A    That is correct.
18   Q    And what was the -- you had mentioned it
19        earlier, but what were -- what was the -- what
20        were the colors of the gang that were operating
21        in that North Bureau when you were younger?
22   A    It was -- it was black and white.
23   Q    And you had on a black hat, right?
24   A    Correct.
25   Q    And would that, wearing that black hat have been

**Page 184**

1         sufficient under this criteria to identify you
2         as a member of that gang?
3         MR. BRANSON: Object to form.
4    A    You know, if -- if -- I would doubt very
5         seriously 'cause that was not the only time I
6         had police contact, I'm sure, you know, waving
7         at police officers or -- or even getting stopped
8         in a car, you know what I mean, wearing similar
9         clothing, they never asked me if I was in a gang
10        because I -- they -- they knew that I was not
11        hanging out with the gang members. If -- if --
12        if an officer is worth their salt, they -- they
13        don't just willy-nilly put you on the list, they
14        have to -- they have to have more than that.
15   BY MR. SULLIVAN:
16   Q    But it would have been sufficient to -- that hat
17        under the terms of this provision, would that
18        color have been sufficient at the time to
19        satisfy --
20   A    That condition?
21   Q    -- (2)(E)?
22        MR. BRANSON: Object to form.
23   A    Yes, but, again it's standing -- if you stand it
24        by itself, yes, that would be -- that would be
25        an identifier.

**Page 185**

1    BY MR. SULLIVAN:
2    Q    So by itself, it would be an identifier even
3         though it wouldn't have been an accurate
4         identifier?
5    A    Correct.
6         MR. BRANSON: Object to form.
7    A    But I -- I doubt anybody would just put me on
8         the list 'cause I was wearing that hat.
9    BY MR. SULLIVAN:
10   Q    What makes you so sure about that?
11   A    Be -- because they didn't -- obviously they
12        didn't -- he didn't stop to ask me if I was in a
13        gang. I'm -- I'm speculating that he was
14        thinking it, but he never stopped me.
15   Q    Let's talk about (F), associates with known
16        criminal street gang members?
17   A    Yes.
18   Q    And this is the -- we talked a little bit about
19        this one earlier, right?
20   A    Yes.
21   Q    And what -- what training do the gang officers
22        receive in terms of distinguishing an associate
23        from a member in -- in the field, like how do
24        you make that distinction?
25   A    And you're asking me to speak about specific

Page 194

1  Q   Is that because -- I mean, you -- you used the
2      phrase hangs out, is that sort of what you
3      would -- the -- the connection that you would
4      make to determine whether there is a -- what a
5      criminal street gang's area was is where they
6      hang out?
7  A   Not -- not -- it would be more than that. And
8      I'll give you a for example an area that I
9      associated with gang activity, you know, like a
10     public park, right, we were talking about that
11     earlier, they could hang out to play basketball,
12     not -- not a big deal. But there's a particular
13     part in town where, historically, where they --
14     they hang out to shoot their guns off, that
15     would be more what I would look at and what my
16     people would probably look at as a gang hangout.
17 Q   But under -- but that's not what the -- that's
18     not the phrase used, right? The public park,
19     like if they were playing basketball, that would
20     be a particular criminal street gang's area,
21     wouldn't it?
22 A   You know, in -- in -- in areas -- in areas, in
23     cities where gangs are more territorial, per se,
24     there is a very defined, on that side of the
25     street, that's ours, this side is ours. We

Page 195

1      don't really have that definition in this -- in
2      this city, there's no -- nothing you can point
3      to. And, again, this is not written for the PD,
4      for just Wichita, it's written for the entire
5      state. The conditions might be different in
6      Kansas City, for example.
7  Q   But within your department, do you know if
8      there's a particular understanding of what that
9      phrase means?
10 A   No, other than -- the only reference we have
11     is state stat.
12 Q   Okay. But within your department, do you have
13     any shared understanding of what the phrase a
14     criminal street gang area means?
15 A   If you're asking do we have that defined, we
16     don't.
17 Q   Do you have a working definition even?
18 A   No, I don't think we have anything in writing.
19     I think it, again, it's -- it's -- it's a --
20     it's up to the officers who are out there to say
21     based on me working this -- this neighborhood,
22     I've known that to be an area where they conduct
23     activities, I guess.
24 Q   Would that -- like the -- the word frequents,
25     would that also be -- have a subjective

Page 196

1      component?
2  A   One and the same.
3  Q   And we talked about 21-6313(2)(F) where it uses
4      the word associates, correct?
5  A   Correct.
6  Q   And that's -- that's one of the factors that
7      could count toward putting somebody -- making
8      somebody a gang member, right?
9  A   According to state law, yes.
10 Q   And you, I think, had some issues we talked
11     about earlier with what associates might mean?
12 A   I did, personally I did, yes.
13 Q   Yeah. And for purposes of this particular
14     criteria, 21-6313(2)(F), do you have a common
15     understanding within the Wichita Police
16     Department of what that means?
17 A   No.
18 Q   Is it like the other factors we talked about,
19     open -- it's subjective?
20 A   It's purely subjective, yes.
21 Q   I want to talk to you about, back to Exhibit 13,
22     which is the chart, right? You see the -- the
23     next box toward the right is -- there's a
24     heading that says nomination procedures? You
25     see that?

