IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PROGENY, A PROGRAM OF      )
DESTINATION INNOVATION     )
INC., CHRISTOPHER          )
COOPER, ELBERT             )
COSTELLO, MARTEL           )   Case No.
COSTELLO, AND JEREMY       )   6:21-cv-01100-EFM-ADM
LEVY, JR., ON BEHALF       )
OF THEMSELVES AND          )
OTHERS SIMILARLY           )
SITUATED,                  )
                           )
            Plaintiffs,    )
                           )
    vs.                    )
                           )
CITY OF WICHITA,           )
KANSAS,                    )
                           )
            Defendant.     )
_____)


VIDEO DEPOSITION OF CHAD BEARD


The video deposition of CHAD BEARD, taken before
Nancy L. Rambo, RPR, CSR, at the law office of
Joseph, Hollander & Craft, Wichita, Kansas, on
the 19th day of December, 2022, commencing at
8:35 a.m.

## Page 30

1  A  We were in charge of identifying and documenting
2     individuals that were gang members, we
3     maintained the -- a gang database, we would then
4     focus on crimes committed by gang members,
5     disseminate information to the department or
6     other members, provide training.
7  Q  When -- when you were a patrol -- a patrol
8     officer in Patrol South, did you identify gang
9     members in that capacity?
10 A  Yes.
11 Q  And how did you do that?
12 A  When I would have contact or -- with
13    individuals, whether they would self-admit,
14    whether they were wearing their colors, flashing
15    hand signs - most commonly it was a self-admit -
16    I would complete a TOPS card or a blue card,
17    send that to the gang intelligence unit.
18 Q  And when you filed -- when you sent in a TOPS
19    card, and tell me what TOPS is again.
20 A  Sure.  Back then, it was -- it was called a TOPS
21    card, targeted offender program.
22 Q  Okay.  And targeting being gangs, right?
23 A  The TOPS unit was also, like I said a targeted
24    offender, but one of those was gang members.
25 Q  Okay.  So you would -- so describe for me, like,

## Page 31

1     you know, how you would -- just give me an
2     example of -- of how you would go about filling
3     out a TOPS card, you'd stop somebody, just kind
4     of explain.
5  A  Sure, if I had contact, like I said, a lot of
6     them were self-admits, so I would complete, it's
7     like a field interview card; it was just a blue
8     card that was relatively small, name, all their
9     information, I believe there was a small section
10    for what criteria they could have met, you could
11    check that.  On the back, there was an associate
12    portion if they were with somebody else, then a
13    short area for a narrative, whether that -- you
14    could fill out that part on the narrative about
15    your contact.  I often referred to a police
16    case 'cause there's not enough space on the
17    back.
18 Q  So if they self -- self-admit, there's one box,
19    correct?
20 A  Correct.
21 Q  And what constituted self-admission?
22 A  If an individual identified themselves as -- as
23    being part of a gang.
24 Q  Then they'd have to -- they'd have to do that
25    verbally?

## Page 32

1  A  Most commonly, I mean, that's -- I would be
2     speaking with them.
3  Q  Okay.  And when you say most commonly, would
4     they ever self-identify in a way that -- where
5     they didn't say I'm a gang member, I'm a member
6     of such and such?
7  A  No, I mean, that -- if we're specifically
8     talking about this time, that's what they would
9     do, they would talk to me verbally.
10 Q  Okay.  And would you ask them if they were
11    members of a gang?
12 A  Yeah.
13 Q  And --
14 A  Yes.
15 Q  -- and some of them would say yes?
16 A  Yes.
17 Q  Did any of them ever volunteer it without you
18    asking?
19 A  Yes.
20 Q  And under what circumstances would they do that?
21 A  Sometimes it would be when they were upset,
22    angry at somebody else, they were actually
23    arguing or fighting with another person and they
24    were identifying what gang they were a part of.
25 Q  So that wouldn't be a direct statement to you

## Page 33

1     but --
2  A  Correct.
3  Q  -- you would hear them say that?
4  A  Yes.
5  Q  And you would mark that down as a
6     self-admission?
7  A  Yes.
8  Q  Okay.  What if they didn't self-admit but you
9     thought they met some of the criteria, what
10    would you do?
11 A  I would mark that criteria that I observed.
12 Q  What was the most frequent criteria that you --
13    that you noticed when you were a patrol officer?
14 A  Colors and associating with other known gang
15    members.
16 Q  So those were the two most often?
17 A  Yeah.  Yes.
18 Q  Okay.
19 A  You would see hand signs occasionally as well.
20 Q  Okay.  And once you turned those TOPS cards in,
21    did anything happen after that?
22 A  I don't know 'cause I would just submit them
23    with my paperwork, and I don't know what they
24    would do with them after I submitted them.
25 Q  Okay.  Did anybody ever call you up about a TOPS

## Page 38

1  A   Yes.
2  Q   The same -- the same procedure, same way they
3      were handled?
4  A   Yes, but as a gang officer, I didn't fill it out
5      every time, it was kind of redundant.  If I had
6      personal contact with the individual, I wouldn't
7      go and make another card.  Usually I would but
8      sometimes I wouldn't.
9  Q   If you didn't make a card, was there a way that
10     you would memorialize a conversation or an
11     interaction?
12 A   Sometimes I would write it in a casebook, but my
13     brain works in different ways and I'm able to
14     recall stuff.
15 Q   Okay.  So would you then put that information
16     anywhere, like into the gang database?
17 A   Yes.
18 Q   And how did you do that?
19 A   There is a -- are you just talking about the
20     actual, like, doing an entry or ...
21 Q   Yeah, just start with that.
22 A   All right.  So within the system, FileMaker,
23     there is a new card request or a new -- new
24     person, click that button, it comes up, and you
25     can input all the information that goes in

## Page 39

1      there; then there's a narrative portion that you
2      could put in there as well.  So part of that
3      would include any type of conversation or
4      interaction that I had with that individual.
5  Q   So even if you didn't fill out a TOPS card,
6      you'd go back and make an entry in the gang
7      database?
8  A   Yes.
9  Q   Okay.  And after that -- after that entry was
10     made in the gang database, do you know what
11     happened then?
12 A   I'm not -- I'm not sure what you --
13 Q   That was a bad question.
14 A   Yeah, sorry.
15 Q   So after you had entered that information in the
16     gang database, would it then become part of that
17     person's information that would show up in the
18     gang database?
19 A   Yes.
20 Q   And we've heard about something called EJustice
21     where active gang members would show up on
22     EJustice; is that right?
23 A   Yes.
24 Q   And if -- so if I looked up, you know, the name
25     of a person on EJustice, what would I see?

## Page 40

1  A   So EJustice would have a little flagging at the
2      top of the person's name that would say they're
3      a gang member, or I think it gave a code.  I
4      can't remember, I'm sorry, I haven't looked in
5      EJustice in forever.
6  Q   Okay.  Okay.  And that was something that was
7      available to, I think Mr. Hemmert said about 700
8      people.  Do you agree with that?
9  A   It would be the commissioned personnel so ...
10 Q   And somebody in records?
11 A   I believe so because SPIDER would have to be
12     able to see that also.
13 Q   Tell us what SPIDER is.
14 A   It's the Special Police Information Data Entry
15     and Retrieval.
16 Q   Okay.  And what does SPIDER do?
17 A   Officers can contact SPIDER, either radio or
18     phone, and ask a person to be checked for wants
19     or warrants, they can request a tow truck,
20     miscellaneous service stuff; if they got a tree
21     in the road or something, they can call them.
22 Q   Okay.  So and -- and if they call about a
23     specific individual, they can also find out if
24     they're a member of a gang, correct?
25 A   Correct.

## Page 41

1  Q   Is that a signal 33?
2  A   Yes.
3  Q   So you call in SPIDER and they would say
4      signal 33 for this person, correct?
5  A   Correct.
6  Q   Okay.  Anything else that you did as a gang
7      officer that you haven't told me about?
8  A   Like I said, we provided training, went to
9      training obviously.  Again, I was working really
10     close with the -- the detectives 'cause we were
11     assigned to investigations, so we were part of
12     investigations.
13 Q   And when you say you were assigned to an
14     investigation, how'd that work?
15 A   We were assigned at night, our -- I switched
16     days back and forth so I -- but our -- our
17     shift, I think, started at 5:00 -- 4:30 and went
18     till, like, 3:00 in the morning.  So we reported
19     to the Sixth Floor, which is the investigations
20     division, so we didn't have a patrol bureau that
21     we were assigned to.
22 Q   Okay.  So you would go, on your start of your
23     shift, you would go up to the Sixth Floor and be
24     told that you needed to take a look at this,
25     that, or the other?

11 (Pages 38 to 41)

## Page 54

1　A　The -- I'd look over them to see, you know, what
2　information they had listed, if it matched up to
3　the information in EJustice at the time. A lot
4　of times before we would ever document somebody,
5　we would look at their case history, we'd pull
6　up all their old cases to see what kind of cases
7　that they had and who they were with. Back
8　then, they did -- there wasn't social media, so,
9　you know, we'd go off of cases and the
10　information that was listed in cases.
11　Q　So that was actually more important than the
12　TOPS cards?
13　A　Well, the -- the TOPS card was important because
14　obviously it was the firsthand knowledge that
15　this officer is providing, and so I'm -- I'm
16　relying on that officer's, you know, statements
17　and -- and information that he's providing to
18　me, but I would also try to verify some of that
19　information on my own.
20　Q　Okay. So you'd try to verify some of that
21　information by looking at cases that --
22　A　Cases and, you know, like I said, if there
23　was -- and it could also go through my
24　experience, if I -- if I knew this guy before,
25　does that make sense, if I had contact with him

## Page 55

1　or I had seen him hanging out at a location,
2　or -- or whatever, then it's essentially
3　verifying that officer's -- what he's reporting
4　to me.
5　Q　So you'd use your own experience to verify if
6　you had had an interaction with that person?
7　A　Correct.
8　Q　And if that was the case, then you'd go ahead
9　and enter that into the gang database?
10　A　If they met criteria, yes.
11　Q　Okay. Any -- were there times when they didn't?
12　A　Yes.
13　Q　And how often would that happen?
14　A　I don't have a exact number.
15　Q　Was it unusual or -- or did it -- was it more
16　often than not, or was it rare?
17　A　It was not rare, it -- it was common, I mean,
18　people would send a card, and that person would
19　not meet criteria so we didn't put them in
20　there.
21　Q　And what were reasons that they wouldn't meet
22　criteria?
23　A　Again, sometimes it -- you know, case history
24　wasn't there, you know, the tattoo, they didn't
25　have any tattoos, there -- there wasn't enough

## Page 56

1　information to verify what the officer had --
2　had -- had sent up. Again, self-admits were
3　very common, and so if a guy self-admitted, then
4　they were usually going, but there was other
5　times where officers may just have, you know,
6　lots of colors, may -- may have saw a hand sign,
7　not sure, you know, they just weren't quite sure
8　and so they -- they felt like that they needed
9　to send the card, which was fine, we looked at
10　it and felt doesn't meet criteria, we're not
11　going to put them in there.
12　Q　And they might document in the narrative that
13　they thought they saw a hand sign but they're
14　not sure?
15　A　Correct.
16　Q　And in that case, you'd say, well, that's not
17　enough?
18　A　Yes.
19　Q　Okay. And you say there were lots of
20　self-admits?
21　A　Back then, yes.
22　Q　Okay. And when you say back then, what time
23　frame are we talking about?
24　A　Again, it was more common when I was a gang
25　intelligence officer. Again, I'm not on the

