IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| PROGENY, a program of Destination Innovations, Inc., CHRISTOPHER COOPER, ELBERT COSTELLO, MARTEL COSTELLO, and JEREMY LEVY, JR., on behalf of themselves and others similarly situated, Plaintiffs, vs CITY OF WICHITA, KANSAS, Defendant. | Case No. 6:21-CV-01100-EFM-ADM |

VIDEO-RECORDED 30(B)(6) ZOOM DEPOSITION OF

CHAD BEARD

VOLUME II

May 25, 2023

10:04 a.m.

Taken at:

Stinson Law Office

1625 North Waterfront Parkway, Suite 300

Wichita, Kansas

Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR

Page 18

1   a notification process.
2         Q.   Any other issues that you are aware of
3   with regard to Deputy Chief Salcido?
4         A.   No.
5         Q.   What about the racial makeup of the
6   gang list was an issue in your discussions with
7   Deputy Chief Salcido?
8         A.   I'm sorry, you're going to have to say
9   that question again.
10        Q.   Sure.  I'll rephrase.  Could you
11  describe the nature of concern that Deputy Chief
12  Salcido had when you refer to him raising the issue
13  of the racial makeup of the gang list?
14        A.   Deputy Chief Salcido's concerns were of
15  persons of color being overrepresented in the
16  database; specifically, African American and
17  Hispanic.
18        Q.   Anything beyond that?
19        A.   And again, are you speaking of just of
20  the racial makeup issue or are you talking about
21  the other issues?
22        Q.   Specifically the racial makeup issue at
23  this point.
24        A.   That's the only concern that Deputy
25  Chief Salcido made.

Page 19

1         Q.   Okay.  Does the department share those
2   same concerns?
3         A.   Yes.
4         Q.   Why?
5         A.   The department obviously recognizes
6   that policing has evolved and that obviously things
7   have changed throughout the years.  There's always
8   going to be a concern if there appears to be an
9   overrepresentation of a certain group and I
10  believe, the City believes that we should work with
11  the community to address any of those types of
12  issues.
13        Q.   You said that there appears to be an
14  overrepresentation.  Is there an
15  overrepresentation?
16             MR. BRANSON: Object to form.
17        A.   I just know -- the City is aware of the
18  statistical makeup of the database and what those
19  are.  Again, I'm not or I'm not a statistician
20  so -- again, the department is aware of the
21  statistics of the database.
22        Q.   (By Mr. Vogel) What are those -- and
23  we'll get into it in a little more detail but at a
24  high level what are those statistics that you are
25  referring to that the department is aware of when

Page 20

1   answering that question?
2         A.   The department is aware that African
3   American and Hispanic individuals make up the
4   majority of the gang database.
5         Q.   Why is that?
6              MR. BRANSON: Object to form.  Why is
7   what?
8         Q.   (By Mr. Vogel) Why -- do you mind
9   reading his answer to the question, please.
10             (Whereupon the Answer: "The department
11  is aware that African American and Hispanic
12  individuals make up the majority of the gang
13  database," was read back.
14        Q.   Why do African American individuals and
15  Hispanic individuals make up the majority of the
16  gang database?
17             MR. BRANSON: Object to form.
18        A.   It's based -- the department is aware
19  that individuals documented into the database based
20  on individual or group criminal activity and if
21  they meet the requirements of K.S.A. 21-6313.
22        Q.   (By Mr. Vogel) So have you done, have
23  you done -- has the department done any research
24  into why African American and Hispanics are
25  overrepresented in the gang database?

