IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

PROGENY, a program of Destination )
Innovations, Inc., CHRISTOPHER    )
COOPER, ELBERT COSTELLO, MARTEL   )
COSTELLO, and JEREMY LEVY, JR.,   ) Case No.
on behalf of themselves and       ) 6:21-CV-01100-
others similarly situated,        ) EFM-ADM
Plaintiffs,                       )
vs                                )
CITY OF WICHITA, KANSAS,          )
Defendant.                        )
_____ )

VIDEOTAPED DEPOSITION OF

JEFFERY S. GILMORE

December 6, 2022

8:31 a.m.


Taken at:

Joseph, Hollander & Craft

500 North Market

Wichita, Kansas


Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR

Page 42

1  got a much smaller, one victim, one suspect type
2  crime, a beer bottle over the head in the club type
3  case, that's going to be to the younger detective,
4  the person with not quite as much experience that
5  needs to get their feet wet so I can take all of
6  those factors in place and make my decision.
7       Q.  Sure.  When you were a gang
8  intelligence officer, you said there were four
9  officers, 10 to 12 detectives?
10      A.  Uh-huh.
11      Q.  And a lieutenant.  Is that the
12 structure?
13      A.  It was then.  It's not now, but it was
14 then.
15      Q.  Okay.  What is it now?
16      A.  Now there is a sergeant underneath the
17 lieutenant.
18      Q.  Got it.  In your time as a gang
19 intelligence officer I assume you interacted with
20 gang members pretty frequently.  Was that the first
21 time in your career that you had substantial
22 experience dealing with gang members?
23      A.  No.
24      Q.  No?  When did you start dealing with
25 gang members frequently?

Page 43

1       A.  I was first, my first involvement was
2  FTO and you don't really know what is going on.
3  You are told by other officers, but that was my
4  first involvement and it increased and as you
5  become more knowledgeable you know what to look
6  for.  You knew the right questions to ask.  You
7  would deal with individuals that were involved in a
8  gang activity on a daily basis.
9       Q.  Was there gang training during your
10 time in the police academy?
11      A.  Yes.
12      Q.  What was that training like?
13      A.  It was a Basics of Gang presentation
14 that was given by the gang intelligence officers.
15      Q.  And approximately how long do you think
16 that presentation would have been?
17      A.  Half a day.
18      Q.  And then was the next time you were
19 trained on any gang activity during the field
20 training that you went to?
21      A.  I don't think I was trained on any
22 field training.  Just encounters on the streets and
23 educated by my field training officer, but I didn't
24 receive any training per se, any classroom training
25 or anything like that.

Page 44

1       Q.  Field training, in quotes?
2       A.  Yes, ma'am.
3       Q.  I see, and then as a patrol officer did
4  you have experience dealing with gang members
5  during your first position there in Patrol South?
6       A.  Yes.
7       Q.  What was the general experience that
8  you had with --
9       A.  Just encountering individuals that were
10 documented as gang members because when you would
11 run someone you would be advised if they were a
12 documented gang member or not.  And a lot of times
13 individuals would self-admit to you that they were
14 gang members and that's how you would encounter
15 them and know that you were in contact with a gang
16 member.
17      Q.  So when you do encounter somebody on a
18 patrol and they self-admit, I'm trying to envision
19 what that scenario looks like.  So is this a
20 traffic stop where you pull somebody out of a car
21 and you are talking to them and they just tell you
22 that they are a member of a certain gang?
23      A.  No, no.  A lot of it is an
24 investigative inquiry.
25      Q.  What does that look like?

