IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

PROGENY, a program of Destination )
Innovations, Inc., CHRISTOPHER )
COOPER, ELBERT COSTELLO, MARTEL )
COSTELLO, and JEREMY LEVY, JR., ) Case No.
on behalf of themselves and ) 6:21-CV-01100
others similarly situated, ) EFM-ADM
Plaintiffs, )
vs )
CITY OF WICHITA, KANSAS, )
Defendant. )
_____)

VIDEOTAPED DEPOSITION OF

DAVID INKELAAR

December 2, 2022

1:05 p.m.

Taken at:

Joseph, Holland & Craft

500 North Market

Wichita, Kansas

Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR

Page 70

1  Beat 29?
2      A.  No.
3      Q.  But you spent the majority of your time
4  there?
5      A.  Yes.
6      Q.  Okay.  Why did you end up spending the
7  majority of your time there?
8      A.  That's where I was assigned by the
9  supervisor.  So what happens is you have beat
10 officers that would be assigned by seniority.
11 Well, I was so low on the totem pole that I was
12 just put wherever there was availability and a
13 large part of the time it was 29-beat.
14     Q.  In all your time as a patrol officer
15 did you ever fill out a TOPS card for an individual
16 to be added to the gang database?
17     A.  As a patrol officer?
18     Q.  Yes.
19     A.  I don't remember as a patrol but I
20 remember in SCAT a couple.
21     Q.  Okay. Let me clarify.  A Community
22 Policing officer is also a patrol officer; correct?
23     A.  Yes.
24     Q.  Is a SCAT officer not also a patrol
25 officer?

Page 71

1      A.  It is a patrol officer, yes.  When I
2  think patrol I'm thinking beat.  Sorry.
3      Q.  Understood.  So I'm talking about all
4  the time up until when you made detective --
5      A.  Oh, yeah, I did.
6      Q.  -- you filled out TOPS cards?
7      A.  A couple, yes.
8      Q.  Was it something you did everyday?
9      A.  No.
10     Q.  Was it something you did once a year?
11     A.  I want to be honest, I can think of
12 only two or three times I ever filled out a TOPS
13 card.
14     Q.  It wasn't a significant part of your
15 work as a patrol officer?
16     A.  No.
17     Q.  Okay.  As a patrol officer did you --
18 was part of your role -- and again, when I say
19 patrol officer I mean all the time up until you
20 made detective.  Was part of your job identifying
21 whether individuals that you interacted with were
22 gang members?
23     A.  No.
24     Q.  Did you regularly try to find out from
25 other people in WPD whether particular individuals

Page 72

1  that you interacted with were gang members?
2      A.  No.
3      Q.  As a patrol officer did you sometimes
4  conduct traffic stops?
5      A.  Yes.
6      Q.  When you conducted a traffic stop as a
7  patrol officer would you contact SPIDER to check
8  information about that individual?
9      A.  What do you mean information?
10     Q.  Would you run a check to see if there
11 were outstanding warrants for the individual you
12 had stopped?
13     A.  Yes.
14     Q.  Okay.  Is it your understanding that
15 part of the standard checks that would be conducted
16 when you radio'd information during a traffic stop
17 would be whether the individual you were
18 interacting with was listed in the gang database?
19     A.  Can you give more detail on that?
20     Q.  Yeah.  Let me ask a little different
21 question.  Are you familiar with a Signal 33?
22     A.  Yes.
23     Q.  What is a Signal 33?
24     A.  It's a flagged gang member.
25     Q.  When is that used?

