```
                                                    1
  1        UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF KANSAS
  2                WICHITA DIVISION

  3
     PROGENY, a program of        )
  4  Destination Innovation, Inc.,)
     CHRISTOPHER COOPER, ELBERT   )
  5  COSTELLO, MARTEL COSTELLO, and)
     JEREMY LEVY, JR., on behalf of)
  6  themselves and others        )
     similarly situated,          )
  7                               )
                                  )
  8        Plaintiffs,            )
                                  )
  9  vs.                          ) Case No.
                                  )
 10  CITY OF WICHITA,             ) 6:21-cv-01100-EFM-ADM
                                  )
 11                               )
         Defendant.               )
 12                               )

 13
              D E P O S I T I O N
 14
        The deposition of CHRISTOPHER COOPER, taken on
 15
     behalf of the Defendant in the above-styled and
 16
     numbered cause, pursuant to the Federal Rules of Civil
 17
     Procedure before Jeffrey J. Elliott, Kansas CCR #912,
 18
     at Wichita City Hall, 455 North Main, 13th Floor,
 19
     Wichita, Sedgwick County, Kansas, on the 16th day of
 20
     June, 2023, commencing at 10:00 a.m.
 21

 22

 23        HARRISON-ELLIOTT REPORTING, LLC
              Certified Court Reporters
 24     1417 North Saint Paul, Wichita, Kansas 67203
         (316)267-8278 phone   (316)267-8621 fax
 25            jeff@harrisonelliott.com
```

```
                                                    2
  1             A P P E A R A N C E S

  2
     FOR THE PLAINTIFF(S):
  3
        Ms. Teresa A. Woody
  4     KANSAS APPLESEED CENTER FOR LAW & JUSTICE, INC.:
        211 East 8th Street - Suite D
  5     Lawrence, Kansas 66044
        twoody@kansasappleseed.org
  6
        Mr. Jordan C. Baehr          (VIA VIDEOCONFERENCE)
  7     SHOOK, HARDY & BACON, LLP
        2555 Grand Boulevard
  8     Kansas City, Missouri 64108
        jbaehr@shb.com
  9

 10

 11  FOR THE DEFENDANT CITY OF WICHITA:

 12     Mr. Charles E. Branson
        FISHER, PATTERSON, SAYLER & SMITH
 13     3550 SW 5th Street
        Topeka, Kansas 66606
 14     cbranson@fpsslaw.com

 15     Mr. David R. Cooper          (VIA VIDEOCONFERENCE)
        FISHER, PATTERSON, SAYLER & SMITH
 16     3550 SW 5th Street
        Topeka, Kansas 66606
 17     dcooper@fpsslaw.com
```

```
                                                    3
  1             I N D E X
     CHRISTOPHER COOPER
  2
  3    Direct Examination by Mr. Branson          4
  4    Cross-Examination by Ms. Woody            56
  5    Redirect Examination by Mr. Branson       74

 11  DEFENDANT DEPOSITION EXHIBIT 88
        Marked for Identification                10
 12     (Interrogatory Answers - C. Cooper)
 13  DEFENDANT DEPOSITION EXHIBIT 89
        Marked for Identification                14
 14     (Color Photo Image - Five Individuals)
 15  DEFENDANT DEPOSITION EXHIBIT 90
        Marked for Identification                16
 16     (Color Photo Image - C. Cooper)
 17  DEFENDANT DEPOSITION EXHIBIT 91
        Marked for Identification                16
 18     (Color Photo Image - C. Cooper)
 19  DEFENDANT DEPOSITION EXHIBIT 92
        Marked for Identification                22
 20     (KDOC Website Instructions - Status Report)

 24  SIGNATURE OF WITNESS                        78
 25  CERTIFICATE OF CERTIFIED REPORTER           79
```

```
                                                    4
  1            CHRISTOPHER COOPER,
  2  of lawful age, having been first duly sworn on his
  3  oath to state the truth, the whole truth, and nothing
  4  but the truth, deposes and says:
  5            DIRECT EXAMINATION
  6  BY MR. BRANSON:
  7  Q.   All right, good morning, Mr. Cooper.  Could you
  8       please state your name for the record?
  9  A.   Yes, Christopher Cooper.
 10  Q.   And, sir, what is your date of birth?
 11  A.   02/03/95.
 12  Q.   And what is your address?
 13  A.   4818 East New Jersey Drive.
 14  Q.   Are you employed?
 15  A.   Yes.
 16  Q.   Where are you employed?
 17  A.   Dold's.
 18  Q.   Dold's?
 19  A.   Dold's Food, Hormel.
 20  Q.   Is that here in Wichita?
 21  A.   Yes.
 22  Q.   And how long have you been employed there?
 23  A.   Two years.
 24  Q.   And what do you do there?
 25  A.   Um, they call -- well, they call it like smoke-
```

