IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PROGENY, a program of Destination Innovations, Inc.,
CHRISTOPHER COOPER, ELBERT COSTELLO,
MARTEL COSTELLO, and JEREMY LEVY, JR.,
on behalf of themselves and others similarly situated,

Plaintiffs,

vs.                                                  Case No. 6:21-cv-01100-EFM-ADM

CITY OF WICHITA, KANSAS,

Defendant.

## Motion for Summary Judgment and Memorandum in Support

The City of Wichita (City) moves for judgment as a matter of law and submits the following

brief in support.

### I. Nature of the Matter

Plaintiffs seek a declaration that K.S.A. 21-6313 through K.S.A. 21-6316 are

unconstitutional. Plaintiffs further seek to enjoin the Wichita Police Department from maintaining

or implementing a "Gang List" which documents gang members and associates and Plaintiffs

further seek an order dismantling its Gang List.

Plaintiffs' claims must fail because (1) K.S.A. 21-6313 through K.S.A. 21-6316 are not

unconstitutional and (2) the maintenance of a Gang List (without regard to whether any plaintiff

is included on the Gang List) does not deprive any person of a constitutionally protected interest.

## II. Statement of Facts

**A.    WPD's Gang Database and the Master Gang List**

**1.    History**

1.    As early as 1989, the WPD had a Gang Unit with officers assigned to investigate gang-related crimes. Exhibit 2, Easter dep., Vol. I, 12:14-16; 21:5-19.

2.    At some point during the 1990s, the WPD created a list of criteria to be used for consistent identification of criminal street gang members. Exhibit 2, Easter dep., Vol. I, 22:5-11.

3.    When Kansas had an influx of gang members coming in from both California and Oklahoma, law enforcement agencies around the state were claiming individuals were gang members but there were no consistent criteria being used to make these determinations. Exhibit 2, Easter dep., Vol. I, 26:7-17; 36:20-37:3; 54:7-10.

4.    Between 1999 and 2002, the Wichita Mayor tasked the WPD to work on a "gang plan" to address the rising violent crimes mainly perpetrated by gang members. This included meeting with community members and continuing to develop criteria to identify criminal street gang members. Exhibit 2, Easter dep., Vol. I, 17:10-13; 36:3-38:10.

5.    Around 2006, the Chief of Police and the Mayor of Wichita requested then-Lieutenant Jeff Easter to draft a proposal to identify criminal street gang members and associates using criteria, which he did in consultation with community groups, other law enforcement agencies, as well as the Mayor's office and Sedgwick County District Attorney's office, the. Exhibit 2, Easter dep., Vol. I, 37:10-38:10; 42:17-20.

### a.    K.S.A. 21-6313

6.    Easter's proposed language was packaged with SB 366 and other criminal-related amendments to the criminal law. See 2006 SB 366 and L. 2006, ch. 194, § 6.

7.    The original language was changed by the Revisor's office, introduced, then

amended by the Senate Judiciary Committee, then the House Judiciary Committee, and then the Conference Committee. Exhibit 2, Easter dep. Vol. I, 57:16-19. Upon passage by both Chambers, SB 366 was signed into law by Governor Sebelius on May 19, 2006. *See id.*

8.      Chapter 21 of Kansas's Statutes Annotated lists Crimes and Punishments. Article 63 defines Crimes Against the Public Safety. SB 366 was listed as 21-6313 and assigned to Chapter 21 and Article 63 because it involves crimes against public safety.

9.      K.S.A. 21-6313 underwent amendment in 2011 and 2013; In 2011, the Legislature expanded the definition used for criminal activity to include "any felony violation of any provision of the uniform controlled substances act prior to July 1, 2009." In 2013, the Legislature enacted the Kansas Racketeer Influenced and Corrupt Organizations (RICO) Act, which incorporated the definitions provided in 21-6313. The statute also individualized criteria that were previously listed as one criterion and removed the criterion indicating an individual's residence was indicative of gang membership. Exhibit 39, Beard Exhibit 37.

10.     At all times, K.S.A. 21-6313 has and does define (a) a criminal street gang, (b) a criminal street gang member, (c) criminal street gang activity, (d) a criminal street gang associate, and (e) a gang-related incident. K.S.A. 21-6313 does not require an act, nor does it prohibit specific conduct. It does not impose a sanction, fine, or penalty. K.S.A. 21-6313.

11.     The definition of a street gang member, found in (b), necessarily includes criminal activity. K.S.A. 21-6313(a); Exhibit 3, McKenna dep., 141:19-142:21.

12.     The definitions from K.S.A. 21-6313 are referenced elsewhere in the statute, including K.S.A. 21-6328 (Kansas's RICO Act), K.S.A. 21-3614 (recruiting criminal street gang members), K.S.A. 21-6315 (criminal street gang intimidation), and K.S.A. 21-6316 (setting bail for criminal street gang members, with exceptions)—all under the umbrella of criminal activity.

###### b.    WPD Policy 527

13.    The WPD formalized its procedure for identifying and documenting gang members into WPD Policy 527. Although it is unknown when Policy 527 was initially created, it was in place by 2003 and was changed to align with K.S.A. 21-6313 after its enactment. Exhibit 2, Easter dep. Vol. I, 33:19-32:6; Exhibit 4, Beard 30b6 dep., 99:6-100:5.

14.    WPD Policy 527 incorporates by the definitions and criteria in K.S.A. 21-6313. Policy 527, § I.E.1 ("Initial identification will be based upon the aforementioned Criminal Street Gang Member or Associate Criteria found in K.S.A. 21-6313.") Exhibit 5, WPD Policy 527.

15.    WPD Policy 527 does not require an act by any citizen, nor does it prohibit specific conduct. It does not impose a sanction, fine, or penalty. Exhibit 5, WPD Policy 527.

**2.    The Gang List is not public and unavailable to most WPD personnel.**

16.    The Gang Database is the repository for gang intelligence data which includes active, inactive, and deceased members and associates of criminal street gangs. Exhibit 6, Bernard Declaration.

17.    By contrast, the Master Gang List consists of the current active criminal street gang members and associates from the Gang Database. Exhibit 7, Salcido dep., 132:15-16; 223:9-15.

18.    EJustice, later replaced by NICHE, is a records management system that documents all incidents of crime. Exhibit 7, Salcido dep., 226:25-227:2; Exhibit 8, Beard dep., 82:16-22.

19.    EJustice only contains entries from the Master Gang List, not the Gang Database. Gang intelligence officers, after receiving required specialized training, are responsible for updating EJustice with gang designations, both adding new documented members and removing inactive members. Doc. Exhibit 8, Beard dep., 82:9-83:1; Exhibit 9, Hemmert dep., 65:18-66:10.

20.    Access to EJustice/NICHE is available to commissioned law enforcement personnel but information in EJustice is accessible to WPD Law Enforcement personnel only

through a name search. Doc. Exhibit 8, Beard dep., 40:1-41:5.

21.    A different law enforcement tool is SPIDER (Special Policy Information Data Entry and Retrieval). Officers can contact SPIDER to request information on outstanding warrants or request other services such as a tow truck. Doc. Exhibit 8, Beard dep., 40:13-21.

22.    SPIDER pulls its information from Ejustice/Niche; therefore, it can only provide a hit for active criminal street gang members. Exhibit 10, Inkelaar dep., 73:1-7.

23.    The responder from SPIDER will advise an officer, including non-gang officers when an individual they are encountering with is an active criminal street gang member or associate by saying "signal 33." Doc. Exhibit 8, Beard dep., 40:22-41:5; Policy 527 § I.D.

24.    Inactive and deceased criminal street gang members are not visible on SPIDER, or Ejustice/NICHE, and cannot be accessed except by non-Gang Intelligence Officers. Exhibit 6, Bernard Declaration.

25.    Under Policy 527, Officers include the gang membership in a probable cause affidavit for person felonies. Exhibit 10, Inkelaar dep., 73:1-7; Policy 527 § I.C.4.a.2.

26.    The inclusion of gang membership in an affidavit to the Court is only for those persons on the Master Gang List, i.e., that are currently active criminal street gang members or associates. Policy 527. Exhibit 6, Bernard Declaration. Thus, affidavits for persons who are inactive in the database do not include information about gang documentation.

27.    The Master Gang List is not published to anyone; it resides in the Gang Database as persons documented as active gang members or associates. The database itself is not shared with other agencies (since 2008-2009) and information from the database is provided only for approved law enforcement purposes. See Policy 527; Exhibit 6, Bernard Declaration.

28.    Through discovery, no details could be located regarding the allegation that the list

was ever made public. Exhibit 11, Johnson dep., 52:3-9; Exhibit 12, Parker-Givens dep., 91:9-23; Exhibit 13, Speer dep., 94:17-97:9. There is no admissible evidence that the Master Gang List is made public or that it is published—either historically or currently; there are only anecdotal stories of the list having once been posted at a barber shop and of a landlord asking for an updated copy of the list. No details could be given regarding the anecdotes that the list was ever made public— nobody has personal knowledge of it happening. Exhibit 11, Johnson dep., 52:3-9; Exhibit 12, Parker-Givens dep., 91:9-23; Exhibit 13, Speer dep., 94:17-97:9.

29.     The one known instance of unauthorized disclosure resulted in criminal charges filed against the offending officer. *See* Exhibit 14, Charging affidavit, *State v. Wendell Nicholson*, Sedgwick County Case No. 2023-CR-000628-FE.3

30.     Nonetheless, safeguards are in place to prevent such publication—the Master Gang List is not printed. While the entries that would comprise the Master Gang List is a query or report that can be produced from the Gang Database, such lists are not created or printed. Exhibit 6, Bernard Declaration. (The "lists" produced to plaintiffs in this action were specific queries/reports generated for discovery in this matter subject to the Protective Order herein).

31.     Information from the database (not the database itself) is provided only for approved law enforcement purposes on an individual-by-individual basis. MOUs to maintain confidence are in place with other law enforcement agencies that exchange gang intelligence. Doc. Exhibit 8, Beard dep., 296:3-10; Exhibit 9, Hemmert dep., 93:22-94:1; Exhibit 15, MOU with U.S. Probation Office.

### 3.     The Process: WPD Gang Intelligence Officers vet all nominations prior to inclusion and again annually.

32.     All WPD officers undergo gang-related training to learn what a gang is, as defined by statute, what a gang member is, as defined by statute, and the criteria required for verification.

All officers are also instructed on the local gangs that have an identified presence in Wichita and their identifiers, as well as a review of previous incidents involving those gangs. The training consists of four hours in the academy and two additional hours annually. Doc. Exhibit 8, Beard dep., 189:16-190:21; 193:1-8.

33.     Individuals may be identified during criminal investigations as being involved in criminal activity and, during the course of the investigation, the officers see signs or indicators of gang membership. Exhibit 16, Bartel dep., 127:16-128:1.

34.     Any WPD officer may nominate someone for inclusion in the database. When an officer notices an individual meeting criteria, or when an individual admits to the officer their status as a criminal street gang member, the officer is trained to complete a TOPS card to "nominate" someone for inclusion on the database. All TOPS cards are forwarded to the Gang Intelligence Unit for review. Exhibit 16, Bartel dep., 128:4-10.

35.     Although any officer can nominate someone, the Gang Database is administered exclusively by Gang Intelligence Officers. Gang Intelligence Officers are the only WPD officers who may add a person to the Gang Database, inactivate a person in the Gang Database, or remove a person from the Gang Database: Exhibit 6, Bernard Declaration. See Policy 527 § 1.B.1 ("The information will be researched by a member of the Gang/Felony Assault Section or VCCRT. … . The individual will be added to the Master Gang List if they meet the criteria defined in K.S.A. 21-6313.").

36.     Persons are added to the Gang Database in the first instance either (1) through research and contacts by gang intelligence officers or (2) (a) by nomination for inclusion on the database by non-gang officers followed by (b) review and verification by Gang Intelligence Officers that the subject meets the criteria for inclusion on the Master Gang List. Exhibit 16, Bartel

dep., 127:16-128:15. WPD Policy 527 incorporates by the definitions and criteria in K.S.A. 21-6313. Policy 527, § I.E.1 ("Initial identification will be based upon the aforementioned Criminal Street Gang Member or Associate Criteria found in K.S.A. 21-6313.")

37.     Gang Intelligence Officers have specialized training and experience to apply statutory criteria to any individual nominated for inclusion. Exhibit 3, McKenna dep., 163:17-164:16. Gang Intelligence Officers use their training, experience, and knowledge of the neighborhoods to make the determinations for inclusion in the Master Gang List, Exhibit 10, Inkelaar dep., 116:13-24, and they converse with each other to discuss individual situations. Exhibit 17, Gilmore dep., 150:20-151:9.

38.     The Courts have recognized Gang Intelligence Officers as experts in the area of gangs and allow them to testify as such in criminal trials. Doc. Exhibit 8, Beard dep., 264:16-22. *See also State v. Brown*, 285 Kan. 261, 267, 173 P.3d 612, 620 (2007), *abrogated on other grounds by State v. Williams*, 306 Kan. 175, 392 P.3d 1267 (2017); *State v. Tran*, 252 Kan. 494, 847 P.2d 680 (1993).

39.     Disparate application of the criteria is avoided by training the officers and the context of information used. Exhibit 9, Hemmert dep., 168:18-169:18. For example, WPD Officers are trained to understand the distinctions between a reliable informant and an informant of untested reliability. Officers also understand the information must be documented. Exhibit 6, Bernard Declaration.

40.     Incidental contact is insufficient to justify inclusion. Associating with known gang members requires conduct indicative of joining or connection based on gang affiliation. Exhibit 6, Bernard Declaration.

41.     Immediate family members are exempted and not employed as a criterion of

associating with known gang members. Doc. Exhibit 8, Beard dep., 249:10-14, Exhibit 6, Bernard Declaration.

42.     Self-admission is a common method by which gang members and associates are identified. Exhibit 16, Bartel dep., 128:-13; 136:18-137:5; Doc. Exhibit 8, Beard dep. 31:18-33:7, 56:2-3, 56:19-21; Exhibit 17, Gilmore dep., 44:7-44:16; Exhibit 9, Hemmert dep., 42:19-43:22.

43.     Some individuals self-admit because they are proud to be a gang member. Exhibit 16, Bartel dep., 130:12-23. A lot of individuals are comfortable confirming their membership and do not try to hide it: "it's almost written on a shirt." Exhibit 18, Thatcher dep., 98:11-17.

