IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

PROGENY, et al,            )    Case No.
vs                         )    6:21-CV-01100-EFM-ADM
                           )
CITY OF WICHITA, KANSAS,   )
Defendant.                 )

VIDEO-RECORDED ZOOM DEPOSITION OF

JEFF EASTER

VOLUME I

May 18, 2023

10:42 a.m.

Taken at:

Stinson Law Firm

1625 North Waterfront Parkway, Suite 300

Wichita, Kansas

Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR

## Page 10

1  okay. It really meant nothing to me to be honest
2  with you.
3      Q.  Okay. Do you have any understanding of
4  what the claims are the plaintiffs are bringing in
5  this case?
6      A.  No, ma'am, I do not.
7      Q.  And you have never looked at the
8  complaint or any of the documents, any of those
9  documents regarding this action?
10     A.  No, I have not.
11     Q.  Do you know who the individuals are who
12 are the plaintiffs?
13     A.  What I was told by Mr. Branson is the
14 group called Progeny.
15     Q.  Okay.  Are you familiar with Progeny?
16     A.  Somewhat familiar with them just
17 because of other dealings.  We had an incident that
18 occurred in the county, not with the Sheriff's
19 Office, and they were on the news quite a bit in
20 reference to that incident.
21     Q.  Are you talking about the incident with
22 Mr. Lofton?
23     A.  Yes, ma'am, I am.
24     Q.  Any other interaction that you have had
25 with anybody at Progeny?

## Page 11

1      A.  No, ma'am.
2      Q.  Do you happen to know who the
3  individual plaintiffs are who are included in the
4  lawsuit?
5      A.  No, ma'am.
6          MR. COOPER: Do you know their names as
7  opposed to know who they are?
8      A.  There is one name because of your
9  subpoena that I recognized but I haven't seen them
10 in several years.
11     Q.  (By Ms. Woody) Which name is that?
12     A.  You would have to repeat the names to
13 me because I do not remember the name at this
14 point.
15     Q.  Elbert Costello?
16     A.  That would be him.
17     Q.  Why were familiar with Mr. Costello?
18     A.  Previous arrests and then there was
19 another case that I was in charge of which was the
20 RICO case where we were following him because he
21 was purchasing crack cocaine from the main target
22 of our investigation.
23     Q.  Was Mr. Costello a target of that RICO
24 claim?
25     A.  He was not.

## Page 12

1      Q.  Sheriff Easter, where did you graduate
2  from high school?
3      A.  Andale High School.
4      Q.  I'm sorry?
5      A.  Andale High School.
6      Q.  Andale, and what year was that?
7      A.  1986.
8      Q.  What did you do after you graduated
9  from high school?
10     A.  I worked at Coleman, which is a company
11 here in the Wichita, Kansas area.  I then worked
12 for Boeing for almost a year and then I joined the
13 Wichita Police Department at the age of 21 in 1989.
14     Q.  Okay. 1989 at the age of 21 you joined
15 the WPD?
16     A.  Yes, ma'am.
17     Q.  What was your initial position there?
18     A.  I was a police officer.
19     Q.  Had you had any college or university
20 before you joined the police department?
21     A.  I had one year of college at Wichita
22 State University at that particular point.
23     Q.  What did you study there?
24     A.  Criminal justice.
25     Q.  I think you ultimately got a degree

## Page 13

1  from Friends University; is that correct?
2      A.  Yes, ma'am, I did.
3      Q.  And when was that?
4      A.  2003, 2004.  I was 35.
5      Q.  Okay.  So did you attend Friends while
6  you were working with the WPD?
7      A.  I did.
8      Q.  I think you got a degree in leadership
9  and management; is that right?
10     A.  That's right.
11     Q.  When you joined the Wichita Police
12 Department in 1989 what motivated you to join WPD?
13     A.  My father had been a Wichita police
14 officer since 1968.  That intrigued me just because
15 of my time at home with him.  I then felt that that
16 was a career that I would like to be involved in,
17 the opportunity to be able to help people, the
18 opportunity to be able to hold folks accountable
19 that victimized other people and it's also a career
20 -- again, I worked at Boeing and Coleman where you
21 are inside all the time and I liked the fact of
22 working in an outdoor environment.
23     Q.  So your dad had been with the Wichita
24 Police Department since 1968.  Was he still at the
25 department when you started or had he retired?

Page 14

1  A. He retired August 4th of, I believe --
2  well, I think it was August 4, 1989. I started the
3  academy August 7 of 1989 so he was no longer there.
4  Q. Okay, and did you have other
5  individuals in your family who worked in law
6  enforcement?
7  A. My brother did as well.
8  Q. Your brother, Kevin?
9  A. That is correct.
10  Q. And I'm very sorry. I'll just say
11  this. I'm very sorry. I know he was killed in the
12  line of duty. I'm very, very sorry to hear that.
13  A. Thank you.
14  Q. I just have a very brief question to
15  ask you about that. I believe that he was shot by
16  somebody who was alleged to be a gang member; is
17  that correct?
18  A. That is correct, out of Dodge City,
19  Kansas.
20  Q. Out of Dodge City. Okay. A gang
21  member out of Dodge City and can you tell me what
22  gang that person was affiliated with?
23  A. No, I could not. It's not a local
24  gang. That happened in 1996 and I do not remember
25  what gang he was a part of.

