IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PROGENY, A PROGRAM OF      )
DESTINATION INNOVATION     )
INC., CHRISTOPHER          )
COOPER, ELBERT             )
COSTELLO, MARTEL           )    Case No.
COSTELLO, AND JEREMY       )    6:21-cv-01100-EFM-ADM
LEVY, JR., ON BEHALF       )
OF THEMSELVES AND          )
OTHERS SIMILARLY           )
SITUATED,                  )
                           )
            Plaintiffs,    )
                           )
    vs.                    )
                           )
CITY OF WICHITA,           )
KANSAS,                    )
                           )
            Defendant.     )
_____)


VIDEO DEPOSITION OF JOSE SALCIDO


The video deposition of JOSE SALCIDO, taken before
Nancy L. Rambo, RPR, CSR, at the law office of
Joseph, Hollander & Craft, Wichita, Kansas, on
the 15th day of December, 2022, commencing at
8:33 a.m.

Page 130

1    process that -- that the lieutenant writes out,
2    they're like, hey -- they have to -- they have
3    to okay the -- the questions with HR, I mean,
4    it's a whole process. And so based on that
5    list, then, you can select the next audit. And
6    it could be somebody from the NET team or
7    somebody from the field that is on a specialty
8    team that wants to be there as a gang officer.
9  Q    Uh-huh. Do -- in your experience, do the
10       officers want to do the audits?
11  A    It's probably not their favorite thing, but --
12       but they do it well when they do it.
13  Q    Why do you think it's not their favorite thing?
14  A    'Cause it takes a long time to do them.
15  Q    So do they usually prefer to be in a -- have
16       another position?
17  A    They prefer -- no, they prefer that position,
18       but they want time to be out driving around, you
19       know, doing some enforcement. That's what they
20       prefer.
21  Q    And you can't do that if you're doing the audit?
22  A    Of course, it's a very rigorous, involved
23       process.
24  Q    You say it's a rigorous and involved process,
25       where are the documents kept relating to the

Page 131

1    audits?
2  A    So, typically, as -- they have to read all the
3       reports, right, they -- they go in -- so we keep
4       them in Laserfiche, and they're police reports.
5  Q    You keep them what?
6  A    We keep them in, it's called Laserfiche.
7  Q    Okay.
8  A    And so they have to literally bring up, like, a
9       specific case and read; that's why it's so
10      involved, they have to read the case, the many
11      cases, and then make notes, or whatever.
12  Q    And where is --
13  A    It's been a long time since I -- I did the audit
14      'cause I did them myself, but it's been ...
15  Q    No, I understand. And where do they keep --
16      where are the notes that they make, where are
17      those kept?
18  A    They're in the -- they should be in -- I can't
19      remember the -- the name of the program, but
20      they had a program; I don't know if they
21      migrated everything to -- to our new RMS, but
22      there was a, like, FileMaker Pro that's been the
23      program for a long time, they make little notes
24      in -- in -- in there.
25  Q    So it would be your expectation if they were

Page 132

1    going to do a rigorous -- do this rigorously
2    that they would be keeping some kind of document
3    about their impressions, their notes, things
4    they're seeing?
5         (Reporter requests clarification
6         of the witness.)
7  A    FileMaker Pro they would.
8  BY MR. SULLIVAN:
9  Q    Is that -- that's one of the programs on the
10      department system?
11  A    That used to be the -- the -- I think it still
12      is, I don't know if they migrated to the new RMS
13      or not, I still think it's FileMaker Pro, but
14      that -- that's -- that's where you make your
15      notes in FileMaker Pro, which is what -- what
16      generates the gang list.
17  Q    The gang list is actually generated in
18      FileMaker Pro?
19  A    Yes.
20  Q    But there are -- and are there notes about the
21      audit that reflect their review? Strike that.
22      Are there --
23  A    No.
24  Q    So they're just -- they're just making changes
25      in the gang list as they're reviewing the file?

