IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| PROGENY, A PROGRAM OF ) <br> DESTINATION INNOVATION ) <br> INC., CHRISTOPHER ) <br> COOPER, ELBERT ) <br> COSTELLO, MARTEL ) <br> COSTELLO, AND JEREMY ) <br> LEVY, JR., ON BEHALF ) <br> OF THEMSELVES AND ) <br> OTHERS SIMILARLY ) <br> SITUATED, ) <br> ) <br> Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> CITY OF WICHITA, ) <br> KANSAS, ) <br> ) <br> Defendant. ) <br> _____) | Case No. <br> 6:21-cv-01100-EFM-ADM |

VIDEO DEPOSITION OF CHAD BEARD

The video deposition of CHAD BEARD, taken before
Nancy L. Rambo, RPR, CSR, at the law office of
Joseph, Hollander & Craft, Wichita, Kansas, on
the 19th day of December, 2022, commencing at
8:35 a.m.

Page 30

1  A  We were in charge of identifying and documenting
2     individuals that were gang members, we
3     maintained the -- a gang database, we would then
4     focus on crimes committed by gang members,
5     disseminate information to the department or
6     other members, provide training.
7  Q  When -- when you were a patrol -- a patrol
8     officer in Patrol South, did you identify gang
9     members in that capacity?
10 A  Yes.
11 Q  And how did you do that?
12 A  When I would have contact or -- with
13    individuals, whether they would self-admit,
14    whether they were wearing their colors, flashing
15    hand signs - most commonly it was a self-admit -
16    I would complete a TOPS card or a blue card,
17    send that to the gang intelligence unit.
18 Q  And when you filed -- when you sent in a TOPS
19    card, and tell me what TOPS is again.
20 A  Sure. Back then, it was -- it was called a TOPS
21    card, targeted offender program.
22 Q  Okay. And targeting being gangs, right?
23 A  The TOPS unit was also, like I said a targeted
24    offender, but one of those was gang members.
25 Q  Okay. So you would -- so describe for me, like,

Page 31

1     you know, how you would -- just give me an
2     example of -- of how you would go about filling
3     out a TOPS card, you'd stop somebody, just kind
4     of explain.
5  A  Sure, if I had contact, like I said, a lot of
6     them were self-admits, so I would complete, it's
7     like a field interview card; it was just a blue
8     card that was relatively small, name, all their
9     information, I believe there was a small section
10    for what criteria they could have met, you could
11    check that. On the back, there was an associate
12    portion if they were with somebody else, then a
13    short area for a narrative, whether that -- you
14    could fill out that part on the narrative about
15    your contact. I often referred to a police
16    case 'cause there's not enough space on the
17    back.
18 Q  So if they self -- self-admit, there's one box,
19    correct?
20 A  Correct.
21 Q  And what constituted self-admission?
22 A  If an individual identified themselves as -- as
23    being part of a gang.
24 Q  Then they'd have to -- they'd have to do that
25    verbally?

Page 32

1  A  Most commonly, I mean, that's -- I would be
2     speaking with them.
3  Q  Okay. And when you say most commonly, would
4     they ever self-identify in a way that -- where
5     they didn't say I'm a gang member, I'm a member
6     of such and such?
7  A  No, I mean, that -- if we're specifically
8     talking about this time, that's what they would
9     do, they would talk to me verbally.
10 Q  Okay. And would you ask them if they were
11    members of a gang?
12 A  Yeah.
13 Q  And --
14 A  Yes.
15 Q  -- and some of them would say yes?
16 A  Yes.
17 Q  Did any of them ever volunteer it without you
18    asking?
19 A  Yes.
20 Q  And under what circumstances would they do that?
21 A  Sometimes it would be when they were upset,
22    angry at somebody else, they were actually
23    arguing or fighting with another person and they
24    were identifying what gang they were a part of.
25 Q  So that wouldn't be a direct statement to you

Page 33

1     but --
2  A  Correct.
3  Q  -- you would hear them say that?
4  A  Yes.
5  Q  And you would mark that down as a
6     self-admission?
7  A  Yes.
8  Q  Okay. What if they didn't self-admit but you
9     thought they met some of the criteria, what
10    would you do?
11 A  I would mark that criteria that I observed.
12 Q  What was the most frequent criteria that you --
13    that you noticed when you were a patrol officer?
14 A  Colors and associating with other known gang
15    members.
16 Q  So those were the two most often?
17 A  Yeah. Yes.
18 Q  Okay.
19 A  You would see hand signs occasionally as well.
20 Q  Okay. And once you turned those TOPS cards in,
21    did anything happen after that?
22 A  I don't know 'cause I would just submit them
23    with my paperwork, and I don't know what they
24    would do with them after I submitted them.
25 Q  Okay. Did anybody ever call you up about a TOPS

Page 38

1  A   Yes.
2  Q   The same -- the same procedure, same way they
3      were handled?
4  A   Yes, but as a gang officer, I didn't fill it out
5      every time, it was kind of redundant. If I had
6      personal contact with the individual, I wouldn't
7      go and make another card. Usually I would but
8      sometimes I wouldn't.
9  Q   If you didn't make a card, was there a way that
10     you would memorialize a conversation or an
11     interaction?
12 A   Sometimes I would write it in a casebook, but my
13     brain works in different ways and I'm able to
14     recall stuff.
15 Q   Okay. So would you then put that information
16     anywhere, like into the gang database?
17 A   Yes.
18 Q   And how did you do that?
19 A   There is a -- are you just talking about the
20     actual, like, doing an entry or ...
21 Q   Yeah, just start with that.
22 A   All right. So within the system, FileMaker,
23     there is a new card request or a new -- new
24     person, click that button, it comes up, and you
25     can input all the information that goes in

Page 39

1      there; then there's a narrative portion that you
2      could put in there as well. So part of that
3      would include any type of conversation or
4      interaction that I had with that individual.
5  Q   So even if you didn't fill out a TOPS card,
6      you'd go back and make an entry in the gang
7      database?
8  A   Yes.
9  Q   Okay. And after that -- after that entry was
10     made in the gang database, do you know what
11     happened then?
12 A   I'm not -- I'm not sure what you --
13 Q   That was a bad question.
14 A   Yeah, sorry.
15 Q   So after you had entered that information in the
16     gang database, would it then become part of that
17     person's information that would show up in the
18     gang database?
19 A   Yes.
20 Q   And we've heard about something called EJustice
21     where active gang members would show up on
22     EJustice; is that right?
23 A   Yes.
24 Q   And if -- so if I looked up, you know, the name
25     of a person on EJustice, what would I see?

Page 40

1  A   So EJustice would have a little flagging at the
2      top of the person's name that would say they're
3      a gang member, or I think it gave a code. I
4      can't remember, I'm sorry, I haven't looked in
5      EJustice in forever.
6  Q   Okay. Okay. And that was something that was
7      available to, I think Mr. Hemmert said about 700
8      people. Do you agree with that?
9  A   It would be the commissioned personnel so ...
10 Q   And somebody in records?
11 A   I believe so because SPIDER would have to be
12     able to see that also.
13 Q   Tell us what SPIDER is.
14 A   It's the Special Police Information Data Entry
15     and Retrieval.
16 Q   Okay. And what does SPIDER do?
17 A   Officers can contact SPIDER, either radio or
18     phone, and ask a person to be checked for wants
19     or warrants, they can request a tow truck,
20     miscellaneous service stuff; if they got a tree
21     in the road or something, they can call them.
22 Q   Okay. So and -- and if they call about a
23     specific individual, they can also find out if
24     they're a member of a gang, correct?
25 A   Correct.

Page 41

1  Q   Is that a signal 33?
2  A   Yes.
3  Q   So you call in SPIDER and they would say
4      signal 33 for this person, correct?
5  A   Correct.
6  Q   Okay. Anything else that you did as a gang
7      officer that you haven't told me about?
8  A   Like I said, we provided training, went to
9      training obviously. Again, I was working really
10     close with the -- the detectives 'cause we were
11     assigned to investigations, so we were part of
12     investigations.
13 Q   And when you say you were assigned to an
14     investigation, how'd that work?
15 A   We were assigned at night, our -- I switched
16     days back and forth so I -- but our -- our
17     shift, I think, started at 5:00 -- 4:30 and went
18     till, like, 3:00 in the morning. So we reported
19     to the Sixth Floor, which is the investigations
20     division, so we didn't have a patrol bureau that
21     we were assigned to.
22 Q   Okay. So you would go, on your start of your
23     shift, you would go up to the Sixth Floor and be
24     told that you needed to take a look at this,
25     that, or the other?

