IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


PROGENY, et al.,                    )
                                    )
            Plaintiffs,             )
                                    )
vs.                                 ) Case No. 6:21-cv-01100-EFM-ADM
                                    )
CITY OF WICHITA, KANSAS,            )
                                    )
            Defendant.              )




VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF SAGE HEMMERT
TAKEN ON BEHALF OF THE PLAINTIFF
DECEMBER 7, 2022
VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF SAGE

HEMMERT, produced, sworn, and examined on the 7th day

of December 2022, between the hours of nine o'clock in

the forenoon and six o'clock in the evening of that

date, before KARA D. INCE, a Certified Court Reporter

within and for the State of Kansas, in a certain cause

now pending IN THE UNITED STATES DISTRICT COURT, FOR

THE DISTRICT OF KANSAS, wherein PROGENY, et al., are

the Plaintiffs and CITY OF WICHITA, KANSAS, is the

Defendant.

Page 39

1  the gang list or -- while you were a patrol officer?
2      A.  While I was a patrol officer, no.
3      Q.  Okay.  Did you ever report people saying
4  that they had satisfied criteria to be a gang
5  member?
6      A.  I completed TOPS cards, the gang ID cards,
7  when I was a patrol officer.
8      Q.  And what -- what's a TOPS card?
9      A.  If you have contact with a gang member --
10 if a patrol officer has contact with a gang member,
11 or somebody they believe to possibly be a gang
12 member, they can fill out a gang ID card.  When I
13 first came out they were these little blue cards.
14 They were hard copy cards that we called blue cards.
15     Q.  Uh-huh.
16     A.  And you would fill it out and then put it
17 in the mail.  They called it the mail.  It was the
18 stuff that got, you know, passed around the city and
19 got to the right spot, and it would go to the gang
20 intel unit.
21         When I was in the unit and actually before
22 I -- before I got into the unit we went to a digital
23 card, but it was the same information, it was just
24 digital, so ...
25         If you -- if you had contact with somebody

Page 40

1  that was documented as a gang member you would do a
2  blue card.  Or if you had contact with somebody that
3  you believed was a gang member but was not yet
4  documented you could do a blue card, and you would
5  list why you thought what they should be documented,
6  and that information would go to the gang
7  intelligence unit for investigation and vetting.
8      Q.  And what -- what would you do if you had
9  somebody that you believed to be a gang member?
10 How -- what kind of things would you document?
11     A.  Name, date of birth, address.  Vehicle
12 that they were in, if they were in a vehicle.
13 Address that they were present at if they were at an
14 address or wherever you contacted them at.
15         If they had any visible tattoos.  If they
16 were wearing -- what they were wearing, clothing,
17 statements that they made, people that they were
18 contacted with.
19     Q.  So were you trained on how to fill out
20 these TOPS cards?
21     A.  Yes.
22     Q.  And what kind of training did you get
23 about that?  When did you get that and what was it?
24     A.  That was part of the gang intel
25 presentation when I was in the academy.  They --

Page 41

1  they showed everybody what a TOPS card was and
2  encouraged people to fill them out.
3         And then when I was in FTO -- so my
4  primary FTO was a gang intelligence officer for
5  several years.  And then the other two FTOs that I
6  would were both -- you know, they'd been around --
7  one of them was a SCAT officer for a long time, and
8  then he ended up being -- he did a very short stint
9  as a gang intelligence officer before promoted.
10        But they -- they had knowledge of -- how
11 to fill out the TOPS cards, and they trained me how
12 to do so.
13     Q.  And was that something that you did pretty
14 routinely?
15     A.  Yeah.  Yes.
16     Q.  Would you do it sort of on a daily basis?
17     A.  No.  It would just be -- you know,
18 primarily the TOPS cards that I filled out were when
19 I had contact with gang members and I would -- I
20 wouldn't say that was a daily basis.
21         I mean, if you -- maybe it would be if you
22 averaged it out, because I might have contact with
23 four or five gang members on a Friday and four or
24 five on a Saturday, but it wasn't -- I didn't
25 have -- I didn't fill out a TOPS card every single

Page 42

1  day.
2      Q.  Okay.  But you -- but sometimes you filled
3  out multiple TOPS cards in a day; correct?
4      A.  Yes.
5      Q.  And who was your -- who was your primary
6  FTO?
7      A.  Jeremy Miller.
8      Q.  And then you said you had two other folks.
9  Who were they?
10     A.  Chris Marceau and Stacy Woodson.  Stacy
11 Woodson's deceased, but Miller and Marceau both
12 still work at WPD.
13     Q.  Okay.  When you -- and when you filled out
14 these TOPS cards, would -- would that be based on
15 your observations of a person?  Is that pretty much
16 what it was?
17     A.  Observations and conversation that I had
18 with the person, yes.
19     Q.  Okay.  And there's some -- some -- one of
20 the criteria for being put on the list is -- is
21 somebody self-identifies as a gang member; right?
22     A.  Self-admits, yes.
23     Q.  And what's that mean?
24     A.  A person tells you they're a gang member
25 -- claims --

