IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| PROGENY, a program of Destination Innovations, Inc., CHRISTOPHER COOPER, ELBERT COSTELLO, MARTEL COSTELLO, and JEREMY LEVY, JR., on behalf of themselves and other similarly situated, | ) ) ) ) ) Case No. ) 6:21-cv-01100-EFM-ADM ) ) |
| Plaintiffs, | ) |
| VS. | ) ) |
| CITY OF WICHITA, KANSAS, | ) ) |
| Defendant. | ) |

------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

JOHN SPEER

MARCH 28, 2023

------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF JOHN SPEER, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on March 28, 2023, from 9:05 a.m. to 2:17 p.m., before Christy Cortopassi, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Insperity, 13737 Noel Road, Suite 1250, Dallas, Texas 75240, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 54

1  A. -- it could be electronically.
2  Q. Okay. How did you get it to them? How did you
3  get it to them?
4  A. Oh. It could be word of mouth, electronically,
5  a phone call, in person, we would see them on the
6  scenes.
7  Q. So a number of different ways, kind of some
8  informal and some were formal, correct?
9  A. Well, I -- when we're at work I believe
10 everything was more or less formal but, yes, that's
11 correct.
12 Q. And what kind of information were -- was being
13 given to the gang intelligence officers that they would
14 input?
15 A. Street names, associates, girlfriends, known
16 hangouts, car descriptions.
17 Q. And this was all based on observations of
18 officers in the drive-by shooting task force, correct?
19 A. Yes. Our piece of it, yes.
20 Q. Okay. And then the gang intelligence officers
21 who were also there could make their own additions to
22 that information; is that right?
23 A. Yes.
24 Q. Was there anybody else other than the drive-by
25 shooting task force and the gang intelligence officers

Page 55

1  who would have been inputting information or giving the
2  gang intelligence officers information to input to that
3  database?
4  A. Yes.
5  Q. Who would those have been?
6  A. All Wichita police officers had the
7  availability or the ability to submit that.
8  Q. Okay. How would they submit it?
9  A. At one point it was hard card that was
10 submitted or field in- --
11 Q. Do you know what kind -- I'm sorry.
12 A. Field intelligence cards.
13 Q. So was it always in some written format?
14 A. Yes.
15 Q. And when you say there were hard cards and gang
16 intelligence cards, were those the same thing or are
17 those two different things?
18 A. The same thing.
19 Q. What information would be set forth on the hard
20 card and the gang intelligence cards?
21 A. Name, date of birth, location of contact,
22 miscellaneous notes would be on there.
23 Q. Gang identification?
24 A. Sure. It could be on there, yes.
25 Q. And that would be based on the information that

Page 56

1  the individual police officer observed when he came into
2  contact with somebody; is that correct?
3  A. Yes. It would -- you could put things in there
4  that you were told, you were advised, that you
5  witnessed.
6  Q. Okay. And so those all went into that -- could
7  go into that computerized database. They went to the
8  gang intelligence officers, did they then input that
9  information into the database?
10 A. They, I believe, used some type of vetting
11 process at the time. I don't know what happened to it
12 once we send it upstairs. Or I -- I did know but I
13 don't recall what the process was at that point.
14 Q. Okay. So this was the status of the gang
15 database when you became a lieutenant of the gang felony
16 assault unit; is that right?
17 A. Yes, ma'am.
18 Q. So how did that change after you became a
19 lieutenant for that unit?
20 A. The -- I think that there had been a yearly
21 vetting process previously. I know that when Jeff
22 Easter and I were there that was a mandatory that each
23 year every single person that we had identified had to
24 be -- they had to put eyes on.
25 And with these cards and/or the information

