### Page 1

```
                UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF KANSAS
                       WICHITA DIVISION


PROGENY, a program of            )
Destination Innovation, Inc.,    )
CHRISTOPHER COOPER, ELBERT       )
COSTELLO, MARTEL COSTELLO, and   )
JEREMY LEVY, JR., on behalf of   )
themselves and others            )
similarly situated,              )
                                 )
            Plaintiffs,          )
                                 )
vs.                              ) Case No.
                                 )
CITY OF WICHITA,                 ) 6:21-cv-01100-EFM-ADM
                                 )
            Defendant.           )
                                 )

                      D E P O S I T I O N

      The deposition of CHRISTOPHER COOPER, taken on
behalf of the Defendant in the above-styled and
numbered cause, pursuant to the Federal Rules of Civil
Procedure before Jeffrey J. Elliott, Kansas CCR #912,
at Wichita City Hall, 455 North Main, 13th Floor,
Wichita, Sedgwick County, Kansas, on the 16th day of
June, 2023, commencing at 10:00 a.m.

              HARRISON-ELLIOTT REPORTING, LLC
                   Certified Court Reporters
         1417 North Saint Paul, Wichita, Kansas 67203
           (316)267-8278 phone   (316)267-8621 fax
                    jeff@harrisonelliott.com
```

### Page 2

```
                      A P P E A R A N C E S

FOR THE PLAINTIFF(S):

    Ms. Teresa A. Woody
    KANSAS APPLESEED CENTER FOR LAW & JUSTICE, INC.:
    211 East 8th Street - Suite D
    Lawrence, Kansas 66044
    twoody@kansasappleseed.org

    Mr. Jordan C. Baehr          (VIA VIDEOCONFERENCE)
    SHOOK, HARDY & BACON, LLP
    2555 Grand Boulevard
    Kansas City, Missouri 64108
    jbaehr@shb.com

FOR THE DEFENDANT CITY OF WICHITA:

    Mr. Charles E. Branson
    FISHER, PATTERSON, SAYLER & SMITH
    3550 SW 5th Street
    Topeka, Kansas 66606
    cbranson@fpsslaw.com

    Mr. David R. Cooper          (VIA VIDEOCONFERENCE)
    FISHER, PATTERSON, SAYLER & SMITH
    3550 SW 5th Street
    Topeka, Kansas 66606
    dcooper@fpsslaw.com
```

### Page 3

I N D E X

CHRISTOPHER COOPER

| | |
|---|---|
| Direct Examination by Mr. Branson | 4 |
| Cross-Examination by Ms. Woody | 56 |
| Redirect Examination by Mr. Branson | 74 |

| | |
|---|---|
| DEFENDANT DEPOSITION EXHIBIT 88 Marked for Identification (Interrogatory Answers - C. Cooper) | 10 |
| DEFENDANT DEPOSITION EXHIBIT 89 Marked for Identification (Color Photo Image - Five Individuals) | 14 |
| DEFENDANT DEPOSITION EXHIBIT 90 Marked for Identification (Color Photo Image - C. Cooper) | 16 |
| DEFENDANT DEPOSITION EXHIBIT 91 Marked for Identification (Color Photo Image - C. Cooper) | 16 |
| DEFENDANT DEPOSITION EXHIBIT 92 Marked for Identification (KDOC Website Instructions - Status Report) | 22 |
| SIGNATURE OF WITNESS | 78 |
| CERTIFICATE OF CERTIFIED REPORTER | 79 |

### Page 4

**CHRISTOPHER COOPER**, of lawful age, having been first duly sworn on his oath to state the truth, the whole truth, and nothing but the truth, deposes and says:

DIRECT EXAMINATION

BY MR. BRANSON:

Q. All right, good morning, Mr. Cooper. Could you please state your name for the record?
A. Yes, Christopher Cooper.
Q. And, sir, what is your date of birth?
A. 02/03/95.
Q. And what is your address?
A. 4818 East New Jersey Drive.
Q. Are you employed?
A. Yes.
Q. Where are you employed?
A. Dold's.
Q. Dold's?
A. Dold's Food, Hormel.
Q. Is that here in Wichita?
A. Yes.
Q. And how long have you been employed there?
A. Two years.
Q. And what do you do there?
A. Um, they call -- well, they call it like smoke-

17

1  (Deposition Exhibit 91 marked
2  for identification.)
3 Q. Sir, this is Exhibit 91.
4 A. Okay.
5 Q. Is that you in that exhibit?
6 A. Yes.
7 Q. Again, you seem to be making kind of the same
8    hand gesture in this exhibit as the prior two
9    exhibits, your middle two fingers crossed and
10   your outside fingers spread out.
11 A. (Witness motioned head up and down.)
12 Q. Sir, is there any reason for this pose?
13 A. Just the same pose, just a pose.
14 Q. So there's at least three pictures here with you
15   making that same gesture. Is there any type of
16   reason that you make that gesture over and over?
17 A. No, it's just a pose.
18 Q. Sir, in your interrogatories you were asked about
19   your criminal history. I believe your answer is
20   on page 4, this is Interrogatory No. 3.
21 A. You said 4?
22 Q. 4. Sir, your answer says that you were involved
23   in some type of incident in 2014. Can you tell
24   me about that?
25 A. Yes.

HARRISON-ELLIOTT REPORTING
(316) 267-8278

18

1 Q. What's your recollection of that incident?
2 A. What do you want to know?
3 Q. Well, just tell me about what happened.
4 A. Just going to a party. Got crazy after and had
5    to go to jail.
6 Q. Okay, what do you mean it got crazy after?
7 A. People started fighting. Guy shot.
8 Q. Were you involved in the fight?
9 A. No.
10 Q. What party was this?
11 A. Don't remember.
12 Q. Who did you go to the party with?
13 A. I cannot recall.
14 Q. Okay. Do you know what the purpose of the party
15   was?
16 A. Have fun.
17 Q. Okay. How did you learn about the party?
18 A. I think it was a status, but I don't recall.
19 Q. When you say status, what do you mean?
20 A. Like Facebook status.
21 Q. Somebody posted something about it on social
22   media?
23 A. I think.
24 Q. Sir, who is Dametrius Williams?
25 A. Uh, a guy that I went to the party with. I think

HARRISON-ELLIOTT REPORTING
(316) 267-8278

19

1    he -- yeah.
2 Q. So that is somebody that you went to the party
3    with?
4 A. Yes.
5 Q. Do you remember anybody else you went to the
6    party with?
7 A. No.
8 Q. Okay. Do you know who Juan Orona is?
9 A. Yes.
10 Q. Who is Juan Orona?
11 A. A family friend.
12 Q. Family friend?
13 A. Well, family's -- basically, a family's grandson,
14   I think.
15 Q. Okay, walk me through that. What does that mean
16   to you?
17 A. Basically, his family grew up with my family.
18 Q. So did you know Juan Orona?
19 A. Not on the -- I'm trying to think. No. Not that
20   I remember.
21 Q. Okay.
22 A. I'm trying to think if that was what we was
23   talking about that one day, but . . .
24 Q. Okay, so Juan Orona is not --
25 A. No, no.

