## Page 1

```
 1  
 2        IN THE UNITED STATES DISTRICT COURT
 3           FOR THE DISTRICT OF KANSAS
 4  
 5  
 6  PROGENY, et al.,
 7       Plaintiffs,
 8   vs.     Case No. 6:21-cv-01100-EFM-ADM
 9  CITY OF WICHITA, KANSAS,
10       Defendant.
11  
12  
13            DEPOSITION OF
14           MARQUETTA ATKINS
15     AS CORPORATE REPRESENTATIVE OF PROGENY,
16  taken on behalf of the Defendant, pursuant to
17  Notice to Take Deposition, beginning at 8:58 a.m.
18  on the 31st day of May, 2023, at the offices of
19  American Civil Liberties Union Foundation of
20  Kansas, 10561 Barkley Street, Suite 500, in the
21  City of Overland Park, County of Johnson, and
22  State of Kansas, before Barbara J. Hoskinson,
23  Certified Court Reporter, Kansas License No. 0434
24  and Missouri License No. 999.
25  
```

## Page 2

```
 1              APPEARANCES
 2  
 3  
 4  ON BEHALF OF THE PLAINTIFFS:
 5  
 6     Ms. Sharon Brett
 7     American Civil Liberties
 8     Union Foundation of Kansas
 9     10561 Barkley Street, Suite 500
10     Overland Park, Kansas, 66212
11     913-490-4100
12     sbrett@aclukansas.org
13  
14     Mr. Paul M. Vogel (By Video Conference)
15     Shook, Hardy & Bacon, LLP
16     2555 Grand Blvd.
17     Kansas City, Missouri, 64108
18     816-474-6550
19     pvogel@shb.com
20  
21  
22  
23  
24  
25  
```

## Page 3

```
 1  ON BEHALF OF THE DEFENDANT:
 2  
 3     Mr. Charles E. Branson
 4     Fisher, Patterson, Sayler & Smith
 5     3550 SW 5th Street
 6     Topeka, Kansas, 66606
 7     785-232-7761
 8     cbranson@fpsslaw.com
 9  
10  
11  ALSO PRESENT:
12  
13     Ms. Kunyu Chin
14     Ms. Manoela Saldanha
15     Mr. Tyler Toelkes
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  
```

## Page 4

```
 1              INDEX
 2  
 3  
 4  Certificate---------------------------- 113
 5  
 6  
 7              WITNESS
 8  ON BEHALF OF DEFENDANT:                PAGE
 9  MARQUETTA ATKINS, AS CORP. REP.
10  Direct-Examination by Mr. Branson         5
11  Cross-Examination by Ms. Brett          108
12  
13  
14              EXHIBITS
15  DEPO EXHIBIT NO.:                    MARKED
16  No 55  Deposition Notice                14
17  No 56  Receipt re: Attorney fees        57
18  No 57  Screen shot of Progeny Events
19      web page                           69
20  No 58  Plaintiff's Responses to
21      Defendant's 1st set                 78
22  No 59  Plaintiff's 1st Supplemental
23      Responses to 1st set of
24      Interrogatories                    78
25  
```

Page 9

1  A. We were approached by Kansas Appleseed to
2  do leadership development with youth touched by
3  the juvenile justice system and so we started
4  working with those young people and Progeny was
5  born at The Seed House there.
6  Q. What year was Progeny born?
7  A. I believe it was around 2015, 2016.
8  Q. And you said it was 2014 that you,
9  Destinations --
10  A. Camp DI was started in 2014.
11  Q. Camp DI?
12  A. Yeah. That's just an entrepreneurship
13  camp.
14  Q. Okay. Tell me what's the difference --
15  what's Destination Innovation, Inc.?
16  A. So, Destination Innovation, Inc. is our,
17  that's the name of our nonprofit. We're home to
18  three programs. So, we have Camp Destination
19  Innovation, which is our entrepreneurship camp for
20  kids; we have Root the Power, which is our civic
21  engagement group for kids; and then we have
22  Progeny which is our juvenile justice initiatives
23  and we choose those three things because those are
24  three things that impact marginalized communities
25  the hardest.

Page 10

1  Q. So, the umbrella, Destination Innovation
2  started in 2014?
3  A. No. We became an official nonprofit in
4  2018. We were fiscally sponsored by -- just as
5  Camp DI by ETE in the previous years. So, it's
6  going to be get a little confusing because I used
7  to work for The Seed House.
8  Q. Okay.
9  A. I had my own nonprofit. Progeny was
10  started at The Seed House. When Laura, the
11  founder of The Seed House, retired the programs
12  that I created came underneath the DI umbrella.
13  That was in, all officially in 2021.
14  Q. Okay. Thank you, that helps me out.
15  A. There you go.
16  Q. You understand today you're a witness for
17  Progeny, what's called a 30(b)(6) deposition,
18  meaning that you're speaking for the plaintiff,
19  Progeny?
20  A. Progeny, yes, I do.
21  Q. Progeny, excuse me. What did you do to
22  prepare for today's deposition?
23  A. What did I do to prepare?
24  Q. Yes.
25  A. Calmed my nerves and just literally

Page 11

1  looked over and thought back over the incidences
2  that our young people have gone through.
3  Q. Did you talk to anybody other than your
4  attorneys in preparation for today?
5  A. Just our team, that's it.
6  Q. When you say just your teams who's that?
7  A. Our team consists of -- do you want just
8  the titles or the names?
9  Q. Title and name would be --
10  A. Director of operations is Margi Ault-
11  Duell.
12  THE REPORTER: Can you spell the last
13  name, please?
14  THE WITNESS: A-U-L-T dash D-U-E-L-L.
15  A. The director, which is Jondalyn Marshall;
16  our, our policy direct -- policy manager, which is
17  Shanae' Calhoun; Desmond Brian White is the
18  manager of Progeny; Tyler Williams is our
19  organizer; Yusef Presley, kind of our youth
20  coordinator; Yadira Palacios is our manager of
21  communications; and Dynasty Win Boring (spelled
22  phonetically) is my executive assistant.
23  Q. So, team consists of about eight people?
24  A. About eight people.
25  Q. Is that the entirety of the employment of

Page 12

1  Progeny?
2  A. No, we also contract our youth leaders.
3  We feel like our youth is the best investment we
4  can make and we want to make sure that we're not
5  sending them back to poverty, so, we have youth
6  leaders.
7  Q. How many youth leaders do you have?
8  A. On average we have, between all of our
9  programs, sometimes between 15 to 20 youth
10  leaders.
11  Q. And those are some type of paid position
12  or stipend?
13  A. They get stipends.
14  Q. When you talk about your team, are those
15  all paid positions?
16  A. Yes.
17  Q. Other than your team and then your
18  contracted youth leaders -- let me back up. Your
19  contracted youth leader you said between all
20  programs is 15 to 20. You're including all three
21  of the programs?
22  A. All three of the programs.
23  Q. How many of those contracted youth
24  leaders are assigned to Progeny?
25  A. We have four main paid youth leaders in

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

Page 13

1  Progeny, but Progeny has about -- right now
2  they're billing out based about 11 to 12 members
3  in it.
4      Q.  Let me see if I understand that.  Four
5  paid?
6      A.  So, we have four between 18 and 25 years
7  old because we travel a lot.  Those are our main
8  youth leaders and so they get the paid stipends to
9  be a part of this work.
10     Q.  Okay.  Then do you have, do you have
11 volunteer youth leaders then?
12     A.  Yeah, young people that are just a part
13 of the -- that come to the meetings and we connect
14 them to opportunities.
15     Q.  Okay.  They're not -- do you consider
16 them members of the Progeny?
17     A.  We consider them members of Progeny,
18 yeah, but it's -- we have kids that just show up
19 sometimes, so...
20         (THEREUPON, Deposition Exhibit No 1 was
21 marked for identification.)
22     BY MR. BRANSON:
23     Q.  This is just the notice.  I'll hand you
24 what's been marked as Exhibit 1.
25         MS. BRETT:  Do you want to do sequential

