## /IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PROGENY, a program of Destination
Innovations, Inc., CHRISTOPHER COOPER,
ELBERT COSTELLO, MARTEL
COSTELLO, and JEREMY LEVY, JR., on
behalf of themselves and others similarly
situated,

               *Plaintiff(s)*,           Case No. 6:21-cv-01100-EFM-ADM

v.

CITY OF WICHITA, KANSAS,

               *Defendant*.

---

## MEMORANDUM IN SUPPORT
## OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Individual Plaintiffs Christopher Cooper, Elbert Costello, Martel Costello, and Jeremy

Levy Jr. and organizational Plaintiff Progeny are among over 5,500 people currently listed in the

Wichita Police Department's ("WPD") Master Gang List and Gang Database. Due to their

inclusion, Plaintiffs—and the putative class they represent—are subjected to the WPD's

surveillance and harassment, live under constant threat of punishment, and, if arrested, face

increased criminal penalties. They live their lives with a constant target on their backs.

Being labeled a gang member also denies Plaintiffs their most basic constitutional

freedoms, including the ability to spend time with family and loved ones, participate in social

activism and assembly, express themselves freely, and visit certain neighborhoods or businesses.

The WPD designates these individuals as gang members or associates without their knowledge or

consent and, once labeled, denies these individuals any meaningful opportunity to contest that

label or be removed from the List and Database.

Plaintiffs bring this lawsuit pursuant to 42 U.S.C. § 1983, on behalf of themselves and a class of similarly situated individuals,[1] seeking to end these pernicious practices and ensure that the WPD's interest in public safety does not come at the cost of Wichita residents' constitutional rights.[2] K.S.A. 21-6313, *et seq.*[3] and WPD policies based upon those statutes are unconstitutionally vague and overbroad, fail to provide procedural due process under the Fourteenth Amendment to the U.S. Constitution, and violate Plaintiffs' First Amendment rights to freedom of association and expression.

There are no genuine disputes of material fact precluding summary judgment, and the overwhelming evidence in this case demonstrates that both K.S.A. 21-6313 and the WPD's policies and practices run afoul of the Constitution. Plaintiffs therefore respectfully request the Court grant summary judgment in their favor on all claims and award the declaratory and injunctive relief requested in the Pretrial Order, Doc. 196 at 44–46.

## PLAINTIFFS' STATEMENT OF MATERIAL UNCONTROVERTED FACTS

1. Plaintiffs incorporate all stipulated facts pled in the Pretrial Order (Doc. 196).[4]

### A.   The City of Wichita and the Wichita Police Department

2. The WPD Gang/Felony Assault Unit (the "Gang Unit") consists of officers, detectives, and supervisors. This includes (1) twelve detectives working primarily on gang and felony assault crimes, three detectives working primarily as liaisons to task forces with federal agencies, and multiple gang intelligence officers; (2) a Violent Crime Community Response Team

---

[1] Plaintiffs' Motion for Class Certification (Doc. 175) is currently pending before the Court.

[2] The WPD is a department of the Defendant, the City of Wichita. *See* Pretrial Order, Doc. 196 at 2 ¶ 2. Except where explicitly noted, facts and claims in this Memorandum that refer to Defendant refer to the City of Wichita, by and through the WPD.

[3] Plaintiffs challenge K.S.A. 21-6313 and the use of definitions contained therein in K.S.A. 21-6413 through K.S.A. 21-6316. All references to K.S.A. 21-6313, *et seq.* in this brief are to the language contained at K.S.A. 21-6313 and any subsequent sections that rely on the definitions and terms contained in K.S.A. 21-6313.

[4] Hereinafter, Plaintiffs refer to the stipulated facts in the Pretrial Order as "PTO Stip."

("VCCRT") comprised of a sergeant, six officers, and a community service officer; and (3) a Juvenile Intervention Unit that includes two officers.[5]

3.      The officers in the Gang Unit are responsible for designating citizens as gang members; adding them to the Master Gang Database and Gang List pursuant to Policy 527; and "monitor[ing] documented gang members and associates for any violations of their parole, probation/parole, bond, pretrial restrictions and report[ing] this to the proper supervising authority with the intent of removing the offender from the community" in accordance with Policy 527.[6]

4.      Officers of color are, and historically have been, underrepresented in the Gang Unit, VCCRT, and other WPD units or divisions responsible for implementing Policy 527, including in leadership.[7]

**B.      K.S.A. 21-6313, Policy 527, and the Mechanics of the Gang Database**

5.      K.S.A. 21-6313 is based on a WPD policy that would eventually become Policy 527 and was authored by former WPD Gang Unit Lieutenant and current Sedgwick County Sheriff Jeff Easter. During the process of enacting the gang legislation Easter drafted, some Kansas state senators voiced concerns that the proposed statute was "intrusive" and "overreaching."[8]

6.      Some WPD personnel refer to the Gang Database as the Master Gang List or simply the "database" or "gang list," and these terms are used interchangeably in WPD documents.[9]

---

[5] Ex. 1, City of Wichita, WPD Gang/Felony Assault Unit, https://www.wichita.gov/WPD/GangUnit/Pages/default.aspx; *see also* Ex. 2, Beard Dep. 70:21–72:5, 90:20–91:14, 96:18–97:10; Ex. 3, Bartel Dep. 57:10–61:20, 83:17–86:14.
[6] Ex. 4, Policy 527; PTO Stip. ¶¶ 20, 23.
[7] Ex. 5, Nicholson Dep. 110:2-6.
[8] Ex. 6, Easter Dep. vol. I 19:17–23:11, 34:19–38:10, 57:9–61:10; PTO Stip. ¶ 14.
[9] *See*, *e.g.*, Ex 4, Policy 527; Ex. 7, Beard 30(b)(6) Dep. 21:13-23, 26:10-20; Ex. 3, Bartel Dep. 127:15–128:15; Ex. 8, Gilmore Dep. 18:5–19:12, 115:4-8; Ex. 9, E-mail from J. Salcido to G. Ramsay (Sept. 24, 2021 3:54 PM).

7.      The WPD only reviews Policy 527 every 24 months because it is considered a non-"critical" policy. Policy 527 last underwent review in August 2019. The WPD has refused to revise the policy during the pendency of this lawsuit.[10]

### Adding People to the Gang Database

8.      WPD officers have wide discretion as to whether to nominate an individual who meets one or more of the criteria for inclusion in the Gang Database.[11] Some WPD personnel nominate more individuals for inclusion in the Gang Database than other WPD personnel.[12]

9.      A person need not be convicted of, charged with, accused of, or suspected of participation in any criminal act in order to be designated as a criminal street gang member and included in the Gang Database.[13]

10.      The WPD has included individuals in the Gang Database who have never been accused of, charged with, or convicted of any criminal act.[14] There have been individual identified in the Gang Database who did not meet the criteria for criminal street gang membership or criminal street gang associateship under K.S.A. 21-6313 and Policy 527.[15]

### Active, Inactive, and Associate Designations within the Gang Database

11.      Under Policy 527, the WPD shifts an individual's status in the Gang Database from "active" to "inactive" if, after three years, "there is no documented activity."[16]

---

[10] Ex. 10, Baird 30(b)(6) Dep. 25:6-25, 26:15-17, 26:18–27:14, 28:14–29:1, 29:10-17; PTO Stip. ¶ 16.

[11] Ex. 11, McKenna Dep. 84:8-22; Ex. 12, Def.'s Resp. to Pls.' First Req. for Admis. Nos. 22, 23; Ex. 13, Muñiz Dep. 28:1-12; *see generally* PTO Stip. ¶¶ 21-22.

[12] Ex. 14, Inkelaar Dep. 101:13-17; Ex. 13, Muñiz Dep. 28:1-12.

[13] Ex. 11, McKenna Dep. 143:9-14, 143:20-23; Ex. 2, Beard Dep. 153:24–154:25; Ex. 7, Beard 30(b)(6) Dep. 53:19-25; *see also* Ex. 12, Def.'s Resp. to Pls.' First Req. for Admis. Nos. 21, 25; Ex. 15, Selected E-mails between WPD and Outside Agencies, at WICHITA 110994–96.

[14] *E.g.*, Ex. 16, Selected Gang Database Entries, at WICHITA 051640, WICHITA 052504, WICHITA 052561, WICHITA 052151, WICHITA 052165, WICHITA 053188–89; *see also* Ex. 17, Mateo Dep. 72:18–73:14.

[15] Ex. 2, Beard Dep. 219:24–221:19.

[16] Ex. 4, Policy 527, at 3; PTO Stip. ¶ 40.

12.     WPD personnel have renewed individuals' "active" status in the Gang Database for an additional three years based on a single instance of the individual wearing clothing of a certain color or sports team.[17] WPD personnel have also maintained or renewed individuals' "active" status for an additional three years based on a single observation of them at a family funeral attended by others the WPD had designated as gang members,[18] or an individual's statement or the officer's belief that members of the individual's family are in gangs.[19]

13.     WPD personnel have also renewed individuals in the Gang Database for being the victim of a crime—for example, suffering domestic violence by someone in the Database, or being shot by people in the Database—while around others also designated as gang members.[20]

14.     WPD personnel have renewed individuals' designations as active gang members based on arrests for person crimes unrelated to gang activity, such as domestic violence battery.[21]

15.     If a person identified as having a gang-related tattoo manages to become "inactive" in the Gang Database, that person can meet one of the K.S.A. 21-6313 criteria required for reactivation as an "active" gang associate or gang member if they do not attempt to remove or conceal an existing tattoo that was originally used to justify adding them to the Gang Database.[22]

### C.     Racial Disparities in the Makeup of the Gang Database

16.     A robust body of social science research shows that people designated by law enforcement as gang members on gang lists nationwide are overwhelmingly Black or Latino.[23]

---

[17] *See, e.g.*, Ex. 16, Selected Gang Database Entries, at WICHITA 006000, WICHITA 023978, WICHITA 024375, WICHITA 052151, WICHITA 051640, WICHITA 051765, WICHITA 052561; *see also* Ex. 18, Salcido Dep. 183:8–185:5.
[18] *See, e.g.*, Ex. 16, Selected Gang Database Entries, at WICHITA 023919.
[19] *Id.* at WICHITA 052433, WICHITA 053640.
[20] *Id.* at WICHITA 023919, WICHITA 052165.
[21] *See, e.g.*, Ex. 19, E-mail from C. Beard to C. Pinkston (Apr. 19, 2021 2:39 PM); Ex. 16, Selected Gang Database Entries, at WICHITA 054643; Ex. 15, Selected E-mails between WPD and Outside Agencies, at WICHITA 098933 (requesting information from Sedgwick County on two individuals, and noting that one "went inactive back in 2014. I would be interested in trying to flag them again").
[22] Ex. 20, SOP for Entries into the Gang Database, at WICHITA 028989.
[23] Ex. 13, Muñiz Dep. 58:24–59:6.

17.     One out of every 34 African American Wichita residents is in the Gang Database.[24]

18.     The Gang Database contains a disproportionate number of persons of color in relation to the population of the City of Wichita.[25] According to 2020 Census data, the City of Wichita population is 67.9% White alone, not Hispanic or Latino; 7.5% Black; and 14.1% Hispanic or Latino. The Sedgwick County population is 64.2% White alone, not Hispanic or Latino; 8.9% Black; and 15.8% Hispanic or Latino.[26]

19.     In the spring of 2021, Deputy Chief Jose Salcido informed WPD leadership that Black and Latinx individuals were overrepresented in the Gang Database.[27] The City admitted that it had no information to contest the accuracy of a Racial Justice Task Force report's demographic statistics confirming overrepresentation—a task force that the City itself commissioned.[28]

20.     Though it is aware that Black individuals are heavily overrepresented in the Gang Database, the WPD has taken no action in response to that information,[29] has not done any research into why minorities make up the majority of the Gang Database, and has no plans to do so.[30]

---

[24] Ex. 7, Beard 30(b)(6) Dep. 50:23–51:7; Ex. 21, Equal Justice Under Law: Report of the Racial Justice Task Force to the Board of Governors of the Wichita Bar Association 22–23.

[25] Ex. 9, E-mail from J. Salcido to G. Ramsay (Sept. 24, 2021 3:54 PM) at WICHITA 055483; *see also* PTO Stip. ¶¶ 51-53; Ex. 7, Beard 30(b)(6) Dep. 12:2-4, 18:10-17, 44:16-24; Ex. 22, Ramsay Dep. 114:5-24; Ex. 18, Salcido Dep. 82:3–85:9; Ex. 23, Decl. of Mark Hartman ¶ 4.

[26] Plaintiffs respectfully request the Court take judicial notice of the 2020 Census query results for the Wichita, Kansas Metropolitan Area and Sedgwick County, attached as Exs. 24-25, Fed. R. Evid. 201; *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571–72 (5th Cir. 2011) (finding that "United States Census data is an appropriate and frequent subject of judicial notice" and citing cases); *see also Long v. Docking*, 283 F. Supp. 539, 544 (D. Kan. 1968) (taking judicial notice of 1967 Annual Census from State Board of Agriculture).

[27] Ex. 9, E-mail from J. Salcido to G. Ramsay (Sept. 24, 2021 3:54 PM); *see also* Ex. 7, Beard 30(b)(6) Dep. 50:8–52:6; Ex. 21, Report of the Racial Justice Task Force, at 22–23.

[28] Ex. 7, Beard 30(b)(6) Dep. 44:18-24.

[29] *Id.* 49:3–50:7.

[30] *Id.* 20:22–21:10; *cf.* Ex. 26, Easter Dep. vol. II 47:19–49:21 (describing a demographic study of violent crime that was "very gang specific").

### D.    Use and Dissemination of Gang Database Information

21.    The WPD Gang Unit instructs non-Gang Unit personnel in how to search for and identify an individual's gang status by name through its Niche electronic search system.[31]

22.    Information including the names, photos, purported addresses, dates of birth and Social Security numbers of persons the WPD designated as gang members or associates was published in a "Gang Activity Informational Bulletin" that was publicly disseminated in October 2011.[32] ███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████[33] █████████████████████

█████████████████████████████████████████████████████████████

███████.[34] As of 2022, the WPD continued to publish bulletins with the names, photos, and dates of birth of gang designees and even non-designated gang suspects.[35]

23.    Policy 527 requires WPD personnel to include gang designation information in arrest affidavits for person felonies, even when the alleged crime is not gang-related.[36] WPD personnel also ascertain and document in charging affidavits whether individuals are designated

---

[31] Ex. 27, Identification of Gang Members and Associates Using Niche.
[32] Ex. 28, October 2011 Gang Bulletin Leak Documents, at WICHITA 056946–71, WICHITA 056941–44.
[33] *Id.* at WICHITA 056941–44, WICHITA 056972, WICHITA 056973.
[34] *Id.* at WICHITA 056945.
[35] *Id.* at WICHITA 079849–51; *see also* PSOF ¶ 30.
[36] Ex. 4, Policy 527, at 2; PTO Stip. ¶¶ 46; *see also* Ex. 7, Beard 30(b)(6) Dep. 74:16-23, 75:2-6; Ex. 29, Selected WPD Affidavits, at WICHITA 118903–06, WICHITA 119347–52; Ex. 30, Decl. of J. Houston Bales ¶ 5; Ex. 31, Decl. of Bach Hang ¶¶ 5, 14.

as gang members or associates in the Gang Database.[37] As a result, all WPD personnel (including approximately 700 commissioned officers or employees) conducting arrests must have access to and use of the information in the Gang Database.[38]

24.     Similarly, WPD personnel have disclosed information from Gang Database entries in WPD trainings given to all commissioned officers and shared it with school resource officers present in Wichita schools.[39]

25.     WPD personnel regularly share individuals' gang designations with other municipal, county, state, and federal law enforcement officers and agencies.[40] For example, the WPD shares its Gang Database information with the Sedgwick County District Attorney's Office. Prosecutors can then seek the enhanced $50,000 minimum bail for those the WPD deems gang members or associates.[41] Historically, WPD personnel have identified some designated gang members in the National Crime Information Center database, which links "criminal (and authorized noncriminal) justice agencies located in the 50 states, the District of Columbia, U.S.

---

[37] Ex. 14, Inkelaar Dep. 18:18-24, 27:25–28:11, 29:12-16, 33:4-10, 35:9–36:1, 37:22–38:7, 75:16–76:2; Ex. 32, Decl. of Jorge De Hoyos ¶ 6; Ex. 30, Bales Decl. ¶ 5; Ex. 33, Decl. of Sonya Strickland ¶ 5; Ex. 31, Hang Decl. ¶ 5.

[38] Ex. 4, Policy 527, at 2; *see also* Ex. 7, Beard 30(b)(6) Dep. 70:16–71:9.

[39] Ex. 2, Beard Dep. 193:1–195:5; Ex. 34, Speer Dep. 73:10-12; Ex. 35, Wichita Street Gang/LEO Update 2012 Presentation at WICHITA 063265; *see also* Ex. 15, Selected E-mails between WPD and Outside Agencies, at WICHITA 103843–44 (WPD school resource officer providing names, dates of birth, and alleged gang status of high school students to school officials, stating "I'm probably sharing some info I'm not supposed to but I want you all to be aware").

[40] PTO Stip. ¶ 48; Ex. 2, Beard Dep. 222:9–227:8, 231:21–237:15; Ex. 36, Hemmert Dep. 93:2-19; Ex. 34, Speer Dep. 73:1-9; Ex. 12, Defs.' Resp. to Pls.' Req. for Admis. Nos. 41, 42; Ex. 15, Selected E-mails between WPD and Outside Agencies, at WICHITA 102627–28 (WPD affirming that it will try to ███████████████████████████), WICHITA 103780 (WPD crime analyst stating, "███████████████████████████").

[41] K.S.A. 21-6316 ("When a criminal street gang member is arrested for a person felony, bail shall be at least $50,000 cash or surety . . . ."); Ex. 2, Beard Dep. 191:19-24, 222:9–223:23; Ex. 15, Selected E-mails between WPD and Outside Agencies, at WICHITA 120587–89 ("I'll be asking for $75k or more. Legally since he is a documented gang member and he's committing person felonies it must be at least $50k. But I am sure Judge Hatfield will set it higher."); Ex. 32, De Hoyos Decl. ¶ 8; Ex. 23, Hartman Decl. ¶ 6; Ex. 30, Bales Decl. ¶ 7; Ex. 33, Strickland Decl. ¶¶ 7-8; Ex. 31, Hang Decl. ¶ 7.

territories and possessions, and select foreign countries to facilitate the cooperative sharing of criminal justice information."[42]

26.     The WPD likewise shares its Gang Database information with the Kansas Department of Corrections ("KDOC"). KDOC may impose enhanced prison or jail conditions and courts may impose stricter parole and probation terms on those in the Gang Database.[43]

27.     At one point, the Sedgwick County Sheriff's Office had direct access to the WPD Gang Database.[44] Even today, intelligence corporals in the Sheriff's Office have direct access to the Gang Database or can at least access information about the Gang Database.[45]

28.     At various points, WPD officers have disclosed Gang Database information to the public. A WPD officer once publicly disclosed a printed copy of the Gang List when he left it on the trunk of his WPD squad car, and the news media ultimately obtained a copy.[46] In another event, a gang bulletin containing names of gang members and their respective gangs was publicly posted at a barbershop in Wichita. WPD personnel pulled this information from the Gang Database and circulated it to outside law enforcement personnel. Someone within law enforcement forwarded it to an unauthorized person who then printed and posted the bulletin.[47]

29.     Media also apparently have access to Gang Database information. In 2021, the Wichita Eagle published an article identifying Plaintiff Elbert Costello as a "documented gang member."[48]

---

[42] PTO Stip. ¶ 48; U.S. Dep't of Justice, Fed. Bureau of Investigation, Privacy Impact Assessment for the National Crime Information Center (Nov. 7, 2022), at 1, https://www.fbi.gov/file-repository/pia-ncic-020723.pdf/view.
[43] Ex. 2, Beard Dep. 236:21–238:8, 224:20–225:13; Ex. 18, Salcido Dep. 240:16–243:16; see also Easter Dep. vol. II 27:3–29:14.
[44] Ex. 26, Easter Dep. vol. II 21:7-15.
[45] Id. at 29:25–30:8.
[46] Ex. 14, Inkelaar Dep. 79:6-20, 80:19–81:4; Ex. 37, Parker-Givens Dep. 91:6–92:8.
[47] Ex. 7, Beard 30(b)(6) Dep. 141:11–146:23; Ex. 26, Easter Dep. vol. II 26:13–27:23, 32:6-20.
[48] Ex. 38, Jason Tidd, FBI: Glasses found with jail search warrant help ID shooter at American Legion, The Wichita Eagle (Mar. 10, 2021 10:34pm) (PLFS00001998–2002, filed as Doc. 1-3).

