# EXHIBIT 02



**Pohlman**USA®

Court Reporting and
Litigation Services

Chad Beard

December 19, 2022

Progeny, et al.
vs.
City Of Wichita, Kansas

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PROGENY, A PROGRAM OF      )
DESTINATION INNOVATION     )
INC., CHRISTOPHER          )
COOPER, ELBERT             )
COSTELLO, MARTEL           )   Case No.
COSTELLO, AND JEREMY       )   6:21-cv-01100-EFM-ADM
LEVY, JR., ON BEHALF       )
OF THEMSELVES AND          )
OTHERS SIMILARLY           )
SITUATED,                  )
                           )
            Plaintiffs,    )
                           )
    vs.                    )
                           )
CITY OF WICHITA,           )
KANSAS,                    )
                           )
            Defendant.     )
_____)


VIDEO DEPOSITION OF CHAD BEARD


The video deposition of CHAD BEARD, taken before
Nancy L. Rambo, RPR, CSR, at the law office of
Joseph, Hollander & Craft, Wichita, Kansas, on
the 19th day of December, 2022, commencing at
8:35 a.m.

```
 1   A   Most commonly, I mean, that's -- I would be
 2       speaking with them.
 3   Q   Okay.  And when you say most commonly, would
 4       they ever self-identify in a way that -- where
 5       they didn't say I'm a gang member, I'm a member
 6       of such and such?
 7   A   No, I mean, that -- if we're specifically
 8       talking about this time, that's what they would
 9       do, they would talk to me verbally.
10   Q   Okay.  And would you ask them if they were
11       members of a gang?
12   A   Yeah.
13   Q   And --
14   A   Yes.
15   Q   -- and some of them would say yes?
16   A   Yes.
17   Q   Did any of them ever volunteer it without you
18       asking?
19   A   Yes.
20   Q   And under what circumstances would they do that?
21   A   Sometimes it would be when they were upset,
22       angry at somebody else, they were actually
23       arguing or fighting with another person and they
24       were identifying what gang they were a part of.
25   Q   So that wouldn't be a direct statement to you
```

1         but --
2    A    Correct.
3    Q    -- you would hear them say that?
4    A    Yes.
5    Q    And you would mark that down as a
6         self-admission?
7    A    Yes.
8    Q    Okay.  What if they didn't self-admit but you
9         thought they met some of the criteria, what
10        would you do?
11   A    I would mark that criteria that I observed.
12   Q    What was the most frequent criteria that you --
13        that you noticed when you were a patrol officer?
14   A    Colors and associating with other known gang
15        members.
16   Q    So those were the two most often?
17   A    Yeah.  Yes.
18   Q    Okay.
19   A    You would see hand signs occasionally as well.
20   Q    Okay.  And once you turned those TOPS cards in,
21        did anything happen after that?
22   A    I don't know 'cause I would just submit them
23        with my paperwork, and I don't know what they
24        would do with them after I submitted them.
25   Q    Okay.  Did anybody ever call you up about a TOPS

```
 1   A   Correct.

 2   Q   All right.  And sometimes did you just have, you

 3       know, just do things without being told that

 4       there was a specific investigation?

 5   A   Yes.

 6   Q   And what would you do then?

 7   A   Again, that was -- cards would come in from

 8       other officers so we would actually review those

 9       to see if any of those persons met criteria to

10       be identified as a gang member.  At one -- at

11       some point during we would conduct an audit of

12       the database.  Again, we would help detectives

13       with follow-up if they needed us to go show a

14       line-up or -- or something like that, we

15       would -- we would help them go do those things.

16           Again, it was a lot of self-initiated that

17       we would go out and either help officers when

18       they get a call or, you know, we were going by

19       locations that we knew were -- were -- members

20       were hanging out or where we had seen activity

21       there before and then documenting that as such,

22       if we needed to.  So it was a lot of

23       self-initiated, you know, surveillance --

24   Q   Uh-huh.

25   A   -- that kind of stuff.  It wasn't necessarily
```

```
 1   A      Yes.  Again, sometimes there had been criminal

 2          activity that occurred at that location, it had

 3          been the victim of a drive-by or shots had been

 4          fired at that location, and so we would go by

 5          and just see if there was activity there, either

 6          in response to or, you know, if there were guys

 7          hanging out.  Also we would do surveillance on

 8          the possible suspects who we believed were

 9          responsible for that drive-by, so we would go

10          and watch those houses or locations.  Excuse me.

11   Q      Sure.  Were there certain places that you

12          routinely checked out to see if people were

13          hanging out?

14   A      As a gang officer?

15   Q      Yes.

16   A      Back then, yes, there was -- there was houses

17          and stuff that -- that -- where people

18          associated with certain gangs.

19   Q      Businesses?

20   A      Yes.

21   Q      What kind of businesses?

22   A      We would often encounter a lot of gang members

23          at -- at some of the nightclubs, seemed to be

24          the most common.  There were some businesses

25          that were -- we identified or, you know, we know
```

1     that were only -- I say we, I knew that were

2     specific to a certain gang.

3   Q   Can you give me some examples?

4   A   Sure, like Harry & Ollie's was primarily a Crip

5     bar, the VIP Club was primarily a Blood

6     location.  Back -- back then there was a -- I

7     can't remember if it was called Grand Central

8     Station or it was something out on -- they

9     changed names several times, but it was out on

10    East Kellogg.

11        There was also after-hours locations where

12    it was after the clubs had closed and you would

13    get people to show up at various -- I think

14    there was a place called The Paradise, I think

15    it was a nightclub but it also had after-hours

16    stuff.  There was a teen club on 13th and Vesta,

17    real active, had a lot of shootings and a couple

18    homicides in the parking lot.

19  Q   So would you go by these places and just kind of

20    see who was there?

21  A   Yes.

22  Q   And would you do that somewhat routinely?

23  A   Yes, I mean, obviously if there's nobody there,

24    we'd just drive by so ...

25  Q   But if there was somebody there, you would

1        document that?

2    A   If it -- if we saw people, yeah.  Yes, sorry.

3    Q   Okay.  And then would that -- would that then be

4        documented into the gang database?

5    A   It could be, yes.

6    Q   Under what circumstances would it be?

7    A   You know, sometimes -- it was a lot of times we

8        would just see that these guys were hanging out

9        and it was just a known location and never --

10       sorry, didn't necessarily mean it would actually

11       go physically into the database.  It could if,

12       you know, if that officer at the time or --

13       wanted to put it in there or felt like it needed

14       to go in there.  Does that make sense?

15   Q   Right.  So -- so -- so some officers might say,

16       I see these guys hanging out and I -- and I --

17       and I'm going to go ahead and put this in the

18       gang -- gang database as associating with other

19       gang members --

20   A   Yeah.

21   Q   -- or whatever, right?  Even if they're just

22       hanging out?

23   A   Correct.

24   Q   So you started at the -- as a gang officer in

25       2002, right?

```
 1    A      Correct.
 2    Q      -- at the beginning of -- okay.  Let me check my
 3           time here.
 4                  MR. BRANSON:  Yeah, 9:53, I mean, as
 5              long as I've got a few minutes to jump on
 6              and make sure my phone works.
 7                  MS. WOODY:  Okay.  All right.  Let's
 8              go about a couple more minutes.
 9                  MR. BRANSON:  Yeah, I mean, if you
10              got -- you know, I don't want to --
11                  MS. WOODY:  I just -- I just want
12              to --
13                  MR. BRANSON:  -- cut you off in the
14              middle of a chunk of whatever you're doing.
15                  MS. WOODY:  I'll try to finish this
16              up --
17                  MR. BRANSON:  Okay.
18                  MS. WOODY:  -- in a little bit here.
19                  MR. BRANSON:  Thanks.
20    BY MS. WOODY:
21    Q      So as the -- as the lieutenant over the gang
22           unit, what were your responsibilities?
23    A      Okay.  So as the -- as the gang lieutenant, I
24           was obviously in charge of -- there was a
25           sergeant and -- over the detectives.  Again, a
```

1    lot more admin-based stuff, making sure

2    scheduling, training was being accomplished.  I

3    was part of a rotation for homicide callout, so

4    I was in the rotation for supervisor for -- for

5    that, obviously I'd supervise major scenes.

6        The duties -- well, let's see.  At the --

7    trying to remember, there was -- we had gang

8    intelligence officers then as well, so there was

9    another sergeant that was in charge of them; and

10   they worked at night, but I was the supervisor

11   over them.  And so essentially I was the

12   supervisor over the -- you know, making sure

13   that that sergeant was maintaining the gang

14   database and disseminating information and, you

15   know, following policy.

16       There's a lot of other duties that a

17   lieutenant gets thrown at that -- that, you

18   know, I did provide some training.  And I

19   provided training throughout my -- my time

20   with -- on that whole span on that so -- so as a

21   lieutenant, and I can't remember if it's current

22   now or if it was back then 'cause, like I said,

23   there was -- when I moved.

24       There's the juvenile intervention unit,

25   which is what I'm a part of -- or supervisor

1    over as well.  And, again, now -- now it's

2    changed, we don't -- I have the two gang

3    intelligence officers, and I have Sergeant

4    Cooper who's in charge of a NIBIN Enforcement

5    Team.  One of my duties as the gang lieutenant

6    is also the director of the Crime Gun

7    Intelligence Center, and that's specific with

8    NIBIN and the collection of cartridge casings

9    and how we use that and so ...

10   Q    Okay.  Let's let Charles get ready for his --

11              MR. BRANSON:  Appreciate it.

12              MS. WOODY:  Yeah.

13              THE VIDEOGRAPHER:  Go off the record

14        at 9:56 a.m.

15              (Thereupon, a recess was taken;

16              whereupon, the following was had.)

17              THE VIDEOGRAPHER:  Okay.  We are

18        back on the record at 10:22 a.m.

19   BY MS. WOODY:

20   Q    Okay.  Lieutenant Beard, I just wanted to ask

21        you a couple follow-up questions on -- to some

22        of your testimony.  With respect to the -- the

23        locations that you would identify as potential

24        gang locations, how -- how did you -- how did

25        the department come to -- to designate those

```
 1        drawer.

 2   Q    Okay.  At some point they were scanned

 3        electronically?

 4   A    Yes.

 5   Q    Do you remember when that was?

 6   A    I was on -- I was the night sergeant, and I know

 7        Donnie Moore was the one that did it because he

 8        was injured.

 9   Q    Okay.

10   A    And so it had to be somewhere in that period

11        between 2015, 2018, I want to say, you know,

12        maybe 2016.

13   Q    Okay.

14   A    Somewhere in there.

15   Q    Okay.  And with respect to the locations, the

16        gang locations, is that just something that kind

17        of went around word of mouth, or was there,

18        like, somewhere I could go look and say, oh,

19        this is a gang hangout and this is a gang

20        hangout?

21   A    Yeah, for the gang intelligence officers, again,

22        it was only the four of -- are you talking

23        about -- I guess let me clarify.  Are you

24        talking about when I was a gang intelligence

25        officer or --
```

1   Q   Let's start with that, yeah.

2   A   Okay.  Yes, it was more of our experience, our

3       knowledge, we recognized based on our experience

4       that this was a gang-associated location.

5   Q   Okay.  But there wasn't, like, someplace where

6       you could go, like, look it up?

7   A   No.

8   Q   Okay.  So that was just based on your judgment

9       and experience that you believed that area was

10      associated with gangs?

11  A   Yes.

12  Q   Why don't we kind of -- you've been -- you've

13      been in the gang unit for quite sometime, let's

14      see, how long, 2002 up to -- 20 years?

15  A   Yes.

16  Q   Almost 21?

17  A   Yes.

18  Q   Why don't you kind of walk me through how the

19      gang unit has changed over the years since you

20      were in it.

21  A   So when I got to the gang unit in 2002, it was,

22      again, four officers and there was a night

23      lieutenant.  I -- I can't remember what his name

24      is.  But -- and at the time, there was also

25      detectives that were on nights, and so that --

```
 1   Q    Okay.  And tell me again when you were the night

 2        sergeant over -- this is when you were over the

 3        gang unit, right?

 4   A    Yes, so this would be 2015 through 2018.

 5   Q    Okay.  And so prior to 2015, it -- all the

 6        instruction was kind of word of mouth?

 7   A    Word of mouth.  There was a policy and then

 8        obviously we had the state law.

 9   Q    Okay.  So was Policy 527 --

10   A    Uh-huh.

11   Q    -- and the state law 21-6313; is that right?

12   A    Correct.

13   Q    And you had those policies, but otherwise how

14        you entered people into the gang database and

15        all that was just simply on-the-job training

16        passed from one officer to another?

17   A    Yes.

18   Q    Okay.  So back when -- when you were on -- you

19        became the night sergeant in charge of the gang

20        database, what did you -- what kind of changes

21        did you make or standard operating procedures,

22        that's what you meant by SOPs, right?

23   A    Correct.

24   Q    Did you implement?

25   A    So I took the, obviously, the input from the
```

1    four gang officers during one of their audits to

2    kind of pretty much just write down what they do

3    for the audit.  And then in conjunction with

4    that, you know, when they get a new TOPS card

5    what things to check.  But it really came down

6    to what -- to make sure that the audit was done

7    in a, kind of a check box type manner.  So the

8    audit was one of the main things in there.

9         The only other complicated thing was is

10    that we -- you know, there was EJustice, and so

11    we were responsible to make sure that that

12    person was flagged in EJustice and maintain the

13    database, so you had two entities that we had to

14    make sure that were accurate.

15  Q    Okay.

16  A    And so that's why there's so much stuff in there

17    about EJustice, and then now it's changed to

18    Niche, and so there's a new process for that.

19  Q    When did it change to Niche?

20  A    I think last year, April 2021, I think, or ...

21  Q    Okay.  So up -- up to that, it was EJustice?

22  A    Yes.

23  Q    And so it was the gang intelligence officers'

24    responsibility to maintain the list and to

25    maintain the flags in EJustice?

```
 1          about EJustice?

 2     A    EJustice is kind of complicated in how you would

 3          get information in there, so it was kind of a

 4          step by step on how to make sure that the person

 5          was entered into EJustice, 'cause EJustice

 6          wasn't really user friendly.

 7     Q    Uh-huh, uh-huh.

 8     A    And so you had to create the different gangs and

 9          then put the person associated within that gang,

10          and it -- it's not a conducive system to -- to

11          put stuff in.  So it really kind of lines out

12          how to exactly put that person so that flag will

13          come up at the top of the page.

14     Q    Okay.  So that's kind of a technical issue?

15     A    Yeah, it's -- it's more just technic --

16          technical stuff on how to make sure it's done

17          correctly, and to remove them.

18     Q    Okay.  Okay.  And then with respect to the

19          audits, what -- what was the SOP for the audits?

20     A    Again, it's -- it's like you described, a

21          checklist.  You know, obviously you go through

22          and you look at their -- any police reports that

23          have happened that past year.  You know, again,

24          you check their social media, you -- you look at

25          the arrests, you -- you look at all those
```

1      things.

2          You also look to see if during that time

3      period you may have put an entry in there, you

4      know, a gang officer may have had contact with

5      that person and -- and noted that in the -- in

6      the narrative already so -- so all that stuff.

7      And, again, it's just a checklist of all the

8      different things to check, and if -- and also if

9      you're going to remove a person, remove, make

10     somebody inactive, there was a process for that

11     as well.  Or you would follow the same process,

12     and if they didn't, you know, if they didn't

13     meet that, then -- then they were made inactive.

14  Q  Okay.  So I've heard from other officers that

15     sometimes people were not added to the list

16     until the audit, is that -- is that your

17     understanding?

18  A  Well, that's possible.  In -- again, are they

19     meaning a brand-new person, or are you talking

20     about a person that was already documented and

21     then re-added because they found new

22     information?

23  Q  I think both?

24  A  Okay.  So during the audit, you sometimes will

25     encounter, while you're doing research on the

1        person that's in the database, you discover

2        another person that -- that you hadn't

3        documented before, didn't know about.

4    Q   Uh-huh.

5    A   And then upon research, you discover he meets

6        criteria.

7    Q   And when you say you discover another person,

8        how would you -- how would you do that, how

9        would that happen?

10   A   Most common -- well, from my experience would be

11       finding police cases -- or, I'm sorry, incidents

12       and all these names are listed, or a traffic

13       stop or it -- somehow it's documented and you

14       keep seeing the same name over and over with

15       this -- this group.  And then you would go

16       through the whole process to see if they meet

17       the criteria.

18   Q   And in that case, that could be just something

19       that popped out from an incident report about a

20       person, and you would then go and look at some

21       of these other things and you could document

22       that person solely based on that paper trail; is

23       that right?

24   A   Yes.

25   Q   Now, do the -- do the audit -- just kind of walk

1        me through how you do the audit --

2    A   Okay.

3    Q   -- how does that work?

4    A   So do you want me to explain it when I was a

5        gang officer, or do you want me to explain it as

6        they do it now?

7    Q   I want you to explain to me both.

8    A   Okay.

9    Q   Let's start with when you were a gang officer.

10   A   Okay.  All right.  So -- so FileMaker was a --

11       was a stand-alone system, we would have to -- so

12       only one person could get on it at a time.  So

13       we would divide the list up between the four of

14       us, and then on each page there's probably like

15       50 names.  And so we would go through each name,

16       and I would look up that person in EJustice,

17       again this is before social media and all that

18       stuff, so we'd look up their cases, try to find

19       arrests, if we had any contacts with them

20       before, whatnot.  And I would have to handwrite

21       all those cases down on a separate piece of

22       paper, and then it would be my turn to go get

23       onto the database, so we'd rotate it.

24   Q   Uh-huh.

25   A   And then I would get to input my information on

1       my people.  And I'd just go through -- and it

2       was a tedious process.  And so essentially the

3       guys do it the same way, now there's only two of

4       them.

5    Q  Uh-huh.

6    A  But they have -- they divide up the list, and

7       they go through each name, and they see if they,

8       you know, meet that criteria, or if there was no

9       activity after three years, then they'll take

10      them off.

11   Q  Put them inactive?

12   A  Yes.

13   Q  Okay.

14   A  I'm sorry, take them off, that's --

15   Q  Okay.

16   A  -- inactive.

17   Q  How -- go ahead.

18   A  So, yeah, that's -- that is the process.  They

19      don't have to do the hand -- I think a lot of

20      them now they cut and paste or they type out

21      their notes to put in the narrative.

22   Q  And that was how it was done when you were

23      there, correct?

24   A  Yes.

25   Q  So how's it done now?

1    A    Well, again, that -- I kind of jumped in and did

2         the -- the guys still print off an old hard copy

3         list of names and they -- they go through and

4         they -- they mark them off.  I think they use

5         highlighters now where they -- they color code

6         it so it's easier to read.

7    Q    Okay.

8    A    And, yeah, they go through each -- each one, and

9         they -- they make sure that they either still

10        meet it or -- or if they don't, then they'll --

11        they'll remove them.

12   Q    Okay.  Let's go back and talk a little bit about

13        how the gang unit changed over time.

14   A    Right.

15   Q    So when you were a gang intel officer, there

16        were four gang intel officers who reported to

17        the night sergeant --

18   A    Yes.

19   Q    -- correct?  When's the next time that changed?

20   A    So in 2017, the unit expanded, they -- they --

21        they changed the name, and it became the Violent

22        Crimes Response Team; and we had, I think, ten

23        at night, and there was six during the daytime.

24        Sergeant Harty was in charge at night, and I

25        think Sergeant Cooper was in charge of the

1        daytime operations.  But all of those guys would

2        be responsible for an audit when -- when it came

3        time so ...

4    Q   Okay.  So there would be 16 people who would be

5        involved in the audit?

6    A   Yes.

7    Q   And what did they call those 16 people, was

8        there a particular name for them?

9    A   Yeah, the Violent Crimes Response Team.

10   Q   Okay.

11   A   Or VCRT.

12   Q   And how -- I mean, that's a significant

13       expansion of the gang unit, correct?

14   A   Right.

15   Q   So how did they add those folks?

16   A   There was a process again where they had an oral

17       board, and then they were selected based on

18       their -- their scores from -- from the oral --

19       or their -- the process that's established

20       through the FOP or through the -- the

21       department.

22   Q   When you say FOP, that's the fraternal --

23   A   Yes, and I say the FOP 'cause they had,

24       obviously, input into what is -- the department

25       chose.  It's the department process for -- it's

```
 1          only officers that were assigned to the unit or

 2          assigned to investigations was the day team.

 3     Q    The six folks on the day team?

 4     A    Yes.

 5     Q    And then so there were six people who were --

 6          were they still called Violent Crimes --

 7     A    Yes.

 8     Q    -- Response Team members?

 9     A    Yes.

10     Q    And so those six folks were the, in essence, the

11          gang unit at that point in time, correct?

12     A    I believe so.  Again, once I moved out, I

13          don't -- I know there were some changes that all

14          happened, I think it was, instead of six it was

15          eight.

16     Q    Okay.  And they were all on days?

17     A    I believe so, yes.

18     Q    Were there any gang intelligence officers?

19     A    Yes.  During that time period, I think there was

20          Cale Carson and Zach Jensen kind of became

21          the -- the gang intelligence officers.

22     Q    So for the period of 2017 to 2021, around there,

23          there weren't any gang intelligence officers?

24     A    By official name, no.

25     Q    Okay.
```

1    A    It was -- they were called the Violence Crimes
2         Response Team.
3    Q    But in 2021, they did put two gang intel
4         officers in?
5    A    Yes.
6    Q    And it was Mr. Carson and Mr. Jensen --
7    A    Yes.
8    Q    -- correct?  Are they still in that position?
9    A    Zach is -- quit and Cale is still in that
10        position.
11   Q    Okay.  All right.  So there were six day -- six
12        day members?
13   A    Uh-huh, yes.
14   Q    And then there were two gang intel officers,
15        when did they work?
16   A    I believe also during the daytime.
17   Q    Okay.  And were there any -- was there anybody
18        else in the gang unit at that time?
19   A    Doing, like, audit or gang database stuff or ...
20   Q    Anything?
21   A    Well, there was still the gang/felony assault
22        unit which had the detectives.
23   Q    Okay.  And how many detectives?
24   A    I'm allotted 16.  I don't know if that was -- at
25        that time, I don't know -- again, I wasn't

```
 1          assigned to investigations then, so I know that

 2          this will be all Lieutenant Bartel.

 3    Q     Okay.  So Lieutenant Bartel is --

 4    A     Yes.

 5    Q     -- the one who took over --

 6    A     Correct.

 7    Q     -- while you were in Patrol North?

 8    A     East.

 9    Q     East, sorry.

10    A     Yeah.

11    Q     Yeah.  And how many of those -- of the 16

12          detectives that are allotted, were -- were some

13          of them specifically for gang, or were they just

14          all accessible for gang?

15    A     Yeah, it -- it's really just the name,

16          gang/felony assault section, they -- they are

17          responsible for all felony level crimes.

18    Q     Okay.

19    A     We do get gang crimes or in -- because most of

20          them are drive-bys or shootings or -- or weapons

21          possession, and so that's where that comes in.

22    Q     Okay.  So did the configuration change again?

23    A     Well, currently right now, Cale Carson and Jess

24          Bernard are my two gang intelligence officers.

25    Q     Okay.
```

1   A   **And those are the only two that are inputting**

2       **information into the database and conduct the**

3       **audit.**

4   Q   Okay.  So they're the only ones now who can

5       actually add people to the database?

6   A   **Yes.  I -- I have access to add somebody because**

7       **I'm the administrator --**

8   Q   Uh-huh.

9   A   **-- but I -- I don't, I -- I pretty much let them**

10      **do all of that.**

11  Q   Okay.  So currently you're the lieutenant over

12      the gang unit, correct?

13  A   **Yes.**

14  Q   And then who -- who reports to you?

15  A   **So I have Sergeant Aaron Moses and Sergeant Chad**

16      **Cooper.**

17  Q   Okay.  And are they day and night?

18  A   **Yes.  Well, I'm sorry, they're both daytime.**

19  Q   Okay.  Both daytime?

20  A   **Yeah, yeah.**

21  Q   All right.  And then who -- who else is in the

22      gang unit?

23  A   **Okay.  So over Sergeant -- Sergeant Moses, he is**

24      **my -- he is the detective sergeant --**

25  Q   Okay.

1      and -- I've always felt like the WPD has come a

2      long way because we give the opportunity for a

3      person to come off the list because there --

4  Q   To become inactive?

5  A   Yes, I -- I say off the list but, yeah, to be

6      inactive and -- and we do a yearly audit to make

7      sure that that's up to date so -- but I think

8      that 14 -- the 14, you know, some -- somewhere

9      in there, I think that's -- that's -- that could

10     be applicable.

11 Q   With respect to the last bullet there, it says

12     that anybody who has been tagged, you know, put

13     on the gang list --

14 A   Uh-huh.

15 Q   -- any adult --

16 A   Uh-huh.

17 Q   -- be notified.  Now today that's not a

18     requirement, correct?

19 A   Correct.

20 Q   So somebody could be on the list and not know

21     it?

22 A   It's possible, yes.

23 Q   And so do you have any disagreement with

24     notifying people once they're put on the list?

25 A   No, that's fine.

```
 1                        whereupon, the following was had.)
 2                        THE VIDEOGRAPHER:  Okay.  We're back
 3            on the record at 11:57 a.m.
 4                        MS. WOODY:  Can you mark this for
 5            me?
 6                        (Deposition Exhibit Number 22
 7                        Marked for Identification.)
 8                        THE REPORTER:  22.
 9    BY MS. WOODY:
10    Q    Okay.  Lieutenant Beard, I'm handing you what's
11         been marked Deposition Exhibit 22.
12    A    Uh-huh.
13    Q    Which is Wichita 060410 (sic).  You see that?
14    A    Yes.
15    Q    That just means that was produced to us by the
16         Wichita Police Department, okay?
17    A    Yes.
18    Q    And it looks like it is an officer's report
19         dated August 30, 2022 so within the last few
20         months.  Do you see that?
21    A    Yes.
22    Q    And can you just tell me what this is?
23    A    So this is an officer's report submitted by
24         myself to Deputy Chief Salcido identifying that
25         I have a social media account that I use for
```

1          intelligence purposes.

2    Q    And is every -- is everyone who -- who does

3         that, is everyone who uses that social -- social

4         media account required to have a document like

5         this?

6    A    Yes, per policy.

7    Q    And when did that -- when did that come into

8         policy?

9    A    I -- I don't -- I don't remember, probably about

10        a year ago maybe.

11   Q    Okay.

12   A    I think is when it was.

13   Q    And so you mentioned that maybe starting in, I

14        think you said 2009, it really became -- social

15        media became a big way to surveil people and see

16        if people met the criteria, correct?

17   A    Yes, that was a method that we could use to

18        gather intelligence.

19   Q    Okay.  And prior to this policy where everybody

20        had to -- to send this to, it looked like Deputy

21        Chief Salcido, was there any -- any

22        documentation that anybody had to have in order

23        to do the social media surveillance?

24   A    No.

25   Q    So who could do it?

1    A    So if we're specifically talking about the gang

2         intelligence --

3    Q    Yes.

4    A    -- I believe most of the gang officers had some

5         type of covert page, if they chose.  They didn't

6         have to have one, but there was a lot to gather

7         so it was beneficial to have a covert social

8         media page.

9    Q    And on this document, you're identifying, you're

10        saying, I'm -- I'm notifying you that I've got

11        an undercover social media account?

12   A    Uh-huh.

13   Q    And I've got a Facebook account and a Snapchat

14        account, correct?

15   A    Yes.

16   Q    And when you say covert, explain what you mean

17        by that.

18   A    Obviously it's not listed under my name.  I'm --

19        I'm not identifying myself as Chad Beard; it's

20        either as a female or another male and a fake

21        name, fake information as -- to gather

22        intelligence.

23   Q    And you -- and -- and you maintain those, one on

24        Facebook and one on Snapchat; is that correct?

25   A    Yes.

1  Q    And about how often do you conduct social media

2       surveillance on -- on those media?

3  A    I check it, you know, sometimes it's daily,

4       other times it's -- it's every other day.  I do

5       check it about every week.  Not so much on

6       Snapchat because it -- I'm not really good at

7       Snapchat.  So Facebook is primarily 'cause you

8       can just kind of scroll through.  I -- I don't

9       communicate with anybody, I just look at the --

10      at what's posted.

11  Q   So is that a department policy that you can't

12      communicate with anybody?

13  A   No, that's -- you can if you -- if you choose to

14      communicate, that's -- that's up to you, or to

15      the officer.  They have to recognize that it

16      could be subject to subpoena or court - what am

17      I trying to say - evidence, discovery is what

18      I'm trying to say.

19  Q   Right, right.  So some officers actually, in

20      addition to making a fake account, actually use

21      that account to communicate with various

22      individuals to maybe ask -- like talk to them

23      about gangs or ask them if they're gang members,

24      things like that?

25  A   They could.  A lot of it is for criminal

1    activity, whether -- my experience has been drug

2    sales and firearm sales, trafficking.

3  Q  So explain to me how that would work, would you

4    pretend that you were somebody who wanted to

5    purchase drugs or firearms?

6  A  Yes, usually -- usually they're already

7    advertising because that gives us the lead as

8    to -- to send the request saying, hey, I'd like

9    to meet up for a purchase.

10  Q  And then when they meet up, it's -- it's the

11    police?

12  A  Correct.

13  Q  Okay.  So on Facebook, what -- what types of --

14    like I assume you use photographs, correct?

15  A  For?

16  Q  Your fake -- your fake cover page?

17  A  Oh, yes.

18  Q  And so what kind of photographs have you used on

19    that page?

20  A  They're all females.

21  Q  All females.  Black, White?

22  A  She's a White female.

23  Q  Okay.  And is that the only one that you've ever

24    used or you just kind of change them every so

25    often?

1  A  I've always used a White female.

2  Q  Okay.

3  A  I know other guys have other races and -- and

4     males and females.

5  Q  Okay.  And have you ever had any, you know,

6     discussions or messages or anything like that

7     while you were covert on Facebook?

8  A  Like messages, what ...

9  Q  Have you ever -- have you ever -- you said you

10     usually just look?

11  A  Yes.

12  Q  Have you yourself ever actually got into a

13     discussion with somebody on Facebook?

14  A  I -- I remember one time, and it wasn't even

15     on -- it was on a different account that I've

16     closed out.

17  Q  Uh-huh.

18  A  I think I asked him where he was at.

19  Q  Okay.

20  A  And he -- I don't even think he responded and

21     so ...

22  Q  Yeah.

23  A  Okay.  I -- I really don't ever talk to them on

24     that.

25  Q  So are there any standard operating procedures

1    about how to, you know, do your undercover

2    surveillance on Facebook?

3  A  Again, a lot of it's -- comes down to the --

4    well, a lot of it comes down to how well the

5    officer knows the -- the social media platform

6    that he's using and what -- what's available to

7    him and what's not, you know, how effectively

8    they can -- they can use that.  So a lot of

9    that, I'm sure a Millennial can do a lot more

10   stuff on -- on social media than I ever could.

11      But I think there's been courses that have

12   been offered.  I went to a training course on

13   social media investigations when it first was

14   pretty -- pretty, I guess, intense or when it

15   was first really popular.  And then I've

16   provided training at a couple of conferences on

17   how to use social media for further -- to

18   further their intelligence gathering, whether

19   that's for gang documentation or just in --

20   today a lot of it actually picks the violence

21   and the -- and the stuff that these guys are

22   involved in, it's not just gang documentation.

23  Q  So when it started out, was it mostly gang

24   documentation?

25  A  A lot of it was, yes.

1    Q    And I think you said back then any of the --
2         anybody in the gang unit could create a fake
3         account and go on, and that really wasn't
4         monitored in any way by the department?
5    A    No.  No, it wasn't monitored; yes, they could
6         create a account.
7    Q    Sorry, that was a compound question --
8    A    It's all right.
9    Q    -- good for you.  Appreciate the clarification.
10   A    You're welcome.
11   Q    So -- so there wasn't really -- so there
12        wasn't -- there weren't really standard
13        operating procedures; is that right?
14   A    Yes.
15   Q    And I take it that we talked about sometimes
16        people would get identified solely for what was
17        seen on social media, correct?
18   A    Yes.
19   Q    And that was at the -- the individual officer's
20        discretion?
21   A    Are you talking about gang intelligence
22        officers?
23   Q    Yes.
24   A    Okay.  Yes, it would be based on their
25        experience, what they were seeing, but they also

```
 1            could talk amongst the four of them or even ask
 2            me if they had a question, I mean, so it
 3            wasn't -- but, yes, it was primarily if they
 4            were seeing what they were doing, they were
 5            pulling that information off and then -- then
 6            they could use that if they're going to document
 7            somebody.
 8    Q    Okay.  And so that would be documented in that
 9            person's gang intelligence card as, you know,
10            saw him on Facebook, this, this, this, and that
11            would be why it was added to the list?
12    A    Yes.
13    Q    Okay.  And I think you said it's not used so
14            much for gang identification anymore; is that
15            right?
16    A    No, it -- it is but there is a lot of other
17            activity that goes on social media that has
18            become prevalent; like I said, sales of drugs
19            and -- and gun trafficking is much more common
20            now, prostitution.  We didn't really see that
21            stuff before, a lot of it -- when it first came
22            popular, it was just representing their gang
23            and -- and that kind of stuff; now it's turned
24            into how they can make additional money or, you
25            know, sales or -- or whatever, there's a lot
```

1        more to social media.

2   Q    And do you see that on -- on Facebook?

3   A    Sometimes.  There are other platforms.  Again,

4        I'm more old school so I stay with the Facebook.

5        I know there's Instagram, again, Snapchat,

6        Twitter, Insta -- yeah, so the other -- other

7        officers may have all those pages as well.  Or I

8        know some of them do.

9   Q    Uh-huh.

10  A    So ...

11  Q    And that is, again, how comfortable they feel on

12       the platform, correct?

13  A    For the most part, yes.

14  Q    And -- and as far as this new policy now, then

15       they would have to list every media format that

16       they were using and --

17  A    Yes.

18  Q    -- and say I'm using this name, this name, and

19       that's what's blanked out here, right, that's

20       the ID that you're using?

21  A    Yes.

22  Q    Okay.  I'm sorry, it's blanked out on

23       Exhibit 22.

24           Okay.  How often do you think people are --

25       well, let me ask this:  Do people ever get

1        extended, their -- their time on the gang list

2        extended just because of what's seen on

3        Facebook?

4     A  Yes.

5     Q  And how often do you think that happens?

6     A  I would say quite a bit.

7     Q  Okay.  And what does it take to be -- once

8        you've met the three criteria, what does it take

9        to be extended on a list?

10    A  Okay.  There is a three-year limit with -- with

11       the Wichita Police Department, and so if you are

12       arrested for a person's misdemeanor or person

13       felony, drug-related crime, except marijuana,

14       we'll -- we'll keep you -- your time will start

15       over, that -- your three years will start over

16       from the time of that arrest or whatnot.

17            If the gang intelligence officer or other

18       officers encounter that person and they are

19       associating with individuals that are other gang

20       members, wearing the colors, flashing the hand

21       signs, the jewelry, or communicating to each

22       other through words could be one -- one way.

23       The other would be, again, maintaining a social

24       media page.  We'll use tattoos if the tattoos

25       are new.  If they were already previously

1    A    Uh-huh.

2    Q    And is that documented anywhere?

3    A    It may be in the SOP specifically, I'm not

4         100 percent sure on that.

5    Q    Okay.  And there's, again, an SOP that -- that

6         talks all about how you put a person on the gang

7         list and what to look for and all that?

8    A    Correct.  And I failed to mention, we can use a

9         firearms possession.  I know it's a property

10        crime, but gang members often carry firearms for

11        the furtherance of the criminal activity.

12        There's also a section in reference to, with

13        state statute, that includes some type of

14        criminal -- or street gang activity --

15   Q    Uh-huh.

16   A    -- where we would use -- so if -- if a

17        individual got caught tagging and it's gang

18        related, tagging is graffiti or --

19   Q    Yeah.

20   A    -- then that would classify 'cause we would

21        identify that as -- as ongoing gang activity.

22   Q    Uh-huh.

23   A    So even though it's a nonperson crime.

24   Q    Okay.  So have you described for me all the --

25        and -- and when you say -- now, if they -- it's

1      an arrest, right --

2  A   Uh-huh.

3  Q   -- that counts, right?

4  A   Yes.

5  Q   It's not a conviction; is that correct?

6  A   That's correct.

7  Q   So any time they are arrested for any one of

8      these incidents, that would increase their time

9      on the list, regardless of whether they were

10     ultimately convicted of it or not?

11  A  Yes.  And I guess it wouldn't increase, it would

12     just start the three years over.

13  Q   Right.  Well, that increases the time on the

14      list, right?

15  A   Right, yeah, like make it longer, longer than --

16      than --

17  Q   Right.  So from whatever date they were

18      arrested, it would be three years from that

19      date?

20  A   Yes.

21  Q   And it would just keep rolling on, you know, for

22      various things, if a person had another one of

23      those incidents, that would add them on for

24      three years from that incident, correct?

25  A   Yes.

```
 1   A    But the main thing is the gang intelligence --
 2        or, I'm sorry, the gang/felony assault section.
 3   Q    Okay.  All right.  Let's -- let's go with that,
 4        then.
 5   A    Okay.  So a lot of gangs, when I -- when I
 6        became a gang intelligence officer, were already
 7        documented as being identified as -- as street
 8        gangs, Crips, Bloods, Folks, the different
 9        Hispanic gangs, all -- you know, Sur 13s, the
10        Vato Loco Boyz, all -- all those gangs were
11        already documented in the database.  But from my
12        experience, those are properly documented street
13        gangs.  The state statute identifies three or
14        more persons, with a common sign, color, or
15        symbol, that involve themselves in some type of
16        criminal behavior.
17             And I believe there's other documentation,
18        probably from the federal side of things, that
19        could identify, you know, the Folks, Crips,
20        Bloods, I'm pretty confident the FBI has
21        identified those all as identified street gangs.
22        So in reference of documenting street gangs,
23        we've only done that a few times since then,
24        but, again, we follow the state statute,
25        specifically three or more persons, common sign,
```

1          color, or symbol, involved in criminal behavior.

2          So there are some local street gangs that have

3          been added to the database based on -- on that.

4     Q    Can you tell me who those -- some of those gangs

5          are that have been added?

6     A    Sure, Midwest Maniacs is one of them and PCI,

7          which is the Paper Chasin Industry.  There would

8          be Players for Life, PFLs, the KODs, Kings of

9          Destruction, the NSGs or the North -- North Side

10         Gangsters are -- then you have your Junior Boys,

11         such as 2nd Streeters, Ash Parks, you've got

12         your Lost Boy Gangsters.  So, yeah, there's

13         several -- there's several gangs that -- that

14         meet the criteria that are local street gangs.

15    Q    And when you say meet the criteria, it requires

16         three people --

17    A    (Witness nods head affirmatively.)

18    Q    -- who, like, are doing common colors, those

19         kinds of things?

20    A    Common signs, colors, or symbols.

21    Q    Okay.

22    A    And usually we see that it's not just one thing,

23         it -- it's usually colors, signs, symbols, hand

24         signs altogether.  For -- for my experience on

25         those gangs that I mentioned, all of those

1      criteria -- all of those things are in -- in

2      there, it's not just one thing.

3    Q  And you say and there are -- and there are three

4      of them joined together for criminal behavior?

5    A  Correct.

6    Q  And what -- what do you -- what defines criminal

7      behavior.

8    A  So it could be -- I believe it can be

9      individually or collectively as a group.  So if

10     they go out and do robberies, drive-bys,

11     carrying firearms, graffiti, drug sales, human

12     trafficking, a lot of -- you know, I could

13     articulate burglaries even though it's a

14     property crime because a lot of time burglaries

15     have led to, you know, confiscation or they

16     would get firearms from burglaries.  Any of

17     that's done in furtherance of their -- of their

18     gang, that could be considered as part of that,

19     representing or identifying themselves as such.

20   Q  Okay.  So if I understood what you just said,

21     you could have five people who are wearing the

22     same colors and have a hand sign that they put

23     together?

24   A  Uh-huh.

25   Q  And --

```
 1    A    I don't personally but I -- I -- Cale and Jess
 2         do that now.  And so when I became the
 3         supervisor over the gang unit in 2015, I wanted
 4         them to give those presentations, to create
 5         their own, to make it something that they took
 6         ownership to, and then they could give their
 7         experience and -- and talk about -- there's
 8         still always the basic stuff, there's always
 9         going to be Bloods, Crips, Folks, or whatever,
10         that they're going to cover, but it's going to
11         have their own take on it.
12    Q    Okay.  So the training materials change over
13         time depending on who's -- who's giving the
14         training, they get modified?
15    A    Yes.
16    Q    Other than -- other than providing training to
17         the recruits, what other kinds of training did
18         you provide?
19    A    I provided -- so there was a couple times where
20         officers came from other outside agencies, from
21         Sedgwick County -- or I'm -- well, Sedgwick
22         County did have some deputies that -- that rode
23         with us, and -- and I essentially gave them
24         on-the-job training as how we do things.  I had
25         them from Dodge City, Great Bend, I believe, and
```

1    A    I've given mandatory in-service training to

2         current commissioned officers about, you know,

3         what current gang activity's gone on, whether

4         it's recently or, you know, explaining why these

5         feuds are going on, or -- or whatnot.  So that's

6         training that I've provided that's mandatory,

7         which is required for every officer every year

8         to go through two mandatory sessions.

9              I know that's kind of general, but that --

10        I have given, you know, community groups as

11        well, you know, neighborhood associations,

12        district advisory board type stuff, I've given

13        it to those as well, some being just 15 minutes.

14        I've also provided it to school staff, the

15        principals.  Certain schools had asked for a

16        presentation, so I've -- I've given it to some

17        of the schools, to the BOE, board of education,

18        security, the SROs.  Yeah, that -- again, a lot

19        of that training took place between 2009 and

20        2014 is where a lot of my presentations took

21        place.

22    Q    And did you use the same PowerPoint over and

23        over again?

24    A    Maybe the general layout but, no, I would try to

25        update it with more current information, current

```
 1            pictures.  We were always getting new
 2            intelligence, especially when we'd give a
 3            presentation about an ongoing feud or beef that
 4            was going on between groups, it was much better
 5            to have -- and then we would try to use current
 6            cases as well that -- that those officers may
 7            have had a part in, and so they'd take a little
 8            bit more interest in the case if -- if they
 9            remember that case, if it's not from 20 years
10            ago they don't know anything about.
11    Q       And when you did it for SROs and community
12            organizations, did you use the same PowerPoints?
13    A       No.  Probably for the SROs but for the public,
14            we would always make a point to block out the --
15            the people's faces so that it wasn't infringing
16            on any of that stuff.  And we wouldn't use any
17            cases that -- that hadn't been just done through
18            court for the public ones if we decided to do a
19            case study.
20    Q       Okay.
21    A       We would use -- most of the case studies would
22            occur when we were doing law enforcement.
23    Q       Okay.  And when you did law enforcement, you
24            would have pictures of people who, you know, had
25            been designated Crips or Bloods or so forth, and
```

1        that was available to everybody on the police

2        force, correct?

3    A   Yes, when -- when we provided that to them.  I

4        mean, we didn't give them the PowerPoint, but, I

5        mean, they -- they got to view it, yes.

6    Q   Right.  Let me mark this one.  This should be

7        26.

8                    (Deposition Exhibit Number 26

9                    Marked for Identification.)

10   A   Thanks.

11   BY MS. WOODY:

12   Q   This is -- Deposition 26 is Wichita 063247 and

13       then 63265.

14   A   Uh-huh, yes.

15   Q   And they come from the same document, I mean,

16       some of these documents are, like, 150 pages,

17       right?

18   A   Yes, I know.

19   Q   So -- so looking at the -- looking at the first

20       page of this, it says Wichita Street Gang,

21       slash, LEO Update 2012, and then it says Wichita

22       Police Department Gang Unit 2012.  Do you see

23       that?

24   A   Yes.

25   Q   So what is this?

```
 1        expiration date.
 2   Q    There's no way to get -- there's no way to get
 3        off?
 4   A    Right, and that's why the Wichita Police
 5        Department has an opportunity to get off the
 6        list.
 7   Q    Or become inactive at least?
 8   A    Yes.  I guess the other, you know, the
 9        associates one, I mean, again, try to narrow or,
10        you know, explain that a little bit better as to
11        what you're talking about, is it with a specific
12        gang, you know, I mean, or are you -- I guess I
13        would like some verbiage of some sort of, you
14        know, through my professional opinion or from,
15        you know, from other verifying information or
16        corroboration that I've -- I've been able to
17        or this is why this is this.
18   Q    Again, that's -- that's not required by the
19        statute?
20   A    It's not required but I know we -- we try to put
21        it in the database a lot.
22   Q    Sometimes you didn't?
23   A    Correct.
24   Q    Were there ever times when through the audit
25        process that -- that somebody was actually --
```

1        there was actually a case where somebody said,

2        this person should never have been put on the

3        list?

4    A   Yes.

5    Q   And what would happen then?

6    A   They -- it would be notified -- noted in the --

7        in the narrative that this person didn't meet

8        criteria and that they were made inactive.

9    Q   Okay.  But they -- but they had been on the list

10       erroneously for a while?

11   A   Correct, for whatever reason, whether it was --

12       when we went back through, they did not meet

13       the -- the criteria --

14   Q   Okay.

15   A   -- based on what we had then.  I mean --

16   Q   Right.  You're looking -- you're looking at --

17       in doing the audit, you're looking at a point in

18       time?

19   A   Right.

20   Q   And so you're looking at the information and

21       somebody says, whoa, this guy doesn't meet the

22       criteria so he should never have been added to

23       the list?

24   A   Correct.

25   Q   And in that case, what you would do is move him

```
 1          to inactive?

 2     A    Yes.

 3     Q    Okay.  How often would that happen?

 4     A    Just from my personal experience of doing the

 5          audit, again, when I did it, it was obviously

 6          looking back at guys that were still flagged,

 7          you know, it's not the time moving forward here,

 8          so I was looking at a lot of guys that had been

 9          documented previously before there was ever a

10          state statute or, you know -- and so I would

11          probably say five or seven guys out of my -- I

12          mean, I -- I probably have a -- maybe ten.   I

13          mean, that specifically.   I mean, I know I made

14          lots of people inactive.

15     Q    Uh-huh.

16     A    But just that specific way would be four or five

17          guys at the most maybe, I mean, five to ten.

18     Q    Five to ten?

19     A    Yeah, probably.

20     Q    Okay.  Okay.

21     A    And I guess I'll clarify that, that's -- we've

22          gone through that -- that's a lot of old

23          flaggings --

24     Q    Uh-huh.

25     A    -- that I think have all been corrected, and
```

```
 1            moving forward, it's ...

 2   Q    Moving forward you try to be more careful --

 3   A    Correct.

 4   Q    -- is that what you're saying?

 5   A    Yes.

 6   Q    Okay.  In your understanding, what are the

 7        effects of -- to an individual if they're listed

 8        on the gang list?

 9   A    So one of the effects, obviously, by the -- the

10        state statute, you -- you will receive the --

11        the bond enhancement for a new person felony,

12        and with that, I mean, a judge can -- the

13        minimum is $50,000.

14   Q    And that's different than -- and that's for any

15        person felony, correct?

16   A    Yes.

17   Q    Even like simple assault, right?

18   A    Well, you need to be a person felony; a simple

19        assault is not a felony.

20   Q    Okay.  Is it a felony, or can it be a

21        misdemeanor as well?

22   A    My understanding of what's in the policy, I'm

23        pretty sure, says it's a felony.  Even in the

24        state statute, it has to be a person felony.

25   Q    Okay.  And when a -- when a person felony occurs
```

1          and you're not a gang member, if you're -- if

2          you're charged with a person felony, you might

3          get a much less bail than $50,000, correct?

4      A   **That's possible, yes.**

5      Q   And so the $50,000 is kind of presumptive; is

6          that right?

7      A   **Yeah, it's a minimum standard that -- that's**

8          **required by the judge.**

9      Q   And would you all in the gang unit, would you

10         talk to the DA and say, hey, this guy, you know,

11         is on the gang list so, you know, when you go

12         ask for bail for him, you need to let the judge

13         know that?

14     A   **So that's what the -- the verbiage that Policy**

15         **527 specifically outlines, that an officer is**

16         **required to put this verbiage that he was**

17         **documented on the date of the incident so that**

18         **the DA, when they do the felony reviews of the**

19         **cases, they know that that's there and then they**

20         **can let the judge know.**

21     Q   So you tell -- you document that for the DA so

22         they know to ask for the higher bail?

23     A   **Yes.**

24     Q   Any other effects that -- from being on the gang

25         list?

1    A    So if you're documented, you could be eligible

2         for what they call gang conditions for either --

3         for post release or for probation or parole,

4         which provides that you can't have certain -- do

5         certain things, wear certain colors, associate

6         with certain people.  I don't know what all the

7         conditions are that's set up through the

8         probation and parole.

9    Q    And are those stricter conditions than you would

10        otherwise receive?

11   A    They could be, I -- again, I don't know what --

12        since it's provided -- or done by probation and

13        parole, I would -- I mean, I could assume that

14        they're stricter, but I -- I don't know because

15        I don't know what they normally give somebody

16        that's not a gang member.

17   Q    So you haven't ever done a comparison of the

18        conditions?

19   A    No.

20   Q    Does the WPD have any responsibility or

21        involvement in enforcing the gang parole and --

22        and -- probation and parole conditions?

23   A    So with that, we will often assist KDOC if they

24        would like a curfew check done or -- you know,

25        that's usually what we will participate in, make

1        sure that those individuals are abiding by their

2        conditions.  And I guess it's not just

3        necessarily those can be gang conditions, those

4        are just conditions of parole as well, not

5        necessarily they are gang conditions.  But, you

6        know, oftentimes when -- when I was a gang

7        officer, if I observed a guy in violation of,

8        you know, associating with known gang members,

9        that could be a -- a -- I would document that

10       for a possible parole violation.

11   Q   Okay.  And when you say KDOC, that's the Kansas

12       Department of Corrections, correct?

13   A   Yes.

14   Q   Okay.

15                MS. WOODY:  And can you mark this

16           for me, please, Nancy.

17                   (Deposition Exhibit Number 27

18                   Marked for Identification.)

19                THE REPORTER:   27.

20   A   Thanks.

21   BY MS. WOODY:

22   Q   Okay.  Lieutenant Beard, I'm handing you a

23       document that's been marked Exhibit 27, it's

24       Wichita 055064 through 65.  Do you see that?

25   A   Yes.

1  Q  And this is an email, it looks like -- well, the

2     main body of the email is an email from you,

3     correct?

4  A  **Yes, it is coming from Brad Elmore, but, yes, it**

5     **looked like from me I sent it to them.**

6  Q  So Brad -- Mr. Elmore has a two-sentence reply,

7     looks good, correct?

8  A  **Yes.**

9  Q  And then under that is the main -- is the main

10    body of the email that you sent --

11 A  **Right.**

12 Q  -- is that right?

13 A  **Yes.**

14 Q  Okay.  And -- and that was on July 23rd, 2019,

15    correct?

16 A  **Yes.**

17 Q  And you're sending this to Donnie Moore and

18    Bradly Elmore, what were their positions?

19 A  **Brad Elmore was my sergeant, and Donald Moore**

20    **was a detective assigned to the gang/felony**

21    **assault section.**

22 Q  And it says, re: Policy 527 review due.  Do you

23    see that?

24 A  **Yes.**

25 Q  And what was -- what was that about?

1    A    So each couple of years, I'm not -- I'm not sure

2         the exact dates, but the Wichita Police

3         Department's policies come up for review, and so

4         they ask us to review the policy, and since it

5         was the Policy 527, they asked the gang unit to

6         review it.

7    Q    Okay.  And the first one says -- and then it

8         says, okay, here's what I came up with, is

9         that -- is that your suggestions, then?

10   A    It -- it would look like it, yes.

11   Q    Okay.

12   A    I really don't remember this one, but, I mean,

13        obviously I wrote it or ...

14   Q    And it says general guidelines, and under --

15        underneath that it says, in red, a member of the

16        gang unit or Violent Crimes Community Response

17        Team will monitor documented gang members and

18        associates for any violations of their parole --

19        probation, slash, parole, bond, pretrial

20        restrictions and will report this to the proper

21        supervising authority with the intent of

22        removing the offender from the community.  Do

23        you see that?

24   A    Yes.

25   Q    And that indicates to me that part of the gang

```
 1          this is right, very close to the time of

 2          transition when I took over the first time as

 3          the -- as the lieutenant.

 4    Q     Okay.

 5    A     And I was taking Steve's place.

 6    Q     Okay.  So he said he's not answering me, what do

 7          you think --

 8    A     Correct.

 9    Q     -- is that right?

10    A     Yes.

11    Q     And then you responded with this email?

12    A     Correct.

13    Q     Okay.

14                    MS. WOODY:  Let's mark this.

15                      (Deposition Exhibit Number 28

16                       Marked for Identification.)

17    A     Thank you.

18                    THE REPORTER:  28.

19                    MS. WOODY:  28.

20    BY MS. WOODY:

21    Q     If you'll take a look at this document, this is

22          from MonicaHarris@sedgwick.gov, who is -- do you

23          know who Ms. Harris is?

24    A     If I remember correctly, she was in charge of

25          community -- or, like, the -- the county
```

1        probation, she's one of the county probation

2        personnel.  I'm not sure if she's a supervisor

3        or what -- what her title is.

4    Q   Okay.  And she's sending this to Daniel Harty,

5        who was Mr. Harty, what was his position?

6    A   Dan Harty was the -- the sergeant in charge of

7        the ten-man unit at night.

8    Q   Okay.  And you're also cc'd there; is that

9        right?

10   A   Yes.

11   Q   And also Courtney Purser?

12   A   Yes.

13   Q   Who's that?

14   A   She's also with community corrections, I -- I'm

15       pretty confident she is a supervisor at

16       community corrections.

17   Q   Okay.  And then in the second paragraph there in

18       her email to -- to Sergeant Harty, she says, I

19       just wanted to follow up with you on what we are

20       doing on the clients you reviewed for us.  Gang

21       requirements have been removed from clients

22       incorrectly placed on our list due to an

23       incorrect DOB.  Do you recall anything about

24       that?

25   A   I'm sorry, which -- where -- where are you?

1  Q    If you -- oh, right here.

2  A    Oh, okay.

3  Q    First bullet -- first bullet point.

4  A    Okay.

5  Q    Uh-huh.

6  A    So I -- I -- looking at all this, I think, is

7       this the -- so obviously we would communicate

8       with parole and probation about their gang

9       status and whether or not they wanted to be --

10      if a probation or parole officer wanted to place

11      them on some type of conditions.  So I don't

12      know if that's because they had an incorrect

13      date of birth or if we had an incorrect date of

14      birth on that, but it looks like they -- the --

15      they removed them off of their -- I would assume

16      they removed them off of their conditions list.

17 Q    And if you look at that second page, there's

18      one, two, three, four, five, six names on that

19      list that they're saying these guys don't look

20      like they should be on the gang list; is that

21      right?

22 A    So, yeah, looks like these names were provided

23      to Monica and they were inquiring whether or not

24      these individuals were flagged or identified as

25      gang members, and this is Harty responding back

1          about what he found.

2    Q     And so in the instance of these six individuals,

3          they were wrongly listed on the gang list

4          because of -- in -- in erroneous DOBs?

5    A     No, they -- I'm not getting that from -- from

6          this.  It looks -- okay.  So like Javin Dean, we

7          never got anything on him that I can find, so

8          that to me means he's never been flagged and

9          he's not in the database, but -- but KD -- or

10         community corrections is asking if he's flagged,

11         and we responded back that he was not.

12             Malcolm Hutton is flagged, but Harty gave

13         them the wrong date of birth; and the one that

14         has the date of birth of 1/3 of 1998, that

15         person is not flagged but the one that has 11/13

16         of '80 is flagged.

17             This James Jackson had -- was initially

18         identified as a Sureno, but he was made inactive

19         so ...

20             Again, Juan Lopez, they don't have anything

21         on him.

22             And then they are asking about Antonio

23         Martinez, and that's a different date of birth;

24         so we do have an Antonio Martinez flagged

25         but not the one --

```
 1   Q    Not this guy?

 2   A    Correct.  And then Timothy Smith, the one with

 3        that date of birth is flagged but not the one on

 4        their list.  So no one's been erroneously

 5        flagged as a gang member.  I think these are

 6        just verifying that -- that --

 7   Q    Well --

 8   A    -- the names that they sent were --

 9   Q    Yeah.

10   A    -- either not given the conditions or they

11        weren't flagged.

12   Q    You think -- well, Javin Dean and Juan Lopez,

13        they don't -- they weren't flagged, correct?

14   A    Correct.

15   Q    And then I think it's Mr. Harty who says, in the

16        future both sides probably should include DOBs

17        to avoid confusion.  The people who were given

18        gang conditions because of a wrong DOB probably

19        have a legitimate complaint.  You see that?

20   A    Yes.

21   Q    So those are instances where some -- somebody

22        was getting the enhanced gang conditions but

23        they really weren't on the gang list?

24   A    That -- that --

25                   MR. BRANSON:  Object to form.
```

1    BY MS. WOODY:

2    Q    Go ahead, you can answer.

3    A    That appears to be the issue.  That sounds like

4         a mistake from Sedgwick County.

5    Q    And so you routine -- you communicated with

6         Sedgwick County and the parole and probation

7         office to identify people who were on the gang

8         list so that they could have these enhanced

9         conditions, correct?

10   A    Yes.

11   Q    What other -- what other ramifications would

12        there be for somebody being listed on the gang

13        list?

14   A    Again, the only other thing would be is we --

15                MR. BRANSON:  Yeah, I'm going to

16        object to form, to being listed on the gang

17        list, if you'll clarify that.

18   BY MS. WOODY:

19   Q    Well, you were going to answer.  You -- if you

20        understand it, you can go ahead and answer.

21   A    Well, the only other place I could see that they

22        have any type of extra enhancements, or

23        whatever, would be, again, back through KDOC and

24        if they're documented within the prison system

25        or, again, parole/probation is really the -- the

1          only -- besides the bond enhancement on the

2          $50,000.

3     Q    So when you say documented in the KDOC, when

4          they were going to -- if somebody was going off

5          to be incarcerated in the system, did you flag

6          them as gang members?

7     A    If KDOC requested our intelligence, then, yes,

8          we would send that to them.

9     Q    Did they do that routinely?

10    A    Yes.

11    Q    So was it -- would I say usually when somebody

12         was going to be incarcerated from Sedgwick

13         County, they would ask you about their status as

14         a gang member?

15    A    They often would, yes.

16    Q    Okay.  And so what would happen, would that --

17         would that person then be subjected to maybe

18         a -- a different facility or stricter scrutiny,

19         restrictions, do you know?

20    A    I --

21                   MR. BRANSON:  Object to form.

22    A    I don't know what happens within KDOC.

23    BY MS. WOODY:

24    Q    Okay.  So you don't know if that had any -- if

25         that had any effects on where the person would

1       be placed for incarceration or any kind of

2       restrictions that they would receive?

3    A   Again, I don't know the operations of -- of

4       KDOC, so that -- that's up to them on how they

5       deal with ...

6    Q   But they did routinely ask you for the

7       information?

8    A   Yes.

9    Q   Are there any other negative effects that --

10      well, let me ask it this way:  Let's -- let's

11      leave aside the bail and all those kinds of

12      things, the kind of legal part of it, all right,

13      if somebody's a documented gang member, would

14      they be subject to pretextual stops?

15   A   Pretextual?

16   Q   Yes.

17   A   There would have to be some other type of

18      activity that's going on, I mean, are you -- I

19      guess I'm not following your question there.

20   Q   Okay.  We've seen many, many incidents of where

21      people who are on the list are stopped for what

22      I would consider a relatively minor traffic

23      infraction, and that seems to happen to those

24      people repeatedly.

25   A   Okay.

```
 1   BY MS. WOODY:
 2   Q    Okay.  Did you have any -- was there any kind of
 3        extra monitoring or surveillance because
 4        somebody was on the gang list?
 5   A    That -- that would be fair to say.
 6   Q    And -- and -- and would that differ from --
 7        well, strike that.  So the fact that they were
 8        on the gang list would make you more likely to
 9        surveil them or monitor their -- their behavior?
10   A    Yes.
11   Q    Okay.  I'm going to switch topics here a little
12        bit, are you -- are you familiar with the term
13        mapping?
14   A    Yes.
15   Q    And what does mapping mean to you?
16   A    It's keeping certain individuals out of an area.
17        The -- the reason I know that is 'cause there's
18        the prostitution mapping that -- that the City
19        does, and we also had -- there's a drug mapping
20        program and -- and a gang mapping program.
21   Q    So explain to me generally how the mapping
22        programs work.
23   A    Again, this is set up through probation and
24        parole, not through us or the -- the Wichita
25        Police Department or the -- the gang unit
```

```
 1          specifically.  So as part of their conditions
 2          for probation, they are to stay out of certain
 3          areas that have been identified by the probation
 4          or parole area as being either high drug, high
 5          crime, violence area without having a legitimate
 6          reason to be there.
 7   Q     And what would be a legitimate reason to be
 8          there?
 9   A     I think some of the things that I remember, like
10          visiting a parent or going to work, school.
11          I -- I know those off the top of my head.
12   Q     Okay.
13                    MS. WOODY:  Let's mark these two.
14                       (Deposition Exhibit Numbers 29 and
15                        30 Marked for Identification.)
16                    THE REPORTER:  29 and 30.
17   BY MS. WOODY:
18   Q     Okay.  Take a look at -- at Deposition
19          Exhibit 29, which is Wichita 079679 through 681.
20          You see that?
21   A     Yep.  Yes, sorry.
22   Q     And so have you seen a document like this
23          before?
24   A     Yes.
25   Q     And what is this?
```

```
 1    A    This is these -- these are very similar to the
 2         prostitution maps that -- that the City has, but
 3         this is for the Sedgwick County Department of
 4         Corrections, which is labeled at the top, so
 5         these are the -- for Sedgwick County.
 6    Q    And it says central mapping zone, does that mean
 7         anything to you?
 8    A    I would assume that that means where the --
 9         where -- where they're talking about because
10         looking at the streets, this is more in the
11         central part of Wichita.
12    Q    And it looks like it's -- the defendant is a
13         person named Aubreon L. Davis.  Do you see that?
14    A    Yes.
15    Q    Do you know who Mr. Davis is?
16    A    I'm familiar with his name, yes.
17    Q    How are you familiar with his name?
18    A    I believe he's documented as a Blood.
19    Q    And if you take a look at the second page, it
20         says, Supervision Agreement, Gang Conditions --
21    A    Yes.
22    Q    -- you see that?  And so these are the -- I'd
23         like you to take a review of this and see if --
24         if these are -- if this refreshes your
25         recollection about what the gang conditions are?
```

```
 1                    MR. BRANSON:  Object to form.
 2    A    Again, the conditions have been different on --
 3         that I remember but they're -- these -- I have
 4         heard or seen these before in general overall, I
 5         guess, if that makes sense.
 6    BY MS. WOODY:
 7    Q    So is this some -- is -- is this something that
 8         the gang unit would be aware of if they were
 9         asked to assist probation and parole in -- in
10         determining whether any of these conditions have
11         been violated?
12    A    Yes.
13    Q    So whoever was doing that monitoring would be
14         familiar with the conditions on this person and
15         would be checking to make sure that they weren't
16         violating them; is that right?
17                    MR. BRANSON:  Object to form.
18    A    Who are you talking about monitoring?
19    BY MS. WOODY:
20    Q    The gang unit person?
21    A    Yeah, see, the -- I was never assigned a
22         specific person or -- or anything like that.
23         What normally would happen is that the probation
24         or corrections would contact us and say, would
25         you mind checking up on this guy or see if he's
```

1        in violation, or we would assist them when they

2        went out and did their checks and we would just

3        be there with them.

4    Q   Okay.  So sometimes you would get a call from

5        probation saying, we want to make sure this guy

6        is in -- living up to the conditions, and they

7        would ask you to go check.  Would they then have

8        to give you some of the conditions so you would

9        know what you were checking for?

10   A   Yes, they would either verbally tell -- I don't

11       remember -- I don't ever remember them sending

12       this specifically.  I mean, they'd usually just

13       tell us, he's got a 11:00 o'clock curfew, he

14       can't, you know, can't be drinking.

15   Q   Okay.  Take a look at page 3 of that document up

16       at the top, and it says number 12, I shall not

17       ride in a car with more than one person unless

18       those persons are my parents, siblings, or my

19       children.  Do you see that?

20   A   Yes.

21   Q   Does that strike you as a pretty strict

22       condition?

23                    MR. BRANSON:  Object to form.

24   A   It does.

25   BY MS. WOODY:

```
 1   Q     Does Wichita have a great public transportation
 2         system?
 3   A     I don't know, I don't use it.
 4   Q     Okay.  Do you think it might be difficult to get
 5         from one place to another if you didn't have
 6         your own car in Wichita?
 7                   MR. BRANSON:  Object to form.
 8   A     Could be.
 9   BY MS. WOODY:
10   Q     Take a look at number 15, it says, I shall not
11         associate with family members or extended family
12         who are documented gang members.  Exception
13         would be immediate family only, i.e., brother,
14         sister, parents, no cousins.  Do you see that?
15   A     Yes.
16   Q     So in your experience, in certain communities do
17         large numbers of people frequently live at the
18         same place?
19                   MR. BRANSON:  Object to form.
20   A     Could you ask that again?
21   BY MS. WOODY:
22   Q     Sure.  In your experience, in certain
23         communities do large numbers, I'll -- I'll
24         change it a little bit, do large numbers of
25         extended family often live at the same place?
```

1                    MR. BRANSON:  Object to form.

2    A    I don't really know how to answer that.  I mean,

3          I've seen houses that have lots of people in

4          them, and I've been to houses that only have one

5          person in there, so I -- I mean ...

6    BY MS. WOODY:

7    Q    So if this person was living in a place that

8          their cousins were also living --

9    A    Right.

10   Q    -- and their cousins had been designated on the

11         gang list, the very fact that they were staying

12         in their house would be a violation of probation

13         conditions, correct?

14                   MR. BRANSON:  Object to form.

15   A    According to this, yes.

16   BY MS. WOODY:

17   Q    Okay.  And then on number 17, it says, I will

18         remain out of the restricted zones as indicated

19         below and outlined in the attached mapping zone

20         form, if required now or in the future.  The

21         only exception is Monday through Friday 6:00 to

22         9:00 -- 6:00 a.m. to 9:30.  You see that?

23   A    Yes.

24   Q    And then it's checked central zone, right?

25   A    Yes.

```
 1   Q     And so if we look back at that map, is that map

 2         saying you can't go into this area between the

 3         hours of 9:30 at night and 6:00 a.m. in the

 4         morning?

 5   A     Yes.

 6                     MR. BRANSON:   Object to form.

 7   BY MS. WOODY:

 8   Q     Okay.  And if you look down on the first page

 9         again, it says -- it says commencing 8/13/20.

10         You see that?

11   A     Yes.

12   Q     Through 7/21/22, correct?

13   A     Yes.

14   Q     And is that the -- do you understand that to be

15         the period of time that that person is on --

16         subject to these conditions?

17   A     It could be, I -- I -- I don't know, I don't

18         fill this form out.

19   Q     Okay.  That'd be something for corrections -- or

20         for Sedgwick County to answer?

21   A     Yes.

22   Q     All right.  Take a look at Exhibit 30 and it's

23         for a defendant named Isaiah Carter.  Do you see

24         that?

25   A     Yes.
```

```
 1   Q   Do you know Mr. Carter?
 2   A   I think he's -- he's identified as a gang member
 3       in the database, I'm not sure what gang.
 4   Q   Okay.  And it looks like, it says, being in this
 5       zone can automatically violate the defendant's
 6       probation.  Do you see that?
 7   A   Yes.
 8   Q   And can you identify this zone, does this mean
 9       anything to you?
10   A   This -- I mean, looking at the -- it looks like
11       it's South Broadway from -- from Waterman all
12       the way down to 47th Street.
13   Q   Okay.  And then if you look at the next page,
14       that's an additional area --
15   A   Yes.
16   Q   -- correct?  And this one, I'm sorry, this one
17       on this page is called north mapping zone.  Do
18       you see that?
19   A   Yes.
20   Q   And the first one is south mapping zone, you see
21       that?
22   A   Yes.
23   Q   So Mr. Carter will be in violation of his
24       probation if he is in either south or north
25       mapping zone, is that what you understand?
```

```
1                    MR. BRANSON:   Object to form.
2      A      According to this form, yes.
3      BY MS. WOODY:
4      Q      Okay.
5                    MS. WOODY:   Could you mark this one
6            for me?
7                         (Deposition Exhibit Number 31
8                         Marked for Identification.)
9      BY MS. WOODY:
10     Q      Lieutenant Beard, I've handed you what's been
11            marked Deposition Exhibit 31, which is Wichita
12            079863.
13     A      Yes.
14     Q      And it's entitled up at the top, WPD/County
15            Corrections Gang Mapping.   Do you see this?
16     A      Yes.
17     Q      Is this a document that you've seen before?
18     A      I think I may have seen this actually in, like,
19            a -- a digital copy, like an email or something.
20     Q      Okay.
21     A      Not an actual hard copy.
22     Q      And what do you understand this to be?
23     A      This is a project that Officer Byers was working
24            on; he was working with community corrections in
25            reference to the drug mapping program, and he
```

1          had contacted corrections about implementing a

2          gang mapping program.  And so he had set up

3          these meetings with them and got this set up.

4          And his request for us was just to let them know

5          who was documented as a gang member and if they

6          would, you know, be applicable for this -- this

7          project that he's working on.

8     Q    And -- and explain the project to me, if you

9          can.

10    A    Well, my understanding from -- from Officer

11         Byers was that they would keep gang members out

12         of certain locations in reference to their

13         probation or parole, and my understanding was

14         those locations were either chosen by -- well,

15         they were chosen by the probation or parole

16         officer.  I thought it had to do with where the

17         offense occurred, and that's why they were

18         mapped out of a certain location because that's

19         where the offense occurred and that's why there

20         was different ones.  And then they would -- they

21         would have to stay out of those certain areas.

22         This was a new program, and I think there was

23         only, like, 10, maybe 15 people that ever got

24         put on this program.

25    Q    When -- when was this program started?

1    A    **Well, he started the drug program before then,**

2         **but I think it was sometime in 2019, 2020.**

3    Q    Okay.  And is it still in effect?

4    A    **No.**

5    Q    You said -- so it was in effect for a while and

6         then it --

7    A    **Yes.**

8    Q    -- stopped?

9    A    **Yeah.**

10   Q    Okay.  Let's take a quick break.

11                  THE VIDEOGRAPHER:  Go off the record

12          at 2:43 p.m.

13                      (Thereupon, a recess was taken;

14                      whereupon, the following was had.)

15                  THE VIDEOGRAPHER:  Okay.  We're back

16          on the record at 2:51 p.m.

17   BY MS. WOODY:

18   Q    Lieutenant Beard, I want to talk about another

19        area where -- where you have some experience,

20        and that is in gang-related testimony, okay?

21   A    **Yes.**

22   Q    So can you explain to me what gang-related

23        testimony is?

24   A    **So often gang testimony comes in because of --**

25        **to explain the inexplicable is one of the -- to**