# EXHIBIT 06



**Pohlman**USA®

## Court Reporting and Litigation Services

---

Jeff Easter  -  Volume I

May 18, 2023

---

Progeny, et al.

vs.

City of Wichita, Kansas

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS


PROGENY, et al,           )    Case No.

vs                     )    6:21-CV-01100-EFM-ADM

                         )

CITY OF WICHITA, KANSAS, )

Defendant.             )

VIDEO-RECORDED ZOOM DEPOSITION OF

JEFF EASTER

VOLUME I


May 18, 2023

10:42 a.m.



Taken at:

Stinson Law Firm

1625 North Waterfront Parkway, Suite 300

Wichita, Kansas




Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR

1          Q.    What was the Gang Unit back in

2    1996-'98?  Was it the same as it is today with Gang

3    Intelligence officers or --

4          **A.    It was Gang Intelligence officers and**

5    **at that point they pretty much worked first shift.**

6          Q.    Okay. Just explain what first shift is

7    for us.

8          **A.    Somewhat eight to five hours.  They did**

9    **periodically ride different shifts on 2nd and 3rd**

10   **shift but their main hours were 8 to 5.**

11         Q.    Just tell us what second shift is and

12   what 3rd shift is as well.

13         **A.    Second shift is generally 2:30 p.m. to**

14   **10:30 p.m..  Third shift is 10:30 p.m. to 7:00 a.m.**

15         Q.    What were the responsibilities of the

16   Gang Unit back in 1996?

17         **A.    Again, I didn't work in the unit but**

18   **their main responsibilities were to insure that**

19   **individuals that were being placed on the list, we**

20   **had what was called TOPS cards that officers would**

21   **send in with their belief of individuals that were**

22   **gang members.  The Gang Intelligence section would**

23   **do all the backgrounds on those particular people**

24   **and then see if they fit at that point the WPD**

25   **criteria to be on the gang list.  They would also**

1    research those individuals once a year and see if

2    those individuals would no longer fit the criteria

3    and they would pull them from the list.  They would

4    also go out and do gang enforcement with the SCAT

5    teams, which back then most of the gang members

6    were selling narcotics and so that was generally

7    the enforcement along with the violent crime that

8    involved the gang members at the time.

9          Q.    Okay.  You say that the WPD had

10   criteria then with respect to the TOPS cards.

11         A.    Correct.

12         Q.    What criteria was the WPD using back in

13   the 1996-'98 time frame?

14         A.    It was very similar to what the state

15   law is now.  For me to be able to go through each

16   one of those criteria I'm not going to be able to

17   do that for you.  I haven't done that business for

18   14 years and we're talking 1997 for that.  So I

19   know you had to fit three of the criteria to be put

20   on the list as a gang member.  Some of that

21   criteria that I recall is that they self-admitted

22   that they were gang members; that they committed

23   violent crimes that were gang-related and that they

24   wore similar colors.  It was a criteria of the gang

25   was three or more people that are involved.  That's

1    just generally -- there was more to it but I don't

2    remember what all of that is without somebody

3    putting a paper in front of me and saying yes,

4    those are it.

5            Q.   When you joined the WPD was there a

6    Gang Unit at that point in time?

7            A.   Yes, there was.

8            Q.   Who was in the Gang Unit?

9            A.   It was an Officer Baughman and Officer

10   Carey.

11           Q.   Just those two?   Were they the complete

12   Gang Unit?

13           A.   Yes, ma'am.

14           Q.   And what did they do?

15           A.   A lot of times if we were out on

16   violent crimes such as drive-by shootings,

17   homicides, those type of things, they would come by

18   if it appeared that there were gang members

19   involved.   At that point I don't believe there was

20   any type of criteria and it was a very loosely put

21   together type unit along with criteria to actually

22   say people were gang members.

23           Q.   When you say criteria, you mean the

24   criteria was loose as well?

25           A.   Yes.   I don't believe there was any

1   criteria at that point.

2           Q.   Do you know how those individuals then

3   decided that people were members of gangs?

4           A.   I do not.

5           Q.   Do you know when the criteria came into

6   effect?

7           A.   I know when I was assigned to the TOPS

8   Unit in '97 there was a criteria that had been

9   created and it was being followed.

10          Q.   Do you know who created it?

11          A.   I do not.

12          Q.   Was John Spear involved in creating it?

13          A.   I do not know if he was involved at

14   that point at all.

15          Q.   Do you have any idea of anyone who was

16   involved in developing the criteria?

17          A.   Again, I wasn't part of the Gang Unit

18   at that point.  I was out on the streets.  You

19   know, I can give you the names of the folks that

20   were in the Gang Unit at the time.  Maybe they can

21   tell you how that was created but I would be

22   guessing because I do not know.

23          Q.   Sure.  Why don't you give me their

24   names.

25          A.   That would be Lance Darling, Tracey

1    Repp.

2              MR. COOPER: Can you spell that?

3         A.    Tracey, T-R-A-C-E-Y; R-E-P-P; Carlton

4    Rogers.  There was a 4th one but I do not remember

5    who that was at this point.

6         Q.   (By Ms. Woody) So by the time you were

7    there in 1996 they were already using some criteria

8    and I think you said that at the time you think it

9    was similar to what the criteria is being used

10   today; is that right?

11        A.    That is correct.

12        Q.   But you don't know exactly how that

13   criteria was arrived at?

14        A.    No, I do not.

15        Q.   Do you know at the time you were -- at

16   the time you joined the police force was there

17   anything such as a gang list or a gang database?

18        A.    At the time that I joined it no, there

19   was not.

20        Q.   At some point in time after you joined

21   did there become a gang list or gang database?

22        A.    Yes, there did.

23        Q.   When was that?

24        A.    I know that I believe it was in

25   1998-'99 time frame there was a grant that was

1          Q.   Was it called -- was it Policy No. 527

2     at that time?

3          A.   Ma'am, I don't remember the policy

4     number on it.

5          Q.   Okay. So after you became the

6     lieutenant over the Gang/Felony Assault Unit, did

7     you make any changes to that policy regarding the

8     gang database?

9          A.   Well, I would have had to make policy

10    changes because I'm the one that authored at the

11    authority of the mayor, which was Carl Brewer, and

12    the police chief, which was Norman Williams, the

13    state statute on gang laws and so once that state

14    statute, what I wrote and submitted was there was

15    changes made going through the legislative process

16    and then when they passed that legislation then I

17    updated that policy to reflect exactly what was in

18    the state statute.

19         Q.   Okay.  So you are the individual who

20    actually drafted the policy that then went to

21    legislation and became state law; is that right?

22         A.   I drafted the state law proposal.

23         Q.   Okay, and when you say the state law

24    proposal, did that include criteria and those kind

25    of things?

1          A.    Yes, ma'am, it did.

2          Q.    And I think you said you drafted the

3    state law proposal at the request of Mayor Brewer

4    and Chief Williams; is that right?

5          A.    Mayor Brewer and yes, ma'am.

6          Q.    Brewer, excuse me, and Chief Williams?

7          A.    Yes, ma'am.

8          Q.    And then so roughly when was that?

9          A.    2007.

10          Q.    Do you recall as it went through the

11    legislative process any changes that were made to

12    your proposal?

13          A.    I don't recall what the changes were.

14    However, there was changes made by the legislative

15    committees on the original proposal.

16          Q.    Do you recall what -- did you have any

17    concern about any of those changes that were made?

18          A.    No, ma'am, I did not.

19          Q.    Did you think they were significant

20    changes from what you had proposed?

21          A.    No, they were not.

22          Q.    So it mostly followed the proposal that

23    you had drafted; is that correct?

24          A.    Yes, ma'am.

25          Q.    And how did you go about drafting that

1    proposal? What did you use to come up with that

2    proposal for the state law?

3             A.    So there were several things that

4    happened there.   During that time frame and prior

5    to that time frame we were having a lot of violent

6    crimes mainly perpetrated by gang members.   We had

7    a lot of narcotics trafficking that was being

8    perpetrated by gang members as well and so the

9    mayor had tasked us, even when I was a sergeant, so

10   this started when I was a sergeant, that we meet

11   with the community; mainly the northeast Wichita

12   community, which is predominantly African American,

13   to come up with a gang plan on how to address the

14   issues taking place with the gangs here in Wichita.

15   We had numerous meetings with the groups of

16   citizens from the NAACP to different church groups

17   that had members in it to other neighborhood

18   association presidents, some of their members and

19   those meetings were taking place for almost a year.

20   So we came up with a gang plan.   We also -- there

21   was questions about the gang criteria that we were

22   using.   There was questions about why it doesn't --

23   Hutchinson and Salina and other people have that

24   kind or other departments have that kind of

25   criteria in amongst their departments because a lot

1   of those departments had nothing, but they were

2   saying that these people were gang members in their

3   community.  So through those meetings and through

4   the guidance of Chief Williams, Lieutenant Spear at

5   the time and Captain Coy Lee and Colonel Tom

6   Stoltz, they were all involved in those meetings as

7   well.  When I became the Gang/Felony Assault

8   lieutenant we had the gang plan in place and then

9   the discussions started more so with the different

10  groups in reference to the criteria.  So I reached

11  out to different departments around the state of

12  Kansas.  I know that Kansas City, Kansas had a very

13  similar gang policy and very similar type of gang

14  criteria and it was very obvious that there was no

15  set standard in the state of Kansas.  So I

16  researched several states, including Florida,

17  Kentucky and Georgia where they had state laws in

18  place.  A lot of their criteria was similar to what

19  we had already and so I drafted the state law

20  change to create state law for gang criteria in the

21  state of Kansas based upon some other states laws.

22  I submitted that.  The process over there is I had

23  to submit it to the Law Department who made some

24  minor changes, who then submitted it to the

25  Legislature for them to put into a committee,

1   debate it and then take a vote on it.

2        Q.   And you say you started working on this

3   when you were as a sergeant; is that right?

4        A.   The gang plan was as a sergeant.  As a

5   lieutenant I was asked -- during the gang plan

6   discussions the criteria came up and so once I

7   became a lieutenant because of the research I had

8   done already as a sergeant on the criteria, I was

9   asked by the Chief and the Mayor to put together a

10  state law proposal for the criteria itself.

11       Q.   Okay.  When you talk about the gang

12  plan, explain what that was.

13       A.   We, several years prior when I was a

14  beat officer, when we had a lot of violent crime, a

15  lot of shootings, a lot of drive-by's in the early

16  '90s, there was no plan.  So what happened is, is

17  individuals or officers from different bureaus were

18  placed in the North Bureau to crack down on the

19  violent crime.  We learned from our mistakes on

20  that because pretty much the gang members would go

21  under because they knew there were no more cops so

22  the only people that were really being stopped and

23  ticketed were citizens that had nothing to do with

24  gang crime; they just lived there and there was

25  quite the amount of frustration from the community

1    about that and so when we had a resurgence in gang

2    crime and violent crime the decision was made to

3    sit down with citizens and map out a gang plan that

4    was put into writing.

5        Q.   What was in that gang plan?

6        A.   How we were going to target specific

7    individuals that were committing the crimes; how we

8    would go about enforcing those type of different

9    type of enforcement tools that we were doing

10   specific to the individuals that were perpetrating

11   those crimes; how we would communicate at

12   neighborhood associations with the amount of crime

13   that was taking place in their neighborhoods.  We

14   would update them on cases that were taking place

15   and we would involve them more in Wichita Police

16   Department operations.

17       Q.   When you say you were going to target

18   the individuals, what do you mean by that and how

19   was that going to be accomplished?

20       A.   Individuals that were suspects in

21   cases, that we would conduct surveillance on them

22   and any type of crime that they committed, that we

23   would hold them responsible for that by arresting

24   them, sticking charges on them and hopefully

25   convictions.  Also, once they were convicted --

1    also, once they were convicted we monitored, along

2    with Parole and Probation, their -- that's what the

3    TOPS Unit did.   We monitored if they were abiding

4    by the rules that their probation or parole officer

5    put on them because there's not enough parole or

6    probation officers to monitor them to make sure

7    that they are not drinking, to make sure that they

8    were within curfew and they were not committing new

9    crimes.   So we supplemented that and we

10   communicated that information in our gang plan with

11   the citizens of Wichita.

12        Q.   Did the gang plan have anything to do

13   with the specific probation or parole conditions

14   that would be imposed on somebody who was

15   designated a gang member?

16        A.   The gang plan did not.   However, state

17   statute did.

18        Q.   And when you say that what do you mean?

19        A.   Part of the state statute was if you

20   were a known gang member and committed a violent

21   crime your bond was automatically set at $50,000.

22        Q.   Was that something that you drafted?

23        A.   It is.

24        Q.   What did you base that on?

25        A.   Other laws and the fact that a lot of

1  get sign off from somebody else in the D.A.'s

2  Office for that?

3        A.    I don't know the answer to that.

4        Q.    Do you happen to recall her having any

5  discussions with you about who or about what

6  discussions were from the D.A.'s Office about that

7  bond number?

8        A.    So her boss would have been Kim Parker.

9  The DA at the point was Nola Foulston.  I do know

10  that she didn't make the decision on her own but

11  she would have to speak with them.  I wasn't privy

12  to those discussions and she relayed back to me

13  that they were fine with that proposal.

14        Q.    Okay.  So then that went on to the

15  State, went into the state proposal and went on to

16  become law under statute; is that correct?

17        A.    That is correct.

18        Q.    And I guess my initial question was a

19  little bit different than that so I kind of want to

20  circle back to that.  In Wichita, people who are

21  designated as gang members get more restrictive

22  parole and probation conditions and I wanted to

23  know if part of the gang plan involved beefing up

24  and making more restrictive those conditions of

25  probation and parole.

1                    MR. COOPER: Object to form.

2            A.    So the reason the TOPS Unit was created

3     was specifically for that because we, when you have

4     more drive-by shootings than there are days in the

5     week, our homicides were a lot higher, most of

6     which was gang-related.  The Chief and at the time

7     the colonel and those types of folks were like what

8     are we going to do to curb some of this because we

9     have -- we were hearing from the citizens, mainly

10    in northeast Wichita, that they were scared to

11    death to even be outside and so that's the time

12    that we started meeting with them, started talking

13    about additional type of -- I'm trying to search

14    for the word here, probation type items,

15    restrictions placed upon known gang members that

16    they couldn't affiliate at certain places; that

17    they couldn't affiliate with other gang members;

18    they couldn't wear colors, those types of things.

19    Were those placed onto known gang members as

20    restrictions by Probation and Parole, yes, they

21    were.

22            Q.    And was it the TOPS unit that suggested

23    those restrictions or formulated them?

24                    MR. COOPER: Object to form; foundation.

25            A.    I know when I was in the TOPS Unit with

Page 46

1    the detectives and I was only an officer there,

2    those were the things that were automatically put

3    onto known gang members that had committed violent

4    crimes.  We then would educate officers that if you

5    see such and such wearing gang colors to notify us

6    in the TOPS Unit.  If you see them, here's their

7    restrictions and where they could be and where they

8    couldn't be, to notify us through a report.  We

9    would get those reports, we would take them over to

10    the Probation and Parole, present those reports to

11    them and then Probation and Parole would handle the

12    issue from that point forward.

13         Q.   But what I'm trying to understand is

14    the actual conditions and restrictions that were

15    suggested, did that come out of the WPD or was that

16    something that the WPD suggested to Parole and

17    Probation that those conditions be made more

18    restrictive?

19              MR. COOPER: Object to form; foundation.

20    You may answer.

21         A.   I wasn't part of the TOPS Unit.  I know

22    we met with Probation and Parole on a consistent

23    basis.  When I came to the TOPS Unit those things

24    were already in place, those type of restrictions.

25         Q.   (By Ms. Woody) So that was already in

1   would provide additional information at the

2   request.  If there was additional information that

3   Probation or Parole requested we would provide all

4   of that over e-mail and/or phone calls.

5        Q.   Was that still going on at the time you

6   left the WPD in 2012?

7        A.   Well, it was still going on when I was

8   promoted to the rank of captain.

9        Q.   Do you know if it's still going on

10   today --

11        A.   I have no idea.

12        Q.   -- at the WPD?  Was one of the purposes

13   of the more restrictive parole and probation

14   conditions to actually try to put gang members back

15   behind bars?

16             MR. COOPER: Object to form; foundation.

17        A.   The answer to that is absolutely.

18   Because of the amount of carnage they were causing

19   here in Wichita, even if we could put them behind

20   bars for 60 days, that meant 60 days that they

21   weren't out here victimizing people.

22        Q.   (By Ms. Woody) And when you talk about

23   known gang members, those are people in the gang

24   database; is that right?

25        A.   That is correct.

1   other than in the early '90s, yes, those

2   discussions took place in the early '90s.

3           Q.   But after the criteria was put into

4   place, after the initial scrubbing and you had the

5   criteria put in place, were you aware of anybody

6   within the WPD who had concerns about any of the

7   criteria being appropriate or overinclusive or

8   anything like that?

9           A.   Within the WPD -- so I'm trying to

10  think here is, I'm trying to remember if after the

11  TOPS Unit and when I left there to become a

12  detective if there were some changes in the

13  criteria because I know when I got back to the Gang

14  Unit as a sergeant that is pretty much the same

15  criteria other than what I drafted for state law

16  and there were some changes made by the Law

17  Department and the legislation, there was some

18  changes to the criteria that was made that was set

19  into state law than what I proposed.

20          Q.   During our discussions do you now have

21  any recollection of what those changes were?

22          A.   I'm sorry, I do not -- yeah, I do not

23  remember what those were.

24          Q.   But I think you said it was not really

25  significant and were minor changes.  Is that still

1    accurate?

2         A.   A lot of it was some language change,

3    not necessarily criteria change.   There was debate

4    in the Legislature about some of the criteria by a

5    couple of senators at the time but I just witnessed

6    those when I was testifying.

7         Q.   Okay, and do you recall which senators

8    those were?

9         A.   I know one was Senator Haley from

10   Kansas City.

11        Q.   Do you recall what the senator's

12   concerns were?

13        A.   Some of the same concerns that you are

14   bringing up today.

15        Q.   Well, tell me what you understand the

16   senator's concerns to be.

17        A.   That it's intrusive; that it's

18   overreaching.   Those type of things.

19        Q.   Okay.   You said that -- I think you

20   said that within the WPD you didn't remember

21   anybody raising those concerns about the criteria.

22   Other than the senators outside of the WPD, do you

23   remember at any time anybody raising concerns about

24   any of the criteria being inappropriate or

25   overbroad or overinclusive or vague or anything

1    like that?

2            A.   Within the department, no, I don't

3    remember that.

4            Q.   Okay. How about outside the department?

5            A.   Yes.   There was some -- during some of

6    our meetings with the community there was questions

7    about the criteria.   There was questions about how

8    this criteria was developed, those type of things.

9            Q.   What did you tell -- what were some of

10   the responses to those questions?

11           A.   Generally in those meetings, because I

12   was a sergeant, that was handled by the Chief of

13   Police who was at the same meetings and basically

14   this criteria was also based off of -- it was very

15   similar to what LAPD had and some of the other

16   larger departments across the nation and I do

17   recall him explaining hey, this has been vetted by

18   these other departments.   We have had this for a

19   while and that the police department was

20   comfortable with our vetting process and was

21   comfortable with our audit process.

22           Q.   So you had mentioned that you looked to

23   Kentucky and Georgia, some states like that, but

24   also people were looking to like LAPD and any other

25   big cities that you can recall?

1            A.    LAPD, Chicago PD.   There was another

2    West Coast one.   I think it was San Diego PD that

3    was looked at as far as their original criteria for

4    gang membership.

5            Q.    Okay, and that was incorporated into

6    the state proposal that you made?

7            A.    No.   That was done prior to -- when the

8    original criteria was developed, what I recall and

9    what I remember about that is some of the

10   discussions is that they looked at some of those

11   departments on the original criteria.   When I

12   looked at state law I looked at state laws in

13   different states related to the gang criteria and

14   that was Georgia, Kentucky and Florida.

15           Q.    Okay, and did that change the

16   criteria -- did you change any criteria from what

17   the WPD had based on anything in those other state

18   statutes?

19           A.    I think there was some other -- again,

20   I would have to look at the criteria again.   I

21   think there was some additional items that were

22   placed into the state law that originally we did

23   not have in our original criteria.

24           Q.    But you don't recall sitting here today

25   what those were?

1          A.   No, because it added the number of
2   criteria that we looked at and so I know there was
3   one or two additional criteria but I don't remember
4   exactly which those were.
5          Q.   Okay, and that's something that you
6   would have added from looking at those other state
7   statutes?
8          A.   Correct, and that's also where the
9   $50,000 bond actually came from was looking at
10  other states statute on it.
11         Q.   Okay.  So once the state -- you
12  testified -- how many times did you testify in
13  support of the state statute; do you recall?
14         A.   One time.
15         Q.   Okay, and that's the time where you
16  heard at least a couple of senators raise some
17  issues about the criteria being overbroad; is that
18  accurate?
19         A.   Yes.  It was in the Senate.
20         Q.   After the state statute was enacted,
21  and when was that, do you recall the initial date
22  that it was enacted?
23         A.   It would have been -- I'm pretty sure
24  it was 2007 so it would have been enacted -- should
25  have either been July of 2007 or July of 2008.  I