# EXHIBIT 07



# **Pohlman**USA®
## Court Reporting and Litigation Services

Lieutenant Chad Beard  -  Volume II

May 25, 2023

Progeny, et al.

vs.

City of Wichita, Kansas

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS


PROGENY, a program of Destination )

Innovations, Inc., CHRISTOPHER    )

COOPER, ELBERT COSTELLO, MARTEL   ) Case No.

COSTELLO, and JEREMY LEVY, JR.,   ) 6:21-CV-01100-

on behalf of themselves and       ) EFM-ADM

others similarly situated,        )

Plaintiffs,                       )

vs                                )

CITY OF WICHITA, KANSAS,          )

Defendant.                        )

_____ )

VIDEO-RECORDED 30(B)(6) ZOOM DEPOSITION OF

CHAD BEARD

VOLUME II

May 25, 2023

10:04 a.m.


Taken at:

Stinson Law Office

1625 North Waterfront Parkway, Suite 300

Wichita, Kansas

Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR

1  with the correction.

2       A.   Yes, and the department knew about

3  Deputy Chief Salcido's concerns prior to the

4  deposition.

5       Q.   Okay.

6       A.   I wanted -- I made a mistake on that.

7  I wanted to make sure that that's accurate.  He let

8  others know about his concerns prior to the

9  deposition.

10      Q.   Okay, certainly.  When did -- prior to

11  the deposition, when did Deputy Chief Salcido let

12  others know about the concerns he had with the gang

13  list?

14      A.   The department was made aware of these

15  issues in the spring of 2021.

16      Q.   Do you recall related to Deputy Chief

17  Salcido's issues with the gang list any other

18  conversations prior to that?

19      A.   The department was unaware of any other

20  conversations.

21      Q.   Okay.  How did Deputy Chief Salcido

22  make the department aware of his concerns?

23      A.   Deputy Chief Salcido spoke with myself

24  and Captain Stevens about forming a community board

25  or gang board in reference to the racial makeup of

1    **the database.**

2        Q.   Did you ever form that community board

3    or gang board?

4        **A.   The department never did, no.**

5        Q.   Why not?

6        **A.   My understanding is because the lawsuit**

7    **had already been filed and prevailing party status**

8    **would apply.**

9        Q.   Any reason you couldn't go ahead and

10   make those changes even during the course of the

11   lawsuit?

12       MR. BRANSON: Object to form; asked and

13   answered.

14       **A.   Again, prevailing party status would**

15   **apply.**

16       Q.   (By Mr. Vogel) And going back to, we

17   have been referring to them as issues.  You

18   mentioned that the issues were the racial makeup of

19   the gang list; is that accurate?

20       **A.   Yes.**

21       Q.   Any other issues that Deputy Chief

22   Salcido raised to the department?

23       **A.   Yes.**

24       Q.   What were those issues?

25       **A.   A process to have a person removed and**

1    a notification process.

2         Q.   Any other issues that you are aware of

3    with regard to Deputy Chief Salcido?

4         A.   No.

5         Q.   What about the racial makeup of the

6    gang list was an issue in your discussions with

7    Deputy Chief Salcido?

8         A.   I'm sorry, you're going to have to say

9    that question again.

10        Q.   Sure.  I'll rephrase.  Could you

11   describe the nature of concern that Deputy Chief

12   Salcido had when you refer to him raising the issue

13   of the racial makeup of the gang list?

14        A.   Deputy Chief Salcido's concerns were of

15   persons of color being overrepresented in the

16   database; specifically, African American and

17   Hispanic.

18        Q.   Anything beyond that?

19        A.   And again, are you speaking of just of

20   the racial makeup issue or are you talking about

21   the other issues?

22        Q.   Specifically the racial makeup issue at

23   this point.

24        A.   That's the only concern that Deputy

25   Chief Salcido made.

```
1   answering that question?

2        A.   The department is aware that African

3   American and Hispanic individuals make up the

4   majority of the gang database.

5        Q.   Why is that?

6             MR. BRANSON: Object to form.  Why is

7   what?

8        Q.   (By Mr. Vogel) Why -- do you mind

9   reading his answer to the question, please.

10            (Whereupon the Answer: "The department

11   is aware that African American and Hispanic

12   individuals make up the majority of the gang

13   database," was read back.

14       Q.   Why do African American individuals and

15   Hispanic individuals make up the majority of the

16   gang database?

17            MR. BRANSON: Object to form.

18       A.   It's based -- the department is aware

19   that individuals documented into the database based

20   on individual or group criminal activity and if

21   they meet the requirements of K.S.A. 21-6313.

22       Q.   (By Mr. Vogel) So have you done, have

23   you done -- has the department done any research

24   into why African American and Hispanics are

25   overrepresented in the gang database?
```

1       A.    The department is not aware of any

2   research that's been done.

3       Q.    Do you have any plans to do any

4   research to that effect?

5       A.    The department may.

6       Q.    Are there currently any plans?

7       A.    Currently there are no plans.

8       Q.    Has there been any discussion to raise

9   the issue further?

10      A.    Currently, no.

11      Q.    You also mentioned two other issues

12  regarding Deputy Chief Salcido's concerns, one

13  being process of removal.  Do you currently have a

14  removal process for the gang database, for members

15  on the gang database?  I'm sorry, and what was your

16  answer, I'm sorry?

17      A.    Yes.

18      Q.    What is that removal process?

19      A.    The Wichita Police Department allows

20  individuals to be removed from the gang database

21  after a time period of three years if there is no

22  ongoing criminal activity, arrests or identified

23  gang activity.

24      Q.    What can a person who is listed on the

25  gang list, what can that person do to initiate a

1    removal?

2          A.    Through the Wichita Police Department

3    there is no official process for a person to become

4    removed if they reach out other than providing that

5    they do not involve themselves in criminal behavior

6    and gang activity.

7          Q.    How long has that been the case?

8          A.    Since 2003.

9          Q.    Has anybody prior to Deputy Chief

10   Salcido raised the issue of there not being a

11   removal process that an individual can initiate?

12         A.    The City is unaware of any of that.

13         Q.    To your recollection, have there been

14   any discussions regarding such a process?

15         A.    There have been discussions, yes.

16         Q.    When were those discussions held?

17         A.    The City is aware that those

18   discussions took place in reference to mediation in

19   this lawsuit.

20         Q.    Any other discussions that you are

21   aware of?

22         A.    The City is not aware of any other

23   discussions.

24         Q.    And then the 3rd issue that we

25   discussed with Deputy Chief Salcido was a

```
 1   notification process; is that accurate?
 2          A.   Yes.
 3          Q.   Do you have a notification process
 4   for when an individual is added to the gang
 5   database?
 6          A.   That's a yes and no.  We have a
 7   notification process for juveniles; no notification
 8   process for adults.
 9          Q.   Is there a formal written policy
10   regarding a notification to juveniles when they
11   have been added to the gang list?
12          A.   Yes.
13          Q.   And what is that?
14          A.   Are you asking for the policy or for
15   what?
16          Q.   I asked for the policy.
17          A.   Policy 527.
18          Q.   Okay, and that, and correct me if I'm
19   wrong, that details the formal process that the
20   Wichita Police Department would go through for
21   notifying a juvenile if they have been added to the
22   gang list; is that accurate?
23          A.   We would -- the department would notify
24   the legal guardian or the parent of the juvenile.
25          Q.   Okay, and is that policy still in
```

1    effect?

2           A.    Yes.

3           Q.    Has that continued to be the practice

4    of the Wichita Police Department?

5           A.    Yes.

6           Q.    How does the Wichita Police Department

7    go about notifying the guardian of a juvenile when

8    they have been added to the gang list?

9           A.    **The current practice of the Wichita**

10   **Police Department for notification of juveniles**

11   **will consist of either phone calls or personal**

12   **contact.**

13          Q.    Anything beyond that?

14          A.    **Prior to that the Wichita Police**

15   **Department had sent notifying letters but that was**

16   **discontinued because of a lack of response.**

17          Q.    How often would you say that the

18   officers in the Gang Unit or more broadly the

19   department are able to make contact with the

20   juvenile's guardian?

21          A.    **The City does not have that exact**

22   **number.**

23          Q.    Are you aware of instances when they

24   are unable to contact the guardian?

25          A.    Yes.

1        Q.   And what happens in that case?

2        A.   The Wichita Police Department does not

3   set a specific amount of time or excuse me, amount

4   of how many times the Gang Intelligence officers

5   may have to try to reach out but there are

6   several -- it's common practice that they will make

7   several attempts and if they can't then we stop.

8        Q.   Is that documented?

9        A.   Yes.

10       Q.   What is that information documented?

11       A.   That information will be documented in

12   the gang database.

13       Q.   If a juvenile is reactivated for lack

14   of a better term, please correct me if I'm wrong,

15   but I'm referring to the act of increasing their

16   continued time on the gang list for a three-year

17   period.  If a juvenile is reactivated is there any

18   notice in that instance?

19       A.   The department is unaware of any

20   renotification if a juvenile is re-added to the

21   list or I guess the question -- if you want to

22   clarify it, are you talking about re-adding

23   somebody or just updating their information?

24       Q.   Let's do that.  So updating the

25   information.

1          A.    Updating, there's not a common practice

2    for the Wichita Police Department to re-notify the

3    juvenile.

4          Q.    Is there a policy that would describe a

5    notification process for that instance?

6          A.    For being re-added?

7          Q.    For updating information.

8          A.    The Wichita Police Department, there is

9    no notification process if a person is updated.

10          Q.    So if they are re-added to the list, so

11    what do you mean by re-added first?

12          A.    An individual may come off the database

13    or may be made inactive and if they were going to

14    be reactivated as a member or an associate they

15    would have to meet state criteria again.  That's

16    what the City is referring to when we talk about

17    re-adding somebody, so they are added back to or

18    made from inactive back to active.  Currently

19    there's no common practice to re-notify or notify

20    them again if they were re-added.

21          Q.    Okay.  Regarding adults, any

22    notification process for adults?

23          A.    No.

24          Q.    So let's break that down.  Any

25    notification for an adult if they are initially

1    added to the gang list?

2          A.    No.

3          Q.    Any notification to an adult if

4    information is updated on the gang list about that

5    adult?

6          A.    No.

7          Q.    Any notification to an adult if they

8    are re-added to the gang list?

9          A.    No.

10         Q.    Then you mentioned you spoke with --

11   let's stick with the documents I guess for a

12   minute.  Are there any other documents other than

13   in Deputy Chief Salcido's or Sheriff Easter depo

14   that you reviewed?

15         A.    Yes.

16         Q.    What were those?

17         A.    I reviewed the state statute.  I

18   reviewed the Wichita Police Department Standard

19   Operating Procedure for the Persons Crimes Bureau.

20   I also reviewed Policy 527 and also a power point,

21   actually I pulled one slide, looked at one slide.

22         Q.    Do you recall what that power point

23   was?

24         A.    It was a recruit, a presentation to

25   recruits from 2004.

```
 1              A.    That information was discussed as part

 2    of the mediation in reference to this lawsuit.

 3              Q.    Anytime before then?

 4              A.    No.

 5              Q.    Do you ever compare those statistics

 6    and by those I mean specifically the racial makeup

 7    of the gang list, do you ever compare that to the

 8    racial makeup of Wichita or Sedgwick County, more

 9    broadly?

10              A.    The City of Wichita is unaware of any

11    comparisons being made.

12              Q.    So you said that the statistics

13    include, I guess, the racial makeup of the gang

14    list.  Substantively, what is the racial makeup of

15    the gang list?

16              A.    The City recognizes that there's

17    members of all races in the gang database to

18    include African American, Hispanic, Caucasian and

19    Native American and Asian.

20              Q.    Is there more of one particular race

21    than another?

22              A.    Yes.

23              Q.    And what is that?

24              A.    African American.

25              Q.    Do you have an idea of how much more
```

```
 1   understanding of what they were evaluating as it

 2   pertains to the gang database?

 3            A.    The City was aware of disproportional

 4   amount of African Americans documented in the

 5   database.

 6            Q.    When did the City become aware of that

 7   disproportionate amount?

 8            A.    The City was aware of it once the

 9   report was generated.

10            Q.    What is the City's response to that?

11            A.    The City has taken no action in

12   reference to this report.

13            Q.    Does it plan to?

14            A.    As part of discussions with mediation,

15   yes.

16            Q.    What actions do you plan to take?

17            MR. BRANSON: I just want to make

18   clarification that you're not asking about the

19   mediation itself.

20            MR. VOGEL: Yes, that is correct.

21       Q.    Outside of the conversations you have

22   had with your attorneys in the mediation, have you

23   discussed any changes or any other actions the

24   department might take in response to this report?

25       A.    No.
```

1          Q.    Has anybody in the department requested

2    any actions or a response from the Wichita Police

3    Department based on this report?

4          **A.    The City is not aware of any.**

5          Q.    Anybody outside the department that you

6    are aware of?

7          **A.    No.**

8          Q.    So I would like to walk through a

9    little bit of the report with you.  If you don't

10   mind turning to page 8 for me.  The task force in

11   this report said that there were some concern that

12   the registry appears to disproportionally affect

13   black Wichitans.  Do you see that?

14         **A.    Yes.**

15         Q.    Is that accurate?

16              MR. BRANSON: Object to form.

17         **A.    The City did not review any specific**

18   **statistics or anything in reference to this report**

19   **other than what is produced in the report itself.**

20         Q.    (By Mr. Vogel) Okay. Then let's look at

21   the statistics that are generated under subheading

22   **A.  What does that says?**

23         **A.    "The registry includes one of every 34**

24   **Black Wichitans, compared to one of every 897 White**

25   **Wichitans."**

1          Q.    Do you agree that that

2   disproportionally affects black Wichitans based on

3   those statistics that you just reviewed?

4               MR. BRANSON: Object to form.

5          A.    The City doesn't know if that

6   disproportionally affects them but it shows one out

7   of every 34 according to this report.

8          Q.    (By Mr. Vogel) Do the numbers in this

9   document reflect the numbers that you generated as

10  part of your statistical reports?

11              MR. BRANSON: Object to form.

12         A.    Again, the City didn't generate these

13  numbers and again, I don't know where they got

14  these numbers or what is generated in this report.

15  I'm sorry, I, the City.

16         Q.    (By Mr. Vogel) I understand that if you

17  say that you can answer on behalf of the City if

18  you say I, I'll just understand and intend it is

19  the City answering the question.  That's fine.

20         A.    Yes, sir.

21         Q.    Do you have any reason based on the

22  last five years of statistics that you have

23  generated and reviewed to believe that these

24  numbers are inaccurate?

25              MR. BRANSON: Object to form.

1          A.    The City has no information to say that

2    these are inaccurate.

3          Q.    (By Mr. Vogel) So these could be

4    accurate; is that accurate?

5                MR. BRANSON: Object to form.

6          A.    Yes, they could be accurate.

7          Q.    (By Mr. Vogel) Let's look at No. 5 on

8    the same page.  It's short.  Could you read for me

9    what that states?

10         A.    "Allow for an individual to be

11   classified as a "gang member" or "gang associate"

12   for activity unrelated to a "criminal street gang."

13         Q.    Okay, and just for clarity, correct me

14   if I'm wrong, but this is related to the concern

15   that the task force had directly above that; is

16   that right?

17               MR. BRANSON: Object to form.

18         A.    This is part of their -- the City

19   recognizes this is part of the WBA report.

20         Q.    (By Mr. Vogel) Okay. Is that concern

21   accurate?

22               MR. BRANSON: Object to form.

23         A.    For the City of Wichita, no.

24         Q.    (By Mr. Vogel) Why not?

25         A.    The City of Wichita recognizes that

1  gang members and gang associates are documented

2  based on the Kansas state statute.

3      Q.    And does the Kansas state statute

4  permit a person to be documented as a gang member

5  for non-gang-related or activity unrelated to a

6  criminal street gang?

7      A.    The City recognizes that based on this

8  report it's not clear what they are referring to

9  when they say activity unrelated to a criminal

10  street gang.

11      Q.    I guess in that instance what would be

12  an activity that's related to a criminal street

13  gang which you could use to document if somebody

14  was a gang member then?

15      A.    The City recognizes that there are

16  state criteria allows for various things, including

17  but not limited to physical evidence, self-admits;

18  all ten different criteria that could be met.

19      Q.    So based on your knowledge of that

20  criteria and I have it for your review if

21  necessary, but based on your knowledge of that

22  criteria, could an individual be classified as a

23  gang member or gang associate without committing

24  any crime?

25      A.    Yes.

1   transparency and notification and opportunities to

2   contest the database are appropriate.

3        Q.   Let's turn to page 23, if you don't

4   mind.  Just as a follow-up to that, why are they

5   appropriate?

6             MR. BRANSON: Object to form.

7        A.   The City recognizes that notifying

8   juvenile parents may help an individual stay out of

9   that lifestyle.  This could also apply to an adult

10  if they were notified.  Additionally, the

11  procedures for documenting and having a review

12  process is appropriate.

13       Q.   (By Mr. Vogel) Why is that review

14  process appropriate?

15            MR. BRANSON: Object to form.

16       A.   The City recognizes that transparency

17  is appropriate to help build relationships with the

18  community.

19       Q.   (By Mr. Vogel) But you can be

20  transparent without a procedural mechanism for

21  removal; is that accurate?

22            MR. BRANSON: Object to form.

23       A.   The City recognizes that.

24       Q.   (By Mr. Vogel) So is there a need for a

25  procedural mechanism for removal?

1              MR. BRANSON: Object to form.

2         A.    The City would recognize that there

3    should be a procedural application or whatever you

4    said, I'm sorry, for removal.

5         Q.   (By Mr. Vogel) So we can continue to

6    page 23 then.  The first or the second paragraph

7    directly above the table here it says, the report

8    states that, "Though white supremacy groups are

9    allegedly classified as criminal street gangs and

10   though those groups have been on the rise, the

11   proportion of white citizens on the gang registry

12   remains low."  My first question with that is, is

13   this statement accurate?

14             MR. BRANSON: Object to the form.  Are

15   you asking if you read it correctly or the

16   foundation of the research is accurate?

17        Q.   (By Mr. Vogel) If I misread it please

18   correct me.  If I read it correctly, is the

19   statement itself; does the WPD believe that the

20   statement itself is foundationally accurate?

21        A.    It is not known to City of Wichita

22   because we don't know where they got this

23   information from.  Wichita Police Department does

24   document white supremacy groups as criminal street

25   gangs.  I have no information to say that they are

1    4(a).  Does that reflect your understanding of the

2    policy, too?

3         **A.    Yes.   The arrest procedure is**

4    **classified as No. 4.**

5         Q.   Okay, and your response is that it does

6    not say the word "must"; is that accurate?

7              MR. BRANSON: Are you asking him if

8    under 4 the word "must" appears anywhere in that?

9         Q.   (By Mr. Vogel) I'm repeating his answer

10   and I'm asking if his answer is accurate.  Just

11   going back to the last question, your answer was it

12   does not include the word "must."  Is that still an

13   accurate answer now having reviewed the document?

14        **A.   I don't see the word "must" in there.**

15        Q.   Okay.  To my next question instead,

16   what does it say?  Could you summarize the

17   procedure as outlined in Policy 527, the Arrest

18   Procedure, for me based on having the document?

19        **A.    Per Policy 527, Wichita Police**

20   **Department recognizes that if a person is**

21   **documented, the officer shall look that information**

22   **up and the affidavit will contain the following**

23   **sentences.**

24        Q.   Okay. We have the document for the

25   record, but when you say the following sentences, I

1    generally refer to those as the gang information.

2    Is that accurate or okay?

3          A.    The verbiage, yeah.

4          Q.    The gang verbiage, okay.   Whether they

5    are a member or an associate; is that accurate?

6          A.    Yes.

7          Q.    Okay.   When is that to be included on

8    an affidavit then?

9          A.    New person level felony crimes.

10         Q.    Outside of a person felony crime is it

11   to be included on an affidavit?

12         A.    It's not required by policy.   An

13   officer may put that on there if he's writing the

14   affidavit.   Again, it's at the discretion of the

15   officer.

16         Q.    For what reason would an officer

17   include that?

18              MR. BRANSON: Object to form.

19         A.    Again, it would be the discretion of

20   the officer.

21         Q.    (By Mr. Vogel) So the policy mandates

22   that if it's a person felony then the gang verbiage

23   for a gang member on the gang list be included; is

24   that accurate?

25         A.    Yes.

1         **A.    The Wichita Police Department does**

2    **recognize that there are events that are**

3    **gang-related.   Is that what you are asking?**

4         Q.    Not quite, but I appreciate the answer.

5    Does the WPD make a determination upon arresting

6    somebody for a person felony whether that person

7    felony is related to criminal street gang activity?

8         **A.    They could, yes.**

9         Q.    Does that affect then what they include

10   in the arrest affidavit?

11             MR. BRANSON: Object to form.

12        **A.    The policy requires that an officer put**

13   **the verbiage when a new person felony is committed**

14   **and they are documented as a gang member.**

15        Q.    (By Mr. Vogel) Is it possible that

16   officers based on the reading of this, based on

17   your policy, are including the gang verbiage which

18   identifies someone as included on the Wichita

19   Police Department gang list in an arrest affidavit

20   for felonies that are unrelated to gang activity?

21             MR. BRANSON: Object to form.

22        **A.    The statute requires that a person**

23   **being arrested on a new person felony be eligible a**

24   **50,000 bond.   So officers should follow the policy**

25   **and put that information, the gang verbiage in**

1    **their affidavit.**

2          Q.    Okay. So per the policy officers should

3    put that information in the arrest affidavit for a

4    person arrested for a person felony that is not

5    gang-related; is that accurate?

6          **A.    Yes.**

7          Q.    You can finish if you need.

8          **A.    Again, it's for a new person felony.**

9          Q.    What is a new person felony?

10         **A.    So an individual that's getting**

11   **arrested and booked on a new charge such as it just**

12   **occurred or it occurred at some point in time but**

13   **during that time they were still documented as a**

14   **gang member.  So during the time of the crime being**

15   **committed if they were documented as a gang member**

16   **it's required to have the verbiage, even if they**

17   **are arrested later on.**

18         Q.    Okay, and regardless of whether that

19   new person felony is actually gang-related?

20         **A.    Correct.**

21         Q.    And I want to go back to when

22   officers -- outside of this, right, why would an

23   officer include information identifying an

24   individual as a gang member in an arrest affidavit

25   for a nonperson felony?

```
 1              A.   Yes.
 2              Q.   The training currently or at least as
 3    of the one that I provided you in 2020 states
 4    "resides in or frequents a particular street gang
 5    area."
 6              A.   Yes.
 7              Q.   What is the difference?
 8              A.   The training power point has "resides
 9    in."
10              Q.   What is the difference in how that
11    criteria is applied?
12                   MR. BRANSON: Object to form.  Which
13    criteria?
14              Q.   What is the difference between how
15    Criteria 4 under the training is applied versus how
16    you would apply Criteria D under state statute,
17    under the current state statute, which does not
18    include the "resides in/or" language.
19              A.   The City of Wichita recognizes that the
20    Gang Intelligence officers should follow the Kansas
21    State statute.
22              Q.   So what would satisfy that criteria per
23    Kansas State statute?  So to be clear, Kansas State
24    statute as it currently stands, "frequents a
25    particular street gangs area," how is that applied
```

1    in practice?

2         A.    The City of Wichita recognizes in

3    practice the Gang Intelligence officers would have

4    to identify or articulate that frequent area to

5    identify it as such.

6         Q.    Can you give me some examples of those

7    areas?

8         A.    As part of past practice Wichita Police

9    Department recognizes that certain houses, venues,

10   bars could be identified as a gang location.

11        Q.    And when you say houses, do you mean

12   residential houses?

13        A.    Yes.

14        Q.    So how do you go about identifying

15   whether a person's residential house is a gang

16   location?

17        A.    The Wichita Police Department

18   recognizes that the Gang Intelligence officers

19   would use multiple resources.  So they could use

20   police cases, personal knowledge, informants,

21   interviews, 9-1-1 calls, complaints, Crime Stoppers

22   tips to establish if that is a gang location.

23        Q.    A gang location and a gang location

24   being a private residence; is that accurate?

25        A.    Yes.

1          Q.    Okay. Would someone meet the criteria

2    if once -- I'll start over.    If the Wichita PD had

3    gone through that process of identifying a house as

4    a particular criminal street gang's area by

5    whatever means it does to do that, would then

6    someone satisfy the criteria for or D, right?

7    Would that criteria be satisfied if a person

8    frequently was seen at that house?

9               MR. BRANSON: Object to form.

10         A.    Again, the City of Wichita recognizes

11   officers, the Gang Intelligence officers discretion

12   in applying the Kansas State statute to that.

13         Q.    (By Mr. Vogel) If someone -- if you

14   have identified -- okay, so let me say, if you have

15   identified a particular house as a particular

16   street gang's area and there's a person that

17   frequently visits that house, would one of the Gang

18   Intelligence officers be able to satisfy or

19   articulate that that person at least meets that one

20   criteria?

21         A.    The City recognizes that that could be

22   possible based on the Gang Intelligence officer's

23   assessment.

24         Q.    Are there any exceptions if that person

25   has a family member who lives at that house?

1          A.    The City recognizes that it's not

2    specifically in the state statute; however, past

3    practice would be one of the factors that the Gang

4    Intelligence officers would use.

5          Q.    So is there an exception for someone

6    who has a family member living in a house that's

7    been identified as a particular criminal street

8    gang area who frequently visits there, is there a

9    exception to not satisfying that criteria?

10          A.    The City recognizes that there could be

11    an exception, yes.

12          Q.    There could be an exception.  So does

13    the City of Wichita recognize a gang member or

14    sorry, a Gang Intelligence officer could also use

15    that to support or justify satisfying that criteria

16    even if that person had a family member at that

17    house?

18          A.    Again, the Gang Intelligence officer,

19    if based on their assessment believed met the

20    criteria of the Kansas statute, then yes, they

21    could use that.

22          Q.    Even if that person -- even if that

23    person does have a family member that lives there,

24    that's still a possibility that that Gang

25    Intelligence officer could use that to justify

1  satisfy using that criteria?

2              MR. BRANSON: Object to form.

3          A.    Again, it's up to the Gang Intelligence

4  officer's assessment.

5          Q.    (By Mr. Vogel) But is that a

6  possibility?

7          A.    Yes.

8          Q.    Okay. If a person lives at that house

9  and that house has been particularly identified as

10 a particular street gang area, does that satisfy

11 this criteria of -- sorry.  I want to be clear --

12 the criteria as listed in the current K.S.A.

13 21-6313?

14             MR. BRANSON: Object to form.

15         A.    Again, the City of Wichita recognizes

16 that the state statute says frequents.  Since

17 "resides in" was removed that could be part of the

18 assessment done by the Gang Intelligence officer to

19 include them as part of meeting one of those

20 statutes.

21         Q.    Even if they lived there?

22         A.    Yes.

23         Q.    So I just want to make sure that I'm

24 clear because that was kind of a long line of

25 questioning.  If a person lives in a house that has

1    been identified as a particular street gang,

2    particular criminal street gang area by the WPD,

3    there are circumstances in which a WPD Gang Intel

4    officer could use the fact that they lived there to

5    satisfy one of the criteria for identifying them as

6    a criminal street gang member under the current

7    statute of 21-6313?

8         A.    Based on the assessment by the Gang

9    Intelligence officer, that would meet the

10   requirement by the state statute "frequents in," so

11   yes.

12        Q.    Do you want to go for another a break

13   real quick.

14             VIDEOGRAPHER: Going off the record at

15   1:47 p.m..

16             (Whereupon a recess was taken form 1:47

17   p.m. to 1:54 p.m.)

18             VIDEOGRAPHER: Back on the record at

19   1:54 p.m..

20        Q.    (By Mr. Vogel) All right.  Coming back

21   on the record after about a ten-minute break.  I

22   want to get into now discussing some of the topics

23   around patrol by Gang Unit officers.  Again, I'm

24   going to ask questions that are really reflective

25   of all the topics in general but just kind of with

```
 1          Q.   Okay.  Even if it were just one person

 2   or two or three realtors?

 3          A.   Yes.

 4          Q.   Okay.  Are there any instances that you

 5   are aware of in which a person from the public

 6   could have found out information derived from the

 7   gang list?

 8          A.   The Wichita Police Department is aware

 9   of incidents, yes.

10          Q.   What are those incidents?

11          A.   There was a gang bulletin that was

12   posted to the public in reference to an ongoing

13   gang feud.

14          Q.   What are the contents of the gang

15   bulletin?

16          A.   It had information about who was

17   involved and what criminal activity was occurring

18   between the two groups.

19          Q.   Did it identify individuals?

20          A.   Yes.

21          Q.   By name?

22          A.   Yes.

23          Q.   Did it identify individuals associated

24   with a particular gang?

25          A.   Yes.
```

1          Q.   And that was publicly released?

2          A.   It was posted, yes, to the public and

3   the media got ahold of it, yes.

4          Q.   When was that?

5          A.   The City doesn't know the exact date,

6   I'm sorry.

7          Q.   2023?

8          A.   No.

9          Q.   2020?

10         A.   2009.

11         Q.   2009?

12         A.   2010.

13         Q.   So around 2009 or 2010 the Wichita

14   Police Department -- 2009, 2010 disseminated

15   information from the gang database that include the

16   name of the individuals and their associated gang

17   was disseminated publicly.

18         A.   Not by the Wichita Police Department.

19         Q.   How was it disseminated then?

20         A.   It was illegally sent to somebody that

21   printed it.

22         Q.   Who illegally printed it?

23         A.   I don't know.

24         Q.   Someone from the Wichita Police

25   Department with access to the gang database?

1          A.    No.

2          Q.    Was there any investigation done as to

3    how this information was released to the public?

4          A.    I don't know if there was a formal

5    investigation ever done, no.

6          Q.    Was there an informal investigation

7    done by members of the WPD?

8          A.    I believe there was an informal

9    investigation, yes.

10         Q.    What were the results of that

11   investigation?

12         A.    That the bulletin had been sent through

13   an e-mail and one of the recipients of that e-mail

14   forwarded it to somebody that shouldn't have gotten

15   it who then printed it.

16         Q.    Do you know -- let's go back all the

17   way to the beginning of the chain.  Who is the

18   first person to touch that information?  Do you

19   know that person?

20         A.    When you're referring touched the

21   information --

22         Q.    Who got it from the gang database and

23   forwarded it.  This is a chain, right?  This is a

24   chain.  We can go back through your answers but

25   someone who had access to the information forwarded

1    it and it was printed, right, and then that was

2    disseminated.  Is that an accurate recollection of

3    the --

4          A.    No.   The bulletin was created because

5    of the ongoing criminal violence that was going on.

6          Q.    Okay.

7          A.    That bulletin was then sent to other

8    law enforcement or personnel.   That information was

9    then forwarded outside of law enforcement personnel

10   to somebody that then printed it.

11         Q.    And then after it was printed?

12         A.    It was posted at a barber shop.

13         Q.    Okay. So going back to that, there was

14   a bulletin created.   Who created the bulletin?

15         A.    Me.

16         Q.    Okay. What was the purpose of that

17   bulletin?

18         A.    Because of the ongoing feud between

19   identified gangs was essentially violence.   We had

20   multiple people getting shot, houses being shot and

21   the violence was escalating.

22         Q.    So you sent -- you -- when I say you at

23   this point I'm saying Captain Chad Beard, who was

24   then --

25         A.    Gang detective.

 1          Q.   A gang detective, created a bulletin

 2   which identified individuals by name and their

 3   associated gang membership from information derived

 4   from the gang database; is that accurate?

 5          A.   Yes.

 6          Q.   And you sent it to law enforcement

 7   personnel; is that accurate?

 8          A.   That is correct.

 9          Q.   Do you recall the law enforcement

10   personnel that you sent it to?

11          A.   I don't.

12          Q.   It was one person?

13          A.   No.

14          Q.   Two persons?

15          A.   It was multiple people.

16          Q.   The entire department?

17          A.   No.

18          Q.   Was it a section of the department?

19          A.   I don't remember exactly who all I sent

20   it to but there was -- the other gang detectives,

21   Homicide, obviously the Gang Intelligence unit.  I

22   think there was a member from the Sheriff's

23   Department, members from the Kansas Department of

24   Corrections.  That's who I can remember.

25          Q.   Okay, and someone, one of the

1    recipients of that then forwarded it to outside of

2    law enforcement personnel?

3         A.   That's my understanding, yes.  I wasn't

4    involved in the investigation other than if there

5    was an investigation but whatever occurred, I don't

6    know -- I was not privy to that.

7         Q.   Okay. Do you recall or are you aware of

8    even where that person worked?

9         A.   No.

10         Q.   So you are not aware, you, Captain Chad

11    Beard, you don't know whether that person was a

12    Wichita Police Department employee or an employee

13    of one of the other organizations; is that

14    accurate?

15         A.   I was told back then that it was

16    outside of the Wichita Police Department.

17         Q.   So one of the recipients not with the

18    Wichita Police Department was the person who

19    forwarded it to outside personnel?

20         A.   Yes.

21         Q.   Which was then printed somewhere and

22    put at a barber shop?

23         A.   Yes.

24         Q.   Are you aware -- following up on that,

25    were there any changes that the Wichita Police

Page 185

```
 1          A.   I just want to just keep getting this

 2    thing done.

 3               MR. BRANSON: How much more time do you

 4    think you have? I'm not holding your feet to the

 5    fire but --

 6               MR. VOGEL: I don't know. We took a

 7    little while on the last one.

 8               MR. BRANSON: Let's go ahead and take

 9    like five minutes.

10               VIDEOGRAPHER: Going off the record at

11    3:45 p.m..

12                (Whereupon a recess was taken from

13    3:45 p.m. to 3:59 p.m.)

14               VIDEOGRAPHER: Back on the record at

15    3:59 p.m.

16          Q.   (By Mr. Vogel) After about a five to

17    10-minute break we're back on the record.  I would

18    like to go ahead and present Captain Beard with

19    another document.

20                (Whereupon Deposition Exhibit No. 43

21    was marked for purposes of identification.)

22          Q.   Captain Beard, do you mind taking a

23    look at that quickly for me and identify that

24    document.  Have you seen this document before?

25          A.   No, I've never seen this before.
```

1          Q.    What does that document appear to you
2     to be?
3          A.    It appears to be a copy of a
4     presentation that says Drug Court Mapping.
5          Q.    Let me ask you, is there a similar
6     mapping program for gang members or is there a gang
7     mapping program?
8          A.    Wichita Police Department did have a
9     gang mapping program.   It no longer does.
10         Q.    It did have a gang mapping program.
11    Can you give me a general overview of what that
12    gang mapping program was?
13         A.    Information from the gang database, who
14    was documented, was shared with members of the
15    Sedgwick County Community Corrections for those
16    persons that were on probation and if the judge or
17    some of their conditions could have been to stay
18    out of certain areas because they were gang
19    members.
20         Q.    And certain areas that we're referring
21    to, are those the mappings?
22         A.    Yes.
23         Q.    When did this program start
24    specifically related to gang mapping?
25         A.    2019, I believe.

1           Q.    So this is fairly recent program?

2           A.    2018, 2019, yes.

3           Q.    Do you know about how many people have

4     been mapped, I would say?

5           A.    I think it's less than 15.

6           Q.    Are all of those people mapped

7     identified on the Wichita Police Department gang

8     list?

9           A.    Without knowing who they are I can't

10     give you that answer.

11          Q.    Okay.  How long did the mapping program

12     continue?

13          A.    I don't have an exact date but it

14     was -- I'm sorry.

15          Q.    Your best recollection, and if you

16     don't know, you can just say you don't remember of

17     don't recall, that's fine.

18          A.    I don't know.

19          Q.    I'll give you, provide you another

20     document here.

21                (Whereupon Deposition Exhibit No. 44

22     was marked for purposes of identification.)

23          Q.    I'll show you what is marked as

24     Exhibit 44.  If you could tell me what that

25     document appears to be.

1          A.    This is an e-mail from Officer Byers to

2   KODC employees and myself.

3          Q.    So you have seen this at least at some

4   point before?

5          A.    Reading through it I'm recollecting

6   what is being said here, yes.

7          Q.    What is the contents or the nature that

8   you are recollecting based on that?

9          A.    Give me one minute to review it here.

10         Q.    Absolutely.

11         A.    So this is an e-mail from Officer Byers

12  to them in reference to stopping gang mapping or

13  continuing the gang mapping because of the filed

14  lawsuit.

15         Q.    This is based on that conversation you

16  had with him; is that accurate?

17         A.    Yes.  He refers to me calling him.  I

18  do remember calling him.

19         Q.    Okay. What was the nature of that

20  discussion?

21         A.    From what I recollect, part of the

22  conversation was that there were very few people

23  mapped anyway and so I was talking about if we

24  wanted to even continue it, but in reference to

25  this I indicated that because of the gang lawsuit

1    we should stop.

2        Q.   Was there any reason outside of the

3    gang lawsuit that made you want to stop the mapping

4    program when you did?

5        A.   From the -- just from what I -- being

6    in the unit and knowing when it was going on, not

7    that it wasn't effective.  There wasn't that many

8    people that were participating in it and it didn't

9    appear to be effective.  I mean, that's the thought

10   but again that was early discussions.  The plan was

11   was to start reviewing it to see if it was

12   something that was viable to continue it.

13       Q.   Any other specific -- let me rephrase

14   the question.  I guess specifically about this

15   lawsuit concerned so as to want to go ahead and

16   cancel the program?

17       A.   Again, it was already in my mind before

18   then that we were going to probably discontinue

19   this program, but because I didn't want to be a

20   part of prevailing party status or anything, I just

21   thought since there was no new people coming into

22   it to just stop doing it right now.

23       Q.   Any plans to continue the mapping

24   program?

25       A.   Not at this time.

```
 1            Q.   For those that are mapped, are they
 2   still currently mapped?
 3            A.   Without knowing exactly who all the
 4   people were I am -- I don't want to speculate.  I
 5   do not believe anybody else is on the mapping
 6   program.  I think they have all expired.
 7            Q.   So continuing kind of general patrol
 8   duties -- oh, I'm sorry.  One last follow-up
 9   question on this, and partly the reason for
10   providing this document.  Do you recognize the date
11   of this e-mail?
12            A.   April 13, 2022.
13            Q.   Okay, and in it Mr. Byers is saying
14   that he had a discussion with you the previous
15   evening?
16            A.   Yes.
17            Q.   So is it fair to say that the mapping
18   program ran sometime from 2019 to mid-2022?
19            A.   That would be accurate.
20            Q.   And no plans to continue it after this?
21            A.   No.
22            Q.   So again, going back to kind of a
23   general duties of patrol officers or Gang
24   Intelligence officers, do Gang Intelligence
25   officers conduct traffic stops?
```

```
1            A.   Yes.

2            Q.   Is it accurate to say that the City of

3    Wichita or the Wichita Police Department, when

4    there was new criteria for defining a criminal

5    street gang member, was codified that you did an

6    audit and made sure that everybody met the new

7    criteria; right?

8            A.   Yes.

9            Q.   That's accurate?

10           A.   Yes.

11           Q.   Did you ever do a similar audit when

12   you had a new definition of a criminal street gang

13   under 21-6313 to determine if the gangs in the gang

14   database met that criteria to be defined as a

15   criminal street gang?

16           A.   It was done in 2006, yes.

17           Q.   Okay. So in 2006 every identified gang

18   in the gang list, somebody went through and said --

19   and made sure that that gang met the definition of

20   all four criteria?

21           A.   Again, I'm talking from experience here

22   that was what was expected of us when we were doing

23   the audit.

24           Q.   Okay.  So it was expected, but did the

25   WPD go through, look at all the gangs in the gang
```

1    database and determine if those gangs actually met

2    the definition of a criminal street gang per Kansas

3    statute?

4        A.    When you refer to WPD, like somebody

5    else, like a supervisor or something?

6        Q.    Anybody in the WPD.

7        A.    So the gang officers at the time were

8    supposed to go through and look to see if those

9    gangs met the criteria.  If they didn't or did not

10   do that, again that's on them, I guess.  But from

11   my knowledge now, I do not have any information to

12   say that any gang that's in the database is not

13   meeting the state criteria.

14       Q.    It's fair to say that there's no

15   documentation identifying the audit of determining

16   whether these groups were criminal street gangs

17   according to statute?

18       A.    Nothing was written down or documented

19   in that sense, no.

20       Q.    Okay.  So without documentation, how do

21   you know that every gang in your gang database

22   meets the state criteria?

23       A.    Again, the Gang Intelligence officers

24   are -- they know what they are supposed to be in

25   there.  So I trust my employees at this point.  I

Page 239

1   mean, I trust those guys.  I know that's not --
2         Q.   So I understand that those guys being
3   the Gang Intel officers we're referring to do an
4   audit of the gang members.
5         A.   Correct.
6         Q.   Is there any sort of similar audit to
7   make sure that the gangs meets the definition of
8   criminal street gang?
9         A.   No.
10        Q.   So we just have to trust that -- what
11  are we -- we are we trusting when you say you trust
12  them?
13             MR. BRANSON: Object to form.
14        A.   I have no information or I'm not aware
15  of any gang that's in the database that's not
16  meeting the state criteria.
17        Q.   (By Mr. Vogel) Are your officers
18  required to make that determination?
19        A.   They are part of the consideration,
20  yes.  Common practice with the Gang Unit has been
21  that they will identify a new gang and it is
22  discussed with either the supervisors or the
23  detectives that are familiar with that and it is
24  determined as a group whether or not that gang will
25  be documented.

1    **officers, yes.**

2         Q.    It was expected but are you certain

3    that occurred?

4              MR. BRANSON: Object to form.

5         **A.    Again, I don't know what the individual**

6    **officer did or did not do.    I mean --**

7         Q.    (By Mr. Vogel) So how can you rely --

8    so what are you relying on to insure that the gangs

9    in your database meet the state criteria for being

10   a criminal street gang other than your previous

11   testimony of trusting those officers?

12        **A.    So during subsequent audits it has not**

13   **been brought to anyone's attention of the Wichita**

14   **Police Department that is not aware that any of**

15   **those gangs that were already documented did not**

16   **meet the state criteria and should have been**

17   **removed.**

18        Q.    What subsequent audits with respect to

19   determining whether a gang meets the state criteria

20   for a criminal street gang have occurred since

21   2006?

22        **A.    I am not aware of any audit that is**

23   **just for street gangs.**

24        Q.    So is it possible, is it possible then

25   that there are gangs listed in the gang database

1    that do not meet the criteria for a criminal street

2    gang?

3              MR. BRANSON: Object to form.

4         A.    Actually yes, there could be because it

5    would be that we would then identify that they

6    don't meet criteria and we would make it not a

7    gang.

8         Q.    (By Mr. Vogel) Have you ever removed a

9    gang from the gang database for not meeting the

10   criteria in 21-6313?

11        A.    They are not physically removed but a

12   person would have been made inactive and there

13   would be no more -- I mean, if a gang does not meet

14   the state criteria, we would stop documenting.

15        Q.    I think you're referring -- my

16   understanding your answer is referring to a person

17   being inactive.  Is there a similar procedure where

18   you make a gang inactive?

19        A.    It's the same thing.  If we determine

20   that whatever made up gang does not meet the state

21   criteria, those people it would have been made

22   inactive and we would have -- we would have put

23   that in there or I mean, saying this is not -- this

24   gang doesn't meet the criteria.

25        Q.    Have you ever identified a gang in the