# EXHIBIT 11



# **Pohlman**USA®
## Court Reporting and Litigation Services

---

Kevin McKenna

December 1, 2022

---

Progeny, et al.

vs.

City of Wichita, Kansas

```
 1            IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF KANSAS

 3

 4  PROGENY, a program of Destination )

 5  Innovations, Inc., CHRISTOPHER    )

 6  COOPER, ELBERT COSTELLO, MARTEL   )

 7  COSTELLO, and JEREMY LEVY,JR., on )

 8  behalf of themselves and others   )Case No.

 9  similarly situated,               )6:21-CV-01100-

10  Plaintiffs,                       )EFM-ADM

11  vs                                )

12  CITY OF WICHITA, KANSAS,          )

13  Defendant.                        )

14  _____)

15              VIDEOTAPED DEPOSITION OF

16                   KEVIN MCKENNA

17                 December 1, 2022

18                     8:31 a.m.

19

20                    Taken at:

21              Joseph, Hollander & Craft

22               500 North Market

23                Wichita, Kansas

24

25  Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR
```

1

```
 1            A.    Yes, sir.
 2            Q.    Including gang intelligence officers
 3  and patrol officers in other divisions?
 4            A.    Yes, sir.
 5            Q.    They all receive the same training with
 6  respect to TOPS cards?
 7            A.    It's given in the Academy, yes, sir.
 8            Q.    Did you receive that training when you
 9  went through Academy?
10            A.    Yes, sir.
11            Q.    Is there training on TOPS cards other
12  than in the Academy?
13            A.    Not that I know of, no.
14            Q.    Let me ask maybe a better question.  Is
15  there ever in-service training on filling out TOPS
16  cards?
17            A.    No.
18            Q.    Okay.  All right.  You said the TOPS
19  card could be a New TOPS card, an Updated TOPS card
20  or Associate TOPS card; is that right?
21            A.    Correct.
22            Q.    Under what circumstance would an
23  officer fill out a New TOPS card?
24            A.    An officer -- they are not required to
25  fill out a TOPS card, okay, but an officer may fill
```

                                                          74

1   out a TOPS card in reference to a vehicle stop that

2   he had where an individual admitted to him that he

3   was a Sur 13 gang member.  So that officer would

4   fill out the card and it's about the size -- we

5   have changed it now.  It's an electronic.  Back

6   when I was on the street it was like about the size

7   of a baseball card.  You would fill it out and he

8   would just say all the guy's information; address,

9   everything, and contact with him on this case and

10  he stated that he admitted to being a Sur 13 gang

11  member and they may put a case number on there to

12  say see this case number.

13        Q.   Are case numbers assigned even for

14  traffic stops?

15        A.   Not every traffic stop, no.

16        Q.   Okay.  So if it was a traffic stop and

17  there wasn't a case number assigned, what reference

18  might -- would that just be blank?

19        A.   No.  He could put a citation number

20  down.  Yeah.

21        Q.   Okay.  If a citation was issued?

22        A.   Yes, sir.

23        Q.   Am I right that an officer could fill

24  out a TOPS card whether or not any ultimate

25  citation was issued?

1          A.    Correct.

2          Q.    Okay, and in that case what would he

3   write down?

4          A.    He could say that he had contact with

5   him on this date at this time and this is what he

6   stated on a traffic stop and most of the time you

7   would see where they would put who they were in the

8   car with or something like that.

9          Q.    Okay.  If an officer filled out a TOPS

10  card after having interaction with an individual

11  who was a witness of an incident that they weren't

12  accused of or a person of interest or suspect in,

13  would they put down a case number or reference

14  number for whatever incident they were connected

15  with even if they weren't like a suspect in that?

16         A.    Yes, sir.

17         Q.    Okay.  This may seem like an unlikely

18  hypothetical, but if an individual were to walk up

19  to a police officer and self identify as a gang

20  member without any other context for the

21  interaction, could the officer fill out a TOPS

22  card?

23         A.    Yes, sir.

24         Q.    How would they catalog that or what

25  reference would they put down for that?

1          A.    On the back of the TOPS card they would

2   just say that on this date at this time they were

3   contacted by this person who stated this.

4          Q.    Okay.

5          A.    There's no requirement to make a case

6   number.

7          Q.    Okay.  If an officer observed an

8   individual in the public and didn't directly

9   interact with them but observed them, for example,

10  using a gang hand sign, could the officer fill out

11  a TOPS card?

12         A.    Does he meet state criteria to be

13  documented as a gang member?

14         Q.    So let me ask you this.  Does an

15  officer only fill out a TOPS card if the individual

16  they are describing meets the state criteria to be

17  documented as a gang member?

18         A.    Not all the time.  We would get TOPS

19  cards that they don't meet the criteria and so they

20  don't get flagged.  An individual that just throws

21  up a gang hand sign standing by himself and nothing

22  else to support it, no, he doesn't meet the

23  criteria.

24         Q.    Okay. An officer could fill out a TOPS

25  card for such an individual; correct?

1      A.    Yes, sir.

2            Q.    But your testimony is per your review

3      if they didn't meet the criteria for gang

4      membership they wouldn't be added to the database?

5            A.    Correct.

6            Q.    Okay. Is filling out a TOPS card the

7      same thing as nominating an individual for addition

8      to the gang database?

9            A.    Yes.

10           Q.    So part of your role as a gang

11     intelligence officer was to review TOPS cards?

12           A.    Yes, sir.

13           Q.    And when you note that the old TOPS

14     cards were about the size of a baseball card, is

15     that an indication that the phrase TOPS card is

16     like a play on TOPS brand baseball cards?

17           A.    I've never made that connection until

18     now so --

19           Q.    You didn't think of it that way?

20           A.    No, but now that's my question when I

21     go back.

22           Q.    Was it part of your role as a gang

23     intelligence officer to sometimes fill out TOPS

24     cards yourself?

25           A.    Yes, sir.

```
 1    submitted by non-Gang Unit patrol officers and
 2    determine whether the individuals described in
 3    those TOPS card met the criteria for addition to
 4    the gang database?
 5           A.   Yes, sir.
 6           Q.   But if a gang intelligence unit -- if a
 7    gang intelligence officer filled out a TOPS card
 8    that would not go through a separate process of
 9    review prior to addition to the gang member --
10           A.   Correct.
11           Q.   And one of the responsibilities you
12    mentioned as a gang intelligence officer was
13    entering the numbers into the gang database;
14    correct?
15           A.   Correct.
16           Q.   So that would include both new members
17    that you identified in the course of your patrol;
18    correct?
19           A.   Yes, sir.
20           Q.   And members that were identified by the
21    submission of a TOPS cards from a nonGang Unit
22    patrol officer?
23           A.   Yes, sir.
24           Q.   Does anybody ever get added to the gang
25    database without a TOPS card being submitted?
```

1        A.    Yes.

2        Q.    How does that process work?

3        A.    As a gang intelligence officer you are

4   not required to submit a TOPS card when you are

5   flagging somebody as a new member because the TOPS

6   card is used for the purpose of an officer turning

7   it into the Gang Unit and we, as being the Gang

8   Unit that runs and manages the database, would not

9   need to fill out a TOPS card for that purpose

10  because we actually have the entry in there so we

11  would document what is in the TOPS card in the

12  entry.

13       Q.    Okay.  When a non-Gang Unit patrol

14  officer completes a TOPS card for a potential gang

15  member and they submit that to the Gang Unit and

16  that person ultimately is added to the gang

17  database, do you keep the TOPS card?

18       A.    Yes, sir.

19       Q.    It becomes part of their file.  But for

20  some individual who you identify directly and don't

21  complete a TOPS card, there's no TOPS card in their

22  file; is that right?

23       A.    Yes, sir.

24       Q.    Is the TOPS card the same thing as a

25  gang card?

```
 1              A.   Yes, sir.
 2              Q.   Okay.  When you say that a gang
 3    intelligence officer is not required to complete a
 4    TOPS card, you mean that they can add a new member
 5    to the gang database without completing a TOPS card
 6    or a gang card before that; correct?
 7              A.   Yes, sir.
 8              Q.   Okay.  Do you also mean or does that
 9    also mean that if an officer has an encounter with
10    an individual who meets one or more criteria for
11    gang membership, they are not under an obligation
12    to complete a TOPS card reporting that encounter?
13              A.   Correct.
14              Q.   So an officer has discretion as to
15    whether to complete a TOPS card for an individual
16    who meets one or more of the criteria for gang
17    membership?
18              A.   Yes, sir.
19              Q.   And is that true both of a gang
20    intelligence officer and a non-Gang Unit patrol
21    officer?
22              A.   Yes, sir.
23              Q.   Are there patrol officers within the
24    Gang Unit that are not gang intelligence officers?
25              A.   No.
```

1   would be in the Gang Intelligence Officer policy.

2           Q.   Okay, and would you be referring to

3   Policy --

4           A.   527, but I don't recall -- I don't

5   recall it being in there.  It may be in -- I forget

6   what it's called now.  I'm sorry.

7           Q.   That's all right.  If it comes to you

8   feel free to share.  Would you expect it to be like

9   in materials that are provided to new gang

10  intelligence officers when they are assigned to the

11  unit?

12          A.   Yes, sir.

13          Q.   Okay. Would those then be training

14  materials?

15          A.   Yes.

16          Q.   Okay.  When an officer is first

17  assigned to the Gang Unit, do they receive

18  something like a handbook specific to that unit?

19          A.   No, sir.

20          Q.   Do they receive training specific to

21  that unit?

22          A.   It's on-the-job training.

23          Q.   Okay. Okay.  Other than Priority 1

24  calls, you said one of the ways that you would

25  determine as a gang intelligence officer whether to

1      Q.   When you knew or when you were assigned

2  to Beat 33, did you know that it was adjacent to

3  Beat 34 and that was the territory of the Seranos

4  gang?

5      A.   Yes.

6      Q.   Was is that something that you had

7  known prior to ever becoming a police officer?

8      A.   Yes.

9      Q.   How did you know that?

10      A.   Read the graffiti around the

11  neighborhood and it's everywhere.

12      Q.   How did you know what the graffiti

13  meant?

14      A.   Because my dad was a Wichita police

15  officer and my mom was the head of Substance Abuse

16  and Violence Prevention and Gang Prevention for USD

17  259.

18      Q.   So you had some family institutional

19  knowledge regarding gang membership and graffiti?

20      A.   Yes, sir.

21      Q.   When you say that the Seranos gang

22  claimed the territory encompassed by Beat 34, what

23  do you mean by that?

24      A.   The internet ruined geographic

25  locations for street gangs.  When street gangs

1    originate they take pride in the intersections of

2    were they originated from, the areas they originate

3    from.  So in Wichita you will see a Latin King will

4    have 16th and Waco.  That's important to them

5    because that's where they originate from; 16th and

6    Waco so they will put 16 on everything.   In

7    Planeview, the Surenos, they originate from the

8    Planeview neighborhood and so that is their home

9    turf.  That is where they live and it's the

10   southern part of Wichita, right, and Surenos is the

11   southerns and the northern part of Wichita which

12   their rivals, the Notanos are in the north part of

13   Wichita and they are the NSGs.  They are the

14   Northside Gangsters; they are the rivals so the

15   Surenos, they recognize themselves as 13, Nortanos

16   recognize themselves as 14.  Opposite colors, that

17   type of stuff.

18          Q.   Okay. Are those geographic designations

19   still in play today?

20          A.   Yes.

21          Q.   So when you say the internet has ruined

22   geographic territories for gangs, is that not true

23   of all gangs?

24          A.   What I mean by that is if you were

25   going to be Bato Loco Boy you would need to be

1   living in the area of 22nd and Jackson.  That's

2   where they originate from is that neighborhood, in

3   that area.  The internet has caused anybody to

4   claim to be a Bato Loco Boy because you can put any

5   emoji in there.  You can claim anything.  You don't

6   know what that means or the history behind it.  You

7   have never even been on Jackson Street and you are

8   claiming that.  Same thing with -- that's what I

9   mean by the geographical locations.  You don't have

10  to live on Volutsia to claim Volutsia block.  And

11  so other people start claiming Volutsia because

12  they go to school with a Volutsia block guy.

13          Q.   Okay, and so you're saying that someone

14  might post on the internet claiming a certain

15  neighborhood or street as theirs even if they have

16  never been to that neighborhood or street?

17          A.   Correct.

18          Q.   Are you also saying someone might

19  post on the internet claiming membership in a

20  certain gang even though they actually have no

21  affiliation with that gang at all?

22          A.   If they don't have any affiliation with

23  the gang then they wouldn't know gang terminology

24  or gang phraseology or the meaning behind some of

25  the terminology that they post.

```
 1    learn and use lingo of a particular gang even if
 2    they hadn't been through an initiation process for
 3    that gang?
 4            A.   Yes, they could do that.
 5            Q.   Okay, and would you agree that somebody
 6    might post on the internet using lingo or
 7    terminology from a particular gang even if they
 8    hadn't been initiated to that gang?
 9            A.   Yes.
10            Q.   Okay, and could somebody post on the
11    internet using lingo or terminology associated with
12    a certain gang even if if they themselves were not
13    a member of that gang?
14                 MR. BRANSON: Object to form.
15            A.   Yes.
16            Q.   (By Mr. Baehr) And again, they could
17    use that lingo or terminology even this they had
18    never been to that gang territory?
19            A.   Correct.
20            Q.   So when you talk about the internet
21    sort of destroying geography, that's part of what
22    you are talking about?
23            A.   Yes, sir.
24            Q.   Okay.  Is it right then to say that the
25    internet has also made it more difficult to
```

```
 1    identify actual gang members as opposed to people
 2    using gang lingo and terminology who weren't
 3    actually gang members?
 4            A.   No.
 5            Q.   Why not?
 6            A.   Because it's not my job to validate you
 7    if you want to claim to be a Wichita Villian Blood.
 8    It's my job to recognize that you are claiming to
 9    be that and it's my job to document that.  I don't
10    need to go fact check with the Wichita Villians and
11    make sure that your a member.  If you want to claim
12    to be a member and you want to associate with
13    members and you want to use terminology then I will
14    make you a member of it and I will document you as
15    one because we also deal with people that get
16    killed in homicides that become members of gangs
17    after that where we didn't even know they were a
18    member and they get killed and then it's very
19    important to them that that individual got killed
20    and they are recognized as a Blood then afterwards
21    and that happens -- that's extremely common.
22            Q.   I'm trying to understand the scenario
23    that you are describing.  So you're saying there
24    are cases where an individual could be a victim of
25    a homicide?
```

1    members that that individual was associated with

2    the Bloods or associated with the Crips and that's

3    the motive behind this homicide.

4         Q.   Are you saying that there might be

5    cases where a community member is killed and

6    members of a gang within Wichita claim that that

7    person was a member of their gang and retaliate for

8    that violence even though that person maybe wasn't

9    actually a member of their gang?

10        A.   Even though that we didn't have that

11   person documented as a member of that gang.

12        Q.   Okay. So you're not saying there are --

13   you're not saying you believe that there are gangs

14   falsely claiming deceased people to have been their

15   members and using that as a pretense to initiate

16   violence?

17        A.   Correct.

18        Q.   You are just saying you don't actually

19   know who is and isn't in a gang?

20        A.   Correct.

21        Q.   You just know who you have defined as

22   being in a gang according to Policy 527?

23        A.   And Kansas state statute, yes.

24        Q.   And Kansas state statute?

25        A.   Yes, sir.

1          Q.   In fact, is it your testimony that it's

2     not particularly your concern to know factually

3     whether a person is in a gang.   It's just your

4     concern to know whether they meet the criteria

5     under Policy 527 and Kansas state statute?

6               MR. BRANSON: Object to form.

7          A.   Yes, sir.

8          Q.   (By Mr. Baehr) And so there may

9     be people who are in a gang who as far as you know

10    do not meet the criteria of Policy 527 and the

11    Kansas State statute?

12         A.   Can you ask that again? I'm sorry.

13         Q.   Yeah.   To your knowledge, there may be

14    individuals in the community who are members of a

15    gang but as far as you know do not meet the

16    criteria of Policy 527 and Kansas state statute?

17         A.   Yes, sir.

18         Q.   Okay, and is it also your testimony

19    that there might be people who meet the criteria of

20    Policy 527 and Kansas state statute who aren't

21    actually a member of any criminal street gang?

22              MR. BRANSON: Object to form.

23         A.   No.

24         Q.   (By Mr. Baehr) Okay. How would you know

25    whether they are actually a member of a criminal

1   used, yes.

2       Q.   Understand.  So not just wearing blue

3   and wearing along with other things?

4       A.   Yes.

5       Q.   Another criteria would be associating

6   with people who are known members of criminal

7   gangs; right?

8       A.   Yes, sir.

9       Q.   And if you meet two of those criteria

10  you could be identified to the database as a gang

11  associate?

12      A.   Yes, sir.

13      Q.   Okay.  You see that I'm wearing a blue

14  tie today?

15      A.   Uh-huh.

16      Q.   You can look at Exhibit 4 there and see

17  that I'm actually listed as a representative of

18  individuals who by definition are listed in the WPD

19  gang database.  Do you see that?

20      A.   Yes.

21      Q.   And so I'm an associate of those

22  individuals; is that true?

23           MR. BRANSON: Object to form.

24      A.   No.

25      Q.   (By Mr. Baehr) Why not?

1        A.   Well, first, you are representing them
2   on a legal matter so it's not like you are
3   associating0with them outside of your professional
4   setting, right, so we wouldn't sit here and flag an
5   individual who is representing a client.   I mean,
6   no.   There has to be reason behind flagging of an
7   individual.
8        Q.   Okay.
9        A.   And it's not just as simple as you
10  happen to wear blue and this guy's favorite color
11  is blue.
12       Q.   And I understand your testimony to be
13  that you would not flag me as an individual for
14  inclusion in the gang database as a gang associate
15  based on the fact that I'm wearing a blue tie and I
16  represent these individuals; is that right?
17       A.   Correct.
18       Q.   Okay.  But my question is if you just
19  looked at the criteria --
20       A.   Uh-huh.
21       Q.   -- is it true that by wearing a blue
22  tie I could be understood to be meeting that
23  criteria, the color criteria?
24            MR. BRANSON: Object to form.
25       A.   No.

```
 1   are criteria that are listed that would cause a

 2   person to meet or meet the definition of criminal

 3   street gang membership; right?

 4        A.   Yes.

 5        Q.   Okay.  So if you look at Item E, it

 6   says, "Adopt such gang style of dress, color." Do

 7   you see that?

 8        A.   Yes.

 9        Q.   Blue would be a gang color; is that

10   right?

11        A.   Yes.

12        Q.   And so under the terms of this statute

13   a person wearing blue would will meet criteria; is

14   that right?

15        A.   Yes.

16        Q.   Okay, and then directly below that it

17   says, "Associates with known criminal street gang

18   members."  Do you see that?

19        A.   Yes.

20        Q.   What does associates mean?

21        A.   That he hangs out; that he surrounds

22   himself with; that he's involved with those people.

23        Q.   Is there a minimum number of times that

24   a person would have to interact with another person

25   in order to be deemed to associate with them?
```

139

```
 1              A.    Well, there's restrictions in here.

 2              Q.    Okay. Is there anything in the statute

 3    or Policy 527 that identifies a number of times

 4    that a person would have to interact with a known

 5    criminal street gang member in order to meet the

 6    definition of associates?

 7              A.    Yes.  Two or more times.

 8              Q.    Where is that?

 9              A.    I'm sorry.  I was thinking of I: Has

10    been stopped in the company of known criminal

11    street gang members two or more times.

12              Q.    So I'll ask again.  Is there anything

13    in K.S.A. 21-6313 or in Policy 527 that identifies

14    the number of interactions a person would have to

15    have with a known criminal street gang member in

16    order to meet the definition of associating with

17    that member?

18              A.    No.

19              Q.    So under the language of the statute

20    and let me ask again, is there anything in the

21    statute that identifies the nature of the

22    association that a person would have?

23                    MR. BRANSON: Object to form.

24              A.    No.

25              Q.    (By Mr. Baehr) So there's nothing in
```

1    this statute that would tell you as an officer

2    okay, a person who is involved with a criminal

3    street gang member in the context of providing them

4    services, that could not be an associate of that

5    criminal street gang member.

6        A.    You are correct.

7        Q.    Okay.  Now, you as an officer, would

8    you consider someone who was associating with a

9    criminal street gang member in order to provide

10   them professional services, would you say that

11   person is associating with a criminal street gang

12   member?

13       A.    No.

14       Q.    Okay, so you would make a judgment call

15   not to state that that person met this criteria but

16   it wouldn't be strictly based on the language of

17   the criteria; is that right?

18       A.    Correct.

19       Q.    So you would employ some unwritten

20   criteria to distinguish between people who

21   associate with criminal street gang members for

22   some purposes from people who associate with them

23   in a way that would make them a likely criminal

24   street gang member; is that right?

25       A.    No. By state law you have to be

1  about the same section.  You're saying this right

2  here, Section 2?

3          Q.   Yeah, that begins having as one of its

4  primary activities.

5          A.   And the question is?

6          Q.   Does that section describe the

7  definition of a criminal street gang member?

8          A.   No.  It's one of the requirements.

9          Q.   Let me ask you this, okay, according to

10  your understanding.  Does a person who -- does a

11  person have to be involved in criminal activity in

12  order to be listed as a gang member in the Wichita

13  Police Department gang database?

14          A.   No.

15          Q.   Okay.  A criminal street gang, in order

16  to be designated as a criminal street gang, has to

17  have as one of its primary purposes the commission

18  of crimes?

19          A.   Yes, sir.

20          Q.   But for an individual to be listed in

21  the gang database, that person doesn't have to be

22  associated with any criminal activity; correct?

23          A.   Correct.

24          Q.   Okay, and so going -- maybe taking a

25  whole step back, let's just look at Policy 527.

                                                    143

 1    be them associating with one another?

 2           A.    Only one particular occasion? Like this

 3    one time?

 4           Q.    If you were in an Old Town bar at

 5    closing and you saw several members of a street

 6    gang sitting at a table together and talking, would

 7    you consider that those individuals associating

 8    with each other under the meaning of Section F?

 9           A.    Yes.

10                 MR. BRANSON: Object to form.

11           Q.    And you wouldn't have to hear what they

12    were saying; is that right?

13           A.    Correct.

14           Q.    And you wouldn't have to see them giving

15    a hand shake or wearing the dress.  It would be

16    them being there together and communicating with

17    each other; correct?

18           A.    There would have to be other

19    circumstances.  There would have to be that they

20    are wearing gang colors, but just because I walk

21    into a restaurant and there's guys sitting there

22    doesn't mean that they get extended on their gang

23    database entry.  Not in my book.

24           Q.    Okay.  Do different officers maybe

25    apply the criteria differently?

1      A.   Yes, and I am very fair and I'm very

2   honest and I have flagged individuals as associates

3   that meet four criteria.  I could make them an

4   active member, but I just made them an associate

5   for right now because I don't want to make them

6   active.  I would rather have a solid associate

7   flagging than a weak active flagging and so I am

8   very much -- if I was the gang officer that did it,

9   did my research and made sure that everybody

10   matched, would meet the criteria.

11      Q.   Okay. You made sure that every person

12   who was nominated for inclusion into the gang list

13   met all the criteria that they needed to to be

14   included in the gang list?

15      A.   Yes, and every time I've testified in

16   court I've done an audit on the person I went to

17   testify on the person before I testified to insure

18   that they were an active gang member.

19      Q.   Okay. When you say -- what did that

20   audit consist of?

21      A.   So you just -- if you are going to go

22   testify to somebody else's audit because I mean we

23   have a lot of people in the Gang Unit.  If you are

24   going to testify to somebody else's audit or you

25   get called over to court to testify to gang

1   three-year period prior to your testimony?

2       A.   Yes, sir.

3       Q.   Okay.  Why was it important to you to

4   insure that anybody that you were going to testify

5   about their gang status was actually a member of

6   the gang they were being identified with?

7       A.   Because you are testifying in court to

8   it and there's an enhancement to the bond and that

9   is the moral and ethical thing to do is to insure

10  that it is correct and I'm not going to just go off

11  of somebody else's work.  If I'm going to swear

12  before a judge and a jury I'm going to be correct

13  about it.  That's why it's important to me because

14  I would never give my last name a bad name.

15      Q.   Okay. You made a comment -- or actually

16  let me strike that.

17          Is it your testimony that you would not

18  go in court and testify that someone was a member

19  of a gang based on -- or let's say associate.  Is

20  it your testimony that you would not go into court

21  and testify that someone was a gang associate based

22  on having observed them wearing a Washington

23  Nationals jersey in a night club, sitting at a

24  table with other individuals listed on the gang

25  list?

1          A.    I personally would not use that one

2     particular single incident as a documentation of

3     fact.

4          Q.    Okay. Why not?

5          A.    Because it's important to me that if an

6     individual, if I'm going to flag an individual that

7     they are actively involved in the gang lifestyle,

8     that there's more supporting evidence than just you

9     happen to stumble across two boxes and that's why.

10         Q.    So you agree that a person could meet

11    two or three of the criteria on the list without

12    being actively involved in the gang lifestyle?

13         A.    I do not, no.

14         Q.    Okay.  Well, let's look back at

15    Exhibit 5 again.  Your testimony is that you would

16    not check the box that an individual was

17    associating with known criminal street gang members

18    based solely on observing that person sitting at a

19    table with them, sitting at a table with a known

20    gang member in a public setting; is that right?

21         A.    One single occurrence, no.

22         Q.    But you agree that criteria F, as it's

23    listed there, doesn't specify that it needs to be

24    more than one occurrence; correct?

25         A.    Correct.

1        Q.    But you -- the way that you would apply

2   it would be more strict than what is actually

3   written in Section B(2)(f)?

4        A.    In the way -- you are correct.   The

5   way I do apply it is like I first referenced when

6   you called me out on it.   I said well, it's two or

7   more times and you are like where.   I'm applying

8   the active two or more times to the associate and

9   yes, you are correct.   Could you flag them as that,

10  yes.   I personally don't do that.

11       Q.    Okay, and so just to clarify, a person

12  could be flagged under Policy 527 and Kansas

13  Statute 21-6313 as a gang associate or member based

14  on being seen in the presence of someone else

15  that's on the list and wearing a sports jersey

16  affiliated with a certain team?

17       A.    So how that --

18            MR. BRANSON: Object to form.

19       Q.    (By Mr. Baehr) Is that right?

20            MR. BRANSON: Object to form.

21       A.    How that would --

22       Q.    You can go ahead and answer.   I just

23  wanted to make sure that the question was clear.

24  I'm asking if it's true.

25            MR. BRANSON: I'm going to ask you to

1   clarify the question.  Are you talking about

2   active, are you talking associate.  You are only

3   saying two times it calls for -- which criteria are

4   you trying to ask him to meet?

5        Q.   Okay.  If you -- please go ahead and

6   give the answer that you were trying to give and

7   we'll try that.

8        A.   Here's an example I can give you.  A

9   patrol officer walks into Heroes bar tonight.  He

10  sees a guy wearing a Washington Nationals jersey

11  and he's sitting at a table with some Wichita

12  Villian Bloods.  He fills out a TOPS card.  The

13  Gang Unit gets the information and they do their

14  even research into it.  Okay.  They may do research

15  that will provide indicia that yes, he is claiming

16  that.  You know, maybe there's more on the

17  internet; social media, all of that, that help

18  support that claim.  Maybe there isn't anything and

19  so that is something that if we walked into a bar

20  and we saw a guy sitting there, I personally would

21  not be like, document that guy as a gang member.

22  There has to be more to it in my case.

23        Q.   Okay.

24        A.   You're saying per state statute, sure.

25  If you want to check the boxes off and do that,

159

1     that's on you, but again, that's why I fact check

2     everything before I testify in court.

3              Q.    Okay, and just to clarify, when you say

4     that's on me, you mean an officer --

5              A.    Yes.

6              Q.    -- an officer could list somebody as a

7     gang member or associate based on meeting the

8     express criteria in the statute and Policy 527 and

9     nothing more and they could put that person in the

10    gang database?

11             A.    Yes.

12             Q.    And they could testify to that person's

13    gang status at a criminal proceeding?

14             A.    You would have to have a gang intel

15    officer that checks off with that and agrees with

16    it.

17             Q.    Okay, but if a gang intel officer

18    checked off on it then that person could testify?

19             A.    Yes.

20             Q.    Or the gang intel officer, if they saw

21    it differently than you, they could testify to the

22    gang status?

23             A.    Yes, sir.

24             Q.    Different officers might have differing

25    views about what other context is necessary for

1   them to decide whether a person who meets the

2   strict express criteria of the statute should be

3   added to the gang database?

4       A.    Yes.

5       Q.    Okay.  So there may be gang

6   intelligence officers who would put someone into

7   the gang database as a gang associate based

8   strictly on seeing someone sitting at a table with

9   other people listed on the gang list and wearing a

10  Washington Nationals jersey?

11              MR. BRANSON: Object to form.

12      A.    Possibly, yes.

13      Q.    (By Mr. Baehr) Okay. In your personal

14  view, such an individual might not be affiliated

15  with a gang; is that true?

16      A.    Correct.

17      Q.    And you personally would not interpret

18  the simple fact of someone sitting at a table with

19  other people on the gang list and wearing a

20  Washington Nationals jersey as behavior intended to

21  claim membership in the gang.

22      A.    No.  I'm telling you that I would not

23  immediately go enter them into the gang database

24  and flag them as an associate.  Okay.  That's what

25  I'm telling you.

161

```
 1          Q.    I understand.   You would need to see
 2   something more; correct?
 3          A.    Correct.
 4          Q.    And some of that something more isn't
 5   necessarily listed in Policy 527 or the statute;
 6   right?
 7          A.    Correct.
 8          Q.    Okay.   So there may be -- there may be
 9   indicia of gang membership that you, as a gang
10   intelligence officer, would find important to
11   determining whether someone is appropriate for
12   inclusion in the gang database that aren't listed
13   in the policy or in the statute.
14                MR. BRANSON: Object to form.
15          A.    Correct.
16          Q.    (By Mr. Baehr) Okay. On the other hand,
17   a different officer could view it differently; is
18   that right?
19          A.    Always.
20          Q.    There could be an officer whose
21   approach to applying Policy 527 and the statute is
22   just to tick the boxes if the person is observed
23   meeting those criteria and enter them in the
24   database; is that right?
25          A.    Yes, sir.
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
1          Q.   I know we have been going awhile.  I

2    think this is a good time for a break so let's go

3    off the record.

4               VIDEOGRAPHER: The time is 12:17 p.m..

5    We are off the record.

6               (Whereupon a recess was taken from

7    12:17 p.m. to 12:30 p.m.)

8               VIDEOGRAPHER: The time is 12:30 p.m.

9    and we're back on the record.

10         Q.   (By Mr. Baehr) All right.  When we went

11   off we were talking about, I think sort of how you

12   applied Policy 527 and the statute as an officer or

13   as a detective if you observed someone in the

14   community who might meet some of the criteria; is

15   that right?

16         A.   Yes, sir.

17         Q.   Okay.  Part of your role as a gang

18   intelligence officer was to review TOPS cards

19   submitted by other officers; is that correct?

20         A.   Yes, sir.

21         Q.   And other officers might apply Policy

22   527 differently than you would; right?

23         A.   Yes, sir.

24         Q.   They might submit a TOPS card for

25   someone that you would not have submitted a TOPS
```

163

1    card for?

2         A.   Yes, sir.

3         Q.   And they might submit it based on a

4    person meeting the strict criteria of Policy 527

5    without indicia that you would consider important

6    to identifying if that person was involved in gang

7    lifestyle?

8         A.   Yes, sir.

9         Q.   And so part of your job was to review

10   the TOPS card and decide whether to actually add

11   that individual to the database; correct?

12        A.   Yes, sir.

13        Q.   And you would conduct additional

14   research to determine whether you should add that

15   individual to the database; is that right?

16        A.   Yes, sir.

17        Q.   Did you ever add individuals to the

18   database based purely on the information in the

19   TOPS card?

20        A.   Yes.

21        Q.   What would determine whether you added

22   an individual to the database based purely on the

23   TOPS card versus conducting additional research?

24        A.   Like self-admits, that when they

25   self-admit to being in a gang that would be an easy

```
 1            A.    Not that I know of.  They have them in
 2     Missouri.
 3            Q.    Are there non-white nationalist groups,
 4     non-motorcycle groups that operate in Kansas?
 5            A.    I personally have not heard of any.
 6            Q.    Are you aware of whether the
 7     Three Percenters operate in Kansas?
 8            A.    I don't know.
 9            Q.    Okay. Are you aware of whether the
10     Patriot Front operates in Kansas?
11            A.    I've heard of the Patriot Guard for the
12     funerals.  The guys, the veterans for the funerals.
13     I don't know what the Patriot Front is.
14            Q.    Is the Patriot Guard a motorcycle
15     group?
16            A.    Yes.
17            Q.    Are they a criminal motorcycle group?
18            A.    No.
19            Q.    Okay, and just to be clear, when you
20     say -- is it your testimony that you are not aware
21     of any Proud Boys operations in Kansas; is that
22     right?
23            A.    Correct.
24            Q.    And you were not aware of white
25     nationalist groups operating in Kansas; is that
```

 1          Q.    Is it true that an officer might submit
 2     a card identifying that an individual met three
 3     criteria of inclusion in the database under Policy
 4     5257 and you would review that card and determine
 5     well, maybe they did meet those criteria
 6     technically but I don't think that they should be
 7     added to the gang database as a gang member?
 8          A.    As an active gang member, yes.
 9          Q.    Okay.  Can you add an individual to the
10     gang database as an inactive member?
11          A.    No.  You would add them as an
12     associate.
13          Q.    Okay.
14          A.    So instead of an active member you
15     would add them as an associate member.
16          Q.    Okay. So let's --
17          A.    Even though they meet three they are an
18     associate.
19          Q.    Okay.  Why would you add them as an
20     associate if they technically met three of the
21     criteria?
22          A.    Back to The Chosen Few.  Let's say
23     you're property -- in the motorcycle culture that
24     refer to women as property of.  So I don't mean
25     derogatory, but your property of is wearing a