# EXHIBIT 14



# **Pohlman**USA®
## Court Reporting and Litigation Services

---

David Inkelaar

December 2, 2022

---

Progeny, et al.
vs.
City Of Wichita, Kansas

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

PROGENY, a program of Destination )

Innovations, Inc., CHRISTOPHER     )

COOPER, ELBERT COSTELLO, MARTEL    )

COSTELLO, and JEREMY LEVY, JR.,    ) Case No.

on behalf of themselves and        ) 6:21-CV-01100

others similarly situated,         ) EFM-ADM

Plaintiffs,                        )

vs                                 )

CITY OF WICHITA, KANSAS,           )

Defendant.                         )

_____ )

VIDEOTAPED DEPOSITION OF

DAVID INKELAAR

December 2, 2022

1:05 p.m.

Taken at:

Joseph, Holland & Craft

500 North Market

Wichita, Kansas

Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR

```
 1                    MR. BAEHR: Okay.

 2                    MR. AUBRY: My selection of a document

 3       represents my evaluation  so that is attorney work

 4       product.

 5                    MR. BAEHR:  Under that claim of work

 6       product, you would instruct him not to answer which

 7       documents he reviewed?

 8                    MR. AUBRY: Yes.

 9           Q.   (By Mr. Baehr) I'll ask the original

10       question.  Did you review or sorry, did Mr. Aubry

11       give you any documents to review?

12           A.   He did not give me any documents to

13       review.

14           Q.   Okay. Apart from meeting with your

15       attorneys did you yourself review any documents in

16       preparation for this deposition?

17           A.   No.

18           Q.   Okay.  As a detective who is no longer

19       in the Gang Unit of WPD, do you know whether you

20       have access to the gang list?

21           A.   I do not.

22           Q.   You don't know or you don't have

23       access?

24           A.   I do not have access to it.

25           Q.   Okay.  So that certainly wouldn't have
```

1     **get off the gang list and that they were upset and**

2     **that they filed the lawsuit because it's hindered**

3     **them and that's all I know.**

4          Q.   How did you come to that understanding?

5          A.   **Just the paper.**

6          Q.   Okay. No one within WPD ever told you

7     anything about the nature of the lawsuit?

8          A.   **No.**

9          Q.   Okay.  Other than reading initial media

10    accounts of the lawsuit have you done any other

11    research about this lawsuit?

12         A.   **No.**

13         Q.   Okay.  At the time you served as a

14    detective within the Gang Unit of WPD, were you

15    aware of the existence of something called the gang

16    list?

17         A.   **Yes.**

18         Q.   Okay, and were you aware of policies

19    governing the inclusion of individuals on the gang

20    list?

21         A.   **I knew that there was like rules for**

22    **it, yeah.**

23         Q.   Did you use those policies to conduct

24    your duties as a detective in the Gang Unit?

25         A.   **So I didn't have access to the gang**

1    database for a long time while I was in the Gang

2    Unit because they didn't have enough -- I don't

3    know what they call it -- licenses for everybody to

4    have it on your new desktop so I didn't have it for

5    a long time.  Even though I was the senior

6    detective in the Gang Unit I didn't have access to

7    it for a long time.  I finally got access to it for

8    a short amount of time and then they stopped it and

9    then made you sign a waiver to get access to it,

10   like do you know the rule stuff and I never

11   reapplied for it.

12        Q.    All right.  You were first assigned to

13   the Gang Unit in you said March of 2019?

14        A.    Uh-huh.

15        Q.    And you were a detective within the

16   unit for a total of about two years?

17        A.    Two and a half, yeah.  Yeah, two years.

18   I'm sorry.

19        Q.    Do you have a recollection, was it more

20   than a year before you had access to the gang list?

21        A.    It was long enough that -- I'm like

22   this is weird; I don't have access to it so I can't

23   tell you the year but it was a substantial amount

24   of time I didn't ever have access to it.

25        Q.    Eventually you did get access to it?

1         A.    For a very short amount of time.

2         Q.    Would that period of time have been

3    less than a year you had access?

4         A.    Yes.

5         Q.    Would it have been less than six

6    months?

7         A.    I hate to give you a specific but it

8    was a short amount of time when they changed the

9    password and then you had to sign this waiver and I

10   didn't want to go through all that stuff so I

11   didn't reapply to have the gang database.

12        Q.    Okay.  Is it your understanding that

13   only individuals who are working within the Gang

14   Unit are eligible to access the gang database?

15        A.    I think you have to be at least

16   associated with the Gang Unit, yes.

17        Q.    Okay, and the Gang Unit includes

18   detectives.

19        A.    Yes.  It really should be Gang/Felony

20   Assault.

21        Q.    Is there also a Violent Crimes

22   Community Response Team group who also is a part of

23   that unit?

24        A.    There's a Violent Crimes Community

25   Response Team.

```
 1          Q.   Was that true when you were a Gang Unit
 2  detective as well?
 3          A.   Yes.
 4          Q.   So you said you think that access to
 5  the gang database was something that you had to ask
 6  permission for?
 7          A.   Yes.
 8          Q.   Who would you ask from?
 9          A.   I tried to get it from Chad Beard and
10  that's who I assume was the gatekeeper.
11          Q.   And there came a point when you no
12  longer had access and you understood that in order
13  to regain access you would have to sign some
14  waiver?
15          A.   Yes.
16          Q.   And then also reask for permission to
17  have access?
18          A.   Yes.
19          Q.   Okay, and you didn't take those steps?
20          A.   I did not.
21          Q.   Okay.  Why didn't you take those steps?
22          A.   It was a hassle to have to sign this
23  waiver and then I believe at that same time is when
24  the lawsuit hits the paper and I didn't want to
25  deal with any of it.
```

1    two that was in what they called the Gang Intel.

2    It was in the office next door so it was just as

3    easy for me to walk over and ask them and then take

4    that information and put in our affidavit.

5        Q.    When you say ask them, you would ask

6    them if a given individual was listed in the

7    database?

8        A.    Yes.

9        Q.    So you didn't yourself feel that

10   directly accessing the database was a particularly

11   valuable thing for your work?

12       A.    No.

13       Q.    And are you testifying that the primary

14   reason that you would have wanted to access the

15   database -- strike that.

16           Is your testimony that the primary

17   reason you would have wanted to know if an

18   individual was listed in the gang database would be

19   to make sure that you filled out the proper

20   affidavit with respect to that individual?

21       A.    It's the wording, the K.S.A. that meets

22   the criteria of a gang member for charging stuff,

23   that would be the only reason.

24       Q.    That would be the only reason you would

25   want to know if someone was on the gang list?

1    matter if they are a gang member, not a gang

2    member; it's whoever is accused of committing a

3    crime you fill out a charging affidavit.  Once you

4    fill out that charging affidavit then you present

5    it to the District Attorney's; whether the

6    applicable charges are valid or not, and they say

7    without prosecution.  It's the same charging

8    affidavit for everybody regardless if they are a

9    gang member or not.  There's just special wording

10   at the end that just indicates the K.S.A. meets the

11   criteria for a gang member but it's no different

12   than anybody else in the charging affidavit.

13        Q.   Okay.  You file a charging affidavit

14   for any case where you are presenting the result of

15   an investigation to the prosecuting attorney;

16   correct?

17        A.   Yes.

18        Q.   But if the person being charged is a

19   gang member in the gang database there's language

20   that has to be included in that affidavit.

21        A.   Yes.

22        Q.   Okay, and so the reason that you would

23   want to know if an individual was listed in the

24   gang database is to make sure you included the

25   proper language in the charging affidavit if you

1    were filing one?

2            A.    To confirm that they were actually

3    listed as a gang, yes.

4            Q.    And there's no other reason that you

5    would have wanted to know if an individual was

6    listed as a member in the gang database.

7            A.    No.

8            Q.    I want to talk a little bit about your

9    personal background.  Where did you grow up?

10           A.    Douglass, Kansas --

11           Q.    Okay.

12           A.    -- half time and then Wichita, Kansas

13    half time.

14           Q.    And was that starting from birth?

15           A.    No.  Third grade when my parents got

16    divorced.

17           Q.    Okay.  Prior to that time had you been

18    full-time in Wichita?

19           A.    I want to say yes but I don't remember.

20           Q.    Fair enough.  So at least starting in

21    3rd grade you spent half of your time growing up in

22    Wichita; is that right?

23           A.    My mom lived in Wichita; my dad lived

24    in Douglass, Kansas.  He had primary custody.

25           Q.    Where in Wichita did you grow up?

1    detective did you interact with gang intelligence

2    officers because they were gang intelligence

3    officers?

4          **A.    No.**

5          Q.    Okay.  Like you didn't work with them

6    or contact them to find out information in order to

7    facilitate you carrying out your job?

8          **A.    Not specifically for gang stuff, no.**

9          Q.    Okay.  As a gang detective do you

10   contact gang intelligence officers for intelligence

11   about individuals?

12         **A.    I would ask them what -- like if they**

13   **were on the list and what gang they were associated**

14   **with.  I didn't ask for like the mother of the**

15   **children or anything like that, no.**

16         Q.    Understood, and to be clear -- well,

17   strike that.

18               Would you contact a gang intelligence

19   officer to learn if an individual is listed on the

20   gang list in order to make sure that you included

21   the right information in the charging affidavit

22   like we discussed earlier?

23         **A.    Yes.**

24         Q.    Would that be the only reason that you

25   would contact them to find out if someone was on

1    the list?

2            A.    Yes.

3            Q.    Are you familiar with Policy 527?

4            A.    I know it exists.  I don't know the

5    details of it.

6            Q.    What is your understanding of what

7    Policy 527 is?

8            A.    I couldn't tell you.

9            Q.    Okay.

10           A.    I would like to see it.

11           Q.    When you say you know that it exists,

12    what do you mean?

13           A.    I know it deals with something in

14    regards to, I believe flagging gang members.

15           Q.    Do you in your role as a Gang Unit

16    detective -- sorry.  Did you in your role as a

17    Gang/Felony Assault unit detective implement Policy

18    527?

19           A.    Without seeing it I don't want to tell

20    you I did, I didn't.

21           Q.    Okay. Do you have an understanding of

22    individuals that you know do implement Policy 527?

23           A.    I know that like Kevin McKenna was a

24    gang intel officer and I think he's a gang expert

25    and like Donny Moore.  Those guys, yeah.

```
 1    confidential."?
 2         A.   Yes.
 3         Q.   Is it your understanding the gang list
 4    is confidential?
 5         A.   Yes.
 6         Q.   Okay. Are you aware of any incident
 7    involving the release of the gang list to the
 8    public?
 9         A.   Only rumor.
10         Q.   Okay.   What rumor are you familiar
11    with?
12         A.   Man, I can't even tell you what year it
13    was but I was told -- the rumor was that somebody
14    had left -- because the gang list used to be an
15    actual paper list and that maybe had fell out of a
16    car and somebody had grabbed it.   That's the only
17    rumor I ever heard of getting out.
18         Q.   Okay, and was that a rumor that you
19    heard at some time while you were working at WPD?
20         A.   Yes.
21         Q.   And your understanding was that it was
22    describing an event that had happened at that time?
23         A.   Yes.
24         Q.   Like in other words, it wasn't
25    something that you, a rumor that you had happened
```

```
 1    prior to when you were in the department?

 2          A.    No.  I was in the department.

 3          Q.    Okay. Do you remember who you heard

 4    that rumor from?

 5          A.    No.  It's been a long time ago.

 6          Q.    And when you say the rumor was that the

 7    list had fallen out of a car, do you mean out of a

 8    police car?

 9          A.    So there's not much in a patrol car so

10    a lot of our work is done on the rear trunk with

11    the case book and from what I understood is it was

12    on there and it got left there.

13          Q.    So it was lost to the officer who was

14    in charge of it?

15          A.    That's what I understood.

16          Q.    You don't know who that officer would

17    have been?

18          A.    No.

19          Q.    And you don't have a memory of what

20    year or even what decade that would have taken

21    place?

22          A.    I think I was in SCAT.

23          Q.    Okay.

24          A.    They quit making a list and they went

25    to a database shortly after that.
```

1          Q.    Okay. So your best recollection would
2     be that it was sometime between years of 2009 and
3     2015?
4          A.    That would be safe, yeah.
5          Q.    If you look at the next paragraph it
6     says, "A gang member or associate will be
7     identified using the code Signal 33."  Is that in
8     reference to the SPIDER check that we just
9     discussed?
10          A.    I don't know.
11          Q.    Okay.  Who, to your understanding,
12     would be responsible for identifying a gang member
13     or associate using Signal 33?
14          A.    I think when they were put into the
15     gang database that's when -- and if they meet the
16     statutory requirement of what the State of Kansas
17     says is a gang member they automatically get the
18     Signal 33 code.
19          Q.    Okay, and just to make sure we're
20     talking about the same thing, a person could be
21     added to the gang list as a gang member or
22     associate; correct?
23          A.    Yes.
24          Q.    And when that happens, you might refer
25     to that as that person being flagged as a Signal

1    of your responsibility to nominate persons to the

2    Master Gang List?

3           A.    Like -- I want to clarify.  Like it's

4    my job to do it?

5           Q.    Correct.

6           A.    No.  My job was to make sure people

7    were safe.

8           Q.    You understood at the time that there

9    was a process to nominate a person for the gang

10   list; correct?

11          A.    Yes.

12          Q.    And you understood that you had the

13   ability to complete a TOPS card and nominate

14   someone for addition to the list?

15          A.    Yes.

16          Q.    But it wasn't your understanding that

17   you had the responsibility to nominate any person

18   you interacted with who might be a gang member for

19   inclusion to the gang list.

20          A.    No.

21          Q.    So you had discretion as to who you

22   nominated for addition to the gang list?

23          A.    Yes.

24          Q.    And is it your understanding that any

25   patrol officer who is interacting with community

1    members has discretion as to whether or not to

2    nominate a particular individual for addition to

3    the gang list?

4         A.    Yes, but it has to meet the statutory

5    requirement.

6         Q.    Understood.   For them to be actually be

7    added it has to meet the statutory list and it's a

8    Gang Intelligence officer that determines whether

9    they do meet the statutory requirement?

10        A.    Yes.

11        Q.    In terms of nominating someone for

12   inclusion to the list any officer can do that;

13   correct?

14        A.    Yes.

15        Q.    But the officer has discretion as to

16   whether or not they do that for any individual.

17        A.    Yes.

18              MR. BRANSON: Can we take a --

19              MR. BAEHR: Yes.  Let's go off the

20   record.

21              VIDEOGRAPHER: We're off the record at

22   2:35 p.m.)

23              MR. BAEHR: Let's take a five-minute

24   break.

25              (Whereupon a recess was taken from 2:35

1    p.m. to 2:48 p.m.)

2              VIDEOGRAPHER: We are back on the

3    record at 2:48 p.m.

4         Q.   (By Mr. Baehr) All right.  When we took

5    that break we were looking at Section I(B)(1),

6    Exhibit 6; is that right?

7         A.   Yes.

8         Q.   Earlier you testified that you think in

9    your 19 years in WPD you could only recall ever

10   nominating maybe three individuals for addition to

11   the gang list?

12        A.   That's not very many, yeah.

13        Q.   And you as a detective today could

14   still nominate someone for addition to the gang

15   list if you wanted to; right?

16        A.   Yes.

17        Q.   Any officer can do that?

18        A.   Yes.

19        Q.   Okay. It isn't your testimony that you

20   have only encountered three gang members in your

21   19 years in the police department; correct?

22        A.   No.  I've encountered more, yes.

23        Q.   Okay, so there's some that you

24   encountered that you didn't nominate?

25        A.   Yes.

```
 1          Q.    Do you happen to be if the three
 2    individuals that you nominated were added to the
 3    gang list?
 4          A.    I don't.
 5          Q.    So you encountered more than three.
 6    Would you say that encountered dozens of gang
 7    members in all your years on the department?
 8          A.    Yeah, I would say that's safe.
 9          Q.    And I think you testified earlier, you
10    may have encountered individuals as a police
11    officer that you didn't know were gang members;
12    right?
13          A.    Yes.
14          Q.    But is it true that you sometimes
15    encountered differs that you believed were gang
16    members but you didn't nominate them to the gang
17    list?
18          A.    Let me clarify.  The reason why I
19    didn't nominate is because they voluntarily
20    self-admitted.
21          Q.    Understood.  And my question is, did
22    you encounter individuals who you believed were
23    gang members who you didn't nominate to be added to
24    the gang list?
25          A.    I never asked them and they didn't tell
```

```
 1            Q.   And it isn't your testimony that you
 2    never encountered any individual who met the
 3    criteria for being listed in the gang membership
 4    other than self-admission; right?
 5            A.   Yes.
 6            Q.   Okay, and when you say yes, you mean
 7    you agree with the statement that -- that was
 8    correct; is that right?
 9            A.   Yes.
10            Q.   So in other words, you believe you
11    encountered individuals who you could have
12    nominated to be included in the gang list but you
13    didn't nominate every individual that you met who
14    could have been nominated?
15            MR. BRANSON:  Object to the form.
16            Q.   (By Mr. Baehr) Is that right?
17            A.   Are you trying to get me to say that
18    yes, I'm sure on your statement.  Can you rephrase
19    it?
20            Q.   Sure.  As you sit here you don't have
21    an exact recollection of every individual you ever
22    encountered as a police officer; correct?
23            A.   No.
24            Q.   To the best of your recollection, do
25    you believe you have encountered individuals who
```

1    were members of gangs that you didn't nominate to

2    be added to the gang list?

3         A.    Yes.

4         Q.    To the best of your recollection, do

5    you believe you encountered individuals who met the

6    criteria for gang membership under the state

7    statute that you didn't nominate for addition to

8    the gang list?

9         A.    Are you asking me to assume that they

10   were gang members?

11        Q.    No.  I'm actually asking you, to the

12   best of your recollection, do you believe you

13   encountered individuals who met the criteria that

14   you could observe for gang membership under the

15   state statute who nevertheless you did not nominate

16   to be added to the gang list?

17        A.    Without asking I wouldn't know of they

18   self-admit or associated most of the time with

19   known gang members.  I'm not sure because I didn't

20   ask.

21        Q.    Okay. Gang intelligence officers are

22   the people within the WPD who are responsible for

23   determining whether an individual should be added

24   to the gang list based on the state statute

25   criteria; correct?

1      Q.    And did you review the criteria as a
2    regular part of your duties as a patrol officer in
3    WPD?
4        A.    No, I did not.
5        Q.    Did you ever receive training on the
6    criteria?
7        A.    I did.
8        Q.    When did you receive training on the
9    criteria?
10       A.    In the academy.
11       Q.    Other than in the academy did you ever
12   receive any training on the gang list criteria?
13       A.    I don't recall but I'm sure I did.
14       Q.    You don't specifically recall?
15       A.    I don't.
16       Q.    When you were assigned to the
17   Gang/Felony Assault unit, did you receive any
18   training on the gang list criteria?
19       A.    No.    I just knew that the enhancements,
20   what they were.
21       Q.    The enhancement?
22       A.    The part that we put into the
23   affidavit.
24       Q.    Okay.  Did you receive training on the
25   gang member language to be added to affidavits when

```
 1   rotation?

 2        A.   Yes.

 3        Q.   As a part of that rotation you

 4   completed a charging affidavit?

 5        A.   Yes.

 6        Q.   Was that the first time you completed a

 7   charging affidavit?

 8        A.   Yes.

 9        Q.   You did that in preparation to apply

10   for detective?

11        A.   Yes.

12        Q.   Okay. So is it right that you didn't

13   receive training on the charging affidavit language

14   relevant to gang members at the time you joined the

15   Gang Unit as a detective?

16        A.   I didn't receive any formal training on

17   it, no.

18        Q.   Okay, and throughout the time that you

19   were on the Gang/Felony Assault unit did you

20   receive any training over any provision of the

21   Policy 527?

22        A.   I don't remember getting it, no.

23        Q.   At any time as a member of the Gang

24   Unit, did you receive training on the criteria for

25   adding a person to the gang list?
```

1          **A.    I don't remember that, no.**

2          Q.    Okay.  As you sit here today -- or a

3    moment ago I asked you what criteria for gang

4    membership under the state statute you can recall

5    off the top of your head.  Do you remember that?

6          **A.    Yes.**

7          Q.    Is that memory based on having reviewed

8    those criteria at some time over the last 19 years?

9          **A.    Yes.**

10         Q.    Do you know when the last time you

11   would have reviewed those criteria was?

12         **A.    I can't tell you the last time I seen**

13   **this policy.**

14         Q.    Would the first time have been in the

15   police academy?

16         **A.    I don't know how long this policy**

17   **existed.  I want to say yes.**

18         Q.    Do you remember receiving training

19   during the police academy for the criteria for

20   adding people to the gang list?

21         **A.    Yes.**

22         Q.    Do you believe you have reviewed those

23   criteria at any time since police academy?

24         **A.    I don't think so.**

25         Q.    Okay.

```
 1            Q.   It wasn't -- you don't recall a time

 2   when you were required to review those criteria as

 3   part of a training.

 4            A.   No.

 5            Q.   Okay.  Is it your belief that other

 6   than voluntarily reviewing the criteria there would

 7   be no reason that a police department member would

 8   be required to review the criteria for gang

 9   membership after graduating from academy?

10            A.   Yes.

11            Q.   Given that you don't specifically

12   recall all of the criteria for gang membership

13   under the state statute, is it fair to say you

14   don't know whether you have encountered individuals

15   who meet those criteria that you haven't nominated

16   to be included on the gang list?

17            A.   That's fair.

18            Q.   Is it fair to say there are officers

19   who have nominated more than three individuals to

20   be added to the gang list over the course of their

21   time in WPD?

22            MR. BRANSON:  Object to form.

23            A.   Yeah.  There's other people.  More than

24   three, yeah, for sure.

25            Q.   (By Mr. Baehr) Okay. Is it fair to say
```

1    that some officers might nominate more people to be

2    added to the gang list than others?

3            MR. BRANSON: Object to form.

4        **A.   I know that there are other people who**

5    **have put in, like McKenna, who work in the Gang**

6    **Intel that put in more than three, yes.**

7        Q.   (By Mr. Baehr) Do you know if there

8    were some patrol officers who tended to nominate

9    people to be added to the gang list more than

10   others?

11       **A.   I don't personally know since I worked**

12   **south side of town.**

13       Q.   Okay.  Based on your experience with

14   the nominations that you made, do you agree it's

15   possible that some officers might have nominated

16   more people to be added to the list than others?

17       **A.   Sure; yeah.**

18       Q.   All right.  Let's look at Exhibit 5,

19   which I think is close to you.  Here it is.  Do you

20   see at the top of the page where it says 21-6313?

21       **A.   Yes.**

22       Q.   Do you understand Exhibit 5 to be a

23   copy of Kansas Statute 21-6313?

24       **A.   Yes.**

25       Q.   And I'll direct you to maybe a third of

```
 1              A.    Yes.
 2              Q.    Do you know whether some other officers
 3     might nominate to the gang database even if a
 4     person didn't self-identify as a gang member?
 5              A.    You would have to ask them.  I don't
 6     know.
 7              Q.    You don't know.  Would you agree that
 8     under the statute someone could be nominated to be
 9     added to the gang list even if they didn't
10     self-identify as a gang member?
11              A.    They could be, yes.
12              Q.    And you would agree that under Policy
13     527, a person could be added to the gang list even
14     if they didn't self-admit as a gang member?
15              A.    They could be, yeah.
16              Q.    Okay. So for you, the criteria that you
17     would apply to determine whether someone actually
18     was a gang member is whether they self-admit.
19              A.    Yes.
20              Q.    Okay. Other officers might apply
21     different criteria to determine whether somebody
22     should be added to the gang list.
23              A.    They could.
24              Q.    Okay.  What does -- if you look back at
25     paragraph (D) that we were just looking at, what
```

 1    everyday for one week you wouldn't consider that

 2    frequenting?

 3         A.    I would not.

 4         Q.    Could a different officer consider that

 5    frequenting?

 6         A.    You would have to ask him.  They could.

 7         Q.    The criteria here don't specify to you

 8    as an officer what exactly frequenting means?

 9         A.    It does not.

10         Q.    And different officers could interpret

11    it differently?

12         A.    They could.

13         Q.    If you look at criteria (F) it says

14    "Associates with known criminal street gang

15    members."  Do you see that?

16         A.    Yes.

17         Q.    What does that mean to you?

18         A.    That they are hanging out with an

19    individual who is a documented gang member.

20         Q.    What does documented gang member mean

21    to you?

22         A.    Meets the criteria of self-admit or the

23    three.

24         Q.    Okay. So if you saw two people together

25    and they both met three of the criteria, you could

1    say they are also associating with each other so

2    they meet criteria (F)?

3              MR. BRANSON:  Object to form.

4         A.   No.  I would say like if you see

5    them -- when we're talking about frequent or

6    multiple times, they are  in the same car, hanging

7    out, that they were hanging out with that same

8    criminal member way more than like if you went to a

9    friends house and played XBox.

10             Q.   So is there a minimum number of times

11   that you have to see two people together to

12   conclude that they were associating with each

13   other?

14        A.   There's not a minimum, no.

15             Q.   Would you conclude that two people who

16   were associating with each other under the meaning

17   of Section F here if you just saw them together one

18   time?

19        A.   No.  I wouldn't associate.

20             Q.   Okay. Looking at the language of

21   Exhibit F, does it specify a minimum number of

22   times that two people would have to be observed

23   together to be considered associating?

24        A.   It does not.

25             Q.   Could different officers interpret the

1  meaning of associate in Section F differently?

2       **A.  They could.**

3       Q.   And so one officer could consider an

4  individual to meet criteria F where a different

5  officer wouldn't consider that person to meet

6  criteria F, is that fair?

7       **A.  Yes.**

8       Q.   Is the same true for criteria D that we

9  just talked about, frequents the gang's area?

10      **A.  Yes.**

11      Q.   And is the same this true for criteria

12  E that we just talked about because of color or

13  style of dress?

14      **A.  Yes.**

15      Q.   Is it true then that two officers could

16  look at the same individual and one conclude that

17  person meets the criteria of gang membership and

18  the other one conclude they don't meet the criteria

19  for gang membership?

20      **A.  They could.**

21      Q.   Okay.  If you look at criteria B,

22  capital B here, it says, "Is identified as a

23  criminal street gang member by state, county or city

24  law enforcement officer or correctional officer or

25  documented reliable informant."  Do you see that?

1          Q.    What does a criminal street gang area

2    mean to you?

3          A.    Just a neighborhood or area or a street

4    that they associate with.

5          Q.    You used the example, I think, of

6    Piru's in the 1300 block of 13th; correct?

7          A.    Yes.

8          Q.    Are there other gangs that are

9    associated with particular blocks within Wichita?

10          A.    Yes.

11          Q.    Some gangs that are associated with

12    particular residences?

13          A.    Yes.

14          Q.    Some gangs that are associated with

15    entire neighborhoods?

16          A.    Yes.

17          Q.    Are there some gangs that are

18    associated with the north side or south side of

19    town?

20          A.    Yes.

21          Q.    Could any of those areas be considered

22    a gang's area to you under the meaning of paragraph

23    D there?

24          A.    To me personally?

25          Q.    Yes.

1          A.    No.  I mean -- if I had like a Nortenos

2    I wouldn't just associate the north side with the

3    whole gang.  It's usually the streets or the --

4    when I say like a neighborhood, like a couple of

5    blocks in that area.

6          Q.    Do you know whether particular criminal

7    street gang area here in the statute is meant to

8    include like the entire north side?

9          A.    I don't take it as that way but --

10          Q.    Could someone else interpret it that

11    way?

12          A.    I guess they could, yeah.

13          Q.    To your knowledge, is there any list or

14    map that would identify what parts of Wichita are a

15    particular street gang area and what parts aren't?

16          A.    Not that I'm aware of.

17          Q.    So if you were going to assess whether

18    an individual met criteria D, you wouldn't

19    reference a set list or map of gang areas?

20          A.    No.

21          Q.    Okay. You would just use your knowledge

22    of the neighborhoods based on your experience as a

23    police officer?

24          A.    Yes.

25          Q.    Okay, and different police officers

1    might have different experience and knowledge;

2    right?

3          A.    Yes.

4          Q.    So they might interpret a gang's area

5    differently than you would?

6          A.    They could.

7          Q.    Is there a way for me as an individual

8    to know if I'm in a particular street gang's area?

9          A.    I think you can request a meeting with

10   Chad Beard to talk over it.

11         Q.    Okay. Let's say I want to go to dinner

12   tonight and I do not want to be considered a gang

13   member, okay, and maybe you would say I don't have

14   to worry about that, but let's say my background,

15   my family, my associates might put me at risk to be

16   considered a gang member.  Okay.  Maybe I meet

17   other criteria on this list.  Okay?

18         A.    Okay.

19         Q.    But I'm not a gang member and I don't

20   want to be added to the gang list.

21         A.    Okay.

22         Q.    How do I avoid going into a criminal

23   street gang's area so that I don't meet that

24   criteria?

25         A.    I don't know.

```
 1    527?

 2          A.    You're asking for my opinion?

 3          Q.    Yes.

 4          A.    It's not appropriate -- the union would

 5    not have any involvement.

 6                MR. BRANSON: You are asking for his

 7    opinion or the position of FOP?

 8          Q.    (By Mr. Baehr) So I'm asking if the FOP

 9    has a position regarding whether Policy 527 should

10    be revised or not.

11          A.    That's Operations.  It would be up to

12    the commanders.

13          Q.    So your answer to that question is no,

14    FOP does not have a position regarding whether

15    Policy 527 should be revised?

16          A.    No, I don't have a position.

17          Q.    Okay.  Do you as a former detective

18    within the Gang/Felony Assault unit have a position

19    or an opinion or as to whether Policy 527 should be

20    revised?

21          A.    Do you want my personal opinion?

22          Q.    Your opinion based on your experience

23    as an officer and a detective within the Gang Unit.

24          A.    I always think that there should be a

25    mechanism or a way that if you are on that to be
```

1    able to talk to see why you are on there and how to

2    be removed.   I think everybody should have a

3    appeals process.

4           Q.    And as you read Policy 527 today it

5    doesn't include any process to challenge somebody's

6    inclusion on the gang list?

7           A.    Not that I'm aware.  I don't remember

8    seeing --

9           Q.    But your personal opinion based on your

10   experience as an officer is that there should be

11   some way to challenge inclusion on the list?

12          A.    Yes.

13          Q.    Okay. Are there any other revisions

14   that you personally think would be appropriate for

15   Policy 527?

16          A.    I haven't read all of it obviously.  I

17   think it's important that there's a grievance

18   procedure.

19          Q.    Okay. In connection with that do you

20   think it's important for there to be a procedure to

21   notify an individual if they are placed on the gang

22   list?

23                MR. BRANSON: Objection to form.

24          A.    I think if they ask we have to tell

25   them if they are on the gang list.