# EXHIBIT 18



**Pohlman**USA®
Court Reporting and
Litigation Services

Jose Salcido

December 15, 2022

Progeny, et al.

vs.

City of Wichita, Kansas

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PROGENY, A PROGRAM OF )
DESTINATION INNOVATION )
INC., CHRISTOPHER )
COOPER, ELBERT )
COSTELLO, MARTEL ) Case No.
COSTELLO, AND JEREMY ) 6:21-cv-01100-EFM-ADM
LEVY, JR., ON BEHALF )
OF THEMSELVES AND )
OTHERS SIMILARLY )
SITUATED, )
)
        Plaintiffs, )
)
   vs. )
)
CITY OF WICHITA, )
KANSAS, )
)
       Defendant. )
_____)


VIDEO DEPOSITION OF JOSE SALCIDO


The video deposition of JOSE SALCIDO, taken before
Nancy L. Rambo, RPR, CSR, at the law office of
Joseph, Hollander & Craft, Wichita, Kansas, on
the 15th day of December, 2022, commencing at
8:33 a.m.

```
 1          had this concept in mind that if we could reach
 2          parents whose kids were stopped in -- in a car
 3          with a known gang member, we -- we could
 4          off-ramp them early.  And so you would reduce
 5          the gang list that way quickly and avoid the
 6          violence downstream, you know what I mean?  If
 7          you didn't get to them early, you were going to
 8          get to them on a case where they went from
 9          putting graffiti on a building to now shooting
10          at somebody.  It's hard to do that when they've
11          shot at somebody 'cause that's a whole different
12          dynamic.
13   Q      You -- you've talked about this notion of
14          reducing the gang list, I think, right, I think
15          I heard you say that a couple times?
16   A      By providing the services.
17   Q      Okay.  By preventing people from getting on the
18          gang list at all --
19   A      Correct.
20   Q      -- is that right?
21   A      Correct.
22   Q      Was it also important to reduce the gang list in
23          terms of making sure that the people on it were
24          actually gang members?
25   A      I can -- I can tell you that -- that if -- if --
```

1     if there's one thing we can do right is -- is
2     audit that gang list.  The -- the guys we got
3     working up there are very good at that, so I'm
4     very confident and I trust that they're -- that
5     they're identifying them based on the -- the
6     criteria.
7          What I will tell you is that it's important
8     to me -- it was important to me, especially at
9     the stage of my career, to do something more.
10    We -- we are not very good -- we're very good at
11    putting them on because they -- we have a whole
12    unit dedicated to that.  What I wanted to do was
13    get very good at getting them out, off-loading
14    them from the gang list.
15         And I think I could do that with a large
16    portion of them, the -- the guys who are barely
17    getting in and those gang members who are kind
18    of indoctrinated into the gang but really have
19    not committed the type of crimes that would make
20    it harder for us to do that.
21  Q   Okay.  And I -- and I appreciate that, and we'll
22      talk a little bit more about that, but just a
23      simple question that I sense you'll probably
24      agree with, but it's important to you to make
25      sure that -- that the people on that list

```
 1          be, I don't know.  You know, I grew up in the
 2          north end.  At some point, I -- I probably could
 3          have ended up as an associate 'cause I had
 4          friends who were in the gang, you know what I
 5          mean?  That was my concern.
 6     Q    Yeah.  And -- and what was it about your
 7          experience growing up that you think might have
 8          put you at risk for being identified as an
 9          associate?
10     A    Well, A, I lived in prime -- you know, the gangs
11          that started in Wichita in 1989, I lived in the
12          same neighborhood, for one, you know, and --
13          and -- and I, you know, I had -- like I said, I
14          had friends who -- who -- who were in the gang,
15          not close friends but, you know, a peer group
16          that hung around the neighborhood.
17     Q    Now, tell me -- I mean, you're sitting here
18          today, you're the deputy chief, you've got
19          military service, you've got two master's, but
20          you had some -- some peers who you knew and --
21          and hung around with a little bit who you knew
22          to be in gangs, right?
23     A    Correct.
24     Q    And what sort of gangs were these?
25     A    They were -- as far as I -- I don't understand
```

1          your question.

2     Q    What -- what gangs were these?

3     A    We had the Vato Loco Boyz that started -- I

4          believe one of the original gangs in Wichita.  I

5          had -- I had friends, one or two friends that

6          were Crips that started here in Wichita at that

7          time.  You know, in 1993, there was a mass -- a

8          mass exodus of Latinos from California due to

9          Governor Wilson, when he passed -- wanted to

10         pass Proposition 187, a lot of Latinos bailed

11         and came here and they started the Sur 13 gang

12         in '93 down in Plainview so ...

13    Q    And did some of these -- some of these gang

14         members in your area, did they dress in a

15         certain way?

16    A    Yes, they did.

17    Q    And what kind of dress did they --

18    A    For the VLBs, it was a black and white, Raiders

19         jackets, bandanas, very distinct bandanas

20         hanging from their pocket.  You don't see that

21         as much today, but back then it was very

22         prevalent.

23    Q    And you would sometimes hang -- yeah, you'd hang

24         around some of these guys in the neighborhood?

25    A    You would run into them in class at school, at

1       church, at the store, you know what I mean?  We

2       played football together, you know what I mean,

3       they -- they were my age.

4    Q  Right.  And there are -- there are -- you guys

5       are like, what, getting together at the

6       playground to play football and you're there

7       with a bunch of guys who -- who are actually

8       gang members?

9    A  Correct.

10   Q  And what were you wearing?

11   A  I was wearing -- well, I wasn't wearing black

12      and white, but I was wearing clothes that to the

13      untrained eye could have looked like I was in a

14      gang.  You know, at one point I went to the

15      store to get a drink, which was -- it was at

16      21st and Waco, and I lived in the 2100 block of

17      Park Place, about a quarter mile, maybe a half,

18      and I remember an officer following me the whole

19      time because he thought I looked like a gang

20      member.  And I don't know who that officer was,

21      but, you know, growing up in the neighborhood, I

22      actually would knock on cops' doors and get

23      football cards.  So I didn't have that distrust

24      of the cops.

25   Q  Uh-huh.

1  A    But, you know, it didn't feel good for me to be

2       followed all the way home just 'cause I could

3       have looked like a gang member, you know what I

4       mean?

5  Q    You felt at one point in time you were profiled

6       a little bit?

7  A    Maybe.

8  Q    Yeah.

9  A    You know, I -- he never spoke to me, but he

10      followed me so slow that I'm like, hey,

11      something's wrong with his car or he's following

12      me home, I mean, he was going like 10 miles an

13      hour.

14 Q    And --

15 A    Or maybe lower, slower than that.

16 Q    -- and do you remember what you were wearing at

17      that point in time?

18 A    I was wearing jeans, a jacket, and a hat.  And

19      it was cold that day kind of like today, and I

20      had it low and it might have looked like I was

21      in a gang.

22 Q    Just because you were wearing your hat low?

23 A    Right, maybe.

24 Q    And -- and because of the area you were walking

25      in?

1   A   Correct.

2   Q   And were you wearing any black and white or

3       anything like that, any of those?

4   A   I can tell you to this day, it made such an

5       impression, I can tell you exactly what I was

6       wearing.  I was wearing a jacket, like a little

7       puffy jacket, green color.

8   Q   Green?

9   A   Yeah, and I think jeans.  But I wasn't -- I

10      wasn't sagging or anything.

11  Q   Sneakers?

12  A   Yes.

13  Q   Winter hat?

14  A   Black, yes.

15  Q   Pulled low?

16  A   Yes.

17  Q   Anything else?

18  A   That's it.

19  Q   And I imagine at that point growing up in that

20      context --

21  A   Uh-huh.

22  Q   -- it was -- there was probably sort of a

23      balancing act of making sure you weren't being

24      identified as a gang member but yet being able

25      to participate with your peers in things?

1                    MR. BRANSON:   Object to form.

2    A    I guess I don't really understand your

3         question --

4    BY MR. SULLIVAN:

5    Q    Yeah.

6    A    -- you mean I had to balance --

7    Q    Well, and I'm just -- I'm just thinking about

8         your -- the example you talked about playing

9         football with these guys, right, you were -- you

10        were playing football with these gang members,

11        but you told me when you were playing football

12        with them you were careful not to wear black and

13        white, right?

14   A    Yes.

15   Q    And -- but at the same time, you wanted to play

16        football with them 'cause that's what kids do,

17        right?

18   A    Yes, and, I mean, in -- it was to me that they

19        knew that I was not that -- you know, that I

20        would never jump into the gang because I had

21        other things, you know, I had school and a stern

22        mom, you know what I mean?  But you would run

23        into them at different places, and so you pretty

24        much were not -- I was unconcerned about what

25        the police thought, but I was very concerned

1       that they thought that -- that they would have

2       thought that I was, you know, very friendly to

3       the cops even at that time.

4   Q   And is one of the -- I think you mentioned -- I

5       think where we started with this line of the

6       conversation is that looking back on it, you

7       think you could have identified -- been

8       identified as an associate?

9   A   Probably as an associate, not a -- not full gang

10      member 'cause I -- you know, whatever but

11      yeah -- yes.  You know, and I will tell you up

12      until 1989, the phenomenon of gangs here was not

13      really strong.  It really kicked off after that

14      movie Colors came to town, and then everybody

15      thought they needed to join a gang.  And I --

16      and that -- that's -- that's what happened.

17  Q   And if you had been identified as an associate,

18      that would have been an error, correct?

19  A   I suppose so, that's why the associate thing has

20      never been very appealing to me.

21  Q   And the associate thing, this gets back, I

22      think, to where we started, you know, the

23      associate -- the designation of associate --

24  A   Uh-huh.

25  Q   -- seems to be a hard one to get right if even

1    enforcement, you know, I mean, pretext stops,

2    that -- that whole thing.

3  Q  Was that -- was that focused on Black and

4    Hispanic areas?

5  A  At the time most of the -- most of the drive-bys

6    were happening in both those communities.

7  Q  Okay.

8  A  Like I said, it took 10 to 15 years for the

9    community to -- to start to engage again.

10 Q  Uh-huh.  And that -- that predated, is it your

11   understanding that predated the Kansas gang

12   statute?

13 A  I don't know what year it passed, but I think it

14   did slightly.

15 Q  Okay.

16 A  Yeah.  And I -- I don't know if Speer provided

17   input into the crafting of the -- the statute, I

18   don't know.  I don't know who provided public

19   testimony, don't know.

20 Q  Okay.  You mentioned, when we were talking about

21   Beard, you said, you used this phrase a new

22   beginning --

23 A  Right.

24 Q  -- right?  And I think you said part of your

25   vision or part -- part of the new beginning

1          would be an effort to reduce the

2          overrepresentation of Black and Latinos on the

3          gang list?

4    A     To -- to offer those kids a new beginning, to

5          say, hey, listen -- you know, and this would

6          have been done in conjunction with -- with,

7          like, the -- the juvenile district attorney or

8          even the district attorney to say, minor crime,

9          let's see if we can get them into services as

10         long as they agree.  I was even considering

11         putting them in -- in a suspended status even as

12         a gang member to say, for a year we'll suspend

13         you as long as you complete drug treatment,

14         tattoo removal, if you want, whatever it is, if

15         you fulfill these conditions you'll -- you'll be

16         held in suspense for a year.  And if you

17         complete all of this stuff, then -- then you

18         don't have to deal with this anymore.

19   Q     And you -- you believed that Blacks and Latinos

20         were overrepresented in --

21   A     I know they're overrepresented.  But -- but --

22         but if -- if -- if you use the same

23         socioeconomic factors in any community, if --

24         if -- if the -- if the -- if the medium

25         household income or the poverty level was the

1        same in -- in the predominantly White area of

2        town you would have gangs there too, you know

3        what I mean?  So it's bigger than just the --

4        the -- the -- I think poverty breeds gangs, you

5        know.  If you look at the history of this

6        country, the Irish, the Italians started out as

7        neighborhood gangs.

8    Q   But they -- it sounds like there's no question

9        in your mind that the Blacks and Latinos are

10       overrepresented?

11   A   No, no question in my mind, I can tell you they

12       are.  I -- I think last time I looked, maybe it

13       was a couple years ago, but I used to keep a --

14       keeps tabs of that.  I'm sensitive.

15   Q   And I -- you're very -- it sounds like you're

16       very educated on the problems?

17   A   Oh, yes.

18   Q   But you've never -- you mentioned the poverty;

19       they're overrepresented, the Blacks and Latinos

20       are over -- overrepresented notwithstanding the

21       poverty?

22   A   Correct.  Correct.  You know, and when -- when

23       we identified the Mongols as a gang, that's a

24       predominantly White -- White gang, and so I was

25       like, okay, this is -- brings a little more

1          **balance.**

2    Q    **Yeah.  And we'll talk a little bit more about**

3          **this maybe later, but White gangs are prominent**

4          **in -- in the area and have been for a long time,**

5          **right?**

6    A    **Yeah, mostly -- mostly with a slant to those**

7          **White gangs are ideological on the white**

8          **supremacy stuff.  We worked a case here years**

9          **ago with -- with -- with one of them.**

10   Q    So back to this -- back to this issue, I'm just

11         trying to sort through in my own head, you move

12         Beard into the field?

13   A    **Uh-huh.**

14   Q    Right?

15   A    **Uh-huh.**

16   Q    And you think there's some resistance, then,

17         from the union, right?

18   A    **Yes.**

19   Q    Okay.  And you think the union, you think one of

20         the reasons they were resistant is they didn't

21         like this -- this vision you had, correct?

22   A    **Correct.**

23   Q    And --

24   A    **And, again, I don't -- I didn't hear this from**

25         **anybody, I just think that it's not coincidental**

```
 1        what specifically were some of the things that

 2        you had wanted to achieve that were basically

 3        chilled by this?

 4    A   Right, so the -- the one thing we talked about

 5        is -- is -- is creating a joint panel with

 6        community members from both the African American

 7        community, and -- and I actually spoke to a

 8        citizen, a community member at the time, and one

 9        from the Latino community and then three law

10        enforcement officers, one being the captain over

11        the -- over the gang unit, and then two other

12        members, maybe a juvenile intervention officer

13        to -- to identify sources, resources.

14            And at the time -- and we were just batting

15        this -- brainstorming this idea around, but it

16        got to the point that I actually called

17        Ms. Johnson, who was married to our -- one of

18        our council persons, Brandon Johnson, to see if

19        she would serve on this board because she is --

20        she would have challenged the -- the -- the --

21        the law enforcement guys on the board, you know

22        what I mean?  I didn't want an agreement, an

23        agreeing voice, I wanted a little bit of a

24        dissenting voice, with somebody that is

25        reasonable and can listen -- listen to reason.
```

1    **After that, you know, once I didn't proceed, I**

2    **didn't ever call her again.  But she had said**

3    **if -- if we can -- if we can talk, I might be**

4    **interested.**

5    And, again, this is part of brainstorming,

6    nothing concrete, nothing that I -- that I --

7    that I pushed further.  But, you know, that

8    was -- that was one -- one idea that -- there

9    could have been others, I was just open to -- to

10   talk to my people to say -- 'cause I wanted to

11   include them in the decision making, I was like

12   how would you do this, but then I didn't do

13   anything with that after -- after this.

14   Q   And how did some of those things, like the joint

15       panel, connect in your mind to your vision for

16       reducing the overrepresentation of Blacks and

17       Latinos on the list?

18   A   Great question.  So as we identified kids that

19       were not really in the gang but were headed that

20       way, we -- we -- we -- what I wanted them to do,

21       or that we were about to put them on the list,

22       say we stopped a kid who met the criteria, to

23       say, hey, we're going to give you an opportunity

24       to contact parents, bring them in here to say,

25       listen, your son is going on this list, that can

```
 1          they also look at all the crimes that the gang

 2          member has potentially committed or not

 3          committed for the period of time.

 4    Q     But if one of -- one of these officers was going

 5          to do an audit of a -- of a gang member, or a

 6          gang associate for that matter, tell me how they

 7          do that.

 8    A     Typically, you would do a full research of the

 9          person, like what -- what crimes they have

10          committed, at least in my time; I don't know if

11          it's changed since.  But they -- they -- they

12          would look at -- at their criminal history and

13          then maybe any other intel, like open source,

14          Facebook, those type of things where -- where

15          they're exhibiting gang behavior.

16    Q     How are they trained to do these audits?

17    A     Typically, there's no formal training, but you

18          kind of do on the job with a -- with a -- with a

19          officer that -- a senior officer from that unit,

20          somebody that's been there awhile.

21    Q     So they don't go to a class?

22    A     I don't think there's a course, no.

23    Q     Do they review any materials?

24    A     To my knowledge, no.

25    Q     Are they trained in -- in the keeping of any
```

1       statistics?

2    A  As far as what?  I guess I don't understand.

3    Q  Do they receive any training in statistics?

4    A  No.

5    Q  They receive any training with regard to bias?

6    A  Yes, the -- the entire department is required to

7       go -- to undergo bias training once a year.

8    Q  What about with respect to the audit process

9       specifically?

10   A  No, not -- not specific to -- to the audit

11      process, no.  Every officer gets it, not just

12      them.

13   Q  And this -- so this training is -- to learn how

14      to do these audits is completely informal?

15   A  Yeah, I -- I think it's on the job; it's like

16      I've been there five years, you come on, I -- I

17      teach you how to do it.

18   Q  Like how long -- how long does -- how long does

19      the -- the one person that was doing the audit

20      teach the new guy, how -- how long do they spend

21      doing it?

22   A  Well, I think it's an ongoing thing because

23      there's some nuances as far as like what, you

24      know -- there would be some nuances as to -- as

25      to like, hey, this is important because type of

```
 1          good at audits or they've demonstrated some kind
 2          of skill?  Usually when you pick a team, you're
 3          trying to appoint people that will be good in a
 4          position, right?
 5     A    Well, I know what you're getting at, the --
 6          the -- it boils down to this, it's -- it's -- if
 7          they want to join the gang unit, then they put
 8          in for the gang unit, and they're expected to do
 9          audits.  We don't -- there's no audit -- there's
10          no audit training other than what they get from
11          the guy who has been there for five years.
12     Q    I know, so you don't -- but you -- so when these
13          guys get there, you don't even know if they're
14          good at audits?
15     A    No.
16     Q    Yeah.
17     A    They actually get -- have to get taught how
18          to -- how we expect for the audit to happen.
19     Q    So what if -- what if there's one open position
20          on NIBIN and all the officers put in for that
21          position, who gets the -- how do you choose who
22          gets to stay to do the audit?
23     A    Well, if there's an open for NIBIN, the --
24          the -- the way I understand the -- the contract,
25          we -- we have to open it to all the CRTs
```

```
 1        you were not committing crimes, you -- you --

 2        you have termed out of the list because you're

 3        past your three years so I can -- I can say,

 4        okay, he comes off the list.

 5   Q    Is there any basis to remove somebody from the

 6        list in your experience other than that

 7        three-year clock?  Have you ever seen anybody

 8        removed from the list on the basis of any fact

 9        other than the expiration of the three years?

10   A    For the first time in my career I saw that this

11        year, and basically the name was similar to

12        somebody else and they attributed -- whoever had

13        made the notes had attributed something to that

14        person that was not true.  When we ran through

15        it, when the officers up there ran through it,

16        they're like, wait a minute, this is not the

17        same guy, there was a mistake, and so that

18        person got dropped.

19   Q    There was a misidentification?

20   A    Yeah, with very similar names.

21   Q    Okay.  And that's the only time --

22   A    In my --

23   Q    -- somebody's been removed from the list for --

24   A    That I can -- that I can remember.

25   Q    Okay.  So based on your recollection, the only
```

1    time somebody's been removed from the list --

2  A  Uh-huh.

3  Q  -- based on a fact other than the expiration of

4    the three years is that single

5    misidentification?

6  A  Yes.

7  Q  And who -- who is the name of that person?

8  A  I -- I -- I don't remember.

9  Q  Who is the officer who did that audit?

10  A  One of the two officers that are sitting up

11    there right now, they ...

12  Q  And who are they?

13  A  I ...

14  Q  All right.

15  A  Yeah.

16  Q  So the -- the new activity that the officers who

17    are doing the audit are reviewing --

18  A  Yes.

19  Q  -- what generally is that activity, how can that

20    get anybody off the list?

21  A  So -- so say you are on the list, right, and

22    this is the best way I can explain it to you,

23    say you're on the list, when I have police

24    contact with you, you are flagged in our system

25    as a signal 33, which is a person on the gang

```
 1   A     That, to me, that -- that would be too broad.
 2         I -- I do think a calculus in an officer's mind
 3         is if this gang member is leaving a known gang
 4         house, hangout, that would be a factor in that
 5         case.
 6   BY MR. SULLIVAN:
 7   Q     And that is something that would be -- and --
 8         strike that.  Tell me -- say more about that,
 9         what do you mean?
10   A     What I'm saying is there are -- there are --
11         there are homes all over the city where gangs
12         either engage in -- in selling drugs or hanging
13         out or there is drive-bys on -- on that hangout,
14         that would be a factor, you know what I mean?
15   Q     So the areas?
16   A     Not necessarily the areas 'cause you can have a
17         gang hangout that would -- that -- that would be
18         outside of -- 'cause I don't know how it is in
19         Philly -- Philly, I believe everything would be
20         very neighborhood based.  Most of our gang
21         members are commuters, they commute somewhere to
22         commit a crime and then drive back.  But it's
23         not as geography-based gang activity here as in
24         other cities.  There's no -- with very few
25         exceptions, there's no gang territory.
```

```
 1        an admission, received an admission?
 2   A    For me to answer your -- your question, I would
 3        have to have more direct -- direct tie -- direct
 4        observation of those officers to -- to
 5        truthfully answer your question.  Now, the
 6        problem is -- is -- not a problem necessarily
 7        but the thing is I would tell you that -- that
 8        we -- we demand and expect those officers when
 9        they're doing this to -- to be very thorough,
10        and I -- I have full faith and confidence in --
11        in that ability, that if they're going to put
12        the gang label on somebody they -- they
13        better -- they better know what they're doing.
14   Q    And it's got to -- you're right, it needs to be
15        thorough, right?
16   A    And I think it is.
17   Q    Okay.  But -- and that's what I'm asking, have
18        you ever seen it or heard about it as a matter
19        of practice that the officers auditing these
20        reports have followed up with the officers who
21        took the admission to make sure that is
22        accurate?
23              MR. BRANSON:  Object to form.
24   A    I -- you know, I'd have to -- there's just so
25        many things, I -- I -- I can't remember specific
```

1      instance where that happened.  I -- I -- I think

2      that we -- we have a lot of faith and -- and

3      trust that our officers are being thorough --

4  BY MR. SULLIVAN:

5  Q    Okay.

6  A    -- when it comes to that.

7  Q    But you -- but you can't tell me whether that's

8      actually happened?

9  A    Well, I'm sure it's happened, but I can't point

10     to a specific instance where that happened.

11 Q    Okay.  Since the introduction of the body -- or

12     the -- let me ask this.  Or the body -- is the

13     body camera footage -- let's -- strike that.

14     Let's say hypothetically speaking there was a

15     report that comes in and the officer states, I

16     received an admission that subject is in the

17     Crips.

18 A    Uh-huh.

19 Q    And we're post 2016 now --

20 A    Uh-huh.

21 Q    -- right, does the auditing officer go watch the

22     body camera footage to confirm that that

23     statement is accurate?

24 A    I --

25            MR. BRANSON:  Object to form.

1    A    I don't know, I -- I would -- you know, the --

2         the thing is I can't -- I don't think I can

3         answer that question 'cause -- 'cause I would

4         assume if -- if they needed to view a case, they

5         would.  But I can't tell you and point

6         specifically to one instance where that

7         happened.

8    BY MR. SULLIVAN:

9    Q    Are they trained to do that?

10   A    They -- if they have access to -- to look at it,

11        I don't know if they do or not.  They -- they

12        could look for those reports to make sure that

13        it was in there.  And it might be happening,

14        I -- I don't know, but I would assume if there's

15        a question in their mind that this person is in

16        a gang or not, they would know.

17            But -- so it's -- it's a lot more complex

18        than that.  So, you know, rarely gang

19        identification happens in a vacuum.  Typically,

20        when they have an admission, the -- they're part

21        of a guy who we know is a well-known, identified

22        gang member, then there's really no reason to go

23        look and -- in the Axon because, you know, the

24        other parts fit.

25   Q    But -- but that's not what you need for the

```
 1          statute, right, the statute -- under the
 2          statute, just an admission is sufficient to
 3          be --
 4     A    Yeah, but very rarely --
 5     Q    -- listed as a member, right?
 6     A    -- very rarely are you just going to take an
 7          admission and -- and put them on there, you have
 8          to have other -- other indicators, you know.
 9          We -- we're not just putting somebody on the
10          list just because they say they're in a gang,
11          you know what I mean, you have to have other --
12          other things.
13     Q    So are you telling me that you -- you would
14          always have other things beyond an admission?
15     A    Yeah, it would be difficult to just put somebody
16          on the list with an admission; you have to have
17          other things like they're hanging out with a
18          very well-known gang member, they've admitted to
19          you, they -- you know, they meet the other --
20          they're committing violent crimes, typically you
21          know, you know this -- this is a commitment.
22          Very rarely are you going to get a miscellaneous
23          report saying this guy admits gang membership
24          and then expect to put them on there.
25     Q    Are the auditors told to review the body camera
```

1      footage in circumstances where there's been a

2      self-admission regardless of whether there are

3      other circumstances?

4   A  To my knowledge, at this point, I -- I don't

5      know if they're told to specifically go -- go

6      and look at that.

7   Q  Is there -- is there any policy that would

8      require them to go and look at that?

9   A  No, but there's an Axon policy where we randomly

10     select things for review, and I guess in that

11     instance there might be a case where that one

12     pops up.

13  Q  And -- but what -- what's that circumstance

14     you're talking about?

15  A  Just random audits of Axon video with citizen

16     contact.

17  Q  But you're not reviewing that circumstance

18     specifically --

19  A  Not for gang --

20  Q  -- to test an admission?

21  A  Not for gang admission, no.

22  Q  So there's no -- the audit process does not test

23     whether there's a veri -- verified admission,

24     correct?

25  A  'Cause independent of everything else, just an

```
 1        supposed to call them back and test that?
 2   A    No, no, no.  Or, like, even an adult, you know,
 3        once they admit it and -- and they're -- they're
 4        engaging in gang crimes, then you got -- you got
 5        what you got.
 6   Q    So for purposes of this section, right, an
 7        admission alone is good enough to satisfy one of
 8        the criteria, right?
 9   A    Yes.
10   Q    Let's look at subsection (2)(D), do you see that
11        one?
12   A    Yes.
13   Q    It says, frequents a particular criminal street
14        gang's area.  Do you see that?
15   A    Yes, I got it.
16   Q    What does frequent mean?
17   A    It means that they -- that they -- they go to
18        that area.
19   Q    Once?
20   A    They hang out in there, they -- they, frequently
21        they hang out in that area.
22   Q    How many is enough, would it be two times?
23   A    I don't know, I mean, what if -- what if they
24        live there, you know, they frequent the park?
25   Q    Let's take your situation, right, going to play
```

```
 1          football at -- at the field.
 2    A     Right.
 3    Q     How many times do you think you did that?
 4    A     I couldn't even -- I couldn't even begin to tell
 5          you.  Every summer, I mean ...
 6    Q     Probably there a few times a week, right?
 7    A     Yes.
 8    Q     So would it be more than -- how many do you
 9          think would constitute frequent?
10              MR. BRANSON:  Are you asking his
11          personal opinion?
12    A     I -- I guess I don't know, I mean, that could
13          be, like, I linger there for many days.
14    BY MR. SULLIVAN:
15    Q     What do you mean by -- how many would be many?
16    A     I don't know, four or five, six, you know, or
17          more.
18    Q     Has -- has there been any training, any -- any
19          identification within the -- the Policy 527 to
20          explain what frequents means?
21    A     I -- I -- you know, again, I -- I don't -- I
22          don't know, I -- I'm not involved in that.  I
23          mean, I'm -- I'm, you know, removed from that.
24    Q     But you supervise --
25    A     Correct.
```

1   Q    -- you supervise that --

2   A    Yeah, yeah.

3   Q    -- section?

4   A    So I don't know what specifically it is in

5        training; there might be, I don't know.

6   Q    Have you had discussions with any other officers

7        what they understand frequent means?

8   A    No.

9   Q    Is part of what's audited intended to determine

10       how many times somebody's visited a particular

11       area?

12  A    That I -- I don't know.

13  Q    It says a particular criminal street gang's

14       area --

15  A    Uh-huh.

16  Q    -- do you know what that means?

17  A    I -- I guess the way I interpret it, it's for --

18       for sometime, we did have geographic-based areas

19       where the -- certain gangs hung out.  Nowadays,

20       it -- it's a lot -- they're, like, spread

21       everywhere.  But -- but like the -- the

22       neighborhood Plainview, south of us, they used

23       to be known as -- as a gang neighborhood,

24       Sur 13s.  And then there was a couple smaller

25       gangs up here that they had a couple blocks and

```
 1          that was it, but I -- I think they've shifted
 2          away from being geographic based and now more
 3          just identifying with a -- with a set.  The --
 4          they're diffused all over the city, you know
 5          what I mean?
 6     Q    So if they're diffuse, wouldn't it be --
 7          somebody's presence in a particular area would
 8          be a less reliable indication of whether they
 9          were in a criminal street gang area?
10     A    Nowadays --
11                    MR. BRANSON:  Object to form.
12     A    -- maybe.  Nowadays maybe.  Back in the day, you
13          could pretty much rely where people -- where
14          the -- the kids kind of hung out.
15     BY MR. SULLIVAN:
16     Q    That time that that officer profiled you,
17          where -- where were you walking?
18     A    I was in -- I was a couple blocks away from my
19          house.
20     Q    And what -- what area specifically?  That was
21          the North Bureau?
22     A    North Bureau, yes.
23     Q    And if you were doing that same thing today,
24          would that be sufficient indication to satisfy
25          this section?
```

1    A    Maybe.

2                    MR. BRANSON:  Object to form.

3    BY MR. SULLIVAN:

4    Q    You say maybe, why?

5    A    You know, they -- they would have to -- they

6         would have to identify me and see if I was doing

7         more than just hanging out there in my

8         neighborhood.

9    Q    But I'm just talking this -- this particular

10        subsection, right, (2)(D), frequents a

11        particular criminal street gang's area, right?

12   A    Uh-huh.

13   Q    If you were walking through there daily on your

14        way from the field and -- is that -- would that

15        be enough?

16                   MR. BRANSON:  Object to form.

17   A    Again, a lot of this in itself, it's not -- it's

18        not this is a gang member, you know what I mean,

19        you have to -- you have to have more than that.

20   BY MR. SULLIVAN:

21   Q    You have to have more than the fact that

22        somebody's just in a particular street?

23   A    Hanging out in the area, yeah.

24   Q    So this criteria is not -- whether somebody's

25        hanging out in a particular area is not a useful

```
 1          criteria for determining whether somebody's a
 2          gang member, right?
 3   A      Not --
 4                  MR. BRANSON:  Object to form.
 5   A      -- not -- not in today's time.  You know, maybe
 6          in the past, yes, not in today's time.
 7   BY MR. SULLIVAN:
 8   Q      Okay.  Roman (E), adopt such gang's style of
 9          dress, color, or use of hand signs or tattoos?
10   A      Yes.
11   Q      Do you see that one?
12   A      I do.
13   Q      And what are -- those are identifiers, right?
14   A      Correct.
15   Q      And those are intended to signal identification
16          with a particular gang or affiliation?
17   A      That is correct.
18   Q      And what was the -- you had mentioned it
19          earlier, but what were -- what was the -- what
20          were the colors of the gang that were operating
21          in that North Bureau when you were younger?
22   A      It was -- it was black and white.
23   Q      And you had on a black hat, right?
24   A      Correct.
25   Q      And would that, wearing that black hat have been
```

1           sufficient under this criteria to identify you

2           as a member of that gang?

3                   MR. BRANSON:  Object to form.

4    A    You know, if -- if -- I would doubt very

5           seriously 'cause that was not the only time I

6           had police contact, I'm sure, you know, waving

7           at police officers or -- or even getting stopped

8           in a car, you know what I mean, wearing similar

9           clothing, they never asked me if I was in a gang

10          because I -- they -- they knew that I was not

11          hanging out with the gang members.  If -- if --

12          if an officer is worth their salt, they -- they

13          don't just willy-nilly put you on the list, they

14          have to -- they have to have more than that.

15   BY MR. SULLIVAN:

16   Q    But it would have been sufficient to -- that hat

17          under the terms of this provision, would that

18          color have been sufficient at the time to

19          satisfy --

20   A    That condition?

21   Q    -- (2)(E)?

22                  MR. BRANSON:  Object to form.

23   A    Yes, but, again it's standing -- if you stand it

24          by itself, yes, that would be -- that would be

25          an identifier.

```
 1   BY MR. SULLIVAN:

 2   Q    So by itself, it would be an identifier even

 3        though it wouldn't have been an accurate

 4        identifier?

 5   A    Correct.

 6                  MR. BRANSON:  Object to form.

 7   A    But I -- I doubt anybody would just put me on

 8        the list 'cause I was wearing that hat.

 9   BY MR. SULLIVAN:

10   Q    What makes you so sure about that?

11   A    Be -- because they didn't -- obviously they

12        didn't -- he didn't stop to ask me if I was in a

13        gang.  I'm -- I'm speculating that he was

14        thinking it, but he never stopped me.

15   Q    Let's talk about (F), associates with known

16        criminal street gang members?

17   A    Yes.

18   Q    And this is the -- we talked a little bit about

19        this one earlier, right?

20   A    Yes.

21   Q    And what -- what training do the gang officers

22        receive in terms of distinguishing an associate

23        from a member in -- in the field, like how do

24        you make that distinction?

25   A    And you're asking me to speak about specific
```

1　　　　training.  I guess if they don't meet the above

2　　　　criteria but they still hang out, then -- then

3　　　　that would be -- with the -- with the gang

4　　　　members, they don't engage in committing the

5　　　　crimes but they associate with the gang, then

6　　　　that -- that would be an associate.

7　Q　But this -- we're looking here under the --

8　　　　under the criteria that would meet the

9　　　　definition of a gang member, right?

10　A　Right.

11　Q　And it says, (2)(F) says, associates with known

12　　　　criminal street gang members.

13　A　Uh-huh.

14　Q　What does associate mean?

15　A　I guess they -- when you stop them in a car with

16　　　　three known gang members and -- and they -- they

17　　　　repeatedly are hanging with the same; or you

18　　　　stop a car after a shooting, they're not --

19　　　　they're not on the gang list but they're --

20　　　　nonetheless, they're in the car, that -- that

21　　　　would be he's hanging around with known gang

22　　　　members that are committing crimes.  That's

23　　　　typically how you would identify -- or fulfill

24　　　　that criteria.

25　Q　What if after today's deposition I got picked up

1    by a car with three known gang members and got

2    in the back and then we got stopped, would --

3    would that -- and -- and would the officer who

4    pulled us over, would -- would that officer be

5    able to determine that I satisfied that

6    criteria?

7                MR. BRANSON:  Object to form.

8  A   I don't -- I don't think they would -- I don't

9    think they would make you an associate

10   independent of anything else.  There would have

11   to be other things.

12  BY MR. SULLIVAN:

13  Q   But that --

14  A   Now, if -- if you had a gun in your lap and you

15   associated, even though it's legal here to have

16   a gun in your lap when you're in a car, that --

17   I'd look at you harder.

18  Q   All right.  Let's go with your hypo, then, let's

19   say I had a gun and I had a permit and I was

20   satisfying the laws for carrying the gun and I

21   was in the car with three known gang members --

22  A   Yeah.

23  Q   -- would that in and of itself satisfy (2)(F) in

24   your --

25  A   It probably would.

1    Q    Okay.  Even though, I mean, it was legal for me

2         to carry the gun, right?

3    A    In Kansas you don't need a permit.

4    Q    Huh?

5    A    You don't need a permit here, you can carry it.

6    Q    Okay.  I can just carry a gun?

7    A    You bet.

8    Q    But that's not -- that's not against the law?

9    A    No.

10   Q    Okay.  But -- so that -- you're -- you're saying

11        that in and of itself would be enough to satisfy

12        that criteria?

13   A    Probably that one thing, to say you're

14        associated, but independent of anything else,

15        you probably would not make it on the gang list

16        'cause there would have to be other things.

17   Q    All right.  And I -- you're making in your mind

18        a distinction between sat -- I'm only -- between

19        satisfying criteria and the gang list.

20   A    Right.

21   Q    I'm not talking about the gang list.  I'm only

22        talking about the criteria --

23   A    Oh, yeah.

24   Q    -- you understand that, right?

25   A    Yeah, you're asking me to -- you bet.  According

1          to the law, that criteria is very -- it's --

2          it's very specific, yeah, that one thing

3          according to this law would -- would make you an

4          associate.  I -- in practice, I don't think we

5          would make you an associate based on that alone.

6          But if you say it meets the criteria, it does,

7          right there.

8     Q    Okay.  And that's -- that's your understanding?

9     A    Yes.

10    Q    And that's your understanding of what the --

11         your office's gang policy follows, correct?

12                   MR. BRANSON:  Object to form.

13    A    My understanding of what the law says, and it

14         says that that is one of the criteria.

15                   MR. SULLIVAN:  Let me take our --

16         our lunch break now.

17                   THE VIDEOGRAPHER:  Go off the record

18         at 12:45 p.m.

19                      (Thereupon, a lunch recess was

20                      taken; whereupon the following was

21                      had.)

22                   THE VIDEOGRAPHER:  Okay.  We're back

23         on the record at 1:40 p.m.

24    BY MR. SULLIVAN:

25    Q    Sir, we were talking about Exhibit 13, which is

1       that flowchart there --

2   A   Yes, sir.

3   Q   -- right?  And we were talking about that first

4       box still, officer identifies, correct?

5   A   Yes.

6   Q   And just focusing on that identification process

7       we were -- you recall we were speaking about the

8       statute, which was -- which we marked as

9       Exhibit 14?

10  A   Yes.

11  Q   And I want to make sure, you understand the

12      statute, whether somebody meets the criteria

13      under the statute is a different issue than

14      whether somebody's put on the gang list --

15  A   Correct.

16  Q   -- correct?  Thank you.  And we talked about --

17      we talked about Section 21-6313(b)(1), and

18      that's the -- the section about admission,

19      correct?

20  A   Yes.

21  Q   And it says, admits to criminal street gang

22      membership --

23  A   Yes.

24  Q   -- right?  And I think what you told me is that

25      in your -- you don't think simply admitting is

1          enough to be on the gang list --

2    A     Per --

3    Q     -- correct?

4    A     -- per the state statute, that in itself could

5          get you on -- on the gang list.

6    Q     Okay.  And -- and that's your interpretation of

7          the state statute?

8    A     That's -- that's what it says.

9    Q     Okay.  Would it -- would it surprise you if

10         there were people on -- who had been identified

11         as gang members, who are on the gang list who --

12         and the only basis for them to be there was

13         their admission?

14   A     It would surprise me if there was -- if that

15         admission card or the -- the gang card that they

16         had had that -- that one, just that one entry.

17   Q     And the next section, just to sort of recap

18         where we were, is 21-6313(2), that is the

19         section that identifies the mult -- multiple

20         criteria for member -- for membership other

21         than --

22   A     Yes.

23   Q     -- self-admission, correct?

24   A     Correct.

25   Q     And we talked about specifically about some of

1          the criteria under 21-6313(2)(D) about

2          frequents, right?

3    A     Yes.

4    Q     I just want to make sure I'm clear on what your

5          testimony is, there's no -- there's no

6          definition within the department of what

7          frequents means, correct?

8    A     No.

9    Q     There's no training with regard to what

10         frequents means?

11   A     To my knowledge, no.

12   Q     All right.  And is there any instruction given

13         to the auditors about what frequent means?

14   A     I don't think so.

15   Q     Okay.  And do you know how this -- how for

16         purposes of identifying a gang member what

17         number is sufficient to satisfy the meaning of

18         frequents?

19   A     No.

20   Q     And -- and you can't give a precise definition

21         of frequents, can you, in terms of number?

22   A     I -- I think it's -- it's -- that term is, you

23         know, it's subjective.

24   Q     Is it -- is it vague?

25                   MR. BRANSON:  Object to the form.

1   A    I think it's subjective.

2   BY MR. SULLIVAN:

3   Q    Meaning what?

4   A    That it's open to -- to interpretation, you know

5        what I mean?

6   Q    And that could lead to inconsistency in terms of

7        how one officer might interpret that word versus

8        another officer, correct?

9             MR. BRANSON:   Object to form.

10  A    I would say with it not being very objective,

11       you know, it can lend itself to -- to be looked

12       at different by a different person.

13  BY MR. SULLIVAN:

14  Q    And we talked about what the phrase, a

15       particular criminal street gang's area might

16       mean --

17  A    Correct.

18  Q    -- right?   And do you -- do you have a specific

19       understanding of what that phrase means?

20  A    Particular refers to an area -- an area where

21       the gang particularly hangs out, like a -- like

22       a park, you know, that's -- that's known for

23       that particular gang area.   As I said before, in

24       the past, identifying those areas was easier.

25       Now, it -- it's -- it's almost not.

1    Q    Is that because -- I mean, you -- you used the

2         phrase hangs out, is that sort of what you

3         would -- the -- the connection that you would

4         make to determine whether there is a -- what a

5         criminal street gang's area was is where they

6         hang out?

7    A    Not -- not -- it would be more than that.  And

8         I'll give you a for example an area that I

9         associated with gang activity, you know, like a

10        public park, right, we were talking about that

11        earlier, they could hang out to play basketball,

12        not -- not a big deal.  But there's a particular

13        part in town where, historically, where they --

14        they hang out to shoot their guns off, that

15        would be more what I would look at and what my

16        people would probably look at as a gang hangout.

17   Q    But under -- but that's not what the -- that's

18        not the phrase used, right?  The public park,

19        like if they were playing basketball, that would

20        be a particular criminal street gang's area,

21        wouldn't it?

22   A    You know, in -- in -- in areas -- in areas, in

23        cities where gangs are more territorial, per se,

24        there is a very defined, on that side of the

25        street, that's ours, this side is ours.  We

1          don't really have that definition in this -- in

2          this city, there's no -- nothing you can point

3          to.  And, again, this is not written for the PD,

4          for just Wichita, it's written for the entire

5          state.  The conditions might be different in

6          Kansas City, for example.

7     Q    But within your department, do you know if

8          there's a particular understanding of what that

9          phrase means?

10    A    No, other than -- the only reference we have

11         is state stat.

12    Q    Okay.  But within your department, do you have

13         any shared understanding of what the phrase a

14         criminal street gang area means?

15    A    If you're asking do we have that defined, we

16         don't.

17    Q    Do you have a working definition even?

18    A    No, I don't think we have anything in writing.

19         I think it, again, it's -- it's -- it's a --

20         it's up to the officers who are out there to say

21         based on me working this -- this neighborhood,

22         I've known that to be an area where they conduct

23         activities, I guess.

24    Q    Would that -- like the -- the word frequents,

25         would that also be -- have a subjective

```
 1        component?
 2   A    One and the same.
 3   Q    And we talked about 21-6313(2)(F) where it uses
 4        the word associates, correct?
 5   A    Correct.
 6   Q    And that's -- that's one of the factors that
 7        could count toward putting somebody -- making
 8        somebody a gang member, right?
 9   A    According to state law, yes.
10   Q    And you, I think, had some issues we talked
11        about earlier with what associates might mean?
12   A    I did, personally I did, yes.
13   Q    Yeah.  And for purposes of this particular
14        criteria, 21-6313(2)(F), do you have a common
15        understanding within the Wichita Police
16        Department of what that means?
17   A    No.
18   Q    Is it like the other factors we talked about,
19        open -- it's subjective?
20   A    It's purely subjective, yes.
21   Q    I want to talk to you about, back to Exhibit 13,
22        which is the chart, right?  You see the -- the
23        next box toward the right is -- there's a
24        heading that says nomination procedures?  You
25        see that?
```

```
 1          process make to examine whether the subject

 2          actually was in an area and whether that area is

 3          a known -- is a criminal street gang area, like

 4          what -- what do they do, where do they -- how do

 5          they test it, what's the benchmark?

 6    A     I think -- I think just the training and

 7          experience tells them, hey, that -- you know,

 8          and the cases that happen in that area would

 9          probably dictate that.  But I'm -- again, I'm

10          speculating because I don't think we would ever

11          nominate somebody just on the gang area

12          criteria, there would be a lot more.

13    Q     You can't nominate somebody simply based on that

14          piece of information alone, right, under the

15          statute?

16    A     Yeah, you'd have to have -- if it's in the

17          second one, you have to have at least three or

18          more, right, on the criteria.

19    Q     Right, but I'm just thinking of hypothetically,

20          right, I want to know -- what I want to

21          understand is what -- how do they evaluate that

22          single piece of information, because that single

23          piece of information is one of the criteria that

24          could be used to nominate somebody to the list,

25          right?
```

1    A    I -- I guess just given their -- their training

2         and experience they would know whether that was

3         a gang area or not.  There's -- there's no --

4         there's -- there's no training associated from

5         the department to say, today this is a gang area

6         and today this is a gang area.  No, it relies

7         on -- on what is written on the nomination card,

8         on the case of someone to say, hey, this is --

9         this is a gang hangout.

10   Q    And these days --

11   A    Or they're committing crimes.

12   Q    Sorry, I didn't mean to interrupt you.  But

13        in -- these days in Wichita, at least, it's not

14        even -- it's not clear what a criminal gang area

15        is at all, right?

16   A    As I said, Wichita's pretty unique, we're --

17        we're not very area -- area -- gangs do not

18        claim a certain area, you know what I mean,

19        it's -- it's -- it's not uncommon to have a gang

20        member from one set living in this house and

21        right across the street having the rival gang,

22        you know what I mean?  So there's no specific,

23        like, borders or areas.  There might be, like --

24        like, transitory areas where right now -- right

25        now would be considered a gang conflict area,

```
 1            and we would identify those.
 2    Q    So I hear -- what I hear you telling me is that
 3         at least with respect to Wichita, this
 4         particular criteria that we're talking about in
 5         21-6313(2)(D) is not a very useful criteria to
 6         assess whether somebody is in a gang or not?
 7    A    Not -- not really, not really.
 8    Q    It's not reliable, is it?
 9    A    Unless we had a hotspot --
10               MR. BRANSON:  Object to form.
11    A    It would be reliable if we had a hotspot of gang
12         conflict in that area.
13    BY MR. SULLIVAN:
14    Q    Okay.
15    A    But -- but, again, it's not a -- it's not a
16         permanent area, and I'll give you a perfect
17         example.  Did you -- did you see the Keeper of
18         the Plains over here?
19    Q    I saw it yesterday.
20    A    Okay.  So Keeper of the Plains, that used to be
21         a gang -- hotspot for gang violence because a
22         lot of the rival gangs would meet there and
23         there'd be shots fired and people shot.  So
24         temporarily that would be a -- considered a gang
25         area.  But as soon as we implemented measures,
```

1    it eliminated it, they were done, we didn't see

2    it anymore.  But we're not going to nominate

3    anybody just 'cause they go to Keeper of the

4    Plains.

5    Q    Okay.  But if that's -- if that is a criteria

6         that is used -- if that is one of the criteria

7         used to put somebody on the gang list and that's

8         not a very re -- that's not a reliable

9         criteria --

10   A    Uh-huh.

11   Q    -- right, then somebody could be put on the gang

12        list on the basis of unreliable criteria, right?

13             MR. BRANSON:  Object to form.

14   A    That -- you're asking me to draw a conclusion.

15        Now, I will tell -- I will tell you this.

16        Again, I'm sure they -- the City gave you, on

17        discovery, they gave you the -- the -- the

18        entire gang database with the -- with -- with

19        the criteria that they fit under that.  I would

20        be very interested in seeing how many have gang

21        area as one of the things.  I don't know.

22   BY MR. SULLIVAN:

23   Q    Okay.  But at least the -- the -- as part of the

24        nomination process, are you aware of any officer

25        who would confirm whether a particular area is a

```
 1    A    Right.

 2    Q    Or suspended until released from incarceration,

 3         right?

 4    A    Right.

 5    Q    And you told me, I think, that once the

 6         three-year period expired -- after three years

 7         if somebody's crime free, that's a pretty good

 8         indication that they wouldn't be part of a gang,

 9         right?

10    A    Correct.

11    Q    But they don't -- they don't come off the list,

12         right?

13    A    Typically, they're -- they're deleted off the

14         list.

15    Q    Are they deleted or are they put to inactive

16         status?

17    A    They're -- under the -- under that -- under the

18         current practice, I think they go into inactive

19         status, which I will tell you I -- I don't agree

20         with inactive status.

21    Q    And why don't you agree with inactive status?

22    A    Because you're either a gang member or you're

23         not.

24    Q    Okay.  And so -- and this inactive, this -- if

25         we look at Exhibit 15, it says, if after the
```

1    initial three-year period there is no documented

2    activity, the individual's status will be

3    changed to inactive --

4  A  **Yeah, right.**

5  Q  -- in the WPD gang database and the flag will be

6    removed from EJustice, right?

7  A  **Correct.**

8  Q  And there's no -- nothing in the statute, in the

9    Kansas statute 21-6313 --

10  A  **Uh-huh.**

11  Q  -- that talks about being an inactive gang

12    member, correct?

13  A  **Correct.**

14  Q  And are you telling me that you don't think this

15    is -- this designation of inactive is --

16    should -- should be in the policy, right?

17  A  **I -- I -- I do agree with you and -- and I told**

18    **you earlier that, you know, when I was thinking**

19    **about, you know, changing the whole approach,**

20    **one of my big pushes was to do away with the**

21    **inactive status.  But, again, as soon as your**

22    **lawsuit hit, I -- everything was frozen.**

23  Q  Okay.  The -- are you aware of people being

24    made -- are there circumstances in which people

25    will be made -- made inactive and not even know

1       they've been made inactive?

2   A   I would assume we don't -- we don't inform them

3       that they -- that they are inactive.

4   Q   Is there -- do people ever, in your experience,

5       come off the list, or are they just made

6       inactive?

7   A   I -- I -- I don't think -- I don't think I've

8       heard of -- of -- of somebody completely

9       dropping off the list and not being inactive.

10      You would have to ask Chad Beard what the

11      rationale is, 'cause I can't remember exactly

12      how he explained why that was relevant to make

13      them inactive, but I was like I don't like

14      inactive, not at all, either you are or you're

15      not.

16  Q   And you're saying that as -- as the deputy,

17      based on your experience as deputy chief of --

18      of that unit, right?

19  A   Right.

20  Q   Or that investigations unit?  I'm interested, I

21      want to ask you some questions about

22      circumstances in which the three-year period

23      would restart.

24  A   Uh-huh.

25  Q   And it can -- it can restart -- it restarts if

1    A    Right.

2    Q    -- a supervisor from the gang/felony assault

3         section will attempt to contact a parent and/or

4         guardian who will be told how the juvenile met

5         the gang criteria and will be informed of

6         intervention options and resources during

7         personal contact communication?

8    A    Yes.

9    Q    So in the case of a juvenile, there's an effort

10        to meet -- to reach out, it sounds like, and

11        communicate to the parent and/or guardian about

12        the fact that the juvenile satisfied the -- the

13        gang criteria?

14   A    Correct.

15   Q    There's no similar thing for adults?

16   A    Correct.

17   Q    There's no analog at all?

18   A    Correct.

19   Q    There's no effort to communicate to them that

20        people have satisfied the criteria --

21   A    Correct.

22                  MR. BRANSON:  Object to form.

23   BY MR. SULLIVAN:

24   Q    -- right?  What's the basis for that distinction

25        of the policy?

```
 1   A    Well, I don't know if you deposed former Chief

 2        Ramsay, but this was his -- this -- he -- he

 3        dealt directly with at the time Lieutenant

 4        Gilmore to -- to institute this -- this

 5        carve-off for juveniles.  I -- I -- I was not

 6        opposed, again, I was not opposed in -- in --

 7        in -- in the vision and the plan that I -- that

 8        I was going to develop -- developing to

 9        informing not only you're meeting gang criteria

10        but here is a mechanism for you to come in,

11        let's talk about this.

12   Q    For people who are adults?

13   A    Yeah, yeah, yeah.

14   Q    And why is that important?

15   A    Well, it's -- it was important to me because

16        the -- the -- once you're identified as a gang

17        member, even when you're incarcerated, if you

18        have the gang label, you're handled different

19        even in prison.  You -- you come out -- you come

20        out after doing time with a gang, you know,

21        identifier, that's -- that's a whole different

22        supervision you get from the Department of

23        Corrections.  That -- that, you know -- I

24        haven't met very independently -- independently

25        wealthy gang members, so it does put a strain, I
```

1          think, on -- and it -- it's -- it's a question

2          of fairness.

3    Q    As a practical -- it has an adverse practical

4          impact on the person who's identified as a gang

5          member?

6    A    Well, that's why --

7                    MR. BRANSON:  Object to form.

8    A    -- you should know exactly what is coming your

9          way if -- if -- if you -- if you want to be a

10         gang member, you should know.

11   BY MR. SULLIVAN:

12   Q    You want to have -- you think it would be fair

13         to basically give people, hey, heads-up?

14   A    Yes, yeah, you know, you probably have not

15         thought of what -- what all -- what all happens.

16         But one thing is to be introduced to the

17         criminal justice system just as -- as an

18         ordinary citizen criminal and another is to --

19         to be -- especially when you go to federal

20         prison.

21   Q    Tell me, I want to understand what the -- what

22         the practical -- you mentioned one of the things

23         associated with being identified as a gang

24         member.  What are the practical consequences to

25         the person who is put on that list that -- that

```
 1        you can see based on your experience?
 2    A   Well --
 3                  MR. BRANSON:  Object to form.
 4    A   -- again, I told you about the criminal justice
 5        system, you get different treatment, closer
 6        supervision, which puts a burden -- I guess
 7        would put a burden on -- on a lot of things, you
 8        know what I mean?
 9  BY MR. SULLIVAN:
10    Q   Like what?
11    A   I don't know, more parole visits to your house,
12        more disruption of -- of your life after parole,
13        probably success of completing parole, probation
14        is harder.  And, again, nothing that -- that I
15        think we were mandated to do but I just thought
16        that -- that, you know, you should have,
17        especially after -- you know, after -- after
18        the -- you get out, maybe you get probation
19        from -- from the courts, from the district
20        attorney's office, you know, are you as apt to
21        get it if you are identified as a gang, I don't
22        know.
23    Q   Does it impact bail conditions?
24    A   Yes, it does, it definitely does, it's $50,000
25        bail anytime you're put in there.  Now, in
```

1    theory it should impact it, but in practice what

2    we were seeing here was that a lot of the bond

3    companies were actually not doing the

4    10 percent; they were doing, like, pennies on

5    the dollar.

6  Q    And that's actually part of the WPD policy that

7       we identified in Exhibit 15, right?

8  A    Yes.

9  Q    It's -- and just to be clear, it's on page 2, it

10      says bonding of criminal street gang members --

11 A    Correct.

12 Q    -- right?

13 A    Yes.

14 Q    And that's different -- that would be different

15      if you were not a criminal street gang?

16 A    You would not get the 50 grand, yes.

17 Q    And your policy there, it references K.S.A.

18      21-6316, do you see that?

19 A    Yes.

20 Q    I didn't see any reference to bonding in that

21      section?

22 A    What were you looking at, sir, again, 21 what?

23 Q    Well, your policy references 21-6316, right?

24 A    Yes.

25 Q    Where it talks about bonding and the $50,000

```
 1          cash or surety, correct?
 2    A     Right.
 3    Q     But that's not -- the $50,000 bonding is not
 4          part of the Kansas statute that we looked at, is
 5          it?
 6    A     It should be under the statute of 6316, not
 7          6313.
 8    Q     Oh, okay, gotcha, thank you.
 9    A     Yeah.
10    Q     I misunderstood.  Are there any other -- any
11          other practical consequences that you can think
12          of?
13                    MR. BRANSON:  Object to form.
14    BY MR. SULLIVAN:
15    Q     What about within the community, within the
16          local community of Wichita?
17    A     I think the local community has no idea who's
18          on -- on the list or is not, you know what I
19          mean, unless they're -- they're told by the
20          person who's on the list themselves.
21    Q     And how would such person on the list themselves
22          find out?
23    A     Basically when they got booked, you're like,
24          hey, you're listed as a member of this gang,
25          you're getting bond conditions.
```

1    Q    And has it been your experience that people

2         sometimes get booked and they've never -- they

3         never even knew they were on the list?

4    A    It's not been my experience, but I've heard that

5         there are occurrences where, like, hey, I -- I

6         had no idea.  But not as frequent as you think.

7    Q    Is there -- is there any other way to find out

8         if you're on the list other than with being

9         charged with a crime?

10   A    If you're a juvenile, I guess we contact your --

11        your -- your, you know, guardian or parents.  If

12        you're an adult, typically -- typically, there

13        is no other way other than the officer telling

14        you, or some gang members know, when we get a

15        return for a warrant check, that -- when they

16        say a signal 33, they know, hey, I'm identified

17        as a gang member.

18   Q    And there's no way to challenge the

19        determination made in that nomination process,

20        is there?

21   A    There is.  Like for bond conditions, when we put

22        the bond condition, you can -- you can challenge

23        the bond condition before the judge.

24   Q    But you got to be arrested first, right?

25   A    Correct, and then same thing, goes to -- if --

1       if it's admissible in trial and you want to

2       challenge your gang membership, you can do it at

3       trial, and that's a whole different thing.  But

4       before that, there -- there was -- there is no

5       way to -- to challenge it.  Now, again, I go

6       back to what I was trying to get done, and what

7       I was trying to get done was a panel of

8       community members and cops to say, hey, bring it

9       and let's see what you have to say.

10  Q  And so let me just -- and we're going to get --

11      I'm going to ask you some questions about that

12      in a bit, but other than if you were charged

13      with a crime and are told you're on the list,

14      this list is otherwise secret, correct?

15  A  Pretty much, yes.

16  Q  What -- what is the enforcement purpose of

17      having a list?

18  A  As far as for us?

19  Q  Yeah, I mean, why keep a list, like why have the

20      list?

21  A  I would say -- you know, we -- we don't

22      necessarily keep a list of sex offenders,

23      registered sex offenders, the KBI does, it helps

24      them identify registered sex offenders.  For us

25      it's a way to -- to -- to present cases where

```
 1           is, like, an outlaw motorcycle club expert, if
 2           you would.
 3    Q      But do -- sitting here today, do you actually
 4           know?
 5    A      As far as what?
 6    Q      Of whether --
 7    A      I don't know 100 percent, I would assume that we
 8           have some on the list.
 9    Q      Okay.
10    A      Which probably increased the number of White
11           males on the -- on the gang list.
12    Q      And are you -- what do you know about the
13           monitoring of social media accounts?
14    A      I -- I -- I -- I think we don't -- we don't do a
15           24/7 monitoring.  I mean, if we have information
16           that something's happening that might have --
17           lead to violence, we'll start looking at social
18           media accounts.
19    Q      When -- do you also create sort of fake social
20           media accounts?
21    A      I think some of my officers do create profiles
22           so they can engage and find out what's going on
23           or what's likely to happen.  And I didn't -- I
24           didn't take an issue with -- when -- when I knew
25           or they informed me that they were going to do
```

1     **this.**

2  Q  **Do you know, are -- are some of those fake**

3     **social media accounts, are those used to -- as a**

4     **tool to help identify people to put on the gang**

5     **list?**

6  A  **I -- I think they're not used to -- to -- to**

7     **identify them; they're used to bolster the**

8     **reason why to put them on the list.**

9  Q  Is that part of the -- the research process

10     involved in the nomination we looked at earlier?

11  A  **Yes.**

12  Q  Would it also be a method -- would that also be

13     one of the tools that officers could use to

14     justify keeping somebody on the list or

15     extending the three-year clock?

16  A  **I think it would be, yes, if -- if there was any**

17     **gang indicia that was present in the videos or**

18     **photos or what have you.**

19            MR. SULLIVAN:  Why don't we go off

20         the record for a few minutes, I got to use

21         the bathroom.

22            THE VIDEOGRAPHER:  Go off the record

23         at 4:15 p.m.

24            (Thereupon, a recess was taken;

25            whereupon, the following was had.)

```
 1          practice is the officer -- the officers up there
 2          read the reports to make sure that what, you
 3          know, what -- what the criteria is is met in
 4          whatever report that was generated.
 5   BY MR. SULLIVAN:
 6   Q    But there's no testing of it, there's no --
 7        there's no -- there's no testing of whether the
 8        judgments of the officers and the criteria that
 9        they're using are actually accurate; isn't that
10        right?
11   A    I think the test is when they get called over to
12        court to testify as to why they believe -- and
13        present that evidence to the board or the judge.
14   Q    But that only happens in --
15   A    That is --
16   Q    That only happens in a very limited number of
17        circumstances, doesn't it?
18               MR. BRANSON:  Object to form.
19   A    I guess it's limited and -- and -- so much as in
20        when the person challenges their -- their gang
21        affiliation or membership, or whatever, or
22        they're included on the list.
23   BY MR. SULLIVAN:
24   Q    And that -- that -- the list -- they don't know
25        that unless they're arrested because the list is
```

1     otherwise secret, right?

2  A  **Yeah, if -- unless the officer tells them that**

3     **you're on the gang list, they don't know.**

4  Q  So there's a -- there's a secret list and unless

5     you have the oppor -- unless you're arrested,

6     you don't have the opportunity currently to

7     challenge whether you're actually a gang member

8     or not, do you?

9          MR. BRANSON:  Object to form.

10  A  **The -- the -- I guess you can -- you can**

11     **challenge it when you get a hearing before a**

12     **judge, but there's no process in place to**

13     **challenge it before that.**

14  BY MR. SULLIVAN:

15  Q  You got to go get yourself arrested --

16  A  **Yeah.**

17  Q  -- right?

18  A  **Yeah.**

19  Q  And that -- and this is part of what we've been

20     talking about, there's no determination of the

21     accuracy of the -- there's no -- strike that.

22     There's no -- there's no determination as to

23     whether the assignment of whether somebody is a

24     gang member or a gang associate is accurate,

25     there's no analysis of that?

```
 1          think -- you know, we're human beings and
 2          there's -- there's room for error.
 3    BY MR. SULLIVAN:
 4    Q    And there's -- there's -- you've talked about
 5          some of the subjective judgments involved in it
 6          today, correct?
 7    A    There's got to be a little subjectivity to it,
 8          but yeah.
 9    Q    Yeah.  And -- and you started off today, I mean,
10          you talked about the importance of data and --
11          and measuring things in a scientific way, right?
12    A    Correct.
13    Q    And assessing all of the facts?
14    A    Uh-huh.
15    Q    And the reason you wanted to do that, part of
16          your vision, sir, right, was to make sure that
17          better judgments and more accurate judgments
18          were being made, right?
19                  MR. BRANSON:  Object to form.
20    A    Well, the more data you have, the better
21          decisions you can make.
22    BY MR. SULLIVAN:
23    Q    And that would include accuracy, would be a
24          component of that?
25    A    I think it would be very important to be
```