# EXHIBIT 21



# EQUAL JUSTICE UNDER LAW

**REPORT OF
THE RACIAL JUSTICE TASK FORCE
TO THE BOARD OF GOVERNORS
OF THE WICHITA BAR ASSOCIATION**

**JUNE 4, 2021**

PLFS00001866

In response to the events leading to the death of George Floyd in Minneapolis last year and the widespread protests that followed, the Board of Governors of the Wichita Bar Association issued a statement that: acknowledged the existence of systemic racism in our society and our legal system; recognized the obligation lawyers have in the administration of justice, improvement of the law, and access to justice; and asserted that the WBA is committed to taking action to help create systemic change in our community.

The Board of Governors then created the Racial Justice Task Force and stated its task as follows: **"To explore the extent to which systemic racism exists as part of our local legal system, identify the particular ways it exists, and then identify ways the WBA or its individual members can address those things to try to eliminate them or reduce them."**

Monte Vines was asked to Chair the task force because he was President-Elect of the WBA and he would then have insight into any suggested changes during his term as WBA President. The goal in selecting task force members was to create a group of local lawyers who could address the task from differing perspectives within our local legal system. The group was diverse as to their roles in our legal system— criminal prosecutors, criminal defense lawyers, civil practice lawyers, those in government agencies and private practice and in-house. We were diverse in personal characteristics—race, gender, and age. We were diverse in our perspectives on social and legal issues. We were supported in our task by WBA staff: Virdena Gilkey, Executive Director; John Lewallen, Sedgwick County Law Librarian; and Cameron Martin, WBA technology support.

We started with 21 members on the task force. We lost a few members along the line, and added two members, for various reasons. One loss, in particular, was retired Judge Greg Waller, who passed away shortly after the task force began to meet. The task force ended up with the following members:

| | |
|---|---|
| Marc Bennett | Sedgwick County District Attorney |
| Judge Monique Centeno | Sedgwick County District Court Judge until Jan. 2021, then *pro tem* Wichita Municipal Court Judge |
| Marc Davis | Law Office of Marc Davis |
| Uyless Dewberry | Senior Counsel, Koch Companies Public Sector |
| Keith Edwards | Joseph, Hollander & Craft |
| Tim Finnerty | Wallace Saunders |
| Bach Hang | State Board of Indigent Defense Services |
| Jason Hart | Assistant U.S. Attorney |
| Donte Martin | Assistant City Manager—City of Wichita |
| Dwayna McFerren | Sedgwick County Public Defender's Office |
| Richard Ney | Ney & Adams |
| Judge Kevin O'Connor | Sedgwick County District Court Judge |
| Steve Rupert | Kansas Board of Indigent Defense Services |
| Trent Santer | Foreman Law |
| Gwen Sharpe | Social Security Administration |
| Mike Stout | Foulston Siefkin |
| Gaye Tibbets | Hite, Fanning & Honeyman |
| Bill Townsley | Fleeson, Gooing, Coulson & Kitch |
| Sara Zafar | Wichita State University, Title IX Coordinator |
| Monte Vines, Chair | Adams Jones Law Firm |

PLFS00001867

All task force members served in their individual capacities, and not on behalf of the organizations they are employed by. So the statements in this report should not be considered to be endorsed by any of these organizations.

The task force did its work during the COVID-19 pandemic. We held all of our full task force meetings by Zoom, which facilitated good communication among task force members while isolated physically.

We began our work by trying to understand the task given us, in order to get to a common understanding of the task and fully embrace it. The initial challenge in that regard was the Board's use of the phrase "systemic racism" as to our legal system. The Board did not define the phrase. We recognize that the phrase can mean different things to different people, and that it can be a very emotionally-charged phrase.

Over the years, our society and our legal system have made great strides in overcoming the extensive, formal and informal, race-based discrimination that has existed in various forms from the founding of our nation, state, and city. Our legal system now has specific prohibitions of slavery, of racial discrimination in housing, public accommodations, and employment, etc. And yet, George Floyd's death (in addition to the deaths of many others in recent years) caused widespread protest because of a growing recognition in our society that his killing is emblematic of continued discrimination against, and injustices experienced by, many people who are racial and ethnic minorities.

Our local legal system is much more than our law enforcement agencies. Our local prosecutors and court systems—federal, state, and municipal—determine what criminal charges to bring, and adjudicate those charges. It is essential to the stability of our community that our court systems are seen across the diverse spectrum of our citizens as being fundamentally fair systems. If we are going to charge someone with a crime, convict them of it, and incarcerate them for it, we want that person and their family and the community to see it as the result of a basically fair process as much as possible.

We also want our citizens' civil legal disputes to be resolved pursuant to federal, state, or municipal law and under the auspices of the courts rather than pursuant to the law of the street and on the streets. That is more likely to occur when people generally believe they can obtain justice from our court systems.



Whether the distrust some people have about the fairness of our law enforcement practices or about the fairness of our local court systems is based on fact or just on perceptions of unfairness, both generate distrust of our local legal system. So both are worthy of our concern. This photo is of a mural painted on a building along the bike path under I-135 expressing a common phrase used at recent protests—"No Justice No Peace!"

It is not our place to try to solve the problems existing in Minneapolis or other cities. But Wichita lawyers, as officers of our local court systems, have a special responsibility for, and an ability to influence, our local legal system. If there are aspects of our local legal system that could be considered racist, or that may appear to be racist, then we should do what we can to address them.

3

PLFS00001868

After a substantial amount of discussion and consideration, the task force came up with the following to guide us in carrying out the task given us:

**One of the basic foundations of our legal system is the concept of "Equal Justice Under Law," which is the motto on the U.S. Supreme Court Building. That motto can be the basis for understanding the phrase "systemic racism" as follows:**

**If there is some part of our local legal system (a law, rule, practice, procedure, etc.) that tends to result in people of different races or ethnicities not getting "equal justice," regardless of any intention or purpose as the basis for it, that is "systemic racism." And if there is some part of our local legal system that gives the appearance to a substantial part of a racial or ethnic group that they are not likely to get "equal justice" from the system, that is the appearance of systemic racism and we are including that in the scope of our task.**

Lawyers know that in our legal system, "justice" is supposed to be the result of a careful, objective, and fair application of our laws to the facts of some specific situation. So comparing the outcomes of two different situations is not a reliable way to determine whether "equal justice" was obtained. But differences in outcomes can certainly raise questions about whether "equal justice" was obtained from the legal system in particular cases and for particular people. And differences in outcomes can lead to a perception of unequal justice—and perceptions certainly matter.

This definition of our task also eliminates the issue of whether there was a racist motive behind creation of some particular aspect of our local legal system. If there are aspects of our local legal system that were created for reasons that have nothing to do with race, but that have the result of people of different races and ethnicities not getting "equal justice," it makes sense to the task force to treat that as an aspect of the system that should be changed. Likewise, if such an aspect of our system gives the appearance to a substantial part of a racial or ethnic group that they are not likely to get "equal justice" from the system, then it makes sense to us to treat that appearance as a problem that should be addressed, again, even if that aspect of the system was created for reasons that have nothing to do with race.

We were sensitive to the fact that the WBA is composed of members from all parts of our local legal system, and with varying social and political views. While we recognize that some WBA members would disagree with a general assertion that "systemic racism" infects our local legal system, we believe that the above definition of the phrase is one that could allow wide acceptance by WBA members of our work.

After coming to this common understanding of the task given to us, we set about to identify aspects of our local legal system that might tend to result in people of different races or ethnicities not getting "equal justice," or that give the appearance that they are not likely to get "equal justice." To do this we reached out to all members of the WBA and invited them to submit any concerns they had in this regard to the task force. We also reached out to the Chairs of several of our practice area committees and asked them to discuss it at a committee meeting and submit any concerns to the task force. And of course we got input from members of the task force. We ended up focusing on six particular aspects of our local legal system that we are making suggestions about to the Board of Governors. No one should conclude that these are the only six aspects of our local legal system that could qualify for concern. Rather, the task force determined that its recommendations about these six aspects of our system would make a significant difference, and that it is better to proceed with action on six things than to hold off while other possible aspects of our system are studied.

4

We divided up the task force members and created smaller teams to explore these aspects of our local legal system in some detail, and to consider possible ways to address them. Each team wrote a report to the whole task force about the aspect they explored, and the entire task force then considered each team's report. After some revisions to reports, the task force approved each report as the recommendations of the entire task force. While not every suggestion on each report received the support of every task force member, there was unanimity on most of the recommendations, and at least a consensus as to all of them. Every task force member was invited to submit a supplemental report to the Board on any of these items that they think the task force has not done justice to.

Of course, identifying a problem is one thing. Identifying solutions is another. The items we have identified are challenging ones to change. But we have given suggestions to the Board for how they might be addressed, both by the WBA as an association and by individual WBA members.

Here are the six aspects of our local legal system that we have identified. Following this introductory section are the reports of each of the task force's teams that explored that aspect. Please review each team's report for a more complete explanation of the problem and of our recommendations on how to address them.

1. **Jury panels tend to lack the racial and ethnic diversity of our community.**

   This can give the appearance to parties who are racial or ethnic minorities that they are not likely to get a fair trial, and it presents the possibility that those parties do not get the same consideration from the jury that they would get from a more diverse panel. Statistics on the racial and ethnic makeup of jury panels are not currently gathered, so this observation is necessarily an informal and anecdotal one. It appears that reasons for this lack of diversity include the following:

   1. Fewer racial and ethnic minority people respond to jury summonses. The reasons appear to include:
      i. economic challenges:
         1. in Sedgwick County, those appearing for jury service are paid $10 per day, plus $2 for lunch, plus mileage.
         2. Racial and ethnic minorities tend to be less able financially to miss work, pay for childcare, obtain transportation, etc.
      ii. a desire not to participate in the court system, perhaps from prior negative experiences with our court system, an outstanding warrant, etc.; and
      iii. a lack of any follow-up or enforcement in our state courts for failing to respond to jury summonses.
   2. Potential jurors of the same racial or ethnic background as one of the parties in the case are sometimes removed through peremptory challenges.
      i. There are many valid reasons for removing a potential juror of the same race or ethnicity by a peremptory challenge.
      ii. Removal of a potential juror by a peremptory challenge solely on the basis of their race or ethnicity was held to be illegal by the U.S. Supreme Court in *Batson v. Kentucky*, 476 U.S. 79 (1986). But courts have allowed peremptory challenges based on factors that some consider mere proxies for race or ethnicity. Some states have recently enacted statutes with more specific standards for peremptory challenges of racial and ethnic minorities.

5

PLFS00001870

The task force recommends the following to address this problem:

1. Ask our state court system to start collecting race and ethnicity data on juror questionnaires and maintain a database of the responses.
2. Recommend that the Sedgwick County Commission increase juror pay to the maximum set by state law, of $50 per day.
3. Ask our state court system to track and maintain the response rate to jury summonses by zip code.
4. To the extent our state court jury clerk has email addresses for summoned potential jurors and uses them to send juror questionnaires, ask the court system to have a reminder email sent from the Sheriff's Office seven days before the appearance date.
5. Start a public relations campaign about the importance of racial and ethnic diversity on juries by:
   a. Declaring the topic for Law Day 2022 in Wichita to be "Enhancing Racial Diversity in Jury Service."
   b. Create an engaging video about this to be shared with civic groups, schools, and on social media.
6. Ask the Kansas Legislature to enact a statute to address the *Batson* protections more specifically.

See the report of the task force team that explored this issue, below, for a more thorough explanation of the problem and the specific recommendations.

2. **Our state court judges, as a group, lacks the racial diversity of our community.**

We currently have 28 state district court judges, none of whom is African-American, Asian-American, or Native-American. Below is the most recent photo of our state court bench from the Sedgwick County court website. There have been some changes of judges since this photo was taken, but the racial makeup has not changed.



6

PLFS00001871

This can give the appearance to people who are racial minorities that our state court system is less likely to understand their particular circumstances. And it presents the possibility that those parties do not get the same level of understanding from our state court system that they would get from a more racially diverse group of judges. This should not be taken to be an assertion that any particular judge is racist. Please refer to the report of the task force team that explored this issue, below, for an explanation of the concern about a state court bench that does not reflect the racial makeup of our community.

The primary reason for this lack of racial diversity appears to be the way we select these judges in Sedgwick County. Kansas law sets partisan election as the default method for choosing state court judges, but it gives each county the right to change to a non-partisan system instead. In Sedgwick County we choose state court judges by partisan election. About half the counties in Kansas have chosen to change to a system of appointment of judges and retention elections. The task force team that explored this issue was not able to get a definitive answer as to whether a system of non-partisan election of judges is available under current law, or what changes in current law would be needed for such an option to exist. There are undoubtedly other reasons that make it difficult to get and keep racial or ethnic minority judges on our state court bench. But the task force believes the primary reason is our system of choosing those judges.

The task force recommends the following to address this problem:

1. The WBA should endorse and pursue a change in how we select state court judges in Sedgwick County to a non-partisan process—either by appointment or non-partisan election. (This would include obtaining clarity from state election officials whether an option of non-partisan judicial elections is currently authorized by Kansas law or whether appointment is the only available option.) See the report from this task force team, below, for an explanation for how this change could make a difference in the racial makeup of our state court bench.
2. Obtain data to determine the race and ethnicity of the lawyers in Sedgwick County, from whom our state court judges are drawn.
3. Obtain data to discern the various factors affecting a lawyer's decision to run for judicial election, including whether partisanship affects their decision.
4. The WBA and/or its individual members should become more involved in strategic recruitment of racially diverse lawyers for open judicial positions. This could include working with both the Republican and Democratic Parties to advance lawyers of color for these positions.
5. Promote education of the public about the importance of judicial selection, the tendency to unwittingly harbor implicit bias in elections against people of a different race or ethnicity, and the important role of the electorate in judicial elections.
6. The WBA should continue to support increases in judicial salaries. Before the recent increase authorized by the Kansas Legislature, Kansas was ranked 50th out of 51 (states and DC) for the level of judicial salaries. The recent authorized raises would probably rank Kansas a bit higher than 50th.

**3. The Gang Member and Gang Associate registry maintained by the Wichita Police Department has the appearance of operating in a way that may not result in "equal justice" for many African-American Wichitans, and with onerous consequences—but more study and engagement with the WPD about these lists is needed in order to reach conclusions and any particular recommendations.**

PLFS00001872

Police departments are authorized by K.S.A. 21-6313 to create and maintain a registry of people who qualify as "criminal street gang members or associates." The WPD has created such a registry that includes large numbers of Wichitans and has used these lists for years in its law enforcement work. The task force assumes that these lists have benefitted the WPD's work in law enforcement in a number of ways. But there are several things about these lists that cause substantial concern to the task force about whether their use results in a lack of "equal justice," or in the appearance of the lack of "equal justice," for African-American Wichitans.

The task force team that explored this issue obtained substantial data about these registries from several law enforcement agencies in Kansas through Kansas Open Records Act requests. This information led us to concern that the registry appears to:

1. Disproportionately affect Black Wichitans.
   a. The registry includes 1 of every 34 Black Wichitans, compared to 1 of every 897 White Wichitans.
   b. Wichita's registry with 1 of every 34 Black Wichitans included compares to Topeka's registry with 1 of 235 Black Topekans included.

2. Classify an unusually high number of people as "gang members" or "gang associates" when compared to registries used in other jurisdictions in Kansas.
   a. That includes Shawnee and Wyandotte Counties, which have a substantially higher number of felony crimes charged per capita than Sedgwick County has.

3. Result in the application of the inflexible provisions of K.S.A. 21-6313 being disproportionately applied in cases which may not have had any relation to "criminal street gang" activity.
   a. That includes a mandatory minimum bond amount of $50,000 for a person on the registry, even if the crime charged is a first offense and is not gang-related.
   b. It includes the possibility of adverse effects at trial, and a greater likelihood that more onerous sentencing and probation conditions will be imposed.
   c. It includes the possibility of more onerous incarceration conditions.

4. Lack transparency and procedural protections for classified individuals, such as notification and opportunity to contest the designation; and

5. Allow for an individual to be classified as a "gang member" or "gang associate" for activity unrelated to a "criminal street gang."

Please see the report of this task force team, below, for a much more thorough explanation of the data collected and the onerous effects for people on the registry.

Because of the complicated nature of this issue and the need to explore it further, including engaging with the WPD to better understand its use of the registry and how that relates to the concerns stated above, the task force is not prepared to make any specific conclusions or recommendations for changes at this time. Instead, the recommendation is that the Board of Governors appoint another task force to continue work on this particular issue with hopes of reaching some specific conclusions after substantial engagement with the WPD.

8

PLFS00001873

**4. Current Kansas law regarding suspension of driver's licenses, including for non-payment of fines for driving-related offenses, presents serious challenges for people of all races and ethnicities who are unable to pay the fines, including in particular racial and ethnic minorities.**

It is very difficult to live and work in Wichita without a valid driver's license, as our public transportation is inadequate to fill the need. Current Kansas law provides for suspension of driver's licenses in a number of situations. Some of those situations require a person to pay certain fines in order to have their license reinstated. Those fines can add up quickly, and people without financial means can find it very difficult to get them paid, along with their other financial obligations—especially without a driver's license to get to work. The result is that some Wichitans go years without a valid driver's license. Some of them drive anyway, including without insurance because of their suspended license.

This is not a race-based problem. It is a problem that affects people of all races that lack the financial ability to pay traffic-related fines assessed against them. Because poverty affects people of minority races and ethnicity at a higher rate than white Wichitans, it is a problem that disproportionately affects minorities.

This issue has also been identified by The Criminal Justice Reform Commission and The Governor's Race and Equity Task Force, both of which made recommendations to the Kansas Legislature to change the law in several respects. The Kansas Legislature changed the law in its 2021 Session as to some of those recommendations. But other recommendations remain for further consideration.

Please see the report of this task force team, below, for a more thorough explanation of the problem, the recent changes in the law, and the remaining recommendations of those two groups. This task force recommends that the WBA support the four remaining recommendations:

1. That the persons seeking a restricted license not be required to pay the $25 fee unless the person has been notified they are in fact eligible for a restricted license.
2. That once a person pays the fines and fees of the underlying traffic ticket, the person pay only one reinstatement fee per case, rather than $100 for each charge listed on the original ticket.
3. That once all fees and fines have been paid, the KDOR immediately (within 3-5 business days) reinstate licenses, rather than waiting 90 days.
4. That a person's license not be suspended solely because the person could not pay the fines and fees for a traffic offense (note: this recommendation was not uniformly supported by the Criminal Justice Reform Commission and the Governor's Race and Equity Task Force).

**5. The decision whether or not to charge a crime, what crime to charge, and what plea negotiations to engage in, are inherently judgment calls of the prosecutor. If those decisions are affected by bias of the prosecutors against racial and ethnic minority people, including any implicit bias, that would be a way that the system would not result in "equal justice" for those people. There is currently a lack of readily accessible data to explore to what extent, if any, this problem exists. But there is data that can be tracked to help explore this potential problem.**

The task force team that explored this issue included both prosecutors and criminal defense attorneys. It would take a case-by-case comparison of the thousands of cases filed each year in order to have some actual data to rely on, rather than mere hunches or suspicions that prosecutors' decisions are adversely affected by bias against racial and ethnic minorities. It appears to the task

9

force team that explored this issue that data does exist that could provide insight into this possible problem—if it could be accessed in an efficient way.

Marc Bennett, the Sedgwick County District Attorney, and a member of this task force team, has started the process of having his office create a computer program capable of gathering relevant information from the cases his office has handled and is handling. If that effort is successful, the data could prove helpful in exploring to what extent, if any, prosecutorial bias exists and keeps racial and ethnic minorities from obtaining "equal justice" from our local legal system.

Please see the report of the task force team that explored this issue, below, for more detail on the data being sought to explore it.

The concept of bias in decision-making, including implicit bias, is uncomfortable to many people. The task force especially appreciates the willingness of the two prosecutors on our task force to take a genuine look at this issue, and the willingness to do the work of creating a means to obtain good data about it.

The task force recommends to the Board of Governors to establish a way to follow up on the data that will hopefully be generated by the computer program being created at the Sedgwick County District Attorney's Office.

6. **Our local legal system affects a wide variety of civil legal matters that people face, including family law, bankruptcy, landlord/tenant, other real estate, consumer protection, employment, social benefits, citizenship, education, personal injury, child in need of care, elder financial abuse, guardianship, and protection from stalking and abuse, among many others. Concerns in the civil justice area center on perceptions of some minorities that they may not be treated fairly because of: the largely non-diverse character of those administering the system; financial challenges resulting in a lack of access to lawyers or other expertise to help them navigate the system; and a relative lack of knowledge of legal rights and processes to allow for effective *pro se* use of the civil legal system.**

Please see the report of the task force team that explored these civil justice issues, below, for a good explanation of each of the problems described above and their various recommendations.

The task force makes the following recommendations to address these problems:

1. As to the problem of perceptions:
   a. The WBA should pursue the recommendations of this task force regarding the lack of racial diversity on jury pools and among our state court judges.
   b. The WBA should support supplemental training of our local judges on the various issues relating to minority races and ethnicity discussed in this report.
   c. The WBA should support making court and legal information available in different languages.
2. As to the problem of access to lawyers and other legal expertise:
   a. The WBA should promote the availability of a limited appearance by lawyers to support otherwise *pro se* people in the areas most technically challenging.
   b. The WBA should promote the importance of financial support for Kansas Legal Services, as well as the importance of *pro bono* work by its members.

PLFS00001875

    c.  The WBA should consider sponsoring a limited number of grants per year for people using the KBA's reduced cost KanAsk-A-Lawyer service.

    d.  The WBA should evaluate the Limited Licensed Legal Technician program that would make licensed non-lawyers available to support people lacking the financial ability to use lawyers.

3.  As to the problem of a relative lack of knowledge of legal rights and processes to allow for effective *pro se* use of the civil legal system:

    a.  The WBA should consider providing resources pages on our website for various areas of civil law to help people know their legal rights and obligations and how to navigate the civil justice system, and ask our various practice area committees to supply and monitor content for those pages.

    b.  The WBA should support an information campaign to promote those resources.

    c.  The WBA should coordinate with our local court systems to provide links to the WBA resource pages.

    d.  The WBA should support and promote the Sedgwick County Law Library as a resource for anyone, including racial minorities, and coordinate with it on outreach and educational programs.

        i.  As to the Sedgwick County Law Library as a resource for financially-challenged people, including minorities, see a supplemental report from John Lewallen, Law Librarian of the Sedgwick County Law Library, attached to this team's report, below. It describes the Law Library's outreach to the public with its extensive legal resources, their recent effort to create a *pro se* self-help center at the law library in conjunction with the Sedgwick County District Court, and their other ideas for meeting the needs of people who must navigate the civil justice system *pro se*.

## CONCLUSION

The members of the task force have put a substantial amount of study, work, and discussion into addressing the task the Board gave us. Our local legal system is such an important part of our community that it is worth our time and effort, and the time and effort of the WBA and its members, to make it as fair and accessible a system as reasonably possible for everyone in our community, including racial and ethnic minorities. All of us on the task force were honored to have this opportunity to explore ways our local legal system might be improved.

It became clear to us that these are difficult issues to deal with, but we believe it is worth the work to implement the recommendations we have made.

The reports from the six task force teams follow.

The WBA Racial Justice Task Force

PLFS00001876

**Wichita Bar Association Racial Justice Task Force**
**Sub-Committee on Diversity of Sedgwick County Jury Panels**

<u>Members</u>:
Monique Centeno
Dwayna McFerren
Jason Hart
Richard Ney
Marc Bennett

<u>Meetings</u>:
The sub-committee met by Zoom on December 9, 2020, January 6, 2021, and April 19, 2021.

At the first meeting we discussed the need to identify what data may be available - whether or not it is currently being made available -- and how to collect the same.

**A. Information Gathered:**
A series of questions was posed to Ellen House, Court Administrator for the 18th Judicial District.  The questions and answers were as follows:

**I. With regard to Information Gathered:**
1.  When the jury clerk gets information from DMV or from voter rolls, is the race of the individual noted?  We assumed it would not be in the information provided by voter registration (not sure about DMV);  <u>According to Philip Davolt, race is not included in either set of data – DMV or Voter</u>
2.  Can someone tell us whether race is a data point that can be obtained from the DMV? <u>Possibly Department of Revenue?</u>
3.  Are there databases other than the DMV?  <u>Voter registration is also used</u>  (we knew this but forgot to include voter registration in the question)
4.  When jurors fill out cards for jury service, could we add a question asking the juror to identify their race?
    <u>**K.S.A. *43-161. Same; juror questionnaires; failure to or falsely answering questions, criminal penalty. Each jury commissioner may require any person whose name has been selected for a jury list prepared in accordance with the provisions of K.S.A. 43-162, and amendments thereto, to answer in writing such questions as the commissioner may address to such person, relating to such person's name, age, residence, occupation and qualifications as a juror, with a view to the due and faithful jury service of such person and such questions involving similar matters relating to all persons living in such person's residence.***</u>
5.  Could we ask for cell phone numbers?  (see #1 below): <u>Yes</u>

**II. With regard to Sedgwick County policy/practice:**
1.  Has the county ever considered contracting with a service/buying software to send a text message to remind people summoned to show up for Jury Service? <u>I know this is a popular tool right now, but honestly, prior to COVID, we experienced pretty good response rates and the expense of such a system did not seem to be cost effective.</u>
2.  Could the Sheriff go out to inquire within anyone who has not called in as to whether they received their summons? <u>Yes, they could, but we utilize the sparse resources of the Sheriff for more urgent needs.  If a juror is seated and then fails to show, if the Court is unable to reach the juror, the Sheriff is sent.</u>
3.  The current payment for jury service is $10 or $15.  Who sets that?  Would the county commission have to vote to approve an increase to $50 per day in Sedgwick County?

12

> K.S.A. **43-171.   Same; jurors' fees.** Jurors shall be paid the following fees from the county general fund:
> (a) An amount, not less than $10 nor more than $50, as determined by the county commission, for each day of attendance, to attend court pursuant to this act; and
> (b) mileage, at the rate authorized by law, for necessary travel in going to and returning from court pursuant to this act.

4. Would it be possible to specifically send more summons out to zip codes where census tracks show neighborhoods are predominately African American – or is the randomness of the jury summons process not something the county can change/manipulate? If we did that, it would no longer be random.

Ellen added, "As a Judicial District, we need to get out into the schools and community and talk about jury service and why it's important.  Not with the . . . video that we currently show, but with something fresh, lively, and compelling.  I would think there would be some sort of grant available to do this." She said she would be willing to work on this idea.

## B. Recommended Action Steps for the Board of Governors

At the 2nd and third meetings of the subcommittee on racial diversity in jury pools, we worked out the recommends we believe the Board of Governors of the Wichita Bar Association should take as to the following priorities:

1. **Racial Identity**:
   a. As the Chief Administrative Judge to require the Jury Clerk to add a question to juror questionnaires, asking people to identify their own race;
   b. Ask the Chief Administrative Judge to require the Jury Clerk to maintain a database of the answers provided to the racial identity question posed on the jury questionnaire.

(2) **Pay**: Recommend that the Sedgwick County Commission vote to increase juror compensation from $15.00 to $50.00 as allowed by K.S.A. 43-171;

(3) **Response Rate**: Ask the Chief Administrative Judge to require the Sedgwick County jury clerk to track and maintain the response rate of jurors their respective home by zip code;

(4) **Reminder Emails**: Inasmuch as the Jury Clerk utilizes email to juror questionnaires to prospective jurors, ask the Chief Administrative Judge to request the Sedgwick County Sheriff send a reminder email to each of those prospective jurors 7 days prior to the date on the jury summons;

(5) **Education** - to communicate the importance of racial diversity on jury panels, implement the following steps to educate the public:
   a. Declare topic of the 2022 Law Day to be "Enhancing Racial Diversity in Jury Service; and
   b. (2) create a video to that effect to be shared with civics groups, schools and on social media.

6. **Legislation**: That the Kansas Legislature consider legislation to address the protections afforded by *Batson v. Kentucky*, 476 U.S. 79 (1986).  By way of example, California AB 3070, passed into law when the Governor signed the bill April 8, 2021.  While the subcommittee did not reach consensus on specific language to be included in such a legislative effort, the subcommittee recognized the opportunity under Kansas law to enhance the *Batson* protections legislatively.

PLFS00001878

**Wichita Bar Association Racial Justice Task Force**
**Subcommittee on Diversity and Judicial Selection Processes**

Members:
Jason Hart
Bill Townsley
Sara Zafar

**QUESTION:** Does the judicial selection process in Sedgwick County promote, or contribute to, the non-representation of persons-of-color among the judiciary?

**HISTORY:**

This report concerns the judicial selection process and the potential reforms that may enhance racial diversity of judges in Sedgwick County. In reaching our conclusions, we reviewed the processes of judicial selection, the reasons for enhancing racial diversity on the bench and the current status of judicial selection in Kansas and Sedgwick County.

Historically, the face of justice in the United States is that of a white male. This remains true today despite that diversity has increased in law schools and state bars across the country. The populations of the City of Wichita and the State of Kansas have also become increasingly diverse; but, that increasing diversity is not reflected on the bench. Kansas is reported to rank 42nd nationally for lack of diversity among judges.

In Kansas, recent studies revealed that both state courts and appellate courts are dominated by white males and that every other demographic group is underrepresented on the bench. In Sedgwick County, the same is true in that, despite that three judges identify as Hispanic, there are no African-American district court judges in Wichita.

The issues of race and gender diversity for judges have been widely researched and reported on in the last 30 years. The underlying reasons for the interest in racial diversity for judges are linked to the American promise to provide equal justice for all. Some of the reasons supporting judicial diversity include:

- Diversity will enhance public confidence in the legitimacy of the courts and the judicial system;

- Diversity of viewpoints will produce a more robust jurisprudence;

- Diversity provides decision-making power to formerly disenfranchised populations;

- Diversity on the bench improves judicial decision making. Supreme Court Justice Powell noted that "a member of a previously excluded group can bring insights to the court that the rest of its members lack";

- Chief Judge Karen Arnold Burger of the Kansas Court of Appeals has commented that if the court does not look like the community it serves, serious consequences may result. She stated "studies have been done that people are more likely to comply with the orders of the court, and more likely to respect a court's decision, if the court looks like them. If you have a bench with no one of color on it, then when people of color come before the court, they perceive,

PLFS00001879

> rightly or wrongly, that they are not going to be understood, that the system is stacked against them."

For these reasons, Sedgwick County with essentially an all-white judiciary is at odds with its more diverse population and is not representative of many of its constituents. Based upon the definitions adopted by the task force, the absence of diversity, and specifically African-Americans, among Sedgwick County district court judges in Sedgwick County results in the appearance of systemic racism in Wichita and erodes confidence in "equal access to justice."

Pursuant to the Kansas Constitution, Article III, Section 6, judicial selection occurs in one of two ways. As the default, Section 6 directs that district judges shall be elected by the electors of the respective judicial districts unless the electors of a judicial district have adopted and not subsequently rejected a method of nonpartisan selection. This language also suggests that the Constitution contemplates "partisan" elections at the default. The Kansas Constitution further states:

> The legislature shall provide a method of nonpartisan selection of district judges and for the manner of submission and resubmission thereof to the electors of a judicial district. A nonpartisan method of selection of district judges may be adopted, and once adopted may be rejected, only by a majority of electors of a judicial district voting on the question at an election in which the proposition is submitted. Whenever a vacancy occurs in the office of district judge, it shall be filled by appointment by the governor until the next general election that occurs more than thirty days after such vacancy, or as may be provided by such nonpartisan method of selection.

Kan. Const. Art. III, § 6.

Thus, judicial selection occurs generally in two methods: non-partisan appointment or partisan election.

In Kansas, state district court judges are selected by election in about half of the judicial districts across the state and by appointment in the remainder. For appellate judges, however, Kansas uses the appointment selection process for Supreme Court justices as defined by the Kansas Constitution. For the Court of Appeals, however, the governor's selection of a judge nominated by a nominating commission must be confirmed by the legislature.

In regard to further distinctions between the two systems of judicial selection, we note that an elected judge will be required to participate in a new election cycle for every general election on a regular cycle (every four years in Sedgwick County) whereas an appointed judge will stand only for a retention election in subsequent election cycles. The import here is the much higher burden of facing a new opponent and related campaign issues (if opposed) as compared to surviving an election which simply asks whether the judge should be retained for another term. Stated differently, in the context of a non-partisan appointment process, there is no looming adversarial aspect (facing a direct challenge by an opponent) nor the rigors of campaign fund-raising in a retention election.

For purposes of this report, we focus on the Sedgwick County election process which is a partisan election in which the candidates are identified by their connection to a political party.

Given the apparent failure of the Sedgwick County system to promote diversity on the bench, much of our recommendations will concern how to improve that record with the continued use of an election selection process.

PLFS00001880

In comparing the appointment process versus the election process, we found that many studies have revealed that the appointment process may promote greater diversity in appellate courts but that there may be little or no difference between election process and the appointment process as it pertains to selection of state district court judges.

The election process for selecting judges is likely skewed in Sedgwick County based upon the political affiliation of the electorate. Here, Sedgwick County is a jurisdiction dominated by republican voters. Accordingly, the judges on the bench are elected by the political makeup of Sedgwick County and that is a republican-dominated jurisdiction in which only republican candidates win general elections.

Sedgwick County's judicial selection process employs partisan elections, as is authorized by KSA 20-2901. Based on historical observation, it appears that Sedgwick County's method of judicial selection has the effect of pushing out judges who identify as persons-of-color, and particularly African-Americans. It appears that African-American judges will typically identify as Democrats and, if a Republican candidate runs against them, that Republican candidate will win. Notably, the data sample for this proposition is small but anecdotally compelling.  For example,  the current governor appointed a black woman who aligned with the Democratic Party to serve out the term of a retiring judge in Sedgwick County.  When the new judge sat for her first election, she was ousted by a white male who ran as a republican.

Currently, of the 28 sitting judges in Sedgwick County District Court, there are only three (3) persons who identify as anything other than white/Caucasian, and those individuals identify as Hispanic or Hispanic/Caucasian. This contributes to the perception that the judiciary does not represent the community it serves, particularly in relation to African-Americans. As has been observed by a Task Force member, "The black community is a major consumer of the criminal justice system and are entitled to representation on the bench."

Notably, there are judicial positions in Sedgwick County that are not subject to election, where African-American judges serve, including a City of Wichita municipal judge and a United States Magistrate Judge.

**ANALYSIS:**

As a preliminary matter, discussion of this issue assumes that the majority of lawyers who identify as persons-of-color also identify as non-Republicans, which may discourage running for judicial positions. Task Force members acknowledged that other factors such as compensation and community support may play a greater role in the decisional process. Task Force members acknowledged that it was unclear whether the lawyers in the community who make up the pool of judicial candidates reflects a greater or lesser percentage of lawyers who identify as people of color.  In light of these data gaps, Task Force members are seeking the lawyer-rolls for Sedgwick County to conduct survey/interviews on these questions.

The method of judicial selection and appointment is codified in KSA 20-2901. On its face, this statute only provides two methods of selection: 1) non-partisan appointment  and 2) election. The subcommittee notes, the appointment process is ultimately performed by a partisan-elected official (the governor), which imparts a partisan bias to that process. Importantly, the statute does not appear to specify that elections are partisan. Moreover, the language of the Constitution advises, "A nonpartisan method of selection of district judges may be adopted..." Arguably, the Kansas Constitution actually provides for a district to adopt a non-partisan method of selection, such as non-partisan elections, and that Constitutional right is not limited by KSA 20-2901.

PLFS00001881

Pursuant to *KSA 20-2901*, a given county chooses its selection process. The county may change that process (as described therein). As an example, if Sedgwick County pursued a change of method (to appointment), petitioners would need 8271 signatures on a petition, as contemplated in the 5% rule of KSA 20-2901(g). That number derives from the 2018 General election, where 165,415 votes were cast for the office of KS Sec of State. If the petitioners collected enough signatures, the matter would not appear on the ballot until 2022. If unsuccessful, another petition could not be brought for eight (8) years.

Sedgwick County employs the elections process, and partisan denominators appear on the ballot. It has been proposed that, rather than petition for the appointment method, the partisan denominators simply be removed from the ballot.

An inquiry to the Secretary of State by a WBA Task Force Subcommittee Member (Q: Does the statute allow for a middle option, allowing a county to choose to undertake non-partisan elections? Put another way, could a county decide to undertake elections but purposefully exclude the R, D, or whatever partisan identifier?) was made and met with uncertainty. The Kansas Secretary of State directed the inquiry to the Kansas Director of Elections. To date, no response has been received.

The primary conclusion to be drawn for the path forward is that, despite some efforts and much dialogue about improving racial equality in the courts, there is still much work to be done.

## RECOMMENDATIONS:

1.  We recommend that the WBA Board of Governors endorse a non-partisan process (whether appointment or election without denomination). This may be done in two ways:

    A.   Propose a change in the Sedgwick County selection process from an election system to the appointment system  to gain the benefit of selective nominations and retention elections for the appointee rather than the current system in which every new judge might face a new general election opponent every four years.  As stated above, the change would require gathering about 8500 signatures from constituents to ensure that the question is placed on the ballot the for the next general election.  If the change was rejected by the voters, it could not be resurrected for another eight years.

    B.   As an alternative to changing the selection process to appointment from the election process, seek and obtain clarity from State Election officials regarding whether the "third option" of non-partisan judicial elections is available/authorized.

2.  Obtain more data (from interview/survey of attorney rolls) to discern to what extent the current judiciary fails to reflect a representative sample of the community of lawyers from which it draws.

3.  Obtain more data to discern the factors affecting an individual's decision to run for judicial election, including whether partisanship affects their decision.

4.  Increase strategic recruitment of diverse lawyers for open judicial positions.  Here, the WBA could help with the recruitment process and potentially work with the Republican and Democratic Parties to advance lawyers of color for judicial positions via the current election process or any alternative process.

5.  Educate the public about the importance of judicial selection, the widespread tendency to unwittingly harbor implicit bias against disadvantaged groups, and the role of the electorate in judicial elections.

PLFS00001882

6. Raise judicial salaries. Seek to promote higher salaries for judges. Currently, Kansas is ranked 50 out of 51 (states and DC) for judicial salaries. The higher salary will help to recruit the best lawyers and lure diverse candidates out of law firms and onto the bench.

PLFS00001883

**Report of Gang Member and Gang Association Registry Subcommittee**

**Members:**
Keith Edwards
Gaye Tibbets
Bach Hang
Steve Rupert

## Summary of Findings

The Gang and Gang Association Registry subcommittee was charged with investigating whether the "criminal street gang member or associate" registry kept by the Wichita Police Department pursuant to K.S.A. 21-6313 was either in its creation or its administration a practice that either did not or appeared not to give "equal justice." We conclude that there is strong evidence that the registry:

1. **Disproportionately affects Black and African American individuals in Wichita;**

2. **Classifies an unusually high number of individuals as "gang members" or "gang associates" when compared to registries used in other jurisdictions in Kansas;**

3. **Results in the application of the inflexible provisions of K.S.A. 21-6313 being disproportionately applied in cases which may not have had any relation to "criminal street gang" activity;**

4. **Lacks transparency and procedural protections for classified individuals, such as notification and opportunity to contest the designation; and**

5. **Allows for an individual to be classified as a "gang member" or "gang associate" for activity unrelated to a "criminal street gang."**

We believe that our findings are cause for concern, and that this issue warrants further exploration.

We initially asked law enforcement about their use of the gang registry through Kansas Open Records Act ("KORA") requests. KORA responses indicated a significant disparity in how the "gang member and associate" classification scheme affected different racial groups in Wichita, as well as a significant disparity in the extent to which the "gang member and associate" classification scheme is used in Wichita compared to other jurisdictions in Kansas.

## Summary of Recommendations

There simply was not time to fully explore all of the nuances of this complicated issue as a part of the WBA's Racial Justice Task Force. That is why we recommend that the WBA appoint a task force that would:

1. Educate bar association members and the public about this law enforcement tool and its use in this community, as it is a practice about which many lawyers and the public are not aware;

2. Work with entities involved with the application of criminal justice in the local legal system to review the Wichita Police Department's current application of the "gang member and associate" classification scheme, and, if possible and necessary, to propose changes in practices and

19

policies which might reduce the disparate impact of the classification scheme on different racial groups; and

3. Explore whether it is appropriate for the WBA to lobby for the repeal or modification of K.S.A. 21-6313 through 21-6316. In particular, to recommend that the bail provisions, which are inconsistent with judges' discretion and case by case review, be repealed in the next legislative session.

**The law**

K.S.A. 21-6313 establishes a framework for law enforcement to classify individuals as "gang members" or "gang associates." A full version of that statute is located in this report at Tab A. The statute includes a list of actions, traits, or events which can indicate that someone is affiliated with a criminal street gang.[1] A person may be classified as a "gang member" if three of those indicators apply to them, or they may be classified as a "gang associate" if two or more of those indicators apply to them. Those possible indicators are as follows:

(A)    Is identified as a criminal street gang member by a parent or guardian;

(B)    is identified as a criminal street gang member by a state, county or city law enforcement officer or correctional officer or documented reliable informant;

(C)    is identified as a criminal street gang member by an informant of previously untested reliability and such identification is corroborated by independent information;

(D)    frequents a particular criminal street gang's area;

(E)    adopts such gang's style of dress, color, use of hand signs or tattoos;

(F)    associates with known criminal street gang members;

(G)    has been arrested more than once in the company of identified criminal street gang members for offenses which are consistent with usual criminal street gang activity;

(H)    is identified as a criminal street gang member by physical evidence including, but not limited to, photographs or other documentation;

---

[1] The statute in subsection (a) defines a "criminal street gang" as follows:

(a)    "Criminal street gang" means any organization, association or group, whether formal or informal: (1) Consisting of three or more persons; (2) having as one of its primary activities the commission of one or more person felonies, person misdemeanors, felony violations of K.S.A. 2020 Supp. 21-5701 through 21-5717, and amendments thereto, any felony violation of any provision of the uniform controlled substances act prior to July 1, 2009, or the comparable juvenile offenses, which if committed by an adult would constitute the commission of such felonies or misdemeanors; (3)   which has a common name or common identifying sign or symbol; and (4)   whose members, individually or collectively, engage in or have engaged in the commission, attempted commission, conspiracy to commit or solicitation of two or more person felonies, person misdemeanors, felony violations of K.S.A. 2020 Supp. 21-5701 through 21-5717, and amendments thereto, any felony violation of any provision of the uniform controlled substances act prior to July 1, 2009, or the comparable juvenile offenses, which if committed by an adult would constitute the commission of such felonies or misdemeanors or any substantially similar offense from another jurisdiction;

PLFS00001885

(I)      has been stopped in the company of known criminal street gang members two or more times; or

(J)      has participated in or undergone activities self-identified or identified by a reliable informant as a criminal street gang initiation ritual.

The Wichita Police Department implemented Policy 527 to utilize the K.S.A. 21-6313 framework. WPD Policy 527 is included with this report at Tab C. When taken together, K.S.A. 21-6313 and WPD Policy 527 allow for any law enforcement officer to request to add an individual to the gang member database without notice to the individual, without any process to challenge the designation, and without any judicial oversight.

**KORA Requests**

After establishing how a person becomes designated as a "gang member" or "gang associate," the subcommittee submitted KORA requests to several law enforcement agencies in Kansas.

KORA requests were sent to police departments in Wichita, and to what we considered similar metropolitan areas—Topeka, Overland Park, and the Kansas City Kansas/Wyandotte County Law Enforcement Office. KORA requests were also sent to the sheriff's departments in Sedgwick County, Shawnee County, Johnson County, and to the Kansas Highway Patrol.

The Sedgwick, Shawnee, and Johnson County Sheriffs' Departments, as well as the Kansas Highway Patrol, do not maintain a gang member database.[2] Gang registry databases are kept by the Wichita, Topeka, and Overland Park Police Departments, as well as by KCK/Wyandotte County Law Enforcement. The KORA responses are included in this report at Tab B. The subcommittee's analysis of that information isas follows:

1. **The Wichita Police Department's list of criminal street gang members contains almost ten times the number of Wichitans than that of other metropolitan areas. The Wichita Police Department appears to be the only law enforcement entity that keeps a list of non-charged "criminal street gang associates."**

The subcommittee surveyed other Kansas metropolitan law enforcement to see whether the WPD's use of the registry differed from the implementation of the registry statewide. We found it did. Evenadjusting for population size, the WPD registry contains close to 10 times more individuals than every other metropolitan area. WPD is also likely[3] the only metropolitan area that classifies individuals as "gang associates."

|  | Population | Criminal street gang member | Criminal street gang associates | Percentage of ICT population |
|---|---|---|---|---|
| **Topeka** | 125,310 | 64 | 0 | 32% |
| **Overland Park** | 195,494 | 39 | n/a | 50.1% |
| **Wyandotte/KCK** | 152,960 | 235 | n/a | 39.2% |
| **Wichita** | 389,938 | 1612 | 292 | 100% |

[2] Our understanding is that Sheriff departments do identify gang members when people are in custody, but not that a registry is kept as a law enforcement tool.
[3] We say likely because no other jurisdiction responded with that designation, though whether that is because they just did not respond or because they do not keep that information should be verified.

21

PLFS00001886

To test whether a higher crime rate might justify the disproportionate use of the registry in Wichita, we also looked at crime rates in the counties[4] that include these metro areas. The numbers below are felony filings per year in the comparative counties, which show that the felony crime rates per county tends to be fairly consistent over a 10 year period.

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sedgwick** | 3283 | 3465 | 3168 | 2917 | 2712 | 2900 | 3260 | 3072 | 3148 | 2997 | 3086 |
| **Shawnee** | 927 | 1432 | 1315 | 1262 | 1401 | 1343 | 1555 | 1352 | 1542 | 1432 | 1826 |
| **Johnson** | 1827 | 2161 | 2281 | 2015 | 1993 | 1970 | 1987 | 2359 | 2216 | 2438 | 2550 |
| **Wyandotte** | 1656 | 1489 | 1505 | 1584 | 1403 | 1380 | 1244 | 1075 | 1201 | 1367 | 1398 |

We then averaged the annual filings and compared to the 2019 populations of each county. Our conclusion was that felony charges per person **were higher in Shawnee and Wyandotte Counties than in Sedgwick County over the ten year period**, which was inconsistent with the idea that heavy felony crime justified ten times as many criminal street gang members being identified in Sedgwick County.

| | **Average Annual Felony Filings, 2009-2019** | **2019 Population** | **Felony Filings per 10k Residents** |
|---|---|---|---|
| **Sedgwick** | 3092 | 516042 | 59.8 |
| **Shawnee** | 1399 | 176875 | 103.2 |
| **Johnson** | 2163 | 602401 | 42.3 |
| **Wyandotte** | 1391 | 165429 | 84.5 |

2. **The Wichita Police Department's list of "criminal street gang members" and "criminal street gang associates" is disproportionately comprised of Black or African American Wichitans. Because Black or African American individuals only comprise a small part of the city's population, the "gang list" touches 1 out of every 34 Black or African American individuals, but only 1 of every 897 white individuals.**

---

[4] The Kansas Judicial Branch maintains a list of criminal cases filed by year in each county.

PLFS00001887

The WPD provided the racial breakdown of those included on the registry and we compared the racial composition of those on the registry with the racial composition of the Wichita population. We found that though Black or African American individuals make up 11% of the population, they are 65% of the registry of the gangs and gang associates. (The members on the list are 14.34% white, 65% Black or African American, and 18% Hispanic).

Though white supremacy groups are allegedly classified as criminal street gangs and though those groups have been on the rise, the proportion of white citizens on the gang registry remains low.

| Race | Number of Classified Individuals | Wichita Population | Likelihood of being Classified |
|---|---|---|---|
| Black | 1239 | 42503 | 1:34 |
| Hispanic | 358 | 67069 | 1:187 |
| White | 273 | 244881 | 1:897 |
| Asian/Indian | 24 | 19886 | 1:1046 |
| Total | 1904 | 389938 | 1:196 |

Also worth noting is that the one in 34 designation rate is much higher than in Topeka, where only 1 out of every 235 Black or African American individuals has been designated as a gang member or associate.

3.   **The consequences of being included on the list of "criminal street gang members" or "criminal street gang associates" are harsh and affect every level of the criminal justice system.**

We interviewed defense lawyers and former prosecutors and probation officers about potential negative effects on those who are listed either as criminal street gang members or "associates." The designation has harsh and far-reaching consequences.

A.   **Traffic Stops**

If law enforcement stops a driver who has been classified as a "gang member" or a "gang associate," WPD policy requires that the law enforcement officers making the stop are notified "by use of Signal 33."[5] When that officer approaches the suspect, the officer is on high alert because of the gang classification, though the driver may not know that he or she has been designated as a dangerous person. Some subcommittee members felt this increases the chance of the kinds of misunderstandings that can lead to a violent interaction between the police and driver.

B.   **Arrest and Pre-Trial Detention**

---

[5] See Policy 527 at Tab C.

PLFS00001888

WPD policy is that if a suspect is designated as a gang member or associate, the arrest warrant affidavit **must** include that designation if he is arrested for any crime, even one that is not gang-related[6].

K.S.A. 21-6313, the statute establishing the criminal street gang classification scheme, mandates those with a gang member or gang associate designation have a bond be set at least $50,000, **even if the arrested individual has no prior criminal offenses. The statute also mandates that the arrested individual** cannot be given a bond without "an appropriate pre-trial supervision program" being implemented. See K.S.A. § 21-6316.

The K.S.A. 21-6316 bail requirements are inconsistent with the recommendation of the Pretrial Justice Task Force Report to the Kansas Supreme Court, which recommends that judges use their discretion and consider the principles below as the guiding ones in setting bond:

1. liberty is the norm and detention is the carefully limited exception;
2. judges should first consider nonmonetary forms of release; and
3. release should be under the least restrictive conditions to assure a defendant's appearance while protecting the public[7].

In addition, prosecutors frequently use the gang designation to argue against the person's release on bond, even in cases alleging offenses unrelated to a criminal street gang.

The subcommittee's understanding is that judges and even some prosecutors would be amenable to eliminating this automatic bond requirement so that judges have the same discretion they have in other cases.

### C.    Trial

Because the arrest affidavit will identify the suspect as a member or associate of a criminal street gang, local media may continually report the crime as "gang-related" even when no other evidence supports that assertion. Also, anecdotally criminal lawyers have reported that judges have allowed the designation of "gang member" or "gang associate" to be admissible evidence on an element of a crime, like "acting in concert." Also, the designation could affect plea negotiations.

### D.    Sentencing and probation conditions

The gang designation could convince a judge to deny a request for probation, even if the offense had nothing to do with gang activity. Even if probation were granted, some judges routinely order that the person abide by the stock version of gang conditions.

"Gang Conditions of Probation," utilized by the Sedgwick County Department of Corrections and attached at Tab D, are restrictive and burdensome. The Supervision Agreement for Adult Probation, included in this report at Tab E for comparison, focuses on restrictions that keep track of the probationer and avoid criminal activity.

Some examples of things forbidden by the "gang conditions supervision agreement" that are not included in the adult probation provisions are:

---

[6] See Policy 527 at Tab C.

[7] Report of Pretrial Justice Task Force to the Kansas Supreme Court, p. 8-15, November 6, 2020, found at https://tinyurl.com/yhxs3ej5 and attached at Tab F.

PLFS00001889

- I shall not go to Towne East Mall, QuikTrip at 21st and Arkansas, QuikTrip at 13th and Oliver, Towne West Mall.
- I shall not attend any court hearing unless I am required by a judge or attorney.
- I shall not acquire any more tattoos.
- I shall abide by a curfew of 9:30 p.m. to 6:00 a.m.
- I shall not ride in the car with more than one (1) person unless those persons are my parents, siblings or my children.
- I will remain out of the restricted zones indicated below and outlined in the attached mapping zone form...: Mapping zones are attached behind the probation conditions at Tab D and include, for example, Kellogg from West Street to 119th Street West and Broadway from Waterman to 21st Street. The zone maps have the designation that "BEING IN THIS ZONE CAN AUTOMATICALLY VIOLATE THE DEFENDANT'S PROBATION" and forbid probationer from being in the zones before 6 am, after 930 pm or any time on a weekend.

These provisions were created in the 1990's, and it is unclear that they deter gang activity or serve the interests of justice as they relate to the probationer. These conditions are much more burdensome than traditional parole conditions and restrict what could be innocent or even productive activity. In addition, there is no requirement that the conditions relate in any way to the to the crime for which the person is on probation.

### E. Incarceration

Being listed on the gang registry can affect the security level at which the prisoner is held by the Department of Corrections. When two people commit the same crime and receive the same sentence, it is likely the person whose name is on the registry will be placed in a more restrictive prison setting.

4. **The WPD's written policy for listing individuals on its criminal street gang registry is nontransparent, does not allow those listed to challenge the designation, even if they are juveniles. Members or associates can be added by "any state, county or city law enforcement's" nomination, and a designation or flag does not have a reliable termination date.**

The WPD uses Policy 527, attached at Tab C, to construct the criminal gang member and criminal gang member associate database. The policy mandates that those who are listed in the database—even those who are associates—will be monitored for any violations "with the intent of removing the offender from the community."

The database is confidential and adults in the database are not informed that they have been included. There is no method to challenge the designation of "criminal gang member" or "criminal gang member associate," despite the harsh consequences described above.

To be added to the database, a law enforcement or corrections officer can send an email with information about how the individual meets the statutory criteria and that "will be researched" by a member of the Gang/Felony Assault Section of the Violent Crimes Community Response Team ("VCCRT").

Anecdotally, we heard from criminal defense lawyers that two clients could be charged and plead to identical crimes, but the white client would not be listed on the registry after conviction, but the Black/African American client would. We also heard that law enforcement would question high school administrators about who in the high school "associated with" juvenile citizens on the registry.

PLFS00001890

Even if the crime is not gang-related, if the arrest is for a person felony, the arrest affidavit **must include** that the individual is a documented criminal street gang member or associate. This subjects the suspect to the consequences above.

The policy provides that when listed in the database, the member or associate will be "active" for three years, excluding time spent in incarceration. After that, the individual's name is not removed from the database, but the flag "will be removed from EJustice." The subcommittee was not sure what that meant, but noted that the name is still included on the database.

However, if before becoming inactive the individual meets **even one** of the criteria again by, say, wearing "gang's style of dress or colors" or is accused of participating in gang related activity, they are reactivated for three years[8]. Essentially, there is never a removal from the list (even at death) and the criteria for having the three year period restart is less than the criteria for being added in the first place. If an inactive member was originally included because of a "gang tattoo," that same tattoo can be justification for adding back on the list if "the member has made no attempt to remove or conceal them."[9] The task force should address the perpetual inclusion in the database and recommend changes to that.

5. **Nationwide, there is a trend to adjust or eliminate gang registries in cities that had used them in the past.**

Collected articles found at https://www.themarshallproject.org/records/1937-gang-injunctions document that concerns of our sub-committee echo those of other cities with similar law enforcement procedures. According to the media, both Chicago and Los Angeles have ceased compiling their gang databases.

**Conclusion**

Our subcommittee recommends a task force be appointed to gather additional perspectives and input from the Wichita Police Department, and to continue to research other avenues to effect change and make subsequent and appropriate recommendations to prevent the unequal treatment by the gang registry of African American citizens. Our subcommittee learned that the ACLU and Kansas Appleseed have filed litigation challenging the constitutionality of K.S.A. 21-6313 through 21-6316 and of the WPD's implementation of the registry. We considered whether that litigation should affect the WBA's study of this issue and concluded it should not.

Regardless of the constitutionality of the legislation or WPD's practices, our firm belief is that having one out of every 34 Black or African American Wichitans on a registry that has harsh consequences is an indication that there is not "equal justice" and that reforms are necessary.

---

[8] The SOP for Entries into the Gang Database states in the subsection "Flagging in the WPD Gang Database" #3(c) that "Three year time element starts over if: (c) Documented wearing gang's style of dress, colors, or has new gang tattoos."

[9] SOP for Entries into the Gang Database, subsection "entries into the WPD Gang Database", #3

PLFS00001891

**Wichita Bar Association Racial Justice Task Force**
**Sub-Committee on Prosecutor Bias**

<u>Members</u>:
Gwen Sharpe
Keith Edwards
Jason Hart
Marc Bennett

The question posed is whether evidence exists to suggest that implicit bias plays a role in the exercise of prosecutorial discretion in charging decisions and plea negotiations. The information necessary to address the question is not currently available in a searchable form using existing databases at the state level.

The office of the District Attorney, 18th Judicial District is attempting to create a computer program capable of gathering the following information from local criminal cases:

1. Adult criminal cases we review — by white, black, Hispanic, Asian and by gender;

2. Adult criminal cases we charge — by same criteria;

3. Outcomes — by the same criteria pulled from (or compared to) the JE of Judgment.

4. Juvenile offender cases — looking at the same 3 criteria above.

I've also asked if a program can be written to pull the following information from existing data:

a. Lead count by racial breakdown;
b. # of cases that plead guilty as charged;
c. # of cases that that plead guilty to amended charges;
d. Same w/ respect to jury trials.
e. # of cases (by race) granted probation at original sentencing;
f. # of cases (by race) sent to prison after probation violation(s).
g. criminal history of defendants using racial breakdown.
h. Whether the Court followed the State's recommendation.

If successful, this information may be helpful in assessing the prevalence, if any, of implicit bias in the exercise of prosecutorial discretion.

PLFS00001892

**Wichita Bar Association Racial Justice Task Force**
**Sub-Committee on Driver's Licensure and**
**Reinstatement of Suspended Licenses**

<u>Members</u>:
Marc Bennett

Our Task Force decided to explore the problems created by Kansas law regarding suspension of driver's licenses for various reasons, including the nonpayment of fines assessed for driving-related traffic offenses. The laws in effect when this task force was created have led to a large number of Kansas being left unable to get their drivers licenses reinstated because of an inability to pay fines and reinstatement fees. It is very difficult to live and work in Wichita without a valid license and our public transportation system is inadequate to address the need.

The practical result is that a suspended license is a serious impediment to a person's ability to be economically productive, not only for themselves and their families, but also for our community (including their ability to earn the money to pay the fines). Another practical result is that many people in this situation continue to drive when their license is suspended, without insurance. If they are stopped again they are charged with driving with a suspended license and without insurance, which increases the fines that much more. Many people have accrued thousands of dollars in unpaid fines that would need to be paid in order to have their license reinstated. If they are in an accident without insurance, others can suffer financial loss as a result.

This is not a race-based problem. It is a problem that affects people of all races that lack the financial ability to pay traffic-related fines that are assessed against them. But because poverty affects people of minority races and ethnicities at a higher rate than white Wichitans, it is a problem that disproportionately affects communities of color. As a result, current Kansas traffic laws have been identified as one part of our local legal system that negatively affects minorities at a disproportionate rate. That made this an appropriate issue for our task force to address. But addressing these issues would improve our local legal system for people of all races and ethnicities who find themselves unable to pay traffic-related fines in order to maintain their driver's licenses.

The question posed is how to positively affect the law with respect to driver's licensure, easing the reinstatement process, reducing fees associated with the same and generally alleviating the burden associated with loss of driving privileges on poor members of the community and, in particular, communities of color.

During the 2021 Kansas Legislative Session, SB 127 was enacted into law effective May 6, 2021 after bills that addressed the issue were passed out of each chamber and then sent to conference committee to work out the differences.

The final draft of the 14 page bill may be found at: <u>sb127_enrolled.pdf (kslegislature.org)</u>

The bill summary--found at <u>summary_sb_127_2021 (kslegislature.org)</u>--makes certain technical changes to the state law including:

1. Adding commercial driver's licenses (CDL) to the list of licenses eligible to be renewed online;

2. Extending the maximum age for online extension from less than 50 to less than 65;

PLFS00001893

3. Allows the Dept. of Revenue to communicate license expiration/ renewal notices by email; Sec. 2 (pp 5-6).

Of more specific relevance to the work of the Task Force, the following changes were made:

1. **License suspension time period.** The bill amends, in a statute requiring suspension of a driver's license for driving when the person's driving privileges are canceled, suspended, or revoked, a provision requiring the Division to extend a period of suspension or revocation an additional 90 days, to state that the suspension or revocation shall not be extended for any additional time *if the person's license was suspended for failure to comply with a traffic citation*. See (b)(2) at page 9;

\* In other words, if the person was ticketed for driving on a suspended license, and the basis for the suspense was failure to comply with a traffic citation, their license can only be suspended an additional 90 days for the new conviction of DWS.

2. **Eligibility and application for restricted driving privileges**. Concerning eligibility for restricted driving privileges for a person whose driver's license expired while the license was suspended for failure to pay fines for traffic citations, the bill removes the requirement that the person has not previously received a stayed suspension as a result of a driving while suspended conviction. The bill removes a nonrefundable $25 fee that current law requires to be submitted to the Division by an applicant for restricted driving privileges in lieu of suspension of driving privileges for failure to comply with a traffic citation. Reinstatement fee. The bill makes a technical amendment to the period during which the Supreme Court is authorized to impose an additional charge per reinstatement fee.

Specifically, K.S.A. (2020 Supp) 8-2110, was amended as follows:

(2) (A)    In lieu of suspension under paragraph (1), the driver may submit to the division of vehicles a written request for restricted driving privileges, ~~with a non-refundable $25 application fee, to be applied by the division of vehicles for additional administrative costs to implement restricted driving privileges. The division shall remit all restricted driving privilege application fees to the state treasurer in accordance with the provisions of K.S.A. 75-4215, and amendments thereto. Upon receipt of each such remittance, the state treasurer shall deposit the entire~~   amount in the state treasury to the credit of the division of vehicles operating fund

(B)    A person whose driver's license has expired during the period when such person's driver's license has been suspended for failure to pay fines for traffic citations, the driver may submit to the division of vehicles a written request for restricted driving privileges, ~~with a non-refundable $25 application fee, to be applied by the division of vehicles for additional administrative costs to implement restricted driving privileges. The division shall remit all restricted driving privilege application fees to the state treasurer in accordance with the provisions of K.S.A. 75-4215, and amendments thereto. Upon receipt of each such remittance, the state treasurer shall deposit the entire amount in the state treasury to the credit of the division of vehicles operating fund~~. An individual shall not qualify for restricted driving privileges pursuant to this section unless the following conditions are met: (i) The suspended license that expired was issued by the division of vehicles; (ii) the suspended license resulted from the individual's failure to comply with a traffic citation pursuant to subsection (b)(1); and (iii) the traffic citation that resulted in the failure to comply pursuant to subsection (b) (1) was issued in this state; ~~and (iv) the individual has not previously received a stayed suspension as a result of a driving while suspended conviction.~~

29

PLFS00001894

3. **Reinstatement Fees**: Continuing law requires a court to assess a $100 reinstatement fee when the court notifies the Division of failure to comply with a traffic citation. Waiving a fine or court costs. The bill allows a person assessed a fine or court costs for a traffic citation to petition the court to waive all or a portion of the costs. The bill authorizes the court to waive or modify payments upon determining that paying the amount due would impose manifest hardship on the person or their immediate family.

New Sec. 3 (e)(2) now reads ([e](1) was unchanged),

> (e) (1)    A person who is assessed a reinstatement fee pursuant to subsection (c) may petition the court that assessed the fee at any time to waive payment of the fee, any additional charge imposed pursuant to subsection (f), or any portion thereof. If it appears to the satisfaction of the court that payment of the amount due will impose manifest hardship on the person or the person's immediate family, the court may waive payment of all or part of the amount due or modify the method of payment.

> (2)    *A person who is assessed a fine or court costs for a traffic citation may petition the court that assessed the fine or costs at any time to waive payment of the fine or costs, or any portion thereof. If it appears to the satisfaction of the court that payment of the amount due will impose manifest hardship on the person or the person's immediate family, the court may waive payment of all or part of the amount due or modify the method of payment.*

## Recommendations

Both the Criminal Justice Reform Commission and the Governor's Race and Equity Task Force have supported legislative changes to address the issue of driver's license suspension and reinstatement.  The various legislative efforts include the following:

1. Recommend that the persons seeking a restricted license not be required to pay the $25 fee unless the person has been notified they are in fact eligible for a restricted license;

2. Recommend that once a person pays the fines and fees of the underlying traffic ticket, the person pay only one reinstatement fee per case, rather than $100 for each charge listed on the original ticket;

3. Recommend that, once all fees and fines have been paid, the KDOR immediately (within 3-5 business days) reinstate licenses, rather than waiting 90 days.

4. Recommend that a person's license not be suspended solely because the person could not pay the fines and fees for a traffic offense (note: this recommendation was not uniformly supported by the Criminal Justice Reform Commission and the Governor's Race and Equity Task Force).

## Conclusion

The changes brought about by SB 127 will make it easier to obtain a restricted license when a driver's license would otherwise be suspended; caps the length of time that suspension can be extended for additional convictions for DWS; and allows cited individuals to request the waiver of costs and fees (as one can do under current law regarding reinstatement fees) for traffic citations in order to limit ballooning debt. These are all good changes in our laws that should alleviate some of these problems.

To more fully address the issues related to driver's license suspension and reinstatement, the task force recommends the Wichita Bar Association support the four additional recommendations put forth by the Criminal Justice Reform Commission and the Governor's Race and Equity Task Force, stated above.

PLFS00001895

**WBA Racial Justice Task Force**
**Sub-Committee on the Civil Justice System**
**2020 – 2021**

**<u>Sub-Committee Members</u>**
Uyless Dewberry
Mike Stout
Trent Santer
Timothy Finnerty

**Background:**

The Wichita Bar Association Racial Justice Task Force was created to explore the extent to which systemic racism exists as part of our local legal system, identify the ways it exists, and then identify ways the Wichita Bar Association ("WBA") or its individual members can address systemic racism to try to eliminate or reduce the effect. Many of the initiatives and recommendations from the WBA Racial Justice Task Force, as well as similar efforts across country, are appropriately focused on the criminal justice impacts of systemic racism. The Sub-Committee on the Civil Justice System ("CJS Sub-Committee") was charged to explore the civil justice system, as opposed to the criminal system, to identify areas where systemic racism may exist.

**Civil Justice:**

In its most recognized form, civil justice is a way for individuals to achieve a fair solution when they have been injured or harmed due to another person's negligence, recklessness, or malpractice. However, civil justice can also determine an individual's ability to achieve a fair solution on more intimate rights– guardianship, housing, employment, school funding, citizenship, social benefits, etc. The Sub-Committee approached the current charge with a focus on civil justice that included remuneration for harm, as well as the broader determination of rights that affect individual's specific life circumstances.

**Approach:**

The CJS Sub-Committee assignment was challenging – survey elements of the Sedgwick County, Kansas civil justice system to determine if systemic racism may prevent meaningful access to justice for minority individuals. The CJS Sub-Committee reviewed potential areas of systemic racism that were identified through literature, Bar Association Surveys, and interviews of legal practitioners, service provides, judiciary members and court administrators. This Sub-committee's work should not be considered exhaustive or all-inclusive. Rather, it should be considered a starting point for further resource investment and solution development to make sure all receive fair adjudication of individual rights within Sedgwick County, Kansas. The following summarizes the CJS Sub-Committee's investigative work on the broader aspects of racial impact that may exist within the Sedgwick County civil justice system.

**Summary of Findings:**

The CJS Sub-Committee did not identify specific aspects of the Sedgwick County, Kansas civil justice system that are, on their face, racially discriminatory. However, racial justice concerns arise in the civil courts where the need to establish individual rights (i.e. guardianship, housing, employment, school funding, citizenship, and social benefits) has required the individual to interact with a non-diverse civil

PLFS00001896

justice system that has few financial incentives or resources available to facilitate legal service or access to justice. Racial justice concerns are further heightened when minority perceptions of unfairness, and deficiencies in knowledge or access to resources encounter an adjudication process that is detailed, rigid and structured.

Perception that justice is unfair is influenced by the level of diversity in individuals charged with administering justice (agency, court administration, attorneys); and those involved in determining final disposition (judges and juries). Along with perception, lack of knowledge and limited resources have arisen as barriers to minority individuals obtaining justice within the civil court. Anecdotal information indicates that minorities experience less successful outcomes in civil court relative to non-minority individuals due to a lack of knowledge concerning legal processes, particularly in cases where the legal process to determine individual rights is rigid, detailed, or highly structured. Resources available to minorities requiring legal services may not be expansive enough, well known, or easily accessed.

Finally, means to afford legal services will impact an individual's ability to become educated as to his or her legal rights. In the absence of legal counsel, there are inadequate "self-help" resources available to educate individuals regarding legal rights and avenues across the broad areas of need. Some of the available resources are in a form (hard copy) or accessibility format (subscription) that does not facilitate low-cost access.

**Summary of Sub-Committee Research and Interviews:**

There is research available regarding the use and/or access to the civil justice system by minority groups; and discussions on the areas of ethnic and/or racial disparity affecting these groups. Available literature focuses heavily on the disparity in access to civil justice for low- and moderate-income individuals, with specific recognition that women, people of color and children are disproportionately represented among those in poverty. Ignorance of legal rights or potential claims, as well as cost of legal services are viewed as the primary inhibitors of access to civil justice. It is estimated that nearly 80 percent of civil legal needs of individuals living in poverty go unmet. Further, historical mistrust of institutions, like the judicial system, contributes to self-help remedies outside the judicial system or a foregone exercise of rights.

There is no data available to ascertain whether there is a statistical disparity in use or access to civil justice for minorities in this region. However, interviews conducted with Sedgwick County, KS legal practitioners, service providers, judiciary members and court administrators indicate perception, ignorance of legal rights and the ability to afford legal services are likely constraints impacting ethnic or racial minorities ability to obtain equal justice in the Sedgwick County civil justice system.

<u>Perception of the Civil Justice System:</u>

There have been recent efforts to increase diversity in areas of the judicial system in order to foster an atmosphere of inclusiveness. Despite these efforts, the ongoing lack of diversity in the administration and adjudication of rights appears to detract from the open engagement and inclusiveness policies that judicial administrators are attempting to foster. For example, the limited diversity in judges and juries were identified contributors to the perception of unfair judgment. In other instances, the lack of diverse agency contacts, volunteer advocates, foster homes and attorneys also contributes to negative perceptions of fairness. For example, in Child in Need of Care ("CINC") cases, the lack of cultural awareness has been identified as a significant contributor to perceptions of unfairness – there is a lack of diversity in DCF staff, attorneys and judges, inadequate culturally appropriate placement of children, and individual

PLFS00001897

ignorance of legal processes to facilitate positive outcomes. These indications, coupled with literature suggesting that negative past experiences with the criminal justice system by minorities may limit their voluntary interactions with "the system", can build to a belief that the entire legal system is unjust and should be avoided.

Knowledge of Legal Rights:

Anecdotal information indicates that minorities experience less successful outcomes in civil court relative to non-minority individuals due to a lack of knowledge concerning legal processes, particularly in cases where the legal process to determine individual rights is rigid, detailed, or highly structured. The WBA provides information on specific legal topics that are intended to educate the public on available rights or processes with the legal system. The Sub-committee identified instances where these "self-help" resources are not available on the range of subjects that would be most beneficial to individuals in need. For example, the WBA assists in facilitating an expungement program by providing relevant information on the process, including potential costs, forms, and legal services. This type of facilitated assistance can assist minorities to navigate the rigid, detailed and structured forms of the civil justice system; or identify individuals to assist them with the process. An expanded range of topics concerning available rights or processes within the legal system may contribute to better outcomes for minorities in civil courts. In addition, establishing more user-friendly methods to engage with these resources, through free online databases and social media campaigns, will facilitate the dissemination and uptake of legal information. Finally, language barriers can also impede uptake of critical legal information – dedicating resources to facilitate the translation of educational materials will similarly increase uptake of legal information.

The Wichita Bar Association Sedgwick County Law Library's mission promotes successful legal research by all members of the legal community and the public through the acquisition, maintenance and circulation of high quality, contemporary and retrospective law related materials which can be effectively accessed through both print and nonprint formats. The stated mission of this County Law Library directly addresses a primary issue affecting minority access to civil justice – ignorance of legal rights. It is unclear to what extent minority groups are aware of the resource.

Access to Legal Resources:

The cost and corresponding ability to afford legal services has a significant impact on minority ability to become educated as to his or her legal rights. The Wichita Bar Association *Find a Lawyer* service assists individuals in connecting to a lawyer in Sedgwick and surrounding counties in Kansas, but only if the individual can afford to pay for legal services. The inability of low to moderate income minorities to afford legal services constrains their ability to utilize this WBA service. However, the Kansas Bar Association ("KBA") provides a relatively low-cost option to access legal services through the *KanAsk-A-Lawyer* service - minimum $50.00 account hold charge, with an actual billing rate of $2.00 per minute. These options can facilitate access to legal services; and, in some cases, provide lower cost avenues to obtain legal representation or advice. One recent judicial rule change is intended to support lower cost legal representation – Rule 115A. Under this rule, attorneys are allowed to represent a client and/or enter an appearance on narrow or discrete issues in a case to support a pro se litigant and once that issue is resolved, exit the representation.

There are additional outside resources to support minority access to civil justice. Kansas Legal Services ("KLS"), a non-profit law firm and community education organization helping low- and moderate-income people in Kansas, regularly experiences greater demand for its services than it has resources to support.

33

PLFS00001898

Agencies, like KLS, help alleviate many of the challenges of ignorance or access to legal rights but are often far too constrained by funding shortfalls relative to known need.  Cost and funding will likely remain a factor to accessing legal support for minorities to litigate personal rights cases.

**Recommendations:**
Perception:

- WBA support efforts to foster inclusiveness in the administration of civil justice by diverse individuals that are reflective of those seeking justice. See Task Force Sub-Committee Recommendations Diversity in Judiciary, and Task Force Sub-Committee Recommendations on Jury Pools.

- WBA consider implementing recommendations by Task Force Sub-committee on jury summons and diversity in the judiciary.

- WBA support supplemental training for the judiciary regarding intangibles (ex: recognizing / understanding racial bias) and substance of diversity issues – utilize a data driven approach for concrete examples.

- WBA support expanded language offerings for court information.

Knowledge

- WBA provide resource pages for various areas of civil law to assist minorities to navigate those systems. Potential action through WBA committees – Public Relations, Bankruptcy, Estate Planning, Family Law, Juvenile Law, Real Estate – Property Rights

- WBA support information campaigns concerning available information and mechanisms to access in a format that is likely to reach minorities in need.

- WBA coordinate online communication strategies with the 18th Judicial District Court to link resource pages located on the WBA website that are intended to assist minorities to navigate areas of civil law? (see above).

- WBA promote the Sedgwick County Law Library as an available resource to minority groups through outreach and educational programs.

Access

- WBA promote limited issue entry of appearance rule with the bar to better support pro se individual by developing a program that puts these individuals together with lawyers willing to provide such limited-issue services.

- WBA sponsor grants for individuals that apply to offset cost at half ($60.00) or whole hour ($120.00) for a limited number of grants per year?

- WBA promote financial support for Kansas Legal Services.

- WBA evaluate *Limited Licensed Legal Technician* program that allows licensed non-lawyers to offer affordable legal support to clients in a particular area.

34

**Report from John Lewallen, Sedgwick County Law Librarian,
on the resources of the Law Library**

*During a normal year(non-pandemic), the library serves approximately 6000 patrons in person. The ratio of attorneys to pro se for as long as we have been keeping statistics has been 2 to 1.*

*Approximately 2000 patrons a year are non-attorney. The very approximate breakdown of that 2000 is 40% white, 25% African American, 25% Mexican/Central American/South American with the final 10% being Asian.*

*Before moving on I should note that serving the public is not only part of our mission, it is also a statutory requirement for us. "Reasonable Access"*

*I mention this because that has always been who we are and what we do.*

*In non-pandemic years, "reasonable access" at the SCLL still meant everything we have. The best example of this that I can think of is that I've taught several pro se patrons how to use LEXIS and more recently Bloomberg Law online.*

*The future:*

*About a year ago at a SCLL Board meeting we began discussing service to the public. A lot of thought and discussion went into this idea and it culminated with approval at the most recent SCLL Board meeting to implement a pro se Self-Help Center at the Law Library. The District Court staff has been wonderful in assisting us with this project and we are very grateful for their work. The idea of the Self-Help Center at least initially is to make certain that the pro se patron has that first form (whatever case type that may be) completed correctly. The form database that we will start with will be somewhat limited but we hope that over time we can add as many preliminary forms as possible.*

*We have several other ideas in mind (101 legal class for the public/101 videos on areas of law on the website) but we want to establish the SH Center first and then incorporate other services.*

PLFS00001900