# EXHIBIT 26



Jeff Easter - Volume II

May 26, 2023

Progeny, et al.

vs.

City of Wichita, Kansas

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF KANSAS
 3
 4   PROGENY, a program of Destination  )
 5   Innovation, Inc., CHRISTOPHER      )
 6   COOPER, ELBERT COSTELLO, MARTEL    )
 7   COSTELLO, and JEREMY LEVY, JR.,    )
 8   on behalf of themselves and others ) Case No.
 9   similarly situated,                ) 6:21-CV-01100
10   Plaintiffs,                        ) EFM-ADM
11   vs                                 )
12   CITY OF WICHITA, KANSAS,           )
13   Defendant.                         )
14   _____)
15            VIDEO-RECORDED ZOOM DEPOSITION OF
16                       JEFF EASTER
17                        VOLUME II
18                      May 26, 2023
19                        2:35 p.m.
20
21                       Taken at:
22             Sedgwick County City Building
23                     455 North Main
24                 Wichita, Kansas 67202
25   Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR
```

```
 1   Crips; a few Junior Boys that tied into those
 2   particular gangs through the dope trade, and then
 3   one individual that was supplying the cocaine or
 4   crack cocaine to both gangs and all of them were
 5   either pled guilty or were convicted.
 6          Q.   I believe you said that Elbert
 7   Costello, one of the plaintiffs in this case, you
 8   were familiar with him because of some involvement
 9   he had with some of the Crips; is that correct?
10          A.   So I was familiar with him prior to
11   that with just different cases that he was involved
12   in over the years.  Particularly, we were following
13   our target that was the main supplier of crack
14   cocaine.  We also had wire tap on him where Elbert
15   Costello had called him to purchase cocaine from
16   him at a location in northeast Wichita.  We
17   followed our target there.  There was a brief
18   contact between him and Elbert Costello and then we
19   started to follow Elbert Costello and we lost him
20   in the area but followed our target back to his
21   house.
22          Q.   You said you were familiar with Mr.
23   Costello from other criminal activities.  Can you
24   tell me about that.  How did you first become aware
25   of Mr. Costello?
```

7

1          A.   There was just different cases that
2   involved him with him being a suspect in different
3   types of crimes.  There was different types of --
4   if I recall correctly, there was a couple of
5   shootings that he was a suspect in and just from
6   the drug trade as well his name kept popping up in
7   those particular cases.
8          Q.   What time frame would that have been?
9          A.   That would have started in the late
10  '90s.
11         Q.   With respect to any of those, any of
12  those instances where he was investigated as a
13  suspect, was he charged with any crimes?
14         A.   I don't remember if he -- what his
15  criminal record is.
16         Q.   Did you believe he was associated with
17  a gang?
18         A.   Yes, but I couldn't tell you which one
19  at this point.
20         Q.   Was he a Crip?
21         A.   I believe -- well, he was either listed
22  as one of the Crip gangs or a Second Streeter which
23  was an offshoot of the Crip gangs.
24         Q.   Was he one of the leaders of the gang
25  or one of the main people in the hierarchy?

8

1	A.	No, he was not.
2	Q.	And after you left the -- after you left the WPD did you have anymore interactions with Mr. Elbert Costello?
5	A.	No, I have not.
6	Q.	I want to go a little bit into some of the training materials that were used in the Gang Unit.  Were you responsible for developing any of those materials?
10	A.	Well, are you talking about training for law enforcement or are you talking about the presentations that I was tasked to do for the community?
14	Q.	Let's talk about training for law enforcement first.
16	A.	As far as the development of it, no, I was not.
18	Q.	Do you know who was?
19	A.	No, I do not.
20	Q.	At any time when you were involved with the Gang Unit, did you do anything to update or change any of the training for law enforcement?
23	A.	I honestly can't answer that because I might have.  I just don't remember.  That was years ago.

```
 1        A.   Yes.  As we discussed before, there was
 2   a grant that was received when I was a sergeant
 3   that provided computers, laptop computers to each
 4   bureau and to the Sheriff's Office that maintained
 5   the gang database so they could have direct access
 6   to it.
 7        Q.   So the Sheriff's Office had direct
 8   access to the gang list just like the WPD did?
 9             MR. COOPER: Object to form.
10        A.   Years ago they did, yes.
11        Q.   (By Ms. Woody) Do you know when that
12   stopped?
13        A.   I assume it stopped when I did do away
14   with our gang unit over here but I can't give you
15   an exact answer.
16        Q.   So when you took over as the Sheriff
17   did certain people in the Sheriff's Office still
18   have direct access to the gang database?
19        A.   No.
20        Q.   Okay. So that happened before you were
21   the Sheriff?
22        A.   No.  It happened after I was the
23   Sheriff.
24        Q.   Okay.
25        A.   But I can actually say that we did not
```

```
 1   and 300 pounds, more than likely that's not the
 2   guy.  So we would provide that information plus any
 3   other identifying markers.
 4         Q.   Okay. During the time when you were
 5   with the WPD, are you aware of the gang database or
 6   parts of the gang database being released to people
 7   in the public, non-law enforcement people?
 8         A.   Okay.  Your question -- and I'm sorry,
 9   it's just the connection.  So your question was if
10   I'm aware of the WPD list being given out to the
11   public?
12         Q.   Yes.
13         A.   Okay.  I am aware of one situation that
14   that gang list was provided in written form to the
15   Sedgwick County Jail and that particular list,
16   somebody within the jail posted at a barber shop in
17   northeast Wichita.
18         Q.   Why was the list provided to the
19   Sedgwick County Jail?
20         A.   Well, I know more about why now.  Back
21   then it was explained to me that you had numerous
22   different gang members from the different sets that
23   were being placed in the jail and they needed to
24   determine whether these folks could be around each
25   other.
```

1       Q.   And you say now you have a different or
2  better understanding?
3       A.   Yeah.  Now that I'm over at the jail
4  it's absolute that we need to have that information
5  because we'll have gang members come in here and
6  tell us specifically I can't be in that pod because
7  I am a Englewood Blood and two of those Crips that
8  are sitting in there, one of them murdered my
9  brother, and so we try to, through classification,
10 through the gang database, which is no longer a
11 list, someone down in our classification area
12 either a, has access to the gang database or they
13 call over to get information when known gang
14 members are booked into the jail.  That way there
15 they are not placed in the same type of pods as
16 other gang members that are rival members.  The
17 classification process is very lengthy because we
18 have people that are arrested and booked in here,
19 especially when we're having violent crime, gang
20 feuds out on the street that individuals are being
21 arrested for homicides of family members that are
22 killed by this person that are actually sitting in
23 jail right now.
24      Q.   So when you say the classification
25 process, can you explain that to me?

27

1     A.   So the classification process is that
2  when somebody is booked into jail and they are
3  going to be housed with us, we go through a whole
4  litany of information; prior arrests, prior
5  convictions, medical needs and gang affiliation or
6  not affiliation necessarily but that are gang
7  members, documented gang members and we take all
8  that information, plug it into the computer and it
9  spits out to us what type of classification that
10 person should be; should it be low, medium or high
11 based upon all the information.  And then we have
12 specific pods that are designed in the jail to
13 house the higher risk inmates, the moderate risk
14 inmates and the low risk inmates.  And then at the
15 same time we have to take a look at our protective
16 custody people which are individuals that either
17 have been threatened by people out on the streets
18 or in our facility, individuals that have given
19 information on the cases they are charged with
20 against other defendants, and we have to make sure
21 that they are protected and not around these other
22 inmates at the same time.
23     Q.   What is the difference between the
24 high, medium -- I'm sorry, and low pods? What is
25 the difference? Are there more restrictions in the

28

1  high risk pod?
2       A.   No.  They don't get restrictions just
3  based on their classification.  They get
4  restrictions based upon their behavior.  So when it
5  comes down to high risk like the folks that are in
6  red because of their violent history, their past
7  history with us, sometimes what they are charged
8  with, all of that takes into consideration.  So if
9  they are going to be moved from one area of the
10 jail to the other they have to be escorted by jail
11 personnel.  Moderate and low risk people do not.
12      Q.   Okay. So they can move about more
13 freely?
14      A.   Correct.
15      Q.   Is there a presumption that if somebody
16 is a listed gang member as to what classification
17 they would be?
18      A.   No.
19      Q.   Are there any other instances where the
20 Sheriff's Office accesses or uses information from
21 the WPD gang database other than what we've already
22 discussed as some investigations or with respect to
23 the jail?
24      A.   No, ma'am, not that I can think of.
25      Q.   But I think you said that maybe

```
 1   somebody in the Sheriff's Office does have direct
 2   access dealing with the jail; is that right?
 3         A.   I believe so.  Have I ever directly
 4   asked, do you have direct access to the gang
 5   database?  No, I have not.  My belief is with our
 6   intelligence or intelligence corporals that they do
 7   have access to the database either by calling over
 8   or they have direct access.  I would have to call,
 9   but that's how I know when gang members are booked
10   in here that we try to separate them by their set.
11         Q.   Who are your intelligence corporals?
12         A.   One of them is Corporal Carlton.  I
13   don't recall -- I don't remember the name of the
14   other corporal.
15         Q.   Is Mr. Carlton a former Wichita police
16   officer?
17         A.   Neither one of them are.
18         Q.   Does the Sheriff's Office ever give out
19   information about somebody being a gang member to
20   any other entity other than the Wichita Police
21   Department?
22         A.   Not that I'm aware of, no.
23         Q.   To any other law enforcement agencies
24   like the KBI or FBI or anybody like that?
25         A.   Not that I'm aware of.  We are not the
```

```
 1    personnel, are you aware of any instances where
 2    anybody in the Sheriff's Office has given out
 3    information about a gang member?
 4         A.   Other than the one instance that I
 5    talked about, no.
 6         Q.   How did that information get posted
 7    publicly?
 8         A.   What I was told was that somebody took
 9    it and posted it on a barber shop, at a barber shop
10    on some type of board and it was viewable by
11    everybody in the barber shop is what I was told.
12         Q.   Do you have any idea how that got to
13    the barber shop; who took it and how they would
14    have gotten their hands on it?
15         A.   Well, as I explained earlier, what I
16    was told was that there used to be lists generated.
17    One was sent to the Sheriff's Office and somebody
18    within the jail had access to that particular list,
19    the paper copy, and took it and posted it is what I
20    was told.
21         Q.   Was anybody -- are you aware of anybody
22    being disciplined or anything like that for that?
23         A.   That was before I was at the Sheriff's
24    Office, ma'am.  I have no idea.
25         Q.   Okay.  So what is the procedure in the
```

32

```
 1   their affidavits any information that if they were
 2   a gang members and we worked tons of cases where
 3   people weren't gang members in the Felony Assault
 4   Unit so it would be the same information except the
 5   fact that they would put in their affidavit the
 6   information out of the gang database or some of the
 7   information out of the gang database as identifying
 8   them as gang members and that's why it was assigned
 9   to the Gang Unit to prosecute.
10        Q.   So if they put in their affidavit that
11   this person was identified as a gang member in the
12   database, they would include what information they
13   had and that would cause that charge to go to the
14   DA's Gang Unit?
15             MR. COOPER: Object to form.
16        A.   Yes.  I mean, so anything that was gang
17   member related or gang-related was assigned to the
18   DA's Gang Unit to prosecution.
19        Q.   (By Ms. Woody) During your time at the
20   WPD were there ever any studies that you were aware
21   of that broke down the gang database by racial
22   demographics?
23        A.   Studies done on it? Not of the gang
24   database.  I was tasked with doing a look at
25   demographics of the violent crime we were having.
```

47

```
 1           Q.   And that involved more than gang
 2   members; is that correct?
 3           A.   No.  It was very gang specific; ag
 4   assaults, ag batteries, drive-by shootings,
 5   homicides that were perpetrated by gang members.
 6           Q.   Did that break down by race?
 7           A.   Yes, it did.
 8           Q.   What do you recall the demographics
 9   being?
10           A.   The highest demographic was African
11   American.  They were right around 70 percent.  The
12   next demographic was white or Caucasian.  The 3rd
13   was Hispanic and the 4th was Asian.
14           Q.   Did the white group include people who
15   were Hispanic or Latino?
16           A.   No.  White was just Caucasian and so if
17   they were Hispanic that was a separate category.
18           Q.   Okay.  What did you do with this
19   information once you had done this study?
20           A.   I was asked to do that by Chief
21   Williams and Deputy Chief Stoltz.  Once I broke
22   down that information that information was provided
23   back to Deputy Chief Stoltz and Chief Norman
24   Williams.
25           Q.   Do you know what they did with it?
```

48

```
 1           A.   No, ma'am, I do not.
 2           Q.   Were you ever asked to update it or
 3   asked to do any follow-up?
 4           A.   No.  They asked me to do that
 5   particular demographic look one time.
 6           Q.   Did they tell you why they wanted you
 7   to do that?
 8           A.   Yeah; because the black-on-black crime
 9   was completely out of control at the time and so
10   they were looking at other ways to engage the
11   African American community in community policing
12   and different types of programs and they wanted
13   statistical material because there was certain
14   groups here that was all the time saying
15   disproportionate police contact, disproportionate
16   police stops, disproportion, those types of things.
17   Well, this was disproportionate as well.  The
18   amount of African American-on-African American
19   crime was extremely disproportionate.  They wanted
20   to be able to provide that information to these
21   different groups.
22           Q.   Do you know if they did provide it to
23   these different groups?
24           A.   I don't know.
25           Q.   Other than that study that you
```

```
 1   on bond, there were certain bars that catered to
 2   the gang members and so they would be mapped around
 3   those particular bars.  That's what I recall on the
 4   gang-related stuff.  So to answer your question
 5   now, yes, there were some bars that were absolutely
 6   infiltrated, attended.  We would always have fights
 7   or shootings at those bars that were known for gang
 8   activity.
 9        Q.   When you say they were mapped with
10   respect to these bars, that means they weren't
11   supposed to go there; is that correct?
12        A.   That was part of the restrictions, yes,
13   ma'am.
14        Q.   So the mapping would be here's where
15   you can't go; is that right?
16        A.   Correct.
17        Q.   That was specific to an individual who
18   was on probation or parole as part of their
19   restrictions; is that correct?
20        A.   Correct, or out on bond.
21        Q.   With respect to -- were there any areas
22   of the city that generally were considered gang
23   areas without regard to a specific person's
24   probation or parole restrictions?
25        A.   You had neighborhoods throughout the
```

55

1   city that was -- I mean, yeah, they had a lot of
2   gang members, particular gang houses that were in
3   those neighborhoods.  You had them in west Wichita,
4   not as much but you had them in north, south and
5   east Wichita.
6           Q.   And how would that information be
7   shared within the department that these were
8   gang-related areas?
9           A.   I wouldn't say we ever said there was
10  any particular gang-related areas.  There was
11  particular houses or neighborhoods that had several
12  gang members that lived in those homes or multiple
13  gang members living in one home.  To be honest with
14  you most beat officers knew that.  We knew it from
15  neighborhood members who wanted us to do something
16  about them in their neighborhood and that's
17  generally how we got the information.
18          Q.   And was that information ever
19  disseminated to the public?  Like when you did
20  these presentation did you ever say these areas are
21  gang-related?
22          A.   No, because there was no really
23  gang-related designated areas in the city of
24  Wichita.  You had some neighborhoods that were more
25  problematic because of the amount of gang members,

56

```
 1   the amount of shooting, the amount of drug activity
 2   that was taking place in those neighborhoods.
 3          Q.   But they weren't specifically
 4   designated as gang-related areas or gang areas?
 5          A.   I've never heard that term; no, ma'am.
 6          Q.   Why don't you give me about ten minutes
 7   and then I'll come back and we'll finish up.  Okay?
 8          A.   Okay, ma'am.
 9               VIDEOGRAPHER: Time is now 3:53 p.m..
10   We are now off the record.
11               (Whereupon a recess was taken from 3:53
12   p.m. to 4:02 p.m.)
13               VIDEOGRAPHER: The time is now is 4:02
14   p.m..  We are now on the record.
15          Q.   Sheriff Easter, at any time when you
16   were with the WPD, were they using social media to
17   identify gang members?
18          A.   Not while I was -- there really wasn't
19   social media per se when I was a lieutenant.
20   Towards the end there I think Facebook was really
21   starting to take off.  I know there were some cases
22   that we did based off of Facebook where they would
23   post pictures of themselves with guns and money and
24   we would violate them on their probation or parole
25   and some of those folks were gang members.
```

57