# EXHIBIT 34



John Speer

March 28, 2023

Progeny, et al.

vs.

City of Wichita, Kansas

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PROGENY, a program of            )
Destination Innovations,         )
Inc., CHRISTOPHER COOPER,        )
ELBERT COSTELLO, MARTEL          )
COSTELLO, and JEREMY LEVY,       ) Case No.
JR., on behalf of themselves     ) 6:21-cv-01100-EFM-ADM
and other similarly situated,    )
                                 )
        Plaintiffs,               )
VS.                              )
                                 )
CITY OF WICHITA, KANSAS,         )
                                 )
        Defendant.                )

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

JOHN SPEER

MARCH 28, 2023

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF JOHN SPEER, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on March 28, 2023, from 9:05 a.m. to 2:17 p.m., before Christy Cortopassi, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Insperity, 13737 Noel Road, Suite 1250, Dallas, Texas 75240, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

```
 1       Q.   Are you aware of any times that the gang list
 2   was published more broadly to others in the police
 3   department or anyone outside of the police department?
 4              MR. BRANSON:   Object to form.
 5       A.   There was a time that we entered some gang
 6   members into NCIC, into the criminal organization and
 7   terrorist organization file in NCIC that they would be
 8   flagged in NCIC as criminal gang members.  And that was
 9   nationwide that that would happen.
10              It was also shared with the Board of
11   Education, not the actual list but gang information was
12   shared with the school district.
13       Q.   (BY MS. WOODY)  So when you talk about the list
14   being shared, was the entire list shared with the NCIC?
15       A.   No.
16       Q.   Like -- no -- okay.
17       A.   No.
18       Q.   How would you determine who to share -- who
19   would be -- whose information would be shared with those
20   entities?
21       A.   I was the deciding factor on that.
22       Q.   And what did you use in your decision making on
23   that issue?
24       A.   That these were some of the most violent street
25   gang members we had in our community.
```

```
 1        Q.   You ever discipline anybody for doing that?
 2        A.   No.  Because we didn't discipline him for
 3   sleeping.
 4        Q.   Was Jose Salcido the -- what was his position
 5   when you were at WPD?
 6        A.   He was a detective of mine for a while in the
 7   gang unit.
 8        Q.   And did he ever express to you any concerns
 9   about the gang unit and how it needed to be run
10   differently?
11        A.   No.
12        Q.   And you had never heard about him suggesting
13   that the gang unit was overinclusive of people of color?
14        A.   No.
15        Q.   And you never have seen any suggested changes
16   that he made to the gang list?
17        A.   That Jose Salcido did?
18        Q.   Yes.
19        A.   No.
20        Q.   At the time that you were in charge of the -- a
21   gang unit and -- was there any way for an individual to
22   challenge their inclusion on the list?
23        A.   No.
24        Q.   So once they were on the list they were just on
25   the list, they didn't have any way to say, hey, I --
```

```
 1   you're wrong or I need to get off or any of those kinds
 2   of things?
 3       A.  Challenging us?  No.  Those challenges need to
 4   occur in courts before -- during a motion or an appeal
 5   and that a judge weighs on -- in on.
 6       Q.  And during the time that you were with the gang
 7   unit and overseeing the gang unit, was there any attempt
 8   to notify individuals that they were on the list?
 9       A.  I think at one point they were trying to reach
10   out to parents but I don't know when that was, honestly.
11       Q.  Not when you were in charge?
12       A.  It could have been.  But I, you know, we would
13   have conversations with parents all the time.  But the
14   formality of it, I think that something started up but I
15   don't know when that occurred.
16       Q.  Okay.  And that wasn't something that you were
17   involved in creating?
18       A.  Well, it could have been but I just don't
19   remember it.
20       Q.  How about adults, was there any attempt, any
21   effort to identify adults who were put on the list, they
22   had been put on the gang database list, considered a
23   gang member?
24       A.  What do you mean identify?
25       Q.  And so you think Joe Brown has met the criteria
```

1   and was put on the gang list.  Was there any attempt to
2   let him know, hey, you have been put on the gang list,
3   we have listed you as a gang member?
4        A.  Oh, I'm sure that those conversations had
5   occurred before.  Sure.
6        Q.  With him?
7        A.  Yeah.  I mean, when we would be out on calls
8   and stuff like that and then people would -- we would be
9   interviewing people.  Those conversations occurred quite
10  frequently, actually, in interview rooms.
11       Q.  Saying that, you know, we know you were on --
12  or that you are a member of this gang, you're on the
13  gang list?
14       A.  Yes, ma'am.
15       Q.  Any attempts to identify people on the gang
16  list who weren't being interviewed or weren't involved
17  in a hearing with the Court or anything like that?
18       A.  No.
19       Q.  Okay. With respect to your -- and to your --
20  the gang unit's interface with the DA's office, you said
21  that, you know, you often gave information to the DA's
22  office.  How did that happen?
23       A.  Well, the same way that any other information
24  would be, you know, given.  It could be a phone call.
25  It could be an email.  It could have been in an

```
 1   place.
 2        A.   It has to do with a medical issue.
 3        Q.   Okay.  So you had a discussion -- any other
 4   discussions that you have had with Mr. Gilmore other
 5   than about medical issues?
 6        A.   Well, yeah.  It's, you know, we talked about
 7   his family and kids and you just catch up.
 8        Q.   Okay.  Did you talk to him about the gang unit,
 9   about individual members on the gang unit?
10        A.   People that -- well, I mean, sure.  I mean,
11   there are times you probably ask, hey, who is assigned
12   now or who is doing what or how are things going.
13        Q.   Okay.  Did you ever make suggestions to him or
14   give him advice or talk to him about specific
15   individuals?
16        A.   Not that I recall, no.
17        Q.   Okay.  You mentioned social media a while back.
18   When did social media become sort of a -- a way to -- an
19   investigative tool?  Let me put it that way.
20        A.   Well, like I -- it really I think started
21   after -- I mean, you start watching what's going on out
22   in the world and everybody else is using it for, you
23   know, sales and targeting and promotions and identifying
24   this, that and the other.
25                  There is significant value in what people
```

1  post online.  And, you know, there have been instances
2  where we have gotten leads and, you know, from social
3  media postings at the time.  It was Facebook and so we
4  would monitor that, you know, on occasion and -- but
5  keep in mind, you know, there's only four officers and
6  there's nine detectives.
7              The nine detectives weren't doing stuff
8  like that except on their individual cases.  But the
9  nine -- and the four officers, I mean, they're, you
10 know, they're identifying and monitoring, you know,
11 stuff that is really in connection with the
12 investigations that we had going on.
13             So -- and in some of those cases they
14 didn't -- the actual gang member didn't have social
15 media but maybe a girlfriend did or a -- another gang
16 member did where they talk about something or refer to
17 somebody.
18             Their street names was -- it was a -- it
19 was a powerful mechanism to try and identify people.
20 Because they have their family name, they have a street
21 name and then they have their birth name.  And sometimes
22 all of those three are different.  And when crimes would
23 occur, depending upon the association with the victim or
24 the people that are there, they may go by a different
25 name in all of those instances.

1            So for -- if we were going to later on try
2   to prove in court that they used a nickname, we wanted
3   to be able to substantiate that and show that this is
4   where this nickname was used at for this person in
5   this context.
6            And that's why social media -- and it's
7   also sometimes there would be, you know, they would be
8   at the skating rink when somebody would get shot but
9   they would post pictures being at the skating rink
10  beforehand.  And we would, you know, utilize that in- --
11  you know, information and, you know, get whatever
12  investigative leads we could from that.
13       Q.  And when did the -- the use of social media
14  start with respect to those investigations?
15       A.  I couldn't tell you.  Whenever Facebook took
16  off I would assume.  I mean, I don't know.
17       Q.  Was that while you were a lieutenant over the
18  gang unit?
19       A.  Yes, that did go on when I was there.  It could
20  have happened before, though.  I don't know.
21       Q.  Okay.  And did you yourself ever monitor social
22  media?
23       A.  No, not really.
24       Q.  You say not really.  Did you use it -- did you
25  personally use it as an investigative tool?  Not just to