# EXHIBIT 36



Sage Hemmert

December 7, 2022

Progeny, et al.
vs.
City Of Wichita, Kansas

```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF KANSAS


PROGENY, et al.,                 )
                                 )
          Plaintiffs,            )
                                 )
vs.                              ) Case No. 6:21-cv-01100-EFM-ADM
                                 )
CITY OF WICHITA, KANSAS,         )
                                 )
          Defendant.             )
```

VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF SAGE HEMMERT
TAKEN ON BEHALF OF THE PLAINTIFF
DECEMBER 7, 2022
VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF SAGE

HEMMERT, produced, sworn, and examined on the 7th day

of December 2022, between the hours of nine o'clock in

the forenoon and six o'clock in the evening of that

date, before KARA D. INCE, a Certified Court Reporter

within and for the State of Kansas, in a certain cause

now pending IN THE UNITED STATES DISTRICT COURT, FOR

THE DISTRICT OF KANSAS, wherein PROGENY, et al., are

the Plaintiffs and CITY OF WICHITA, KANSAS, is the

Defendant.

```
 1   day.
 2        Q.   Okay.  But you -- but sometimes you filled
 3   out multiple TOPS cards in a day; correct?
 4        A.   Yes.
 5        Q.   And who was your -- who was your primary
 6   FTO?
 7        A.   Jeremy Miller.
 8        Q.   And then you said you had two other folks.
 9   Who were they?
10        A.   Chris Marceau and Stacy Woodson.  Stacy
11   Woodson's deceased, but Miller and Marceau both
12   still work at WPD.
13        Q.   Okay.  When you -- and when you filled out
14   these TOPS cards, would -- would that be based on
15   your observations of a person?  Is that pretty much
16   what it was?
17        A.   Observations and conversation that I had
18   with the person, yes.
19        Q.   Okay.  And there's some -- some -- one of
20   the criteria for being put on the list is -- is
21   somebody self-identifies as a gang member; right?
22        A.   Self-admits, yes.
23        Q.   And what's that mean?
24        A.   A person tells you they're a gang member
25   -- claims --
```

```
 1        Q.    Go ahead.  I'm sorry.
 2        A.    Claims to be a gang member.
 3        Q.    And then -- and they actually say that,
 4   I'm a member of such and such gang?
 5        A.    Well, the verbiage that they use is not
 6   identical to what you just said.  Typically they
 7   won't say I'm a member of the Bloods gang.  They'll
 8   say something like, I'm a Blood; you know, I'm a
 9   Blood; you know, I'm with Bloods.  But, yes.
10        Q.    Okay.  And there's no other way that you
11   can self-admit?  It has to be by telling you that?
12   It's not just something that you observed and you
13   decide they've admitted it because of what they're
14   wearing or how they're acting?
15        A.    Yes.  That -- I mean, yes.  They have --
16   they have to admit it to you.
17        Q.    Okay. And if you do that, there's a box
18   that you check that says, oh, they admit it; right?
19        A.    There's a box that you check, and then
20   there's a -- there's a space where you can write
21   down what they actually said as close to verbatim as
22   you -- as possible.
23        Q.    And what were the other criteria that you
24   applied when you were filling out the TOPS cards?
25   Do you recall that?
```

```
 1        A.    Not in the time that I was there.
 2        Q.    Let's go back to conversations you might
 3   have outside.
 4              We talked parole and probation, KDOC.
 5   Anybody else that you would talk to about specific
 6   gang members who wasn't inside the WPD or people who
 7   were on the list?
 8        A.    No.
 9        Q.    Sheriff's office, other law enforcement,
10   KBI?  Anything like that?
11        A.    If -- you know, if like a sheriff's deputy
12   reached out and had a question about somebody, I
13   would -- you know, I would -- I would communicate
14   with other law enforcement.
15              I know that there were MOUs with
16   particular agencies as far as dissemination of
17   actual records or -- when I say "dissemination of
18   records," like dissemination of records as they
19   pertain to gangs and a person's gang membership.
20              And I don't know the ins and outs of all
21   of that.  I know that Beard was the person that kind
22   of oversaw that for us.  But we couldn't just send
23   a -- we couldn't just send somebody's gang database
24   sheet to any law enforcement that asked.  We had to
25   have an MOU or, you know, there were rules that
```

1    conference.  That was part of your dues.
2         Q.   Okay.  When you -- when you talked about
3    presentations made to educators, what kind of
4    information would you be giving them?
5         A.   Basically how to recognize more of the
6    subtle signs of street gang activity within the
7    schools, so that they could address it before it
8    resulted in violence.
9         Q.   And what kind of things would you be
10   talking about?
11        A.   Language that was used.  You know, a lot
12   of it is -- sometimes it's like -- and this isn't
13   just in the gang context, but just with kids in
14   general -- but they're almost speaking a different
15   language.  If you don't know what the words that
16   they're using mean, it's hard to decipher what's --
17   what's going on.  And so that would be part of it.
18             And then some of the more subtle ways of
19   gang representation, like how to wear your colors,
20   you know.  ==Like Wichita City High School is not==
21   ==going to let you wear a blue do-rag hanging out of==
22   ==your left back pocket to school.==  ==But they might let==
23   ==you wear blue shoe laces and blue beads in your hair==
24   ==and a blue belt that you can use to represent if you==
25   ==want, stuff like that==.

```
 1   questioned at a motion to admit gang evidence or at
 2   a PV hearing or something, how's it going to turn
 3   out?  If it's not -- you know, bulletproof then
 4   leave them off.  Don't -- don't document somebody.
 5            So the question about age would be --
 6   would -- would be determined by those kind of --
 7   that ethos.
 8            You know, you put a nine-year-old in the
 9   gang database, I think anybody's going to have a
10   problem with that.  And if that was to go before the
11   Court, it wouldn't go well.
12        Q.   If juveniles were put on the gang -- if
13   you included a juvenile on the gang list, was there
14   something special that you had to do?
15        A.   There had to be a contact to their parent,
16   and Beard took care of that.
17        Q.   Okay.  So you would -- would you notify
18   them, hey, we just put this juvenile on the list?
19        A.   Yes.
20        Q.   And then he would take it from there as
21   far as trying to contact somebody?
22        A.   Correct.
23        Q.   Was there any notice that was necessary if
24   you put an adult on the gang list?
25        A.   No.
```

Case 6:21-cv-01100-EFM   Document 207-28   Filed 09/29/23   Page 9 of 17

Page 144

1      Q.   So it's conceivable that somebody could be
2  on the gang list and not know they were on the list;
3  correct?
4      A.   Yes.
5      Q.   Was -- was there -- when you were there,
6  if somebody found out they were on the list and
7  thought they shouldn't be on the list, was there a
8  way that they could challenge that?
9      A.   They could -- yes, there was.  There was a
10 process, and it involved debriefing.  And I really
11 don't know what else it involved because that was
12 Step 1, and nobody ever did that.  And I had that
13 conversation with several gang members and told them
14 that and -- but it never happened, so ...
15     Q.   When you say "debriefing," what do you
16 mean?
17     A.   Give -- have a conversation with us and
18 answer our questions, like similar to what you and I
19 are doing.
20     Q.   And you never had anybody take you up on
21 that?
22     A.   No.
23     Q.   How many times did you have somebody ask
24 you about it?
25     A.   I had people -- so we're clear, I did have

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
 1   people that would debrief with me, but it wasn't
 2   because they wanted off the gang list.
 3            I had conversations with -- you know, a
 4   typical setting for this would be a guy on a car
 5   stop and he'd say something to the effect of, you
 6   know, I don't even gang bang anymore.  And then
 7   my -- my response was always, that -- that may be
 8   true.  If that's true, my door is always open.
 9            And I had cards, you know, with my number
10   on it.  And I would pass those out if they would
11   take it.  But I would say, you can call me any time,
12   we can sit down and talk, and we can see about
13   getting you off the list, but you got to talk to me
14   first.  You got to come talk to me.  And no one ever
15   took me up on that.
16       Q.   Okay.  So as far as you're aware, there
17   was nobody who -- who successfully -- who tried or
18   successfully challenged their inclusion on the list?
19       A.   As far as I know, no.
20       Q.   I want to talk a little bit about some of
21   the places that you would surveil where you thought
22   there were going to be gang members.  And you
23   mentioned concerts as a -- as a potential place;
24   right?
25       A.   Yes.
```

```
 1   another reason for extending them on the list?
 2        A.   No.
 3        Q.   If they were just at the concert, would
 4   you even note them?
 5        A.   No.
 6             Well, just at the concert, it would depend
 7   if -- it would depend on -- typically no is -- would
 8   be my answer.  It would be possible that we would
 9   make a list -- we would do a miscellaneous report of
10   all the people that were at the concert if it was a
11   particular -- it the concert catered to one
12   particular gang.
13        Q.   Can you remember an instance of that?
14        A.   Yes, I can.
15             There was a concert at Club Bounce in Old
16   Town and it was -- there were two rappers that were
17   going to be performing.  And one of them was named
18   Rich the Factor, and he was -- I believe he was from
19   like Omaha, Nebraska, and he was a Crip.  And then
20   the other rapper that was gonna be performing after
21   him was I think Zach Payne from Wichita that was a
22   Villain Blood.
23             And typically Club Bounce at the time was
24   managed by Elbert Costello, and it was almost
25   exclusively a Blood club.  So only -- for the most
```

1  or not to add somebody or extend them on the gang
2  list?
3      A.  I -- I can't really say that one criteria
4  was weighed more than the other, with the exception
5  of the gang area criteria was not -- I understand
6  why that's in the statute, but the nature of Wichita
7  criminal street gangs are that claiming an area is
8  not a -- you know, that's not as much of a thing in
9  Wichita as it is in other places.
10         And not for -- I mean, for some gangs it
11 is.  I mean, every -- every -- there's no absolutes,
12 so I don't want to say absolutes.  But typically in
13 Wichita a criminal street gang does not say, hey,
14 14th and Estelle is our area.  That's -- that's not
15 how it operates.
16     Q.  Okay.  So if somebody had marked that on a
17 TOPS card, for instance, you wouldn't give that as
18 much weight as other criteria?
19     A.  Well, I'd want to know why they thought
20 that.  So if they -- you know, I'd want to know why
21 they -- why they -- why they marked that.
22     Q.  Okay.  But the rest of the criteria you
23 would give pretty much equal weight to?
24     A.  Yes.  I think so.  I don't have the
25 criteria in front of me, but yes.

```
 1    thinking that kind of that glorified outlaw criminal
 2    persona, you know, they don't look at those people
 3    as bad and dangerous people.  That's just -- that's
 4    my life experience, that's my opinion.
 5        Q.   Okay.  Thank you.
 6             We're going to take a quick break so I can
 7    get those criterion in front of you and then -- and
 8    then we'll be pretty close to being done.
 9        A.   Okay.
10        Q.   Thanks.
11             THE VIDEOGRAPHER:  All right.  The time is
12    now 1:16 p.m.  We are now off the record.
13             (Off the record.)
14             THE VIDEOGRAPHER:  The time now is
15    1:21 p.m.  We are now on the record.
16    BY MS. WOODY:
17        Q.   Okay.  Mr. Hemmert, I'm showing you what's
18    previously been marked Deposition Exhibit 5, and
19    this is the Kansas Statute 21-6313.
20             Is this the statute you were referring to
21    when you said that has the criteria in it?
22        A.   Yes.
23             (Deposition Exhibit No. 5 was marked for
24    identification.)
25    BY MS. WOODY:
```

```
 1        Q.   And that's something that you're familiar
 2   with?
 3        A.   Yes.
 4        Q.   Okay.  If you look down there where it
 5   says B2.  Do you see that there?
 6        A.   Yes.
 7        Q.   And under the -- underneath that is a list
 8   of -- of criterion.  Is that the criteria that you
 9   applied what you were in the gang unit?
10        A.   Yes.
11        Q.   Okay.  So we were talking about if
12   there -- if a -- how they would satisfy this and
13   which ones of them might be subjective -- have some
14   subjectivity to them; right?
15        A.   Yes.
16        Q.   And it's identified by a -- as a street --
17   a criminal street gang member by a parent or
18   guardian.  That's probably not subjective; correct?
19        A.   So what I would say is it's -- it would
20   still need to be vetted, and that -- that's what
21   I -- I guess my answer about subjectivity would
22   be -- so just because a parent would identify a kid,
23   you know, you would want to vet that in some way,
24   how does that parent know to identify that kid.  So
25   it's subjective in terms of it's as subjective as
```

 1   any other statute that needs to be investigated and
 2   vetted.
 3        Q.   Okay.  And would you say that all of
 4   these, you would need to investigate and vet each
 5   one of these criteria that's listed here?
 6        A.   Yes.  And some of the -- as a gang
 7   officer, some of these are your own, you know,
 8   observations that you're relying on, which I think
 9   is what we were talking about.
10             But certainly, you know, if a state,
11   county, or city law enforcement officer identifies a
12   person as a criminal street gang member, okay, well,
13   you would want -- if you -- you would want to know
14   how do you know what a gang member is and why do
15   you -- why are you identifying this person as a gang
16   member?
17             So, yes, everything -- there's going to be
18   context in everything.
19        Q.   Okay.  And each of these criteria is going
20   to require some context other than just what you see
21   written down in the statute?
22        A.   Yes.
23        Q.   Okay.  And I think we talked about -- and
24   if you look at 2E, it says, "Adopt such gang style
25   of dress, color, use of hand signs, or tattoos."

```
 1             Do you see that?
 2       A.    Yes.
 3       Q.    Okay.  So could any one of those things --
 4   meeting any one of those things satisfy that
 5   criterion in E?
 6       A.    Yes.
 7       Q.    But you said you wouldn't apply it that
 8   way; correct?
 9       A.    Well, again, with context.
10             So if -- if we'll do a hypothetical.  That
11   if you're looking at a person's booking photos,
12   okay, you're updating a person and there's -- they
13   were booked 10 times in that 12-month period that
14   you're reviewing, and in that ten times they are
15   wearing a blue shirt nine of those 10 times, and
16   five of those nine times it's a blue North Carolina
17   shirt and they are -- they're a neighborhood Crip.
18             Would I use that as adopt such gang style
19   of dress?  Yes, I would, in that instance.
20             If the same 10 booking photos and he's got
21   five in a red shirt, three in an orange, one in a
22   black and one in a blue, am I going to use that one
23   time that he was pictured in a booking photo in a
24   blue shirt to start his time over?  No.
25             So that's just one example, but, yeah, the
```

```
 1   context matters.
 2       Q.   Okay.  And again, because the context
 3   matters, different gang officers could do that
 4   different; correct?
 5       A.   Yes.
 6       Q.   Okay.  I don't think I have any further
 7   questions.  Thank you very much for your time.  I
 8   appreciate it.
 9       A.   Thank you.
10                    CROSS-EXAMINATION
11   BY MR. BRANSON:
12       Q.   I just have a couple few to follow-up.
13            You were testifying earlier about
14   pretextual stops in regard to the task force.
15            When you were discussing pretextual stops,
16   does that mean that you could stop a person for any
17   reason that you wanted or did the stop have to
18   require a valid lawful reason?
19       A.   It had to require a valid lawful reason.
20       Q.   You also testified earlier about these two
21   individuals trespassing in the apartment parking lot
22   that had been a recent scene of a crime.  Do you
23   remember that?
24       A.   I do.
25       Q.   Okay.  Is trespassing a crime in the state
```