# EXHIBIT 57



# MALONE, DWIRE & THOMPSON

Est. 1959

ATTORNEYS AT LAW

November 21, 2022

## ***NOTICE PURSUANT TO 12-105b ***

City Council
City of Wichita
Wichita City Clerk, 13th Floor
455 N. Main
Wichita, KS 67202

**Re:    Former Chief of Police Gordon Ramsay v. City of Wichita**

Clerk of the City of Wichita:

The purpose of this letter is to place the City of Wichita on notice of the settlement demand of former Wichita Chief of Police, Gordon Ramsay, who will be joining Deputy Chiefs Jose Salcido and Chester Pinkston, and former Deputy Chief Wanda Givens, who already submitted their required settlement notice to the City. They come together in a unified front as the entire command staff of the Wichita Police Department to call upon the City to take action to end the corruption, lies, and lack of transparency that harmed them and continues to harm the City of Wichita.

The City is requested to preserve and not destroy documents. Per the requirements of K.S.A. §12-105b, this letter provides the City five specific pieces of information which include:

        1) The name and address of the claimants, their attorney and law firm;
        2) A ***concise statement*** of the facts including the date, time, place and circumstances revolving around the event complained of;
        3) The name and address (if known) of the City Employee(s) involved in the incident;
        4) A concise statement of the nature and injury claimed; and
        5) A statement of the monetary damages being requested.

**1.**     **Name and Address of Claimant and Law Firm:**
        Claimant:     Former Chief of Police, Gordon Ramsay (hereinafter "Chief Ramsay".)
        Attorney:     James A. Thompson, Supreme Court Number 21263
        Law Firm:    Malone Dwire & Thompson, LLC, P.O. Box 2082, Wichita, KS 67201.

***Direct all communications regarding these claims to Malone, Dwire & Thompson.***



---

*www.mdtlawyer.com*        *P.O. Box 2082  Wichita, KS 67201*        *(316) 265-4248*

*jthompson@mdtlawyer.com*

## 2.        Factual Basis of Claim

While the vast majority of law enforcement officers in Wichita and Sedgwick County work hard every day to keep their community safe and maintain good effective relationships with the community, there remain small pockets of corruption, sexism, homophobia, and racism operating within the Wichita Police Department and City of Wichita.

The beliefs and attitudes expressed by a small cabal of some SWAT members and officers are inconsistent with the principles necessary for proper 21st century policing. Together with his executive staff of the Wichita Police Department, Chief Ramsay attempted on numerous occasions to root out and deal with those issues and implement much needed changes to create greater transparency and accountability. Consequently, agents, employees, and staff of the City of Wichita defamed and retaliated against the Chief Ramsay and his executive staff of the Wichita Police Department and created a hostile work environment for not only Chief Ramsay and his executive staff, but also for anyone who dares try to report or fix problems within the city.

City Manager Bob Layton, Human Resources Director Chris Bezruki, the Fraternal Order of Police and others resisted, or outright defied, actions by Chief Ramsay and his executive staff to address these issues. Bob Layton and Bezruki repeatedly lied about their knowledge of incidents within this abhorrent subculture and took action to protect and/or conceal it. Bob Layton, Bezruki and others, in concert with senior leadership of the Fraternal Order of Police, took retaliatory actions against Chief Ramsay, and his executive staff in efforts to undermine their authority and effectiveness as leaders of the Wichita Police Department. Actions that continued after Chief Ramsay left the City of Wichita. Layton, Bezruki, the Fraternal Order of Police and others made a collaborative attempt to silence and discredit Chief Ramsay and the entire executive staff of the Wichita Police Department in order to install new handpicked replacements who would be more pliable, and willing to look the other way.

While it is good that the City hired a new police chief (and Chief Ramsay and his executive staff wish him well), it is doubtful he will have the success this City deserves so long as the systemic problems with corruption and lack of transparency remain and the Chief of Police is not allowed to make the needed changes because of interference by the FOP, Layton and Bezruki.

### *City Manager Bob Layton*

At least two police chiefs have been approached by Layton to violate the law and obstruct a criminal/administrative investigation. Layton asked Chief Gordon Ramsay to show favor and give a pass or "restart" in an ongoing criminal/administrative investigation to a WPD Captain under investigation. Layton also asked Interim Chief Lem Moore to give the same captain a "restart" concerning the ongoing criminal/administrative investigation. This captain is also believed to be releasing confidential information about criminal cases in violation of City policy. City Manager Layton and Assistant Manager Donte Martin wanted the captain to be given a "break" so he could attend a top-level FBI school despite reservations by Chief Ramsay, the Deputy Chiefs and the FBI.

After a high-profile officer involved shooting, Chief Ramsay and his executive staff chose not to

promote the Officer. Deputy Chief Givens authored a "skip letter" and approved by Chief Ramsay, explaining the basis for denying him the promotion. After the public outcry, Bob Layton lied saying he did not have a copy of the skip letter despite the letter being a part of the employee's personnel file and easily accessible to Layton as the City Manager.

Layton lied to the public and the City Council when he denied knowing about the texting investigation despite WPD leadership personally informing him about the text messages and their repugnant content. Layton wanted it to "go away." Layton told Chief Ramsay that because the officer involved in the shooting of Marquez Smart case was also involved in the texting case and sent the "ultimate de-escalators" text message it required a quick settlement for legal purposes so as not to create additional liability and potential costs for the City. City Attorney Jennifer Magana and a deputy city attorney assigned to assist WPD were also aware of the texting case. Layton then pushed for the *Smart v. City of Wichita* case to settle, which it did and apparently without the Smart family or its attorneys, ever being notified of the texts, which likely violates the ongoing duty to supplement discovery in ongoing cases. Because of the changes made by Chief Ramsay while he was there, the texting case was brought before the Citizen Review Board, an entity Chief Ramsay pushed to be created. But for Ramsay's tenure and his push for transparency, it is unlikely the public would have ever known about the texting matter.

Chief Ramsay asked Layton on numerous occasions to keep Bezruki out of police discipline until it reached his level of contractual involvement. Layton refused to do so. Despite Bezruki's inappropriate relationship with the FOP being brought to his attention, Layton did not overrule Bezruki when he arbitrarily overturned grievances, and when Bezruki negotiated with the FOP the most favorable contract by far of any city employee organization.

In his ongoing efforts to discredit Chief Ramsay, Layton is marginalizing and trying to force out Deputy Chief Pinkston and Deputy Chief Salcido, by giving assignments to the remaining interim deputy chief. Layton refused to consider Salcido or Pinkston for the next interim chief. As part of the job duties for the interim chief, Bob Layton told at least one applicant he wanted them to come in and discipline Deputy Chief Salcido and Deputy Chief Pinkston. Chief Ramsay knows this because he was told by the potential appointee what Layton had said to him.

### Bezruki's inappropriate relationship with FOP

Bob Layton was warned about Chris Bezruki's apparent inappropriate relationship with the Wichita Fraternal Order of Police, wherein it appears gifts including expensive dinners are being exchanged for preferential contracts and favors towards its members. When WPD executive staff made decisions with which the FOP disagreed, the FOP leadership ran to Bezruki, and sometimes Layton, who would overturn those decisions.

Former HR specialist, Olivia Hensley, who worked for the city from 2012 to 2016, describes one such event where a male officer inappropriately took a female officer into the bathroom of a bar. Professional Standards investigated the incident. Recommendations were made for discipline, the Chief concurred. The investigation was sent to Director Bezruki for him to review. According to Ms. Hensley, the file languished on Bezruki's desk for weeks to the point PSB called inquiring about it. Ms. Hensley spoke to Bezruki who instructed her to review the file and give him her

opinion, which she did. She recommended he sign off on the memo as requested. Bezruki then provided his signature without reviewing it and then discussed it with City Manager Bob Layton for his approval as well. Shortly thereafter, the FOP representatives took Bezruki to lunch. Upon returning from that lunch, Bezruki reversed his decision on the employee discipline.

Ms. Hensley states there were many other instances like this as well. Ms. Hensley claims these lunches with the FOP occurred often. She also notes Bezruki did not give other employee organizations the same access or opportunity to meet with him.

Finally, Ms. Hensley retains a "strong suspicion" that Layton and Bezruki had a former relationship with each other before Layton hired Bezruki. She remembers the manner in which Bezruki was hired seemed quick and she thought it was strange that "we didn't have multiple people." [applicants]. She also remembers instances where Layton and Bezruki gave individuals preferential treatment. Preferential treatment in the hiring process is against the law. Finally, she remembers a woman hired because, according to Bezruki "she was easy on the eyes." A comment that devalues and objectifies women.

On December 7, 2021, Deputy Chief Salcido spoke with the Kansas City office of the FBI regarding the value of contracts and Mr. Bezruki receiving free dinners and gifts from the FOP in violation of the law. The FBI opened an investigation into Mr. Bezruki.

### *Reversal of Discipline for Sgt. Maurice Mitchell*

WPD Sergeant Maurice Mitchell "slapped the ass" of a female officer of the Wichita Police Department. The City of Wichita charged Sergeant Mitchell with battery. The City of Wichita Municipal Court and the Wichita City Prosecutor's Office allowed Mr. Mitchell to enter a diversion agreement and avoid prosecution after he provided "letters of apology, made a charitable cash donation, and completed sexual harassment training." During the internal investigation, Sgt. Mitchell admitted his wrongdoing. Upon the recommendation of claimant Deputy Chief Wanda Givens, Chief Ramsay demoted Sergeant Mitchell to officer and a non-supervisory position.

The Fraternal Order of Police appealed the demotion. Leadership attempted to mediate the matter and offered to allow Mitchell to retest after a year. However, Bezruki continued his interference. Bezruki was not interested in how women felt about the sexual harassment. Bezruki removed the senior female HR Specialist Diversity Manager from the case and excluded her from meetings on the topic. Moreover, Bezruki dismissed the opinion of Deputy Chief Givens, the only female on the executive staff of WPD. Despite Mr. Mitchell's admission as part of the diversion process, Bezruki, as HR Director, repeated on at least three occasions to Chief Ramsay that not only was "slapping the ass" of a female officer not a sexual battery and should never have been sent to a prosecutor, but he also declared it was not even sexual harassment. His comments devalued and further objectified not just the female officer, but all women. Moreover, while leadership attempted to mediate the matter, Bezruki, unilaterally, or with the approval of Layton, reinstated Mitchell to Sergeant and reversed the decision of Chief Ramsay and his executive staff. By overriding the previously imposed discipline, and circumventing the ongoing mediation, Bezruki intentionally undermined Chief Ramsay and his executive staff in the eyes of the officers and created additional discord within the police department. Most importantly, Bezruki's reversals sent a clear message

to the executive staff that Bezruki controlled discipline over the officers, and the FOP controlled Bezruki.

### *Racist and Violent Text Messages*

In or about May 2021, the WPD was made aware of racist, violent, and misogynistic text messages by members of the WPD SWAT team. Appalled by the text messages, Chief Ramsay and the entire Executive Staff initially believed that the outcome of the investigation could be potentially significant discipline. Chief Ramsay warned City Manager Layton that Bezruki should not be involved in the investigation of the issue because of Bezruki's inappropriate relationship with the FOP. Layton disregarded this information. Bezruki repeatedly and intentionally interfered in the investigation into the text message scandal. Rather than agreeing with Chief Ramsay and the executive staff, Bezruki, to no one's surprise, sided with, and parroted the position of the FOP, specifically claiming the actions of the officers were protected by the First Amendment and therefore NOT punishable despite the position of Chief Ramsay and the executive staff. Bezruki claimed the recommendations of Chief Ramsay and the executive staff would be heavy handed, overreaching, and overzealous.

Having seen Bezruki reverse their decision with Sgt. Mitchell, Chief Ramsay and his executive staff wanted to avoid Bezruki undermining them again regarding the discipline of the officers. Bezruki fostered discord and unrest between the FOP and Police Administration and significantly undermined police administration on operational matters and discipline. HR had set the tone on this investigation by telling executive staff the 1st Amendment protected the text messages. The outcome of the investigation was dictated by an overly passionate Bezruki. You can have the best Chief of Police and Executive Staff in the country but if the HR Director runs discipline and is in bed with the Union, he and the union run the Department and not the Chief of Police. Chief Ramsay and his executive staff became public scapegoats for the City in its efforts to avoid liability.

The City of Wichita, through its City Manager and Human Resources Director intentionally lied about their knowledge of the text messages and wrongfully placed the blame for the "lack of punishment" on Chief Ramsay and the executive staff of WPD, portraying them as incompetent. When the issue of the racist and violent text messages went before the Citizen's Review Board, the City of Wichita threw Chief Ramsay and his executive staff under the proverbial bus to defame and discredit them and protect the City Manager, the HR Director, and others.

Despite reports to the contrary, District Attorney Marc Bennett's office was informed about the Brady/Giglio problems created by the text messages. A Lieutenant in Professional Standards Bureau was specifically tasked with this assignment as they conducted the investigation and Mr. Bennett's office was provided a digital file with all the text messages as required by law for discovery processes to satisfy the Brady/Giglio requirements. Yet Layton and others indicated Chief Ramsay and his executive staff failed to inform Bennett's office, which is patently false.

### Gang List

The "gang list" is predominantly comprised of people of color, especially African American and Latino men. Chief Ramsay and his executive staff recognized the immense problems with the

"gang list," especially regarding racial issues, the lack of transparency, and the unregulated placement of individuals on the list. Chief Ramsay and the Deputy Chiefs implemented notification for parents of children placed on the list and added intervention for juveniles in 2016 and 2017. Chief Ramsay and the executive staff also wanted to employ a due process procedure to remove adults from the list. Deputy Chief Salcido proposed a five-member panel comprised of three officers and two citizens, with the citizens being a member of the African American community and the other from the Latino community since both groups are overrepresented on the gang list. The City of Wichita and the FOP reacted with hostility and resentment towards these recommendations.

### Police Shooting Investigations

Chief Ramsay, through Deputy Chief's Salcido and Pinkston, attempted to implement much needed changed in the way WPD conducted police shooting investigations. The FOP vigorously objected to these changes and took steps to prevent them. Current City policy prohibits the release of information, findings and discipline regarding citizen complaints about city employees. This needs to change.

In late October of 2020, following an Officer Involved Shooting documented under WPD Case number 20C067015 wherein five officers discharged their weapons, the union can be observed in the AXON videos interfering with the focus officers. The FOP interference occurred not only at the scene, but they also actively attempted to contact officers in the interview rooms. The FOP claimed the union paid for the attorney; therefore, they were entitled to be present in the room with the officers during the detective's interview of the shooting officer during the criminal investigation.

The FOP further hindered the investigation by refusing to turn over notes for the case and argued for some time that the notes were union work product and thus protected. Deputy Chief Salcido contacted DA Marc Bennett to discuss possible charges for union members interfering in any future cases or for not turning in notes for discovery.

On December 20, 2020, Officer Froese shot a bank robbery suspect at 13th and Webb. FOP President Inkelaar and Vice President Asmussen again demanded to be present with attorney Jim Pratt, who the FOP retained to represent Officer Lee Froese. Deputy Chief Salcido told them the FOP would have to file a PERB violation and take it up then, but they would not be allowed into the room with the officer and his attorney. Deputy Chief Salcido's rationale is that police officers who kill a person are not entitled to additional rights not afforded to ordinary members of the public. Deputy Chief Salcido also contacted District Attorney Marc Bennett regarding their conduct. The 6th Amendment entitles officers, like every person, to legal counsel, but being an officer does not give them extra rights in the criminal justice process.

Unfortunately, ensuring the integrity of officer involved shooting investigations created a rift with the FOP who filed a grievance over this change. In a letter to Deputy Chief Salcido from FOP President WPD Officer David Inkelaar on January 5, 2021, Inkelaar asserted the following:

Up until 12/21/20, FOP Representatives have been given access

Page **6** of **15**

> to bargaining unit members involved in a critical incident as soon
> as both the member and representative at present in the
> Investigations Division work area and the FOP representative
> introducing the bargain member to the attorney provided by the
> FOP soon after the attorney arrived at City Hall. Furthermore,
> there has been no limit to the number of FOP Representatives and
> the presence of a supervisor or investigator was not required when
> the FOP representative spoke with the bargaining unit member.

Detective Inkelaar's argument is essentially that officers are entitled to extra rights unavailable to ordinary citizens. This is contrary to any recognized reasonable best practices for any criminal investigative process and is certainly not a constitutional right or a right under collective bargaining. There is no right to interfere with the criminal process for investigating officer involved shootings.

FOP President Dave Inkelaar also sent emails to Layton in July 2021 and met with him in an effort to interfere with discipline and remove executive leadership. In his email to Layton in July 2021, Inkelaar said the following in pertinent part:

> I am following up on the email I sent you last week asking for
> a meeting. I wanted to follow the chain of command and give you
> an opportunity to help us resolve some issues we are having with
> Chief Ramsay and the Command Staff. If you are not willing to
> meet, I will address my concerns with the city council and the
> media, if necessary.

Bezruki, Layton, and others within WPD and the City of Wichita, working in concert with the FOP, created a hostile work environment for Chief Ramsay and the executive staff.

### *Sexual Harassment*

In response, to Bezruki's statements in front of Chief Ramsay that slapping the bottom of a woman was not sexual harassment, Deputy Chief Givens filed a grievance with the City of Wichita against Mr. Bezruki. Mr. Bezruki refused to cooperate with Captain Blake Mumma who Assistant City Manager Donte Martin appointed to investigate the issue opened under Internal Administration Investigation 21PSB-4578. Despite numerous attempts by Captain Mumma to speak with Bezruki over several months, Bezruki refused. Deputy Chief Givens inquired many times regarding the status of the investigation between September 2021 and December 2021 only to learn Bezruki still had not been questioned. It became obvious that Mr. Bezruki refused to cooperate and was stalling the investigation. Deputy Chief Givens filed a complaint with the Kansas Human Rights Commission as a result. Deputy Chief Givens retired and left her employment with WPD rather than continue subjecting herself to continued discrimination and a hostile work environment.

Chris Bezruki was the "Ethics Officer" for the City of Wichita responsible for processing complaints. As such, Bezruki abused his position and violated the Wichita Code of Ethics by stalling and refusing to cooperate despite Assistant City Manager Donte Martin ordering the

investigation. The City failed to force his cooperation and thereby is complicit in his violating the code of ethics and creating a hostile work environment for myself, my executive staff and others.

### *Defamation and Whistle Blower Retaliation*

On September 2, 2021, Mr. Bezruki directed Susan Leiker to call Deputy Chief Givens and ask if she started a "petition for females not to work with Sergeant Mitchell." Mr. Bezruki and other city employees made this allegation in front of at least Sergeant Brunsheen, Officer Paul Zamorano, and Detective Dave Inkelaar, all members, and officers of the FOP. These comments were made during the retirement ceremony of Terry Jones. Bezruki created and spread the rumor as retaliation for filing a complaint about him for sexual harassment regarding his comments that slapping a woman on the buttocks is not sexual harassment.

In retaliation for Chief Ramsay warning about the inappropriate relationship between the FOP and Bezruki, and for their positions on sexual harassment, the racist/violent texts, and for refusing to give Wichita Police Department Officers special treatment as demanded by the FOP, Bob Layton and Chris Bezruki took retaliatory actions against Chief Ramsay and his executive staff including but not limited to withholding already approved pay raises for claimants Deputy Chiefs Salcido and Pinkston for approximately six months.

Chief Ramsay believes the actions against himself, and his executive staff were undertaken as part of a concerted effort to discredit them in the eyes of the Office of the Secretary of Labor, the Department of Justice, FBI, and other governmental entities for whom they might be called to testify regarding the work environment and subculture at the City of Wichita and the Wichita Police Department. The City is particularly worried about being put under a consent decree by the federal government for ongoing civil rights violations.

In July of 2021, Deputy Chief Salcido received an ethics complaint regarding HR Director Bezruki accepting free dinners and gifts from the FOP. Bezruki is in charge of negotiating the police union contracts and negotiates contracts that are far more favorable than the other employee unions. As required, Deputy Chief Salcido forwarded the complaint to Assistant City Manager Donte Martin who, after a several month delay, met with the complainant and Deputy Chief Salcido.

Inkelaar's meeting with Layton in July 2021 to give Layton "an opportunity to resolve some issues" regarding Ramsay, Givens, Salcido, and Pinkston is contemporaneous with the ethics complaint against Bezruki wherein Salcido and the ethics complainant met with Assistant City Manager Donte Martin.

Shortly thereafter, Bezruki reversed Chief Ramsay's demotion of Sgt. Mitchell and reinstated his rank without consulting with Chief Ramsay or any of the executive staff. Bezruki reversed the discipline as part of his retaliatory conduct towards Chief Ramsay and the executive staff and his intent to sow discord and unrest within WPD so he and Layton could replace the leadership of WPD.

On February 4, 2022, WPD officer and FOP President David Inkelaar claimed retaliation by Lt. Bartel because Inkelaar had to share a city owned vehicle with two other officers rather than being

given a vehicle for his sole use when there is an unassigned car. Deputy Chief Salcido investigated the allegation and denied the grievance after finding Lt. Bartel's approach was consistent with past practice and aligned with best interest of the city and taxpayers. Lt. Bartel possessed a legitimate business reason for maintaining an unassigned car for detectives to conduct city business when those detectives did not have a city vehicle assigned to them. The FOP then appealed Deputy Chief Salcido's denial of the grievance. Chief Ramsay also denied Inkelaar's appeal. The FOP then appealed to the HR department who again reversed the decision of leadership in favor of the President of the FOP who wanted a car all to himself.

Importantly, Deputy Chief Salcido conducted the initial meeting with Inkelaar regarding the grievance in an interview room where the meetings are recorded so there would be no misunderstandings about the initial complaint. Inkelaar and the FOP went straight to Bezruki who immediately forbid recording meetings with the FOP.

### *Racial Discrimination*

Both Deputy Chief Salcido and former Deputy Chief Givens are people of color. Deputy Chief Givens is an African American woman and Deputy Chief Salcido is a Latino man. The actions against both are motivated, at least in part, by racial animus of those within the City of Wichita. One such example of this animus can be seen in the difference in reviews between Deputy Chief Pinkston and Deputy Chief Salcido as noted in Deputy Chief Salcido's EEOC complaint. Therein, Deputy Chief Salcido outlines that on his performance evaluation of April 29, 2022, which negatively mentioned the discipline given to an officer regarding the racist text messages, while Deputy Chief Pinkston did not receive that same negative addition in his performance review despite also being involved in that decision. Chief Ramsay believes that pockets of racism does exist within the city of Wichita.

### Bogus Survey

A "survey" conducted by Dr. Delores Craig-Moreland on behalf of Wichita State University and the Wichita Police Department was circulated by Captain Wendell Nicholson and Captain Kevin Kochenderfer among officers despite concerns about the security of the survey. Deputy Chief Pinkston twice instructed Nicholson and Kochenderfer not to conduct the survey. Dr. Craig-Moreland contacted Chief Ramsay on November 10, 2021, stating the following:

> I believe we urgently need a telephone conversation. It has come to my attention the officer survey security was compromised. There is a rumor the surveys were left unsecured and copied. I know I need to withdraw all information from the officer surveys because I no longer have confidence the set of responses was valid and genuine.

This survey was used to defame, discredit, and undermine the authority and reputation of Chief Ramsay and the executive staff despite the concerns raised by Dr. Craig-Moreland and executive staff.

**Councilman Frye's Outburst**

During the city council meeting on September 20, 2022, Councilman Bryan Frye stated the following:

> The definition of extortion: the practice of obtaining something, especially money, through force or threats. It's mind-blowing that two current deputy chiefs of the Wichita Police Department have resorted to this tactic. Deputy Chiefs Salcido and Pinkston should resign immediately.

Evidently, Councilman Frye's dictionary does not include retaliation and slander because Councilman Frye maliciously made these very public and very inflammatory comments from the city council bench. Frye's comments came the day after Deputy Chief's Salcido and Pinkston submitted their state mandated notice to the City of Wichita of their intent to file a lawsuit against the city. Kansas law requires Deputy Chief Salcido and Pinkston give that notice pursuant to K.S.A. 12-105b, which requires they state the factual justification for their claims. Frye's slanderous remarks are yet another very public and high-profile example of retaliation against executive staff for calling out corruption, retaliation, and harassment. Frye's defamatory comments violate federal, state and city law and send a very clear message to any other whistleblowers in the City of Wichita that if they dare come forward, they too will suffer the same calculated character assassination.

Rather than appreciating the bravery of these law enforcement officers for stepping forward, Councilman Frye shamefully chose to slander their names accusing them of extortion for following the law. Rather than acknowledging the 93 years of combined experience of Deputy Chiefs Salcido, and Pinkston, along with former Deputy Chief Givens, Frye chose to punch down. Rather than recognizing the rarity of three deputy chiefs stepping forward in unison to expose corruption within the city, Fry chose to crucify the messengers. Frye's actions are part and parcel of the ingrained systemic problems with the City of Wichita and the FOP, and the level to which it has reached.

For these reasons, Councilman Frye is added to this mandatory notice as a future defendant. Moreover, the City and Councilman Frye are put on public notice of his conflict of interest regarding any business that may come before the Wichita City Council including, but not limited to, claimants' employment and or settlement of these claims. Councilman Frye must recuse himself from any further votes or business regarding Chief Ramsay or the executive staff who have come forward together to expose the problems in City Hall, and evidently on the City Council.

**3.      Name of Public Officers involved (as known to date):**

Numerous individuals employed by the City of Wichita are involved including City Manager, Robert Layton, City Human Resources Director Chris Bezruki, Captain Wendell Nicholson, Captain Kevin Kochenderfer, Detective David Inkelaar, Sergeant Jamie Crouch, Officer Lee T. Froese, and Councilman Bryan Frye.

*Additional City Employee Witnesses*:
Captain Blake Mumma
Susan Leiker
Terry Jones
Van Haley
Jennifer Magana Sharon Dickgrafe
Captain Christian Cory
Lt. Jason Bartel
Lt. Rod Miller
Assistant City Manager, Donte Martin Janet Johnson
Interim Chief Lemuel Moore
Sgt. Bart Brunsheen
Former Wichita HR Employee Olivia Hensley
Officer Paul Zamorano
Lt. Kim Warehime

**4.     Injury Sustained:**

Chief Ramsay suffered adverse employment actions because of the toxic subculture within the WPD and City of Wichita. A factor in Chief Ramsay's decision to leave was Bezruki's interference in discipline, and the continued obstruction in Ramsay's efforts to change department culture, subverting department leadership, stirring unrest and discord within the organization and fueling a toxic culture by Bezruki, Layton and the FOP.  Moreover, Chief Ramsay suffered a loss of reputation and job opportunities because of the defamatory comments and publicity by those within the City of Wichita as described above. If forced to file suit, Chief Ramsay will likely bring claims under the First and Fourteenth Amendments, Title VII, and state law claims of outrage, defamation, negligent infliction of emotional distress, violations of federal and state whistleblower protection acts, and any other claims allowed under the facts. He will seek attorney fees, costs, compensatory damages, punitive damages, and any other damages or fines available pursuant to state or federal law.

***Wichita Code of Ethics***

The City of Wichita Code of Ethics names the Human Resources Director as the City's Ethics Officer. The Code of Ethics states as follows:

> The City of Wichita's Code of Ethics outlines expected behaviors for employees. The City will conduct its business fairly, impartially, in an ethical manner, and in full compliance with all applicable laws, policies and regulations. Employees will not engage in conduct that raises questions about the City's honesty, impartiality and reputation, or otherwise causes embarrassment to the City.

The Wichita Code of Ethics includes the following examples, in pertinent part:

**A. I am ethical in all activities.**
> I put the public's interest above my own.
> I do not allow personal biases to dictate my job behavior.
> I make impartial decisions, free of bribes, unlawful gifts, and personal
> interests. I do not make work decisions based on any personal relationship.
> I admit when I am wrong and try to remedy the
> situation. I avoid exceeding, or appearing to exceed,
> my authority. I do not behave in ways that could
> embarrass the City.

**B. I am financially responsible.**
> I manage City resources entrusted to me in a prudent and responsible
> manner. I do not misuse public funds for personal gain or for unintended
> purposes.

**C. I use public property properly.**
> I do not show favoritism in allowing the use of public
> property. I do not falsify, or inappropriately destroy, reports
> or records.

**D. I follow appropriate practices regarding gifts.**
> I do not use my official position to solicit gifts, donations, discounts or services for
> personal gain, or where the circumstances involved with the gift, donation, discount or
> service give even the appearance of unfair influence.
>
> If a gift, donation, discount or service is offered to me, I do not accept it if I believe or it
> appears that the item offered could influence my behavior in favor of the person or
> organization offering it.
>> □ An occasional non-monetary item of nominal value is not considered a "gift,"
>> such as food at a reception generally open to employees or the public, as long as
>> it does not present any appearance of a conflict of interest. "Nominal value"
>> means
>> $100 or less on any occasion or in total from one person or organization during
>> a consecutive twelve-month period.
>> □ If I receive a gift (such as food, seasonal decorations, etc.) from vendors or
>> City business partners, I make it available to my work group.
>
> I do not accept travel, meals, or refreshments from persons doing business with the City,
> unless the refreshments or meals are furnished as an incidental part of my appearance at
> a public event in an official capacity, as hospitality extended for a purpose unrelated to
> the City's official business, or if travel, meals and lodging are provided in connection
> with teaching, a speaking engagement, participation on a professional or civic panel, or
> conference attendance in an official capacity.

Employees are required to cooperate with investigations. Moreover, employees are prohibited
from making "false reports."

Employees reporting violation are supposed to be protected from retaliation pursuant to §*10 – Confidentiality and Whistle Blower Protection*, which states as follows:

> **Protection Against Retaliation** It is a violation of this Code to retaliate in any form against an individual who, in good faith, reports a violation of this Code, or assists in the investigation of a reported violation. An employee who retaliates will be subject to disciplinary action, up to and including termination.

It is apparent that numerous individuals, including Bezruki and Layton violated Wichita's Code of Ethics.

In regard to retaliatory discharge claims, the courts of Kansas stated as follows:

> Kansas recognizes this tort as a limited exception to the at-will employment doctrine. *See Campbell v. Husky Hogs, L.L.C.*, <u>255 P.3d 1, 5</u> (Kan. 2011). Retaliatory discharge claims are often recognized in circumstances where an employee is "discharged in contravention of public policy." *Id*. Kansas uses the same burden-shifting approach that is applied in discrimination cases for analyzing retaliatory discharge claims. *See Bracken v. Dixon Indus., Inc.*, <u>38 P.3d 679, 682</u> (Kan. 2002). If a plaintiff can establish a prima facie case of retaliatory discharge, it raises "'a rebuttable presumption of a retaliatory intent.'" *Id*.

*Great-West Fin. Retirement Plan Servs. v. Comput. Consulting Servs. of Am.*, No. 17-2136-CM-GEB, at *6 (D. Kan. Aug. 23, 2019) (finding third party plaintiff is not entitled to indemnification from third party defendant for third party plaintiff's intentional conduct of retaliatory discharge against original plaintiff.) "Because an employer rarely announces retaliation as its motive for terminating an employee, "Our Supreme Court has adopted a burden-shifting approach to analyze cases involving retaliatory discharge based on discrimination." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1116 (10th Cir. 2001). "The Kansas Supreme Court has recognized retaliatory discharge for whistleblowing as an actionable tort. A whistleblowing retaliatory discharge action is a public policy exception to the employment-at-will doctrine. Kansas courts have adopted the *McDonnell Douglas* burden-shifting approach for analyzing retaliatory discharges claims." *Howard v. Millard Refrigerated Services, Inc.*, 505 F. Supp. 2d 867, 882 (D. Kan. 2007).

An action for defamation includes libel and slander. To show a prima facie case of defamation, plaintiff must show 1) uttering or publishing of false or defamatory words, 2) communicated to a third party and 3) those false and defamatory words exposed plaintiff to public hatred, contempt or ridicule, deprived him of social acceptance and/or resulted in harm to his reputation. The key to proving a defamation action is showing injury to reputation. "*Prosser on Torts,* as recognized by the Kansas Court of Appeals, defines defamation "as an act which tends to injure reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse derogatory or unpleasant feelings or opinions against him." See also

*Smith v. Mission Associates Limited Partnership*, 225 F. Supp. 2d 1293, 1303 (D. Kan. 2002).

**5.     Damages Requested:**

At this time, Chief Ramsay requests the following:

Chief Ramsay would like a public apology from the City of Wichita.

Damages of $400,000.00, which Chief Ramsay is asking to be put towards hiring an independent investigator into ethical complaints against City leaders and all complaints and findings be made public in every case.

Payment of any legal costs and fees incurred by Chief Ramsay.

In addition, Chief Ramsay is asking that the City change its policy to make citizen complaints about City employees' public information along with findings and any discipline received.

In addition to the damages requested, claimant requests that Bob Layton and Bezruki (if still employed by the City of Wichita) recuse themselves from any third-party independent review and any disciplinary proceedings regarding Deputy Chief Pinkston or Deputy Chief Salcido.

Finally, Chief Ramsay joins with Deputy Chief Salcido, Deputy Chief Pinkston and former Deputy Chief Givens, who together formed the entire executive staff of the Wichita Police Department, to collectively call for the immediate resignation of both City Manager Robert Layton, and Human Resources Director Chris Bezruki.

**6.     Document Preservation:**

**At this time, Claimants place the City of Wichita on notice to please preserve all documents that in any way relate to the incidents outlined in this 12-105b notice letter, and any documents requested by Chief Ramsay or the Deputy Chiefs through KORA which were not provided.**

**[Remainder of Page Intentionally Left Blank]**

7.      **Conclusion:**

It is abundantly clear, the City of Wichita, through its agents, employees, and staff undertook a pattern and practice of retaliation to discredit, defame and remove Chief Ramsay and his executive staff. Despite this, he is willing to forego litigation to bring this matter to a swift and final conclusion upon reasonable settlement. If the City of Wichita is unwilling to settle the claims, they will fully pursue all remedies available to them under the law.

Thank you for your immediate and prompt attention in this matter.

Sincerely,

*James A. Thompson*

James A. Thompson
Attorney at Law

Cc: Mayor Brandon Whipple, Vice-Mayor/Councilwoman Becky Tuttle, Councilman Brandon Johnson, Councilman Mike Hoheisel, Councilman Jeff Blubaugh, Councilman Bryan Frye, and Councilwoman Maggie Ballard.