# EXHIBIT 41

## Filed Under Seal



**Class Title:**     **Gang Awareness and Domestic Terrorism**
               **(Handout 1 of 2 – Gangs)**

**Class Code:**     **05.11**

**Handout Title:**     **Understanding Gangs**

**Reviewed by:**     **Bruce H. Morton**

**Instructed by:**


**LEARNING OBJECTIVES:**

**Upon completion of the class by written examination and/or practical testing, the participant will be able to:**

**1.     Define Gangs.**

**2.     Identify the indicators that gang members display.**

**3.     Explain the three R's of the gang mentality.**

**4.     Explain why kids join gangs.**

**5.     Identify the four major services that a confidential informant can provide in a gang investigation.**

**6.     Explain the importance of graffiti to gang members.**

**7.     Identify the different initiation rituals that gangs use for membership.**


**INTRODUCTION**

       Gangs have been in the United States for hundreds of years and they are no longer just a big city problem.  Gangs can be found in suburbs, small cities and towns, and rural areas.  If you do not think you have a gang problem, it may be because you do not know what to look for, or your agency is hoping that if they ignore it, the problem will go away.

       The best way to determine if gangs are in your area is to check the overall crime rate and watch for graffiti.  If groups of gang clothing clad juveniles accompany a noticeable escalation in crime, officers can be fairly certain that gangs are present in the area.

       Gangs throughout the United States are different.  What we discuss may not be the situation for your area.  Your situation may be different but the gang members themselves,

WICHITA  090309 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

and the factors that enable them to exist are basically the same everywhere.  It is fairly easy to develop intelligence information on gangs.  The problem is that things can change so rapidly in the gang world that the new information may soon be outdated.  The key to gaining knowledge about a specific gang is to get out and talk to the people involved.  It is possible for a gang to be dormant for a while and not commit any crime.

## K.S.A. 21-4226-defines a gang

Kansas state law defines the term "criminal street gang" to mean any organization, association or group whether formal or informal:  Consisting of three or more persons; has a common name or common identifying sign or symbol; has as one of its primary activities the commission of one or more person felonies, person misdemeanors, felony violations of the uniform controlled substances act; whose members, individually or collectively, engage in or have engaged in the commission, attempted commission, conspiracy to commit or solicitation of two or more person felonies, person misdemeanors, felony violations of the uniform controlled substances act.

## HISTORY

The United States is a country of immigrants, but throughout American history other citizens have not welcomed all ethnic immigrant populations into this country.  Irish, Italians, Polish, Asian, Mexican, and other ethnic groups have had to fight racism, prejudice, and unemployment once in the United States.  Each group of new immigrants usually settles in the same area of the United States as earlier immigrants from their home country.  The increased immigration into the United States experienced during the early 1900's saw the majority of these new immigrant families settling in New York City.

The first American criminal street gang was an Irish gang that appeared in New York City in 1820.  They called themselves The Forty Thieves.  The Forty Thieves and other Irish gangs formed to rebel against the low social status and prejudice shown toward Irish immigrants.  The gangs turned to crime for profit to relieve their frustrations.  These Irish gangs had developed a particular dress code, used nicknames, and most associated in one area of New York known as Five Points (turf).

Immigration populations had a continual effect on the development of street gangs.  When immigrant populations arrived in the United States in many instances these populations were treated the same way the Irish were treated when they arrived.  Within those immigrant populations ethnic youth street gangs developed.

In this country there are African-American, Hispanic, Asian, Puerto Rican, Jamaican, Cuban, Russian and other ethnic gangs.   Motorcycle gangs, Prison, White Supremacists, and other gangs also operate in the United States.

One thing that all gang members have in common is their gang membership is shown through their behaviors.  Many times, gang members display certain colors and types of clothing and wear gang related tattoos.  It's not what a person wears, what tattoos they have, their age, race, or even baggy clothes that make a person a gang member, it is particular actions motivated by a particular set of ethics.

Gangs are unified through the use of colors, certain types of clothing, tattoos, brands, or logos.  Many gangs sport certain hairstyles and communicate through the use of predetermined hand signals and graffiti.

WICHITA  090310 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

Gangs may identify with a gang of national prominence or may only be concerned with their local turf. Some of the nationally recognized gangs are:  Crips, Bloods, Folk Nation, People Nation, MS-13, Mexican Mafia, Surenos, and 18th Street.

## GANG CHARACTERISTICS

Some of the most identifiable indicators of a gang member include: mode of dress, tattoos, graffiti, hand signals, language, and gang mentality.

### Clothing

Clothing with logos of sports teams is popular attire with gangs because of the colors, and sometimes because of the letters or symbols used.  Certain gangs will also adopt certain brands or designers.  They use the brand name or initials to represent something related to their gang.  Learn what is popular in your area.

Some things to look for in gang related clothing and styles would be the following:

- White athletic type undershirt.
- Polo type knit shirts (oversized) and usually worn buttoned to the top and not tucked in.
- Pants worn low, or "sagging" and cuffed inside at the bottom or dragging on the ground.
- Short pants cut off under-the-knee, worn with knee-high socks.
- A predominance of dark or dull clothing, or clothing of one particular color.
- Oversized shirts.
- Caps worn to the right or left, or backwards.
- A rag is hanging out of one of their back pockets, or their belt buckles are pushed around to the right or left.
- Shoelaces are different colors.

Get to know the gang related clothing and styles in your area.

If you see a youth at the mall wearing a blue cap and baggy pants does that mean that he is a gang member?  No!  Law enforcement needs to be careful as gang clothing styles have been adopted by many of today's youth.

Many gang members have stopped wearing their colors and have changed their style of clothing in an attempt to fool law enforcement and hide their gang affiliation.  This is being done due to new laws that have harsher penalties if it can be proven that the suspect is a gang member.

### Graffiti

Gang graffiti is often the first indication that gang activity is present in your community.  Gangs use graffiti to mark gang territorial boundaries.  Another reason graffiti exists is to communicate with other gang members.  Gang graffiti is used to issue challenges, give warnings, or boast about acts accomplished or acts about to occur, such as a drive-by shooting or robbery.

Graffiti can help law enforcement to track gang growth, affiliation, and sometimes gang members.  Frequently, a great deal of intelligence can be gathered, such as the

WICHITA  090311 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

nicknames or monikers of gang members, warnings, threats to other gangs, availability of drugs, pending gang wars, and more. Graffiti should be photographed and removed as soon as possible.

It is important for officers to understand that while some graffiti symbols have meanings on a national level, local gangs may adopt other kinds of graffiti or create their own. This fact illustrates how necessary it is for individual law enforcement agencies to develop local gang intelligence.

Establishing ties with school authorities and the general public is one way to develop intelligence about local gangs and graffiti. Teachers may inadvertently find the meanings of certain symbols on notebooks, books, papers, and clothing or they may overhear gang members talking about graffiti symbols.

**Tattoos**

Tattoos also reflect the signs, symbols, and rituals of a particular gang. Officers should look for the following when a tattoo is discovered:

- Gang names
- Nicknames
- Symbols associated with the gang
- Symbols of power or strength
- Weapon of choice
- Gothic script or unusual text

**Gang Signs**

Gang hand signs are another form of communication among gang members. Similar to graffiti, hand signals can be used to issue challenges to rival gang members, greet a fellow gang member or identify one's gang affiliation.

Gang signs either express pride in affiliation, issue taunts, or boast of perceived power. Gang hand signals are a good indication of gang involvement.

You do not have to learn all the gang signs. Just know that signs are used to communicate membership and issue threats.

**Language**

Gang members speak in a certain vernacular that is influenced, in part, by the region in which they live and the gang to which they belong. Gang language is marked by uncommon terms, words, names, and phrases. Similar to any language, these terms change frequently. Listen to gangsta rap in order to learn gang slang. Study the Rap Dictionary at www.rapdict.org.

**Gang Mentality**

The gang mentality is common to all gangs and consists of the three R's: Reputation, Respect, and Retaliation.

WICHITA  090312 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

All gang members strive to establish a reputation and gain respect through that reputation.  In the event a gang member or the member's gang is disrespected, retaliation is sought.  Much of gang violence is retaliation.

A reputation for the individual gang members and for the gang as a whole is of the utmost importance in the gang culture.  Individual reputations help establish the gang's reputation.  Individuals build their own reputation, by acquiring power.  Power is acquired through committing brazen crimes or serving time in prison for armed robbery, assault, or murder.  It is not uncommon for gang members to embellish their past criminal activities in order to obtain more respect and power within their gang.

Some gangs require, by written or spoken regulation, that the gang member must always show disrespect to rival gang members.  Failure to show disrespect places an entire gang's reputation at stake and that is unacceptable in the gang world.  If a gang member witnesses a fellow member failing to disrespect, "dis", a rival gang through hand signs, graffiti, or a simple stare-down, they can issue a "violation" to their fellow member and he can actually be "beaten down" by his own gang as punishment.  After a "dis" has been issued, if it is witnessed, the third "R", retaliation, will become evident.

It must be understood that in gang culture, no challenge goes unanswered.  Many times drive-by shootings and other acts of violence are used as retaliation following an event perceived as a "dis".  A common occurrence is a confrontation between a gang set and a single rival "gangbanger".  Outnumbered, he departs the area and returns with his "homeboys" to complete the confrontation to keep his reputation intact.  This may occur immediately, or follow a delay, used for planning and obtaining the necessary equipment to complete the retaliatory strike.

If a gang member is the victim of violence he will seldom cooperate with the police.  He may make the statement that he and his "homeboys" will take care of the problem.  **Officers need to pay special attention to statements that are made immediately after an incident.  If they meet the legal standard of <u>excited utterances</u> they should be documented as such.**

In gangbanging, today's witness – is tomorrow's suspect – is the next day's victim.

## HISPANIC GANGS

Hispanic gangs began forming in California during the early 1920s.  They started as loose knit groups banding together for unity and socializing in the barrios (neighborhoods) where the same culture, customs, and language prevailed.  Gang members were male youths ranging from 14 to 20-years-old.  Property crimes such as burglary, strong-arm robbery, and vandalism were their crimes of choice.

These gangs had no formal structure or leadership.  They were very defensive of their barrio, and they would protect it with a vengeance.  Gang fights occurred between rival gangs as a result of disputes, turf differences, or transgressions, that were real or imaginary. Often, their weapons included knives, zip guns, chains, clubs, rocks, and bottles.

The commission of a crime became a way of gaining status within the gang.  Imprisonment in the California Youth Authority or the California Department of Corrections earned a gang member great stature with other gang members.

WICHITA  090313 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

By the 1980s, these gangs began targeting their communities and surrounding neighborhoods for drive-by shootings, assaults, murders, and other felonious crimes. Violence became a way of life.

The gangs developed some organization and structure.  Leaders emerged from the ranks of older gang members who had been stabbed or shot in gang fights or released from the youth authority or prison.  Known as "veteranos", these gang leaders began to recruit new members and train them in gang-related criminal activities.  They continued to be turf oriented, and gang fights progressed to gang wars.

The age span for gang members widened, encompassing male youths ranging from 12 to 25-years-old, who were willing to fight and die for the gang.  Most of the gangs required new members to commit a crime, such as stealing a car, or committing a burglary or robbery, before becoming a gang member.

Female associates had little claim to the gang.  They assumed the role of traditional girlfriends but, at times would challenge other females in rival gangs to fight.  Because they were less likely to be arrested for gang activities, they were sometimes used by male gang members to carry weapons and narcotics.

As the Hispanic gang members evolved, they established unique trademarks such as tattoos, hand signs, monikers, and graffiti.  Elaborate tattoos, depicting the initials or name of a gang, symbolized loyalty to a particular gang.  Hand signs formed the letters of the gang's initials.  Monikers were names assumed by, or given to, gang members, and they were usually retained for life.  Intricate graffiti, or placa, clearly marked the gang's territorial boundaries and served as a warning to rival gangs. Gang members used these distinguishing characteristics to demonstrate gang allegiance, strengthen gang participation, and challenge rival gangs.

Today, in many areas, Hispanic gang members range in age from 12 to 40-years old, and many are second or third generation gang members.

Adult Hispanic gang members recruit and use juvenile gang members to commit crimes or carry weapons because juveniles are subject to less severe sentences compared to adult penalties.

Recruitment of new gang members often requires the prospective member to commit a drive-by shooting or some other form of felonious assault.  Loyalty to their gang usually extends to their death.

Reliance on tattoos, hand signs, and graffiti continues to dominate the gangs' characteristics.  These symbols are frequently used to threaten rival gangs and endorse allegiance to their own gang.

Hispanic gangs criminal activities currently range from robberies, burglaries, larceny, vehicle thefts, receiving stolen property, to assaults, batteries, drive-by shootings, and murders. They are becoming involved as entrepreneurs in the selling of narcotics, particularly PCP, Mexican tar heroin, methamphetamine, and marijuana.

The gangs' arsenals have expanded to large-caliber handguns, shotguns, and automatic weapons; and their crimes are becoming more violent.

WICHITA  090314 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

A few of the gangs are beginning to recruit non-Hispanic gang members, and some Hispanic gang members are joining different ethnic gangs.  Various Hispanic gangs are aligning with other ethnic gangs, usually from the same neighborhood.  This affiliation allows them more neighborhood protection from rival gangs.

Hispanic female gangs are starting to evolve exclusive of the traditionally male-dominated Hispanic gangs.  These female gangs can be just as violent as the male gangs.

**AFRICAN-AMERICAN GANGS**

African American gangs began forming in California during the 1920s.  They were not territorial; rather, they were loose associations, unorganized, and rarely violent. They did not identify with graffiti, monikers, or other gang characteristics.

These early gangs consisted generally of family members and neighborhood friends who involved themselves in limited criminal activities designed to perpetrate a "tough guy" image and to provide an easy means of obtaining money.

From 1955 to 1965, the African American gangs increased in numbers.  They operated primarily in south central Los Angeles and Compton.  This was partly due to more African American youths bonding together for protection from rival gangs.

It was not until the late 1960s, when the Crips and Bloods--the two most violent and criminally active African American gangs originated.  The Crips began forming in southeast Los Angeles by terrorizing local neighborhoods and schools with assaults and strong-arm robberies.  They developed a reputation for being the most fierce and feared gang in the Los Angeles area.

Other African American gangs formed at about the same time to protect themselves from the Crips.  One such gang was the Bloods, which originated in and around the Piru Street area in Compton, California; thus, some Bloods gangs are referred to as Piru gangs. The Bloods, which were outnumbered at the time by the Crips three to one, became the second, most vicious African American gang in the Los Angeles area.

Both the Crips and Bloods eventually divided into numerous, smaller gangs (or "sets") during the 1970s. They kept the Crips' and Bloods' (Piru) name, spread throughout Los Angeles County, and began to claim certain neighborhoods as their territory. Their gang rivalry became vicious and bloody.

By 1980, there were approximately 15,000 Crips and Bloods gang members in and around the Los Angeles area. The gangs ranged in size from a few gang members to several hundred and had little, if any, organized leadership.  The typical age of a gang member varied from 14 to 24-years-old.

Initiation into a gang required the prospective member to "jump in" and fight some of the members already in the gang.  Another initiation rite required them to commit a crime within the neighborhood or an assault against rival gang members.

They remained territorial and motivated to protect their neighborhoods from rival gang members.  They established unique and basic trademarks such as colors, monikers, graffiti, and hand signs.  The color blue was adopted by the Crips as a symbol of gang recognition; red became the color of the Bloods.  Monikers, such as "Killer Dog," "12-

WICHITA  090315 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

Gauge," and "Cop Killer", often reflected their criminal abilities or their ferociousness as gang members. Graffiti identified the gang and hand signs displayed symbols, usually letters, unique to the name of their gang.  It was not unusual for members to "flash" hand signs at rival gang members as a challenge to fight.  They took great pride in displaying their colors and defending them against rival gangs.  They were willing to die for the gang, especially in defense of their colors and neighborhood.  It was not until the early 1980s, that the era of drive-by shootings began.

They became involved in a variety of neighborhood crimes such as burglary; robbery; assault; and the selling of marijuana, LSD, and PCP.  The issue of gang involvement in narcotics trafficking was generally considered to be of a minor nature prior to the 1980s. However, by 1983, African American Los Angeles gangs seized upon the availability of narcotics, particularly crack, as a means of income.  Crack had supplemented cocaine as the most popular illicit drug of choice.  Prime reasons for the widespread use of crack were its ease of conversion for smoking, the rapid onset of its effect on the user, and its comparatively inexpensive price.

The migration of African-American Los Angeles gang members during the 1980s, to other United States cities, often for reasons other than some vast gang-inspired conspiracy, resulted in the spread of crack sales and waves of violence.  The spread of crack sales can be traced back to the gang members' family ties in these cities and to the lure of quick profits.  These two reasons provided most of the inspiration and motivation for the transplanted gang members.

Crips and Bloods gangs and their members in narcotics trafficking display considerable diversity, which allows for different levels of involvement from narcotic selling by adolescents to the more important roles of directing narcotics trafficking activities.  In the past, an individual's age, physical structure, and arrest record, were often principal factors in determining gang hierarchy; money derived from narcotic sales soon became the symbol that signified power and status.

Crips and Bloods have established criminal networks throughout the country and capitalized on the enormous profits earned from the trafficking and selling of crack cocaine. In 1987, nine members of the Nine-Deuce Hoovers, a Crip gang, migrated from Los Angeles to Seattle, Washington, where they ran three crack houses, with crack transported from California each week.  One gang member was subsequently arrested and pleaded guilty in 1988 to selling crack near a school and using a gun to further his narcotic enterprise.  He was sentenced to 25 years in prison and is currently incarcerated in Leavenworth Federal Prison, in Kansas.

Today we find that the African American gang members now range in age from 12 to 35 years old, with some as old as 40 years old.  The gangs vary in size from 30 members to as many as 1,000. They continue to fight each other for narcotic-related profits and in defense of territory. Many remain unstructured and informal with only a few of them are becoming organized with some definitive gang structure.

Some of the older gang members, known as "Original Gangsters", who have been in the gang for a long time, are often the recruiters and trainers of new gang members.  Many are second and third generation gang members and have been incarcerated in prison.  Due to their propensity for violence, prison and jail officials have found it necessary to house hardcore members in high-security cellblocks or separate facilities.

WICHITA  090316 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

Some of the more experienced gang members are beginning to abandon established characteristics, such as wearing the colors blue and red, and are now trying to disguise their gang affiliation by wearing nondescript black and white clothing.  Other members continue to rely on the gang trademarks, and neighborhoods abound with graffiti signifying the presence of gangs.

Some of the gangs have formed alliances with other ethnic gangs, and some Crips and Bloods gangs now include Hispanic or Asian gang members.  Female gang members are rare, but those who do participate play a minor role in gang activity and are used to rent crack houses or traffic in narcotics.

When gangs became involved in the crack cocaine market, there was a tremendous increase of street-level violence as gangs battled over the profitable narcotics trade.  Violence is a routine part of doing business, and it is used to terrorize citizens and other gangs resisting their intrusion.  They make no effort to distinguish between intended rival gang victims or innocent bystanders.

Besides crack cocaine, African American gang members also sell marijuana and PCP; and some have purchased chemicals for their own production of PCP.

Their use of weapons has evolved to high-powered, large-caliber handguns and automatic and semi-automatic weapons, including AK-47 assault rifles and Mac-10s with multiple-round magazines; and they sometimes wear police-type body armor.  A gang member may not have a gun on his person, but there is usually one nearby.  The weapon may be in a nearby parked car, bush, trash can, or any other place near where the gang member is sitting.  Often times gang members will have their women conceal a gun on their person due to the fact that male officers are reluctant to search a female or they do not know how to search a female properly.  Get to know the African American gangs in your area.  Get out of your car and talk to them.  Learn their street names, see if they have tattoos, talk to them about graffiti in the area.  Many of them will talk to you.

## ASIAN GANGS

The term "Asian" is really an umbrella term describing many types of street gangs.  Many people describe Japanese, Chinese, Korean, South Pacific, Southeast Asia gangs and organized crime groups, as "Asian".

Typically Asian street gangs are nomadic.  They will not claim turf like traditional Latino street gangs.  All Asian street gangs and organized crime groups are criminal enterprises; banded together with one goal in mind, to make money.  Asian organized crime groups tend to have a formal leadership structure, while most Asian street gangs have no formal leadership structure.  Most often an Asian gang member will try to hide his gang affiliation and will not admit to law enforcement that he is a member of a gang.

Tattoos, self-mutilations, and burning have become an important custom for most Asian street gangs.  Gang members will burn themselves with cigarettes, cigars, or car lighters,  as an act of bravery and to prove commitment to the gang.  Burn scarring is the most common physical marking used to show gang membership.  Gang members will also cut themselves to form long scars.  These scars have the same significance as burns and tattoos.  Many Asian gangs will also use tattoos, but continue the practice of burn scarring.

WICHITA  090317 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

Some Asian gangs relate to a stylized dress that is unique to their particular group or is modeled after traditional Latino or African-American street gangs.  While engaging in criminal activity, gang members will often color their hair and wear "new wave" haircuts. After the crime, the color is washed out and often they will cut their hair to further hide being identified by a witness.

Asian gangs tend to select other Asian's to be victims of their crimes.  This is because many Asian people have a fear of authorities from past experiences, and will not contact the police.  It is estimated that approximately only thirty percent of Asian crime victims report the incident to the police.  It is estimated that over eighty percent of Asian owned businesses pay shake down money to gangs and Asian criminal groups to stay protected from those groups violence.  The crimes predominantly committed by Asian gangs are home invasions, auto theft, and extortion, check and credit card fraud.  When committing these crimes gang members are typically armed with semi-auto handguns and rifles.  They like top quality weapons, and know how to use them.  The 9mm semi-auto pistol, with high capacity magazine, is a weapon used frequently.

Asian refugees and immigrants have a distrust for the American banking system so they tend to keep their valuables in their homes.  It is estimated that between fifty five and sixty percent of Asian households hide large quantities of money in their homes.  Asian gangs will gather intelligence on a family once they have been selected as a target for a home invasion.  They may follow a family for days before committing the crime.  Asian gangs have an estimated ninety five percent success rate on the home invasions they commit.

Once inside the residence, these home invasions are most often very violent.  If the gang member's questions are not answered, and the victims do not give up their valuables then the victims will be physically assaulted.  Many times the family members are killed. Many of the gang members travel from town to town, committing home invasions.

Asian gang members have also branched out into the lucrative area of check and credit card fraud.  Using a computer, a business payroll check can be scanned and then fake checks can be printed and cashed by the gang members.  They will only be in a town for a few days so when a business realizes the checks are bogus, the gang members have left the area.

**SKINHEADS**

White gangs have been forming in California for decades.  Early white gangs were oriented around motorcycle gangs like the Hells Angels.  Today's outlaw motorcycle gangs are not considered street gangs, but are considered to be organized crime groups.  It was not until the late 1980s, that the Skinheads were identified as the primary source of white street gang violence in the state of Kansas.

The original skinhead groups began to establish associations with some of the more traditional white supremacy groups such as the Ku Klux Klan (KKK) and the White Aryan Resistance (WAR). Gang members would travel throughout California and other parts of the country to attend KKK and WAR rallies, marches, and demonstrations. Skinheads have participated in cross-burnings and become members of the American Klan in Modesto.

Skinheads have attended the annual meeting of the Aryan Nations' Church, a Neo-Nazi organization in Idaho linked to The Order, a former domestic terrorist organization.

WICHITA  090318 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

Skinhead gang members identify the imprisoned and deceased Order members as "prisoners of war" and "martyrs" in the white-supremacist movement. Skinheads groups are racially motivated and not territorial nor inspired to commit crimes for profit. Both males and females belong to the group and the ages vary from teens through the mid-twenties. They commit such crimes as vandalism, assaults, drive-by shootings and murders. Their targets are often non-whites, Jewish, homeless, mixed race couples, and homosexual individuals. Confrontations between skinheads and their targets are usually random. In the past their weapons of choice included baseball bats, knives, fists, and steel toed boots. Current day groups use those as well as handguns, rifles, and automatic weapons.

They are loose-knit and unorganized, but there is some evidence that a few of the gangs have developed an internal gang structure. Some have printed and distributed membership applications, collected dues, established rules and regulations, and conducted meetings with formal minutes. The application for the American Front Skinhead gang implies that if a member betrays the organization, the punishment is "death by crucifixion". Some of the gangs have established phone hot lines, post office boxes, and their own publications intended to recruit new members.

Similar to other gangs, Skinheads resort to graffiti, hand signs, and tattoos as typical gang characteristics. Common graffiti includes swastikas, lightning bolts, and slogans to profess Nazism. Most of the graffiti is used to deface property rather than indicate gang territory. Hand signs include both the Nazi salute and formation of the letters "W" and "P" for White Power. Tattoos include: swastikas, Nazi flags, hooded Ku Klux Klansmen, letters WSU and AYM for White Student Union and Aryan Youth Movement, and the letters SWP for Supreme White Power and WAR for White Aryan Resistance.

They continue to shave their heads, but some now have short hair or have grown their hair long to disguise their gang membership.

Skinheads continue to travel throughout the country to associate with other Skinhead gangs, and commit or encourage hate crimes of racial violence. Skinheads remain aligned with white-supremacist groups, and they continue to attend KKK and other hate group meetings and rallies. These groups maintain a power base derived from racism and bigotry, and they often resort to violence in support of their beliefs.

Skinhead groups wear certain types of clothing that can help identify them. They will normally wear Doc Marten combat style boots, and prefer the boots that have a steel toe. The laces used on the boots will either be red or white. The pants worn will be blue or black jeans or black BDU style pants. The shirt is normally a white tee shirt, and red suspenders or "braces," as they call them. A nylon flight or bomber jacket is a common outer garment.

There are several Skinhead gangs in central Kansas. The River City Skinheads are in Haysville and Derby. The Hammerskins are in Hutchinson. The River City Skinheads business card has the word "Oi" in one top corner and the #88. "Oi" means common people, and 88 stand for "Heil Hitler". The letter "H" is the eighth letter of the alphabet.

## NAZI LOW RIDERS

Nazi Low Riders (NLR) originated in the California prison system and still derive much of their power from inside corrections facilities, the group has also become a vicious street gang in several areas in California.

WICHITA  090319 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

The Nazi Low Riders first gained recognition as a street gang in Costa Mesa in the early 1990s.  NLR members, who are mostly in their teens and early 20s, began to spread throughout California and eventually moved east when they were released on parole. Today, NLR is probably the fastest-growing white gang in California.  The group has spilled into Arizona, Nevada, Utah, and Oklahoma.  In 1996, there were only 28 confirmed NLR members.  In 1998, that number had risen to 331, with an estimated additional 1,000 members.

The gang's explosive growth is a concern for several reasons.  First, some members have been known to be heavily involved in the production and trade of methamphetamine. Second, gang members have also developed a reputation for being ruthlessly violent. Finally, and perhaps most disturbing, the Nazi Low Riders are vicious white supremacists.

NLR members exhibit extremely violent criminal behavior, both in prison and on the streets. They have developed a strong network within their own ranks and with other white power gangs.  Unlike earlier loosely affiliated racist skinheads, NLR is organized and motivated by profit.  NLR's tight criminal operations have helped to position it as the "gang of gangs" among white supremacists and a major force in the West Coast criminal world.

Although some observers argue that NLR's actions are based more on criminal motivation than racist ideology, both play an important role in the gang's profile.  The two fundamental requirements for NLR membership are that an individual be a proven criminal, and that he or she is willing to show loyalty to the white race.  The gang's white power message has also become an integral factor in the violent acts members commit.  As one NLR member said, "Hate is survival".

NLR members generally tend to focus their hatred on Blacks and "race traitors," defined as people who are involved in interracial relationships.  They have also expressed hatred for Jews, Asians and other minorities.  There appears to be an unusual paradox within the NLR;  a few NLR members have Hispanic surnames and members who have Hispanic girlfriends or wives are accepted into the ranks.  However, this is true only for Hispanics.  Blacks and other non-whites are not tolerated.  Some authorities have attributed this "alliance" between whites and Hispanics to a shared hatred of Blacks.  Others have concluded that NLR opposes only Northern Californian Hispanics because of criminal gang rivalries.  The alliance might also be explained by the fact that NLR members often live in primarily Latino neighborhoods where they are outnumbered.  One former NLR member explained, "You must have at least half white blood but no black blood".

Like most of those in gangs, NLR members have created a self-contained culture that includes graffiti, hand signals, tattoos, a dress code and culture.  Much of it is based on Nazi symbolism and icons, but the exact symbols of the gang vary from place to place.  For example, an NLR member in Huntington Beach might dress differently from one in Lancaster.  Unlike other skinheads, Nazi Low Riders do not adhere to specific rules on tattoos or dress, making immediate identification of gang members more difficult for law enforcement.

Although there is no single tattoo required of NLR members, symbols like the swastika, "SS" lightning bolts and other Nazi-related images, including pictures of Hitler, are widespread in the gang.  Some NLR members prefer eagles, skulls and demons.  Tattoos or patches with the numeral "88" (the eighth letter of the alphabet is H, hence 88 signifies "HH" or Heil Hitler) and "WP" (White Power) are also popular.  Abbreviations representing

WICHITA  090320 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

white power phrases such as "WSU" (White Student Union) and "AYM" (Aryan Youth Movement) are also common.

In addition to Nazi and white power-related tattoos that have been popular among other white supremacist gang members, NLR has its own versions. A tattoo consisting of the letters "NLR" is quite common and often appears on the stomach, back and neck, or in small letters above the eyebrows and on the knuckles. Some prefer the full words "Nazi Low Riders," often written in Old English script. For some, the runic alphabet (characters of any of several alphabets used by the Germanic peoples from about the third to the 13th centuries) is becoming a popular way of encoding a message about their white power gang affiliation. Recently, NLR members have been more reticent about admitting their NLR association, realizing that it can be a liability. Some have claimed that NLR signifies "never lose respect" or "no longer racist". Although most members tend to wear their tattoos proudly in visible places, some now opt for smaller, less conspicuous images in less visible spots.

With regard to dress, NLR members frequently wear white supremacist or Nazi paraphernalia such as T-shirts printed with a white power band logo, but they are becoming savvy enough to hide such clothes from law enforcement officials and the public.

NLR is considered dangerous because it is well organized and tightly knit. Its criminal operations are run efficiently through excellent means of communication. Letters called "kites" are exchanged between NLR members in prison and their counterparts outside. The letters often use the runic alphabet, making them more difficult for law enforcement to monitor.

As noted, NLR members are particularly dominant in the trade and production of methamphetamine, which is relatively easy to produce, and is both high in demand and very profitable. NLR members have established themselves in the business of running "meth labs" out of any place they can find, from million-dollar homes to motel rooms. In San Bernardino, NLR has created numerous meth labs. In Orange County, in Antelope Valley, and Riverside, the gang has become a major distributor of the drug. It is also likely that NLR is working with some motorcycle gangs in meth production and distribution.

NLR members are often addicted to methamphetamine, a factor that increases their proclivity towards violence. On the other hand, their use of drugs may keep them from organizing more effectively than they already have.

One unique aspect of NLR is the participation of females, who form the backbone of the gang. NLR depends on females, not only for personal and financial support, but also for the continuation of business operations when male members are incarcerated. According to an Upland law enforcement report, female members act as liaisons to meth users unaffiliated with the NLR. The females supply these addicts with drugs and sexual favors. Eventually, NLR members recruit these drug users through force and intimidation and coerce them to commit crimes. In addition, these addicts are often targets of NLR-organized robberies, whose profits go towards the gang's expenses and lifestyle. Since the victims engage in illegal activity, the crimes often go unreported.

Nazi Low Riders have participated in a wide variety of crimes outside of the drug trade, including credit card fraud, assault and illegal gun trafficking. Unlike traditional skinhead groups, NLR members are armed with much more than steel-toed boots and fists. Today, they often carry handguns, rifles and automatic weapons, many of which are illegal.

WICHITA  090321 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

While trying to prove themselves, gain "honor", and build a vicious image in the gang world, NLR has also proved to be a threat to law enforcement. In the spring of 1998, armed NLR members attacked two police officers in Torrance, CA. When one reached for an officer's gun, the officer's partner shot and killed him.

NLR is a criminal force to reckon with in California, and the gang could evolve into a national problem over the next few years. While NLR is predominantly in California, some members have already settled in Reno and Las Vegas, Nevada, and Lake Havasu City, Arizona. Authorities anticipate that NLR members will continue their eastward migration. Law enforcement's vigilant efforts in confronting the dangers NLR poses to public order and safety have been commendable. This report is intended to increase public awareness about the growing menace of this gang.

## WHY KIDS JOIN GANGS

Hopelessness generally exists in neighborhoods plagued by gangs. Youths who join gangs do not see other alternatives to an otherwise bleak life. An individual who lacks an education or trade skills may believe the gang will lead to power and money.

For many kids who have a bad home life, joining a gang can provide a sense of camaraderie, friendship, and family. Kids who are having problems in school or at home can experience success and gain confidence in a gang. When a person joins a gang he finds that he now commands respect, fear and recognition from his gang affiliation.

The gang provides a sense of security and protection within a mean neighborhood in which enemies are a part of daily life.

The gang life lures some individuals because it appear exciting and glamorous, an image created, in part, by the media.

Some people join gangs, because it is a family tradition. Their father or brothers are gang members. The decision to join a gang only seems natural when they come of age.

## GANG INITIATION

Gang initiations are bloody, brutal rituals that test a person's willingness to be a member of a gang. The initiation is designed to test mental and physical strength. Someone who flees in the face of danger, or someone who will not follow a gang's orders, is not a desirable candidate.

Street gangs use a variety of acts of initiation to induct an individual into full membership. These acts may include one or more of the following:

- "**Beat in**" or "jump in" - the inductee must prove him/herself by enduring a severe beating by a pre-determined number of members for a pre-determined number of minutes. During this act the members use fists, kicks and stomps, or even clubs to beat the new member. This is frequently called an "act of love". It is also, in many cases, an act of extreme violence. The new member, at best, may survive with broken ribs, cuts and contusions or maybe a broken jaw.

WICHITA  090322 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

However, the beating can be so severe that the person could suffer permanent injury, or even death.

- **Commit a crime** - inductee(s) may be required to commit such crimes as armed robbery, drive-by shooting, assault on an innocent victim, rape an innocent victim, and even murder.  The inductee might be required to kill an innocent victim, a rival gang member, or even a police officer.

- **Blessed In -** occasionally, a prospective gang member will not have to endure any of the normal gang initiation rituals.  He or she may be "blessed in".  This may be the result of the prospects reputation as one who is worthy of gang membership, or he may be a family member of a gang member who has vouched for his worthiness and loyalty.

- **"Sex in"** - female inductees are frequently "sexed in" by having intercourse with multiple members of the gang.  This is sometimes used in lieu of being beaten in.  It has been reported that females, on occasion, have been required to consent to sex with a person known to be HIV positive.

K.S.A. 21-4227 makes it illegal to recruit someone into a criminal street gang.

Getting out of a gang can be as violent as joining.  Many gangs require lifetime memberships.

Many street gangs require the person wanting to depart from the gang's way of life to endure a "beat out".  This beating frequently is more severe and more injurious to the member than the beating he/she may have taken to join.

Kansas state statute makes it a crime for anyone to threaten bodily injury, commit injury, threaten property or damage property as a way of deterring someone from leaving a gang or for punishment for leaving the gang.


**GANG MEMBERSHIP LEVELS**

There are several levels of commitment within the gang membership structure.  The easiest way to categorize or measure the level of commitment would be to sub-group members into three categories:  peripheral, associates and hard-core.

Peripheral members are those on the outer edge of gang activity.  They may wear the clothing and associate periodically with the gang.  They may not be fully trusted or accepted by the gang and are, therefore, not fully informed about gang activities.

Associates are those who are becoming regularly involved in gang activity.  These are probably the most dangerous because they are the ones that are trying to prove themselves and to make a name for themselves within the gang.

Hard-core members are totally committed to the street lifestyle and often perpetrate the most serious offenses attributed to their gang.  The leader(s) of the gang will normally be a hardcore member(s).

WICHITA  090323 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

Hard-core gang member status does not necessarily require a lot of time in, as a gang member.  The hard-core status can be attained easily by involving oneself in repeated acts of gang violence.

**DETERMINING GANG MEMBERSHIP**

Kansas state statute, K.S.A. 21-4226, defines a criminal street gang member.  The law says a person is a gang member if they admit to it or if they meet three or more of the following criteria:
1. A parent or guardian identifies them as a gang member.
2. If a law enforcement officer or correctional officer or reliable informant identifies them as a gang member.
3. An untested informant identifies them as a gang member and it is corroborated by independent information.
4. If they reside in or frequent a particular gang's area and adopts that gang's style of dress, color, hand signs or tattoos and associates with known gang members.
5. If they have been arrested more than once while in the company of identified gang members for offenses which are consistent with gang activity.
6. If they are identified as a gang member by evidence such as photographs, or other documentation.
7. If they have been stopped in the company of known gang members more than twice.
8. If they have participated in or undergone activities self-identified or identified by a reliable informant as a gang initiation ritual.

K.S.A. 21-4226 also defines a street gang associate.  An associate is someone who admits to being associated with a gang or they meet two or more of the above listed criteria.

Many police departments keep a database on gang members and in order to be placed in that database an individual would normally have to meet a specific criteria.

**DETERMINING INFLUENTIAL STATUS OF A GANG MEMBER**

Even when a person is identified as a gang member, very little is conveyed about the person's authority or personal involvement in the gang.  Among the varying degrees of membership, hardcore members are more likely to become leaders.

In determining how influential a gang member is within his gang, an officer should look at the following factors:  family background, criminal history, age, and experience.

**Family Background:**  If a gang member's brothers, cousins, father, uncles, and grandfather have all been gang members in his gang that would increase the amount of influence the gang member would possess.

**Criminal History:**  Members with a violent criminal history will have more prestige and power.

**Age:**  If one gang member is as violent as another, then the oldest will have more influence.

WICHITA  090324 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

**Experience:**  How long have they been in the gang?

**Money** derived from narcotic sales also can determine power and status within a gang.

## IMPORTANCE OF VIOLENCE IN THE GANG WORLD

Violence is used by gang leaders to test a gang follower's loyalty to the gang. Members who are willing to kill and commit violent crimes are less likely to go to authorities when the gang commits criminal acts.

Violence is used as a tool to control neighborhoods.  Individual gang members gain more power and better their reputation within the gang through the use of violence.  This use of violence also increases the fear the community has of the gang and betters the gang members reputation in the gang world.  Violence is also the primary form of gang retribution.

## RELUCTANT WITNESSES

People who are witnesses to gang crimes, are scared and concerned about gang retaliation and the gang dominance of their neighborhood.  Witnesses often reside in a community in which there exists a subculture that discourages being a snitch.

Witnesses may be involved in gang activity themselves.  Gang cases are often characterized by the rotating status of victim, witness, and defendant.

Many gang members who are victims of crime will not talk to law enforcement, preferring to handle the matter themselves.

## GANG MIGRATION

Street gangs have migrated throughout the country in a variety of ways.  A large street gang will dispatch members to start a chapter in a new city or neighborhood, to further some form of criminal activity.  This has been referred to as the "imperialist method".

Another way an established street gang can spread its influence is referred to as "franchising".  Often done to realize a profit from criminal activity, this method calls for an existing gang to contact local residents and recruit them into the enterprise.

Today, gangs are found in every state in the union.  The above techniques of gang migration have accounted for a small percentage of gang formation.

Gang culture has been exported throughout the country.  This was done with the help of the music and movie industries and through written and video media.  Gang culture has been electronically spread to every state.

A new street gang often will form because young people have an interest in the gang lifestyle, and will look for resources of information.  If possible, the curious will find someone who was, or claims to have been, a gang member in another location (e.g., a young person who recently moved into the area from a city, such as Chicago or Los

WICHITA  090325 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

Angeles).  This person now becomes the resident "gang expert," and the gang will shape its structure and rules by this person's information.  In addition, gang members and their associates watch movies and television programs depicting gang life.  From this they convert information for their purposes.

People are moving from the city into smaller cities and towns.  Some of them bring the big city gang sub-culture with them through their children.  Gangs were already present in the rural parts of the country; the impact of these families moving will only tend to magnify the gang problem.

In many instances, if a gang is formed in an area, sooner or later rival gangs will form.

## INTERACTING WITH GANG MEMBERS

Allowing someone to retain his dignity by showing him respect, despite who or what the person is, is an important step toward developing a relationship with gang members. Ninety percent of the time, a gang member will respond to an officer who is respectful.

Gang members generally do not care about your ethnic background, gender, religion, or physical appearance.  What's important is the manner in which you treat others and conduct your business. To gang members, it is important who you are, not what you are. Being fair, efficient, and knowledgeable (streetwise) are strong qualities for an officer to possess.

Contrary to the misconception that gang members do not snitch on one another, gang members do snitch; however they snitch for very specific reasons. A gang member may talk to the police in order to take out a fellow gang member, so that he gains more influence or power within the gang.  A gang member may hope to weaken a rival gang by providing an officer with information on that rival gang.  A gang member may "talk" to obtain a future "favor" from law enforcement, such as a reduced jail or prison sentence.  A gang member may talk to an officer if they feel certain the officer will not reveal the source of your information to other gang members. Gang members can become confidential informants.  As with any informant, an officer needs to understand the gang member's motives for providing information.

Because street gangs have become increasingly involved in drug-related crimes, the tactics outlined in the following sections have a strong drug enforcement orientation.  It is assumed that agencies have a thorough working knowledge of how to implement drug enforcement tactics.  Descriptions here are brief and primarily provide a context for such tactics in gang suppression.

## USE OF CONFIDENTIAL INFORMANTS AND UNDERCOVER OFFICERS

Two tactics employed by agencies in the gang suppression effort are the use of CI's and undercover officers.

The cornerstone of gang suppression efforts is cultivation and use of confidential informants (CI's).  Agencies usually employ this tactic despite its high cost in terms of maintenance, time, protection, preparation for court testimony, and possible eventual relocation.

WICHITA  090326 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

Working under the direction of investigators, CI's supply four major services:

- Purchasing drugs, weapons, and other items from, or selling them to, gang members who thereby expose themselves to arrest and prosecution.

- Introducing undercover officers to gang members to infiltrate, purchase or sell drugs, and collect essential information.

- Providing data, such as the location of crack houses and other business locations, assets held by gang members, the identity of gang leaders and violent members, past crimes and who committed them, planned crimes, MO's, addresses, and telephone numbers.

- Serving as witnesses at trials.

CI-supplied information about imminent clashes between gangs, including those at schools, or planned killings are of particular value to proactive suppression efforts. Gang investigators may be able to defuse gang fights or prevent murders by acting on tips from reliable informants. They may not only prevent the incident in question, but also prevent more violent gang warfare.

Generally, the most valuable CI is a member of the targeted gang; however, members of rival gangs, friends of gang members, or persons who are not affiliated with gangs but who compete against them in the drug market can serve as CI's and provide highly useful information. In some cases, agencies import professional CI's, often through the cooperation of Federal agencies, such as ATF.

A common range of motives applies to persons who decide to become gang-related CI's: money, revenge, fear, elimination of competition, prosecutorial or judicial leniency, and repentance. Some gang members, perhaps pressured by friends, commit themselves to the gang before fully understanding the scope of its violence and criminal activity. These individuals often develop reservations and seek a way to terminate their involvement. They may regard becoming CI's as an acceptable way to exit gang life, especially when faced with the possibility of arrest or lengthy incarceration. Frequently, the use of undercover officers is extremely difficult because of the nature and/or demographics of the targeted gang (for example, other cultures). Under the appropriate circumstances, however, undercover officers may achieve the following results through gang infiltration, or by other means:

- Drug buys made as part of either buy/bust operations or long-range investigations.

- Reverse stings.

- Provision of information that supports request for court-ordered electronic surveillance, and establishes probable cause for issuance of search or arrest warrants.

- Tapping or transmission of incriminating conversations with gang members.

- Identification of potential CI's.

- Identification of supplies of drugs and weapons to gang members.

WICHITA  090327 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

- Identification of gang members, gang assets, and location of drug houses.

**SURVEILLANCE/AREST, BUY/BUST, AND REVERSE STING OPERATIONS**

Three approaches to curbing drug trafficking by gangs are surveillance/arrest, buy/bust, and reverse sting operations.

One traditional approach to curbing open-air drug trafficking by gangs is surveillance, followed by the surveillance officer arresting parties to the transaction. Surveillance occurs from unmarked vehicles, buildings, or any other location providing a clear view of the market area.  Alternatively, the surveillance officer may observe transactions from a more distant point and identify the buyer and seller by radio to a jump-out squad, which then moves in and makes the arrests. The second approach reveals neither the surveillance officer nor the surveillance location.

Buy/bust operations have proved effective against gang members. In the most basic form of this tactic, undercover officers make drug buys and either immediately arrest the sellers, or signal jump-out squads.  In some scenarios, the arresting officers are hidden in the back of vans driven by the undercover buyers.  To better protect undercover identities, a variant of this tactic allows the undercover officers to make the buys and remove themselves from the scene; then backup units, which either observed the transaction, or were in radio contact with undercover officers, move in for the arrests.  Yet another variation avoids alerting targeted gang members until they all have made sales to either undercover officers or CI's, after which arrests are made en masse.

Each transaction is recorded on audiotape or videotape (preferably the latter), from which officers familiar with the neighborhood, often can identify the sellers.  The tapes also may be effective in persuading gang members to become CI's.

In reverse sting operations, which target drug buyers, undercover officers effect the arrests of gang members, or their customers, on charges of either purchasing drugs or, in States with the appropriate legislation, soliciting for the purpose of buying drugs.  In soliciting cases, actual drugs are not needed because the offense is triggered when buyers, at the request of undercover officers, show their money.  At that point, the undercover officers, in sight of surveillance teams parked nearby, direct the buyers to locations where drugs supposedly are available, or otherwise convince them to drive away, perhaps by expressing concern about police in the area.  The undercover officer videotapes the solicitation.  After a customer drives away from the solicitation scene, officers in a marked police vehicle intercept the customer, whose driver's license provides identification, and explain that the stops are routine because the area is dangerous and known for drug activity.  If appropriate, officers issue traffic tickets.  In any event, the stop serves to corroborate the solicitation, and the encounter with the uniformed officer is also videotaped. Arrests are made at a later time.

When undercover officers actually sell drugs during reverse stings, buyers are videotaped and, upon completion of the transaction, arrested by a backup unit, which may also seize the buyer's vehicle under State forfeiture laws.  Included among the many details that must be considered prior to such operations is protection of the drugs, avoidance of entrapment, officer safety, arrest and booking procedures, and, if a large number of arrests are expected, coordination with courts and corrections.

WICHITA  090328 (CONFIDENTIAL - SUBLET TO PROTECTIVE ORDER - )

**INTERDICTION, BARRIERS, SWEEPS, AND WARRANT EXECUTION**

Additional investigative approaches to gang enforcement involve the interdiction of gang drug supplies and the use of roadblocks, street barriers, police sweeps, and execution of warrants.

Interdicting gang drug supplies through traffic stops, must be supported by observation of illegal activity, or at least by reasonable suspicion. Searches of vehicles and occupants must be based on probable cause unless they occur as incidental to arrest, in conformance with the plain view exception, with the consent of the driver or owner, or in accordance with agency regulations governing impoundment searches.

Probable cause may arise during the interaction between officers and the driver and passengers, such as the detection of odors associated with marijuana or substances used to mask the smell of drugs; pry marks on the vehicle; or narcotics paraphernalia in plain view.

Some police agencies have established roadblocks, because of traffic congestion, due to street narcotics activity by gangs. These roadblocks involve checks of driver's licenses and vehicle registrations, and may result in arrests, not only for traffic-related violations, but also for drug-related offenses. If drugs are found, roadblocks may be regarded as a form of interdiction. Agencies often use roadblocks, in conjunction with other tactics, to target gang activity in a neighborhood, such as uniformed saturation patrol, undercover buys, reverse stings, and asset seizure.

Some agencies have erected street barriers, combined with increased police presence, in neighborhoods seriously afflicted with drug trafficking, drive-by shootings, and other illegal activity by gangs.

In Bridgeport, Connecticut's, Project Phoenix, for example, the barriers create a maze of dead-end streets in a neighborhood. This greatly reduces the ease with which drug purchasers can turn off the adjacent interstate, make their buys, and quickly return to the highway. If conditions improve enough to warrant dismantling the barriers, residents and the police must make a strong commitment to improve overall conditions and retain control of the neighborhood. Before other agencies proceed with this tactic, they must first consider how barriers also may inhibit the access of emergency vehicles (for example, fire and ambulance).

Police sweeps are intended to provide at least temporary relief to neighborhoods suffering from particularly intense gang violence or drug activity. A sweep can target criminal activity on the streets, in buildings (as in apartment complexes), or both.

To help ensure that criminal activity does not reassert its dominance after a high-profile sweep, one agency maintains an intense patrol presence in the area for the following 6 weeks. During that period, other city agencies begin to rehabilitate the neighborhood. For example, streets and alleys are cleaned and made passable, unoccupied buildings are boarded up, unsalvageable structures are demolished, and fire and housing codes are enforced. Subsequently, patrol officers identify the area's law enforcement needs on a continuing basis, and other city agencies also remain involved.

Because of the habitual criminality exhibited by hardcore gang members, a critical first step in gang enforcement is to determine whether outstanding arrest or bench warrants have been issued for them; if so, such warrants should be executed. Developing probable

WICHITA  090329 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

cause to support search warrants can prove highly fruitful.  For example, the Riverside, California, Police Department investigated gangs and related violent crimes, including drug dealing, for 2 months to prepare a 174-page search warrant affidavit.  The affidavit supported 100 warrants that targeted gang member residences in Riverside and the surrounding area. Following a detailed operations plan covering chain of command, communications, operational procedures and timing, and responsibilities of all involved, more than 300 officers from 35 agencies executed the warrants in 1 day.  The operation resulted in 55 arrests on various charges, including murder.   Officers seized 98 firearms (some fully automatic), explosive devices (including hand grenades), knives, and other weapons.

Search warrants, in support of crack house raids, may yield dividends, although in many cases, large amounts of drugs are not on the premises.  Gangs frequently use their own version of a just-in-time inventory system by supplying crack houses with small quantities of the drug on an hourly basis.  Stash houses are often more promising warrant-authorized raid targets, as are clandestine laboratories, although extreme caution is mandatory during their dismantling because of the dangerous chemicals that may be present.

## OTHER INVESTIGATIVE APPROACHES

Other investigative approaches to gang enforcement include surveillance, follow-up investigations in departments with gang units, and task forces.

As previously noted, surveillance is appropriate in many investigative contexts. Techniques applicable to gangs include use of listening devices, wiretaps, body wires, car-tagging devices for electronic tracking, audio and video equipment, and simple observation.

Wiretaps and listening devices are usually restricted to surveillance of major players and to investigations leading to prosecutions of gang members as participants in conspiracies, such as in Racketeer Influenced and Corrupt Organizations (RICO) type cases. Some agencies monitor audiotapes and have them reviewed by paralegals, detectives, investigators, and prosecutors for all pertinent gang intelligence, which is then entered into the gang database.

Agencies use surveillance techniques to identify stash houses, safe houses, crack houses, and street sales locations.  In a typical procedure, agency gang specialists conduct surveillances of crack houses and street sales locations, videotape the criminal activity, and if probable cause exists, make arrests or obtain search warrants.

As a case example, investigators working for the San Diego DA's Office taped state-of-the-art audio equipment to a CI's body to corroborate drug purchases transacted from the CI's vehicle, inside apartments, or in front of crack houses.  After each transaction, the agency recorded the CI's debriefing on the same audiotape used during the purchase.  The debriefing included the suspect's name, description, quantity of drugs purchased, and any other pertinent information.  During the 4-month investigation, the CI made 65 drug purchases from gang members, and the tape enabled the CI to prepare effective court testimony.

In another San Diego operation, a CI made purchases from a vehicle in which a video camera and microphones were installed.  The agency found videotaping more effective than audio taping for corroborating drug purchases because it eliminated the

WICHITA  090330 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

possibility of a defense based on false identification, a tactic often used by defendants and their attorney's.

Police agencies differ in the extent to which they use gang unit members to conduct follow-up investigations. Policies from two different agencies related to this issue are highlighted below. One agency states, "The [gang unit] will also concentrate on follow-up investigations. Through their expertise about gangs, the members of the unit have become adept at putting together cases with very meager evidence and, often, intimidated witnesses".

However, gang unit members, often required to be available around the clock, generally are careful not to become overly involved in follow-up investigations. They also need enough time to fulfill the unit's proactive responsibilities in areas such as intelligence and prompt responses to threatened gang incidents.

In contrast, the Gang Task Force (GTF) in another agency conducts follow-up investigations in conjunction with other investigative units on all criminal acts committed by targeted gang members. To identify crimes committed by gang members, GTF's criminal intelligence officer, who compiles a list of all crimes in which a targeted gang member is likely to be involved, reviews all police reports daily. The unit supervisor coordinates the follow-up investigations on those crimes. GTF conducts most of the investigations, but other units handle specialized investigations, such as homicides, sexual assaults, and arson. In those cases, a GTF officer is assigned to assist the investigating unit. Task Forces, whether composed of agencies within one jurisdiction or across jurisdictions (such as local-county or local-Federal), task forces offer a framework that often can magnify the effectiveness of investigations. Advantages associated with this investigative approach include:

- Availability of more resources than otherwise could be brought to bear, including personnel, skills, and specialized equipment.

- A pool of undercover officers (and perhaps CI's) whose identities are not known by local gangs.

- Avoidance of duplicate investigations.

- Ability to select from a wider range of laws on which to base investigations and prosecutions (best charge in best court) or to seek court permission to use investigative techniques such as electronic surveillance.

- Coordination in gathering and sharing gang-related information.

- Containment of the inter-jurisdictional mobility of some gangs.

A formal task force agreement can help participants avoid misunderstandings pertaining to interagency issues such as command and control, responsibilities, objectives, asset sharing, overtime, liability, insurance, access to confidential information, weapons policies, rotation of personnel out of the task force, cross designation, tactics, and funding.

Investigations leading to the arrests of gang members for violations of State or local firearms laws, may qualify for referral, via ATF, to U.S. attorneys for prosecution under one of the Federal Trigger lock statutes, which often carry stiffer penalties than those authorized by State firearms legislation. For example, a gang member convicted for the use or possession of a firearm during a crime of violence or drug trafficking receives a mandatory

WICHITA  090331 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

consecutive sentence of 5 years in Federal prison, even in the absence of prior convictions. Gang members violating another Trigger lock law, the Armed Career Criminal Statute, face 15 years to life in Federal prison.

Gang investigators may choose to pattern their investigations on the Federal Continuing Criminal Enterprise Statute, or its State counterparts, or on Federal or State RICO Statutes.  Gang members convicted under the RICO conspiracy approach, for instance, face not only incarceration, but also possible erosion of their economic base through asset forfeiture and injunctive relief.

Apart from RICO legislation, laws in all States authorize asset forfeiture in connection with drug trafficking, drug manufacture, and, in some States, other crimes.  Gang units often refer such cases to their agencies' financial investigation units, which may pursue forfeiture on either a criminal or civil basis.

In many States, gang investigations benefit from legislation based on the "mad dog pack" theory.  Under certain circumstances, such legislation holds individual gang members responsible for actions of the gang as a whole, even if they were not present when the crime was committed.  Perhaps the most widely known legislation of this type is California's Street Terrorism Enforcement and Prevention (STEP) Act.  Under this law, a single homicide and an attempted murder led to the prosecution of 32 gang members.  The outcome of this case included a 22-year State prison sentence for a gang member who was riding in the car from which shots were fired; a 3-year sentence for a gang member who, though not in the car at the time of the shooting, was present at a meeting where the shooting was planned; and a 2-year sentence for the head of the gang, who was neither at the planning meeting, nor in the car.  Whether agencies are able to take full advantage of investigations patterned on legislation, such as the STEP Act depends, in general, on how thoroughly agencies identify the gangs in their respective jurisdictions and how well they document the identity of each gang member (see Chapter 7 for details on the STEP Act).  Another frequently used investigative approach is to revoke the bail, probation, or parole of gang members whenever possible.

**SUPPRESSION THROUGH PATROL**

Another form of gang enforcement is suppression through patrol, which includes directed patrol and community-oriented policing.

Under a directed-patrol approach, agencies provide the relevant information about a gang-related problem, as well as, directives for action to uniformed officers.  Among other possible tasks within the problem neighborhood, officers overtly enforce drug and other criminal laws, as well as, local ordinances.  Visible police presence hinders gang street activities and encourages citizens to participate in safe outdoor neighborhood activities. Directed patrol can solidify an effective relationship between the patrol force and gang officers by increasing two-way communication and by assigning more resources to the gang problem.  For example, some patrol officers could be directed to work for a few hours each day on specified gang-related tasks, such as answering gang-related calls for service, gathering gang-related information, executing warrants on gang members, or carrying out gang prevention activities.

Directed patrol is an integral part of a multi-agency task force approach established in 1991, in the operations division of the Ft. Wayne, Indiana, Police Department.  It's Community Anti-Narcotics (CAN) concept advocates a more thorough approach in which a

WICHITA  090332 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

team of officers, under the direction of the community-policing supervisor, goes through five basic steps in each CAN operation.

Step 1, targeting, involves selecting a target area after analyzing crime data (for example, call-for-service, felony arrest, drug line, crime stoppers, and gang data) and conducting video surveillance. Several other police departments assist with Step 2, surveillance. Step 3, intensive undercover enforcement, lasts 2 to 4 weeks. One 2-week CAN sweep in 1992, resulted in approximately 50 arrests. Step 4 is saturation patrol. Step 5 is evaluation. In 1992, this involved door-to-door canvassing by CAN officers (reserve officers assisted in 1991), who also distributed crime prevention information and made referrals to city resources. Community-oriented policing, a proactive, decentralized, neighborhood-based approach, stresses close interaction and cooperation between citizens and uniformed patrol officers, who are frequently based at neighborhood substations. The community policing philosophy emphasizes identification and resolution of problems and conditions that cause crime, rather than focusing exclusively on individual incidents.

Ideally, neighborhood residents and police jointly define the problems, select the targets, and share in developing appropriate strategies. Solutions to underlying problems or conditions that contribute to neighborhood crime include removing abandoned cars, improving street lighting, converting pay phones to function on a call-out basis only, securing advance permission from business owners for police to enter private property (for example, parking lots and exterior stairs), and arresting and investigating gang members or other loitering individuals.

Many view community-oriented policing as an attractive option for addressing the fears and misapprehensions that often are prevalent among minority communities. As one gang unit commander explained, the agency must sell its anti-gang program to minorities so that they will not consider it a form of repression against their respective communities.

## SUPPRESSION THROUGH ENFORCEMENT OF CODES AND ABATEMENT ORDINANCES

Compliance with health, building, and zoning codes, as well as, nuisance abatement ordinances, may be enforced to close crack houses, clandestine laboratories, and other gang locations; to evict gang members from apartments used for drug-related purposes; and to otherwise control gang activity. For example, one agency produced evidence resulting in the eviction of 324 tenants for drug-related reasons over a 30-month period and, in some instances, used eviction threats as leverage to cultivate CI's.

In one jurisdiction, law enforcement and another city agency, cooperate to survey buildings in high-crime areas and determine whether codes are being violated. The legal owners of buildings with code violations are given 1 month to comply. If violations are not remedied within the allotted period, the property is fenced off and boarded up. If, after a series of additional notifications, the owner does not respond, the property is subject to demolition, or the city can rehabilitate the property for resale or conversion to public housing, to avoid leaving buildings in a boarded-up condition.

## CONCLUSION

No city, town, or neighborhood is totally immune from the threat of gangs. The first step in prevention is for those in authority to study the underlying reasons for gang formation: hopelessness, family, money, power and excitement. If communities meet

WICHITA  090333 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )

these needs, gangs will have a hard time establishing a foothold.  However, once gang involvement is suspected, authorities must take time to study the situation to determine the extent and type of problem they need to deal with.  A variety of social and law enforcement agencies need to become involved in the discussion process from the beginning.  Police and community members need to arrive at a consensus of how serious the gang problem is and then work together to combat any criminal activity.

WICHITA  090334 (CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER - )