# EXHIBIT 42

## Filed Under Seal

| | |
|---|---|
| **From:** | Watson, Donielle |
| **To:** | dlawatson@gmail.com |
| **Subject:** | FW: Youth Gang Strategies |
| **Date:** | Thursday, December 12, 2019 11:36:00 AM |
| **Attachments:** | StrategiesAddressGangActivitySupressionInterventionPrevention.pdf |
| | image002.png |

---

**From:** Moore, Donald <DWMoore@wichita.gov>
**Sent:** Tuesday, November 12, 2019 3:25 PM
**To:** Watson, Donielle <DWatson@wichita.gov>
**Subject:** FW: Youth Gang Strategies

Give it a look

---

**From:** Troy Robinson [KDOC] <Troy.Robinson@ks.gov>
**Sent:** Tuesday, November 12, 2019 12:43 PM
**To:** Moore, Donald <DWMoore@wichita.gov>
**Subject:** Youth Gang Strategies

Donnie,

You previously asked for resources identifying gang management strategies at the Youth level.  I came across the attached report.

It addresses strategies within West Virginia, yet the last 10 pages contain an OJJDP list of promising and proven programs with links.  It is a 2010 report, so I cannot guarantee all the links still work, but there are a lot of references listed.

Hope it helps.



**Troy Robinson, Intelligence Program Director**
**Security Threat Group Manager**

KDOC Enforcement, Apprehensions and Investigations
P.O. Box 1568, Hutchinson, KS 67504-1568
office: 620.625.7254 | fax: 620.728.3478 | troy.robinson@ks.gov
secure: troy.robinson@leo.gov | trobinson@mocic.riss.net

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Strategies to Address Gang Activity

Suppression, Intervention and Prevention



September 14, 2010

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
WICHITA 055298

# STRATEGIES TO ADDRESS GANG ACTIVITY

**Table of Contents**

**Page 4**       **Introduction**

**Page 5**       **Suppression**
1. Asotin County
2. Bellevue Police Department
3. Eugene (Oregon) Police Department
4. Kennewick Police Department
5. Lewis County
6. Lynnwood Police Department
7. Othello Police  Department
8. City of Renton
9. Seattle Police Department
10. Spokane County Sheriff
11. City of Tacoma
12. Thurston County Sheriff
13. Wenatchee Police Department
14. City of Yakima
15. Yakima County Sheriff

**Page 30**      **Prevention/Intervention – Washington State**
1. Bellevue Boys &  Girls Club
2. New Futures
3. City of Yakima
4. YMCA of the Inland Northwest
5. Girls on the Run
6. City of Seattle
7. Neighborhood House – Seattle
8. City of Tacoma
9. Greater King County Police Activities League

**Page 52**      **Programs from around the Nation**
1. Gang Resistance Is Paramount Program - Paramount, CA
2. Independence Youth Court – Independence, MO
3. Movimiento Ascendencia - Pueblo, CO
4. Operation Ceasefire – Boston, MA
5. Philadelphia Youth Violence Reduction Partnership - Philadelphia, PA
6. Responding In Peaceful and Positive Ways - Ashland, VA

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER               WICHITA 055299

7. Gang Prevention Through Targeted Outreach – Boys & Girls Clubs of America
8. Broader Urban Involvement and Leadership Development (BUILD) – Chicago, IL
9. Supporting Adolescents with Guidance and Employment (SAGE) - Durham, NC
10. Comprehensive Gang Model, Chicago, IL
11. East Texas Experiential Learning Center - Nacogdoches, TX
12. Breaking Cycles – San Diego County, CA
13. Tri-Agency Resource Gang Enforcement Team – Westminster, CA

**Page 88**       **OJJDP Promising and Proven Programs**
1. Youth Gangs
2. Youth Violence Prevention
3. Youth Gun Violence
4. Violence in Schools

## INTRODUCTION

This collection of strategies to address gang activity was put together at the request of a Washington State law enforcement agency that was experiencing moderate to severe gang activity.  This police department was doing a good job of keeping their community safe but was hindered, like all departments, with limited resources.  This compilation of successful strategies is designed to give local communities additional ideas on how their peers combat gangs.  Some of these strategies may be useful – with appropriate tweaking based on the needs of your particular community – while some may not be applicable.

The information is divided into four sections:  1) local law enforcement efforts, 2) local private and public prevention & intervention efforts, 3) programs from around the nation, and 4) OJJDP Promising and Proven Programs.  Please note that the programs from around the nation (section 3) are often very well funded and cannot usually be exactly duplicated with our often meager resources.  They have been included, however, as a resource to be studied with the expectation that one or two components from each program may be replicable in some form at the local level.

The intervention/prevention/suppression efforts detailed in this portfolio obviously do not reflect the entire effort in our state.  This publication is designed to be continually updated as new ideas are implemented and current ideas are submitted.  Please feel free to forward those efforts to the contact listed below.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER              WICHITA 055300

Many thanks are owed to those who contributed their ideas to this effort.

*Washington Violent Crime Prevention Partnership*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     WICHITA 055301

## SUPPRESSION

**Implementing Agency:**     **Asotin County Sheriff**
**Contact Name:**            **G.K. Bancroft**
**Contact Phone:**           **(509) 243-4717**
**Summary**

In Asotin County we have no gang issues per se. The gang members we do see are transient in nature and are usually related to bringing drugs into our area. We develop cases against those individuals and make the appropriate arrests. There are the assorted "wanna be" gangsters who cross the line and are arrested.

We have no local ordinances in Asotin County concerning gang activity. My office monitors trends and will take steps to enact ordinances if necessary. We rely on RCW at present for any enhanced sentencing for those who may be affiliated with a gang and their illegal activity in Asotin County can be tied to their gang affiliation.

**Implementing Agency:**     **Battleground Police Department**
**Contact Name:**            **Chief Bob Carden (formerly of Visalia, CA)**
**Contact Phone:**           **360-425-5200**
**Summary**

I received your request and wanted to let you know that for the last three years, until my recent appointment as Interim Chief in Battle Ground, Washington, I was Chief of Police in Visalia, California. This was after having served eight years in Marysville, Washington as Chief of Police. One of the primary reasons for my return to Visalia (having worked up through the ranks there earlier in my career) was to address gang violence. The year I returned, we had close to 100 drive-by shootings, so as you can see, gang activity was significant. We undertook a very aggressive effort to address this problem, and had tremendous success after three years of effort. Our strategies, while not minimizing our suppression efforts, focused a great deal on intervention and prevention, especially with regard to youth, family, schools and the faith based community. We also developed a strong program to address communication deficiencies with various ethnic and cultural groups.

If you would like to talk with me more about some of the programs that we found to be successful, I would be pleased to speak with you.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055302

**Implementing Agency:**    **Bellevue Police Department**
**Contact Name:**    **Detective Jeff Christiansen**
**Contact Phone:**    **425-452-4178**

**Summary**

Bellevue experiences loosely organized gangs, patterned after Southern California Sureno gangs that have no defined leadership and are comprised of predominately 14 to 18 year old males. The majority of the crimes they commit are pr4operty related and include car prowls and tagging, however they do on occasion commit some strong arm robberies and other violent crimes, generally when they are together and sufficiently outnumber their victims.

Bellevue Police Department (BPD) has a dedicated gang detective who monitors all gang related crimes as well as contact with gang members or gang associates as well as investigates gang crimes. This detective relies heavily on District Patrol Officers, School Resource Officers, and Neighborhood Officers to assist me in identifying any new gang members or any new trends.

1) School Resource Officers:
BPD currently staffs middle and high schools with assigned officers. These SRO's frequently provide the initial intelligence on prospective gang members due to their continual close proximity with the students. The student's gang involvement is often identified by gang-related raffiti written on their clothing or school accessories.

2) Neighborhood Officers:
There are officers that have been placed in store front locations in Bellevue that police their areas. They are mindful of gang activities and provide the gang detective with intelligence including activities and gang members.

3) Training of Bellevue Parks and Recreation activity and events personnel:
BPD offers educational training to the summer Parks and Recreation staff at the request of their Director. The training covers what to look for physically (tattoos, clothing and hand-written monikers) and behaviorally in terms of warning signs of potential gang behavior or affiliation.

4) Zero tolerance enforcement policy:
Officers are encouraged to take full enforcement action with all criminal law violations. Although King county Youth Center does not allow for booking of juveniles for many crimes, juvenile gang associates and members are generally booked when they meet the K.C.Y.C. parameters.

5) Regional Intelligence and information sharing:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    WICHITA 055303

Bellevue participates in the regional Gang Enforcement Team.  The team is a collaborative effort to address gang activity in the Puget Sound Region.  Information is shared in person and via e-mail with gang bulletins and intelligence documents.  GETEM also provides gang detectives and officers the ability to make inquiries which all other participating personnel can contribute.

6) Intra-agency intelligence:
   BPD maintains an internal document containing information of gang associates and members. This document allows officers to easily query the most active persons for warrants on a routine basis.

---

**Implementing Agency:**     **Clallam County Prosecutors Office**
**Contact Name:**            **Deborah Kelly, Prosecutor**
**Contact Phone:**           **360-417-2297**
**Summary**

We have some ongoing activity that always flies just below the radar. About every five to eight years we'll have some folks visit us from the greater Seattle-Pierce-Kitsap area who try to organize a conspicuous in-your-face presence usually among our juvenile population. Whenever that occurs, we resume our chronic offenders-special emphasis program meetings…vigorously prosecute everything with the police reporting all field contacts with our list of identified offenders to probation counselors…and gradually send the worst offenders off for lengthy prison sentences. Then it all goes dormant for another five to eight years.

---

**Implementing Agency:**     **Eugene Police Department, Eugene, Oregon**
**Contact Name:**            **Chief Pete Kerns**
**Contact Phone:**           **(541) 682-5111**
**Summary**

We have one Detective and one Analyst whose primary assignment is working on gang activity.  Their role is to identify gang members through investigation, and document them with the State of Oregon using statewide criteria which is based on many factors.  In this way we are integrated with agencies throughout the state that work on gang issues.  Additionally:

- EPD coordinates LEGIT (Law Enforcement Gang Intervention Team), which is comprised of police officers, analysts, Parole/Probation Officers, and Department of Youth Services. The goal is to share information and conduct multi-faceted gang investigations, facilitate intervention strategies for adult and youth offenders, provide a more global viewpoint of local gang activity, and provide reliable information to the School Resource Team.
- We coordinate with 4J and Bethel School Districts through our School Resource Team. The school resource team also provides feedback to LEGIT.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                WICHITA 055304

- EPD coordinates with community graffiti issues to identify and document gang graffiti. It is important that we differentiate between gang graffiti and tagging because gang graffiti is a good source of information about gang territory, gang composition and gang conflict.
- We provide resource to the public regarding gang issues in general, but also work with the community (e.g. neighborhoods) that is affected by criminal gang behavior.
- EPD coordinates with other agencies where there are investigations involving gang activity in order to facilitate the identity and eventual successful conclusion of these investigations. In the past two years, this has involved state and federal level investigations.
- We belong to national, regional and state organizations to stay current on gang trends.

In addition to this work that focused on street gangs, we have one Detective whose primary assignment includes working on Outlaw Motorcycle Gangs (OMG). OMG's differ from street gangs in that they are much more organized and their criminal activity resembles organized crime, as opposed to street level crimes. Because of that difference, the investigative activity differs:

- Belong to national, regional and state organizations that coordinate nationwide and regional gang information sharing
- Partner with State and Federal agencies that also work on OMG's to ensure seamless investigations across jurisdictional boundaries
- Work with other local jurisdictions to provide investigative assistance, training and OMG recognition information
- Ensure that timely, and accurate information is disseminated to police officers where OMG activity poses a safety risk

**Implementing Agency:**       **Kennewick Police Department**
**Contact Name:**              **Ken Hohenberg**
**Contact Phone:**             **(509) 585-4208**
**Summary**

From my perspective the most important thing to consider when dealing with criminal gang behavior is gathering good intelligence. It is critical that every police officer participates and works hard to gather good accurate information on gang members, associates and trends on the street.

KPD has a primary detective assigned as a liaison for all intelligence and works with our crime analyst to gather crucial information. We also have a dedicated gang officer who takes the lead on every patrol squad and special enforcement team to facilitate and coordinate information and intelligence.

 Another important aspect is the sharing of intelligence with other agencies. This is best accomplished with regularly scheduled face to face meetings. Again this is a major part of the intelligence gathering and sharing process. It also builds trust and relationships with the other participating agencies. These meetings should also include members from the legal department and code enforcement units of the participating jurisdictions.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055305

We also market what we do to an extent in the media. We want gang members to know that Law Enforcement is very interested in their activity, do not tolerate criminal gang activity and most importantly that they will be held accountable if they commit crime. We are relentless in dealing with criminal gang activity throughout the year. We continue to pull together local, county, state, and federal partners several times a year to execute a specific planned strategic criminal gang sweep. We focus our attention specifically on gang members. This focus includes rounding up suspected gang members, associates or others that harbor or facilitate their criminal behavior. The media can play an important role in public education of address criminal gang activity as well as sending a clear message that we do not tolerate this type of behavior.

We also use community outreach to get members of the public involved. We collaborate with local schools and members of the public to educate them on criminal gang activity. We hold regular meetings throughout the community and engage members of the public to learn about criminal gang activity. We currently have a focus group of law enforcement, educators, and community members working on the challenges of dealing with criminal gang behavior throughout our bi-county area in Benton and Franklin Counties.

I cannot stress the importance of building relationships with our federal partners in addressing these global issues. Good working relationships along with effective communication are paramount on addressing issues and have to start with our local partners. If local agencies cannot work and support each other it is difficult to bring in other federal agencies and expect them to resolve the issues for us.

| | |
|---|---|
| **Implementing Agency:** | **Lewis County** |
| **Contact Name:** | **Michael Golden, Prosecuting Attorney** |
| **Contact Phone:** | **(360) 740-1240** |

**Summary**

In Lewis County, we have had a burgeoning gang problem, which we are working very hard to nip in the bud. I have participated in public gang forums, talking with parents about the gang problem, who the gangs are and how to keep their kids out of gangs. That is part of our education and prevention role. Beyond that, we have a Gang Task Force, which is intended to be a clearing house of mostly-public information about the names and natures of the gangs in our area, what they are up to and who is openly self-identified as a gang member or wanna-be. For confidential information, we work closely with line officers and detectives from all local agencies, DOC, Juvenile probation, and CPS to make sure that we know who is who and what the relationships are between the various players. This helps us in prosecution because we have a better idea of why things are happening, who is likely to be willing to testify, and who might be lying to get someone else in trouble and who might be covering up.

When charging gang crimes, we plead and prove aggravators and enhancements to obtain long sentences. Where possible, we stack sentences, and we always stack enhancements. Two years ago, we

9

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055306

had several drive by shootings. By charging and proving an Assault 1 with a firearm enhancement for each person in the group fired-upon, we obtained a sentence of 90+ years. Others drive-bys resulted in sentences of 30+ and 60+ years. The drive-bys have stopped for now.

For statutes that are helpful in prosecuting gang crime, try RCW 9.101.010, 9A.46.120,  9A.48.105, 9.94A.030(12), (13) and (14), 9.94A.533(9), 9.94A.535, 9.94A.829 and 9.94A.833. The residential landlord tenant act also has a gang-related provision: RCW 59.18.510. Civil damages and penalties are available pursuant to RCW 4.24.330.

| | |
|---|---|
| **Implementing Agency:** | **Lynnwood Police Department** |
| **Contact Name:** | **Sgt. T.J. Brooks** |
| **Contact Phone:** | **(425) 744-6900** |
| **Summary** | |

I am the Sgt of Special Operations of the Lynnwood Police Department.  I have been a police officer of 29 years and in Special Ops for 19 years.

The mission of my unit is to identify criminal trends within our city and to address these problems using all legal means.  By our actions it is our goal to eliminate the problems; however, in the real world we understand we sometimes only move problems to another jurisdiction.

Whatever the problems involve a drug house, gangs, graffiti (taggers), burglars etc. we utilize every method to impact their ability to operate in our city.  Often times we use unconventional legal methods to complete these tasks.

Making it a hostile environment on the street for criminals, works.  We try to be at their every turn providing maximum attention to every illegal act regardless of how small. We often inform these criminals of our intent so they realize a change is necessary, jail is likely or relocating is an option.   We advise our patrol officers of these problems so they too can address any issues they encounter.

We often use partnerships with DOC, Mall Security, ICE, Transit, and other municipal, state or federal agencies to achieve our goal.  Especially when dealing with foreign nationals who are criminals or gang members.  If they don't take our actions seriously the final alternative is to solicit assistance from ICE.  Partnerships with other organizations or agencies have been invaluable to our success.

| | |
|---|---|
| **Implementing Agency:** | **Othello Police Department** |
| **Contact Name:** | **Chief Steve Dunnagan** |
| **Contact Phone:** | **(509) 488-3314** |
| **Summary** | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055307

Under the Washington's Landlord Tennant act if anyone who lives in or works in a multi family complex suspects gang activity they can report it to the property manager. Once reported the RCW requires the manager to conduct an investigation to determine if the complaint is valid. If it is valid the RCW requires the manager abate the problem. Remedies include being able to go right to the unlawful detainer for eviction.

Since the law says the complaint has to come from someone who lives or works in or around the building, law enforcement did not have a dog in the fight. The fix for Law Enforcement was to add gang activity in apartment buildings to their nuisance ordinances and include language that gives the police authority to put the manager on notice of their responsibility under Washington law.

 RCW 59.18.510 Gang-related activity--Notice and demand the landlord commence unlawful detainer action--Petition to court--Attorneys' fees.

(1)(a) Any person whose life, safety, health, or use of property is being injured or endangered by a tenant's gang-related activity, who has legal standing and resides, works in, or owns property in the same multifamily building, apartment complex, or within a one-block radius may serve the landlord with a ten-day notice and demand that the landlord commence an unlawful detainer action against the tenant. The notice and demand must set forth, in reasonable detail, facts and circumstances that lead the person to believe gang-related activity is occurring. The notice and **demand shall be served by delivering a copy personally to the landlord or the landlord's agent. If the person is unable to personally serve the landlord after exercising due diligence, the person may deposit the notice and demand in the mail, postage prepaid, to the landlord's or the landlord's agent's last known address.**

**(b) A copy of the notice and demand must also be served upon the tenant engaging in the gang-related activity by delivering a copy personally to the tenant. However, if the person is prevented from personally serving the tenant due to threats or violence, or if personal service is not reasonable under the circumstances, the person may deposit the notice and demand in the mail, postage prepaid, to the tenant's address, or leave a copy of the notice and demand in a conspicuous location at the tenant's residence.**

**(2)(a) Within ten days from the time the notice and demand is served, the landlord has a duty to take reasonable steps to investigate the tenant's alleged noncompliance with RCW 59.18.130(9). The landlord must notify the person who brought the notice and demand that an investigation is occurring. The landlord has ten days from the time he or she notifies the person in which to conduct a reasonable investigation.**

**(b) If, after reasonable investigation, the landlord finds that the tenant is not in compliance with RCW 59.18.130(9), the landlord may proceed directly to an unlawful detainer action or take reasonable steps to ensure the tenant discontinues the prohibited activity and complies with RCW 59.18.130(9). The landlord shall notify the person who served the notice and demand of whatever action the landlord takes.**

**(c) If, after reasonable investigation, the landlord finds that the tenant is in compliance with RCW 59.18.130(9), the landlord shall notify the person who served the notice and demand of the landlord's findings.**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055308

(3) The person who served the notice and demand may petition the appropriate court to have the tenancy terminated and the tenant removed from the premises if:  (a) Within ten days of service of the notice and demand, the tenant fails to discontinue the gang-related activity and the landlord fails to conduct a reasonable investigation; or (b) the landlord notifies the person that the landlord conducted a reasonable investigation and found that the tenant was not engaged in gang-related activity as prohibited under RCW 59.18.130(9); or (c) the landlord took reasonable steps to have the tenant comply with RCW 59.18.130(9), but the tenant has failed to comply within a reasonable time.

(4) If the court finds that the tenant was not in compliance with RCW 59.18.130(9), the court shall enter an order terminating the tenancy and requiring the tenant to vacate the premises. The court shall not issue the order terminating the tenancy unless it has found that the allegations of gang-related activity are corroborated by a source other than the person who has petitioned the court.

(5) The prevailing party shall recover reasonable attorneys' fees and costs. The court may impose sanctions, in addition to attorneys' fees, on a person who has brought an action under this chapter against the same tenant on more than one occasion, if the court finds the petition was brought with the intent to harass. However, the court must order the landlord to pay costs and reasonable attorneys' fees to the person petitioning for termination of the tenancy if the court finds that the landlord failed to comply with the duty to investigate, regardless of which party prevails.  [1998 c 276 § 5.]

Another idea would be to have all the businesses in town post their parking lots with no trespassing signs.  The sign would state the exact hours that the lot was off limits.  This would allow the police to contact people who are hanging around, cruising or milling around.  I am sure there are some jurisdictions where businesses limit access to their property to cut down on gangs loitering.

---

**Implementing Agency:**     **City of Renton**
**Contact Name:**            **Carlene Balcomb-Bartok**
**Contact Phone:**           **(425) 430-7362**
**Summary**
Grafitti Abatement

In the battle against graffiti, Renton City Council passed a new Graffiti Control Ordinance to help prosecute graffiti offenders and reduce the damages inflicted on property owners.

The city has also identified various 'hot spots' throughout the city and placed cameras in these locations to help identify and prosecute vandals and those guilty of graffiti activity.

In addition, the city will be hiring a part-time graffiti abatement coordinator to help manage the program, and is recruiting volunteers, partnering with local businesses and community members, providing graffiti-removal kits to graffiti victims with limited resources, and launching a comprehensive education campaign.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                WICHITA 055309

"Graffiti is a crime and it costs governments and our communities thousands of dollars to clean it up," said Mayor Denis Law. "Our goal is to make people think twice before committing an act of vandalism in the first place, and make them pay the price."

*The Graffiti Control Ordinance*

- Makes it illegal to possess graffiti paraphernalia with the intention of using it to deface public or private property.
- Allows the court to order those convicted of graffiti vandalism to pay damages to the victim, including the City of Renton.
- Allows public funds to be used for graffiti removal.
- Allows the city to assign up to a $5,000 liability to the parent of a minor who commits graffiti vandalism.
- Authorizes the city to offer up to a $300 reward for information leading to the identification and apprehension of any person who commits graffiti vandalism.

Wipe Out Graffiti, the city's anti-graffiti education campaign, encourages people to report graffiti, document it, and abate it quickly. People should call 9-1-1 immediately if they see "tagging" in progress.

The city has also established a graffiti hotline, 425-430-7373, where people can report existing graffiti.  To volunteer or participate in the city's program, to donate supplies for the graffiti removal kits, or to sponsor a community volunteer opportunity call 425-430-6624.

Graffiti has a negative impact on our community. It gives the appearance that our community is unsafe, which creates fear and devalues property.  Citizen awareness, reporting graffiti and immediately removing it has a positive impact on keeping the area graffiti-free.  If you are a witness to graffiti vandalism as it is happening, call 911, and give as much information as possible about the suspect(s) and the location.

In order to eradicate graffiti from occurring in our City, it takes a conscious team effort from everyone - *all* citizens of Renton, including all residents, and all business owners.  The City currently offers a $300 Reward to anyone who reports information that leads to the arrest and conviction of anyone caught tagging property of any kind within the city limits.

*What is the best way to prevent graffiti?*

- Rapid and continual removal is the best way to eliminate the problem. Studies show that removal within 24-48 hours results in a lower rate of recurrence. Commercial and residential property owners in Renton are responsible for graffiti removal on their property.

*What should a property owner do if they are hit with graffiti?*

- **Record It:** Take a picture of the graffiti before it is removed. Photographs will assist law enforcement in their investigation.
- **Report It:** Contact the Renton Police Department if you are hit with graffiti or if you notice a vandalism act in progress, call 911.  If you see that graffiti has been put up in the neighborhood, report it by email or call 425-430-7373.

13

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055310

- **Remove It:** Remove graffiti promptly and completely.

*How can I get rid of it?*

- Paint can be used to cover over graffiti on smooth, painted surfaces. It is a low-cost and relatively safe product compared to removing graffiti with some chemical solvents.
- Chemical removers can be harmful to the user and the environment. You should contact a professional to gather more information about these types of products.
- Pressure washing can be effective, using water or water in combination with other products to remove graffiti from a surface. It can, however, wear down the surface being treated.

*Is there anything else business owners can do?*

- Get educated. In turn, you can help educate others about the importance of reporting and cleaning up graffiti.
- Adopt a spot in your neighborhood and ensure it stays clean and free of graffiti.
- Add or improve lighting around your property to promote natural surveillance
- Organize a neighborhood watch--dedicate a meeting to graffiti and invite police / code enforcement.
- Make sure your property is well maintained and cared for. Nicely maintained buildings and grounds discourage vandalism.

| | |
|---|---|
| **Implementing Agency:** | **Seattle Police Department** |
| **Contact Name:** | **Lt. Carmen Best** |
| **Contact Phone:** | **206 684-5565** |

**Summary**

The Seattle Police Department has seven specific roles in the Seattle Youth Violence Prevention Initiative that have been implemented:

- School Emphasis Officers
- Street Outreach/Critical Incident Response
- Seattle's Gun Project
- Gang Unit Increase (One Afternoon Squad/ Two Evening Squads)
- Emergency Gang Response Management System
- Regional Gang Task Force
- Building collaboration among criminal justice agencies and community based organizations
- Youth Centers

**School Emphasis Officers**

The school emphasis officers program has four officers assigned to work within four Middle Schools and a fifth officer is assigned to Garfield High School. The four middle schools are Denny Middle, Aki Kurose, Mercer Middle, and Washington Middle School. The officers are Erin Rodriguez, Kevin Stuckey, Sam Braboy, and Nick Carter. The program has two pilot projects; one officer previously assigned to the school emphasis officer program will work with Juvenile Drug Court on interventions

14

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055311

with juvenile offenders. Another officer will be assigned to elementary schools doing prevention work with the youth in Rainier Valley. The School Emphasis Officers have recently completed a department training outlining the keeping of department records. Two of the officers will participate in the conflict resolution training that is supported by Weed and Seed and the Seattle Youth Violence Prevention Initiative. We have recently completed the School Emphasis Officer Manual which is currently under department review. The officers have worked well on bringing services to their individual schools.

## Street Outreach/Critical Incident Response

SYPVI Street Outreach is modeled after the Columbia Shaw Collaborative program in Washington DC. The Central Area Network (Urban League of Metropolitan Seattle) manages the Street Outreach program under Director Jamila Taylor. Street Outreach workers are required to complete a total of six phases of training and three specific trainings to be authorized to conduct street outreach. The modules of training include, Orientation, Ethics, Best Practices in Outreach, Interviewing, Conflict Resolution, De-escalation training, Legal Policy & Protocols, Resource and Personal Development . The protocol has been implemented. We have successfully been in contact with Street Outreach and other members of the community when a shooting with an injury has occurred.

## Seattle's Gun Project

Similar to Boston's Ceasefire program, Seattle has implemented similar strategies in conducting effective enforcement/investigations of gun related incidents. SPD has a partnership with ATF, and the WSP Crime Lab. ATF owns the IBIS equipment and the NIBIN Network. WSP Crime Lab provides the facility and scientific expertise, which facilitates the use of IBIS/NIBIN. SPD provides technicians to operate the IBIS/NIBIN equipment making entries and comparisons of shell casings under the scientific guidance of the Crime lab.

King County Police Chief's Association has agreed (December 2008) to mirror SPD in the handling and processing of recovered firearms and shell casings.

Specific Data that we collect as a matter of policy:
- All firearms are traced using the ATF eTrace system ATF terms this capturing the data on the *outside* of the firearm.
- All eligible firearms are test fired and the shell casings entered in IBIS. ATF terms this capturing the data *inside* the firearm
- All eligible recovered (recovered from scenes, non-police generated) shell casings are entered into IBIS/NIBIN. Comparisons are made between the entered shell casings linking related incidents.
- Both recovered firearms and shell casings are swabbed for DNA. These swabs are then available to the case detectives for submission to the Crime Lab

## Gang Unit Increase (One Afternoon Squad/ Two Evening Squads)

In the last year, SPD has increased the gang unit by almost double. An afternoon squad was implemented in April of 2009 along with the addition of a Gang Sergeant for one of the two evening squads.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055312

## Regional Gang Task Force

Regional Gang Task Force is a coordinated operational response currently being used in Seattle is to target gang-related crime by disrupting and dismantling gangs and their coordinated criminal efforts. In order to suppress the criminal enterprises of active gangs, span local boundaries, the SPD has convened bi-weekly meetings of a Special Gang Enforcement Workgroup, a multi-jurisdictional workgroup that includes local, state, and federal partners, including SPD, US Attorney's Office, King County Prosecuting Attorney's Office, Federal Bureau of Investigation, Department of Corrections, King County Sheriff's Office, Des Moines PD, Tukwila PD, Kent PD, Renton PD, SeaTac PD, and Federal Way PD. This valuable program has seen coordination from police agencies across three separate counties from Tacoma PD to Lynnwood PD. The workgroup meets bi-weekly to discuss current and active cases that span multiple jurisdictions and require a coordinated approach, and to share relevant information on active gang members.

## Collaboration

Building collaboration among criminal justice agencies and community based organizations is a twofold approach: 1) creating an open communication between the police department, King County Juvenile Probation and Detention and Parole.  This project helps bring clarity to existing investigations involving known gang members and youth engaged in violence 2) Due to safety concerns and a recent shooting at the YSC, SPD and the Youth Service Center have been meeting on how to improve safety during court hours. With the Youth Service Center being in a known gang area, rival gangs must enter this area for court which can cause a disturbance. We are working closely with the court system to identify potential disturbances and send SPD personnel or Street Outreach workers to reduce possible violence.

## Youth Centers

The Youth Centers is a program instituted by the Seattle Parks and Recreation giving youth a safe place to be when other places are closed. The Youth Centers have officers working closely with the youth interacting in scheduled activities. Currently, Garfield Teen Life Center is the only Youth Center open with Rainier Community Center opening soon.

| Implementing Agency: | **Spokane County Sheriff** |
|---|---|
| Contact Name: | **Sgt. Mike Kittilstved** |
| Contact Phone: | **(509) 323-7461** |

**Summary**

The Spokane County Sheriff's Department just completed an 18+ month investigation into several criminal gang organizations and their related drug distribution networks within Spokane County and Eastern WA.  Our takedown last week was the culmination of over 33 Federal Indictments and 28 State defendants.

First, partnerships are **essential** to any successful gang enforcement unit.  We value our partners at the Federal (particularly the FBI, Border Patrol and ATF), State (WA State DOC and Washington State Patrol) and the local agencies (Spokane Police, Spokane Valley Police, Spokane County Sheriff's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055313

Office).  Our unit was designated in January 2008 as an FBI Safe Streets Task Force.  They fund a significant amount of operations costs; salaries of assigned personnel still come from their host agencies.  The FBI also provides Secret and Top Secret security clearances and Federal credentials; thus, our Task Force Officers (TFOs) are allowed to operate within State and Federal guidelines and have access to sophisticated investigative techniques we have never had before on the local level.  This tool has been critical to our success in targeting gang leadership through very stiff Federal sentences; not only to remove those in leadership positions within the organized criminal gang elements but to also send a message that Spokane County (and Eastern WA) is not a friendly place for those committing serious crimes.

The TFOs assigned to this unit are assigned voluntarily and are very dedicated to the long hours and hard work necessary to make the unit successful in keeping our community safe.  The (SVCGET) maintains, equips, trains, and operates an efficient investigative component capable of immediate response to the most serious criminal acts of which impact federal and state jurisdiction, responsibilities and competencies including but limited to murder, armed robberies, weapons violations, kidnapping, RICO statute (Racketeer Influenced and Corrupt Organizations), drug trafficking violations and human trafficking.   While this description is the "official" description of the SVCGET provided in such documents as the recently completed Spokane County Comprehensive Gang Assessment (Assessment), the average Spokane County citizen values their work as the strong arm of law enforcement that is protecting our communities from hard core criminals and vicious crimes.  What the vast majority of the community doesn't realize is the complexity of garnering resources, intensive training, sophisticated techniques and equipment required, and the exemplary dedication of the unit members who put their lives on the line every day to protect our citizens.

The long standing partnership between the Spokane County Sheriff's Office (SCSO) and the Greater Spokane Substance Abuse Council (GSSAC) strengthens the collaborative efforts with the SVCGET to focus on reducing the impact of gangs in our communities.  GSSAC is our designated community organizer in regards to gang issues.  We have also had success in the schools through our collaboration with ESD101 on a prevention/intervention grant.  This grant formed the first task force of law enforcement, educators, administrators, School Resource Deputies, GSSAC and other community groups aimed at reducing gang related school violence in Spokane County.  The program has resulted in new presentations being created and then several hundred educators and parents having been trained in gang recognition.

**Implementing Agency:**      **City of Tacoma**
**Contact Name:**              **Lt. Bart Hayes**
**Contact Phone:**             **(253) 594-7984**
**Summary**
- Tacoma PD has a full time gang unit that is staffed by 6 officers, a sergeant and a representative from the Department of Corrections. The DOC representative has been

17

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055314

extremely helpful by allowing the officers to get into gang member apartments and residences that the officers would not otherwise be able to get into without a warrant. To date, our gang unit has seized more than $100,000 in cash and this can mostly be attributed to having a dedicated DOC officer.

- Recently one of our detectives working in conjunction with the Pierce County Prosecutors office and the South Sound Gang Task Force has done a large scale RICO (racketeering influenced criminal organization) investigation into one of our Crip gangs. Approx. 37 gang members were arrested for numerous felonies.  This is the first time the state RICO statute was used by a law enforcement agency in Washington. So far the majority of the suspects have pled guilty and only a handful of cases remain to be adjudicated.

- The Tacoma Police Department has recently started a "gang cadre". This is a program that will allow regular patrol officers to receive gang training and work with the gang unit several times a month. This will benefit all patrol officers by having more officers with gang knowledge on the street and it will benefit our gang unit by having a lot of extra gang officers to use for any future gang emphasis and to make permanent selections for the gang unit.

**Implementing Agency:**       **Thurston County Sheriff**
**Contact Name:**              **Lt. Chris Mealy**
**Contact Phone:**             **(360) 786-5508**
**Summary**

Gang activity in Thurston County has been a growing problem for the last couple of years. Recognizing this, local law enforcement agencies formed a working group to discuss information and what enforcement activities could be done in a cooperative manner.

Two federal grants were applied for and obtained. The result is the Thurston County Sheriff's Office Gang Enforcement Project. This project's purpose is to investigate, prevent, and impact illegal street gang activity within the unincorporated areas of the county in cooperation with local police departments, schools, and youth violence prevention groups such as Together.

Thurston County Sheriff's Gang Education PowerPoint Presentation:



18

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055315

### What is a gang?

- This definition is simple and functional:
- It allows the authorities to take a proactive approach to prevent a gang getting into an organized structure.
- Gangs can range from a loose knit group of individuals whom hang out together and commit crimes.
- Gangs can be a formal organization with a leader or ruling council, gang colors, gang identifiers, and gang name.

### Gateway to gang life

- Kid's/Adult's become:
- Intrigued by life style of gangsters.
- They will "hang" with them to prove their allegiance.
- They will commit crimes to prove themselves to the gang.

### Gateway to gang life

- Inspiring gang member's go through a initiation process once their accepted into a gang.
- The inductee will receive a physical beating from a set number of members of the gang the inductee is joining.
- The inductee will be punched and kicked anywhere on the body by the group of gang members.
- The inductee is not permitted to block any blows distributed by the gang.
- Most gangs will not allow a blow to the head since the injury cannot be concealed.
- If inductee survives beating, they become a member of the gang.



### Rules of a gang

- The violence committed to join a gang.
- Once becoming a gang member it is very difficult to get them out.
- A gang member will often wear certain color of clothing, make-up or obtain brandings or tattoo's.
- Clothing is often worn certain ways and usually affiliated with gang structure.

### Gang structure

- O.G.'s -   • Original gangster. They are in it forever.



### Gang Indicators

### Gang structure

- Hardcore –
  - Comprise of 5 to 10% of gang.
  - These are die-hard gangster's
  - Thrive on gang lifestyle/companionship.
  - Almost always the leader's and without them the gang may fall apart.
  - Gang violence determined by most violent hardcore members.

### Gang structure

- Regular members –(Associates)
  - Usually range from 14 to 17 years old.
  - Their job is robbery/theft.
  - They are money oriented.
  - They were initiated into the gang.
  - They will back up hard core members.
  - Stay in gang long enough they will become hardcore member.
  - Join gang for status and recognition.
  - They will wear gang colors, attend gang functions, and may participate in gang related criminal activity to fulfill their emotional need to belong.

### Gang structure

- Wanna-be's –
- Could-be's -

Age's 11 to 13 years old. (See below)

Age's 10 and under. (Usually exposed to gang life through family and/or living close to area impacted by gang activity)

Their jobs are tagging and stealing.

They are not yet initiated into the gang.

They will hang out with gang and do almost everything asked of them by gang.

They want to prove themselves worthy of the gang.

### Examples of Tagging/Graffiti

### Examples of various Gang signs

### Make-up of different gangs.

- Hardcore:
- They want all rival gangs dead.
- Their main objective is to make money and get rid of their rivals.
- Most of these gangs are African-American or Spanish/Latino decent.
- Recently Gothic or cult followings have taken the to the gang life.

### Make-up of different gangs.

- Scavenger gangs (Wanna-be's):
- Have no real backing from the "real" gangsters.
- They can be harmed or killed for using sect names.
- Usually trouble makers.
- Commonly found in Suburb's.
- Join gangs for the want to be "cool" and the intimidation factor.

### Make-up of different gangs.

- Territorial Gangs:
- They protect their block, neighborhood, or city.
- Their purpose is to keep their gangs in their neighborhoods and they join for respect.



### Girls and Gangs

- Girls attracted to gangsters:
- Want the "respect" they feel they will acquire once people see them dating gang member.
- Gang members will use them for their sexual enjoyment.
- Gang members very rarely get in a serious relationship with a girl that "hangs" with the gang.
- She can end up pregnant and most of the Gang member will abandon her and the baby.
- Girls will often be used for trafficking drugs and guns for gang members.

19

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     WICHITA 055316





**Implementing Agency:**      **Wenatchee Police Department**
**Contact Name:**            **Captain Doug Jones**
**Contact Phone:**           **(509) 888-4203**
**Summary**

The Wenatchee Police Department maintains within our Special Services Division (SSD) a core group of 4 officers and a supervisor known as our ProAct unit whose primary function is gang intervention and suppression.   Our SSD leads the department in implementing our comprehensive gang strategy focusing on Prevention, Intervention, and Enforcement action plans (see attached WPD gang strategy document).   On the enforcement end, we've found success (reduced gang related violent crime) in suppressing gang activity through swift, aggressive, and comprehensive investigation of gang incidents.  Calling out and committing our 4 officer team immediately after an incident occurs increases our ability to locate and arrest suspects and sends a clear message to gang members that WPD response to their crimes will be swift and comprehensive and they will be caught and held accountable.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055317

## WENATCHEE POLICE DEPARTMENT

**2008 – 2010 Strategic Plan**

## Comprehensive Gang Strategy

Wenatchee Police Department recognizes there are criminal street gangs operating in the City of Wenatchee.  People who are members of or affiliate with these criminal street gangs live within the city limits as well as in other areas within the Wenatchee Valley.  In addition, gang members come from surrounding areas, including, but not limited to; Quincy, Chelan and Bridgeport.

Gangs have been in the Wenatchee Valley for many years and continue to create problems, most notably, increased criminal activity that affects our community's quality of life. WPD has devoted various resources towards combating this problem (gangs and gang activity) and the solutions have met with varying success over the years.

WPD is seeking to implement a new strategy to deal with gangs, gang recruitment and gang activity.  We recognize that any strategy put in place has to partner with members of the community, businesses, schools and especially other groups involved with criminal justice, in order to maximize the potential impact.

Chief Tom Robbins recently wrote a letter to the state legislatures, in support of a gang related bill, which ultimately failed.  In his letter, Chief Robbins wrote; "It is most evident that gang members and associate willfully commit serious crimes against persons and property and demonstrate absolutely no respect for the law abiding citizens of our community." Chief Robbins also pointed out that juveniles join gangs for a variety of societal reasons and he referred to the 2006 assessment by the Office of Juvenile Justice Delinquency Prevention, which completed a study on the gang issue in Wenatchee.  Chief Robbins stated; "Unfortunately, regardless of the reason, these youth are functioning as criminals and are a clear and present danger to our citizens and very destructive to public and private property." Finally Chief Robbins recognized that the best chance for real success would be to reduce the number of youth involved in gangs and see them lead productive lives (a larger societal problem), but that unless we aggressively enforce laws and bring the violators to justice and hold them accountable on a long term basis, the problem will continue to worsen.

In response to the continued and escalating gang problems in Wenatchee, WPD formed a work group to present strategies to deal with this issue.  This group included the following personnel: Officers Miller, Johnson, J. Reinfeld, Chance, Geiger, Martin, Thompson and Sgt. Dresher.  These officers represent gang officers, patrol officers and a school resource officer.  Several meetings were held resulting in this comprehensive plan to reduce gang related crime and the impact such crimes have on our community.

Comprehensive Gang Strategy, Page B-1

Part of our mandate in developing this comprehensive gang strategy was the result of the new WPD overall Strategic Plan and Mission Statement.  We would refer the reader to those documents for further information on the purpose and need for this comprehensive gang strategy.

The gangs referred to in this document are "criminal street gangs".  The primary activity of these gangs involves criminal activity.  The age of the gang members varies widely (although a typical age range is from around 15 years old to around 23 years old) and the types of criminal activity gang members are involved in varies even more.  The reality for the Wenatchee Valley is that most of the gang members here are Hispanic, although there are a few gang members from other ethnic groups.  Regardless, the Wenatchee Police Department does not direct resources based on a persons ethnic group, but rather on their behavior relating to criminal conduct.

It is recognized that the goal of dealing with gangs must incorporate various responses and levels of intervention.  Early on in the process we decided to come up with strategies for the following levels of response; Prevention, Intervention and Enforcement.  This three-prong approach also mirrors the final report recommendations of the 2007 Washington State Legislative Work Group on gang related crime.

At the time of the final compiling of this comprehensive gang strategy, WPD has reorganized part of the department.  This includes renaming the Neighborhood Resource Team (NRT) to the Special Services Division (SSD).  At some point (anticipated to be the summer of 2008) the intent is to increase the number of officers in that unit and to integrate the two gang officer positions into SSD.  Some of these officers will form a "PROACT" unit, attached to SDD and they will be tasks with gang investigations and coordination of gang related tasks.

The state legislation also formed a Gang Related Work Group, which just returned its study and suggestions (January 2008).  Any results or actions taken at the state level, as a result of this study, may impact our abilities to deal with gangs within the City of Wenatchee.

**Prevention:**

Prevention would best be applied to younger "at risk" youth.  One source indicates this age would generally be from around 11 to 13 years of age.  In addition, parents would benefit from prevention strategies as they look for information and tools to prevent their kids from joining or associating with gangs.  Community members would also be a focus in this area (ie. Block Watch).  Active gang members and "associates" would not be a primary focus in this area.

**Intervention:**

This area targets associates, younger brothers and sisters of gang members, parents, classmates, etc.  In addition, police officers would be involved in this area in respect to training them in identifying gang members, problem areas, etc.

Comprehensive Gang Strategy, Page B-2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

WICHITA 055318

**Enforcement:**

Law Enforcement is best suited to deal in this area. Enforcement would include arresting gang members, active patrols, zero tolerance, bike patrols, etc. Partnering with other criminal justice organizations would also benefit the enforcement aspect. We believe most of our time (Law Enforcement) will be spent in this area. As part of this, gang members need to understand that actions have consequences!

Many tactics or strategies will span more than one area or category listed above.

In addition to dividing this comprehensive strategy into these three areas, we also attempted to detail three timelines for implementation. These are; Immediate, Soon and Future. The intent is to keep from having "lofty goals" that are always waiting to be implemented.

**Immediate:**

Strategies that can be put into effect now and which require little or no preparation to implement.

**Soon:**

Strategies which can conceivably be put into effect within a few months. These strategies might need more planning or may be dependant upon other factors such as the development of a process, money, additional officers, etc.

**Future:**

Strategies which will be implemented further into the future than a few months. These strategies might depend upon new laws, research, manpower, money, developed processes and/or programs, etc.

The layout of this comprehensive gang strategy document will list actions for each area (Prevention, Intervention and Enforcement) and each action in those areas will be marked as "Immediate, Soon or Future". A timeline will be forthcoming, listing in chronological order what specific actions can be implemented immediately, soon or in the future.

At the end of the Enforcement section, we'll cover laws. These include current laws in which we need to continue to enforce or start enforcing, and laws that we should consider implementing in the City of Wenatchee (i.e. Curfew).

Definition of a gang:

RCW 59.18.030 states:
"Gang" means a group that: (a) Consists of three or more persons; (b) has identifiable leadership or an identifiable name, sign, or symbol; and (c) on an ongoing basis, regularly conspires and acts in concert mainly for criminal purposes.
"Gang-related activity" means any activity that occurs within the gang or advances a gang purpose.

I. **Prevention:**

1. **G.R.E.A.T. program (FUTURE — Some research has been done but at this time the school district can not dedicate the necessary time to the program)**
   - Any future implementation of this program will depend greatly upon the availability of the school district to participate. Without their participation, this program will not be possible.
   - This is an established program, similar to the D.A.R.E. program, but oriented around gangs.
   - G.R.E.A.T. stands for Gang Resistance Education And Training.
   - The program is geared towards kids in the 6th grade (11-13 years old).
   - An officer assigned to this would go to an 80 hour training course then be committed to "fulltime" instruction of students in schools, for 13 weeks.
   - We would suggest this position be filled by someone from the Special Services Division (SSD) or by a third gang officer position (more on that later).
   - Federal grant money is available if we qualify.

2. **Gang information pamphlets (IMMEDIATE — We have pamphlets)**
   - Gang information pamphlet to distribute to at-risk families or those living in affected geographical areas.
   - The pamphlet contains:
     ◆ Information about gangs and what to look for to determine if kids are moving towards a gang.
     ◆ Information about parental rights and responsibilities.
     ◆ Current laws affecting both the kids and the parents.
     ◆ Finally, avenues or suggestions to assist parents or citizens in dealing with gang problems.

3. **Block Watch (Future — Per WPD strategic plan, scheduled for January of 2009)**
   - Bring back a Block Watch program, especially in gang affected areas.
     ◆ This function will rest with the SSD Division.
     ◆ The potential benefits of this program are well recognized.

4. **Parental Interaction (SOON — Possible implementation when SSD evolves)**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055319

> Interaction with parents during parent/teacher conferences. Set up a "booth" with the information pamphlet and to answer questions. The dates for this type of event would dictate who would perform this function; SSD, Gang Officers or Patrol.

5. **Internet and Media (IMMEDIATE — Some work has been done on the web site already. Further implementation when SSD evolves. )**
   > Develop the Police Department web site and create a section regarding gang awareness and information. Create a URL or link on that site for citizens to enter data or send an email, to give information about gangs or gang activity.
   > Use the radio to give information and get community input/ideas. PSA's can be done and talks like the "Take 2" program can be done.

6. **WPD Gang Officers (IMMEDIATE — Already in effect, but needs to be maintained)**
   > Maintain a viable gang unit/officers at WPD
   > The Departmental Strategic Plan is to increase the personnel in the SSD and integrate the two current gang officer positions into that unit and form a PROACT unit as part of SSD. With this structure, there will be a central focus for gang investigations and activity, which will work with shift gang officers.
   > Continued gang training for officers tasked with additional gang investigations responsibilities.
   > Continue sending gang officers to conferences, when appropriate, to update intelligence/training.
   > Maintain communications (mostly through email) with "The Wagon", which is an email based state gang information group (connected through ILGIA — The International Latino Gang Investigators Association).
   > Encourage participation in state gang issues (i.e. State gang advisory board) when possible.
   > The officers working in SSD are valuable as a full time effort into the gang problem.

7. **Addition of Officer/Corporal to SSD  (SOON — Anticipated to occur in summer of 2008)**
   > Bringing the Special Services Division to full strength (as outlined in the proposal) will allow that unit to be fully utilized and increase our (WPD) ability to deal with gang related issues.
   > Officers assigned to SSD should have an interest in dealing with gang related issues.

8. **SRO's (IMMEDIATE — Continue)**
   > Continue the School Resource Officers and their interaction with our local schools. They are a great asset in dealing with gangs in the schools, dealing with parents and with gang intelligence information.

*Comprehensive Gang Strategy, Page B-5*

II.  **Intervention:**

1. **Identify at-risk youth and attempt intervention (IMMEDIATE — Continue)**
   > These youth may be the younger siblings of gang members or they may be others who have been identified by a variety of sources or means as "at-risk".
   > Home visits or school contacts with the kids and the parents.
   > The gang information pamphlet can be a starting point.
   > Counseling with the kids should occur and they should be given information on some other "outlets", like the community center, night court, etc. as well as the negative results of being in a gang (age appropriate conversations of course).

2. **Public presentations (IMMEDIATE — Occurring already and needs to be strengthened through SSD)**
   > These can be as a result of requests or department initiated.
   > Again, these presentations can be based on information in the gang pamphlets as well as in power point or other material.
   > These will occur at the schools, churches, service clubs or other locations as requested.

3. **Parental contacts (IMMEDIATE — Occurring already and needs to be strengthened through SSD and patrol)**
   > Upon arrests of juveniles for gang related crimes, contact should be made with parents. The gang information pamphlet should be given to these parents.

4. **Police training/resources/reports/stats (IMMEDIATE — In progress and needs to be strengthened through SSD)**
   > Periodic shift training on gangs and related topics (done by gang officers)
   > Gang officer continues to publish a gang update, at least monthly.
   > Establish a report box in the squad room, where gang related reports can be kept for officers to review.
   > Add data fields to current Incident/Supplemental report forms, for gang related information (at least a field to indicate "Gang Related").
     ❖ This would mostly be for statistic gathering purposes to assist with future trends, needs, etc.
   > Identify problem areas and post these areas on the board.
     ❖ Develop a usable form, to assist officers in determining why an area is a problem and what could be done to help eliminate or reduce the problem (i.e. add street lights, cut down trees, focus on a particular gang house).
     ❖ Have a list of resources available for officers who wish to work on the problems.
   > Train officers on the importance of including gang background information on arrest reports dealing with gang members, especially when they are arrested for gang related crimes.

*Comprehensive Gang Strategy, Page B-6*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055320

    ❖ Shift gang officers can assist with this
- Conduct a yearly statistical analysis of gang activity from reports and other sources.
  - ❖ This would be done by the gang officers and reviewed at a staff meeting.
  - ❖ While measuring how our gang strategy is working may be difficult, this process would be of assistance in this goal.

5. **Graffiti clean-up (IMMEDIATE — Occurring already, but needs to be strengthened through SSD)**
   - Establish a routine graffiti documentation and clean-up procedure.
   - Encourage participation of VIPs and community volunteers
   - Partner with paint supply businesses for supplies
   - Establish a "court approved" procedure to get juvenile offenders to assist in painting over graffiti
     - ❖ Work with Juvenile and Court Commissioners.
   - Modify the city ordinance and change the mandatory clean-up from 15 days to 7 days. This allows us to get the graffiti painted over quicker and creates less liability when we go out and paint over the graffiti.
   - Place spray paint cans and graffiti remover in the trunks of patrol cars, so officers can do quick paint-over's.
   - Work with VIPS to establish a "routine" for paint-over's.

6. **Various types of patrols and focuses. These are outlined under the "Enforcement" section, for continuity, although they could easily fall into the "Intervention" and even "Prevention" categories.**

## III. Enforcement:

1. **High Enforcement Area Target – H.E.A.T. (IMMEDIATE — Occurring)**
   - This involves patrol shifts adopting a strategy of working in High Enforcement Area Target locations.
   - These locations are established by the gang officers or can be situational dependant (i.e. active gang members in a certain area).
   - Ideally each patrol officer would make it a point to spend 15 to 30 minutes in a designated HEAT location, per shift.
   - For example;
     - ❖ Methow Park is designated a HEAT location. One officer (no matter their assigned area in town) spends 30 minutes at the park. The officer could walk the park, sit on a bench, talk with people or just sit in his car by the park
     - ❖ The 700 block of Cashmere is a HEAT location. Another officer (no matter their assigned area in town) spends 15 minutes in the 700 block of Cashmere. The officer can sit in his car, walk the sidewalks, talk with people or make contacts with neighbors.
     - ❖ All officers on a shift will make an effort to spend the allotted time in an HEAT location.

2. **Pro-Active Gang Enforcement (P.A.G.E.) Patrols (IMMEDIATE — Occurs but needs to be strengthened through SSD)**
   - One or two days a month get all of our gang officers together to work gang emphasis.
   - Under normal circumstances, officers work an "altered shift" to accommodate this.
   - Officers work whatever hours fit the plan and work together as a unit to work on gang related issues.
   - Officers also conduct a monthly gang meeting and training during this time.
   - Two consecutive days are ideal and officers need to coordinate this with their supervisors.
   - We have already done this on two consecutive months, with great success!

3. **Partner with Non-Police agencies (SOON — Occurs, but still needs work)**
   - With DOC to arrest DOC gang members violating DOC restrictions/requirements. This will also include assisting DOC with home visits of gang members on as regular a basis as possible.
   - With Federal authorities when possible, including BATF, FBI, ICE, to seek more severe sanctions or other assistance with gang members.
     - ❖ As part of this, shift training will be done to let officers know what requirements are needed by these agencies for them to "adopt" a case.
   - Utilize intelligence information officer (Shawn Mahood) for information and dissemination of information.
   - City of Wenatchee Code Enforcement Officer
   - HUD Housing Authorities
   - With groups such as the C.A.F.E. Group. This group has already been approached. They may be willing and capable of assisting with interaction with the Hispanic community affected by gang activity. We need to determine what level of involvement they would have and exactly what role they would play. Corporal West is the contact person for this group.

4. **Coordinate with Chelan County Prosecuting Attorneys (CCPA) Office and the Wenatchee City Attorney (IMMEDIATE)**
   - For any gang enforcement to be effective, we need to work with CCPA/City Attorney.
   - Our ultimate goal in working closely with CCPA and the City Attorney is to prosecute gang members, who commit gang related crimes, to the fullest extent possible.
   - Hold periodic meetings at the administrative level with these attorneys. Discuss this comprehensive gang strategy and how to best work together to accomplish successful prosecution of gang members.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    WICHITA 055321

➢ Shift training will be done with officers to further train them on fulfilling the requirements necessary to help CCPA/City Attorney to their jobs.

5. **Partner with area Police agencies (SOON — Some progress, needs to be strengthened through SSD)**
   ➢ Start with CCSO – to form a coordinated gang response unit.
   ➢ We need to communicate with CCSO (and other agencies as we develop this) to have them commit one or two Deputies to meet with our gang officers for gang intelligence sharing and training.
   ➢ Encourage CCSO to take part in the PAGE patrols.
   ➢ Limit the operational range of our participation. In other words, if Douglas County wanted to join this effort, we wouldn't want to commit our Officers to Bridgeport gang enforcement. However, our local gang members live and play in Malaga, E. Wenatchee, Cashmere, etc. There is value in our officers, as part of the PAGE patrols, arresting the gang members in areas even outside the city limits, as this gives the message that they can't hide if they are wanted by the police and are members of a gang that's active in Wenatchee.
   ➢ Participation by CCSO (and other agencies) can benefit both them and WPD.
   ➢ Include DCSO and EWPD in the process.
   ➢ Continue working with the C.R.D.T.F. and encourage our gang officers to interact with this unit. Working narcotics related cases against gang members is an effective way to deal with them, as many gang members are involved in the use and distribution of controlled substances.

6. **Pro-Active shift patrols (SOON — Occurs when manning allows and needs to be strengthened through SSD)**
   ➢ These patrols will be manned by patrol shifts officers and/or gang officers and would focus around neighborhoods affected by gang activity.
      ❖ Marked units (2 officers minimum)
      ❖ Unmarked vehicle patrols (2 officers minimum)
      ❖ Bike Patrol (2 officers minimum)

7. **Strict Enforcement philosophy towards gang related activity (IMMEDIATE — Work in progress)**
   ➢ Gang members should expect to be arrested and WPD offices will arrest gang members for all gang related criminal activity.
   ➢ Encourage appropriate officer safety pat downs of gang members when on contacts with them.

8. **Technologies (FUTURE — Constantly needs to be monitored/updated)**
   ➢ Utilize technologies available to assist in dealing with gang members
   ➢ Cameras
      ❖ The G2 Sentinel camera system, which was procured through TTP. Place this item in gang affected areas to locate or record gang related crime. This item needs to be placed in a "secure" location.

      ❖ Option 1 – Install city maintained cameras at high gang impact areas.
         ○ These more costly cameras would be either permanent or moveable by officers/City Employees.
         ○ They would transmit video to an established location, like River Com or be self-sustained (record to their own unit).
      ❖ Option 2 – Purchase an inexpensive wireless camera system, which can be placed in affected areas.
         ○ The cameras would be relatively cheap, so if one was stolen it wouldn't be a major loss.
         ○ They would be placed as need arises, by officers.
         ○ Establish a location for the receiver/recorder for these cameras on a case by case basis.
   ➢ Crime/gang tracking database software
   ➢ Other technologies like; GPS trackers, covert audio/video devices, photo capability on MDT's, firearm simulation devices to train officers (Sims), etc.

9. **LAWS (SOON/FUTURE — Work in progress)**
   ➢ Utilize current laws and examine other potential laws, to assist us in dealing with this issue. All of these laws should be outlined in some form in the gang information pamphlet.

   ➢ Current laws
      ❖ 6A.18.090 — Trespass – This existing law has recently been bolstered by a written trespass process relating to city parks and property (a 45 day written trespass process, ordinance # 2006-43). This should be used judiciously when appropriate with gang members.
      ❖ 6A.06.090 — Malicious Mischief – This existing law is most used on "minor" graffiti cases.
      ❖ 6A.07.030 — Graffiti prohibited – This law makes it unlawful for persons to do graffiti within the city. This law has not generally been used by officers. We should determine if this law can be used in conjunction with the Malicious Mischief law.
      ❖ 6A.07.040 — Graffiti (notice of removal) – This law dictates that property owners will cover over graffiti on their property within 15 days of a notice being served on them by the Police. As earlier suggested, this statute should be reviewed and revised.
      ❖ 59.18.510 — Gang-related activity – Notice and demand the landlord commence unlawful detainer action – Unfortunately, this law is almost useless. It's meant to protect other occupants, tenants and neighbors from having to put up with someone living with/near them who are engaging in gang activity. The statute is cumbersome and requires the property owner/tenant to put themselves at a level of risk. Still, if situations arise where this can

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                WICHITA 055322

be used, it should be.  See proposed laws below for a possible resolution by implementing a city code.

- ❖ 9A.82.050 — Trafficking in stolen property first degree – A person who knowingly initiates, organizes, plans, finances, directs, manages, or supervises the theft of property for sale to others, or who knowingly traffics in stolen property, is guilty of trafficking in stolen property in the first degree (Class B felony).
- ❖ 9A.82.050 — Trafficking in stolen property second degree — A person who recklessly traffics in stolen property is guilty of trafficking in stolen property in the second degree (Class C Felony).
- ❖ 9A.82.060 — Leading organized crime — A person commits the offense of leading organized crime by:
  - ○ (a) Intentionally organizing, managing, directing, supervising, or financing any three or more persons with the intent to engage in a pattern of criminal profiteering activity (Class A felony); or
    (b) Intentionally inciting or inducing others to engage in violence or intimidation with the intent to further or promote the accomplishment of a pattern of criminal profiteering activity (Class B felony).
  - ○ There's a need to establish a "pattern of criminal profiteering" (see attached sheets for full descriptions)
- ❖ 69.50 — All laws under the Uniform Controlled Substances Act, including drug related seizures.
- ❖ 10.105.010 — This is the Felony Seizure law.  We have already started using this law. This law basically allows for seizure of property used for or gained from any felony, upon conviction of a person for that felony.
- ❖ Other crimes, such as: Drive-by Shooting, Assault, Criminal Conspiracy, Obstructing, Perjury, Theft, etc.
- ❖ While not a "typical" law, there are rules governing gang activity at school — WA 148-120-100 (gangs and schools), which governs gang activity, dress, etc. at school.
- ❖ Gang Definitions
  - ○ Use the RCW definition of "Gang" RCW 59.18.030
  - ○ 10) "Gang" means a group that: (a) Consists of three or more persons; (b) has identifiable leadership or an identifiable name, sign, or symbol; and (c) on an ongoing basis, regularly conspires and acts in concert mainly for criminal purposes.
  - ○ 11) "Gang-related activity" means any activity that occurs within the gang or advances a gang purpose.

➢ **Proposed Laws**

Comprehensive Gang Strategy, Page B-11

- ❖ Curfew — Curfew laws have to be crafted carefully to fall within what the courts consider constitutional, but there are working curfews in the state, including in Tacoma and Toppenish.
  - ○ Here is Tacoma's curfew law as an example (from the TPD web site):
  - ○ To ensure the safety of Tacoma citizens, especially minors, the Tacoma Police Department enforces curfew regulations for children under the age of 18. These regulations make it unlawful for children to loiter, idle, or play unsupervised in parks, playgrounds, beaches, vacant lots, or other public places and buildings between the hours of midnight and 6 a.m. each day. Additionally, it is unlawful for children to loiter, idle, or play unsupervised on public highways, throughways, or other right-of-ways, whether on foot or by vehicle, at any time. This law does not apply to a minor accompanied by his or her parent, guardian, or other adult responsible for child care and custody, or in situations where the minor is upon an emergency errand or legitimate business directed by the parent, guardian or adult supervisor. Violation of this ordinance will result in a civil infraction for the child, and can result in the same for the supervising adult if they knowingly permit the minor to violate this regulation
- ❖ Possession of graffiti materials by minors prohibited (This law is in initial proposal stages with the city).
  - ○ There are several examples of this law around the countries.  Basically it prohibits minors from possessing items commonly used to cause graffiti.
  - ○ A Los Angles example specifically prohibits the possession of these items "in designated public places".
  - ○ For Wenatchee, we might attempt to only regulate possession between certain hours, like between 10:00 pm and 5:00 am (when most graffiti occurs)
  - ○ Or the possession might have conditions, like "possessed at a time, location and circumstance when the items were reasonably intended to be used to cause graffiti"
  - ○ See attached law sheet for examples.
- ❖ Public Nuisance/premises used by gangs
  - ○ Possible wording (taken from a Denver CO code) – It shall be unlawful for any owner, manager, tenant, lessee, occupant, or other person having any legal or equitable interest or right of possession in any real property, vehicle, or personal property, to intentionally, knowingly, recklessly, or negligently commit, conduct, promote, facilitate, permit, fail to prevent, or otherwise let happen, any Class one or Class two public nuisance in, on, or using any property in which they hold any legal or equitable

Comprehensive Gang Strategy, Page B-12

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055323

interest or right of possession. Every day on which a violation exists shall constitute a separate violation and offense.

- An example of a "class one" activity -"Any gang-related criminal activity"

○ Possible wording (taken from Dade CO, FL)  The Board of County Commissioners of Miami-Dade County, hereby finds and declares that any places or premises which are used as the site of the unlawful sale or delivery of controlled substances, prostitution, youth and street gang activity, gambling, illegal sale or consumption of alcoholic beverages, or lewd or lascivious behavior, may be a public nuisance that adversely affects the public health, safety, morals, and welfare.

- For the purpose of this article the following definitions shall apply: Public nuisance: Any place or premise which has been used on more than two (2) occasions within a twelve-month period: "(2) By a youth and street gang for the purpose of conducting a pattern of youth and street gang activity"

- And a section from the Denver code could be added: "a) Gang related criminal activity: means any criminal violation of federal law, state law, or City Code committed by two (2) or more persons, acting jointly, through a conspiracy, or in complicity, where those persons are members of the same association or organization which has as one (1) of its purposes the commission of crime."

❖ Gang recruitment — Recruitment of juveniles for criminal street gang.
   ○ Possible language;
   ○ Any person age eighteen years or older who solicits, invites, recruits, encourages or otherwise causes or attempts to cause a juvenile to actively participate in or become a member of a criminal street gang shall be guilty of a gross misdemeanor.

❖ Anti-Gang law — This law has been in the news lately and Sunnyside is apparently the first Washington city to implement it. There are similar laws in California and other states, with much the same language. Yakima, Toppenish and Grandview are among the cities looking at this law and have or are in the process of implementing their own, similar laws.
   ○ Basically the law makes it a misdemeanor to be a gang member (This summary is simplified).
   ○ Grandview is looking to modify the law adopted by Sunnyside.  Their version will focus "on making it easier to

punish intimidation, harassment and other gang like activity rather than having to prove gang membership", in order to ease the "burden of proof" that someone had to be in a gang.  Their version will also make gang membership a crime, too.
   ○ With the lack of state laws covering gang activity and the recent failure of the anti-graffiti/gang enhancement law at the state level, cities have moved towards local laws.
   ○ A movement by cities across the state, especially if their laws are similar, might have an impact on gang activity.
❖ Other laws that may help curb criminal street gangs

This document is a "living document"; meaning changes will be made based on information available and in order to adapt to changing trends and times.

Respectfully submitted,

WPD Gang Strategy Work Group:

Sergeant Kevin Dresker            Officer Phil Thompson
Officer Brian Miller              Officer Gary Geiger
Officer Jared Reinfeld            Officer Rick Johnson
Officer Tracy Martin              Officer Brian Chance

(Updated January 5th, 2008)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER            WICHITA 055324

**Implementing Agency:**   **City of Yakima**
**Contact Name:**   **Kathy Coffee**
**Contact Phone:**   **(509) 575-6050**

**Summary**

Gang Free Initiative

The Yakima Police Department has prioritized gang enforcement for a number of years.  The Gang Enforcement Unit was formed in 2004 in response to an increase in gang activity.  The ProAct Unit was formed in 2007 with an emphasis on property crimes. Both units are now focusing on gang activity and related crimes.  Combined, these two units comprise 14 highly trained law enforcement officers.

It is estimated the police department spends approximately 7% of its resources (not including the dedicated funds for GET, ProAct, and Community Services) in gang suppression.  This represents **$1,444,800** of the department's annual budget not including capital fund expenses.

This number includes staff and personnel time for administration, policing, corrections, crime analysis, and clerical duties.  Also included is fuel, prisoner housing, and general supplies related to gang enforcement.  This is only an estimate and is likely conservative as we know our detectives spend a considerable amount of their time dealing with gang related crimes.

*Gang Enforcement Team (GET):*

Formed in 2004, this unit specializes in developing information related to gang activities, works with BATF to develop firearm cases against gang members, and oversees the department's gang database, (now GangNet).  While this is primarily a suppression unit, at times the officers may find themselves in the role of prevention and intervention.

| Gangs | 2010 Salary | 2010 Benefits | *2009 Overtime | Total |
|---|---|---|---|---|
| Sergeant | $86,809 | $26,770 | $18,870 | $132,449 |
| (6) Officers | $432,483 | $137,000 | $51,740 | $621,223 |
| | | | | **$753,672** |

*actual cost of overtime in 2009 – difficult to project 2010 overtime

Initially the GET Unit vehicles and equipment was funded by a Justice Assistance Grant for approximately $110,000.

*ProAct:*

28

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055325

Formed in 2007 and funded with the Library Tax with the unit's initial focus to address property crime. The unit has been redirected to focus on gang activity and related crime. ProAct works an opposite shift of GET unit to ensure 7 days a week coverage of a specialized unit to address gang activity. ProAct is considered a suppression unit.

| Pro Act | 2010 Salary | 2010 Benefits | *2009 Overtime | Total |
|---|---|---|---|---|
| Sergeant | $85,382 | $31,071 | $4,736 | $121,189 |
| (5) Officers | $368,792 | $119,188 | $36,747 | $524,727 |
| | | | | $645,916 |

*actual cost of overtime in 2009 – difficult to project 2010 overtime

*Community Services:*
In addition to the suppression activities described above, the City invests additional resources into intervention and prevention efforts through the Police Department's Community Services division. The majority of the unit is housed at YPAL with the primary responsibility to implement the department's crime prevention programs; i.e., block watch, VIP's, CFRH, YPAL, SRO's, and GREAT. The SRO's and GREAT officers work in the various schools, but are considered a function of Community services.

It is difficult to place a percentage of this unit's time to actual gang prevention, intervention, or suppression. Many of their duties overlap into the three disciplines, especially those of the SRO's.

Working on the concept that reducing gang activity and involvement is multiple disciplines, it is reasonable to assume all of these officers are committed to reduction of gang activity in some form or other, mostly prevention and intervention.

| Com Svc | 2010 Salary | 2010 Benefits | *2009 Overtime | Total |
|---|---|---|---|---|
| Lt. | $95,241 | $33,525 | $3,043 | $131,809 |
| Sergeant | $82,988 | $30,904 | $9,316 | $123,208 |
| Officer | $74,239 | $28,205 | $11,773 | $114,217 |
| GREAT Sgt | $78,268 | $24,829 | new position | $103,097 |
| (4) SRO's | $330,736 | $117,463 | $24,132 | $472,331 |
| PSS 2 | $43,768 | $20,483 | $5,357 | $69,608 |
| PSS 1 | $35,892 | $15,207 | $2,684 | $53,783 |
| | | | | $1,068,053 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055326

*actual cost of overtime in 2009 – difficult to project 2010 overtime

| | | |
|---|---|---|
| 7% of Budget | | $1,444,800 |
| GET | | $   753,672 |
| ProAct | | $   645,916 |
| Community Services | | $1,068,053 |
| | **TOTAL** | $3,912,441 |

*Yakima Police Athletic League:*
Staffed by a Sergeant, Police Officer, and PSS2 and overseen b y a Lieutenant the YPD community Services Unit offers a variety of programs at the YPAL Center such as boxing, wrestling, bowling, PAL-Achievers, recreation room movies nights and Manners Matter.  On any given date there are approximately 500 current YPAL youth members.

Summer activities include a golfing program that emphasizes sportsmanship and etiquette.  Youth will also be offered day long activities including breakfast and lunch provided by the Yakima School District

*School Resource Officers:*
The Yakima Police Department has four (4) police officers assigned to work in the Yakima School District.  The officers' salaries are split between the school district (75%) and the city (25%).  SRO's handle all calls for police service on the school campuses.  Their duties include campus security, classroom instruction, interacting with students and staff and serving as a positive image of the Yakima Police Department.

## PREVENTION/INTERVENTION

**Implementing Agency:**     **Bellevue Boys & Girls Club**
**Contact Name:**             **Kathy Haggart**
**Contact Phone:**            **(425) 454-6162**
**Summary**
The Bellevue Boys & Girls Club was contacted in 1995 by the Bellevue Police to help them get some young men who were involved in gang activity around the Crossroads area involved in some positive activities.  It was felt that they were turning to gangs because they didn't have anything else to do.  We opened a computer lab in a public housing site (where most of them lived) and it was just cool enough and cutting edge enough to attract them.  Of course, they stole all of the hard-drives out of the computers the first week, but ended up bringing them back when they realized they were just hurting themselves.

30

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER              WICHITA 055327

Crime (not just specifically due to gangs) dropped 33% in that neighborhood in the first 6 month, and police calls due to juveniles committing violent acts dropped 55% - this was all documented by the police.  We ended up opening 3 more Clubs in public housing.

| | |
|---|---|
| **Implementing Agency:** | **New Futures** |
| **Contact Name:** | **Kendra Han, Program Director** |
| **Contact Phone:** | **(206) 248-9467** |

**Summary**

New Futures mission is to create communities where children thrive. We operate four community learning centers in low income high crime apartment complexes in South King County. We work primarily work with refugee and immigrant families whose children are most at risk of school failure and the most difficult to reach with the support they need to succeed in school and in life.

*What Makes New Futures Unique:*
New Futures' on-site, integrated, and culturally competent service model allows us to work very effectively with the children and youth who are at greatest risk of school failure living in the families that are the most difficult for schools and other social service agencies to reach. We attribute our long-term success at partnering with these communities to three essential characteristics of our work:

1) *Neighborhood-Based***:** New Futures operates year-round at the apartment complexes where the families we serve live, providing very easy access to our programs for both children and their parents. Our staff members develop trusting relationships with the residents and are considered friends and neighbors. To be as accessible as possible, our centers are often open in the evenings, and people do not have to make appointments to meet with staff.

2) *Integrated:* Helping children thrive is a complex undertaking. By partnering with families, local schools and teachers, apartment property management, and more than 50 other community agencies, our programs help children and parents simultaneously address challenges at an individual, family and neighborhood level.

3) *Responsive:* Since our inception, our programs have been created in response to families' stated needs and interests, and have incorporated their values. Our programs are more effective because they are the result of collaboration between staff and participants to ensure they are relevant to people's lives. Our staff members receive extensive cultural competency training, and reflect the communities they serve.

New Futures Youth Program is offered four days a week for2-3 hours after school, at our four community learning centers. The program goals are to enhance social support networks, promote academic achievement, increase self-esteem, and foster positive peer interactions. Youth are acknowledged and nurtured for the strengths and skills they bring to their community. They receive daily help with homework and academic planning. Throughout the year, youth help plan and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER       WICHITA 055328

participate in fun, healthy recreational activities that strengthen their positive social networks, connect them with caring adult mentors, provide opportunities to explore college and career options, allow them to enjoy new experiences, and develop leadership skills. Examples of activities include break-dancing lessons, volunteering at local senior centers and food banks, field trips, and movie nights.

Our Youth Coordinators ensure that youth are completing needed credits for high school graduation and to pursue post-secondary education and career goals, organize visits to local colleges, and invite Youth Program alumni to come back and talk to youth about their college experience. Youth Coordinators also act as liaisons between school, parents, and youth, helping to ensure that students are attending school, meeting academic goals, and thinking about their futures. They meet with students, teachers and counselors; help students and parents address concerns; and intervene when students are struggling.

**Implementing Agency:**     **City of Yakima**
**Contact Name:**           **Kathy Coffee**
**Contact Phone:**          **(509) 575-6050**
**Summary**
Gang Awareness Campaign
LAUNCH:
    A One Hour television special produced in both Spanish and English covering who gets involved in gangs, why they get involved, signs to look for if child is getting involved, things a parent or guardian can do to keep kids out of gangs, and a source to call if help is needed.  The special was aired at 7:00 PM on Saturday, April 10th at no charge on the following "local" stations:

- KAPP (ABC) in English
- KCYU (FOX) in English
- KIMA (CBS) in English
- KNDO (NBC) in English
- KYVE (PBS) in English
- KVNW (Univision) in Spanish
- V-Me (PBS) in Spanish

A 30" public service campaign was then launched on Monday, April 12th for 12 (twelve) consecutive weeks and $37,500 (thirty-seven thousand five hundred) was raised for this campaign which all "local" media matched on at least a one-for-one basis with many two for one. Seven total 30" spots/print ads were created and run in three consecutive flights of 4/12-5/9, 5/10-6/13, and 6/14-7/4. The following local media were included:

1. PRINT:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER            WICHITA 055329

o  Yakima Herald Republic - Full color, three column by six inches, 73 total ads in English
o  El Sol - Full color, three column by six inches, 73 total ads in Spanish

2.  RADIO:
  o   Gap Broadcasting /KFFM – 30 second spots, 148 total in English
  o  New NW Broadcasting /KXDD – 30 second spots, 134+ total in English
  o  LUNA Broadcasting/ 2 stations – 30 second spots, 225 total in Spanish

3.  TELEVISION:
  o  KAPP TV (ABC) – 30 second spots, 498 total in English
  o  KCYU TV (FOX) – 30 second spots, 293 total in English
  o  KNDO TV (NBC) – 30 second spots, 387 total in English
  o  KIMA TV (CBS) – 30 second spots, 285 total in English
  o  KYVE (PBS) – 30 seconds spots, 150 total in English
  o  KUNW TV (Univision) – 30 seconds spots, 455 total in Spanish
  o  V-Me (PBS)- 30 second spots, 150 total in Spanish

The following organizations contributed to the campaign (in order of dollar commitment)
- Yakima City Police Department
- United Way of Central Washington
- Yakima Valley Community Foundation
- Yakima Downtown Rotary
- ESD 105
- YCTV (City of Yakima )
- Total Value of Campaign (Estimated) $100,000+

   In addition, 18,000 brochures were printed (9000 in English and 9000 in Spanish) for distribution as well as 50 DVDs of the original television special (25 in English and 25 in Spanish) to compliment neighborhood presentations. Copies of both are included with this recap.
        The place to go for assistance was our local 211 phone bank. The call kept increasing as the campaign continued to a point where they became almost overloaded with requests for additional information and/or places parents or guardians could go for help in keeping their children out of gangs or if their child was already involved in a gang. It has now leveled off at a lower rate but calls still coming in.
        Our specific thanks to the ad hoc committee that created the content and facilitated the production and scheduling.
Ad hoc committee:
- Mr.  Mike Sheppard, Publisher Yakima Herald Republic
- Mr. Bob Berry, General Manager KUNW/Univision
- Mr. Ken Messer, General Manager KYVE (PBS)

33

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055330

Talent:
- Sgt. Dave Cortez-City of Yakima Police Department
- Lupita Mason- Yakima School District

Brochure content:
- Anna Marie Dufault- ESD 105

| **Implementing Agency:** | **YMCA of the Inland Empire** |
|---|---|
| **Contact Name:** | **Chris Knowlton** |
| **Contact Phone:** | **(509)777-9622 #115** |

**Summary**

Hello Mark, My name is Chris Knowlton and I am a Teen Program Director for the YMCA of the Inland Northwest in Spokane Washington. I was given your request from my supervisor and she asked me to respond to your questions. I currently manage our youth outreach programs that serve youth involved with juvenile court. In our youth services, we do not have a special program just for gang affiliated youth. The only criteria for the youth we serve are that they are involved in some capacity with the Juvenile Justice System. I have been working with "at-risk" youth for 13years.In that time I have served youth from first time offenders on a diversion contract to hardened gang affiliated youth serving extended sentences. I personally feel the most effective, innovative prevention and/or intervention program that we use is not so much a program but a method of relating to these young adults. The first step my staff and I attempt to accomplish is to help the youth grasp the possibility that adults in their community do care about them. We work with them because we believe that their life matters and they have potential to be a successful contributing member to our community.

We utilize the search institutes 40 developmental Assets which show that a young person is more likely to succeed if they have more assets present and working in their lives. We approach each juvenile offender with this in mind. Youth in our community need positive adult role models who believe in them. Our goal is to show them a different and better way in which they can live. I have attached a flyer with some information about one of our programs. We feel what youth need is someone who is willing to be their friend and cares enough to help. In my experience if we want youth to change for the better, we need to target their inward character which will reflect with a change in their outward behavior. The more positive role models that youth have the better their chances will be. If you have any questions, please contact me.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                WICHITA 055331

## Purpose

- Friends & Servants is a YMCA program focused on serving troubled youth and juvenile offenders in the greater Spokane area.

- The purpose is to Intervene and Invest in the lives of troubled youth. To break the cycle of hopelessness and self-destruction, and to empower them to succeed.

- We are committed to provide support, guidance, opportunity, and encouragement, to meet the physical, emotional, and spiritual needs of local youth.

## Who We Serve

Young men and women, From 13-19 years old
Referred by the juvenile justice system to fulfill court required community service and restitution. Typically these youth are lacking support, guidance, resources, and role models in their current situations.

## Our Mission

The mission of the YMCA is to put Christian principles into practice through programs that build healthy spirit, mind and body for all.



YMCA Spokane Valley Branch
Friends & Servants
Mirabeau Point
2421 N. Discovery Place
Spokane, WA 99216



Breaking the Cycle of Hopelessness

35

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055332

## Program Goals

- Build meaningful and trusting relationships with troubled teens.
- Model and share the love of Christ.
- Provide opportunities to develop self-worth.
- Assist youth in fulfilling court required community service and restitution.
- Provide work training and job opportunities.
- Encourage them to look ahead and set goals for their future.
- Assist them in exploring and pursuing educational and career options.
- Help connect them to other resources in the community.

## Work Experience Projects

Providing youth with an avenue to fulfill court requirements while giving them a positive work experience and introducing them to values, principals, and skills that will help them succeed in the workplace.

- Lawn Care and Landscaping Services
- Community Service Projects
- YMCA maintenance

*Special Thanks to The Moyer Foundation for providing equipment.*



## Support and Assistance

Additional services providing practical help, instruction and positive relationships

- One on one mentoring and goal setting
- Group fellowship and bible studies
- Employment assistance
- Educational/Vocational assistance
- Recreational activities

## How You Can Help

**Program Volunteer:**
Work along side kids in the various Work Experience Projects

**Support Volunteer:**
Assist with special events, fundraising, recreational activities, and community relations.

**Financial Support:**
Contribute financially to operating expense or special projects

**Community Partner:**
Provide employment opportunities and practical assistance to youth.

**Contact Us:**
Chris Knowlton
(509) 777-9622, ext 137
cknowlton@ymcaspokane.org

## Guiding Beliefs

**We Believe** that each young person is equally and incredibly valuable in the sight of God.

**We Believe** that every kid can become a successful, contributing member of our society.

**We Believe** the "Cycle of Hopelessness" is broken as young people begin to realize that they can change their lives for the better.

**We Believe** that encouraging a strong work ethic will enable young people to develop self-respect, dignity, and hope for the future.

**We Believe** that as a community, we must help young people now or we will suffer for our lack of compassion and vision.



---

**Implementing Agency:**       **Girls on the Run**
**Contact Name:**              **Kerin Brasch, Executive Director, Puget Sound Chapter**
**Contact Phone:**             **206-528-2118,**
**Summary**

*Mission*:  To prepare and educate girls third through fifth grade for a lifetime of self-respect and healthy living.

*Vision*:  Girls on the Run is a *prevention* program that develops the physical, emotional, mental & social skills girls need – before and during adolescence, when research shows they need and benefit from it the most. The purpose of Girls on the Run is to empower girls early in their lives to find strength, courage and self-respect from within and draw upon it as they face the challenges of adolescence and adulthood. The program is based on the belief that it is critical to reach girls at this arly age (third through fifth grade) to prepare them for adolescence and prevent at-risk behaviors such as eating disorders, substance abuse, depression, obesity, and promiscuity.

*Program Description:* Girls on the Run uses the physical activity of running in combination with these life lessons because studies show that females who participate in physical activities or sports

36

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055333

experience higher levels of self esteem and confidence, as well as lower levels of depression than those who do not. Exercise has also shown to boost girls' self -esteem by offering them tangible experience of competency and success. To this end, throughout the program, the girls train to run or walk in a 3.1 mile community running event.

*Curriculum is delivered in two weekly sessions over 10-weeks, and is divided into three parts:*
- Part 1: Understanding themselves and setting personal goals(4 weeks)
- Part 2: Learning skills to foster leadership, team building and cooperation (4 weeks)
- Part 3: Examining their relationship to the community, including development and implementation of a community service project (4 weeks)

The program will typically run twice per school year: from September through December ending with a run in the New Balance Girls on the Run 5k in early December and again from March through June ending with another "graduation" 5k.  Programs are administered by volunteer coaches (typically 3 for a maximum number of 15 girls per site) and each girl is assigned a Running Buddy, volunteers who run with them to encourage and cheer for them as they reach their goal of crossing the finish line in the 5k run.

*Contacts for Washington State:*
Puget Sound:  Kerin Brasch, Executive Director, 206-528-2118, kerin@girlsrun.org
Tri-Cities (Benton, Franklin Counties):  Misty Fewel, 509-947-5766, misty@ymcatricities.org
Chelan County:  Shelly Wold, 509-682-6198, swold@cvch.org
Tonasket:  Julie Goyette, 509-429-2289, juliegoyette@gmail.com
Southwest Washington:  Keri Verhei, keripeterson@hotmail.com or Christy VanCuren, christyvancuren@yahoo.com
Northwest Washington:  Jennifer Gallant, 360-733-8630, jgallent@whatcomymca.org

**Implementing Agency:**     **City of Seattle**
**Contact Name:**     **Mariko Lochhart**
**Contact Phone:**     **(206) 233-7195**
**Summary**

*Seattle Youth Violence Prevention Initiative*

The Seattle Youth Violence Prevention Initiative sets a new direction by identifying and helping young people who are at a vulnerable point in their lives.  Specifically, the Initiative:

- Helps youth with repeat offenses re-enter society from state and county detention programs.
- Provides alternatives for youth who are arrested for crimes, but released because they don't meet the admission criteria for county detention.
- Helps middle-school truants and students at risk of suspension stay in school and succeed.
- Prevents victims of violence and their friends and relatives from continuing the cycle of violence through retaliation.

37

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER      WICHITA 055334

The Initiative doesn't wait for youth to seek out help; Initiative staff and partners seek them out. Whether it's helping them stay in school, re-enter society or manage their anger, the objective is to intervene at a crucial time in their lives and offer them a better path.

While Seattle has experienced some of the lowest overall crime rates in decades, the number of juvenile violent crime incidents has remained constant at about 800 a year.

Easy access to guns has clearly introduced life-and-death consequences to confrontations between our children.

*Our Approach*

Initiative planners began by examining programs in Seattle and in cities across the nation including Boston, Baltimore, Chicago, San Jose, Washington D.C. and Lowell, Mass.

Representatives from cities with proven strategies to decrease youth violence were invited to Seattle to share their innovative programs. Baltimore's Operation Safe Kids used intensive outreach to juvenile offenders and saw a 44 percent drop in the number of youth re-arrested. "The lesson for Seattle is collaboration. You always need a strategy," advised Director Chris Williams.

Penny Griffith works with Latino youth and their parents in neighborhoods in Washington, D.C., where they dramatically reduced shootings and stabbings. "The community got angry and said enough is enough," Griffith said.

Seattle's Initiative incorporates many of the ideas from these national models. It proposes a new approach to street outreach with the use of violence interrupters who are privy to information on the street and may actually prevent violent acts and retaliation before they occur.

*Engaging Our Young People*

Young people will be referred to a wide range of services through juvenile court, police, community outreach workers, schools, Seattle Parks and Recreation youth centers, and the neighborhood network agencies.

The Seattle Initiative calls for establishing extended hours at some youth centers, giving children a safe place to go, or be taken, to stay out of trouble. In addition to case management, anger management and recreation programming, the City will support more community-based projects that engage and mentor young people.

In April 2009, school emphasis officers were assigned to four middle schools, where they work to improve attendance and train children to deal with conflict. In summer of 2009, the Initiative helped to fund summer youth employment, giving 200 young people an opportunity to learn important job skills and putting them on a path for a better future.

Even before the Initiative began, Seattle police stepped up emphasis patrols, working especially closely with schools, and doubled the number of officers working in the gang unit. Mayor Nickels emphasized that law enforcement can be only part of the solution. He also acknowledged members of the faith community for their efforts and contributions.

38

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055335

*Initiative Director*

In April 2009, Mariko Lockhart was selected as the inaugural director of the Initiative. Lockhart was president and state director of Communities In Schools of New Jersey and has served as a consultant on management, race and diversity. Lockhart works with the three network coordinators, collaborating on outreach, intake and referral, and data collection and analysis.

*Three Neighborhood Networks*

One message came through loud and clear from representatives in other cities:  Government should not dictate all the details of a plan.  The City of Seattle has been very deliberate in setting the direction and goals, but asking communities to help determine what's needed in their neighborhoods.

Initiative efforts are coordinated through three neighborhood networks in southeast, southwest and central Seattle, where indicators of future violent behaviors, such as discipline rates in schools, are the highest.  The lead agencies are the Urban League of Metropolitan Seattle for the central network; Southwest Youth and Family Services; and a consortium of agencies in the southeast network led by Rainier Vista Boys and Girls Club.

These youth-focused, community-led networks serve as hubs to coordinate and tailor services around each youth, including outreach, case management, family support, anger management, youth employment and pre-apprenticeships, recreation, school emphasis officers, emphasis patrols and neighborhood matching fund projects led by youth.

*Accountability and Goals*

Simply tracking how much money is spent and how many young people receive services is not a meaningful measure of success.  Seattle's Youth Violence Prevention Initiative will include strict measures of accountability at two levels – whether neighborhoods and schools are safer, and whether individual lives are transformed as measured by indicators, such as school performance and recidivism.

The Initiative is charged to achieve:

- A fifty percent reduction in juvenile violent crime court referrals in the three network neighborhoods.
- A fifty percent reduction in the number of suspensions/expulsions due to violent incidents in five selected middle schools.

City staff manage contracting for many of the services provided in the plan and research best practices in each category of funding to assure that interventions are appropriate and effective for the populations served by the Initiative.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055336

**Implementing Agency:**    **Neighborhood House**
**Contact Name:**    **Erin Lawrence Cook**
**Contact Phone:**    **(206) 588-4900**

**Summary**

Using an intensive, coordinated and community based approach as well as proven prevention strategies, the national program being piloted and enhanced by the Seattle-based nonprofit agency Neighborhood House works to build more resilient youth, stronger families and safer communities.

The Neighborhood House pilot: In 2007, Neighborhood House received seed funding from the Bill & Melinda Gates Foundation to pilot CASASTART, a national program that strives to keep high-risk middle school youth, ages nine to 14, free from drug, gang and criminal involvement. Starting in September 2007, four case managers are working with up to 80 students at three South Seattle middle schools: Aki Kurose and Denny. The program is recruiting students most in need of help – youth with truancy problems, poor school performance, extreme behavior challenges, and those who are already showing signs of substance abuse or gang involvement. Over the next four years (2007 to 2011) Neighborhood House plans to serve more than 300 youth plus their families, improving not just their lives but the overall school environment as well.

Why it's needed: Over the past several years, along with local and national experts, Neighborhood House has recognized a clear upswing in youth substance abuse and gang and criminal activity in Seattle's low-income, immigrant and refugee communities. The perpetrators and victims of crimes also are getting younger and younger. For example, from 2004 to 2006, one in four Seattle robbery and assault suspects was between the ages of 10 and 17. These alarming trends follow the steady erosion of after-school and summer youth activities that provide positive alternatives, particularly to those most at risk.

How it works: CASASTART – developed by the National Center on Addiction and Substance Abuse (CASA) at Columbia University – targets high-risk youth during their transition from childhood to adolescence. This is a crucial period in a children's cognitive, physical and social development, and a time when they are particularly vulnerable to negative influences. Youth and families in the program receive 18 to 24 months of counseling, tutoring, life skills training, mentoring, family interventions and home visits, as well as access to treatment for substance abuse and other health problems. At the core of the program are case managers, who are on call around the clock, and serve only 15 to 18 young people and their families at any given time. They work with the youth during and after school, helping them design and carry out a clear plan to achieve their goals.

Who's involved: Another desired outcome of CASASTART is that of systems enhancement at the program, administrative and policy levels – to change the relationships of agencies and institutions to each other and with at-risk youth to help sustain healthy neighborhoods and environments for youth. In addition to the case managers relationships with schools and partners, CASASTART links this initiatives with decision makers in the political, public, philanthropic, and private sectors to review progress of youth, families, and interagency service delivery systems, as well as administrative or public policy affecting CASASTART communities though both its Administrative Oversight and its Advisory Council.

Outcomes: Currently operating in 142 schools in 49 cities and counties across the nation, CASASTART's impacts have been well documented. Compared to a control group, youth in the program were:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    WICHITA 055337

- 60 percent less likely to sell drugs
- 20 percent less likely to use drugs in the past 30 days
- 20 percent less likely to commit a violent act
- More likely to be promoted to the next grade in school

Neighborhood House anticipates similar results with its program. An evaluation plan will measure a range of outcomes, including improved performance on the WASL (Washington Assessment of Student Learning); improved school attendance; decreased police contacts; decreased negative peer attachment; and reduced likelihood of drug use.

Costs vs. benefits: The average cost of providing CASASTART'S intensive and comprehensive case management services, including 24-hour on-call access, is $5,000 per child annually. The anticipated return on investment in Washington includes increased funding to local school districts (tied to increased school attendance); reduced costs to juvenile justice/juvenile court systems; fewer missed work days for low-income parents (due to court proceedings, responding to calls from the school, etc.); reduced pressures on the substance abuse treatment system; and reduced property damage and criminal activity in low-income neighborhoods. Of course, the ultimate return on investment is the increased likelihood for a rewarding, productive adolescence and adulthood for the youth who are facing huge obstacles to success.

Neighborhood House partners: Neighborhood House is proud to be partnering with the Bill & Melinda Gates Foundation; Nesholm Foundation; City of Seattle – Office of Neighborhoods, Seattle Public Schools, and the National Center for Addiction and Substance Abuse (CASA).

Since 1906, Neighborhood House has helped immigrants, refugees and low-income people overcome economic, educational and employment challenges. They learn to rely on themselves and each other, to fulfill their dreams, and to become active members of a free and democratic society. From the moment of their birth to the twilight of their years, people depend upon Neighborhood House for hope and opportunity.

| | |
|---|---|
| **Implementing Agency:** | **Consortium of Yakima Valley Agencies** |
| **Contact Name:** | **Yakima County Sheriff Ken Irwin** |
| **Contact Phone:** | **(509) 574-2500** |

**Summary**

1. _Short description of your organization_:

   Stand Up for Outlook is a consortium of residents of Outlook and approximately sixteen Yakima Valley community agencies working to decrease gang violence and fear and increase positive regard and neighborliness in the community of Outlook. Educational Service District 105, Yakima County Sheriff's Office, Yakima Valley Farmworkers Clinic/Northwest Community Action Center/Readiness to Learn program, and Sunnyside School District/Outlook Elementary School are all leading coordination efforts.

2. _Describe your organization's programs and the population you serve:_

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055338

The Stand Up for Outlook project serves the residents of Outlook, WA and the families and children in the Outlook Elementary School. There are approximately 125 households in the "core" of Outlook and again that many in the "zip code area" which serves Outlook. There are 600 Kindergarten through 5th grade students at Outlook Elementary. Two Readiness to Learn case managers/community organizers currently work with schoolchildren and their families to reduce non-academic barriers to learning. Additionally these community organizers empower Outlook residents to create community well being by decreasing gang violence and abating graffiti. Funding for these positions ends June 30, 2010.

3.   *Purpose of the Program/Project:*

ESD 105 and the Sheriff's Office were recipients of American Reinvestment and Recovery Act (ARRA) monies which came through the Bureau of Justice with the expressed purpose of a) creating/maintaining jobs; and b) organizing communities to address gang violence and graffiti abatement.

The community of Outlook was jointly selected by ESD 105 and the Yakima County Sheriff's Office because of a history of violent gang related crime there, including homicide, over the past 10 + years culminating in two sheriff deputies being shot at and one of the deputies being wounded by an Outlook 16 year old during an investigation in July 2009.

The Bureau of Justice funding was one time and expires June 30, 2010. Government and agency discussion and coordination began in May 2009 with community efforts beginning in January 2010, they continue to grow, and need to be sustained to have true community change take place. The majority of funding from the grant would continue the good work started by one of the two Readiness to Learn case manager/community organizer case manager positions currently working in the community. This case manager/community organizer would be hired by and supervised through the Yakima County Sheriff's Office to create measurable change that empowers at-risk and economically disadvantaged individuals and families to achieve a greater level of self-sufficiency. This mission is accomplished by engaging local communities and businesses through advocacy and coordination. The Yakima County Sheriff's Office mission perfectly matches the goals of the Stand Up for Outlook project, "… to consistently contribute to improving Yakima County's reputation as a safe place to live, work, play, learn and visit."

Additional grant dollars over and above the cost of the case manager/case worker would support summer arts and sports activities for the children of Outlook, community meeting space, child care, translation services, paint to paint out the graffiti and other costs associated with cleaning up and empowering a community.

4.   *Goals and Objectives/Evaluation Plan:*

The Stand Up for Outlook project officially began in July 2009. Yakima County partners held ten planning meetings from August through December at the Outlook Elementary school.  In December 2009, a door to door survey was administered to residents to gather data to share at the first community meeting which was held January 11, 2010. Results of the survey indicated that over 90% the residents were afraid to be outside in Outlook at night and over 90% were afraid to leave their homes because of threat of home invasion/potential loss of property. Results of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055339

survey also indicated that residents wanted to make things better in Outlook and they were willing to help make that happen. They indicated that having a community gathering space/park would be welcome as well as more activities for children and youth.

At the January community meeting eighty five residents formed three work groups – graffiti paint out, increasing community lighting, and forming block watches. Graffiti paint crews have successfully painted over graffiti in and around Outlook. A block watch captain has been identified and residents have heard from another successful block watch captain in Toppenish how to organize for success. Lighting is being secured through a combined effort of Power and Lighting personnel (current and retired), Washington State Department of Transportation traffic safety monies, Yakima County planning department, Yakima County commissioner leadership, and the "can do" spirit of community organizers who have been tenacious in solving the conundrum.

Stand Up for Outlook plans to administer another door to door survey in December 2010 to see if the residents perceive an increase in safety and a decrease in fearfulness.

*Quantitative data* includes:
- number of community meetings held  (six since January 2010),
- number of residents attending and involved (we have had from 50-80 participants at each meeting)
- number of different community agencies involved (currently sixteen different agencies),
- number of clean ups held (one in March and another planned for June)
- number of people participating in the clean up effort (60 people involved in spring event)
- number of block watches established (one underway)
- number of residents painting out graffiti (varies from time to time a core group of seven).
- number of light poles erected and lighting in the community of Outlook
- number of families attending parenting classes (18 families)
- number of violent gang related crimes in the area 2009 – 2010
- number of property crimes in the area 2009 - 2010

*Qualitative data* includes increasing the number of residents who report feeling safe in Outlook. Last spring Outlook Elementary School personnel asked the children who live in the "town" of Outlook to draw how they feel about living there. They drew dark colored pictures and described the neighborhood as "scary". Their parents tell them to "run home as fast as you can when you get off of the bus!" A qualitative outcome of the Stand Up for Outlook project would be the children's drawings would be brightly colored and they would describe living in Outlook as "safe and fun"! A sense of hopefulness has been expressed by the residents as they have come up to the planning committee members and said, "We really appreciate all you're doing for our community – thank you!"

To keep moving forward we are planning the following events:
June 2010 – community meeting on June 21, 2010
June 28, 29, 30 - Basketball camp

43

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055340

July 19-23 – Art camp

August – community meeting

July 2010 – June 2011 continued law enforcement emphasis in the area and relationship building between deputies and community members

We will know we are effective if the people keep coming to and participating in the events and if they report an increase in feeling safe. Ultimately crime will be reduced.

The time line for increasing community safety and neighborliness is ongoing. The time line for the Yakima Valley Community Foundation grant is one year, beginning as soon as funding could be awarded.

5.  *Program/Project Budget:*

The Stand Up for Outlook project respectfully requests $50,000 from the Yakima Valley Community Foundation. $45,000 of the money will pay the salaries and benefits for one Readiness to Learn case manager/community organizer whose position is ending June 30, 2010.  The remaining $5,000 will pay for community activities and events up to $3,500 and the additional $1,500 will go for administrative expenses (bookkeeping overtime possibly necessary due to capacity).

Currently the project has spent about $5,000 on clean up, graffiti abatement and the cost of public meetings. Approximately $2,500 will be spent on summer youth activities. $10,000 of Justice Assistance Grant money was used with other funding from the Sunnyside School District to pay the salary and benefits of the two case managers/community organizers. Currently theses two positions are for the school year only. The Stand Up for Outlook project envisions the position funded by the YVCF through the Yakima County Sheriff's Office as being year round.

No additional monies are "in hand" for this project. Other funding possibilities include Sunnyside's Promise and federal grants. The federal grant applications are currently being written and if awarded, funding may be designated for this project.

Due to uncertainty with school budgets, it is not known at this time if Sunnyside School District will have money to contribute to either of the successful Readiness to Learn case manager positions.

6.  *Why a YVCF grant is needed*:

The one year Bureau of Justice, Justice Assistance Grant money ends June 2010. The Stand Up for Outlook project has benefited from Central Washington Comprehensive Mental Health fundraising efforts as that agency provided FREE parenting classes in Spanish in Outlook and in English in Sunnyside for approximately eighteen families total. The cost for a 12 week session (all inclusive – child care, meal, facilitators) is about $5,000 so a total of $10,000 benefitted families in Outlook and Sunnyside. Additionally, Comprehensive Mental Health provided organizational expertise resulting in the first community meeting being rewarding and empowering for the residents.

44

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

WICHITA 055341

ESD 105 Bureau of Justice grant monies have supported the time and effort of the Yakima County Community Mobilization coordinator which is a benefit to the community of Outlook of at least $10,000. Time from the other sixteen community agencies who sent staff to work on this project could easily be estimated at $150,000. Increased Sheriff patrols to the area has resulted in an estimated $10,000 benefit to the community. The Sunnyside School District has allowed the use of buildings and translation services at a benefit of approximately $2,500.  If this grant proposal is not successful, we will continue to seek funding from other private foundations and grant making entities.

7.  *Community Partners:*
The Stand Up for Outlook project shines as an outstanding collaboration of community partners. In addition to Educational Service District 105, the Yakima County Sherriff's Office, the Yakima County Violent Crime Task Force, Yakima Valley Farm Workers/NCAC/ Readiness to Learn and the Sunnyside School District have contributed many hours of assistance. The Central Washington Comprehensive Mental Health gang specialist has been involved in all aspects of the project. The Sunnyside Police Department have sent personnel to planning meetings and allowed the use of their Police Explorers youth group to distribute meeting fliers, conduct the community survey, and coordinate the recycling/clean up day in Outlook. Yakima County Juvenile Justice has sent staff to faithfully attend the meetings. Additionally, they have allowed use of translation equipment and have sent youth in need of community service to assist with clean up efforts. Other agencies who have lent the time, talent and treasure of their people include: the Sunnyside division of the Department of Social and Health Services, the Sunnyside Ministerial Association, LOVE, Inc. of Sunnyside, Merit Resource Services, Catholic Family and Child Services, 21st Century afterschool programs. The residents of Outlook who have participated are by far the most important partner as they live in the community. All of the agencies involved in the project have been clear that we are there to listen and help to solve the problem through compassionate, wise action and support.

8.  *Community Impact:*
Sheriff Ken Irwin has been a true leader in this project. He envisions a "Stand Up" project in every community in the Valley. He is fond of saying, "We can't arrest our way out of this…." This statement captures the complexity of gang violence as not being solved through suppression efforts alone; but in coordination with thoughtful and respectful community organizing efforts which get neighbors looking out for one another's good and  ensuring a safe community for children and families.

The Stand Up for Outlook project has already benefited the community of Outlook by bringing them hope that someone, somewhere cares.  The residents are hard working people, many of whom hold two jobs and are focused on getting their family fed, clothed and sheltered. Outlook is unincorporated so there is "no city hall" with employees at the ready to answer questions and solve problems. Truly, if we (the collective 'we') don't do it, no one else will.  YVCF funding will ensure the continuation of high quality community organizing through the employment of two skilled case managers

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                WICHITA 055342

*9.  Diversity:*

The two Readiness to Learn case managers/community organizers are both bilingual and bicultural in English and Spanish. Meetings have had Spanish language translation and child care provided. Written meeting notifications and follow up phone calls in resident's native language were consistently delivered.  Resident's input has been listened to and respected. The  Stand Up for Outlook planning committee members thought planning a park would be a great "next step" for the community.  However, residents clarified that safety continued to be their top concern and the money was reallocated to offer youth summer programming and the installation of street lights.

*10. Story:*

*"To create real change, you may have to go places you haven't gone before"*
   *Common Sense for Community Change*

 The March Outlook community clean up day was a success! Over 80 residents participated in clearing brush, picking up trash and recycling. One of the local farmers, Joe Partch, brought in his large equipment to clear land. A sheriff's deputy stated that he had never been able to see the highway from that spot in town before. A local Boy Scout troop and students from Grandview High School participated alongside young people being supervised from the Yakima County Juvenile Justice Center. One of the Clean Up Day participants had a more complicated story…..

 In December a team of three (one of whom is a reserve officer with the Yakima County Sheriff's department) visited an Outlook home conducting the community safety survey. The young woman in the home indicated that she and her parents were so afraid of her brother due to his gang involvement that they locked all of their bedroom doors at night. This young man continued to follow the three surveyors as they walked the streets of Outlook. Back at the office, the reserve Sheriff's deputy called in the address of the home and a deputy was dispatched. He arrested the young man who had an outstanding warrant.  The family was now safe in their home.

 On that fine March clean up day, who should appear, but this same young man! He was helping to bring the chairs back into the church basement after the community BBQ and picnic. He had served his time and was out enjoying the sunshine of the day and obviously happy to be involved in something greater than himself.  He says he has learned from his experience and we all fervently hope and trust that this is true

The mystery and beauty of life is that we never know what will make a difference for someone else. We think by gathering data and quantifying things we will know what "makes a difference" and then if we just do "more" of those things we will have less "bad things happen" and all will be well.

Perhaps the difference we are seeking isn't just in the community of Outlook but in all of us involved in the project. We have gotten to know people we wouldn't have, listened and learned together, been

46

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055343

saddened and inspired by the stories we've heard and have given and gotten hope from each other. Yakima Valley Community Foundation funds are what we need to continue this work.

| | |
|---|---|
| **Implementing Agency:** | **City of Tacoma** |
| **Contact Name:** | **Lisa Wojtanowicz** |
| **Contact Phone:** | **(253) 591-5267** |
| **Summary** | |

*Lunchtime Connections*

Studies have shown that those in kindergarten through fifth grade are especially susceptible to involvement in gangs, poor performance at school and feeling, in general, like they simply don't belong. Imagine the difference you could make if you decide to spend at least one lunch break a month with a child. The Lunchtime Connections With Kids Safe and Clean team believes it's time to invest in our youngest citizens. With your help, they're more likely to stay away from gangs, do well in school, and look for ways to invest in our community.

A Q&A With Lunchtime Connections With Kids Safe and Clean Team Members Lisa Wojtanowicz, Melissa Cordeiro and Assistant Chief Bob Sheehan

*What has Lunchtime Connections With Kids been up to in the last several months?*
Our program got off to a great start! We were quickly able to get into Sheridan Elementary School and begin establishing relationships and bonds with the kids. What really helped us was having Stacey Riley, a dedicated school staff member who works 10 hours a week, on our side. She has been fantastic. She coordinates all the volunteer documentation and ensures that our team is informed of current school events, which works great for coming up with topics of conversation. Working closely with the school, we have been able to document over 200 volunteer hours in the last school quarter alone!  I think we are making a difference!

*How have the kids reacted to these visits?*
Oh my gosh, the kids love it! Once you've gone to the schools a few times, they begin to recognize and remember you. They all crowd around trying to talk to youand get your attention.  It is really something to see. The kids at Sheridan Elementary School are extremely polite and are very attentive. I remember one kiddo that was actually shocked to hear that we were there just to have lunch with him and his friends, and to talk to them, just because we wanted to. I think he sat a little taller that day.

*Assistant Chief Sheehan, any memorable moments you'd like to share?*
It was right after the tragic deaths of the four Lakewood Officers. I had a nice lunch with the kids and, afterwards, a third grade teacher invited us to her classroom. During the visit, we had a question answer period which was electrifying. At one point, I was asked how I felt about the Lakewood deaths by a student. All the children were interested. The kids seemed sad and very emotional about the question. You could see the concern on their beautiful little faces, and I could feel the emotion in the room. I became unsure how to respond to them. I felt like this was a defining moment, as tears welled up in my eyes because of the sincerity and concern these kind young children had for me and the deceased officers. I simply told them the truth. I said I was very saddened by the officers' deaths and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    WICHITA 055344

concerned about their surviving families. I told them I was having a rough day and needed something to lift me up. I then, in all sincerity, told them that my sadness had changed to joy today because of the wonderful time I had spent with the third grade kids at Mckinley Elementary School. I sincerely meant what I said, and the kids knew it. Their looks of concern and worry changed to smiles. I took my badge off my chest and passed it around the room as the police officer and the third graders of Sheridan Elementary School related to each other over a very tragic event. At that moment, those kids realized they had a positive impact on me instead of me on them. I will never forget this moment and the very emotional interaction that occurred. It is my very humble opinion that these types of experiences do not happen very often in life but, when they do, it is wonderful for all involved. We must always do our best to savor these times and use them as memories to keep us going in the rough times. Thank you for asking me to share this experience.

*Melissa, did you experience any challenges along the way?*
I have to laugh at this. Personally, I experienced a major challenge… I discovered that I was incredibly intimidated by the thought of being around so many kids. What was I supposed to talk about?  Would they even care that I was there? What if nobody wanted to have lunch with me?  It took me several weeks to build up the courage (yes, courage) to attend my first school lunch.  And, boy, was it worth it!  For me, the experience really showed me that even though the purpose of this program is to give Tacoma's youth positive role models and healthy relationships within the community, it has also benefited me as that role model. By just being there, it has taught me that something as natural as listening and caring can and does have a huge impact on a child. You always hear about it, but to actually see it and experience it is something indescribable.

*Lisa, what's next for the team?*
Currently our team, like most other Safe and Clean teams, has been working on transition and sustainability. What is really exciting is that we were able to bring Communities in Schools of Tacoma to the table and have had a couple of discussions around merging our two programs. This would allow us to expand the Lunchtime Connections With Kids program to an additional three Tacoma elementary schools: Fern Hill, Edison and Sherman in addition to our pilot school, Sheridan. We are all very excited about this possibility.

| | |
|---|---|
| **Implementing Agency:** | **Greater King County Police Activities League (GKCPAL)** |
| **Contact Name:** | **Nhadira Johnson** |
| **Contact E-Mail:** | **nhadira@kingcountypal.com** |
| **Summary** | |

**Laws and Paws**
The Laws and Paws (LAP) is a six-week dog program funded by the Greater King County Police Activity League (GKCPAL) in partnership with the SeaTac Police Department, the King County Sheriff's Office, Chinook Middle School, and Homeward Pet Animal Shelter, a no kill shelter in Woodinville, Washington.

*The LAP Mission*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055345

To teach young people confidence, self-esteem, compassion, respect, and empathy through the training of dogs. In return, the dogs they train become more adoptable.

*The LAP Dogs*

The dogs used for the LAP program are approved based on personality and temperament testing. In most cases, these dogs are only in need of basic socialization and obedience skills to be good family members. Together, the students and dogs teach each other valuable skills and lessons for life.

*Program Details*

Students who are accepted into the program are partnered with another students to teach the dogs basic obedience and socialization skills, as well as basic agility skills.
The program is three days a week for six weeks. Two of the days are spent training the dogs and one day is spent in the classroom. During the classroom portion of the program, LAP brings in different presenters such a veterinarians, veterinarian technicians, rescue groups, and animal control officers. These presenters teach the LAP students about their professions and the key aspects of humane animal treatment. There is also a class offered on animal cruelty and juvenile violence.

By the end of the six-week program, LAP holds a graduation for its students and their dogs are returned to the local shelter, where they are put up for adoption. Most often all of LAP's dogs are adopted within 48 hours after completing the program.

*Joining the Program*

In order to join the program, students must fill out an application, write a short essay, and complete a behavioral assessment questionnaire. After they have completed the application process and turned their packet in by the deadline, they are considered for the program.

For more information please contact:
Karen Davy, Program Manager, at Karen.Davy@kingcounty.gov


**Bits & Cuffs Rescure Ranch Program**
*Our Mission*

Some students may never experience what life is like in the country and we want to afford them the opportunity to do so. By helping others we help ourselves.

*Program Description*

Bits and Cuffs is an exclusive six week program that takes PAL students out of the city to experience life on a horse ranch. Twice a week select PAL students and their mentors will visit the Hunter Creek Rescue Ranch (HCRR) to participate in a specialized equine and farm education along with new and exciting outdoor activities. The program includes hands on training from the experienced staff at HCRR working directly with the rescue horses.

Each one of the horses used for the program came from various backgrounds of abuse and neglect before rehabilitation at the ranch. The program carefully introduces students to rescue horses and creates an environment of mutual respect and appreciation. The students will learn

49

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055346

how to properly care for, handle and eventually ride the horses under the supervision of the HCRR staff.

During the six week program, students will also experience what day to day life is like on a real horse ranch. Hard work and lots of fun with outdoor activities such as: hiking, fishing, campfire cooking, woodworking, gardening, roping, horseshoes, and much more. The program also includes guest teachers, speakers, and mentors each delivering a unique education, message, or friendship. At the end of the program, awards and prizes are given to students that demonstrate ability to learn and work hard. Snack and lunch is also provided.

For more information contact Brandelyn Tafoya at huntercreekrescue@gmail.com

**Music Program Mission**

To produce the following outcomes in the targeted population of at-risk youth:

- Increase their decision-making skills
- Increase their conflict-resolution skills
- Develop and maintain relationships with positive, caring adults
- Increase their school attendance
- Provide a positive environment that encourages creativity over delinquent activity
- Gain confidence by learning creative ways to express emotion without violence
- Build self-esteem and promote a new positive outlook on life
- 

*Program Description*

With the help of professional audio engineers, record producers, and musicians, young people will learn to compose music and lyrics, and produce and record original music using state-of-the-art, industry-standard equipment and technology. Participants have use of music production software and a professional-caliber recording studio free of charge.

Learn more about The Hendrix Music Academy by viewing King County TV's video about the program.

*Session Formats*

Students will be introduced, in sessions, to the fundamentals of Pro Tools, which is the industry's most widely used software environment for sound recording and manipulation. The object of these Pro Tools sessions is to understand sound and the ways to manipulate it to create special effects and achieve optimum sound quality. Topics covered include: the importance of having a good sound source on set, sound correction, synchronization, editing, and mixing.

Groups of up to five at-risk youth students will visit the recording studio several times a week over a six month period of time. Students will learn to work as a group and how to use the studio and equipment to create, write, perform, and record original musical works in a professional creative working environment. Students will learn about the music business and the many careers that exist in the music industry.

There are several three-hour sessions per week, each week has a new focus. Each session will be broken down into three units, with a ten minute break between each unit. There are lectures/discussions, group projects, independent learning, and hands-on equipment lessons and practice. In addition to these, there will be critical listening assignments each week.

50

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055347

*Students*

Students will work on a long-term team music project and their own personal music project. Students will choose their musical path and what role they want to play in the creation and recording of an original musical work in the studio.  Several music industry professionals will drop by and educate students in the studio and give music lessons if students are interested.

Students take one or two music related field trips during the course. Some field trips may include Experience Music Project, Guitar Center, live music performances, and local colleges with music programs, such as Seattle Art Institute, UW, and Shoreline Audio Production School. At the end of the course, students will receive a copy of their own music on CD to take with them.

For more information contact Tina Hendrix: (425) 430-1888 or by e-mail
tinahendrix1@yahoo.com

**PAL Coed Flag Football**

*Our Mission*

To provide a recreational activity where young people can build a community of friends, while learning the life skills of dedication, respect, and commitment on and off the football field.

*Program Details*

This is a free recreational program open to boys and girls, ages 5-17.
Youth participants learn the fundamentals of flag football with volunteers from the King County Sheriff's Department, while making new friends in their community.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    WICHITA 055348

## PROGRAMS FROM AROUND THE NATION

**Independence Youth Court**
**Independence, Missouri**

**Evaluation:**

The Independence Youth Court (IYC) was established in 1985 as a partnership between the local bar association, the Juvenile Division of the Jackson County (Mo.) Family Court, the city of Independence (Mo.), and the Independence Police Department. The youth court receives hundreds of referrals a year, with most of them coming from the Independence Police Department. Shoplifting, truancy, and vandalism make up the vast majority of cases, but the court may also hear cases involving status offenses, third-degree assaults, and minor drug and alcohol violations.

The IYC uses the youth judge model, in which there are no jurors, the case is argued by youths volunteering as defense attorneys and prosecutors, and youth volunteer judges are responsible for all proceedings and making the sentencing decision. While not part of the formal process, the executive director is present during court hearings as a spectator and reviews the sentence to make sure that the youth and his or her parents understand the disposition.

Youths may volunteer for IYC beginning at age 13. Defendants may be as young as 7 but no older than 16. All volunteers involved in the IYC must pass a youth bar exam to serve as attorneys or judges. Finally—unlike most youth courts—defendants may plead not guilty during their initial appearance, prompting an adjudication hearing. When a youth makes a "not guilty" plea, the youth judge is responsible for determining whether a finding of guilt is warranted. However, because the IYC is a diversion program, the youth still must comply with the initial diversion agreement regardless of the finding. If not, the defendant may be referred back to the Jackson County Family Court.

**Evaluation:**

IYC was part of the Evaluation of Teen Courts (ETC) project. The ETC project used a quasi-experimental design to evaluate the impact of four diverse teen courts in four different States. The ETC project identified teen courts suitable for evaluation based on several criteria, including 1) willingness to participate in an evaluation, 2) caseload size, 3) length of operation, 4) courtroom model, and 5) geographical location. The evaluation tracked youth outcomes in four treatment groups (i.e., teen courts) and four nonequivalent (nonrandomized) comparison groups. The composition of the comparison groups varied from site to site. The IYC comparison group was constructed from electronic records of first-time offenders referred to the Jackson County Family Court in 2000 but who would have qualified for the IYC. The program and comparison youths were matched on demographic characteristics and offense. The principal data sources included 1) self-administered questionnaires completed by youths and their parents, 2) teen court program files and administrative records, and 3) police and court records.

**Outcome:**

The findings of the ETC project suggest that teen courts are a promising alternative for the juvenile justice system. In IYC the results indicate that youths referred to teen court were significantly less

52

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    WICHITA 055349

likely to be re-referred to the juvenile justice system for a new offense within 6 months of their initial offense. Specifically, 9 percent of IYC youths recidivated, compared with 28 percent of comparison youths.

**References:**

Butts, Jeffrey A., and Janeen Buck. 2000. *Teen Courts: A Focus on Research.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Butts, Jeffrey A., Janeen Buck, and Mark Coggeshall. 2002. *The Impact of Teen Court on Young Offenders.* Washington, DC: The Urban Institute.

**Contact:**

**Judge Susan Watkins, Executive Director**
Independence Youth Court
111 East Maple

Independence, MO 64050

Phone: 8163257750
Fax: 8163257749
E-mail: YouthCt@Indepmo.org

Web site: http://www.ci.independence.mo.us/municourt/youthcourt.stm

**Philadelphia Youth Violence Reduction Partnership**
**Philadelphia, Pennsylvania**

**Intervention:**

The Philadelphia Youth Violence Reduction Partnership (YVRP) is a multi-agency effort involving various youth-serving organizations and criminal justice agencies partnering to reduce Philadelphia's homicide rate and put violent youthful offenders on the path toward a productive majority. Since its establishment in 1999, YVRP has sought to help 14- to 24-year-olds at greatest risk of killing or being killed. Almost all YVRP participants are under court supervision, having contact with a probation or parole officer, and most have been convicted or adjudicated on a violent or drug-related charge at least once.

YVRP not only provides participants with increased supervision but also brings them support through access to critical resources such as employment, mentoring, healthcare, and drug treatment. While most probation departments are short on resources and face extremely heavy caseloads, in YVRP street workers, smaller caseloads, and police partnerships help bridge the gaps. Street workers in consultation

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     WICHITA 055350

with probation officers develop mentoring relationships with the participants and connect them with much needed social support, ranging from mental health counseling to employment assistance. Street workers also help participants' parents get jobs and find housing and health care, thereby providing participants with more stable family lives.

With smaller caseloads, YVRP probation officers have more time to closely supervise their probationers. Police also accompany probation officers to the homes and hangouts of participants, serving as a reminder that the police support probation and allowing for police contact and interaction outside of the context of enforcement.

YVRP involves more than 10 public and private organizations and a staff of more than 50 police officers, probation officers, and street workers. The staff aim to see participants and their families more than 25 times a month to help connect the young offenders to school, work, or counseling, while ensuring strict enforcement of their probation.

**Evaluation:**

The evaluation relied on monitoring data collected from January 2000 to July 2003. To determine whether YVRP Police Districts experienced change in their levels of violence, evaluators collected the homicide data of the 24th and 25th Police Districts from 1994 to September 2003. The evaluation team analyzed monthly statistics on each participant and the holding of semi-annual interviews with street workers, police, and probation officers. The evaluators followed street workers closely to learn about their relationships with participants and shadowed probation officers to gain insights into their daily activities.

**Outcome:**

Preliminary analysis of youth homicides in the YVRP Police Districts seems to provide at least initial evidence that the YVRP is indeed helping high-risk youths stay alive. The 10 years of homicide data collected from the Philadelphia Police on the YVRP Police Districts reveals that homicides in the 24th and 25th Police Districts were significantly lower after the start of YVRP. In looking at the raw averages, the 25th District saw a decrease from an average of 5.8 youth homicides per quarter before YVRP to 3.4 after YVRP. In the 24th District, youth homicides declined by an average of 1 per quarter over 4 years. The 25th District also saw a significant reduction in the number of homicides for all ages. There was, however, not a significant decrease in the number of homicides for victims of all ages in the 24th District.

Homicide trends also may support the conclusion that YVRP is having a positive effect in the districts in which it operates. The rate of homicide reduction was greater in the YVRP Police Districts than in the city as a whole. Trends show that 24th District homicides were slowly increasing over time, and during the quarter that YVRP was implemented there was a dramatic decline in homicides. However, following the immediate decrease, homicides have continued to increase at a faster pace than before YVRP. But this rate is significantly lower than the increase citywide.

In the 25th Police District, youth homicides dropped after the inception of YVRP and have continued to drop. This is in stark contrast to the city as a whole, where since the introduction of YVRP there has been a trend toward increased youth homicides. A similar pattern is seen in the trend of homicides of individuals of all ages in the 25th District.

54

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER      WICHITA 055351

**Risk Factor:**

*Community*
- Availability of alcohol and other drugs
- Availability of firearms
- Community crime / High crime neighborhood
- Neighborhood youth in trouble

*Peer*
- Gang involvement / Gang membership
- Peer alcohol, tobacco, and/or other drug use
- Association with delinquent and/or aggressive peers

*School*
- Low academic achievement
- Dropping out of school

*Family*
- Family history of problem behavior / Parent criminality
- Family management problems / Poor parental supervision and/or monitoring
- Pattern of high family conflict
- Poor family attachment / Bonding
- Family violence
- Broken home
- Sibling antisocial behavior

*Individual*
- Antisocial behavior and alienation / Delinquent beliefs / General delinquency involvement / Drug dealing
- Gun possession / Illegal gun ownership and/or carrying
- Early onset of aggression and/or violence
- Cognitive and neurological deficits/Low intelligence quotient/Hyperactivity
- Victimization and exposure to violence
- Life stressors
- Mental disorder / Mental health problem / Conduct disorder

**Protective Factor:**

*Community*
- Presence and involvement of caring, supportive adults in the community

*Peer*
- Involvement with positive peer group activities

*Family*
- Opportunities for prosocial family involvement
- Having a stable family

*Individual*
- Positive expectations / Optimism for the future
- Healthy / Conventional beliefs and clear standards
- Perception of social support from adults and peers

**References:**

Fight Crime: Invest in Kids. 2004. *Caught in the Crossfire: Arresting Gang Violence by Investing in Kids.* Washington, DC.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055352

McClanahan, Wendy S. 2004. *Alive at 25: Reducing Youth Violence Through Monitoring and Support.* Philadelphia, Pa.: Public/Private Ventures.

**Contact:**

**Wendy S. McClanahan**
Public/Private Ventures
2000 Market Street
Philadelphia, PA 19103

Phone: 2155640749
Fax: 2155574469
E-mail:

Web site: http://www.ppv.org

**John Delaney**
Philadelphia District Attorney's Office
1421 Arch Street

Philadelphia, PA 19102-1507

Phone: 215.686.8203
Fax:
E-mail:

**Responding In Peaceful and Positive Ways**
**Ashland, Virginia**

**Intervention:**

Responding In Peaceful and Positive Ways (RIPP) is a school-based violence prevention program designed to provide students in middle and junior high schools with conflict resolution strategies and skills. RIPP targets the universal population of students enrolled in grades 6, 7, and 8 in middle and junior high school and is suitable for children from all socioeconomic, racial/ethnic, and cultural backgrounds. The program combines a classroom curriculum of social/cognitive problem solving with

56

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     WICHITA 055353

real-life skill-building opportunities such as peer mediation. Students learn to apply critical thinking skills and personal management strategies to personal health and well-being issues. RIPP teaches key concepts such as

- The importance of significant friends or adult mentors

- The relationship between self-image and gang-related behaviors

- The effects of environmental influences on personal health

Using a variety of lessons and activities, students learn about the physical and mental development that occurs during adolescence, analyze the consequences of personal choices on health and well-being, learn that they have nonviolent options when conflicts arise, and evaluate the benefits of being a positive family and community role model.

**Evaluation:**

Several studies have examined the effectiveness of RIPP. The first evaluated RIPP sixth graders at three urban middle schools serving predominantly African-American students. Classes were randomly assigned to an intervention (n=305) or a no-intervention control group (n=321). Self-report and school disciplinary data was collected at pretest, posttest, 6-month, and 1-year follow-up. In the second study, RIPP was evaluated in an ethnically diverse rural school using pretest, posttest, and 1-year follow-up self-report data of randomly assigned sixth grade students. Pretest data was collected from 96 students in the intervention group and 108 students in the control group. The third study evaluated RIPP sixth and seventh graders, using a between-school design in an ethnically diverse rural setting to compare outcomes over 2 years between four intervention schools (n=655) and four control schools (n=685). Self-report measures were completed pretest (the beginning of sixth grade) and at four other time points, concluding in the fall semester of eighth grade. The next study evaluated RIPP seventh graders in two public middle schools serving predominantly African-American students where the RIPP program had also been implemented in the sixth grade. Students were randomly assigned by homeroom to the intervention (n=239) or the control group (n=237). Participants were given a pretest, posttest, 6-month follow-up, and 12-month follow-up.

**Outcome:**

RIPP has demonstrated efficacy in urban schools that serve predominantly African-American youths, as well as in more ethnically diverse rural schools. In comparison with control students, at posttest, students who participated in RIPP have shown

- Fewer disciplinary violations for violent offenses

- Fewer in-school suspensions

- Increased use of peer mediation programs

- Fewer fight-related injuries

- Greater knowledge of effective problem-solving skills

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        WICHITA 055354

Students also reported significantly lower approval of violent behavior, more peer support for nonviolent behavior, and less peer pressure to use drugs.

In a within-school evaluation of RIPP, compared with control students, RIPP–6 students at posttest were significantly less likely to have disciplinary code violations for carrying weapons, were less likely to have in-school suspensions, had lower reported rates of fight-related injuries, and were more likely to participate in their schools' peer-mediation programs. RIPP–7 participants showed a significant increase in their knowledge of curriculum material and a trend for greater decreases in anxiety. At 6-month follow-up, RIPP–7 students reported lower rates of peer pressure to use drugs and showed a significant increase in prosocial responses to hypothetical problem situations. In another study, compared with students at control schools, students at intervention schools reported more favorable attitudes toward nonviolence, less favorable attitudes toward violence, and greater knowledge of the material covered in the intervention. Significant differences in the frequency of aggression were found at posttest. An evaluation of RIPP–8 is currently under way.

**Risk Factor:**

*Community*
- Availability of firearms
- Community crime / High crime neighborhood
- Economic deprivation / Poverty / Residence in a disadvantaged neighborhood
- Neighborhood youth in trouble

*Peer*
- Gang involvement / Gang membership
- Peer alcohol, tobacco, and/or other drug use
- Association with delinquent and/or aggressive peers

*School*
- Negative attitude toward school / Low bonding / Low school attachment / Commitment to school

*Family*
- Broken home

*Individual*
- Antisocial behavior and alienation / Delinquent beliefs / General delinquency involvement / Drug dealing
- Gun possession / Illegal gun ownership and/or carrying
- Favorable attitudes toward drug use/Early onset of AOD use/Alcohol and/or drug use
- Early onset of aggression and/or violence
- Victimization and exposure to violence
- Poor refusal skills
- Life stressors

**Protective Factor:**

*Community*
- Presence and involvement of caring, supportive adults in the community

*Peer*
- Involvement with positive peer group activities
- Good relationships with peers

*School*
- Presence and involvement of caring, supportive adults in school

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055355

- High expectations of students
- High quality schools / Clear standards and rules

*Individual*
- Social competencies and problem solving skills
- Positive / Resilient temperament
- Self-efficacy
- Positive expectations / Optimism for the future
- High individual expectations
- Healthy / Conventional beliefs and clear standards

**References:**

Farrell, Albert D., Aleta Lynn Meyer, Terri N. Sullivan, and Eva M. Kung. 2003. "Evaluation of the Responding In Peaceful and Positive Ways (RIPP) Seventh Grade Violence Prevention Curriculum." *Journal of Child and Family Studies* 12(1):101–20.

Farrell, Albert D., Aleta Lynn Meyer, and Kamila S. White. 2001. "Evaluation of Responding In Peaceful and Positive Ways (RIPP): A School-Based Prevention Program for Reducing Violence Among Urban Adolescents." *Journal of Clinical Child Psychology* 30(4):451–63.

Meyer, Aleta Lynn, Albert D. Farrell, Wendy Bauers Northup, Eva M. Kung, and Laura Plybon. 2000. *Promoting Nonviolence in Early Adolescence: Responding In Peaceful and Positive Ways.* New York, N.Y.: Kluwer Academic/Plenum Publishers.

**Contact:**

**Wendy Bauers Northup**
Prevention Opportunities, LLC
12458 Ashland Vineyard Lane

Ashland, VA 23005

Phone: 8042618547
Fax: 8042618580
E-mail: nor@co.henrico.va.us

Web site: http://www.has.vcu.edu/RIPP


**Supporting Adolescents with Guidance and Employment (SAGE)**
**Durham, North Carolina**


**Intervention:**
Supporting Adolescents with Guidance and Employment (SAGE) is a violence-prevention program developed specifically for African-American adolescents. The program consists of three main

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055356

components, namely a Rites of Passages (ROP) program, a summer jobs training and placement (JTP) program, and an entrepreneurial experience that uses the Junior Achievement (JA) model.

The purpose of the first component, ROP, is to develop a strong sense of African-American cultural pride and ethnic identity in the participants and instill a sense of responsibility in their community, their peers, and themselves. In seminars held every other week over 8 months, the program curriculum (developed in 1993 by the Durham, N.C., Business and Professional Chain) also promotes self-esteem, positive attitudes, and the avoidance of a range of risky behaviors. Instructors cover topics such as conflict resolution, African-American history, male sexuality, and manhood training. Mentors from the community provide outreach experiences and tutoring.

The second component, the JTP experience, places youths in summer jobs at desirable worksites such as dentist offices, local museums, and recreational centers. Site supervisors are encouraged to provide structure. Youths are trained in appropriate business behavior and dress. Job counselors work with the youths to resolve issues such as transportation.

The third component, JA, teaches how to develop and implement a small business. With the guidance of volunteer advisers from the local business community, youths form a legal corporation, develop a business plan, elect officers, and sell stock to family and friends. They also market and sell a product (e.g., T-shirts, caps).

The overall approach of SAGE is based on the theory that positive gains in personal and social responsibility, educational aspirations, and academic achievement—in tandem with employment training and opportunities fostered by community mentors—will make a positive impact on reducing violence among the participants.

**Evaluation:**

SAGE was assessed using a longitudinal, randomized field trial in which program applicants were assigned to one of three programmatic conditions: 1) guidance plus employment (ROP, JTP, and JA), 2) employment only (JTP and JA), and 3) a comparison group eligible for delayed participation in JA only. Survey data collection points occurred at baseline, at 18 months, and at 30 months after the program began. After completion of baseline questionnaires, the 255 eligible youths (African-American males ages 12–16) were assigned to each group: 86 to the guidance and employment (ROP/JTP/JA) condition, 84 to the employment-only (JTP/JA) condition, and 85 to the comparison condition. The mean age of the participants was 14. Fifty-three percent reported receiving free lunches at school; 18 percent reported that their mothers had not completed high school; and 50 percent were not living with a father. Self-report and archival data was used to assess the effectiveness of SAGE on behavioral outcomes for a variety of risk behaviors (e.g., violence-related behaviors such as physical fighting, carrying or using a weapon; alcohol-, tobacco-, and other drug-related behaviors such as use, abuse, and commerce; and risky sexual behaviors). In addition to outcome measurements, the self-report survey included questions regarding process measurement. Baseline data indicated that during the previous year, many had engaged in various violence-related behaviors, including fighting (63 percent) and carrying a gun (22 percent) or a knife (30 percent).

**Outcome:**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                WICHITA 055357

Despite the absence of statistical significance, the pattern of results from the evaluation provides tentative evidence that participation in SAGE can reduce the likelihood of violence-related and other health-risk behaviors among African-American male adolescents. At the 18-month follow-up, the mean number of problem behaviors reported by the employment-with-guidance group declined, in contrast to the slight increase of the comparison group and to no change in the employment-only group. Examining each behavioral outcome individually, differences in a positive direction for employment-with-guidance were observed for 8 of the 10 outcomes, relative to the control group. For the employment-only group, positive differences were observed for 7 of the 10 outcome measures. Of the 10 behavioral outcomes examined, the program seemed to have the greatest benefits for reducing reports for carrying a gun, selling illegal drugs, and injuring others with a weapon. However, programmatic gains were not sustained over the 30-month follow-up. Assessment of the psychosocial constructs (e.g., increasing self-esteem, educational aspirations, beliefs supporting aggression) found no statistically significant effects. The relatively small group sizes in this study may have diminished the possibilities for finding statistically significant effects. In addition, the analysis was performed on all participants according to the group to which they were randomly assigned, regardless of their actual level of exposure to the programmatic components. This "intent to treat" approach is viewed as the most rigorous approach for assessing programmatic effects in randomized designs, but it is also a conservative one that may underestimate the actual impact if all the young men had participated fully in the intervention activities. Including all participants—regardless of their level of exposure to treatment—may have contributed to the lack of statistically significant findings and may have underestimated the actual impact of the program.

**Risk Factor:**
*Peer*
- Gang involvement / Gang membership
- Peer alcohol, tobacco, and/or other drug use
- Association with delinquent and/or aggressive peers

*School*
- Low academic achievement

*Individual*
- Antisocial behavior and alienation / Delinquent beliefs / General delinquency involvement / Drug dealing
- Gun possession / Illegal gun ownership and/or carrying
- Favorable attitudes toward drug use/Early onset of AOD use/Alcohol and/or drug use
- Early onset of aggression and/or violence
- Cognitive and neurological deficits/Low intelligence quotient/Hyperactivity
- Victimization and exposure to violence
- Life stressors
- Early sexual involvement
- Mental disorder / Mental health problem / Conduct disorder

**Protective Factor:**
*Community*
- Presence and involvement of caring, supportive adults in the community
- Prosocial opportunities for participation / Availability of neighborhood resources
- Rewards for prosocial community involvement

*Peer*
- Involvement with positive peer group activities

*Individual*

61

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055358

- Social competencies and problem solving skills
- Self-efficacy
- Positive expectations / Optimism for the future
- High individual expectations
- Healthy / Conventional beliefs and clear standards
- Perception of social support from adults and peers

**References:**

Flewelling, Robert, M.J. Paschal, Karen Lissy, Barri Burrus, Christopher Ringwalt, Phillip Graham, Verna Lamar, May Kuo, and Dorothy Browne. 1999. *A Process and Outcome Evaluation of 'Supporting Adolescents With Guidance and Employment (SAGE)': A Community-Based Violence Prevention Program for African-American Male Adolescents.* Final Report for Grant No. U81/CCU408504–01, funded by the Centers for Disease Control and Prevention.

**Contact:**

**Arnold Dennis**
Durham County Department of Social Services
P.O. Box 810
Durham, NC 27701

Phone: (919) 560-8086

E-mail: adennis@dsscar.co.durham.nc.us

**Boys and Girls Club Gang Prevention Through Targeted Outreach**
**Atlanta, Georgia**

**Intervention:**

The overall philosophy of the program is to give at-risk youths ages 6 to 18 what they seek through gang membership (supportive adults, challenging activities, and a place to belong) in an alternative, socially positive format. There are four components of the initiatives as stated by the Boys and Girls Clubs of America (BGCA): 1) community mobilization of resources to combat the community gang problem; 2) recruitment of 50 youths at risk of gang involvement (prevention) or 35 youths already involved in gangs (intervention) through outreach and referrals; 3) promoting positive developmental experiences for these youths by developing interest-based programs that also address the youths' specific needs through programming and mainstreaming of youths into the Clubs; and 4) providing individualized case management across four areas (law enforcement/juvenile justice, school, family, and Club) to target youths to decrease gang-related behaviors and contact with the juvenile justice system and to increase the likelihood that they will attend school and improve academically.

**Evaluation:**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    WICHITA 055359

The evaluation included 21 Boys and Girls Clubs that used the prevention approach and 3 Clubs that used the intervention approach. BGCA selected the sites through a competitive process in summer 1997. All of the prevention Clubs began using Gang Prevention Through Targeted Outreach (GPTTO) either simultaneous with the start of the evaluation or 1 year beforehand. The intervention Clubs developed their projects between 1 and 3 years before the start of the evaluation. The study included 932 prevention youths and 104 intervention youths who were recruited to each Club/project over about a 10-month period. The target youth survey subsample consisted of 236 prevention and 66 intervention youths. Given the complexity of the Gang Intervention Through Targeted Outreach and GPTTO models, the evaluation used multiple methods for gathering information, including a review of case management records, questionnaires, and interviews and focus groups with program youths and Club directors.

**Outcome:**

The evaluation concluded that more frequent GPTTO Club attendance is associated with the following positive outcomes: 1) delayed onset of one gang behavior (less likely to start wearing gang colors); 2) less contact with the juvenile justice system (less likely to be sent away by the court); 3) fewer delinquent behaviors (less likely to steal and less likely to start smoking pot); 4) improved school outcomes (higher grades and greater valuing of doing well in school); and 5) more positive social relationships and productive use of out-of-school time (engaging in more positive afterschool activities and increased levels of positive peer and family relationships).

**Risk Factor:**
*Community*
- Community crime / High crime neighborhood
- Social and physical disorder / Disorganized neighborhood
- Economic deprivation / Poverty / Residence in a disadvantaged neighborhood
- Neighborhood youth in trouble

*Peer*
- Gang involvement / Gang membership
- Peer alcohol, tobacco, and/or other drug use
- Association with delinquent and/or aggressive peers

*School*
- Dropping out of school
- School suspensions
- Truancy / Frequent absences

*Family*
- Family history of problem behavior / Parent criminality
- Sibling antisocial behavior

*Individual*
- Antisocial behavior and alienation / Delinquent beliefs / General delinquency involvement / Drug dealing
- Favorable attitudes toward drug use/Early onset of AOD use/Alcohol and/or drug use
- Poor refusal skills
- Life stressors

**Protective Factor:**
*Peer*
- Involvement with positive peer group activities

63

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055360

*Individual*
- Social competencies and problem solving skills
- Positive / Resilient temperament
- Positive expectations / Optimism for the future
- Healthy / Conventional beliefs and clear standards
- Perception of social support from adults and peers

**References:**

Arbreton, Amy J.A., and Wendy S. McClanahan. 2002. *Targeted Outreach: Boys and Girls Clubs of America's Approach to Gang Prevention and Intervention.* Philadelphia, Pa.: Public/Private Ventures.

**Contact:**

**Marie Gordon**
Boys and Girls Club of America
1275 Peachtree Street, NE
Atlanta, GA 30309-3506

Phone: 4044875700
Fax: 4044875789
E-mail: info@bgca.org

Web site: http://www.bgca.org

**Broader Urban Involvement and Leadership Development Program (BUILD)**
**Chicago, Illinois**

**Intervention:**

Chicago, Ill.'s BUILD (for Broader Urban Involvement and Leadership Development) program combines several popular gang prevention strategies in an ambitious attempt to curb gang violence in some of the city's most depressed and crime-ridden neighborhoods. Founded on the principle that youths join gangs because they lack other, more constructive opportunities and outlets, BUILD tries to "reach out to young people and provide alternatives to increasing violence" by

- Deploying trained street workers, who seek to establish a rapport with gang-involved youth and serve as positive role models

- Organizing afterschool sports programs and other recreational activities for at-risk and gang-involved youths

- Designing and delivering violence prevention curricula in local schools

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                WICHITA 055361

- Designing and delivering a violence prevention curriculum at the Cook County Juvenile Temporary Detention Center

- Providing career training, college counseling, and financial aid to students from low-income schools

- Working with corporate sponsors, community leaders, parents, and activists to coordinate local antiviolence initiatives and coalitions

Established in 1969 to address gang violence in Chicago's West Town community, BUILD has since expanded its activities to six other low-income, high-crime areas (Cabrini–Green, Humboldt Park, Logan Square, Ravenswood, Lakeview, and Uptown). The program's violence prevention curriculum at the local detention center reaches both male and female youths from throughout Cook County. BUILD estimates its various activities to date have involved more than 77,000 youths from around the Chicago area.

**Evaluation:**

In 1999 a team of researchers from Loyola University examined the impact of BUILD's detention center curriculum on detainees' recidivism rates. Their evaluation used a quasi-experimental design—comparing a random sample of 60 BUILD students with a matched random sample of 60 detainees who received no BUILD instruction. While some girls were included in the program, most participants were African-American males, ages 10–17. Juveniles in both the treatment and control groups were released into the community after their stays and followed for 1 year to determine their rates of recidivism and time to recidivism. The amount of time (or number of classroom days) BUILD participants were involved in the program was also tracked to determine whether length of stay affected recidivism patterns.

In the mid-1990s the Center for Latino Research at DePaul University also conducted an 18-month nonexperimental process evaluation, assessing the implementation of all of BUILD's programs in two of its target communities: Cabrini–Green and Uptown. This evaluation collected service records and qualitative data from interviews with staff, clients, focus groups, site visits, and monthly reports to form a subjective impression of how well BUILD staff were meeting their stated objectives of community resource development, prevention, and remediation.

**Outcome:**

The Loyola study of BUILD's detention program found that BUILD youths had significantly lower recidivism rates than their counterparts from the control group. According to the study, only 33 percent of BUILD youths recidivated within 1 year, versus 57 percent of non-BUILD participants. BUILD participants who did recidivate also had a longer average time to recidivism than youths from the control group (9.6 months versus 7.6 months). Finally, the study found that BUILD students who recidivated spent significantly fewer days in the BUILD classroom (an average of 6.17) than nonrecidivators (an average of 9.35 days).

The Center for Latino Research's process evaluation of BUILD found that the program was extremely well implemented. Overall, the team reported, "the program's objectives were accomplished and in many instances exceeded, [owing] to the efforts of BUILD's dedicated staff." BUILD's policy of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                WICHITA 055362

hiring staff with strong connections to the local community (including former gang members) and its strong emphasis on staff development were repeatedly identified as critical factors in the program's success.

**Risk Factor:**
*Community*
- Community crime / High crime neighborhood
- Social and physical disorder / Disorganized neighborhood
- Community instability
- Neighborhood youth in trouble

*Peer*
- Gang involvement / Gang membership
- Association with delinquent and/or aggressive peers

*School*
- Low academic achievement
- Negative attitude toward school / Low bonding / Low school attachment / Commitment to school
- Inadequate school climate / Poorly organized and functioning schools / Negative labeling by teachers
- Dropping out of school
- School suspensions
- Truancy / Frequent absences

*Family*
- Family history of problem behavior / Parent criminality
- Broken home

*Individual*
- Antisocial behavior and alienation / Delinquent beliefs / General delinquency involvement / Drug dealing
- Teen parenthood
- Favorable attitudes toward drug use/Early onset of AOD use/Alcohol and/or drug use
- Victimization and exposure to violence
- Poor refusal skills
- Early sexual involvement

**Protective Factor:**
*Community*
- Presence and involvement of caring, supportive adults in the community
- Prosocial opportunities for participation / Availability of neighborhood resources
- Rewards for prosocial community involvement

*Peer*
- Involvement with positive peer group activities

*School*
- Presence and involvement of caring, supportive adults in school
- Opportunities for prosocial school involvement

*Family*
- Opportunities for prosocial family involvement

*Individual*
- Social competencies and problem solving skills
- Positive expectations / Optimism for the future

66

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    WICHITA 055363

- Healthy / Conventional beliefs and clear standards

**References:**

Thompson, David, and Leonard A. Jason. 1986. "Effective School-Based Intervention: The Evaluation of BUILD's Gang Membership Prevention Program." Final Evaluation Report. Chicago, Ill.: Dysfunctioning Child Center of Michael Reese Hospital.

Lurigio, Arthur, G. Bensiger, and S.R. Thompson. 2000. "A Process and Outcome Evaluation of Project BUILD: Years 5 and 6." Unpublished Report. Chicago, Ill.: Loyola University, Department of Criminal Justice.

Mendez, Mervin. *Positive Choices.* Chicago, Ill: DePaul University, Center for Latino Research.

**Contact:**

**Freddy Calixto**
Broader Urban Involvement and Leadership Development
1223 North Milwaukee Avenue
Chicago, IL 60622

Phone: 7732272880
Fax: 7732273012
E-mail: build@buildchicago.org

Web site: http://www.buildchicago.org

**Comprehensive Gang Model**
**Chicago, Illinois**

**Intervention:**

The Comprehensive, Communitywide Approach to Gang Prevention, Intervention, and Suppression Program (also known as the Comprehensive Gang Strategy, the Comprehensive Gang Model, or the Spergel Model) is based on the assumption that gang violence is a product of social disorganization. The model presumes that gangs become chronic and serious problems in communities where key organizations are inadequately integrated and sufficient resources are not available to target gang-involved youth. To address these problems, the Comprehensive Gang Model calls for community institutions—including law enforcement, social welfare agencies, and grass roots organizations—to work together to achieve a more integrated, team-oriented approach. The model identifies five core elements, or strategies, that communities should incorporate into their programs to achieve successful outcomes:

1. *Community mobilization.* Local citizens and organizations are involved in a common enterprise. The

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055364

program consists of local police officers, probation officers, community youth workers, church groups, boys and girls clubs, a Latino community organization, and several local residents who work as a team to understand the gang structures and provide social intervention and social opportunities whenever they can.

2. *Social intervention.* The program reaches out to youths unable to connect with legitimate social institutions. A youth, the gang structure, and the environmental resources must be taken into account before the youth is provided with crisis counseling, family counseling, or referral to services such as drug treatment, jobs, training, educational programs, or recreation.

3. *Provision of social opportunities.* Youths at different points in their lives need different things. Older gang members may be ready to enter the legitimate job field and need training and education to do so. Younger youths at risk of becoming gang members may need alternative schools or family counseling. The program provides individualized services for each youth based on his or her needs.

4. *Suppression.* This not only consists of surveillance, arrest, probation, and imprisonment to stop violent behavior but also involves great communication between agency service providers and control providers. All providers jointly decide what happens to a particular youth when trouble arises or when it is about to.

5. *Organizational change and development of local agencies and groups.* All workers need to work closely with one another and collaborate. Former gang members working as community youth workers need to be given as much respect as the police officers in the program. Each group can provide important information for the program that the other may not be able to obtain.

To date, the Comprehensive Gang Model has been tested in at least six sites across the country. From 1992 through 1995, the Chicago Police Department ran the Gang Violence Reduction Project—a comprehensive, communitywide program designed to reduce serious violence in Chicago's gang-ridden Little Village neighborhood. In 1994 OJJDP also launched a series of 4- and 5-year demonstration projects, testing the model in five different cities: Bloomington–Normal, Ill.; Mesa, Ariz.; Riverside, Calif.; San Antonio, Texas; and Tucson, Ariz.

**Evaluation:**

The Little Village Gang Violence Reduction Project in Chicago was evaluated by Spergel and Grossman using a quasi-experimental design. The evaluation collected and analyzed data on 493 youths who were either program youths (195), quasiprogram youths who received some services (90), or a comparison group who did not receive services (208). The quasiprogram and comparison youths consisted of selected members of the same two gangs, the Latin Kings and the Two Six. The distinguishing feature between the quasiprogram and comparison youths was service contacts. Evaluators discovered that some gang members selected as part of the comparison group did receive some sort of service contact. These members became the quasiprogram group. Data collection included interviews, criminal history records, aggregate level police arrest data, field observations, community surveys, and focus groups. Respondents in all three groups were asked about their activities in relation to a series of 16 crimes, 9 of which involved violence either with or without a weapon and 7 of which were property related. The youths were also asked about drug-selling behavior. A series of indexes was constructed from these questions and used to determine the ratio of violence to property crime as well as violence to drug-selling activity.

Spergel and a group of colleagues at the University of Chicago also evaluated all five of the sites involved in OJJDP's national demonstration project. Although there were minor variations in the evaluation design at each of the sites, all five programs were assessed using a quasi-experimental

68

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    WICHITA 055365

research design. Treatment groups in each locale (varying in size from 101 to 258 subjects, ages 12–21) were matched with appropriate control groups from comparable neighborhoods outside the treatment area. Individual and group progress was then tracked using arrest data, field observations, project contact and service records, and surveys and interviews of program staff and participants. Multivariate statistical models were used to control for differences in demographic background, previous arrest history, and other distinguishing characteristics between program youths and comparison youths. The national evaluation team also conducted organizational surveys, interviews, focus groups, and site visits to collect qualitative data on the implementation of the Comprehensive Gang Model at each site.

**Outcome:**

Spergel and Grossman's initial evaluation of the Little Village site concluded that serious gang violence among the targeted gang members was lower than among members of comparable gangs in the area. Specifically, there were fewer arrests for serious gang crimes (especially aggravated batteries and aggravated assaults) involving members of targeted gangs in comparison with a control group of youths from the same gangs and members of other gangs in Little Village. It appears that the coordinated project approach, using a combination of various social interventions involving youth outreach workers and suppression tactics, was more effective for more-violent youths, while the sole use of youth workers was more effective for less-violent youths. The study also found that the project was apparently most effective in assisting older youths to significantly reduce their criminal activities (particularly violence) more quickly than would have been the case if no project services had been provided. However, the project did not appear to be effective with younger youths. Finally, residents of the target area reported significantly greater improvement in community conditions, perceptions of gang crime, and police effectiveness in dealing with gang crime.

The evaluation of the national OJJDP demonstration project produced mixed results. Two of the five cities involved in the initiative reported positive outcomes. Youths enrolled in Riverside, Calif.'s program (Building Resources for the Intervention and Deterrence of Gang Engagement) were "three times as successful in the odds ratio of success to failure in reducing serious-violence arrests as comparison youth." Program youths also had a lower ratio of failure to success for repeat drug arrests, and local crime records indicate that serious violence offenses, less-serious violence offences, and property offenses all declined substantially throughout the Riverside community during the program's operation. Similarly, youths involved in the Mesa Gang Intervention Program had arrest levels 18 percent lower than comparison youth over a 4-year period. The targeted area also experienced a 10.4 percent greater reduction in selected juvenile-type crimes than the control area. However, the remaining three OJJDP demonstration sites (Bloomington–Normal, Ill.; San Antonio, Texas; and Tucson, Ariz.) all reported no statistically significant change in arrest patterns at either the individual or community level as a result of treatment. Based on the qualitative data collected in interviews, focus groups, and organizational surveys, Spergel concludes that the lack of treatment effect in these three communities resulted from poor program implementation. All three communities had difficulty establishing successful interagency collaborations and tended to neglect one or more of the five required program elements (community mobilization, social intervention, etc.).

**Risk Factor:**
*Community*
- Availability of firearms
- Community crime / High crime neighborhood

69

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     WICHITA 055366

- Social and physical disorder / Disorganized neighborhood
- Community instability

*Peer*

- Gang involvement / Gang membership
- Peer alcohol, tobacco, and/or other drug use

*Individual*

- Antisocial behavior and alienation / Delinquent beliefs / General delinquency involvement / Drug dealing

**Protective Factor:**

*Community*

- Safe environment / Low neighborhood crime

*Peer*

- Involvement with positive peer group activities

**References:**

Illinois Criminal Justice Information Authority. 1999. "Reducing Youth Gang Violence in Urban Areas: One Community's Effort." *On Good Authority* 2(5):1–4.

———. 2000. "Outcomes of the Gang Violence Reduction Project." *On Good Authority* 4(3):1–4.

Spergel, Irving A., and Susan F. Grossman. 1997. "The Little Village Project: A Community Approach to the Gang Problem." *Social Work* 42:456–70.

Spergel, Irving A., K.W. Wa, S.E. Choi, Susan F. Grossman, A. Jacob, A. Spergel, and E.M. Barrios. 2003. *Evaluation of the Gang Violence Reduction Project in Little Village: Final Report Summary.* Chicago, Ill.: University of Chicago, School of Social Service Administration.

Spergel, Irving A., K.W. Wa, and R.V. Sosa. 2005a. *Evaluation of the Bloomington–Normal Comprehensive Communitywide Approach to Gang Prevention, Intervention, and Suppression Program: Final Report Summary.* Chicago, Ill.: University of Chicago, School of Social Service Administration.

———. 2005b. *Evaluation of the Mesa Gang Intervention Program: Final Report Summary.* Chicago, Ill.: University of Chicago, School of Social Service Administration.

———. 2005c. *Evaluation of the Riverside Comprehensive Communitywide Approach to Gang Prevention, Intervention, and Suppression Program: Final Report Summary.* Chicago, Ill.: University of Chicago, School of Social Service Administration.

———. 2005d. *Evaluation of the San Antonio Comprehensive Communitywide Approach to Gang Prevention, Intervention, and Suppression Program: Final Report Summary.* Chicago, Ill.: University of Chicago, School of Social Service Administration.

———. 2005e. *Evaluation of the Tucson Comprehensive Communitywide Approach to Gang Prevention, Intervention, and Suppression Program: Final Report Summary.* Chicago, Ill.: University of Chicago, School of Social Service Administration.

**Contact:**

**Irving A. Spergel**
School of Social Service Administration, Universit
969 East 60th Street
Chicago, IL 60637–2640

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                WICHITA 055367

Phone: 7737021134
Fax: 7737020874
E-mail: jasperge@midway.uchicago.edu

**East Texas Experiential Learning Center**
**Nacogdoches, Texas**

**Intervention:**

The goal of the East Texas Experiential Learning Center was to reduce multiple risk factors for the use and abuse of alcohol, tobacco, illegal drugs, and inhalants (ATIDI) among economically disadvantaged seventh graders in Nacogdoches, a rural East Texas community. The project consisted of school-based intervention, afterschool trips, weekend day trips at local wilderness facilities and forestlands, Wilderness Challenge Ropes adventure camp (5-day sessions), and community-based programming.

Objectives of the project:
- Improve high-risk youths' social competence.
- Increase high-risk youths' feelings of autonomy.
- Increase high-risk youths' sense of purpose and future.
- Increase high-risk youths' cognitive and social problem-solving skills.
- Increase high-risk youths' perception of harm of ATIDI use by themselves and their peers.
- Increase high-risk youths' involvement in alternative activities that do not include ATIDI use.
- Decrease high-risk youths' level of conflict and violence in the home, school, and community.
- Increase negative attitudes toward ATIDI use among youths, peers, family, school, and community.
- Increase the involvement of family, school, neighborhood, and community in dealing with ATIDI problems.
- Enhance the climate at home, school, and in the community.
- Increase perception of harm of ATIDI use in the family, school, and community.
- Increase parenting and teaching skills.

**Evaluation:**

The research design of this study was a pretest–posttest, comparison-group experimental design. The sample population was randomly selected from incoming seventh grade students at Thomas J. Rusk Middle School in Nacogdoches who were assigned to either a treatment group or a control group. The population base over a 3-year period consisted of four cohorts, with 396 treatment subjects and 257 control subjects. However, this study is restricted to cohort 4, which was the only complete year of the grant. Cohort 4 consisted of 105 treatment subjects (54 percent white, 28 percent African-American, and 18 percent Hispanic) and 93 control subjects (55 percent white, 32 percent African-American, and 13 percent Hispanic). All students were assessed preintervention and postintervention through the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     WICHITA 055368

National Youth Survey, which measures risk factors, resiliency, self-efficacy, ATIDI attitudes, ATIDI use, personal autonomy, self-esteem and self-image, adjustment issues, and parent, school, intellectual, and school bonding.

**Outcome:**

It appears that experiential and adventure education does produce some observable change with seventh grade students in several areas of performance. The program succeeded in promoting resiliency and a sense of trust in the school or treatment environment. In addition, the intervention significantly improved overall academic performance, and discipline reports were significantly fewer for the experimental group than for the control group.

The study was limited in that researchers were able to collect data on only one cohort, which does not allow for the comparison of different treatment groups. Owing to time constraints, the study was unable to determine whether participants in experiential learning differ on numerous personality traits or if they indirectly differ on educational characteristics from those who do not wish to participate. Another limitation is the nature of the National Youth Survey, which is directed to a population unlike the one found in rural East Texas.

**Risk Factor:**
*Community*
- Availability of alcohol and other drugs
- Community crime / High crime neighborhood
- Social and physical disorder / Disorganized neighborhood
- Economic deprivation / Poverty / Residence in a disadvantaged neighborhood

*Peer*
- Gang involvement / Gang membership
- Peer alcohol, tobacco, and/or other drug use
- Association with delinquent and/or aggressive peers

*School*
- Low academic achievement
- Negative attitude toward school / Low bonding / Low school attachment / Commitment to school

*Family*
- Family history of problem behavior / Parent criminality
- Family management problems / Poor parental supervision and/or monitoring
- Poor family attachment / Bonding
- Low parent education level / Literacy

*Individual*
- Antisocial behavior and alienation / Delinquent beliefs / General delinquency involvement / Drug dealing
- Favorable attitudes toward drug use/Early onset of AOD use/Alcohol and/or drug use
- Early sexual involvement
- Mental disorder / Mental health problem / Conduct disorder

**Protective Factor:**
*Community*
- Presence and involvement of caring, supportive adults in the community
- Prosocial opportunities for participation / Availability of neighborhood resources

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055369

- High community expectations
- Safe environment / Low neighborhood crime
- Nondisadvantaged neighborhood

*Peer*
- Involvement with positive peer group activities

*School*
- Student bonding (attachment to teachers, belief, commitment)
- Above average academic achievment / Reading and math skills

*Individual*
- Social competencies and problem solving skills
- Positive expectations / Optimism for the future
- High individual expectations

**References:**

Caramanian, Paul. 1998. "The Impact of Experiential Learning on the Perception of Seventh Grade Students Regarding the Use of Alcohol, Tobacco, Other Drugs, and Inhalants." Unpublished Dissertation. Houston, Texas: Texas Southern University.
Choate, Robert. 1999. "East Texas Experiential Learning Center: Final Report." Nacogdoches, Texas: East Texas Experiential Learning Center.

**Contact:**

**Bruce Payette, Ph.D.**
SFA Station
P.O. Box 13019
Nacogdoches, TX 75962

Phone:
Fax:
E-mail: Bpayette@sfasu.edu

**Gang Resistance Is Paramount (GRIP)**
**Paramount, CA**

**Intervention:**

Gang Resistance Is Paramount (GRIP), originally Alternatives to Gang Membership, began in 1982 as an attempt to curb gang membership and discourage future gang involvement in Paramount, Calif. The program's objectives are to educate students about the dangers of gangs, discourage the city's youth from joining gangs, educate the students' parents about the signs of gang involvement, and provide parents with the resources that will help them eliminate gang activities in their homes and neighborhoods. GRIP staff are familiar with gang activity, but they avoided gang involvement. Most of them are community members who live or have lived in Paramount. Their training is updated continually, and the program has had low turnover.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    WICHITA 055370

GRIP has four elements

1. A school-based curriculum, consisting of 23 lessons, for second and fifth graders. In eight lessons the second graders are taught about a) peer pressure, b) drugs, c) alcohol, d) self-esteem, e) family, f) crime, g) gangs and territory, and h) gangs and vandalism. They are discouraged from joining a gang through video presentations, workbook exercises, songs, and discussion of alternatives to gangs such as recreational activities. Fifth graders review topics such as gang graffiti, gangs and death, how gang activity affects the family, the consequences of getting gang tattoos, gangs and crime, resisting peer pressure to join a gang, future opportunity preparation, and alternatives to gang membership. Gang membership is discouraged through the promotion of recreational activities, video presentations, current event discussions, and open dialog between students. An in-school follow-up program in the ninth grade caps the program. Topics such as drugs, alcohol, dropping out of high school, teen pregnancy, self-esteem, the consequences of a criminal lifestyle, the importance of higher education, and preparing for career opportunities are discussed.
2. Parent education in the form of neighborhood meetings at which parents are taught about the warning signs of gang involvement and how to keep their children out of gangs are held throughout the community. Handouts are given in both English and Spanish and include everything from information on programs and activities at the city's recreation department to information about tattoo removal programs and graffiti hotline numbers.
3. Antigang counseling of parents and youths regarding the youths' gang activities. Sessions are set up by request or referral and occur in the parents' home, over the phone, or in office.
4. Involvement in city recreational activities is encouraged. Sports, classes, special events, and programs specifically for young teens are provided, during which gang clothing is not allowed.

GRIP has undergone six separate studies. The first two tested elementary students before and after participation in the program. Before the program, 50 percent of students were undecided about gang involvement. After participation, 90 percent responded negatively toward gangs, compared with a control group who showed no change over that time period. The third and forth studies surveyed seventh and ninth graders who had participated in the program; both showed that 90 percent of students still had negative attitudes toward gangs. The fifth study crosschecked the names of program participants with police records and found that 96 percent were not identified as gang members.

**Evaluation:**

The most recent GRIP evaluation used a nonrandomized posttest design. An anonymous survey was administered to 735 ninth graders in Paramount before the start of GRIP lessons. The survey asked the students if they had previously participated in the GRIP program and what their experience was with gang activity. It also asked them to read a series of statements pertaining to gangs and then asked if they agreed, disagreed, or were undecided about each one. There were 505 students who had participated in GRIP in the second, fifth, or both grades; 209 students ended up in the control group saying they had never participated, while 21 students did not answer the question. Seventy-eight percent of the sample was Latino, 10 percent African American, 2 percent Asian American, 1 percent white, and 8 percent answered "other" (most of them citing Hispanic or Puerto Rican as their ethnicity).

**Outcome:**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055371

The evaluation showed that only 6 percent of ninth graders who had participated in GRIP reported being involved in gang activity, compared with 9 percent of youths in the control group. Of the males who reportedly participated in gang activity, 52 percent had participated in GRIP, whereas 71 percent of the females had participated in the program. This shows that females may not relate to the curriculum as much as males do.

The biggest difference between the groups manifested in perceptions of drugs and alcohol in gang life: 72 percent of GRIP participants felt that drugs and alcohol were a significant part, while only 57 percent of nonparticipants felt this was so. Overall both groups displayed levels of antigang sentiment when it came to questions about safety, tattoos, graffiti, and violence. Both groups also responded favorably to the importance of high school, not getting arrested, making sure family members did not join a gang, and not hanging out with or dressing like gang members. The majority of each group realized that family and friends would be affected if they joined a gang and reported that they would not join a gang if their friends did.

**Risk Factor:**
*Community*
- Availability of alcohol and other drugs
- Availability of firearms
- Community crime / High crime neighborhood
- Economic deprivation / Poverty / Residence in a disadvantaged neighborhood
- Neighborhood youth in trouble

*Peer*
- Gang involvement / Gang membership
- Association with delinquent and/or aggressive peers

*School*
- Low academic achievement
- Negative attitude toward school / Low bonding / Low school attachment / Commitment to school

*Family*
- Family history of problem behavior / Parent criminality
- Family management problems / Poor parental supervision and/or monitoring
- Having a young mother
- Broken home
- Sibling antisocial behavior
- Family transitions
- Low parent education level / Literacy

*Individual*
- Favorable attitudes toward drug use/Early onset of AOD use/Alcohol and/or drug use
- Victimization and exposure to violence
- Lack of guilt and empathy
- Poor refusal skills

**Protective Factor:**
*Community*
- Presence and involvement of caring, supportive adults in the community
- Prosocial opportunities for participation / Availability of neighborhood resources
- Safe environment / Low neighborhood crime

*Peer*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055372

- Involvement with positive peer group activities
- Good relationships with peers

*School*
- Strong school motivation / Positive attitude toward school

*Individual*
- Social competencies and problem solving skills
- Self-efficacy
- Positive expectations / Optimism for the future
- High individual expectations
- Healthy / Conventional beliefs and clear standards
- Perception of social support from adults and peers

**References:**

Arnette, June Lane, and Marjorie C. Walsleben. 1998. "Combating Fear and Restoring Safety in Schools." *Juvenile Justice Bulletin*. Washington, D.C.: U.S. Department of Justice: Office of Juvenile Justice and Delinquency Prevention.

Solis, Angelica, Wendy Schwartz, and Tamika Hinton. 2003. "Gang Resistance Is Paramount (GRIP) Program Evaluation: Final Report Oct. 1, 2003." Los Angeles, Calif.: University of Southern California, USC Center for Economic Development.

**Contact:**

**Tony Ostos, Manager**
Gang Resistance Is Paramount Program
16400 Colorado Avenue
Paramount, CA 90723

Phone: 1.562.220.2120
Fax: 1.562.630.2713
E-mail: tostos@paramountcity.com

Web site: http://www.paramountcity.com

**Movimiento Ascendencia**
**Pueblo, Colorado**

**Intervention:**

*Movimiento Ascendencia* (Upward Movement) was established in Pueblo, Colo., to provide girls with positive alternatives to substance use and gang involvement. Outreach workers recruited 8- to 19-year-old females to the program, though some girls were instead referred to it. The program, which serves both at-risk and gang-involved youth, is headed by the Pueblo Youth Services Bureau and consists of a project director, a coordinator, and three outreach workers who are trained in conflict mediation and resolution skills, signs and symptoms of drug and alcohol abuse, and providing information on

76

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                WICHITA 055373

sexuality, pregnancy, and sexually transmitted diseases. The five professionals work closely together.

Activities are designed around three main components: cultural awareness, mediation or conflict resolution, and self-esteem or social support. Participation in any of the Movimiento Ascendencia activities is voluntary. The program includes

- *Mentoring.* Girls are matched with a female mentor with whom they spend at least 2 hours a week for 9 months.

- *Organized sports and recreational activities,* such as movies, pizza parties, and talent and fashion shows.

- *U\*R\*IT*—tutoring and homework support given by staff twice a week after school within the school. This component also includes gender-specific life skills training on topics such as self-esteem, pregnancy prevention, personal grooming, personal safety and self-defense, loss and grief, relationships and emotions, and career goals.

- *Cultural enhancement*—attending cultural fairs, listening to speakers talk about different cultures, day trips into Denver or Colorado Springs.

- *Case management.* An initial home visit and needs assessment is conducted when a girl first joins the program. She is referred to services in the community.

- *Parental involvement.* Parents transport children to activities and scheduling activities that include the family, such as an annual awards banquet.

- *Safe Haven* provides a safe place where girls can go within their communities.

**Evaluation:**

The program was evaluated as part of a study looking at adolescent female gang intervention/prevention programs. A nonequivalent-group, quasi-experimental design was used to study gang members, former gang members, and non–gang members. The treatment group consisted of a random sample of program participants, while the control group consisted of a "snowball" sample gathered through school and juvenile justice contacts. Interview-based surveys were conducted during the final 12 months of the program. Level of delinquency was measured by incidents such as throwing objects at people or cars, purposely damaging or destroying someone else's property, running away from home, stealing or trying to steal something worth less than $50, stealing or trying to steal something worth more than $50, carrying a concealed weapon other than a pocket knife, and knowingly buying, selling, or holding stolen goods. Academic performance and self-esteem were also measured. The treatment group consisted of 61 girls, 32 non–gang members, 20 gang members, and 9 former gang members. The control group also consisted of 61 girls, 32 non–gang members, 13 gang members, and 16 former gang members. The girls in the treatment group averaged 14.8 years of age; the control group's average age was 15.4. There were no statistically significant differences between the two groups at baseline.

**Outcome:**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055374

Girls in the treatment group showed a greater reduction in delinquency than girls in the control group during the preprogram and postprogram periods. This difference was statistically significant, at the .01 level. Preprogram reports showed that the control group had significantly higher grades than the treatment group. Postprogram reports showed that both groups had statistically significant increases in reported average grades, resulting in a nonsignificant difference between the two groups after the program. There were no differences found in the Hare self-esteem scale measures between the two groups.

**Risk Factor:**
*Community*
- o   Neighborhood youth in trouble

*Peer*
- o   Gang involvement / Gang membership

*School*
- o   Low academic achievement
- o   Negative attitude toward school / Low bonding / Low school attachment / Commitment to school

*Individual*
- o   Favorable attitudes toward drug use/Early onset of AOD use/Alcohol and/or drug use
- o   Cognitive and neurological deficits/Low intelligence quotient/Hyperactivity
- o   Poor refusal skills
- o   Mental disorder / Mental health problem / Conduct disorder

**Protective Factor:**
*Peer*
- o   Involvement with positive peer group activities

*School*
- o   Strong school motivation / Positive attitude toward school

*Family*
- o   Opportunities for prosocial family involvement

*Individual*
- o   Social competencies and problem solving skills
- o   Healthy / Conventional beliefs and clear standards

**References:**

Williams, Katherine, G. David Curry, and Marcia I. Cohen. 1999. *Evaluation of Youth Gang Drug Intervention/Prevention Programs for Female Adolescents Volume 1: Final Report.* Washington, DC: U.S. Department of Justice, National Institute of Justice.

———. 2002. Gang Prevention Programs for Female Adolescents: An Evaluation. In Winifred L. Reed and Scott H. Decker (eds.). *Responding to Gangs: Evaluation and Research.* Washington, DC: U.S. Department of Justice, National Institute of Justice, 225–63.

**Contact:**

**Molly Melendez**
Pueblo Youth Services Bureau
1920 Valley Drive

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                     WICHITA 055375

Pueblo, CO 81008

Phone: 7195425161
Fax: 7195421335
E-mail: PuebYouth@aol.com

**Operation Ceasefire**
**Boston, Massachusetts**

**Intervention:**

Originally developed by the Boston Police Department's Youth Violence Strike Force, Operation Ceasefire is a problem-solving police strategy that seeks to reduce gang violence, illegal gun possession, and gun violence in communities. As a deterrence strategy, the intervention posits that crimes can be prevented when the costs of committing the crime are perceived by the offender to outweigh the benefits of committing a crime. It targets high-risk youths as well as serious and violent juvenile offenders. The program is just one element of a collaborative, comprehensive strategy (which also includes the Boston Gun Project and Operation Night Light) implemented in Boston, Mass., to address escalating gang activity and rising violent crime rates. It combines aggressive law enforcement and prosecution efforts aimed at recovering illegal handguns, prosecuting dangerous felons, increasing public awareness, and promoting public safety and antiviolence.

The program's suppression tactics include numerous warrants and long sentences for chronic offenders, aggressive enforcement of probation restrictions, and deployment of Federal enforcement powers. The prevention strategy is centered on an ambitious communications campaign involving meetings with both community groups and gang members. Everyone in the community is informed that gang violence will provoke a zero-tolerance approach and that only an end to gang violence will stop new gang-oriented suppression activities. Ideally, these activities should be combined with a variety of other law enforcement strategies and grassroots community initiatives to combat crime.

The goals of the program are to carry out a comprehensive strategy to apprehend and prosecute offenders who carry firearms, to put others on notice that offenders face certain and serious punishment for carrying illegal firearms, and to prevent youths from following the same criminal path.

Operation Ceasefire's first main element is a direct law-enforcement attack on illicit firearms traffickers who supply youths with guns. The program frames a set of activities intended to systematically address the patterns of firearm trafficking:

- Expanding the attention of local, State, and Federal authorities to include intrastate trafficking in Massachusetts-sourced guns

- Focusing enforcement attention on traffickers of those makes and calibers of guns most used by gang members

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055376

- Focusing enforcement attention on traffickers of those guns showing a short time to crime (18 months or less)

- Focusing enforcement attention on traffickers of guns used by the city's most violent gangs

- Attempting to restore obliterated serial numbers

- Supporting these practices through analysis of crime gun traces generated by the Boston Police Department's investigations and arrests involved with gangs or violent crimes

The second element involves deterring violent behavior by chronic gang members by reaching out directly to gangs, saying explicitly that violence will not be tolerated, and by following every legally available route when violence occurs. Simultaneously, service providers, probation and parole officers, and church and other community groups offer gang members services and other kinds of help.

**Evaluation:**

Operation Ceasefire has been evaluated using a basic one-group, time-series design and a nonrandomized quasi-experiment to compare youth homicide trends in Boston with youth homicide trends in other large U.S. cities. No control groups were used in the evaluation for three reasons: 1) the aim of the program was to address serious youth violence wherever it presented itself in the city, 2) the target of the intervention was defined as the self-sustaining cycle of violence in which all gangs were caught up and to which all gangs contributed, and 3) the communications strategy was explicitly intended to affect the behavior of gangs and individuals not directly subjected to enforcement attention.

The key outcome variable in the assessment of the Ceasefire program was the monthly number of homicide victims age 24 and younger. The homicide data were obtained from the Boston Police Department's Office of Research and Analysis (January 1991 through May 1998). The evaluation also examined the monthly counts of citywide shots-fired, citizen calls for service data, and citywide official gun assault incident report data (January 1991 through December 1997).

**Outcome:**

The Operation Ceasefire program was officially implemented on May 15, 1996. Boston had averaged 44 youth homicides per year from 1991 through 1995. In 1996 the number of youth homicides decreased to 26 and further decreased to 15 in 1997.

A comparison of Boston's youth violence trends with other cities during the program period suggests that Operation Ceasefire may have been effective in reducing youth homicides, gun assault incidents, and "shots fired" calls for service. The intervention was associated with a statistically significant decrease (63 percent) in the monthly number of youth homicides. However, Operation Ceasefire was but one element of a collaborative, comprehensive strategy implemented in Boston. Others included Boston's 10-Point Coalition. The Operation Ceasefire program has been replicated in other cities, including Minneapolis, Minn.; St. Louis, Mo.; and Los Angeles, Calif.

**Risk Factor:**
*Community*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055377

- Availability of alcohol and other drugs
- Availability of firearms
- Community crime / High crime neighborhood
- Social and physical disorder / Disorganized neighborhood
- Community instability
- Low community attachment
- Economic deprivation / Poverty / Residence in a disadvantaged neighborhood
- Neighborhood youth in trouble

*Peer*

- Gang involvement / Gang membership
- Peer alcohol, tobacco, and/or other drug use
- Association with delinquent and/or aggressive peers

*School*

- Negative attitude toward school / Low bonding / Low school attachment / Commitment to school
- Inadequate school climate / Poorly organized and functioning schools / Negative labeling by teachers
- Dropping out of school
- School suspensions
- Truancy / Frequent absences

*Family*

- Family history of problem behavior / Parent criminality
- Family management problems / Poor parental supervision and/or monitoring
- Family violence

*Individual*

- Antisocial behavior and alienation / Delinquent beliefs / General delinquency involvement / Drug dealing
- Gun possession / Illegal gun ownership and/or carrying
- Favorable attitudes toward drug use/Early onset of AOD use/Alcohol and/or drug use
- Early onset of aggression and/or violence
- Victimization and exposure to violence
- Lack of guilt and empathy
- Poor refusal skills
- Life stressors

**Protective Factor:**

*Community*

- Presence and involvement of caring, supportive adults in the community
- Prosocial opportunities for participation / Availability of neighborhood resources
- High community expectations
- Safe environment / Low neighborhood crime
- Nondisadvantaged neighborhood
- Rewards for prosocial community involvement

*Peer*

- Involvement with positive peer group activities
- Good relationships with peers

*School*

- Presence and involvement of caring, supportive adults in school
- High quality schools / Clear standards and rules

81

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER       WICHITA 055378

*Family*
- Effective parenting
- Good relationship with parents / Bonding or attachment to family

*Individual*
- Social competencies and problem solving skills
- Self-efficacy
- Healthy / Conventional beliefs and clear standards
- Perception of social support from adults and peers

**References:**

Braga, Anthony A., David M. Kennedy, Elin J. Waring, and Anne Morrison Piehl. 2001. "Problem-Oriented Policing, Deterrence, and Youth Violence: An Evaluation of Boston's Operation Ceasefire." *Journal of Research in Crime and Delinquency* 38(3):195–225.

**Contact:**

**James Jordan or Gary French**
Boston Police Department
One Schroeder Plaza
Boston, MA 02120–2014

Phone: 6173434200
Fax: 6173434481
E-mail: JordanJ.bpd@ci.boston.ma.us

Web site: http://www.bostonstrategy.com/programs/11_OpCeaseFire.html

**San Diego County Breaking Cycles**
**San Diego, California**

**Intervention:**

San Diego County (Calif.) Breaking Cycles has components of both prevention and graduated sanctions.

The prevention component targets youths who are not yet involved in the juvenile justice system but who exhibit problem behavior such as disobeying their parents, violating curfew, repeated truancy, running away from home, or experimenting with drugs or alcohol. Youths can also self-refer if they experience parental neglect or abuse or they have other problems at home. Community Assessment Teams (CATs)—consisting of a coordinator, case managers, probation officers, and other experts—assess the needs of the youth and his or her family and then provide direct services or referrals to resources in the community to reduce the high-risk behaviors. CATs speak many different languages to communicate directly with their clients. Whenever possible, services are brought directly to the client

82

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                WICHITA 055379

and family.

The graduated sanctions component tries to prevent further involvement in delinquency by combining sanctions with treatment. A juvenile who is at risk of an out-of-home placement can be referred to Breaking Cycles through a Juvenile Court Order, then a screening committee determines whether the juvenile will enter the program by examining his or her current offense, prior criminal history, and other personal, social, and family characteristics. A youth is brought to Breaking Cycles, put into Juvenile Hall, and begins a 10- to 14- day evaluation of educational performance, mental health needs, drug/alcohol dependencies, self and family resiliency, institutional adjustment, and strengths and future goals. A case plan is developed for each youth by a multidisciplinary team, with the family's input. A youth can be placed in a community-based institution or a home. Many youths start in a highly structured environment and, through goal attainment, step down to a lower level of commitment. Reassessments are performed weekly on the basis of public safety, the youth's rehabilitation, and subsequent compliance with the program's case plan developed in the assessment plan.

**Evaluation:**

The prevention component of this program was evaluated using a quasi-experimental design with a matched comparison group. The treatment group (n=208) consisted of a random sample of clients who received services for a minimum of 60 days between Jan. 1 and June 30, 1999. The control group (n=184) consisted of a matched sample of juveniles referred to the Probation Department during the same time period whose cases were referred to counseling then closed. A case was eliminated from inclusion if the juvenile was referred for a criminal offense, was over 16, or had ever been a ward. Data was collected using program/probation files, telephone interviews with a parent or guardian, and criminal history checks at 4 time periods: during the intervention, 1 to 6 months after the intervention, 7 to 12 months after the intervention, and 13 to 18 months after intervention. Average age for the treatment group was 13.3, and for the control group it was 14.1. The treatment group was 58 percent male, the control group 67 percent male. The ethnicity varied slightly between the treatment and control groups: Hispanic (52 percent in the treatment group, 46 percent in the control), white (31 percent and 37 percent, respectively), African-American (10 percent and 9 percent, respectively), and Asian-American (4 percent and 5 percent, respectively).

The graduated sanctions component was evaluated using a retrospective quasi-experimental design with a nonequivalent comparison group. The treatment group (n=264) consisted of a random sample of Breaking Cycles cases in 1999. The control group consists of a random sample of cases assigned to juvenile probation supervision during the first 4 months of 1995 (before Breaking Cycles was implemented) and 1997 (after the implementation of the Juvenile Correctional Intervention Program). The sample was divided and data was analyzed by commitment length: 240 days (out of 365), 150 days, and 90 days. The average age for both groups was 15, and 85 percent were male. The groups had similar ethnic compositions: 56 percent versus 47 percent Hispanic, 19 percent versus 21 percent white, 18 percent versus 21 percent African-American, and 5 percent versus 8 percent Asian-American. Data regarding risk factors, intervention received, school performance, and criminal activity was obtained by reviewing probation and institutional files. Criminal activity was tracked through the Probation Department's computer system and through adult records. Placement after 1 year was obtained through Probation. Data was collected at 6, 12, and 18 months after treatment/release.

**Outcome:**

83

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    WICHITA 055380

The evaluation of the prevention component found that the treatment group was less likely to receive a referral to probation (19 percent versus 27 percent); however, there was no real difference between the two groups in the amount of true findings (7 percent versus 9 percent). The treatment group was significantly less likely to use alcohol and drugs both preintervention and postintervention. There was virtually no change in school enrollment status for the treatment group after the intervention (97 percent versus 96 percent), while there was a decrease in enrollment for the control group (99 percent versus 91 percent). Both groups showed a decrease in the amount of juveniles suspended or expelled. The treatment group dropped from 54 percent to 38 percent, while the control group dropped from 57 percent to 39 percent. School performance was measured by being at the appropriate grade level in school. At pretest almost all juveniles were at the appropriate grade level (96 percent of the treatment group, 97 percent of the control), but by posttest the percentage for the control group dropped to 84 percent while the treatment group only dropped to 94 percent.

The evaluation of the graduated sanctions component for youths committed 240 days of a year found that the treatment group was less likely than the control group to have a referral to probation or a true finding during each of the time periods, but the differences decreased over time. Youths in the treatment group were continually less likely to be wards of the court; at 18 months, 37 percent were wards compared with 58 percent of controls. The treatment group was significantly more likely before the program to have used alcohol (95 percent versus 73 percent) and drugs (95 percent versus 80 percent). After the program the differences were no longer significant for alcohol use (64 percent versus 73 percent) and were significantly less likely for drug use (55 percent versus 75 percent). The treatment group was proportionally more likely to be enrolled in school 1 year after their commitment.

The evaluation of the graduated sanctions component for youths committed 150 days found that after the first 6 months the treatment group was more likely to receive a referral to probation, after 12 months were less likely, and after 18 months were again more likely. However, the treatment group was always less likely than the control group to have a true finding. Youths in the treatment group were significantly less likely to be wards of the court at 12 months and were still less likely at 18 months (47 percent versus 63 percent). Both groups showed a decrease in the use of alcohol and drugs; however, the drop was less substantial for the control group (95 percent to 55 percent versus 80 percent to 75 percent). The treatment group was significantly more likely to be enrolled in school 1 year after commitment.

The evaluation of the graduated sanctions component for youths committed 90 days found that at the beginning of the study there was little difference in the amount of referrals, then at 12 months the treatment group had more and at 18 months the treatment group had less. At each time period the treatment group was less likely to have a true finding.

Youths in the treatment group were less likely than the control group to be wards of the court at all time periods, though none were statistically significant. The treatment group was significantly more likely to have used drugs and alcohol before the program (96 percent versus 72 percent), but after the program the difference was no longer significant (68 percent versus 67 percent). There were no differences between the two groups in school enrollment 1 year after commitment.

**References:**

Burke, Cynthia, and Susan Pennell. 2001a. *Breaking Cycles Evaluation: A Comprehensive Approach to Youthful Offenders.* San Diego, Calif.: San Diego Association of Governments.

84

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055381

———. 2001b. *What Works: San Diego County's Breaking Cycles Program.* San Diego, Calif.: San Diego Association of Governments.

Howell, James C. 2003. *Preventing and Reducing Juvenile Delinquency: A Comprehensive Framework.* Thousand Oaks, Calif.: Sage Publications.

**Contact:**

**Kim Allen, Probation Director**
San Diego County Probation
7798 Starling Drive, Suite 200
San Diego, CA 32123

Phone: 8584922328
Fax: 8584922339
E-mail: kim.allen@sdcounty.ca.gov

Web site: http://www.sdcounty.ca.gov/probation/jfs/bcaboutus.html

**Tri-Agency Resource Gang Enforcement Team**
**Orange County, California**

**Intervention:**

The Tri-Agency Resource Gang Enforcement Team (TARGET) program in Orange County, Calif., is a gang crime intervention program intended to provide a strong criminal justice response to offenses committed by gang members. The goal of the TARGET program is to reduce gang crime by selectively incarcerating the most violent and repeat (recidivist) gang offenders (based on their criminal records). Individuals are identified as repeat gang offenders on the basis of their criminal record, with the assistance of reliable police intelligence. Once these offenders are identified, they are monitored closely for new offenses. When a gang member is arrested, the offender is prosecuted by the district attorney assigned to the TARGET unit to obtain the lengthiest period of incarceration possible to deter future criminal offending. All targeted gang members who are on probation are supervised by the probation officer assigned to the unit, and their activities are closely monitored. The unit also is charged with gang suppression, and members are regularly called to testify in other jurisdictions as gang experts.

TARGET uses a multijurisdictional model that integrates law enforcement, probation, and prosecution efforts. It represents a multi-agency approach to targeting current gang members with suppression measures while also targeting entire gangs with police suppression. Each team in the TARGET program consists of gang investigators, a probation officer, a deputy district attorney, and a district attorney investigator. This program uses a three-pronged strategy: 1) selective incarceration of the

85

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    WICHITA 055382

most violent and repeat older gang offenders in the most violent gangs, 2) enforcement of probation controls (graduated sanctions and intensive supervision) on younger, less violent gang offenders, and 3) arrests of gang leaders in "hot spots" of gang activity.

These team members are housed together at a local law enforcement facility to concentrate a highly coordinated team effort toward the gang problem in that jurisdiction. This model promotes maximum communication and coordination between agencies. By physically locating three or more agencies in the same room, both the frequency and quality of interagency communication and cooperation are dramatically enhanced. The personnel assigned to the team are able to share thoughts, strategies, and case information on gang-related crime without delay.

**Evaluation:**

This evaluation used an unconventional logic model approach to test the effectiveness of the TARGET program. The logic model approach requires specification regarding how a program is intended to work as well as measurement of the treatment, the outcome, and key mediating variables. The basic version of the logic model approach is to identify one major intervening variable between the independent and dependent variables. The intervening variable—incarceration of repeat gang offenders—is the proximal variable that is expected to change directly as a result of program activities and is a precondition of successful outcome. In addition, two comparison communities were selected that had similar types and amounts of gang crime, to rule out a general decrease in gang crime in the region. Data collection included 84 months of data, 12 months before program implementation and 72 months after implementation. During the evaluation period, the program processed 237 cases involving repeat gang offenders identified by police detectives on the basis of criminal records and police intelligence. All cases had a favorable prosecution outcome, and nearly all defendants were kept in continuous custody from arrest through sentencing.

**Outcome:**

The evaluation results reveal that following program implementation the gang crime trend is relatively consistent with the proposed theory of the program. First, the placement of repeat offenders in custody appears to have had an effect on reducing gang crime. Gang crime decreased by 11 percent during 1992, the 1st year of the program. The cumulative reduction in gang crime was 64 percent through 1993, 59 percent through 1994, and 47 percent through 1997.

In addition, the evaluation ruled out several plausible alternative explanations (i.e., the reduction in gang crime was attributable to a general decrease in crime in the area or the reduction in gang crime was attributable to a general decrease in gang crime in the region). First, the data reveals a greater decrease in gang crime than in nongang crime during the 1st year of implementation. While this initial program effect disappears in subsequent years, the initial decline in gang crime cannot be attributed to an overall reduction of crime in the community. Second, the program community experienced a greater decline in total violent crime than that found in comparison communities with a comparable gang crime problem. This decline in the program community cannot be attributed to a general reduction in violent crime.

**Risk Factor:**
*Community*
- Availability of alcohol and other drugs

86

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                WICHITA 055383

*Peer*
- Gang involvement / Gang membership

**Protective Factor:**

*Community*
- Safe environment / Low neighborhood crime

**References:**

Kent, Douglas R., Stewart I. Donaldson, Phelan A. Wyrick, and Peggy J. Smith. 2000. "Evaluating Criminal Justice Programs Designed to Reduce Crime by Targeting Repeat Gang Offenders." *Evaluation and Program Planning* 23:115–24.

**Contact:**

**Chief Andrew E. Hall**
Westminster Police Department
8200 Westminster Blvd.
Westminster, CA 92683

Phone: (714) 898-3315
Web site: http://www.ci.westminster.ca.us/depts/police/detectives/crimes_against_persons.asp

87

## OJJDP PROMISING & PROVEN PROGRAMS

To access these resources, cut and paste the program name, the journal and date ie., *Addressing Gang Problems: A Model for Problem Solving Bureau of Justice Assistance, 1997* into your search engine.

### Youth Gangs

- Addressing Community Gang Problems: A Model for Problem Solving
  *Bureau of Justice Assistance, 1997*
  The model was developed through the Comprehensive Gang Initiative initiated by the Bureau of Justice Assistance. The model is intended for use by police, other law enforcement agencies, and public and private organizations. The model rests on three principles: (1) adaptability to a variety of gang-related problems and a variety of jurisdictions; (2) flexibility; and (3) the use of a multifaceted approach by government, private agencies, and community participation. Central features of the model are its focus on harmful behaviors, continuous diagnosis of problems, coordination of responses, performance monitoring, impact evaluation, and adaptation to change. The model uses a comprehensive, four-stage problem-solving approach that includes scanning to identify problems, analysis, response, and assessment. The model is a dynamic, ongoing process that provides guidance in examining a problem and determining what factors allow the problem to persist.

- Addressing Community Gang Problems: A Practical Guide
  *Bureau of Justice Assistance, 1998*
  Communities initiate the problem-solving process by searching for and identifying gang problems (scanning). The second step involves investigating specific gang problems in greater detail (analysis). Communities can then develop an action plan (response) and evaluate that plan's effectiveness (assessment). To aid in the problem-solving process, three criteria have been developed for defining a gang: community recognition of a group, group recognition of itself as a distinct group of adolescents or young adults, and group involvement in enough illegal activities to get a consistent negative response from law enforcement and neighborhood residents. While gang violence has escalated and gang involvement in drugs has been a feature of gang life for many years, gangs are increasingly and almost exclusively blamed for drug and violence problems of the past decade. Gangs and the media both benefit from exaggerated portrayals of gangs and gang life. The best possible explanation of the relationship between gangs and violence is that it depends primarily on the gang's organization. Gang graffiti tells police officers who is in what gang, territories claimed by gangs, and what gangs are trying to move or expand. Quick removal of graffiti is a standard anti-graffiti recommendation, the underlying idea being that graffiti artists will tire of having their work obliterated and give up. In planning a comprehensive solution to gang problems, a needs assessment is often the first step. Needs assessment involves laying the groundwork, identifying current gang activities, identifying and setting priorities, and developing a consensus. In addition, communities with existing or emerging gang problems should plan, develop, and implement comprehensive, harm-specific responses that include a broad range of community-based components. Civil remedies are available to deal with gang-related harm, and the best chance of obtaining swift legal action against gangs is to bring matters before courts of limited jurisdiction. Community evaluation of antigang efforts provides valuable information for decision-makers, documents efforts so they may be replicated elsewhere, and enables public agencies to justify gang prevention program costs.

- Criminal Behavior of Gang Members and At-Risk Youths
  *National Institute of Justice, 1998*
  Recent estimates predict that there are currently more than 16,000 active gangs in the United States, and gang members number close to 1 million individuals and are responsible for over 600,000 crimes per year. Discussing research on gangs and gang-related criminal behaviors, the author details both a Colorado-Florida and a Cleveland research study focused on self-reported data concerning gang-related criminal activities. The data generated by these research studies indicate significant differences between the behavior of gang members and at-risk youths, although both groups indicated involvement with guns and gang members. Gang members are often more involved in selling drugs than are at-risk youths, and gang leaders typically engage in the more serious forms of criminal behavior such as the drug trade. This research preview

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    WICHITA 055385

suggests that earlier studies have identified a close relationship between gang membership and various forms of criminal behavior.

- "Designing Out" Gang Homicides and Street Assaults
  *National Institute of Justice, 1998*
  The use of traffic barriers to block automobile access to streets was examined to determine whether this tactic could reduce gang crime and violence in Los Angeles.

- Gangs in Rural America, Final Report
  *National Institute of Justice, 2001*
  Data were drawn from four separate sources: local police agency responses to three waves (1996 to 1998) of the National Youth Gang Surveys (NYGS), county-level economic and demographic data, a rural-urban classification and county-level measures of primary economic activity, and county-level data on access to interstate highways. Four general explanatory frameworks about rural gang development were ecological, economic deprivation, population composition, and diffusion. Findings suggested that the most consistent indicators of a gang presence in non-metropolitan counties were those reflecting social stability and the composition of the population. Gangs were more likely to be reported in jurisdictions located in counties experiencing economic growth. There was only modest support for arguments that urban gangs spread into rural areas through diffusion. Of the police agencies reporting gangs in 1997, only 41 percent indicated the presence of at least one youth gang at the time of the interview. It was likely that because both the number of gangs in any single rural jurisdiction was small, and the number of members in any single gang was also small, rural gangs were often short-lived. Indicators of a gang presence in these communities were self-identification by youth, the presence of graffiti or tattoos, affiliation with others thought to be gang members, and the wearing of gang colors. The types of problems associated with gangs ranged from graffiti to selling drugs to murder. Only 43 percent of those reporting gangs described the gang problems in their community as "serious." The estimated number of current gang members who came into the area from another jurisdiction varied from "none" to "all of them," but most estimates ranged between 10 and 30 percent. The most frequent agency response to gang activity was suppression through strict enforcement -- "zero tolerance."

- Gangs in Small Towns and Rural Counties
  *Office of Juvenile Justice and Delinquency Prevention, 2005*
  National trends in gang problems are documented through the National Youth Gang Survey (NYGS), which annually surveys a representative sample of law enforcement agencies across the country to determine the presence and characteristics of local gang problems. The NYGS indicates that although a number of smaller city and rural county agencies reported gang problems from 1996 through 2001, most of these agencies experienced unstable, intermittent gang problems that were comparatively minor in terms of the number of gangs and gang members and impact on the community. Population shifts, however, particularly in relation to the large influx of immigrants, may change this trend, as language barriers and the marginalization of immigrant groups may foster more gang formation and affiliation. Steps in developing a local antigang action plan are to acknowledge the gang problem based on an objective assessment; develop an agreement among stakeholders to cooperate in addressing potential and actual gang problems; conduct an objective assessment of the gang problem by using the NYGC (National Youth Gang Center) gang problem assessment protocol; set goals and objectives once the gang problem is analyzed; develop and integrate relevant services and strategies through the use of the NYGC planning and implementation guide; and develop and evaluate the gang strategy.

- Gang Suppression and Intervention: Community Models
  *Office of Juvenile Justice and Delinquency Prevention, 1994*
  The proposed general and specific models for youth gang suppression and intervention assume that the gang problem and related criminal behavior stem from two interacting conditions: poverty and social disorganization. Other significant or contributing factors include institutional racism, cultural misadaptation, deficiencies in social policy, and the availability of criminal opportunities. Certain action areas must be addressed in implementing the operational strategies of community mobilization, provision of opportunities, social intervention, suppression, and organizational change and development. These areas are problem assessment, development of youth gang policy, managing the collaborative process, creation of program goals and objectives, programming, coordination and community participation, youth accountability, staffing, training, research evaluation, and funding priorities. Following a description of the tasks of community mobilization, roles in youth gang suppression and intervention are described for the police, prosecution,

89

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055386

courts, probation, corrections, parole, schools, youth employment, a community-based youth agency, and grassroots organizations

- Gang Suppression and Intervention: Problem and Response
  *Office of Juvenile Justice and Delinquency Prevention, 1994*
  This summary integrates the findings of seven data- collection and research phases conducted in the initial assessment of the National Youth Gang Suppression and Intervention Program. Due to methodological problems, the scope and seriousness of the youth gang problem are not reliably known. Law enforcement and media reports, however, suggest that criminal youth gangs are active in nearly every State as well as in Puerto Rico and other U.S. territories. The close relationship of gangs, violence, and a significant crime problem are most evident when the criminal records of youth gang members are compared with those of youths who are not in gangs. Youth gang membership is associated with significantly higher levels of delinquency and index crimes. This report considers the characteristics of gang structure, the social contexts in which gangs emerge, emerging and chronic gang problems, and strategic responses. The five basic strategies that have emerged in addressing youth gangs are neighborhood mobilization, social intervention, provision for social and economic opportunities, gang suppression and incarceration, and an organizational development strategy. A discussion of institutional responses focuses on the police, prosecution, the judiciary, probation/parole, corrections, schools, community organizations, and employment. Policies and procedures, as well as promising approaches, are also summarized. Common elements associated with reducing the youth gang problem for significant time periods include clear recognition of a youth gang problem, proactive leadership by representatives of significant criminal justice and community-based agencies, mobilization of both formal and informal community networks, and a focus on community activities that contribute to positive youth development.

- Growth of Youth Gang Problems in the United States: 1970-1998
  *Office of Juvenile Justice and Delinquency Prevention, 2001*
  Appendix
  The prevalence and seriousness of gang problems have fluctuated over time, with gang activity escalating during some periods and diminishing during others. The last three decades of the 20th century were characterized by a major escalation of youth gang problems throughout the Nation. This report presents detailed information on the numbers and specific identities of gang problem localities, the size of these localities, rates of growth, and location by State and region of the cities, towns, villages, and counties that reported gang problems between the 1970's and late 1990's. By the late 1990's, 3,700 identified localities in the United States, totaling the highest number ever reported presence of gang problems. In the 1970's, 19 States reported gang problems; by the late 1990's, all 50 States and the District of Columbia had reported gang problems. The States with the largest number of gang-problem cities in 1998 were California, Illinois, Texas, Florida, and Ohio. Nationwide, there was a substantial decrease in the concentration of gang cities in the higher ranking States as gang problems continued to spread to new States. The regional location of gang cities changed radically during the three-decade period. In the 1970's, the West ranked the highest in the reported number of gang cities, and the South ranked the lowest. In 1998, the South ranked second. In the late 1990's, there were approximately 200 cities with populations of 100,000 or more, and every one of these large cities reported youth gang problems. Gang problems however, were not confined to large cities. One of the best documented developments of this period was a striking increase in the growth of gang problems in the Nation's smaller cities, towns, and villages. Reasons for the striking increase in the number of gang problem localities are discussed under seven headings: drugs, immigration, gang names and alliances, migration, government policies, female-headed households, and gang subculture and the media. An analysis of projected growth rates of gang problem cities provides a basis for predicting future trends in the number of gang cities. The data provides support for a prediction that the rate of growth that prevailed in the later 1990's will decrease in the early 2000's and a prediction that the actual number of gang localities will decrease.

- Office of Juvenile Justice and Delinquency Prevention Comprehensive Gang Model: A Guide to Assessing Your Community's Youth Gang Problem
  *National Youth Gang Center, 2002*
  The assessment guide, A Guide to Assessing Your Community's Youth Gang Problem, provides a blueprint for conducting an in-depth assessment of the gang problem in the community and guidance for the assessment process. It describes the data variables, sources of data, and data-collection instruments. It also provides suggestions on how to organize and analyze the data and guidelines for preparation of an Assessment Report that will present the results of the data-collection effort, as well as an analysis of the data and key findings regarding the community's gang problem.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055387

- **Office of Juvenile Justice and Delinquency Prevention Comprehensive Gang Model: Planning for Implementation**
  *Office of Juvenile Justice and Delinquency Prevention, 2002*
  The implementation manual, Planning for Implementation, provides a guide to development of an implementation plan. It provides a process for developing a plan to implement the Office of Juvenile Justice and Delinquency Prevention Comprehensive Gang Model, including worksheets that facilitate that process. It also describes the work of an Intervention Team, including street outreach workers' roles. The manual also offers examples of individual agencies' activities and core criteria for each of the Model's five strategies.

- **A Parent's Quick Reference Card: Recognizing and Preventing Gang Involvement**
  *Office of Community Oriented Policing Services, 2005*
  This reference card lists warning signs that indicate a child may be involved in a gang and actions parents can take to prevent gang involvement. Parents are encouraged to familiarize themselves with local gangs' symbols, seek help early, and consider contacting school officials, local law enforcement, faith leaders, and community organizations for additional assistance.

- **Preventing Adolescent Gang Involvement**
  *Office of Juvenile Justice and Delinquency Prevention, 2000*
  This Bulletin provides information on which to build a comprehensive strategy to prevent youth gang involvement, as it examines the youth gang problem within the larger context of juvenile violence.

- **Responding to Gangs: Evaluation and Research**
  *National Institute of Justice, 2002*
  The projects reflect a diverse set of methodologies and interests. They present a representative selection of the National Institute of Justice's (NIJ) collection of gang-related research. Chapter 1 discusses a decade of gang research and the findings of the NIJ gang portfolio. Each research project is summarized. Chapter 2 presents the evolution of street gangs and examines form and variation. Chapter 3 describes the risk factors, delinquency, and victimization risk for young women in street gangs. Chapter 4 focuses on youth gang homicides in the 1990's. Three issues of importance to the understanding of gang homicide -- measurement, trends, and correlates are examined. The National Evaluation of the Gang Resistance Education and Training (G.R.E.A.T.) Program is outlined in chapter 5. This program is classroom-based and consists of eight lessons designed to teach middle school students life skills that enable them to resist the pressures of gangs, drugs, and delinquency. Chapter 6 evaluates Nevada's antigang legislation and gang prosecution units. Chapter 7, presents an evaluation of a task force approach to gangs. The task force, known as JUDGE (Jurisdictions Unified for Drug Gang Enforcement), did not clear up the question of whether specific gang enforcement yielded better results than did traditional forms of law enforcement. Chapter 8 describes an evaluation of gang prevention programs for female adolescents. It was found that gang membership showed as much variation for young women as it did for men. Chapter 9 focuses on reducing gang violence in Boston. Chapter 10 describes the development of a GIS-based regional gang incident tracking system. Recommendations for future directions in gang research include incorporating some of the insights of research literature outside the gang field; funding collaborative efforts; and considering the use of a dynamic problem-solving approach

- **Youth Gang Programs and Strategies**
  *Office of Juvenile Justice and Delinquency Prevention, 2000*
  Outlines programs that have been and are being used to break the appeal of gangs and reduce gang crime violence.

## Youth Violence Prevention

- **Allegheny County, PA: Mobilizing to Reduce Juvenile Crime**
  *Office of Juvenile Justice and Delinquency Prevention, 1997*
  This report describes the development of the communitywide collaborative process designed to reduce juvenile crime and violence in Allegheny County, documents examples of the program's achievements, and examines the reasons for the program's success.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          WICHITA 055388

- **Allegheny County, PA: Mobilizing to Reduce Juvenile Crime**
  *Office of Juvenile Justice and Delinquency Prevention, 1997*
  This report describes the development of the communitywide collaborative process designed to reduce juvenile crime and violence in Allegheny County, documents examples of the program's achievements, and examines the reasons for the program's success.

- **Best Practices of Youth Violence Prevention: A Sourcebook for Community Action**
  *National Center for Injury Prevention and Control/Division of Violence Prevention, 2002*
  This resource includes information on the best practices known for four promising strategies to prevent youth violence.

- **Blueprints for Violence Prevention**
  *Office of Juvenile Justice and Delinquency Prevention, 2001*
  This report describes the criteria established by the Center for the Study and Prevention of Violence to designate model programs called Blueprints for Violence Prevention and discusses the activities of the 11 programs from the more than 500 reviewed that have met those standards.

- **Blueprints for Violence Prevention (Full Report)**
  *Office of Juvenile Justice and Delinquency Prevention, 2004*
  This report describes the Blueprints for Violence Prevention programs, which have the common aim of preventing violence by juveniles; the lessons learned from evaluations of Blueprints program implementation; and recommendations for program designers, funders, and the agencies and organizations responsible for implementing programs.

- **Comprehensive Responses to Youth at Risk: Interim Findings from the SafeFutures Initiative (Summary)**
  *Office of Juvenile Justice and Delinquency Prevention, 2000*
  This report describes the lessons learned over the first 3 years of OJJDP's SafeFutures initiative, which focuses on preventing and controlling juvenile delinquency and violence based on research on risk and protective factors and experience with promising strategies.

- **Families and Schools Together: Building Relationships**
  *Office of Juvenile Justice and Delinquency Prevention, 1999*
  Using parent-professional collaborative teams, the Families and Schools Together (FAST) program sponsored by OJJDP systematically reaches out to entire families and organizes multifamily groups to increase parent involvement with at-risk youth.

- **Guide for Implementing the Comprehensive Strategy for Serious, Violent, and Chronic Juvenile Offenders**
  *Office of Juvenile Justice and Delinquency Prevention, 1995*
  This report provides guidance and resources to help states, cities, and communities implement OJJDP's Comprehensive Strategy for Serious, Violent, and Chronic Juvenile Offenders.

- **Healing the Hate: A National Hate Crime Prevention Curriculum for Middle Schools**
  *Office of Juvenile Justice and Delinquency Prevention, 1997*
  Designed for middle-school teachers and other professionals who work with youth, this curriculum addresses the extent of hate crime in America and instructs youth in strategies that are proven effective in reducing hate crimes among youth.

- **Juvenile Justice Journal, Volume IV, Number 2 (Making a Difference Issue)**
  *Office of Juvenile Justice and Delinquency Prevention, 1997*
  This journal presents articles, publication reviews, and news items on research and promising programs in juvenile delinquency prevention, youth violence prevention, juvenile gangs, mentoring for youth, and restitution and community service programs.

- **Juvenile Mentoring Program: A Progress Review**
  *Office of Juvenile Justice and Delinquency Prevention, 2000*
  This document lists the parameters under which the 164 current OJJDP Juvenile Mentoring Program (JUMP) programs operate and presents preliminary findings from the program's national evaluation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                WICHITA 055389

- [Nurturing Parenting Programs](#)
  *Office of Juvenile Justice and Delinquency Prevention, 2000*
  This resource describes the Nurturing Parenting Programs, a family-centered parenting initiative designed to address the generational cycle of violence in which parents rear children in the context of the violence they experienced as children.

- [Safe Harbor: A School-Based Victim Assistance/Violence Prevention Program](#)
  *Office for Victims of Crime, 2003*
  After describing Safe Harbor, a promising program that addresses both violence prevention and victim assistance in school settings, this bulletin discusses the demographic and implementation differences in the school sites that are replicating the program and reviews evaluations of the program's effectiveness.

- [Successful Program Implementation: Lessons From Blueprints](#)
  *Office of Juvenile Justice and Delinquency Prevention, 2004*
  This report presents lessons on successful program implementation learned from the process evaluation of the Blueprints for Violence Prevention initiative.

- [Want to Resolve a Dispute? Try Mediation](#)
  *Office of Juvenile Justice and Delinquency Prevention, 2000*
  This resource describes how youth can create a mediation program in their communities that will help prevent violence.

- [Youth Gang Programs and Strategies](#)
  *Office of Juvenile Justice and Delinquency Prevention, 2000*
  Outlines programs that have been and are being used to break the appeal of gangs and reduce gang crime violence.

- [Youth Violence: A Community-Based Response -- One City's Success Story](#)
  *Office of Juvenile Justice and Delinquency Prevention, 1996*
  The foundation of Boston's approach to youth violence has been to build coalitions and partnerships among police, prosecutors, probation officers, correctional officials, youth and social service personnel, school officials, judges, health professionals, parents, and young people; these partnerships allow organizations and individuals to share information, keep track of at risk-youth and violent young offenders, and coordinate resources to help youth.

- [Best Practices of Youth Violence Prevention: A Sourcebook for Community Action](#)
  *National Center for Injury Prevention and Control/Division of Violence Prevention, 2002*
  This resource includes information on the best practices known for four promising strategies to prevent youth violence.

- [Blueprints for Violence Prevention](#)
  *Office of Juvenile Justice and Delinquency Prevention, 2001*
  This report describes the criteria established by the Center for the Study and Prevention of Violence to designate model programs called Blueprints for Violence Prevention and discusses the activities of the 11 programs from the more than 500 reviewed that have met those standards.

- [Blueprints for Violence Prevention (Full Report)](#)
  *Office of Juvenile Justice and Delinquency Prevention, 2004*
  This report describes the Blueprints for Violence Prevention programs, which have the common aim of preventing violence by juveniles; the lessons learned from evaluations of Blueprints program implementation; and recommendations for program designers, funders, and the agencies and organizations responsible for implementing programs.

- [Comprehensive Responses to Youth at Risk: Interim Findings from the SafeFutures Initiative (Summary)](#)
  *Office of Juvenile Justice and Delinquency Prevention, 2000*

93

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055390

This report describes the lessons learned over the first 3 years of OJJDP's SafeFutures initiative, which focuses on preventing and controlling juvenile delinquency and violence based on research on risk and protective factors and experience with promising strategies.

- Families and Schools Together: Building Relationships
  *Office of Juvenile Justice and Delinquency Prevention, 1999*
  Using parent-professional collaborative teams, the Families and Schools Together (FAST) program sponsored by OJJDP systematically reaches out to entire families and organizes multifamily groups to increase parent involvement with at-risk youth.

- Guide for Implementing the Comprehensive Strategy for Serious, Violent, and Chronic Juvenile Offenders
  *Office of Juvenile Justice and Delinquency Prevention, 1995*
  This report provides guidance and resources to help states, cities, and communities implement OJJDP's Comprehensive Strategy for Serious, Violent, and Chronic Juvenile Offenders.

- Healing the Hate: A National Hate Crime Prevention Curriculum for Middle Schools
  *Office of Juvenile Justice and Delinquency Prevention, 1997*
  Designed for middle-school teachers and other professionals who work with youth, this curriculum addresses the extent of hate crime in America and instructs youth in strategies that are proven effective in reducing hate crimes among youth.

- Juvenile Justice Journal, Volume IV, Number 2 (Making a Difference Issue)
  *Office of Juvenile Justice and Delinquency Prevention, 1997*
  This journal presents articles, publication reviews, and news items on research and promising programs in juvenile delinquency prevention, youth violence prevention, juvenile gangs, mentoring for youth, and restitution and community service programs.

- Juvenile Mentoring Program: A Progress Review
  *Office of Juvenile Justice and Delinquency Prevention, 2000*
  This document lists the parameters under which the 164 current OJJDP Juvenile Mentoring Program (JUMP) programs operate and presents preliminary findings from the program's national evaluation.

- Nurturing Parenting Programs
  *Office of Juvenile Justice and Delinquency Prevention, 2000*
  This resource describes the Nurturing Parenting Programs, a family-centered parenting initiative designed to address the generational cycle of violence in which parents rear children in the context of the violence they experienced as children.

- Safe Harbor: A School-Based Victim Assistance/Violence Prevention Program
  *Office for Victims of Crime, 2003*
  After describing Safe Harbor, a promising program that addresses both violence prevention and victim assistance in school settings, this bulletin discusses the demographic and implementation differences in the school sites that are replicating the program and reviews evaluations of the program's effectiveness.

- Successful Program Implementation: Lessons From Blueprints
  *Office of Juvenile Justice and Delinquency Prevention, 2004*
  This report presents lessons on successful program implementation learned from the process evaluation of the Blueprints for Violence Prevention initiative.

- Want to Resolve a Dispute? Try Mediation
  *Office of Juvenile Justice and Delinquency Prevention, 2000*
  This resource describes how youth can create a mediation program in their communities that will help prevent violence.

- Youth Gang Programs and Strategies
  *Office of Juvenile Justice and Delinquency Prevention, 2000*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055391

Outlines programs that have been and are being used to break the appeal of gangs and reduce gang crime violence.

- **Youth Violence: A Community-Based Response -- One City's Success Story**
  *Office of Juvenile Justice and Delinquency Prevention, 1996*
  The foundation of Boston's approach to youth violence has been to build coalitions and partnerships among police, prosecutors, probation officers, correctional officials, youth and social service personnel, school officials, judges, health professionals, parents, and young people; these partnerships allow organizations and individuals to share information, keep track of at risk-youth and violent young offenders, and coordinate resources to help youth.

## Youth Gun Violence

- **Fighting Juvenile Gun Violence**
  *Office of Juvenile Justice and Delinquency Prevention, 2000*
  This Bulletin describes the implementation of OJJDP's Partnerships to Reduce Gun Violence Program at four demonstration sites in Baton Rouge and Shreveport, Louisiana; Oakland, California; and Syracuse, New York.

- **Gun Use by Male Juveniles: Research and Prevention**
  *Office of Juvenile Justice and Delinquency Prevention, 2001*
  This study discussed results from the Rochester Youth Development Study, a longitudinal analysis of illegal gun ownership and use by juveniles, and current prevention efforts aimed at reducing juvenile gun violence.

- **Hands Without Guns**
  *Office of Juvenile Justice and Delinquency Prevention, 1999*
  This report provides information on Hands Without Guns, a public health and education campaign designed to combat gun violence by providing a forum for positive youth voices.

- **Juvenile Justice Journal, Volume III, Number 2 (Youth Violence Issue)**
  *Office of Juvenile Justice and Delinquency Prevention, 1997*
  This publication presents two different, but complementary, articles about encouraging progress in reducing youth gun violence in the overall effort to combat juvenile violence and delinquency.

- **Promising Strategies to Reduce Gun Violence**
  *Office of Juvenile Justice and Delinquency Prevention, 1999*
  This resource presents profiles of sixty programs that address the problem of gun violence, examines the nature of the problem from a national perspective, and discusses the process of developing a solution.

- **Reducing Gun Violence: Operation Ceasefire in Los Angeles**
  *National Institute of Justice, 2005*
  Operation Ceasefire was developed in response to gang-related gun violence in the Hollenbeck area of Los Angeles. Planned by 19 public and private agencies working with researchers, this initiative was intended to send gang members the message that there would be consequences for all members of a gang if any one member committed a crime that involved guns. The working group, which began meeting in early 1999, examined trouble spots to find a location where an intervention would have an impact. It selected the Hollenbeck section of the city because of its high crime rate, particularly violent crime. In the community's view, gangs were at the core of homicides and gun violence, and the researchers' confirmed this. An array of enforcement agencies were involved in a coordinated strategy that included stepped up police patrol in five reporting districts; mounted police patrols in the parks and adjacent public housing developments; the County Housing Authority police patrolling in a housing complex that was a hotbed for gang activity; and police and probation officers visiting the homes of several well-known gang members, arresting three who had outstanding warrants or probation violations. Other enforcement levers included inspection by health and child welfare agencies at properties where gang members congregated. The intervention seemed to be most effective during the suppression phase, with the effect declining slightly in the deterrence phase; however, because the decline continued into the deterrence phase, the possibility of a longer term effect cannot be ruled out.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055392

- Reducing Youth Gun Violence: An Overview of Programs and Initiatives (Program Report)
  *Office of Juvenile Justice and Delinquency Prevention, 1996*
  This report discusses a wide range of youth violence prevention strategies and includes relevant research, evaluation, and legislation to provide a context for successful violence prevention program implementation.

- Strategies to Reduce Gun Violence
  *Office of Juvenile Justice and Delinquency Prevention, 1999*
  This fact sheet presents an overview of the findings from 'Promising Strategies to Reduce Gun Violence,' an OJJDP Report that describes sixty programs designed to address gun violence.

## Violence in Schools

- Closer Look at Drug and Violence Prevention Efforts in American Schools: Report on the Study on School Violence and Prevention
  *U.S. Department of Education, 2002*
  This second of three reports from the Study on School Violence and Prevention, is an intensive and detailed examination on a limited number of schools covering the extent of problem behavior in schools, efforts used by schools to prevent problem behavior and the quality of their implementation, and planning processes used for prevention activities and the use of information.

- Community Outreach Through Police in Schools
  *Office for Victims of Crime, 2003*
  This document describes the Community Outreach through Police in Schools Program, which is a short-term, prevention-oriented, school-based group intervention that brings together police officers and children as group co-leaders to provide weekly sessions for middle school students at risk of being exposed to violence.

- Creating Safe and Drug-Free Schools: An Action Guide
  *U.S. Department of Education and Office of Juvenile Justice and Delinquency Prevention, 1996*
  This manual presents background information on school safety and action steps for use by schools, parents, students, and community and business groups in developing a strategy to ensure safe schools.

- Creating Safe Schools: A Comprehensive Approach
  *Office of Juvenile Justice and Delinquency Prevention, 2001*
  This discussion of approaches to enhancing school safety emphasizes the need for broad-based efforts on the part of the entire community, including educators, students, parents, law enforcement agencies, businesses, and faith-based organizations and discusses 10 essential components of safe school planning.

- Crime in the Schools: Reducing Conflict With Student Problem Solving
  *National Institute of Justice, 1999*
  This study describes and assesses a student-based problem-solving model for reducing crime in the Nation's schools.

- Evaluation of Violence Prevention Programs in Middle Schools
  *National Institute of Justice, 1995*
  A 16-month evaluation compared the separate and combined impact of the following New York City middle school violence prevention programs from February 1993 to June 1994: (1) Project S.T.O.P. (Schools Teaching Options for Peace), a traditional conflict resolution program, which included a curriculum and peer mediation; and (2) the Safe Harbor Program, which included a 20-session curriculum, a counseling component, and a schoolwide anti-violence campaign.

- Families and Schools Together: Building Relationships
  *Office of Juvenile Justice and Delinquency Prevention, 1999*
  Using parent-professional collaborative teams, the Families and Schools Together (FAST) program sponsored by OJJDP systematically reaches out to entire families and organizes multifamily groups to increase parent involvement with at-risk youth.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    WICHITA 055393

- **Healing the Hate: A National Hate Crime Prevention Curriculum for Middle Schools**
  *Office of Juvenile Justice and Delinquency Prevention, 1997*
  Designed for middle-school teachers and other professionals who work with youth, this curriculum addresses the extent of hate crime in America and instructs youth in strategies that are proven effective in reducing hate crimes among youth.

- **Preventing School Violence: Plenary Papers of the 1999 Conference on Criminal Justice Research and Evaluation--Enhancing Policy and Practice through Research, Volume 2**
  *National Institute of Justice, 2000*
  Three plenary papers of the 1999 Conference on Criminal Justice Research and Evaluation -- Enhancing Policy and Practice Through Research focus on what is being done and what can be done to prevent violence in schools.

- **Safe Harbor: A School-Based Victim Assistance/Violence Prevention Program**
  *Office for Victims of Crime, 2003*
  After describing Safe Harbor, a promising program that addresses both violence prevention and victim assistance in school settings, this bulletin discusses the demographic and implementation differences in the school sites that are replicating the program and reviews evaluations of the program's effectiveness.

- **Safe School Initiative: An Interim Report on the Prevention of Targeted Violence in Schools**
  *U.S. Secret Service, 2000*
  This report presents preliminary findings from the U.S. Secret Service's National Threat Assessment Center's (NTAC's) analysis of the behavior and thinking of more than 30 school shooters.

- **School and Community Interventions to Prevent Serious and Violent Offending**
  *Office of Juvenile Justice and Delinquency Prevention, 1999*
  The Study Group on Serious and Violent Juvenile Offenders concludes that timely comprehensive school-based and community-based interventions hold the greatest potential for preventing serious violent juvenile offending.

- **School Crime Patterns: A National Profile of U.S. Public High Schools Using Rates of Crime Reported to Police: Report on the Study on School Violence and Prevention**
  *U.S. Department of Education, 2002*
  In this third of three reports from the Study on School Violence and Prevention, the focus was on survey results reflecting the proportion of high schools that had high rates of violence, the characteristics of high schools with high rates of violent crime, and the methods used to control disorder related to the level of violence.

- **School Health Guidelines to Prevent Unintentional Injuries and Violence**
  *Centers for Disease Control and Prevention, 2001*
  This report summarizes school health recommendations for preventing unintentional injury, violence, and suicide among young persons.

- **Toward Safe and Orderly Schools—The National Study of Delinquency Prevention in Schools**
  *National Institute of Justice, 2004*
  This report presents the findings from a national, federally funded study which surveyed school staff and students on school safety and the programs used to prevent problem behavior and promote a safe school environment.

- **Wide Scope, Questionable Quality: Drug and Violence Prevention Efforts in American Schools, Report on the Study on School Violence and Prevention**
  *U.S. Department of Education, 2002*
  In this first of three reports from the Study on School Violence and Prevention, a national examination is conducted on the status of school safety and what schools are doing to promote safety and prevent problem behavior.

97

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    WICHITA 055394

- **Wide Scope, Questionable Quality: Three Reports from the Study on School Violence and Prevention (Executive Summary)**
  *U.S. Department of Education, 2002*
  This report presents a summary of findings from a three-part Study on School Violence and Prevention conducted by the U.S. Department of Education and National Institute of Justice investigating the extent of problem behavior in schools across the United States and various aspects of delinquency prevention efforts and strategies in schools.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    WICHITA 055395