Page 197

1  A   Yes.
2  Q   What is the -- what is that referring to? And
3      just -- and let me -- strike that, let me -- let
4      me ask it this way. That box is entitled
5      Nomination Procedure, and under it, it says, any
6      officer may nominate a person to be added to the
7      master gang list by routing the nominee's
8      personal information to the gang unit, right, do
9      you see that?
10 A   Yes.
11 Q   And what is that referring to?
12 A   So, you know, let's say I'm -- I'm on beat
13     patrol, I'm not -- I'm not in a specialist team
14     and I'm not in the gang unit but I'm -- I'm
15     just -- I have a beat assignment and -- and I
16     come across an individual that I think meets
17     gang criteria. What I -- what I would do, and
18     back in the day we had what -- what they call
19     blue cards, and it was a very simple -- and I
20     don't know if you have a sample of a blue card,
21     what it used to look like, but you could write
22     all the -- all the identifiers on this blue card
23     and you would submit -- it was called a TOP
24     card, and you would send it in. We now have the
25     digital version of the TOP card, and I think

Page 198

1   most of the nominations come in that way. But
2   the officers -- the nominating officer would --
3   would send that through to the two officers
4   working in the gang unit doing the vetting and
5   adding -- or looking at the gang list.
6  Q  Okay. And so what about just -- what if we just
7     sort of focus on the period after 2016, after
8     you became deputy chief maybe.
9  A  Yes.
10 Q  I think what you're telling me is an officer out
11    in the field would rely on the criteria that we
12    looked at in the statute --
13 A  Uh-huh.
14 Q  -- that we marked as Exhibit 14 to identify
15    somebody that they could then nominate for the
16    gang list --
17 A  Correct.
18 Q  -- correct? Is the nomination an actual --
19    like, it's like a separate process? Like you
20    identify them first, right?
21 A  Right.
22 Q  You at the time -- you know, before 2016, there
23    was a TOPS card maybe filled out; is that right?
24 A  Yes, we'll still do a TOPS card but it's digital
25    now.

Page 199

1  Q  Okay. So they -- the officer fills out the TOPS
2     card?
3  A  Yes.
4  Q  And then that TOPS card goes -- where is that
5     entered, what's the -- the system, the digital
6     system?
7  A  I think it's on our mobile data terminal, it's
8     part of the -- the -- the -- there's, like, an
9     internal website where they could go get that
10    form and send it through.
11 Q  What's that called, that -- that --
12 A  I don't remember what we call it, but that form,
13    it's -- it's under the -- the SharePoint for --
14    for -- internal SharePoint for PD.
15 Q  Okay. So the -- am I correct, then, the
16    information the officer sees in the field --
17 A  Uh-huh.
18 Q  -- is put in -- into that digital TOPS card,
19    right?
20 A  And it's sent through, yes.
21 Q  And --
22 A  And I think we still have blue cards, but I --
23    I -- I don't know for certain that we do.
24 Q  Okay. Who is that sent through to?
25 A  It's -- it's routed to the gang unit, ends up

Page 200

1     with the two officers who do the -- who do the
2     audit.
3  Q  So the -- it goes to the two offi -- two
4     officers in the unit, and who are -- the gang
5     intel?
6  A  The gang intel officers, yeah, they do the
7     vetting and they look at -- at, you know, at
8     whatever it is that they do, like criminal --
9     criminal history, incidents that might be
10    related.
11 Q  Okay. And what evaluation is made by those two
12    officers of the information that they receive at
13    that point in time?
14 A  They would see how it con -- if it fit -- fits
15    the state statute before they put them on the
16    list.
17 Q  And so they -- they -- they make an -- their own
18    reference to the state statute?
19 A  They -- they look at it, yes, they would have
20    to. I don't think they even look at the
21    statute, they -- they know it, they know the
22    criteria.
23 Q  Okay. And if the officer who filled out the
24    TOPS card said, you know, so-and-so -- or the
25    subject frequents a particular street gang

Page 201

1     area --
2  A  Uh-huh.
3  Q  -- all right, let's say the officer filled --
4     filled out a TOPS card with that observation in
5     it --
6  A  Right.
7  Q  -- what effort do the two gang intel officers
8     make to assess that particular information? Do
9     they take that officer at his or her word, or do
10    they make a deeper inquiry into it?
11 A  I think that they -- they -- they do as -- as
12    thorough of a search as they can, but I think
13    you would have to ask them exactly to get -- to
14    get exactly what it is that's going through
15    their mind.
16 Q  But -- but you -- you don't know actually
17    what -- are they doing their own evaluation of
18    that, or are they just seeing if those words are
19    in there?
20 A  No, I think they're doing -- they're evaluating
21    every nominee to make sure that, hey, we have
22    enough elements here to -- to -- to put them as
23    a active gang member.
24 Q  But -- so let's say, just for the sake of
25    argument, I filled out a TOPS card --

| | Page 222 | | Page 224 |
|---|---|---|---|
| 1 | do is -- and, I don't know, your mom says | 1 | policy, the definition section of this policy. |
| 2 | he's -- he's in a gang, I'm tired of him playing | 2 | Do you see that? |
| 3 | with the gang members, or whatever, you're | 3 | A   Yes. |
| 4 | nominated.  So what we do is we don't -- we're | 4 | Q   And the policy, is that the departmental policy? |
| 5 | not this all-seeing eye, you know what I mean, | 5 | A   If it refers to policy, it is the WPD policy. |
| 6 | there might have been cases that were never | 6 | Q   Okay.  So let's just mark the policy as |
| 7 | identified of you committing crimes with other | 7 | Exhibit 15, okay? |
| 8 | gang members even two weeks ago, you know -- you | 8 |         (Deposition Exhibit Number 15 |
| 9 | know what I mean, so we -- we look at those | 9 |          Marked for Identification.) |
| 10 | cases to say, okay, you know, was he just an | 10 | BY MR. SULLIVAN: |
| 11 | onlooker, was he actively participating in | 11 | Q   Or you can -- you can confirm that this is the |
| 12 | the -- in the -- in the -- in the -- in the | 12 | policy.  Is this the policy you're talking |
| 13 | violent crime out here, you know what I mean? | 13 | about? |
| 14 | So we -- we pick up those cases too. | 14 | A   It would actually -- yeah, it would actually be |
| 15 | Q   Well, put -- put self -- there's no self -- in | 15 | referring to this policy. |
| 16 | my hypo, there's no self-admission, right? | 16 | Q   Sorry, what the -- just so the record's clear, |
| 17 | A   Okay. | 17 | I've marked -- |
| 18 | Q   So it's just, it's somebody who satisfied the -- | 18 | A   Gang offenders, yes. |
| 19 | satisfied three of the criteria in 21-6313, | 19 | Q   -- I've marked as Exhibit 15 a document entitled |
| 20 | section 2, okay? | 20 | Wichita Police Department Policy Manual, Policy |
| 21 | A   Uh-huh. | 21 | 527, Gang Offenders, right? |
| 22 | Q   And if there's no self-admission, what -- | 22 | A   Yes. |
| 23 | what -- where is the guidance in the department | 23 | Q   And it says down at the bottom, revised 9 -- |
| 24 | in writing that tells the two officers what to | 24 | September 2019, right? |
| 25 | look at before they nominate somebody to -- | 25 | A   Uh-huh. |

| | Page 223 | | Page 225 |
|---|---|---|---|
| 1 | A   I don't think we have anything in writing; it's | 1 | Q   So it says -- the flowchart says, individual |
| 2 | just, you know, it's just probably the officers | 2 | would be added to the master gang list if they |
| 3 | conferring with their supervisors to say, hey, I | 3 | meet the criteria in policy, the definition |
| 4 | have this, what do you think, that -- there's | 4 | section of this policy, right? |
| 5 | always a -- there's always a exchange. | 5 | A   Correct. |
| 6 | Q   The next box is master gang list, do you see | 6 | Q   And which -- specifically which section is that? |
| 7 | that? | 7 | A   So it would be E, right, identification in the |
| 8 | A   Yes. | 8 | WPD gang database. |
| 9 | Q   Is there -- is there a gang list other than the | 9 | Q   Okay.  And that -- so that's based on the |
| 10 | master gang list? | 10 | criteria in K.S.A. 21-6313 that we have been |
| 11 | A   No, it's -- it's -- it's the list that comes out | 11 | looking at? |
| 12 | of the -- | 12 | A   Correct. |
| 13 |        (Reporter requests clarification | 13 | Q   And that's -- that will -- that will put |
| 14 |         of the witness.) | 14 | somebody onto the gang list, right? |
| 15 | A   -- FileMaker Pro. | 15 | A   If they meet the criteria according to policy, |
| 16 | BY MR. SULLIVAN: | 16 | yes. |
| 17 | Q   So the FileMaker Pro is where some of -- is it, | 17 | Q   Okay.  And there's no other criteria identified |
| 18 | like, where some of the -- the backup is, some | 18 | in this section other than what's on the gang -- |
| 19 | of the -- | 19 | other than what is in 21-6313, right? |
| 20 | A   Yes, that's where the notes are put in, like on | 20 | A   Correct. |
| 21 | this case he was doing this, on this case he was | 21 | Q   So there's no -- this stuff about -- that you |
| 22 | doing this, on this incident I had contact and | 22 | talked to me about about researching and |
| 23 | he admitted this. | 23 | referring of those other things, that's not |
| 24 | Q   And then it says, individual will be added to | 24 | actually part of the criteria, correct? |
| 25 | the master list if they meet the criteria in | 25 | A   No, but it's part of the work product, how we do |

## Page 226

1  our work. Now, if I put all of that into
2  policy, you would have a book, and -- and so
3  policy kind of informs, it's not all inclusive.
4  Q  But this stuff that you talked to me -- this
5     research process that you told me about --
6  A  Yes.
7  Q  -- that's not part of the policy?
8  A  That's not codified in policy, no.
9  Q  It's not anywhere in the policy?
10 A  No.
11 Q  And it's not in the statute, right --
12 A  Correct.
13 Q  -- 21 --
14 A  Correct.
15 Q  -- 21-6313?
16 A  Yes.
17 Q  Okay. So the next thing, it says, flagging
18    active in EJUS. Do you see that?
19 A  Yeah, it should be EJ -- I'm sorry, EJustice,
20    that's our old records management; we no longer
21    have EJustice.
22 Q  Okay. How is that -- is that something
23    different than what -- I think you said
24    Laserfiche before?
25 A  Yeah, yeah, EJustice is just a records

## Page 227

1  management system where we enter all crime
2  incidents.
3  Q  Okay. And both Exhibit 13 and Exhibit 15
4     reference this three-year period, right?
5  A  Correct.
6  Q  And Exhibit 15 says, the identified individual
7     will remain either active or associate for a
8     minimum of three years, right?
9  A  Yes.
10 Q  Where did that come from?
11 A  That -- that was just a -- that was just a --
12    when -- when -- at the beginning of all the
13    gang -- gang database and the gang list, way
14    before my time, they came up with the three
15    year.
16 Q  Who -- who came up with that?
17 A  I -- I don't know. You know, it's just part --
18    it's -- it's part of the policy when I got here
19    that that's -- that was -- it's always -- as far
20    as I can remember, it's always been three years.
21 Q  And that's not in the statute, is it?
22 A  Nope, no, it's not.
23 Q  You say that as if that surprises you?
24 A  No, in the statute, I knew it was not in the
25    statute. I knew that that was -- that was

## Page 228

1  established by policy that it was three years.
2  Q  And you don't -- did you ever ask why that is?
3  A  No.
4  Q  Have you ever received any explanation of why
5     there's that three-year period in there?
6  A  I -- no.
7  Q  Do you know what the basis for it is?
8  A  No.
9  Q  Do you know if that's ever been assessed against
10    best practices?
11 A  No.
12 Q  Have you ever consulted an expert in gang
13    databases as to whether that's standard or not?
14 A  No.
15 Q  Would it be -- would it be a best practice to
16    iden -- to identify somebody as a gang member
17    based on self-admission alone?
18       MR. BRANSON: Object to form.
19 A  I guess I don't understand your question.
20 BY MR. SULLIVAN:
21 Q  Would -- would you consider it a best practice
22    to identify somebody as a gang member and to be
23    put on a gang list based only on self-admission?
24       MR. BRANSON: Object to form.
25 A  I don't -- I -- I don't know if -- I mean, I

## Page 229

1  guess I don't -- I don't -- I can't give you --
2  I can't tell you if that would be a best
3  practice or not, I --
4  BY MR. SULLIVAN:
5  Q  Okay.
6  A  -- I don't know. I think there's -- there's --
7     like, again, like the example I gave you, there
8     could be a kid with -- with Down's or autistic
9     that would say I'm a gang member but I wouldn't
10    put him on the list.
11 Q  Do you know what purpose this three-year period
12    has?
13 A  If -- if I gave you what I think, it would be my
14    opinion of what the three years is.
15 Q  Tell me, please.
16 A  I think three years is if you're crime free for
17    three years, you know, pretty much that --
18    that -- that would tell me that -- that your --
19    I mean, your gang days are done.
20 Q  But what is the -- what -- what's the rationale
21    for being on there for -- what's the rationale
22    for that three-year policy?
23 A  I think it was set in --
24       MR. BRANSON: Objection, asked and
25    answered.