## Page 57

1　streets, so they may be encountering it, I'm
2　just not getting a whole lot of that now.
3　Obviously I'm a lieutenant so I'm not ...
4　Q　Okay. So back -- you're talking about the 2002
5　to 2009 period?
6　A　Yes.
7　Q　Okay. And then once you became a detective, how
8　long were you in that position?
9　A　Till 2014.
10　Q　And what happened -- what happened then?
11　A　I got promoted to sergeant.
12　Q　Okay. And was that still with respect to the
13　gang unit?
14　A　No.
15　Q　Okay. Where were you then?
16　A　I went to Patrol North -- Patrol East as a
17　sergeant.
18　Q　Okay. What are the responsibilities of a
19　sergeant?
20　A　Sergeant is to actually be out there with the
21　officers, making calls with them. Obviously
22　we're making supervisory decisions, arrest
23　approval, we would conduct traffic
24　investigations in reference to officers'
25　vehicles, we would -- any use-of-force

15 (Pages 54 to 57)

Page 74

1    That's not just that single one.
2  Q  And how about if they were seen there two or
3    three times?
4  A  Again, just on that, that's just one criteria,
5    you would need three.
6  Q  Right, but that -- you could enter that as -- as
7    a criteria?
8  A  Yes.
9  Q  Right.
10  A  It -- it could be entered as a criteria, yes.
11  Q  Okay.  Okay.  And how did that work, did you --
12    you know, 'cause, I mean, I'm sure that there
13    were times when you didn't see all three
14    criteria at once, so how would that typically
15    work that you would keep track of those
16    criteria?
17  A  Are you referring to, like, an audit or when
18    you're first flagging somebody?
19  Q  When you're first flagging somebody?
20  A  Okay.  Again, if -- sometimes you would -- there
21    would be a time period obviously that you would
22    see an individual or you would get -- you may
23    get a TOPS card, you know, at the first of the
24    year and he doesn't meet criteria.  Well, you
25    get one six months later and now he does.  So

Page 75

1    sometimes there was a break -- or not a break
2    but a -- just there was a gap that, you know, he
3    didn't meet criteria and so -- and then at some
4    point he does, and then that's when he would be
5    added to the database.
6  Q  So how -- where's -- where do you store the
7    records, say, for somebody who's met one
8    criteria but hasn't met all of them yet, how do
9    you keep track of that?
10  A  Again, if a person didn't meet the criteria,
11    they just weren't inputted, and so kind of like
12    what you said before, usually there was just --
13    all of them were met at that exact moment.
14  Q  Okay.
15  A  We didn't put people in there and only mark one
16    and say we're going to save this for later.
17  Q  Okay.  So that didn't go into the gang
18    database --
19  A  Yeah.
20  Q  -- if you only had one criteria?
21  A  Yes.
22  Q  Was it -- was it kept anywhere else so that you
23    could say, okay, this day he made this criteria
24    and this day he made this one and this day he
25    made that one?

Page 76

1  A  No, there was no official record or anything.
2    The only thing we did was the -- the TOPS cards
3    that people didn't meet, we put them in an
4    inactive box, and so sometimes you could go back
5    and look to see if there was a previous card.
6  Q  And was that, like, a physical box that the
7    cards were kept in, or was it --
8  A  Yeah, it was like a drawer --
9  Q  Okay.
10  A  -- like an index drawer.
11  Q  And you said it was the inactive box?
12  A  Yeah, we just called it all of that, I mean, it
13    was -- we didn't rename it, like, did not meet
14    criteria, or something, we just put it all in an
15    inactive box.
16  Q  Okay.  And were there other folks in that drawer
17    who were -- actually, I mean, had been on the
18    list and were taken off and were inactive?
19  A  Yes.
20  Q  And so their names and cards were just in this
21    drawer?
22  A  Yes.
23  Q  Okay.  'Cause they were taken out of the gang
24    database?
25  A  They were made --

Page 77

1  Q  Out of EJustice, they were taken off EJustice --
2  A  Yes, they -- they were removed from EJustice,
3    they were changed inactive in the database, and
4    then their card was placed in the -- in the
5    inactive draw.
6  Q  Gotcha.  So they -- so they stayed on the
7    database with a marker of inactive?
8  A  Correct.
9  Q  Okay.  And then their cards went in the drawer,
10    and that would be the cards that had all the
11    cases on them and all that information?
12  A  Whatever was put on there by the officer or --
13    but, yes, it could include case numbers.
14  Q  Basically be their -- their gang history,
15    correct, in -- in the database?
16  A  Yes, again, it's very limited on -- on space, so
17    a lot of times it was the highlights or just --
18  Q  Okay.
19  A  -- summary.
20  Q  Okay.  And those would stay in the drawer as
21    long as the person was inactive, if they were --
22    had already been on the list and were inactive?
23  A  Yeah, we -- we didn't -- once they were put in
24    there, I mean, until we finally scanned them all
25    in, I mean, then we -- they just remained in the

20 (Pages 74 to 77)

Page 82

```
 1          four gang officers during one of their audits to
 2          kind of pretty much just write down what they do
 3          for the audit.  And then in conjunction with
 4          that, you know, when they get a new TOPS card
 5          what things to check.  But it really came down
 6          to what -- to make sure that the audit was done
 7          in a, kind of a check box type manner.  So the
 8          audit was one of the main things in there.
 9              The only other complicated thing was is
10          that we -- you know, there was EJustice, and so
11          we were responsible to make sure that that
12          person was flagged in EJustice and maintain the
13          database, so you had two entities that we had to
14          make sure that were accurate.
15     Q    Okay.
16     A    And so that's why there's so much stuff in there
17          about EJustice, and then now it's changed to
18          Niche, and so there's a new process for that.
19     Q    When did it change to Niche?
20     A    I think last year, April 2021, I think, or ...
21     Q    Okay.  So up -- up to that, it was EJustice.
22     A    Yes.
23     Q    And so it was the gang intelligence officers'
24          responsibility to maintain the list and to
25          maintain the flags in EJustice?
```

Page 83

```
 1     A    Correct.
 2     Q    So in -- do you recall exactly when it was when
 3          you -- when you wrote down how these standard
 4          operating procedures written down, the year or
 5          anything like that?
 6     A    It's -- my -- it's got to be 20 -- it's between
 7          2015 and 2018.
 8     Q    Okay.
 9     A    It was -- it -- I really want to say it's 2016.
10     Q    Okay.
11     A    Somewhere in there.
12     Q    Okay.  And what kind of thing -- so are there
13          now actual written SOPs that you can look at?
14     A    So there -- there was an SOP that was -- that
15          was made by us, and I believe it was sent
16          through channels and -- and approved.  We may
17          have to adjust it again now because of Niche.
18          But, yes, in addition to Policy 527, there is an
19          SOP that Officer Carson and Officer Bernard
20          could follow.
21     Q    Okay.  So tell me what's in that SR -- SOP.
22     A    If I remember correctly, it's really just a step
23          by step, like if you get the information from an
24          officer what to follow going forward, whether
25          you, you know, you -- I think one of it's
```

Page 84

```
 1          obviously look at their police incidents, check
 2          for social media, try to verify -- you know,
 3          read the police reports that -- that originally
 4          gave you the information, whether it's -- such
 5          as an officer sent up a card or sent an email,
 6          or whatever, as to why they believe that this
 7          individual's associated with a gang.  And it
 8          really goes through all that and then how to put
 9          that information into the actual database.  I
10          mean, it's fairly self-explanatory, I mean, you
11          fill in the boxes.
12     Q    Okay.  So it's like -- it's a checklist?
13     A    Essentially, yes.
14     Q    Okay.  So you -- if you get a TOPS card or an
15          email from an officer saying, I want -- you
16          know, I think this person needs to be documented
17          as a gang member, it's a checklist of what you
18          would check to see if you -- if you would enter
19          that person into the gang database?
20     A    Yes, I don't think it's an actual physical
21          checklist --
22     Q    Okay.
23     A    -- but it's -- it's a standardized, hey, make
24          sure you check these points.
25     Q    Okay.  All right.  And then what would it say
```

Page 85

```
 1          about EJustice?
 2     A    EJustice is kind of complicated in how you would
 3          get information in there, so it was kind of a
 4          step by step on how to make sure that the person
 5          was entered into EJustice, 'cause EJustice
 6          wasn't really user friendly.
 7     Q    Uh-huh, uh-huh.
 8     A    And so you had to create the different gangs and
 9          then put the person associated within that gang,
10          and it -- it's not a conducive system to -- to
11          put stuff in.  So it really kind of lines out
12          how to exactly put that person so that flag will
13          come up at the top of the page.
14     Q    Okay.  So that's kind of a technical issue?
15     A    Yeah, it's -- it's more just technic --
16          technical stuff on how to make sure it's done
17          correctly, and to remove them.
18     Q    Okay.  Okay.  And then with respect to the
19          audits, what -- what was the SOP for the audits?
20     A    Again, it's -- it's like you described, a
21          checklist.  You know, obviously you go through
22          and you look at their -- any police reports that
23          have happened that past year.  You know, again,
24          you check their social media, you -- you look at
25          the arrests, you -- you look at all those
```

22 (Pages 82 to 85)

Page 86

1 things.
2      You also look to see if during that time
3 period you may have put an entry in there, you
4 know, a gang officer may have had contact with
5 that person and -- and noted that in the -- in
6 the narrative already so -- so all that stuff.
7 And, again, it's just a checklist of all the
8 different things to check, and if -- and also if
9 you're going to remove a person, remove, make
10 somebody inactive, there was a process for that
11 as well.  Or you would follow the same process,
12 and if they didn't, you know, if they didn't
13 meet that, then -- then they were made inactive.
14 Q   Okay.  So I've heard from other officers that
15 sometimes people were not added to the list
16 until the audit, is that -- is that your
17 understanding?
18 A   Well, that's possible.  In -- again, are they
19 meaning a brand-new person, or are you talking
20 about a person that was already documented and
21 then re-added because they found new
22 information?
23 Q   I think both?
24 A   Okay.  So during the audit, you sometimes will
25 encounter, while you're doing research on the

Page 87

1 person that's in the database, you discover
2 another person that -- that you hadn't
3 documented before, didn't know about.
4 Q   Uh-huh.
5 A   And then upon research, you discover he meets
6 criteria.
7 Q   And when you say you discover another person,
8 how would you -- how would you do that, how
9 would that happen?
10 A   Most common -- well, from my experience would be
11 finding police cases -- or, I'm sorry, incidents
12 and all these names are listed, or a traffic
13 stop or it -- somehow it's documented and you
14 keep seeing the same name over and over with
15 this -- this group.  And then you would go
16 through the whole process to see if they meet
17 the criteria.
18 Q   And in that case, that could be just something
19 that popped out from an incident report about a
20 person, and you would then go and look at some
21 of these other things and you could document
22 that person solely based on that paper trail; is
23 that right?
24 A   Yes.
25 Q   Now, do the -- do the audit -- just kind of walk

Page 88

1 me through how you do the audit --
2 A   Okay.
3 Q   -- how does that work?
4 A   So do you want me to explain it when I was a
5 gang officer, or do you want me to explain it as
6 they do it now?
7 Q   I want you to explain to me both.
8 A   Okay.
9 Q   Let's start with when you were a gang officer.
10 A   Okay.  All right.  So -- so FileMaker was a --
11 was a stand-alone system, we would have to -- so
12 only one person could get on it at a time.  So
13 we would divide the list up between the four of
14 us, and then on each page there's probably like
15 50 names.  And so we would go through each name,
16 and I would look up that person in EJustice,
17 again this is before social media and all that
18 stuff, so we'd look up their cases, try to find
19 arrests, if we had any contacts with them
20 before, whatnot.  And I would have to handwrite
21 all those cases down on a separate piece of
22 paper, and then it would be my turn to go get
23 onto the database, so we'd rotate it.
24 Q   Uh-huh.
25 A   And then I would get to input my information on

Page 89

1 my people.  And I'd just go through -- and it
2 was a tedious process.  And so essentially the
3 guys do it the same way, now there's only two of
4 them.
5 Q   Uh-huh.
6 A   But they have -- they divide up the list, and
7 they go through each name, and they see if they,
8 you know, meet that criteria, or if there was no
9 activity after three years, then they'll take
10 them off.
11 Q   Put them inactive?
12 A   Yes.
13 Q   Okay.
14 A   I'm sorry, take them off, that's --
15 Q   Okay.
16 A   -- inactive.
17 Q   How -- go ahead.
18 A   So, yeah, that's -- that is the process.  They
19 don't have to do the hand -- I think a lot of
20 them now they cut and paste or they type out
21 their notes to put in the narrative.
22 Q   And that was how it was done when you were
23 there, correct?
24 A   Yes.
25 Q   So how's it done now?

23 (Pages 86 to 89)

## Page 90

1    A   Well, again, that -- I kind of jumped in and did
2        the -- the guys still print off an old hard copy
3        list of names and they -- they go through and
4        they -- they mark them off.  I think they use
5        highlighters now where they -- they color code
6        it so it's easier to read.
7    Q   Okay.
8    A   And, yeah, they go through each -- each one, and
9        they -- they make sure that they either still
10       meet it or -- or if they don't, then they'll --
11       they'll remove them.
12   Q   Okay.  Let's go back and talk a little bit about
13       how the gang unit changed over time.
14   A   Right.
15   Q   So when you were a gang intel officer, there
16       were four gang intel officers who reported to
17       the night sergeant --
18   A   Yes.
19   Q   -- correct?  When's the next time that changed?
20   A   So in 2017, the unit expanded, they -- they --
21       they changed the name, and it became the Violent
22       Crimes Response Team; and we had, I think, ten
23       at night, and there was six during the daytime.
24       Sergeant Harty was in charge at night, and I
25       think Sergeant Cooper was in charge of the

## Page 91

1        daytime operations.  But all of those guys would
2        be responsible for an audit when -- when it came
3        time so ...
4    Q   Okay.  So there would be 16 people who would be
5        involved in the audit?
6    A   Yes.
7    Q   And what did they call those 16 people, was
8        there a particular name for them?
9    A   Yeah, the Violent Crimes Response Team.
10   Q   Okay.
11   A   Or VCRT.
12   Q   And how -- I mean, that's a significant
13       expansion of the gang unit, correct?
14   A   Right.
15   Q   So how did they add those folks?
16   A   There was a process again where they had an oral
17       board, and then they were selected based on
18       their -- their scores from -- from the oral --
19       or their -- the process that's established
20       through the FOP or through the -- the
21       department.
22   Q   When you say FOP, that's the fraternal --
23   A   Yes, and I say the FOP 'cause they had,
24       obviously, input into what is -- the department
25       chose.  It's the department process for -- it's

## Page 92

1        not a promotion, it's just being selected for a
2        specialty unit.
3    Q   Okay.  And FOP is the union, right?
4    A   Correct.
5    Q   Okay.  So -- so those people were all added, and
6        they were just called Violent Crimes Response
7        Team members?
8    A   Yes.
9    Q   Okay.  And what was your position at this point
10       in time?
11   A   So at that point, I believe I was -- I can't
12       remember exactly when they -- I thought it was
13       2017, so I would -- or maybe it was 2018, I
14       think it was 2018 is when they -- they started,
15       so that would have been right when I was
16       finishing as a sergeant and then I got moved out
17       to Patrol North --
18   Q   Okay.
19   A   -- as a lieutenant.
20   Q   Okay.  All right.  So were you happy
21       about that change?
22   A   Well, I -- I wanted to get promoted.
23   Q   No, okay, I mean, let me back up.  Were you
24       happy about the change to the gang unit?
25   A   Oh, I thought it would -- it was appropriate,

## Page 93

1        yes, I mean, 'cause the -- I felt like the -- it
2        was overwhelming for the four officers to work
3        on that audit.  And we had a lot of, obviously,
4        violence that was going on that I felt like we
5        could address better with a specialized team.
6    Q   Did you have anything to do with designing that
7        team?
8    A   Yes.
9    Q   Okay.  Tell me about that.
10   A   So we didn't know what the numbers would be or
11       what they were going to allocate to us, but
12       we -- I say we, I think it was myself and at the
13       time Sergeant Bartel had initially -- we
14       initiated a violent crimes task force; that took
15       place back in 2017 because the amount of
16       violence that was going on, and that ran for
17       about three months, I think.
18       And we kind of took that approach where we
19       had, you know, this specialized unit focused on
20       our most violent offenders and -- and then
21       applied that to becoming a violent crimes unit
22       where you would have some guys work at night and
23       then the other guys work during the daytime.
24       They would all be responsible for some part of
25       gang intelligence, but, again, the -- a lot of

24 (Pages 90 to 93)

## Page 106

1    A   I've never heard the off-ramp thing, but the
2        juvenile intervention unit would be a -- they
3        were -- they were part of the notification
4        process for juveniles that's in Policy 527.
5        When we had them, I say we, when the unit had
6        them or I had them assigned to me, I -- I would
7        have them go make the notifications and offer
8        resources to -- to parents.
9            Obviously we would want to try to intervene
10       if we could catch somebody before and not get
11       them on the list.  Usually that person would --
12       when they're getting notified is already going
13       to be on the list, and so by having them go and
14       make contact and offer the resources, we were
15       trying to get them to stay out of trouble for
16       that -- that three-year period so that they
17       could be changed to inactive.  Does that make
18       sense?
19   Q   Uh-huh, yeah.  So they were already on the list,
20       and they're going out to try to tell them that
21       they're on the list, tell the parents they're on
22       the list and tell them how to stay off the list?
23   A   Correct, how to --
24   Q   Or how to stay -- not get tagged again for three
25       years?

## Page 107

1    A   Yes, and offer them resources and -- and -- and,
2        you know ...
3    Q   So how do they do those -- how did -- well,
4        let's step back.  So part of Policy 527 is that
5        juveniles, if a juvenile is put on the list, you
6        need to notify the parent or guardian of that
7        juvenile; is that right?
8    A   Yes.
9    Q   So how does the gang unit undertake those
10       notifications?
11   A   So the initial was to send a noti -- or a
12       certified letter, but we didn't have much luck
13       with that, so we started doing phone calls and
14       then trying to actually physically go to their
15       address.
16   Q   And when did the phone calls and going to their
17       address start?
18   A   I'm not 100 -- I don't know.
19   Q   Can you give me a general idea based on where
20       you would --
21          MR. BRANSON:  She was catching up.
22          THE REPORTER:  No, I'm good.
23   BY MS. WOODY:
24   Q   Okay.  I'm sorry, let me finish my question.
25   A   Okay.

## Page 108

1    Q   Can you give me a general idea based on your
2        tenure and experience when that notification
3        procedure changed?
4    A   I'm pretty sure it happened in, like, 2016,
5        2018, somewhere -- I -- I'm pretty sure it was
6        right when I was the sergeant on nights.  Again,
7        I'm -- I'm really confident that -- between that
8        2015 to 2018.
9    Q   Uh-huh.
10   A   Because I'm -- I'm -- Lieutenant Gilmore was in
11       charge of the actual section at that time.
12   Q   Okay.  And so that's when they started trying to
13       make phone calls or have somebody go out?
14   A   Yes.
15   Q   And are those contacts documented anywhere?
16   A   Yes.  What I would request is that that
17       information be put in the narrative of the
18       database.
19   Q   Okay.  So that would be for each individual
20       juvenile where there was a contact, it would --
21       you would look at that individual's gang card,
22       if I can call it that, and it would show there
23       somewhere in the narrative that the parent had
24       been contacted or had tried to contact and that
25       there -- and then whatever resources had been

## Page 109

1        suggested, those kinds of things or not?
2    A   Not so much on the resources.  It might mention
3        that.
4    Q   Okay.
5    A   And I don't think we put all of the certified
6        letters in.  I -- I don't think we put in the
7        narrative that a certified letter was sent to
8        everybody.  We saved all those --
9    Q   Uh-huh.
10   A   -- but we didn't actually physically put that
11       part in there.  But, yes, if they -- they went
12       out and made contact with them, then -- then
13       that should be going in the narrative.
14   Q   Okay.  And you'd have to look at each
15       individual's gang card to see if the
16       notification took place?
17   A   Yes.
18   Q   Okay.  Do you -- do you have any idea how --
19       what percentage of juveniles who are on the list
20       that they're able to notify the parents or
21       guardians?
22   A   I don't -- I don't know the percentage or the
23       exact numbers of that.
24   Q   Do you have a general sense, is it, you know,
25       most of the juveniles or not very many, I mean,

PohlmanUSA  Court  Reporting
(877)  421-0099    www.PohlmanUSA.com

Page 134

1  Q   And if you look there, there's also, there was a
2      taking people off the list if they hadn't been
3      in trouble for 14 months.  Do you see that?
4  A   Yes.
5  Q   And is that something that you agree with?
6  A   I know ours is three -- three years.  I would
7      probably think that maybe split the difference,
8      you know, maybe -- whatever that would make it.
9      Personally, I don't -- that's -- that's not a
10     huge issue to me, you know what I mean, it -- I
11     recognize that there are people that are very
12     active in what they're doing right now, and
13     there's others that maybe still claim their
14     membership that have stayed on -- on the list
15     because they continue to get arrested.  So ...
16 Q   So you don't really have a problem with -- with
17     that?
18 A   Not so much, I'd have to take a little bit
19     more -- maybe a standardized look at it, or
20     whatever, just to see, you know, maybe -- I'd
21     like to, like, maybe compare, you know, who's in
22     the database, maybe how -- how they've -- how
23     long they've been on -- you know what I mean, if
24     we could, like I said, come to more of a mutual,
25     you know, between -- between the three years

Page 135

1      and -- I've always felt like the WPD has come a
2      long way because we give the opportunity for a
3      person to come off the list because there --
4  Q   To become inactive?
5  A   Yes, I -- I say off the list but, yeah, to be
6      inactive and -- and we do a yearly audit to make
7      sure that that's up to date so -- but I think
8      that 14 -- the 14, you know, some -- somewhere
9      in there, I think that's -- that's -- that could
10     be applicable.
11 Q   With respect to the last bullet there, it says
12     that anybody who has been tagged, you know, put
13     on the gang list --
14 A   Uh-huh.
15 Q   -- any adult --
16 A   Uh-huh.
17 Q   -- be notified.  Now today that's not a
18     requirement, correct?
19 A   Correct.
20 Q   So somebody could be on the list and not know
21     it?
22 A   It's possible, yes.
23 Q   And so do you have any disagreement with
24     notifying people once they're put on the list?
25 A   No, that's fine.

Page 136

1  Q   Okay.  I think one of the things that's not in
2      that memo that -- that Deputy Chief Salcido had
3      talked about was getting rid of the inactive
4      list altogether?
5  A   Uh-huh.
6  Q   And getting rid of anybody who was just an
7      associate.
8  A   Uh-huh.
9  Q   Have you heard that?
10 A   We had talked about -- once this came about, I
11     think we talked about having the inactives
12     removed off of the database but keeping the
13     legacy information, because there is a lot of
14     history that -- that's in that information.  So,
15     again, I don't want to just throw it all away, I
16     mean, there's -- there's a lot of stuff in
17     there.  I mean, I know of shootings that still
18     go on today because of what happened almost
19     20 years ago when I was first a gang officer,
20     and it still rings true with those guys today.
21     But, no, I -- I don't have a problem with
22     removing the inactives out of the -- the main
23     database, or whatever, and putting, you know --
24     putting all their files, you know, in a folder
25     or something.

Page 137

1  Q   Okay.  And then how about the associates, how
2      about removing them?
3  A   I -- I understand removing associates; however,
4      I'm going to fall back to that a lot of our
5      associates are -- are -- are really just active
6      members that -- that haven't met all three
7      criteria, but a lot of it's with our Mong -- or
8      I was going to say Mongols, but our motorcycle
9      gangs where we have support groups which are
10     specific -- that's their specific function;
11     they -- they can never become a full member
12     because they'll never get patched in, but they
13     are the support club.  And some of those support
14     people will meet the -- the -- the three minimum
15     criteria, but my training and work experience, I
16     know for a fact that they -- they're not a
17     member because they're not a patched member of
18     the club.  So I always know they're always going
19     to be an associate.  Does that make sense?
20 Q   Uh-huh.
21 A   So -- so I would have a little bit -- I think
22     it's applicable, but, again, there -- there
23     would be things that I just gave you that
24     example, or whatever, where I know for a fact
25     that this is a support club person, they're

35 (Pages 134 to 137)

Page 138

1  going to this -- this same location, or
2  whatever, but they're not a full mem -- member
3  because they don't have a patch.
4  Q  Okay.
5  A  So I have a couple hang-ups with some of that,
6  and it just comes down to being able to
7  articulate --
8  Q  Right.
9  A  -- as -- as my profession would allow.
10  Q  I think maybe what you're saying is sometimes --
11  you think that most of the people who are on the
12  associates list really do qualify as gang
13  members, is that what you're saying?
14  A  Well, it -- they can.  Now, it's not -- because
15  there are a lot of times there is a lot of
16  documentation that -- that -- that -- that
17  there -- that there's available but -- and I
18  don't want to get into the mediation - but I,
19  again, I wouldn't have that big -- I wouldn't
20  have that much of a problem with associates
21  coming off the list.
22  Q  Okay.  Let me just ask you real quickly right
23  now about the notification of juveniles.  So
24  everybody gets sent a certified letter, right?
25  A  No.

Page 139

1  Q  No, okay.  So it's changed?
2  A  Yes.
3  Q  Okay.  So -- so tell me how it works now.
4  A  Okay.  So the certified letter was the -- what
5  initially happened as part of the -- when they
6  started the program.
7  Q  Okay.
8  A  We got so many of those back un -- unserved, or
9  whatever, we realized that it's not an effective
10  way to do that.  So that's when we changed it to
11  either a phone call and/or personal contact.
12  Q  Uh-huh.
13  A  And that usually meant either I would -- so when
14  I was the night sergeant, I would make a phone
15  call to the parent and I would tell them about,
16  you know, that their child had been documented,
17  that we would like to, if you -- if you wanted
18  to, to set up an appointment to meet with
19  Lieutenant Gilmore so that you could go over the
20  actual flagging and then discuss options for,
21  you know, resources and different things.  Some
22  of those went very well; some of them, just got
23  hung up on.  But I usually had the -- the
24  gang -- so now for a personal contact, we would
25  either have the gang officers or I prefer the

Page 140

1  juvenile intervention unit go out, or they --
2  they work together --
3  Q  Uh-huh.
4  A  -- and go out and actually try to make contact,
5  leave a card.  I think they do try a phone call
6  if they're not having luck.  We really want to
7  try to do personal contact.
8  Q  And is there any certain number of times that
9  they need to try to make contact, or is it a one
10  and done, or how's that work?
11  A  I rely on their common sense, I would expect
12  they need to make two or three or four attempts,
13  that's -- that's the common -- you know, leave a
14  card, make a phone call, go back by, you know,
15  go by the school.
16  Q  Do they document those attempts anywhere?
17  A  If they do, I don't know about it.
18  Q  So that would be the folks who are actually
19  doing that who I would -- who I would need to
20  talk to about that?
21  A  Correct.
22  Q  Why don't we take a 15-minute break and --
23       THE VIDEOGRAPHER:  Go off the record
24  at 11:43 a.m.
25       (Thereupon, a recess was taken;

Page 141

1  whereupon, the following was had.)
2       THE VIDEOGRAPHER:  Okay.  We're back
3  on the record at 11:57 a.m.
4       MS. WOODY:  Can you mark this for
5  me?
6       (Deposition Exhibit Number 22
7  Marked for Identification.)
8       THE REPORTER:  22.
9  BY MS. WOODY:
10  Q  Okay.  Lieutenant Beard, I'm handing you what's
11  been marked Deposition Exhibit 22.
12  A  Uh-huh.
13  Q  Which is Wichita 060410 (sic).  You see that?
14  A  Yes.
15  Q  That just means that was produced to us by the
16  Wichita Police Department, okay?
17  A  Yes.
18  Q  And it looks like it is an officer's report
19  dated August 30, 2022 so within the last few
20  months.  Do you see that?
21  A  Yes.
22  Q  And can you just tell me what this is?
23  A  So this is an officer's report submitted by
24  myself to Deputy Chief Salcido identifying that
25  I have a social media account that I use for

36 (Pages 138 to 141)

## Page 162

1     oldest one maybe now is 18 or 19.
2   Q  Okay.
3   A  I think he's -- I think he just turned 18.
4   Q  Okay.  All right.  And so those five or six guys
5     are now their own gang even though they have
6     affiliations where they continue with other
7     gangs; is that right?
8   A  Yeah, there's only -- there's definitely two
9     guys that I know that were part of two separate
10     gangs.
11   Q  Okay.
12   A  The other guys may be just identifying
13     themselves as Ridge.
14   Q  Okay.  And what kind of criminal behavior have
15     they been involved in?
16   A  They've been involved in -- I believe they've
17     been suspects in several shots fired shootings
18     or drive-bys.  Like I said, I know they -- their
19     house has been targeted multiple times as such.
20     They do have a very distinct hand sign --
21   Q  Uh-huh.
22   A  -- that identifies them and they -- they have
23     been beefing with several other groups that --
24     when I say groups, mostly Crips, the -- they --
25     they seem to beef with whoever seems to be

## Page 163

1     making them mad at the time.
2   Q  Okay.
3   A  So they are -- unfortunately, they're very
4     active because of their behavior.
5   Q  And -- and you say they've been suspected in
6     shootings and such, have they been convicted of
7     any of that?
8   A  I -- I don't know of any convictions.  I -- I
9     think they've -- there's been arrests for, like
10     I said, weapons violations and firearms-related
11     cases, but I don't -- I don't have their file or
12     anything in front of me that I could --
13   Q  Okay.
14   A  -- tell you that.
15   Q  And they had a hand sign, if I recall, it's
16     kind -- it's kind of like this?
17   A  Yes, it's kind -- it looks kind of like
18     hang time, or whatever --
19   Q  Yeah, yeah.
20   A  -- but it's like FOB and I don't -- and I
21     assume --
22   Q  Thumb up and the -- and the next three knuckles
23     folded and then your --
24   A  Yeah, it's -- this is like the B, or whatever.
25   Q  Yeah.

## Page 164

1   A  I'm not sure if there -- if this is the F part
2     of it.  I -- I don't know if we've ever had
3     somebody specifically tell us what these --
4   Q  But if I did this, it's like Hook 'Em Horns,
5     right?
6   A  Well, yeah, it's --
7   Q  Same -- same thing as Hook 'Em Horns, right?
8   A  Could be, yeah.
9   Q  Yeah.
10   A  So -- but they use the social emoji, they do
11     FOB, and they do the hand sign --
12   Q  Okay.
13   A  -- for the social emoji.
14   Q  And FOB means what?
15   A  I don't -- I don't know if I've ever really
16     known what that -- what that means.
17   Q  Okay.
18   A  But they -- they -- the gang intel guys may know
19     exactly what that means.  I just -- I just know
20     that they're Ridge.
21   Q  Okay.  Okay.  So it's -- so I think we've --
22     we've covered that.  And as far as you know,
23     they -- they -- you don't know that they've ever
24     had any actual criminal convictions or criminal
25     behavior?

## Page 165

1   A  Yeah, I don't know if -- like the oldest one, I
2     don't know if he's been convicted.  I know he's
3     been in JDF and has been released and -- and
4     stuff so I don't know what -- what his status
5     is.
6   Q  And JDF is?
7   A  I'm sorry, juvenile detention facility.
8   Q  Yeah, okay.  But you don't know if he has -- you
9     don't know if there's ever anything he's been
10     sustained on in JDF?
11   A  I don't know about any convictions.
12   Q  Okay.  All right.  I want to talk to you --
13     well, let's -- let's -- huh.  Let me talk to you
14     a little bit about the gang unit itself, and I
15     want you to kind of tell me the history of the
16     gang unit within the WPD.
17   A  Okay.  Well, from my knowledge, it started back
18     in 1990.  When gangs came to Wichita, there was
19     obviously the influx of crack cocaine that came
20     here from the West Coast.  And so under a -- my
21     understanding is under a federal grant that they
22     were able to obtain cameras and -- and the
23     laptops and the FileMaker Pro system, but there
24     was an initial team that was started that would
25     focus on violent crime and gangs, whatever, and

Page 166

1  that was -- I think they called them SCAT, I
2  mean, as part of that, so the Special Community
3  Action Team. And that hit the streets back in
4  the early '90s to deal with the -- the large
5  amount of violence that was going on in the city
6  and the drugs.
7      So that unit, I think, met out of -- out of
8  city hall, and then I don't know where -- how
9  it -- how it progressed into where it became a
10  gang intelligence unit, but that was just --
11  when I got on the department in 1998 and then in
12  2002, I've always -- prior to that, when I was
13  in patrol, 1999 -- 1998, it was always just a
14  four-man unit. I know that some of the sheriff
15  department rode along with the gang officers
16  back then, and this is before I became a gang
17  officer, but it was always just a four-man unit
18  assigned to investigations.
19      Back then, I knew there was a drive-by task
20  force that was started at some point to deal
21  with the amount of drive-bys. And, again, I --
22  I don't know the specifics of who created the
23  database or -- or, you know -- I just know it
24  was already -- it was already in play when I --
25  when I came up there.

Page 167

1  Q   In 1998, when you joined the force --
2  A   Uh-huh.
3  Q    -- there was already a gang database and a
4  gang -- and four gang intelligence officers?
5  A   Yes.
6  Q   Do you know who was some of the first -- some of
7  the first leaders of that unit or leaders of
8  that -- putting the gang database together?
9  A   So the guys that I remember would be like
10  Carlton Rogers, Jeremy Miller, Paul Holmes, were
11  some of the original people. Then I know there
12  were other gang officers before me that were
13  then gang detectives when I came up there, so
14  like Jamie Hosty, Rick Wymer, Carl Hill, I
15  believe Jose Salcido, were all gang officers at
16  some point, and then they became gang
17  detectives, and then that's when I came up as a
18  gang intel officer.
19  Q   Okay. So let's start back with the time you
20  first -- well, so when you -- those -- it was
21  the four officers, and I think we then kind of
22  walked through how it changed after -- and how
23  it, you know, took on different configurations
24  after you were there, and for a while it
25  definitely got a lot bigger, correct?

Page 168

1  A   Yes.
2  Q   And now it's back to being a smaller unit; is
3  that right?
4  A   Yes.
5  Q   And are you happy that it's a smaller unit?
6  A   Again, I mentioned before, I think, you know, a
7  four-to-six-man unit would be much more
8  appropriate, especially dealing with an audit, I
9  think it would be much more effective and
10  efficient by having more people assigned to the
11  unit. So I would like to see more people
12  assigned than two.
13  Q   Okay. Does the gang unit have any special
14  identifiers within the police department that it
15  uses?
16  A   Currently, no, but the -- we do have a -- we had
17  a coin that was made, we had a logo that was --
18  that was made. Let's see, it was probably back
19  in 20 -- it was 2015 to 2018, I believe, it was
20  designed. Before that, there was a -- kind of a
21  logo that -- that they had, it was like a large
22  police badge and there was a brick wall that was
23  on it that said gang unit.
24      There was -- originally, when I received
25  the training, the gang officers wore green

Page 169

1  shirts and it had yellow writing on it, it said
2  gang unit, and they wore blue jeans, because as
3  part of that history that I was talking about
4  they went to Los Angeles Sheriff Department and
5  did, like, a week out there, and that's what LA
6  County Sheriff was utilizing, green -- green
7  Polo shirts and -- and blue jeans, I think.
8  Q   Okay.
9  A   And so that was the uniform at the time. I
10  don't know if there was really a logo that went
11  with it. But then --
12  Q   So the colors were green and blue, huh?
13  A   Well, it was green and yellow were the colors.
14  Q   Green and yellow --
15  A   Yeah.
16  Q    -- were the colors? Okay.
17  A   So on the original Polo shirts, or whatever.
18  And I -- I would assume that they took some of
19  that from the sheriff, but our WPD's colors were
20  green at -- at the time also so -- so there's
21  that logo and then the -- the logo with the --
22  it's got like the -- not the crusader head but
23  I'm just -- it's like a knight --
24  Q   Okay.
25  A    -- or whatever, with the -- like a ploof (ph)

## Page 186

1  department that was the only thing that we
2  received in the academy.
3  Q  Okay.  And so when you were -- when you were on
4  patrol, initially you -- you kind of sought out
5  personally and got some of that on-the-job
6  training --
7  A  Yes.
8  Q  -- from current gang officers, correct?
9  A  Yes.
10 Q  And so then in 2002, you actually joined the
11 gang unit, and was there -- what training did
12 you get as you came into the gang unit?
13 A  So there was -- I attended a -- I know I
14 attended one gang presentation to the recruits
15 given by Lieutenant Speer, and then I also --
16 again, a lot of it was, you know, hands-on
17 knowledge, real-time stuff, actually getting out
18 there, interacting with these individuals,
19 and -- and my partner at the time was Dan Harty,
20 and so I -- you know, all his ups and downs,
21 whatever worked for him, I took a lot of that
22 with me.
23    I watched them give presentations, you
24 know, I -- I looked through the presentations
25 that they had and I studied them.  I also

## Page 187

1  studied the database.  Like I talked about
2  before, I -- I have a real good knack of
3  recognizing people and -- and remembering those
4  persons and what they've been involved in and
5  who their girlfriend is and -- and the car, so
6  that helped me learn who the individuals were
7  the most -- and then to where the point I almost
8  didn't need the database because I knew who --
9  who was doing what and who was -- you know, what
10 gang they're already in.  And so that was a
11 skill set that I -- that I had that I -- that I
12 excelled in -- in that position with.
13    But, again, a lot of it comes down to just
14 on-the-job experience, or whatever, getting out
15 there, doing the interviews, interacting with
16 these guys.  I did put in requests, and I think
17 I -- you know, I would go to some of the gang
18 conferences, or whatever, when they came
19 available, but, again, it came up to funding and
20 availability and that kind of stuff.
21 Q  So when you say the gang conferences, what are
22 you talking about there?
23 A  So there was -- there was like a -- a Midwest
24 Gang Investigators Association that was put on
25 by -- I think it's now, like, the Koch Crime

## Page 188

1  Commission, I think, was one of the --
2  Q  The Koch Crime Commission?
3  A  Yes.
4  Q  Okay.
5  A  It's C -- or, sorry, K-O-C-H.  Or at least the
6  Wichita Crime Commission; they used to call it
7  the Koch Crime Commission.
8  Q  Right.
9  A  They would have a annual conference.  And,
10 again, if I got the opportunity to go to that, I
11 would go.  And then it was -- I ended up
12 developing my own PowerPoints because I wanted
13 something that I could talk about from my
14 experiences, my -- you know, the cases that I
15 had been involved in, the photographs that I had
16 taken of the guys when I was interacting with
17 them, and so it was more relevant to me.
18 And so then that's when I created my own and
19 then started providing training to recruits
20 and -- and that -- and that kind of stuff so ...
21 Q  And when do you think you would have developed
22 those, your own materials, about what time
23 frame?
24 A  It had to be probably 2003, 2004 so not real
25 long after I'd been there but, you know, within

## Page 189

1  the last -- within that year or so, because I
2  felt like it was important to keep kind of a --
3  a running, not novel but legacy, I guess, of
4  what I was experiencing or whatnot so ...
5  Q  So you've said that you used that PowerPoint
6  that you put together to do your -- to do
7  training for other people, correct?
8  A  Yes.
9  Q  And that -- that start pretty soon after you put
10 that together?
11 A  I believe so, yes.
12 Q  So tell me the kinds of training that you would
13 give using those materials.
14 A  Sure.  So with that, I would -- we would -- I
15 say we, usually we gave it as a group, or
16 whatever, but we would be scheduled to give the
17 recruits, as an example, so we had four hours to
18 provide training to the recruits.  So we would
19 talk about -- before we didn't have a state
20 statute, but we'd go through the criteria, we'd
21 talk about filling out a TOPS card and what was
22 required, we would talk about what a gang was,
23 what a gang member was, what is an associate.
24    And then so when the state statute came
25 about, we'd obviously go through that entire --

## Page 190

1  the 26 -- 21-6313, we'd go through all that and
2  explain that to them.  Then we would break it
3  down into the different gangs that are here in
4  Wichita.  And I don't want to bore you with all
5  that but, you know, just the different sets, you
6  know, the sets, the subsets, and the, you know,
7  the other sets that are -- that are here,
8  whether it's the Crips, the Bloods, the Folks,
9  Hispanic gangs, Asian gangs, white supremacists,
10  motorcycle gangs, we'd go through all the ones
11  that were identified here in Wichita.
12      And then we would give identifiers, colors,
13  you know, what they were involved in, and then I
14  believe we talked about what weapons.  Then
15  we -- we would do some case history or case
16  study of some of the violence that they were
17  involved in and -- and how we worked that case.
18  So give them an overall view of what gangs were
19  affecting Wichita and then what they might
20  encounter and then how to document that through
21  a TOPS card or in their reports.
22  Q  So that's the training you would give to the
23      recruits, correct?
24  A  Uh-huh.
25  Q  And do you still do that?

## Page 191

1  A  I don't personally but I -- I -- Cale and Jess
2      do that now.  And so when I became the
3      supervisor over the gang unit in 2015, I wanted
4      them to give those presentations, to create
5      their own, to make it something that they took
6      ownership to, and then they could give their
7      experience and -- and talk about -- there's
8      still always the basic stuff, there's always
9      going to be Bloods, Crips, Folks, or whatever,
10      that they're going to cover, but it's going to
11      have their own take on it.
12  Q  Okay.  So the training materials change over
13      time depending on who's -- who's giving the
14      training, they get modified?
15  A  Yes.
16  Q  Other than -- other than providing training to
17      the recruits, what other kinds of training did
18      you provide?
19  A  I provided -- so there was a couple times where
20      officers came from other outside agencies, from
21      Sedgwick County -- or I'm -- well, Sedgwick
22      County did have some deputies that -- that rode
23      with us, and -- and I essentially gave them
24      on-the-job training as how we do things.  I had
25      them from Dodge City, Great Bend, I believe, and

## Page 192

1  Johnson County, all came down to do either a
2  ride-along or -- or, you know, hang out with us
3  for a day to -- and we would go through
4  everything.
5  Q  You'd go -- you'd give them the presentation?
6  A  Give them the presentation, they would go out
7      for a ride-along, you know, they would -- all
8      the things that we did as a gang intelligence
9      officer, you know, doing their surveillance,
10      documenting the stuff from the database, you
11      know, reviewing the TOPS cards, part of the
12      audit, I mean, we'd just tell them, you know,
13      what our duties were.
14      Like I said, I've -- I've given
15      presentations for Newman and Friends and WSU,
16      I've given it to the district attorney's office,
17      I've given it to the juvenile detention
18      facility, I've given it to community
19      corrections, probation.  Again, several of the
20      conferences that I attended, whether it was the
21      Midwest Gang or the Kansas Gang Investigators
22      one I presented at.  And, again, that wasn't,
23      like, the whole time; it was I just had an hour
24      slot, or whatever.
25  Q  Right, right, no, I understand, yeah.

## Page 193

1  A  I've given mandatory in-service training to
2      current commissioned officers about, you know,
3      what current gang activity's gone on, whether
4      it's recently or, you know, explaining why these
5      feuds are going on, or -- or whatnot.  So that's
6      training that I've provided that's mandatory,
7      which is required for every officer every year
8      to go through two mandatory sessions.
9      I know that's kind of general, but that --
10      I have given, you know, community groups as
11      well, you know, neighborhood associations,
12      district advisory board type stuff, I've given
13      it to those as well, some being just 15 minutes.
14      I've also provided it to school staff, the
15      principals.  Certain schools had asked for a
16      presentation, so I've -- I've given it to some
17      of the schools, to the BOE, board of education,
18      security, the SROs.  Yeah, that -- again, a lot
19      of that training took place between 2009 and
20      2014 is where a lot of my presentations took
21      place.
22  Q  And did you use the same PowerPoint over and
23      over again?
24  A  Maybe the general layout but, no, I would try to
25      update it with more current information, current

49 (Pages 190 to 193)

## Page 214

1   Q   And that just contains the stats of, like, okay,
2   there's this many active gang members, this many
3   inactive gang members, this many people who are
4   deceased, correct?
5   A   That and I think what we were also looking at
6   like demographic wise, ethnicity, and then
7   Lieutenant Gilmore's kind of started where we
8   wanted to see how many people came off and how
9   many people we added and then like the average
10   age --
11   Q   Okay.
12   A   -- that kind of stuff.
13   Q   And did you ever -- I mean, is there anywhere
14   you could go to say, oh, this person was on the
15   list, you know, Joe Blow was on the list in 2015
16   but in 2016 he was inactive, I mean, is there a
17   place you could look for that?
18   A   Well, the only way I would know would be in the
19   actual database itself, you would be able to see
20   that he was previously flagged and then you
21   would noti -- be notified or you would see that
22   he reactivated. It's something that we could
23   probably find out or figure out, I guess, but it
24   would just have to go through each --
25   Q   Person?

## Page 215

1   A   Yeah. Unless they made it -- a notation on
2   their list --
3   Q   Okay.
4   A   -- that we added this guy back. But, again,
5   we're -- when you -- when you have the list,
6   we're only -- we're leaving the inactives out
7   'cause we're not dealing with them.
8   Q   So once you're made an active, how would you be
9   reactivated?
10   A   You would have to meet all new criteria, whether
11   that's all three or you self-admit.
12   Q   Okay. When you look at the criteria there in --
13   in Policy 527, are you comfortable with all
14   those, or do you think that there's some that
15   need to be modified?
16   A   On the -- from Policy 527 or from the state
17   statute?
18   Q   From Policy 527?
19   A   There's -- there's no criteria listed in Policy
20   527, I guess I don't -- I'm not --
21   Q   Okay. I'm sorry then, take a look at the --
22   A   Okay.
23   Q   -- state statute, it just makes reference to it,
24   right? Are there any criteria there that's in
25   Exhibit 5 that you -- that you think needs to be

## Page 216

1   modified, or are you happy with all of them?
2   A   The one personal thing that I -- I would like to
3   have seen was if instead of just saying gang
4   members it would -- I would like to have it
5   clarified more as to a particular set, because
6   right now it's just -- it's very general, like,
7   has been stopped in the company of known
8   criminal street gang members. I have always
9   made it a point to -- to, in my personal
10   opinion, that it should be of the same set if
11   you're going to document somebody. Just because
12   they're hanging out with some -- another gang
13   member by chance doesn't necessarily mean that
14   that's -- but if they're regularly hanging out
15   with members of the Crips over and over and
16   over, then, yes, then that -- that gives me
17   reason to believe that they're associating with
18   the Crips.
19   Q   So other -- because otherwise you could have a
20   bunch of kids playing basketball and some of
21   them are on the -- you know, designated as Crips
22   and some are designated Bloods or one of them --
23   one each and they can be -- they can meet that
24   criteria of associating?
25   A   That is a specific example. Again, I always

## Page 217

1   talk common sense. A basketball game, I'm not
2   going to use that as -- as them associating
3   with -- with criminal street gang members. If
4   it's on a car stop or, you know, hanging out at
5   a club or -- or something, you know, that's a
6   little bit more intimate. I mean, I -- playing
7   in a basketball game is not my consideration
8   of -- of criminal street gang activity, unless
9   there's -- they're throwing up hand signs and
10   all that stuff while they're doing it, but,
11   again, I wouldn't use that necessarily as -- as
12   criteria met.
13   Q   But if two -- if two -- two people from a
14   separate gang are hanging out at a club, that
15   could be associating with gang members?
16   A   It could be, but, again, I always -- my preference
17   or my -- what I did with the database, I always
18   preferred it to be members of the same gang set,
19   especially the known members that they're known
20   to associate with.
21   Q   And that was your -- your way of handling it,
22   correct?
23   A   Yes, and I tried to pass that on as much as I
24   could to the other officers.
25   Q   But the way the statute's written you could --

55 (Pages 214 to 217)

## Page 218

1  you could do it if it were just two different --
2  two members of different gangs?
3  A  Correct.
4  Q  And -- and you think there were times that it
5  actually happened, that somebody was -- met a
6  criteria because of that?
7  A  I think so, yes.
8  Q  Okay.  Any -- anything else that you would --
9  you would like to see modified in the statute?
10  A  The -- I wish they would have had, you know,
11  some type of -- oh, we have the -- the
12  expiration date, you know, if they would have
13  put in there that there -- you know, you will be
14  documented for two years --
15  Q  Uh-huh.
16  A  -- or whatever, make it kind of standard.
17  Looking back on some -- you know, having some
18  type of process to be notified or appeal, I
19  think, should be in the state statute so make it
20  standardized across the state.
21  Q  Because right now in the state statute, there's
22  no requirement for notification, correct?
23  A  Correct, yes --
24  Q  Okay.
25  A  -- there is no notification, there's no

## Page 219

1  expiration date.
2  Q  There's no way to get -- there's no way to get
3  off?
4  A  Right, and that's why the Wichita Police
5  Department has an opportunity to get off the
6  list.
7  Q  Or become inactive at least?
8  A  Yes.  I guess the other, you know, the
9  associates one, I mean, again, try to narrow or,
10  you know, explain that a little bit better as to
11  what you're talking about, is it with a specific
12  gang, you know, I mean, or are you -- I guess I
13  would like some verbiage of some sort of, you
14  know, through my professional opinion or from,
15  you know, from other verifying information or
16  corroboration that I've -- I've been able to
17  or this is why this is this.
18  Q  Again, that's -- that's not required by the
19  statute?
20  A  It's not required but I know we -- we try to put
21  it in the database a lot.
22  Q  Sometimes you didn't?
23  A  Correct.
24  Q  Were there ever times when through the audit
25  process that -- that somebody was actually --

## Page 220

1  there was actually a case where somebody said,
2  this person should never have been put on the
3  list?
4  A  Yes.
5  Q  And what would happen then?
6  A  They -- it would be notified -- noted in the --
7  in the narrative that this person didn't meet
8  criteria and that they were made inactive.
9  Q  Okay.  But they -- but they had been on the list
10  erroneously for a while?
11  A  Correct, for whatever reason, whether it was --
12  when we went back through, they didn't meet
13  the -- the criteria --
14  Q  Okay.
15  A  -- based on what we had then.  I mean --
16  Q  Right.  You're looking -- you're looking at --
17  in doing the audit, you're looking at a point in
18  time?
19  A  Right.
20  Q  And so you're looking at the information and
21  somebody says, whoa, this guy doesn't meet the
22  criteria so he should never have been added to
23  the list?
24  A  Correct.
25  Q  And in that case, what you would do is move him

## Page 221

1  to inactive?
2  A  Yes.
3  Q  Okay.  How often would that happen?
4  A  Just from my personal experience of doing the
5  audit, again, when I did it, it was obviously
6  looking back at guys that were still flagged,
7  you know, it's not the time moving forward here,
8  so I was looking at a lot of guys that had been
9  documented previously before there was ever a
10  state statute or, you know -- and so I would
11  probably say five or seven guys out of my -- I
12  mean, I -- I probably have a -- maybe ten.  I
13  mean, that specifically.  I mean, I know I made
14  lots of people inactive.
15  Q  Uh-huh.
16  A  But just that specific way would be four or five
17  guys at the most maybe, I mean, five to ten.
18  Q  Five to ten?
19  A  Yeah, probably.
20  Q  Okay.  Okay.
21  A  And I guess I'll clarify that, that's -- we've
22  gone through that -- that's a lot of old
23  flaggings --
24  Q  Uh-huh.
25  A  -- that I think have all been corrected, and

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

Page 242

1   A   Okay.
2   Q   That, in my experience, is not something that
3       the general public is typically pulled over for
4       for traffic offense.  Would you agree?
5           MR. BRANSON:  Object to your
6       experience.
7   A   I mean, I've stopped them before, so I can't,
8       per se, what other officers do.  But I use that
9       stop, yes, to -- to conduct a stop.
10  BY MS. WOODY:
11  Q   Okay.  And once the stop had occurred, what
12      would you -- what would you do then?
13  A   Well, you're going to have to be much more
14      specific than that --
15  Q   Okay.
16  A   -- 'cause that, I mean, that's really general.
17  Q   You've pulled somebody over who you believe is a
18      known gang member and you've pulled them over
19      for failure to -- to signal within 100 feet of
20      an intersection, what do you do then?
21  A   Well, again, this hypothetical is not going to
22      work because there is -- I mean, they could be
23      making movements within a car, there could be
24      all kinds of different situations, I mean, we
25      could probably do 50 different scenarios with

Page 243

1       what I would do next, and it really depends on
2       how the stop is -- you know, takes place.
3   Q   So let's say the stop takes place and you walk
4       up to the car and say, what are you guys doing,
5       they say, we're riding around?
6   A   Again --
7           MR. BRANSON:  Object to form.
8   A   -- yeah, this hypothetical is just -- I mean, I
9       can't -- I can't give you how I'm going to
10      respond to that.
11  BY MS. WOODY:
12  Q   Because when you stop them, you're actually
13      looking for something, right?
14  A   Yes.
15          MR. BRANSON:  Object to form.
16  BY MS. WOODY:
17  Q   So you're -- you're stopping them because you
18      believe that, because either their gang
19      affiliation or something else that's going on,
20      they're involved in something, correct?
21          MR. BRANSON:  Object to form.
22  A   I was furthering the -- our investigation, yes,
23      this was a pretextual stop to see if there was
24      other information or evidence or something that
25      we could develop, yes.

Page 244

1   BY MS. WOODY:
2   Q   Okay.  Did you have any -- was there any kind of
3       extra monitoring or surveillance because
4       somebody was on the gang list?
5   A   That -- that would be fair to say.
6   Q   And -- and -- and would that differ from --
7       well, strike that.  So the fact that they were
8       on the gang list would make you more likely to
9       surveil them or monitor their -- their behavior?
10  A   Yes.
11  Q   Okay.  I'm going to switch topics here a little
12      bit, are you -- are you familiar with the term
13      mapping?
14  A   Yes.
15  Q   And what does mapping mean to you?
16  A   It's keeping certain individuals out of an area.
17      The -- the reason I know that is 'cause there's
18      the prostitution mapping that -- that the City
19      does, and we also had -- there's a drug mapping
20      program and -- and a gang mapping program.
21  Q   So explain to me generally how the mapping
22      programs work.
23  A   Again, this is set up through probation and
24      parole, not through us or the -- the Wichita
25      Police Department or the -- the gang unit

Page 245

1       specifically.  So as part of their conditions
2       for probation, they are to stay out of certain
3       areas that have been identified by the probation
4       or parole area as being either high drug, high
5       crime, violence area without having a legitimate
6       reason to be there.
7   Q   And what would be a legitimate reason to be
8       there?
9   A   I think some of the things that I remember, like
10      visiting a parent or going to work, school.
11      I -- I know those off the top of my head.
12  Q   Okay.
13          MS. WOODY:  Let's mark these two.
14          (Deposition Exhibit Numbers 29 and
15          30 Marked for Identification.)
16          THE REPORTER:  29 and 30.
17  BY MS. WOODY:
18  Q   Okay.  Take a look at -- at Deposition
19      Exhibit 29, which is Wichita 079679 through 681.
20      You see that?
21  A   Yep.  Yes, sorry.
22  Q   And so have you seen a document like this
23      before?
24  A   Yes.
25  Q   And what is this?

62 (Pages 242 to 245)

## Page 246

1    **A    This is these -- these are very similar to the**
2    **prostitution maps that -- that the City has, but**
3    **this is for the Sedgwick County Department of**
4    **Corrections, which is labeled at the top, so**
5    **these are the -- for Sedgwick County.**
6    Q    And it says central mapping zone, does that mean
7    anything to you?
8    **A    I would assume that that means where the --**
9    **where -- where they're talking about because**
10   **looking at the streets, this is more in the**
11   **central part of Wichita.**
12   Q    And it looks like it's -- the defendant is a
13   person named Aubreon L. Davis.  Do you see that?
14   **A    Yes.**
15   Q    Do you know who Mr. Davis is?
16   **A    I'm familiar with his name, yes.**
17   Q    How are you familiar with his name?
18   **A    I believe he's documented as a Blood.**
19   Q    And if you take a look at the second page, it
20   says, Supervision Agreement, Gang Conditions --
21   **A    Yes.**
22   Q    -- you see that?  And so these are the -- I'd
23   like you to take a review of this and see if --
24   if these are -- if this refreshes your
25   recollection about what the gang conditions are?

## Page 247

1         MR. BRANSON:  Object to form.
2    **A    Again, the conditions have been different on --**
3    **that I remember but they're -- these -- I have**
4    **heard or seen these before in general overall, I**
5    **guess, if that makes sense.**
6    BY MS. WOODY:
7    Q    So is this some -- is -- is this something that
8    the gang unit would be aware of if they were
9    asked to assist probation and parole in -- in
10   determining whether any of these conditions have
11   been violated?
12   **A    Yes.**
13   Q    So whoever was doing that monitoring would be
14   familiar with the conditions on this person and
15   would be checking to make sure that they weren't
16   violating them; is that right?
17        MR. BRANSON:  Object to form.
18   **A    Who are you talking about monitoring?**
19   BY MS. WOODY:
20   Q    The gang unit person?
21   **A    Yeah, see, the -- I was never assigned a**
22   **specific person or -- or anything like that.**
23   **What normally would happen is that the probation**
24   **or corrections would contact us and say, would**
25   **you mind checking up on this guy or see if he's**

## Page 248

1    in violation, or we would assist them when they
2    went out and did their checks and we would just
3    be there with them.
4    Q    Okay.  So sometimes you would get a call from
5    probation saying, we want to make sure this guy
6    is in -- living up to the conditions, and they
7    would ask you to go check.  Would they then have
8    to give you some of the conditions so you would
9    know what you were checking for?
10   **A    Yes, they would either verbally tell -- I don't**
11   **remember -- I don't ever remember them sending**
12   **this specifically.  I mean, they'd usually just**
13   **tell us, he's got a 11:00 o'clock curfew, he**
14   **can't, you know, can't be drinking.**
15   Q    Okay.  Take a look at page 3 of that document up
16   at the top, and it says number 12, I shall not
17   ride in a car with more than one person unless
18   those persons are my parents, siblings, or my
19   children.  Do you see that?
20   **A    Yes.**
21   Q    Does that strike you as a pretty strict
22   condition?
23        MR. BRANSON:  Object to form.
24   **A    It does.**
25   BY MS. WOODY:

## Page 249

1    Q    Does Wichita have a great public transportation
2    system?
3    **A    I don't know, I don't use it.**
4    Q    Okay.  Do you think it would be difficult to get
5    from one place to another if you didn't have
6    your own car in Wichita?
7         MR. BRANSON:  Object to form.
8    **A    Could be.**
9    BY MS. WOODY:
10   Q    Take a look at number 15, it says, I shall not
11   associate with family members or extended family
12   who are documented gang members.  Exception
13   would be immediate family only, i.e., brother,
14   sister, parents, no cousins.  Do you see that?
15   **A    Yes.**
16   Q    So in your experience, in certain communities do
17   large numbers of people frequently live at the
18   same place?
19        MR. BRANSON:  Object to form.
20   **A    Could you ask that again?**
21   BY MS. WOODY:
22   Q    Sure.  In your experience, in certain
23   communities do large numbers, I'll -- I'll
24   change it a little bit, do large numbers of
25   extended family often live at the same place?

63 (Pages 246 to 249)

## Page 250

1    MR. BRANSON: Object to form.
2  A  I don't really know how to answer that. I mean,
3     I've seen houses that have lots of people in
4     them, and I've been to houses that only have one
5     person in there, so I -- I mean ...
6  BY MS. WOODY:
7  Q  So if this person was living in a place that
8     their cousins were also living --
9  A  Right.
10 Q  -- and their cousins had been designated on the
11    gang list, the very fact that they were staying
12    in their house would be a violation of probation
13    conditions, correct?
14    MR. BRANSON: Object to form.
15 A  According to this, yes.
16 BY MS. WOODY:
17 Q  Okay. And then on number 17, it says, I will
18    remain out of the restricted zones as indicated
19    below and outlined in the attached mapping zone
20    form, if required now or in the future. The
21    only exception is Monday through Friday 6:00 to
22    9:00 -- 6:00 a.m. to 9:30. You see that?
23 A  Yes.
24 Q  And then it's checked central zone, right?
25 A  Yes.

## Page 251

1  Q  And so if we look back at that map, is that map
2     saying you can't go into this area between the
3     hours of 9:30 at night and 6:00 a.m. in the
4     morning?
5  A  Yes.
6     MR. BRANSON: Object to form.
7  BY MS. WOODY:
8  Q  Okay. And if you look down on the first page
9     again, it says -- it says commencing 8/13/20.
10    You see that?
11 A  Yes.
12 Q  Through 7/21/22, correct?
13 A  Yes.
14 Q  And is that the -- do you understand that to be
15    the period of time that that person is on --
16    subject to these conditions?
17 A  It could be, I -- I -- I don't know, I don't
18    fill this form out.
19 Q  Okay. That'd be something for corrections -- or
20    for Sedgwick County to answer?
21 A  Yes.
22 Q  All right. Take a look at Exhibit 30 and it's
23    for a defendant named Isaiah Carter. Do you see
24    that?
25 A  Yes.

## Page 252

1  Q  Do you know Mr. Carter?
2  A  I think he's -- he's identified as a gang member
3     in the database, I'm not sure what gang.
4  Q  Okay. And it looks like, it says, being in this
5     zone can automatically violate the defendant's
6     probation. Do you see that?
7  A  Yes.
8  Q  And can you identify this zone, does this mean
9     anything to you?
10 A  This -- I mean, looking at the -- it looks like
11    it's South Broadway from -- from Waterman all
12    the way down to 47th Street.
13 Q  Okay. And then if you look at the next page,
14    that's an additional area --
15 A  Yes.
16 Q  -- correct? And this one, I'm sorry, this one
17    on this page is called north mapping zone. Do
18    you see that?
19 A  Yes.
20 Q  And the first one is south mapping zone, you see
21    that?
22 A  Yes.
23 Q  So Mr. Carter will be in violation of his
24    probation if he is in either south or north
25    mapping zone, is that what you understand?

## Page 253

1     MR. BRANSON: Object to form.
2  A  According to this form, yes.
3  BY MS. WOODY:
4  Q  Okay.
5     MS. WOODY: Could you mark this one
6     for me?
7     (Deposition Exhibit Number 31
8     Marked for Identification.)
9  BY MS. WOODY:
10 Q  Lieutenant Beard, I've handed you what's been
11    marked Deposition Exhibit 31, which is Wichita
12    079863.
13 A  Yes.
14 Q  And it's entitled up at the top, WPD/County
15    Corrections Gang Mapping. Do you see this?
16 A  Yes.
17 Q  Is this a document that you've seen before?
18 A  I think I may have seen this actually in, like,
19    a -- a digital copy, like an email or something.
20 Q  Okay.
21 A  Not an actual hard copy.
22 Q  And what do you understand this to be?
23 A  This is a project that Officer Byers was working
24    on; he was working with community corrections in
25    reference to the drug mapping program, and he

**64 (Pages 250 to 253)**

## Page 254

1  had contacted corrections about implementing a
2  gang mapping program.  And so he had set up
3  these meetings with them and got this set up.
4  And his request for us was just to let them know
5  who was documented as a gang member and if they
6  would, you know, be applicable for this -- this
7  project that he's working on.
8  Q    And -- and explain the project to me, if you
9  can.
10  A    Well, my understanding from -- from Officer
11  Byers was that they would keep gang members out
12  of certain locations in reference to their
13  probation or parole, and my understanding was
14  those locations were either chosen by -- well,
15  they were chosen by the probation or parole
16  officer.  I thought it had to do with where the
17  offense occurred, and that's why they were
18  mapped out of a certain location because that's
19  where the offense occurred and that's why there
20  was different ones.  And then they would -- they
21  would have to stay out of those certain areas.
22  This was a new program, and I think there was
23  only, like, 10, maybe 15 people that ever got
24  put on this program.
25  Q    When -- when was this program started?

## Page 255

1  A    Well, he started the drug program before then,
2  but I think it was sometime in 2019, 2020.
3  Q    Okay.  And is it still in effect?
4  A    No.
5  Q    You said -- so it was in effect for a while and
6  then it --
7  A    Yes.
8  Q    -- stopped?
9  A    Yeah.
10  Q    Okay.  Let's take a quick break.
11        THE VIDEOGRAPHER:  Go off the record
12  at 2:43 p.m.
13        (Thereupon, a recess was taken;
14        whereupon, the following was had.)
15        THE VIDEOGRAPHER:  Okay.  We're back
16  on the record at 2:51 p.m.
17  BY MS. WOODY:
18  Q    Lieutenant Beard, I want to talk about another
19  area where -- where you have some experience,
20  and that is in gang-related testimony, okay?
21  A    Yes.
22  Q    So can you explain to me what gang-related
23  testimony is?
24  A    So often gang testimony comes in because of --
25  to explain the inexplicable is one of the -- to

## Page 256

1  explain motive as to why an individual would --
2  most of my experience is from -- is from
3  homicides or shootings, why somebody would do
4  the -- commit the crime because of it's gang
5  motivated, gang related based on ongoing feuds
6  between rival gangs.
7  Q    So you would have an instance where a crime had
8  been committed and there didn't appear to your
9  average juror, for instance, to be a reason why
10  that happened, correct?
11  A    Correct.
12  Q    So gang-related testimony would be allowed in
13  that case to say, well, there was an ongoing
14  feud between, say, the Crips and the Bloods and
15  this guy's a Blood and the guy who got shot was
16  a Crip and that's because of all these other
17  things that have been going on, correct?
18  A    Yes.
19  Q    And in that gang-related testimony, are you
20  allowed to introduce historical information
21  about the gangs?
22  A    Yes.
23  Q    And are you allowed to introduce instances of
24  violence where the defendant was not involved?
25  A    Yes.

## Page 257

1  Q    And then using your -- your expertise, I think
2  you said you're allowed to some degree to
3  speculate; is that correct?
4  A    I'm allowed to give my opinion.
5  Q    Okay.  And -- and -- and your opinion is based
6  oftentimes on this historical information that
7  you've testified to; is that right?
8  A    That's part of it, the historical information,
9  and then usually whatever occurred with that
10  specific incident.
11  Q    Okay.  And so you give your opinion that the --
12  that the motive for the shooting was because of
13  a gang feud, for instance; is that right?
14  A    Yes.
15  Q    And that is evidence that if the person were not
16  on the gang list would not ever be admissible;
17  is that right?
18        MR. BRANSON:  Object to form.
19  A    I'm sorry, could you -- could you say that
20  again?
21  BY MS. WOODY:
22  Q    Sure.  That's evidence that if the person wasn't
23  on a gang list would not be admissible?
24        MR. BRANSON:  Object to form.
25  A    If they weren't on the gang list?  I wouldn't

65 (Pages 254 to 257)

Page 258

1  say that that's not possible; just because
2  they're not on the list doesn't mean that it
3  could be a gang-related, motivated incident.
4  BY MS. WOODY:
5  Q   Okay. But if you have two instances where
6     there's been a homicide and in one instance you
7     have somebody who was designated as a gang
8     member and the other instance neither party's
9     designated as a gang member, the first instance
10    you can -- you're allowed to introduce evidence
11    of a lot of other violent acts and so forth in
12    that case, correct?
13       MR. BRANSON: Object to form.
14  A  If it's a gang-motivated incident, yes.
15  BY MS. WOODY:
16  Q   And in the second case, none of that testimony
17    would be allowable?
18       MR. BRANSON: Object to form.
19  A  If it's not a gang-motivated incident, yes.
20  BY MS. WOODY:
21  Q   And the -- the -- the person who is testifying
22    that it is a gang-related incident or
23    gang-motivated incident is you, correct?
24  A  I'm -- I have been one of the persons, yes.
25  Q   Okay. And so how do -- how is it determined

Page 259

1     when the DA will attempt to use gang-related
2     testimony, do you know?
3  A  Sometimes they already know that the incident is
4     already involving gangs during the felony
5     review, or they're even on -- I mean, a lot of
6     times they're called in to -- on homicides
7     anyway so they're there when the investigation's
8     ongoing. Then there's usually a hearing. But
9     they -- they have knowledge based on the reports
10    or the investigating detective will provide them
11    saying that this is a gang-motivated incident.
12  Q   So somebody, a detective in the gang unit or in
13    the assault, felony assault unit will go to
14    the -- will say to the DA, yeah, we believe this
15    is a gang-motivated shooting, or whatever?
16  A  If it's a gang-motivated one. If it's a
17    homicide, then the homicide detective would --
18  Q   Okay.
19  A  -- notify ...
20  Q   But either way, they could notify him it was
21    gang related?
22  A  Yes.
23  Q   Okay. And -- and then kind of walk me through
24    the process of what happens if your -- if the DA
25    says, okay, we're going to put together -- we're

Page 260

1     going to try to introduce gang -- gang-related
2     evidence in this particular case, explain --
3     kind of walk me through what happens.
4  A  Well, individual DAs can request different
5     things, but they would usually request to review
6     the gang documentation of -- of the individuals
7     that are involved if they're -- if they're
8     documented, and then any ongoing feuds that have
9     been going on between those groups and
10    especially if the victim or suspect were ever
11    involved in any of those feuds, we would provide
12    that to them. And I would imagine there would
13    be a court -- a motion hearing to admit gang
14    evidence.
15  Q   Okay. And would you testify at that hearing?
16  A  I have, yes.
17  Q   Okay. And you would provide the Court with the
18    nature of the feud that's been going on between
19    the two groups, correct?
20  A  Yes.
21  Q   And the Court would decide whether they were
22    going to let that evidence in or not?
23  A  Yes.
24  Q   How many of those motion hearings would you say
25    you've been involved in?

Page 261

1  A  I don't know, probably at least eight to ten
2     homicide cases; there's been other shooting
3     cases that I -- that I testified at but I
4     don't ...
5  Q   And -- and in the cases where you're -- where
6     there's a motion for the entry of gang-related
7     evidence you've testified, are you aware
8     of any instance where the Court has not allowed
9     that?
10  A  I believe so, I believe that it was -- there was
11    a motion that it was denied, but I -- I don't
12    know which cases.
13  Q   Do you know any -- remember any particulars
14    about that case, any specifics?
15  A  I don't, I'm sorry.
16  Q   But in -- in -- in the other cases that
17    you're -- that you testified in at the motion
18    stage, the judge did allow it?
19  A  Yes.
20  Q   Do you remember who the judge was who denied it?
21  A  I don't.
22  Q   Do you remember who the prosecutor was?
23  A  I don't.
24  Q   -- in that case? So say the motion is granted,
25    which is what happens more often than not,

66 (Pages 258 to 261)

Page 262

```
 1        correct?
 2           MR. BRANSON:  Object to form.
 3    A   I don't know on that.
 4    BY MS. WOODY:
 5    Q   In -- in your experience, which happens more
 6        often than not?
 7    A   The times that I have testified, it has -- the
 8        motion has been passed.
 9    Q   And so what happens after that?
10    A   Well, then it would -- it would go to trial if
11        it ever would -- if it'd go to trial then, then
12        I could be called again as a -- to testify.
13    Q   And how many times do you think you've actually
14        testified in trial?
15    A   As a gang expert or as --
16    Q   Yes, as a gang expert?
17    A   Oh, probably -- in front of a jury, I mean, at
18        least eight -- those eight to ten times on the
19        homicide cases.  Then the RICO case, I've
20        testified on that as well.  And then there's
21        been other motions and stuff without a jury that
22        I've provided, you know, my opinion on stuff
23        that I ...
24    Q   On the -- on the jury trials that are gang --
25        the gang-related cases, the eight to ten that
```

Page 263

```
 1        you testified in, how many of the defendants in
 2        those cases were people of color?  How many of
 3        the defendants?
 4    A   I believe all of them were.
 5    Q   And in those cases, do you recall the outcomes
 6        of those various cases, guilty or not guilty?
 7    A   I believe the majority of, if not all of them,
 8        were guilty.
 9    Q   Okay.  You talked about the RICO case, explain
10        to me what the -- the RICO case that you
11        testified in was about.
12    A   So that was a -- in 2006, there was an ongoing
13        Crip Racketeering Influenced Corrupt
14        Organization investigation that took place, and
15        during that investigation, obviously, several
16        people were indicted, and I testified in federal
17        court in reference to gang documentation, the
18        Crips and gang activity that occurred here in
19        Wichita.
20    Q   Okay.  And so you were kind of giving historical
21        information about the Crips and -- and just
22        various things that they've been -- they've been
23        involved in over the years; is that accurate?
24    A   Yes.
25    Q   Okay.  Anything else that you testified about in
```

Page 264

```
 1        that case?
 2    A   I think that was primarily the -- the main
 3        portion of my testimony.  There was probably
 4        some minor things that I -- to the ongoing
 5        investigation, you know, collecting of some
 6        evidence or -- but I -- the bulk was about
 7        criminal gang activity.
 8    Q   How -- how is it determined who is going to
 9        offer the expert testimony on a given case?
10    A   So when I was a detective, if I was the lead
11        case agent already, it kind of became my -- my
12        case, and so I would be the -- the main one.
13        They obviously look toward, you know, for those
14        that had the most experience or had done it for
15        a while, testified before, but like I said, I
16        wasn't the only one.  I believe, you know, Aaron
17        Chaffee, Joe Stearns, I think Rod Miller, Harty,
18        Elmore have all had experience testifying in
19        gang -- Donnie Moore, Erik Guzman have all
20        testified as -- testified as experts or as
21        providing gang testimony in reference to ongoing
22        feuds and -- and of such.  So it didn't
23        necessarily have to be me every -- every time,
24        or -- or whatnot.  A lot of times it was because
25        I was familiar with the case or I helped -- I
```

Page 265

```
 1        came in to assist on the homicide and I was just
 2        part of the case already.
 3    Q   Okay.  Did you ever have instances where you
 4        weren't part of the case but you were called in
 5        to give gang testimony?
 6    A   I don't -- I don't remember any of those.  I --
 7        I usually had -- would have some type of
 8        involvement in the case from the beginning or,
 9        you know, I played a role usually in some
10        part -- in part of the investigation; it wasn't
11        like I just came in out of the blue to testify
12        about a case.
13    Q   Okay.  I'm going to show you what's --
14           MS. WOODY:  I've just got one copy
15        of this, Charles, I'll let you look at it
16        first.
17           MR. BRANSON:  Okay.
18           MS. WOODY:  If we could mark this.
19           (Deposition Exhibit Number 32
20           Marked for Identification.)
21    BY MS. WOODY:
22    Q   I -- I may have to stand up here.  I'm going to
23        let Charles look at it first so that he's seen
24        it.
25           MR. BRANSON:  Lot of pages.
```

67 (Pages 262 to 265)

## Page 294

1    know, a supervisor over them directly as well.
2    I think I've mentioned some of the changes
3    in the state law or, you know, even the policy
4    that -- that I think could be done, in --
5    including a notification process, an appeals
6    process. Those types of things, I think, are
7    all very applicable in -- in today's, you know,
8    policing, that we would make it more equitable,
9    be more transparent.
10       Again, I have nothing to hide in reference
11   to -- I'm very proud of -- of our unit, and the
12   gang intelligence officers, I think, know how to
13   flag people, you know, and are using the -- the
14   appropriate criteria and the -- but I think
15   there's always room for improvement with any
16   unit or agency.
17   Q   When you say make it more equitable, what do you
18   mean by that?
19   A   Just I guess to be more along the -- the lines
20   of transparency, you know, explaining or
21   providing information to the people so that they
22   know what we do and so there's a better
23   understanding, whether that's through community
24   engagement, through meetings or presentations,
25   you know, more than just a DAB meeting, or

## Page 295

1    whatever, if it means that we, you know, try to
2    get more into the community that's -- that's
3    affected, whether that's the people of color,
4    whether that's Hispanic or African American,
5    or whatever, is try to -- to -- to help them
6    understand where we're coming from or why these
7    individuals, you know, are documented as such
8    and ...
9    Q   Could it also be to hear what their perspective
10   is?
11   A   Absolutely.
12   Q   So just give me a second, I'm going to take a
13   quick look here, and we may be close to being
14   done.
15       THE VIDEOGRAPHER:  Go off the record
16   at 3:42 p.m.
17       (Discussion held off the record.)
18       THE VIDEOGRAPHER:  Okay. We're back
19   on the record at 3:44 p.m.
20   BY MS. WOODY:
21   Q   Okay. Lieutenant Beard, I just have a couple of
22   follow-up questions, and one of them was when
23   you talked to KDOC or KDOC would call you or
24   say, is this person a gang member, or the DA
25   would, would you just give them the list off the

## Page 296

1    name, or would you have to do some kind of an
2    audit at that point?
3    A   So what normally would happen -- first of all,
4    we'd always have a MOU in place with KDOC so
5    that we just weren't handing over their
6    information, but what I would normally like to
7    see is that they would -- the gang intelligence
8    officer or myself would review that flagging to
9    make sure that all the criteria are
10   appropriately marked before we just send that
11   off. So it's a verification.
12   Q   Okay. Not really an audit but just --
13   A   A mini audit.
14   Q   -- communications in there? Yeah.
15   A   Correct, and then that information would be sent
16   to them. If it was the DA's office, same thing
17   but we wouldn't send it to them, we would
18   usually bring it over physically, let them
19   review it, or the defense attorney; once they're
20   done, we would take it back and destroy it.
21   Q   And you talked about some changes that you think
22   it would be good to see made to the state
23   statute itself, correct?
24   A   Correct.
25   Q   And if -- and without those changes, the policy

## Page 297

1    at -- at WPD might change, but across the state,
2    it might still be --
3    A   Correct.
4    Q   -- it might still be problematic?
5    A   I don't know if problematic but, you know, where
6    it's applied, if -- if -- if agencies choose to
7    follow the state statute, then -- I mean, again,
8    those are from my -- my opinion of my -- you
9    know, where I think those things could be shored
10   up. Whether or not that -- that individual
11   department continues to -- does something on
12   their own or continues the -- I don't
13   necessarily see it as a problem, but I just, I
14   like to see progress.
15   Q   Okay. And it would be progress to have the
16   state -- to have the state statute modified in
17   your mind?
18   A   Yes, with those suggestions that I've provided.
19   Q   Okay. I have no further questions.
20
21        CROSS-EXAMINATION
22   BY MR. BRANSON:
23   Q   I just have a couple. You testified earlier
24   about the consequences of -- of being on the
25   gang list, or you were asked about consequences

75 (Pages 294 to 297)