Page 21

1         A.   The department is not aware of any
2   research that's been done.
3         Q.   Do you have any plans to do any
4   research to that effect?
5         A.   The department may.
6         Q.   Are there currently any plans?
7         A.   Currently there are no plans.
8         Q.   Has there been any discussion to raise
9   the issue further?
10        A.   Currently, no.
11        Q.   You also mentioned two other issues
12  regarding Deputy Chief Salcido's concerns, one
13  being process of removal.  Do you currently have a
14  removal process for the gang database, for members
15  on the gang database?  I'm sorry, and what was your
16  answer, I'm sorry?
17        A.   Yes.
18        Q.   What is that removal process?
19        A.   The Wichita Police Department allows
20  individuals to be removed from the gang database
21  after a time period of three years if there is no
22  ongoing criminal activity, arrests or identified
23  gang activity.
24        Q.   What can a person who is listed on the
25  gang list, what can that person do to initiate a

Page 22

1  removal?
2     A.  Through the Wichita Police Department
3  there is no official process for a person to become
4  removed if they reach out other than providing that
5  they do not involve themselves in criminal behavior
6  and gang activity.
7     Q.  How long has that been the case?
8     A.  Since 2003.
9     Q.  Has anybody prior to Deputy Chief
10 Salcido raised the issue of there not being a
11 removal process that an individual can initiate?
12    A.  The City is unaware of any of that.
13    Q.  To your recollection, have there been
14 any discussions regarding such a process?
15    A.  There have been discussions, yes.
16    Q.  When were those discussions held?
17    A.  The City is aware that those
18 discussions took place in reference to mediation in
19 this lawsuit.
20    Q.  Any other discussions that you are
21 aware of?
22    A.  The City is not aware of any other
23 discussions.
24    Q.  And then the 3rd issue that we
25 discussed with Deputy Chief Salcido was a

Page 23

1  notification process; is that accurate?
2     A.  Yes.
3     Q.  Do you have a notification process
4  for when an individual is added to the gang
5  database?
6     A.  That's a yes and no.  We have a
7  notification process for juveniles; no notification
8  process for adults.
9     Q.  Is there a formal written policy
10 regarding a notification to juveniles when they
11 have been added to the gang list?
12    A.  Yes.
13    Q.  And what is that?
14    A.  Are you asking for the policy or for
15 what?
16    Q.  I asked for the policy.
17    A.  Policy 527.
18    Q.  Okay, and that, and correct me if I'm
19 wrong, that details the formal process that the
20 Wichita Police Department would go through for
21 notifying a juvenile if they have been added to the
22 gang list; is that accurate?
23    A.  We would -- the department would notify
24 the legal guardian or the parent of the juvenile.
25    Q.  Okay, and is that policy still in

Page 24

1  effect?
2     A.  Yes.
3     Q.  Has that continued to be the practice
4  of the Wichita Police Department?
5     A.  Yes.
6     Q.  How does the Wichita Police Department
7  go about notifying the guardian of a juvenile when
8  they have been added to the gang list?
9     A.  The current practice of the Wichita
10 Police Department for notification of juveniles
11 will consist of either phone calls or personal
12 contact.
13    Q.  Anything beyond that?
14    A.  Prior to that the Wichita Police
15 Department had sent notifying letters but that was
16 discontinued because of a lack of response.
17    Q.  How often would you say that the
18 officers in the Gang Unit or more broadly the
19 department are able to make contact with the
20 juvenile's guardian?
21    A.  The City does not have that exact
22 number.
23    Q.  Are you aware of instances when they
24 are unable to contact the guardian?
25    A.  Yes.

Page 25

1     Q.  And what happens in that case?
2     A.  The Wichita Police Department does not
3  set a specific amount of time or excuse me, amount
4  of how many times the Gang Intelligence officers
5  may have to try to reach out but there are
6  several -- it's common practice that they will make
7  several attempts and if they can't then we stop.
8     Q.  Is that documented?
9     A.  Yes.
10    Q.  What is that information documented?
11    A.  That information will be documented in
12 the gang database.
13    Q.  If a juvenile is reactivated for lack
14 of a better term, please correct me if I'm wrong,
15 but I'm referring to the act of increasing their
16 continued time on the gang list for a three-year
17 period.  If a juvenile is reactivated is there any
18 notice in that instance?
19    A.  The department is unaware of any
20 renotification if a juvenile is re-added to the
21 list or I guess the question -- if you want to
22 clarify it, are you talking about re-adding
23 somebody or just updating their information?
24    Q.  Let's do that.  So updating the
25 information.

Page 26

1   A. Updating, there's not a common practice
2  for the Wichita Police Department to re-notify the
3  juvenile.
4   Q. Is there a policy that would describe a
5  notification process for that instance?
6   A. For being re-added?
7   Q. For updating information.
8   A. The Wichita Police Department, there is
9  no notification process if a person is updated.
10   Q. So if they are re-added to the list, so
11  what do you mean by re-added first?
12   A. An individual may come off the database
13  or may be made inactive and if they were going to
14  be reactivated as a member or an associate they
15  would have to meet state criteria again. That's
16  what the City is referring to when we talk about
17  re-adding somebody, so they are added back to or
18  made from inactive back to active. Currently
19  there's no common practice to re-notify or notify
20  them again if they were re-added.
21   Q. Okay. Regarding adults, any
22  notification process for adults?
23   A. No.
24   Q. So let's break that down. Any
25  notification for an adult if they are initially

Page 27

1  added to the gang list?
2   A. No.
3   Q. Any notification to an adult if
4  information is updated on the gang list about that
5  adult?
6   A. No.
7   Q. Any notification to an adult if they
8  are re-added to the gang list?
9   A. No.
10   Q. Then you mentioned you spoke with --
11  let's stick with the documents I guess for a
12  minute. Are there any other documents other than
13  in Deputy Chief Salcido's or Sheriff Easter depo
14  that you reviewed?
15   A. Yes.
16   Q. What were those?
17   A. I reviewed the state statute. I
18  reviewed the Wichita Police Department Standard
19  Operating Procedure for the Persons Crimes Bureau.
20  I also reviewed Policy 527 and also a power point,
21  actually I pulled one slide, looked at one slide.
22   Q. Do you recall what that power point
23  was?
24   A. It was a recruit, a presentation to
25  recruits from 2004.

Page 28

1   Q. Why did you review that particular
2  power point?
3   A. It was prior to the 2006 gang statute
4  being enacted.
5   Q. Why did you feel that that was
6  necessary to review prior to this deposition?
7   A. The City needed to review how a gang
8  was identified prior to 2006.
9   Q. Okay. We'll get into that one a little
10  further so hold some of the questions for just a
11  minute. Going back to the people that you talked
12  to, there's quite a few here. Could you give me a
13  brief -- I'll walk through the list. If you can
14  give me kind of a brief overview, please, of the
15  nature of the conversations that you had with each
16  individual. Is that okay?
17   A. Sure.
18   Q. What was the nature of your
19  conversation with Mr. Carlton Rogers?
20   A. Sergeant Rogers was a Gang Intelligence
21  officer in the late 1990s. The City requested to
22  speak with him to get his input on how he did his
23  work during that time.
24   Q. What was the substance of that
25  conversation?

Page 29

1   A. Sergeant Rogers spoke about how many
2  people were in the unit at the time, the gang
3  database and some of the duties and functions that
4  he normally did during his time as a Gang
5  Intelligence officer.
6   Q. What information did he provide you
7  specifically about the gang database going back to
8  his time as a sergeant?
9   A. The City's conversation with Carlton
10  Rogers consisted more of documenting individuals in
11  the database, the audit process. More of the
12  conversation with Sergeant Rogers was just his
13  duties and functions as a Gang Intelligence
14  officer.
15   Q. What were the differences between how
16  people were added to the database during his tenure
17  and the current practice of adding people to the
18  database?
19   A. The City recognized that when Carlton
20  Rogers was a gang officer that the gang statute was
21  not in effect and so there was other criteria that
22  was very similar to what is in the state statute
23  but not the exact same.
24   Q. Then I may pronounce his name
25  incorrectly, or wrong. Todd, you said Ojile?

8 (Pages 26 to 29)

Page 186

1  Q. What does that document appear to you
2  to be?
3  A. It appears to be a copy of a
4  presentation that says Drug Court Mapping.
5  Q. Let me ask you, is there a similar
6  mapping program for gang members or is there a gang
7  mapping program?
8  A. Wichita Police Department did have a
9  gang mapping program. It no longer does.
10  Q. It did have a gang mapping program.
11  Can you give me a general overview of what that
12  gang mapping program was?
13  A. Information from the gang database, who
14  was documented, was shared with members of the
15  Sedgwick County Community Corrections for those
16  persons that were on probation and if the judge or
17  some of their conditions could have been to stay
18  out of certain areas because they were gang
19  members.
20  Q. And certain areas that we're referring
21  to, are those the mappings?
22  A. Yes.
23  Q. When did this program start
24  specifically related to gang mapping?
25  A. 2019, I believe.

Page 187

1  Q. So this is fairly recent program?
2  A. 2018, 2019, yes.
3  Q. Do you know about how many people have
4  been mapped, I would say?
5  A. I think it's less than 15.
6  Q. Are all of those people mapped
7  identified on the Wichita Police Department gang
8  list?
9  A. Without knowing who they are I can't
10  give you that answer.
11  Q. Okay. How long did the mapping program
12  continue?
13  A. I don't have an exact date but it
14  was -- I'm sorry.
15  Q. Your best recollection, and if you
16  don't know, you can just say you don't remember of
17  don't recall, that's fine.
18  A. I don't know.
19  Q. I'll give you, provide you another
20  document here.
21  (Whereupon Deposition Exhibit No. 44
22  was marked for purposes of identification.)
23  Q. I'll show you what is marked as
24  Exhibit 44. If you could tell me what that
25  document appears to be.

Page 188

1  A. This is an e-mail from Officer Byers to
2  KODC employees and myself.
3  Q. So you have seen this at least at some
4  point before?
5  A. Reading through it I'm recollecting
6  what is being said here, yes.
7  Q. What is the contents or the nature that
8  you are recollecting based on that?
9  A. Give me one minute to review it here.
10  Q. Absolutely.
11  A. So this is an e-mail from Officer Byers
12  to them in reference to stopping gang mapping or
13  continuing the gang mapping because of the filed
14  lawsuit.
15  Q. This is based on that conversation you
16  had with him; is that accurate?
17  A. Yes. He refers to me calling him. I
18  do remember calling him.
19  Q. Okay. What was the nature of that
20  discussion?
21  A. From what I recollect, part of the
22  conversation was that there were very few people
23  mapped anyway and so I was talking about if we
24  wanted to even continue it, but in reference to
25  this I indicated that because of the gang lawsuit

Page 189

1  we should stop.
2  Q. Was there any reason outside of the
3  gang lawsuit that made you want to stop the mapping
4  program when you did?
5  A. From the -- just from what I -- being
6  in the unit and knowing when it was going on, not
7  that it wasn't effective. There wasn't that many
8  people that were participating in it and it didn't
9  appear to be effective. I mean, that's the thought
10  but again that was early discussions. The plan was
11  was to start reviewing it to see if it was
12  something that was viable to continue it.
13  Q. Any other specific -- let me rephrase
14  the question. I guess specifically about this
15  lawsuit concerned so as to want to go ahead and
16  cancel the program?
17  A. Again, it was already in my mind before
18  then that we were going to probably discontinue
19  this program, but because I didn't want to be a
20  part of prevailing party status or anything, I just
21  thought since there was no new people coming into
22  it to just stop doing it right now.
23  Q. Any plans to continue the mapping
24  program?
25  A. Not at this time.

Page 190

1  Q.  For those that are mapped, are they
2  still currently mapped?
3  A.  Without knowing exactly who all the
4  people were I am -- I don't want to speculate.  I
5  do not believe anybody else is on the mapping
6  program.  I think they have all expired.
7  Q.  So continuing kind of general patrol
8  duties -- oh, I'm sorry.  One last follow-up
9  question on this, and partly the reason for
10 providing this document.  Do you recognize the date
11 of this e-mail?
12 A.  April 13, 2022.
13 Q.  Okay, and in it Mr. Byers is saying
14 that he had a discussion with you the previous
15 evening?
16 A.  Yes.
17 Q.  So is it fair to say that the mapping
18 program ran sometime from 2019 to mid-2022?
19 A.  That would be accurate.
20 Q.  And no plans to continue it after this?
21 A.  No.
22 Q.  So again, going back to kind of a
23 general duties of patrol officers or Gang
24 Intelligence officers, do Gang Intelligence
25 officers conduct traffic stops?

Page 191

1  A.  Yes.
2  Q.  Just do they -- do Gang Intelligence
3  officers, I guess for lack of a better term, are
4  they -- is their goal in traffic stops, is it a
5  traffic regulation goal?  I'll just reask the
6  question.  What are the general goals of Gang
7  Intelligence officers when they are going about
8  conducting a traffic stop?
9  A.  All officers are responsible for some
10 form of traffic enforcement.  The Wichita Police
11 Department asks that or requires that from the
12 department.  So if they observe reckless driving or
13 drunk driving or whatever, it's a responsibility of
14 the officer to stop that.  So the Wichita Police
15 Department recognizes that Gang Intelligence
16 officers or officers in general will use pretext
17 stops to further their investigation that's
18 ongoing.
19 Q.  Can you describe to me what a
20 pretextual stop is?
21 A.  So a pretext stop is a vehicle stop
22 based on a valid traffic infraction or violation
23 and the officer has information or knowledge or
24 wants to further his investigation because
25 something else is afoot or something else is going

Page 192

1  on that he believes, whether he has suspicion or
2  whatever, the traffic stop is to get into that
3  investigation.
4  Q.  So the intent is and again, correct me
5  if I'm wrong, the intent is more to do with another
6  investigation as opposed to the traffic rule
7  itself.  Is that an accurate --
8  A.  Yes.
9  Q.  How common are pretextual stops with
10 the Gang Intel officers?
11 A.  Again, the Gang Intel officers will use
12 it on a regular basis as they are allowed to do so.
13 I don't have a specific amount or numbers that are
14 pretext compared to just a normal violation that
15 they might have observed.
16 Q.  Does the WPD keep those numbers at all?
17 A.  The department is not aware of that.
18 I'm not aware of that.
19 Q.  I guess can you describe for me what a
20 common scenario would be for a particular
21 pretextual stop?
22 A.  So --
23 MR. BRANSON:  Object to form.
24 A.  -- from common practice and my
25 experience or what not, there may be a person that

Page 193

1  is wanted; that you are going to see the vehicle
2  that's associated with them, see a traffic
3  infraction, stop the vehicle and determine if yes,
4  that's him, no, it's not, and go from that.
5  Pretext stops could also be observations in
6  reference to a drug complaint or where you see
7  suspicious activity going on; a car pulls up, a
8  person goes inside for two or three minutes, comes
9  right back out.  You will end conducting a traffic
10 stop to find out what is going on.  And again,
11 there's usually some type of criminal behavior or
12 activity that's going on that's going to further
13 their investigation.
14 Q.  So you mentioned one example of someone
15 going to a house and then coming out.  They might
16 be in stopping that person; is that accurate?
17 A.  Yes.  Especially if there was like a
18 drug complaint or something from that residence.
19 Q.  Okay.  Can you give me some other
20 examples of what other factors might be involved,
21 specifically related to the Gang Intel officers,
22 what other factors might cause a Gang Intel officer
23 to want to initiate a pretextual stop?
24 A.  So a lot of our -- from past experience
25 and knowledge, the ongoing feuding that goes on