Page 45

1       A.  Well, you make contact.  You run an
2  individual.  If you are making a traffic stop and
3  you are checking everything out you may run their
4  information, you run their driver's license.  When
5  you run the driver's license you run that through
6  SPIDER and it will come back that that individual
7  is Signal 33.
8       Q.  Okay.
9       A.  Then you are advised, so you are being
10 advised by SPIDER that this person is a documented
11 gang member and at that point you would inquire and
12 see what they tell you and you would document all
13 of that.
14      Q.  When you say you inquire, do you just
15 ask them?
16      A.  Sure.
17      Q.  Are you in a gang?
18      A.  Just ask them.
19      Q.  Do you recall ever asking somebody if
20 they are in a gang when you haven't received that
21 Signal 33 warning from SPIDER?
22      A.  Yes.
23      Q.  What circumstances would lead to you to
24 ask that question?
25      A.  There would be indicators, maybe the

Page 46

1  dress that they are wearing; maybe I saw them throw
2  up a hand sign, a gang sign; the way that they
3  talk, things that they say, slang that they use,
4  stuff that would alert me that there's possible
5  gang involvement here.
6       Q.  Which gangs did you interact with when
7  you were on Patrol South?
8       A.  In the 90s the most prevalent and high
9  activity gangs were the neighborhood Crips in the
10 Wichita area and that's who I had contact with the
11 most.
12      Q.  You said you were partnered up when you
13 were a gang intelligence officers.  Who were your
14 partners during your years there?
15      A.  I had several.  For a few brief weeks
16 Jose Salcido; Carl Hill.  He's now retired, and my
17 long term partner, James Espinoza.
18      Q.  Okay.  How long were you partnered with
19 Mr. Espinoza?
20      A.  Years; over three years.
21      Q.  I'm curious what the supervision looks
22 like.  Do you report directly to the lieutenant or
23 did you at the time or did you report to detectives
24 who then reported to the lieutenant?
25      A.  We were on nights as gang intelligence

Page 47

1  officers.  We worked basically the 5 to 3-shift; we
2  came in at 5:00 in the evening and we got off at
3  3:00 in the morning and there was a sergeant at
4  that time assigned to nights and I reported to him.
5  He was our direct supervisor, but our overall boss
6  was the gang lieutenant.
7       Q.  Who was your sergeant when you were
8  there?
9       A.  It is now Sheriff Jeff Easter.
10      Q.  When you were a gang intelligence
11 officer?
12      A.  Yes.  He was a sergeant at night and
13 he's now Sedgwick County Sheriff.
14      Q.  All right.  I think I might take a
15 quick break and we'll get back into your long list
16 of WPD positions after that.
17          VIDEOGRAPHER:  Going off the record at
18 9:27 a.m.
19          (Whereupon a recess was taken from 9:27
20 a.m. to 9:36 a.m.)
21          VIDEOGRAPHER:  We are back on the record
22 at 9:36 a.m..
23      Q.  (By Ms. Calvert) All right.  So we're
24 speaking about your time as a gang intelligence
25 officer in the early 2000s, I believe.

Page 48

1       A.  Yes, ma'am.
2       Q.  Is that correct? You said that you had
3  been trained on identifying gang members and
4  various different trainings related to gangs.  What
5  kind of training did you receive on the gang list
6  that the WPD maintains?
7       A.  I don't know that I received anything
8  on the gang list as individual training.  I mean, I
9  was instructed and shown how to use the gang
10 database --
11      Q.  Okay.
12      A.  And how that worked and then how to run
13 a list.  If I wanted to pull up and do an inquiry
14 and run a list, I was shown how to do that.  I mean
15 that's the training that I received as -- that
16 program is pretty user friendly and kind of follow
17 the prompts and you can run the list and then the
18 other members of the team would show me how to do
19 inquiries or run just a certain list of criteria
20 and so forth.
21      Q.  When you say run a list, what do you
22 mean by run a list?
23      A.  Like if you wanted to know who are all
24 the documented gang members that are active gang
25 members that are Piru Bloods.  You can type that in

Page 49

1  and run just that.
2       Q.  Okay. When you say other criteria, what
3  kind of other criteria?
4       A.  You might want to know who another set
5  was, who were the Folk gang members or who are the
6  certain set of Crip gang members.  You could
7  differentiate out what you wanted.  If you were
8  advised by someone that this person did this or is
9  claiming this, then you could run that.
10      Q.  Does that include like running a name
11 and searching for associates, things like that?
12 Could you search for that in the database?
13      A.  I'm not sure I understand what you are
14 asking me.  I'm sorry.
15      Q.  If you are searching for a person,
16 could you search for particular associates
17 connected to them?  I just want to know --
18      A.  I don't believe that you could.  I
19 believe that you could pull up -- you could type in
20 their name and look at their gang sheet and see the
21 name listed on that sheet.
22      Q.  Okay.
23      A.  Then there's a box at the bottom that
24 says Associates and see if those names were in
25 there, but you couldn't just run who are their

Page 94

1  from being an active gang member.
2     Q.  What was that process?
3     A.  That process was to go a three-year
4  period with no negative gang contacts; with no
5  negative police contacts; without meeting the
6  criteria set up within the guidelines of the City
7  of Wichita.
8     Q.  You mentioned during this juvenile
9  program that you were working on that you notified
10 like over a hundred --
11    A.  It wasn't over a hundred.
12    Q.  Approximately --
13    A.  I sent out -- I've turned all this over
14 so I know it's there. I want to say 70 to 80
15 registered letters I sent out.
16    Q.  Just notifying them of their status --
17    A.  Uh-huh.
18    Q.  -- as a documented gang member. Did
19 you ever do that for adults? What was that
20 notification process?
21    A.  I did not, I did not.
22    Q.  There was no notification process?
23    A.  At that time when I was there it was
24 not.
25    Q.  Did you ever consider a notification

Page 95

1  process?
2     A.  We had talked about it, the fact
3  that -- yes, we had talked about that.
4     Q.  Who is we?
5     A.  Myself, my boss being the bureau
6  commanders that had been talked about in the past
7  of sending out letters to individuals letting them
8  know they had been documented as an active gang
9  member within the community.
10    Q.  What were those conversations like?
11    A.  I honestly don't remember. I know that
12 it had been discussed. When you ask that question,
13 I can recall that, but I never did it.
14    Q.  Do you remember where you stood on the
15 issue?
16    A.  Oh, I would have zero problem with it.
17 I mean, yeah. It wouldn't bother me a bit.
18    Q.  Why didn't you implement a program like
19 that?
20    A.  I think probably time. You know,
21 that's a busy position, ma'am. There is a lot
22 going on in that position and I worked a lot of
23 overtime all the time. I was called in in the
24 middle of the night all the time. Time. Time
25 constraints were big. I can remember the time

Page 96

1  constraint that other projects put on me and a lot
2  of times you are just treading water just trying to
3  keep going.
4     Q.  What other community complaints and
5  questions would you get?
6     A.  Well, you get questions for training.
7  People would want gang training.
8     Q.  Who was generally requesting?
9     A.  USD 259, the school systems, school
10 security. You would be asked sometimes to conduct
11 in-service training for teachers, security staff,
12 hospital security, different security teams like at
13 Wesley Hospital, St. Joseph Hospital and so forth;
14 Basics of Gang presentations, things like that.
15    Q.  Did you create those trainings?
16    A.  A lot of the trainings that I would do
17 and the meetings that I would attend would be very
18 impromptu, ad-lib training where I would discuss
19 things with them and answer questions. Used a lot
20 of existing power points that had been created in
21 years past that we would go in and modify. So I
22 wouldn't say that I created them but we would go in
23 and modify them to be current and up to date.
24 Things of that nature.
25    Q.  Okay. Just a moment. What would you

Page 97

1  modify? What would you modify about those
2  trainings?
3     A.  You would go in because you would pull
4  up -- some of those slides you would have like
5  enough documenting gang members within the
6  community and those numbers obviously would change.
7  Sometimes they would increase and sometimes they
8  would decrease; deceased gang members; gang members
9  in prison, gang members that were killed in gang
10 activity, things like those numbers. You would
11 adjust those types of numbers to update to make
12 sure that it was current so that you were providing
13 proper and updated information.
14    Q.  So did you give those trainings alone
15 or --
16    A.  I had done them alone and also with
17 other sergeants and detectives.
18    Q.  Do you recall any other instances of
19 taking someone off of a gang list? You mentioned
20 this one example of this young man, but are there
21 any others that you remember being taken off of the
22 gang list?
23    A.  I never took anybody off the gang list
24 other than that one directed by Chief Ramsay. Now,
25 I did remove people from being an active gang

Page 98

1  member when they fulfilled the criteria when I was
2  in gang intelligence. I never did that as a
3  supervisor because that's something that gang
4  intelligence officers do, but as a gang
5  intelligence officer I did. I removed them from
6  being an active gang member.
7     Q. When you say removed can you explain
8  what that looks like in the database?
9     A. You switch it to inactive. It says
10 active, you switch it to inactive.
11    Q. Got it, and you have to physically go
12 in and do that --
13    A. You do.
14    Q. -- at the end of the three years?
15    A. You have to go in and you do an audit.
16 It is brutal and it is painstaking because you go
17 through every name on that list and you review that
18 name and you review all of the cases and all of the
19 documentation and then the individuals that have
20 fulfilled the three years of inactivity are
21 switched from an active to inactive gang member.
22 They are no longer on the list as an active gang
23 member.
24    Q. How often do you do the audit?
25    A. Every year.

Page 99

1     Q. And it's just the gang intelligence
2  officers that do it; it's not detectives or
3  sergeants or lieutenants?
4     A. That is correct.
5     Q. And how many intelligence officers did
6  you have in the Gang Unit?
7     A. Four.
8     Q. Four?
9     A. That's why it was brutal.
10    Q. About how long did it take?
11    A. Months.
12    Q. Why was it only intelligence officers
13 doing the audit?
14    A. Because they have the training
15 experience and the knowledge.
16    Q. More than detectives?
17    A. Absolutely.
18    Q. What different training, experience and
19 knowledge did they have?
20    A. They deal with it every single day.
21 They deal with the individuals every single day.
22 They are the ones that document, review the TOPS
23 cards and place individuals into the gang database.
24 They have the experience.
25    Q. Okay. So I want to, I think, take a

Page 100

1  little higher view of the gang database as it
2  functions within the unit, right? So you mentioned
3  earlier that as a lieutenant it was one of your
4  responsibilities to manage the database but it
5  sounds like the intelligence officers are the ones
6  kind of in and out of it all the time. Can you
7  elaborate on how the database functions in the
8  unit?
9     A. Well, first of all, you have four
10 people that go in and make changes because that
11 limits -- other people can look at it like the gang
12 lieutenant. I couldn't modify it, okay, because
13 the less people that can modify it the more control
14 that you have. You have got four people that can
15 modify that gang database; four people that can add
16 somebody or four people that can make someone
17 inactive. Okay. I can only speak about when I was
18 the commander, but that limits access and that
19 helps you maintain your span of control. So if
20 something is inaccurate or incorrect or wrong, you
21 know what, I know it's one of four people. But if
22 I've got 12 detectives working for me and they can
23 all go in and make adjustments to the gang
24 database, now we have a problem because I've lost
25 control and that is why it is done that way.

Page 101

1     Q. Okay. So when officers make changes to
2  the database, whether it's making someone inactive,
3  adding additional information, that kind of thing,
4  is there any kind of notification process in the
5  unit about any updates that have happened in the
6  system?
7     A. No.
8     Q. Did you have any supervisory duties as
9  it relates to the database itself and the use of
10 it?
11    A. As far as allowing if we had -- say a
12 gang intelligence officer moved on, transferred
13 out, quit, got promoted, I would make sure
14 administratively that their access to the gang
15 database was terminated and the new person coming
16 on, their administrative functions would be added
17 so that they could do those things.
18    Q. Anything else?
19    A. There would be times when we would need
20 administrative purchased items and get things done,
21 updates to the system. I would authorize that. I
22 would allocate funds for that; I would arrange for
23 those functions. I would speak to IT in reference
24 to that.
25    Q. Anything else?

Page 122

1  memorializing that this young man was taken off?
2  A. No.
3  Q. And you are not aware of any others
4  that might indicate that?
5  A. No, ma'am.
6  Q. Okay. I want to go back to the audit
7  that you mentioned that happens yearly and I want
8  to in fine detail go through that audit process and
9  what it looks like as an intelligence officer
10 that's conducting the audit itself. So what time
11 of year did you say you do the audit?
12 A. Usually starts right after the first of
13 the year every year.
14 Q. And what is the first step in an audit?
15 A. Now, I can only speak about it in past
16 tense. I can't speak about it now when I was
17 there.
18 Q. In your time as a gang intelligence
19 officer and as a lieutenant, were they the same?
20 A. Yes. You basically you have the list
21 and you would run a list. We would run a list,
22 print it out.
23 Q. A list of?
24 A. Of all the active gang members within
25 the Wichita community that are on the list. We

Page 123

1  would print that out and there were four of us or
2  four of them when I was the commander and we would
3  split that list up so there is an even amount of
4  names on each list and then it's divided out
5  amongst the four and you start at the top of your
6  list and you pull up that name and you research and
7  do a full background check on that individual.
8  Q. So what does research entail?
9  A. Well, you would start by running their
10 name in the database, seeing if they have had any
11 police cases or period and if they have you look
12 and see what part they played in that case. Were
13 they merely a witness; were they a victim in that
14 case or were they a suspect in that case and then
15 you see if their -- and then you read that case to
16 its entirety and then you see if anything, any
17 information in that case meets any of the criteria
18 set forth within the policy if they indeed should
19 remain active or -- and then you document; you
20 would take those events and you would document them
21 in the database and that is one thing you would do.
22 Q. So one part of the audit is just
23 updating active records. Say they were on a
24 traffic stop and there was some documentation about
25 a red bandana in their pocket and you read that

Page 124

1  information in the traffic -- you would add that to
2  their TOPS card?
3  A. It all depends on the circumstances.
4  It doesn't always mean that. Every situation is
5  different. I mean, just because a young individual
6  or an individual period has a red bandana, that
7  doesn't mean they are a gang member. It could be
8  coupled -- you have to take the totality of all the
9  circumstance and bring them together and take a
10 look at it.
11 Q. Okay. Is there any documentation about
12 guiding intelligence officers through the audit
13 process that's not contained in 527?
14 A. No, not to my knowledge.
15 Q. Okay. So the officers interpret the
16 policy and apply it during the audit, but there's
17 not a document kind of outlining step-by-step --
18 A. No, ma'am.
19 Q. -- that process. So when you say every
20 situation is different, it's the totality of the
21 circumstances, how do you find the totality of the
22 circumstances? How do you determine what those
23 circumstances are?
24 A. Well, I think a lot of it comes from
25 experience and you know, and I'll use your example

Page 125

1  of a car stop, and you have got an individual that
2  does have a red bandana, okay, but he's also in the
3  car with two other individuals who are sporting all
4  red and then when you are conducting your
5  background check or you have personal knowledge
6  because you have dealt with them before and you
7  know that two of the other people in that car are
8  documented Blood gang members, and you listen to
9  the conversations and what is said. Those are the
10 circumstances that I'm talking about when they all
11 come together and you make your determination.
12 Q. So when you are conducting the audit
13 you are looking at the officer's report, that's the
14 document --
15 A. Yes, ma'am.
16 Q. -- that you are using to determine the
17 totality of the circumstances?
18 A. Yes.
19 Q. So that was one task during the audit
20 was updating any cards with any recent potentially
21 gang-related activity. When you go to move someone
22 to inactive, what is that -- what documents do you
23 look at, what searches do you run. Walk me through
24 that process on the computer.
25 A. When you go to switch someone to

Page 138

1  hanging out with them; you have been in cars with
2  them when there's been traffic stops. You are
3  associating with them and you are friends with them
4  and that is what being associated with them would
5  mean.
6    Q.  How would you define hanging out?
7    A.  Well, if you are -- I don't know. To
8  me hanging out -- I can give you what my definition
9  is. Hanging out is two individuals sitting in a
10 house together watching TV; two individuals going
11 to the club that night and hanging out, they are
12 friends. Driving down the street in a car; sitting
13 on the porch out in front of a house. That's how I
14 would define that.
15   Q.  Okay. So what was your response to
16 parents or people trying to avoid gang list status
17 about ways to avoid associating with gang members,
18 if you have any?
19   A.  Well, what I would tell them is I would
20 explain to them, if you have knowledge that an
21 individual is a gang member, you know what? I
22 wouldn't be hanging out with them. Okay. If you
23 have knowledge that someone is a gang member and
24 that they are engaged in gang activity you have a
25 responsibility to not hang out with them.

Page 139

1    Q.  Does that include family members?
2    A.  That was a common question that got
3  asked a lot and that was a problem and I would tell
4  them, you know what, because I heard that a lot as
5  far as my cousin is a gang member over here. I
6  said well, you have to make a decision. You are
7  associating with this individual. I can't change
8  what that says. If you are associating with
9  someone and they are a gang member it meets part of
10 the criteria is how it was explained to them.
11   Q.  Okay. Were there any like Gang Unit
12 documents that would define associate in a way that
13 you just described or in any other ways?
14   A.  Not to my knowledge.
15   Q.  I've got similar questions about gang
16 locations and if people would come in and ask about
17 how do I avoid being in a gang location. What do
18 you consider a gang location; how did you have that
19 conversation with people?
20     MR. BRANDON: Object to form.
21   Q.  (By Ms. Calvert) You can still answer.
22     MR. BRANSON: Well, what are you asking
23 him to answer? About location or can you --
24   Q.  Can I rephrase?
25     MR. BRANSON: Please.

Page 140

1    Q.  So I guess I'll start with the
2  question, how do you define a gang location?
3    A.  It is not that difficult because we
4  never used like this intersection or this block
5  because you know what? Anybody walks down the
6  street, anybody can drive down the street and I
7  think common sense has to come into play here, but
8  when you are going to a home which is what we use
9  as far as gang hangouts or locations, when we know
10 this home is directly related to gang violence;
11 when we know that multiple people that are
12 documented gang members all live in this house and
13 then another individual is hanging out at that
14 house, that is a gang location and that is how we
15 determined that. That is how I determined that.
16   Q.  The residences were typically --
17   A.  Or businesses. Some businesses in the
18 community were known to be gang, known gang
19 hangouts where certain sets would hang out and
20 that's all that would be in there and you knew if
21 someone from an opposing set went in there, there
22 was going to be a shooting or some type of active
23 disturbance.
24   Q.  So like we said, if it was a family
25 member's house, what would be your advice to their

Page 141

1  parents or those people looking to either become
2  inactive off the gang list or have their active
3  status explained?
4    A.  Well, that can be explained away but
5  it's also important to understand, ma'am, that's
6  only one of the three criteria. Okay. That's why
7  there's three sets in the criteria out of the ten
8  because you could meet one by accident. You can
9  meet one by coincidence. Your cousin is a gang
10 member, your brother is a gang member, your father
11 is a gang member or your grandfather is a gang
12 member. It happens. One happens. But now couple
13 it with two and then couple it with three. If you
14 have got all three and you meet the criteria of
15 three, that's why it's not just one. That's why
16 it's three. So that is the reasoning for that and
17 that is the justification and the way to make sure
18 that someone doesn't get mistakenly identified as a
19 gang member just because they are hanging out with
20 their cousin or their brother that's a gang member
21 because they have to meet two more of those
22 criteria as well.
23   Q.  You mentioned businesses. Are there
24 specific businesses you can recall as gang
25 locations?

36 (Pages 138 to 141)

Page 150

1  predominately have always gotten along and done
2  very well together. So yes, you would still be
3  associated with a documented gang member.
4      Q.  It doesn't matter what gang the
5  associated person is with; it is just any gang
6  member?
7      A.  Correct.
8      Q.  Okay. Is all of this information
9  documented anywhere? I'm just trying to find a
10 place where I can read about all of this.
11     A.  No.
12     Q.  Okay. So it's just verbal training?
13     A.  I say no, to my knowledge.
14     Q.  Okay.
15     A.  There may have been something developed
16 that someone else developed after me. There were
17 about -- there's been three or four gang commanders
18 since I was there so I can only speak about my
19 time. But that answer is no.
20     Q.  Okay. So in those conversations with
21 your intelligence officers about, you know, do we
22 consider this a gang location, that's something
23 that they would come and you would talk over
24 together to come up with an answer; is that
25 correct?

Page 151

1      A.  If it wasn't an obvious answer to them,
2  that answer is yes.
3      Q.  If it wasn't obvious to them, yes, you
4  would talk it over?
5      A.  We would discuss it, yes.
6      Q.  Okay. As lieutenant, do you have final
7  say over whether it qualified or not?
8      A.  I never had to implement that but would
9  I have if I needed to interject, absolutely.
10     Q.  Okay. Besides asking whether you think
11 someone qualifies as a gang location, can you think
12 of other kind of clarifying questions the
13 intelligence officers had for you to define 527
14 terms?
15     A.  No, not the specific questions, I don't
16 remember. It's been so long.
17     Q.  But would you say they were all about
18 location then? Can you remember any other topics,
19 if not the questions?
20     A.  Yeah. I don't want to say they were
21 all about location but I just don't recall. I'm
22 sorry. I'm sure there were others. I just don't
23 remember them.
24     Q.  So was this -- they would come in and
25 ask a question and that would be the instigator for

Page 152

1  this informal conversation; correct?
2      A.  Yes.
3      Q.  Was there ever a time where you just
4  had a meeting and you instigated kind of this
5  informal training to talk about definitions?
6      A.  Yes. Like prior to starting the audit
7  --
8      Q.  Okay.
9      A.  I would have all the officers into my
10 office, the gang officers sit down and say hey,
11 we're starting the audit Monday --
12     Q.  Uh-huh.
13     A.  And we're going -- get your list
14 printed out, get them divided up and come see me
15 and I want to see exactly how many are on the list
16 right now and then we're going to set a deadline up
17 so that we have this done in a timely manner so we
18 can get you guys back on the streets.
19     Q.  Sure. So that's the procedure of the
20 audit. Was there additional training about the
21 content of the audit?
22     A.  I think there may have been some
23 additional comments like if you had brand new gang
24 intelligence officers, explaining to them how the
25 audit would work and the process, but the majority

Page 153

1  of that took place between that new officer and the
2  veteran gang intelligence officer who had been on
3  the team awhile.
4      Q.  So the peer training, not top down
5  training?
6      A.  That is correct; yes, ma'am.
7      Q.  Were those conversations ever
8  documented, those trainings ever memorialized in
9  any way?
10     A.  No.
11     Q.  Were you aware of during any of your
12 time at WPD, of concerns from other WPD members
13 about the gang database; about how it was run or
14 Policy 527?
15     A.  No.
16     Q.  You weren't aware of any concerns,
17 whether in writing or kind of general gossip?
18     A.  Can I ask a question?
19     Q.  Sure.
20     A.  What is the time frame on this?
21     Q.  Your entire time at WPD.
22     A.  Once recently.
23     Q.  Can you describe that for me?
24     A.  Very briefly, because I don't have a
25 lot of knowledge on it, but there was talk about it

39 (Pages 150 to 153)