Page 73

1      A.  So the reason I hesitated on that is I
2  don't think SPIDER had access to the gang database
3  but I know in eJustice they had had flags where
4  they could put like this person is associated or
5  were a gang member.  I think that's where SPIDER
6  got that information, but I don't know how it got
7  from the gang database to eJustice.
8      Q.  In your time as a patrol officer did
9  you sometimes receive a Signal 33 indicating that
10 someone you observed was an identified gang member?
11     A.  Yes.
12     Q.  Okay.  Is it your testimony that you
13 are not sure where that information came from?
14     A.  Well, I'm sure it came from the gang
15 database but I can't tell you who put that from the
16 database to eJustice.  I don't know who did that.
17     Q.  Who would have radio'd you the Signal
18 33?
19     A.  SPIDER.
20     Q.  Okay.  So you don't know how the
21 information got to SPIDER but they provided it to
22 you?
23     A.  Yes.
24     Q.  Do you know whether SPIDER ran a check
25 for whether someone was in the gang database

19 (Pages 70 to 73)

Page 82

1  33?
2     A.  Yes.
3     Q.  Apart from being put into the database,
4  there also is the possibility that one member of
5  the department would radio to another using Signal
6  33 to identify a particular individual as a gang
7  member; right?
8     A.  **I don't want to speculate but it could,**
9  **I guess.**
10    Q.  I think earlier you said that sometimes
11 SPIDER would --
12    A.  **Yes.**
13    Q.  -- would radio a Signal 33 to identify
14 a gang member; right?
15    A.  **Yes.**
16    Q.  Other than SPIDER are you aware of any
17 one else within WPD who would radio Signal 33 to
18 identify an individual as a gang member?
19    A.  **I've heard Chad Beard get on the radio**
20 **and say they are flagged 33.**
21    Q.  Anyone else?
22    A.  **Maybe Kevin McKenna when he was in**
23 **Intel when out on the streets.**
24    Q.  Anyone else?
25    A.  **Not that I can remember.**

Page 83

1     Q.  Okay. Do you learn what Signal 33 means
2  in the police academy?
3     A.  **Yes.**
4     Q.  So every officer in the department
5  knows what Signal 33 means?
6     A.  **Yes.**
7     Q.  All right. If you will look with me at
8  the next paragraph in the Section B, Nomination
9  Procedure. Do you see that it says, "Any state,
10 county or city law enforcement officer or
11 correctional officer may nominate a person to be
12 added to the Master Gang List." Do you see that
13 phrase?
14    A.  **Yes.**
15    Q.  Whose responsibility do you understand
16 it to be to nominate persons to the Master Gang
17 List?
18    A.  **Patrol officers, different agencies,**
19 **like correctional officers and that can nominate**
20 **but then there's a vetting process.**
21    Q.  Okay, and do you know who conducts the
22 vetting process?
23    A.  **The Gang Intel.**
24    Q.  Gang intelligence officers, okay. When
25 you were a patrol officer did you consider it part

Page 84

1  of your responsibility to nominate persons to the
2  Master Gang List?
3     A.  **Like -- I want to clarify. Like it's**
4  **my job to do it?**
5     Q.  Correct.
6     A.  **No. My job was to make sure people**
7  **were safe.**
8     Q.  You understood at the time that there
9  was a process to nominate a person for the gang
10 list; correct?
11    A.  **Yes.**
12    Q.  And you understood that you had the
13 ability to complete a TOPS card and nominate
14 someone for addition to the list?
15    A.  **Yes.**
16    Q.  But it wasn't your understanding that
17 you had the responsibility to nominate any person
18 you interacted with who might be a gang member for
19 inclusion to the gang list.
20    A.  **No.**
21    Q.  So you had discretion as to who you
22 nominated for addition to the gang list?
23    A.  **Yes.**
24    Q.  And is it your understanding that any
25 patrol officer who is interacting with community

Page 85

1  members has discretion as to whether or not to
2  nominate a particular individual for addition to
3  the gang list?
4     A.  **Yes, but it has to meet the statutory**
5  **requirement.**
6     Q.  Understood. For them to be actually be
7  added it has to meet the statutory list and it's a
8  Gang Intelligence officer that determines whether
9  they do meet the statutory requirement?
10    A.  **Yes.**
11    Q.  In terms of nominating someone for
12 inclusion to the list any officer can do that;
13 correct?
14    A.  **Yes.**
15    Q.  But the officer has discretion as to
16 whether or not they do that for any individual.
17    A.  **Yes.**
18       MR. BRANSON: Can we take a --
19       MR. BAEHR: Yes. Let's go off the
20 record.
21       VIDEOGRAPHER: We're off the record at
22 2:35 p.m.)
23       MR. BAEHR: Let's take a five-minute
24 break.
25       (Whereupon a recess was taken from 2:35

22 (Pages 82 to 85)

Page 102

1  the way down the page there's a letter B. Do you
2  see that?
3      A. B starts with, "is identified."
4      Q. No. It's a lower case (b) and it starts
5  with "Criminal street gang members." Do you see
6  that? It's above where you just --
7      A. Yes.
8      Q. Just to sort of navigate to the
9  statute, do you see that under the title at the
10 top, the first section is a lower case (a.) Do you
11 see that?
12     A. Yes.
13     Q. And then the second section begins with
14 the lower case (b); right?
15     A. Yes.
16     Q. And just for clarification, you see
17 that the section that begins with a lower case (a)
18 defines "a criminal street gang." Do you see that?
19     A. Yes.
20     Q. And the paragraph or the section that
21 begins with lower case (b) defines criminal street
22 gang member. Do you see that?
23     A. Yes.
24     Q. So starting with the section that
25 begins with paragraph (b) it says, "Criminal street

Page 103

1  gang member is a person who (a) admits to criminal
2  street gang membership or (2) meets three of the
3  following criteria." Do you see that?
4      A. Yes.
5      Q. So your understanding is that one
6  condition that a person could meet that would make
7  them a criminal street gang member is admitting to
8  being a criminal street gang member.
9      A. Yes.
10     Q. And if they don't admit to being a
11 criminal street gang member then they have to meet
12 three of the following criteria to be considered a
13 street gang member; right?
14     A. Yes.
15     Q. Okay, and we already discussed what
16 some of those criteria were you remembered
17 associating with other gang members, wearing gang
18 colors; is that right?
19     A. Yes.
20     Q. Okay. So let's look at paragraph (E),
21 capital E that begins "Adopts such gang's style of
22 dress." Do you see that?
23     A. Yes.
24     Q. Do you think that's the criteria that
25 you were referring to earlier when you referenced

Page 104

1  colors?
2      A. Yes.
3      Q. Okay. What does, "Adopts such gang's
4  style of dress, color, use of hand signs or
5  tattoos" mean?
6      A. In regards to like Crips and Bloods.
7  Bloods typically wear red. Crips wear blue.
8  Having like their color showing like a bandana that
9  might be blue or red. Tattoos may be representing
10 the Crip gangs or Blood gangs, hand signs to
11 describe their neighborhoods and associations.
12     Q. Okay. So let's start with color. You
13 mentioned red and blue as colors that could be gang
14 colors; is that right?
15     A. No. Associated with Crips and Bloods.
16     Q. Okay. So red is associated with Bloods?
17     A. Yes.
18     Q. Crips is associated with blue.
19     A. Sure.
20     Q. Are you aware of any other colors that
21 are associated with gangs?
22     A. Yes.
23     Q. What other color?
24     A. Like black for BLB, blue can be
25 Nortenos, and Surenois red. So just because the

Page 105

1  color alone doesn't mean they are gang members.
2  It's they use those colors to help associate their
3  gangs.
4      Q. Some gangs use the same colors to
5  associate?
6      A. Yes.
7      Q. And there are many colors that are used
8  by various gangs to associate with their gang
9  membership.
10     A. Yes.
11     MR. BRANSON: Object to form.
12     Q. (By Mr. Baehr) Are you aware of any
13 colors that are not used by any gang to identify
14 their members?
15     A. No, I'm not.
16     Q. Okay. But just because a person is
17 wearing red, for example, doesn't mean they are a
18 member of the Blood gang; correct?
19     A. Yes.
20     Q. Okay. But a person wearing red would
21 meet the criteria described in the section (E) here
22 under the state statute; is that right?
23     MR. BRANSON: Object to form.
24     A. No. I think you have to associate. If
25 you knew some Bloods were living in this

Page 106

1  neighborhood; you knew that this house was
2  associated with the Blood gang members, that that
3  red color could be an association with that gang.
4  It wouldn't be like if you went to like the mall
5  and you see Mr. Aubry in a red shirt, you would
6  associate him with a Blood gang member. There has
7  to be more to it than just the color of somebody's
8  shirt.
9      Q.  Is what you're saying is that meeting a
10 single criteria of wearing a color that's
11 associated with a gang wouldn't be enough to meet
12 the criteria of a gang member under the state
13 statute?
14     A.  Yes.
15     Q.  Okay. You have to meet at least three
16 criteria under the statute to be listed as a gang
17 member; right?
18     A.  Yes.
19     Q.  And you gave the example of being -- I
20 think you said in a gang neighborhood?
21     A.  Well, a neighborhood or a residence
22 associated with gang activity.
23     Q.  A neighborhood or residence?
24     A.  Yes.
25     Q.  Okay. So if you will look with me at

Page 107

1  the paragraph directly above that that has a
2  capital (D) it says, "Frequents a particular
3  criminal street gang's area." Do you see that?
4      A.  Yes.
5      Q.  So are you saying that being or being
6  present at a residence in a neighborhood that's
7  associated with a particular gang is another
8  criteria for gang membership under the state
9  statute?
10     A.  I think common sense has to be applied
11 when looking at this. I mean, you can't go say
12 like Andover, Kansas or Augusta, Kansas, a small
13 town. You can't just assume -- certain gangs start
14 in different neighborhoods. Like we have the
15 Piru's here in Wichita associated with like 13th
16 Street. They know that those gang members lived
17 within that area so they associate that area with
18 the Blood membership. You can't just go to some
19 random that everybody wearing blue is a Crip or
20 everybody wearing red. There has to be some
21 knowledge of the residence you are at and the
22 individuals that you hang out, if they hang out
23 together to associate as a gang member.
24     Q.  Okay. So you understand that the
25 statute requires a person to meet three criteria of

Page 108

1  gang membership in order to be considered a gang
2  member; right?
3      A.  Yes.
4      Q.  Is your testimony that not everyone who
5  meets three criteria under this statute is
6  necessarily a gang member?
7      A.  Yes.
8      Q.  Okay. So a person could meet three or
9  more criteria under K.S.A. 21-6313 and not actually
10 be a gang member; correct?
11     A.  Yes.
12     Q.  Okay. So how do you determine whether
13 someone who meets three of the criteria under
14 K.S.A. 21-6313 is a gang member or not?
15     A.  You are asking me, Dave Inkelaar, how
16 do I?
17     Q.  Sure.
18     A.  I usually ask. And if they don't tell
19 me then I don't make assumptions.
20     Q.  Okay. So for you, you wouldn't assume
21 that they are a gang member unless they
22 self-identified as a gang member?
23     A.  Yes.
24     Q.  And you wouldn't nominate for inclusion
25 unless they self-identified?

Page 109

1      A.  Yes.
2      Q.  Do you know whether some other officers
3  might nominate to the gang database even if a
4  person didn't self-identify as a gang member?
5      A.  You would have to ask them. I don't
6  know.
7      Q.  You don't know. Would you agree that
8  under the statute someone could be nominated to be
9  added to the gang list even if they didn't
10 self-identify as a gang member?
11     A.  They could be, yes.
12     Q.  And you would agree that under Policy
13 527, a person could be added to the gang list even
14 if they didn't self-admit as a gang member?
15     A.  They could be, yeah.
16     Q.  Okay. So for you, the criteria that you
17 would apply to determine whether someone actually
18 was a gang member is whether they self-admit.
19     A.  Yes.
20     Q.  Okay. Other officers might apply
21 different criteria to determine whether somebody
22 should be added to the gang list.
23     A.  They could.
24     Q.  Okay. What does -- if you look back at
25 paragraph (D) that we were just looking at, what

Page 114

1    A. Uh-huh.
2    Q. What does that mean to you?
3       MR. BRANSON: Are you asking him the
4  whole section?
5    Q. (By Mr. Baehr) Let me ask a different
6  question. How would a person meet that criteria?
7    A. So a law enforcement officer, state,
8  county police officers, who document an informant
9  that's been documented through courts to be a
10  reliable source.
11    Q. Okay, and to be clear, if a law
12  enforcement officer said that person is in a gang,
13  would that meet criteria B to your interpretation?
14    A. Yes.
15    Q. Okay, or if an informant who had been
16  documented as reliable by a court said that person
17  is in a gang that would also meet the criteria B;
18  correct?
19    A. Yes.
20    Q. You can set that exhibit aside. Oh,
21  I'm sorry, I do have one more question. If you
22  look back at paragraph D that we were just talking
23  about, frequents a particular criminal street
24  gang's area, do you see that?
25    A. Yes.

Page 115

1    Q. What does a criminal street gang area
2  mean to you?
3    A. Just a neighborhood or area or a street
4  that they associate with.
5    Q. You used the example, I think, of
6  Piru's in the 1300 block of 13th; correct?
7    A. Yes.
8    Q. Are there other gangs that are
9  associated with particular blocks within Wichita?
10    A. Yes.
11    Q. Some gangs that are associated with
12  particular residences?
13    A. Yes.
14    Q. Some gangs that are associated with
15  entire neighborhoods?
16    A. Yes.
17    Q. Are there some gangs that are
18  associated with the north side or south side of
19  town?
20    A. Yes.
21    Q. Could any of those areas be considered
22  a gang's area to you under the meaning of paragraph
23  D there?
24    A. To me personally?
25    Q. Yes.

Page 116

1    A. No. I mean -- if I had like a Nortenos
2  I wouldn't just associate the north side with the
3  whole gang. It's usually the streets or the --
4  when I say like a neighborhood, like a couple of
5  blocks in that area.
6    Q. Do you know whether particular criminal
7  street gang area here in the statute is meant to
8  include like the entire north side?
9    A. I don't take it as that way but --
10    Q. Could someone else interpret it that
11  way?
12    A. I guess they could, yeah.
13    Q. To your knowledge, is there any list or
14  map that would identify what parts of Wichita are a
15  particular street gang area and what parts aren't?
16    A. Not that I'm aware of.
17    Q. So if you were going to assess whether
18  an individual met criteria D, you wouldn't
19  reference a set list or map of gang areas?
20    A. No.
21    Q. Okay. You would just use your knowledge
22  of the neighborhoods based on your experience as a
23  police officer?
24    A. Yes.
25    Q. Okay, and different police officers

Page 117

1  might have different experience and knowledge;
2  right?
3    A. Yes.
4    Q. So they might interpret a gang's area
5  differently than you would?
6    A. They could.
7    Q. Is there a way for me as an individual
8  to know if I'm in a particular street gang's area?
9    A. I think you can request a meeting with
10  Chad Beard to talk over it.
11    Q. Okay. Let's say I want to go to dinner
12  tonight and I do not want to be considered a gang
13  member, okay, and maybe you would say I don't have
14  to worry about that, but let's say my background,
15  my family, my associates might put me at risk to be
16  considered a gang member. Okay. Maybe I meet
17  other criteria on this list. Okay?
18    A. Okay.
19    Q. But I'm not a gang member and I don't
20  want to be added to the gang list.
21    A. Okay.
22    Q. How do I avoid going into a criminal
23  street gang's area so that I don't meet that
24  criteria?
25    A. I don't know.

30 (Pages 114 to 117)