37

1 Army, so . . .
2 Q. Sir, you allege in your complaint that you were
3    going to receive some type of scholarship or some
4    sort of help from Kansas State University?
5 A. Yes.
6 Q. Tell me about that.
7 A. Um, just talked to the coach. He was looking at
8    picking me up.
9 Q. What coach?
10 A. I cannot remember at the time. Who was -- I
11    don't recall the coach.
12 Q. How did they get in touch with you?
13 A. A friend that already went to school there.
14 Q. Okay, who was that friend?
15 A. Jessie.
16 Q. Do you know the last name?
17 A. No. He was a roommate.
18 Q. He was a roommate?
19 A. Yeah.
20 Q. When was he a roommate?
21 A. When I went to college.
22 Q. Was he a roommate with you at Highland?
23 A. Yes.
24 Q. And then he went to K-State?
25 A. Yes.

HARRISON-ELLIOTT REPORTING
(316) 267-8278

38

1 Q. And that's how you got introduced to a coach at
2    K-State?
3 A. Yes.
4 Q. All right. But you don't remember who the coach
5    was?
6 A. No.
7 Q. Was the head coach or assistant coach?
8 A. Pretty sure it was assistant.
9 Q. You allege in your complaint that you were pre-
10    paring to transfer there. Tell me what that
11    means.
12 A. Well, basically, he was looking at picking me up
13    the next coming season.
14 Q. Had you made an application to K-State?
15 A. No. I haven't actually filled out -- I hadn't
16    had time to.
17 Q. Why didn't you have time to?
18 A. Because I was -- well, I went to jail, so . . .
19 Q. So you went to jail before you could do anything
20    as far as --
21 A. Yeah, anything as to school, yeah.
22 Q. -- making any commitment to K-State or anything
23    like that?
24 A. Yeah.
25 Q. Sir, when did you first learn that you may be

HARRISON-ELLIOTT REPORTING
(316) 267-8278

39

1    included in the gang list?
2 A. I think when I got pulled over and -- well, not
3    pulled over, but when I went to jail.
4 Q. When you were arrested?
5 A. Yes.
6 Q. And that's for the shooting incident in 2014?
7 A. Mm-hmm, yes.
8 Q. You ever been arrested at any other time?
9 A. No.
10 Q. That's your only arrest?
11 A. Yes.
12 Q. And how did you learn that you were on the gang
13    list?
14 A. Um, I didn't. Just after my attorney. Like,
15    after I talked to my attorney and she was telling
16    me.
17 Q. So your attorney told you that you were on the
18    gang list?
19 A. Later, like later on that I'm on the gang list,
20    yeah.
21 Q. Tell me how that happened. I just want to know
22    how you first became aware that you were on the
23    gang list.
24       MS. WOODY: I need to clarify some-
25    thing. He's not talking about us going

HARRISON-ELLIOTT REPORTING
(316) 267-8278

40

1    through any alleged gang -- alleged things
2    on the gang card, he's talking about when
3    did you first know that you were on the gang
4    list, not what you and I talked about.
5 A. Oh, like -- okay, then -- yeah, basically, like
6    when I was going to jail.
7 Q. Okay.
8 A. After that, no.
9 Q. Who told you that you were on the gang list?
10 A. Whew, I do not recall. Probably the police. I
11    don't recall.
12 Q. Do you remember anything else that you were told
13    about being on the gang list?
14 A. No.
15 Q. You just know that at some point somebody told
16    you that you were on the gang list after you were
17    arrested?
18 A. Basically because I -- yeah.
19 Q. Sir, do you remember what your bond amount was
20    when you were arrested for first-degree murder?
21 A. I think it was about 50K, 50,000.
22 Q. Okay, you think. Can you tell me why you think
23    that?
24 A. I just think that's what the bail was. I'm not
25    too for sure because it was a while ago.

HARRISON-ELLIOTT REPORTING
(316) 267-8278

41

1  Q. Did $50,000 seem low for somebody charged for
2     first-degree murder?
3  A. I've never been charged and so, no.
4  Q. Sir, when you were arrested you went before a
5     judge?
6  A. Yes.
7  Q. And that's when your bond was set is when you
8     appeared in front of the judge?
9  A. I think.
10 Q. So the judge set your bond amount?
11 A. I think.
12 Q. Sir, after you testified in Mr. Williams' case,
13    you accepted a plea to obstruction and you were
14    given 18 months probation. Do you recall that?
15 A. Yes.
16 Q. When you were placed on probation, you were given
17    certain conditions of probation?
18 A. Yes.
19 Q. Those conditions included obeying the law?
20 A. Yes.
21 Q. Probably curfew?
22 A. Yes.
23 Q. Probably get a job or go to school?
24 A. Yes.
25 Q. Not to hang out with other felons?

HARRISON-ELLIOTT REPORTING
(316) 267-8278

42

1  A. Yes.
2  Q. Not to hang out with known gang members?
3  A. Yes.
4  Q. Sir, were those conditions of your probation
5     imposed by the judge?
6  A. Yes.
7  Q. And those conditions or probation, were they
8     monitored by your Community Corrections Officer?
9  A. Yes.
10 Q. Do you remember who your Community Corrections
11    officer was?
12 A. No.
13 Q. Sir, you allege in your complaint that you have
14    been stopped many times by the Wichita Police
15    Department. Before your arrest in 2014, had you
16    ever been stopped by the Wichita Police Depart-
17    ment?
18 A. Yes.
19 Q. When was that?
20 A. Don't recall.
21 Q. Do you have any approximate type of date, any
22    reference of anything going on that you can refer
23    to?
24 A. Uh, I just know before I graduated.
25 Q. Before you graduated --

HARRISON-ELLIOTT REPORTING
(316) 267-8278

43

1  A. High school.
2  Q. -- from high school. You had been stopped?
3  A. Yes.
4  Q. How many times before you graduated from high
5     school?
6  A. I can't give you exact number.
7  Q. All right. Sir, on page 9 of your answers to
8     interrogatories, in your response to
9     Interrogatory No. 10 you state that you believe
10    since 2013, you estimate that you had been pulled
11    over five to six times.
12 A. Probably.
13 Q. Is that your testimony?
14 A. Probably, yes.
15 Q. How many times before you graduated from high
16    school do you think were part of that five to six
17    times?
18 A. Maybe two.
19 Q. How many times after graduation and before your
20    arrest were you pulled over?
21 A. You said after?
22 Q. After your graduation and before your arrest in
23    2014.
24 A. Yeah, I don't recall, but a few.
25 Q. A few, okay. Do you think you were pulled over

HARRISON-ELLIOTT REPORTING
(316) 267-8278

44

1     after your arrest? Not counting the arrest
2     itself, but do you think you were pulled over
3     after your arrest?
4  A. Like, after I got arrested and --
5  Q. Yes. So you were custody for quite a while.
6  A. Yes.
7  Q. Then you went on probation in August of 2017.
8  A. Mm-hmm. (Witness motioned head up and down.)
9  Q. Do you think you were pulled over after your
10    arrest in 2017?
11 A. Huh-uh, no, I -- I don't recall, sir.
12 Q. Sir, do you remember anything about any of the
13    times that you were pulled over?
14 A. Yes.
15 Q. What do you remember?
16 A. Just being harassed for no reason.
17 Q. Okay. And why do you say it was for no reason?
18 A. I mean, when you get pulled over and let go for
19    no reason.
20 Q. So are you alleging that somebody in the Wichita
21    Police Department pulled you over and they said
22    they didn't have any reason for pulling you over?
23 A. Well, no. They had a reason I guess.
24 Q. What were the reasons that you were given for
25    your stops?

HARRISON-ELLIOTT REPORTING
(316) 267-8278

49

1  house?
2  A. Yes.
3  Q. So am I correct that that timeframe is after
4     graduation in 2013 and before your arrest in
5     2014?
6  A. Yes, somewhere around . . .
7  Q. Who is your aunt?
8  A. Martel's aunt.
9  Q. Martel's aunt?
10 A. I mean mom.
11 Q. Mom?
12 A. I'm sorry, mom.
13 Q. Do you recall her name?
14 A. Yes.
15 Q. What's her name?
16 A. Therese.
17 Q. Therese?
18 A. Yes.
19 Q. Is that also Latrice?
20 A. Yes.
21 Q. Sir, you allege in your complaint that you lost a
22    job opportunity after a background check. Can
23    you tell me what you mean by that?
24 A. I kind of just assumed. Yeah.
25 Q. Tell me what you assumed.

HARRISON-ELLIOTT REPORTING
(316) 267-8278

50

1  A. Because I was on gang file.
2  Q. What job was this?
3  A. Spirit.
4  Q. Spirit AeroSystems?
5  A. Yes.
6  Q. And when did you apply for a job at Spirit Aero-
7     Systems?
8  A. I do not recall the date.
9  Q. Was it after you were off Community Corrections?
10 A. Yes.
11 Q. So sometime after August 2017?
12 A. After that, yes.
13 Q. Do you have any time reference that you can make
14    that would narrow it down? Was this in 2018?
15 A. I don't want to say yes and be wrong, so I'm not
16    too for sure.
17 Q. No, that's a fair answer. Before 2020?
18 A. Maybe. Yes, yes, yes, for sure because I've been
19    at my job for two years now.
20 Q. Do you recall, did you actually have an interview
21    for that job?
22 A. I talked to the lady, so no. No interview.
23 Q. So did you make a written application, then?
24 A. Yes, I talked to the lady and we was getting
25    everything taken care of and she was supposed to

HARRISON-ELLIOTT REPORTING
(316) 267-8278

51

1  be calling me back for the interview.
2  Q. When you say you talked to the lady, was this on
3     the phone --
4  A. Yes.
5  Q. -- was this in person or how was --
6  A. On the phone.
7  Q. So just if you would, take me through the
8     process. You found out about a job and tell me
9     what you did.
10 A. Just applied for it.
11 Q. And how did you apply?
12 A. Online.
13 Q. Okay, it was an online application?
14 A. Yes.
15 Q. And then did somebody call you or did you call
16    somebody?
17 A. I think I called to get ahold of somebody. And
18    then I -- I want to say I didn't get ahold of
19    somebody and somebody called back.
20 Q. Somebody called you back?
21 A. Yes.
22 Q. And when they called you back, what did they tell
23    you?
24 A. They were going to look at my application.
25 Q. And did you hear from that person again?

HARRISON-ELLIOTT REPORTING
(316) 267-8278

52

1  A. No.
2  Q. Did you hear from anybody again --
3  A. No.
4  Q. -- from Spirit?
5  A. No.
6  Q. No phone call, no letter?
7  A. No.
8  Q. No nothing.
9  A. No.
10 Q. So, sir, do you have any knowledge that any back-
11    ground check was run on you?
12 A. Um, pretty sure. They background check every-
13    body.
14 Q. What makes you say that?
15 A. Don't all jobs?
16 Q. So you're assuming that there's some type of
17    background check.
18 A. Yes.
19 Q. But you don't have any knowledge or information
20    that one was actually conducted?
21 A. That was what I said, I assumed.
22 Q. And as it stands today, you don't have any idea
23    why you did not get that job, do you?
24 A. No, I mean -- no. Never thought about it.
25 Q. Sir, as part of your complaint you allege that

HARRISON-ELLIOTT REPORTING
(316) 267-8278

53

1 you had to stop associating with family members.
2 A. Yes.
3 Q. Was that while you were on Community Corrections?
4 A. Yes.
5 Q. Is that a condition of your Community
6 Corrections?
7 A. Yes.
8 Q. Do you know why you were told to stop associating
9 with those family members?
10 A. I assumed. I'm pretty sure.
11 Q. You assumed and you're pretty sure what, though?
12 A. I'm -- they -- I think they said they -- well, I
13 think they told me they were on the gang file at
14 the time, so . . . yeah.
15 Q. What family members was this?
16 A. Like Elbert and Martel, I think they said they
17 were on that, so . . .
18 Q. Anybody else?
19         MS. WOODY: Can I clarify something?
20     Which Elbert?
21 A. Little Elbert.
22         MS. WOODY: Okay.
23 Q. Thank you. Little Elbert and then Martel.
24 A. Yes.
25 Q. Anybody else?
HARRISON-ELLIOTT REPORTING
(316) 267-8278

54

1 A. I'm not too for sure. But I knew they were for
2 sure.
3 Q. Did you know if little Martel or -- I apologize
4 for referring to him as little Martel, but --
5 A. He's a grown man.
6         MS. WOODY: Little Elbert.
7 A. Yeah, little Elbert.
8 Q. I'm sorry, little Elbert. And then Martel, were
9 you aware if either of those individuals had
10 criminal convictions at that time?
11 A. At the time probably, yes. Elbert for sure. I
12 think Elbert was in jail before, so . . .
13 Q. Was one of your conditions of probation not to
14 associate or be around other convicted felons?
15 A. Yes.
16         MR. BRANSON: So we've been going just
17     a little over an hour. This be a good time
18     for a short break?
19         MS. WOODY: Yeah.
20         MR. BRANSON: And I can see what else
21     if anything I need to do, but we're pretty
22     close.
23 (REPORTER'S NOTE: At this time a brief recess was
24 taken at 11:10 a.m., whereupon, the following
25 proceedings were had at 11:15 a.m.:)
HARRISON-ELLIOTT REPORTING
(316) 267-8278

55

1 Q. (By Mr. Branson) Mr. Cooper, we were just on a
2 short five, six-minute break here. As you came
3 back in the room your counsel indicated that you
4 wanted to clarify something on the record on the
5 timeline of your ownership of the Mustang.
6 A. Yes.
7 Q. Okay, go ahead.
8 A. I want to say I owned the Mustang like 2017 to
9 around '18-ish or between there. Well, that's
10 when I ended up getting rid of the Mustang.
11 Q. Okay.
12 A. So . . .
13 Q. Give me a second to put the timeline together.
14 A. Yeah, yeah, yeah, because I was like it was so
15 long ago, yeah, it had me . . .
16 Q. Okay, so you got the Mustang after --
17 A. I got out of jail.
18 Q. -- you got out of jail.
19 A. Yes.
20 Q. Okay. So knowing that the Mustang was not the
21 car that you were driving before you were
22 arrested in 2014 --
23 A. Yes.
24 Q. -- does that change any of your answers about
25 what was going on, you know, between 2013 and
HARRISON-ELLIOTT REPORTING
(316) 267-8278

56

1 2014?
2 A. Of me getting pulled over?
3 Q. Right.
4 A. No.
5 Q. Okay, just it was a different vehicle --
6 A. Yes.
7 Q. -- besides the Mustang.
8 A. Yes.
9         MR. BRANSON: Okay, makes sense.
10     Thanks, I appreciate that. That's all the
11     questions I have.
12         CROSS-EXAMINATION
13 BY MS. WOODY:
14 Q. Okay, I just have a few questions for you. Mr.
15 Cooper, I want to ask you just a little bit about
16 the Mustang because I think it's gotten pretty
17 confused.
18 A. Yeah, it was so confusing.
19 Q. Were you actually stopped when you were driving
20 the Mustang?
21 A. Yes.
22 Q. And because you bought the Mustang sometime
23 between 2017 and 2018, those stops would have
24 been in that timeframe --
25 A. Yeah.
HARRISON-ELLIOTT REPORTING
(316) 267-8278