44.     But even self-admits are verified by gang intelligence officers through watching the reporting officers' AXON video. Exhibit 3, McKenna dep., 165:18-166:14; Exhibit 16, Bartel dep., 120:7-11; 128:18-129:6; Exhibit 9, Hemmert dep., 182:3-18; Exhibit 10, Inkelaar dep., 83:15-23; Exhibit 7, Salcido dep., 197:12-198:5; Exhibit 3, McKenna dep., 163:17-164:16. Gang Intelligence Officers confirm hearing the person self-admit before adding them to the Master Gang List; a social media post alone does not suffice. Exhibit 3, McKenna dep., 168:15-25.

45.     The WPD does not maintain a map identifying specific gang areas. However, there are known areas where gang members hang out and engage in criminal activity, Exhibit 2, Easter dep. Vol. II, 54:21-55:20.

46.     Determinations by Gang Intelligence Officers for inclusion in the database depend on the totality of circumstances, knowledge, and experience. Exhibit 17, Gilmore dep., 124:19-125:11.

47.     The reviewing officer looks at the information with skepticism to ensure there is a very specific reason for inclusion, Exhibit 9, Hemmert dep., 175:9-176:4, and Gang Intelligence Officers lean toward being underinclusive rather than overinclusive. Exhibit 3, McKenna dep.,

153:1-15.

**4.      The Master Gang List undergoes a full audit every year.**

48.      WPD Policy 527 requires an annual audit to ensure accuracy and remove expired individuals. Policy 527 § I.E.1.

49.      This is a painstaking process in which every name and every case are reviewed every year. Exhibit 17, Gilmore dep., 98:15-25.

50.      The WPD Gang Intelligence Officers understand accuracy is critical. Exhibit 13, Speer dep., 56:25-57:12.

51.      The annual audits consist of reviewing each individual to confirm if they meet the required criteria or determine if they no longer meet criteria. Doc. Exhibit 8, Beard dep., 88:15-89:4, 90:8-11.

52.      WPD removes persons from the Master Gang List if the person goes three years without being involved in anything that meets statutory criteria for a criminal street gang member or associate. Beard 30b6, 21:18-21:23; Policy 527, § I.E.1.

**5.      Removal from the Master Gang List**

53.      Any person may request a meeting with the gang commander and offer information to challenge inclusion and request removal. Exhibit 16, Bartel dep., 126:20-127:2; Exhibit 4, Beard 30b6 dep., 21:24-22:6.

54.      When a person is no longer considered an active gang member or associate, the designation is removed from the WPD records management system, EJustice/NICHE, as a documented gang member. Exhibit 16, Bartel dep., 120:11-18, 122:2-24, 141:10-142:6; Doc. Exhibit 8, Beard dep., 77:1-8; Exhibit 4, Beard 30b6 dep., 21:13-23; Exhibit 19, Cory dep., 78:7-97:13. This also means SPIDER will no longer notify officers the person is "signal 33." Doc. 186-21, Declaration of J Bernard. That person's status in the Gang Database is changed from active to

inactive and they are no longer on the Master Gang List. Policy 527, § E.1.

55.     The historic information retained in the database—criminal intelligence—is necessary to effectively investigate, solve and/or prevent crimes in the present. Doc. Exhibit 8, Beard dep., 136:8-17.

56.     Access to view information on inactive members is restricted even further than access to the Master Gang List. Exhibit 16, Bartel dep., 121:24 – 122:24.; Doc. Exhibit 8, Beard dep., 77:1-8; Exhibit 4, Beard 30b6 dep., 21:13-23; Exhibit 19, Cory dep., 78:7-97:13.

57.     Only the Gang Intelligence Officers have access to view the information in the Gang Database. Exhibit 16, Bartel dep., 121:24-122:24.

58.     Once inactive (i.e., removed from the Master Gang List), a person must again meet criteria (self-admit or meet the required multiple statutory criteria) before again being included on the Master Gang List. Beard 30b6, 26:10-26:20; Policy 527, § I.E.1.

### 6.     Juvenile Notifications

59.     WPD attempts to notify and contact guardians of juveniles about inclusion in the Gang Database. Exhibit 17, Gilmore dep., 94:8-17; Exhibit 4, Beard 30b6 dep., 23:9-24:2.

60.     Initially, certified letters were sent, but many of those were returned undelivered. Doc. Exhibit 8, Beard dep., 138:22-10. Because sending certified letters was ineffective, officers instead began making phone calls and physically visiting the homes to make contact, documented in the database. Doc. Exhibit 8, Beard dep., 107:4-15; 139:10-23; 108:15.

61.     Currently, the gang officers and juvenile intervention unit officers work together and visit the home to make personal contact, making phone calls only when multiple attempts to visit the home and school are unsuccessful. Id., 139:24-140:15; Exhibit 4, Beard 30b6 dep., 24:9-12.

**B.    Individually Named Plaintiffs**

**1.    Christopher Cooper**

62.    Cooper attended Highland Community College near St. Joseph Missouri following graduation from high school in 2013. Exhibit 20, Cooper dep, 31:16-32:1; 32:22-33:5.

63.    Highland gave Cooper a scholarship to play football, and he received a second scholarship from the U.S. Army because of his father's military service. Exhibit 20, Cooper dep, 36:19-37:1.

64.    Cooper was injured during the first season of football while playing for Highland and was unable to complete the season. Exhibit 20, Cooper dep, 33:24-34:25

65.    Cooper was never on the track team for Highland Community College. Exhibit 20, Cooper dep, 35:9-16.

66.    Cooper was charged with first-degree murder in 2014 and went to jail after being interviewed by the police. Exhibit 20, Cooper dep, 62:7-12.

67.    Cooper was accused of murdering Juan Orona. C. Cooper Depo., 20:19-16.

68.    The Judge set Cooper's bond during a hearing. Exhibit 20, Cooper dep, 41:4-11.

69.    Coooper thinks his bond was about $50,000. C. Cooper Depo., 40:19-21.

70.    Cooper didn't think a $50,000 bond was low for someone charged with first-degree murder. Exhibit 20, Cooper dep, 41:1-2.

71.    Cooper was convicted of obstructing justice in 2016. Cooper Dep., 22:21-23:8.

72.    The U.S. Army discontinued its scholarship to Cooper at the time of his conviction. Exhibit 20, Cooper dep, 66:12-15.

73.    Cooper never applied to Kansas State University ("K-State"). Exhibit 20, Cooper dep 38:14-18; 76:6-7.

74.    K-State did not offer Cooper a scholarship. Exhibit 20, Cooper dep, 37:2-38:16.

75.     Cooper did not attend K-State because they would not let a convicted felon live on campus. Exhibit 20, Cooper dep, 64:2-65:8; 76:10-12.

76.     Cooper thinks living off campus required him to do "too much." Exhibit 20, Cooper dep, 64:2-65:8.

77.     Cooper also did not apply for admission to Wichita State University ("WSU"). Exhibit 20, Cooper dep, 75:17-21.

78.     Cooper believes he can never go back to school because of his criminal record as a violent offender, *Exhibit 20, Cooper dep,* 70:9-17,

79.     Cooper believes all employers run background checks as part of the application process and he assumed an employer can see that he was listed on a gang database on the background check. He assumed if he applied for a job and didn't get a call back it was because of the background check. Exhibit 20, Cooper dep, 49:21-52:24.

80.     Cooper doesn't believe the gang list denied him job opportunities; he testified he assumes all employers run background checks and would see his criminal history. *Exhibit 20, Cooper dep*, 49:21-52:24.

81.     Cooper's probation conditions prevented him from participating in public events, such as the Wichita River Festival. Exhibit 20, Cooper dep, 69:13-70:6; 74:14-75:16.

82.     The limits of Cooper's employment positions occur because of his probation conditions, such as limiting his participation in public events such as the Wichita Riverfest. *Exhibit 20, Cooper dep,* 69:13-70:6.

83.     Cooper understands the conditions of his probation were determined by a judge, *Exhibit 20, Cooper dep,* 41:16-42:6,

84.     Cooper's probation was monitored by community corrections. Exhibit 20, Cooper

dep, 42:7-9.

85.     Cooper recognizes his inability to attend certain community events were due to his probation conditions, not inclusion on the gang list. *Exhibit 20, Cooper dep,* 74:14-75:16.

86.     Cooper was pulled over by law enforcement maybe two times when he was in high school and a few times after graduating high school for a total of 5-6 times. Exhibit 20, Cooper dep, 43:7:24.

87.     Cooper admits the WPD had a reason to pull him over for the traffic stops and that he has never filed a complaint with the WPD regarding the stops. Exhibit 20, Cooper dep, 44:20-45:9.

88.     Cooper consented to a search request when he was pulled over by law enforcement. Exhibit 20, Cooper dep, 70:24-71:2.

89.     Cooper did not drive a car registered in his name before his arrest for first degree murder, *Exhibit 20, Cooper dep*, 55:16-56:6,

90.     Cooper does not recall if he was pulled over following his arrest and jail time in 2017. *Exhibit 20, Cooper dep,* 43:25-44:11.

91.     Cooper was told by other people that police were hiding in the bushes and taking pictures of him. Exhibit 20, Cooper dep, 71:17-19, but Cooper never saw any police and had no contact with police officers. Exhibit 20, Cooper dep, 76:16-24.

92.     Cooper assumed he could not associate with family members since they were also on the gang list and a condition of his probation was that he could not associate with gang members. Exhibit 20, Cooper dep, 52:25-53:14.

93.     Another condition of Cooper's probation was to not associate with other convicted felons. Exhibit 20, Cooper dep, 54-13:15. The family members Cooper alleges he was unable to

associate with were convicted felons. Exhibit 20, Cooper dep, 54:8:12.

94.    Cooper could not produce a single document, communication, statement, memorandum, recording, photograph, drawing, note, journal, blog, email, social media account, or report to support any of the facts relating to any of the allegations set forth or the harm he's suffered as a direct result of being included on the WPD's gang database. Exhibit 21, C. Cooper Response to Defendant's First Request for Production, ## 1, 2, 3, 4, 5, 6, 7, 8, 12, 14, and 15.

95.    Cooper has not made any attempt to contest his designation as a criminal street gang member. Exhibit 21, C. Cooper Response to Defendant's First Request for Production, # 17. Cooper has not attempted to file a complaint or report regarding the WPD's alleged conduct. Exhibit 21, C. Cooper Response to Defendant's First Request for Production, # 18, 19.

96.    Cooper has maintained employment since 2014. Exhibit 22, C. Cooper Response to Defendant's First Interrogatories, # 6.

**2.    Jeremy Levy, Jr.**

97.    Levy claims that he was stopped by police at a QuickTrip when he was thirteen years old and told he could not go to certain QuickTrips or Towne East Mall or wear certain colors. Exhibit 23, Levy dep., 32:6-32:22.

98.    Levy believes he was on the gang file because 'police' told him he could not go to these places. Exhibit 23, Levy dep., 32:6-23.

99.    Levy assumed he did not get a job at "Lids" because he was on the gang list, but does not know why he did not get the job. Exhibit 23, Levy dep., 32:24-35:4.

100.    After being convicted as a juvenile, Levy claims he was told he could not apply for a job working in a hospital and be a gang member but cannot remember the name of the company, anyone he spoke to or if the employer did background checks. Exhibit 23, Levy dep., 35:5-36:20.

101.    Levy was convicted of first-degree murder that occurred in 2017 and is serving a

sentence of 25 years to life. Exhibit 23, Levy dep., 17:23-18:9; Exhibit 28, M. Costello Exhibit 85.

102.    Levy admits his trial attorney challenged the admissibility of testimony from the WPD regarding his gang affiliation at his pre-trial and trial. Exhibit 23, Levy dep., 25:23-26:13.

103.    The judge overruled the challenge and allowed the testimony. Exhibit 23, Levy dep., 26:5-13.

104.    Levy contested his conviction and the use of gang testimony on appeal. See *State of Kansas v. Jeremy D. Levy*, 485 P.3d 605 (2021).

105.    The Kansas Supreme Court found that "[t]he district court did not err when it held Detective Hemmert's gang testimony was relevant. There was significant evidence "that gang membership or activity [was] related to the crime charged." *Id.* at 239 (citation omitted).

106.    Further the Supreme Court ruled the evidence not unduly prejudicial. *Id* at 240.

107.    Levy admits his family members are active criminal street gang members and that he spent time with them. Exhibit 23, Levy dep., 19:17-20:7; 30:7-17; 30:23-31:8.

108.    Levy was aware for multiple years before his arrest for first-degree murder that the WPD considered him a criminal street gang member, and he never challenged the designation. Exhibit 23, Levy dep., 31:14-32:5.

109.    Levy admits his inclusion on the Gang List did not increase his sentence. Exhibit 23, Levy dep., 40:9-15.

110.    Levy admits he does not know what his conditions of release on parole will be, so he has no support to allege they will be different from anyone else's. Exhibit 23, Levy dep., 40:17-24.

111.    Levy could not produce a single document, communication, statement, memorandum, recording, photograph, drawing, note, journal, blog, email, social media account,

or report to support any of the facts relating to any of the allegations set forth or the harm he's suffered as a direct result of being included on the WPD's gang database. Exhibit 21, Levy's Response to Defendant's First Request for Production, ## 1, 2, 3, 4, 5, 6, 7, 8, 12, 14, and 15.

112.    Levy has not made any attempt to contest his designation as a criminal street gang member. Exhibit 24, Levy's Response to Defendant's First Request for Production, # 17.

113.    Levy has not attempted to file a complaint or report regarding the WPD's alleged conduct. Exhibit 21, C. Cooper Response to Defendant's First Request for Production, # 18, 19.

### 3.    Martel Costello

114.    M. Costello was convicted of criminal damage to property in 2012, intimidation of a witness in 2013, and in 2017 for multiple felonies committed in 2016 and 2017. Exhibit 25, M. Costello dep., 27:20-10; 28:25-29:7; 29:24-30:6; 32:16-33:16 and Exhibit 27, M. Costello Exhibit 84.

115.    M. Costello was renewed on the gang list in 2016 for being in the company of other gang members, including his father, Plaintiff Elbert Costello. Exhibit 26, Carson Declaration.

116.    M. Costello believes that either the judge or the probation officer imposed probation conditions on him, including gang conditions. Exhibit 25, M. Costello dep., 35:21-36:15.

117.    M. Costello's probation was revoked upon a violation and M. Costello was sentenced to serve his underlying sentence. Exhibit 25, M. Costello dep., 39:17-23.

118.    M. Costello understands that a judge revoked his probation for staying out past curfew, not for associating with other gang members, regardless of what information he was told by others. Exhibit 25, M. Costello dep., 43:21-45:4; Exhibit 25, M. Costello depo Exhibit 86.

119.    M. Costello's probation was revoked for failing to obey the law and four instances of violating curfew. Exhibit 25, M. Costello dep., Exhibit 86.

120.    M. Costello understands the sanctions for his parole violations that resulted in a

revocation of his parole and a return to jail were not violations of gang conditions. Exhibit 25, M. Costello dep., 39:24-42:10.

121.    M. Costello had prior probation violations for alcohol and being out past curfew six times and was placed on house arrest for 90 days. Exhibit 25, M. Costello dep., 49:13-25, 49:21-25.

122.    During his house arrest period M. Costello's house was shot at and his cousin Plaintiff Christopher Cooper was shot, causing officers to search his house eventually locating a handgun. Exhibit 25, M. Costello dep., 50:2-4; 50:25-51:12, 57:4-12.

123.    Officers took photographs of pictures and clothing, including a red shirt, red hat, red pants, and a shirt with a picture of him and his brother that officers had laid out on a bed. Exhibit 25, M. Costello depo., 51:16-52:07

124.    M. Costello does not know the names of the officers that allegedly harassed him, nor does he recall details of each encounter. ROG 13.

125.    M. Costello does not recall the specific dates of any traffic stops. Exhibit 10, Interrogatories to M. Costello.

126.    M. Costello was engaged in various criminal activities during this time. Dep., 27:20-10; 28:25-29:7; 29:24-30:6; 32:16-33:16 and Exhibit 27, M. Costello Exhibit 84.

127.    M. Costello designated himself as a Pirus gang member on an intake form he signed upon his entry into the Ellsworth Correctional Facility on February 22, 2021. Exhibit 25, M. Costello dep., 45:8-46:17; Exhibit 25, M. Costello depo Exhibit 31, M. Costello Exhibit 87.

128.    M. Costello was not placed under arrest, was not threatened with arrest, and was not prevented from moving freely by an officer who recognized him at a convenience store. Exhibit 25, M. Costello dep., 59:14-60:21.

129.    M. Costello could not produce a single document, communication, statement, memorandum, recording, photograph, drawing, note, journal, blog, email, social media account, or report to support any of the facts relating to any of the allegations set forth or the harm he's suffered as a direct result of being included on the WPD's gang database. Exhibit 32, M. Costello Response to Defendant's First Request for Production, ## 1, 2, 3, 4, 5, 6, 7, 8, 12, 14, and 15.

130.    M. Costello has not attempted to contest his designation as a criminal street gang member. Exhibit 323, M. Costello's Response to Defendant's First Request for Production, # 17.

131.    M. Costello did not file a complaint or report regarding the WPD's alleged conduct. Exhibit 32, M. Costello's Response to Defendant's First Request for Production, # 18, 19.

132.    M. Costello has been employed in between his convictions and parole violations since October 2017. Exhibit 30, M. Costello's Response to Defendant's First Interrogatories, # 6.

**4.    Elbert Costello**

133.    E. Costello was convicted of manslaughter in 1997 when he shot and killed someone following an altercation. Exhibit 33, E. Costello Dep., 19:6-17.

134.    E. Costello was sentenced to 51 months in the Kansas Department of Corrections (KDOC). Exhibit 33, E. Costello Dep Exhibit 63.

135.    The Salina Police Department informed WPD that E. Costello was a suspected gang member causing him to be listed as a gang associate in the WPD Gang List. Affidavit of C. Cason ¶ 8.

136.    E. Costello understands that a court sets bond and probation conditions and those conditions are enforced by probation officers. Exhibit 33, E. Costello Dep., 50:11-17.

137.    E. Costello agrees there is no evidence to indicate the conditions of his post-release were higher because of his gang affiliation. Exhibit 33, E. Costello Dep., 23:8-24.

138.    E. Costello can't remember the last time he was stopped by the police, but it was at

least four years ago. Exhibit 33, E. Costello Dep., 23:25 -25:2.

139.    While E. Costello claims he was subjected to "increased surveillance and harassment by the WPD officers" it has been at least four years since he was stopped. Exhibit 33, E. Costello Dep., 24:21-25:1, and the alleged harassment started after E. Costello was released from prison in 2000. Exhibit 33, E. Costello Dep., 25:3-7.

140.    E. Costello was discharged from post-release supervision on June 22, 2003. Exhibit 33, E. Costello Dep., 27:23 -28:3

141.    No restrictions were imposed on E. Csotello following his post-release supervision discharge in 2003. Exhibit 33, E. Costello Dep., 28:6 -29:1.

142.    E. Costello stated he was on probation for a drug paraphernalia conviction in 2011. Exhibit 33, E. Costello Dep., 26:3-9 49:19-50-6.

143.    He admits his probation was revoked several times but can't recall what for, other than he believed one was for being a gang member. Exhibit 33, E. Costello Dep., 46:18-47:7.

144.    He claims his probation officer threatened to revoke him for wearing a shirt with red writing on it but did not do so. Exhibit 33, E. Costello Dep., 47:12-20.

145.    Since release from prison E. Costello has been arrested nine times, has been present at three shootings and one shots fired incident. Exhibit 26, Carson Declaration.

146.    E. Costello was informed by his intake counselor that the prison assigns points based on the crime committed to determine the classification status, but he doesn't remember if he had to answer any questions related to gang affiliation when he was first brought into custody. Exhibit 33, E. Costello Dep., 20:24 -21:21.

147.    E. Costello has been employed by the same employer for seven years and has been employed steadily since 2013 Exhibit 33, E. Costello Dep., 6:3-5; Exhibit 34, E. Costello's

Response to Defendant's First Interrogatories, # 6.

148.    E. Costello could not produce a single document, communication, statement, memorandum, recording, photograph, drawing, note, journal, blog, email, social media account, or report to support any of the facts relating to any of the allegations set forth or the harm he's suffered as a direct result of being included on the WPD's gang database. Exhibit 35, E. Costello Response to Defendant's First Request for Production, ## 1, 2, 3, 4, 5, 6, 7, 8, 12, 14, and 15.

149.    E. Costello has not attempted to contest his designation as a criminal street gang member. Exhibit 34, E. Costello's Response to Defendant's First Request for Production, # 17.

150.    E. Costello did not file a complaint or report regarding the WPD's alleged conduct. Exhibit 34, E. Costello's Response to Defendant's First Request for Production, # 18, 19.

151.    E. Costello has been employed in between his convictions and parole violations since October 2017.

**4.    Progeny**

152.    Progeny started operation in 2015 or 2016. Exhibit 36, Atkins Dep., 9:6-7.

153.    Progeny is a juvenile justice initiatives program of Destination Innovation, Inc. Exhibit 36, Atkins Dep., 9:16-22.

154.    Destination Innovation, Inc did not become a non-profit until 2018. Exhibit 36, Atkins Dep.,

155.    Progeny did not become a part of Destination Innovation, Inc until 2021. Exhibit 36, Atkins Dep., 9-13.

156.    Progeny is governed by the Destination Innovations (DI) board. Exhibit 36, Atkins Dep., 65:18-66:16. The board "governs" but does not make program decisions. Exhibit 36, Atkins Dep., 67:11-18.

157.    All programming decisions for both DI and Progeny are ultimately made by the

executive director, Marquetta Atkins; although there is a three-person team that weighs in, and some decisions involve the youth. Exhibit 36, Atkins Dep., 67:19-24; 68:9-20; 68:25-69:3.

158.   Progeny works with youth touched by the juvenile justice system to teach them leadership, how to change policy in a way that it impacts them. Exhibit 36, Atkins Dep., 14:25-15:3.

159.   Progeny visits schools and youth organizations from around the City of Wichita. Exhibit 36, Atkins Dep., 21:20-22:6.

160.    Progeny estimates it is asked to speak to youths or engage other organizations 12 times a year. Exhibit 36, Atkins Dep., 24:17-22.

161.   Progeny went through a building stage where they engaged about five people in 2016 and 2017. Exhibit 36, Atkins Dep., 25:14-26:14.

162.   Progeny hosted an event in partnership with the City regarding recent shootings. Exhibit 36, Atkins Dep., 27:9-13.

163.   Prior to the pandemic Progeny's events "ebbed and flowed" as they came into contact with juveniles in trauma. Atkin Dep., 27:21-28:2.

164.    Progeny continued to have meetings until the Pandemic hit in 2020 then started hosting meetings on Zoom. Exhibit 36, Atkins Dep., 28:13-29:13.

165.   Progeny started in-person meetings again in 2022, when Progeny started hosting hybrid meetings on Monday and Thursdays. Progeny then started meeting at its new center in 2023. Exhibit 36, Atkins Dep., 29:16-25.

166.   Progeny members have met consistently on Monday and Thursday throughout 2023 with occasional issues based upon 'whatever other events are happening.' Exhibit 36, Atkins Dep., 21:4-9.

167.   The Pandemic impacted Progeny attendance 'greatly'. Exhibit 36, Atkins Dep., 31:11-20.

168.   Pre-pandemic attendance at meetings could range from a low of three to a high of 60. Exhibit 36, Atkins Dep., 32:5-33:4.

169.   Post-pandemic attendance at Progeny meetings are about the same. Exhibit 36, Atkins Dep., 33:5-9.

170.   A typical event will have about 60 people attending. Exhibit 36, Atkins Dep., 33:12.

171.   In early 2023 they had a meeting that was standing room only of about 60 people. Exhibit 36, Atkins Dep., 32:22-33:4.

172.   Attendance at Progeny's Monday and Thursday meetings varies between a low of three to four people and a high of eleven to fifteen and has varied consistently since before the pandemic. Aktins Dep., 33:15-34:10.

173.   Attendance at events varies and is inconsistent. Exhibit 36, Atkins Dep., 34:14-17.

174.   Throughout 2022 and 2023 Progeny testified that it held dozens of events. Exhibit 36, Atkins Dep., 70:1-77:16.

175.   Progeny's list of meetings and events is published on its website, although several more events occur that are not published on the website. Exhibit 36, Atkins Dep., 32:23-25; 73:20-21.

176.   Progeny's membership numbers have been consistent throughout the pandemic, Exhibit 36, Atkins Dep., 33:25-34:10, and attendance at meetings are the same post-pandemic as they were pre-pandemic. Exhibit 36, Atkins Dep., 33:5-9.

177.   The Executive Director of Progeny, Marquetta Atkins, is unable to provide specific details of the harms alleged; she testified to providing information to her attorneys who then wrote

out the discovery responses, but she could not qualify the responses when confronted. Exhibit 36, Atkins Dep., 99:19-100:21.

178.   Despite claims that Progeny cannot hold events where some Progeny members would be in direct proximity with individuals on the gang list Progeny refused to identify any individual this would affect. Aktins Dep., 91:14-92:11.

179.   At the event where allegedly "way too much WPD" came and kids were scared to attend, a total of one WPD officer sat outside, across the street, and did not engage with anyone until Atkins initiated a conversation with him. Exhibit 36, Atkins Dep., 73:21-74:3; 93:7-94:15; 94:25-96:1. The event was a sign-making event to prepare to protest the Governor's re-direction of funds. Exhibit 36, Atkins Dep., 93:23-94:15. The officer did not engage with anyone except for the Progeny representatives who went to speak to him. Exhibit 36, Atkins Dep., 95:21-96:1.

180.   Progeny, through Atkins, claims some kids told her they would not come to the event because of the officer being present outside. Aktins Dep., 94:14-24.

181.   Progeny testified that the event was cancelled because it did not want "them to engage with the WPD in any kind of way or be profiled in any kind of way." Atkin Dep., 94:5-7.

182.   No specific harm could be identified by Progeny's 30(b)(6) designee. Exhibit 36, Atkins Dep., 92:7-11.

183.   Progeny does not allege that any arrests of their members was unlawful. Exhibit 36, Atkins Dep., 96:25:97:11.

184.   There is no evidence that any Plaintiff or Progeny member was unlawfully arrested.

185.   When asked questions about the information provided in the response to interrogatories, Progeny's 30(b)(6) designee could not supply details to allow Defendant to identify any officer, date, time, or location involved in the purported instances. Exhibit 36, Atkins

Dep., 97:12-103:18.

186.    In response to Defendant's request for specific information to support Plaintiff's accusation that "Progeny members and youth leaders have been harassed by WPD officers on numerous occasions," none of the examples Plaintiff provided include a time of day, location, or officer involved in the alleged incident for Defendant to further investigate. Exhibit 37, Progeny Response to Interrogatories, #9.

187.    In response to Defendant's request for specific information to support Plaintiff's accusation that "Progeny members and youth leaders have been harassed by WPD officers on numerous occasions," eight examples listed eyewitnesses who were promised to be identified later but were not; the remaining three were witnessed by Marquetta Atkins, who could not provide specific information when asked in the deposition. Exhibit 37, Progeny Response to Interrogatories, #9; Exhibit 36, Atkins Dep., 97:12-103:10.

188.    In response to Defendant's request for specific information to support Plaintiff's accusation that "Progeny members and youth leaders have been harassed by WPD officers on numerous occasions," the dates provided were vague, such as "various dates throughout 2017" or "somewhere between May and August of 2022," preventing Defendant from being able to investigate the allegation. Exhibit 37, Progeny Response to Interrogatories, #9.

189.    Plaintiff provided a total of eleven instances of members and/or youth leaders harassed by WPD: eight were for one person, N.M., who is not included as one of the four Progeny staff and members allegedly "subjected to increased surveillance, reputational harm, and other negative consequences[.]:" Id.; Doc. 196, Pre Trial Order, § 3.a,vi,a,

190.    Of the individually identified Progeny staff and members, only one (D.B.W.) is included in Plaintiff's response to Defendant's interrogatory seeking specific information, and that

one individual is only one of the eleven instances vaguely described. Id.

191.     There is no evidence that any of the instances of harassment identified by Progeny violated the Fourth Amendment or any statute.

### III. Questions Presented

1.     Plaintiffs lack Article III standing. On the record and evidence, Plaintiffs have not and do not (a) suffer an injury in fact, (b) that is fairly traceable to the WPD's Policy 527 and maintenance of a Gang Database, (c) that is likely to be redressed by a favorable judicial decision.

    a.     On the record and evidence, Plaintiffs do not suffer and have not suffered an invasion or deprivation of a legally protected interest that is concrete and particularized and actual or imminent that is caused by WPD's Policy 527 and maintenance of a Gang Database. The injuries claimed by Plaintiffs are the incidents of criminal conduct and involvement with the criminal justice system—incidents which occur without regard to K.S.A. 21-6313, Policy 527, and/or the Gang Database.

    b.     The injuries claimed by Plaintiffs are not legally protected interests and are not traceable to WPD's Policy 527 and maintenance of a Gang Database. Identification as gang members or associates does not alter a person's legal status. Policy 527, K.S.A. 21-6313, and maintenance of the Gang Database does prohibit any constitutionally protected expression or association. Policy 527, K.S.A. 21-6313, and maintenance of the Gang Database does not prohibit or restrict Plaintiffs' ability to associate or hold meetings. Plaintiffs claimed injuries are not an objectively justified fear of real consequences of Policy 527 or K.S.A. 21-6313, as there are no real consequences from Policy 527 or K.S.A. 21-6313.

      c.      Plaintiffs' claimed injuries are not redressed by the relief they request. Plaintiffs, like all persons, are subject to surveillance by law enforcement, arrest, prosecution, conviction, sentencing and the incidents to each step of the criminal justice system.

2.      WPD Policy 527 and K.S.A. 21-6313 not unconstitutionally vague, whether facially or as-applied. Neither, Policy 527 nor K.S.A. 21-6313 prohibit any conduct and do not impinge on First Amendment freedoms.

      a.      Inherent to the definition of a criminal street gang (and, thus, a criminal street gang member or associate) is an organization, association or group with a primary activity of committing person crimes or felony drug crimes.

      b.      K.S.A. 21-6313, K.S.A. 21-6314, K.S.A. 21-6315, and K.S.A. 21-6316 do not reach a substantial amount of constitutionally protected conduct, are not impermissibly vague in all of their applications, and do not authorize or encourage arbitrary and discriminatory enforcement.

      c.      People of ordinary intelligence can understand the conduct prohibited by K.S.A. 21-6314 and K.S.A. 21-6315. As applied, objective evidence supported the identification of Plaintiffs as criminal street gang members or associates.

      d.      For the instances in which any Plaintiff was subject to bail, confinement, and conditions of release—the bail, confinement and conditions were imposed by a court accompanied by the due process rights afforded by the code of criminal procedure.

3.      K.S.A. 21-6313 and WPD Policy 527 do not deprive any Plaintiff of a liberty interest without due process—they do not significantly alter a state-recognized right. The harms or injuries claimed by Plaintiffs—bail, conditions of pretrial release and post-conviction

confinement or supervision—exist independent of K.S.A. 21-6313 or WPD Policy 527 and are not altered by K.S.A. 21-6313 or WPD Policy 527. K.S.A. 21-6313 and WPD Policy 527 do deprive any Plaintiff of a constitutionally protected right and due process is not required apart from that already afforded by the code of criminal justice.

4.     K.S.A. 21-6313 and WPD Policy 527 do not infringe upon the Plaintiffs rights of expression or association. K.S.A. 21-6313 and WPD Policy 527 do not prohibit or punish any expression. K.S.A. 21-6313 and WPD Policy 527 do not prohibit or punish association with family, other gang member, or with any other person, group or entity. Plaintiffs' assertions of injury are allegations of subjective chill and do not present a claim for a specific current objective harm or a threat of specific future harm. Plaintiffs' subjective allegations of chill do not arise from an objectively justified fear of real consequences imposed by K.S.A. 21-6313 or WPD Policy 527.

## IV. Argument and Authorities

**A.     Plaintiffs lack Article III standing. The Court lacks subject matter jurisdiction.**

The "Judicial Power" of the federal courts extends only to "Cases" and "Controversies." U.S. Const. art. III, § 2; *see Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). A case or controversy requires that a plaintiff possess standing to sue as "[s]tanding to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Article III standing requires the plaintiff to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id*. "As the party invoking federal jurisdiction, plaintiff bears the burden of establishing each element of Article III standing." *Id*.

 "[T]he proof required to establish standing increases as the suit proceeds." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). "At the pleading stage, general factual allegations of

injury resulting from the defendant's conduct may suffice," while on summary judgment, the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts,' … which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)). "Regardless of the stage of litigation at which the court evaluates standing, the standing inquiry remains focused on whether the party invoking jurisdiction had a sufficient stake in the outcome when the suit was filed." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162 (10th Cir. 2023).

These gatekeeping requirements are designed to ensure the judiciary's "proper role in our system of government," one in which the courts do not "usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). When managing local policing, federal courts are to be particularly mindful of their limited role: The "special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law" means courts must show "restraint in the issuance of injunctions against state officers engaged in the administration of the states' criminal laws in the absence of irreparable injury which is both great and immediate." *City of Los Angeles v. Lyons*, 461 U.S. 95, 112 (1983) (citations omitted).

"An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial" risk that the harm will occur.'" *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 409, 414 n.5).

### 1.    The individual plaintiffs lack standing for injunctive relief.

Plaintiffs claim past injuries and threat of future injuries that are not and cannot be directly related to their inclusion in the Gang List. As this Court noted, Plaintiffs here must demonstrate a continuing injury or credible threat of imminent harm because their alleged past injuries, standing alone, cannot support a request for prospective relief—the type being requested here. ECF. 28, p.

13, citing *PeTA v. Rasmussen*, 298 F.3d 1198, 1202 (10th Cir. 2002).

To show an injury-in-fact, a plaintiff must demonstrate "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (quoting *Lujan*, 504 U.S. at 560). "Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is 'certainly impending.' " *Lujan*, 504 U.S. at 564 n.2.

None of the Plaintiffs have been subjected to punishment, or threatened punishment, for gang membership or association or for associating with family, gang members or anyone else. There is no admissible evidence to support Plaintiffs' allegation that their designation as a "criminal street gang member" or "associate"on WPD's Gang list is itself an ongoing injury, or is an injury that is "certainly impending."

### 2. Progeny lacks standing.

To have standing to sue on its own behalf, a Plaintiff Association must show (among other things) that the association has suffered injury in fact. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).

This Court dismissed Progeny's attempt to seek relief on behalf of its members and held the allegations of the necessity to divert resources did not meet the required elements to demonstrate standing. ECF 28, at 17-20. Though Progeny's remaining allegations of direct First Amendment injuries survived a motion to dismiss, they do not survive the requirements under a summary judgment standard. Progeny claims injury to its right of association owing to the statutory criteria, and attendant WPD policy, that a person may be added to the Gang List simply by associating with the other persons already on the list. Because of this, Progeny alleges it is

prevented from holding town hall or other large gatherings. Progeny cannot base its claims on behalf of its members, but only on its own behalf.

An organization does not have standing merely because it pursues laudable goals or sincerely believes in an issue. *See Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017) ("an interest in the underlying law does not equal an injury"); *Plotkin*, 239 F.3d at 886 ("[G]ood intentions are not enough for federal standing."). Progeny cannot demonstrate that K.S.A. 21-6313 or WPD Policy 527 prevents Progeny from holding any type of event. Progeny can, has, and continues to hold meetings and events without restriction or consequence from K.S.A. 21-6313 or WPD Policy 527.

### 3.     Being listed on the gang list is not an injury—WPD Policy 527 does not prohibit any conduct and does not penalize any conduct.

Plaintiffs' claims are premised on an assertion that being on the Gang List causes injury in the form of punishment without due process because it restricts association and/or expression. Progeny then builds the premise and claims people forego such association to spare themselves and their families the "consequences" of the statute and policy.

Plaintiffs contend that:

Pretrial, probation, and parole gang release conditions are also based significantly on the WPD's designation of individuals as gang members or associates. Those conditions include prohibitions on speech content and free association, as well as chilling exercise of First Amendment rights.

Pretrial Order, p. 21. Plaintiffs claim:

[K.S.A.] 21-6313 and WPD Policy 527 violate the rights of plaintiffs and others similarly situated to freedom of United States Constitution by prohibiting certain constitutionally protected expressive and associative behaviors. Specifically, the WPD's designation of individuals as gang members and associates (leading to significant legal and social harm) based on their contact with others in their own families, neighborhoods, religious, political and social groups, as well as designation based on clothing, gestures, speech, and tattoos punishes plaintiffs and others for engaging in activity protected by the First Amendment

Pretrial Order, p. 41-42. Plaintiffs also claim:

> [K.S.A.] 21-6313 and WPD Policy 527 violate the rights of plaintiffs and others similarly situated to freedom of association and expression under the First Amendment by having a chilling effect on certain constitutionally protected expressive and associative behaviors. Specifically, the WPD's designation of individuals as gang members and associates (leading to significant legal and social harm) based on individuals' contact with others in their own families, neighborhoods, religious, political and social groups, as well as designation based on clothing, gestures, speech, and tattoos unconstitutionally deters plaintiffs from engaging in activity protected by the First Amendment.

Pretrial Order, p. 42. Finally, Plaintiffs claim:

> Each individual Plaintiff faces reputational harm because the information in the Gang Database has been disseminated to the public, and are routinely shared with the Sedgwick County Sherrif's Office, the Kansas Department of Corrections, all WPD commissioned officers and resource officers present in Wichita schools.

Pretrial Order, pp. 15-16, 22-23.

Gang membership is not a crime. Association with gang members is not a crime. No plaintiff has been deprived of a constitutional right to associate or constitutional right of expression because of K.S.A. 21-6313 or WPD Policy 527. No plaintiff, prospective class member, or any person have been nor could ever be charged for violating K.S.A. 21-6313 or WPD Policy 527. K.S.A. 21-6313, itself, is not a criminal statute and does not prohibit, proscribe, or penalize any conduct—whether associational conduct or expressive conduct. Likewise, WPD Policy 527 does not prohibit, proscribe, or penalize any conduct—whether associational conduct or expressive conduct. Each Plaintiff, and *every* other person, is free to associate with any person they choose, wear any clothing they choose, make any gesture they choose, engage in any speech they choose, and get any tattoo they choose.

Being identified as a gang member or associate and being listed on the Gang List or in the Gang Database is not, itself, an injury. Nor does documentation/identification as a gang member or associate prohibit any expressive conduct. Inclusion on the gang list or in the database does not

punish any person. A person included or listed will, often, never know they were identified or listed as a gang member or associate.

Being listed on the gang list or in the database, itself, has no effect on any plaintiff. Identification as a gang member or associate by the WPD does not prevent any person from associating with family. Punishment is permitted only after a person is convicted of a crime. Restrictions on associations and conduct may be imposed as conditions of pretrial release for persons charged with a crime, and as conditions of various post-conviction release, confinement and sentencing. However, as discussed more fully below, conditions of release, conviction and sentencing (1) are *not* imposed by the City of Wichita, (2) are imposed by a court, prisoner review board, or the secretary of corrections, and (3) are all accompanied by due process protections under the code of criminal procedure. Thus, Plaintiffs lack standing because of their inability to demonstrate the second prong. Any injury suffered is not traceable to the challenged conduct of the WPD.

No plaintiff and no prospective class member has been charged with a violation of K.S.A. 21-6314 or K.S.A. 21-6315.

### 4. The "harms" identified by plaintiffs are not harms imposed by K.S.A. 21-6313 or WPD Policy 527.

The WPD does not impose conditions of release or confinement on criminal defendants, whether pretrial or post-conviction. As more fully discussed below, conditions of release are imposed by the court, the secretary of corrections, and the prisoner review board. Plaintiff identify conditions of release—both pretrial and post-conviction as the harms at issue.

### a. Condition of pretrial release

Criminal defendants in Kansas are afforded the right to make bail by the Kansas Constitution Bill of Rights. "Excessive bail shall not be required, nor excessive fines imposed, nor

cruel or unusual punishment inflicted." Kan. Const. Bill of Rights, § 9. The right to bail requires an individualized determination whether the detainee poses a risk to himself or others. *State v. Cuchy*, 270 Kan. 763, 19 P.3d 152 (2001) (mandatory detention period for all persons arrested for DUI before presentation to magistrate, absent individualized determination risk posed by arrestee violates the right to bail).

Post-arrest proceedings for criminal cases are generally set out in Chapter 22, Article 29. K.S.A. 22-2901(1) provides in part: "If the arrest has been made on probable cause, without a warrant, [the defendant] shall be taken without unnecessary delay before the nearest available magistrate and a complaint shall be filed forthwith." Once before the magistrate, the "magistrate shall fix the terms and conditions of the appearance bond upon which the defendant may be released." K.S.A. 22-2901(3).

Pretrial release is set out in Chapter 22, Article 28. K.S.A. 22-2801 provides: "The purpose of this article is to assure that all persons, regardless of their financial status, shall not needlessly be detained pending their appearance to answer charges or to testify, or pending appeal, when detention serves neither the ends of justice nor the public interest." Specifically, K.S.A. 22-2802 requires an individualized assessment by the magistrate with respect to the availability of bail, release prior to trial, the conditions of release, the amount of an appearance bond, and whether to require cash bond or personal recognizance.

> (1) Any person charged with a crime shall, at the person's first appearance before a magistrate, be ordered released pending preliminary examination or trial upon the execution of an appearance bond in an amount specified by the magistrate and sufficient to assure the appearance of such person before the magistrate when ordered and to assure the public safety. If the person is being bound over for a felony, the bond shall also be conditioned on the person's appearance in the district court …. Unless the magistrate makes a specific finding otherwise, if the person is being bonded out for a person felony or a person misdemeanor, the bond shall be conditioned on the person being prohibited from having any contact with the alleged victim of such offense for a period of at least 72 hours. The magistrate may

impose such of the following additional conditions of release as will reasonably assure the appearance of the person for preliminary examination or trial:

> (a) Place the person in the custody of a designated person or organization agreeing to supervise such person;

> (b) place restrictions on the travel, association or place of abode of the person during the period of release;

> (c) impose any other condition deemed reasonably necessary to assure appearance as required, including a condition requiring that the person return to custody during specified hours;

> (d) place the person under a house arrest program pursuant to K.S.A. 2022 Supp. 21-6609, and amendments thereto; or

> (e) place the person under the supervision of a court services officer responsible for monitoring the person's compliance with any conditions of release ordered by the magistrate.

K.S.A. 22-2802(1).

### *b.* ***Post-conviction confinement and conditions of release***

Kansas statutes provides a number of sentencing options post-conviction that include the following:

    a.    a "community correctional services program" that assigns the defendant for supervision, confinement, detention, care or treatment, subject to conditions imposed by the court and the defendant remains subject to the continuing jurisdiction of the court. K.S.A. 21-6603(b).

    b.    confinement to a "correctional institution" under control of the secretary of corrections. K.S.A. 21-6603(c).

    c.    confinement to "house arrest" that restricts the inmate within the community, home or noninstitutional residential placement and specific sanctions are imposed and enforced. K.S.A. 21-6603(d).

    d.    release on "parole" whereby a prisoner is released from a correctional institution to

the community prior to the expiration the prisoner's sentence, subject to conditions imposed by the prisoner review board and to supervision by the secretary of correction. Parole also means the release by a court of competent jurisdiction of a person confined in the county jail or other local place of detention after conviction and prior to expiration of such person's sentence, subject to conditions imposed by the court and its supervision. K.S.A. 21-6603(e).

e.   "postrelease supervision" is provided for persons convicted of crimes committed on or after July 1, 1993, and is release of a prisoner to the community after having served a period of imprisonment, subject to conditions imposed by the prisoner review board and to supervision by the secretary of correction. K.S.A. 21-6603(d) and K.S.A. 21-6803(p).

f.   "probation", a procedure under by which convicted person is released by the court after imposition of sentence, without imprisonment or after a term of imprisonment in felony cases, subject to conditions imposed by the court and subject to the supervision of the probation service of the court or community corrections.

g.   "suspension of sentence" is a procedure under which a defendant, convicted of a crime, is released by the court without imposition of sentence. The release may be with or without supervision in the discretion of the court. In felony cases, the court may include confinement in a county jail not to exceed 60 days, which need not be served consecutively, as a condition of suspension of sentence pursuant to subsection (b)(4) of K.S.A. 21-6702, and amendments thereto.

Inclusion on the gang list alone is insufficient for enhanced penalties on conviction. Under the Kansas Sentencing Guidelines, if it is shown at sentencing that the offender committed any

felony violation for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further or assist in any criminal conduct by gang members, the sentence shall be presumed imprisonment. K.S.A. 21-6804(k). The sentencing court may impose an optional nonprison sentence and such nonprison sentence is not considered a departure and is not subject to appeal. *Id*. The presumptive imprisonment requires proof of specific intent. *Id*.

Any conditions or restrictions of imprisonment, release, probation, or parole etc. are conditions imposed by the court, the secretary of corrections, or prisoner review board. The City and the WPD do not impose conditions or restrictions for persons subject to pretrial release or subject to conviction and sentence. The conditions and restrictions imposed by the court, the secretary of corrections, or prisoner review board are not conditions because of the WPD gang list and are imposed only in a manner in which the defendant is afforded due process.

> **c.     *The gang list does not cause reputational harm because it is not shared publicly.***

The final harm plaintiffs attempt to demonstrate is that to their reputation. Plaintiffs claim reputational harm through denials of employment, lost scholarship opportunities, and being reported in the Wichita Eagle as a "known gang member" are attributed to the WPD's adding their name in a database. The claims are unsupported by the record. A discussed above, this alleged injury again fails the second prong to demonstrate standing: The reputational harms suffered by Plaintiffs are not traceable to their inclusion on the Gang List or in the Gang Database.

**5.     A favorable decision by this Court does not resolve Plaintiffs' concerns.**

Plaintiffs cannot meet the third prong to demonstrate standing. Plaintiffs request a declaration that K.S.A. 21-6313 through K.S.A. 21-6316 are unconstitutional and seek to dismantle WPD's Gang List. Pretrial Order, at 44-45. Even if that were to occur, the result remains

the same—each person arrested and charged is subject to prosecution for a crime, imposition of bail, conditions of pretrial release and, if convicted, sentencing and conditions of confinement or post-convention supervision. Gang membership and gang activity remain factors that the court can and will consider at each step of the criminal justice process. None of the relief requested prevents the presentation of relevant information and evidence during a criminal proceeding. The relief requested does not prevent a local newspaper from reporting an individual is a known gang member, or employers from running a background check and denying employment based on criminal history (note that criminal history does include gang membership), nor does it prevent a state university from pulling a scholarship when an individual is a convicted criminal. Because a favorable judicial decision in this case will not redress the harms Plaintiffs allege, Plaintiff lack standing.

**B.    Due process claim—Vagueness (Count I). Neither WPD Policy 527 nor K.S.A. 21-6313 are void for vagueness, facially or as applied.**

Neither, Policy 527 nor K.S.A. 21-6313 prohibit any conduct and do not impinge on First Amendment freedoms. Inherent to the definition of a criminal street gang (and, thus, a criminal street gang member or associate) is an organization, association or group with a primary activity of committing person crimes or felony drug crimes. K.S.A. 21-6313, K.S.A. 21-6314, K.S.A. 21-6315, and K.S.A. 21-6316 do not reach a substantial amount of constitutionally protected conduct, are not impermissibly vague in all of their applications, and do not authorize or encourage arbitrary and discriminatory enforcement. People of ordinary intelligence can understand the conduct prohibited by K.S.A. 21-6314 and K.S.A. 21-6315. As applied, objective evidence supported the identification of Plaintiffs as criminal street gang members or associates. For the instances in which any Plaintiff was subject to bail and conditions of release—the bail and conditions were imposed by a court accompanied by the due process rights afforded by the code of criminal procedure.

A statute may be challenged as vague in two ways; First, a plaintiff may challenge the statute as vague as applied to his particular circumstances, *See Galbreath v. City of Oklahoma City*, 568 Fed.Appx. 534, 539 (10th Cir. 2014), or second, a plaintiff may make a facially vague challenge. *See Dr. John's, Inc. v. City of Roy,* 465 F.3d 1150, 1157 (10th Cir. 2006).

Neither WPD Policy 527 nor K.S.A. 21-6313 prohibit or penalize conduct, neither does the policy nor the statute create a deprivation of plaintiffs' rights. This Court has previously declared, whether or not a statute labeled penal, it must "meet the challenge that it is constitutionally vague." *Citing Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966). ECF 28, at 22. Giaccio is easily distinguished and does not control here. In *Giaccio,* the Court struck a civil law that allowed a jury to assess costs to a criminal defendant even if acquitted as violating due process because it was so vague and standardless. "A statute must provide reasonably precise standards so that judges or juries are not left to decide arbitrarily what is prohibited and what is not in each particular case. *Id*, at 403. "Vagueness challenges, however, are greeted with a strong presumption in favor of the statute's validity." *See Schrag v. Dinges*, 788 F. Supp. 1543, 1553 (D. Kan. 1992) (citing *United States v. National Dairy Prods. Corp.,* 372 U.S. 29, 32 (1963)). Here, WPD policy 527 and K.S.A. 21-6313 do not proscribe any conduct or impose any penalty. Combined they clearly state that if you engage in criminal activity and meet the criteria in K.S.A. 21-6313(b) or (c) you could be identified as a criminal street gang member or associate. Plaintiffs focus on attacking the enumerated criteria as vague but ignore the context, plain language, and standards within the statute. Furthermore, the policy and statute do not prohibit any conduct by Plaintiffs. Plaintiffs claim they fear being listed or continued on the gang list. But inclusion on the list or in the database is not a cognizable injury.

## 1. Neither K.S.A. 21-6313 nor WPD Policy 527 are facially void for vagueness.

Plaintiffs appear to make a facial challenge to WPD's policy 527 and K.S.A. 21-6313

alleging numerous terms are vague and overbroad as applied to the Wichita Community. Pretrial Order ECF 196, at 13. However, such claims are "strong medicine" and require the plaintiff to show "the challenged law would be vague in the vast majority of its applications." *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (citations omitted).

K.S.A. 21-6313 has a limited application to the general public and is directed solely at identifying those in the community engaged in "criminal street gang" activity. Plaintiffs allege the policy and statute can be applied with impunity to innocent members of the community that may be members of a fraternity, or family members or people displaying certain clothing or tattoos. This is inconsistent with the statute, with Policy 527, and with the WPD practices under both. To be considered for inclusion on the gang list, there must first be a criminal street gang, then the person must first be associated with a criminal street gang. Context matters and colors alone, location alone, and incidental contact/association does not result in a person being added to the gang list. Plaintiffs' claims and contentions untether the statute from the text, which requires a criminal street gang (a group of persons whose purpose includes the commission of person felonies and misdemeanors and felony drug crimes.

Persons are added to the Gang Database in the first instance either (1) through research and contacts by gang intelligence officers or (2) (a) by nomination for inclusion on the database by non-gang officers followed by (b) review and verification by Gang Intelligence Officers that the subject meets the criteria for inclusion on the Master Gang List. Exhibit 16, Bartel dep., 127:16-128:15. WPD Policy 527 incorporates by the definitions and criteria in K.S.A. 21-6313. Policy 527, § I.E.1 ("Initial identification will be based upon the aforementioned Criminal Street Gang Member or Associate Criteria found in K.S.A. 21-6313.")

Any state, county, or city law enforcement officer or correctional officer may nominate a

person for inclusion on the gang list. Only gang intelligence officers can add individuals to the Gang Database. Gang Intelligence Officers within the Gang Unit evaluate nominations to the Gang Database with reference to the criteria set forth in K.S.A. 21-6313 and WPD Policy 527. If the Gang Intelligence Officer determines that a person meets the criteria and should be added to the Gang Database, that Officer will create a Gang Database entry identifying the person as either a criminal street gang member or a criminal street gang associate. Gang Intelligence Officers are the ones solely responsible for maintaining the Gang Database.

All WPD officers undergo gang-related training: four hours in the academy and two additional hours annually. While any officer can nominate someone, the Gang Database is administered only by Gang Intelligence Officers, no other WPD personnel can add a person to the Gang Database, inactivate a person in the Gang Database, or remove a person from the Gang Database. Exhibit 6, Bernard Declaration. Additions to the database, or Master Gang List, is done only by Gang Intelligence Officers who use their training and experience and apply statutory criteria to vetted persons nominated for inclusion. Gang Intelligence Officers lean to being underinclusive rather than overinclusive. The definition of a street gang member necessarily includes criminal activity. K.S.A. 21-6313(a); *See* Policy 527 § 1.B.1 ("The information will be researched by a member of the Gang/Felony Assault Section or VCCRT. ... . The individual will be added to the Master Gang List if they meet the criteria defined in K.S.A. 21-6313.").

Determinations by Gang Intelligence Officers for inclusion in the database depend on the totality of circumstances, officer's knowledge, and experience. Disparate application of the criteria is avoided by training the officers and the context of information used. The officers are trained to be familiar with gang-specific information, such as hand signs. The reviewing officer looks at the information with skepticism to ensure there is a very specific reason for inclusion. The Courts have

recognized Gang Intelligence Officers as experts in the area of gangs and allow them to testify as such in criminal trials.

To evaluate criteria such as frequenting street gang's area, adoption of a gang's style of dress, color, hand signs or tattoos, and associating with known criminal street gang members, Gang Intelligence Officers use their training, experience, and knowledge of the neighborhoods to make the determinations for inclusion in the Master Gang List. Exhibit 10, Inkelaar dep., 116:13-24. Gang Intelligence Officers converse with each other and discuss individual situations to make determinations based on their training and experience. Exhibit 17, Gilmore dep., 150:20-151:9. Incidental contact is insufficient— associating with known gang members requires conduct indicative of joining or connection based on gang affiliation. Exhibit 6, Bernard Declaration. Also, immediate family members are exempted and not employed as a criterion of associating with known gang members. Doc. Exhibit 8, Beard dep., 249:10-14, Doc.186-21, Declaration of J Bernard.

Application of the individual criteria are understandable by people of ordinary intelligence and do not foster arbitrary or discriminatory enforcement. Individuals are not added on a whim or without proper vetting. There is evidence to the contrary.

*K.S.A. 21-6313(b)(2)(D) – "frequents a particular criminal street gang's area"* - The WPD does not maintain a map identifying specific gang areas. There are known areas where gang members hang out and engage in criminal activity, but where gangs congregate changes over time, and people relocate. Experience and training inform officers' knowledge of current areas of gang activity. Gang Intelligence Officers are knowledgeable of current gang activities and designate gang areas based on gang activity, including gang-related crime, violence, and drug activity. Gang Intelligence Officers use their training, experience, and knowledge of the neighborhoods to make

the determinations for inclusion in the database. Additionally, mapping is used to track gang crimes and helps determine where resources are needed to support grant writing for additional social services and displacement.

*K.S.A. 21-6313(b)(1), "Admits to criminal street gang membership"* – Self-admission is a common method by which gang members and associates are identified. Exhibit 16, Bartel dep., 136:18-137:5; Doc. Exhibit 8, Beard dep. 31:18-33:7, 56:2-3, 56:19-21; Exhibit 17, Gilmore dep., 44:7-44:16; Exhibit 9, Hemmert dep., 42:19-43:22. Some individuals self-admit because they are proud to be a gang member. Exhibit 16, Bartel dep., 130:12-23. A lot of individuals are comfortable confirming their membership and do not try to hide it: "it's almost written on a shirt." Exhibit 18, Thatcher dep., 98:11-17.

Even self-admits are verified by gang intelligence officers through watching the reporting officers' AXON video. Gang Intelligence Officers confirm hearing the person self-admit before adding them to the Master Gang List. A social media post alone does not suffice.

*K.S.A. 21-6313(b)(2)(B) "documented reliable informant"* – People of ordinary intelligence can understand what a reliable informant is and understand what it means to document a reliable informant. WPD Officers are trained to understand the distinctions between a reliable informant and an informant of untested reliability. Officers also understand the information must be documented.

*K.S.A. 21-6313(b)(2)(D) – "frequents a particular criminal street gang's area"* - The WPD does not maintain a map identifying specific gang areas. There are known areas where gang members hang out and engage in criminal activity, but where gangs congregate changes over time, and people relocate. Experience and training inform officers' knowledge of current areas of gang activity. Gang Intelligence Officers are knowledgeable of current gang activities and designate

gang areas based on gang activity, including gang-related crime, violence, and drug activity. Gang Intelligence Officers use their training, experience, and knowledge of the neighborhoods to make the determinations for inclusion in the database. Additionally, mapping is used to track gang crimes and helps determine where resources are needed to support grant writing for additional social services and displacement.

K.S.A. 21-6313(b)(2)(E) – *"adopts such gang's style of dress, color, use of hand signs or tattoos"*- Identification based on dress utilizes multiple factors at the same time: colors, specific sports teams, and how the attire is worn. Trained officers know what to look for and follow up with questions to verify gang identification based on their observations. There is a continuity of training for Gang Intelligence Officers to safeguard against variation in interpretations. The dress is, like all criteria, viewed in context.

K.S.A. 21-6313(b)(2)(F) - *"associates with known criminal street gang members"*- To associate with someone is interpreted in its common usage. Associate is commonly defined to mean "to join as a partner, friend, or companion," "to join or connect together," or "to bring together or into relationship in any of various intangible ways." Merriam-Webster. (n.d.). Associate. In Merriam-Webster.com dictionary. Retrieved September 29, 2023, from https://www.merriam-webster.com/dictionary/associate. Inclusion in the database is not based solely of an officer's nomination, the Gang Intelligence Officers conduct additional research before adding the individual to the database.

## 2.     Neither WPD Policy 527 nor K.S.A. 21-6313 are void for vagueness as applied.

For an as-applied vagueness challenge, the analysis must be tethered to the factual context in which the ordinance was applied. *United States v. Franklin-El*, 554 F.3d 903, 910 (10th Cir. 2009) ("Because this is an as-applied challenge, we consider this statute in light of the charged conduct."). The "charged" conduct is not an offense, does not involve an arrest, charges or a

conviction. Rather, the conduct is identification as a gang member or associate and inclusion in the database.

For the same reason each plaintiff fails to prove evidence of harm for Article III standing, they also fail to prove evidence of vagueness as applied to each plaintiff.

### a.      Christopher Cooper

Plaintiff Christopher Cooper provides no admissible evidence to support his claim of harms resulting from inclusion on the WPD's gang database. Cooper alleges he "suffered continuous harassment" for "minor traffic violations," ECF 196, at 31, Response to ROG 10, resulting in him having to drive family members' cars to avoid being pulled over. ECF 196, at 31. But Cooper did not drive a car registered in his name before his arrest for first degree murder, *Exhibit 20, Cooper dep*, 55:16-56:6, and he does not recall if he was pulled over following his arrest and jail time in 2017. *Exhibit 20, Cooper dep,* 43:25-44:11. Cooper recalls being pulled over by law enforcement maybe two times when he was in high school and a few times after graduating high school for a total of 5-6 times. *Exhibit 20, Cooper dep,* 43:7:24. He consented to a search request when he was pulled over, *Exhibit 20, Cooper dep,* 70:24-71:2, and admits the WPD had a reason to pull him over for the traffic stops, so he didn't file a complaint with the WPD regarding the stops. *Exhibit 20, Cooper dep,* 44:20-45:9; RFP Response #18.

Cooper alleges he's "been denied employment of his choice because of Defendants' sharing of the Gang List with other entities." ECF 196, at 31, ROG Response 11. Cooper is, however, employed. ROG Response #6. The restriction of his position occur because of his probation conditions, such as limiting his participation in public events such as the Wichita Riverfest. *Exhibit 20, Cooper dep,* 69:13-70:6. Cooper doesn't believe the gang list denied him job opportunities; he testified he assumes all employers run background checks and would see his criminal history. *Exhibit 20, Cooper dep*, 49:21-52:24. And he recognizes his inability to attend

certain community events are due to his probation conditions, not inclusion on the gang list. *Exhibit 20, Cooper dep,* 74:14-75:16. Further, Plaintiffs can provide no instance of the WPD sharing information from the gang list with entities outside of other law enforcement agencies that could have impacted Cooper's employment opportunities. "Damage to prospective employment opportunities is too intangible to constitute deprivation of a liberty interest." See *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1559 (10th Cir. 1993) (citing *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1269(10th Cir. 1989).

Plaintiffs contend Cooper was preparing to transfer to K-State (Kansas State University) and he lost a scholarship because of his inclusion on the gang list. ECF 196 Page 29. In fact, Cooper never applied to K-State, he was never offered a scholarship, and he is banned from living on campus because of his felon status. *Exhibit 20, Cooper dep*, 76:16-24; 37:2-38:16; 64:2-65:8. Cooper did attend Highland Community College with a scholarship to play football and a U.S. Army scholarship. *Exhibit 20, Cooper dep*, 36:19-37:1. But he was never on the track team for Highland Community College, *Exhibit 20, Cooper dep,* 35:9-16, and could not complete the first football season playing football for Highland because of an injury. *Exhibit 20, Cooper dep,* 33:24-34:25. He lost the U.S. Army scholarship when he went to prison. *Exhibit 20, Cooper dep,* 66:12-15. Cooper believes he can never go back to school because of his criminal record as a violent offender, *Exhibit 20, Cooper dep,* 70:9-17, and that living off campus requires him to do "too much." *Exhibit 20, Cooper dep,* 64:2-65:8. Cooper's decision not to pursue an education is his own choice, not the fault of the WPD and its gang database. Any harm suffered is not a result of the Defendants' intelligence gathering or application of WPD policy 527 or K.S.A. 21-6313.

Cooper's assumes his bail was set at $50,000 as a result of being listed in the Gang Database. ECF 196 Page 30. However, he was charged with first degree murder of Juan Orona.

*Exhibit 20, Cooper dep*, 20:9-16, and went to jail following arrest in 2017. *Exhibit 20, Cooper dep,* 62:7-12. Cooper understands his bail was set by a judge, *Exhibit 20, Cooper dep,* 41:4-11. Similarly, the Complaint alleges Cooper's "strict probation" conditions were the result of being on the gang list, forcing him to move away from his family because they, too, were documented gang members. ECF 196 Page 30, ROG Response 10. Yet Cooper understands the conditions of his probation were determined by a judge, *Exhibit 20, Cooper dep,* 41:16-42:6, and monitored by a community corrections officer. *Exhibit 20, Cooper dep,* 42:7-9. While the conditions did prohibit Cooper from associating with other gang members, Cooper assumed himself that this included his family members who were also documented gang members, *Exhibit 20, Cooper dep,* 52:25-53:14. He further understood a probation condition prevented him from associating with other convicted felons, *Exhibit 20, Cooper dep,* 54-13:15, and the family members Cooper alleges he was unable to associate with were convicted felons. *Exhibit 20, Cooper dep,* 54:8:12. Cooper also recognizes his inability to attend certain community events were due to his probation conditions, not inclusion on the gang list. *Exhibit 20, Cooper dep,* 74:14-75:16.

Cooper provides no documentation, statements, communications, recordings, photographs, notes, journals, blogs, emails, tax records, to support the claims made in the Complaint. Cooper's Response to RFP ##1, 2, 3, 4, 5, 6, 7, 8, 12, 17, 18 and 19. Plaintiff Cooper cannot provide any admissible evidence to demonstrate the Gang Database or Gang List caused him a particularized harm.

### b.    *Jeremy Levy, Jr.*

Plaintiff Jeremy Levy, Jr., is currently incarcerated for murder in the first degree, ECF 196 Page 29, and is serving a sentence of 25 years to life. *Exhibit 23, Levy dep.,* 17:23-18:9.

Levy claims prior to his incarceration he was denied employment and harassed by police and restricted in his ability to wear certain colors, patronize certain businesses, and freely associate

and socialize with others. ECF 196 Page 28. Consistent with the other Plaintiffs, Mr. Levy can provide no evidence or documentation of the allegations made on his behalf.

Levy admits to being charged as a juvenile with burglary and pleading to what he thought was misdemeanor and being placed in an "out-of-home boys' placement." Exhibit 23, Levy dep., 28:17-30-6. Levy claims that he was stopped by police at a QuickTrip when he was thirteen years old and told he could not go to certain QuickTrips or Towne East Mall or wear certain colors. Exhibit 23, Levy dep., 32:6-32:22. Levy believes he was on the gang file because 'police' told him he could not go to these places. Exhibit 23, Levy dep., 32:6-23.

Levy further claims he was denied employment, however, Levy assumed he did not get a job at "Lids" because he was on the gang list. But does not know why he did not get the job. Exhibit 23, Levy dep., 32:24-35:4. After being convicted as a juvenile, Levy claims he was told he could not apply for a job working in a hospital and be a gang member but cannot remember the name of the company, anyone he spoke to or if the employer did background checks. Exhibit 23, Levy dep., 35:5-36:20:

Levy was arrested and tried for first-degree murder. He alleges because of his inclusion on the gang list prosecutors in his murder trial were allowed to introduce his alleged gang status at trial and discuss gang incidents and evidence of a gang feud. Nothing in the law allows membership on a gang list to be admitted in court and presented to a jury as evidence of guilt. Levy admits his trial attorney challenged the gang affiliation testimony both pretrial and during trial. Exhibit 23, Levy dep., 25:23-26:13. Levy also contested his conviction and the use of gang testimony on appeal. See *State of Kansas v. Jeremy D. Levy*, 485 P.3d 605 (2021). The Kansas Supreme Court found that "[t]he district court did not err when it held Detective Hemmert's gang testimony was relevant. There was significant evidence "that gang membership or activity [was]

related to the crime charged." *Id.* at 239 (citation omitted). Further the Supreme Court ruled the evidence wasnot unduly prejudicial. *Id* at 240. Levy admits his inclusion on the gang list did not increase his sentence. Exhibit 23, Levy dep., 40:9-15.

Finally, Levy complains that he could be subject to "extremely harsh gang conditions while on parole." ECF 196 Page 29. Levy admits he does not know what his conditions of release on parole will be or if they will be different than anyone else's. Exhibit 23, Levy dep., 40:17-24.

### c.      *Elbert Costello*

Elbert Costello was unaware he was included in the gang list until after he was arrested and convicted of manslaughter in Saline County, Kansas in 1997 and incarcerated. ECF 196 Page 25. Upon his conviction he was sentenced to 51 months in the Kansas Department of Corrections (KDOC). Exhibit 33, E. Costello Dep Exhibit 63. Costello was informed by his intake counselor that the prison assigns points based on the crime committed to determine the classification status, but he doesn't remember if he had to answer any questions related to gang affiliation when he was first brought into custody. Exhibit 33, E. Costello Dep., 20:24 -21:21. There is no evidence presented by E. Costello that WPD shared any information about him with the court's or prosecutors in Saline County or with KDOC. In fact, it was the Salina Police Department that informed WPD that E. Costello was a suspected gang member causing him to be listed as a gang associate in the WPD Gang List. Affidavit of C. Cason ¶ 8. There is no evidence WPD supplied any information about E. Costello to KDOC.

E. Costello further complains he was subject to 'highly restrictive and untenable probation conditions" upon conviction for possession of drug paraphernalia. ECF 196 Page 25. However, E. Costello testified that since his discharge from post-release in 2003 nobody else put any restrictions on him. Exhibit 33, E. Costello Dep., 28:6-29:1. Later, E. Costello on cross examination stated he was on probation for a drug paraphernalia conviction in 2011. Exhibit 33, E. Costello Dep., 26:3-

9 49:19-50-6. He claims his probation officer threatened to revoke him for wearing a shirt with red writing on it but did not do so. Exhibit 33, , E. Costello Dep., 47:12-20. An unacted upon threat by a probation officer cannot be attributed to the WPD. He admits his probation was revoked several times but can't recall what for, other than he believed one was for being a gang member. Exhibit 33, E. Costello Dep., 46:18-47:7. E. Costello admits it is the court that sets his bond and the court and probation officer that set the conditions of his probation. 50:11-17.

E. Costello alleges since his release from prison (November 13, 2000) he has been subjected to 'increased' surveillance and experienced an increased number of traffic stops. E. Costello has presented no evidence to establish how surveillance or traffic stops have increased. And while he alleges he is "still subject to surveillance and harassment and often has to endure needless and invasive traffic stops[,]", he admits that he can't remember the last time he was stopped by the police, but it was at least four years ago. *Exhibit 33, E. Costello Dep.,* 23:25 -25:2. Further, he fails to provide evidence of resulting damage. *E. Costello RFP Responses*, 5, 12, 14, 15.

Mr. E. Costello "fears harassment or, worse, additional punishment if he gets together with others—including family members—for a beer, a barbecue, a family dinner, or a funeral." ECF 196 Page 26. Yet he concedes these are harms imposed by a judge, not the WPD. *Exhibit 33, E. Costello Dep.,* 50:11-17. Additionally, there is no evidence to suggest any surveillance under his post-release status was more or less than any other probationer/parolee who is not a documented gang member.

Consistent with the other named Plaintiffs, E. Costello fails to provide a single document, statements, communications, recordings, photographs, notes, journals, blogs, emails, and tax records, to support allegations the allegations or claims brought forth on his behalf. E. Costello

RFP Responses 1, 2, 3, 4. 6, 7, 8 14, 15. Nor is there any evidence to support that damage occurred as a result. E. Costello RFP Responses 5, 12, 14, 15. And he never attempted to challenge the designation to the WPD. E. Costello RFP Responses 17, 18, 19.

E. Costello claims most of the entries in the gang database that cause him to be renewed are from photos of him socially interacting with others in the gang database. (ECF 196 Page 26) The half-truth of this statement must be exposed. E. Costello's socializing with others in the gang database includes: 9 arrests, being present at three shootings and one shots fired incident. Carson Declaration ¶ 11.

Finally, E. Costello complains he was identified as a "known gang member" in a story in *The Wichita Eagle*. ECF 196 Page 26. Apparently, a parole officer stated to the reporter that the alleged perpetrator of the shooting had been seen in January 2021 with Mr. Costello, who was a "known gang member." *The Wichita Eagle* has since revised its article to remove Mr. Costello's name, after receiving complaints from Mr. Costello's friends and family. Complaint, ¶ 139. This allegation is unrelated to Defendant. It is against WPD policy to disclose information contained in the gang database, including the Master Gang List of active documented criminal street gang members and associates. There is no evidence where the parole officer got his information.

### d.    Martel Costello

Martel Costello claims he has never been a member of a gang. ECF 196 Page 26. However, he admits he identified himself to Ellsworth Correctional Facility members as a "Pirus" gang associate. Exhibit 25, M. Costello depo 45:8-46:17 and Exhibit 31, M. Costello Exhibit 87.

M. Costello was convicted of criminal damage to property in 2012, intimidation of a witness in 2013, and in 2017 for multiple felonies committed in 2016 and 2017. He did not become aware that he was listed on the Gang List until his arrest in 2016. He has not attempted to contest his designation as a criminal street gang member. After his conviction in 2017 he was placed on

probation by the Court and given conditions of probation by the Court and his probation officer, not WPD.

M. Costello claims he had bond set at or over $50,000 at least seven times. ECF 196, at 27. However, he presents no evidence as to why bond was set in those amounts after being charged with high level felonies as reflected in his KDOC record.

M. Costello was renewed on the gang list in 2016 for being in the company of other gang members, including his father, Plaintiff Elbert Costello. Exhibit 26, Carson Declaration ¶16 c. However, there is no evidence that M. Costello was ever violated on his pre-trial release, probation, or post-release supervision for associating with gang members.

M. Costello reports prior probation violations that resulted in his house arrest. These violations were because of alcohol and being out past curfew six times. M. Costello claims that he was subject to invasive searches where his property was destroyed, and possessions thrown on the floor and officers laid clothes on his bed to resemble the outline of a body. ECF 196, at 27. During his house arrest period M. Costello's house was shot at and his cousin Plaintiff Christopher Cooper was shot, causing officers to search his house eventually locating a handgun. Officers took photographs of pictures and clothing, including a red shirt, red hat, red pants, and a shirt with a picture of him and his brother that officers had laid out on a bed. Exhibit 25, M. Costello depo., 51:16-52:07. Surveillance video obtained from the scene shows M. Costello with a gun in his hand. Carson Declaration, ¶ 21.k.

M. Costello complains of harassment by being stopped by policed multiple times a month between 2014 and 2016. ECF 196 Page 27. The record is clear that M. Costello was engaged in various criminal activities during this time. Plaintiff does not recall the specific dates of the traffic stops. He does not know the names of the officers that allegedly harassed him, nor does he recall

details of each encounter because he was stopped so often and most stops involved multiple officers. He never filed a complaint or report regarding the WPD's alleged conduct.

M. Costello's probation was revoked by the Court and was sentenced to serve his underlying sentence. Exhibit 25, M. Costello depo., 39:17-23. He understands that a judge revoked his probation for being out past curfew, not for associating with other gang members, regardless of what information he was told by others. Exhibit 25, M. Costello dep., 43:21-45:4. That is consistent with the Journal Entry of Probation Violation Hearing where it shows he was revoked for failing to obey the law and four instances of violating curfew. Exhibit 25, M. Costello dep., Exhibit 86.

Finally, M. Costello complains he was concerned by a chance encounter with a WPD officer while on work release. ECF 196 Page 29. He was not placed under arrest, was not threatened with arrest, and was not prevented from moving freely by an officer who recognized him at a convenience store. Exhibit 25, M. Costello dep., 59:14-60:21.

### e.  *Progeny*

Plaintiffs' contendProgeny has organizational standing to sue for its own injuries, as well as associational standing to sue on behalf of its members for claims of First Amendment overbreadth and facial vagueness. ECF 196 Page 22. However, this Court ruled "Progeny has standing to sue for direct injuries it has allegedly suffered as a result of the Gang List *but does not have standing to sue as an association on behalf of its members*." ECF 28 Page 20. (Emphasis added).

Progeny further complains that it has to divert resources away from its other work to provide assistance and resources to those who are suffering from the consequences of being in the WPD's Gang Database. ECF 196 Page 24. Again, this Court has determined that Progeny has no standing to bring this claim: "Progeny here alleges no more than ordinary expenditures in line with

its purpose as an organization… Spending resources to assist these individuals remains within the ordinary purpose of Progeny, and thus such expenditures are ordinary as well. This is not an injury in fact sufficient to confer standing." ECF 28, at 17. That brings us to the remaining claims of Progeny; that it cannot hold meetings in large groups or even one-on-one, hold member events or use members likeness or stage protests for fear its members could be placed on the gang list.

Progeny through its 30(b)(6) designee Marquetta Atkins testified that Progeny started operation in 2015 or 2016. Exhibit 36, Atkins Dep., 9:6-7. Progeny is a juvenile justice initiatives program of Destination Innovation, Inc. Exhibit 36, Atkins Dep., 9:16-22. Destination Innovation, Inc did not become a non-profit until 2018. Exhibit 36, Atkins Dep., Progeny did not become a part of Destination Innovation, Inc. until 2021. Exhibit 36, Atkins Dep., 9-13.

Progeny works with youth touched by the juvenile justice system to teach them leadership, how to change policy in a way that it impacts them. Exhibit 36, Atkins Dep., 14:25-15:3. Progeny visits schools and youth organizations from around the City of Wichita. Exhibit 36, Atkins Dep., 21:20-22:6. When asked how often this happens, Progeny responded "we're busy". Atkin Dep., 24:2-4. Progeny estimates it is asked to speak to youths or engage other organizations 12 times a year. Exhibit 36, Atkins Dep., 24:17-22. Progeny went through a building stage where they engaged about five people in 2016 and 2017. Exhibit 36, Atkins Dep., 25:14-26:14. From that time until the Pandemic in 2020, Progeny hosted an event in partnership with the City regarding recent shootings. Exhibit 36, Atkins Dep., 27:9-13.

Prior to the pandemic Progeny's events "ebbed and flowed" as they came into contact with juveniles in trauma. Atkin Dep., 27:21-28:2. Progeny continued to have meetings until the Pandemic hit in 2020 then started hosting meetings on Zoom. Exhibit 36, Atkins Dep., 28:13-29:13. In person meetings did not start up again until 2022 when Progeny started hosting hybrid

meetings on Monday and Thursdays. Progeny started meeting at its new center in 2023. Exhibit 36, Atkins Dep., 29:16-25. Progeny members have meet consistently on Monday and Thursday throughout 2023 with occasional issues based upon 'whatever other events are happening.' Exhibit 36, Atkins Dep., 21:4-9. The Pandemic impacted attendance 'greatly'. Exhibit 36, Atkins Dep., 31:11-20. Pre-pandemic attendance at meetings could range from a low of three to a high of 60. Exhibit 36, Atkins Dep., 32:5-33:4. Post-pandemic attendance at Progeny meetings are about the same. Exhibit 36, Atkins Dep., 33:5-9. Sixty is typical for an event. Exhibit 36, Atkins Dep., 33:12. In early 2023 they had a meeting that was standing room only of about 60 people. Exhibit 36, Atkins Dep., 32:22-33:4.

Attendance at Progeny's Monday and Thursday meetings varies between a low of three to four people and a high of eleven to fifteen and has varied consistently since before the pandemic. Aktins Dep., 33:15-34:10. Progeny concede attendance at events varies and is inconsistent. Exhibit 36, Atkins Dep., 34:14-17.

Throughout 2022 and 2023 Progeny testified that it held dozens of events (apart from this twice-weekly meetings). Exhibit 36, Atkins Dep., 70:1-77:16. Despite claims that Progeny cannot hold events where some progeny members would be in direct proximity with individuals on the gang list Progeny refuses to identify any individual this would affect. Aktins Dep., 91:14-92:11. Progeny fails to identify a single event or program that was cancelled due to this expressed fear.

Progeny identifies one sign making event to protest the governor that was cancelled due to a single police car being present outside the event on a public street. Exhibit 36, Atkins Dep., 92:15-94:24. The officer did not engage with anyone at the event until Progeny told him to leave. Exhibit 36, Atkins Dep., 95:1-25. Progeny, through Atkins, claims some kids told her they would not come to the event because of the officer being present outside. Aktins Dep., 94:14-24. Progeny

testified that the event was cancelled because it did not want "them to engage with the WPD in any kind of way or be profiled in any kind of way." Atkin Dep., 94:5-7.

Progeny further complains that it must talk with protest participants about their connections to the juvenile legal system in case they are arrested because it could affect their probation and/or gang status. ECF 196, 24. Nothing here alleges they are prevented from carrying on their activities.

**C.     Due process claim—Stigma Plus (Count III). Plaintiffs' procedural due process claim fails because the WPD's gang list and gang database do not significantly alter a state-recognized right.**

By its terms, a cause of action under § 1983 requires both the deprivation of a federal right and that the defendant acted under color of state law. 42 U.S.C. § 1983;[1] *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence*, 927 F.2d 1111, 1115 (10th Cir. 1991). The City does not dispute that the City's actions were taken under color of state law. Therefore, plaintiffs must show a deprivation of a federal right.

Plaintiffs claim WPD Policy 527 and its maintenance of a gang database violates Plaintiffs' rights to procedural due process. "Specifically, the WPD's failure to provide individuals it designates as criminal gang members and associates with notice of and an opportunity to challenge such designation violates procedural due process." Pretrial Order, at 41. Plaintiffs' claim fails because the gang database does not significantly change or alter Plaintiffs' legal status.

A cognizable liberty interest may be implicated when "a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," such that procedural

---

[1] Section 1983 provides, in relevant part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State …, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress … .

due process is required permitting the person to clear his or her name. *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) (statute allowing posting of notice in liquor stores prohibiting sales to specific person implicate liberty interest requiring notice and opportunity to be heard); *Gwinn v. Awmiller*, 354 F.3d 1211, 1216 (10th Cir. 2004) (classification of prisoner as sexual offender not been convicted of sexual offense implicated liberty interests because classification reduced rate good time credits could accrue); *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1558 (10th Cir. 1993) (allegations were sufficient for liberty interest claim on motion to dismiss but claim failed on summary judgment motion based upon the lack of evidence). This is commonly known as the stigma plus doctrine. *Gwinn*, 354 F.3d at 1216.

"Damage to one's reputation alone, however, is not enough to implicate due process protections." *Gwinn*, 354 F.3d at 1216 (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976) (stating that "reputation alone, apart from some more tangible interests such as employment, is neither 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause")). "Stigmatization or reputational damage alone, no matter how egregious, is not sufficient to support a § 1983 cause of action." *McGhee v. Draper*, 639 F.2d 639, 643 (10th Cir. 1981).

> [A] plaintiff asserting that the government has violated the Due Process Clause by impugning his or her "good name, reputation, honor, or integrity," *Jensen*, 998 F.2d at 1558, must demonstrate that: (1) the government made a statement about him or her that is sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she asserts is false, and (2) the plaintiff experienced some governmentally imposed burden that "significantly altered [his or] her status as a matter of state law." *Paul*, 424 U.S. at 710–11. This is sometimes described as the "stigma plus" standard.

*Gwinn*, 354 F.3d at 1216.

### 1.   No Plaintiff acquires any new or altered "legal status" from being identified as a gang member or associate.

The Tenth Circuit recently explained that, in addition to stigma, some change in legal status is needed to assert a claim under the stigma-plus doctrine. *Al-Turki v. Tomsic*, 926 F.3d 610, 617

(10th Cir. 2019). The requisite "change in status must be 'significant[].'" *Id.* (alteration in original) (quoting *Paul v. Davis*, 424 U.S. at 711). "If the plaintiff establishes that the alleged defamation would significantly change the plaintiff's legal status, then the plaintiff is entitled to a name-clearing hearing to prove the falsity of the defamatory information." *Id.* (citing *Codd v. Velger*, 429 U.S. 624, 627 (1977) (proper remedy is "an opportunity to refute the charge" (internal quotation marks omitted)); *Nixon v. City and Cty. of Denver*, 784 F.3d 1364, 1368 (10th Cir. 2015) ("Once infringement of a liberty interest is established, the [plaintiff] must show that he was not afforded an adequate name-clearing hearing that comports with the Due Process Clause.");

Even if we assume that the inclusion of plaintiffs on the gang list or in the gang database defamed plaintiff, plaintiffs "still need to satisfy the second sub-element: that plaintiffs" suffered a 'governmentally imposed burden that significantly altered his status as a matter of state law.'" *Hinkle v. Beckham Cnty. Bd. of Cnty. Commissioners*, 962 F.3d 1204, 1230 (10th Cir. 2020) (quoting *Al-Turki*, 926 F.3d at 618) (internal quotation marks and citation omitted).

The Tenth Circuit has included, as actions sufficient to satisfy the second sub-element,

a.   Taking away the right to operate a vehicle. *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011).

b.   Revoking parole. *Id*.

c.   Falsely labeled a person as a sex offender and further required him to register as a sex offender. *Gwinn,* 354 F.3d at 1224.

A stigma-plus claim requires alteration of a state-recognized right, *Al-Turki*, 926 F.3d at 618–19, inclusion of gang membership or association in the database does not alter Plaintiffs' rights. In *Al-Turki*, the Tenth Circuit discussed and analyzed two cases illustrating how the defamation/stigma claimed by Plaintiffs here fails to meet the requirement for the alteration of a state-recognized right.

Other circuits have similarly required an alteration of a state-recognized

right to allege a stigma-plus claim. Two opinions illustrate how the harm suffered by the plaintiff must be to an interest protected by state law. In *Alston v. City of Madison*, 853 F.3d 901, 909 (7th Cir. 2017), the plaintiff alleged that his inclusion in a program to deter certain repeat violent offenders violated his procedural-due-process rights under the stigma-plus doctrine. The Seventh Circuit held that although the program subjected the plaintiff to "increased surveillance and increased punishment" for probation violations, "neither fact altered [the plaintiff's] legal rights." 853 F.3d at 910. Rather, law enforcement "just did what they always had the authority to do"—closely monitor the plaintiff's conduct and exercise their "discretion to seek punishment at the strong end of the spectrum." *Id.* at 910.

In *Behrens v. Regier*, 422 F.3d 1255, 1256 (11th Cir. 2005), the plaintiff alleged that officials from the Florida Department of Children and Families erroneously designated him as a verified child abuser and thereby prevented him from adopting a second child. The Eleventh Circuit held that the plaintiff failed to allege a plus factor giving rise to a procedural-due-process claim because state law "provide[d] that the decision to place a child in a prospective home is a discretionary one," and therefore did not confer any adoption right of which the plaintiff was deprived. *Id.* at 1261. The court also rejected the plaintiff's claim that his previous adoption of another child conferred a "protectable legal status" upon him, as the State had the discretion to reexamine an applicant's qualifications for each prospective adoption. *Id.* at 1262–63.

*Al-Turki*, 926 F.3d at 618–19. In *Alston v. City of Madison*, to address the disproportionate percentage of crime caused by repeat violent offenders, the Madison police department created a special unit and program. Prominent in the program was increased surveillance of repeat violent offenders to deter criminal conduct and, for persons identified as repeat violent offenders who continued to reoffend, the department pursued strict enforcement and punishment to the greatest extent possible. Program detectives coordinated with other agencies seeking help implementing the program and particularly encouraged the probation-revocation hearing examiners to revoke the probation of persons identified as repeat violent offenders who violated their probation terms. 853 F.3d at 904–05. Alston sued, claiming an equal protection violation based on race and also claiming his identification as a repeat violent offender deprived him of liberty without due process of law. Alston argued the identification was stigmatizing which subjected him to increased surveillance, penalties, and reporting requirements. The Seventh Circuit rejected both the equal

protection and due process claims. As to the stigma plus due process claim, the Seventh Circuit

said:

> Alston can prove the "stigma" portion of the stigma-plus test. The focused
> deterrence program's entire purpose was to monitor repeat violent offenders.
> Anyone selected for the program carried that brand. Without question, being
> classified as a "repeat violent offender" harms one's reputation.
>
> But Alston can get no further because he has not shown that being selected
> for the program altered a previously recognized legal status or right.

853 F.3d at 909. The *Alston* Court noted that a probationer's liberty interest is necessarily limited

by special probation conditions. *Id*. (citing *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)). Being

required to comply with conditions of probation—even if the condition is imposed because Alston

was identified as a repeat violent offender—was not a sufficient reduction in Alston's liberty to

require due process. *Id*., at 909-10.

> Nor did the police department or investigations unit implement the program
> in a way that altered Alston's previously recognized legal status or rights. The
> defendants do not dispute that program members were subjected to increased
> surveillance and increased punishment. Indeed, that was the program's entire
> purpose. But neither fact altered Alston's legal rights. Alston has provided no
> evidence that being included in the program authorized the investigations unit to
> conduct its surveillance in a way that violated his preexisting rights. The detectives
> just did what they always had the authority to do: closely monitor Alston's conduct.
> Likewise, the increased penalties that the police department wanted enforced
> against program members were penalties already authorized by law. Alston was not
> threatened with new or increased sentencing ranges. The department always had
> the discretion to seek punishment at the strong end of the spectrum. *Bryn Mawr*
> *Care, Inc. v. Sebelius*, 749 F.3d 592, 602–03 (7th Cir. 2014). It simply chose to
> exercise that discretion within the scope of the program.

*Id.*, at 910 (7th Cir. 2017).

Plaintiffs point to WPD's gang database and the policy and practice of including

documentation of whether a person arrested is a "known gang member" or "known gang associate"

in arrest affidavits. Plaintiffs contend this "inform[s] other criminal justice system personnel of the

WPD's assessment" of gang membership or association "which triggers additional scrutiny and

punishment by the courts, parole/probation, and more." Pretrial Order, 18. Plaintiffs also contend

that "increased surveillance and engagement increases the chances of individuals in the Gang

Database of interacting with the criminal justice system," *id*., at 19, and that such being "under

constant surveillance, and their everyday activities could subject them to renewed inclusion on the

Master Gang List." *Id*., at 20. Plaintiffs also point to persons identified as gang members or

associates may be subject to:

      a.     bail or bond of $50,000 under K.S.A. 21-6316,

      b.     "enhanced" prison conditions,

      c.     "stricter" conditions of pretrial release, probation and/or parole,

      d.     being monitored by WPD for violations of conditions of pretrial release, probation and/or parole with the goal have returning the person to confinement without regard to whether the violation was gang-related.

Pretrial Order, 19-20.

     None of the "impacts" or "harms" identified by Plaintiffs constitute a governmentally

imposed burden that significantly altered his status as a matter of state law. WPD's identification

of Plaintiffs or others as gang members or associates does not significantly alter their status as a

matter of state law and does not violate their preexisting rights:

      a.     Persons who have no law enforcement or criminal justice encounters (*i.e.*, are not stopped, not arrested, not charged) are unaffected by being identified as a gang member or associate.

      b.     All persons are subject to lawful surveillance by law enforcement officers without regard to whether the person is identified as a gang member or associate.

      c.     All persons are subject to being stopped based on reasonable suspicion or probable cause to believe the person has or is committing an offense or infraction without regard to whether the person is identified as a gang member or associate.

d.  Persons arrested for a crime are to be presented to a magistrate and are entitled to reasonable bail for non-capital offenses (*see* Kan. Const. Bill of Rights, § 9 and *State v. Cuchy*, 270 Kan. 763, 19 P.3d 152 (2001)) based on an individualized determination by a magistrate who "shall fix the terms and conditions of the appearance bond upon which the defendant may be released." K.S.A. 22-2901(3). These rights and procedures apply without regard to whether the defendant is identified as a gang member or associate.

e.  Persons violating conditions of pretrial release are subject to having the release revoked or the conditions of release modified without regard to whether the person is identified as a gang member or associate.

f.  Convicted persons are subject to sentence—to confinement or post-conviction supervision without regard to whether the person is identified as a gang member or associate.

g.  Persons violating conditions of post-conviction supervision (whether community corrections, parole, probation, postrelease supervision, etc.) may have their parole or probation revoked or the conditions of release modified without regard to whether the person is identified as a gang member or associate.

h.  Convicted persons who are confined to jail or a correctional facility are subject to conditions imposed by the court or the secretary of corrections without regard to whether the person is identified as a gang member or associate.

A "moving party is entitled to summary judgment as a matter of law where 'the nonmoving party has failed to make a sufficient showing on an essential element of [the party's] case with respect to which [the party] has the burden of proof.'" *Jensen v. Redevelopment Agency of Sandy*

*City*, 998 F.2d 1550, 1559 (10th Cir. 1993) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323,

(1986). There is no evidence that identification in the gang database alters any person's legal status.

In sum, no Plaintiff acquired any "legal status" from being identified as a gang member or

associate. Thus, Plaintiffs fail to state a stigma plus claim.

2.      **Disclosure of documentation of gang membership or association in an arrest affidavit does not deprive a person of a liberty interest without due process. The process afforded by the criminal justice system is the requisite due process.**

The disclosure, or "publication" of documentation of gang membership or association in

an arrest affidavit is accompanied by a procedure for a hearing for the arrestee—*i.e.*, is

accompanied by due process.

> WPD Policy 527 requires WPD personnel, when arresting an individual for a person felony, to ascertain and document in the arrest affidavit whether that individual is designated as a criminal street gang member or associate in the Gang Database—even when the alleged crime is not gang-related.

WPD Policy 527 provides that "If a criminal street gang member is arrested for a person felony"

the arresting officer will determine if the arrestee is documented as a criminal street gang member

or associate and, if so, the arrest affidavit will include a statement the arrestee is documented as a

criminal street gang member or associate as defined in K.S.A. 21-6313. Plaintiffs contend this

disclosure by WPD personnel of the documentation to other criminal justice system personnel

triggers additional scrutiny and punishment by the courts, parole/probation, and more." *Pretrial*

*Order,* at 18.

> K.S.A. 21-6316 provides:

> When a criminal street gang member is arrested for a person felony, bail shall be at least $50,000 cash or surety, and such person shall not be released upon the person's own recognizance pursuant to K.S.A. 22-2802, and amendments thereto, ***unless the court determines on the record*** that the defendant is not likely to reoffend, an appropriate intensive pre-trial supervision program is available and the defendant agrees to comply with the mandate of such pre-trial supervision.

(Emphasis added.) The text of the statute acknowledges the constitutional right to bail and the requirement that the court make an individualized determination of the propriety of whether to impose a bond, the amount of that bond, and the risks posed by the pretrial release of the detainee.

Conditions of release for a person convicted and awaiting sentencing and/or who is appealing a conviction are governed by K.S.A. 22-2804(1):

> A person who has been convicted of a crime and is either awaiting sentence or has filed a notice of appeal may be released by the district court under the conditions provided in K.S.A. 22-2802, and amendments thereto, if the court or judge finds that the conditions of release will reasonably assure that the person will not flee or pose a danger to any other person or to the community.

The disclosure by the WPD that an individual is documented as a gang member or associate does not equate to imposition of bond in any amount. Rather, the disclosure alerts the court, the prosecutor and the defendant that the WPD possesses evidence of gang affiliation and stands ready to offer that evidence for consideration by the court when making a bail/bond determination.

**D.**    **Plaintiff's rights of association and expression are not violated by Policy 529 or K.S.A. 21-6313.**

    **1.**    **Violation of First Amendment Right of Association and Expression— Direct Prohibition (Count VI) and Chilling Effect (Count VII).**

All Plaintiffs allege violation of the First Amendment right of Association and Expression.[2] Plaintiffs claim the City's policy and practice of maintaining a Gang Database violates the freedom of association and expression "by prohibiting certain constitutionally protected expressive and associative behaviors." Pretrial Order, 41-42. Plaintiff claim

> designation of individuals as gang members and associates … based on their

---

[2] The Pretrial order notes:
> The individual plaintiffs bring all of these claims. As an organization, Progeny brings only the claims on behalf of its members asserting that § 21-6313 and WPD Policy 527 are overbroad and unconstitutionally vague (Count I), and that they violate Progeny's First Amendment rights of association and expression (Count VI).

ECF 196, at 41 n. 3.

contact with others in their own families, neighborhoods, religious, political and social groups, as well as designation based on clothing, gestures, speech, and tattoos punishes plaintiffs and others for engaging in activity protected by the First Amendment.

Pretrial Order, 42.

### a.    *Expression*

Plaintiffs' conduct is not protected speech. First, Plaintiffs do not base their claim on actual speech—*i.e.*, written or verbal expression. The extent Plaintiffs' of the verbal or written expression involves the inclusion in the database of persons who self-admit to gang membership or association. Plaintiffs' instead assert their claim based on conduct such as clothing worn, gestures, and tattoos.

A necessary element to transform conduct into protected speech is that the plaintiff had the "intent to convey a particularized message." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 410–411 (1974)). To determine whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play the inquiry is whether there was an intent to convey a particularized message and whether there is a great likelihood the message would be understood by those who viewed it. *Id.*

Plaintiffs are emphatic that the clothes they wear, the tattoos they display, the hand signs they use and the colors they chose have nothing to do with gang affiliation. This Court already determined that the free expression claim "though framed under the First Amendment, is actually a different species of the procedural due process claim." ECF 28, at 35. Plaintiffs disclaim that they are engaging in expressive conduct or symbolic speech. Thus, if a Plaintiff is included in the database, in part, because of clothing, color, gesture, and/or tattoo the claim is the WPD is mistaken in construing the particular conduct as evidence of gang membership or association. Whether the Plaintiffs are added to the gang list for expressing like for a particular team or an affinity for a

particular hand contortion is matter of due process. Here again, Plaintiffs suffer no consequences of from addition to the gang list. The Plaintiffs First Amendment Rights of Expression have not been impugned by Policy 527 or K.S.A. 21-6313.

While persons can be added to the database for self-admitted gang membership, none of the Plaintiffs were included for that reason nor were any of Progeny's members.

### b.    Punishment

Punish means "to impose a penalty on for a fault, offense, or violation" or "to inflict a penalty for the commission of (an offense) in retribution or retaliation." Merriam-Webster. (n.d.). Punish. In Merriam-Webster.com dictionary. Retrieved September 28, 2023, from https://www.merriam-webster.com/dictionary/punish. Punishment is "the act of punishing" or "a penalty inflicted on an offender through judicial procedure." Merriam-Webster. (n.d.). Punishment. In Merriam-Webster.com dictionary. Retrieved September 28, 2023, from https://www.merriam-webster.com/dictionary/punishment. *Black's Law Dictionary* defines punishment as "[a] sanction—such as a fine, penalty, confinement, or loss of property, right, or privilege — assessed against a person who has violated the law." PUNISHMENT, Black's Law Dictionary (11th ed. 2019).

Inclusion on the gang list or in the database does not punish Plaintiffs or anyone else nor is it punishment.

### c.    Association

Plaintiffs premise their association claim on the "chilling effect" presented by WPD's designation of individuals as gang members and associates on Plaintiffs' contact/association with others. Pretrial Order, at 42. Plaintiffs' claim to be chilled in their contacts or associations for fear of being labeled or known as an alleged gang member or associate. *Id*., at 22.

A chilling effect on the exercise of a plaintiff's First Amendment rights may amount to a

judicially cognizable injury in fact, provided it "arise[s] from an objectively justified fear of real consequences." *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004). "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). The "chill" necessary for prospective relief in First Amendment cases requires that the plaintiff demonstrate "a credible threat of prosecution or other consequences flowing from the statute's enforcement." *D.L.S.*, 374 F.3d at 975.

Policy 527 and K.S.A. 21-6313 do not criminalize, prohibit, or proscribe any conduct. Neither prohibits association with family, association with gang members, or association with anyone or any organization.

Policy 527 and K.S.A. 21-6313 do not cause, inflict, or permit any form of punishment. Inclusion on the WPD Gang List does not, in and of itself, carry any criminal penalty nor does it impose any sentence upon a person convicted of a crime. Being a gang member is not a crime. Inclusion on the Gang List does not satisfy the element for any criminal offense.

Policy 527 and K.S.A. 21-6313 do not create a deprivation of life, liberty, or property. WPD Policy 527, the database, and list maintained thereunder are not governmental action that deprives a person of a protected interest, whether expression or association. Plaintiffs' perceived harms reflect speculation and conjecture and not a credible threat of prosecution or other consequences flowing from Policy 527. The contentions of harm are not caused by identification on the Gang List or inclusion in the database. Rather, the "harms" claimed are the consequences of criminal activity and an interaction with the criminal justice system, which are afforded a myriad of due process protections by the code of criminal procedure.

Factually, K.S.A. 21-6313 and WPD Policy 527 do not preclude Plaintiffs from associating

with their families, with other gang members, or anyone else. Under K.S.A. 21-6313 and WPD Policy 527, the individual Plaintiffs' are free to meet and associate where and with whom they please. Any current restrictions on Plaintiffs' freedoms entail Levy's imprisonment and Martel Costello's postrelease supervision. Neither is attributable to K.S.A. 21-6313 or WPD Policy 527.

Progeny can, has, and continues to hold meetings and events without restriction by K.S.A. 21-6313 and WPD Policy 527.

First Amendment protections may be triggered by a chilling effect of government action because "First Amendment freedoms need breathing space to survive.'" *Am. for Prosperity Found. v. Bonta*, ―― U.S. ――, 141 S. Ct. 2373, 2389 (2021) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). But, as *Button* made clear, that chilling effect must arise from "[t]he threat of sanctions may deter" the the exercise of First Amendment freedoms as well as "the actual application of sanctions." *Button*, 371 U.S. at 433. Inclusion in the database is not a sanction nor does it cause any sanction.

Plaintiffs' claims of a "subjective" chill are not adequate. *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003). Plaintiffs tacitly expressed desire to avoid being identified as gang members or associates is not the avoidance of a sanction, prosecution or threat of prosecution.

**E.       Standing conclusion.**

Plaintiffs lack standing. The records does not demonstrate an invasion of a legally protected interest. Plaintiffs do not suffer any concrete and particularized harm from K.S.A. 21-6313 or WPD Policy 527. The harms and injuries advanced by plaintiffs are conjectural or hypothetical—not real—and are not imminent. Finally, a favorable decision by this Court does nothing to resolve the claimed harms.

## V. Conclusion

For the foregoing reasons, the City of Wichita is entitled to judgment as a matter of law as to all claims.

**Fisher, Patterson, Sayler & Smith, LLP**
3550 S.W. 5th Street
Topeka, Kansas 66606
Tel: (785) 232-7761 | Fax: (785) 232-6604
dcooper@fpsslaw.com | cbranson@fpsslaw.com

<u>**s/David R. Cooper**</u>

| | |
|---|---|
| David R. Cooper | #16690 |
| Charles E. Branson | #17376 |

**Attorneys for Defendant**

Jennifer L. Magaña, #15519
City Attorney
Sharon L. Dickgrafe, #14071
Chief Deputy City Attorney
City Hall-13th Floor
455 North Main
Wichita, Kansas 67202
P: (316) 268-4681 | F: (316) 268-4335
sdickgrafe@wichita.gov
**Attorneys for City of Wichita**

## Certificate of Service

On September 29, 2023, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record:

<u>**s/David R. Cooper**</u>