Page 15

1  Q. Okay. So that happened prior to you
2  joining the Wichita Police Department; is that
3  correct?
4  A. No, it did not. It happened in 1996.
5  I had been a police officer --
6  Q. In '96?
7  A. -- for seven years.
8  Q. Okay. I'm sorry. I misheard you. You
9  said 1986. Sorry. Okay. Thank you very much. So
10  just kind of walk me briefly through your history
11  with the WPD. I think that's probably the quickest
12  way to go through that.
13  A. Oh, you want me to walk you through
14  this. You're not going to ask questions?
15  Q. Yes. I think that would be faster.
16  A. Okay. So I spent approximately four to
17  five years as a beat officer, both in the Patrol
18  East and Patrol North Bureaus. I then was
19  appointed to the SCAT team which was the low level
20  narcotics gang type unit that was assigned to
21  Patrol North. I went from there to what was called
22  a TOPS Unit which was with detectives for the
23  Targeted Offender program. It was also housed at
24  that point with the WPD Gang Unit. I was promoted
25  at that point and became a detective, was assigned

Page 16

1  to the DEA Task Force. I then was reassigned to
2  the Burglary section of the Wichita Police
3  Department. Back then -- I say Burglary. Back
4  then it was a unit that worked burglaries,
5  larcenies, financial crimes for the Patrol East
6  Division, but you were housed in the detective
7  section. I was promoted to the rank of sergeant
8  where I was put in charge of the SCAT Unit in
9  Patrol South. From that point I was reassigned to
10  the Night Investigations lieutenant where we
11  handled everything from -- mainly it was all felony
12  type cases, so your felony DV's or domestic
13  violence cases up to homicide. I was also the
14  Night Investigations sergeant at the time that the
15  Gang Unit was assigned to nights so the four
16  officers assigned to the Gang Unit were assigned to
17  me on nights. I then was promoted from that rank
18  to the rank of lieutenant where I went to Patrol
19  East as the 3rd shift lieutenant and then was
20  re-assigned to Community Policing as the community
21  policing SCAT lieutenant for Patrol East. I then
22  was re-assigned to Felony/Gang Assault section of
23  the detective section and then was promoted to the
24  rank of captain, where I served in Patrol North
25  until my election to Sheriff in 2012.

Page 17

1  Q. So you left WPD in 2012 to run for the
2  Sheriff's Office; is that correct?
3  A. I ran for the Sheriff's Office at the
4  same time I was a captain. When I was elected in
5  August -- I'm sorry, in November of 2012, the
6  Sheriff then decided that he was going to leave
7  office early in December and I -- it's a whole
8  process, but was appointed Sheriff in December of
9  2012 and then was sworn in in January of 2013.
10  Q. Okay, and you said that when you were
11  -- you said that when you were the night sergeant,
12  when do you recall that time frame was?
13  A. 1999 to -- it was either 2001 or 2002.
14  Q. Who -- when the Gang Unit became part
15  of the Night Investigations who were the officers
16  who reported to you that had those Gang Unit
17  duties?
18  A. Officer Espinoza, Officer Weimer.
19  There was -- people came and went. So Officer
20  Olson, Officer Brown and Officer -- I can't think
21  of his name right now.
22  Q. How long were you in that position?
23  You said until around --
24  A. About three years.
25  Q. Then you became lieutenant on Patrol

5 (Pages 14 to 17)

Page 18

1  East on 3rd shift; is that correct?
2     A.  That is correct.
3     Q.  And then you were a lieutenant over the
4  Felony Gang/Felony Gang Unit; is that right?
5     A.  The Gang/Felony Assault Unit; yes,
6  ma'am.
7     Q.  When did you become in charge of the
8  Gang/Felony Assault Unit?
9     A.  2005, I believe.
10    Q.  All right, and how long were you in
11 that position?
12    A.  Until 2008.
13    Q.  And then you were a captain at Patrol
14 North for four years before you became Sheriff; is
15 that correct?
16    A.  That is correct.  I would have to look
17 at my resume to get you exact dates to be real
18 honest with you but that's what I recall is that
19 time frame.
20    Q.  Okay. Back when you were with the TOPS
21 Unit you said that you were housed with the Gang
22 Unit; is that correct?
23    A.  That is correct.
24    Q.  What time frame was that?
25    A.  1996 to 1998.

Page 19

1     Q.  What was the Gang Unit back in
2  1996-'98?  Was it the same as it is today with Gang
3  Intelligence officers or --
4     A.  It was Gang Intelligence officers and
5  at that point they pretty much worked first shift.
6     Q.  Okay. Just explain what first shift is
7  for us.
8     A.  Somewhat eight to five hours.  They did
9  periodically ride different shifts on 2nd and 3rd
10 shift but their main hours were 8 to 5.
11    Q.  Just tell us what second shift is and
12 what 3rd shift is as well.
13    A.  Second shift is generally 2:30 p.m. to
14 10:30 p.m..  Third shift is 10:30 p.m. to 7:00 a.m.
15    Q.  What were the responsibilities of the
16 Gang Unit back in 1996?
17    A.  Again, I didn't work in the unit but
18 their main responsibilities were to insure that
19 individuals that were being placed on the list, we
20 had what was called TOPS cards that officers would
21 send in with their belief of individuals that were
22 gang members.  The Gang Intelligence section would
23 do all the backgrounds on those particular people
24 and then see if they fit at that point the WPD
25 criteria to be on the gang list.  They would also

Page 20

1  research those individuals once a year and see if
2  those individuals would no longer fit the criteria
3  and they would pull them from the list.  They would
4  also go out and do gang enforcement with the SCAT
5  teams, which back then most of the gang members
6  were selling narcotics and so that was generally
7  the enforcement along with the violent crime that
8  involved the gang members at the time.
9     Q.  Okay.  You say that the WPD had
10 criteria then with respect to the TOPS cards.
11    A.  Correct.
12    Q.  What criteria was the WPD using back in
13 the 1996-'98 time frame?
14    A.  It was very similar to what the state
15 law is now.  For me to be able to go through each
16 one of those criteria I'm not going to be able to
17 do that for you.  I haven't done that business for
18 14 years and we're talking 1997 for that.  So I
19 know you had to fit three of the criteria to be put
20 on the list as a gang member.  Some of that
21 criteria that I recall is that they self-admitted
22 that they were gang members; that they committed
23 violent crimes that were gang-related and that they
24 wore similar colors.  It was a criteria of the gang
25 was three or more people that are involved.  That's

Page 21

1  just generally -- there was more to it but I don't
2  remember what all of that is without somebody
3  putting a paper in front of me and saying yes,
4  those are it.
5     Q.  When you joined the WPD was there a
6  Gang Unit at that point in time?
7     A.  Yes, there was.
8     Q.  Who was in the Gang Unit?
9     A.  It was an Officer Baughman and Officer
10 Carey.
11    Q.  Just those two?  Were they the complete
12 Gang Unit?
13    A.  Yes, ma'am.
14    Q.  And what did they do?
15    A.  A lot of times if we were out on
16 violent crimes such as drive-by shootings,
17 homicides, those type of things, they would come by
18 if it appeared that there were gang members
19 involved.  At that point I don't believe there was
20 any type of criteria and it was a very loosely put
21 together type unit along with criteria to actually
22 say people were gang members.
23    Q.  When you say criteria, you mean the
24 criteria was loose as well?
25    A.  Yes.  I don't believe there was any

Page 22

1  criteria at that point.
2      Q.  Do you know how those individuals then
3  decided that people were members of gangs?
4      A.  I do not.
5      Q.  Do you know when the criteria came into
6  effect?
7      A.  I know when I was assigned to the TOPS
8  Unit in '97 there was a criteria that had been
9  created and it was being followed.
10     Q.  Do you know who created it?
11     A.  I do not.
12     Q.  Was John Spear involved in creating it?
13     A.  I do not know if he was involved at
14 that point at all.
15     Q.  Do you have any idea of anyone who was
16 involved in developing the criteria?
17     A.  Again, I wasn't part of the Gang Unit
18 at that point.  I was out on the streets.  You
19 know, I can give you the names of the folks that
20 were in the Gang Unit at the time.  Maybe they can
21 tell you how that was created but I would be
22 guessing because I do not know.
23     Q.  Sure.  Why don't you give me their
24 names.
25     A.  That would be Lance Darling, Tracey

Page 23

1  Repp.
2          MR. COOPER: Can you spell that?
3      A.  Tracey, T-R-A-C-E-Y; R-E-P-P; Carlton
4  Rogers.  There was a 4th one but I do not remember
5  who that was at this point.
6      Q.  (By Ms. Woody) So by the time you were
7  there in 1996 they were already using some criteria
8  and I think you said that at the time you think it
9  was similar to what the criteria is being used
10 today; is that right?
11     A.  That is correct.
12     Q.  But you don't know exactly how that
13 criteria was arrived at?
14     A.  No, I do not.
15     Q.  Do you know at the time you were -- at
16 the time you joined the police force was there
17 anything such as a gang list or a gang database?
18     A.  At the time that I joined it no, there
19 was not.
20     Q.  At some point in time after you joined
21 did there become a gang list or a gang database?
22     A.  Yes, there did.
23     Q.  When was that?
24     A.  I know that I believe it was in
25 1998-'99 time frame there was a grant that was

Page 24

1  given and so I know that there was a list created
2  already but it was a paper list and then there was
3  a grant that was received to place computers in
4  each one of the bureaus and the gang database you
5  could access it from those computers.  I'm thinking
6  that time frame was '98-'99.
7      Q.  And you say prior to there being a
8  computerized gang list that you could access
9  through the computers there was already a paper
10 list; correct?
11     A.  That is correct.
12     Q.  And who was in charge of that paper
13 list; do you know?
14     A.  I have no idea.
15     Q.  Do you know how the paper list was
16 created?
17     A.  No, I do not.
18     Q.  Was there -- did you ever have any
19 interactions with an individual named Bob Bachman?
20     A.  He was a beat officer with the Wichita
21 Police Department at the same time frame that I was
22 with the police department.
23     Q.  At least some people have said that Mr.
24 Bachman may have been the source of the original
25 list because he kept cards on people in his patrol

Page 25

1  car.  Do you know anything about that?
2      A.  I know he had an extensive, in his
3  trunk, mug photos of individuals, not just gang
4  members and, in fact, we emulated that process as
5  beat officers of individuals that we were dealing
6  with, not just gang members, but individuals we
7  were dealing with on a consistent basis that we
8  kept mug photos in a storage kind of bin in our
9  vehicles.
10     Q.  Was that something that you emulated --
11 Mr. Bachman was the first one you were aware of
12 doing that and then other officers started doing it
13 as well?
14     A.  That is correct, ma'am.
15     Q.  And you said it wasn't specifically
16 related to gang members at that time?
17     A.  No.  I know I had mug photos that
18 consisted of people that were burglars, people that
19 were committing robberies, people that were
20 committing violent crime.  Most of mine consisted
21 of individuals -- I rode 42-Beat.  Most of mine
22 consisted of individuals that lived on the 42-Beat
23 that were known burglars, known people to commit
24 drive-by's, known people that committed violent
25 crimes.

## Page 26

1  Q. At some point in time was there a
2  decision to divide some of those people out into
3  who were gang members were and who were not?
4  **A. I did not do that with what I had, no.**
5  Q. Do you know if there was a department
6  decision to do that?
7  **A. Well, at some point the department made**
8  **the decision to actually have the criteria that I**
9  **talked to you about before and to have a gang**
10 **database.**
11 Q. Do you when that was?
12 **A. No, ma'am, I do not.**
13 Q. But it would have been prior, you
14 think, to 1998?
15 **A. Yes. I know that -- again, 1996 I was**
16 **assigned to the TOPS Unit and the gang database was**
17 **already in existence then.**
18 Q. Okay. So you had been with the WPD at
19 that point in time about what?
20 **A. Seven years.**
21 Q. Seven or eight years? Seven years, and
22 you said it wasn't there when you joined the WPD
23 but it was there by the time you were in the TOPS
24 department in 1998; correct?
25 **A. In 1996, yes, ma'am.**

## Page 27

1  Q. 1996. Excuse me, 1996. So at some
2  point during those seven years a gang list was
3  developed?
4  **A. A gang database, yes, ma'am.**
5  Q. Okay. Did you ever hear of anybody who
6  was involved in developing that list?
7  MR. COOPER: Object to form.
8  Q. (By Ms. Woody) You can answer.
9  **A. I mean, it was -- there was numerous**
10 **people that went through the Gang Unit. There was**
11 **different supervisors. To tell you who actually**
12 **created that I wouldn't know that.**
13 Q. Okay. So during the time from the time
14 that you joined the WPD up until 1996, who would
15 have been the folks in charge of the Gang Unit?
16 **A. I don't remember, ma'am.**
17 Q. Was John Spear one of those people?
18 **A. He was at one point in charge of the**
19 **Gang Unit. For me to be able to tell you what**
20 **those dates are, you would have to ask him because**
21 **I don't remember when he became in charge of the**
22 **Gang Unit.**
23 Q. So in 1996 there were already criteria
24 and there was already a gang list. Was there
25 criteria memorialized anyplace? Was it written

## Page 28

1  down anywhere?
2  MR. COOPER: Object to form.
3  **A. So there was -- computers were just**
4  **being introduced and I know the gang officers had**
5  **the gang database in their computers, their desktop**
6  **computers. They would print the list from there to**
7  **be able to provide that to different officers in**
8  **the field or different units.**
9  Q. (By Ms. Woody) So they could print that
10 out and give it to anybody, any officer they
11 thought needed it or should have it; is that right?
12 **A. That is correct.**
13 Q. Was there any way at that point in time
14 when that was on the desktop, was there any other
15 way for any officers to access that list?
16 **A. Not at that time.**
17 Q. At some point in time other officers
18 did become able to access the database; is that
19 correct?
20 **A. That is correct.**
21 Q. When was that?
22 **A. That part I know John Spear -- I don't**
23 **know if he was the sergeant or the lieutenant in**
24 **the Gang Unit. I don't remember that, but the**
25 **grant that I talked about previously that they were**

## Page 29

1  **able to get laptop computers to each bureau so that**
2  **the gang database could be accessed by the**
3  **computer. So that would have been 1997 or 1998.**
4  Q. Okay. So in 1997 or 1998 they were able
5  to fund some laptops and I think Mr. Spear
6  testified that he got a grant in order to be able
7  to do that. Do you recall anything about that?
8  **A. Yes. I'm aware that they were able to**
9  **get a grant to be able to get those computers.**
10 Q. Okay, and were the computers in every
11 patrol car?
12 **A. No. It was one per bureau and then**
13 **they also gave one to the Sheriff's Office.**
14 Q. Okay. So anybody in the bureau could
15 use the laptop computer to access the database; is
16 that accurate?
17 **A. So the way that it worked, because I**
18 **was in charge of the SCAT team in south Wichita**
19 **when that happened, that computer was with the SCAT**
20 **team because again, they did the field work on low**
21 **level narcotics and gang crimes and so they are the**
22 **ones that kept the computer. If people or people,**
23 **if officers were wanting to know hey, is this**
24 **person in the gang database, one of those SCAT**
25 **officers would look it up and let them know.**

Page 30

1  Q. Okay. So again, it was so you could
2  request it -- there was more people you could
3  request it of at that point in time; is that right?
4  A. That would be right.
5  Q. And at some point in time did it become
6  even more accessible to officers in the WPD
7  and employees in the WPD?
8  A. Yes, it did.
9  Q. When was that?
10  A. That part I don't know when that
11  occurred actually. Again, I left the SCAT Unit and
12  went to Night Investigations. I know that there
13  was more accessibility. I don't remember how that
14  happened; if it was -- there became more
15  accessibility when MCTs came on and that would have
16  been about 1998 or '99 that you could access the
17  gang database from your MCT, but how all that
18  happened I don't know. When I took over the Gang
19  Unit in 2000 and again in 2003, 2004, those things
20  were set in place already.
21  Q. When you say MCT, can you explain what
22  you mean.
23  A. Mobile Computer Terminal. So it's the
24  laptops that are in the squad cars.
25  Q. Okay. So at that point in time any

Page 31

1  officer could access from the squad car -- could
2  access the gang database from the squad car; is
3  that correct?
4  A. That is correct.
5  Q. And at some point it was becoming even
6  more available to employees of the police
7  department.
8  A. I know when I was in the Gang Unit
9  that's how everybody was accessing it, including
10  our detectives. They would have the gang database
11  on their desktops and so it was very accessible to
12  pretty much every member of the Wichita Police
13  Department at that point for Read Only.
14  Q. Right, meaning they could look at it
15  but they couldn't make changes to it on their own;
16  correct?
17  A. They could not make any changes to it;
18  that is correct, ma'am.
19  Q. At some point in time did the
20  department decide to formalize the gang database
21  into some kind of a formal policy?
22  A. Yeah. I do recall that there was a
23  policy on it. I don't remember when that actually
24  happened, though.
25  Q. Do you know who was involved in

Page 32

1  creating that policy?
2  A. No, I do not recall at this point.
3  Q. And that was a policy, a written policy
4  that somebody could look at and say okay, here's
5  what the criteria are; correct?
6  A. Correct.
7  Q. Was it always called Policy 527 or was
8  it referred to by some other name earlier on?
9  A. I'm sorry, ma'am, I have been gone from
10  there for so long I couldn't tell you.
11  Q. Okay. How has that written policy
12  distributed and when do you recall it being
13  distributed? When did you become aware of it as a
14  written policy?
15  A. Well, to answer your second question, I
16  don't remember. To answer the first question,
17  generally over at the police department the way
18  that would work is they would create a new policy.
19  In squads they would pass it out to you. We had
20  what was called a Blue Book and you were required
21  to read the policy and then place it into your Blue
22  Book which contained all of our policies. That
23  Blue Book had to be with you inside your squad car
24  while you were working.
25  Q. When you were with the TOPS department

Page 33

1  was that policy in the Blue Book?
2  A. Ma'am, I don't remember when it was
3  created.
4  Q. Okay, and you don't know who was
5  involved in creating it?
6  A. No, ma'am.
7  Q. At any time were you involved in
8  reviewing the policy with respect to the gang
9  database?
10  A. Yes, I was.
11  Q. When was that?
12  A. It's when I took over the Gang/Felony
13  Assault Unit is when I was responsible for making
14  sure that all policies related to the Gang/Felony
15  Assault Unit and the Gang Unit, which this policy
16  would have fell underneath it, were reviewed yearly
17  and any updates that were made to it was my
18  responsibility.
19  Q. Okay. So that would have started
20  sometime around 2003, 2004 when you became
21  lieutenant over the Gang Unit; is that right?
22  A. That would be correct.
23  Q. And at that time you do recall that
24  there was a written policy; correct?
25  A. Yes, ma'am, there was.

9 (Pages 30 to 33)

Page 34

1  Q. Was it called -- was it Policy No. 527
2  at that time?
3  A. Ma'am, I don't remember the policy
4  number on it.
5  Q. Okay. So after you became the
6  lieutenant over the Gang/Felony Assault Unit, did
7  you make any changes to that policy regarding the
8  gang database?
9  A. Well, I would have had to make policy
10 changes because I'm the one that authored at the
11 authority of the mayor, which was Carl Brewer, and
12 the police chief, which was Norman Williams, the
13 state statute on gang laws and so once that state
14 statute, what I wrote and submitted was there was
15 changes made going through the legislative process
16 and then when they passed that legislation then I
17 updated that policy to reflect exactly what was in
18 the state statute.
19 Q. Okay. So you are the individual who
20 actually drafted the policy that then went to
21 legislation and became state law; is that right?
22 A. I drafted the state law proposal.
23 Q. Okay, and when you say the state law
24 proposal, did that include criteria and those kind
25 of things?

Page 35

1  A. Yes, ma'am, it did.
2  Q. And I think you said you drafted the
3  state law proposal at the request of Mayor Brewer
4  and Chief Williams; is that right?
5  A. Mayor Brewer and yes, ma'am.
6  Q. Brewer, excuse me, and Chief Williams?
7  A. Yes, ma'am.
8  Q. And then so roughly when was that?
9  A. 2007.
10 Q. Do you recall as it went through the
11 legislative process any changes that were made to
12 your proposal?
13 A. I don't recall what the changes were.
14 However, there was changes made by the legislative
15 committees on the original proposal.
16 Q. Do you recall what -- did you have any
17 concern about any of those changes that were made?
18 A. No, ma'am, I did not.
19 Q. Did you think they were significant
20 changes from what you had proposed?
21 A. No, they were not.
22 Q. So it mostly followed the proposal that
23 you had drafted; is that correct?
24 A. Yes, ma'am.
25 Q. And how did you go about drafting that

Page 36

1  proposal? What did you use to come up with that
2  proposal for the state law?
3  A. So there were several things that
4  happened there. During that time frame and prior
5  to that time frame we were having a lot of violent
6  crimes mainly perpetrated by gang members. We had
7  a lot of narcotics trafficking that was being
8  perpetrated by gang members as well and so the
9  mayor had tasked us, even when I was a sergeant, so
10 this started when I was a sergeant, that we meet
11 with the community; mainly the northeast Wichita
12 community, which is predominantly African American,
13 to come up with a gang plan on how to address the
14 issues taking place with the gangs here in Wichita.
15 We had numerous meetings with the groups of
16 citizens from the NAACP to different church groups
17 that had members in it to other neighborhood
18 association presidents, some of their members and
19 those meetings were taking place for almost a year.
20 So we came up with a gang plan. We also -- there
21 was questions about the gang criteria that we were
22 using. There was questions about why it doesn't --
23 Hutchinson and Salina and other people have that
24 kind or other departments have that kind of
25 criteria in amongst their departments because a lot

Page 37

1  of those departments had nothing, but they were
2  saying that these people were gang members in their
3  community. So through those meetings and through
4  the guidance of Chief Williams, Lieutenant Spear at
5  the time and Captain Coy Lee and Colonel Tom
6  Stoltz, they were all involved in those meetings as
7  well. When I became the Gang/Felony Assault
8  lieutenant we had the gang plan in place and then
9  the discussions started more so with the different
10 groups in reference to the criteria. So I reached
11 out to different departments around the state of
12 Kansas. I know that Kansas City, Kansas had a very
13 similar gang policy and very similar type of gang
14 criteria and it was very obvious that there was no
15 set standard in the state of Kansas. So I
16 researched several states, including Florida,
17 Kentucky and Georgia where they had state laws in
18 place. A lot of their criteria was similar to what
19 we had already and so I drafted the state law
20 change to create state law for gang criteria in the
21 state of Kansas based upon some other states laws.
22 I submitted that. The process over there is I had
23 to submit it to the Law Department who made some
24 minor changes, who then submitted it to the
25 Legislature for them to put into a committee,

Page 38

1  debate it and then take a vote on it.
2      Q.  And you say you started working on this
3  when you were as a sergeant; is that right?
4      A.  The gang plan was as a sergeant.  As a
5  lieutenant I was asked -- during the gang plan
6  discussions the criteria came up and so once I
7  became a lieutenant because of the research I had
8  done already as a sergeant on the criteria, I was
9  asked by the Chief and the Mayor to put together a
10 state law proposal for the criteria itself.
11     Q.  Okay.  When you talk about the gang
12 plan, explain what that was.
13     A.  We, several years prior when I was a
14 beat officer, when we had a lot of violent crime, a
15 lot of shootings, a lot of drive-by's in the early
16 '90s, there was no plan.  So what happened is, is
17 individuals or officers from different bureaus were
18 placed in the North Bureau to crack down on the
19 violent crime.  We learned from our mistakes on
20 that because pretty much the gang members would go
21 under because they knew there were no more cops so
22 the only people that were really being stopped and
23 ticketed were citizens that had nothing to do with
24 gang crime; they just lived there and there was
25 quite the amount of frustration from the community

Page 39

1  about that and so when we had a resurgence in gang
2  crime and violent crime the decision was made to
3  sit down with citizens and map out a gang plan that
4  was put into writing.
5      Q.  What was in that gang plan?
6      A.  How we were going to target specific
7  individuals that were committing the crimes; how we
8  would go about enforcing those type of different
9  type of enforcement tools that we were doing
10 specific to the individuals that were perpetrating
11 those crimes; how we would communicate at
12 neighborhood associations with the amount of crime
13 that was taking place in their neighborhoods.  We
14 would update them on cases that were taking place
15 and we would involve them more in Wichita Police
16 Department operations.
17     Q.  When you say you were going to target
18 the individuals, what do you mean by that and how
19 was that going to be accomplished?
20     A.  Individuals that were suspects in
21 cases, that we would conduct surveillance on them
22 and any type of crime that they committed, that we
23 would hold them responsible for that by arresting
24 them, sticking charges on them and hopefully
25 convictions.  Also, once they were convicted --

Page 40

1  also, once they were convicted we monitored, along
2  with Parole and Probation, their -- that's what the
3  TOPS Unit did.  We monitored if they were abiding
4  by the rules that their probation or parole officer
5  put on them because there's not enough parole or
6  probation officers to monitor them to make sure
7  that they are not drinking, to make sure that they
8  were within curfew and they were not committing new
9  crimes.  So we supplemented that and we
10 communicated that information in our gang plan with
11 the citizens of Wichita.
12     Q.  Did the gang plan have anything to do
13 with the specific probation or parole conditions
14 that would be imposed on somebody who was
15 designated a gang member?
16     A.  The gang plan did not.  However, state
17 statute did.
18     Q.  And when you say that what do you mean?
19     A.  Part of the state statute was if you
20 were a known gang member and committed a violent
21 crime your bond was automatically set at $50,000.
22     Q.  Was that something that you drafted?
23     A.  It is.
24     Q.  What did you base that on?
25     A.  Other laws and the fact that a lot of

Page 41

1  individuals that were committing violent crime were
2  immediately getting out of jail, were harassing and
3  intimidating witnesses and then the case would no
4  longer go forward or were committing other violent
5  crimes against witnesses and other people such as
6  drive-by shootings and murders.  So that was
7  proposed and the Legislature agreed with that
8  proposed and passed it into state law.
9      Q.  And that proposal was specific to
10 people who had been designated by some local entity
11 as a gang member; correct?
12         MR. COOPER:  Object to form.
13     Q.  (By Ms. Woody) Go ahead.  I'm sorry, I
14 didn't understand you.
15     A.  Following our criteria, if they reached
16 the level that they were a known gang member based
17 on our criteria, so yes.
18     Q.  So people who were -- other folks who
19 weren't designated as gang members who engaged in
20 person felonies were not subject to the minimum
21 $50,000 bond?
22     A.  By state statute, no, they were not.
23     Q.  By Wichita policy were they?
24         MR. COOPER:  Object to form.
25     A.  We do not have a policy on what bonds

Page 42

1  would be. That was set by state statute. Bonds
2  are also set by judges.
3    Q. (By Ms. Woody) And so you are the
4  person who drafted the mandatory, the $50,000
5  minimum for gang members and that's in the state
6  statute; correct?
7    A. That is correct.
8    Q. And it wasn't meant to apply to
9  individuals accused of the violent crimes or person
10 crimes who weren't gang members; correct?
11   A. No, it was not because what we were
12 seeing was those folks weren't the ones that were
13 going back out and re-victimizing people
14 immediately, nor were they the ones harassing
15 and/or intimidating witnesses to the point where
16 they would not testify.
17   Q. Did you work with the District
18 Attorney's Office in Wichita on any of these state
19 proposals that you made?
20   A. Yes, I did.
21   Q. Who at the District Attorney's Office
22 did you work with?
23   A. So they had a specific unit over there
24 that dealt with nothing but the gang crime. I
25 would have to get back with you -- she's gone from

Page 43

1  there now. I would have to get back with you on
2  her name. She was in charge of the Gang Unit over
3  there and I cannot remember her name.
4    Q. Okay. When would this have been, like,
5  time frame?
6    A. It would have been around -- well, when
7  I was in the Gang Unit, the 2004 to 2007 time
8  frame.
9    Q. So there was an individual over at the
10 D.A.'s Office who was responsible for gang crime or
11 oversaw the gang crime and you think that
12 individual, you think it's a woman, was involved in
13 the state proposal; is that right?
14   A. She is the one I worked with at the
15 D.A.'s Office and also on all crimes that we were
16 dealing with and then also that I had spoken to and
17 worked with to find out the DA's opinion on the
18 $50,000 set bond on folks that commit violent
19 crimes that were gang members. CJ Riggs is her
20 name; CJ Rigg.
21   Q. Okay. So you worked with Ms. Rigg to
22 see how the D.A.'s Office felt about the $50,000
23 minimum bond; is that right?
24   A. That is correct.
25   Q. Did she have to get -- did she have to

Page 44

1  get sign off from somebody else in the D.A.'s
2  Office for that?
3    A. I don't know the answer to that.
4    Q. Do you happen to recall her having any
5  discussions with you about who or about what
6  discussions were from the D.A.'s Office about that
7  bond number?
8    A. So her boss would have been Kim Parker.
9  The DA at the point was Nola Foulston. I do know
10 that she didn't make the decision on her own but
11 she would have to speak with them. I wasn't privy
12 to those discussions and she relayed back to me
13 that they were fine with that proposal.
14   Q. Okay. So then that went on to the
15 State, went into the state proposal and went on to
16 become law under statute; is that correct?
17   A. That is correct.
18   Q. And I guess my initial question was a
19 little bit different than that so I kind of want to
20 circle back to that. In Wichita, people who are
21 designated as gang members get more restrictive
22 parole and probation conditions and I wanted to
23 know if part of the gang plan involved beefing up
24 and making more restrictive those conditions of
25 probation and parole.

Page 45

1    MR. COOPER: Object to form.
2    A. So the reason the TOPS Unit was created
3  was specifically for that because we, when you have
4  more drive-by shootings than there are days in the
5  week, our homicides were a lot higher, most of
6  which was gang-related. The Chief and at the time
7  the colonel and those types of folks were like what
8  are we going to do to curb some of this because we
9  have -- we were hearing from the citizens, mainly
10 in northeast Wichita, that they were scared to
11 death to even be outside and so that's the time
12 that we started meeting with them, started talking
13 about additional type of -- I'm trying to search
14 for the word here, probation type items,
15 restrictions placed upon known gang members that
16 they couldn't affiliate at certain places; that
17 they couldn't affiliate with other gang members;
18 they couldn't wear colors, those types of things.
19 Were those placed onto known gang members as
20 restrictions by Probation and Parole, yes, they
21 were.
22   Q. And was it the TOPS unit that suggested
23 those restrictions or formulated them?
24   MR. COOPER: Object to form; foundation.
25   A. I know when I was in the TOPS Unit with

12 (Pages 42 to 45)

Page 54

1  A. Early on when we talked about the
2  original two gang officers, absolutely that was a
3  concern. A lot of us questioned how people were
4  even -- because there was no criteria, and how
5  people were being placed onto the gang database.
6  At a certain point somebody made the decision, I
7  can't tell you who that is, to create the criteria
8  and to start utilizing that criteria to put people
9  into the gang database. I know that in the
10 beginning of that that whole database was scrubbed
11 so everybody that was on there that was placed on
12 there by the original two officers were deleted
13 because it was very questionable on how that
14 started. That's why we or the police department at
15 the time decided we have got to have criteria, we
16 have to set by that criteria. We have to also
17 audit those individuals because someone might be a
18 gang member when they are 17 or 18 doesn't mean
19 they are a gang member for life. So that's how
20 that occurred and kind of the maturation of how the
21 gang database created into this criteria and then
22 the criteria was put into state law.
23     Q. Do you remember the time when the
24 original gang database that was put together by the
25 two was scrubbed?

Page 55

1   A. No. I just know that that occurred.
2       Q. And how do you know that that occurred?
3   A. Because when I went up to the TOPS Unit
4  two of the officers up there were involved in that
5  process prior to me coming up there.
6       Q. Who were those officers?
7   A. I believe it was Lance Darling and
8  Tracey Repp.
9       Q. Did they tell you when they were
10 involved in that process?
11  A. No, they did not.
12      Q. Do you have a sense of right before you
13 joined the TOPS Unit or earlier?
14  A. Well, I believe it was earlier but I
15 couldn't -- I don't know when. I just know that
16 they had told me that that -- we all had concerns
17 about the original gang officers. We're not hiding
18 that. I'm not hiding that fact, and how people
19 were put on there didn't agree with because I can
20 tell you there was folks that they were telling me
21 were gang members that I was telling them, no, they
22 are not and there was -- they were using well, they
23 got arrested for minor offenses such as drinking
24 and those type of things. That's not a gang
25 related offense, and so a lot of us questioned that

Page 56

1  process back in the early '90s. Obviously somebody
2  within the police department questioned that
3  process, too. That's why the new criteria was
4  developed and those type of things, and I know
5  Lance and Tracey were involved with scrubbing that
6  particular list. When that occurred, I can't tell
7  you for sure. I know it was done when I came there
8  in '96.
9       Q. Okay, and so sometime you think in the
10 early '90s that the criteria probably came into
11 place and became a new standard for putting people
12 in the gang database; correct?
13  A. Correct.
14      Q. After that did you ever have -- after
15 the criteria were in place did you ever have -- did
16 anyone ever have concerns about whether those
17 criteria were correct or whether they were
18 sufficiently objective; I mean, anything like that?
19  A. No, and actually, the state legislature
20 confirmed that they were okay with it as well.
21      Q. So you don't recall within the WPD ever
22 having any discussions about a need to change the
23 criteria during the time that you were with the
24 WPD?
25  A. I'm trying to think back in -- well,

Page 57

1  other than in the early '90s, yes, those
2  discussions took place in the early '90s.
3       Q. But after the criteria was put into
4  place, after the initial scrubbing and you had the
5  criteria put in place, were you aware of anybody
6  within the WPD who had concerns about any of the
7  criteria being appropriate or overinclusive or
8  anything like that?
9   A. Within the WPD -- so I'm trying to
10 think here is, I'm trying to remember if after the
11 TOPS Unit and when I left there to become a
12 detective if there were some changes in the
13 criteria because I know when I got back to the Gang
14 Unit as a sergeant that is pretty much the same
15 criteria other than what I drafted for state law
16 and there were some changes made by the Law
17 Department and the legislation, there was some
18 changes to the criteria that was made that was set
19 into state law than what I proposed.
20      Q. During our discussions do you now have
21 any recollection of what those changes were?
22  A. I'm sorry, I do not -- yeah, I do not
23 remember what those were.
24      Q. But I think you said it was not really
25 significant and were minor changes. Is that still

15 (Pages 54 to 57)

```
 1       IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF KANSAS
 3
 4   PROGENY, a program of Destination  )
 5   Innovation, Inc., CHRISTOPHER      )
 6   COOPER, ELBERT COSTELLO, MARTEL    )
 7   COSTELLO, and JEREMY LEVY, JR.,    )
 8   on behalf of themselves and others ) Case No.
 9   similarly situated,          ) 6:21-CV-01100
10       Plaintiffs,              ) EFM-ADM
11   vs                           )
12   CITY OF WICHITA, KANSAS,     )
13       Defendant.               )
14   _____)
15       VIDEO-RECORDED ZOOM DEPOSITION OF
16                JEFF EASTER
17                 VOLUME II
18               May 26, 2023
19                2:35 p.m.
20
21             Taken at:
22       Sedgwick County City Building
23             455 North Main
24           Wichita, Kansas 67202
25   Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR
```

Page 1

```
 1   APPEARANCES:
 2      On behalf of the Plaintiffs:
 3      Ms. Teresa A. Woody
 4      Kansas Appleseed Center for Law & Justice
 5      211 East 8th Street, Suite D
 6      Lawrence, Kansas 66044
 7      (785)251-8160
 8      twoody@kansasapplesed.org
 9
10      Mr. Paul M. Vogel (Appearing through Zoom)
11      Shook, Hardy & Bacon, LLP
12      2555 Grand Boulevard
13      Kansas City, Missouri 64108
14      (816)474-6550
15      pvogel@shb.com
16
17      On behalf of the Defendant, City of Wichita:
18      Mr. David R. Cooper
19      Fisher, Patterson, Sayler & Smith
20      3550 SW 5th Street
21      Topeka, Kansas 66606
22      (785)232-7761
23      Fax: (785)232-6604
24      dcooper@fpsslaw.com
25
```

Page 2

```
 1                TRANSCRIPT INDEX
 2   APPEARANCES.................................
 3
 4   EXAMINATION OF JEFF EASTER - VOLUME II
 5   BY MS. WOODY................................
 6   BY MR. COOPER...............................
 7
 ...
19   REPORTER'S CERTIFICATE......................
```

Page 3

```
 1          VIDEOGRAPHER: We are now on the record.
 2   This is the continued videotaped deposition of Jeff
 3   Easter. Today's date is May 26, 2023, and the time
 4   is 2:35 p.m. Central time. My name is Jackie Jones,
 5   the videographer. The court reporter is Kathy
 6   Bonfiglio, also with PohlmanUSA Court Reporting.
 7   All counsel will be reflected on the stenographic
 8   record. Will counsel remind the witness he is
 9   still under oath.
10          CONTINUED DIRECT EXAMINATION
11   BY MS. WOODY:
12      Q. Good afternoon, Sheriff Easter.
13   Between the time we had the first part of your
14   deposition and today, have you done anything to
15   prepare for this second part of your deposition?
16      A. No, I have not.
17      Q. Have you reviewed any transcript of
18   your prior deposition?
19      A. No, I have not.
20      Q. Have you reviewed any documents?
21      A. No, I have not.
22      Q. Okay. When we were talking last week we
23   talked a little bit about the RICO case that was
24   brought and can you tell me -- the RICO case
25   involving the gangs, and can you tell me again what
```

Page 4

```
 1  Baco Loco Boys were tatooed up in VLBs and had
 2  their own colors. The Sorenos and Nortenos; same
 3  thing. The Asians and Back Killers and there was a
 4  couple of other Asian gangs; the white gangs, the
 5  white supremacist gangs that we had. The 8-Ball
 6  Crips were specifically white. They would be
 7  tatooed up with 8-balls and those type of things so
 8  every gang set had their specific tattoos.
 9      Q.  How did you learn about those tattoos
10  so that you were able to affiliate them with
11  specific gangs?
12      A.  A lot of times from the gang members
13  themselves. Back in the '90s they liked to brag
14  about it.
15      Q.  In the '90s they would show you a
16  tattoo and tell you what it meant; is that right?
17      A.  A lot of times they would tell us
18  exactly what it meant and the colors they affiliate
19  with.
20      Q.  And other than that, did you have any
21  other ways of categorizing tattoos as being
22  affiliated with specific gangs?
23      A.  A lot of times it was from the
24  individuals telling us and then through different
25  cases that we had where we would seize evidence
                                                    53
```

```
 1  that this stuff would be listed out in paperwork
 2  or it would be listed out who they affiliate with,
 3  those type of things through search warrants.
 4      Q.  Did you ever look to other
 5  jurisdictions or other areas of the country to
 6  compare tattoos that were affiliated with gangs?
 7      A.  Yes. We had an influx of individuals
 8  coming in from the Englewood, California area or
 9  area during the 1990s and also Tulsa and Oklahoma
10  City. So some of the 18th Street folks that were
11  Hispanic; some of the Hoover Crips, those type of
12  things. The issue in Wichita was that they would
13  affiliate with them but they would come up with
14  their own kind of click. A lot of our gangs here
15  neighborhood related. They grew up in the
16  neighborhoods, they were related and they would
17  adopt their own type of gang signs and colors.
18      Q.  Were there certain areas that you
19  categorized as gang-related areas? Categorized?
20      A.  I'm sorry, what was that again?
21      Q.  Were there certain geographic areas of
22  Wichita that you designated as gang-related areas?
23      A.  So I think you are kind of getting back
24  to your question of mapping. What I recall on that
25  is if individuals were on probation, parole or out
                                                    54
```

```
 1  on bond, there were certain bars that catered to
 2  the gang members and so they would be mapped around
 3  those particular bars. That's what I recall on the
 4  gang-related stuff. So to answer your question
 5  now, yes, there were some bars that were absolutely
 6  infiltrated, attended. We would always have fights
 7  or shootings at those bars that were known for gang
 8  activity.
 9      Q.  When you say they were mapped with
10  respect to these bars, that means they weren't
11  supposed to go there; is that correct?
12      A.  That was part of the restrictions, yes,
13  ma'am.
14      Q.  So the mapping would be here's where
15  you can't go; is that right?
16      A.  Correct.
17      Q.  That was specific to an individual who
18  was on probation or parole as part of their
19  restrictions; is that correct?
20      A.  Correct, or out on bond.
21      Q.  With respect to -- were there any areas
22  of the city that generally were considered gang
23  areas without regard to a specific person's
24  probation or parole restrictions?
25      A.  You had neighborhoods throughout the
                                                    55
```

```
 1  city that was -- I mean, yeah, they had a lot of
 2  gang members, particular gang houses that were in
 3  those neighborhoods. You had them in west Wichita,
 4  not as much but you had them in north, south and
 5  east Wichita.
 6      Q.  And how would that information be
 7  shared within the department that these were
 8  gang-related areas?
 9      A.  I wouldn't say we ever said there was
10  any particular gang-related areas. There was
11  particular houses or neighborhoods that had several
12  gang members that lived in those homes or multiple
13  gang members living in one home. To be honest with
14  you most beat officers knew that. We knew it from
15  neighborhood members who wanted us to do something
16  about them in their neighborhood and that's
17  generally how we got the information.
18      Q.  And was that information ever
19  disseminated to the public? Like when you did
20  these presentation did you ever say these areas are
21  gang-related?
22      A.  No, because there was no really
23  gang-related designated areas in the city of
24  Wichita. You had some neighborhoods that were more
25  problematic because of the amount of gang members,
                                                    56
```