Page 133

1  A    So I guess to explain to you how I -- I remember
2       doing it - and it's been many years ago, so
3       memory can fail me - but what would happen is
4       let's say you were in a gang, right, I bring you
5       up in our records management system and look
6       through your records. I look, okay, he was
7       arrested for, I don't know, shooting at a house.
8       So I would go to the case actually and read --
9       read the whole thing, and then based on what I
10      found there, I can make a note in FileMaker Pro
11      saying on this date, he identified himself as a
12      member of the Folk Nation, you know, to Officer
13      So-and-So, 'cause it's in the report. And then
14      I would make the note there, and I -- I'd move
15      on. There are no notes as far as on this date
16      I -- I did an audit, found this, nothing --
17      nothing of that.
18  Q    So maybe I'm just not following very well, but
19      what are you auditing? I mean, there's a gang
20      list, right?
21  A    We want to make sure that the -- that the member
22      who you're putting on the list meets the state
23      criteria. If not ...
24  Q    But there's -- there's al -- maybe I'm -- so
25      there's already a list, though, right, there's a

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com

Page 182

```
 1   A   Maybe.
 2           MR. BRANSON:  Object to form.
 3   BY MR. SULLIVAN:
 4   Q   You say maybe, why?
 5   A   You know, they -- they would have to -- they
 6       would have to identify me and see if I was doing
 7       more than just hanging out there in my
 8       neighborhood.
 9   Q   But I'm just talking this -- this particular
10       subsection, right, (2)(D), frequents a
11       particular criminal street gang's area, right?
12   A   Uh-huh.
13   Q   If you were walking through there daily on your
14       way from the field and -- is that -- would that
15       be enough?
16           MR. BRANSON:  Object to form.
17   A   Again, a lot of this in itself, it's not -- it's
18       not this is a gang member, you know what I mean,
19       you have to -- you have to have more than that.
20   BY MR. SULLIVAN:
21   Q   You have to have more than the fact that
22       somebody's just in a particular street?
23   A   Hanging out in the area, yeah.
24   Q   So this criteria is not -- whether somebody's
25       hanging out in a particular area is not a useful
```

Page 184

```
 1       sufficient under this criteria to identify you
 2       as a member of that gang?
 3           MR. BRANSON:  Object to form.
 4   A   You know, if -- if -- I would doubt very
 5       seriously 'cause that was not the only time I
 6       had police contact, I'm sure, you know, waving
 7       at police officers or -- or even getting stopped
 8       in a car, you know what I mean, wearing similar
 9       clothing, they never asked me if I was in a gang
10       because I -- they -- they knew that I was not
11       hanging out with the gang members.  If -- if --
12       if an officer is worth their salt, they -- they
13       don't just willy-nilly put you on the list, they
14       have to -- they have to have more than that.
15   BY MR. SULLIVAN:
16   Q   But it would have been sufficient to -- that hat
17       under the terms of this provision, would that
18       color have been sufficient at the time to
19       satisfy --
20   A   That condition?
21   Q   -- (2)(E)?
22           MR. BRANSON:  Object to form.
23   A   Yes, but, again it's standing -- if you stand it
24       by itself, yes, that would be -- that would be
25       an identifier.
```

Page 183

```
 1       criteria for determining whether somebody's a
 2       gang member, right?
 3   A   Not --
 4           MR. BRANSON:  Object to form.
 5   A   -- not -- not in today's time.  You know, maybe
 6       in the past, yes, not in today's time.
 7   BY MR. SULLIVAN:
 8   Q   Okay.  Roman (E), adopt such gang's style of
 9       dress, color, or use of hand signs or tattoos?
10   A   Yes.
11   Q   Do you see that one?
12   A   I do.
13   Q   And what are -- those are identifiers, right?
14   A   Correct.
15   Q   And those are intended to signal identification
16       with a particular gang or affiliation?
17   A   That is correct.
18   Q   And what was the -- you had mentioned it
19       earlier, but what were -- what was the -- what
20       were the colors of the gang that were operating
21       in that North Bureau when you were younger?
22   A   It was -- it was black and white.
23   Q   And you had on a black hat, right?
24   A   Correct.
25   Q   And would that, wearing that black hat have been
```

Page 185

```
 1   BY MR. SULLIVAN:
 2   Q   So by itself, it would be an identifier even
 3       though it wouldn't have been an accurate
 4       identifier?
 5   A   Correct.
 6           MR. BRANSON:  Object to form.
 7   A   But I -- I doubt anybody would just put me on
 8       the list 'cause I was wearing that hat.
 9   BY MR. SULLIVAN:
10   Q   What makes you so sure about that?
11   A   Be -- because they didn't -- obviously they
12       didn't -- he didn't stop to ask me if I was in a
13       gang.  I'm -- I'm speculating that he was
14       thinking it, but he never stopped me.
15   Q   Let's talk about (F), associates with known
16       criminal street gang members?
17   A   Yes.
18   Q   And this is the -- we talked a little bit about
19       this one earlier, right?
20   A   Yes.
21   Q   And what -- what training do the gang officers
22       receive in terms of distinguishing an associate
23       from a member in -- in the field, like how do
24       you make that distinction?
25   A   And you're asking me to speak about specific
```

47 (Pages 182 to 185)

Page 186

1    training. I guess if they don't meet the above
2    criteria but they still hang out, then -- then
3    that would be -- with the -- with the gang
4    members, they don't engage in committing the
5    crimes but they associate with the gang, then
6    that -- that would be an associate.
7  Q    But this -- we're looking here under the --
8    under the criteria that would meet the
9    definition of a gang member, right?
10 A   Right.
11 Q   And it says, (2)(F) says, associates with known
12    criminal street gang members.
13 A   Uh-huh.
14 Q   What does associate mean?
15 A   I guess they -- when you stop them in a car with
16    three known gang members and -- and they -- they
17    repeatedly are hanging with the same; or you
18    stop a car after a shooting, they're not --
19    they're not on the gang list but they're --
20    nonetheless, they're in the car, that -- that
21    would be he's hanging around with known gang
22    members that are committing crimes. That's
23    typically how you would identify -- or fulfill
24    that criteria.
25 Q   What if after today's deposition I got picked up

Page 187

1    by a car with three known gang members and got
2    in the back and then we got stopped, would --
3    would that -- and -- and would the officer who
4    pulled us over, would -- would that officer be
5    able to determine that I satisfied that
6    criteria?
7         MR. BRANSON: Object to form.
8  A   I don't -- I don't think they would -- I don't
9    think they would make you an associate
10    independent of anything else. There would have
11    to be other things.
12 BY MR. SULLIVAN:
13 Q   But that --
14 A   Now, if -- if you had a gun in your lap and you
15    associated, even though it's legal here to have
16    a gun in your lap when you're in a car, that --
17    I'd look at you harder.
18 Q   All right. Let's go with your hypo, then, let's
19    say I had a gun and I had a permit and I was
20    satisfying the laws for carrying the gun and I
21    was in the car with three known gang members --
22 A   Yeah.
23 Q   -- would that in and of itself satisfy (2)(F) in
24    your --
25 A   It probably would.

Page 188

1  Q    Okay. Even though, I mean, it was legal for me
2    to carry the gun, right?
3  A   In Kansas you don't need a permit.
4  Q   Huh?
5  A   You don't need a permit here, you can carry it.
6  Q   Okay. I can just carry a gun?
7  A   You bet.
8  Q   But that's not -- that's not against the law?
9  A   No.
10 Q   Okay. But -- so that -- you're -- you're saying
11    that in and of itself would be enough to satisfy
12    that criteria?
13 A   Probably that one thing, to say you're
14    associated, but independent of anything else,
15    you probably would not make it on the gang list
16    'cause there would have to be other things.
17 Q   All right. And I -- you're making in your mind
18    a distinction between sat -- I'm only -- between
19    satisfying criteria and the gang list.
20 A   Right.
21 Q   I'm not talking about the gang list. I'm only
22    talking about the criteria --
23 A   Oh, yeah.
24 Q   -- you understand that, right?
25 A   Yeah, you're asking me to -- you bet. According

Page 189

1    to the law, that criteria is very -- it's --
2    it's very specific, yeah, that one thing
3    according to this law would -- would make you an
4    associate. I -- in practice, I don't think we
5    would make you an associate based on that alone.
6    But if you say it meets the criteria, it does,
7    right there.
8  Q   Okay. And that's -- that's your understanding?
9  A   Yes.
10 Q   And that's your understanding of what the --
11    your office's gang policy follows, correct?
12         MR. BRANSON: Object to form.
13 A   My understanding of what the law says, and it
14    says that that is one of the criteria.
15         MR. SULLIVAN: Let me take our --
16    our lunch break now.
17         THE VIDEOGRAPHER: Go off the record
18    at 12:45 p.m.
19         (Thereupon, a lunch recess was
20         taken; whereupon the following was
21         had.)
22         THE VIDEOGRAPHER: Okay. We're back
23    on the record at 1:40 p.m.
24 BY MR. SULLIVAN:
25 Q   Sir, we were talking about Exhibit 13, which is

48  (Pages 186 to 189)

Page 194

1  Q   Is that because -- I mean, you -- you used the
2      phrase hangs out, is that sort of what you
3      would -- the -- the connection that you would
4      make to determine whether there is a -- what a
5      criminal street gang's area was is where they
6      hang out?
7  A   Not -- not -- it would be more than that.  And
8      I'll give you a for example an area that I
9      associated with gang activity, you know, like a
10     public park, right, we were talking about that
11     earlier, they could hang out to play basketball,
12     not -- not a big deal.  But there's a particular
13     part in town where, historically, where they --
14     they hang out to shoot their guns off, that
15     would be more what I would look at and what my
16     people would probably look at as a gang hangout.
17 Q   But under -- but that's not what the -- that's
18     not the phrase used, right?  The public park,
19     like if they were playing basketball, that would
20     be a particular criminal street gang's area,
21     wouldn't it?
22 A   You know, in -- in -- in areas -- in areas, in
23     cities where gangs are more territorial, per se,
24     there is a very defined, on that side of the
25     street, that's ours, this side is ours.  We

Page 195

1      don't really have that definition in this -- in
2      this city, there's no -- nothing you can point
3      to.  And, again, this is not written for the PD,
4      for just Wichita, it's written for the entire
5      state.  The conditions might be different in
6      Kansas City, for example.
7  Q   But within your department, do you know if
8      there's a particular understanding of what that
9      phrase means?
10 A   No, other than -- the only reference we have
11     is state stat.
12 Q   Okay.  But within your department, do you have
13     any shared understanding of what the phrase a
14     criminal street gang area means?
15 A   If you're asking do we have that defined, we
16     don't.
17 Q   Do you have a working definition even?
18 A   No, I don't think we have anything in writing.
19     I think it, again, it's -- it's -- it's a --
20     it's up to the officers who are out there to say
21     based on me working this -- this neighborhood,
22     I've known that to be an area where they conduct
23     activities, I guess.
24 Q   Would that -- like the -- the word frequents,
25     would that also be -- have a subjective

Page 196

1      component?
2  A   One and the same.
3  Q   And we talked about 21-6313(2)(F) where it uses
4      the word associates, correct?
5  A   Correct.
6  Q   And that's -- that's one of the factors that
7      could count toward putting somebody -- making
8      somebody a gang member, right?
9  A   According to state law, yes.
10 Q   And you, I think, had some issues we talked
11     about earlier with what associates might mean?
12 A   I did, personally I did, yes.
13 Q   Yeah.  And for purposes of this particular
14     criteria, 21-6313(2)(F), do you have a common
15     understanding within the Wichita Police
16     Department of what that means?
17 A   No.
18 Q   Is it like the other factors we talked about,
19     open -- it's subjective?
20 A   It's purely subjective, yes.
21 Q   I want to talk to you about, back to Exhibit 13,
22     which is the chart, right?  You see the -- the
23     next box toward the right is -- there's a
24     heading that says nomination procedures?  You
25     see that?

Page 197

1  A   Yes.
2  Q   What is the -- what is that referring to?  And
3      just -- and let me -- strike that, let me -- let
4      me ask it this way.  That box is entitled
5      Nomination Procedure, and under it, it says, any
6      officer may nominate a person to be added to the
7      master gang list by routing the nominee's
8      personal information to the gang unit, right, do
9      you see that?
10 A   Yes.
11 Q   And what is that referring to?
12 A   So, you know, let's say I'm -- I'm on beat
13     patrol, I'm not -- I'm not in a specialist team
14     and I'm not in the gang unit but I'm -- I'm
15     just -- I have a beat assignment and -- and I
16     come across an individual that I think meets
17     gang criteria.  What I -- what I would do, and
18     back in the day we had what -- what they call
19     blue cards, and it was a very simple -- and I
20     don't know if you have a sample of a blue card,
21     what it used to look like, but you could write
22     all the -- all the identifiers on this blue card
23     and you would submit -- it was called a TOP
24     card, and you would send it in.  We now have the
25     digital version of the TOP card, and I think

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com

Page 198

1  most of the nominations come in that way.  But
2  the officers -- the nominating officer would --
3  would send that through to the two officers
4  working in the gang unit doing the vetting and
5  adding -- or looking at the gang list.
6  Q    Okay.  And so what about just -- what if we just
7       sort of focus on the period after 2016, after
8       you became deputy chief maybe.
9  A    Yes.
10 Q    I think what you're telling me is an officer out
11      in the field would rely on the criteria that we
12      looked at in the statute --
13 A    Uh-huh.
14 Q    -- that we marked as Exhibit 14 to identify
15      somebody that they could then nominate for the
16      gang list --
17 A    Correct.
18 Q    -- correct?  Is the nomination an actual --
19      like, it's like a separate process?  Like you
20      identify them first, right?
21 A    Right.
22 Q    You at the time -- you know, before 2016, there
23      was a TOPS card maybe filled out; is that right?
24 A    Yes, we'll still do a TOPS card but it's digital
25      now.

Page 199

1  Q    Okay.  So they -- the officer fills out the TOPS
2       card?
3  A    Yes.
4  Q    And then that TOPS card goes -- where is that
5       entered, what's the -- the system, the digital
6       system?
7  A    I think it's on our mobile data terminal, it's
8       part of the -- the -- the -- there's, like, an
9       internal website where they could go get that
10      form and send it through.
11 Q    What's that called, that -- that --
12 A    I don't remember what we call it, but that form,
13      it's -- it's under the -- the SharePoint for --
14      for -- internal SharePoint for PD.
15 Q    Okay.  So the -- am I correct, then, the
16      information the officer sees in the field --
17 A    Uh-huh.
18 Q    -- is put in -- into that digital TOPS card,
19      right?
20 A    And it's sent through, yes.
21 Q    And --
22 A    And I think we still have blue cards, but I --
23      I -- I don't know for certain that we do.
24 Q    Okay.  Who is that sent through to?
25 A    It's -- it's routed to the gang unit, ends up

Page 200

1  with the two officers who do the -- who do the
2  audit.
3  Q    So the -- it goes to the two offi -- two
4       officers in the unit, and who are -- the gang
5       intel?
6  A    The gang intel officers, yeah, they do the
7       vetting and they look at -- at, you know, at
8       whatever it is that they do, like criminal --
9       criminal history, incidents that might be
10      related.
11 Q    Okay.  And what evaluation is made by those two
12      officers of the information that they receive at
13      that point in time?
14 A    They would see how it con -- if it fit -- fits
15      the state statute before they put them on the
16      list.
17 Q    And so they -- they -- they make an -- their own
18      reference to the state statute?
19 A    They -- they look at it, yes, they would have
20      to.  I don't think they even look at the
21      statute, they -- they know it, they know the
22      criteria.
23 Q    Okay.  And if the officer who filled out the
24      TOPS card said, you know, so-and-so -- or the
25      subject frequents a particular street gang

Page 201

1       area --
2  A    Uh-huh.
3  Q    -- all right, let's say the officer filled --
4       filled out a TOPS card with that observation in
5       it --
6  A    Right.
7  Q    -- what effort do the two gang intel officers
8       make to assess that particular information?  Do
9       they take that officer at his or her word, or do
10      they make a deeper inquiry into it?
11 A    I think that they -- they -- they do as -- as
12      thorough of a search as they can, but I think
13      you would have to ask them exactly to get -- to
14      get exactly what it is that's going through
15      their mind.
16 Q    But -- but you -- you don't know actually
17      what -- are they doing their own evaluation of
18      that, or are they just seeing if those words are
19      in there?
20 A    No, I think they're doing -- they're evaluating
21      every nominee to make sure that, hey, we have
22      enough elements here to -- to -- to put them as
23      a active gang member.
24 Q    But -- so let's say, just for the sake of
25      argument, I filled out a TOPS card --

Page 222

1    do is -- and, I don't know, your mom says
2    he's -- he's in a gang, I'm tired of him playing
3    with the gang members, or whatever, you're
4    nominated.  So what we do is we don't -- we're
5    not this all-seeing eye, you know what I mean,
6    there might have been cases that were never
7    identified of you committing crimes with other
8    gang members even two weeks ago, you know -- you
9    know what I mean, so we -- we look at those
10   cases to say, okay, you know, was he just an
11   onlooker, was he actively participating in
12   the -- in the -- in the -- in the -- in the
13   violent crime out here, you know what I mean?
14   So we -- we pick up those cases too.
15   Q   Well, put -- put self -- there's no self -- in
16       my hypo, there's no self-admission, right?
17   A   Okay.
18   Q   So it's just, it's somebody who satisfied the --
19       satisfied three of the criteria in 21-6313,
20       section 2, okay?
21   A   Uh-huh.
22   Q   And if there's no self-admission, what --
23       what -- where is the guidance in the department
24       in writing that tells the two officers what to
25       look at before they nominate somebody to --

Page 224

1    policy, the definition section of this policy.
2    Do you see that?
3    A   Yes.
4    Q   And the policy, is that the departmental policy?
5    A   If it refers to policy, it is the WPD policy.
6    Q   Okay.  So let's just mark the policy as
7        Exhibit 15, okay?
8            (Deposition Exhibit Number 15
9            Marked for Identification.)
10   BY MR. SULLIVAN:
11   Q   Or you can -- you can confirm that this is the
12       policy.  Is this the policy you're talking
13       about?
14   A   It would actually -- yeah, it would actually be
15       referring to this policy.
16   Q   Sorry, what the -- just so the record's clear,
17       I've marked --
18   A   Gang offenders, yes.
19   Q   -- I've marked as Exhibit 15 a document entitled
20       Wichita Police Department Policy Manual, Policy
21       527, Gang Offenders, right?
22   A   Yes.
23   Q   And it says down at the bottom, revised 9 --
24       September 2019, right?
25   A   Uh-huh.

Page 223

1    A   I don't think we have anything in writing; it's
2        just, you know, it's just probably the officers
3        conferring with their supervisors to say, hey, I
4        have this, what do you think, that -- there's
5        always a -- there's always a exchange.
6    Q   The next box is master gang list, do you see
7        that?
8    A   Yes.
9    Q   Is there -- is there a gang list other than the
10       master gang list?
11   A   No, it's -- it's -- it's the list that comes out
12       of the --
13           (Reporter requests clarification
14           of the witness.)
15   A   -- FileMaker Pro.
16   BY MR. SULLIVAN:
17   Q   So the FileMaker Pro is where some of -- is it,
18       like, where some of the -- the backup is, some
19       of the --
20   A   Yes, that's where the notes are put in, like on
21       this case he was doing this, on this case he was
22       doing this, on this incident I had contact and
23       he admitted this.
24   Q   And then it says, individual will be added to
25       the master list if they meet the criteria in

Page 225

1    Q   So it says -- the flowchart says, individual
2        would be added to the master gang list if they
3        meet the criteria in policy, the definition
4        section of this policy, right?
5    A   Correct.
6    Q   And which -- specifically which section is that?
7    A   So it would be E, right, identification in the
8        WPD gang database.
9    Q   Okay.  And that -- so that's based on the
10       criteria in K.S.A. 21-6313 that we have been
11       looking at?
12   A   Correct.
13   Q   And that's -- that will -- that will put
14       somebody onto the gang list, right?
15   A   If they meet the criteria according to policy,
16       yes.
17   Q   Okay.  And there's no other criteria identified
18       in this section other than what's on the gang --
19       other than what is in 21-6313, right?
20   A   Correct.
21   Q   So there's no -- this stuff about -- that you
22       talked to me about about researching and
23       referring of those other things, that's not
24       actually part of the criteria, correct?
25   A   No, but it's part of the work product, how we do

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com

Page 226

1    our work.  Now, if I put all of that into
2    policy, you would have a book, and -- and so
3    policy kind of informs, it's not all inclusive.
4    Q    But this stuff that you talked to me -- this
5         research process that you told me about --
6    A    Yes.
7    Q    -- that's not part of the policy?
8    A    That's not codified in policy, no.
9    Q    It's not anywhere in the policy?
10   A    No.
11   Q    And it's not in the statute, right --
12   A    Correct.
13   Q    -- 21 --
14   A    Correct.
15   Q    -- 21-6313?
16   A    Yes.
17   Q    Okay.  So the next thing, it says, flagging
18        active in EJUS.  Do you see that?
19   A    Yeah, it should be EJ -- I'm sorry, EJustice,
20        that's our old records management; we no longer
21        have EJustice.
22   Q    Okay.  How is that -- is that something
23        different than what -- I think you said
24        Laserfiche before?
25   A    Yeah, yeah, EJustice is just a records

Page 227

1    management system where we enter all crime
2    incidents.
3    Q    Okay.  And both Exhibit 13 and Exhibit 15
4         reference this three-year period, right?
5    A    Correct.
6    Q    And Exhibit 15 says, the identified individual
7         will remain either active or associate for a
8         minimum of three years, right?
9    A    Yes.
10   Q    Where did that come from?
11   A    That -- that was just a -- that was just a --
12        when -- when -- at the beginning of all the
13        gang -- gang database and the gang list, way
14        before my time, they came up with the three
15        year.
16   Q    Who -- who came up with that?
17   A    I -- I don't know.  You know, it's just part --
18        it's -- it's part of the policy when I got here
19        that that's -- that was -- it's always -- as far
20        as I can remember, it's always been three years.
21   Q    And that's not in the statute, is it?
22   A    Nope, no, it's not.
23   Q    You say that as if that surprises you?
24   A    No, in the statute, I knew it was not in the
25        statute.  I knew that that was -- that was

Page 228

1    established by policy that it was three years.
2    Q    And you don't -- did you ever ask why that is?
3    A    No.
4    Q    Have you ever received any explanation of why
5         there's that three-year period in there?
6    A    I -- no.
7    Q    Do you know what the basis for it is?
8    A    No.
9    Q    Do you know if that's ever been assessed against
10        best practices?
11   A    No.
12   Q    Have you ever consulted an expert in gang
13        databases as to whether that's standard or not?
14   A    No.
15   Q    Would it be -- would it be a best practice to
16        iden -- to identify somebody as a gang member
17        based on self-admission alone?
18           MR. BRANSON:  Object to form.
19   A    I guess I don't understand your question.
20   BY MR. SULLIVAN:
21   Q    Would -- would you consider it a best practice
22        to identify somebody as a gang member and to be
23        put on a gang list based only on self-admission?
24           MR. BRANSON:  Object to form.
25   A    I don't -- I -- I don't know if -- I mean, I

Page 229

1    guess I don't -- I don't -- I can't give you --
2    I can't tell you if that would be a best
3    practice or not, I --
4    BY MR. SULLIVAN:
5    Q    Okay.
6    A    -- I don't know.  I think there's -- there's --
7         like, again, like the example I gave you, there
8         could be a kid with -- with Down's or autistic
9         that would say I'm a gang member but I wouldn't
10        put him on the list.
11   Q    Do you know what purpose this three-year period
12        has?
13   A    If -- if I gave you what I think, it would be my
14        opinion of what the three years is.
15   Q    Tell me, please.
16   A    I think three years is if you're crime free for
17        three years, you know, pretty much that --
18        that -- that would tell me that -- that your --
19        I mean, your gang days are done.
20   Q    But what is the -- what -- what's the rationale
21        for being on there for -- what's the rationale
22        for that three-year policy?
23   A    I think it was set in --
24           MR. BRANSON:  Objection, asked and
25        answered.

PohlmanUSA Court Reporting
(877) 421-0099     PohlmanUSA.com