Page 50

1  Q   Okay. And who were they?
2  A   Jeff Easter.
3  Q   Okay.
4  A   Now the sheriff.
5  Q   Uh-huh.
6  A   And then Todd Ojile, I think he -- I know Scott
7      Heimerman was also -- I'm getting -- getting
8      kind of mixed in with the detective part of
9      my --
10 Q   Gotcha.
11 A   -- stuff in there as well so -- Speer and Easter
12     were my primary when I was a gang intelligence
13     officer.
14 Q   Okay, thanks.
15 A   To clarify, we had a night lieutenant that was
16     actually who we were assigned to even though
17     they were -- so it was Lieutenant Bret Giffen,
18     Lieutenant Ralph Clark, and -- I can't remember
19     his name. There was -- again, we were on nights
20     so we had -- they had a night lieutenant, so we
21     kind of reported to him, but it was all under
22     the gang/felony assault section.
23 Q   Okay. All right. And you said that you were
24     interested and you applied back in 2002, was --
25     was the gang unit seen as kind of a promotion?

Page 51

1  A   Obviously I didn't get any new pay or anything,
2      but I considered it as -- as such.
3  Q   Okay.
4  A   I mean, I -- I thought it was -- it was a more
5      specialized group.
6  Q   Okay. Was it difficult to get into?
7  A   I would think so, yes, I was -- I had to conduct
8      a oral board, and I know other people put in for
9      it.
10 Q   Okay. And so when you say an oral board, you
11     mean a personal interview?
12 A   Uh-huh.
13 Q   And --
14 A   I'm sorry, yes.
15 Q   Okay. And -- and you know other people put in
16     for it but you were selected?
17 A   Yes.
18 Q   And was it pretty common that when an opening
19     would come up -- come about in the -- come open
20     in the gang unit that there would be a fair
21     number of applicants for that?
22 A   Yes.
23 Q   So you were with -- in 2009, did you become a
24     detective --
25 A   Yes.

Page 52

1  Q   -- in the gang unit?
2  A   Yes.
3  Q   I'll try not to walk on your answers if you'll
4      try to let me ask my questions --
5  A   Yeah.
6  Q   -- okay? All right. So in 2009 you became a
7      detective in the gang unit?
8  A   Yes.
9  Q   And how did your duties and responsibilities
10     change?
11 A   As a detective, you work during the daytime,
12     you're assigned cases that occur -- or cases
13     that are made by patrol officers, whether that
14     included a arrested person that was in custody
15     or you had a case where you needed to do
16     follow-up, such as a shooting, a drive-by,
17     weapons violation, so that would be conducting
18     follow-up interviews and then preparing an
19     affidavit, collecting all the evidence, and then
20     presenting it to the district attorney's office
21     for possible charging.
22         We then also were, you know, subject to
23     call out on -- on homicides and shootings, so we
24     would come in on that. As -- my duties
25     specifically in that -- in my capacity, I still

Page 53

1      worked on the gang database, I provided
2      training, and worked really close with the gang
3      intelligence officers.
4  Q   And when you say you still worked on the gang
5      database, what would you do with respect to the
6      gang database?
7  A   With that, I -- I would still identify or
8      document individuals if they met criteria, and
9      then obviously I would testify as needed in
10     court, provide, you know -- I helped disseminate
11     information. It became less, it wasn't as much,
12     I guess, because obviously you want the gang
13     intelligence officers to -- that to be their
14     primary role.
15 Q   Okay. So the primary role of the gang
16     intelligence officer, one of the primary things
17     is to maintain the gang database?
18 A   Yes.
19 Q   And I think you mentioned that you would, like,
20     look at TOPS cards from other officers as they
21     came in?
22 A   As a gang --
23 Q   As a gang intelligence officer?
24 A   Yes.
25 Q   And what would you do with that, with those?

14 (Pages 50 to 53)

Page 54

1  A  The -- I'd look over them to see, you know, what
2     information they had listed, if it matched up to
3     the information in EJustice at the time. A lot
4     of times before we would ever document somebody,
5     we would look at their case history, we'd pull
6     up all their old cases to see what kind of cases
7     that they had and who they were with. Back
8     then, they did -- there wasn't social media, so,
9     you know, we'd go off of cases and the
10    information that was listed in cases.
11 Q  So that was actually more important than the
12    TOPS cards?
13 A  Well, the -- the TOPS card was important because
14    obviously it was the firsthand knowledge that
15    this officer is providing, and so I'm -- I'm
16    relying on that officer's, you know, statements
17    and -- and information that he's providing to
18    me, but I would also try to verify some of that
19    information on my own.
20 Q  Okay. So you'd try to verify some of that
21    information by looking at cases that --
22 A  Cases and, you know, like I said, if there
23    was -- and it could also go through my
24    experience, if I -- if I knew this guy before,
25    does that make sense, if I had contact with him

Page 55

1     or I had seen him hanging out at a location,
2     or -- or whatever, then it's essentially
3     verifying that officer's -- what he's reporting
4     to me.
5  Q  So you'd use your own experience to verify if
6     you had had an interaction with that person?
7  A  Correct.
8  Q  And if that was the case, then you'd go ahead
9     and enter that into the gang database?
10 A  If they met criteria, yes.
11 Q  Okay. Any -- were there times when they didn't?
12 A  Yes.
13 Q  And how often would that happen?
14 A  I don't have a exact number.
15 Q  Was it unusual or -- or did it -- was it more
16    often than not, or was it rare?
17 A  It was not rare, it -- it was common, I mean,
18    people would send a card, and that person would
19    not meet criteria so we didn't put them in
20    there.
21 Q  And what were reasons that they wouldn't meet
22    criteria?
23 A  Again, sometimes it -- you know, case history
24    wasn't there, you know, the tattoo, they didn't
25    have any tattoos, there -- there wasn't enough

Page 56

1     information to verify what the officer had --
2     had -- had sent up. Again, self-admits were
3     very common, and so if a guy self-admitted, then
4     they were usually going, but there was other
5     times where officers may just have, you know,
6     lots of colors, may -- may have saw a hand sign,
7     not sure, you know, they just weren't quite sure
8     and so they -- they felt like that they needed
9     to send the card, which was fine, we looked at
10    it and felt doesn't meet criteria, we're not
11    going to put them in there.
12 Q  And they might document in the narrative that
13    they thought they saw a hand sign but they're
14    not sure?
15 A  Correct.
16 Q  And in that case, you'd say, well, that's not
17    enough?
18 A  Yes.
19 Q  Okay. And you say there were lots of
20    self-admits?
21 A  Back then, yes.
22 Q  Okay. And when you say back then, what time
23    frame are we talking about?
24 A  Again, it was more common when I was a gang
25    intelligence officer. Again, I'm not on the

Page 57

1     streets, so they may be encountering it, I'm
2     just not getting a whole lot of that now.
3     Obviously I'm a lieutenant so I'm not ...
4  Q  Okay. So back -- you're talking about the 2002
5     to 2009 period?
6  A  Yes.
7  Q  Okay. And then once you became a detective, how
8     long were you in that position?
9  A  Till 2014.
10 Q  And what happened -- what happened then?
11 A  I got promoted to sergeant.
12 Q  Okay. And was that still with respect to the
13    gang unit?
14 A  No.
15 Q  Okay. Where were you then?
16 A  I went to Patrol North -- Patrol East as a
17    sergeant.
18 Q  Okay. What are the responsibilities of a
19    sergeant?
20 A  Sergeant is to actually be out there with the
21    officers, making calls with them. Obviously
22    we're making supervisory decisions, arrest
23    approval, we would conduct traffic
24    investigations in reference to officers'
25    vehicles, we would -- any use-of-force

Page 70

1  A  Correct.
2  Q  -- at the beginning of -- okay. Let me check my
3     time here.
4         MR. BRANSON: Yeah, 9:53, I mean, as
5     long as I've got a few minutes to jump on
6     and make sure my phone works.
7         MS. WOODY: Okay. All right. Let's
8     go about a couple more minutes.
9         MR. BRANSON: Yeah, I mean, if you
10    got -- you know, I don't want to --
11        MS. WOODY: I just -- I just want
12    to --
13        MR. BRANSON: -- cut you off in the
14    middle of a chunk of whatever you're doing.
15        MS. WOODY: I'll try to finish this
16    up --
17        MR. BRANSON: Okay.
18        MS. WOODY: -- in a little bit here.
19        MR. BRANSON: Thanks.
20 BY MS. WOODY:
21 Q  So as the -- as the lieutenant over the gang
22    unit, what were your responsibilities?
23 A  Okay. So as the -- as the gang lieutenant, I
24    was obviously in charge of -- there was a
25    sergeant and -- over the detectives. Again, a

Page 71

1  lot more admin-based stuff, making sure
2  scheduling, training was being accomplished. I
3  was part of a rotation for homicide callout, so
4  I was in the rotation for supervisor for -- for
5  that, obviously I'd supervise major scenes.
6      The duties -- well, let's see. At the --
7  trying to remember, there was -- we had gang
8  intelligence officers then as well, so there was
9  another sergeant that was in charge of them; and
10 they worked at night, but I was the supervisor
11 over them. And so essentially I was the
12 supervisor over the -- you know, making sure
13 that that sergeant was maintaining the gang
14 database and disseminating information and, you
15 know, following policy.
16     There's a lot of other duties that a
17 lieutenant gets thrown at that -- that, you
18 know, I did provide some training. And I
19 provided training throughout my -- my time
20 with -- on that whole span on that so -- so as a
21 lieutenant, and I can't remember if it's current
22 now or if it was back then 'cause, like I said,
23 there was -- when I moved.
24     There's the juvenile intervention unit,
25 which is what I'm a part of -- or supervisor

Page 72

1  over as well. And, again, now -- now it's
2  changed, we don't -- I have the two gang
3  intelligence officers, and I have Sergeant
4  Cooper who's in charge of a NIBIN Enforcement
5  Team. One of my duties as the gang lieutenant
6  is also the director of the Crime Gun
7  Intelligence Center, and that's specific with
8  NIBIN and the collection of cartridge casings
9  and how we use that and so ...
10 Q  Okay. Let's let Charles get ready for his --
11        MR. BRANSON: Appreciate it.
12        MS. WOODY: Yeah.
13        THE VIDEOGRAPHER: Go off the record
14    at 9:56 a.m.
15        (Thereupon, a recess was taken;
16        whereupon, the following was had.)
17        THE VIDEOGRAPHER: Okay. We are
18    back on the record at 10:22 a.m.
19 BY MS. WOODY:
20 Q  Okay. Lieutenant Beard, I just wanted to ask
21    you a couple follow-up questions on -- to some
22    of your testimony. With respect to the -- the
23    locations that you would identify as potential
24    gang locations, how -- how did you -- how did
25    the department come to -- to designate those

Page 73

1     places as gang related?
2  A  That would be based on our experience, you know,
3     actually being there and seeing those locations,
4     seeing who was there. Again, the only other way
5     that was -- that I could think of that we would
6     often do that, obviously, is if we knew that
7     there was a -- a specific person living there
8     and we were seeing people hanging out there or
9     if it had been, like, the victim of a drive-by
10    or a shooting had happened there or some type of
11    incident had occurred there, that kind of drew
12    our attention to that location.
13 Q  And did you have anyplace where you documented
14    that these are gang places?
15 A  In the narrative of some of the entries into the
16    database it -- it would -- it quite possibly
17    could be put in there. If we would do a check
18    at -- at Harry & Ollie's and we would see
19    individuals in there, then, yes, we would put
20    that we observed A, B, and C at this location.
21 Q  And you said that some officers would -- could
22    put somebody on a gang list just on that basis,
23    correct?
24 A  Again, there would be -- you would have to have
25    other criteria that would be met before that.

19 (Pages 70 to 73)

Page 74

1 That's not just that single one.
2 Q And how about if they were seen there two or
3 three times?
4 A Again, just on that, that's just one criteria,
5 you would need three.
6 Q Right, but that -- you could enter that as -- as
7 a criteria?
8 A Yes.
9 Q Right.
10 A It -- it could be entered as a criteria, yes.
11 Q Okay. Okay. And how did that work, did you --
12 you know, 'cause, I mean, I'm sure that there
13 were times when you didn't see all three
14 criteria at once, so how would that typically
15 work that you would keep track of those
16 criteria?
17 A Are you referring to, like, an audit or when
18 you're first flagging somebody?
19 Q When you're first flagging somebody?
20 A Okay. Again, if -- sometimes you would -- there
21 would be a time period obviously that you would
22 see an individual or you would get -- you may
23 get a TOPS card, you know, at the first of the
24 year and he doesn't meet criteria. Well, you
25 get one six months later and now he does. So

Page 75

1 sometimes there was a break -- or not a break
2 but a -- just there was a gap that, you know, he
3 didn't meet criteria and so -- and then at some
4 point he does, and then that's when he would be
5 added to the database.
6 Q So how -- where's -- where do you store the
7 records, say, for somebody who's met one
8 criteria but hasn't met all of them yet, how do
9 you keep track of that?
10 A Again, if a person didn't meet the criteria,
11 they just weren't inputted, and so kind of like
12 what you said before, usually there was just --
13 all of them were met at that exact moment.
14 Q Okay.
15 A We didn't put people in there and only mark one
16 and say we're going to save this for later.
17 Q Okay. So that didn't go into the gang
18 database --
19 A Yeah.
20 Q -- if you only had one criteria?
21 A Yes.
22 Q Was it -- was it kept anywhere else so that you
23 could say, okay, this day he made this criteria
24 and this day he made this one and this day he
25 made that one?

Page 76

1 A No, there was no official record or anything.
2 The only thing we did was the -- the TOPS cards
3 that people didn't meet, we put them in an
4 inactive box, and so sometimes you could go back
5 and look to see if there was a previous card.
6 Q And was that, like, a physical box that the
7 cards were kept in, or was it --
8 A Yeah, it was like a drawer --
9 Q Okay.
10 A -- like an index drawer.
11 Q And you said it was the inactive box?
12 A Yeah, we just called it all of that, I mean, it
13 was -- we didn't rename it, like, did not meet
14 criteria, or something, we just put it all in an
15 inactive box.
16 Q Okay. And were there other folks in that drawer
17 who were -- actually, I mean, had been on the
18 list and were taken off and were inactive?
19 A Yes.
20 Q And so their names and cards were just in this
21 drawer?
22 A Yes.
23 Q Okay. 'Cause they were taken out of the gang
24 database?
25 A They were made --

Page 77

1 Q Out of EJustice, they were taken off EJustice?
2 A Yes, they -- they were removed from EJustice,
3 they were changed inactive in the database, and
4 then their card was placed in the -- in the
5 inactive draw.
6 Q Gotcha. So they -- so they stayed on the
7 database with a marker of inactive?
8 A Correct.
9 Q Okay. And then their cards went in the drawer,
10 and that would be the cards that had all the
11 cases on them and all that information?
12 A Whatever was put on there by the officer or --
13 but, yes, it could include case numbers.
14 Q Basically be their -- their gang history,
15 correct, in -- in the database?
16 A Yes, again, it's very limited on -- on space, so
17 a lot of times it was the highlights or just --
18 Q Okay.
19 A -- summary.
20 Q Okay. And those would stay in the drawer as
21 long as the person was inactive, if they were --
22 had already been on the list and were inactive?
23 A Yeah, we -- we didn't -- once they were put in
24 there, I mean, until we finally scanned them all
25 in, I mean, then we -- they just remained in the

20 (Pages 74 to 77)

Page 82

1  four gang officers during one of their audits to
2  kind of pretty much just write down what they do
3  for the audit. And then in conjunction with
4  that, you know, when they get a new TOPS card
5  what things to check. But it really came down
6  to what -- to make sure that the audit was done
7  in a, kind of a check box type manner. So the
8  audit was one of the main things in there.
9       The only other complicated thing was is
10 that we -- you know, there was EJustice, and so
11 we were responsible to make sure that that
12 person was flagged in EJustice and maintain the
13 database, so you had two entities that we had to
14 make sure that were accurate.
15 Q  Okay.
16 A  And so that's why there's so much stuff in there
17 about EJustice, and then now it's changed to
18 Niche, and so there's a new process for that.
19 Q  When did it change to Niche?
20 A  I think last year, April 2021, I think, or ...
21 Q  Okay. So up -- up to that, it was EJustice?
22 A  Yes.
23 Q  And so it was the gang intelligence officers'
24    responsibility to maintain the list and to
25    maintain the flags in EJustice?

Page 83

1  A  Correct.
2  Q  So in -- do you recall exactly when it was when
3     you -- when you wrote down how these standard
4     operating procedures written down, the year or
5     anything like that?
6  A  It's -- my -- it's got to be 20 -- it's between
7     2015 and 2018.
8  Q  Okay.
9  A  It was -- it -- I really want to say it's 2016.
10 Q  Okay.
11 A  Somewhere in there.
12 Q  Okay. And what kind of thing -- so are there
13    now actual written SOPs that you can look at?
14 A  So there -- there was an SOP that was -- that
15    was made by us, and I believe it was sent
16    through channels and -- and approved. We may
17    have to adjust it again now because of Niche.
18    But, yes, in addition to Policy 527, there is an
19    SOP that Officer Carson and Officer Bernard
20    could follow.
21 Q  Okay. So tell me what's in that SR -- SOP.
22 A  If I remember correctly, it's really just a step
23    by step, like if you get the information from an
24    officer what to follow going forward, whether
25    you, you know, you -- I think one of it's

Page 84

1  obviously look at their police incidents, check
2  for social media, try to verify -- you know,
3  read the police reports that -- that originally
4  gave you the information, whether it's -- such
5  as an officer sent up a card or sent an email,
6  or whatever, as to why they believe that this
7  individual's associated with a gang. And it
8  really goes through all that and then how to put
9  that information into the actual database. I
10 mean, it's fairly self-explanatory, I mean, you
11 fill in the boxes.
12 Q  Okay. So it's like -- it's a checklist?
13 A  Essentially, yes.
14 Q  Okay. So you -- if you get a TOPS card or an
15    email from an officer saying, I want -- you
16    know, I think this person needs to be documented
17    as a gang member, it's a checklist of what you
18    would check to see if you -- if you would enter
19    that person into the gang database?
20 A  Yes, I don't think it's an actual physical
21    checklist --
22 Q  Okay.
23 A  -- but it's -- it's a standardized, hey, make
24    sure you check these points.
25 Q  Okay. All right. And then what would it say

Page 85

1  about EJustice?
2  A  EJustice is kind of complicated in how you would
3     get information in there, so it was kind of a
4     step by step on how to make sure that the person
5     was entered into EJustice, 'cause EJustice
6     wasn't really user friendly.
7  Q  Uh-huh, uh-huh.
8  A  And so you had to create the different gangs and
9     then put the person associated within that gang,
10    and it -- it's not a conducive system to -- to
11    put stuff in. So it really kind of lines out
12    how to exactly put that person so that flag will
13    come up at the top of the page.
14 Q  Okay. So that's kind of a technical issue?
15 A  Yeah, it's -- it's more just technic --
16    technical stuff on how to make sure it's done
17    correctly, and to remove them.
18 Q  Okay. Okay. And then with respect to the
19    audits, what -- what was the SOP for the audits?
20 A  Again, it's -- it's like you described, a
21    checklist. You know, obviously you go through
22    and you look at their -- any police reports that
23    have happened that past year. You know, again,
24    you check their social media, you -- you look at
25    the arrests, you -- you look at all those

22 (Pages 82 to 85)

Page 86

1  things.
2  You also look to see if during that time
3  period you may have put an entry in there, you
4  know, a gang officer may have had contact with
5  that person and -- and noted that in the -- in
6  the narrative already so -- so all that stuff.
7  And, again, it's just a checklist of all the
8  different things to check, and if -- and also if
9  you're going to remove a person, remove, make
10 somebody inactive, there was a process for that
11 as well.  Or you would follow the same process,
12 and if they didn't, you know, if they didn't
13 meet that, then -- then they were made inactive.
14 Q   Okay.  So I've heard from other officers that
15     sometimes people were not added to the list
16     until the audit, is that -- is that your
17     understanding?
18 A   Well, that's possible.  In -- again, are they
19     meaning a brand-new person, or are you talking
20     about a person that was already documented and
21     then re-added because they found new
22     information?
23 Q   I think both?
24 A   Okay.  So during the audit, you sometimes will
25     encounter, while you're doing research on the

Page 87

1      person that's in the database, you discover
2      another person that -- that you hadn't
3      documented before, didn't know about.
4  Q   Uh-huh.
5  A   And then upon research, you discover he meets
6      criteria.
7  Q   And when you say you discover another person,
8      how would you -- how would you do that, how
9      would that happen?
10 A   Most common -- well, from my experience would be
11     finding police cases -- or, I'm sorry, incidents
12     and all these names are listed, or a traffic
13     stop or it -- somehow it's documented and you
14     keep seeing the same name over and over with
15     this -- this group.  And then you would go
16     through the whole process to see if they meet
17     the criteria.
18 Q   And in that case, that could be just something
19     that popped out from an incident report about a
20     person, and you would then go and look at some
21     of these other things and you could document
22     that person solely based on that paper trail; is
23     that right?
24 A   Yes.
25 Q   Now, do the -- do the audit -- just kind of walk

Page 88

1      me through how you do the audit --
2  A   Okay.
3  Q   -- how does that work?
4  A   So do you want me to explain it when I was a
5      gang officer, or do you want me to explain it as
6      they do it now?
7  Q   I want you to explain to me both.
8  A   Okay.
9  Q   Let's start with when you were a gang officer.
10 A   Okay.  All right.  So -- so FileMaker was a --
11     was a stand-alone system, we would have to -- so
12     only one person could get on it at a time.  So
13     we would divide the list up between the four of
14     us, and then on each page there's probably like
15     50 names.  And so we would go through each name,
16     and I would look up that person in EJustice,
17     again this is before social media and all that
18     stuff, so we'd look up their cases, try to find
19     arrests, if we had any contacts with them
20     before, whatnot.  And I would have to handwrite
21     all those cases down on a separate piece of
22     paper, and then it would be my turn to go get
23     onto the database, so we'd rotate it.
24 Q   Uh-huh.
25 A   And then I would get to input my information on

Page 89

1      my people.  And I'd just go through -- and it
2      was a tedious process.  And so essentially the
3      guys do it the same way, now there's only two of
4      them.
5  Q   Uh-huh.
6  A   But they have -- they divide up the list, and
7      they go through each name, and they see if they,
8      you know, meet that criteria, or if there was no
9      activity after three years, then they'll take
10     them off.
11 Q   Put them inactive?
12 A   Yes.
13 Q   Okay.
14 A   I'm sorry, take them off, that's --
15 Q   Okay.
16 A   -- inactive.
17 Q   How -- go ahead.
18 A   So, yeah, that's -- that is the process.  They
19     don't have to do the hand -- I think a lot of
20     them now they cut and paste or they type out
21     their notes to put in the narrative.
22 Q   And that was how it was done when you were
23     there, correct?
24 A   Yes.
25 Q   So how's it done now?

23 (Pages 86 to 89)

Page 90

1  A  Well, again, that -- I kind of jumped in and did
2     the -- the guys still print off an old hard copy
3     list of names and they -- they go through and
4     they -- they mark them off. I think they use
5     highlighters now where they -- they color code
6     it so it's easier to read.
7  Q  Okay.
8  A  And, yeah, they go through each -- each one, and
9     they -- they make sure that they either still
10    meet it or -- or if they don't, then they'll --
11    they'll remove them.
12 Q  Okay. Let's go back and talk a little bit about
13    how the gang unit changed over time.
14 A  Right.
15 Q  So when you were a gang intel officer, there
16    were four gang intel officers who reported to
17    the night sergeant --
18 A  Yes.
19 Q  -- correct? When's the next time that changed?
20 A  So in 2017, the unit expanded, they -- they --
21    they changed the name, and it became the Violent
22    Crimes Response Team; and we had, I think, ten
23    at night, and there was six during the daytime.
24    Sergeant Harty was in charge at night, and I
25    think Sergeant Cooper was in charge of the

Page 91

1     daytime operations. But all of those guys would
2     be responsible for an audit when -- when it came
3     time so ...
4  Q  Okay. So there would be 16 people who would be
5     involved in the audit?
6  A  Yes.
7  Q  And what did they call those 16 people, was
8     there a particular name for them?
9  A  Yeah, the Violent Crimes Response Team.
10 Q  Okay.
11 A  Or VCRT.
12 Q  And how -- I mean, that's a significant
13    expansion of the gang unit, correct?
14 A  Right.
15 Q  So how did they add those folks?
16 A  There was a process again where they had an oral
17    board, and then they were selected based on
18    their -- their scores from -- from the oral --
19    or their -- the process that's established
20    through the FOP or through the -- the
21    department.
22 Q  When you say FOP, that's the fraternal --
23 A  Yes, and I say the FOP 'cause they had,
24    obviously, input into what is -- the department
25    chose. It's the department process for -- it's

Page 92

1     not a promotion, it's just being selected for a
2     specialty unit.
3  Q  Okay. And FOP is the union, right?
4  A  Correct.
5  Q  Okay. So -- so those people were all added, and
6     they were just called Violent Crimes Response
7     Team members?
8  A  Yes.
9  Q  Okay. And what was your position at this point
10    in time?
11 A  So at that point, I believe I was -- I can't
12    remember exactly when they -- I thought it was
13    2017, so I would -- or maybe it was 2018, I
14    think it was 2018 is when they -- they started,
15    so that would have been right when I was
16    finishing as a sergeant and then I got moved out
17    to Patrol North --
18 Q  Okay.
19 A  -- as a lieutenant.
20 Q  Okay. Okay. All right. So were you happy
21    about that change?
22 A  Well, I -- I wanted to get promoted.
23 Q  No, okay, I mean, let me back up. Were you
24    happy about the change to the gang unit?
25 A  Oh, I thought it would -- it was appropriate,

Page 93

1     yes, I mean, 'cause the -- I felt like the -- it
2     was overwhelming for the four officers to work
3     on that audit. And we had a lot of, obviously,
4     violence that was going on that I felt like we
5     could address better with a specialized team.
6  Q  Did you have anything to do with designing that
7     team?
8  A  Yes.
9  Q  Okay. Tell me about that.
10 A  So we didn't know what the numbers would be or
11    what they were going to allocate to us, but
12    we -- I say we, I think it was myself and at the
13    time Sergeant Bartel had initially -- we
14    initiated a violent crimes task force; that took
15    place back in 2017 because the amount of
16    violence that was going on, and that ran for
17    about three months, I think.
18       And we kind of took that approach where we
19    had, you know, this specialized unit focused on
20    our most violent offenders and -- and then
21    applied that to becoming a violent crimes unit
22    where you would have some guys work at night and
23    then the other guys work during the daytime.
24    They would all be responsible for some part of
25    gang intelligence, but, again, the -- a lot of

24 (Pages 90 to 93)

## Page 106

1  A  I've never heard the off-ramp thing, but the
2     juvenile intervention unit would be a -- they
3     were -- they were part of the notification
4     process for juveniles that's in Policy 527.
5     When we had them, I say we, when the unit had
6     them or I had them assigned to me, I -- I would
7     have them go make the notifications and offer
8     resources to -- to parents.
9        Obviously we would want to try to intervene
10    if we could catch somebody before and not get
11    them on the list.  Usually that person would --
12    when they're getting notified is already going
13    to be on the list, and so by having them go and
14    make contact and offer the resources, we were
15    trying to get them to stay out of trouble for
16    that -- that three-year period so that they
17    could be changed to inactive.  Does that make
18    sense?
19 Q  Uh-huh, yeah.  So they were already on the list,
20    and they're going out to try to tell them that
21    they're on the list, tell the parents they're on
22    the list and tell them how to stay off the list?
23 A  Correct, how to --
24 Q  Or how to stay -- not get tagged again for three
25    years?

## Page 107

1  A  Yes, and offer them resources and -- and -- and,
2     you know ...
3  Q  So how do they do those -- how did -- well,
4     let's step back.  So part of Policy 527 is that
5     juveniles, if a juvenile is put on the list, you
6     need to notify the parent or guardian of that
7     juvenile; is that right?
8  A  Yes.
9  Q  So how does the gang unit undertake those
10    notifications?
11 A  So the initial was to send a noti -- or a
12    certified letter, but we didn't have much luck
13    with that, so we started doing phone calls and
14    then trying to actually physically go to their
15    address.
16 Q  And when did the phone calls and going to their
17    address start?
18 A  I'm not 100 -- I don't know.
19 Q  Can you give me a general idea based on where
20    you would --
21          MR. BRANSON:  She was catching up.
22          THE REPORTER:  No, I'm good.
23 BY MS. WOODY:
24 Q  Okay.  I'm sorry, let me finish my question.
25 A  Okay.

## Page 108

1  Q  Can you give me a general idea based on your
2     tenure and experience when that notification
3     procedure changed?
4  A  I'm pretty sure it happened in, like, 2016,
5     2018, somewhere -- I -- I'm pretty sure it was
6     right when I was the sergeant on nights.  Again,
7     I'm -- I'm really confident that -- between that
8     2015 to 2018.
9  Q  Uh-huh.
10 A  Because I'm -- I'm -- Lieutenant Gilmore was in
11    charge of the actual section at that time.
12 Q  Okay.  And so that's when they started trying to
13    make phone calls or have somebody go out?
14 A  Yes.
15 Q  And are those contacts documented anywhere?
16 A  Yes.  What I would request is that that
17    information be put in the narrative of the
18    database.
19 Q  Okay.  So that would be for each individual
20    juvenile where there was a contact, it would --
21    you would look at that individual's gang card,
22    if I can call it that, and it would show there
23    somewhere in the narrative that the parent had
24    been contacted or had tried to contact and that
25    there -- and then whatever resources had been

## Page 109

1     suggested, those kinds of things or not?
2  A  Not so much on the resources.  It might mention
3     that.
4  Q  Okay.
5  A  And I don't think we put all of the certified
6     letters in.  I -- I don't think we put in the
7     narrative that a certified letter was sent to
8     everybody.  We saved all those --
9  Q  Uh-huh.
10 A  -- but we didn't actually physically put that
11    part in there.  But, yes, if they -- they went
12    out and made contact with them, then -- then
13    that should be going in the narrative.
14 Q  Okay.  And you'd have to look at each
15    individual's gang card to see if the
16    notification took place?
17 A  Yes.
18 Q  Okay.  Do you -- do you have any idea how --
19    what percentage of juveniles who are on the list
20    that they're able to notify the parents or
21    guardians?
22 A  I don't -- I don't know the percentage or the
23    exact numbers of that.
24 Q  Do you have a general sense, is it, you know,
25    most of the juveniles or not very many, I mean,

## Page 134

1  Q  And if you look there, there's also, there was a
2      taking people off the list if they hadn't been
3      in trouble for 14 months. Do you see that?
4  A  Yes.
5  Q  And is that something that you agree with?
6  A  I know ours is three -- three years. I would
7      probably think that maybe split the difference,
8      you know, maybe -- whatever that would make it.
9      Personally, I don't -- that's -- that's not a
10     huge issue to me, you know what I mean, it -- I
11     recognize that there are people that are very
12     active in what they're doing right now, and
13     there's others that maybe still claim their
14     membership that have stayed on -- on the list
15     because they continue to get arrested. So ...
16 Q  So you don't really have a problem with -- with
17     that?
18 A  Not so much, I'd have to take a little bit
19     more -- maybe a standardized look at it, or
20     whatever, just to see, you know, maybe -- I'd
21     like to, like, maybe compare, you know, who's in
22     the database, maybe how -- how they've -- how
23     long they've been on -- you know what I mean, if
24     we could, like I said, come to more of a mutual,
25     you know, between -- between the three years

## Page 135

1      and -- I've always felt like the WPD has come a
2      long way because we give the opportunity for a
3      person to come off the list because there --
4  Q  To become inactive?
5  A  Yes, I -- I say off the list but, yeah, to be
6      inactive and -- and we do a yearly audit to make
7      sure that that's up to date so -- but I think
8      that 14 -- the 14, you know, some -- somewhere
9      in there, I think that's -- that's -- that could
10     be applicable.
11 Q  With respect to the last bullet there, it says
12     that anybody who has been tagged, you know, put
13     on the gang list --
14 A  Uh-huh.
15 Q  -- any adult --
16 A  Uh-huh.
17 Q  -- be notified. Now today that's not a
18     requirement, correct?
19 A  Correct.
20 Q  So somebody could be on the list and not know
21     it?
22 A  It's possible, yes.
23 Q  And so do you have any disagreement with
24     notifying people once they're put on the list?
25 A  No, that's fine.

## Page 136

1  Q  Okay. I think one of the things that's not in
2      that memo that -- that Deputy Chief Salcido had
3      talked about was getting rid of the inactive
4      list altogether?
5  A  Uh-huh.
6  Q  And getting rid of anybody who was just an
7      associate.
8  A  Uh-huh.
9  Q  Have you heard that?
10 A  We had talked about -- once this came about, I
11     think we talked about having the inactives
12     removed off of the database but keeping the
13     legacy information, because there is a lot of
14     history that -- that's in that information. So,
15     again, I don't want to just throw it all away, I
16     mean, there's -- there's a lot of stuff in
17     there. I mean, I know of shootings that still
18     go on today because of what happened almost
19     20 years ago when I was first a gang officer,
20     and it still rings true with those guys today.
21     But, no, I -- I don't have a problem with
22     removing the inactives out of the -- the main
23     database, or whatever, and putting, you know --
24     putting all their files, you know, in a folder
25     or something.

## Page 137

1  Q  Okay. And then how about the associates, how
2      about removing them?
3  A  I -- I understand removing associates; however,
4      I'm going to fall back to that a lot of our
5      associates are -- are -- are really just active
6      members that -- that haven't met all three
7      criteria, but a lot of it's with our Mong -- or
8      I was going to say Mongols, but our motorcycle
9      gangs where we have support groups which are
10     specific -- that's their specific function;
11     they -- they can never become a full member
12     because they'll never get patched in, but they
13     are the support club. And some of those support
14     people will meet the -- the -- the three minimum
15     criteria, but my training and work experience, I
16     know for a fact that they -- they're not a
17     member because they're not a patched member of
18     the club. So I always know they're always going
19     to be an associate. Does that make sense?
20 Q  Uh-huh.
21 A  So -- so I would have a little bit -- I think
22     it's applicable, but, again, there -- there
23     would be things that I just gave you that
24     example, or whatever, where I know for a fact
25     that this is a support club person, they're

Page 138

1  going to this -- this same location, or
2  whatever, but they're not a full mem -- member
3  because they don't have a patch.
4  Q   Okay.
5  A   So I have a couple hang-ups with some of that,
6      and it just comes down to being able to
7      articulate --
8  Q   Right.
9  A   -- as -- as my profession would allow.
10 Q   I think maybe what you're saying is sometimes --
11     you think that most of the people who are on the
12     associates list really do qualify as gang
13     members, is that what you're saying?
14 A   Well, it -- they can.  Now, it's not -- because
15     there are a lot of times there is a lot of
16     documentation that -- that -- that -- that
17     there -- that there's available but - and I
18     don't want to get into the mediation - but I,
19     again, I wouldn't have that big -- I wouldn't
20     have that much of a problem with associates
21     coming off the list.
22 Q   Okay.  Let me just ask you real quickly right
23     now about the notification of juveniles.  So
24     everybody gets sent a certified letter, right?
25 A   No.

Page 139

1  Q   No, okay.  So it's changed?
2  A   Yes.
3  Q   Okay.  So -- so tell me how it works now.
4  A   Okay.  So the certified letter was the -- what
5      initially happened as part of the -- when they
6      started the program.
7  Q   Okay.
8  A   We got so many of those back un -- unserved, or
9      whatever, we realized that it's not an effective
10     way to do that.  So that's when we changed it to
11     either a phone call and/or personal contact.
12 Q   Uh-huh.
13 A   And that usually meant either I would -- so when
14     I was the night sergeant, I would make a phone
15     call to the parent and I would tell them about,
16     you know, that their child had been documented,
17     that we would like to, if you -- if you wanted
18     to, to set up an appointment to meet with
19     Lieutenant Gilmore so that you could go over the
20     actual flagging and then discuss options for,
21     you know, resources and different things.  Some
22     of those went very well; some of them, just got
23     hung up on.  But I usually had the -- the
24     gang -- so now for a personal contact, we would
25     either have the gang officers or I prefer the

Page 140

1      juvenile intervention unit go out, or they --
2      they work together --
3  Q   Uh-huh.
4  A   -- and go out and actually try to make contact,
5      leave a card.  I think they do try a phone call
6      if they're not having luck.  We really want to
7      try to do personal contact.
8  Q   And is there any certain number of times that
9      they need to try to make contact, or is it a one
10     and done, or how's that work?
11 A   I rely on their common sense, I would expect
12     they need to make two or three or four attempts,
13     that's -- that's the common -- you know, leave a
14     card, make a phone call, go back by, you know,
15     go by the school.
16 Q   Do they document those attempts anywhere?
17 A   If they do, I don't know about it.
18 Q   So that would be the folks who are actually
19     doing that who I would -- who I would need to
20     talk to about that?
21 A   Correct.
22 Q   Why don't we take a 15-minute break and --
23         THE VIDEOGRAPHER:  Go off the record
24     at 11:43 a.m.
25         (Thereupon, a recess was taken;

Page 141

1      whereupon, the following was had.)
2          THE VIDEOGRAPHER:  Okay.  We're back
3      on the record at 11:57 a.m.
4          MS. WOODY:  Can you mark this for
5      me?
6          (Deposition Exhibit Number 22
7      Marked for Identification.)
8          THE REPORTER:  22.
9  BY MS. WOODY:
10 Q   Okay.  Lieutenant Beard, I'm handing you what's
11     been marked Deposition Exhibit 22.
12 A   Uh-huh.
13 Q   Which is Wichita 060410 (sic).  You see that?
14 A   Yes.
15 Q   That just means that was produced to us by the
16     Wichita Police Department, okay?
17 A   Yes.
18 Q   And it looks like it is an officer's report
19     dated August 30, 2022 so within the last few
20     months.  Do you see that?
21 A   Yes.
22 Q   And can you just tell me what this is?
23 A   So this is an officer's report submitted by
24     myself to Deputy Chief Salcido identifying that
25     I have a social media account that I use for

Page 186

1  department that was the only thing that we
2  received in the academy.
3  Q  Okay. And so when you were -- when you were on
4    patrol, initially you -- you kind of sought out
5    personally and got some of that on-the-job
6    training --
7  A  Yes.
8  Q  -- from current gang officers, correct?
9  A  Yes.
10 Q  And so then in 2002, you actually joined the
11   gang unit, and was there -- what training did
12   you get as you came into the gang unit?
13 A  So there was -- I attended a -- I know I
14   attended one gang presentation to the recruits
15   given by Lieutenant Speer, and then I also --
16   again, a lot of it was, you know, hands-on
17   knowledge, real-time stuff, actually getting out
18   there, interacting with these individuals,
19   and -- and my partner at the time was Dan Harty,
20   and so I -- you know, all his ups and downs,
21   whatever worked for him, I took a lot of that
22   with me.
23      I watched them give presentations, you
24   know, I -- I looked through the presentations
25   that they had and I studied them. I also

Page 187

1  studied the database. Like I talked about
2  before, I -- I have a real good knack of
3  recognizing people and -- and remembering those
4  persons and what they've been involved in and
5  who their girlfriend is and -- and the car, so
6  that helped me learn who the individuals were
7  the most -- and then to where the point I almost
8  didn't need the database because I knew who --
9  who was doing what and who was -- you know, what
10 gang they're already in. And so that was a
11 skill set that I -- that I had that I -- that I
12 excelled in -- in that position with.
13     But, again, a lot of it comes down to just
14 on-the-job experience, or whatever, getting out
15 there, doing the interviews, interacting with
16 these guys. I did put in requests, and I think
17 I -- you know, I would go to some of the gang
18 conferences, or whatever, when they came
19 available, but, again, it came up to funding and
20 availability and that kind of stuff.
21 Q  So when you say the gang conferences, what are
22   you talking about there?
23 A  So there was -- there was like a -- a Midwest
24   Gang Investigators Association that was put on
25   by -- I think it's now, like, the Koch Crime

Page 188

1  Commission, I think, was one of the --
2  Q  The Koch Crime Commission?
3  A  Yes.
4  Q  Okay.
5  A  It's C -- or, sorry, K-O-C-H. Or at least the
6    Wichita Crime Commission; they used to call it
7    the Koch Crime Commission.
8  Q  Right.
9  A  They would have a annual conference. And,
10   again, if I got the opportunity to go to that, I
11   would go. And then it was -- I ended up
12   developing my own PowerPoints because I wanted
13   something that I could talk about from my
14   experiences, my -- you know, the cases that I
15   had been involved in, the photographs that I had
16   taken of the guys when I was interacting with
17   them, and so it was more relevant to -- to me.
18   And so then that's when I created my own and
19   then started providing training to recruits
20   and -- and that -- and that kind of stuff so ...
21 Q  And when do you think you would have developed
22   those, your own materials, about what time
23   frame?
24 A  It had to be probably 2003, 2004 so not real
25   long after I'd been there but, you know, within

Page 189

1  the last -- within that year or so, because I
2  felt like it was important to keep kind of a --
3  a running, not novel but legacy, I guess, of
4  what I was experiencing or whatnot so ...
5  Q  So you've said that you used that PowerPoint
6    that you put together to do your -- to do
7    training for other people, correct?
8  A  Yes.
9  Q  And that -- that start pretty soon after you put
10   that together?
11 A  I believe so, yes.
12 Q  So tell me the kinds of training that you would
13   give using those materials.
14 A  Sure. So with that, I would -- we would -- I
15   say we, usually we gave it as a group, or
16   whatever, but we would be scheduled to give the
17   recruits, as an example, so we had four hours to
18   provide training to the recruits. So we would
19   talk about -- before we didn't have a state
20   statute, but we'd go through the criteria, we'd
21   talk about filling out a TOPS card and what was
22   required, we would talk about what a gang was,
23   what a gang member was, what is an associate.
24      And then so when the state statute came
25   about, we'd obviously go through that entire --

### Page 190

1  the 26 -- 21-6313, we'd go through all that and
2  explain that to them. Then we would break it
3  down into the different gangs that are here in
4  Wichita. And I don't want to bore you with all
5  that but, you know, just the different sets, you
6  know, the sets, the subsets, and the, you know,
7  the other sets that are -- that are here,
8  whether it's the Crips, the Bloods, the Folks,
9  Hispanic gangs, Asian gangs, white supremacists,
10  motorcycle gangs, we'd go through all the ones
11  that were identified here in Wichita.
12     And then we would give identifiers, colors,
13  you know, what they were involved in, and then I
14  believe we talked about what weapons. Then
15  we -- we would do some case history or case
16  study of some of the violence that they were
17  involved in and -- and how we worked that case.
18  So give them an overall view of what gangs were
19  affecting Wichita and then what they might
20  encounter and then how to document that through
21  a TOPS card or in their reports.
22  Q  So that's the training you would give to the
23  recruits, correct?
24  A  Uh-huh.
25  Q  And do you still do that?

### Page 191

1  A  I don't personally but I -- I -- Cale and Jess
2  do that now. And so when I became the
3  supervisor over the gang unit in 2015, I wanted
4  them to give those presentations, to create
5  their own, to make it something that they took
6  ownership to, and then they could give their
7  experience and -- and talk about -- there's
8  still always the basic stuff, there's always
9  going to be Bloods, Crips, Folks, or whatever,
10  that they're going to cover, but it's going to
11  have their own take on it.
12  Q  Okay. So the training materials change over
13  time depending on who's -- who's giving the
14  training, they get modified?
15  A  Yes.
16  Q  Other than -- other than providing training to
17  the recruits, what other kinds of training did
18  you provide?
19  A  I provided -- so there was a couple times where
20  officers came from other outside agencies, from
21  Sedgwick County -- or I'm -- well, Sedgwick
22  County did have some deputies that -- that rode
23  with us, and -- and I essentially gave them
24  on-the-job training as how we do things. I had
25  them from Dodge City, Great Bend, I believe, and

### Page 192

1  Johnson County, all came down to do either a
2  ride-along or -- or, you know, hang out with us
3  for a day to -- and we would go through
4  everything.
5  Q  You'd go -- you'd give them the presentation?
6  A  Give them the presentation, they would go out
7  for a ride-along, you know, they would -- all
8  the things that we did as a gang intelligence
9  officer, you know, doing their surveillance,
10  documenting the stuff from the database, you
11  know, reviewing the TOPS cards, part of the
12  audit, I mean, we'd just tell them, you know,
13  what our duties were.
14     Like I said, I've -- I've given
15  presentations for Newman and Friends and WSU,
16  I've given it to the district attorney's office,
17  I've given it to the juvenile detention
18  facility, I've given it to community
19  corrections, probation. Again, several of the
20  conferences that I attended, whether it was the
21  Midwest Gang or the Kansas Gang Investigators
22  one I presented at. And, again, that wasn't,
23  like, the whole time; it was I just had an hour
24  slot, or whatever.
25  Q  Right, right, no, I understand, yeah.

### Page 193

1  A  I've given mandatory in-service training to
2  current commissioned officers about, you know,
3  what current gang activity's gone on, whether
4  it's recently or, you know, explaining why these
5  feuds are going on, or -- or whatnot. So that's
6  training that I've provided that's mandatory,
7  which is required for every officer every year
8  to go through two mandatory sessions.
9     I know that's kind of general, but that --
10  I have given, you know, community groups as
11  well, you know, neighborhood associations,
12  district advisory board type stuff, I've given
13  it to those as well, some being just 15 minutes.
14  I've also provided it to school staff, the
15  principals. Certain schools had asked for a
16  presentation, so I've -- I've given it to some
17  of the schools, to the BOE, board of education,
18  security, the SROs. Yeah, that -- again, a lot
19  of that training took place between 2009 and
20  2014 is where a lot of my presentations took
21  place.
22  Q  And did you use the same PowerPoint over and
23  over again?
24  A  Maybe the general layout but, no, I would try to
25  update it with more current information, current

Page 246

1  A   This is these -- these are very similar to the
2      prostitution maps that -- that the City has, but
3      this is for the Sedgwick County Department of
4      Corrections, which is labeled at the top, so
5      these are the -- for Sedgwick County.
6  Q   And it says central mapping zone, does that mean
7      anything to you?
8  A   I would assume that that means where the --
9      where -- where they're talking about because
10     looking at the streets, this is more in the
11     central part of Wichita.
12 Q   And it looks like it's -- the defendant is a
13     person named Aubreon L. Davis. Do you see that?
14 A   Yes.
15 Q   Do you know who Mr. Davis is?
16 A   I'm familiar with his name, yes.
17 Q   How are you familiar with his name?
18 A   I believe he's documented as a Blood.
19 Q   And if you take a look at the second page, it
20     says, Supervision Agreement, Gang Conditions --
21 A   Yes.
22 Q   -- you see that? And so these are the -- I'd
23     like you to take a review of this and see if --
24     if these are -- if this refreshes your
25     recollection about what the gang conditions are?

Page 247

1        MR. BRANSON: Object to form.
2  A   Again, the conditions have been different on --
3      that I remember but they're -- these -- I have
4      heard or seen these before in general overall, I
5      guess, if that makes sense.
6  BY MS. WOODY:
7  Q   So is this some -- is -- is this something that
8      the gang unit would be aware of if they were
9      asked to assist probation and parole in -- in
10     determining whether any of these conditions have
11     been violated?
12 A   Yes.
13 Q   So whoever was doing that monitoring would be
14     familiar with the conditions on this person and
15     would be checking to make sure that they weren't
16     violating them; is that right?
17       MR. BRANSON: Object to form.
18 A   Who are you talking about monitoring?
19 BY MS. WOODY:
20 Q   The gang unit person?
21 A   Yeah, see, the -- I was never assigned a
22     specific person or -- or anything like that.
23     What normally would happen is that the probation
24     or corrections would contact us and say, would
25     you mind checking up on this guy or see if he's

Page 248

1      in violation, or we would assist them when they
2      went out and did their checks and we would just
3      be there with them.
4  Q   Okay. So sometimes you would get a call from
5      probation saying, we want to make sure this guy
6      is in -- living up to the conditions, and they
7      would ask you to go check. Would they then have
8      to give you some of the conditions so you would
9      know what you were checking for?
10 A   Yes, they would either verbally tell -- I don't
11     remember -- I don't ever remember them sending
12     this specifically. I mean, they'd usually just
13     tell us, he's got a 11:00 o'clock curfew, he
14     can't, you know, can't be drinking.
15 Q   Okay. Take a look at page 3 of that document up
16     at the top, and it says number 12, I shall not
17     ride in a car with more than one person unless
18     those persons are my parents, siblings, or my
19     children. Do you see that?
20 A   Yes.
21 Q   Does that strike you as a pretty strict
22     condition?
23       MR. BRANSON: Object to form.
24 A   It does.
25 BY MS. WOODY:

Page 249

1  Q   Does Wichita have a great public transportation
2      system?
3  A   I don't know, I don't use it.
4  Q   Okay. Do you think it might be difficult to get
5      from one place to another if you didn't have
6      your own car in Wichita?
7        MR. BRANSON: Object to form.
8  A   Could be.
9  BY MS. WOODY:
10 Q   Take a look at number 15, it says, I shall not
11     associate with family members or extended family
12     who are documented gang members. Exception
13     would be immediate family only, i.e., brother,
14     sister, parents, no cousins. Do you see that?
15 A   Yes.
16 Q   So in your experience, in certain communities do
17     large numbers of people frequently live at the
18     same place?
19       MR. BRANSON: Object to form.
20 A   Could you ask that again?
21 BY MS. WOODY:
22 Q   Sure. In your experience, in certain
23     communities do large numbers, I'll -- I'll
24     change it a little bit, do large numbers of
25     extended family often live at the same place?

Page 262

1  correct?
2  MR. BRANSON: Object to form.
3  A  I don't know on that.
4  BY MS. WOODY:
5  Q  In -- in your experience, which happens more
6     often than not?
7  A  The times that I have testified, it has -- the
8     motion has been passed.
9  Q  And so what happens after that?
10 A  Well, then it would -- it would go to trial if
11    it ever would -- if it'd go to trial then, then
12    I could be called again as a -- to testify.
13 Q  And how many times do you think you've actually
14    testified in trial?
15 A  As a gang expert or as --
16 Q  Yes, as a gang expert?
17 A  Oh, probably -- in front of a jury, I mean, at
18    least eight -- those eight to ten times on the
19    homicide cases. Then the RICO case, I've
20    testified on that as well. And then there's
21    been other motions and stuff without a jury that
22    I've provided, you know, my opinion on stuff
23    that I ...
24 Q  On the -- on the jury trials that are gang --
25    the gang-related cases, the eight to ten that

Page 263

1     you testified in, how many of the defendants in
2     those cases were people of color? How many of
3     the defendants?
4  A  I believe all of them were.
5  Q  And in those cases, do you recall the outcomes
6     of those various cases, guilty or not guilty?
7  A  I believe the majority of, if not all of them,
8     were guilty.
9  Q  Okay. You talked about the RICO case, explain
10    to me what the -- the RICO case that you
11    testified in was about.
12 A  So that was a -- in 2006, there was a ongoing
13    Crip Racketeering Influenced Corrupt
14    Organization investigation that took place, and
15    during that investigation, obviously, several
16    people were indicted, and I testified in federal
17    court in reference to gang documentation, the
18    Crips and gang activity that occurred here in
19    Wichita.
20 Q  Okay. And so you were kind of giving historical
21    information about the Crips and -- and just
22    various things that they've been -- they've been
23    involved in over the years; is that accurate?
24 A  Yes.
25 Q  Okay. Anything else that you testified about in

Page 264

1     that case?
2  A  I think that was primarily the -- the main
3     portion of my testimony. There was probably
4     some minor things that I -- to the ongoing
5     investigation, you know, collecting of some
6     evidence or -- but I -- the bulk was about
7     criminal gang activity.
8  Q  How -- how is it determined who is going to
9     offer the expert testimony on a given case?
10 A  So when I was a detective, if I was the lead
11    case agent already, it kind of became my -- my
12    case, and so I would be the -- the main one.
13    They obviously look toward, you know, for those
14    that had the most experience or had done it for
15    a while, testified before, but like I said, I
16    wasn't the only one. I believe, you know, Aaron
17    Chaffee, Joe Stearns, I think Rod Miller, Harty,
18    Elmore have all had experience testifying in
19    gang -- Donnie Moore, Erik Guzman have all
20    testified as -- either as experts or as
21    providing gang testimony in reference to ongoing
22    feuds and -- and of such. So it didn't
23    necessarily have to be me every -- every time,
24    or -- or whatnot. A lot of times it was because
25    I was familiar with the case or I helped -- I

Page 265

1     came in to assist on the homicide and I was just
2     part of the case already.
3  Q  Okay. Did you ever have instances where you
4     weren't part of the case but you were called in
5     to give gang testimony?
6  A  I don't -- I don't remember any of those. I --
7     I usually had -- would have some type of
8     involvement in the case from the beginning or,
9     you know, I played a role usually in some
10    part -- in part of the investigation; it wasn't
11    like I just came in out of the blue to testify
12    about a case.
13 Q  Okay. I'm going to show you what's --
14    MS. WOODY: I've just got one copy
15    of this, Charles, I'll let you look at it
16    first.
17    MR. BRANSON: Okay.
18    MS. WOODY: If we could mark this.
19    (Deposition Exhibit Number 32
20    Marked for Identification.)
21 BY MS. WOODY:
22 Q  I -- I may have to stand up here. I'm going to
23    let Charles look at it first so that he's seen
24    it.
25    MR. BRANSON: Lot of pages.

Page 294

1   know, a supervisor over them directly as well.
2      I think I've mentioned some of the changes
3   in the state law or, you know, even the policy
4   that -- that I think could be done, in --
5   including a notification process, an appeals
6   process. Those types of things, I think, are
7   all very applicable in -- in today's, you know,
8   policing, that we would make it more equitable,
9   be more transparent.
10     Again, I have nothing to hide in reference
11  to -- I'm very proud of -- of our unit, and the
12  gang intelligence officers, I think, know how to
13  flag people, you know, and are using the -- the
14  appropriate criteria and the -- but I think
15  there's always room for improvement with any
16  unit or agency.
17 Q  When you say make it more equitable, what do you
18  mean by that?
19 A  Just I guess to be more along the -- the lines
20  of transparency, you know, explaining or
21  providing information to the people so that they
22  know what we do and so there's a better
23  understanding, whether that's through community
24  engagement, through meetings or presentations,
25  you know, more than just a DAB meeting, or

Page 295

1   whatever, if it means that we, you know, try to
2   get more into the community that's -- that's
3   affected, whether that's the people of color,
4   whether's that's Hispanic or African American,
5   or whatever, is try to -- to -- to help them
6   understand where we're coming from or why these
7   individuals, you know, are documented as such
8   and ...
9  Q  Could it also be to hear what their perspective
10    is?
11 A  Absolutely.
12 Q  So just give me a second, I'm going to take a
13    quick look here, and we may be close to being
14    done.
15        THE VIDEOGRAPHER: Go off the record
16    at 3:42 p.m.
17        (Discussion held off the record.)
18        THE VIDEOGRAPHER: Okay. We're back
19    on the record at 3:44 p.m.
20 BY MS. WOODY:
21 Q  Okay. Lieutenant Beard, I just have a couple of
22    follow-up questions, and one of them was when
23    you talked to KDOC or KDOC would call you or
24    say, is this person a gang member, or the DA
25    would, would you just give them the list off the

Page 296

1   name, or would you have to do some kind of an
2   audit at that point?
3  A  So what normally would happen -- first of all,
4   we'd always have a MOU in place with KDOC so
5   that we just weren't handing over their
6   information, but what I would normally like to
7   see is that they would -- the gang intelligence
8   officer or myself would review that flagging to
9   make sure that all the criteria are
10  appropriately marked before we just send that
11  off. So it's a verification.
12 Q  Okay. Not really an audit but just --
13 A  A mini audit.
14 Q  -- communications in there? Yeah.
15 A  Correct, and then that information would be sent
16  to them. If it was the DA's office, same thing
17  but we wouldn't send it to them, we would
18  usually bring it over physically, let them
19  review it, or the defense attorney; once they're
20  done, we would take it back and destroy it.
21 Q  And you talked about some changes that you think
22  it would be good to see made to the state
23  statute itself, correct?
24 A  Correct.
25 Q  And if -- and without those changes, the policy

Page 297

1   at -- at WPD might change, but across the state,
2   it might still be --
3  A  Correct.
4  Q  -- it might still be problematic?
5  A  I don't know if problematic but, you know, where
6   it's applied, if -- if -- if agencies choose to
7   follow the state statute, then -- I mean, again,
8   those are from my -- my opinion of my -- you
9   know, where I think those things could be shored
10  up. Whether or not that -- that individual
11  department continues to -- does something on
12  their own or continues the -- I don't
13  necessarily see it as a problem, but I just, I
14  like to see progress.
15 Q  Okay. And it would be progress to have the
16  state -- to have the state statute modified in
17  your mind?
18 A  Yes, with those suggestions that I've provided.
19 Q  Okay. I have no further questions.
20
21        CROSS-EXAMINATION
22 BY MR. BRANSON:
23 Q  I just have a couple. You testified earlier
24  about the consequences of -- of being on the
25  gang list, or you were asked about consequences

75 (Pages 294 to 297)