11 (Pages 39 to 42)

Page 43

1    Q.  Go ahead.  I'm sorry.
2    A.  Claims to be a gang member.
3    Q.  And then -- and they actually say that,
4  I'm a member of such and such gang?
5    A.  Well, the verbiage that they use is not
6  identical to what you just said.  Typically they
7  won't say I'm a member of the Bloods gang.  They'll
8  say something like, I'm a Blood; you know, I'm a
9  Blood; you know, I'm with Bloods.  But, yes.
10    Q.  Okay.  And there's no other way that you
11  can self-admit?  It has to be by telling you that?
12  It's not just something that you observed and you
13  decide they've admitted it because of what they're
14  wearing or how they're acting?
15    A.  Yes.  That -- I mean, yes.  They have --
16  they have to admit it to you.
17    Q.  Okay.  And if you do that, there's a box
18  that you check that says, oh, they admit it; right?
19    A.  There's a box that you check, and then
20  there's a -- there's a space where you can write
21  down what they actually said as close to verbatim as
22  you -- as possible.
23    Q.  And what were the other criteria that you
24  applied when you were filling out the TOPS cards?
25  Do you recall that?

Page 44

1    A.  The -- the criteria that I would use
2  primarily would be dress, hand signs, tattoos, and
3  maybe associates if you contact with -- if you have
4  contact with several gang members at once.
5    Q.  And when you say "contact with several
6  gang members at once," what contacts are you talking
7  about there?
8    A.  Do you want it -- like, are you asking for
9  examples?
10    Q.  Yes.
11    A.  So an example would be if you stop a car
12  and there's four gang members inside or there's --
13  yeah, let's say there's three or four gang members,
14  or five or whatever, multiple.
15        What was really common when I was on
16  patrol was you'd go to a house party, a disturbance
17  with shots fired, where either somebody got shot at
18  the house party or the house got shot up in a
19  drive-by, and a lot of patrol officers would respond
20  to this and work this shooting.  And during the
21  course of this shooting you'd have contact with
22  several gang members that were -- you know, a lot --
23  a lot of times the same set that were all attending
24  this party.  They were all there.
25    Q.  And so would you note that -- would you

Page 45

1  make notations of who was at the party?
2    A.  Yes.
3    Q.  And would those be recorded in TOPS cards
4  for all of those folks?
5    A.  Yes.
6    Q.  So same with the -- same with the car.
7  You stop a car and there's four people in the car
8  and -- and at least some of them have gang
9  membership, would you document all of them?
10    A.  Probably.
11    Q.  You say that with a qualifier.  What --
12  when would you not?
13    A.  Well, yeah.  You know, I guess you would
14  apply was discernment and common sense.
15        If you stop a car and there's two brothers
16  in it that are both gang members, and their mom was
17  driving the car and these guys are -- well,
18  regardless of how old they are, but especially if
19  they're 17 or 18, you wouldn't do a TOPS card on the
20  mom.
21    Q.  But you would on them?
22    A.  If there was information -- you know, if
23  there was useful information that you gained from
24  the TOPS card -- or from the contact, then you
25  would.  Like if -- if they're Crips and they're both

Page 46

1  wearing all blue, for instance, or if you have a
2  conversation with one of them and they self-admit,
3  again, during the conversation, you know, you would
4  do a TOPS cards so they would be updated.
5    Q.  So under that circumstance you could --
6  you could do a TOPS card because you observed that
7  they were both wearing blue and that was a Crip
8  color; right?
9    A.  Yeah.  In that hypothetical scenario, yes.
10    Q.  Okay.  So I think you said that the
11  criteria you applied most of the time were either
12  they were around other people who were gang members;
13  right?
14    A.  Yes.
15    Q.  Were dressed, hand signs, and tattoos;
16  correct?
17    A.  Correct.
18    Q.  And when you say "dress," just describe
19  for me what you're talking about there.
20    A.  Colors primarily.
21        You know, there's more -- I guess more to
22  it maybe than colors.  Like neighborhood Crips tend
23  to wear North Carolina gear.  Piru Bloods tend to
24  wear Philadelphia Phillies' gear because they're red
25  and there's a big P on the front of it, so you

Page 47

1 would, you know, notate that. But definitely color
2 is the -- is the main thing.
3      Crips dress to the left. Folks dress to
4 the right. So where that comes in is like if
5 they're wearing a hat and it's tilted to the left,
6 that could be considered dressing to the left. You
7 know, you'd look at the totality of circumstances
8 obviously, but if they have a -- a do-rag, just call
9 it a rag, like a bandanna hanging out of a pocket,
10 if it's hanging out of the left side for Crips or
11 the right side for Folks, that would be significant.
12      Q. Okay. So you're looking -- so you could
13 say, well, somebody's wearing their hat tilted to
14 the left, so that means something to you?
15      A. It might. I mean, that's -- that's one of
16 the more obscure -- that's one of the more obscure
17 indicators. And not everybody, especially younger
18 guy's, don't necessarily represent that way, but it
19 could.
20      Q. Okay. And in the instance where you
21 documented somebody because they were in a car,
22 would it be necessary for them to be doing anything
23 other than riding in the car to be documented?
24 Would they have to be engaged in a crime?
25      A. Well, the -- what we're talking about, I

Page 48

1 think, still is filling out a TOPS card.
2      Somebody doesn't get documented as a gang
3 member just because they have a TOPS card filled
4 out. But the word "documented" kind of has meaning
5 within the gang world.
6      So is that what we're talking about, that
7 a person could get a TOPS card filled out on them
8 because of a car stop?
9      Q. Yes.
10      A. Would they have to be engaged in a crime?
11 No, not necessarily.
12      Q. Okay. They could -- in a situation you
13 said where the two guys are riding with their mom,
14 that's not necessarily a criminal offense; right?
15      A. No, not necessarily.
16      Q. But you could still fill out a TOPS card
17 in that -- in that instance?
18      A. Correct.
19      Q. And then so tell me, then, what happens to
20 actually get somebody documented. You've got these
21 TOPS cards. So what happens?
22      A. So as a patrol officer, you fill out the
23 TOPS card, and then if it's a hard copy TOPS card it
24 gets routed to the gang unit. If it's -- well, it's
25 the same thing if it's a digital one. It just goes

Page 49

1 straight there. There's a folder that you drop it
2 in.
3      And then the gang intel -- when I say gang
4 unit, what I'm referring to is the gang intelligence
5 unit, which at the time was a four-officer unit that
6 operated out of the sixth floor of city hall. And
7 those four gang intel officers are who received that
8 TOPS card and vet it, investigate the information on
9 it, and they ultimately maintain and administer the
10 gang database. So if somebody was to be put into
11 the database, it would be one of those four officers
12 that ultimately put that person in.
13      Q. And when you were in patrol north, do you
14 recall who those four officers were?
15      A. When I first started it was Joe Stearns,
16 Aaron Chaffee, Rod Miller, and I believe Jav --
17 Javier Guete. And so guys were getting promoted out
18 of the gang unit a lot, so there was a lot of
19 turnover. I believe those were the four that I
20 started. But there -- there was some significant
21 turnover. During the three years that I was at
22 patrol north there was a gang unit -- a lot of times
23 the gang -- the gang intelligence unit guys, you
24 know, they were -- that was a pretty hard unit to
25 get into. The people that would get hired there

Page 50

1 were older a lot of times and had pretty good work
2 reputations, and they tended to get promoted. So
3 there's quite a few people that were in the gang
4 unit at the time that I was at patrol north.
5      Q. And one of those four individuals could
6 put somebody on the gang list by reviewing their
7 TOPS cards; correct?
8      A. They would have to vet -- investigate and
9 vet that information and so -- and -- and they would
10 make the determination as to whether -- after their
11 review, whether that information was sufficient to
12 put that person in the database.
13      Q. And when you say "vet," what -- what did
14 they do to vet the information?
15      A. Well, let's say you got a -- a TOPS card
16 from somebody that --
17      (Phone call)
18      A. Sorry.
19      Let's say you got a TOPS card from
20 somebody that gave some information about a -- a
21 statement that a guy said. They say -- they checked
22 the self-admit box and -- just, for instance, let's
23 say that they don't put -- they don't put anything
24 down verbatim as to what he said. So the gang
25 officer contacts that patrol officer and says, "Hey,

13 (Pages 47 to 50)

Page 63

1  police case, they would generate that report so that
2  you could review that and you can keep up to speed
3  on what had happened in the last 24 hours. I would
4  review that.
5      And then we would hit the streets, and,
6  you know, whatever was on the agenda for the night.
7  It could be find a witness; it could be there's a
8  concert going on at this place; it could be we know
9  there's going to be a house party or a venue party
10  at this and there's going to be a lot of gang
11  members there; or this person is wanted for this
12  that we need to go find.
13      And then as you're out on the street as,
14  you know, you'd have all four bureaus now. The
15  whole city is your responsibility. So as shootings
16  happen, you respond. Gang unit works all the
17  homicides. It's -- you know, there's a lot of
18  different tasks that go into the gang unit.
19      Q.  When you -- so you would come in and
20  either the detectives or the lieutenant could give
21  you a list of things to do; correct?
22      A.  Yes. And I didn't mention this, but also
23  the sergeant. So we had a sergeant that our direct
24  supervisor.
25      Q.  Okay.

Page 64

1      A.  And that -- that person might have -- a
2  lot of times would have, you know, hey, we need to
3  go find this person and interview them; we need to
4  go pull video here; we -- you know, whatever.
5  There's -- myriad of different things.
6      Q.  When you say "pull video," what do you
7  mean?
8      A.  Like get footage from, you know, crime
9  scene. You know, there's a lot of surveillance
10  video all over the city -- businesses, homes,
11  whatever -- and maybe sometimes a detective would be
12  like, hey, I contacted this homeowner; they're going
13  to let us download their Ring doorbell camera, but
14  he was at work today; he's going to be home at 6:00;
15  can you guys go over there and download that and
16  leave the jump drive on my desk. Sure.
17      That -- I mean, that would be something
18  that we would do.
19      Q.  So when you started there in 2016, who
20  were the other gang intelligence officers?
21      A.  Donny Moore, Bryan Knowles, Eric Guzman.
22      Q.  And just kind of explain the -- the
23  organization of the gang unit for me as far as the
24  positions and who reported to whom.
25      A.  The four of us reported to Chad Beard. He

Page 65

1  was our sergeant. Chad Beard reported to Jeff
2  Gilmore, who was the lieutenant of the gang felony
3  assault unit.
4      I don't remember who the captain of
5  persons' crimes was at the time. Rusty Leeds and
6  Mike Allred were -- at some point of my time in the
7  gang unit were the persons' crimes captains.
8      And then above that would be a deputy
9  chief and then the chief. That would be the
10  organizational structure.
11      Q.  I'm sorry.
12      A.  My first partner and I guess kind of my --
13  my first partner and my training officer as far as
14  the gang unit went was Eric Guzman. He was the most
15  senior guy in the gang unit at the time that I
16  joined and I was the most junior. And that was my
17  first partner.
18      Q.  So what kind of training did you go
19  through as a new person in the gang unit?
20      A.  The -- well, first, we could talk about
21  the database.
22      There's -- there's a specific -- at the
23  time, there was a specific way to write things, even
24  the punctuation, in the database and the verbiage
25  used there. Everything was very particular. And so

Page 66

1  how to update people, how all of that works. You
2  know, like the time periods that we've talked about
3  already. How to change peoples' status in
4  e-Justice, how to make sure that we don't have
5  people in e-Justice showing as a gang member when
6  they have fallen off the list in the database, that
7  kind of thing.
8      So there's a lot of database maintenance
9  that -- that I -- that Guzman and Beard trained me
10  on.
11      And then also in the gang unit you have a
12  lot of contacts with people outside of WPD, like
13  probation, parole, KDOC, the sheriff's office, other
14  departments. The -- and this isn't outside WPD
15  necessarily, but the detectives on the sixth floor.
16      When you come from patrol and SCAT you're
17  an officer. You don't interact with the detectives
18  on the sixth floor very often. And in the gang unit
19  you do all the time because you're assigned to
20  investigations and your office is up there with
21  them. So there's -- there's a lot of new, and
22  Guzman and Beard trained me on that.
23      The other thing would be the testimony.
24  That's a big part of being a gang intel officer is
25  the court testimony.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

Page 91

1  coming and going and identifying them, because I
2  know -- you know, I know the people that I'm looking
3  for that are -- you know, I can recognize -- you
4  know, hundreds of gang members in Wichita I can
5  recognize when I see them and know who they are.
6       And I'm also looking for, you know,
7  fights, people fighting, people flashing guns,
8  people, you know, that are obviously armed, getting
9  guns out of trunks, putting guns in waistbands.
10  These are things that you see all the time. And --
11  but primarily, you know, I'm looking for those
12  people that we talked about that are engaged in
13  these feuds.
14       And if you see them, you know, if you
15  catch them -- you see them going into the club, then
16  maybe you wait till -- you make note of what vehicle
17  they arrived in and you get in a position where you
18  can observe them when they leave. And then when
19  they leave, you know, let's say three or four gang
20  members get into a vehicle and they leave, they pull
21  out onto 21st Street, you're going to pull out with
22  them and you're going to observe them until they
23  commit a traffic violation. Assuming they do commit
24  a traffic violation, you're going to get on the
25  radio and communicate to the marked units, who are

Page 92

1  in the area but out of sight, and you're going to
2  say, failed to maintain lane.
3       You're going to be giving your location,
4  first of all. So you're going to say, westbound on
5  21st. Okay, got a fail to maintain lane. And then
6  they come up and they stop the car and you keep
7  driving.
8       Q. And when they stop the car, they're
9  looking for an opportunity to search the car;
10  correct?
11       A. Yes.
12       Q. Do they fill out any kind of TOPS reports
13  or cards or any kind of police reports at that
14  point?
15       A. Well, they do police reports if there's --
16  you know, if it's -- if police action is taken,
17  yeah, they're doing police reports.
18       We didn't do TOPS cards that summer
19  because we were just having -- I mean, too many gang
20  contacts. We'd -- I mean, I don't know the actual
21  stats on how many gang contacts we had that summer,
22  but I would estimate it's over 500.
23       Q. And that lasted for 90 days you say?
24       A. Yes.
25       Q. Is there anything like that since then?

Page 93

1       A. Not in the time that I was there.
2       Q. Let's go back to conversations you might
3  have outside.
4       We talked parole and probation, KDOC.
5  Anybody else that you would talk to about specific
6  gang members who wasn't inside the WPD or people who
7  were on the list?
8       A. No.
9       Q. Sheriff's office, other law enforcement,
10  KBI? Anything like that?
11       A. If -- you know, if like a sheriff's deputy
12  reached out and had a question about somebody, I
13  would -- you know, I would -- I would communicate
14  with other law enforcement.
15       I know that there were MOUs with
16  particular agencies as far as dissemination of
17  actual records or -- when I say "dissemination of
18  records," like dissemination of records as they
19  pertain to gangs and a person's gang membership.
20       And I don't know the ins and outs of all
21  of that. I know that Beard was the person that kind
22  of oversaw that for us. But we couldn't just send
23  a -- we couldn't just send somebody's gang database
24  sheet to any law enforcement that asked. We had to
25  have an MOU or, you know, there were rules that

Page 94

1  governed that.
2       Q. Do you remember any of the -- any of the
3  organizations that you had those MOUs with?
4       A. I'm pretty sure we had them with KDOC,
5  which would include parole with basically the -- the
6  Kansas Department of Corrections, which would
7  include parole. And that's the only -- that's the
8  only one that I'm -- and I'm like 90 percent sure we
9  had an MOU with them.
10       Q. Okay. But you don't know that that KBI or
11  anything like that?
12       A. No.
13       Q. Lieutenant Beard would be the person who
14  knows that?
15       (Reporter clarification.)
16  BY MS. WOODY:
17       Q. Beard.
18       A. Yes. That would be my guess.
19       Q. Okay. So what did you do after you were
20  in the gang unit with WPD?
21       A. I promoted out of the gang intelligence
22  unit and I became a detective, and I was assigned to
23  the gang felony assault unit.
24       Q. What did you do in that position?
25       A. I was assigned cases to investigate that

24 (Pages 91 to 94)

Page 167

1   A.  No.  What I said was when I was in patrol
2   and filled out TOPS cards, those were the two most
3   common criteria that I included on a TOPS card.
4       Q.   Okay.  And so tell me about -- tell me --
5   well, let me ask you this:  If -- is it -- if you
6   see somebody and they're wearing gang colors, is
7   that one thing or -- and is that sufficient or do
8   you have to have something else to -- to meet that
9   criteria?
10      A.  Well -- so if a person is wearing gang
11  colors, is that sufficient to meet the criteria?  Is
12  that what you said?
13      Q.   Yes.
14      A.  No.
15      Q.   What else would be required?
16          MR. BRANSON:  Teresa, I'm going to ask you
17  to clarify.  As a gang intelligence officer, patrol
18  officer, or what?
19          MS. WOODY:  Well, anybody who -- anybody
20  who is flagging the criteria.  Any police officer
21  who is flagging the criteria.
22          MR. BRANSON:  For inclusion on a TOPS
23  card?
24          MS. WOODY:  No, for -- for meeting the
25  criteria -- for meeting one of the criteria to be

Page 168

1   put into the gang database.
2           MR. BRANSON:  So you're specifically
3   asking if whether the criteria -- simply reviewing
4   the criteria for addition on to the database?
5           MS. WOODY:  Yes.
6           MR. BRANSON:  Okay.
7       A.   And, I'm sorry, ma'am, can you repeat the
8   question?
9   BY MS. WOODY:
10      Q.   Sure.  Sure.
11          If a person's wearing gang colors, would
12  that be sufficient to meet one of the criterion?
13      A.   No.  And I say no because there has to be
14  context.
15      Q.   And where is that written in any policy
16  that there -- that that -- the color alone is not
17  sufficient?  Is that in any written policy?
18      A.   Well, I think the statute, along with
19  color it says, adopts a particular gang's dress,
20  color, hand signs, and tattoos.  So that has a
21  different meaning than if the criteria was stated,
22  for instance.
23          MR. BRANSON:  Cooper, you're still sharing
24  your screen.
25      A.   That will have a -- that -- if the statute

Page 169

1   read that, and it doesn't, that would have -- I'm
2   sorry -- if the statute reads what I just said -- if
3   the statute read, and it doesn't, for instance,
4   wears a gang color, then, you know, those two things
5   mean two different things.  That's -- that's the
6   context or that's -- I guess that's the -- how I'm
7   interpreting it.
8   BY MS. WOODY:
9       Q.   That's how you're interpreting it?
10  Correct?
11      A.  Yeah.
12      Q.   You think -- is it possible that other
13  people would interpret it differently, other people
14  in the gang unit?
15          MR. BRANSON:  Object to form.
16      A.  It's possible.  I think there's continuity
17  of training to safeguard against that, but it is
18  possible.
19  BY MS. WOODY:
20      Q.   So what -- when you -- when you were
21  looking at those criterion with an eye toward
22  whether or not somebody would be on the gang list,
23  what would you require to satisfy that criterion?
24      A.  The overall theme that governed everything
25  that I did in terms of managing the database,

Page 170

1   whether it's updating somebody, you know, starting
2   their time over or flagging a new person is two
3   things:  If this is argued, this documentation, if
4   it's argued in court, is what I'm doing going to be
5   deemed reasonable and in the proper spirit of the
6   statute and what it was intended for; and the other
7   thing is, for the database to be an intelligence
8   tool, we want to have the right people in the
9   database and we don't want to have people that don't
10  belong in there in the database, because then it
11  loses its effectiveness.  If you just stick
12  thousands of people from Wichita in there that don't
13  belong in there, then you just have a -- you know,
14  could have a pile of junk instead of an intelligence
15  tool.
16          So within that -- within those, you
17  know -- and that -- that's how I was trained, and
18  that's the message that I gave to the new people
19  when they joined.  Within that context, they have to
20  meet, demonstratively meet three criteria per the
21  statute to be documented as a member.  Or two
22  criteria to be documented as an associate or
23  self-admit to either of those.
24      Q.   So other than self-admission, what did you
25  most often consider when you were deciding whether

43 (Pages 167 to 170)

Page 175

1  scene and come away with a different perception of
2  whether that person -- a person should be added to
3  the list for being at the funeral; is that true?
4      A.  I -- I don't know how you could add a
5  person to the list just for going to the funeral.
6  What I was talking about was updating somebody and
7  restarting their time.
8      Q.  Okay.
9      A.  So I suppose that, yes, you could have two
10  gang officers that see the same thing and they
11  interpret it differently.
12      Now, a lot of that -- or some of that may
13  depend on how proficient they are.  Do they know
14  what that hand signs mean or whatever, you know,
15  stuff like that.  So that's a training issue.  And
16  you try to train to a standard of where you remove
17  that subjectivity, but it is possible, yes.
18      Q.  Okay.  And that is true of most of the
19  criteria; like what would constitute a sufficient --
20  you know, wearing red and so forth, that could be
21  subjective as well as to how much of that is -- is
22  appropriate; right?
23      A.  Could be.
24      Q.  Would you say from -- for -- and we've
25  already talked about the idea that if there was an

Page 176

1  area, you yourself would be kind of skeptical of
2  that unless somebody could give you a very specific
3  reason of why they have included it; correct?
4      A.  Correct.
5      Q.  So there's an -- there's -- and there's an
6  element of subjectivity to all those criteria; isn't
7  that right?
8      MR. BRANSON:  Object to form.
9      A.  I would feel more comfortable answering
10  that question if I could go down the -- look at the
11  list of criteria and answer it in my head for each
12  of those before I said yes or no.
13  BY MS. WOODY:
14      Q.  Well, we'll -- we'll get that for you.
15      A.  Okay.
16      Q.  All right.  Let's flip over right now real
17  quickly, though, to gang-related testimony.  And you
18  said you'd probably done that, say, 15 times; is
19  that right?
20      A.  Yes.
21      Q.  And those are cases where -- well, you
22  tell me, when would that evidence come into play?
23      A.  When it's -- when it has probative value
24  to the matter being litigated.
25      Q.  And what's that mean to you?

Page 177

1      A.  It has evidentiary value that outweighs
2  any prejudicial value.
3      Q.  And you would give that testimony, and
4  would your testimony usually include a lot of
5  background on the gangs and so forth?
6      A.  Yes.
7      Q.  And when you -- when you provided that
8  testimony, would you sometimes go into incidents
9  that had occurred that the defendant hadn't been
10  involved in?
11      A.  Yes.
12      Q.  And you could do that if the person was a
13  gang -- was on the gang list; correct?
14      A.  There has to be more than just that.
15      Q.  Could you -- but if they weren't on the
16  gang list, that -- that evidence wouldn't come into
17  play; correct?
18      A.  That's not necessarily true.  If -- it has
19  more to do with the crime being investigated and
20  whether there's any gang testimony that has
21  probative value than it does whether the victim and
22  suspect are both gang members.  I mean, that's
23  the -- that's -- yeah.
24      Q.  But in order to use that, use that
25  evidence, you have to -- if has to be against

Page 178

1  somebody who is on the gang list; right?
2      A.  No.
3      Q.  It can be used against anybody?
4      A.  If gang evidence is probative, even if you
5  had somebody on trial that was not a documented gang
6  member, but there was gang testimony that was
7  probative to the matter, then, yes, that could be
8  admitted and would be offered.
9      Q.  Okay.  And, again, that can include
10  incidents in which the defendant had not been
11  involved?
12      A.  I don't understand the question.
13      Q.  Sure.  So if you're -- if you're
14  testifying about a bunch of things, like there's a
15  beef going on, and you're saying, okay, all this led
16  up to this crime that we're here about today; right?
17      A.  Uh-huh.
18      Q.  So you're putting into evidence things
19  that may have happened when the defendant wasn't
20  present; correct?
21      A.  Yes.
22      Q.  Okay.  And do you believe that your
23  average person would consider a person who is a gang
24  member to be a bad person?
25      MR. BRANSON:  Object to form.

45 (Pages 175 to 178)

Page 179

1    A.  No.  I don't believe that.
2   BY MS. WOODY:
3    Q.  Why not?
4    A.  It doesn't square with my life experience
5   that your average person thinks gang members are bad
6   people, especially in this day and age, or today.
7    Q.  And why is that?
8        MR. BRANSON:  Object to form.
9        (Reporter clarification.)
10       MR. BRANSON:  I said object to form and
11  asked and answered.
12  BY MS. WOODY:
13   Q.  Sure.  You said in this day and age people
14  don't necessarily consider gang members to be bad
15  people.  And I'm asking, why would you say that?
16   A.  Well, there are popular celebrities that
17  are gang members.  People, you know, they're not --
18  people don't think that they're bad people.
19       You know, there's gang -- gang culture is
20  sung about and rapped about and celebrated in some
21  popular culture, and I think that's more mainstream
22  than not.
23       You know, I don't think most people object
24  to that.  And I just -- you know, I think that --
25  that most people have a -- have a bend towards

Page 180

1   thinking that kind of that glorified outlaw criminal
2   persona, you know, they don't look at those people
3   as bad and dangerous people.  That's just -- that's
4   my life experience, that's my opinion.
5    Q.  Okay.  Thank you.
6        We're going to take a quick break so I can
7   get those criterion in front of you and then -- and
8   then we'll be pretty close to being done.
9    A.  Okay.
10   Q.  Thanks.
11       THE VIDEOGRAPHER:  All right.  The time is
12  now 1:16 p.m.  We are now off the record.
13       (Off the record.)
14       THE VIDEOGRAPHER:  The time now is
15  1:21 p.m.  We are now on the record.
16  BY MS. WOODY:
17   Q.  Okay.  Mr. Hemmert, I'm showing you what's
18  previously been marked Deposition Exhibit 5, and
19  this is the Kansas Statute 21-6313.
20       Is this the statute you were referring to
21  when you said that has the criteria in it?
22   A.  Yes.
23       (Deposition Exhibit No. 5 was marked for
24  identification.)
25  BY MS. WOODY:

Page 181

1    Q.  And that's something that you're familiar
2   with?
3    A.  Yes.
4    Q.  Okay.  If you look down there where it
5   says B2.  Do you see that there?
6    A.  Yes.
7    Q.  And under the -- underneath that is a list
8   of -- of criterion.  Is that the criteria that you
9   applied what you were in the gang unit?
10   A.  Yes.
11   Q.  Okay.  So we were talking about if
12  there -- if a -- how they would satisfy this and
13  which ones of them might be subjective -- have some
14  subjectivity to them; right?
15   A.  Yes.
16   Q.  And it's identified by a -- as a street --
17  a criminal street gang member by a parent or
18  guardian.  That's probably not subjective; correct?
19   A.  So what I would say is it's -- it would
20  still need to be vetted, and that -- that's what
21  I -- I guess my answer about subjectivity would
22  be -- so just because a parent would identify a kid,
23  you know, you would want to vet that in some way,
24  how does that parent know to identify that kid.  So
25  it's subjective in terms of it's as subjective as

Page 182

1   any other statute that needs to be investigated and
2   vetted.
3    Q.  Okay.  And would you say that all of
4   these, you would need to investigate and vet each
5   one of these criteria that's listed here?
6    A.  Yes.  And some of the -- as a gang
7   officer, some of these are your own, you know,
8   observations that you're relying on, which I think
9   is what we were talking about.
10       But certainly, you know, if a state,
11  county, or city law enforcement officer identifies a
12  person as a criminal street gang member, okay, well,
13  you would want -- if you -- you would want to know
14  how do you know what a gang member is and why do
15  you -- why are you identifying this person as a gang
16  member?
17       So, yes, everything -- there's going to be
18  context in everything.
19   Q.  Okay.  And each of these criteria is going
20  to require some context other than just what you see
21  written down in the statute?
22   A.  Yes.
23   Q.  Okay.  And I think we talked about -- and
24  if you look at 2E, it says, "Adopt such gang style
25  of dress, color, use of hand signs, or tattoos."

46 (Pages 179 to 182)

Page 183

1    Do you see that?
2    A.  Yes.
3    Q.  Okay.  So could any one of those things --
4  meeting any one of those things satisfy that
5  criterion in E?
6    A.  Yes.
7    Q.  But you said you wouldn't apply it that
8  way; correct?
9    A.  Well, again, with context.
10    So if -- if we'll do a hypothetical.  That
11  if you're looking at a person's booking photos,
12  okay, you're updating a person and there's -- they
13  were booked 10 times in that 12-month period that
14  you're reviewing, and in that ten times they are
15  wearing a blue shirt nine of those 10 times, and
16  five of those nine times it's a blue North Carolina
17  shirt and they are -- they're a neighborhood Crip.
18    Would I use that as adopt such gang style
19  of dress?  Yes, I would, in that instance.
20    If the same 10 booking photos and he's got
21  five in a red shirt, three in an orange, one in a
22  black and one in a blue, am I going to use that one
23  time that he was pictured in a booking photo in a
24  blue shirt to start his time over?  No.
25    So that's just one example, but, yeah, the

Page 184

1  context matters.
2    Q.  Okay.  And again, because the context
3  matters, different gang officers could do that
4  different; correct?
5    A.  Yes.
6    Q.  Okay.  I don't think I have any further
7  questions.  Thank you very much for your time.  I
8  appreciate it.
9    A.  Thank you.
10    CROSS-EXAMINATION
11  BY MR. BRANSON:
12    Q.  I just have a couple few to follow-up.
13    You were testifying earlier about
14  pretextual stops in regard to the task force.
15    When you were discussing pretextual stops,
16  does that mean that you could stop a person for any
17  reason that you wanted or did the stop have to
18  require a valid lawful reason?
19    A.  It had to require a valid lawful reason.
20    Q.  You also testified earlier about these two
21  individuals trespassing in the apartment parking lot
22  that had been a recent scene of a crime.  Do you
23  remember that?
24    A.  I do.
25    Q.  Okay.  Is trespassing a crime in the state

Page 185

1  of Kansas?
2    A.  Yes.
3    Q.  Is trespassing also a city ordinance
4  violation?
5    A.  Yes.
6    Q.  I have no other questions.
7    MS. WOODY:  No further questions.
8    Thank you very much.  Appreciate it.
9    THE VIDEOGRAPHER:  All right.  The time
10  now is 1:27 p.m.  We are now off the record.
11    MS. WOODY:  Read and sign, guys?
12    MR. BRANSON:  Yes, please.
13    THE COURT REPORTER:  And, Ms. Woody, how
14  would you like your transcript?
15    MS. WOODY:  You need to talk to somebody
16  other than me about that.
17    THE COURT REPORTER:  Okay.  We'll get with
18  the firm then.
19    Mr. Branson, how would you like yours?
20    MR. BRANSON:  Electronic's fine.
21    THE COURT REPORTER:  Okay.  And then I'm
22  not sure how -- I think Sharon might be the only
23  other person I need to ask.  How would you like your
24  transcript?
25    MS. BRETT:  I'll -- I don't need my own

Page 186

1  copy.  Thank you.  We'll just have the one copy for
2  plaintiffs.
3    THE COURT REPORTER:  Does anybody else
4  need to place an order today?
5    MR. COOPER:  Kara, this is not a separate
6  order.  This is David Cooper.
7    THE COURT REPORTER:  Okay.
8    MR. COOPER:  When you send the city's copy
9  to Charles, would you please copy our assistant,
10  Lorraine Henderson, lhenderson@ --
11    THE COURT REPORTER:  Yes,
12  lhenderson@fpsslaw.com?
13    MR. COOPER:  Right.  And send her the
14  invoice.  You'll get paid faster.
15
16
17
18
19
20
21
22
23
24
25

47 (Pages 183 to 186)