Page 57

1  that we had on file on them to make sure that the
2  information was current, that it was in compliance with
3  what criteria that was being used at the time. And that
4  was something, because our information, it was critical
5  but it needed to be accurate.
6  And -- because we would -- some of this
7  information would be used later in prosecutions. And we
8  wanted the ability to be able to go in and say it
9  occurred, you know, the who, what, when, where, why, and
10 how of cases when you're, you know, in court or in
11 your -- you are in a suppression or you are on appeal or
12 something along those lines.
13 So -- especially with what the gang
14 detectives were doing at the time. That was one thing
15 that had changed, is that that had become -- and I'm not
16 sure change is a correct word. It was just something
17 that was mandated, that they had to do.
18 And they would be pulled from the streets
19 and they would park in the office and they had to do
20 every single one of them.
21 The other thing was, is that we had to
22 expand the -- we had to put the gang database and make
23 it mobile and put it on a laptop for the gang officers.
24 So I wrote some grants. We did some private funding
25 and were able to get some laptops that had the gang

Page 66

1  the opinion that there needed to be uniformity in how we
2  were doing things, not only on a local level but on a
3  state level. Everybody needed to be on the same page
4  regarding what they were doing, how they were tracking
5  information. And I thought that we also needed it for
6  transparency.
7      Q. And did you convey your feelings and beliefs to
8  somebody?
9      A. Well, Jeff and I had talked about that, I'm
10 sure, at multiple times.
11     Q. Did you talk to any legislators or anybody who
12 was involved in enacting the statute?
13     A. No.
14     Q. You never testified in favor of the statute?
15     A. I never testified what?
16     Q. In favor of a statute or in support of a
17 statute?
18     A. No.
19     Q. Do you know anybody in the Wichita Police
20 Department who did testify or support such a statute in
21 the legislature?
22     A. I believe Jeff Easter did.
23     Q. And did you -- do you recall what his
24 involvement was?
25     A. No.

Page 67

1      Q. But you believe he either worked with the
2  legislature or testified in support of such a statute?
3      A. I don't know.
4      Q. But you yourself, other than talking to
5  Mr. Easter, did you ever have any other conversations
6  with anybody about the state statute or the enactment of
7  the statute?
8      A. I honestly don't recall.
9      Q. Did you ever have any conversations with
10 anybody at the DA's office about that?
11     A. I don't believe so.
12     Q. How about any of your superiors in the Wichita
13 Police Department?
14     A. I'm sure that at command staff meetings it was
15 brought up. Because, I mean, you know, we try to keep
16 up to speed on what's going on at the state level when
17 we're having command staff meetings. But specifically,
18 nothing outside of that.
19     Q. Did you ever draft up anything, you know, that
20 might be included in the statute?
21     A. I have no idea.
22     Q. Do you recall anybody in the Wichita Police
23 Department who did draft something as -- to be included
24 in the statute?
25     A. No.

Page 68

1      Q. Do you know if any of the criteria that the
2  Wichita Police Department was using was given to anyone
3  who was involved in enacting the legislation?
4      A. No, I don't.
5      Q. If somebody did know that, who would that
6  person be?
7           MR. BRANSON: Object to form.
8      Q. (BY MS. WOODY) You can answer.
9      A. Outside of Jeff Easter, I don't know.
10     Q. Okay. Are you familiar with any criteria that
11 said that if you resided in a certain area of Wichita
12 that would be an indicator of gang membership as being
13 one of the criteria?
14          MR. BRANSON: Object to form.
15     Q. (BY MS. WOODY) You can answer.
16     A. If you live in a certain area?
17     Q. Right.
18     A. No.
19     Q. Did you -- are you familiar with the mapping of
20 gang areas by the Wichita Police Department?
21     A. Mapping as in the use of GIS on tracking, yes.
22     Q. When you talk about that, tell me -- explain
23 what you mean?
24     A. Well, if there's gang activity in a certain
25 area, GIS, we produce what was called hotspot maps as I

Page 69

1  talked about earlier. And that's how you allocate
2  resources. Those things are also used, you know, for,
3  you know, in grant writing where areas need maybe more
4  social services.
5           So it's just not all law enforcement based,
6  it's community based. And we could also watch on
7  there as -- because as part of community policing
8  displacement is part of that. And when displacement
9  would occur, because when you put police resources in an
10 area that you are having a lot of violent crime
11 displacement is going to occur.
12          And it doesn't take long for you to see
13 where crime is going to start popping up again. Or the
14 times that it is occurring are important. Because it is
15 how you allocate manpower and resources within the
16 department. So I'm familiar with it on that side.
17     Q. Are you familiar with mapping on any kind of
18 issues like where narcotics might be more prevalent or
19 anything like that where actual maps of the city were
20 created that said, you know, these areas have higher
21 incidences of narcotics, for instance?
22     A. Yes.
23     Q. And what were those?
24     A. We could do that for basically, you know, any
25 part one offense.

Page 70

1  Q. Was it done for gang membership?
2  A. No. It wasn't done for gang membership, it was
3  done for gang activity.
4  Q. At the time that you were the lieutenant over
5  the gang unit, was there any kind of a distinction
6  between being a gang member and being a gang associate?
7  A. Yes.
8  Q. And when had that come into place; do you know?
9  A. I don't know.
10 Q. It was already that way when you came to
11 that -- to leave that unit?
12 A. Yes.
13 Q. What was the difference?
14 A. The difference was, is that being a gang
15 associate you didn't meet all of the criteria to be a
16 gang -- considered a gang member or identify as a gang
17 member.
18 Q. So you met some of the criteria but not as many
19 of the criteria as you needed to?
20 A. Yes. I think that's accurate.
21 Q. Do you recall -- I think you said at some point
22 you thought you had to meet three of the criteria to be
23 considered a gang member, right?
24 A. There was some number, yes.
25 Q. And do you recall how many of the criteria you

Page 71

1  had to meet to be considered a gang associate?
2  A. No, I don't.
3  Q. Now you have mentioned that the gang list was
4  transferred -- or gang intelligence officers received
5  laptops at some point so they could check the gang list
6  while they were actually out in the streets, right?
7  A. Right.
8  Q. At some point in time did access to the gang
9  list become available to additional people within the
10 WPD?
11 A. Well, all of the gang detectives had access to
12 it, I had access to it.
13 Q. And what time frame would this have been?
14 A. Between '99 and 2005.
15 Q. Okay. So you had access to it. I'm assuming
16 Mr. Easter had access to it, the gang intelligence
17 officers had access to it, the gang detectives had
18 access to it, and any officers that were assigned to the
19 gang unit had access to it?
20 A. Well, there's -- there were only nine
21 detectives. So there's nine detectives, four officers,
22 the sergeant, and the lieutenant.
23 Q. Okay. And did anybody else have access to it
24 at that time?
25 A. Not that I recall.

Page 72

1  Q. Okay. And at some point did it become
2  available to more people than just those folks that you
3  have mentioned?
4  A. I don't believe so.
5  Q. Okay. Was there any way that anybody could --
6  anyone else on the police department could view the gang
7  list or find out who was on it?
8  A. Yes.
9  Q. And how would that happen?
10 A. Inquiry.
11 Q. So explain to me how that would work?
12 A. We have a murder and the homicide detective
13 working the case comes over and he wants to know -- he
14 has heard some street names, he wants to know
15 potentially who those people are. He would ask somebody
16 to pull it up in the database and see if they had
17 anything on it.
18 Q. Okay. And so did he have to make any kind of a
19 written inquiry or this was just -- he could just come
20 over and ask for it?
21 A. Both.
22 Q. Was it required that he make a written inquiry?
23 A. No.
24 Q. So he could just ask for it?
25 A. Yes.

Page 73

1  Q. Are you aware of any times that the gang list
2  was published more broadly to others in the police
3  department or anyone outside of the police department?
4  MR. BRANSON: Object to form.
5  A. There was a time that we entered some gang
6  members into NCIC, into the criminal organization and
7  terrorist organization file in NCIC that they would be
8  flagged in NCIC as criminal gang members. And that was
9  nationwide that that would happen.
10 It was also shared with the Board of
11 Education, not the actual list but gang information was
12 shared with the school district.
13 Q. (BY MS. WOODY) So when you talk about the list
14 being shared, was the entire list shared with the NCIC?
15 A. No.
16 Q. Like -- no -- okay.
17 A. No.
18 Q. How would you determine who to share -- who
19 would be -- whose information would be shared with those
20 entities?
21 A. I was the deciding factor on that.
22 Q. And what did you use in your decision making on
23 that issue?
24 A. That these were some of the most violent street
25 gang members we had in our community.

19 (Pages 70 to 73)

Page 94

1  and I need to -- if I can just take five minutes.
2      Q.  That's fine.
3      A.  And come back and talk about that.
4      Q.  That's fine.
5      A.  Is that fine?
6      Q.  Yes.
7          THE VIDEOGRAPHER:  We are going off the
8  record at 11:31.
9          (Break taken from 11:31 a.m. to 11:36 a.m.)
10         THE VIDEOGRAPHER:  We are back on the
11 record.  The time is 11:36.
12     Q.  (BY MS. WOODY)  Mr. Speer, during the break you
13 had -- you were asked to spell the Uhuru group that we
14 talked about posting the list, the gang list, from
15 previously.  I just want to revisit that a little bit,
16 it reminds me of a couple of questions.
17         How did -- what's your understanding about
18 why they posted the list, I mean, you -- how long was it
19 posted?  Do you have any understanding of that?
20     A.  No.
21     Q.  How did WPD learn that that list had been
22 posted?
23     A.  I don't know.
24     Q.  Do you know how long it was actually posted?
25     A.  No.

Page 95

1      Q.  And do you -- did you ever have any discussion
2  with anybody at this organization as to why they posted
3  it or how they got it or anything like that?
4      A.  No.
5      Q.  Did anyone within the WPD have that
6  conversation with them?
7          MR. BRANSON:  Object to form.
8      A.  No.  I don't know.
9      Q.  (BY MS. WOODY)  You don't know.  Okay.  Do you
10 recall anyone at that organization who was contacted by
11 the WPD and the name of anybody at that organization?
12     A.  No.
13     Q.  Do you recall anybody within the WPD who talked
14 about that being posted?
15     A.  Yes.  There was conversations about it.
16     Q.  And who were involved in those conversations?
17     A.  I honestly don't remember.  That was a really
18 long time ago and I don't remember.
19     Q.  Okay.  Do you remember the positions of the
20 people who might have talked about it even if you don't
21 remember their names?
22     A.  No.  No.
23     Q.  Do you remember the circumstances of those
24 conversations?
25     A.  No.

Page 96

1      Q.  Was -- did that happen while you were the
2  lieutenant of the gang unit?
3      A.  No.  Well, I don't recall but what it did and
4  the reason that it came about is because I told them
5  there's not to be anymore printed lists for the intel
6  officers to use because it got comprised.
7      Q.  So you think that did happen during the time
8  that you were a lieutenant?
9      A.  I don't think so.  I mean, I don't know.  I
10 don't remember.
11     Q.  Okay.  But you were the person who said, no
12 more printed list because this got disclosed?
13     A.  Well, at the time, at the time we were talking
14 about it, it could have been, hey, this happened in the
15 past and I don't want printed lists from our database
16 out there, and if there is I want to know who has a
17 copy.
18     Q.  So prior to that time that you think some of
19 the -- some folks in the gang unit actually did have a
20 printed list that they have with them?
21     A.  Well, yeah.  Remember, every -- it was the
22 whole reason why we didn't want that kind of information
23 in this -- we needed to consolidate this from the trunks
24 of police cars into a database.  Is having all of this
25 information just spread out that officers collected and

Page 97

1  having a breach like any breach of information, you
2  know, no organization wants.
3          And so we had to tighten things down.  And
4  I don't remember what the circumstances were.  We were
5  talking about it.  But as far as lists were concerned
6  that were from our database while I was there and I
7  think even Jeff to a certain extent.  There could have
8  been some SCAT supervisors that had the list but, I
9  mean, there were exceptions but there weren't very many.
10     Q.  And why would there have been exceptions who
11 were allowed to have the printed list?
12     A.  In case the gang intel officers were off you
13 would have a SCAT supervisor that would have it or
14 something like that.
15     Q.  Do you recall any individual -- any SCAT
16 supervisor who actually had a copy of that list?
17     A.  No.
18     Q.  But you believe that some of them had access to
19 it, at least from time to time?
20     A.  Yes.
21     Q.  Let's talk a little about the makeup of the
22 gang list.  Did the WPD keep any statistics about the
23 demographics of the list?
24     A.  Yes.
25     Q.  And when did they start keeping those