HARRISON-ELLIOTT REPORTING
(316) 267-8278

20

1 Q. -- a friend or a family member?
2 A. No, no. I had to think about that.
3 Q. Sir, would it refresh your memory if I told you
4    that Juan Orona was killed by gunfire that night?
5 A. I think I recall it now, yeah.
6 Q. And Dametrius Williams and you were charged with
7    his murder?
8 A. Yes.
9 Q. Sir, you were in fact charged with first degree
10   murder in his death on July 21st, 2014; is that
11   correct?
12 A. I think.
13 Q. Is that your answer, I think?
14 A. Yeah, I -- yeah.
15 Q. Were you also charged with Dametrius Williams?
16 A. Yeah.
17 Q. Sir, tell me what happened that night for you to
18   be charged.
19 A. I can't even tell you why I was even charged. I
20   mean . . . I don't know, I heard about a party.
21 Q. Just taking me a second here, I need to find
22   something in your complaint. Sir, in your
23   complaint do you remember giving information to
24   your attorneys that you were at a party in 2014
25   and there was gunfire and somebody jumped in your

HARRISON-ELLIOTT REPORTING
(316) 267-8278

21

1  car and you drove off?
2  A. Yes.
3  Q. Does that refresh your memory about this event?
4  A. Yes.
5  Q. Okay. Explain what happened, then.
6  A. We were just here at the party. It was a fight
7     that broke off [sic] and I heard guns shooting
8     and stuff. I was already in the car and I waited
9     for whoever rode with me and we left. We left
10    right after.
11 Q. And was Dametrius Williams one of the people that
12    jumped in your car?
13 A. Yes.
14 Q. And then you drove off after the gunfire?
15 A. Yes.
16 Q. Sir, were you offered a plea in your case if you
17    testified in Dametrius Williams' case?
18 A. I think, yes.
19 Q. And did you in fact testify in Dametrius
20    Williams' case?
21 A. Yes.
22 Q. And what did you testify to?
23 A. Um, basically -- was it obstruction of justice?
24    Something like that.
25 Q. That's what you pled to --

HARRISON-ELLIOTT REPORTING
(316) 267-8278

22

1  A. Yeah.
2  Q. -- but can you tell me what you testified to?
3  A. I don't recall that day, like, I don't recall all
4     the answers -- I mean the questions that they was
5     asking, so . . .
6  Q. And did you plead to obstruction because you knew
7     that there was a shooting and you drove Dametrius
8     Williams away from the scene?
9  A. No.
10 Q. Why did you plead to obstruction?
11 A. So I could get out of jail.
12            (Deposition Exhibit 92 marked
13             for identification.)
14 Q. Sir, I'm going to hand you Exhibit 92. Sir, this
15    is a printout from the Kansas Department of
16    Corrections. The first page has a bunch of
17    instructions about their website, and I'm going
18    to ask you to look at page 2. Sir, does that
19    list your name and your date of birth?
20 A. Yes.
21 Q. Okay. At the bottom of it, sir, does it list
22    your conviction in 2016 for obstructing
23    apprehension/prosecution?
24 A. I'm sorry, I was looking at this. Can you say
25    that again?

HARRISON-ELLIOTT REPORTING
(316) 267-8278

23

1  Q. Down at Convictions towards the bottom --
2  A. Mm-hmm, yes.
3  Q. -- it has the Sedgwick County case and the case
4     number with an offense date of June 21st, 2014
5     and a conviction of obstructing apprehension/
6     prosecution. Do you recognize that as the crime
7     that you were convicted of?
8  A. Yes.
9  Q. All right. Sir, it has an offense date of June
10    21st, 2014. Is that the party and the shooting
11    that we have been talking about?
12 A. I think. I don't recall the date.
13 Q. No reason to believe that it's not the date?
14 A. Yeah.
15 Q. All right. Then it gives you a sentencing date
16    of February 4th, 2016. Does that sound correct,
17    the date that you were actually sentenced?
18 A. I think.
19 Q. And above that, sir, it also gives a discharge
20    date from Community Corrections. Do you see that
21    date, August 7th of 2017?
22 A. Yes.
23 Q. Do you believe that that's the date you were dis-
24    charged from Community Corrections?
25 A. I think so.

HARRISON-ELLIOTT REPORTING
(316) 267-8278

24

1  Q. Any reason to think it's not the date?
2  A. Not -- no.
3  Q. Okay. Sir, when you were convicted you were
4     placed on probation; is that correct?
5  A. Yes.
6  Q. And you were assigned to Community Corrections in
7     Sedgwick County?
8  A. Yes.
9  Q. And that was for 18 months. Does that sound
10    right?
11 A. I think. (Witness motioned head up and down.)
12 Q. Sir, I want to ask you some other questions about
13    your interrogatories. We'll come back -- well,
14    no, hang on. Sir, have you ever heard of the
15    Gangster Disciples?
16 A. No. What's that?
17 Q. Gangster Disciples, another gang?
18 A. No.
19 Q. Okay. Sir, you said in your answer to your
20    Interrogatory No. 3 that the charges stemmed from
21    an altercation at a party which was alleged to be
22    gang related. Can you explain your answer to me
23    why you believe that that party was gang related?
24 A. I don't think it was gang related.
25 Q. But that's what you put in your answer?

HARRISON-ELLIOTT REPORTING
(316) 267-8278

29
1 A. Yes.
2 Q. Who was at your aunt's house?
3 A. Family.
4 Q. Okay, do you remember who was there?
5 A. Lot of family.
6 Q. How many people?
7 A. I cannot recall. We have a big family.
8 Q. More than 10?
9 A. Yes.
10 Q. More than 20?
11 A. No, I'm not going to push that, so -- so some-
12    where maybe between.
13 Q. Okay.
14 A. I don't know.
15 Q. You said somebody started shooting. Who started
16    shooting?
17 A. Don't know.
18 Q. Where did the shooting come from?
19 A. Outside.
20 Q. Were you in the house when you were shot?
21 A. No.
22 Q. Where were you at when you were shot?
23 A. Garage.
24 Q. You were in the garage?
25 A. Yes.
HARRISON-ELLIOTT REPORTING
(316) 267-8278

30
1 Q. Was the garage door open?
2 A. No.
3 Q. So somebody was shooting from outside the garage?
4 A. Yes.
5 Q. Are you then saying that the bullet traveled
6    through the garage and struck you?
7 A. Yes.
8 Q. Okay, where were you struck?
9 A. Leg.
10 Q. Was there and police investigation into the
11    shooting that you are aware of?
12 A. I'm not too for sure. I was probably in the
13    hospital.
14 Q. Did you ever become aware of anybody that may
15    have been responsible for the shooting?
16 A. No.
17 Q. Was there anybody else around besides family
18    members?
19 A. No.
20 Q. Do you think a family member shot at you?
21 A. No.
22 Q. If it wasn't a family member, do you have any
23    idea who shot you?
24 A. No.
25 Q. Do you have any idea why somebody shot at the
HARRISON-ELLIOTT REPORTING
(316) 267-8278

31
1    house or at you?
2 A. No.
3 Q. Sir, are you familiar with the term TrackNation
4    17?
5 A. Yes.
6 Q. Tell me how you're familiar with that term.
7 A. That was one of my social media accounts.
8 Q. What does that term signify to you?
9 A. I ran track and my number.
10 Q. Have you ever heard of the -- have you ever heard
11    the number 17 being associated with the Piru
12    Blood gang?
13 A. No.
14 Q. Sir, I want to ask you some questions about your
15    schooling and some allegations in your complaint.
16    Where did you attend high school?
17 A. East.
18 Q. Wichita East?
19 A. Yes.
20 Q. When did you graduate?
21 A. '13.
22 Q. 2013?
23 A. Yes, sir.
24 Q. And did you in fact graduate from Wichita East
25    High School?
HARRISON-ELLIOTT REPORTING
(316) 267-8278

32
1 A. Yes. Yes, sorry. My mouth was kind of dry.
2 Q. No problem. And before you answer that I will
3    say that if at any time you need a break, as long
4    as I don't have a question pending, you say, hey,
5    I need a break, need to go use the restroom or
6    get a drink or whatever --
7 A. Okay.
8 Q. -- please feel free. Okay?
9 A. (Witness motioned head up and down.)
10 Q. Only thing I ask is that if there is a question
11    pending, that you answer that question before we
12    break. Okay?
13 A. Gotcha.
14 Q. All right. So you said you graduated from
15    Wichita East High School.
16 A. Yes.
17 Q. And that was 2013?
18 A. Yes.
19 Q. What did you do after high school?
20 A. Um, went to college.
21 Q. Where was that at?
22 A. That was at Highland Community College.
23 Q. Where was Highland Community College located?
24 A. Outside of St. Joe, Missouri.
25 Q. When did you start attending Highland Community
HARRISON-ELLIOTT REPORTING
(316) 267-8278

33

1 Q. College?
2 A. I don't recall the exact date.
3 Q. Was it the fall after your high school
4    graduation?
5 A. Yes.
6 Q. What were you going to study at Highland
7    Community College?
8 A. Sports medicine.
9 Q. And did you also play sports?
10 A. Yes.
11 Q. What sports?
12 A. Football and track.
13 Q. Did you do those sports in high school?
14 A. Yes.
15 Q. Did you play football, then, for Highland
16    Community College?
17 A. Yes.
18 Q. For how long?
19 A. Just that one, like, year.
20 Q. One season?
21 A. Yeah.
22 Q. Did you complete the season?
23 A. No.
24 Q. Why didn't you complete the season?
25 A. Um, I think I -- I got hurt early. Like, it was

HARRISON-ELLIOTT REPORTING
(316) 267-8278

34

1    my knee.
2 Q. Okay. What happened to your knee?
3 A. ACL.
4 Q. Did you tear it?
5 A. In high school.
6 Q. Did you have to have it repaired?
7 A. Yes.
8 Q. Did you have surgery on it?
9 A. Yes.
10 Q. When did you have surgery on it?
11 A. Do not recall the date.
12 Q. Was it while you were in high school or --
13 A. That was, yes.
14 Q. So you injured it in high school then?
15 A. And it was still bothering me around -- well, I
16    got -- I re-tweaked it.
17 Q. Okay, so you don't think you completed the foot-
18    ball season with Highland?
19 A. No. Well, red shirt. I don't know if that
20    counts.
21 Q. You red-shirted?
22 A. Yeah. Well, what they call white shirt. They
23    call it white shirt when you get injured, so --
24 Q. So it was a medical red shirt of some sort?
25 A. Yeah, I guess.

HARRISON-ELLIOTT REPORTING
(316) 267-8278

35

1 Q. You said track also. Did you do track at
2    Highland?
3 A. I was trying, yep.
4 Q. You were trying?
5 A. Yes.
6 Q. Tell me what you mean by trying.
7 A. Basically, I was just running with the team.
8    They was trying to get me on, so . . .
9 Q. Were you ever officially on the track team at
10    Highland?
11 A. No, not necessarily.
12 Q. So you were working out with the team trying to
13    make the team, then?
14 A. No, the coach wanted me on the team and I was
15    just working out and I had to stay in one sport,
16    so . . .
17 Q. Okay, I just want to make sure I understand. So
18    you weren't actually ever on Highland's track
19    team.
20 A. No.
21 Q. Did you complete your freshman year at Highland
22    academically?
23 A. Yes.
24 Q. Do you know what your grades were?
25 A. Pretty decent.

HARRISON-ELLIOTT REPORTING
(316) 267-8278

36

1 Q. Okay, what's pretty decent?
2 A. I don't recall, but I'm pretty sure I was passing
3    classes.
4 Q. You think you were passing?
5 A. Yes.
6 Q. All right. Did you go back to Highland after
7    your freshman year?
8 A. No.
9 Q. Was that because you were convicted in the
10    Sedgwick County case?
11 A. Yes.
12 Q. In your Sedgwick County case, you were arrested
13    shortly after the shooting; is that correct?
14 A. Yes.
15 Q. And you were stayed in custody until you were
16    placed on -- until you were sentenced and you
17    were placed on Community Corrections?
18 A. Yes.
19 Q. Sir, were you receiving any type of scholarship
20    or aid when you were at Highland Community
21    College?
22 A. Yes.
23 Q. And what was that?
24 A. My scholarship was for football and also I was
25    getting another one because my father was in the

HARRISON-ELLIOTT REPORTING
(316) 267-8278

37

1 Army, so . . .
2 Q. Sir, you allege in your complaint that you were
3    going to receive some type of scholarship or some
4    sort of help from Kansas State University?
5 A. Yes.
6 Q. Tell me about that.
7 A. Um, just talked to the coach. He was looking at
8    picking me up.
9 Q. What coach?
10 A. I cannot remember at the time. Who was -- I
11    don't recall the coach.
12 Q. How did they get in touch with you?
13 A. A friend that already went to school there.
14 Q. Okay, who was that friend?
15 A. Jessie.
16 Q. Do you know the last name?
17 A. No. He was a roommate.
18 Q. He was a roommate?
19 A. Yeah.
20 Q. When was he a roommate?
21 A. When I went to college.
22 Q. Was he a roommate with you at Highland?
23 A. Yes.
24 Q. And then he went to K-State?
25 A. Yes.

HARRISON-ELLIOTT REPORTING
(316) 267-8278

38

1 Q. And that's how you got introduced to a coach at
2    K-State?
3 A. Yes.
4 Q. All right. But you don't remember who the coach
5    was?
6 A. No.
7 Q. Was the head coach or assistant coach?
8 A. Pretty sure it was assistant.
9 Q. You allege in your complaint that you were pre-
10    paring to transfer there. Tell me what that
11    means.
12 A. Well, basically, he was looking at picking me up
13    the next coming season.
14 Q. Had you made an application to K-State?
15 A. No. I haven't actually filled out -- I hadn't
16    had time to.
17 Q. Why didn't you have time to?
18 A. Because I was -- well, I went to jail, so . . .
19 Q. So you went to jail before you could do anything
20    as far as --
21 A. Yeah, anything as to school, yeah.
22 Q. -- making any commitment to K-State or anything
23    like that?
24 A. Yeah.
25 Q. Sir, when did you first learn that you may be

HARRISON-ELLIOTT REPORTING
(316) 267-8278

39

1    included in the gang list?
2 A. I think when I got pulled over and -- well, not
3    pulled over, but when I went to jail.
4 Q. When you were arrested?
5 A. Yes.
6 Q. And that's for the shooting incident in 2014?
7 A. Mm-hmm, yes.
8 Q. You ever been arrested at any other time?
9 A. No.
10 Q. That's your only arrest?
11 A. Yes.
12 Q. And how did you learn that you were on the gang
13    list?
14 A. Um, I didn't. Just after my attorney. Like,
15    after I talked to my attorney and she was telling
16    me.
17 Q. So your attorney told you that you were on the
18    gang list?
19 A. Later, like later on that I'm on the gang list,
20    yeah.
21 Q. Tell me how that happened. I just want to know
22    how you first became aware that you were on the
23    gang list.
24    MS. WOODY: I need to clarify some-
25    thing. He's not talking about us going

HARRISON-ELLIOTT REPORTING
(316) 267-8278

40

1    through any alleged gang -- alleged things
2    on the gang card, he's talking about when
3    did you first know that you were on the gang
4    list, not what you and I talked about.
5 A. Oh, like -- okay, then -- yeah, basically, like
6    when I was going to jail.
7 Q. Okay.
8 A. After that, no.
9 Q. Who told you that you were on the gang list?
10 A. Whew, I do not recall. Probably the police. I
11    don't recall.
12 Q. Do you remember anything else that you were told
13    about being on the gang list?
14 A. No.
15 Q. You just know that at some point somebody told
16    you that you were on the gang list after you were
17    arrested?
18 A. Basically because I -- yeah.
19 Q. Sir, do you remember what your bond amount was
20    when you were arrested for first-degree murder?
21 A. I think it was about 50K, 50,000.
22 Q. Okay, you think. Can you tell me why you think
23    that?
24 A. I just think that's what the bail was. I'm not
25    too for sure because it was a while ago.

HARRISON-ELLIOTT REPORTING
(316) 267-8278

41

1 Q. Did $50,000 seem low for somebody charged for
2    first-degree murder?
3 A. I've never been charged and so, no.
4 Q. Sir, when you were arrested you went before a
5    judge?
6 A. Yes.
7 Q. And that's when your bond was set is when you
8    appeared in front of the judge?
9 A. I think.
10 Q. So the judge set your bond amount?
11 A. I think.
12 Q. Sir, after you testified in Mr. Williams' case,
13    you accepted a plea to obstruction and you were
14    given 18 months probation. Do you recall that?
15 A. Yes.
16 Q. When you were placed on probation, you were given
17    certain conditions of probation?
18 A. Yes.
19 Q. Those conditions included obeying the law?
20 A. Yes.
21 Q. Probably curfew?
22 A. Yes.
23 Q. Probably get a job or go to school?
24 A. Yes.
25 Q. Not to hang out with other felons?

HARRISON-ELLIOTT REPORTING
(316) 267-8278

42

1 A. Yes.
2 Q. Not to hang out with known gang members?
3 A. Yes.
4 Q. Sir, were those conditions of your probation
5    imposed by the judge?
6 A. Yes.
7 Q. And those conditions or probation, were they
8    monitored by your Community Corrections Officer?
9 A. Yes.
10 Q. Do you remember who your Community Corrections
11    officer was?
12 A. No.
13 Q. Sir, you allege in your complaint that you have
14    been stopped many times by the Wichita Police
15    Department. Before your arrest in 2014, had you
16    ever been stopped by the Wichita Police Depart-
17    ment?
18 A. Yes.
19 Q. When was that?
20 A. Don't recall.
21 Q. Do you have any approximate type of date, any
22    reference of anything going on that you can refer
23    to?
24 A. Uh, I just know before I graduated.
25 Q. Before you graduated --

HARRISON-ELLIOTT REPORTING
(316) 267-8278

43

1 A. High school.
2 Q. -- from high school. You had been stopped?
3 A. Yes.
4 Q. How many times before you graduated from high
5    school?
6 A. I can't give you exact number.
7 Q. All right. Sir, on page 9 of your answers to
8    interrogatories, in your response to
9    Interrogatory No. 10 you state that you believe
10    since 2013, you estimate that you had been pulled
11    over five to six times.
12 A. Probably.
13 Q. Is that your testimony?
14 A. Probably, yes.
15 Q. How many times before you graduated from high
16    school do you think were part of that five to six
17    times?
18 A. Maybe two.
19 Q. How many times after graduation and before your
20    arrest were you pulled over?
21 A. You said after?
22 Q. After your graduation and before your arrest in
23    2014.
24 A. Yeah, I don't recall, but a few.
25 Q. A few, okay. Do you think you were pulled over

HARRISON-ELLIOTT REPORTING
(316) 267-8278

44

1    after your arrest? Not counting the arrest
2    itself, but do you think you were pulled over
3    after your arrest?
4 A. Like, after I got arrested and --
5 Q. Yes. So you were custody for quite a while.
6 A. Yes.
7 Q. Then you went on probation in August of 2017.
8 A. Mm-hmm. (Witness motioned head up and down.)
9 Q. Do you think you were pulled over after your
10    arrest in 2017?
11 A. Huh-uh, no, I -- I don't recall, sir.
12 Q. Sir, do you remember anything about any of the
13    times that you were pulled over?
14 A. Yes.
15 Q. What do you remember?
16 A. Just being harassed for no reason.
17 Q. Okay. And why do you say it was for no reason?
18 A. I mean, when you get pulled over and let go for
19    no reason.
20 Q. So are you alleging that somebody in the Wichita
21    Police Department pulled you over and they said
22    they didn't have any reason for pulling you over?
23 A. Well, no. They had a reason I guess.
24 Q. What were the reasons that you were given for
25    your stops?

HARRISON-ELLIOTT REPORTING
(316) 267-8278

45

1 A. They said the hundred feet, the signal thing.
2 Q. Were you ever issued any citations for that?
3 A. No.
4 Q. Did you ever make any complaints about being
5    pulled over?
6 A. Family.
7 Q. Did you ever complain to anybody with the Wichita
8    Police Department?
9 A. No.
10 Q. Sir, you allege in your complaint that you
11    started driving a family car around. Did you
12    have your own car?
13 A. Yes.
14 Q. What kind of car did you have?
15 A. Um, what time?
16 Q. Like, what type of car did you have?
17           MS. WOODY: He said at what time.
18 Q. Oh, that's fair. Did you have a car in high
19    school?
20 A. Yes.
21 Q. Was this your own personal car registered to you?
22 A. No.
23 Q. So you had a car you used in high school, then?
24 A. Pass down.
25 Q. All right. What car did you use in high school?

HARRISON-ELLIOTT REPORTING
(316) 267-8278

46

1 A. Navigator.
2 Q. Who owned that car?
3 A. My father.
4 Q. All right. What is your father's name?
5 A. Christopher.
6 Q. Your father is also Christopher?
7 A. Yes.
8 Q. Is that the vehicle that you drove when you
9    allege that you were pulled over --
10 A. No.
11 Q. -- a couple times before you graduated?
12 A. No.
13 Q. Okay, what were you driving when you were pulled
14    over?
15 A. At that time, I don't recall. Maybe my mother's.
16    I don't recall.
17 Q. Okay. Did you have any access to other vehicles
18    besides your mother's and your father's?
19 A. No.
20 Q. Do you know how your mother's vehicle was
21    registered?
22 A. No.
23 Q. Were either of those vehicles registered in your
24    name?
25 A. No.

HARRISON-ELLIOTT REPORTING
(316) 267-8278

47

1 Q. After you graduated from high school, were you
2    using different vehicles?
3 A. Yes.
4 Q. What vehicles were you using after you graduated
5    from high school?
6 A. Mustang.
7 Q. Was this vehicle registered to you?
8 A. Yes.
9 Q. Okay. Was that the vehicle that you were pulled
10    over in after high school and before you were
11    arrested?
12 A. Before high school -- I mean after high school,
13    yes.
14 Q. You specifically recall being pulled over in the
15    Mustang?
16 A. Yes.
17 Q. Sir, you allege in your complaint that you
18    started driving other family members' vehicles.
19    When did you start doing that?
20 A. Um, once I was getting pulled over all the times.
21 Q. What vehicle were you driving when you were being
22    pulled over?
23 A. Mustang.
24 Q. Your Mustang?
25 A. Yes.

HARRISON-ELLIOTT REPORTING
(316) 267-8278

48

1 Q. So this is the period between 2013 and your
2    arrest in 2014?
3 A. No, I -- I don't recall.
4 Q. Okay, fair enough. I just want to make sure I
5    understand your testimony. You testified
6    earlier, if I recall your testimony correctly,
7    that when you were in high school you were using
8    your mom and dad's vehicles.
9 A. Yes.
10 Q. And then at some point after high school after
11    you graduated you started using the Mustang?
12 A. Yes.
13 Q. And used that Mustang up until you were arrested
14    in 2014?
15 A. I'm sorry, I'm trying to get it all -- because I
16    don't really remember. Okay, when I got arrested
17    I was using my mom's car.
18 Q. When you were arrested?
19 A. Yes.
20 Q. Okay. So what I was trying to ask you about
21    there is when you started driving family members'
22    vehicles --
23 A. Mm-hmm.
24 Q. -- and I believe you testified that was after you
25    started getting pulled over leaving your aunt's

HARRISON-ELLIOTT REPORTING
(316) 267-8278

49

1       house?
2 A. Yes.
3 Q. So am I correct that that timeframe is after
4       graduation in 2013 and before your arrest in
5       2014?
6 A. Yes, somewhere around . . .
7 Q. Who is your aunt?
8 A. Martel's aunt.
9 Q. Martel's aunt?
10 A. I mean mom.
11 Q. Mom?
12 A. I'm sorry, mom.
13 Q. Do you recall her name?
14 A. Yes.
15 Q. What's her name?
16 A. Therese.
17 Q. Therese?
18 A. Yes.
19 Q. Is that also Latrice?
20 A. Yes.
21 Q. Sir, you allege in your complaint that you lost a
22       job opportunity after a background check. Can
23       you tell me what you mean by that?
24 A. I kind of just assumed. Yeah.
25 Q. Tell me what you assumed.

HARRISON-ELLIOTT REPORTING
(316) 267-8278

50

1 A. Because I was on gang file.
2 Q. What job was this?
3 A. Spirit.
4 Q. Spirit AeroSystems?
5 A. Yes.
6 Q. And when did you apply for a job at Spirit Aero-
7       Systems?
8 A. I do not recall the date.
9 Q. Was it after you were off Community Corrections?
10 A. Yes.
11 Q. So sometime after August 2017?
12 A. After that, yes.
13 Q. Do you have any time reference that you can make
14       that would narrow it down? Was this in 2018?
15 A. I don't want to say yes and be wrong, so I'm not
16       too for sure.
17 Q. No, that's a fair answer. Before 2020?
18 A. Maybe. Yes, yes, yes, for sure because I've been
19       at my job for two years now.
20 Q. Do you recall, did you actually have an interview
21       for that job?
22 A. I talked to the lady, so no. No interview.
23 Q. So did you make a written application, then?
24 A. Yes, I talked to the lady and we was getting
25       everything taken care of and she was supposed to

HARRISON-ELLIOTT REPORTING
(316) 267-8278

51

1       be calling me back for the interview.
2 Q. When you say you talked to the lady, was this on
3       the phone --
4 A. Yes.
5 Q. -- was this in person or how was --
6 A. On the phone.
7 Q. So just if you would, take me through the
8       process. You found out about a job and tell me
9       what you did.
10 A. Just applied for it.
11 Q. And how did you apply?
12 A. Online.
13 Q. Okay, it was an online application?
14 A. Yes.
15 Q. And then did somebody call you or did you call
16       somebody?
17 A. I think I called to get ahold of somebody. And
18       then I -- I want to say I didn't get ahold of
19       somebody and somebody called back.
20 Q. Somebody called you back?
21 A. Yes.
22 Q. And when they called you back, what did they tell
23       you?
24 A. They were going to look at my application.
25 Q. And did you hear from that person again?

HARRISON-ELLIOTT REPORTING
(316) 267-8278

52

1 A. No.
2 Q. Did you hear from anybody again --
3 A. No.
4 Q. -- from Spirit?
5 A. No.
6 Q. No phone call, no letter?
7 A. No.
8 Q. No nothing.
9 A. No.
10 Q. So, sir, do you have any knowledge that any back-
11       ground check was run on you?
12 A. Um, pretty sure. They background check every-
13       body.
14 Q. What makes you say that?
15 A. Don't all jobs?
16 Q. So you're assuming that there's some type of
17       background check.
18 A. Yes.
19 Q. But you don't have any knowledge or information
20       that one was actually conducted?
21 A. That was what I said, I assumed.
22 Q. And as it stands today, you don't have any idea
23       why you did not get that job, do you?
24 A. No, I mean -- no. Never thought about it.
25 Q. Sir, as part of your complaint you allege that

HARRISON-ELLIOTT REPORTING
(316) 267-8278

53

1  you had to stop associating with family members.
2  A. Yes.
3  Q. Was that while you were on Community Corrections?
4  A. Yes.
5  Q. Is that a condition of your Community
6     Corrections?
7  A. Yes.
8  Q. Do you know why you were told to stop associating
9     with those family members?
10 A. I assumed. I'm pretty sure.
11 Q. You assumed and you're pretty sure what, though?
12 A. I'm -- they -- I think they said they -- well, I
13    think they told me they were on the gang file at
14    the time, so . . . yeah.
15 Q. What family members was this?
16 A. Like Elbert and Martel, I think they said they
17    were on that, so . . .
18 Q. Anybody else?
19        MS. WOODY: Can I clarify something?
20        Which Elbert?
21 A. Little Elbert.
22        MS. WOODY: Okay.
23 Q. Thank you. Little Elbert and then Martel.
24 A. Yes.
25 Q. Anybody else?

HARRISON-ELLIOTT REPORTING
(316) 267-8278

54

1  A. I'm not too for sure. But I knew they were for
2     sure.
3  Q. Did you know if little Martel or -- I apologize
4     for referring to him as little Martel, but --
5  A. He's a grown man.
6        MS. WOODY: Little Elbert.
7  A. Yeah, little Elbert.
8  Q. I'm sorry, little Elbert. And then Martel, were
9     you aware if either of those individuals had
10    criminal convictions at that time?
11 A. At the time probably, yes. Elbert for sure. I
12    think Elbert was in jail before, so . . .
13 Q. Was one of your conditions of probation not to
14    associate or be around other convicted felons?
15 A. Yes.
16        MR. BRANSON: So we've been going just
17        a little over an hour. This be a good time
18        for a short break?
19        MS. WOODY: Yeah.
20        MR. BRANSON: And I can see what else
21        if anything I need to do, but we're pretty
22        close.
23 (REPORTER'S NOTE: At this time a brief recess was
24 taken at 11:10 a.m., whereupon, the following
25 proceedings were had at 11:15 a.m.:)

HARRISON-ELLIOTT REPORTING
(316) 267-8278

55

1  Q. (By Mr. Branson) Mr. Cooper, we were just on a
2     short five, six-minute break here. As you came
3     back in the room your counsel indicated that you
4     wanted to clarify something on the record on the
5     timeline of your ownership of the Mustang.
6  A. Yes.
7  Q. Okay, go ahead.
8  A. I want to say I owned the Mustang like 2017 to
9     around '18-ish or between there. Well, that's
10    when I ended up getting rid of the Mustang.
11 Q. Okay.
12 A. So . . .
13 Q. Give me a second to put the timeline together.
14 A. Yeah, yeah, yeah, because I was like it was so
15    long ago, yeah, it had me . . .
16 Q. Okay, so you got the Mustang after --
17 A. I got out of jail.
18 Q. -- you got out of jail.
19 A. Yes.
20 Q. Okay. So knowing that the Mustang was not the
21    car that you were driving before you were
22    arrested in 2014 --
23 A. Yes.
24 Q. -- does that change any of your answers about
25    what was going on, you know, between 2013 and

HARRISON-ELLIOTT REPORTING
(316) 267-8278

56

1     2014?
2  A. Of me getting pulled over?
3  Q. Right.
4  A. No.
5  Q. Okay, just it was a different vehicle --
6  A. Yes.
7  Q. -- besides the Mustang.
8  A. Yes.
9        MR. BRANSON: Okay, makes sense.
10       Thanks, I appreciate that. That's all the
11       questions I have.
12             CROSS-EXAMINATION
13 BY MS. WOODY:
14 Q. Okay, I just have a few questions for you. Mr.
15    Cooper, I want to ask you just a little bit about
16    the Mustang because I think it's gotten pretty
17    confused.
18 A. Yeah, it was so confusing.
19 Q. Were you actually stopped when you were driving
20    the Mustang?
21 A. Yes.
22 Q. And because you bought the Mustang sometime
23    between 2017 and 2018, those stops would have
24    been in that timeframe --
25 A. Yeah.

HARRISON-ELLIOTT REPORTING
(316) 267-8278

61

1  A.  Yes.
2  Q.  -- and there was a shooting?
3  A.  Yes.
4  Q.  And one of the guys involved in the shooting
5      ended up being in your car when you left.
6  A.  Yes.
7  Q.  Did you see him shoot anybody when you were at
8      the party?
9  A.  No, ma'am.
10 Q.  So how did you first learn that the police wanted
11     to talk to you about this incident?
12 A.  I go on break and I'm getting a lot of phone
13     calls from my uncle and my mother.
14 Q.  Okay, which uncle?
15 A.  Elbert.
16 Q.  And what were they telling you?
17 A.  Asking me what was going on. And I didn't have
18     answer because I didn't know.
19 Q.  Why did they think something was going on?
20 A.  Because they said the police were looking for me.
21 Q.  Did you know that before?
22 A.  No.
23 Q.  So what did you do when you found out the police
24     were looking for you?
25 A.  Left work and I went to talk to my mother.

HARRISON-ELLIOTT REPORTING
(316) 267-8278

62

1  Q.  And what did you do after you talked to your mom?
2  A.  The police were already there.
3  Q.  Police were there, okay.
4  A.  (Witness motioned head up and down.)
5  Q.  And so did you agree to talk to the police?
6  A.  Yeah.
7  Q.  And you said that you were then charged with
8      first-degree murder; is that correct?
9  A.  Yes.
10 Q.  And after you went to the police station, did you
11     go directly to jail?
12 A.  Yes.
13 Q.  And you said there was a bond hearing and you
14     think your bond was set at least at $50,000; is
15     that right?
16 A.  Yes.
17 Q.  Were you able to pay that?
18 A.  No.
19 Q.  So how long did you actually sit in jail without
20     being able to pay the bond?
21 A.  I stayed in jail that whole time.
22 Q.  How long was it roughly?
23 A.  Like a year or a little over, maybe.
24 Q.  Okay. Was it during that time after you had been
25     in jail for about a year that you agreed to plead

HARRISON-ELLIOTT REPORTING
(316) 267-8278

63

1      to obstruction of justice?
2  A.  Yes.
3  Q.  And why did you agree to plead to that?
4  A.  Because they were basically telling me they were
5      just going to -- basically, they were going to be
6      telling me like, ah, you're a gang member and
7      you're going to get charged with this. And I'm,
8      like, no, I'm not.
9  Q.  You pled because you felt like if they tried you,
10     they were going to say you were a gang member.
11         MR. BRANSON: Object to form.
12 Q.  Is that correct?
13 A.  Yes.
14 Q.  So once you got -- once you pled and you got let
15     out of jail, were you told that you had what were
16     called gang conditions on your parole?
17         MR. BRANSON: Object to form.
18 A.  Yes.
19 Q.  What kind of curfew did you have for instance?
20 A.  6:00.
21 Q.  So you had to be home at 6:00 every night?
22 A.  Yes.
23 Q.  And I believe you said it was for 18 months; is
24     that correct?
25 A.  I think -- I was I believe so.

HARRISON-ELLIOTT REPORTING
(316) 267-8278

64

1  Q.  And you also couldn't hang out with anybody who
2      was on the gang list; is that right?
3         MR. BRANSON: Object to form.
4  A.  Yes.
5  Q.  Did you complete all the terms of your probation?
6  A.  Yes.
7  Q.  Did you have any probation or parole violations
8      during that time?
9  A.  No.
10 Q.  Since that time after you completed your parole,
11     have you ever had any charges or arrests?
12 A.  No, ma'am.
13 Q.  Now, you had said that you were going to apply to
14     go to K-State; is that right?
15 A.  Yes.
16 Q.  And did you understand or believe that once you
17     applied, you were going to get a football
18     scholarship?
19 A.  Yes.
20 Q.  But after you got out of jail, were you able to
21     do that?
22 A.  No.
23 Q.  And why not?
24 A.  For one, they couldn't -- for me to play -- well,
25     since I was a felon, I wasn't able to stay on the

HARRISON-ELLIOTT REPORTING
(316) 267-8278

65

1 campus. So for me -- they told me if I wanted to
2 come there, I would have to get like my own
3 place, like basically my own house down there and
4 live and basically just make my roundabouts going
5 to the school, coming back, going back off
6 campus. And that was doing too much. I couldn't
7 do it, I couldn't afford it. Yeah, I -- that was
8 a lot.
9 Q.  So did you try another way to try to go to
10     college?
11 A.  Yes.
12 Q.  What was that?
13 A.  I tried to go to WSU.
14 Q.  And what's WSU?
15 A.  Wichita State University.
16 Q.  And what did you do to try to go to Wichita
17     State?
18 A.  I had a friend that he basically was running
19     track with WSU and he kinda talked to the coach
20     for me because that's what he was doing, so he
21     was -- the coach was willing to give me a
22     scholarship to run back for them. So when I was
23     coming up, I was doing track practices. Then
24     when it was time for meets, since I was on
25     corrections and I had ankle monitor, so it was

66

1  hard for me to practice with it because, like,
2  the ankle monitor would be hitting my ankle all
3  the time every day. Or for track meets that
4  would be right outside of Wichita, Kansas and I
5  wasn't able to go run in them, so there was no
6  point for me to stay.
7  Q.  So you weren't able to get the track scholarship,
8      then?
9  A.  No.
10 Q.  Were you able to afford to go to Wichita State
11     without it?
12 A.  No, I -- I'm sorry -- because after I went to
13     jail and everything, I lost basically the
14     scholarship the Army was giving me for my father,
15     so I wasn't able to.
16 Q.  And so let's talk about the incident with that
17     Mr. Branson brought up about when you got shot in
18     the leg in 2018.
19 A.  Mm-hmm. (Witness motioned head up and down.)
20 Q.  You were over at your aunt's house; is that
21     right?
22 A.  Yes.
23 Q.  With family?
24 A.  Yes.
25 Q.  Why was everybody gathered over at your aunt's

67

1  house?
2  A.  My niece passed away that morning.
3  Q.  And how old was your niece?
4  A.  Like a month.
5  Q.  Okay, so had you just found out about this that
6      morning?
7  A.  Yes.
8  Q.  And so who all was gathered at the house there?
9  A.  Grandmas, aunts. Of course, the parents of the
10     baby that passed. Hmm, just people like that.
11 Q.  And you said that when the shooting happened you
12     were sitting in the garage; is that right?
13 A.  Yes.
14 Q.  Who all was in that garage?
15 A.  My uncle, my aunt. Not Elbert. But like my
16     nieces, little cousins. Just family, lot of
17     family.
18 Q.  Were there children in the garage?
19 A.  Yes.
20 Q.  Were there elderly people in the garage?
21 A.  Yes.
22 Q.  And what were people doing in the garage?
23 A.  Just grieving and doing -- sipping on couple
24     beers.
25 Q.  Just being with family?

68

1  A.  Yeah.
2  Q.  And you said the garage door was closed?
3  A.  Yes, all the way.
4  Q.  And tell us what happened when you knew there was
5      a shooting and how you knew there was a shooting.
6  A.  Really, I didn't know that there was a shooting
7      until I got hit, actually, because we were
8      listening to music and so, like, we didn't really
9      hear anything on the outside. And the only way I
10     really knew there was shooting is I seen a spark
11     hit the ground. By the time I seen that, I was
12     already hit, so . . .
13 Q.  With the garage doors closed, did anybody from
14     the outside even know that you were in the
15     garage?
16 A.  No.
17 Q.  So they couldn't see you in the garage?
18 A.  No.
19 Q.  And they couldn't see anybody else in the garage?
20 A.  They couldn't see nobody.
21 Q.  And you never found who fired the shots or why?
22 A.  Don't know.
23 Q.  And you went to the hospital after that, correct?
24 A.  Yes.
25 Q.  Were you ever charged with anything related to

HARRISON-ELLIOTT REPORTING
(316) 267-8278

69

1 that shooting?
2 A. No.
3 Q. And again, have you ever been in any kind of
4 arrest, charges, trouble after you completed your
5 parole and probation?
6 A. No.
7 Q. And you are currently employed and have been
8 continuously?
9 A. Yes.
10 Q. Okay. What effect would you say being on the
11 gang list has had on you?
12     MR. BRANSON: Object to form.
13 A. Well, for one, when I worked at Metro, like,
14 there was a lot of sales I couldn't participate
15 in. So, like, we have a big promotional sale for
16 a new phone that was just coming out and they
17 wanted to promote it at something like the
18 Riverfest, and I wouldn't be able to go up there
19 because -- and I was like the store manager at
20 the time, so if the store manager is not able to
21 be at the Riverfest to make sales, it was -- it
22 was a lot because that was part of the conditions
23 and I couldn't go to like Riverfest. They wanted
24 me to go flyering, like put flyers on people's
25 cars and stuff like that, and so I wouldn't be

HARRISON-ELLIOTT REPORTING
(316) 267-8278

70

1 able to go to certain QuikTrips. So one of the
2 Metros I was managing was next door to a QuikTrip
3 and so, like, I couldn't even go there to get a
4 snack or give flyers there, to give people flyers
5 for the new promotions. It was -- yeah, I
6 couldn't do anything.
7 Q. Now, any other effects do you think that having
8 been on the gang list has had on you?
9 A. Just me being targeted and me missing, like, not
10 ever being able to go back to school. I mean, it
11 messed up a lot for me because I wasn't able to
12 finish school and so, therefore, I wasn't able to
13 go do what I wanted to pursue in life. I wanted
14 to be like a sports trainer/therapist, and I
15 couldn't go back to school because they'd think
16 I'm a criminal or, you know, or violent offender
17 and I couldn't stay on their property.
18 Q. Okay. You mentioned that the police stopped you
19 frequently when you had the Mustang. Did they
20 usually ask to search your car when they stopped
21 you?
22     MR. BRANSON: Object to form.
23 A. Yes.
24 Q. And did you ever not allow them to search your
25 car?

HARRISON-ELLIOTT REPORTING
(316) 267-8278

71

1 A. Always let 'em. Just so I could go home fast as
2 possible.
3 Q. Did they ever find anything that --
4 A. No.
5 Q. Just let me finish my question. Did they ever
6 find anything like drugs or firearms or anything
7 in your car?
8 A. No, ma'am.
9 Q. Okay. You also mentioned a time when you were at
10 some family funerals. Do you recall that?
11 A. Yes.
12 Q. What happened there that -- well, did anything
13 happen there that was related to you being on the
14 gang list or being on the gang list?
15     MR. BRANSON: Object to form. Lacks
16 foundation.
17 A. Just people telling us that people -- that police
18 are in the bushes watching us for, like, no
19 reason. Like all -- we were at my niece's that
20 we were already talked abut that passed away that
21 morning of me getting the shot. So I want to say
22 it was the weekend, the weekend, that Friday
23 after all that or so, but police was watching us
24 from the bushes. Pretty sure taking pictures. I
25 mean, we can't even grieve in peace. That's not

HARRISON-ELLIOTT REPORTING
(316) 267-8278

72

1 even like -- I could see if it was like older
2 folks. But, no, it's a baby funeral.
3 Q. Mr. Branson mentioned an incident where you were
4 in a club and you and the younger Elbert Costello
5 were attacked. Do you recall that?
6 A. Yes.
7 Q. And did you recognize anybody who attacked you as
8 being a gang member?
9 A. No. Too many people.
10 Q. Were you ever charged with anything as a result
11 of that --
12 A. No.
13 Q. -- of that fight?
14 A. No.
15 Q. And is that the only time that you have been in
16 an altercation like that?
17 A. Yes.
18 Q. During the time that you were in jail, did you
19 ever get any bad conduct or anything like that?
20 A. No.
21 Q. Just give me one second. Mr. Branson asked you
22 about using the social media handle, if you will,
23 of TrackNation 17. Do you recall that?
24 A. Yes.
25 Q. Does that have anything to do with being a gang

HARRISON-ELLIOTT REPORTING
(316) 267-8278

73

1  member?
2  A. No, ma'am.
3  Q. And tell us again, what does that mean? Why did
4     you use that?
5         MR. BRANSON: Object to form.
6  A. I used to run track and -- okay, so when I was
7     young, when I played -- when I very first started
8     playing football, I didn't claim the number, but
9     my first number was 48 and everybody made fun of
10    me because that number was so high in the
11    position I played, so I kind of dropped it down
12    and my number had been 17. Then once I got to
13    about middle school, like around -- no, actually,
14    it was middle school going to high school, that's
15    it when I changed my number 24 and I've been 24
16    ever since.
17 Q. So do you also use the social media name Track-
18    Nation 24 as well?
19 A. Yeah, it's like CooperChris 24 or something 24 or
20    Track-something 24, but I've got a couple of
21    accounts with that.
22 Q. And were any of those -- any of those hands gang
23    related in any way?
24 A. No.
25 Q. Were they intended to signify gang members in any
              HARRISON-ELLIOTT REPORTING
                  (316) 267-8278

74

1  way?
2  A. No.
3         MS. WOODY: I don't have any further
4     questions right now.
5              REDIRECT EXAMINATION
6  BY MR. BRANSON:
7  Q. Christopher, I have a few follow-ups to your
8     counsel's questions. You talked about when you
9     worked at Metro PCS --
10 A. Mm-hmm. (Witness motioned head up and down.)
11 Q. -- and couldn't go to Riverfest, couldn't go to
12    certain locations.
13 A. (Witness motioned head up and down.)
14 Q. You were on conditions of probation at that time,
15    correct?
16 A. Yes.
17 Q. And it was part of your conditions of probation
18    that you couldn't do these things?
19 A. Yes.
20 Q. You have no knowledge whether or not that was
21    because you were listed as a gang member or just
22    a condition of probation?
23 A. Um, I don't want to say, but at the time I think
24    that they told me that that was because of gang
25    conditions. It was my probation officer. Like
              HARRISON-ELLIOTT REPORTING
                  (316) 267-8278

75

1  the 905 or whatever they call it down on -- yeah,
2  they told me like that's part of the gang --
3  Q. I'm sorry, the nine one five?
4  A. 905 building or whatever.
5  Q. Okay, that's you're referring to?
6  A. Yeah, the probation building, yeah, that's where
7     I was at. So they told me that it was part of
8     our gang conditions and I wasn't able to go to
9     QuikTrips, the mall, and stuff like Riverfest,
10    festivals and stuff like that.
11 Q. But that was being enforced as a condition of
12    your probation; is that right?
13 A. Yes, they told me it was gang conditions.
14 Q. As a condition of your probation on Community
15    Corrections.
16 A. Yes.
17 Q. Okay. So Wichita State, you brought up Wichita
18    State. Did you ever apply for admission to
19    Wichita State University?
20 A. Uh, no.
21 Q. What was the name of the coach?
22 A. I'm sorry, um -- sorry, I'm burping, I just want
23    to want to --
24 Q. You're all right.
25 A. At the time, I do not recall. I wish I could
              HARRISON-ELLIOTT REPORTING
                  (316) 267-8278

76

1  look, but I -- I don't remember his name.
2  Q. So the only school that you have ever applied to
3     and been accepted at has been Highland Community
4     College.
5  A. Yes.
6  Q. You never applied to K-State.
7  A. Didn't have time.
8  Q. Never applied to WSU.
9  A. No.
10 Q. And you didn't go to K-State because they would
11    not let a convicted felon live on campus.
12 A. Yes.
13 Q. You talked or you testified a little bit about
14    the funeral of the young child.
15 A. Mm-hmm. (Witness motioned head up and down.)
16 Q. You said people are saying that police are in the
17    bushes taking pictures.
18 A. Yes.
19 Q. Were you ever stopped by anybody at that funeral?
20 A. I wasn't driving, so . . .
21 Q. Did you come into contact with police at the
22    funeral?
23 A. I mean, my mother was driving and I don't think
24    they pulled her over.
25        MR. BRANSON: That's all the questions
              HARRISON-ELLIOTT REPORTING
                  (316) 267-8278