Page 14

1  exhibit numbers or do you want to do your own
2  exhibit numbers?  And maybe we can go off the
3  record for just a minute and talk about it.
4         (THEREUPON, an off the record discussion
5  was held; WHEREUPON, the exhibit was re-marked as
6  Deposition Exhibit No 55.)
7      BY MR. BRANSON:
8      Q.  Ms. Atkins, you've been handed what's now
9  been marked as Exhibit 55.
10     A.  Uh-huh, yeah.
11     Q.  Do you recognize Exhibit 55?
12     A.  Yes.
13     Q.  Okay.  You recognize it as the Notice for
14 today's deposition?
15     A.  Yes, I do.
16     Q.  Okay, and it also includes five topics.
17 Have you had a chance to review those five topics?
18     A.  Yes, I have.
19     Q.  And are you prepared today to answer
20 questions regarding those five topics?
21     A.  To the best of my abilities, yes.
22     Q.  We've talked a little bit about Progeny
23 already.  Can you tell me what Progeny's mission
24 is?
25     A.  So, Progeny works with youth touched by

Page 15

1  the juvenile justice system to teach them
2  leadership, how to change policy in a way that it
3  impacts them, and they chose the name Progeny
4  because they want to adults to know that we are
5  what you created.
6      Q.  How does Progeny carry out its mission?
7      A.  We recruit and connect young people who
8  have been touched by the system or are passionate
9  about juvenile justice reform and we teach them
10 about organizing, we teach them leadership, we
11 connect them to fellowship on a state, local and
12 national level.  They learn policy work, how to
13 create policies, and we also care about their
14 health and their wellness, so, making sure we
15 create a space that's healthy and conducive to
16 helping young people thrive.  We burst the bubble
17 and show them a life outside of the one they know.
18     Q.  What is the age group that you focus on
19 in Progeny?
20     A.  Our goal is to work with young people
21 from 14 to 25 years old is what we consider youth,
22 so, we typically hit about 16 to 25 because again,
23 we travel a lot.
24     Q.  What do you travel for?
25     A.  We travel for conferences, we travel for

Page 16

1  fellowship, and we travel for work.
2      Q.  Okay.  Conferences are like self-
3  explanatory.  Tell me about fellowship.
4      A.  In the juvenile justice world we think
5  that the impacted person should be centered in the
6  work, so, we create -- there's fellowship
7  opportunities that are created to move juvenile
8  justice work.  So, learning about policy,
9  leadership development, research, those kind of
10 things.  There's all kinds of opportunities for
11 fellowship.  It's almost the exact same thing that
12 the young lady is doing here, almost like an
13 internship.
14     Q.  Then you said you travel for work.  Can
15 you tell me some examples of that?
16     A.  Two of our Progeny members are going to a
17 legislative session in New Mexico next week, so,
18 they're going to meet with senators and -- the
19 politicians from around the country next week in
20 New Mexico to talk about policy change and things
21 that need to happen in the juvenile justice world.
22 So, that's an example of a trip.
23     Q.  When you say members, is that, is that
24 team members or does that include volunteers?
25     A.  It's a combination.  So, it's going to be

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street    6420 W. 95th Street    800 E. 1st Street
Topeka, KS 66604       Suite 101              Suite 305
785-273-3063           Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com    913-383-1131           316-201-1612

Page 21

1  A. Yeah, it all depends on funding.
2  Q. Has there ever been a period of time when
3  you've not been able to fill those slots?
4  A. We get our leaders -- we have our --
5  we've consistently had our four, four leaders at
6  least who are part of Progeny.
7  Q. You indicated you went out and you do
8  presentations at schools and things like that to
9  recruit youth, is that right?
10  A. Right, and just to get youth perspective.
11  I'm a firm believer that we have far too many
12  conversations about the future without the future
13  at the table and, so, when we're talking about
14  juvenile justice reform and what people need to
15  feel healthy and sustainable we go to the source
16  and talk to the young people to see what they
17  need.
18  Q. And tell me, what does that look like,
19  going to the source?
20  A. We go to schools. We get invitations
21  from different youth organizations to go and
22  speak. We get invitations from the City to go and
23  speak, so, different -- it's different kind of
24  outlets.
25  Q. Okay. What -- are these schools all just

Page 22

1  located within the City of Wichita?
2  A. Yeah. Particularly we work with USD 259.
3  Q. What other organizations invite you to
4  speak?
5  A. We've been invited by other youth
6  organizations around the city. I don't know --
7  for clarity, specifically I don't know if I want
8  to say the names of those youth organizations
9  because they're not involved in this case and I
10  want to protect them from this, but we get invited
11  by different organizations that do social justice
12  kind of work, so, ACLU, Kansas Appleseed. We work
13  with orgs across the country, Hazen Foundation,
14  different stuff like that.
15  Q. Okay. Well, I appreciate you wanting to
16  protect other organizations or so from this -- uh-
17  oh.
18  MR. BRANSON: For the record, we lost the
19  lights.
20  MS. BRETT: We lost power. Maybe we can
21  go off the record a second.
22  (THEREUPON, an off the record discussion
23  was held.)
24  BY MR. BRANSON:
25  Q. I think the last question was, I was just

Page 23

1  saying I appreciate you wanting to protect other
2  organizations. I'm not trying to be intrusive to
3  other organizations, just trying to get a feel for
4  your reach out in the community and how that
5  happens. I'm not looking to bring anybody else
6  along into this. So, is there some other examples
7  that you can give us of youth organizations that
8  you present to or talk with?
9  A. Just all youth nonprofits around our
10  city.
11  Q. Okay.
12  A. So just basically, basic youth nonprofits
13  across the city.
14  Q. I'm not from Wichita. I don't know who
15  those organizations are. Could you name some of
16  those for me?
17  A. So, we work with Rise Up for Youth, we
18  have worked with Girls United, we have worked with
19  NAACP Youth. Those are just to name a few.
20  Q. And again, is that primarily speaking
21  roles or how does that work? What work do you do
22  with them?
23  A. We do speaking -- we go out and speak to
24  young people, our youth go out and speak to the
25  young people, and sometimes in a mentorship

Page 24

1  capacity, so, yeah.
2  Q. How many times a year does that occur?
3  A. That's a hard question to answer. We're
4  busy. We have multiple -- so, like I said, we
5  have three different programs and so we are busy,
6  but typically -- that's a hard question to answer.
7  Q. Okay.
8  A. So, let me -- well, I'll table that one,
9  yeah.
10  Q. Well, let me, let me try to focus it down
11  a little bit.
12  A. Uh-huh.
13  Q. I want to speak -- I know you have three
14  different programs, but I really want to speak
15  solely to the Progeny program.
16  A. Uh-huh.
17  Q. How many times a year do you think
18  Progeny program is asked to go out and speak to
19  other youth and engage with these other
20  organizations?
21  A. Let's just say if we did -- let's just
22  say 12 times. If we did it, get asked once a
23  month to go out and speak we go and speak once a
24  month. I'm saying that loosely because it's
25  contingent on when they reach out to us and ask us

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                   Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131                316-201-1612

Page 25

1  to speak.  So, it varies, it changes.
2      Q.  Absolutely, I understand.  Got to be some
3  flexibility throughout the year I'm sure.
4      A.  Right.
5      Q.  And has that been consistent since the
6  beginning of Progeny?
7      A.  No.  The pandemic made sure that we
8  didn't go too much of anywhere, so, the pandemic
9  slowed us down, but we did more Zoom stuff, but
10 there was a building stage in the beginning where
11 we had to build the program and then develop it
12 and then when we got the wings underneath us it
13 became a little bit more consistent.
14     Q.  Tell me about -- let me ask you
15 prepandemic, you said there was a building period
16 and you got your wings underneath you.  Tell me
17 about that period of time when it comes to Progeny
18 and reaching out and talking with other
19 organizations.
20     A.  Progeny, in the beginning we got about
21 five young people that were touched by the
22 juvenile justice system.  This was our beginner
23 crew and, so, that was mostly us meeting and
24 trying to decipher who we were, what the mission
25 of the work was going to be, what was important to

Page 26

1  the young people, how they were impacted, what
2  they needed to be sustainable, feel healthy and
3  thrive.  So, that was mostly us meeting once a
4  week to kind of form a culture around Progeny and
5  what the mission of the work was going to be.
6      Q.  Okay, and how long did that period of,
7  maybe if I can use the term kind of ramp-up time,
8  how long did that period last?
9      A.  About a year or two --
10     Q.  Okay.
11     A.  -- of building.
12     Q.  What time frame would that be?
13     A.  That would be around -- I would put us
14 right around 20 -- 2016ish, 2017ish.
15     Q.  After that period of time you used the
16 term kind of got your wings.
17     A.  Uh-huh.
18     Q.  Tell me about that period of time.  Why
19 don't we go all the way up to say the pandemic
20 because I know everything changed for everybody at
21 that time.
22     A.  So, Progeny was -- what do you
23 specifically want to know?
24     Q.  Well, you said you had the kind of ramp-
25 up time --

Page 27

1      A.  Uh-huh.
2      Q.  -- where you had a select group of
3  leaders, you were going out and meeting with
4  folks, kind of start-up period of time.
5      A.  Uh-huh.
6      Q.  You said after that you kind of got your
7  wings?
8      A.  Right.
9      Q.  Tell me what you mean by you kind of got
10 your wings.
11     A.  We hosted an event in partnership with
12 the City and it was around making sure that we
13 didn't have incidents like the shootings that were
14 happening here, and so we had a rally at the
15 Center where we invited the community out to come
16 speak and WPD was invited, too.  We asked them not
17 to come in uniform, but they did, and we did
18 events like that.  We did online Zoom events in
19 partnership with some of our national programs and
20 we had our weekly Progeny meetings.
21     Q.  Okay, and did those meetings or events
22 stay consistent until the pandemic hit?
23     A.  It ebbed and flowed.  We work for young
24 people touched by the juvenile justice  system, so
25 we had kids that were still cycling in and out; we

Page 28

1  had kids that were still going to trauma, through
2  trauma; we had kids that were homeless; we had
3  kids that were struggling; so, we encountered
4  every -- it's week-to-week encountering the things
5  that these young people were going through.  So,
6  consistent, but it depends on what your version of
7  consistent means.
8      Q.  Okay.  Well, I guess by consistent I mean
9  you've already indicated that you were busy,
10 plenty to do, I guess, is that right?
11     A.  Uh-huh.  The world keeps on cycling, our
12 kids are still in trauma, so, yeah, a lot to do.
13     Q.  So, you were continuing to reach out and
14 have your meetings?
15     A.  Uh-huh.
16     Q.  All right.  Then pandemic hit, 2020.
17 Tell me how that affected your operations for
18 Progeny.
19     A.  Well, we could not meet in person, so, we
20 know how it affect the world in general.  We did
21 move to doing things on Zoom.  We were mostly
22 concerned with how the pandemic would impact our
23 young people, especially once the pandemic was
24 over and you had young people that were isolated.
25 We were worried about young people being profiled


5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 29

1 because they didn't have accessibility to masks.
2 We wondered what kind of mandates were coming
3 down, you know, and then we worried about when
4 school opened back up, understanding that these
5 young people were losing socialization, that they
6 were being impacted by depression from being in
7 the house, and understanding that there was going
8 to be a heightened sense of sensitivity when they
9 got back into the schools and wanted to get in
10 front of that.
11    Q.  Okay.  I assume the pandemic had effects
12 on your ability to meet personally with people?
13    A.  Yes.  We just -- we Zoomed.
14    Q.  When did you start in-person meetings
15 again?
16    A.  We didn't really get back into really
17 doing in-person meetings until 2022.
18    Q.  Okay.  Tell me about 2022 and then return
19 to in-person meetings.
20    A.  2022 were hybrid, so, we did mostly Zoom
21 still a lot in 2022.  We just recently moved into
22 our new location just a few months ago, but we
23 meet -- met on Thursdays.  We met on Thursdays via
24 Zoom for a long time until we got our building,
25 yeah.

Page 30

1    Q.  You said you just got your building a few
2 months ago?
3    A.  A few months ago, yeah.
4    Q.  So, you were still meeting on Zoom?
5    A.  We were still meeting on Zoom or we would
6 meet at the Center.
7    Q.  And what's the Center?
8    A.  The Center is just a local nonprofit
9 organization that's just like a community center.
10    Q.  Okay, starting in 2022 how often did you
11 meet at the Center?
12    A.  We met -- we meet on Thursday nights,
13 Monday nights and Thursday nights, and if we had
14 any events -- and events are where we open up for
15 the community young people to come in and have
16 panel discussions and discuss what's impacting
17 them and impacting their community, so, yeah.
18    Q.  So, starting in 2022 you're still doing
19 some things hybrid, but you were still having --
20 you went back to having in-person meetings on
21 Mondays and Thursdays?
22    A.  Mondays and Thursdays, uh-huh.
23    Q.  Is that every Monday and Thursday?
24    A.  Contingent on -- pretty much every Monday
25 and Thursday.  Again it's contingent on what the

Page 31

1 Progeny manager has going on or what our youth
2 have going on.  Or whatsoever it's pretty
3 consistent.
4    Q.  What about 2023, is that consistent?
5    A.  2023, yeah.
6    Q.  Again Monday, Thursdays?
7    A.  Monday, Thursday meetings.
8    Q.  With occasional issues based on whatever
9 programs or events are happening?
10    A.  There you go.
11    Q.  Okay.  How did the pandemic affect your
12 -- I'm trying to figure out how to correctly say
13 the term membership here that captures the right
14 group of people.  How did -- let me ask it this
15 way:  How did the pandemic affect attendance at
16 your events?
17    A.  We met via Zoom, so, of course we
18 couldn't have necessarily events in person, so, it
19 impacted us greatly, but we just shifted like the
20 world shifted to Zoom meetings and --
21    Q.  Okay, so -- I'm sorry.
22    A.  I was just going to say that's also -- we
23 have to realize we're working with young people
24 that have been touched by the system or come from
25 marginalized communities so how it impacts them is

Page 32

1 accessibility.  Do they have accessibility to a
2 WiFi, do they have accessibility to a laptop, do
3 they have accessibility, so, that impacts when you
4 have to do it via Zoom.
5    Q.  Sure.  Before pandemic do you have an
6 idea of what your average attendance was on those
7 Monday-Thursday meetings?
8    A.  It depends on the circumstances.  So, I
9 go back to average attendance if -- we have young
10 people that cycle back into the system, so,
11 sometimes we were missing young people because
12 they were in jail.  Sometimes we were missing
13 young people because they didn't have
14 accessibility to transportation.  Sometimes we
15 were missing young people because they were going
16 through trauma.  So, it just varies week to week.
17    Q.  Okay.  What would be a low attendance for
18 one of these meetings?
19    A.  A low attendance is if we have three or
20 four people show up.
21    Q.  What would be a high attendance?
22    A.  A high attendance is when we can fill up
23 the room, so, you know, we had a community meeting
24 probably about three or four months ago and it was
25 standing room only, so.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604             Suite 101                   Suite 305
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

Page 33

1  Q. Can you give me an idea what that might
2  be?
3  A. I think there was about 60 people in that
4  space.
5  Q. Post pandemic are your meetings
6  attendance similar to your prepandemic?
7  A. It's about the same. We're building our
8  base, so, we're getting a little bit more young
9  people engaged, but about the same.
10 Q. So, three to four low, up to 60 for a
11 high?
12 A. 60 is for an event. So, typically if we
13 have an event, community event, we'll get about 60
14 or so people there.
15 Q. So, I'm going to break that down a little
16 bit. Your Monday-Thursday meetings, three to four
17 was low. What would be a high for a Monday
18 meeting?
19 A. 11 to 15 people.
20 Q. Okay, and has that been consistent post
21 pandemic?
22 A. It varies.
23 Q. Can you tell me what you mean by it
24 varies?
25 A. What I said earlier, week to week. So,

Page 34

1  it's contingent about what the kids are going
2  through. So, we have some weeks where we have a
3  full house and we have some weeks where the kids,
4  some of the young people are going through things,
5  whether it's in jail, whether or not they have
6  accessibility to transportation, whether or not
7  they're going through some kind of trauma or
8  depression. It varies.
9  Q. The same as it varied prepandemic?
10 A. Same as it varied prepandemic, yes.
11 Q. And again I think you said you had a
12 recent event, standing room only, 60ish people?
13 A. Uh-huh. The community showed up, yeah.
14 Q. And your events like this, is that
15 consistent with what you were seeing prepandemic?
16 A. I will say it varies. There's nothing
17 that's consistent. When you do community work,
18 especially in Wichita, sometimes you can have a
19 full house, sometimes you can have barely -- that
20 just goes along with throwing events. So, I don't
21 want to say consistent because there's no
22 consistency when you do this work. It's just the
23 climate of the community during that time.
24 Q. I understand.
25 A. Yeah.

Page 35

1  Q. Could be the topic, could be time of
2  year, all sorts of things?
3  A. It could be all sorts of things. It's
4  just -- there is nothing consistent about
5  community work. A given experience, when the City
6  did the "No Ferguson Here" event we were in East
7  High School gym, it was a full house. The second
8  time they did it barely anybody showed up. It's
9  never consistent, so, it varies.
10 Q. Does Progeny maintain any type of
11 membership roster?
12 A. We do keep -- so, I wanted to say this:
13 Keep in mind, we're a small grassroots
14 organization. So, do we keep a list of our
15 members? Yeah, we try to track our members. Are
16 we as consistent with it as we need to be? We're
17 small, we're a nonprofit, we're understaffed and
18 overworked, so, it's -- I mean, we're a small
19 nonprofit.
20 Q. When you say you try to track your
21 members, can you just define for me what you
22 consider to be a member of Progeny?
23 A. So, going back to what we said earlier, a
24 youth leader that's done an interview, a youth
25 leader that's done an interview that is -- we have

Page 36

1  our four to six paid youth leaders or we have
2  young people that show up, just show up to be a
3  part of the experience. So, again it varies,
4  yeah.
5  Q. Okay. So, you count anybody that shows
6  up for events then as members?
7  A. No. You don't automatically become a
8  member of Progeny for just showing up to events.
9  It's just the youth that show up consistently
10 every Thursday to be a part of the work, yeah.
11 Q. Okay. Is there a certain number of times
12 they have to show up to be considered a member or
13 is there some way you designate them and say,
14 welcome, you're finally a member?
15 A. If you are one of our four to six youth
16 leaders you fill out an application, you do an
17 interview, and that's how you become an official
18 member of Progeny. So, Progeny has three levels
19 to it. This is just for -- this just happened
20 this year, this change. So, Progeny has three
21 levels. We have our youth leaders, which is our
22 paid stipend youth leaders. We have our youth
23 that are considered to be a part of Progeny but
24 they are not actively paid stipends every single
25 month, but they are connected to opportunities.

Page 61

1  A. He had -- go ahead.
2  MS. BRETT: Object to form.
3  BY MR. BRANSON:
4  Q. This isn't -- this receipt appears to be
5  dated January 19th, 2022.
6  A. Uh-huh.
7  Q. There's some written notations above the
8  date. Do you see where I'm looking at?
9  A. Yes, that it was reimbursed to us by a
10 donor, yes.
11  Q. Okay, that says donor.
12  A. Uh-huh.
13  Q. Tell me what the process is to get
14 reimbursed by a donor.
15  A. This process in particular, we had a
16 community meeting with different young -- men from
17 the community because we had young men that are,
18 that was consistently cycling in and out of the
19 system. There was a person that was actually
20 visiting from out of town and when we talked to
21 him about what Yusef was going through he donated
22 the money to us to reimburse us for this.
23  Q. How often do you get reimbursed for
24 expenditures --
25  A. Doesn't happen often.

Page 62

1  MR. BRANSON: Take a break, go off the
2 record.
3  (THEREUPON, an off the record discussion
4 was held.)
5  BY MR. BRANSON:
6  Q. The expenditure made on behalf of Yusef
7 Presley, at the time this expenditure was made
8 what was Yusef Presley's status with Progeny?
9  A. I don't want to tell you the wrong thing
10 'cause I'm trying to remember the exact date that
11 we hired Yusef and right now I'm not -- I don't
12 have it clear in my head when we hired Yusef on.
13 I think this happened before he was hired, but I
14 need to double-check that. We hired Yusef because
15 he lost his job. He was spiraling and he was
16 suicidal. He was cycling in and out of the
17 system, he was constantly being profiled or
18 whatsoever and an opportunity became available for
19 him to get hired on because with us he won't lose
20 his job because he goes to jail.
21  Q. When you say he was hired on, was -- you
22 mentioned his name earlier as part of the Progeny
23 team as a youth coordinator?
24  A. Yeah, he just, he became a part of the
25 Progeny team, yeah.

Page 63

1  Q. And you're unsure if he was a youth
2 coordinator when this expenditure actually
3 occurred?
4  A. I can't remember, I can't remember when
5 we hired him on. That part I'm blanking on, so,
6 I don't want to lie to you.
7  Q. That's fine. Before he was hired as a
8 youth leader did he hold any -- was he a --
9 excuse me. Before he was hired as a youth
10 coordinator --
11  A. Uh-huh.
12  Q. -- did he hold any other membership
13 position?
14  A. He was a youth leader. If we can create
15 opportunities, if it makes sense, we've hired four
16 Progeny youth leaders in the past. We have two
17 currently working for us now.
18  Q. Okay, thank you. We've talked about
19 Progeny's source of funding. What is your -- what
20 is Progeny's fiscal year?
21  A. DI as a whole, our fiscal year is
22 December -- calendar year.
23  Q. Okay, January to December?
24  A. Yeah.
25  Q. Does Progeny have separate funding --

Page 64

1 does it have a separate budget from Destination
2 Innovation, Inc.?
3  A. Destination Innovation, Inc. is the hub.
4 All of our programs have budgets. Each one of our
5 programs have budgets. They have their own --
6  Q. What is the 2023 budget for Progeny?
7  A. For -- I know DI specific. I forgot the
8 total Progeny's number. For DI specific is about
9 246,000 -- I mean, sorry, 746,000 dollars, around
10 that amount. I don't want to lie to you about
11 Progeny's numbers, so, I -- it's not fresh on my
12 brain right now.
13  Q. And I'm not trying to pin you down on any
14 of this. Can you just --
15  A. No, I just want to make sure that I'm
16 clear about, I mean that I'm giving you accurate
17 information. I don't want to give misinformation.
18  Q. No, I appreciate that, thank you. Can
19 you give me a rough estimate of Progeny's portion
20 of DI's 746,000 dollar budget?
21  A. It can be anywhere between two to three
22 hundred thousand dollars. Progeny is our
23 heaviest-staffed program, most demanding program.
24  Q. And that's the 18 staff and then four
25 youth leader stipend positions?



Page 65

1  A. Progeny has Tyler, Shanae' is contracted,
2  and Yusef and Desmond as all full-time staff. We
3  also have our communications manager that does a
4  portion of Progeny, I do a portion of Progeny,
5  Margi does a portion of Progeny, and our
6  accountant does a portion of Progeny. So, we all
7  work a little bit in that program.
8  Q. Okay. So, the eight people that you
9  named earlier, they may also do work for different
10 programs or the umbrella --
11 A. Program, yeah.
12 Q. -- programs? Okay.
13 A. Small nonprofit, all hands on deck.
14 Q. I understand. The emergency funds then
15 you budget for Progeny, assuming four people, is
16 2,000 a year?
17 A. About, yes.
18 Q. What's the governance structure of
19 Progeny?
20 A. So, DI has a board as a whole. We have
21 debt-free justice committees, we have committees
22 around our no kid jails or Youth First kind of
23 work, and we have our youth leaders which we
24 consider to be their own governance because we
25 like to center the youth in our work, we're a

Page 66

1  youth-adult partnership, and, so, that's the basic
2  structure.
3  Q. Okay, you -- and you said DI and I just
4  want to make sure we have it clear in the record.
5  DI is Destination Innovation?
6  A. Destination innovation. So, our board
7  has, since we do entrepreneurship, juvenile
8  justice, and specific engagement, our board is a
9  mash-up of entrepreneurs, social justice workers,
10 attorneys, that kind of thing that understand the
11 work that we do collectively.
12 Q. Does the DI board then provide the
13 governance for --
14 A. All of our programs, yes.
15 Q. Including Progeny?
16 A. Including Progeny.
17 Q. As executive director what is your role
18 in the DI board?
19 A. I'm the ED. I'm the ED, so, on the board
20 I, I do report out. I have a board president. I
21 chose not to be in that position because we're a
22 growing organization and I can't wear many hats
23 and, so, my position on the board is as the role
24 that the ED plays. I come in, I do my report
25 out, we work in partnership and they make sure

Page 67

1  that I stay compliant and not go to jail for
2  wanting to help kids.
3  Q. In your role as executive director what
4  amount of discretion do you carry on the day-to-
5  day operations of Progeny?
6  A. Can you clarify that question for me?
7  Q. Well, what, what types of decisions for
8  Progeny do you have to take before your board of
9  directors?
10 A. This particular lawsuit I had to take
11 before my board of directors. My board is a
12 governance board. They don't get involved in
13 programming that way. We talk about things. Just
14 for clarity I feel like the right hand should
15 always know what the left hand is doing in any
16 organization, but they don't get too heavily
17 involved in our programming at all. They do
18 governance.
19 Q. How are your programming decisions made
20 then throughout Progeny?
21 A. By me and collectively as a team. Again,
22 we're a youth-adult partnership so we involve our
23 young people in some of the decision-making
24 processes, too.
25 Q. When you're deciding what programs to

Page 68

1  pursue how do you make that decision?
2  A. Programs to pursue?
3  Q. Sure. Well, not trying to be complicated
4  here.
5  A. No.
6  Q. You indicated that you make the decision
7  what, how Progeny carries out its programming.
8  A. Uh-huh.
9  Q. How do, how do you decide what that's
10 going to be for Progeny?
11 A. Literally we have team meetings and we
12 discuss things that we want to be a part of or
13 things that we want to do and we collectively
14 decide what's good and in the realm and scope of
15 the work that Progeny does and ultimately our
16 executive team, which is me, Margi and Jondalyn,
17 we, we decipher if that's something that is
18 conducive or we have the capacity for to be able
19 to do. So, it's collective work. We're a small
20 nonprofit.
21 Q. Okay. You named your executive team. Is
22 that the executive team for DI or is that the
23 executive team for Progeny?
24 A. DI.
25 Q. And does the executive team then make

Page 69

1  those decisions for each program like Progeny?
2      A.  Yes, but we do it collectively as a team.
3  Ultimately it's up to me.
4      Q.  How are -- this may be a similar
5  question, or similar answer.  How, how does
6  Progeny decide it's going to host or participate
7  in the event?
8      A.  Just like any nonprofit, we plan events.
9  It's nothing complicated or rocket science.  We
10 plan out the scope of our work.  Our work is
11 juvenile justice reform.  We're focused on Senate
12 bill 387, we're focused on debt-free justice work,
13 to eliminate fines and fees for youth.  We're
14 focused on transparency when it comes to the gang
15 list and how our young people in our communities
16 are profiled by that list.  We are focused on
17 holistically making sure that we're creating
18 spaces for young people to thrive and be healthy
19 and feel safe in their community.
20          (THEREUPON, Deposition Exhibit No 57 was
21 marked for identification.)
22      BY MR. BRANSON:
23      Q.  I'm going to hand you what's been marked
24 as Exhibit 57.
25      A.  Uh-huh.

Page 70

1      Q.  It's a print-off from your website events
2  page.
3      A.  Yep.
4      Q.  Do you recognize everything that's
5  depicted on there?
6      A.  Absolutely.
7      Q.  Okay.  I know we talked about events
8  earlier, but I just wanted to ask you a little bit
9  about these events.  Page 1, you list the 40
10 million dollar investment.  Is that on October
11 20th, was that 2022?
12     A.  That was 20 -- yeah, 2022, yep.
13     Q.  And it goes over onto the next page if
14 that helps.
15     A.  Uh-huh.
16     Q.  What was that event?
17     A.  That was a conversation around -- when we
18 do this listening sessions with our community to
19 ask young people what would they do if they had
20 money to invest in their community, what does a
21 healthy thriving community look like for you, and
22 so we have had a panel discussion, we had
23 different speakers come in and we had poetry, we
24 had singers.  It was a pretty great event.
25     Q.  Okay.  Can you estimate the attendance?

Page 71

1      A.  That was the standing room only event.
2      Q.  Okay.  Next after that, there's a, the
3  sit-down with Progeny.  What was that?
4      A.  Again, it's a event where we open it up
5  to the community to come and discuss how the
6  system is impacting our youth, how can we come up
7  with restorative justice measures to keep our kids
8  out of prison and from engaging with, with
9  officers.  We discussed gang lists.  We discussed
10 all those, those things.  Anything that impacts
11 our community and young people in a negative way,
12 that's the space to have these discussions.
13     Q.  Was that hosted in August of 2022?
14     A.  I can't give you an exact -- I can't give
15 you an exact date on this kind of stuff.  I don't
16 -- again, I don't want to lie to you.  We have
17 three different programs that I have to, main
18 programs that I manage so we have a lot going on,
19 but this was a -- I don't know when this was.  I
20 remember this event 'cause I was there, but I
21 can't remember the exact date of this event.
22     Q.  Okay.  Do you think it's possibly in
23 2022?
24     A.  It was possibly in 2022, maybe 2023.
25     Q.  Okay, and you said you were at this

Page 72

1  event.  How was, how well was this event attended?
2      A.  We probably, based off of this picture --
3  but there were more young people there -- I'd say
4  we probably had about 20 people in that space.
5      Q.  Okay.  Was that what was expected for
6  that event?
7      A.  No, we wanted more.
8      Q.  Did you believe the event was successful?
9      A.  I believe an event is successful if you
10 have two people in the room.  Impact is impact, no
11 matter small or large.
12     Q.  Moving on, there's another event, Debt
13 Free Justice, Fines and Fees Community listening
14 session?
15     A.  Uh-huh.
16     Q.  Tell me what that is.
17     A.  Debt free Justice is the national
18 program.  We have it on a Kansas-based Debt Free
19 Justice group and we have a national-based Free
20 Justice group.  Our national group came in and did
21 a community listening session to discuss how fines
22 and fees impacted our community -- we have a whole
23 video up, you can go and check it out -- with
24 young people talking about how fines and fees
25 impacted their lives or whatsoever and different


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com
6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131
800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 73

1  realms that they incur fines and fees from being
2  profiled, from punitive stuff, from getting caught
3  up when they were kids, and how they cycle in and
4  back out of the system and how it harms them.
5  So, that was that event and that event was in May
6  of last year, I believe.
7      Q.  And --
8      A.  I had Covid so I didn't go to that event.
9      Q.  Okay.
10     A.  So, it might not have been in May.  I had
11 Covid, it was in July.
12     Q.  Do you have any idea what the attendance
13 was at that event?
14     A.  I had Covid, so, I wasn't -- I was on
15 Zoom.  They -- I would say they probably had about
16 20 to 30 people.  There probably could have been
17 more.  I'm not sure.  One event that you guys
18 don't have on this list talking about events is
19 the first community event that I -- there's two
20 events -- well, there's a bunch that are not on
21 here, but in the event where we had a community
22 listening session and that's when we had way too
23 much WPD showed up, all the cop cars were out.
24 The kids were too afraid to come in the event
25 because they were scared they were going to be

Page 74

1  profiled.  I was getting calls from kids the whole
2  time, so, we had more cops in that event than we
3  had youth because they were too scared to come in.
4      Q.  I believe you talked about that event in
5  your interrogatories --
6      A.  Uh-huh.
7      Q.  -- answers.
8      A.  Yeah, it's not on this list.
9      Q.  We'll get to that one.
10     A.  Yeah.
11     Q.  The art exhibit, Too Deeply Rooted to be
12 Muted, what was that event?
13     A.  That was in part -- that, Too Deeply
14 Rooted to be Muted was just in Mulberry Art
15 Gallery.  It was just an art piece that we did in
16 response to our fight with the gang list, our
17 fight with Cedric Lofton being murdered at JIAC
18 and young people were in a space where they felt
19 like they weren't being heard, that they don't
20 feel safe in their own communities, and, so, that
21 art was inspired to let people know that these
22 young people are going to continue to speak up and
23 speak out.
24     Q.  Was this a specific timed event, meaning
25 it happened in a day and a certain time or was it

Page 75

1  just a display that was --
2      A.  It was just a display of art, come and
3  go.
4      Q.  I think you talked about the next one,
5  the I Am Why Workshop a little bit.
6      A.  Uh-huh.
7      Q.  But can you tell me about the event
8  listed on this exhibit?
9      A.  So, I Am Why is the national program we
10 partnered with to do facilitation for young women
11 and gender-expansive youth to talk about the
12 policies that impact them and to give affirmation
13 on why they will be the person that opens the door
14 for the next generation of young people to not go
15 through what they went through and their
16 reclaiming their voices and their narrative.
17     THE REPORTER:  I'm sorry?
18     THE WITNESS:  Reclaiming their voices and
19 their narrative.
20 BY MR. BRANSON:
21     Q.  And I believe you may have told me
22 earlier, but this was a four-day event?
23     A.  Lasted four days, yes.
24     Q.  And this is one where participants were
25 paid 30 dollars an hour to --

Page 76

1      A.  To be a part of the work, again because
2  we feel like our youth are the best investment we
3  can make.
4      Q.  The next event that you have listed on
5  here is Yusef's awarded the Spirit of Youth award.
6  Was this an event or just acknowledgment of an
7  award?
8      A.  He just got an award.  That was in
9  Washington D.C., it's not in Wichita.  That was
10 not a local event.
11     Q.  Next one after that, State of youth, part
12 of it appears the Juneteenth Wichita celebration?
13     A.  Yeah.  We have another one coming up on
14 the 17th.  Every -- for the past three years I
15 host a State of Youth at NAACP.  I run the Kansas
16 Kids Corner for Juneteenth ICT and we host a State
17 of Youth as collective, not of just our programs
18 but other programs, and the young people talk
19 about the issues that are impacting them in the
20 city.  So, it's inclusive of environmental
21 justice, gang list profiling, prison to, school to
22 prison pipelines, foster to prison pipelines,
23 victim to prison pipelines, all of the systems
24 that exist that can get our kids incarcerated,
25 environmental justice, lack of jobs, lack of

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street    6420 W. 95th Street    800 E. 1st Street
Topeka, KS 66604    Suite 101    Suite 305
785-273-3063    Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com    913-383-1131    316-201-1612

Page 77

1  investment, all kinds of things. Whatever those
2  young people desire we give them the platform to
3  speak on it.
4      Q. Okay, and that event was hosted by
5  Progeny, right?
6      A. No, that's Juneteenth ICT. We host that.
7  It's not -- it's a, it's a collective event. So,
8  Progeny is a part of that event, but we open it
9  up to other youth programs to be a part of it,
10  too.
11      Q. And what was the attendance like for that
12  event?
13      A. That's Juneteenth, so, I wouldn't -- this
14  event in particular, since it's a Juneteenth ICT
15  celebration it's open to the whole community. I
16  wouldn't put that in just the Progeny realm.
17      Q. Okay. Last one I think that's on here is
18  the Youth First Convening.
19      A. That was in a different state.
20      Q. Okay, just -- so, tell me what that is.
21      A. We're a part of a Youth First cohort and
22  we travel with them twice a year. This one was
23  in California, Oakland, California, I believe --
24  San Francisco, one of those -- Berkeley, one of
25  those. We were in the West Coast, so, we were in

Page 78

1  California or whatsoever, and that is just
2  different programs that do the same work as we do
3  all across the nation coming together to build
4  fellowship, to build strategy around the work that
5  we do, and for our young people to be around other
6  young people across the country that have been
7  impacted around the system to have discussions and
8  build.
9      Q. And that has a picture with it. Is that
10  just, you know, Progeny --
11      A. That was us --
12      Q. -- members?
13      A. Just landing.
14      Q. Okay.
15      A. Yeah. One of those people are not a part
16  of Progeny. They're a part of another cohort from
17  a different state.
18      (THEREUPON, Deposition Exhibit No 58 and
19  No 59 were marked for identification.)
20      BY MR. BRANSON:
21      Q. I'm going to hand you what's been marked
22  as Exhibit 58 and 59. 58 is -- do you recognize
23  that as plaintiff's, plaintiff Progeny's response
24  to defendant's first set of interrogatories?
25      A. Yes, I do.

Page 79

1      Q. Okay, and 59 is plaintiff's, plaintiff
2  Progeny's first supplemental responses to
3  defendant's first set of interrogatories?
4      A. Yes.
5      Q. Did you provide the answers for
6  plaintiff's, plaintiff Progeny's responses to
7  defendant's first set of interrogatories, Exhibit
8  58?
9      A. I assisted in providing the answers, yes.
10  So, these are stories and instances that we got
11  from our young people and community members and
12  then instances where I was involved in some of the
13  stuff, too. So, it's a culmination.
14      Q. And is that your signature on the
15  verification page listed on page 26?
16      A. That is my signature.
17      Q. And I note it goes from 24 to 26.
18      A. Uh-huh.
19      MR. BRANSON: I don't think there is a
20  25. Do you know if there's a 25?
21      MS. BRETT: I don't know. I don't know
22  what happened there. I think that 26 was sent
23  separately perhaps.
24      MR. BRANSON: That would be my guess.
25      MS. BRETT: Yeah.

Page 80

1      MR. BRANSON: So, I just wanted to make
2  sure I wasn't missing anything.
3      MS. BRETT: I'm confidently representing
4  to you that there is no 25 in existence.
5      MR. BRANSON: I thought that was the
6  case, thank you.
7      BY MR. BRANSON:
8      Q. Referring you over to Exhibit 59,
9  plaintiff Progeny's first supplemental responses
10  to defendant's first set of interrogatories, did
11  you provide answers for the interrogatories on
12  Exhibit 59?
13      A. Again, it was a culmination of community
14  meetings, Progeny interactions and then some of
15  them, so, yes, with the help of our community and
16  our Progeny youth leaders. This is real life, so,
17  this is ongoing stories that are out there.
18      Q. I understand that may be how you
19  generated the information to put on the answers,
20  but are these your answers?
21      A. These are my answers.
22      Q. There's no verification page on this set
23  of interrogatories. That's why I wanted to make
24  sure that these are in fact your answers.
25      A. Okay.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street    6420 W. 95th Street    800 E. 1st Street
Topeka, KS 66604    Suite 101    Suite 305
785-273-3063    Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com    913-383-1131    316-201-1612

Page 89

1  THE WITNESS: This one, okay.
2  MS. BRETT: Uh-huh, bottom of page 5.
3  BY MR. BRANSON:
4  Q. The supplemental answer at the bottom of
5  page 5.
6  A. So, how am I -- how do -- are you wanting
7  me to respond the lieutenant and officer saying
8  self-admit means different things to different
9  officers?
10  Q. Your contention in paragraph 63 is that
11  the WPD has a practice of falsely indicating
12  individuals self-admitted to gang membership when
13  entering them into the gang list. Your response
14  to that interrogatory is that Lieutenant Beard and
15  Officer Hemmert testified that self-admit means
16  different things to different officers. Is that
17  your response?
18  A. I can't answer for Lieutenant Beard and
19  Officer Hemmert. I'm trying to make sure I'm
20  understanding your question. Self-admit means
21  different things to different officers?
22  Q. I'm just asking you if that sentence is
23  your response to interrogatory number 4?
24  A. I'm, I'm not clear.
25  Q. Okay. The interrogatory number 4 asks

Page 90

1  you a specific question about a specific paragraph
2  in the complaint.
3  A. Uh-huh.
4  Q. The supplemental answer after the colon
5  is a sentence that starts with Lieutenant Beard.
6  A. Gotcha.
7  Q. Is that your response to interrogatory
8  number 4?
9  A. That self-admit means different things to
10  different officers? That's their response. So, I
11  say this, and I don't want to complicate it
12  because I want to answer in a direct way. As
13  an organization we know what happens in our
14  community --
15  Q. Okay, I'm going to stop you there.
16  A. Right.
17  Q. I'm simply asking you is this your
18  response to the, to the interrogatory? It says
19  this is your supplemental answer in response to
20  interrogatory number 4. Is this what you are
21  putting as your answer for number 4?
22  A. Yes.
23  Q. Okay. Your response is followed by a
24  statement that plaintiffs anticipate identifying
25  additional evidence to support their claims during

Page 91

1  preparation of the pretrial order and briefing for
2  summary judgment and will include additional
3  citations to the record at such time. Other than
4  the depositions that are yet scheduled to be
5  taken, do you plan to do any further investigation
6  or discovery to provide evidence to support your
7  response?
8  MS. BRETT: Object to the form.
9  BY MR. BRANSON:
10  Q. You can answer.
11  A. I'll do what is required of me to do.
12  Q. I'll be flipping between pages here.
13  Hang on just a sec. I'm going to have you go to
14  page -- Exhibit 58, page 8, question 8. Question
15  8 asks you about paragraph 106 of the complaint
16  that the gang list is a direct impediment to
17  carrying out Progeny's mission. In response to
18  that interrogatory you state that Progeny cannot
19  hold events where some Progeny members would be in
20  direct proximity with individuals listed on the
21  gang list. What events are you speaking of?
22  A. Any of our events. If a person is on the
23  gang list and they're still on probation, if they
24  have any interaction with another gang member it
25  can potentially get them incarcerated or put back

Page 92

1  in jail or be a violation of their probation. We
2  work with youth impacted by the juvenile justice
3  system. If any of our young people are on that
4  list we are potentially putting them in harm's way
5  by having them interact with each other because of
6  that being on the gang list.
7  Q. Okay. Is there any specific person that
8  you can identify in this answer?
9  A. No. I don't identify because I don't
10  want to pigeonhole or place our young people as
11  being gang members. That's your list, not ours.
12  Q. It's no my list, I'm just the attorney.
13  A. I understand. I'm sorry, that's the WPD
14  list, not ours. I apologize.
15  Q. In your response about events, you have
16  just testified that it's any event. Is there any
17  particular circumstance or event or person that
18  you can think of that supports your answer?
19  A. We were going to do a protest one time
20  when the governor was in town in response to money
21  being taken out of Senate bill 367. The police
22  were sent to our event and sat outside of the
23  event where the kids were just going to put Xs on
24  their mouth and hold up signs. The kids would not
25  come into the event because they seen the police

Page 93

1  car on the outside and they were afraid, so, they
2  circled the block, called us and let us know that
3  they were not coming in because they were afraid.
4      Q.  Let me ask you some questions about that.
5      A.  Uh-huh.
6      Q.  What event was this?
7      A.  This was an event where the governor was
8  doing a proclamation at the Center around those
9  energy poles Evergy put in the northeast community
10 saying that they weren't going to be -- that --
11 well, it was just to apologize for the damage that
12 was done to those communities and, so, the young
13 people were going to go to that event and protest
14 it because the same day that event was happening
15 20 million dollars got swept from Senate bill 367
16 and, so, police were called.  The emails were
17 supplied to support that, and our young people
18 were too afraid to come to that event.
19     Q.  Okay.  Where was this event held?
20     A.  We at that time were on 13th at -- what
21 is the name of -- the place?  It's on 13th and
22 Vesta -- Kansas collaborative.
23     Q.  And was this where the governor was going
24 to appear?
25     A.  No.  We were, we were hosting an event

Page 94

1  where the young people were making signs and
2  getting ready to go over to that space.  We ended
3  up canceling it as a whole because we didn't feel
4  like we could protect our young people, especially
5  since they're impacted, and we don't want them to
6  engage with the WPD in any kind of way or be
7  profiled in any kind of way.
8      Q.  Okay. So, my understanding is you were
9  having a sign-making event in preparation to go
10 protest the governor's appearance somewhere else?
11     A.  They were just going to raise awareness
12 about the money being swept, the 20 million
13 dollars that is supposed to be placed to, to give
14 money back to the community for juvenile prisons
15 being shut down.
16     Q.  And at your sign-making event then police
17 arrived?
18     A.  Police sat outside the event.  We
19 actually went out and told them to leave and I
20 actually sent an email on the same accord because
21 our kids were afraid and our kids would not come
22 into the event and so we shut down the whole
23 protest because we were afraid for our young
24 people.
25     Q.  You say police arrived.  How many?

Page 95

1      A.  There was one cop car sitting outside
2  watching the event and I don't know how many other
3  cop cars swept through.  I don't know.
4      Q.  Where was the cop car at?
5      A.  Sitting across the street from the event.
6      Q.  On a public street?
7      A.  It was on a public street, but we still
8  have the email and evidence that was supplied to
9  let them know that they were watching us, watching
10 our event.
11     Q.  I appreciate that.  Just try to answer my
12 questions, please.  Did the officer interact with
13 anyone?
14     A.  Us, when we went and told him to leave
15 our kids alone.
16     Q.  Before you engaged the officer did the
17 officer interact with anyone?
18     A.  An officer's presence is enough to
19 interact with anyone when you are in front of
20 young people who have been impacted by the system.
21     Q.  Other than the officer's mere presence,
22 did you witness the officer interact with anyone?
23     A.  He interacted with us.
24     Q.  After you engaged him?
25     A.  After we engaged him because the kids

Page 96

1  felt threatened and scared by him being there.
2      Q.  Continuing your response, you talk about
3  the impact of a youth leader being arrested on the
4  operations of Progeny.  Are you alleging that
5  these arrests are unlawful?
6      A.  I'm alleging that these young people get
7  harassed every day for just existing and that they
8  come up with ways.  Nijah got arrested sitting
9  outside of his apartment because somebody called
10 -- they claimed somebody called and said that they
11 complained that strangers was outside.  His
12 apartment was on a dead-end street, it was on I
13 believe 10th or 11th and Hydraulic, and nobody
14 from that neighborhood calling the cops because
15 somebody sitting in a car.
16     Q.  Are you alleging there was an unlawful
17 arrest?
18     A.  I'm alleging that these young people were
19 profiled and that they found a reason to arrest,
20 to arrest them.  Too often we know that this is
21 happening and we gaslight communities to make them
22 think that their stories are not true and we know
23 that this happens in communities, period.
24     Q.  Okay.  I appreciate your, your narrative
25 and I understand your statement.  My question is

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                   Suite 305
785-273-3063         Overland Park, KS 66212         Wichita, KS 67202
www.appinobiggs.com       913-383-1131                316-201-1612

Page 97

1  are you alleging that there was an unlawful
2  arrest, meaning an arrest that was not supported
3  by the law?
4      MS. BRETT:  Objection.  I think at this
5  point that's been asked and answered.  She's
6  explained what she's alleging.
7      BY MR. BRANSON:
8   Q.  You can respond.
9   A.  I agree with what was just stated.
10  Q.  So, you have no further response?
11  A.  No further response.
12  Q.  Okay.  I'm going to ask you to look at
13 Exhibit 59 and go to page 9.  Ironically this is
14 interrogatory 9.  In response to interrogatory
15 number 9 that asks questions about your
16 allegations in paragraph 107 and 108 that Progeny
17 members and youth leaders have experienced
18 repeated harassment by WPD officers you've listed
19 several examples.  On page 9, number 1, references
20 is it Nijah?
21  A.  Nijah, his role --
22  Q.  Nijah?
23  A.  Nijah Metcalf.
24  Q.  Metcalf?
25  A.  Uh-huh.

Page 98

1   Q.  And the response is that you're a witness
2  to that.  Please tell me everything you witnessed.
3   A.  They call me every time they get pulled
4  over, so, it can be whatever frivolous reasons why
5  they get pulled over and they'll call me and go,
6  I've been pulled over, can you come.
7   Q.  Okay.  This has identified a date of July
8  15th, approximately 12:12 p.m.  Tell me what you
9  witnessed.
10  A.  That doesn't have a year on it, so, I
11 know that it wasn't this -- it wasn't this year.
12 I don't think it was this year.  This has happened
13 so many different times on so many different
14 occasions, it's not going to be date specific for
15 me, but I can tell you incidents where when I
16 showed up they were let go.
17  Q.  Okay, I'm asking you specifically about
18 the one that you listed on this answer.
19  A.  Yeah, but there's no specifics around it,
20 so, it's not giving me any information on what
21 happened that day.  They get pulled over pretty
22 consistently, so, I need more clarification.
23  Q.  I don't mean to argue, but --
24  A.  I'm not --
25  Q.  -- this is your response?

Page 99

1   A.  I'm not arguing.  I'm answering.
2   Q.  Yeah.  This was your response so I'm
3  asking --
4   A.  It is, it's my response.
5   Q.  Okay.
6   A.  But again they have been pulled over so
7  many different times on so many different
8  occasions that I need more information to give you
9  more clarity of what happened that day.  So,
10 saying date, July 15th, 12:12, does not give me
11 enough information when Nijah gets pulled over for
12 existing.
13     MS. BRETT:  Can we go off the record for
14 just a minute, Charles?
15     MR. BRANSON:  Sure.
16     (THEREUPON, an off the record discussion
17 was held.)
18     BY MR. BRANSON:
19  Q.  Okay, Ms. Atkins, we were talking about
20 response to interrogatory number 9, response
21 number 1, in reference to Mr. Metcalf on July 15th
22 at approximately 12:12 p.m.  Based upon your
23 response is there anything that you can remember
24 about that specific event?
25  A.  Particularly since Nijah's name is on

Page 100

1  this sheet of paper and numerous times, I would
2  need to know the specific evidence that we sent
3  over so I can tell you about that time.  Just
4  looking at this doesn't give -- I can't pull that
5  out of my head.
6   Q.  Okay.  Is there a reason you didn't
7  reference the evidence that you're referring to
8  now with regard to this event in your response?
9   A.  Say that again for me, please.
10  Q.  Is there a reason you did not reference
11 the evidence you say that was provided in your
12 response?
13  A.  Is there a reason why I didn't reference
14 the evidence in this response?
15  Q.  Yeah.  You -- your response in your own
16 words is pretty vague.
17  A.  I supplied, I supplied the evidence that
18 I had to my attorneys, so, that, that's how I did
19 it.  Now, how the response was written, but I
20 supplied the information that I had to my
21 attorneys.
22  Q.  Under number 2 with regard to Mr.
23 Presley, you're again identified as the witness.
24  A.  Uh-huh.
25  Q.  What can you tell me about that event?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street    6420 W. 95th Street    800 E. 1st Street
Topeka, KS 66604    Suite 101    Suite 305
785-273-3063    Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com    913-383-1131    316-201-1612

Page 101

1  A. Again, all of the evidence is supplied to
2  our attorneys to give to you guys, so, this
3  information on this sheet is very vague. These
4  young people have been pulled over numerous times
5  and, so, I would want to see the evidence so I
6  can tell you what happened that day. We're going
7  over a span of now almost seven, eight years.
8  Q. Supplemental answer number 4 on page 11
9  references Mr. Metcalf again and a particular
10 event witnessed or experienced by you with a call
11 from a friend's mother. Can you tell me anything
12 about that event?
13 A. Nijah actually called me to let me know
14 that they were being harassed by the police. That
15 was the initial thing that I was telling you about
16 when they were sitting outside of his apartment,
17 sitting on the car. The police said that they got
18 a complaint, which is common, and gave them
19 probable cause to search their car or whatsoever,
20 and his friend's mother also sent me a message on
21 Facebook because we were trying to figure out
22 where the boys were. They called me but I didn't
23 know where -- I didn't end up finding where they
24 were till after the fact, that they were sitting
25 in front of the apartment or whatsoever. So, they

Page 102

1  just let me know that they were being profiled by
2  the police.
3  Q. You say they let you know that they were
4  being profiled by the police.
5  A. The police -- they were being -- this is
6  hard for me 'cause it's like playing a game that
7  we know that's real life and --
8  Q. Ma'am, I'm not trying to play any games
9  with you. You used the term profile and I need
10 to know what you mean by that.
11 A. Profiled, when black boys exist in their
12 communities or just exist in this world and police
13 officers figure out ways to say that they got a
14 call or there was a complaint or they look
15 suspicious, it's profiled. Their existence is
16 suspicious. Their existence is criminalized and
17 their existence gives probable cause for people to
18 typecast, stereotype and harass them. It's real.
19 Q. Number 11 in your supplemental response
20 on page 11, another reference to Mr. Metcalf, and
21 follows on page 12, c. You list yourself again as
22 a witness.
23 A. Uh-huh.
24 Q. Can you tell me what this event is?
25 A. They got pulled over, they called me and

Page 103

1  said I got pulled over. The officer came up to
2  the car and I heard the officer say -- you know,
3  they give the spiel and then they run their names
4  and he said, you guys are listed on the gang list,
5  and I told Nijah put me on speaker phone. I
6  said, put me on speaker phone and I told him who
7  I was and what I did and let him know that he was
8  profiling him and that that doesn't fly and that,
9  that was that interaction. They end up letting
10 them go.
11 Q. Notwithstanding your definition of
12 profiling, do you have any evidence to say that
13 the officer did not have any legal reason to make
14 a stop?
15    MS. BRETT: Objection. That's calling
16 for a legal conclusion. You can answer if you
17 know.
18 A. I don't know.
19    MR. BRANSON: Tell you what, if we want
20 to take a short break I am pretty close to being
21 done.
22    MS. BRETT: Sure, want to take five?
23    (THEREUPON, a recess was taken.)
24 BY MR. BRANSON:
25 Q. Just have a couple more questions for you

Page 104

1  and we'll be done pretty soon. Take you back to
2  Exhibit 58, page 19. This is in response to
3  interrogatory number 14 alleging in paragraph 256
4  that Progeny's been directly chilled and
5  discouraged from organizing, conducting, and
6  attending peaceful assemblies. On page 19 part of
7  your response, second full paragraph, starts
8  "Progeny has canceled an event related to Laura
9  Kelly and Evergy poles that plaintiff was planning
10 to protest due to police intimidation." Other
11 than the presence of a patrol car across the
12 street from where you were sign-making, can you
13 explain or detail to me what police intimidation
14 you're referring to?
15 A. We were called and told the police were
16 being called on us by, by a person that was at
17 the event to give us a heads-up. We also supplied
18 evidence of the email exchange that we had with
19 the chief of police in regards to that officer
20 being there and, so, it's all been submitted.
21 Q. Other than the things you named, anything
22 else?
23 A. That's pretty much all been, has been
24 submitted by our attorney.
25 Q. Page 21 of Exhibit 58 in response to

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street, Topeka, KS 66604, 785-273-3063
6420 W. 95th Street, Suite 101, Overland Park, KS 66212, 913-383-1131
800 E. 1st Street, Suite 305, Wichita, KS 67202, 316-201-1612
www.appinobiggs.com