30.     Former WPD Captain Wendell Nicholson was charged with and subsequently received diversion for crimes where the underlying facts included at least 22 instances of publicly sharing information derived from the Gang Database, including identifying individuals listed in the Database and their alleged gang affiliations. This occurred during Capt. Nicholson's employment with the WPD.[49]

31.     On at least one occasion, a former WPD Gang Unit officer shared information with Section 8 housing authority employee Angela Cox about purported gang members living and hanging out at a residence on East Kensington, leading to the initiation of eviction proceedings against those individuals.[50] This approach is consistent with ███████████████████████ ████████████████████████████████████.[51]

32.     The disclosure of law enforcement gang designations can carry significant social stigma, including being negatively viewed by one's community, social rejection, and loss of employment opportunities, in addition to legal consequences including ineligibility for certain forms of immigration relief, and the imposition of restrictive probation and parole conditions.[52]

**E.     WPD Officers' Inconsistent and Unverified Application of K.S.A. 21-6313 and Policy 527**

33.     After completing the police academy, most officers do not receive additional training on how to identify potential gang members under Policy 527.[53] The WPD does not require Gang Unit officers to review the criteria for gang membership after graduating Academy and prior

---

[49] Ex. 39, Affidavit of Brandon Monroe (Nicholson Charging Affidavit).
[50] Ex. 40, Wichita Police Department Performance Appraisal, at WICHITA 125457.
[51] Ex. 41, Gang Awareness and Domestic Terrorism: Understanding Gangs, at 25; Ex. 42, Strategies to Address Gang Activity: Suppression, Intervention and Prevention, at 11.
[52] Ex. 13, Muñiz Dep. 47:9-22, 53:17–54:7.
[53] Ex. 11, McKenna Dep. 74:11-17, 78:6-9; Ex. 14, Inkelaar Dep. 94:1-10, 97:12–98:1.

to joining the Gang Unit,[54] and officers assigned to the Gang Unit do not receive any gang-unit specific training.[55]

34.     K.S.A. 21-6313 and Policy 527 do not limit officers' discretion in nominating an individual for inclusion in the Gang Database.[56] Furthermore, K.S.A. 21-6313 and Policy 527 allow gang intelligence officers to add individuals directly to the Gang Database without review by any other WPD personnel.[57]

35.     As a result, each officer applies the statutory criteria differently.[58] Former Capt. Nicholson testified that the criteria are "subjective sorts of things."[59] Deputy Chief Salcido likewise affirmed that there were several aspects of K.S.A. 21-6313 that are subjective, and understandings could vary between officers.[60] Former WPD Sergeant Sage Hemmert stated that application of K.S.A. 21-6313's criteria depends on "context" and admitted that WPD officers can interpret the criteria differently.[61] At least one officer admits to relying on their personal judgment and not the language of the statutory criteria in determining whether individuals meet the criteria for gang membership.[62]

36.     Even if an individual meets three criteria for gang membership under K.S.A. 21-6313, a gang intelligence officer might exercise their discretion and choose not to add them to the

---

[54] Ex. 14, Inkelaar Dep. 100:5-10.
[55] *Id.* at 94:16-20; Ex. 11, McKenna Dep. 88:16-22.
[56] *See* Ex. 11, McKenna Dep. 74:22–75:12, 75:23–78:9, 82:24–84:22; Ex. 14, Inkelaar Dep. 84:8–85:17, 86:8–87:8, 91:24–92:3.
[57] Ex. 11, McKenna Dep. 82:6-10, 82:24–83:12, 84:2-7.
[58] *Id.* at 152:24–153:10, 163:21–164:8; Ex. 14, Inkelaar Dep. 109:20-23.
[59] Ex. 5, Nicholson Dep. 145:1-2.
[60] Ex. 18, Salcido Dep. 178:10–196:2, 196:10-20, 192:15–193:12, 205:12–207:10.
[61] Ex. 36, Hemmert Dep. 180:16–184:5.
[62] Ex. 11, McKenna Dep. 141:14-18; *see also* Ex. 18, Salcido Dep. 317:4-8.

Gang Database, or may add them as an associate instead of a member.[63] For example, Det. Kevin McKenna would not designate a lawyer who represents gang members while wearing a blue tie.[64]

37.     Some gang intelligence officers are not necessarily concerned with whether an individual is truly a gang member when adding them to the Gang Database, but rather only with whether they meet the criteria set out in Policy 527 and K.S.A. 21-6313.[65]

38.     Some WPD officers believe that strictly applying the criteria stated in K.S.A. 21-6313 and Policy 527 is not enough to reliably identify individuals as gang members; they prefer additional context and evidence to make that determination. But other officers add individuals to the Gang Database and even testify to a defendant's gang status in criminal proceedings based on nothing more than meeting the express criteria in K.S.A. 21-6313 and Policy 527.[66]

39.     WPD officers can add individuals to the Gang Database or renew their status based solely on social media postings.[67] The WPD does not monitor Gang Unit officers' use of social media for Gang Database purposes, nor does the WPD verify the social media evidence officers collect as purported proof of gang affiliation.[68] The WPD permits Gang Unit officers to create fake social media accounts to monitor individuals' social media activity, which Deputy Chief Salcido confirmed officers use to justify additions and renewals to the Gang Database.[69]

---

[63] Ex. 11, McKenna Dep. 203:1-18.
[64] *Id.* at 134:16–135:25.
[65] *Id.* at 125:24–126:21, 128:18–129:17; *see also* Ex. 43 Wichita Gang Data Base Presentation, at WICHITA 085383 ("Are they 'real gangsters'? Does it matter? Traditional ties, or not, they have adopted the lifestyle.").
[66] Ex. 11, McKenna Dep. 156:3–158:10, 159:8–162:25; Ex. 14, Inkelaar Dep. 109:7-23.
[67] PTO Stip. ¶ 41; Ex. 2, Beard Dep. 148:1-23; Ex. 44, Wichita Gang Data Base Presentation, at WICHITA 085578 (listing ███████ as one of two "main sources of identification"); Ex. 16, Selected Gang Database Entries, at WICHITA 030056, WICHITA 052138, WICHITA 030070, WICHITA 030074, WICHITA 053640, WICHITA 053918.
[68] Ex. 2, Beard Dep. 148:1-23.
[69] *Id.* at 141:23–151:24; Ex. 18, Salcido Dep. 306:12–307:18.

40.    Gang Unit personnel have counted a single instance of an individual using a gang hand sign/handshake on social media as a self-admission of gang membership.[70] Gang Unit personnel have also counted a single observation of an individual purportedly using gang signs on social media as satisfying at least two separate criteria for renewing and re-designating a previously inactive gang member as an active gang associate.[71]

41.    The WPD's Gang Database policies are notably similar to the policies of other law enforcement agencies, including the Los Angeles Police Department, where inaccurate and falsified gang designations were internally investigated and publicly disclosed, leading to reforms in the database policies.[72]

42.    The fact that the criteria are poorly defined also makes it difficult for individual citizens to avoid meeting those criteria unknowingly and unintentionally.[73]

43.    There are individuals designated as gang members or associates in the Gang Database who maintain that they are not, or have never been, a member of a criminal street gang or an "associate" of a criminal street gang.[74] Former Capt. Nicholson agreed that as written, the policy and statute can "lead to incorrectly identifying people in the community as gang members."[75]

---

[70] Ex. 16, Selected Gang Database Entries, at WICHITA 053640.

[71] *Id.* at WICHITA 053917–18.

[72] Ex. 13, Muñiz Dep. 18:12–19:9, 25:2–26:1; *see also* Heather Murphy, Los Angeles Officers Suspended After Boy Is Wrongly Labeled a Gang Member, New York Times (Jan. 8, 2020), https://www.nytimes.com/2020/01/08/us/lapd-gang-database.html; Douglas S. Wood, California pulls access to LAPD gang data in database after prosecutors say officers falsified records, CNN (July 14, 2020), https://www.cnn.com/2020/07/14/us/lapd-gang-database-california/index.html.

[73] Ex. 13, Muñiz Dep. 35:13–36:12.

[74] *See, e.g.*, Ex. 45, Decl. of Christopher Cooper ¶ 3; Ex. 46, Decl. of Elbert Costello ¶ 3; Ex. 47, Decl. of Martel Costello ¶ 3; Ex. 48, Decl. of Jeremy Levy ¶ 4; Ex. 29, Selected WPD Affidavits, at WICHITA 118903–06, WICHITA 119347–52; Ex. 23, Hartman Decl. ¶ 12.

[75] Ex. 5, Nicholson Dep. 145:12-16.

44.     There are WPD personnel who themselves meet two or more criteria of criminal street gang membership or associateship—including the "Three-Percenters," a criminal militia group whose members have been indicted and convicted for organized federal criminal activity— yet they are not designated as criminal street gang members or associates in the Gang Database.[76] And WPD personnel are aware of individuals who meet three or more criteria of criminal street gang membership but are not designated as criminal street gang members in the Gang Database.[77]

*Self-Admission*

45.     Under K.S.A. 21-6313, information from a parent or guardian, a confidential informant, or another law enforcement agency or correctional facility could qualify as evidence of gang membership.[78] However, there is "no . . . set standard" for what constitutes a documented reliable informant.[79]

46.     Deputy Chief Salcido acknowledged that there is no requirement that a gang intelligence officer review body camera video footage to verify a purported self-admission. He was unable to point to any specific instance in which that actually happened.[80]

47.     Some WPD officers mark the "self-admit" criterion as satisfied based not on a direct admission to the officer, but rather on other interactions that they overheard.[81] Other officers require an admission made directly to the officer by the individual themselves in order to mark an

---

[76] Ex. 18, Salcido Dep. 56:2–62:20.

[77] Ex. 49, City of Wichita, Wichita Citizen's Review Board Report and Recommendation, at 22, https://www.wichita.gov/WPD/Citizen%20Review%20Board/WCRB%20Report%20and%20Recommendations .pdf; Ex. 50, U.S. Attorney's Office for the District of Columbia, Press Release, https://www.justice.gov/usao-dc/pr/six-california-men-four-whom-self-identify-members-three-percenter-militias-indicted; Ex. 51, Stanford University, Mapping Militant Organizations: "Three Percenters," https://cisac.fsi.stanford.edu/mappingmilitants/ profiles/three-percenters; Ex. 11, McKenna Dep. 203:1-18; *see also* Ex. 11, McKenna Dep. 180:6-8.

[78] Ex. 3, Bartel Dep. 131:2-23.

[79] Ex. 52, Thatcher Dep. 93:4-5.

[80] Ex. 18, Salcido Dep. 162:17–166:21.

[81] Ex. 2, Beard Dep. 32:7–33:7.

individual as a self-admit.[82] WPD officers have considered (1) being in the presence of others in the Database, (2) being arrested with others in the Database, (3) stating that one "has hung out with [gang] members in the past," and (4) having a tattoo of the ███████████ as a self-admission.[83] A single video showing a person throwing hand signs may also be counted as a self-admission or satisfying two separate criteria for gang associateship.[84]

### *"Frequenting" a "Criminal Street Gang Area"*

48.     Policy 527 does not define "particular criminal street gang's area," nor does it establish criteria for determining what constitutes a "particular street gang's area," as used in K.S.A. 21-6313(b)(2)(D) and applied by the WPD in designating individuals as gang members or associates in its Gang Database.[85] Officers interpret and apply that criterion based on their individual knowledge and experience.[86] The WPD has no documented criteria or guidelines for what constitutes a gang area or location.[87]

49.     Individuals may only learn that the WPD considers certain areas of the city or businesses to be "gang areas" when they are prohibited from frequenting those areas or businesses as a condition of probation or parole.[88]

---

[82] Ex. 36, Hemmert Dep. 42:19–43:16.

[83] Ex. 16, Selected Gang Database Entries, at WICHITA 053925.

[84] *See id.* at WICHITA 053917; *see also* PTO Stip. ¶ 25.

[85] Ex. 2, Beard Dep. 78:15–79:11; Ex. 14, Inkelaar Dep. 115:8-6; Ex. 12, Defs.' Resp. to Pls.' First Req. for Admis. Nos. 6, 8.

[86] Ex. 14, Inkelaar Dep. 115:8-6; *see also* Ex. 7, Beard 30(b)(6) Dep. 115:14–120:11; Ex. 11, McKenna Dep. 121:1–123:12; Ex. 18, Salcido Dep. 148:20-25, 180:13–181:14, 193:14–196:2, 204:19–206:7; Ex. 2, Beard Dep. 78:15–79:11; Ex. 52, Thatcher Dep. 94:12–95:7.

[87] Ex. 2, Beard Dep. 78:15–79:11; *see also* Ex. 7, Beard 30(b)(6) Dep. 115:14–120:11; Ex. 52, Thatcher Dep. 94:12–95:7; Ex. 26, Easter Dep. vol. II 57:3-5 ("Q. But they weren't specifically designated as gang-related areas or gang areas? A. I've never heard that term; no, ma'am."); Ex. 53, Selected Gang Mapping Documents, at WICHITA 047401–43, WICHITA 047474–515, WICHITA 055098–101, WICHITA 079677–78.

[88] Ex. 2, Beard Dep. 244:11–245:6, 245:18–255:9; Ex. 7, Beard 30(b)(6) Dep. 185:20–189:21.

50.     WPD officers routinely surveil places they believe to be associated with gangs, even purported gang members' ███████.[89] The WPD adds individuals to the Gang Database merely because officers witnesses them "hanging out" at those locations.[90] However, WPD officers acknowledge that street gangs are no longer associated with specific geographic locations.[91]

51.     At least one WPD officer admits that there is no way to avoid going into a potential "gang area" for purposes of avoiding inclusion in the Gang Database, and many officers are unable to define what "gang area" means.[92]

52.     Likewise, WPD officers differ in their interpretation of what "frequenting" a gang area under K.S.A. 21-6313(b)(2)(D) means.[93] Deputy Chief Salcido believes "frequent" means to "linger there for many days . . . four or five, six . . . or more." To his knowledge, the WPD does not provide a standard definition for "frequents" and there is no training or instructions given to auditors on its meaning. He describes "frequents" as "subjective" and "open to interpretation" and therefore different officers could view it differently.[94]

53.     The WPD admits that a Gang Unit officer could apply the "frequents a particular street gang's area" criterion to identify a person as a gang member or associate because the WPD has identified their family member's house as a "criminal street gang area."[95]

---

[89] *See, e.g.*, Ex. 29, Selected WPD Affidavits, at WICHITA 102157; Ex. 15, Selected E-mails between WPD and Outside Agencies, at WICHITA 108294, WICHITA 108714; Ex. 54, E-mail from D. Harty to B. Mumma (July 26, 2019 10:38 PM), at WICHITA 125847 (describing surveillance of ███████████████████ and that "███████████████████████████████████████████").

[90] Ex. 2, Beard Dep. 44:11–46:23; *see also* Ex. 8,__, Gilmore Dep. 51:6-15; Ex. 44, Wichita Gang Data Base Presentation, at WICHITA 085578 (listing ████████████████ as one of two "main sources of identification").

[91] *See* Ex. 11, McKenna Dep. 121:21–123:12; Ex. 18, Salcido Dep. 148:20-25, 180:13–181:14, 193:14–196:2.

[92] Ex. 14, Inkelaar Dep. 115:1–117:25; Ex. 52, Thatcher Dep. 94:12–96:2; Ex. 5, Nicholson Dep. 142:14–21; Ex. 36, Hemmert Dep. 171:3-15; *see also* Ex. 26, Easter Dep. vol. II 55:21 –57:3-5.

[93] Ex. 14, Inkelaar Dep. 111:7-12, 113:8-10; Ex. 18, Salcido Dep. 178:10–180:12, 191:25–193:12.

[94] Ex. 18, Salcido Dep. 178:10–180:12, 191:25–193:12.

[95] Ex. 7, Beard 30(b)(6) Dep. 115:22–119:7; *see also* Ex. 55, Selected Gang Conditions E-mails, at WICHITA 121147 (███████████████████████████████████████████████████████████ ██████████).

54. The "frequenting" a gang area criterion in Policy 527 applies even to visiting family members. There is no written exception to allow someone to visit a family member at one of these residences when applying the criteria in K.S.A. 21-6313.[96] People designated as gang members are subject to restrictions on associating with family members who are also designated as gang members, which could result in them being unable to live with family members.[97]

### F. Lack of Due Process Afforded to Individuals Listed in the Gang Database

*No Notice of Inclusion in Gang Database*

55. The WPD does not provide notice to any adult designated as a gang member or gang associate of their inclusion in the Gang Database,[98] nor do they notify adults when the WPD renews their inclusion in the Database, or moves them from inactive to active.[99]

56. Policy 527 only requires that officers *attempt* to notify the parents or guardians of juveniles when the WPD adds the juvenile to the Gang Database.[100] The WPD's attempts are demonstrably unsuccessful, managing to notify no more than 50% of juveniles (or the parents or guardians thereof).[101]

57. Failure to notify individuals designated as gang members and associates in the Gang Database creates inaccuracies. For this very reason, other U.S. law enforcement departments with similar gang databases do have notification and removal processes.[102]

---

[96] Ex. 7, Beard 30(b)(6) Dep. 117:24–119:7.
[97] Ex. 2, Beard Dep. 249:10–250:15; *see also* Ex. 32, De Hoyos Decl. ¶¶ 10-11; Ex. 23, Hartman Decl. ¶¶ 8, 10; Ex. 30, Bales Decl. ¶¶ 9, 11; Ex. 33, Strickland Decl. ¶¶ 9, 11; Ex. 31, Hang Decl. ¶¶ 9, 11.
[98] PTO Stip. ¶¶ 28-29; Ex. 36, Hemmert Dep. 143:23–144:5; Ex. 2, Beard Dep. 135:11-22; Ex. 3, Bartel Dep. 129:7-18; Ex. 34, Speer Dep. 110:15-18; Ex. 18, Salcido Dep. 239:9-21; Ex. 12, Defs.' Resp. to Pls.' First Req. for Admis. Nos. 26–28.
[99] Ex. 7, Beard 30(b)(6) Dep. 23:3–27:9; *see also* PTO Stip. ¶¶ 28-29.
[100] Ex. 4, Policy 527, at 3; *see also* Ex. 56, Juvenile Notice Attempt Log; PTO Stip. ¶¶ 30-31.
[101] Ex. 56, Juvenile Notice Attempt Log; PTO Stip. ¶ 33.
[102] Ex. 13, Muñiz Dep. 43:13–44:1, 45:19-22, 45:22-25.

***No Opportunity to Challenge Inclusion in the Gang Database***

58.     The WPD does not afford individuals added to or included in the Gang Database as gang members or associates with an opportunity to challenge their inclusion.[103]

59.     The City recognizes that there should be a procedural application for removal from the Gang Database, but no such procedure exists.[104]

60.     In 2021, Deputy Chief Salcido proposed revisions to Policy 527 that would create a new process for providing notice to those added to the Gang Database and allowing individuals to petition for removal from the Gang Database.[105] However, Lt. Jason Bartel, the Gang Unit commander at the time, was opposed to making the changes and argued to Deputy Chief Salcido that his proposed changes could not be made because those changes would require additional resources and because of this lawsuit.[106] The City of Wichita and the Fraternal Order of Police also reacted with hostility and resentment toward Deputy Chief Salcido's recommendations, and his recommendations were ultimately never adopted.[107] Even now, the WPD has no plans to change its policies to address these due process problems.[108]

61.     Under the WPD's current practices, individuals included in the Gang Database who have not had any documented gang activity in three years are changed to "inactive" status, but they are not removed from the Database. Deputy Chief Salcido has never heard of anyone "completely dropping off the list and not being inactive," and the only time he had heard of someone being

---

[103] PTO Stip. ¶ 36; Ex. 14, Inkelaar Dep. 152:17–153:12; Ex. 18, Salcido Dep. 244:21–246:15, 313:24–314:13; Ex. 34, Speer Dep. 108:20–109:5; Ex. 12, Defs.' Resp. to Pls.' First Req. for Admis. Nos. 33, 34; Ex. 19, E-mail from C. Beard to C. Pinkston (Apr. 19, 2021 2:39 PM); Ex. 31, Hang Decl. ¶ 8.
[104] Ex. 7, Beard 30(b)(6) Dep. 21:24–22:19, 55:19–56:4; PTO Stip. ¶¶ 36-38.
[105] Ex. 18, E-mail from J. Salcido to G. Ramsay (Sept. 24, 2021 3:54 PM); *see also* Ex. 10, Baird 30(b)(6) Dep. 64:3-9.
[106] Ex. 10, Baird 30(b)(6) Dep. 72:7–74:16.
[107] Ex. 18, Salcido Dep. 103:4–104:4, Ex. 22, Ramsay Dep. 114:5-24; Ex. 57, Ramsay Right to Sue Letter; Ex. 9, E-mail from J. Salcido to G. Ramsay (Sept. 24, 2021 3:54 PM)
[108] Ex. 7, Beard 30(b)(6) Dep. 16:2–17:1.

"removed" from the Master Gang List was when the WPD misattributed something to the incorrect person due to similar names.[109]

### *Insufficient Audit Process*

62.     The WPD claims to engage in a yearly audit process that begins with examining the Master Gang List and then revising the Gang Database accordingly to mark active gang members and associates as inactive, incarcerated, or deceased.[110] However, the WPD's standard operating procedure on the audit process does not provide any guidance on how to apply the statutory criteria .[111]

63.     Deputy Chief Salcido repeatedly acknowledged the lack of any methodology in the audit,[112] which is unusual even when compared to the audit processes of other U.S. law enforcement agency gang databases.[113]

64.     The WPD's yearly audit does not include a determination on whether the gangs in the Gang Database continue to meet the criteria of K.S.A. 21-6313 for eligibility as a "criminal street gang."[114] Some gangs listed in the Gang Database may no longer meet the criteria for a "criminal street gang" under K.S.A. 21-6313.[115]

### G.     Policy 527's Limitations on Expressive and Associative Activity

---

[109] Ex. 18, Salcido Dep. 136:5–137:6, 231:5–233:15; *see also* PTO Stip. ¶¶ 37-38.
[110] Ex. 20, SOP for Entries into the Gang Database, at WICHITA 028990; Ex. 2, Beard Dep. 42:10-12, 81:13–82:8, 85:18–86:13, 87:25–90:11; Ex. 8, Gilmore Dep. 97:18–101:7, 122:6–123:21, 125:12–131:15; *see also* Ex. 2, Beard Dep. 98:23–99:3, 135:1-10; Ex. 13, Muñiz Dep. 42:2-17.
[111] Ex. 18, Salcido Dep. 50:22–51:20, 116:13–117:17, 128:5-18; Ex. 7, Beard 30(b)(6) Dep. 238:7–239:9; Ex. 8, Gilmore Dep. 124:11–18, 130:19–23, 152:20–153:15.
[112] Ex. 18, Salcido Dep. 50:22–51:20.
[113] Ex. 13, Muñiz Dep. 42:2–43:8.  *See, e.g.,* Ex. 16, Selected Gang Database Entries, at WICHITA 053188–89 (not marking individual as "inactive" until over five years after the anticipated inactive date).
[114] Ex. 7, Beard 30(b)(6) Dep. 237:2–239:9.
[115] *Id.* at 241:24–242:7.

*Expressive Limitations*

65.     The criteria for designating someone as a member of a criminal street gang target expressive conduct. For example, "clothing" is a prominent criterion for documenting people as gang members or associates.[116]

66.     Almost any color can be a gang color for meeting state criteria. According to one officer, this includes North Carolina blue, dark blue, red, green, black, brown, yellow, and orange.[117] Others have considered blue, ███████████████████████████, and the color combinations of ███████████████████████████████████████████████████████ ███████████████████████████████████ to be associated with criminal street gangs.[118]

67.     WPD personnel have considered clothing and tattoos related to the following sports teams and locations as associated with criminal street gangs: ██████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████. WPD personnel associate clothing and/or tattoos for some of these teams with multiple different gangs, including rival gangs.[119]

---

[116] *E.g.*, Ex. 8, Gilmore Dep. 51:6-15.

[117] *Id.* at 143:24–144:19.

[118] *Id.* at 144:2-16; Ex. 11, McKenna Dep. 139:9–15; *e.g.*, Ex. 58, Wichita Street Gangs: Gang Identification and Introduction to Criminal Street Gang Investigation Presentation, at WICHITA 089508, WICHITA 089516, WICHITA 089552, WICHITA 089568, WICHITA 089578, WICHITA 089592; Ex. 59, Street Gangs in Wichita Presentation, at WICHITA 088461, WICHITA 088467, WICHITA 088472–76, WICHITA 088478, WICHITA 088480, WICHITA 088482–83, WICHITA 088485, WICHITA 088488–90, WICHITA 088492, WICHITA 088494–96, WICHITA 088499, WICHITA 088501–03, WICHITA 088505, WICHITA 088507, WICHITA 088509, WICHITA 088511; Ex. 60, Wichita Gang Unit 2003 Basic Gang Manual, at 5–12.

[119] Ex. 59, Street Gangs in Wichita Presentation, at WICHITA 088460, WICHITA 088462, WICHITA 088467–68, WICHITA 088477–78, WICHITA 088480, WICHITA 088488, WICHITA 088490, WICHITA 088494, WICHITA 088496; Ex. 60, Wichita Gang Unit 2003 Basic Gang Manual, at 6–7, 9; Ex. 61, Wichita Police Department Street Gang Awareness 2011 at WICHITA 033288–91; Ex. 62, Selected TOPS Cards, at WICHITA 035369; Ex. 63, Wichita Street Gang Identifiers; Ex. 64, 2012 – General Gang Info.

68.     WPD personnel have considered at least the numbers ███████████

█████████████████████████████████████; the phrases ███████

███████████████████████████████████████████████████████

█████; and the symbols of a ████████████████████████████████

███████████████████████████████████████████████████████

█████████ to be associated with criminal street gangs.  WPD personnel associate many of these

numbers, phrases and symbols with multiple different gangs.[120]

69.     The WPD trains its officers to consider certain types of tattoos to be "gang-related."

These include tattoos expressing statements of support for individuals ("█████"), ethnic identities

(█████████████████████), neighborhoods or locations (█████████████████████

█████████████████), and political opinions (████████████████████████████

█████████████████).[121]

70.     If three individuals wear common colors or symbols, and one of them commits a

crime, that would be sufficient for the WPD to consider all three to be a gang in Wichita.[122] WPD

has identified new purported criminal street gangs based on clothing, hand signs, and social media

postings without reference to any criminal activity.[123]

71.     No policy or authority defines or limits the number or variety of "style[s] of dress,"

"color[s]," "hand signs," or "tattoos," as used in K.S.A. 21-6313(b)(2)(E), that WPD personnel

---

[120] Ex. 63, Wichita Street Gang Identifiers.
[121] *See, e.g.*, Ex. 59, Street Gangs in Wichita Presentation, at WICHITA 088460, WICHITA 088468, WICHITA 088467, WICHITA 088486, WICHITA 088488, WICHITA 088490, WICHITA 088496, WICHITA 088505, WICHITA 088514–44, WICHITA 088519, WICHITA 088529, WICHITA 088533; *see also* Ex. 44 Wichita Gang Data Base Presentation, at WICHITA 085572–75 (discussing gang graffiti with image of "████████████" graffiti); *see also* Ex. 16, Selected Gang Database Entries, at WICHITA 053925 (noting ████████████████).
[122] Ex. 2, Beard Dep. 156:5–158:9.
[123] *See, e.g.*, Ex. 28, October 2011 Gang Bulletin Leak Documents, at WICHITA 079849–51.

may consider to be associated with criminal street gangs when designating persons as criminal street gang members or associates.[124]

72.     The WPD does not make available to the general public any list or other documented designation of the styles of dress, colors, hand signs, or tattoos that it considers to be affiliated with gang membership or association.[125] And even one article of clothing of a sufficient color could meet WPD's standard for wearing particular clothing/dress associated with a gang.[126]

73.     At least one WPD officer admitted that the criteria for identifying a particular style of dress as indicative of gang status is outdated, broad, and unclear. Det. Thatcher acknowledged that many gang members no longer adhere to specific dress styles.[127]

74.     Deputy Chief Salcido acknowledged that he himself could have been considered an associate because he had friends in a peer group and football teammates who were gang members. As a youth, a WPD officer once thought Deputy Chief Salcido was a gang member based on how he was dressed.[128]

75.     Likewise, the WPD renewed one individual in the Gang Database for "wearing a ███████ hoodie" when arrested for traffic charges.[129] And the WPD renewed Progeny Youth Leader A.M. in the Gang Database for wearing a █████ hat to the Wichita East High School graduation.[130] The WPD renewed another individual in the Gang Database for posting Facebook photos of himself wearing "gang colors and a ████████ hat with an ██."[131]

---

[124] Ex. 52, Thatcher Dep. 96:12–97:8.
[125] Ex. 7, Beard Dep. 78:15–79:11; Ex. 12, Defs.' Resp. to Pls.' First Req. for Admis. No. 8.
[126] Ex. 18, Salcido Dep. 183:8–185:5.
[127] Ex. 52, Thatcher Dep. 96:12–97:8.
[128] Ex. 18, Salcido Dep. 56:2–62:20.
[129] Ex. 16, Selected Gang Database Entries, at WICHITA 006000.
[130] *Id.* at WICHITA 024375.
[131] *Id.* at WICHITA 051765.

*Associational Limitations*

76.     The WPD primarily uses individuals' social relationships with purported gang members or associates to add or renew those individuals' status in the Gang Database.[132] The Gang Database entries and TOPS cards for the individual Plaintiffs and Progeny staff reveal a strong focus on their relationships with others.[133]

77.     The definition of the phrase "associates with known criminal street gang members" in K.S.A. 21-6313 depends entirely on the situation at hand and what information is available to the officer.[134] There is no WPD document or policy that defines what it means to "associate" with another person in the Gang Database.[135] Lt. Jeffrey Gilmore, for example, interprets "association" to mean "hanging out with," being "in cars with," or being "friends" with others in the Database.

78.     Neither K.S.A. 21-6313 nor Policy 527 identify the number or nature of interactions a person must have with a known gang member to meet the definition of "associating."[136]

79.     K.S.A. 21-6313's criterion of being "in the company of a gang member" could be met by virtue of being a family member, neighbor, or friend of a purported gang member.[137] People can satisfy the K.S.A. 21-6313 criterion "by accident" or by "coincidence," such as in the case where "your brother is a gang member, your father is a gang member, or your grandfather is a gang member. It happens."[138]

---

[132] *See* Ex. 44, Wichita Gang Data Base Presentation, at WICHITA 085578 (listing ███████ ████████ as the "main sources of identification").

[133] Ex 16, Selected Gang Database Entries. *See also, e.g.*, Ex. 62, Selected TOPS Cards, at WICHITA024371–72 (Progeny Youth Leader A.M. nominated for appearing in a video with other purported gang members, for being Facebook friends with other supposed gang members, and for being a passenger in car driven by his cousin, allegedly identified as a member of a rival gang), WICHITA 024419 (nominating Progeny Youth Leader D.B. based exclusively on his choice of companions), WICHITA 024423 (same).

[134] Ex. 3, Bartel Dep. 142:7-24.

[135] Ex. 8, Gilmore Dep. 139:1-14.

[136] Ex. 11, McKenna Dep. 140:12–141:6; Ex. 14, Inkelaar Dep. 112:10-24.

[137] Ex. 22, Ramsay Dep. 61:9-24.

[138] Ex. 8, Gilmore Dep. 140:24–141:22.

80.     Former Deputy Chief Wanda Parker-Givens testified that she has never been to the homes of her niece or nephew because she fears being associated with them. She also fears giving rides to children that she coaches due to possible association and placement in the Gang Database.[139] Former Deputy Chief Parker-Givens also told former Chief Ramsay that she was worried about being seen with a family member listed in the Gang Database.[140]

81.     Former Capt. Nicholson also testified that people in the community are afraid to ride in a vehicle with their own family members because of the potential for being included in the Gang Database as a result.[141]

82.     WPD officers also track and surveil the social and recreational activities of certain members of the Wichita community to bolster inclusion of those individuals in the Gang Database. For example, the WPD uses social media as an investigative tool to find further purported proof of gang affiliation.[142] If a purported gang member does not have social media, the WPD might look at the person's girlfriend's account.[143]

83.     The WPD also documents the names of all individuals who attend certain concerts in the Gang Database and police reports.[144]

84.     The WPD regularly surveils funerals and uses officers' observations to add or renew individuals in the Gang Database.[145] Officers frequently rely on the presence of other

---

[139] Ex. 37, Parker-Givens Dep. 62:22–63:13.
[140] Ex. 22, Ramsay Dep. 55:8-15.
[141] Ex. 5, Nicholson Dep. 118:8-16.
[142] PTO Stip. ¶ 41; *see supra* PSOF ¶¶ 49-50, 70.
[143] Ex. 34, Speer Dep. 135:17–137:12; *see also* Ex. 65, Layton Dep. 90:2-15.
[144] Ex. 36, Hemmert Dep. 145:20-25, 147:3-14. *See, e.g.*, Ex. 16, Selected Gang Database Entries, at WICHITA 023978, WICHITA 024146, WICHITA 053214; Ex. 15, Selected E-mails between WPD and Outside Agencies, at WICHITA 096006–07.
[145] *See, e.g.*, Ex. 52, Thatcher Dep. 31:11–35:5, 39:7-42:22; Ex. 16, Selected Gang Database Entries, at WICHITA 053496 (renewed for being observed at funeral by gang officers), WICHITA 053609 (renewed twice for attending funerals with other gang members present), WICHITA 053645 (renewed for attending the funeral of a purported gang member), WICHITA 030074 (same), WICHITA 053214 (renewed for attending alleged Blood member Elbert Jr.'s

purported gang members as evidence of gang affiliation, but the WPD has also renewed individuals for merely attending the funeral of a purported gang member, with no other alleged members' presence noted.[146]

### H.    Impact of Inclusion in Gang Database

85.    Pursuant to K.S.A. 21-6316, if an individual designated as a criminal street gang member or associate in the Gang Database is arrested for a person felony, that individual is subject to an enhanced default minimum of $50,000 cash or surety bail. This default minimum applies regardless of the nature of the felony or whether it is alleged to be gang-related.[147]

86.    Evidence of purported gang membership may be introduced against a designated individual even when not directly relevant to the charged offense.[148]

87.    When a person in the Gang Database is sentenced to probation or released on parole or pre-trial, they must abide by additional special conditions ("gang conditions"), including early curfews, staying away from certain people or places, and other restrictions on associative and expressive conduct.[149] Gang conditions can be imposed even if the charged offense or the facts of the case have little or nothing to do with gang activity.[150]

88.    The WPD plays an active role in determining gang conditions of release and their application to individuals, collaborating closely with other government agencies and even drafting

---

funeral, and also for attending the funeral of an alleged Crip member); Ex. 15, Selected E-mails between WPD and Outside Agencies, at WICHITA 095675.

[146]Ex. 16, Selected Gang Database Entries, at WICHITA 053645, WICHITA 030074.

[147] K.S.A. 21-6316; Ex. 32, De Hoyos Decl. ¶ 8; Ex. 23, Hartman Decl. ¶ 6; Ex. 30, Bales Decl. ¶¶ 5, 7-8; Ex. 33, Strickland Decl. ¶¶ 7-8; Ex. 31, Hang Decl. ¶ 7.

[148] PTO Stip. ¶ 45; Ex. 32, De Hoyos Decl. ¶ 13; Ex. 30, Bales Decl. ¶ 13; Ex. 33, Strickland Decl. ¶ 13; Ex. 31, Hang Decl. ¶ 13.

[149] Ex. 32, De Hoyos Decl. ¶¶ 10-12; Ex. 23, Hartman Decl. ¶¶ 8-10; Ex. 30, Bales Decl. ¶¶ 9-12; Ex. 33, Strickland Decl. ¶¶ 9-12; Ex. 31, Hang Decl. ¶¶ 9-12; Ex. 66, Sample Gang Conditions of Release; *see also* Ex. 15, Selected E-mails between WPD and Outside Agencies, at WICHITA 095050.

[150] *See* Ex. 32, De Hoyos Decl. ¶¶ 4-5, 11; Ex. 23, Hartman Decl. ¶¶ 3, 10; Ex. 30, Bales Decl. ¶¶ 4-5, 11; Ex. 33, Strickland Decl. ¶¶ 4, 11; Ex. 31, Hang Decl. ¶¶ 4, 11; *see also* Ex. 66, Sample Gang Conditions of Release.

policies for them.[151] Other agencies rely heavily on the WPD's determination that someone is a gang member when imposing and enforcing these conditions.[152]

89.      Gang conditions have included "mapping" individuals listed as gang members, i.e., prohibiting them from entering large geographic zones at certain times of the day.[153] The Sedgwick County Department of Corrections ("SCDOC") instituted this program in 2019 with input from the WPD, and both agencies collaborated in the program's function.[154] The City paused the mapping program in mid-2022, in large part because of this lawsuit.[155]

90.      The WPD created a specialty unit, initially called the TOPS Unit, specifically to monitor people in the Gang Database who were subject to parole and probation conditions.[156] The goal was—and remains to this day—to "absolutely" put people in the Gang Database back behind bars if they are found to violate any probation or parole conditions, even those wholly unrelated to gang activity, such as having a drink or not meeting curfew.[157]

---

[151] Ex 67, Selected Gang Conditions E-mails, at WICHITA 047462–71 (SCDOC employee seeking input from WPD ████████████), WICHITA 081321–22 (SCDOC officer asking various law enforcement officers, including WPD, to "████████████████████████████████████████████"), WICHITA 098750 (WPD officer recommending gang conditions for an individual to Sedgwick County prosecutor); Ex. 32, De Hoyos Decl. ¶ 9.

[152] *See, e.g.*, Selected Gang Conditions E-mails, at WICHITA 047454–55 (attaching SCDOC gang conditions policy ████████████████████████████████████████████), WICHITA 097964–65 ("████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████"); WICHITA 121147–48 ("████████████████████████████████████████████████████████████████████████████ ███████████████"); Ex. 15, Selected E-mails between WPD and Outside Agencies, at WICHITA 080535–37 (responding to "████████████████████" request from KDOC), WICHITA 080650–51 (providing photos and gang status to KDOC for ████████████), WICHITA 105928–29.

[153] *See, e.g.*, Ex. 53, Selected Gang Mapping Documents, at WICHITA 047445–46 ("███████████████ ████████████████████████████████████████████████████████████████████████████████ (emphasis original)), WICHITA 079679–80, WICHITA 098334 ("██████████████████████████ ███████████████████████"). *But see id.* at WICHITA 109547 (██████████████████████████ ███████████).

[154] *Id.* at WICHITA 047401, WICHITA 047444, WICHITA 047449.

[155] Def.'s Resp. to Mot. for Class Cert., Doc. 187, at 15 (citing Ex. 7, Beard 30(b)(6) Dep. at 187:3-5, 190:10-19; Ex. 2, Beard Dep. at 253:22–255:9); Ex. 7, Beard 30(b)(6) Dep. at 188:11–189:22. *But see* Ex. 53, Selected Gang Mapping Documents, at WICHITA 120201 (approximately 32 gang members eligible for mapping).

[156] Ex. 6, Easter Dep. vol. I 39:17–40:11, 44:18–46:12.

[157] *Id.* at 39:20–40:11, 48:12-18; *see also* Ex. 4, Policy 527, at 1; Ex. 15, Selected E-mails between WPD and Outside Agencies, at WICHITA 095378 (agreeing to provide Mr. Cooper's and another's Gang Database information in order

91.     Those who have been designated as gang members or associates and subjected to gang conditions have found it difficult to comply with the gang conditions, particularly those that prevent them from associating with friends and family. Complying with the associational restrictions is especially difficult because a person may not know—and may never find out—whether they have been included in the Gang Database, thus those around them who are subject to gang conditions can unknowingly violate those conditions.[158]

92.     Designation in the Database carries consequences beyond probation and parole conditions. For example, a criminal defendant who is otherwise eligible for deferred prosecution under the Sedgwick County Drug Court Program, or other diversion programs, is disqualified if that defendant has a current gang affiliation under Kansas law.[159] Councilmember Brandon Johnson spoke of a former gang member who tried to enter a contract with artists for an event, and law enforcement encouraged the artists to break the contract because they believed he was a gang member and would cause trouble.[160] Councilmember Johnson also testified that he knew someone on the Gang List who had been denied housing because the WPD interfered with the landlord negotiations.[161]

## I.     Targeting of Minority Communities and Community Distrust in the WPD

93.     Former Deputy Chief Parker-Givens testified that as an African American female who coached and attended church in the community, she was concerned that simply being seen

---

to return M. Costello to prison for violating gang conditions), WICHITA 096577 ("I am not sure of his probation stipulations but he has always been a pain in our but[t] and would be nice to get him revoked if possible.").
[158] Ex. 32, De Hoyos Decl. ¶ 11; Ex. 23, Hartman Decl. ¶ 10; Ex. 30, Bales Decl. ¶ 11; Ex. 33, Strickland Decl. ¶ 11; Ex. 31, Hang Decl. ¶ 11.
[159] Ex. 68, Drug Court Eligibility Criteria.
[160] Ex. 69, Johnson Dep. 52:3–54:18.
[161] *Id.* at 88:1-7.

with one of her nieces or nephews in the wrong zip code could lead to her being placed in the Gang Database and cause issues for her career.[162]

94.     Councilmember Johnson has friends who are in the Gang Database and whom the WPD has pulled over for no apparent reason,[163] and has personally witnessed law enforcement harassing individuals at places like the QuikTrip on 13th and Oliver for supposedly being gang members when they were not.[164]

95.     The Gang Unit once mistook a historically Black fraternity (Kappa Alpha Psi) as a gang because the fraternity's colors are crimson and cream. The Gang Unit believed that the fraternity's planned gathering was a gang party. Fraternity members attending the event included respected members of the community, including medical doctors. Former Capt. Nicholson had to explain the differences between Bloods and the fraternity to the Gang Unit.[165]

**J.      The Gang Database's Impact on Progeny**

96.     Progeny is a putative class representative in this class action suit.[166]

97.     A small executive staff and team of Youth Leaders run Progeny. Progeny works with and employs individuals in the Gang Database, and its members have suffered harms from inclusion in the Gang Database. Progeny staff members and Youth Leaders are either listed themselves or have family members and friends who are listed in the Gang Database.[167]

---

[162] Ex. 37, Parker-Givens Dep. 58:18–59:03.
[163] Ex. 69, Johnson Dep. 12:6-21.
[164] *Id.* at 66:21–67:4; *see also* Ex. 70, Criminal Investigation Record of surveillance and traffic stop.
[165] Ex. 5, Nicholson Dep. 147:7–148:10.
[166] Plfs.' Mot for Class Cert., Doc. 175.
[167] PTO Stip. ¶ 57; Ex. 71, Decl. of Marquetta Atkins ¶ 5; Ex. 16, Selected Gang Database Entries, at WICHITA 024374–76, WICHITA 024424–26, WICHITA 047528–30.

98.     Progeny staff and Youth Leaders have been included in the Gang Database based on their clothing color, use of hand signs, social media activity, and "association" with others.[168] The four Progeny staff added to the Gang Database are not active gang members.[169]

99.     Progeny staff member D.B.W. has been subjected to pretextual stops based on the identity of his companions.[170] Progeny Youth Leader D.B.'s inclusion in the Gang Database has been based at least in part on the identity of his companions, including school friends.[171] Progeny Youth Leader A.M. has been subjected to pretextual stops, and the WPD monitors his social media.[172] Progeny Youth Leader K.C. was added to the Gang Database as a juvenile, but the WPD's apparent single attempt to notify her parent of that fact via certified mail was unsuccessful.[173] At least as recently as October 21, 2019, the WPD provided information to SCDOC that D.B., K.C., and A.M. were gang members.[174]

100.     Progeny members and staff have experienced repeated harassment by WPD officers, including being pulled over while on their way to school or work and questioned about gang activity.[175] As recently as August 2023, a WPD patrol car followed a Progeny staff member

---

[168] Ex. 16, Selected Gang Database Entries, at WICHITA 024374–76, WICHITA 024424–26, WICHITA 047528–30.
[169] Ex. 71, Atkins Decl. ¶ 5.
[170] Ex. 62, Selected TOPS Cards, at WICHITA 047524–25; *see also id.* at WICHITA 047526–27 (only criterion marked is "professional LEO identification" but the notes say only that they were arrested for stolen property).
[171] Ex. 62, Selected TOPS Cards, at WICHITA 024419–23. The TOPS card Bates stamped as WICHITA 024419 is particularly concerning for its errors, inconsistency, and lack of detail. Despite the nominating officer checking the criterion of "professional LEO identification," the narrative says nothing about any other law enforcement officer positively identifying D.B. as a member or associate of any gang. Instead, the narrative focuses only on the driver, who "denied affiliation with any gang" but apparently struck the nominating officer as a gang member based on his ██████ shirt and shoes and ███ shorts.
[172] Ex. 62, Selected TOPS Cards, at WICHITA 024371–73; Ex. 72, Progeny's Second Suppl. Resp. to Interrog. No. 9; Ex. 73, Facebook Messages.
[173] Ex. 74, E-mail from C. Carson to C. Beard (Sept. 8, 2022 1:22 PM); Ex. 76, Juvenile Notification List (juvenile notification mailed to K.C.'s parent on an unknown date but returned 6/28/2017).
[174] Ex. 15, Selected E-mails between WPD and Outside Agencies at WICHITA 104869, WICHITA 104878, WICHITA 104889, WICHITA 104898.
[175] Ex. 71, Atkins Decl. ¶ 16; Ex. 73, Pl. Progeny's Second Suppl. Resp. to Def.'s Interrog. No. 9; *see also, e.g.*, Ex. 15, Selected E-mails between WPD and Outside Agencies, at WICHITA 093274–75 (listing separate traffic stops of Progeny Youth Leaders D.B. and A.M, with protective sweeps resulting in nothing found); Ex. 29, Selected WPD Affidavits, at WICHITA 099299–301 (attesting to stop of A.M. because they recognized his vehicle); Ex. 76, Progeny Staff Text Messages; Ex. 77, Progeny Facebook Post; Ex. 73, Facebook Messages.

driving from the Progeny office to his destination, changing lanes twice when he did. The following morning, the same staff member awoke to find a WPD patrol car parked outside his home.[176]

101.   The WPD has requested that Progeny hold an event for Youth Leaders to meet with new officers, but the event did not take place because Youth Leaders did not feel comfortable with the possibility of being profiled when around police.[177]

102.   Because Progeny members and Youth Leaders are in the Gang Database, they are subject to enhanced criminal charges and consequences, including the admission of highly prejudicial Gang Database information as evidence in criminal proceedings.[178]

103.   Because Progeny members and Youth Leaders are in the Gang Database, attendance at Progeny events where others also in the Gang Database may be present risks violating probation or parole conditions and could subject Progeny members and staff to an enhanced bail of over $50,000, even if the offense is not gang related.[179]

104.   Progeny achieves its goals by hosting town halls, educating and working with Kansas state government officials, providing feedback to local and state leaders regarding policy priorities, organizing youth and community leaders around juvenile justice reform, and publishing written reports and other documents that translate youths' insights and needs into calls for government action.[180] Progeny and its members are restricted from achieving these goals through organizing, conducting, and attending peaceable assemblies because doing so creates grounds for the WPD to add or renew Progeny members and event attendees in the Gang Database, and to

---

[176] Ex. 71, Atkins Decl. ¶ 17.
[177] Ex. 71, Atkins Decl. ¶ 14; Ex. 78, Pl. Progeny's Resp. to Def.'s Interrog. No. 14; Ex. 79, Progeny 30(b)(6) Dep. 72:12–74:3.
[178] *See supra* PSOF ¶¶ 32, 85-92; K.S.A. 21-6316; Ex. 4, Policy 527.
[179] K.S.A. 21-6316; *see also* Ex. 71, Atkins Decl. ¶¶ 7-10.
[180] Ex. 71, Atkins Decl. ¶ 4; Ex. 79, Progeny 30(b)(6) Dep. 15:6-17.

harass, detain, search, and surveil them pursuant to K.S.A. 21-6313 and Policy 527.[181] Progeny has altered the way in which it approaches its protests and events.[182]

105.    For example, in April 2021, Progeny planned to hold a protest at an event where Governor Laura Kelly would be present. The WPD contacted Progeny before it had a chance to protest at the event, and Progeny cancelled the protest. That same day, a WPD officer stationed himself outside the building where Progeny was holding a meeting. Progeny staff had to go outside to confront the officer stationed to ask him to leave. This caused an interruption in Progeny's activities, diverted staff time and attention, intimidated attendees, and caused stress and discomfort to staff and attendees.[183]

106.    As another example, in February 2019, Progeny attempted to hold an event for community action against violence, but many young individuals would not come into the event due to the number of police vehicles they saw outside and because of the number of police officers attending the meeting, in part because of the youths' fear of being added to the Gang Database.[184] Because of the police presence outside of and attendance at the event, some people could not determine whether Progeny was connected to or collaborating with the police or other law enforcement, including with respect to the Gang Database. This confusion dissuaded people from attending or signing up to be a part of Progeny. [185]

107.    K.S.A. 21-6313 and Policy 527 also strongly discourage Progeny from holding in-person meetings of any kind. Most individuals have no way of knowing whether they are included in the Gang Database, or whether others affiliated with Progeny are. Meeting in large groups or

---

[181] Ex. 71, Atkins Decl. ¶¶ 8-15, 19; Ex. 78, Progeny's Resp. to Def.'s Interrog. Nos. 8, 12, and 13.
[182] Ex. 71, Atkins Decl. ¶¶ 8-14.
[183] Ex. 71, Atkins Decl. ¶ 13; Ex. 78, Progeny's Resp. to Def.'s Interrog. No. 14.
[184] Ex. 71, Atkins Decl. ¶¶ 11-12; Ex. 78, Progeny's Resp. to Def.'s Interrog. No. 14.
[185] Ex. 71, Atkins Decl. ¶¶ 11-12.

even one-on-one puts Progeny members at risk of causing each other to be designated as gang members or associates by the WPD.[186]

108.     For individuals whose inclusion in the Gang Database is known or who have in the past been directly involved in street gang activity, K.S.A. 21-6313 and Policy 527 effectively forbid Progeny from providing services or support to such persons. Interaction of any kind with such individuals carries the risk of life-long gang member or associate designation and the many accompanying legal consequences of that designation.[187]

109.     WPD officers continue to target and scrutinize Progeny's lawful associational activities. In August 2023, Progeny hosted a juvenile probation focus group meeting, during which a Progeny staff member observed a WPD officer across the street from Progeny's offices using binoculars to surveil the meeting.[188]

### K.     Chris Cooper's Inclusion in the Gang Database

110.     Chris Cooper is a 28-year-old Black resident of Wichita, Kansas. He is a putative class representative in this class action suit. He has suffered various harms as a result of his inclusion in the Gang Database.[189]

111.     In 2014, Mr. Cooper was a college student at Highland Community College.[190] He had received an athletic scholarship to K-State and was preparing to transfer there.[191]

112.     While on summer break from school, Mr. Cooper attended a party, at which an altercation and shooting occurred. Mr. Cooper ran to his car to leave the party. Unbeknownst to

---

[186] *See* Ex. 71, Atkins Decl. ¶¶ 7-9; Ex. 78, Progeny's Resp. to Def.'s Interrog. Nos. 8, 12, and 13.
[187] Ex. 71, Atkins Decl. ¶¶ 7-10; *see supra* PSOF ¶¶ 32, 76-79, 85-92.
[188] Ex. 71, Atkins Decl. ¶ 18.
[189] Ex. 80, Cooper Dep. 4:10-13; Plfs.' Mot for Class Cert., Doc. 175; Ex. 45, Cooper Decl. ¶ 2.
[190] Ex. 80, Cooper Dep. 32:14-22.
[191] Ex. 45, Cooper Decl. ¶ 4; Ex. 80, Cooper Dep. 36:19–37:8; Ex. 81, Cooper Resp. to Def.'s Interrog. No. 12.

Mr. Cooper, one of the individuals riding in Mr. Cooper's car as he drove away had been involved in the shooting.[192]

113.    In the next few days, Mr. Cooper was arrested and charged with first-degree murder. Mr. Cooper had no criminal history prior to this event.[193]

114.    At his arrest, Mr. Cooper learned for the first time that he had been included in the Gang Database and had been designated an "active" gang associate since 2015, when he was 18 years old.[194] The WPD added (and later renewed) Mr. Cooper to the Gang Database based on his clothing and his Facebook activity, including photos of him with family members and friends.[195]

115.    Mr. Cooper has never been and is not currently involved in or associated with a criminal street gang in Wichita or anywhere else.[196]

116.    The WPD has cited Mr. Cooper's photographs with family members—including his uncle, Elbert Costello, and his cousin, Martel Costello—and attendance of his cousin's funeral as reasons to extend his three-year active period in the Gang Database.[197]

117.    On one occasion, the WPD renewed Mr. Cooper's active status for attending a wake for his one-month-old niece, who had died earlier that day.[198] WPD officers were surveilling the wake, and at some point during the wake, someone shot at the house and its attached closed garage, hitting Mr. Cooper in the leg.[199]

---

[192] Ex. 45, Cooper Decl. ¶ 4; Ex. 80, Cooper Dep. 17:22–18:9, 18:24–19:7, 20:22–22:1; Ex. 81, Cooper Resp. to Def.'s Interrog. No. 3.
[193] Ex. 80, Cooper Dep. 20:3-16, 23:9-22, 38:25–39:11; Ex. 81, Cooper Resp. to Def.'s Interrog. No. 3; *see also* Ex. 16 Selected Gang Database Entries, at WICHITA 023919.
[194] Ex. 16, Selected Gang Database Entries, WICHITA 023920; Ex. 80, Cooper Dep. 38:25–39:5; PTO Stip. ¶ 55.
[195] Ex. 16, Selected Gang Database Entries, at WICHITA 023919.
[196] Ex. 45, Cooper Decl. ¶ 3; Ex. 80, Cooper Dep. 12:14–13:1, 13:22–14:2; Ex. 81, Cooper Resp. to Def.'s Interrog. No. 9.
[197] Ex. 16, Selected Gang Database Entries, at WICHITA 023919.
[198] *Id.* (describing the wake as "a large Blood party"); Ex. 80, Cooper Dep. 66:16–68:24, 71:9–72:2.
[199] Ex. 80, Cooper Dep. 66:16–69:2, 71:9–72:2; *see also* Ex. 83, M. Costello Dep. 50:1-13.

118.    When Mr. Cooper was arrested, his bail was set at $50,000 because he was in the Gang Database. Mr. Cooper remained in jail because he and his family could not afford bail.[200]

119.    Eventually, the prosecution offered Mr. Cooper a plea deal: he could plead to obstruction of justice and accept probation. Ultimately, believing he had no choice, Mr. Cooper accepted the plea. At that point, he had been detained pretrial in jail for a year.[201]

120.    Mr. Cooper lost his scholarship to K-State and has never been able to go back to college.[202]

121.    Following his release, Mr. Cooper was placed on strict probation with gang conditions. He had a 6 p.m. curfew for over a year. He had to live away from his family because some of them were in the Gang Database. Mr. Cooper's enhanced probation conditions forced him to move away from and cease contact with members of his family. Despite these hard conditions, Mr. Cooper completed his probation without any violations.[203]

122.    Mr. Cooper experiences continuous surveillance and harassment by the WPD. He has been stopped repeatedly for traffic infractions, almost always for failure to signal within 100 feet of an intersection.[204] When officers approach his car, they already know his name and treat him like a criminal. These pretextual stops ceased after he began driving a car registered to a family member.[205]

123.    When Mr. Cooper was employed at Metro PCS, he was unable to participate in profitable sales events, including flyering events at certain locations such as the mall, certain neighborhoods and parks, and the annual Riverfest due to his inclusion in the Gang Database and

---

[200] Ex. 45, Cooper Decl. ¶¶ 6-7; Ex. 80, Cooper Dep. 62:13-23.
[201] Ex. 45, Cooper Decl. ¶ 8; Ex. 80, Cooper Dep. 62:24–63:18.
[202] Ex. 45, Cooper Decl. ¶ 16; Ex. 80, Cooper Dep. 38:9-24, 65:9–66:15, 76:10-12.
[203] Ex. 45, Cooper Decl. ¶¶ 9-10; Ex. 80, Cooper Dep. 52:25–54:2, 63:14–64:12, 75:7-13.
[204] Ex. 45, Cooper Decl. ¶ 14; Ex. 81, Cooper Resp. to Def.'s Interrog. No. 10; Ex. 80, Cooper Dep. 43:7-14.
[205] Ex. 45, Cooper Dep. 44:9–45:13, 56:19–59:14; Ex. 81, Cooper Resp. to Def.'s Interrog. No. 10, 15.

the potential presence of gang members at those locations.[206] Even when working in Metro PCS storefront locations, Mr. Cooper risked violating probation terms due to potential interactions with customers or police over which he had no control.[207]

124.    Due to those experiences, since that time Mr. Cooper has avoided retail and sales jobs where he would have to interact with the public and has instead been limited to warehouse employment.[208]

125.    Mr. Cooper applied for a job with Spirit Aerospace that would have been a promotion in position and salary. He believed that he was going to be offered the job, but after a background check, he was turned down. Mr. Cooper believes that he was turned down because the background check identified him as an active gang member.[209]

### L.    Martel Costello's Inclusion in the Gang Database

126.    Martel Costello is a 27-year-old Black resident of Wichita, Kansas. He is a putative class representative in this litigation. He has suffered various harms as a result of his inclusion on the Gang Database.[210]

127.    Until June 28, 2023, Mr. Costello was incarcerated in the Ellsworth Correctional Facility due to a probation violation. He was convicted of a marijuana offense and possession of firearms (his aunt's gun).[211]

---

[206] Ex. 45, Cooper Decl. ¶ 10; Ex. 80, Cooper Dep. 69:13–70:6; Ex. 81, Cooper Resp. to Def.'s Interrog. No. 11.
[207] Ex. 45, Cooper Decl. ¶ 10; Ex. 81, Cooper Resp. to Def.'s Interrog. No. 11.
[208] Ex. 45, Cooper Decl. ¶ 11; Ex. 81, Cooper Resp. to Def.'s Interrog. No. 11.
[209] Ex. 45, Cooper Decl. ¶ 12; Ex. 80, Cooper Dep. 49:21–50:12; Ex. 81, Cooper Resp. to Def.'s Interrog. No. 11.
[210] Ex. 47, M. Costello Decl. ¶ 2.
[211] Ex. 83, M. Costello Resp. to Def.'s Interrog. No. 3; Ex. 82, M. Costello Dep. 29:24–30:6, 51:5-6.

128.     Mr. Costello learned he was on the Gang List for the first time when he was charged with these crimes.[212] The WPD added Mr. Costello to the Gang Database based on his clothing and his Facebook activity, including photos of him with friends.[213]

129.     Mr. Costello has never been involved in any gang activity and was never told why he was placed on the Gang List in the first place.[214]

130.     In 2016, Mr. Costello's active status was renewed for another three years simply because WPD personnel observed him at a concert with his father and two others, all of whom the WPD believed were gang members.[215]

131.     Due to his status on the Gang List, Mr. Costello's bond amounts were set very high. His mother had to place her home as collateral in order to bond him out of jail.[216]

132.     Mr. Costello was released pre-trial and eventually sentenced to probation.[217] While on probation, he was forced to abide by certain special conditions, due to his designation as a gang member. These conditions included not having any contact with any other known gang members, abiding by a strict curfew, and more.[218]

133.     While on pretrial release and probation, WPD officers repeatedly harassed Mr. Costello by subjecting him to multiple traffic stops and searches.[219]

---

[212] Ex. 47, M. Costello Decl. ¶¶ 4-5.
[213] Ex. 16, Selected Gang Database Entries, at WICHITA 024147.
[214] Ex. 47, M. Costello Decl. ¶¶ 3-4.
[215] Ex. 16, Selected Gang Database Entries, at WICHITA 024146.
[216] Ex. 47, M. Costello Decl. ¶ 6.
[217] Ex. 82, M. Costello Dep. 30:7-14.
[218] *Id.* at 43:21–44:17. Ex. 47, M. Costello Decl. ¶ 8.
[219] Ex. 82, M. Costello Dep. 54:23–55:23; Ex. 84, M. Costello Resp. to Def.'s Interrog. No. 13; Ex. 47, M. Costello Decl. ¶ 9; *see also, e.g.*, Ex. 15, Selected E-mails between WPD and Outside Agencies, at WICHITA 093513–14 (describing stop of M. Costello after leaving a "Blood party" and that a "[p]rotective sweep [was] conducted but no contraband was located").

134. The WPD's harassment of Mr. Costello included invasive searches of his residence, where WPD officers destroyed his property and threw his possessions on the floor.[220] During one such search, WPD officers removed red clothing items from Mr. Costello's closet and laid it out on his bed in the shape of a person lying down, resembling the outline of a victim's body. Mr. Costello interpreted this to constitute a threat that the WPD intended to cause him physical harm.[221]

135. After experiencing this increased harassment and surveillance, Mr. Costello was returned to jail on several occasions due to alleged probation violations.[222]

136. According to the police, Mr. Costello once violated his probation because he was out past curfew by less than ten minutes.[223] Mr. Costello received 90 days of house arrest for violating curfew.[224]

137. Mr. Costello incurred an additional probation violation for attending a wake at his home for his niece, who died earlier that day.[225] Mr. Costello was on house arrest at the time.[226] WPD officers were surveilling the wake, and at some point during the wake, someone shot at the house.[227] Mr. Costello was charged with possession of a firearm, and although that charge lacked evidentiary support and was later dismissed, he was still found to have violated the terms of his probation.[228]

138. In 2018, the Sedgwick County District Attorney's Office contacted the WPD, stating that "we're trying to get [Mr. Costello] to prison" and requesting that the WPD provide

---

[220] Ex. 82, M. Costello Dep. 51:7–52:15; Ex. 47, M. Costello Decl. ¶ 10.
[221] Ex. 82, M. Costello Dep. 51:7–52:15; Ex. 47, M. Costello Decl. ¶ 11.
[222] Ex. 82, M. Costello Dep. 36:16–37:4, 39:24–44:25, 54:23–55:23; Ex. 83, M. Costello Resp. to Def.'s Interrog. No. 13; Ex. 47, M. Costello Decl. ¶ 12.
[223] Ex. 82, M. Costello Dep. 44:10-21, 49:15-20; *see also* Ex. 84, 2019 Journal Entry of Probation Violation Hearing.
[224] Ex. 82, M. Costello Dep. 49:18-25.
[225] *Id.* at 50:1–51:4; *see also* Ex. 80, Cooper Dep. 66:16–69:2, 71:9–72:2.
[226] Ex. 82, M. Costello Dep. 50:1-4.
[227] *Id.* at 50:1-7; *see also* Ex. 80, Cooper Dep. 66:16–69:2, 71:9–72:2.
[228] Ex. 82, M. Costello Dep. 50:19–51:6.

"gang sheets" for two individuals as evidence that Mr. Costello violated "a bunch of gang conditions by associating with known gang members." Lt. Gilmore responded to the prosecutor: "I will make sure you have them." One of the two individuals was Christopher Cooper, Mr. Costello's cousin.[229]

139. Mr. Costello's recent incarceration resulted from violating his probation prohibition on contacts with certain family members by attending his brother's funeral.[230] Police informed Mr. Costello that he had violated his probation because he was around gang members at his brother's funeral.[231] Even though Mr. Costello had been released from jail on bond to attend, the WPD nevertheless renewed him for attending. Despite "███████████████████████████████ ██████████████████████████████," the WPD ████████████████████████ ████████████████" to monitor the funeral and informed ████████████████.[232]

140. In anticipation of his release from prison, Mr. Costello participated in Ellsworth's work release program, which allowed him to leave the prison and relocate to Wichita to perform maintenance and roadwork for the City of Wichita.[233] While on a lunch break during his shift for the City, Mr. Costello stopped at a convenience store to microwave his food, which is permitted.[234] A WPD officer confronted him, stating that he "knew" Mr. Costello and calling him by his first name. When Mr. Costello attempted to leave, the WPD officer told him to stop and indicated that he knew Mr. Costello was working for the City.[235] The WPD officer made statements that Mr. Costello understood to be warnings that the WPD would be watching him when he was released.[236]

---

[229] Ex. 15, Selected E-mails between WPD and Outside Agencies, at WICHITA 095378.
[230] *Id.* at WICHITA 101684–85; Ex. 47, M. Costello Decl. ¶ 15.
[231] Ex. 82, M. Costello Dep. 55:17–56:7.
[232] Ex. 16, Selected E-mails between WPD and Outside Agencies, at WICHITA 101684–85.
[233] Ex. 47, M. Costello Decl. ¶ 16.
[234] Ex. 82, M. Costello Dep. 52:19–53:5.
[235] *Id.* at 53:6-25; 59:22–60:14.
[236] Ex. 47, M. Costello Decl. ¶ 17.

141.    All of these experiences cause Mr. Costello to fear that WPD officers will harass or intimidate him in the future, including by approaching him out of the blue now that he has been released.[237]

**M.    Elbert Costello's Inclusion in the Gang Database**

142.    Elbert Costello is a 47-year-old Black resident of Wichita, Kansas. He is a putative class representative in this litigation. He is currently listed as an "active" gang member in the WPD Gang Database and has suffered various harms as a result.[238]

143.    WPD added Mr. Costello to the Database in 1997, when Mr. Costello was 22.[239]

144.    Mr. Costello is not a member of a criminal street gang in Wichita or anywhere else.[240] Mr. Costello has relatives who were involved with gangs, and he believes he was designated as gang member because of his association with them.[241]

145.    Nonetheless, WPD officers believed Mr. Costello to be affiliated with a gang, and WPD officers have repeatedly suspected Mr. Costello of committing gang-related crimes.[242]

146.    In 2011, following a search of his home, Mr. Costello was charged with possession with intent to distribute. He accepted a plea of possession of paraphernalia and received one year of probation. Because of the burden of the gang conditions imposed on him, Mr. Costello was repeatedly found to have violated his probation, ultimately spending six months in jail and enduring probation restrictions for approximately three years.[243]

---

[237] *Id.* ¶¶ 18-19; Ex. 82, M. Costello Dep. 54:9-11, 54:16-22.
[238] Ex. 16, Selected Gang Database Entries, at WICHITA 023977–80; Ex. 46, Decl. of Elbert Costello ¶ 2.
[239] Ex. 16, Selected Gang Database Entries at WICHITA 023979–80; PTO Stip. ¶ 55.
[240] Ex. 85, E. Costello Dep. 12:11-13:1.
[241] Ex. 46, E. Costello Decl. ¶ 4.
[242] Ex. 26, Easter Dep. vol. II 7:22–9:1.
[243] Ex. 86, E. Costello Suppl. Resp. to Def.'s Interrog. No. 11.

147.    Both during and following his probation and parole, Mr. Costello was subjected to increased surveillance and harassment by WPD officers.[244] Mr. Costello was—and continues to be—routinely stopped by the WPD for minor traffic violations. WPD officers routinely pull Mr. Costello over for infractions such as "not signaling within 100 feet," and then subject Mr. Costello to invasive questioning.[245]

148.    While Mr. Costello was on probation, the police would search his car anytime he was stopped because he was on the Gang List and subject to special gang conditions of release.[246]

149.    Mr. Costello also avoids visiting certain businesses or establishments in his community—including gas stations—that he believes the WPD sees as "gang hangouts."[247]

150.    The Gang Database record for Mr. Costello includes dozens of entries pertaining to his actions over the last 25 years. The majority of those entries concern photos of him on Facebook or notations of him socially interacting with others on the Gang List. Each instance has led to Mr. Costello being "renewed" in the Gang Database for an additional three years as an "active gang member."[248] For example, Mr. Costello's active status was once renewed for another three years because WPD personnel observed him at a concert with his son Martel Costello and two others, all of whom the WPD believed were gang members.[249]

151.    Mr. Costello's Gang Database entry also contains notes about his tattoos that the WPD believes are gang-related.[250]

---

[244] Ex. 85, E. Costello Dep. 25:3-7.
[245] *Id.* 27:9-16; Ex. 86 E. Costello Suppl. Resp. to Def.'s Interrog. No. 11.
[246] Ex. 46, E. Costello Decl. ¶ 7.
[247] Ex. 86, E. Costello Suppl. Resp. to Def.'s Interrog. No. 14.
[248] Ex. 16, Selected Gang Database Entries, at WICHITA 023978–79.
[249] *Id.* at WICHITA 023978.
[250] *Id.* at WICHITA 023978–79.

152.     Mr. Costello's Gang Database entry also contains several notes about his presence at various night clubs, despite the WPD's knowledge that he works as a concert promoter who works out of clubs.[251]

153.     Mr. Costello's Gang Database entry notes his attendance at five different funerals, leading the WPD to renew him for attending with other purported gang members present.[252] Mr. Costello was also renewed for attending his grandniece's wake when a drive-by shooting occurred, although he was not present during the shooting.[253]

154.     The WPD has also renewed Mr. Costello's three-year "active" period simply for wearing "gang colors." Mr. Costello's Gang Database entry contains a January 16, 2021 notation that an officer observed Mr. Costello in a photo on social media wearing a red ████████████ baseball cap.[254] The photo was taken at a funeral for Mr. Costello's childhood friend.[255] Because the color red is associated with a gang, the WPD deemed this a gang-related activity and extended Mr. Costello's period of "active" gang membership until January 2, 2024.[256] Similarly, in 2015, the WPD extended Mr. Costello's "active" period for another three years simply because he "posted a photo of himself wearing gang colors," despite noting in the same entry that he "ha[d] no new gang cases."[257]

155.     Under the terms of his probation, Mr. Costello was forbidden from wearing certain clothing colors and from visiting certain places because of his inclusion in the Gang Database.[258]

---

[251] *Id.*
[252] *Id.*
[253] *Compare id.* at WICHITA 023978 (noting 4/21/18 shooting incident) *with id.* at WICHITA 023919 (same) *and id.* at WICHITA 024146 (same); *see also* Ex. 80, Cooper Dep. 66:16–69:2, 71:9–72:2; Ex. 82, M. Costello Dep. 50:1-13.
[254] Ex. 16, Selected Gang Database Entries, at WICHITA 023978.
[255] Ex. 85, E. Costello Dep. 34:7–35:7.
[256] Ex. 16, Selected Gang Database Entries, at WICHITA 023978; *see also* Ex. 85, E. Costello Dep. 35:1-14; Ex. 87, E. Costello Resp. to Interrog. No. 13.
[257] Ex. 16, Selected Gang Database Entries, at WICHITA 023978.
[258] Ex. 85, E. Costello Dep. 46:10-17.

156.    Mr. Costello received six months of jail time for violating the terms of his probation. On one occasion, the WPD found that Mr. Costello violated the terms of his probation by interacting with friends. Mr. Costello neither knew nor believed that his friends were affiliated with gangs. On another occasion, a probation officer threatened to impose additional sanctions on Mr. Costello for wearing a shirt with red writing on it.[259]

157.    Several years ago, Mr. Costello and his friend organized a community Christmas party for a family in need at a skating rink. The WPD informed the skating rink that gang members would be in attendance, and the skating rink cancelled the event.[260]

158.    Mr. Costello fears additional harassment and punishment if he attends social and family gatherings—such as barbecues, family dinners, or funerals—with his family or friends.[261] He has avoided interacting with lifelong friends because he knows that associating with others on the Gang List will renew his own status as an active gang member on the Gang List and can result in others potentially being classified as gang members or associates.[262]

159.    Mr. Costello also fears that the WPD will perceive his certain clothing, tattoos, or social media activity as gang-related and renew his active status on that basis.

N.    **Jeremy Levy's Inclusion in the Gang Database**

160.    Jeremy Levy is a 24-year-old Black male from Wichita. He is a putative class representative in this class action suit. He has suffered various harms as a result of his inclusion in the Gang Database. [263]

---

[259] *Id.* at 46:23–47:22, 47:23–48:7.
[260] *Id.* 41:16–43:17.
[261] Ex. 46, E. Costello Decl. ¶ 14.
[262] *Id.* ¶ 15; Ex. 85, E. Costello Dep. 32:18–33:11.
[263] Ex. 48, Levy Decl. ¶ 2.

161.    Mr. Levy is incarcerated at the Hutchison Correctional Facility until at least 2042 following a 2017 conviction of first-degree felony murder, when he was 18 years old.[264]

162.    Mr. Levy is not, nor has he ever been, a member or associate of a criminal street gang in Wichita or elsewhere.[265]

163.    Mr. Levy's Gang Database nomination card indicates that Officer Hemmert believed Mr. Levy satisfied the criteria of being contacted with other gang members, being arrested with other gang members, and being identified by a confidential informant.[266] Mr. Levy's Gang Database entry indicates that the confidential informant who purportedly initially identified him as a gang member belonged to a rival gang of the gang Mr. Levy supposedly belonged to.[267]

164.    In 2017, Mr. Levy was the victim of a drive-by shooting by unknown suspects. The WPD renewed Mr. Levy's three-year "active" period based on this incident—even though he was the victim—because "this is thought to be involved in the ongoing feud" between two gangs.[268]

165.    Due to his inclusion on the Gang List, the prosecutor was allowed to introduce evidence at trial of Mr. Levy's alleged gang status and multiple alleged "gang incidents" of an alleged "gang feud" for over six months prior to the alleged incident in which Mr. Levy was charged.[269]

166.    Mr. Levy did not participate in the alleged 13 gang feud events the prosecution introduced, and maintains that the incident for which he was charged was not gang-related.[270]

---

[264] Ex. 88, Levy Dep. 14:12-15, 16:24–17:2, 17:6–18:9; *see also* Ex. 16, Selected Gang Database Entries, at WICHITA 024322.
[265]  Ex. 88, Levy Dep. 20:13-15, 21:1-4; Ex. 89, Levy Resp. to Def.'s Interrog. No. 9; Ex. 48, Levy Decl. ¶ 4.
[266] Ex. 62, Selected TOPS Cards, at WICHITA 036070.
[267] Ex. 16, Selected Gang Database Entries, at WICHITA 024322.
[268] *Id.*
[269] Ex. 88, Levy Dep. 25:3-19; Ex. 48, Levy Decl. ¶ 5.
[270] Ex. 48, Levy Decl. ¶ 6.

167.    Inclusion on the Gang List caused Mr. Levy to be denied employment before his incarceration.[271]

168.    When Mr. Levy is released on parole, he will be subject to highly restrictive supervision conditions that will prevent him from associating with his family and friends.[272]

## ARGUMENTS AND AUTHORITIES

### I.    Legal Standard

Summary judgment is appropriate if "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[273] Federal Rule of Civil Procedure 56 requires summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[274] Once the movant has met this initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[275]

### II.    K.S.A. 21-6313, *et seq.* is unconstitutionally vague, in violation of the Fourteenth Amendment.

"A basic feature of Due Process is that a law must clearly define what it prohibits, or otherwise be held 'void for vagueness.'"[276] Furthermore, "[w]here a law deals with areas of First Amendment import, there is the additional concern that the uncertain terms will inhibit those First Amendment freedoms, as 'citizens [will] steer far wider of the unlawful zone than if the boundaries

---

[271] *Id.* ¶ 7; Ex. 88, Levy Dep. 34:10–35:17.
[272] Ex. 88, Levy Dep. 21:12-18, 41:10–42:18; Ex. 2, Beard Dep. 236:21–238:8, 224:20–225:13; Ex. 18, Salcido Dep. 240:16–243:16.
[273] Fed. R. Civ. P. 56(a).
[274] *United States ex rel. Smith v. Boeing Co.*, No. CIV A 05-1073-WEB, 2009 WL 2486338, at *2 (D. Kan. Aug. 13, 2009).
[275] *Britvic Soft Drinks Ltd. v. Acsis Tech., Inc.*, 265 F. Supp. 2d 1179, 1184 (D. Kan. 2003).
[276] *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

of the forbidden areas were clearly marked.'"[277] K.S.A. 21-6313 defines membership in and association with a "criminal street gang" using a range of vaguely described characteristics that do not require a purported gang member to support or even know about the gang itself, nor be involved in any gang activity.[278] Using this statutory definition, state actors can formally label Kansas residents as "gang members," subjecting them to myriad injuries and indignities based on the clothes they choose to wear, the company they choose to keep, and the places they choose to visit. *See* PSOF ¶¶ 3, 8-10, 22, 31-32, 47-54, 65-72, 75-92, 98-109, 114, 116-118, 121-125, 130-140, 146-158, 167; *infra* Section III.A.3. Indeed, the City of Wichita, acting through the WPD, has done so to Plaintiffs.

As discussed below, the statutory definitions in K.S.A. 21-6313 and implemented in Policy 527 fail to clearly define the conduct that will result in a resident being labeled a gang member or gang associate in Kansas, making both the statute and policy void for vagueness.[279] The statute and policy are "impermissibly vague for . . . two independent reasons.  First, [they] fail[] to provide people of ordinary intelligence a reasonable opportunity to understand what conduct [they] prohibit[].  Second, [they] authorize[] or even encourage[] arbitrary and discriminatory enforcement."[280]  Moreover, as set forth below, K.S.A. 21-6313 and Policy 527 are unconstitutionally vague both on their faces and as applied to Plaintiffs.[281]

---

[277] *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (quoting *Grayned*, 408 U.S. at 109) (alterations omitted).
[278] *See* K.S.A. 21-6313 (defining "criminal street gang member" and "criminal street gang associate").
[279] *See Grayned*, 408 U.S. at 108; *see also Dr. John's*, 465 F.3d at 1157.
[280] *Hill v. Colorado*, 530 U.S. 730, 732 (2000); *see also Chicago v. Morales*, 527 U.S. 41, 56–57 (1999); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *Dodger's Bar & Grill, Inc. v. Johnson Cnty. Bd. of County Comm'rs*, 32 F.3d 1436, 1443 (10th Cir. 1994).
[281] *See, e.g.*, *Kan. Judicial Review v. Stout*, 519 F.3d 1107, 1118 (10th Cir. 2008) (determining plaintiff brought both a facial and as-applied challenge to statute's constitutionality).

**A. Plaintiffs are entitled to summary judgment because K.S.A. 21-6313, *et seq.* is unconstitutionally void-for-vagueness on its face.**

Where, as here, an imprecise law implicates First Amendment rights, it is facially invalid if "the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'"[282] But "even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests."[283] K.S.A. 21-6313 is unconstitutionally vague on its face under both standards.

1. The scope of impermissibly limited conduct is substantial when compared with any legitimate use of K.S.A. 21-6313.

On its face, K.S.A. 21-6313 brands Kansans as gang members and associates based on the exercise of their rights under the First and Fourteenth Amendments. For example, K.S.A. 21-6313(b) states that a person is a "criminal street gang member" if they meet three or more of the listed criteria, such as "adopt[ing] [a] gang's style of dress, color, use of hand signs or tattoos,"[284] "frequent[ing] a particular criminal street gang's area,"[285] and "associat[ing] with known criminal street gang members."[286] Meeting only two such criteria makes a person a "criminal street gang associate."[287] These criteria encompass conduct protected by the First Amendment rights to freedom of expression and association, such as symbolic speech (including dress), social media posts, spending time with family who may be labeled gang members, or attending events where gang members may be present.[288] The criteria also implicate the Fourteenth Amendment rights "to remove from one place to another according to inclination," "to remain in a public place of [one's]

---

[282] *Morales*, 527 U.S. at 52 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).
[283] *Id.* (citing *Kolender*, 461 U.S. at 358).
[284] K.S.A. 26-6313(b)(2)(E).
[285] K.S.A. 26-6313(b)(2)(D).
[286] K.S.A. 26-6313(b)(2)(F).
[287] K.S.A. 26-6313(c)(2).
[288] *See infra* Section III.A.3.

choice,"[289] and to form and maintain intimate human relationships, especially with family.[290] A statute may be held facially unconstitutional when its "impermissible applications . . . are substantial when 'judged in relation to the statute's plainly legitimate sweep.'"[291] Such is the case with K.S.A. 21-6313, and it should be struck down as facially overbroad.

2. <u>K.S.A. 21-6313 fails to establish constitutional standards to protect liberty interests.</u>

K.S.A. 21-6313 also should be held unconstitutional as "impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests."[292] Central to the void-for-vagueness doctrine is "the requirement that a legislature establish minimal guidelines to govern law enforcement."[293] In enacting K.S.A. 21-6313, the Kansas legislature failed to do so, thereby authorizing "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections."[294] K.S.A. 21-6313 fails to establish standards sufficient to notify the public and to guide law enforcement to avoid arbitrary deprivations of the rights to expression, assembly, expressive and intimate association, and autonomous movement—and is thus unconstitutionally vague on its face.

      *i.* *K.S.A. 21-6313 and Policy 527 fail to make clear what conduct will result in gang designation.*

First, due to the lack of standards in K.S.A. 21-6313, people of "ordinary intelligence" are not provided an opportunity to understand how they can avoid being marked as gang members by the state, and the statute is impermissibly vague as a result.[295] For example, neither K.S.A. 21-6313 nor Policy 527 provides any information that allows a person of "ordinary intelligence" to

---

[289] *Morales*, 527 U.S. at 52.
[290] *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984).
[291] *Morales*, 527 U.S. at 52 (quoting *Broadrick*, 413 U.S. at 615).
[292] *See id.* (citing *Kolender*, 461 U.S. at 358).
[293] *Kolender*, 461 U.S. at 358.
[294] *See id.*
[295] *See, e.g.*, *Hill*, 530 U.S. at 732.

recognize the dress style, clothing color, tattoos, or hand gestures that are associated with criminal street gangs. The WPD treats a virtual rainbow of colors as gang-related, considering at least blue, red, green, black, brown, yellow, and orange, as well as the combinations of ████████ ████████████████████████████████████████████████████ ████████████████████ to be associated with criminal street gangs. PSOF ¶ 66. Additionally, WPD personnel believe clothing and tattoos related to an array of sports teams and locations are associated with criminal street gangs. Under the WPD's application of K.S.A. 21-6313, just wearing clothing supporting a particular sports team—including the ████████████████ ████████████████████████████████████ (among many more)—satisfies one of the criteria for inclusion in the Gang Database. PSOF ¶ 67. Indeed, WPD personnel have maintained or renewed individuals' designations as active gang members for an additional three years based upon *single* instances of wearing clothing of a certain color or sports team. PSOF ¶¶ 75, 154.

The same lack of notice infects other statutory criteria for gang-membership designation. A person of ordinary intelligence cannot avoid "frequenting a particular criminal street gang's area" without knowing how to recognize that an "area" is associated with a gang or what counts as "frequenting" such an area. PSOF ¶¶ 48-54, 149. The statute does not provide the general public with that essential guidance. Likewise, K.S.A. 21-6313 does not state what it means to "associate" with "known criminal street gang members," nor does it provide the public with any information or explanation on how to identify a "known" gang member. PSOF ¶¶ 77-79. The term "associate" is vague enough to encompass any number of protected social connections to family and friends, from political assemblies to intimate relationships. PSOF ¶¶ 53-54, 76-84, 91. An ordinary person may have routine, innocuous interactions with family, friends, neighbors, and co-workers, but

unknowingly be in the presence of someone designated as a criminal street gang member. PSOF ¶¶ 79, 107; *see* PTO Stip. ¶ 34. Moreover, by defining a "criminal street gang member" based on their connections to other (similarly defined) "criminal street gang members," the statute creates a self-perpetuating cloud of suspicion over certain communities that becomes nearly impossible to dispel. *See* PSOF ¶¶ 16-20, 76-84, 93-95.

Moreover, there is no requirement that a person know of, or intend to express, any gang affiliation when they choose what to wear, where to go, and with whom to speak. The absence of any knowledge or intent requirement poses further constitutional dangers.[296] In addition, K.S.A. 21-6313 contains absolutely no requirement that a person engage in or be suspected of any criminal activity, no scienter requirement, and no requirement that a person actually participate in *or even be suspected of participating in* criminal street gang activity in order to be designated as a gang member or associate and subjected to consequent harms. PSOF ¶¶ 9-10. Indeed, of the ten possible criteria for criminal street gang membership under K.S.A. 21-6313(b)(2), only *one* contains any reference to actual criminal activity, and *none* contains any element of scienter.[297]

Consequently, a law-abiding Kansan who wears any of the "wrong" colors or color combinations at the "wrong" place with the "wrong" people may be added to the Gang Database, or have their designation renewed, despite the absence of any criminal intent or activity.  Simply attending a family funeral meets the statutory criteria when other attendees are designated as gang members. PSOF ¶¶ 84, 116-117, 137, 139. Wearing a red ███████████ baseball cap is likewise treated as evidence of gang membership under the statute and WPD policy. PSOF ¶¶ 57, 154.

---

[296] *See Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("[T]he constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*."), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).
[297] *See* K.S.A. 21-6313(b)(2)(G).

However, WPD personnel do not treat all conduct within the literal scope of the statutory criteria the same. For example, according to one Gang Unit officer, a lawyer who wears blue ties and "associates" with clients who are designated gang members would not meet either the "color" or the "association" criterion. PSOF ¶¶ 36. In this officer's view, the "association" criterion excludes purely professional associations and the "color" criterion is not satisfied if a person just "happen[s] to wear" a gang color. PSOF ¶¶ 36. The statutory text includes no such exceptions, however, nor any guidance for creating or applying such exceptions. In this scheme, a person of reasonable intelligence cannot determine whether the outfit they wear on any given day is more like the acceptable blue tie or the purportedly "gang-affiliated" red █████ hat.

### ii.   K.S.A. 21-6313 and Policy 527 encourage arbitrary enforcement.

Such ambiguity underscores the second, independent reason that K.S.A. 21-6313 and Policy 527 are impermissibly vague: without intelligible standards, the statute and policy authorize, encourage, and even *require* arbitrary and discriminatory enforcement.[298] Members of the WPD Gang Unit use Policy 527, which incorporates the criteria listed in K.S.A. 21-6313, to determine whether to label an individual a "gang member" or "gang associate." If applied according to the plain terms on the statute's face, these criteria would encompass incalculable swaths of Wichita's population, including essentially all clergy and congregants, police and other union members, musicians and concertgoers, retail workers, and other professional and social service providers—including lawyers and judges. Even the WPD officers responsible for applying the statute and policy cannot define what will and will not meet the criteria, and individual officers necessarily apply the criteria differently from one another. PSOF ¶¶ 33-54.

The evidence shows that WPD officers rely on their personal judgment and not the

---

[298] *See, e.g.*, *Hill*, 530 U.S. at 732.

language of the statutory criteria when determining whether an individual meets the criteria for gang membership. Former Capt. Nicholson described the criteria as "subjective sorts of things." PSOF ¶ 35. Deputy Chief Salcido likewise testified to K.S.A. 21-6313's subjectivity and that WPD officers have varying understandings of the criteria and their application. PSOF ¶ 35. Former WPD Officer Sage Hemmert testified that application of K.S.A. 21-6313's criteria depends on "context" and admitted that WPD officers can interpret the criteria differently. *Id.* Det. McKenna resorted to non-statutory justifications to explain why he would not designate a lawyer who represents gang members and wears blue ties as a "criminal street gang associate." PSOF ¶ 36. K.S.A. 21-6313's facial breadth and imprecision allow WPD officers to discriminate between the droves of individuals who qualify as gang members under its plain terms.

Numerous terms in K.S.A. 21-6313 are vague and require unpredictable WPD assessments, leading to arbitrary additions to the Gang Database. For instance, under K.S.A. 21-6313(b)(2)(B), a "documented reliable informant" or another law enforcement agency or correctional facility with information on an individual can constitute evidence of gang membership, but there is "no . . . set standard" that defines who may qualify as a documented reliable informant. PSOF ¶ 45. Some WPD officers require a direct admission from an individual before they identify that person as a gang member. PSOF ¶ 47. On the other hand, other WPD officers mark an individual as a "self-admitted" gang member based upon information they gathered from second-hand conversations. PSOF ¶ 47. Still other officers have considered a statement that one "has hung out with [gang] members in the past," a tattoo, or a video of an individual throwing hand signs as a self-admission. PSOF ¶ 47. Deputy Chief Salcido acknowledged that gang intelligence officers are not required to review body camera video footage to verify a purported self-admission, and he was unable to identify an instance where they had done so. PSOF ¶ 46. Former Capt. Nicholson admitted that,

51

due to the vagueness of K.S.A. 21-6313, application of the statute through Policy 527 could lead to incorrectly identifying people in the community as gang members. PSOF ¶ 43.

Neither K.S.A. 21-6313 nor Policy 527 provide guidance or instructions on distinguishing innocent conduct that happens to fall within the literal scope of the criteria from conduct that is purposely and meaningfully associated with gang membership. No provision limits the WPD's interpretation of the statute. Consequently, some Gang Unit officers focus only on the literal scope of the K.S.A. 21-6313 criteria to designate citizens as gang members without concern for their actual gang involvement, while others apply unwritten standards and exceptions of their own making to identify who they believe are "actual" gang members. PSOF ¶ 35, 37.

This lack of guidance in the law empowers WPD officers to indulge their whims when applying the criteria, resulting in arbitrary distinctions and discriminatory outcomes. In one incident, WPD officers mistook a historically Black fraternity gathering for a gang party. PSOF ¶ 95. There were no allegations that the fraternity members were engaged in or connected with criminal activity, nor did the WPD need such allegations to consider them a gang. PSOF ¶ 9-10, 95. The Gang Unit sought to designate them as gang members for associating in public wearing their fraternity colors of crimson and cream, until alerted to their error by a Black officer. PSOF ¶ 95.

On the other hand, there are WPD personnel who meet two or more criteria for gang membership or associateship, yet are not so designated in the Gang Database. PSOF ¶¶ 44. Certain WPD and Sedgwick County personnel have expressed support for and affiliation with the "Three-Percenters," a criminal militia group whose members have been indicted and convicted for organized federal criminal activity. *Id.* Yet neither these officers nor any other individuals are designated as gang members or associates of "Three-Percenters" in the Gang Database. *Id.* None

of the WPD witnesses in this case are able to explain why those individuals have been excluded from the Gang Database. Meanwhile, there are individuals designated as gang members (or associates) in the WPD Gang Database who maintain that they are not—nor have ever been—a member or associate of a criminal street gang. The failure to provide guidance or instruction has thus encouraged the kind of "standardless sweep" by law enforcement that the constitution prohibits,[299] which has led to the undeniable overrepresentation of Black and Latinx/Hispanic individuals in the Gang Database. PSOF ¶¶ 16-20. Such inequities are the inevitable result of a statute and policy so facially broad and vague that no person of ordinary intelligence could understand and avoid their sweep. Likewise, unable to apply such vague provisions by their plain terms, WPD officers are left to make subjective, arbitrary, and discriminatory decisions in attempting to a the statute. K.S.A. 21-6313 and Policy 527 are facially overbroad and vague, and the Court should find them unconstitutional.

### B. Plaintiffs are entitled to summary judgment because K.S.A. 21-6313, *et seq.* and Policy 527 are void-for-vagueness as applied to Plaintiffs.

K.S.A. 21-6313 and Policy 527 are impermissibly vague as applied to Plaintiffs because the statute and policy failed to provide notice that certain acts could lead to Plaintiffs' placement in the Gang Database. Additionally, the vagueness of the statute and policy have allowed WPD officers to arbitrarily add and renew Plaintiffs in the Gang Database for years and even decades. PSOF ¶¶ 114, 130, 143, 164. And because the statute and policy fail to intelligibly describe what conduct may lead to gang status renewal, Plaintiffs continue to fear that engaging in protected First and Fourteenth Amendment activity will extend their active status in the Gang Database. *See* PSOF ¶¶ 104-109, 123-124, 140-141, 158-159.

Chris Cooper is not and has never been a member of criminal street gang. PSOF ¶ 115. Mr.

---

[299] *See Kolender* at 358.

Cooper never received any notice of his inclusion in the Gang Database until he was arrested for a non-gang related incident, and more importantly, the WPD never informed him of *why* it added him. PSOF ¶ 114. To avoid "associat[ing] with known criminal street gang members"[300] and thus violating his release conditions and being renewed in the Gang Database, Mr. Cooper was forced to live away from and cease contact with family members whom he thinks are in the Gang Database. PSOF ¶ 121. Further, because K.S.A. 21-6313 fails to provide any context on what constitutes a "particular street gang's area,"[301] Mr. Cooper is forced to avoid retail and sales jobs where he may have to attend events at the local mall and certain neighborhoods and parks, and to avoid gathering for funerals and other events because he fears being at the wrong place with the wrong people. PSOF ¶¶ 123-124. The vagueness of K.S.A. 21-6313 infringes upon Mr. Cooper's ability to engage in constitutionally protected First and Fourteenth Amendment activity.

Martel Costello is not and has never been a member of a criminal street gang. PSOF ¶ 129. But when charged with marijuana and firearms offenses—both unrelated to any gang activity—Mr. M. Costello was informed that he had previously been placed in the Gang Database. PSOF ¶ 127-128. The WPD has renewed Mr. M. Costello's active status for associative activities such as attending a concert with his father and two other friends who were listed as gang members. PSOF ¶ 130. Likewise, Mr. M. Costello was later found to have violated his gang probation conditions for attending his brother's funeral, where the WPD believed some of the funeral attendees were gang members. PSOF ¶ 139. The WPD did not identify the *known* criminal street gang members, nor did the WPD explain how Mr. M. Costello would have known the identity of the alleged gang members. Like any reasonable individual, Mr. M. Costello could not have anticipated that spending time with his father or attending a sibling's funeral would lead to his gang status renewal.

---

[300] *See* K.S.A. 21-6313(b)(2)(F).
[301] *See* K.S.A. 21-6313(b)(2)(D).

Elbert Costello is not a member of a criminal street gang. PSOF ¶ 144. Yet because the WPD designated him a gang member, Mr. E. Costello was subjected to enhanced gang probation conditions for a non-gang related offense, which he was unable to meet due to his daily interactions with family and friends. PSOF ¶¶ 146, 156. For decades, the WPD has renewed Mr. E. Costello as an active gang member based on clothing color and his social relationships with friends and family, including purportedly wearing a red ███████████ baseball cap while attending a childhood friend's funeral. PSOF ¶¶ 150, 153-154, 156. Mr. E. Costello avoids certain businesses and establishments in his local community out of concern that they might be "gang areas," resulting in an extension of his time in the Gang Database. PSOF ¶ 149; *see also* PSOF ¶ 152. Again, the WPD provides no notice of which colors or clothes are "gang-related" nor what a "particular criminal street gang's area" might be. Mr. E. Costello lives in constant fear that engaging in benign First and Fourteenth Amendment activity will lead to renewal of his active gang status. PSOF ¶¶ 149, 158-159.

Jeremy Levy, Jr. is not and has never been a member of a criminal street gang. PSOF ¶ 162. The WPD added Mr. Levy to the Gang Database because he allegedly was contacted by an officer in the presence of gang members, was arrested together with gang members, and a "confidential informant" identified him as a gang member. PSOF ¶ 163. As a result of his addition to the Gang Database, prejudicial evidence concerning Mr. Levy's purported gang membership and unrelated gang activity was introduced at his criminal trial, and Mr. Levy's First and Fourteenth Amendment rights will be severely limited when he is paroled.[302] *See* PSOF ¶¶ 165-166, 168. As with the other Plaintiffs, Mr. Levy will be forced to restrict his life to avoid extensions to his active status in the Gang Database.

---

[302] *See infra* Section IV (discussing gang conditions of release).

Plaintiff Progeny is a non-profit organization based in Wichita that seeks to assist youth involved in the criminal legal system and to work toward reducing and eventually eliminating the myriad harms caused by the juvenile justice system. PTO Stip. ¶ 56; PSOF ¶ 104. Progeny works with and employs individuals designated in the Gang Database. PSOF ¶¶ 97-99. The WPD added these individuals to the Database for reasons such as wearing clothing with purported gang colors, using purported gang hand signs, social media activity, and "association" with others included in the Database. PSOF ¶ 98. Hosting town halls, meetings, and gatherings—in other words, associating—with individuals involved in the criminal justice system, including those at risk for gang designation, is critical to Progeny's mission and purpose. PSOF ¶ 104. Yet because K.S.A. 21-6313 and Policy 527 fail to make clear what types of "associating" or other conduct may lead to inclusion in the Gang Database (and individuals have no way of knowing who is included in the Database) Progeny members are unable to freely associate for political, social, or any purposes without putting themselves and those they seek to serve at risk of gang designation. PSOF ¶¶ 103-108.

As a result, Progeny has cancelled events and been discouraged from assembling and protesting due to WPD contact and surveillance. PSOF ¶¶ 103-107. WPD officers regularly harass Progeny members and surveil Progeny meetings, substantiating fears that association will lead to censure and enhanced criminal consequences. PSOF ¶¶ 100, 109. And for individuals whose inclusion in the Gang Database is known, K.S.A. 21-6313 and Policy 527 effectively forbid Progeny from providing services or support to such persons, directly preventing it from helping current or former gang members transition to a gang-free life. PSOF ¶ 108.

Because Plaintiffs are unable to conform their conduct to avoid inclusion or renewal in the Gang Database, and because application of the statutory criteria through Policy 527 is arbitrary

and deprives Plaintiffs of their constitutional freedoms, K.S.A. 21-6313 is void for vagueness.

**III.   K.S.A. 21-6313, *et seq.* and Policy 527 fail to provide procedural due process under the Fourteenth Amendment.**

The undisputed facts establish that the WPD has failed to provide the individual Plaintiffs and the putative class procedural due process as required by the Fourteenth Amendment.[303] Procedural due process claims involve a two-step inquiry: an individual must first demonstrate they possess a protected interest, and then show that they were denied the appropriate level of process.[304] Here, Plaintiffs satisfy both steps of the inquiry.

**A.  Plaintiffs possess a protected liberty interest under the stigma-plus doctrine.**

Plaintiffs possess a protected liberty interest in their reputations. The Due Process Clause is triggered when "a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," plus an alteration or extinguishment of rights or status recognized by state law.[305] This combination of government-imposed stigma, plus the alteration of a legal right, is known as the "stigma-plus" doctrine. Under the stigma-plus doctrine, an individual possesses a liberty interest implicating procedural due process rights when (1) "the government made a false statement . . . that was sufficiently derogatory to injure [the plaintiff's] reputation,"[306] and (2) "the plaintiff experienced some governmentally imposed burden that significantly altered her status as a matter of state law."[307] The WPD's practices and policies violate Plaintiffs' liberty interests by depriving them of procedural due process under the stigma-plus doctrine.

---

[303] U.S. Const. Amend. XIV, § 1 (prohibiting a state from "depriv[ing] any person of life, liberty, or property, without due process of law").
[304] *Merrifield v. Bd. of Cnty. Comm'rs*, 654 F.3d 1073, 1078 (10th Cir. 2011) (quoting *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009)).
[305] *See Paul v. Davis*, 424 U.S. 693, 708 (1976); *Wisconsin v. Constantineau*, 400 U.S. 433, 436–37 (1971).
[306] *Brown v. Montoya*, 662 F.3d 1152, 1168 (10th Cir. 2011).
[307] *Gwinn v. Awmiller*, 354 F.3d 1211, 1216 (10th Cir. 2004) (quotations omitted).

1.  <u>The WPD has made false, derogatory statements that injured Plaintiffs'</u>
    <u>reputations.</u>

The first prong of the stigma-plus doctrine is satisfied here because the WPD injured

Plaintiffs' reputations by labeling them criminal street gang members or associates.

First, the WPD made false statements about each Plaintiff by labeling each one as a

criminal street gang member or associate. PSOF ¶¶ 114-117, 128-130, 142-143, 163-165. These

statements are false because none of the individual Plaintiffs is currently involved in a criminal

street gang in Wichita or elsewhere.  PSOF ¶¶ 115, 129, 144, 162. The same is true for others who

have been designated as gang members or associates in the Gang Database but maintain that they

are not, or have never been, a member or associate of a criminal street gang. *See* PSOF ¶ 43. For

these reasons, Plaintiffs' designations as gang members or associates in the Gang Database

constitute false statements.

Second, the WPD's false statements are sufficiently derogatory and stigmatizing to give

rise to due process protections.[308] This Court has already determined that a false designation as a

gang member is "sufficiently derogatory to injure [a person's] reputation."[309] In declining to

dismiss Plaintiffs' procedural due process claim, the Court properly reasoned that a gang member

designation "inescapably implies that a person is involved, at least in some capacity, with criminal

activity, which is generally recognized as defamatory *per se* under relevant state law."[310] Courts

across the country agree.[311] By falsely labeling Plaintiffs as gang members or associates, the WPD

---

[308] *See, e.g.*, *Paul*, 424 U.S. at 697 ("Imputing criminal behavior to an individual is generally considered defamatory *per se*, and actionable without proof of special damages.").

[309] Mem. & Order, Doc. 28, at 25.

[310] *Id.* Notably, the definitions of "criminal street gang," "criminal street gang activity," "criminal street gang member" and "criminal street gang associate" under K.S.A. 21-6313 underscore this false implication: while criminality is necessary and central to the definitions of a "criminal street gang" and "criminal street gang activity," no criminal act or intent is required for designation as a gang member or associate under the statute or Policy 527. PSOF ¶¶ 9-10.

[311] *See, e.g.*, *Pedrote-Salinas v. Johnson*, No. 17 C 5093, 2018 WL 2320934, at *5 (N.D. Ill. May 22, 2018) ("There is no question that being labeled a gang member harms one's reputation."); *Medrano v. Salazar*, No. 5:19-cv-00549-JKP, 2020 WL 589537, at *6 (W.D. Tex. Feb. 5, 2020) ("[B]eing improperly included in a 'gang database carries with

injured each Plaintiff's reputation.

2. The WPD's sharing of Gang Database information triggers Due Process protections.

In addition to wrongly labeling individuals as criminal street gang members, the WPD has repeatedly provided this false information from its Gang Database to individuals outside the Department. In fact, the WPD has a documented history of improperly publicizing and sharing information from its Gang Database—both to other government agencies and to the public—identifying alleged gang members or associates. Improper intra-governmental sharing of information satisfies the stigma-plus doctrine's public disclosure requirement.[312] Moreover, multiple courts have specifically held that gang database information is sufficiently public to satisfy the stigma-plus doctrine where, as here, it is shared with other law enforcement agencies.[313]

The WPD regularly shares individuals' gang designations with other municipal, county, state, and federal law enforcement officers and agencies. PSOF ¶ 25. Moreover, the WPD historically identified some designated gang members in the National Crime Information Center database, thus identifying individuals as gang members to local, state, and federal agencies across all U.S. states and territories, as well as with some foreign countries. *Id.* Thus, even among law enforcement, the WPD's dissemination of Gang Database information is massively widespread.

Other dissemination of Gang Database information includes a WPD officer providing

---

it the stigma of being a gang member, which is tied to a host of unfortunate implications such as involvement in criminal conduct. There is no question that being labeled a gang member harms one's reputation.'" (quoting *Pedrote-Salinas*, 2018 WL 2320934, at *5)); *see also Alston v. City of Madison*, 853 F.3d 901, 909 (7th Cir. 2017) ("repeat violent offender" classification harms one's reputation); *Latif v. Holder*, 28 F. Supp. 3d 1134, 1150 (D. Or. 2014) (No-Fly List placement carries stigma of being a suspected terrorist).

[312] *See, e.g.*, *Larry v. Lawler*, 605 F.2d 954, 959 (7th Cir. 1978) (finding sufficiently public the Civil Service Commission's sharing of plaintiff's stigmatizing label with federal agencies on a need to know basis); *Castillo v. Cnty. of Los Angeles*, 959 F. Supp. 2d 1255, 1261 (C.D. Cal. 2013) (finding plaintiff's inclusion in Child Welfare Services Case Management System sufficiently public where information in the database was not publicly available but was available to governmental entities and agencies).

[313] *See, e.g.*, *Medrano*, 2020 WL 589537, at *6; *Pedrote-Salinas*, 2018 WL 2320934, at *5 (holding defendant sufficiently publicized plaintiffs' inclusion in a gang database when they shared the information with immigration officials).

information from the Gang Database to a Section 8 housing authority employee, "start[ing] an eviction process based on . . . information about gang activity." PSOF ¶ 30. In addition, the Wichita Eagle published an article identifying Elbert Costello as a "documented gang member[]" based on information that more than likely originated from the Gang Database. PSOF ¶ 29.

WPD employees have also publicly leaked information from the Gang Database on multiple occasions. A WPD officer once left a printed copy of the Gang List on the trunk of his squad car for all to see, and it ultimately ended up in the hands of the media. PSOF ¶ 28. On another occasion, a gang bulletin containing names of gang members and their respective gangs that WPD personnel had pulled from the Gang Database and circulated to outside law enforcement personnel was printed and publicly displayed at a barbershop in Wichita. *Id.* In yet another incident comprising multiple leaks, former Capt. Nicholson was charged with and subsequently received diversion for crimes based on, among other things, over 22 instances of publicly disclosing information from the Gang Database over a 12-month period. PSOF ¶ 30.

For these reasons, the Court should find that the WPD's gang designations are sufficiently public statements to trigger due process protections.

> 3.  <u>As a consequence of the WPD's false public statements, Plaintiffs experienced a governmentally imposed alteration of their legal status.</u>

Plaintiffs satisfy the "plus" prong of the stigma-plus doctrine because their designation in the Gang Database restricts their freedom of movement, association, expression, and economic activity.[314] Courts routinely find such consequences sufficiently alter an individual's legal status to meet the "plus" prong.[315] Plaintiffs face a litany of burdens so long as the WPD labels them as

---

[314] *See* Mem. & Order, Doc. 28, at 26–27 (finding such "tangible consequences" sufficient to satisfy stigma-plus).

[315] *See, e.g.*, *Gwinn*, 354 F.3d at 1223–24 (sex offender registration altered legal status by imposing extra parole and probation restrictions); *Brown*, 662 F.3d at 1168 (same); *Castillo*, 959 F. Supp. 2d at 1261–62 (inclusion in the Child Welfare Services database had "serious implications" for plaintiff's licensure ability); *Hall v. Marshall*, 479 F. Supp.

gang members.

> i. *Plaintiffs endured enhanced bond, pretrial, probation, and parole*
> *conditions because of their gang designations.*

By their inclusion on the Gang List, Plaintiffs have each received (or will receive) enhanced bond, pretrial, probation, and parole gang conditions of release. The WPD does not hide the fact that the goal of these conditions—and, indeed, Policy 527 itself—is to return those listed in the Gang Database to jail or prison, even for conduct wholly unrelated to gang activity. PSOF ¶¶ 90, 138. The gang conditions include numerous restrictions on daily life, such as who one may associate with, one's clothing, the hours one may leave their home, the number of people allowed in a car, the use of hand signs, the areas of town one may travel to, and the use of social media and electronic communications. PSOF ¶ 87. To ensure compliance with these special conditions, the WPD's specialty TOPS unit specifically monitors those with gang conditions. PSOF ¶ 90.

In addition, individuals designated as gang members or associates are subject to a statutory enhanced minimum $50,000 cash or surety bail if arrested for a person felony.[316] This enhanced bond applies regardless of whether the offense is gang-related and is difficult for defendants to afford. PSOF ¶ 85. Mr. Cooper languished in jail for a year because he was unable to afford this enhanced bail, PSOF ¶ 118, while Mr. M. Costello's mother had to place her home as collateral to bond him out. PSOF ¶ 131.

> ii. *Plaintiffs' inclusion in the Gang Database has restricted and*
> *continues to restrict their right of free movement.*

As designated gang members, Plaintiffs are frequent subjects of police surveillance and harassment, restricting their free movement. PSOF ¶¶ 99-100, 122, 133-136, 140-141, 147-149,

---

2d 304, 314 (E.D.N.Y. 2007) (factually false and reputation-harming presentence report resulting in parole denial); *Latif*, 28 F. Supp. 3d at 1150 (No-Fly List legally barred plaintiffs from travel).
[316] K.S.A. 21-6316.

158. WPD officers have routinely stopped and questioned the Costellos and Mr. Cooper. PSOF ¶¶ 122, 133-136, 140-141, 147-149. Gang parole conditions have expressly limited their movements. PSOF ¶¶ 121, 123, 136-137, 155. Plaintiffs also avoid community businesses, such as gas stations, that they believe—though they cannot know for sure—the WPD has identified as "gang hangouts." PSOF ¶ 149. Mr. E. Costello was also denied access to a business because of his gang designation: a skating rink cancelled his Christmas party for a family in need after the WPD informed the rink that gang members would be in attendance. PSOF ¶ 157. Mr. Cooper has avoided certain areas where gang members might be present and consequently missed employment and sales opportunities. PSOF ¶¶ 123-124. This harassment and restriction of Plaintiffs' freedom to travel is directly tied to the WPD's gang designations. PSOF ¶¶ 122.

      The WPD's publication of Gang Database information also harms Plaintiffs and their loved ones by putting them at risk of harassment, violence, or discrimination at the hands of third parties. After a gang bulletin including the names, photos, and purported addresses of WPD gang designees was publicly disclosed and disseminated in October 2011, ███████████████████████████████ ██████████████████████████████████████████████████████████████ PSOF ¶ 22. ████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████████ *Id.* ███████████████████████ ██████████████████████████████████████████████████████████. *Id.* As recently as 2022, the WPD continued to publish bulletins identifying gang designees and even non-designated gang suspects that were leaked. *Id.*; *see also* PSOF ¶ 30.

            iii.    *Gang designation altered Plaintiffs' legal decisions in criminal proceedings.*

      Because the WPD wrongfully labeled them as gang members, Messrs. Cooper, Levy, and

M. Costello were forced to make decisions in their criminal cases that they would not have otherwise made. Mr. Cooper could not afford the enhanced $50,000 bail and therefore remained incarcerated pretrial for a year before accepting a plea deal for probation with gang conditions. PSOF ¶¶ 118-119. Similarly, Mr. M. Costello's bond amounts were set so high that his mother had to offer her home as collateral. PSOF ¶ 131.

In 2017, Mr. Levy was charged with murder in connection with a shooting following a dispute over a romantic relationship. Mr. Levy was not and had never been in a gang. PSOF ¶ 162. At trial, the prosecutor introduced evidence of Mr. Levy's alleged gang status as well as evidence of multiple alleged "gang incidents" of an alleged "gang feud" for over six months prior to the incident leading to the charged offense. PSOF ¶¶ 165-166. The introduction of this highly prejudicial evidence—resulting directly from his designation as a gang member—affected Mr. Levy's legal prospects at trial. *See id.* Evidence of purported gang membership may be introduced against a designated individual even when not directly relevant to the charged offense. PSOF ¶¶ 86, 102, 165.

Gang Database designation also alters Plaintiffs' legal status after trial and sentencing. PSOF ¶¶ 32, 87. Gang Database designees are ineligible for certain diversion programs. PSOF ¶ 92. Plaintiffs were subject to post-sentencing gang conditions because of their designation. For example, Mr. Cooper had a 6 p.m. curfew for over a year and was forced to live away from his family because some of them were on the Gang List. PSOF ¶ 121. Similarly, Mr. M. Costello was forbidden from wearing certain clothing colors and from visiting certain places while on probation. *See* PSOF ¶ 132, 136-137, 139.

> iv.   *Gang designation limits Plaintiffs' employment opportunities.*

Gang conditions have also restricted Plaintiffs' employment opportunities. For example,

to avoid inadvertently associating with purported gang members, Mr. Cooper avoids retail and sales jobs requiring public interaction. He has missed out on profitable sales events at the mall, certain neighborhoods and parks, and the annual Riverfest due to gang members' potential presence there. PSOF ¶¶ 123-125. His employment is limited to warehouses to avoid the possibility of encountering other Gang Database designees and being renewed as a result. *See id.* Following his prosecution and pretrial detainment, Mr. Cooper lost his scholarship to K-State and has never been able to attend college, thus curtailing his employment and economic prospects. PSOF ¶¶ 111, 120.

Mr. E. Costello's Gang Database entry contains several notes about his presence at various night clubs with other purported gang members, despite the WPD's knowledge that he works as a concert promoter who works out of clubs. PSOF ¶ 152. His presence at a club while working thus creates a risk of active status renewal.

> v.   *Gang designation restricts Plaintiffs' interactions with friends and family.*

Inclusion in the Gang Database also restricts with whom Plaintiffs may associate and affects family gatherings such as funerals. In fact, the WPD cited Mr. Cooper's photographs with family members—including his uncle, Mr. E. Costello, and his cousin, Mr. M. Costello—and attendance of his cousin's funeral as reasons to extend his three-year active period on the Gang List. PSOF ¶ 116. The Costellos' active statuses were renewed for another three years on similar grounds. PSOF ¶¶ 139, 153-154. For these reasons, Mr. E. Costello fears additional harassment and punishment if he attends social and family gatherings—such as barbecues, family dinners, or funerals. PSOF ¶ 158. Therefore, he has avoided interacting with lifelong friends named on the Gang List because he knows it will only prolong his own status as an active gang member and can result in others potentially being classified as gang members or associates. *Id.* And as described

above, Mr. Cooper avoided living with his own family while on probation. PSOF ¶ 121.

<em>vi.   Gang designation limits housing options.</em>

Inclusion in the Gang Database limits an individual's housing options, whether through gang conditions of release, restricting individuals' ability to freely associate with family, or disqualifying individuals from Section 8 housing.[317] PSOF ¶¶ 22, 31, 79-81, 87, 91, 121. At least once, a WPD officer shared information with a Section 8 housing authority employee about purported gang members—putative class members—living and hanging out at a residence on East Kensington, leading to the initiation of eviction proceedings against those individuals. PSOF ¶ 31. ███████████████████ was a concern specifically raised following a WPD gang bulletin disclosure in 2011.  PSOF ¶ 22.

Any one of these harms on its own is sufficient to satisfy the plus prong of the stigma-plus analysis, entitling Plaintiffs to appropriate process to safeguard their liberty interests.

**B.  Plaintiffs were denied an appropriate level of process.**

Due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner.[318] The WPD denied Plaintiffs and class members even the most basic level of process, from notice of their inclusion in the Gang Database to an opportunity to challenge their designation.

1.   <u>The WPD does not provide notice of inclusion in the Gang Database.</u>

The WPD fails to provide individuals notice of their inclusion in the Gang Database. The Supreme Court has held that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are

---

[317] *See supra* Section II.A.2.i; *infra* Section IV.B.
[318] *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

*essential*."[319] The Tenth Circuit has further explained that due process requires "notice of the charges, an opportunity to present witnesses and evidence in defense of those charges, and a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action."[320] Yet the WPD fails to notify any adult of their inclusion or change in status in the Gang Database. PSOF ¶¶ 55. And while WPD policy requires that officers *attempt* to notify the parents or guardians of juveniles when the WPD adds the juvenile to the Gang Database, its attempts are demonstrably unsuccessful. PSOF ¶ 56. The WPD has successfully notified no more than 50% of juveniles (or the parents or guardians thereof) of the juvenile's designation as a gang member or associate. *Id.*

A person may never find out that the WPD designated them in the Gang Database. PTO Stip. ¶ 34; *see also* PSOF ¶ 91.  Many individuals only find out they are in the Gang Database when they are arrested, charged with a crime, and subjected to the enhanced bond or other gang conditions as a result of designation. PSOF ¶ 91; PTO Stip. ¶ 35.  Thus, the WPD fails to provide proper notice to those added or renewed in the Database in violation of their due process rights.

### 2. Plaintiffs have no opportunity to challenge their gang designations at any time or in any manner.

Even upon discovering their designation in the Gang Database, Plaintiffs have no recourse to challenge or appeal their designation in further violation of their due process rights. PSOF ¶¶ 58-59. Once added, a person remains in the Gang Database in perpetuity. PSOF ¶¶ 59, 61.

Due process requires that one be able to challenge their designation as a gang member or associate.[321] Without such procedures, there is a significant risk of error.[322] Despite top WPD

---

[319] *Constantineau*, 400 U.S. at 437 (emphasis added).
[320] *Gwinn*, 354 F.3d at 1219.
[321] *Gwinn*, 354 F.3d at 1219.
[322] *See Youth Justice Coal. v. City of Los Angeles*, 264 F. Supp. 3d 1057, 1069 (C.D. Cal. 2017).

leadership's awareness of the significant due process violations and proposals for reform, the WPD has refused to create a process whereby individuals named in the Gang Database can protest or appeal their inclusion.[323] PSOF ¶ 60. The WPD has deliberately chosen not to address these due process concerns through policy.[324] *Id.*

### C.  Plaintiffs face a significant risk of erroneous deprivation.

Plaintiffs are entitled to pre-deprivation process because the WPD's application of criteria for gang designations is ripe for error.[325] The WPD's policies and practices allow for gang designations that are subjective and likely to capture people who are not involved in gang or criminal activity, such as the Plaintiffs. PSOF ¶¶ 8-10, 35-37, 41, 43, 57. In fact, other courts have already ruled that the very factors the WPD uses to identify gang membership—close association, joint criminal activity, and self-admissions—are unreliable.[326] Because the risk of erroneous deprivation is considerable and no formal removal procedures exist, Plaintiffs are entitled to pre-deprivation process.

Due to these very concerns, other law enforcement agencies with similar gang databases, such as the Los Angeles Police Department, have implemented notification and removal processes. PSOF ¶ 57. Even so, WPD personnel have opposed and thwarted efforts to implement notification and removal processes. PSOF ¶¶ 59-60.

Because the WPD denies Plaintiffs and putative class members notice and any opportunity

---

[323] At best, an individual can be moved to "inactive" status. PSOF ¶ 61; PTO Stip. ¶¶ 38-40. But this change does nothing to address individuals wrongfully added to the Gang Database in the first instance. And those classified as "inactive" continue to experience the same harms: the WPD continues to share an individual's "inactive" status externally, and inactive designees are still subject to targeted monitoring, including on social media. PSOF ¶¶ 22-32, 39, 50, 76, 82-84; PTO Stip. ¶ 40. Finally, inactive designees face a lower threshold for their status to be changed to active than those individuals not already listed in the Gang Database. *Compare* PTO Stip. ¶¶ 11-13 *with* PTO Stip. ¶ 40.

[324] *See* 42 U.S.C. § 1988.

[325] *See supra* Section II.

[326] *See, e.g.*, *Vasquez v. Rackauckas*, 734 F.3d 1025, 1046 (9th Cir. 2013); *Youth Justice Coal.*, 264 F. Supp. 3d at 1069.

to challenge their designation in the Gang Database, the Court should grant Plaintiffs summary judgment on their procedural due process claim.

## IV.    K.S.A. 21-6313, *et seq.*, and Policy 527 directly prohibit certain constitutionally protected expressive and associative behaviors in violation of the First Amendment.

K.S.A. 21-6313, *et seq.* and Policy 527 directly prohibit a number of both expressive and associative behaviors, a constitutional infringement that cannot pass strict scrutiny.

### A.  The WPD's application of K.S.A. 21-6313 and Policy 527 targets a broad swath of speech based on its content.

A regulation affecting speech is subject to strict scrutiny if the regulation is content-based.[327] Content-based laws are "those that target speech based on its communicative content" and are "presumptively unconstitutional."[328] Such limitations "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."[329] "The commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys."[330] But a neutrally written ordinance may still be content-based on two other grounds: (1) if the government "cannot justify it without referencing the content of the speech involved" or (2) if the government adopted the regulation because it "disagreed with a message being conveyed."[331]

Here, the WPD's enforcement of K.S.A. 21-6313, *et seq.* via Policy 527 targets and regulates a wide variety of forms of speech based on their content. These forms of speech include tattoos, clothing, and social media activity.

---

[327] *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641–42 (1994).
[328] *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).
[329] *Id.*
[330] *Id.* (citing *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 564 (2011)).
[331] *Harmon v. City of Norman, Okla.*, 981 F.3d 1141, 1148 (10th Cir. 2020).

*Tattoos.* The WPD considers and trains its officers to view certain tattoos as gang-related, including tattoos expressing statements of support for individuals ("███"), ethnic identities ("███ ███"), neighborhoods or locations (street and intersection references), and political opinions ("███████"). PSOF ¶¶ 67, 69. By singling out certain tattoos, the WPD targets and suppresses particular political speech, including anti-police speech—evincing disagreement with the message conveyed. Expressing support or grief over the loss of a loved one can implicate both religious and associative rights.[332] The WPD also reactivates inactive individuals as "active" based on a failure to remove or cover alleged gang tattoos, forcing individuals to choose between silencing themselves or risking continued Gang List inclusion and its consequences. PSOF ¶ 15.

*Clothing.* Similarly, the WPD also considers and trains its officers to view certain types of clothing as gang-related. PSOF ¶¶ 65-68. WPD officers may consider clothing representing certain sports teams or locations as evidence of gang affiliation, even commonplace and geographically proximate sports teams such as the ████████████████. PSOF ¶ 67. Indeed, according to the WPD, wearing a █████ shirt may be an indication of affiliation with both Crips and Bloods—two supposedly rival gangs. *See* PSOF ¶ 67.

Even more broadly, WPD officers view clothing of numerous colors as evidence of gang affiliation. For example, officers associate blue with Crips and red with Bloods. *See* PSOF ¶ 66. But colors carry a wide variety of political, religious, and cultural meanings. For instance, red is associated with the Republican Party, blue with the Democratic Party, green with environmentalism and Islam, etc. In fact, WPD officers have testified that they consider virtually *all* colors as possible evidence of gang affiliation. PSOF ¶ 66.

---

[332] *See infra* Section IV.B.2.

***Social media.*** Furthermore, the WPD regularly trawls through individuals' social media accounts for statements of support for individuals, ethnic or neighborhood pride, political opinions, emojis, or other statements they perceive as gang-related. PSOF ¶¶ 39, 40, 68, 70, 82; *see also* PTO Stip. ¶ 40. WPD officers can and do add people to the Gang Database or renew their active status based solely on social media activity. PTO Stip. ¶ 41. For example, the WPD added Mr. Cooper to the Gang Database as an associate based in part on his Facebook posts showing Mr. Cooper wearing red and black ███ brand clothing, as well as photos stating "Free Kejuan" and "RIP Pigg." *See* PSOF ¶ 114. The WPD also renewed Mr. Cooper's active status because his social media page purportedly showed him using the name "Track Nation 17." *Id.* Additionally, the WPD added Mr. M. Costello to the Gang Database as an associate and renewed his status based in part on his Facebook posts where he purportedly used "gang terms" and colors. PSOF ¶ 128.

The WPD directly restricts all of the above expressive speech by designating individuals who engage in it as gang members or associates in the Gang Database and subjecting them to the many harms discussed above.[333] PSOF ¶¶ 22, 31-32, 65-72, 75-92, 100, 102-109, 114, 118-125, 128-140, 146-158; *supra* Section III.A. These direct prohibitions are not limited to merely expressive conduct or symbolic speech, such as an article of clothing, but rather extend to actual written speech in the form of tattoos containing words, and statements made on social media.[334]

***Gang conditions of release.*** Inclusion or renewal in the Gang Database and on the Gang List also results in downstream direct prohibition of broad swaths of speech. Onerous pretrial, probation, or parole gang conditions of release are imposed on criminal defendants as a direct result of their designation as gang members and associates. PSOF ¶¶ 87, 89. Those conditions

---

[333] *See supra* Sections II.B, III.3.
[334] *But cf.* Mem. & Order, Doc. 28, at 34–36 (First Amendment claim regarding clothing color concerns expressive conduct or symbolic speech that falls under procedural due process claim).

forbid individuals from wearing specific colors or types of clothing. PSOF ¶ 87. They also prohibit individuals from obtaining any new tattoos, regardless of what those tattoos are or whether they could possibly be related to any gang. *Id.* Yet another gang condition forbids the sending, sharing or posting of any text, video, or picture through a cell phone or the Internet that includes any statement or image that can be in any way associated with a gang. *Id.* The City contends that these gang conditions of release are imposed not by the WPD but rather by other agencies, but the truth is the WPD actively collaborates with other agencies to determine those conditions and to whom they apply—even drafting policies for other agencies, which the WPD then aggressively enforces. PSOF ¶¶ 88, 90.

Ultimately, WPD officers have unfettered discretion over determining which individuals, groups, or causes a person can or cannot support, grieve, or celebrate without being designated a gang member. PSOF ¶¶ 8, 12, 15, 34, 36, 39-40, 47, 65-75. No WPD policy lays out standards or guidelines for distinguishing criminal speech from political, religious, artistic, or other kinds of speech. PSOF ¶¶ 35, 39, 71, 73. K.S.A. 21-6313 and Policy 527 thus empower WPD officers to suppress political and cultural expression that they dislike or disagree with, including anti-police expression. Because Policy 527 and K.S.A 21-6313 are content-based—facially and as applied— they are presumptively unconstitutional.[335]

### B. As applied, K.S.A. 21-6313, *et seq.* and Policy 527 infringe on Plaintiffs' right to association.

The Supreme Court has held that First Amendment protection extends to an implied right of freedom of association under certain circumstances.[336] The First Amendment protects the "right

---

[335] *Reed*, 576 U.S. at 163.
[336] *City of Dallas v. Stanglin*, 490 U.S. 19, 23 (1989); *Roberts*, 468 U.S. at 622 ("[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."); Mem. & Order, Doc. 28, at 36.

to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion."[337]

The undisputed facts demonstrate that the WPD's implementation and application of K.S.A. 21-6313, *et seq.* and Policy 527 punish Plaintiffs and others for engaging in protected associative behaviors, lest the WPD designate them or renew their status in the Gang Database.

### 1. The WPD's policies and practices prevent Progeny from fully exercising its expressive associational rights.

To fulfill its mission of reimagining the juvenile justice system and reinvesting in community-based alternatives, Progeny hosts town halls, facilitates conversations with impacted youth, provides support and services to youth who are involved in the criminal legal system or transitioning back into the community, engages with elected officials regarding their policies and reform efforts that may impact system-involved youth, and organizes youth and community leaders around reform. PTO Stip. ¶ 56; PSOF ¶ 104. Progeny also creates and publishes reports and other documents that translate youths' insights and needs into calls for government action. PSOF ¶ 104; PTO Stip. ¶ 57. These activities are core First Amendment activities.

Progeny is run by a small executive staff and a team of Youth Leaders, at least four of whom are included in the Gang Database themselves, or who have family members and friends who are included. PSOF ¶¶ 97-98. Those who have been designated in the Gang Database have been subjected to increased surveillance, reputational harm, and other negative consequences of being included in the Gang Database. PSOF ¶¶ 99-100, 102-107. None of the four designated individuals associated with Progeny are active gang members. PSOF ¶ 98.

Because Progeny staff and members are in the Gang Database, the very existence and use of the Gang Database and Gang List make it more difficult for Progeny to fulfill its mission of

---

[337] *Roberts*, 468 U.S. at 618.

helping Wichita youth involved in the criminal justice system.[338] Moreover, the WPD's gang designation and harassment of Progeny staff and members directly restricts their associative and expressive conduct. Progeny has cancelled protests and events due to WPD presence in the area because of the concern that those in attendance could be added to the Gang Database, among other things. In February 2019, Progeny's attempt to hold an event for community action against violence was thwarted when police presence at the event led many would-be attendees to avoid the area for, among other things, fear of being designated as gang members. PSOF ¶ 106. In April 2021, following contact with the WPD, Progeny cancelled a planned protest at an event where Governor Laura Kelly would be present. PSOF ¶ 105. Later that day, a WPD officer stationed himself outside the building where Progeny was holding a meeting, and Progeny staff was forced to interrupt the meeting to ask the officer to leave. *Id.* On another occasion, the WPD requested that Progeny Youth Leaders meet with new officers, but the event did not take place because Youth Leaders did not feel comfortable with the possibility of being profiled by police. PSOF ¶ 101. WPD officers continue to target and scrutinize Progeny's lawful associational activities, causing interruption in Progeny's activities, diverting staff time and attention, intimidating attendees, and causing stress and discomfort to staff and attendees. PSOF ¶¶ 105, 109.

When Progeny wishes to engage in protest or assembly, it must warn its participants that if they are arrested while protesting, it could affect their probation or Gang Database status. *See* PSOF ¶¶ 103-104, 107. Progeny and the individual must determine whether participation is worth the risk, thereby limiting both the individual and Progeny's ability to protest. *See* PSOF ¶¶ 103-104, 107.

---

[338] *See supra* Section II.B.

Progeny and its members are restricted from achieving their goals and fulfilling their mission through organizing, conducting, and attending peaceable assemblies because doing so creates grounds for the WPD to add Progeny members and event attendees to the Gang List and to harass, detain, search, and surveil them pursuant to K.S.A. 21-6313 and Policy 527. PSOF ¶¶ 104, 107. The WPD's policies and practices thus infringe on Progeny's right of association to convene and engage in First Amendment activities.

        2.   <u>The WPD's policies and practices infringe on the individual Plaintiffs' right to expressive association.</u>

The WPD's implementation and application of K.S.A. 21-6313 and Policy 527 also infringe on the individual Plaintiffs' and others' protected freedom of expressive association.

As an initial matter, the WPD relies heavily on individuals' social relationships with purported gang members or associates in order to add or renew those individuals to the Gang Database. PSOF ¶¶ 76-84. For instance, the majority of entries in Mr. E. Costello's Gang Database file consists of his social interactions with others, leading to repeated renewal of his active status. PSOF ¶¶ 150, 153. Gang Database files for the other individual Plaintiffs and Progeny staff reveal a similar focus on their relationships with others. PSOF ¶¶ 98-99, 114, 116, 128, 130, 137, 139, 144, 150, 153, 156. The WPD's targeting of these social relationships is particularly odious because it operates with total disregard for familial relationships. For example, the Costellos— father and son—were renewed in the Gang Database for attending a concert together. PSOF ¶¶ 130, 150.

***Funerals.*** One particularly egregious and unconstitutional WPD practice is the targeting of individuals' associative conduct of attending funerals. Funerals are an archetypical public gathering at which attendees can assemble together to express their love, respect, and grief for the deceased and to support one another in their sorrow. Funerals often take place at religious locations

and include religious services. This sort of assembly and exercise of religion are core activities protected under the First Amendment.[339]

The WPD regularly surveils funerals and uses officers' observations to add or renew individuals in the Gang Database. PSOF ¶ 84. WPD officers frequently rely on the presence of other purported gang members at a funeral as evidence of an individual's gang affiliation. *Id.* However, mere attendance at a purported gang member's funeral is sufficient for renewal, with no other alleged members' presence necessary. *Id.* Mr. E. Costello's Gang Database entry notes his attendance at no less than five funerals, which the WPD cited for renewing his active status on multiple occasions. PSOF ¶ 153. Messrs. M. Costello and Cooper were both renewed for attending the funeral of Elbert Costello, Jr. (E. Costello's son, M. Costello's brother, and Mr. Cooper's cousin) at a church. PSOF ¶¶ 116, 139. The Costellos and Mr. Cooper were also renewed for attending the wake of an infant niece when a drive-by shooting occurred, injuring Mr. Cooper. PSOF ¶¶ 117, 137, 153.

The WPD targets funerals even when it lacks knowledge or suspicion of any criminal activity. Several officers were involved in surveilling Elbert Jr.'s funeral "████████████ ██████████████," despite the WPD "███████████████████████████ ██████████████████████████," and despite Elbert Sr.'s pleas to attendees not to wear "███████████████." *See* PSOF ¶ 84, 116, 139. The WPD was aware that Mr. M. Costello had been released from jail on bond in order to attend the funeral. PSOF ¶ 139. Nevertheless, the WPD assisted in revoking his probation, resulting in incarceration in the Ellsworth facility, and renewed him and Mr. Cooper in the Gang Database for attending the funeral. PSOF ¶ 139.

---

[339] *Roberts*, 468 U.S. at 618; *Stanglin*, 490 U.S. at 25 ("[T]he right of expressive association extends to groups organized to engage in speech that does not pertain directly to politics.").

***Gang conditions of release.*** The WPD's direct prohibitions on associations also come in the downstream form of gang conditions of release. The WPD is intimately involved in crafting gang conditions in close partnership with other agencies. PSOF ¶ 88. These gang conditions expressly forbid numerous associative behaviors, including: not going to certain specified locations; not attending public court hearings unless ordered to do so; not wearing certain clothing; not associating with anyone affiliated with any gang; not associating with anyone with a drug conviction; not being in the presence of someone currently on pretrial supervision, probation, parole, or with an active criminal case; not being present near a school or school parking lot without prior permission; not riding in a car with more than one person, unless those persons are immediate family members; not associating with any non-immediate family members designated as gang members; not visiting or having telephonic or electronic communications with any jailed or imprisoned person; and more. PSOF ¶ 87.

These conditions of release are problematic for numerous reasons. Many of them have nothing to do with gang-related activity on their face, and some are imposed with seemingly little to no connection with the facts of an individual's criminal case. *Id.* Criminal defendants have found it difficult to comply with these gang conditions specifically because of the associational restrictions. PSOF ¶ 91. Compliance with gang conditions is rendered even more difficult by the fact that a defendant's contacts may not know—and may never find out—that the WPD has designated them as a gang member or associate, and thus those around them who are subject to these gang conditions can unknowingly violate their conditions. *Id.*

Many of these associational restrictions can be particularly severe when a gang condition intersects with a familial relationship—for instance, living with a parent on the Gang List, having a spouse currently in jail or prison, or co-parenting a child with a person with a drug conviction.

Moreover, prohibiting an individual from attending court hearings not only prevents them from expressing support for friends or family who are parties to the proceedings, but also from exercising their First Amendment right to access open courts as a member of the public.[340]

In this manner, the WPD punishes those designated as gang members or associates based on their expressive associational conduct in violation of the First Amendment.

### C. The WPD's practices and policies directly prohibiting expressive and associational conduct cannot withstand strict scrutiny.

For the reasons described above, the WPD's enforcement and application of K.S.A. 21-6313, *et seq.* and Policy 527 are content-discriminatory and impinge on constitutionally protected First Amendment associational rights, and thus strict scrutiny applies.[341] The burden therefore lies with the City to identify a compelling state interest and to prove that the WPD's application of K.S.A. 21-6313 and Policy 527 are narrowly tailored to serve that interest.[342] The City cannot meet this burden.

The WPD's practices and policies cannot be considered narrowly tailored for multiple reasons. First, even if the City claims that it has a compelling state interest in public safety, one does not need to even be suspected of criminal activity—much less arrested, charged, or convicted—in order to be designated a gang member or associate. PSOF ¶¶ 9-10. Neither K.S.A. 21-6313 nor Policy 527 require anything more than engaging in certain kinds of expressive or associational behavior for designation. The Gang Database is replete with entries whose narratives do not involve criminal activity. *Id.* The WPD's practices cannot be narrowly tailored to serve a

---

[340] *See, e.g., Tennessee v. Lane*, 541 U.S. 509, 523 (2004) (citing *Press-Enter. Co. v. Superior Court of Cal., Cnty. of Riverside*, 478 U.S. 1, 8–15 (1986)).
[341] *Reed*, 576 U.S. at 163; *Turner Broad. Sys.*, 512 U.S. at 641–42; *Stanglin*, 490 U.S. at 23 (quoting *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 40 (1973)).
[342] *Kennedy v. Bremerton School Dist.*, --- U.S. ---, 142 S. Ct. 2407, 2421, 2426 (2022); *Turner Broad. Sys.*, 512 U.S. at 641–42; *see also* Mem. & Order, Doc. 28, at 36.

public safety interest if those practices lack a connection to criminal activity beyond protected First Amendment expressions or associations.

Second, the WPD's enforcement and application of K.S.A 21-6313 and Policy 527 cannot be narrowly tailored because the statute and its implementing policy are overbroad and vague.[343] Neither include definitions of what certain critical terms mean, and the WPD's implementation sweeps in a wide range of individuals who may be associating with one another for completely benign reasons and engaging in constitutionally protected activities. For instance, so long as there is another person already on the Gang List in attendance, or the event occurs in a "criminal street gang's area," K.S.A. 21-6313 and Policy 527 permit gang designation of KU fans watching a basketball game at a local bar while wearing red and blue and "waving the wheat," or Freemasons convening at a Masonic Temple while wearing symbolic regalia and greeting each other with secret handshakes. It would also permit designation of individuals who wear red "Make America Great Again" hats to a rally in support of former President Donald Trump, or wear pink when participating in the Women's March.[344]

But the Court need not rely on hypotheticals. The precise sort of gross overreach fostered by the statute's unconstitutional terms already occurred when WPD officers mistakenly identified a Black fraternity gathering as a gang party.[345] PSOF ¶ 95. Though that error was ultimately caught, the same has not been true for Progeny's planned meetings and protests, or countless family wakes, funerals, social gatherings, concerts, shared car rides, and other instances of expression and association.

---

[343] *See supra* Section II.
[344] Lynn Berry, <u>Thousands gather for Women's March rallies across the US</u>, PBS News Weekend (Jan. 18, 2020), https://www.pbs.org/newshour/nation/thousands-gather-for-womens-march-rallies-across-the-us.
[345] *See supra* Section II.

Third, K.S.A. 21-6313 and Policy 527 are inconsistently applied and selectively enforced. The Gang Database is over-inclusive and contains inaccuracies: there are individuals who have been designated in the Gang Database but who maintain that they are not gang members or associates (false positives), and officers are aware of individuals who do satisfy gang member or associate criteria but are not included in the Gang Database (false negatives). PSOF ¶¶ 36-37, 43-44. There are WPD personnel who themselves qualify for inclusion, and WPD and Sedgwick County law enforcement personnel who have self-admitted affiliation with "Three Percenters" are not included as gang members. PSOF ¶ 44. Gang intelligence officers' broad, unfettered discretion over adding or renewing individuals is incompatible with narrow tailoring.

Not only does the WPD target and condemn a wide variety of innocuous, non-gang related speech, its practices remain unarticulated, unregulated, and unevenly applied. The WPD does not have any formal or informal policy or guidelines for understanding and consistently applying the statutory criteria. PSOF ¶¶ 33-54, 71, 73, 77-79. For these reasons, the City cannot articulate a compelling government interest that these vague criteria definitively serve, nor demonstrate that the statute or Policy 527 are narrowly tailored to that interest.

## V.     K.S.A. 21-6313, *et seq.* and Policy 527 have a chilling effect on constitutionally protected expressive and associative behaviors in violation of the First Amendment.

As the Court has already observed, "[e]ven beyond direct restrictions of these associational rights, First Amendment protections are triggered by '[t]he risk of a chilling effect on association because First Amendment freedoms need breathing space to survive.'"[346] The undisputed evidence shows that the WPD's implementation and application of K.S.A. 21-6313 and Policy 527 chill Plaintiffs' expressive and associative conduct.

---

[346] *See* Mem. & Order, Doc. 28 at 36 (citing *Am. for Prosperity Found. v. Bonta*, --- U.S. ---, 141 S. Ct. 2373, 2389 (2021); *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

The individual Plaintiffs and Progeny staff have been added to or renewed in the Gang Database based on their clothing choices, social media posts, or exercise of rights to expressive association.[347] PSOF ¶¶ 98-99, 114, 116-117, 128, 130, 137, 139, 150, 153-154, 163. Plaintiffs now fear that engaging in certain kinds of disfavored expressive speech—wearing clothing, getting tattoos, or posting on social media—will renew their gang status and subject them to the downstream consequences of being deemed gang members, including higher bail and gang release conditions if later charged or convicted with a crime, even if that crime is not gang-related. PSOF ¶¶ 102-108, 159.

Likewise, the individual Plaintiffs fear that gathering with family and friends for funerals or other events will cause them to be renewed in the Gang Database or cause their family or friends to be added or renewed. PSOF ¶ 158, *see also* PSOF ¶¶ 121, 141, 168. Progeny has hesitated to hold or refrained altogether from holding events or engaging in protest because some Progeny staff have been designated as gang members, thereby creating a risk that anyone else in attendance at such events might be added or renewed in the Gang Database. PSOF ¶¶ 104-108. WPD officers continue to surveil Progeny meetings and staff. PSOF ¶¶ 100, 109.

Notably, the chilling effects of the WPD's Gang Database practices on association extend beyond Plaintiffs. These impacts are also well understood by the WPD's own Black employees. Former Deputy Chief Parker-Givens testified that she avoids certain contact with children she coaches and even her own family members for fear of being labelled a gang member or associate in the Gang Database. PSOF ¶ 93. Similarly, former Capt. Nicholson also testified that he knew of members of the community who were afraid to ride in a vehicle with family members because of the potential for Gang Database inclusion. PSOF ¶ 81. These experiences disproportionally

---

[347] *See supra* Sections II.B, IV.

impact persons of color in Wichita, as the Gang Database includes many more Black and Latinx/Hispanic individuals than white individuals. PSOF ¶ 17-20.

Ultimately, the WPD's implementation and application of K.S.A. 21-6313 and Policy 527 force Plaintiffs to choose between exercising their expressive and associative rights at the risk of (continued) gang designation, or relinquishing the most fundamental human connections and activities that undergird American culture and society. This First Amendment dilemma is constitutionally intolerable.

**VI.     Plaintiffs are entitled to injunctive and declaratory relief.**

If the Court finds in favor of Plaintiffs on any of the above claims—i.e., if they succeed on the merits—then Plaintiffs are entitled to equitable relief, as set forth below.

**A.  Plaintiffs are entitled to injunctive relief.**

To obtain an injunction, Plaintiffs must demonstrate three additional things beyond success on the merits: (1) they will suffer irreparable harm absent an injunction, for which there is no adequate remedy at law; (2) the balancing of harms merits injunctive relief; and (3) if issued, an injunction would not be against the public interest.[348]

1.  The WPD's constitutional violations constitute irreparable harm for
     which there is no adequate remedy at law.

The Tenth Circuit and the District of Kansas have consistently held that a violation of constitutional rights is, in and of itself, irreparable harm.[349] Indeed, "[w]hen an alleged

---

[348] *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007).

[349] *See, e.g.*, *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1236 (10th Cir. 2005); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009); *Kansas v. United States*, 171 F. Supp. 3d 1145, 1155 (D. Kan. 2016) (same), *aff'd in part sub nom. Kansas by & through Kansas Dep't for Child. & Families v. SourceAmerica*, 874 F.3d 1226 (10th Cir. 2017); *Schell v. OXY USA, Inc.*, 822 F. Supp. 2d 1125, 1142 (D. Kan. 2011), *amended*, No. 07-1258-JTM, 2012 WL 3939860 (D. Kan. Sept. 10, 2012); *Adams By & Through Adams v. Baker*, 919 F. Supp. 1496, 1505 (D. Kan. 1996) ("A deprivation of a constitutional right is, itself, irreparable harm.").

constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."[350] Other jurisdictions have applied this rule when granting a permanent injunction.[351]

### 2. The balancing of harms merits injunctive relief.

The Plaintiffs have "an interest in prevention of violations of . . . constitutional rights, whereas" the WPD "has no interest in being allowed to act in an unconstitutional manner."[352] The City "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations."[353] Although the WPD certainly has a legitimate interest in identifying those who commit crimes and rooting out violence in Wichita, the City cannot claim it is harmed by having to abide by policies and procedures, and carry out the WPD mission, in a manner that respects the community's constitutional rights. This element also weighs in favor of injunctive relief.

### 3. Granting an injunction would not be against the public interest.

By their very nature, injunctions to uphold constitutional rights are necessarily in the public interest. The Tenth Circuit has recognized that "the public has a . . . profound and long-term interest in upholding an individual's constitutional rights."[354] As such, an injunction here would not be "adverse to the public interest in this case" because it would "prevent the infringement of plaintiff's

---

[350] *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) (citation omitted); *see also Shaw v. Jones*, --- F. Supp. 3d ---, 2023 WL 4684682, at *32 (D. Kan. July 21, 2023); *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001), *abrogated on other grounds by Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019); *Elrod v. Burns*, 427 U.S. 347, 373 (1976); 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ("When an alleged deprivation of a constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary."). *But see Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) ("[W]hile we must nonetheless engage in our traditional equitable inquiry as to the presence of irreparable harm in such a context, we remain cognizant that the violation of a constitutional right must weigh heavily in that analysis.").

[351] *See, e.g., Doe v. Kentucky ex rel. Tilley*, 283 F. Supp. 3d 608, 615 (E.D. Ky. 2017); *United States v. Colorado City*, No. 3:12-cv-8123-HRH, 2017 WL 1384353, at *12 (D. Ariz. Apr. 18, 2017).

[352] *See Planned Parenthood of Ark. & E. Okla. v. Cline*, 910 F. Supp. 2d 1300, 1308 (W.D. Okla. 2012).

[353] *Zepeda v. U.S. Immig. & Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).

[354] *Awad*, 670 F.3d at 1132 (internal quotation marks omitted); *see also Shaw*, 2023 WL 4684682, at *34 ("It is always in the public interest to prevent the violation of a party's constitutional rights." (quoting *Free the Nipple-Fort Collins*, 916 F.3d at 807)).

. . . rights under the [Constitution]."[355] This undoubtedly serves the public interest, as "it is *always* in the public interest to prevent the violation of a party's constitutional rights."[356] This final factor likewise merits granting the injunctive relief Plaintiffs request.

### B.  Plaintiffs are entitled to declaratory relief.

Plaintiffs are likewise entitled to declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

"In determining whether to grant declaratory relief, the Court should inquire (1) whether a declaratory action would settle the controversy; (2) whether it would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fending' or 'to provide an arena for a race to res judicata'; (4) whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether an alternative remedy would be better or more effective."[357] Unlike the standard for obtaining injunctive relief, Plaintiffs need not show irreparable harm to obtain declaratory relief.

Plaintiffs' demand satisfies each of these factors. Declaratory relief would settle this controversy and ensure that the unconstitutional provisions of K.S.A. 21-6313, *et seq.* are no longer in force, thereby clarifying the legal issues in this case. Such relief would also alleviate many of the harms Plaintiffs and the putative class experience, and would not improperly infringe upon state jurisdiction, as it is the federal court's job to "say what the law is."[358] Finally, although injunctive relief is an appropriate and necessary remedy here, granting an injunction does not

---

[355] *Bannister v. Bd. of Cnty. Comm'rs*, 829 F. Supp. 1249, 1253 (D. Kan. 1993); *see also Planned Parenthood,* 910 F. Supp. 2d at 1308; *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987).
[356] *Awad*, 670 F.3d at 1132 (internal quotation marks omitted; emphasis added).
[357] *Shaw*, 2023 WL 4684682, at *35 (quoting *Bell Helicopter Textron, Inc. v. Heliqwest Int'l., Ltd.*, 385 F.3d 1291, 1299 (10th Cir. 2004)).
[358] *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1322 (2016) (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)).

preclude the issuance of declaratory relief. Indeed, although a request for declaratory relief often accompanies a request for injunctive relief, they are nevertheless separate remedies.[359] If summary judgment is granted in favor of Plaintiffs, they are entitled to the declaratory relief that they seek.

## CONCLUSION

For all the foregoing reasons, Plaintiffs are entitled to summary judgment on their claims. Plaintiffs respectfully request that judgment be entered in their favor and that the Court order the prospective relief requested in the Pretrial Order (Doc. 196).

Dated:  September 29, 2023

Respectfully submitted,

SHOOK, HARDY & BACON LLP

/s/ Paul M. Vogel
Paul M. Vogel KSD #79022
Mitchell F. Engel KS #78766
Thomas J. Sullivan (admitted pro hac vice)
Jordan C. Baehr KS #27213
2555 Grand Boulevard
Kansas City, MO 64108
Phone: (816) 474-6550
tsullivan@shb.com
mengel@shb.com
jbaehr@shb.com
pvogel@shb.com

KANSAS APPLESEED CENTER FOR
LAW AND JUSTICE, INC.

/s/ Teresa A. Woody
Teresa A. Woody KS #16949
211 E. 8th Street, Suite D
Lawrence, KS   66044
Phone: (785) 251-8160
twoody@kansasappleseed.org

---

[359] Van Deelen v. Fairchild, No. 05-2017, 2005 U.S. Dist. LEXIS 30503, at *19–20 (D. Kan. Dec. 1, 2005) (citing cases); see Steffel v. Thompson, 415 U.S. 452, 467 (1974); see also Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 33 (2008).

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF KANSAS

*/s/ Sharon Brett*
Sharon Brett KS #28696
Kunyu Ching KS #29807
Karen Leve KS #29580
10561 Barkley Street, Suite 500
Overland Park, KS 66212
Phone: (913) 490-4100
sbrett@aclukansas.org
kching@aclukansas.org
kleve@aclukansas.org

COUNSEL FOR PLAINTIFFS,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED