# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

PROGENY, a program of Destination
Innovations, Inc., CHRISTOPHER COOPER,
ELBERT COSTELLO, MARTEL
COSTELLO, and JEREMY LEVY, JR., on
behalf of themselves and others similarly
situated,

                    *Plaintiff(s)*,             Case No. 6:21-cv-01100-EFM-ADM

v.

CITY OF WICHITA, KANSAS,

                    *Defendant*.

---

## MEMORANDUM IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

As set forth more fully in Plaintiffs' Motion for Summary Judgment (Doc. 206) and

Memorandum in Support (Doc. 207), the uncontroverted evidence demonstrates that K.S.A. 21-

6313 *et seq.* and the Wichita Police Department's policies and practices in maintaining its Gang

List and Database violate the U.S. Constitution and infringe Plaintiffs' most fundamental

freedoms. In its competing Motion for Summary Judgment (Doc. 205), Defendant makes little

effort to deny—much less rebut with record evidence—the essential facts establishing Plaintiffs'

claims and right to the relief requested. Instead, unable to marshal evidence in support of its own

arguments, Defendant entreats this Court to *ignore* the record evidence by engaging in improper

credibility determinations and drawing impermissible inferences against Plaintiffs, all in

contravention of the well-settled standard for summary judgment.

As the Court is well aware, on summary judgment, it is "required to view the facts and

draw reasonable inferences in the light most favorable to the party opposing the summary

judgment motion."[1] Under this standard, Plaintiffs' wealth of evidence, including consistent testimony, interrogatory answers, and declarations regarding their personal experiences as WPD Gang Database designees, are not only sufficient to defeat summary judgment, they stand alone as uncontroverted and unrebutted. Accordingly, Defendant's motion must fail.

**PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS**

### A.    WPD's Gang Database and the Master Gang List

#### 1.    History

1.      As early as 1989, the WPD had a Gang Unit with officers assigned to investigate gang-related crimes. Exhibit 2, Easter dep., Vol. I, 12:14-16; 21:5-19.

**RESPONSE:** Uncontroverted.

2.      At some point during the 1990s, the WPD created a list of criteria to be used for consistent identification of criminal street gang members. Exhibit 2, Easter dep., Vol. I, 22:5-11.

**RESPONSE:** Uncontroverted as to the WPD's creation of criteria during the 1990s. Controverted as to whether the criteria resulted in consistent identification of criminal street gang members. The deposition portion cited does not address consistency of identification. Further controverted that WPD personnel apply the criteria consistently. In support, Plaintiffs incorporate by reference Plaintiffs' Statement of Facts ("PSOF") from their Memorandum in Support of Summary Judgment (Doc. 207) ¶¶ 8, 33-40, 45, 47-48, 51-52 and the sources cited therein.

3.      When Kansas had an influx of gang members coming in from both California and Oklahoma, law enforcement agencies around the state were claiming individuals were gang members but there were no consistent criteria being used to make these determinations. Exhibit 2, Easter dep., Vol. I, 26:7-17; 36:20-37:3; 54:7-10.

**RESPONSE:** Controverted. The deposition portion cited does not address any "influx of gang members coming in from both California and Oklahoma." Moreover, this statement is immaterial

---

[1] *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotes omitted); *see also Logan v. Corning, Inc.*, 159 F.R.D. 46, 50 (D. Kan. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986)).

and therefore improperly included in Defendant's statement of uncontroverted material facts, per Summary Judgment Guideline No. 3, which instructs parties to include only "facts that could affect the outcome under the governing law."

4. Between 1999 and 2002, the Wichita Mayor tasked the WPD to work on a "gang plan" to address the rising violent crimes mainly perpetrated by gang members. This included meeting with community members and continuing to develop criteria to identify criminal street gang members. Exhibit 2, Easter dep., Vol. I, 17:10-13; 36:3-38:10.

**RESPONSE:** Uncontroverted, but Plaintiffs object to this statement as immaterial in contravention of Summary Judgment Guideline No. 3.

5. Around 2006, the Chief of Police and the Mayor of Wichita requested then-Lieutenant Jeff Easter to draft a proposal to identify criminal street gang members and associates using criteria, which he did in consultation with community groups, other law enforcement agencies, as well as the Mayor's office and Sedgwick County District Attorney's office, the. Exhibit 2, Easter dep., Vol. I, 37:10-38:10; 42:17-20.

**RESPONSE:** Controverted to the extent this statement suggests that "community groups, other law enforcement agencies, as well as the Mayor's office, and Sedgwick County District Attorney's office" authored any written drafts or revisions to the proposed bill that would become K.S.A. 21-6313. Easter drafted his proposal in 2007.[2] Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

> ### a. K.S.A. 21-6313

6. Easter's proposed language was packaged with SB 366 and other criminal-related amendments to the criminal law. See 2006 SB 366 and L. 2006, ch. 194, § 6.

**RESPONSE:** Uncontroverted.

7. The original language was changed by the Revisor's office, introduced, then amended by the Senate Judiciary Committee, then the House Judiciary Committee, and then the Conference Committee. Exhibit 2, Easter dep. Vol. I, 57:16-19. Upon passage by both Chambers, SB 366 was signed into law by Governor Sebelius on May 19, 2006. *See id*.

**RESPONSE:** Controverted to the extent this statement suggests that the Revisor's office or any

---

[2] Pretrial Order, Doc. 196, at Section 2.a ("PTO Stip.") ¶ 14; Doc. 205-2, Easter Dep. vol. I 35:2-9.

legislative committee made any significant alterations to Easter's draft proposal. Rather, any changes made to Easter's draft were rhetorical rather than substantive, and the final bill mostly followed Easter's proposal.[3] Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

8.     Chapter 21 of Kansas's Statutes Annotated lists Crimes and Punishments. Article 63 defines Crimes Against the Public Safety. SB 366 was listed as 21-6313 and assigned to Chapter 21 and Article 63 because it involves crimes against public safety.

**RESPONSE:** Uncontroverted.

9.     K.S.A. 21-6313 underwent amendment in 2011 and 2013; In 2011, the Legislature expanded the definition used for criminal activity to include "any felony violation of any provision of the uniform controlled substances act prior to July 1, 2009." In 2013, the Legislature enacted the Kansas Racketeer Influenced and Corrupt Organizations (RICO) Act, which incorporated the definitions provided in 21-6313. The statute also individualized criteria that were previously listed as one criterion and removed the criterion indicating an individual's residence was indicative of gang membership. Exhibit 39, Beard Exhibit 37.

**RESPONSE:** Uncontroverted.

10.     At all times, K.S.A. 21-6313 has and does define (a) a criminal street gang, (b) a criminal street gang member, (c) criminal street gang activity, (d) a criminal street gang associate, and (e) a gang-related incident. K.S.A. 21-6313 does not require an act, nor does it prohibit specific conduct. It does not impose a sanction, fine, or penalty. K.S.A. 21-6313.

**RESPONSE:** Uncontroverted as to K.S.A. 21-6313 defining "criminal street gang," "criminal street gang member," "criminal street gang activity," "criminal street gang associate," and "gang-related incident." Controverted as to K.S.A. 21-6313's requirement of an act, in view of Defendant's own contradictory assertion that K.S.A. 21-6313(b)'s definition of "a street gang member" "necessarily includes criminal activity."[4] Further controverted as to the statute's prohibition of specific conduct or imposition of a sanction, fine, or penalty. In support, Plaintiffs incorporate by reference PSOF ¶¶ 65-79 and the sources cited therein. The statutory definitions

---

[3] Doc. 207-7, Easter Dep. vol. I 35:2-24, 57:9–58:3.
[4] *Infra* Defendant's Statement of Facts ("DSOF") ¶ 11; *see also* DSOF ¶¶ 9, 12.

are also used in other statute sections that outlaw certain acts or otherwise impose penalties for engaging in certain acts.[5]

11.    The definition of a street gang member, found in (b), necessarily includes criminal activity. K.S.A. 21-6313(a); Exhibit 3, McKenna dep., 141:19-142:21.

**RESPONSE:** Uncontroverted that K.S.A. 21-6313 defines both "criminal street gang member" and "criminal street gang," which describes "the commission, attempted commission, conspiracy to commit or solicitation" of certain types of crimes.[6] Controverted to the extent that the structure of K.S.A. 21-6313, including the sequential definitions of "criminal street gang" and "criminal street gang activity," falsely implies that those designated as criminal street gang members have been adjudicated guilty of criminal activity. Further controverted in that K.S.A. 21-6131(b)'s definition of "criminal street gang member" does not include any requirement that an individual be convicted, accused, or even suspected of any criminal activity to be branded a criminal street gang member by the state. In support, Plaintiffs incorporate by reference PSOF ¶¶ 8-10 and the sources cited therein.

12.    The definitions from K.S.A. 21-6313 are referenced elsewhere in the statute, including K.S.A. 21-6328 (Kansas's RICO Act), K.S.A. 21-3614 (recruiting criminal street gang members), K.S.A. 21-6315 (criminal street gang intimidation), and K.S.A. 21-6316 (setting bail for criminal street gang members, with exceptions)—all under the umbrella of criminal activity.

**RESPONSE:** Uncontroverted as to the use of K.S.A. 21-6313's definitions in other state law statutes. Controverted to the phrase "all under the umbrella of criminal activity," which is vague and ambiguous. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

### b.    WPD Policy 527

13.    The WPD formalized its procedure for identifying and documenting gang members into WPD Policy 527. Although it is unknown when Policy 527 was initially created, it was in

---

[5] *See, e.g.*, K.S.A. 21-6314, 21-6315, 21-6316, 21-6328.
[6] K.S.A. 21-6313(a), (b).

place by 2003 and was changed to align with K.S.A. 21-6313 after its enactment. Exhibit 2, Easter dep. Vol. I, 33:19-32:6; Exhibit 4, Beard 30b6 dep., 99:6-100:5.

**RESPONSE:** Controverted to the extent this statement suggests that, prior to K.S.A 21-6313's enactment, the WPD used substantially different criteria than those listed in the statute. Rather, K.S.A. 21-6313's criteria was based in part on criteria the WPD was already using.[7] Further controverted to the extent the portion of Easter's deposition cited ("Easter dep. Vol. I, 33:19-32:6") prevents accurate assessment of evidentiary support for this statement. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

14.    WPD Policy 527 incorporates by the definitions and criteria in K.S.A. 21-6313. Policy 527, § I.E.1 ("Initial identification will be based upon the aforementioned Criminal Street Gang Member or Associate Criteria found in K.S.A. 21-6313.") Exhibit 5, WPD Policy 527.

**RESPONSE:** Uncontroverted.

15.    WPD Policy 527 does not require an act by any citizen, nor does it prohibit specific conduct. It does not impose a sanction, fine, or penalty. Exhibit 5, WPD Policy 527.

**RESPONSE:** Controverted. Plaintiffs incorporate their response *supra* to DSOF ¶ 10.

**2.    The Gang List is not public and unavailable to most WPD personnel.**

16.    The Gang Database is the repository for gang intelligence data which includes active, inactive, and deceased members and associates of criminal street gangs. Exhibit 6, Bernard Declaration.

**RESPONSE:** Controverted to the extent Defendant fails to specify the relevant portion of the Bernard Declaration that supports this fact statement, in contravention of Summary Judgment Guideline No. 10. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

17.    By contrast, the Master Gang List consists of the current active criminal street gang members and associates from the Gang Database. Exhibit 7, Salcido dep., 132:15-16; 223:9-15.

**RESPONSE:** Uncontroverted based on PTO Stip ¶ 5.

---

[7] Doc. 205-2, Easter Dep. vol. I 36:15-22 (testifying that his draft proposal that ultimately became K.S.A. 21-6313 was "based on some other states['] laws" that "was similar to what we already had . . . .").

18.    EJustice, later replaced by NICHE, is a records management system that documents all incidents of crime. Exhibit 7, Salcido dep., 226:25-227:2; Exhibit 8, Beard dep., 82:16-22.

**RESPONSE:** Uncontroverted.

19.    EJustice only contains entries from the Master Gang List, not the Gang Database. Gang intelligence officers, after receiving required specialized training, are responsible for updating EJustice with gang designations, both adding new documented members and removing inactive members. Doc. Exhibit 8, Beard dep., 82:9-83:1; Exhibit 9, Hemmert dep., 65:18-66:10.

**RESPONSE:** Controverted to the extent that it suggests that gang members and associates are completely removed from EJustice once designated inactive. Inactive individuals are no longer flagged in EJustice as gang members, but they are not removed entirely.[8] Further controverted to the extent this statement implies that gang intelligence officers' "specialized training," as described in the cited portion of the Hemmert deposition, covers anything other than entering and revising information in the Gang Database and EJustice. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

20.    Access to EJustice/NICHE is available to commissioned law enforcement personnel but information in EJustice is accessible to WPD Law Enforcement personnel only through a name search. Doc. Exhibit 8, Beard dep., 40:1-41:5.

**RESPONSE:** Uncontroverted as to commissioned personnel having access to EJustice. Controverted to the extent this statement attempts to distinguish between "commissioned law enforcement personnel" and "WPD Law Enforcement personnel" in a vague and ambiguous manner. Further controverted because the cited deposition portion describes officers' ability to contact SPIDER to search specific individuals' names, not EJustice. Further controverted because the cited deposition portion does not address NICHE. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

21.    A different law enforcement tool is SPIDER (Special Policy Information Data Entry and Retrieval). Officers can contact SPIDER to request information on outstanding warrants

---

[8] Doc. 205-8, Beard Dep. 82:9–83:1.

or request other services such as a tow truck. Doc. Exhibit 8, Beard dep., 40:13-21.

**RESPONSE:** Uncontroverted.

22.    SPIDER pulls its information from Ejustice/Niche; therefore, it can only provide a hit for active criminal street gang members. Exhibit 10, Inkelaar dep., 73:1-7.

**RESPONSE:** Uncontroverted as to SPIDER pulling information from Ejustice and providing hits for those flagged as gang members. Controverted because the cited deposition portion does not address active or inactive status of designated gang members.

23.    The responder from SPIDER will advise an officer, including non-gang officers when an individual they are encountering with is an active criminal street gang member or associate by saying "signal 33." Doc. Exhibit 8, Beard dep., 40:22-41:5; Policy 527 § I.D.

**RESPONSE:** Uncontroverted.

24.    Inactive and deceased criminal street gang members are not visible on SPIDER, or Ejustice/NICHE, and cannot be accessed except by non-Gang Intelligence Officers. Exhibit 6, Bernard Declaration.

**RESPONSE:** Uncontroverted that the identity of individuals designated as inactive or deceased are not flagged as active in Ejustice/NICHE and therefore not noted as active when queried through SPIDER. Controverted as to whether anyone besides gang intelligence officers can access the identity of inactive and deceased individuals. WPD officers may ascertain whether an individual is identified as a gang member or associate—regardless of active, inactive, or deceased status—in the Gang Database by inquiring directly from a gang intelligence officer.[9] Further controverted to the extent Defendant fails to specify the relevant portion of the Bernard Declaration that supports this fact statement, in contravention of Summary Judgment Guideline No. 10. The Bernard Declaration does not address who may access information about inactive or deceased individuals.

25.    Under Policy 527, Officers include the gang membership in a probable cause affidavit for person felonies. Exhibit 10, Inkelaar dep., 73:1-7; Policy 527 § I.C.4.a.2.

---

[9] PTO Stip. ¶ 43.

**RESPONSE:** Uncontroverted.

26.    The inclusion of gang membership in an affidavit to the Court is only for those persons on the Master Gang List, i.e., that are currently active criminal street gang members or associates. Policy 527. Exhibit 6, Bernard Declaration. Thus, affidavits for persons who are inactive in the database do not include information about gang documentation.

**RESPONSE:** Controverted. Policy 527 does not limit inclusion of gang membership in arrest affidavits to "active" individuals.[10] In support, Plaintiffs incorporate by reference PSOF ¶¶ 23 and the sources cited therein.  Defendant's Rule 30(b)(6) representative testified that WPD personnel include in arrest affidavits gang membership information from the Gang Database, not merely the Master Gang List.[11] Further controverted to the extent Defendant fails to specify the relevant portion of the Bernard Declaration that supports this fact statement, in contravention of Summary Judgment Guideline No. 10. Further controverted as to the statement that "affidavits for persons who are inactive in the database do not include information about gang documentation," because Defendant fails to cite to any evidence for that proposition, in contravention of Summary Judgment Guideline No. 10.

27.    The Master Gang List is not published to anyone; it resides in the Gang Database as persons documented as active gang members or associates. The database itself is not shared with other agencies (since 2008-2009) and information from the database is provided only for approved law enforcement purposes. See Policy 527; Exhibit 6, Bernard Declaration.

**RESPONSE:** Controverted. The WPD has published or otherwise made available copies of and information from the Master Gang List and the Gang Database to other law enforcement agencies nationwide, as well as the media.[12] In support, Plaintiffs incorporate by reference PSOF ¶¶ 21-32

---

[10] Doc. 205-5, Policy 527; *see also* PTO Stip. ¶¶ 5, 9-10, 38, 46-47.

[11] Doc. 207-8, Beard 30(b)(6) Dep. 70:16–71:6, 74:9-14 (making no distinction between active or inactive individuals for the purposes of arrest affidavits); Ex. 1, Beard 30(b)(6) Dep. 66:15–67:5, 67:13-20, 78:11–79:16 (same).

[12] *See, e.g.*, Doc. 205-15, MOU with U.S. Probation Office; Wichita Police Department, <u>Top Wanted Gang Members</u>, Wichita Eagle, <u>https://www.kansas.com/news/local/crime/article987902.html</u> (last accessed Oct. 16, 2023); <u>PHOTOS: Sedgwick County, Wichita police's most wanted (June 2)</u>, Wichita Eagle, <u>https://www.kansas.com/news/local/crime/article142360814.html</u> at 15 (last accessed Oct. 16, 2023); <u>PHOTOS: Sedgwick County, Wichita police's most wanted (Oct. 13)</u>, Wichita Eagle, <u>https://www.kansas.com/news/local/crime/article167127502.html</u> at 51, 52 (last accessed Oct. 16, 2023); *see also* Amy Renee Leiker, <u>Man, 19, arrested in unsolved homicide from May</u>, Wichita

and the sources cited therein. Further controverted as Policy 527 does not address "approved law enforcement purposes," much less limit information sharing to such purposes.[13] Further controverted to the extent Defendant fails to specify the relevant portion of the Bernard Declaration that supports this fact statement, in contravention of Summary Judgment Guideline No. 10.

      28.    Through discovery, no details could be located regarding the allegation that the list was ever made public. Exhibit 11, Johnson dep., 52:3-9; Exhibit 12, Parker-Givens dep., 91:9-23; Exhibit 13, Speer dep., 94:17-97:9. There is no admissible evidence that the Master Gang List is made public or that it is published—either historically or currently; there are only anecdotal stories of the list having once been posted at a barber shop and of a landlord asking for an updated copy of the list. No details could be given regarding the anecdotes that the list was ever made public— nobody has personal knowledge of it happening. Exhibit 11, Johnson dep., 52:3-9; Exhibit 12, Parker-Givens dep., 91:9-23; Exhibit 13, Speer dep., 94:17-97:9.

**RESPONSE:** Controverted. Plaintiffs incorporate their response *supra* to DSOF ¶ 27. Further controverted to the extent this statement consists of improper legal arguments and conclusions, in contravention of Summary Judgment Guideline No. 6.

      29.    The one known instance of unauthorized disclosure resulted in criminal charges filed against the offending officer. See Exhibit 14, Charging affidavit, State v. Wendell Nicholson, Sedgwick County Case No. 2023-CR-000628-FE.3

**RESPONSE:** Uncontroverted as to criminal charges filed against former Captain Wendell

---

Eagle (Aug. 8, 2014), https://www.kansas.com/news/local/crime/article1083239.html ("Police said [homicide victim] was a known gang member"); Matt Riedl, Police: Teen who was shot at West High was armed; mom disputes that (+video), Wichita Eagle (Dec. 5, 2015), https://www.kansas.com/news/local/crime/article48180155.html ("[WPD Chief Nelson] Mosley said the [teen police shooting victim] was a documented gang member."); Tim Potter, On emergency radio traffic: How a Wichita police shooting played out, Wichita Eagle (Sept. 30, 2016), https://www.kansas.com/news/local/crime/article105201121.html ("[WPD Chief Gordon] Ramsay said [unarmed police shooting victim] is a documented gang member who is known to police"); Tim Potter, Mother speaks out after 18-year-old son gunned down, Wichita Eagle (Oct. 16, 2016), https://www.kansas.com/news/local/crime/article106508152.html ("Both the victim and the suspect are 'documented gang members,' [WPD Sgt. Nikki] Woodrow said"); Ron Sylvester, Drivers in crash that killed Wichita Southeast student may be tried as adults, Wichita Eagle (Aug. 8, 2014), https://www.kansas.com/news/local/crime/article1024155.html ("[P]olice said both [defendants] were known gang members"); Amy Renee Leiker, Feud between gang members led to bystander killing, affidavit says, Wichita Eagle (Aug. 9, 2017), https://www.kansas.com/news/local/crime/article166205677.html ("Levy is a member of the Piru Blood criminal street gang, according to the [police] affidavit."); Jason Tidd, A gang member took off his ankle monitor, Wichita police say. They're looking for him., Wichita Eagle (July 24, 2018), https://www.kansas.com/news/local/crime/article215457685.html ("Police said [former convict] is a documented gang member"); Kaitlyn Alanis, Weekend shooting investigation affected by 'lack of cooperation,' Wichita police say, Wichita Eagle (Apr. 29, 2019), https://www.kansas.com/news/local/crime/article229802714.html ("The male victim is a 'documented gang member,' Officer Paul Cruz said").
[13] Doc. 205-5, Policy 527.

Nicholson. Controverted as to Capt. Nicholson's conduct constituting "[t]he one known instance of unauthorized disclosure." There is substantial evidence of unauthorized disclosures beyond former Captain Wendell Nicholson.[14]

30.    Nonetheless, safeguards are in place to prevent such publication—the Master Gang List is not printed. While the entries that would comprise the Master Gang List is a query or report that can be produced from the Gang Database, such lists are not created or printed. Exhibit 6, Bernard Declaration. (The "lists" produced to plaintiffs in this action were specific queries/reports generated for discovery in this matter subject to the Protective Order herein).

**RESPONSE:** Controverted. To the extent Defendant asserts that "the Master Gang List is a query or report that can be produced from the Gang Database" but it is somehow "not created" is incompatible with Defendant's assertion that gang intelligence officers audit the List on an annual basis in a process that begins with examining the List and then revising the Gang Database accordingly to mark active gang members and associates as inactive, incarcerated, or deceased.[15] In support, Plaintiffs incorporate by reference PSOF ¶ 62 and the sources cited therein. The WPD also regularly created and sent the Master Gang List to outside agencies.[16] Further controverted to the extent this statement suggests that "safeguards"—whatever unspecified procedures exist besides purportedly not printing out a physical copy of the List—are effective in preventing publication. In support, Plaintiffs incorporate their response *supra* to DSOF ¶ 27. Further controverted to the extent Defendant fails to specify the relevant portion of the Bernard Declaration that supports this fact statement, in contravention of Summary Judgment Guideline No. 10.

31.    Information from the database (not the database itself) is provided only for approved law enforcement purposes on an individual-by-individual basis. MOUs to maintain confidence are in place with other law enforcement agencies that exchange gang intelligence. Doc.

---

[14] *See supra* Plaintiffs' Response to Defendant's Statement of Facts ("PR-DSOF") ¶ 27.

[15] *See infra* DSOF ¶¶ 48-52; *see also* PTO Stip. ¶ 19.

[16] *See, e.g.*, 208-2, Selected E-mails between WPD and Outside Agencies, at WICHITA 102627–28 (WPD affirming that it will try to send SCDOC the updated Gang List daily), WICHITA 103780 (WPD crime analyst stating, "Here is the updated Gang List as of today. I will plan on sending this out to you every Monday, Wednesday and Friday moving forward."), WICHITA 104869 ("Here is today's updated gang list.").

Exhibit 8, Beard dep., 296:3-10; Exhibit 9, Hemmert dep., 93:22-94:1; Exhibit 15, MOU with U.S. Probation Office.

**RESPONSE:** Uncontroverted as to the WPD obtaining memoranda of understanding from other law enforcement agencies. Controverted because the cited deposition portions do not address "approved law enforcement purposes," nor do they limit sharing of Gang Database information "on an individual-by-individual basis." Further controverted because according to the MOU cited, the WPD provides copies of the *entire* Gang Database to other agencies, obviating any supposed "individual-by-individual basis" limitation.[17] The WPD has sent copies of the Master Gang List to other law enforcement agencies without any request as to specific individuals.[18]

### 3. The Process: WPD Gang Intelligence Officers vet all nominations prior to inclusion and again annually.

32.    All WPD officers undergo gang-related training to learn what a gang is, as defined by statute, what a gang member is, as defined by statute, and the criteria required for verification. All officers are also instructed on the local gangs that have an identified presence in Wichita and their identifiers, as well as a review of previous incidents involving those gangs. The training consists of four hours in the academy and two additional hours annually. Doc. Exhibit 8, Beard dep., 189:16-190:21; 193:1-8.

**RESPONSE:** Controverted. In support, Plaintiffs incorporate by reference PSOF ¶ 33 and the sources cited therein.

33.    Individuals may be identified during criminal investigations as being involved in criminal activity and, during the course of the investigation, the officers see signs or indicators of gang membership. Exhibit 16, Bartel dep., 127:16-128:1.

**RESPONSE:** Uncontroverted that WPD officers may come to believe that an individual is a gang member during investigation of criminal activity. Controverted as to the accuracy and consistency of officers' assessment of "signs or indicators of gang membership." As described above, K.S.A. 21-6313's criteria are subjective, and each officer applies them differently.[19]

---

[17] *See, e.g.*, Doc. 205-15, MOU with U.S. Probation Office ("I understand that my agency will receive a downloaded 'Read Only' copy of the Gang Database.").
[18] *See supra* PR-DSOF ¶ 27.
[19] *See supra* PR-DSOF ¶ 2.

34.     Any WPD officer may nominate someone for inclusion in the database. When an officer notices an individual meeting criteria, or when an individual admits to the officer their status as a criminal street gang member, the officer is trained to complete a TOPS card to "nominate" someone for inclusion on the database. All TOPS cards are forwarded to the Gang Intelligence Unit for review. Exhibit 16, Bartel dep., 128:4-10.

**RESPONSE:** Uncontroverted as to any WPD officer being able to nominate an individual for inclusion in the Gang Database by completing and sending TOPS cards to the Gang Unit for review. Controverted as to the accuracy and consistency of officers' assessments of whether an individual meets the statutory criteria or self-admits. As described above, K.S.A. 21-6313's criteria are subjective, and each officer applies them differently.[20]

35.     Although any officer can nominate someone, the Gang Database is administered exclusively by Gang Intelligence Officers. Gang Intelligence Officers are the only WPD officers who may add a person to the Gang Database, inactivate a person in the Gang Database, or remove a person from the Gang Database: Exhibit 6, Bernard Declaration. See Policy 527 § 1.B.1 ("The information will be researched by a member of the Gang/Felony Assault Section or VCCRT. …. The individual will be added to the Master Gang List if they meet the criteria defined in K.S.A. 21-6313.").

**RESPONSE:** Uncontroverted as to the factual accuracy of this statement.[21] Controverted to the extent Defendant fails to specify the relevant portion of the Bernard Declaration that supports this fact statement, in contravention of Summary Judgment Guideline No. 10.

36.     Persons are added to the Gang Database in the first instance either (1) through research and contacts by gang intelligence officers or (2) (a) by nomination for inclusion on the database by non-gang officers followed by (b) review and verification by Gang Intelligence Officers that the subject meets the criteria for inclusion on the Master Gang List. Exhibit 16, Bartel dep., 127:16-128:15. WPD Policy 527 incorporates by the definitions and criteria in K.S.A. 21-6313. Policy 527, § I.E.1 ("Initial identification will be based upon the aforementioned Criminal Street Gang Member or Associate Criteria found in K.S.A. 21-6313.")

**RESPONSE:** Uncontroverted.

37.     Gang Intelligence Officers have specialized training and experience to apply statutory criteria to any individual nominated for inclusion. Exhibit 3, McKenna dep., 163:17-164:16. Gang Intelligence Officers use their training, experience, and knowledge of the neighborhoods to make the determinations for inclusion in the Master Gang List, Exhibit 10,

---

[20] *See supra* PR-DSOF ¶ 2.
[21] PTO Stip. ¶ 23.

Inkelaar dep., 116:13-24, and they converse with each other to discuss individual situations. Exhibit 17, Gilmore dep., 150:20-151:9.

**RESPONSE:** Controverted as the cited portions of the McKenna and Inkelaar depositions do not describe any specialized training. Further controverted because the cited portion of the Gilmore deposition addresses only discussions between gang intelligence officers about "gang locations" in particular, not "individual situations."

38.    The Courts have recognized Gang Intelligence Officers as experts in the area of gangs and allow them to testify as such in criminal trials. Doc. Exhibit 8, Beard dep., 264:16-22. *See also State v. Brown*, 285 Kan. 261, 267, 173 P.3d 612, 620 (2007), *abrogated on other grounds by State v. Williams*, 306 Kan. 175, 392 P.3d 1267 (2017); *State v. Tran*, 252 Kan. 494, 847 P.2d 680 (1993).

**RESPONSE:** Uncontroverted as to gang intelligence officers testifying in criminal proceedings. However, whether unspecified courts have "recognized Gang Intelligence Officers as experts" is immaterial in contravention of Summary Judgment Guideline No. 3.

39.    Disparate application of the criteria is avoided by training the officers and the context of information used. Exhibit 9, Hemmert dep., 168:18-169:18. For example, WPD Officers are trained to understand the distinctions between a reliable informant and an informant of untested reliability. Officers also understand the information must be documented. Exhibit 6, Bernard Declaration.

**RESPONSE:** Controverted as to whether the WPD avoids disparate application of the statutory criteria. As described above, K.S.A. 21-6313's criteria are subjective, and each officer applies them differently.[22] Further controverted as to whether "the context of information used" also prevents disparate application, as that phrase is vague and ambiguous. Further controverted to the extent Defendant fails to specify the relevant portion of the Bernard Declaration that supports this fact statement, in contravention of Summary Judgment Guideline No. 10. Further controverted to the extent that the Bernard Declaration does not address officer training, the distinction between a reliable informant and an informant of untested reliability, or documentation of "the information."

---

[22] *See supra* PR-DSOF ¶ 2.

40.     Incidental contact is insufficient to justify inclusion. Associating with known gang members requires conduct indicative of joining or connection based on gang affiliation. Exhibit 6, Bernard Declaration.

**RESPONSE:** Controverted to the extent this statement reflects the perspective of a single WPD officer. Further controverted as neither K.S.A. 21-6313 nor Policy 527 address the sufficiency of "incidental contact" or what "associating with known gang members" requires.[23] In support, Plaintiffs incorporate by reference PSOF ¶¶ 35, 77-78 and the sources cited therein. Further controverted to the extent Defendant fails to specify the relevant portion of the Bernard Declaration that supports this fact statement, in contravention of Summary Judgment Guideline No. 10.

41.     Immediate family members are exempted and not employed as a criterion of associating with known gang members. Doc. Exhibit 8, Beard dep., 249:10-14, Exhibit 6, Bernard Declaration.

**RESPONSE:** Controverted as the cited deposition portion concerns probation gang conditions of release, not the WPD's application of the "associating with known gang members" criterion.[24] Further controverted as neither K.S.A. 21-6313 nor Policy 527 describe any immediately family member exemptions for any criteria.[25] Further controverted as the WPD has relied on individuals' association with immediate family members as reasons to add or renew their active status in the Gang Database, or as information otherwise pertinent to those individuals' gang status.[26] Further controverted to the extent Defendant fails to specify the relevant portion of the Bernard Declaration that supports this fact statement, in contravention of Summary Judgment Guideline No. 10.

---

[23] *See* K.S.A. 21-6313; Doc. 205-5, Policy 527.
[24] Doc. 207-3, Beard Dep. 245:18–249:15.
[25] K.S.A. 21-6313; Doc. 205-5, Policy 527.
[26] *See, e.g.*, *infra* DSOF ¶ 115 (acknowledging that Mr. M. Costello was renewed "for being in the company of other gang members, including his father, Plaintiff Elbert Costello"); PSOF ¶ 79; Doc. 205, at 52; Doc. 208-3, Selected Gang Database Entries, at WICHITA 023978 (renewing Elbert Costello for attending a concert with his son, Martel Costello), WICHITA 024146–47 (renewing M. Costello for attending a concert with his father; describing M. Costello's presence at locations or events with his brother), WICHITA 030086 (Det. McKenna adding individual based on a Facebook photo and McKenna's knowledge that the individual was the father of another designated gang member), WICHITA 024425 (noting Progeny Youth Leader D.B.'s presence with his brother, also an alleged gang member), WICHITA 053497 (noting designated individual's brother is also an alleged gang member).

42. Self-admission is a common method by which gang members and associates are identified. Exhibit 16, Bartel dep., 128:-13; 136:18-137:5; Doc. Exhibit 8, Beard dep. 31:18-33:7, 56:2-3, 56:19-21; Exhibit 17, Gilmore dep., 44:7-44:16; Exhibit 9, Hemmert dep., 42:19-43:22.

**RESPONSE:** Uncontroverted as to WPD personnel commonly marking individuals as having self-admitted gang membership or associateship. Controverted as to the accuracy and consistency of any purported self-admission. WPD officers vary in what they consider a "self-admission." In support, Plaintiffs incorporate by reference PSOF ¶¶ 45-47 and the sources cited therein.

43. Some individuals self-admit because they are proud to be a gang member. Exhibit 16, Bartel dep., 130:12-23. A lot of individuals are comfortable confirming their membership and do not try to hide it: "it's almost written on a shirt." Exhibit 18, Thatcher dep., 98:11-17.

**RESPONSE:** Uncontroverted, but Plaintiffs object to this statement as immaterial in contravention of Summary Judgment Guideline No. 3.

44. But even self-admits are verified by gang intelligence officers through watching the reporting officers' AXON video. Exhibit 3, McKenna dep., 165:18-166:14; Exhibit 16, Bartel dep., 120:7-11; 128:18-129:6; Exhibit 9, Hemmert dep., 182:3-18; Exhibit 10, Inkelaar dep., 83:15-23; Exhibit 7, Salcido dep., 197:12-198:5; Exhibit 3, McKenna dep., 163:17-164:16. Gang Intelligence Officers confirm hearing the person self-admit before adding them to the Master Gang List; a social media post alone does not suffice. Exhibit 3, McKenna dep., 168:15-25.

**RESPONSE:** Controverted. No WPD policy requires verification of a self-admission by viewing AXON video.[27] Further controverted as the cited portions of the Bartel, Hemmert, Inkelaar, and Salcido depositions do not address verification of self-admissions by watching AXON video. Further controverted to the extent this statement suggests that all self-admissions are verified by watching AXON video.[28] Further controverted because WPD officers vary in what they consider a "self-admission." In support, Plaintiffs incorporate by reference PSOF ¶¶ 45-47 and the sources cited therein.

---

[27] Doc. 207-16, Salcido Dep. 162:17–166:21.
[28] Doc. 205-3, McKenna Dep. 166:15–167:13 (describing adding individuals to the Gang Database based on purported self-admissions even in the absence of AXON video); *see also* Doc. 207-16, Salcido Dep. 162:17–166:21 (Deputy Chief Jose Salcido unable to point to any specific incident where self-admission was verified by AXON video).

45.     The WPD does not maintain a map identifying specific gang areas. However, there are known areas where gang members hang out and engage in criminal activity, Exhibit 2, Easter dep. Vol. II, 54:21-55:20.

**RESPONSE:** Uncontroverted as to the WPD not maintaining a map identifying specific gang areas. Controverted as to the existence of "known areas where gang members hang out and engage in criminal activity." In support, Plaintiffs incorporate by reference PSOF ¶¶ 48-54 and the sources cited therein.

46.     Determinations by Gang Intelligence Officers for inclusion in the database depend on the totality of circumstances, knowledge, and experience. Exhibit 17, Gilmore dep., 124:19-125:11.

**RESPONSE:** Uncontroverted to the extent that gang intelligence officers may rely on their personal knowledge and experience in deciding whether to include an individual in the Gang Database. Controverted to the extent that this statement implies that all gang intelligence officers always rely on "the totality of circumstances" in deciding to include an individual in the Gang Database. Neither K.S.A. 21-6313 nor Policy 527 address "the totality of the circumstances."

47.     The reviewing officer looks at the information with skepticism to ensure there is a very specific reason for inclusion, Exhibit 9, Hemmert dep., 175:9-176:4, and Gang Intelligence Officers lean toward being underinclusive rather than overinclusive. Exhibit 3, McKenna dep., 153:1-15.

**RESPONSE:** Controverted. The cited portion of the Hemmert deposition discusses Det. Hemmert's viewing the concept of a "gang area" with skepticism, not all "information" and not all "reviewing officers."[29] Further controverted as to all gang intelligence officers leaning toward underinclusivity, as the cited portion of the McKenna deposition discusses only Det. McKenna's personal practices and not the practice of all gang intelligence officers.

---

[29] *Compare* Doc. 205-9, Hemmert Dep. 175:24–176:4 ("Q. . . . [A]nd we've already talked about the idea that if there was an *area*, you yourself would be kind of skeptical of that unless somebody could give you a very specific reason of why they have included it correct? A. Correct.") *with* Doc. 207-28, Hemmert Dep. 171:3-15 (giving less weight to the "gang area" criterion because "the nature of Wichita criminal street gangs are that claiming an area is not a -- you know, that's not as much of a thing in Wichita as it is in other places. . . . [T]ypically in Wichita a criminal street gang does not say, hey, 14th and Estelle is our area. That's – that's not how it operates").

#### 4. The Master Gang List undergoes a full audit every year.

48.    WPD Policy 527 requires an annual audit to ensure accuracy and remove expired individuals. Policy 527 § I.E.1.

**RESPONSE:** Controverted. The plain text of Policy 527 does not use the term "audit" or mandate any annual audit procedure. Further controverted in that "expired individuals" (which Plaintiffs interpret to mean individuals who qualify as "inactive") are not "remove[d]." Individuals listed in the Gang Database remain in the Database in perpetuity.[30] Any "removal" from the Master Gang List simply means marking an individual inactive in the Gang Database.[31] The Master Gang List is nothing more than "a query or report that can be produced from the Gang Database."[32] In support, Plaintiffs incorporate by reference PSOF ¶¶ 58-64 and the sources cited therein.

49.    This is a painstaking process in which every name and every case are reviewed every year. Exhibit 17, Gilmore dep., 98:15-25.

**RESPONSE:** Uncontroverted as to an audit of the Master Gang List occurring every year. Controverted in that the WPD's yearly audit includes researching only active members, not every single name in the Gang Database.[33]

50.    The WPD Gang Intelligence Officers understand accuracy is critical. Exhibit 13, Speer dep., 56:25-57:12.

**RESPONSE:** Controverted. The cited deposition portion states only Former WPD Deputy Chief Speer's opinion that the information in field intelligence cards and/or the Gang Database "was critical but it needed to be accurate" because such information would later be used in criminal prosecutions. Speer never served as a gang intelligence officer,[34] and the cited portion of his deposition says nothing about gang intelligence officers' understanding of anything.

---

[30] PTO Stip. ¶ 38.
[31] Doc. 205-8, Beard Dep. 89:6-16.
[32] *Supra* DSOF ¶ 31.
[33] PTO Stip. ¶ 19.
[34] Ex. 2, Speer Dep. 15:15–23:20.

51.    The annual audits consist of reviewing each individual to confirm if they meet the required criteria or determine if they no longer meet criteria. Doc. Exhibit 8, Beard dep., 88:15-89:4, 90:8-11.

**RESPONSE:** Uncontroverted as to the audit process consisting of gang intelligence officers reviewing Gang Database entries, criminal case records, social media, and other information to determine whether each individual's active status should be renewed for another three years. Controverted as to the accuracy and consistency in determining whether individuals actually satisfy criteria, as the criteria are vague and subjective, and each officer applies them differently.[35]

52.    WPD removes persons from the Master Gang List if the person goes three years without being involved in anything that meets statutory criteria for a criminal street gang member or associate. Beard 30b6, 21:18-21:23; Policy 527, § I.E.1.

**RESPONSE:**  Uncontroverted to the extent this statement indicates that individuals that go three years without WPD personnel finding that they meet the statutory criteria may be marked as inactive and therefore not included in the next version of the Master Gang List.[36] Controverted in that individuals who do not meet any statutory criteria for three years are not "remove[d]." Plaintiffs incorporate their response *supra* to DSOF ¶ 48.

### 5. Removal from the Master Gang List

53.    Any person may request a meeting with the gang commander and offer information to challenge inclusion and request removal. Exhibit 16, Bartel dep., 126:20-127:2; Exhibit 4, Beard 30b6 dep., 21:24-22:6.

**RESPONSE:** Uncontroverted that in the past, select individuals have sought meetings with a gang unit commander and requested removal from the Gang List. Controverted to the extent that this statement implies that that such a request and meeting constitutes a formal policy or actually results in removal from the Master Gang List.[37] There is no documented evidence that the WPD ever

---

[35] *See supra* PR-DSOF ¶ 2.
[36] *But see* Doc. 208-3, Selected Gang Database Entries, at WICHITA 053189 (noting that individual would remain active until 9/25/12, but not marking that individual as inactive until 1/28/2018).
[37] PTO Stip. ¶¶ 38, 39 (no WPD policy on providing a process for removal from the Gang Database).

removed a person from the Gang Database in response to that person's request to be removed.[38]

54.    When a person is no longer considered an active gang member or associate, the designation is removed from the WPD records management system, EJustice/NICHE, as a documented gang member. Exhibit 16, Bartel dep., 120:11-18, 122:2-24, 141:10-142:6; Doc. Exhibit 8, Beard dep., 77:1-8; Exhibit 4, Beard 30b6 dep., 21:13-23; Exhibit 19, Cory dep., 78:7-97:13. This also means SPIDER will no longer notify officers the person is "signal 33." Doc. 186-21, Declaration of J Bernard. That person's status in the Gang Database is changed from active to inactive and they are no longer on the Master Gang List. Policy 527, § E.1.

**RESPONSE:** Controverted to the extent Defendant fails to specify the relevant portion of the Declaration of J Bernard (Doc. 186-21) that supports this fact statement, in contravention of Summary Judgment Guideline No. 10. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

55.    The historic information retained in the database—criminal intelligence—is necessary to effectively investigate, solve and/or prevent crimes in the present. Doc. Exhibit 8, Beard dep., 136:8-17.

**RESPONSE:** Controverted. The cited deposition portion does not state that historic information retained in the database is necessary to effectively investigate, solve, or prevent crimes in the present. The cited deposition portion states only that Capt. Beard is personally reluctant to give up "legacy information," and that he knows of present-day shootings that occurred because of events in the past. He does not state that those shootings were investigated, solved, or prevented because of Gang Database information. Further controverted to the extent it suggests that the Gang Database is necessary because it serves as the WPD's sole tool for collecting and preserving criminal intelligence. The WPD employs other tools, such as NICHE.[39]

56.    Access to view information on inactive members is restricted even further than access to the Master Gang List. Exhibit 16, Bartel dep., 121:24 – 122:24.; Doc. Exhibit 8, Beard dep., 77:1-8; Exhibit 4, Beard 30b6 dep., 21:13-23; Exhibit 19, Cory dep., 78:7-97:13.

---

[38] PTO Stip. ¶ 37.
[39] *See supra* DSOF ¶ 20.

**RESPONSE:** Controverted. The WPD routinely shares the Gang Database and information from the Gang Database internally and with other law enforcement and government agencies nationwide.[40] Further controverted in that WPD officers may ascertain whether an individual is identified as a gang member or associate—regardless of active, inactive, or deceased status—in the Gang Database by inquiring directly from a gang intelligence officer.[41] All WPD personnel (including approximately 700 commissioned officers or employees) conducting arrests must have access to and use of the information in the Gang Database.[42]

57.    Only the Gang Intelligence Officers have access to view the information in the Gang Database. Exhibit 16, Bartel dep., 121:24-122:24.

**RESPONSE:** Controverted. Plaintiffs incorporate their response *supra* to DSOF ¶ 56.

58.    Once inactive (i.e., removed from the Master Gang List), a person must again meet criteria (self-admit or meet the required multiple statutory criteria) before again being included on the Master Gang List. Beard 30b6, 26:10-26:20; Policy 527, § I.E.1.

**RESPONSE:** Controverted to the extent that this statement suggests that WPD personnel accurately and consistently ascertain whether criteria are met before changing an inactive individual's status to active in the Gang Database. Plaintiffs incorporate their response *supra* to DSOF ¶ 51, as well as PSOF ¶¶ 12-14, 75, 84 and the sources cited therein. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

**6.    Juvenile Notifications**

59.    WPD attempts to notify and contact guardians of juveniles about inclusion in the Gang Database. Exhibit 17, Gilmore dep., 94:8-17; Exhibit 4, Beard 30b6 dep., 23:9-24:2.

**RESPONSE:** Uncontroverted.

60.    Initially, certified letters were sent, but many of those were returned undelivered. Doc. Exhibit 8, Beard dep., 138:22-10. Because sending certified letters was ineffective, officers

---

[40] *See supra* PR-DSOF ¶¶ 27-28, 30-31.
[41] PTO Stip. ¶ 43.
[42] Doc. 205-5, Policy 527, at 2; *see also* Doc. 207-8, Beard 30(b)(6) Dep. 70:16–71:9.

instead began making phone calls and physically visiting the homes to make contact, documented in the database. Doc. Exhibit 8, Beard dep., 107:4-15; 139:10-23; 108:15.

**RESPONSE:** Uncontroverted.

61.     Currently, the gang officers and juvenile intervention unit officers work together and visit the home to make personal contact, making phone calls only when multiple attempts to visit the home and school are unsuccessful. *Id.*, 139:24-140:15; Exhibit 4, Beard 30b6 dep., 24:9-12.

**RESPONSE:** Uncontroverted.

## B.    Individually Named Plaintiffs

### 1.    Christopher Cooper

62.     Cooper attended Highland Community College near St. Joseph Missouri following graduation from high school in 2013. Exhibit 20, Cooper dep, 31:16-32:1; 32:22-33:5.

**RESPONSE:** Uncontroverted.

63.     Highland gave Cooper a scholarship to play football, and he received a second scholarship from the U.S. Army because of his father's military service. Exhibit 20, Cooper dep, 36:19-37:1.

**RESPONSE:** Uncontroverted.

64.     Cooper was injured during the first season of football while playing for Highland and was unable to complete the season. Exhibit 20, Cooper dep, 33:24-34:25

**RESPONSE:** Uncontroverted, but Plaintiffs object to this statement as immaterial in

contravention of Summary Judgment Guideline No. 3.

65.     Cooper was never on the track team for Highland Community College. Exhibit 20, Cooper dep, 35:9-16.

**RESPONSE:** Uncontroverted, but Plaintiffs object to this statement is immaterial in contravention

of Summary Judgment Guideline No. 3.

66.     Cooper was charged with first-degree murder in 2014 and went to jail after being interviewed by the police. Exhibit 20, Cooper dep, 62:7-12.

**RESPONSE:** Uncontroverted.

67.     Cooper was accused of murdering Juan Orona. C. Cooper Depo., 20:19-16.

**RESPONSE:** Uncontroverted as to the factual accuracy of the fact statement. Controverted to the extent the portion of Mr. Cooper's deposition cited ("C. Cooper Depo., 20:19-16") prevents accurate assessment of evidentiary support for this statement.

68. The Judge set Cooper's bond during a hearing. Exhibit 20, Cooper dep, 41:4-11.

**RESPONSE:** Uncontroverted.

69. Coooper thinks his bond was about $50,000. C. Cooper Depo., 40:19-21.

**RESPONSE:** Uncontroverted.

70. Cooper didn't think a $50,000 bond was low for someone charged with first-degree murder. Exhibit 20, Cooper dep, 41:1-2.

**RESPONSE:** Uncontroverted, but Plaintiffs object to this statement is immaterial in contravention of Summary Judgment Guideline No. 3.

71. Cooper was convicted of obstructing justice in 2016. Cooper Dep., 22:21-23:8.

**RESPONSE:** Uncontroverted, but incomplete. Mr. Cooper remained in jail pretrial for a year because he could not afford to pay the $50,000 bond, and as a result, he accepted a plea to obstruction of justice, believing that he had no reasonable alternative and that the prosecution would seek to introduce evidence of purported gang membership at trial.[43]

72. The U.S. Army discontinued its scholarship to Cooper at the time of his conviction. Exhibit 20, Cooper dep, 66:12-15.

**RESPONSE:** Uncontroverted.

73. Cooper never applied to Kansas State University ("K-State"). Exhibit 20, Cooper dep 38:14-18; 76:6-7.

**RESPONSE:** Uncontroverted.

74. K-State did not offer Cooper a scholarship. Exhibit 20, Cooper dep, 37:2-38:16.

**RESPONSE:** Controverted to the extent the cited portion of the Cooper deposition does not

---

[43] Doc. 205-20, Cooper Dep. 22:6-11, 62:13–63:13.

address whether K-State offered Mr. Cooper a scholarship. Mr. Cooper testified that he understood or believed that he would be offered a scholarship once he applied to K-State, but that he was unable to do so because he had been jailed pre-trial as the result of the criminal case against him.[44]

75.    Cooper did not attend K-State because they would not let a convicted felon live on campus. Exhibit 20, Cooper dep, 64:2-65:8; 76:10-12.

**RESPONSE:** Uncontroverted.

76.    Cooper thinks living off campus required him to do "too much." Exhibit 20, Cooper dep, 64:2-65:8.

**RESPONSE:** Controverted as an incomplete characterization of Mr. Cooper's testimony. Mr. Cooper testified that because he was not permitted to live on campus, he would have to find his own housing and transportation to campus, which he could not afford to do.[45] Plaintiffs further object to this statement as immaterial in contravention of Summary Judgment Guideline No. 3.

77.    Cooper also did not apply for admission to Wichita State University ("WSU"). Exhibit 20, Cooper dep, 75:17-21.

**RESPONSE:** Uncontroverted.

78.    Cooper believes he can never go back to school because of his criminal record as a violent offender, Exhibit 20, Cooper dep, 70:9-17,

**RESPONSE:** Controverted to the extent this statement misstates Mr. Cooper's testimony that he has a "criminal record as a violent offender." Rather, Mr. Cooper testified that he believed he could not return to school because the school would *think* he was a criminal or violent offender.[46]

79.    Cooper believes all employers run background checks as part of the application process and he assumed an employer can see that he was listed on a gang database on the background check. He assumed if he applied for a job and didn't get a call back it was because of the background check. Exhibit 20, Cooper dep, 49:21-52:24.

**RESPONSE:** Uncontroverted.

---

[44] *Id.* at 38:14-24, 54:13-19.
[45] *Id.* at 64:24–65:8.
[46] *Id.* at 70:9-17.

80.     Cooper doesn't believe the gang list denied him job opportunities; he testified he assumes all employers run background checks and would see his criminal history. Exhibit 20, Cooper dep, 49:21-52:24.

**RESPONSE:** Controverted to the extent this statement misstates Mr. Cooper's testimony. Mr. Cooper did not testify that he "doesn't believe the gang list denied him job opportunities" in the deposition portion cited. Rather, he testified that he believed he lost a job opportunity with Spirit Aerosystems because he was "on [the] gang file."[47] Furthermore, Mr. Cooper testified only that he assumed that all jobs involved a background check; he did not testify that he assumed all employers "would see his criminal history."[48]

81.     Cooper's probation conditions prevented him from participating in public events, such as the Wichita River Festival. Exhibit 20, Cooper dep, 69:13-70:6; 74:14-75:16.

**RESPONSE:** Controverted to the extent this statement omits Mr. Cooper's testimony that his probation conditions were the more severe conditions for those designated as gang members or associates ("gang conditions").[49] Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

82.     The limits of Cooper's employment positions occur because of his probation conditions, such as limiting his participation in public events such as the Wichita Riverfest. Exhibit 20, Cooper dep, 69:13-70:6.

**RESPONSE:** Uncontroverted to the extent Mr. Cooper's probation conditions limited his employment opportunities. Controverted to the extent this statement omits Mr. Cooper's testimony that his probation conditions were gang conditions of release imposed only on those included in the WPD's Gang Database. Plaintiffs incorporate their response *supra* to DSOF ¶ 81. Further controverted because Mr. Cooper testified that he was unable to pursue his plans to become a sports trainer or therapist because he was unable to return to school.[50]

---

[47] *Id.* at 49:21–50:5.
[48] *Id.* at 52:10-21.
[49] *Id.* at 74:14–75:16.
[50] *Id.* at 70:7-17.

83.     Cooper understands the conditions of his probation were determined by a judge, Exhibit 20, Cooper dep, 41:16-42:6,

**RESPONSE:** Controverted to the extent this statement misstates Mr. Cooper's testimony. Mr. Cooper testified that he understood that his probation conditions were "imposed" by the judge, not that they were "determined" by the judge.[51] Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

84.     Cooper's probation was monitored by community corrections. Exhibit 20, Cooper dep, 42:7-9.

**RESPONSE:** Uncontroverted, but Plaintiffs object to this statement as immaterial in contravention of Summary Judgment Guideline No. 3.

85.     Cooper recognizes his inability to attend certain community events were due to his probation conditions, not inclusion on the gang list. Exhibit 20, Cooper dep, 74:14-75:16.

**RESPONSE:** Controverted to the extent this statement omits Mr. Cooper's testimony that his probation conditions were gang conditions of release imposed only on those included in the WPD's Gang Database. Plaintiffs incorporate their responses *supra* to DSOF ¶¶ 81-82.

86.     Cooper was pulled over by law enforcement maybe two times when he was in high school and a few times after graduating high school for a total of 5-6 times. Exhibit 20, Cooper dep, 43:7:24.

**RESPONSE:** Uncontroverted.

87.     Cooper admits the WPD had a reason to pull him over for the traffic stops and that he has never filed a complaint with the WPD regarding the stops. Exhibit 20, Cooper dep, 44:20-45:9.

**RESPONSE:** Controverted to the extent this statement misstates Mr. Cooper's testimony. Mr. Cooper testified that even though the police pulled him over for purportedly failing to signal within 100 feet, they never issued him any tickets for any infraction.[52] He testified that he believed that

---

[51] *Id.* at 42:4-6.
[52] *Id.* at 44:15–45:3.

the WPD had a reason for pulling him over, but he did not admit to the legitimacy of that reason.[53]

Plaintiffs further object to this statement in that whether Mr. Cooper ever filed a complaint with

the WPD is immaterial in contravention of Summary Judgment Guideline No. 3.

88.    Cooper consented to a search request when he was pulled over by law enforcement.
Exhibit 20, Cooper dep, 70:24-71:2.

**RESPONSE:**  Uncontroverted, but Plaintiffs object to this statement as immaterial in

contravention of Summary Judgment Guideline No. 3.

89.    Cooper did not drive a car registered in his name before his arrest for first degree
murder, Exhibit 20, Cooper dep, 55:16-56:6,

**RESPONSE:** Controverted as the cited portion of the Cooper deposition does not address vehicle

registration in his name.

90.    Cooper does not recall if he was pulled over following his arrest and jail time in
2017. Exhibit 20, Cooper dep, 43:25-44:11.

**RESPONSE:** Uncontroverted.

91.    Cooper was told by other people that police were hiding in the bushes and taking
pictures of him. Exhibit 20, Cooper dep, 71:17-19, but Cooper never saw any police and had no
contact with police officers. Exhibit 20, Cooper dep, 76:16-24.

**RESPONSE:** Controverted to the extent this statement misstates Mr. Cooper's testimony. Mr.

Cooper did not testify that he had no contact with police officers; rather, he testified that when

attending a specific funeral, he was not pulled over because he was not driving, and that although

his mother was driving, he did not think the police pulled her over.[54] Subject to, and without

waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

92.    Cooper assumed he could not associate with family members since they were also
on the gang list and a condition of his probation was that he could not associate with gang
members. Exhibit 20, Cooper dep, 52:25-53:14.

---

[53] *Id.* at 44:20-23; *see also* Doc. 207-50, Cooper Dep. at 57:3–58:22 (describing the nature of the unjustified stops).
[54] Doc. 205-20, Cooper Dep. 76:19-24.

**RESPONSE:** Controverted to the extent this statement misstates Mr. Cooper's testimony by omitting his clarification that he was informed and believed that other relatives (namely, Martel Costello and Elbert Costello, Jr.) were "on the gang file."[55] Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

93.    Another condition of Cooper's probation was to not associate with other convicted felons. Exhibit 20, Cooper dep, 54-13:15. The family members Cooper alleges he was unable to associate with were convicted felons. Exhibit 20, Cooper dep, 54:8:12.

**RESPONSE:** Controverted to the extent this statement misstates Mr. Cooper's testimony. Mr. Cooper testified that Elbert Jr. and M. Costello had "probably" had criminal convictions at the time in question. He did not testify that they were convicted felons.[56] Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

94.    Cooper could not produce a single document, communication, statement, memorandum, recording, photograph, drawing, note, journal, blog, email, social media account, or report to support any of the facts relating to any of the allegations set forth or the harm he's suffered as a direct result of being included on the WPD's gang database. Exhibit 21, C. Cooper Response to Defendant's First Request for Production, ## 1, 2, 3, 4, 5, 6, 7, 8, 12, 14, and 15.

**RESPONSE:** Controverted. Mr. Cooper described the harms he has suffered both in his responses to Defendant's interrogatories and in his deposition testimony.[57]

95.    Cooper has not made any attempt to contest his designation as a criminal street gang member. Exhibit 21, C. Cooper Response to Defendant's First Request for Production, # 17. Cooper has not attempted to file a complaint or report regarding the WPD's alleged conduct. Exhibit 21, C. Cooper Response to Defendant's First Request for Production, # 18, 19.

**RESPONSE:** Controverted to the extent the cited sources merely state that Mr. Cooper is not aware of any non-privileged documents responsive to Defendant's Requests for Production Nos. 17, 18, and 19. Mr. Cooper's discovery responses do not state that he did not attempt to contest

---

[55] Doc. 205-20, Cooper Dep. 53:12–54:2.
[56] *Id.* at 54:8-15.
[57] *See, e.g., id.* 49:21–50:12; Doc. 207-80, Cooper Dep. 38:9-24, 43:7-14, 44:9–45:13, 52:25–54:2, 56:19–59:14, 62:13–64:12, 65:9–66:15, 69:13–70:6, 75:7-13, 76:10-12; Doc. 207-51, Cooper Resp. to Def.'s Interrog. Nos. 10-16, 18-22.

his designation or to file a complaint or report regarding the WPD's conduct. Further controverted to the extent this statement implies that a process to contest inclusion exists, that Mr. Cooper (or anyone else designated in the Gang Database) was aware of such a process, or that such a process is meaningful in that it could result in removal from the Gang Database.[58] Plaintiffs further object to this statement to the extent that whether Mr. Cooper attempted to contest his designation or filed a complaint or report is immaterial in contravention of Summary Judgment Guideline No. 3. Defendant acknowledges that there is no WPD policy that provides individuals included in the Gang Database an opportunity to challenge their inclusion, there is no documented incident of the WPD removing anyone from the list following a request to do so, and there is no policy providing any process for a person to be fully removed or deleted from the Database.[59] Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

96.    Cooper has maintained employment since 2014. Exhibit 22, C. Cooper Response to Defendant's First Interrogatories, # 6.

**RESPONSE:** Uncontroverted.

### 2. Jeremy Levy, Jr.

97.    Levy claims that he was stopped by police at a QuickTrip when he was thirteen years old and told he could not go to certain QuickTrips or Towne East Mall or wear certain colors. Exhibit 23, Levy dep., 32:6-32:22.

**RESPONSE:** Uncontroverted.

98.    Levy believes he was on the gang file because 'police' told him he could not go to these places. Exhibit 23, Levy dep., 32:6-23.

**RESPONSE:** Uncontroverted.

99.    Levy assumed he did not get a job at "Lids" because he was on the gang list, but does not know why he did not get the job. Exhibit 23, Levy dep., 32:24-35:4.

---

[58] *See* PTO Stip. ¶¶ 28-29, 36-39.
[59] PTO Stip. ¶¶ 36-38.

**RESPONSE:** Controverted to the extent this statement mischaracterizes Mr. Levy's testimony. Mr. Levy initially testified that he did not know why he did not get the job at Lids, and then clarified that he "assumed it was just [the] gang file. It had to have been the gang file. That's the only reason it could have been. Wasn't nothing else wrong."[60] Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

100.    After being convicted as a juvenile, Levy claims he was told he could not apply for a job working in a hospital and be a gang member but cannot remember the name of the company, anyone he spoke to or if the employer did background checks. Exhibit 23, Levy dep., 35:5-36:20.

**RESPONSE:** Controverted to the extent this statement mischaracterizes Mr. Levy's testimony. Mr. Levy testified that he had applied to a construction company but was told he could not get the job because he was "on the gang file." This construction company worked on hospitals. Mr. Levy did not testify that he could not apply for a job "working in a hospital."[61] Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

101.    Levy was convicted of first-degree murder that occurred in 2017 and is serving a sentence of 25 years to life. Exhibit 23, Levy dep., 17:23-18:9; Exhibit 28, M. Costello Exhibit 85.

**RESPONSE:** Controverted to the extent Exhibit 28 does not address Mr. Levy but rather another Plaintiff, and to the extent Defendant fails to specify the relevant portion of Exhibit 28 that supports this fact statement, in contravention of Summary Judgment Guideline No. 10. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

102.    Levy admits his trial attorney challenged the admissibility of testimony from the WPD regarding his gang affiliation at his pre-trial and trial. Exhibit 23, Levy dep., 25:23-26:13.

**RESPONSE:** Uncontroverted.

103.    The judge overruled the challenge and allowed the testimony. Exhibit 23, Levy dep., 26:5-13.

---

[60] Doc. 205-23, Levy Dep. 33:10–35:4.
[61] *Id.* at 35:5–36:17.

**RESPONSE:** Uncontroverted.

104.    Levy contested his conviction and the use of gang testimony on appeal. *See* State of *Kansas v. Jeremy D. Levy*, 485 P.3d 605 (2021).

**RESPONSE:** Uncontroverted.

105.    The Kansas Supreme Court found that "[t]he district court did not err when it held Detective Hemmert's gang testimony was relevant. There was significant evidence "that gang membership or activity [was] related to the crime charged." *Id.* at 239 (citation omitted).

**RESPONSE:** Uncontroverted.

106.    Further the Supreme Court ruled the evidence not unduly prejudicial. *Id* at 240.

**RESPONSE:** Uncontroverted.

107.    Levy admits his family members are active criminal street gang members and that he spent time with them. Exhibit 23, Levy dep., 19:17-20:7; 30:7-17; 30:23-31:8.

**RESPONSE:** Uncontroverted.

108.    Levy was aware for multiple years before his arrest for first-degree murder that the WPD considered him a criminal street gang member, and he never challenged the designation. Exhibit 23, Levy dep., 31:14-32:5.

**RESPONSE:** Controverted to the extent this statement mischaracterizes Mr. Levy's testimony. The cited deposition says nothing about challenging his designation. Further controverted to the extent this statement implies that a process to contest inclusion exists, that Mr. Levy (or anyone else designated in the Gang Database) was aware of such a process, or that such a process is meaningful in that it could result in removal from the Gang Database.[62] Further controverted because, as Defendant acknowledges, Mr. Levy contested the admissibility of evidence concerning his purported gang affiliation before and during trial and on appeal.[63] Plaintiffs object to this statement because whether Mr. Levy ever challenged his designation is immaterial in contravention of Summary Judgment Guideline No. 3. Defendant acknowledges that there is no

---

[62] *See* PTO Stip. ¶¶ 28-29, 36-39.
[63] *See supra* DSOF ¶¶ 102-104.

WPD policy that provides individuals included in the Gang Database an opportunity to challenge their inclusion, there is no documented incident of the WPD removing anyone from the list following a request to do so, and there is no policy providing any process for a person to be fully removed or deleted from the Database.[64] Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

109.    Levy admits his inclusion on the Gang List did not increase his sentence. Exhibit 23, Levy dep., 40:9-15.

**RESPONSE:** Uncontroverted.

110.    Levy admits he does not know what his conditions of release on parole will be, so he has no support to allege they will be different from anyone else's. Exhibit 23, Levy dep., 40:17-24.

**RESPONSE:** Uncontroverted to the accuracy of this fact statement at the time of Mr. Levy's deposition. Controverted in that Mr. Levy has since submitted a declaration attesting to his expectation of gang conditions if and when he is paroled.[65] Further controverted to the extent this statement consists of improper legal arguments and conclusions, in contravention of Summary Judgment Guideline No. 6.

111.    Levy could not produce a single document, communication, statement, memorandum, recording, photograph, drawing, note, journal, blog, email, social media account, or report to support any of the facts relating to any of the allegations set forth or the harm he's suffered as a direct result of being included on the WPD's gang database. Exhibit 21, Levy's Response to Defendant's First Request for Production, ## 1, 2, 3, 4, 5, 6, 7, 8, 12, 14, and 15.

**RESPONSE:** Controverted.  Mr. Levy described the harms he has suffered in his deposition testimony.[66]

112.    Levy has not made any attempt to contest his designation as a criminal street gang member. Exhibit 24, Levy's Response to Defendant's First Request for Production, # 17.

---

[64] PTO Stip. ¶¶ 36-38.
[65] Doc. 207-35, Decl. of Jeremy Levy ¶ 8.
[66] *See, e.g.*, Doc. 205-23, Levy Dep. 25:3-19, 34:10–35:17.

**RESPONSE:** Controverted to the extent the cited source merely states that Mr. Levy is not aware of any non-privileged documents responsive to Defendant's Requests for Production No. 17. Mr. Levy's discovery response does not state that he did not attempt to contest his designation.[67] Plaintiffs incorporate their response *supra* to DSOF ¶ 108.

113.    Levy has not attempted to file a complaint or report regarding the WPD's alleged conduct. Exhibit 21, C. Cooper Response to Defendant's First Request for Production, # 18, 19.

**RESPONSE:** Controverted in that the cited source does not address Mr. Levy but rather is directed to another Plaintiff. Further controverted in that Mr. Levy's discovery responses to Defendant's Requests for Production Nos. 18 and 19 directed to him do not state that he did not attempt to file a complaint or report regarding the WPD's conduct.[68] Plaintiffs further object to this statement in that whether Mr. Levy attempted to file a report or complaint regarding the WPD's conduct is immaterial in contravention of Summary Judgment Guideline No. 3. Plaintiffs incorporate their response *supra* to DSOF ¶ 108. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

### 3. Martel Costello

114.    M. Costello was convicted of criminal damage to property in 2012, intimidation of a witness in 2013, and in 2017 for multiple felonies committed in 2016 and 2017. Exhibit 25, M. Costello dep., 27:20-10; 28:25-29:7; 29:24-30:6; 32:16-33:16 and Exhibit 27, M. Costello Exhibit 84.

**RESPONSE:** Uncontroverted.

115.    M. Costello was renewed on the gang list in 2016 for being in the company of other gang members, including his father, Plaintiff Elbert Costello. Exhibit 26, Carson Declaration.

**RESPONSE:** Uncontroverted as to the factual accuracy of this statement. Controverted to the extent Defendant fails to specify the relevant portion of the Carson Declaration that supports this

---

[67] Doc. 205-24, Plf. Jeremy Levy, Jr.'s Resp. to Def.'s First Req. for Prod. of Docs, at 8.
[68] Ex. 3, Plf. Jeremy Levy, Jr.'s Suppl. Resp. to Def.'s First Req. for Prod. of Docs, at 8–9. Defendant's Exhibit 24 redacts Mr. Levy's initial responses to Requests for Production Nos. 18 and 19. Plaintiffs submit an unredacted version of Mr. Levy's supplemental responses in conjunction with this opposition brief.

fact statement, in contravention of Summary Judgment Guideline No. 10. Further controverted in that Plaintiffs object to ¶¶ 3-6, 8-11, 13-17, 21-23 of the Carson Declaration for violating multiple evidentiary rules. First, the Gang Database entries are before the Court and speak for themselves.[69] The paragraphs at issue merely repeat the Database entries and do not offer any particular material insight that the Court is not capable of gleaning itself. The Court should exclude these paragraphs under Federal Rule of Evidence 403 for needlessly presenting cumulative evidence.

Similarly, to the extent the Carson Declaration attempts to provide an opinion, the Court should exclude such an opinion—whether expert[70] or lay—as inadmissible. Rules 701 and 702 require opinion testimony to be helpful to the trier of fact in order to be admissible.[71] The Court should exclude these paragraphs because the purported opinions included therein are not helpful, but rather unnecessary and cumulative as discussed above.

Plaintiffs further object to the Carson Declaration to the extent it purports to interpret or otherwise explain other gang intelligence officers' understanding and mental state when they added specific events or notes in the Gang Database entries. The Carson Declaration does not establish a foundation or otherwise explain how Officer Carson possesses personal knowledge as to what other reporting officers knew or understood at the time they added their notes, how he came to obtain that knowledge, or that he was even employed at the WPD when each of these

---

[69] Doc. 208-3, Selected Gang Database Entries, at WICHITA 023918–20, WICHITA 023977–80, 024145–48, WICHITA 024321–23.

[70] If Defendant seeks to offer Officer Carson as an expert witness, it is precluded from doing so because it failed to name him in its untimely expert disclosures. Docs. 172, 174; Ex. 4, Def.'s Second Suppl. Rule 26(a) Disclosures (disclosing Officer Carson as a fact or lay witness only); Ex. 5, Def.'s Desig. of Expert Rebuttal Witnesses (designating only Robert Mateo); *see also* Fed. R. Civ. P. 26(a)(2) (requiring advance disclosure of expert testimony).

[71] *United States v. Kearn*, 863 F.3d 1299, 1307–08 (10th Cir. 2017); *see also* Fed. R. Evid. 701(b) ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . helpful to clearly understanding the witness's testimony or to determining a fact in issue."); Fed. R. Evid. 702(a) ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.").

notes were made. Officer Carson's statements about what other officers said should be excluded under Rule 602 for lack of personal knowledge and Rule 803 as hearsay.

Furthermore, to the extent the Carson Declaration attempts to include photographs, Defendant violates Rule 1002. The declaration includes only cropped portions of selected photographs and does not include all photographs the WPD apparently retained of Plaintiffs at the time.[72] Defendant does not attach or cite to the original photographs as produced in discovery, thereby depriving the Court of their full context. Furthermore, it does not appear that those photos are included in the Gang Database entries themselves, but rather are only referenced.[73] For all these reasons, the Court should exclude ¶¶ 3-6, 8-11, 13-17, 21-23 of the Carson Declaration.

Plaintiffs note that Officers Carson and Bernard were first disclosed to Plaintiffs as potential witnesses on June 7, 2023, two days before the close of discovery.[74] As a result, Plaintiffs had no reasonable opportunity to depose either officer, and to the extent these declarations contradict record evidence and testimony of other WPD witnesses, they should be disregarded. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

116.   M. Costello believes that either the judge or the probation officer imposed probation conditions on him, including gang conditions. Exhibit 25, M. Costello dep., 35:21-36:15.

**RESPONSE:** Uncontroverted.

117.   M. Costello's probation was revoked upon a violation and M. Costello was sentenced to serve his underlying sentence. Exhibit 25, M. Costello dep., 39:17-23.

---

[72] *E.g.*, Doc. 205-26, Carson Decl. ¶ 13.b (stating that "[p]hotos [of Martel Costello] were not able to be located" but including purported photos of Mr. M. Costello with no context or explanation); *compare id.* ¶ 3.a *with, e.g.*, Ex. 6, WPD Photos of Chris Cooper.
[73] *See* Doc. 205-26, Carson Decl. ¶ 13.b (describing saving photos to "the 'gang hub'" and "Laserfiche"); Doc. 208-3, Selected Gang Database Entries, at WICHITA 023918–20, WICHITA 023977–80, 024145–48, WICHITA 024321–23.
[74] Doc. 108, Second Am. Sched. Order. *Compare* Ex. 7, Def.'s First Suppl. Rule 26(a) Discls. at 1–2 *with* Ex. 4, Def.'s Second Suppl. Rule 26(a) Discls. at 1–2.

**RESPONSE:** Uncontroverted.

118.    M. Costello understands that a judge revoked his probation for staying out past curfew, not for associating with other gang members, regardless of what information he was told by others. Exhibit 25, M. Costello dep., 43:21-45:4; Exhibit 25, M. Costello depo Exhibit 86.

**RESPONSE:** Uncontroverted, but incomplete and misleading. WPD officers, his probation officer, and his bail bondsman told Mr. Costello that he violated probation by associating with gang members at his brother's funeral. He only learned of the reasons cited to the judge at his deposition on June 20, 2023.[75]

119.    M. Costello's probation was revoked for failing to obey the law and four instances of violating curfew. Exhibit 25, M. Costello dep., Exhibit 86.

**RESPONSE:** Uncontroverted.

120.    M. Costello understands the sanctions for his parole violations that resulted in a revocation of his parole and a return to jail were not violations of gang conditions. Exhibit 25, M. Costello dep., 39:24-42:10.

**RESPONSE:** Controverted in that the cited deposition testimony discusses probation violations for not meeting "curfew set by his gang conditions."[76] Further controverted in that this statement misstates Mr. Costello's testimony. Mr. Costello testified concerning probation violations, not parole violations.[77] Additionally, Mr. Costello did not testify that his prior returns to jail for probation violations were not violations of gang conditions; rather, he testified that Section III of Exhibit 86 to his deposition did not expressly discuss gang conditions.[78]

121.    M. Costello had prior probation violations for alcohol and being out past curfew six times and was placed on house arrest for 90 days. Exhibit 25, M. Costello dep., 49:13-25, 49:21-25.

---

[75] Doc. 205-25, M. Costello Dep. 44:2-25; Ex. 8, Suppl. Decl. of Martel Costello ¶¶ 2-3.
[76] Doc. 205-25, M. Costello Dep. 39:24–42:10 (discussing Ex. 86 to M. Costello Dep.); Doc. 205-29, Ex. 86 to M. Costello Dep., at 3.
[77] Doc. 205-25, M. Costello Dep. 39:24–42:10.
[78] *Id.* at 40:12–41:23; *see also* Doc. 205-29, Ex. 86 to M. Costello Dep., at 3 (providing no explanation of previous probation violations for which Mr. Costello was returned to jail).

**RESPONSE:** Controverted. This statement misstates Mr. Costello's testimony in that Mr. Costello testified that he violated probation on one occasion by being out past curfew by six minutes, not that he violated curfew six times.

122.    During his house arrest period M. Costello's house was shot at and his cousin Plaintiff Christopher Cooper was shot, causing officers to search his house eventually locating a handgun. Exhibit 25, M. Costello dep., 50:2-4; 50:25-51:12, 57:4-12.

**RESPONSE:** Uncontroverted, but incomplete and misleading in that the handgun did not belong to Mr. Costello; it was his aunt's. The charges against Mr. Costello for possession of a firearm were later dismissed.[79]

123.    Officers took photographs of pictures and clothing, including a red shirt, red hat, red pants, and a shirt with a picture of him and his brother that officers had laid out on a bed. Exhibit 25, M. Costello depo., 51:16-52:07

**RESPONSE:** Uncontroverted, but incomplete and misleading in that the officers dug through Mr. Costello's closet, took out the red clothing, and laid it out on his bed in the shape of a body. [80]

124.    M. Costello does not know the names of the officers that allegedly harassed him, nor does he recall details of each encounter. ROG 13.

**RESPONSE:** Controverted in that Defendant fails to specify a relevant portion of any exhibit that supports this fact statement, in contravention of Summary Judgment Guideline No. 10. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

125.    M. Costello does not recall the specific dates of any traffic stops. Exhibit 10, Interrogatories to M. Costello.

**RESPONSE:** Controverted in that Exhibit 10 does not consist of Defendant's interrogatories to Mr. M. Costello, and Defendant fails to specify the relevant portion of the cited exhibit that supports this fact statement, in contravention of Summary Judgment Guideline No. 10. Subject to,

---

[79] Doc. 205-25, M. Costello Dep. 50:25–51:6.
[80] *Id.* at 51:7–52:15.

and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

126.    M. Costello was engaged in various criminal activities during this time. Dep., 27:20-10; 28:25-29:7; 29:24-30:6; 32:16-33:16 and Exhibit 27, M. Costello Exhibit 84.

**RESPONSE:** Controverted to the extent that the phrase "during this time" is undefined, vague, and ambiguous. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

127.    M. Costello designated himself as a Pirus gang member on an intake form he signed upon his entry into the Ellsworth Correctional Facility on February 22, 2021. Exhibit 25, M. Costello dep., 45:8-46:17; Exhibit 25, M. Costello depo Exhibit 31, M. Costello Exhibit 87.

**RESPONSE:** Controverted. In completing the intake form, Mr. Costello was not "designat[ing] himself" but rather indicating that he understood others—particularly the WPD—had designated him as associating with Pirus. He was not placed on any restrictions at Ellsworth relating to being a gang member.[81]

128.    M. Costello was not placed under arrest, was not threatened with arrest, and was not prevented from moving freely by an officer who recognized him at a convenience store. Exhibit 25, M. Costello dep., 59:14-60:21.

**RESPONSE:** Controverted in that this statement misstates Mr. Costello's testimony. Mr. Costello did not testify that he "was not prevent from moving freely" by the officer; rather, he testified that the officer ordered him to stop.[82] Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

129.    M. Costello could not produce a single document, communication, statement, memorandum, recording, photograph, drawing, note, journal, blog, email, social media account, or report to support any of the facts relating to any of the allegations set forth or the harm he's suffered as a direct result of being included on the WPD's gang database. Exhibit 32, M. Costello Response to Defendant's First Request for Production, ## 1, 2, 3, 4, 5, 6, 7, 8, 12, 14, and 15.

---

[81] Ex. 8, M. Costello Suppl. Decl. ¶¶ 4-7.
[82] Doc. 205-25, M. Costello Dep. 59:22–60:9.

**RESPONSE:** Controverted. Mr. M. Costello described the harms he has suffered in his responses to Defendant's interrogatories and in his deposition testimony.[83]

130.    M. Costello has not attempted to contest his designation as a criminal street gang member. Exhibit 323, M. Costello's Response to Defendant's First Request for Production, # 17.

**RESPONSE:** Controverted to the extent the cited source merely states that Mr. Costello is not aware of any non-privileged documents responsive to Defendant's Requests for Production No. 17. Mr. Costello's discovery response does not state that he did not attempt to contest his designation.[84] Further controverted to the extent this statement implies that a process to contest inclusion exists, that Mr. Costello (or anyone else designated in the Gang Database) was aware of such a process, or that such a process is meaningful in that it could result in removal from the Gang Database.[85] Plaintiffs object to this statement to the extent that whether Mr. Costello attempted to contest his designation is immaterial in contravention of Summary Judgment Guideline No. 3. Defendant acknowledges that there is no WPD policy that provides individuals included in the Gang Database an opportunity to challenge their inclusion, there is no documented incident of the WPD removing anyone from the list following a request to do so, and there is no policy providing any process for a person to be fully removed or deleted from the Database.[86] Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

131.    M. Costello did not file a complaint or report regarding the WPD's alleged conduct. Exhibit 32, M. Costello's Response to Defendant's First Request for Production, # 18, 19.

**RESPONSE:** Controverted in that Mr. Costello's discovery responses to Defendant's Requests for Production Nos. 18 and 19 do not state that he did not attempt to file a complaint or report

---

[83] *See, e.g.*, Doc. 207-53, Plf. Martel Costello's Resp. to Def.'s First Set of Interrogs. Nos. 10-13; Doc. 207-52, M. Costello Dep. 30:7-14, 43:21–44:17, 51:7–52:15, 52:19–53:25, 54:9-11, 54:16–56:7, 59:22–60:14.
[84] Doc. 205-32, Plf. Martel Costello's Resp. to Def.'s First Req. for Prod. of Docs, at 7.
[85] *See* PTO Stip. ¶¶ 28-29, 36-39.
[86] PTO Stip. ¶¶ 36-38.

regarding the WPD's conduct.[87] Plaintiffs further object to this statement in that whether Mr.

Costello attempted to file a report or complaint regarding the WPD's conduct is immaterial in

contravention of Summary Judgment Guideline No. 3. Plaintiffs incorporate their objections and

response *supra* to DSOF ¶ 130. Subject to, and without waiving Plaintiffs' objections, the

remaining portion of this paragraph is uncontroverted.

132.    M. Costello has been employed in between his convictions and parole violations since October 2017. Exhibit 30, M. Costello's Response to Defendant's First Interrogatories, # 6.

**RESPONSE:** Uncontroverted.

### 4. Elbert Costello

133.    E. Costello was convicted of manslaughter in 1997 when he shot and killed someone following an altercation. Exhibit 33, E. Costello Dep., 19:6-17.

**RESPONSE:** Uncontroverted.

134.    E. Costello was sentenced to 51 months in the Kansas Department of Corrections (KDOC). Exhibit 33, E. Costello Dep Exhibit 63.

**RESPONSE:** Uncontroverted.

135.    The Salina Police Department informed WPD that E. Costello was a suspected gang member causing him to be listed as a gang associate in the WPD Gang List. Affidavit of C. Cason ¶ 8.

**RESPONSE:** Uncontroverted as to Mr. Costello's Gang Database entry stating the WPD added

Mr. Costello as a gang associate based on information the Salina Police Department provided.[88]

Assuming the source cited ("Affidavit of C. Cason") refers to Defendant's Exhibit 26 (Doc. 205-

26), Plaintiffs incorporate their objections and response *supra* to DSOF ¶ 115.

136.    E. Costello understands that a court sets bond and probation conditions and those conditions are enforced by probation officers. Exhibit 33, E. Costello Dep., 50:11-17.

**RESPONSE:** Uncontroverted.

---

[87] Doc. 205-32, Plf. Martel Costello's Resp. to Def.'s First Req. for Prod. of Docs, at 7–8.
[88] Doc. 208-3, Selected Gang Database Entries, at WICHITA 023979.

137.    E. Costello agrees there is no evidence to indicate the conditions of his post-release were higher because of his gang affiliation. Exhibit 33, E. Costello Dep., 23:8-24.

**RESPONSE:** Controverted to the extent this statement misstates Mr. Costello's testimony. Mr. Costello testified that the Conditions of Post-Release Supervision document he was shown during deposition did not reflect "a higher level of surveillance" because of any gang affiliation.[89] He did not testify that "there is no evidence" of a higher level of surveillance, much less that the conditions of his release as a whole were not higher due to his gang designation.

138.    E. Costello can't remember the last time he was stopped by the police, but it was at least four years ago. Exhibit 33, E. Costello Dep., 23:25 -25:2.

**RESPONSE:** Controverted to the extent this statement misstates Mr. Costello's testimony. Mr. Costello testified that he was last stopped by the police more than three years ago but less than four.[90]

139.    While E. Costello claims he was subjected to "increased surveillance and harassment by the WPD officers" it has been at least four years since he was stopped. Exhibit 33, E. Costello Dep., 24:21-25:1, and the alleged harassment started after E. Costello was released from prison in 2000. Exhibit 33, E. Costello Dep., 25:3-7.

**RESPONSE:** Controverted to the extent this statement misstates Mr. Costello's testimony. Plaintiffs incorporate their response *supra* to DSOF ¶ 138. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

140.    E. Costello was discharged from post-release supervision on June 22, 2003. Exhibit 33, E. Costello Dep., 27:23 -28:3

**RESPONSE:** Uncontroverted.

141.    No restrictions were imposed on E. Csotello following his post-release supervision discharge in 2003. Exhibit 33, E. Costello Dep., 28:6 -29:1.

**RESPONSE:** Uncontroverted.

---

[89] Doc. 205-33, E. Costello Dep. 23:8-24.
[90] *Id.* at 24:10-20 ("Q. More than three years ago? A. Yes. Q. More than four years ago? A. Don't gotta go that far back.").

142.    E. Costello stated he was on probation for a drug paraphernalia conviction in 2011. Exhibit 33, E. Costello Dep., 26:3-9 49:19-50-6.

**RESPONSE:** Controverted to the extent this statement misstates Mr. Costello's testimony. One cited deposition portion (26:3-9) says nothing about a 2011 conviction for drug paraphernalia. The other cited portion (49:19–50:6) does not mention drug paraphernalia. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

143.    He admits his probation was revoked several times but can't recall what for, other than he believed one was for being a gang member. Exhibit 33, E. Costello Dep., 46:18-47:7.

**RESPONSE:** Uncontroverted.

144.    He claims his probation officer threatened to revoke him for wearing a shirt with red writing on it but did not do so.[91]

**RESPONSE:** Uncontroverted.

145.    Since release from prison E. Costello has been arrested nine times, has been present at three shootings and one shots fired incident. Exhibit 26, Carson Declaration.

**RESPONSE:** Controverted to the extent this statement misstates the number of times Mr. Costello was arrested since his release from prison. Mr. Costello's Gang Database entry reflects only seven specified arrests since the WPD learned he was no longer incarcerated, not nine.[92] Further controverted in that this statement misleadingly implies that Mr. Costello has been arrested on a consistent, periodic basis since he was released through the present. He has not been arrested on any charges for more than a decade.[93] Further controverted to the extent this statement implies that Mr. Costello was an active participant in shooting other individuals.[94] Further controverted to the extent Defendant fails to specify the relevant portion of the Carson Declaration that supports this fact statement, in contravention of Summary Judgment Guideline No. 10. Further controverted as

---

[91] *Id. at* 47:12-20.
[92] Doc. 208-3, Selected Gang Database Entries, at WICHITA 023978–79 (changed from incarcerated to active status on 1/14/02; arrested on 03/06/06, 2/15/06, 2/24/07, 9/17/07, 4/14/08, 8/4/09, and 10/08/09).
[93] *Id.*
[94] *Contra id.*

to the admissibility of ¶¶ 3-6, 8-11, 13-17, 21-23 of the Carson Declaration. Plaintiffs incorporate

their objections and response *supra* to DSOF ¶ 115.

146.    E. Costello was informed by his intake counselor that the prison assigns points based on the crime committed to determine the classification status, but he doesn't remember if he had to answer any questions related to gang affiliation when he was first brought into custody. Exhibit 33, E. Costello Dep., 20:24 -21:21.

**RESPONSE:** Uncontroverted.

147.    E. Costello has been employed by the same employer for seven years and has been employed steadily since 2013 Exhibit 33, E. Costello Dep., 6:3-5; Exhibit 34, E. Costello's Response to Defendant's First Interrogatories, # 6.

**RESPONSE:** Uncontroverted.

148.    E. Costello could not produce a single document, communication, statement, memorandum, recording, photograph, drawing, note, journal, blog, email, social media account, or report to support any of the facts relating to any of the allegations set forth or the harm he's suffered as a direct result of being included on the WPD's gang database. Exhibit 35, E. Costello Response to Defendant's First Request for Production, ## 1, 2, 3, 4, 5, 6, 7, 8, 12, 14, and 15.

**RESPONSE:** Controverted. Mr. Costello described the harms he has suffered in his responses to

Defendant's interrogatories and in his deposition testimony.[95]

149.    E. Costello has not attempted to contest his designation as a criminal street gang member. Exhibit 34, E. Costello's Response to Defendant's First Request for Production, # 17.

**RESPONSE:** Controverted to the extent the cited source merely states that Mr. Costello is not

aware of any non-privileged documents responsive to Defendant's Requests for Production No.

17. Mr. Costello's discovery response does not state that he did not attempt to contest his

designation.[96] Further controverted to the extent this statement implies that a process to contest

inclusion exists, that Mr. Costello (or anyone else designated in the Gang Database) was aware of

such a process, or that such a process is meaningful in that it could result in removal from the Gang

---

[95] *See, e.g.*, Doc. 207-57, Plf. Elbert Costello's Resp. to Def.'s First Set of Interrogs. Nos. 10, 13; Doc. 207-56, Plf. Elbert Costello's Suppl. Resp. to Def.'s First Set of Interrogs. Nos. 11, 12, and 14; Doc. 207-55, E. Costello Dep. 25:3-7, 27:9-16, 32:18–33:11, 34:7–35:7, 41:16–43:17, 46:10-17, 46:23–48:7.
[96] Doc. 205-35, Plf. Elbert Costello's Resp. to Def.'s First Req. for Prod. of Docs, at 8.

Database.[97] Further controverted to the extent that whether Mr. Costello attempted to contest his designation is immaterial in contravention of Summary Judgment Guideline No. 3. Defendant acknowledges that there is no WPD policy that provides individuals included in the Gang Database an opportunity to challenge their inclusion, there is no documented incident of the WPD removing anyone from the list following a request to do so, and there is no policy providing any process for a person to be fully removed or deleted from the Database.[98]

150.    E. Costello did not file a complaint or report regarding the WPD's alleged conduct. Exhibit 34, E. Costello's Response to Defendant's First Request for Production, # 18, 19.

**RESPONSE:** Controverted in that Mr. Costello's discovery responses to Defendant's Requests for Production Nos. 18 and 19 do not state that he did not attempt to file a complaint or report regarding the WPD's conduct.[99] Plaintiffs further object in that whether Mr. Costello attempted to file a report or complaint regarding the WPD's conduct is immaterial in contravention of Summary Judgment Guideline No. 3. Plaintiffs incorporate their response *supra* to DSOF ¶ 149. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

151.    E. Costello has been employed in between his convictions and parole violations since October 2017.

**RESPONSE:** Controverted in that this statement fails to cite to any evidence, in contravention of Summary Judgment Guideline No. 10. Further controverted in that this statement appears to relate to Mr. M. Costello, not Mr. E. Costello.[100] Mr. E. Costello has had no convictions since 2011.[101]

---

[97] *See* PTO Stip. ¶¶ 28-29, 36-39.
[98] PTO Stip. ¶¶ 36-38.
[99] Doc. 205-35, Plf. Elbert Costello's Resp. to Def.'s First Req. for Prod. of Docs, at 8–9.
[100] *See supra* DSOF ¶ 132.
[101] Doc. 207-56, Plf. Elbert Costello's Suppl. Resp. to Def.'s Interrog. Nos. 3, 11; *see also* Doc. 208-3, Selected Gang Database Entries, at WICHITA 023978 (no new convictions or parole violations between October 2017 and February 2022).

### 5. Progeny

152.    Progeny started operation in 2015 or 2016. Exhibit 36, Atkins Dep., 9:6-7.

**RESPONSE:** Uncontroverted.

153.    Progeny is a juvenile justice initiatives program of Destination Innovation, Inc. Exhibit 36, Atkins Dep., 9:16-22.

**RESPONSE:** Uncontroverted.

154.    Destination Innovation, Inc did not become a non-profit until 2018. Exhibit 36, Atkins Dep.,

**RESPONSE:** Controverted to the extent Defendant fails to specify the relevant portion of the Atkins deposition that supports this fact statement, in contravention of Summary Judgment Guideline No. 10. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

155.    Progeny did not become a part of Destination Innovation, Inc until 2021. Exhibit 36, Atkins Dep., 9-13.

**RESPONSE:** Uncontroverted.

156.    Progeny is governed by the Destination Innovations (DI) board. Exhibit 36, Atkins Dep., 65:18-66:16. The board "governs" but does not make program decisions. Exhibit 36, Atkins Dep., 67:11-18.

**RESPONSE:** Controverted to the extent this statement misstates Progeny's testimony. Progeny's Rule 30(b)(6) representative testified that the Destination Innovation Board of Directors "is a governance board. They don't get involved in programming that way. . . . [T]hey don't get too heavily involved in our programming at all."[102] Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

157.    All programming decisions for both DI and Progeny are ultimately made by the executive director, Marquetta Atkins; although there is a three-person team that weighs in, and some decisions involve the youth. Exhibit 36, Atkins Dep., 67:19-24; 68:9-20; 68:25-69:3.

---

[102] Doc. 205-36, Progeny 30(b)(6) Dep. 67:11-18.

**RESPONSE:** Uncontroverted.

158.    Progeny works with youth touched by the juvenile justice system to teach them leadership, how to change policy in a way that it impacts them. Exhibit 36, Atkins Dep., 14:25-15:3.

**RESPONSE:** Uncontroverted.

159.    Progeny visits schools and youth organizations from around the City of Wichita. Exhibit 36, Atkins Dep., 21:20-22:6.

**RESPONSE:** Uncontroverted.

160.    Progeny estimates it is asked to speak to youths or engage other organizations 12 times a year. Exhibit 36, Atkins Dep., 24:17-22.

**RESPONSE:** Controverted to the extent this statement misstates Progeny's testimony. Progeny's Rule 30(b)(6) representative estimated that Progeny is asked to speak to other youth and engage with other organizations approximately once a month, but "it varies, it changes."[103] Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

161.    Progeny went through a building stage where they engaged about five people in 2016 and 2017. Exhibit 36, Atkins Dep., 25:14-26:14.

**RESPONSE:** Uncontroverted.

162.    Progeny hosted an event in partnership with the City regarding recent shootings. Exhibit 36, Atkins Dep., 27:9-13.

**RESPONSE:** Controverted to the extent this statement misstates Progeny's testimony. Progeny's Rule 30(b)(6) testimony does not address the temporal proximity of the shootings referenced.[104] Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

163.    Prior to the pandemic Progeny's events "ebbed and flowed" as they came into contact with juveniles in trauma. Atkin Dep., 27:21-28:2.

---

[103] *Id.* at 24:27–25:4 ("A. . . . So it varies, it changes. Q. Absolutely, I understand. Got to be some flexibility throughout the year I'm sure. A. Right.").
[104] *See id.* at 27:11-18.

**RESPONSE:** Controverted to the extent this statement misstates Progeny's testimony. Progeny's Rule 30(b)(6) representative testified that once the pandemic hit, Progeny's meetings and events "ebbed and flowed" because "it's week-to-week encountering the things that these young people were going through. So, consistent, but it depends on what your version of consistent means."[105]

164.    Progeny continued to have meetings until the Pandemic hit in 2020 then started hosting meetings on Zoom. Exhibit 36, Atkins Dep., 28:13-29:13.

**RESPONSE:** Uncontroverted as to the accuracy of the fact statement. However, this statement is immaterial in contravention of Summary Judgment Guideline No. 3.

165.    Progeny started in-person meetings again in 2022, when Progeny started hosting hybrid meetings on Monday and Thursdays. Progeny then started meeting at its new center in 2023. Exhibit 36, Atkins Dep., 29:16-25.

**RESPONSE:** Uncontroverted as to the accuracy of the fact statement. However, this statement is immaterial in contravention of Summary Judgment Guideline No. 3.

166.    Progeny members have met consistently on Monday and Thursday throughout 2023 with occasional issues based upon 'whatever other events are happening.' Exhibit 36, Atkins Dep., 21:4-9.

**RESPONSE:** Controverted to the extent the cited portion of Progeny's Rule 30(b)(6) testimony addresses filling Youth Leader positions, not meetings.

167.     The Pandemic impacted Progeny attendance 'greatly'. Exhibit 36, Atkins Dep., 31:11-20.

**RESPONSE:** Uncontroverted as to the accuracy of the fact statement, but misleading and incomplete in that it omits Progeny's 30(b)(6) representative's testimony that the pandemic's impact on meeting attendance mainly had to do with meeting virtually as opposed to in person.[106]

168.    Pre-pandemic attendance at meetings could range from a low of three to a high of 60. Exhibit 36, Atkins Dep., 32:5-33:4.

---

[105] *Id.* at 27:21–28:7.
[106] *Id.* at 31:15–32:4.

**RESPONSE:** Uncontroverted.

169.    Post-pandemic attendance at Progeny meetings are about the same. Exhibit 36, Atkins Dep., 33:5-9.

**RESPONSE:** Uncontroverted. However, this statement is immaterial in contravention of Summary Judgment Guideline No. 3.

170.    A typical event will have about 60 people attending. Exhibit 36, Atkins Dep., 33:12.

**RESPONSE:** Uncontroverted.

171.    In early 2023 they had a meeting that was standing room only of about 60 people. Exhibit 36, Atkins Dep., 32:22-33:4.

**RESPONSE:** Uncontroverted.

172.    Attendance at Progeny's Monday and Thursday meetings varies between a low of three to four people and a high of eleven to fifteen and has varied consistently since before the pandemic. Aktins Dep., 33:15-34:10.

**RESPONSE:** Controverted to the extent this statement misstates Progeny's testimony. Progeny's Rule 30(b)(6) representative testified that attendance post-pandemic varied in the same way that it varied pre-pandemic.[107] Plaintiffs object to this statement to the extent a pre- or post-pandemic distinction is immaterial in contravention of Summary Judgment Guideline No. 3. Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

173.    Attendance at events varies and is inconsistent. Exhibit 36, Atkins Dep., 34:14-17.

**RESPONSE:** Uncontroverted.

174.    Throughout 2022 and 2023 Progeny testified that it held dozens of events. Exhibit 36, Atkins Dep., 70:1-77:16.

**RESPONSE:** Uncontroverted.

175.    Progeny's list of meetings and events is published on its website, although several more events occur that are not published on the website. Exhibit 36, Atkins Dep., 32:23-25; 73:20-21.

---

[107] *Id.* at 27:21–28:7, 33:5–34:10.

**RESPONSE:** Controverted to the extent one cited deposition portion (32:23-25) does not address publication (or lack thereof) on Progeny's website.  Subject to, and without waiving Plaintiffs' objections, the remaining portion of this paragraph is uncontroverted.

176.    Progeny's membership numbers have been consistent throughout the pandemic, Exhibit 36, Atkins Dep., 33:25-34:10, and attendance at meetings are the same post-pandemic as they were pre-pandemic. Exhibit 36, Atkins Dep., 33:5-9.

**RESPONSE:** Uncontroverted.

177.    The Executive Director of Progeny, Marquetta Atkins, is unable to provide specific details of the harms alleged; she testified to providing information to her attorneys who then wrote out the discovery responses, but she could not qualify the responses when confronted. Exhibit 36, Atkins Dep., 99:19-100:21.

**RESPONSE:** Controverted as this statement mischaracterizes Progeny's testimony. Progeny's 30(b)(6) representative testified that she could not recall details of one specific instance listed in Progeny's interrogatory response regarding one Progeny Youth Leader being pulled over, because the Youth Leader calls her every time he is pulled over, and he has been pulled over multiple times. She further testified that she provided information to her attorneys regarding that instance which informed Progeny's interrogatory response.[108] The cited portion does not state that Ms. Atkins was unable to provide specific details of "the harms alleged."

178.    Despite claims that Progeny cannot hold events where some Progeny members would be in direct proximity with individuals on the gang list Progeny refused to identify any individual this would affect. Aktins Dep., 91:14-92:11.

**RESPONSE:** Controverted as this statement mischaracterizes Progeny's testimony. Progeny's 30(b)(6) representative declined to identify specific individuals on the Gang List because she "[didn't] want to pigeonhole or place our young people as being gang members. That's your list, not ours."[109]

---

[108] *Id.* at 97:12–100:21.
[109] *Id.* at 92:7-11; *cf.* K.S.A. 21-6313(b)(2)(B), (C) (providing for identification of a gang member via an informant).

179.    At the event where allegedly "way too much WPD" came and kids were scared to attend, a total of one WPD officer sat outside, across the street, and did not engage with anyone until Atkins initiated a conversation with him. Exhibit 36, Atkins Dep., 73:21-74:3; 93:7-94:15; 94:25-96:1. The event was a sign-making event to prepare to protest the Governor's re-direction of funds. Exhibit 36, Atkins Dep., 93:23-94:15. The officer did not engage with anyone except for the Progeny representatives who went to speak to him. Exhibit 36, Atkins Dep., 95:21-96:1.

**RESPONSE:** Controverted to the extent that this statement conflates two separate events. The sign-making event took place in April 2021, when Progeny planned to hold a protest at an event where Governor Laura Kelly would be present. A separate event, which many young individuals declined to attend due to the number of police vehicles they saw outside and because of the number of officers present at the meeting, was a February 2019 community action against violence event. Because of the police presence, some people could not determine whether Progeny was connected to or collaborating with the police, including with respect to the Gang Database. This confusion dissuaded people from attending or signing up to be a part of Progeny.[110]

180.    Progeny, through Atkins, claims some kids told her they would not come to the event because of the officer being present outside. Aktins Dep., 94:14-24.

**RESPONSE:** Uncontroverted to the extent this refers to the February 2019 community action against violence event described in Plaintiffs' response *supra* to DSOF ¶ 179.

181.    Progeny testified that the event was cancelled because it did not want "them to engage with the WPD in any kind of way or be profiled in any kind of way." Atkin Dep., 94:5-7.

**RESPONSE:** Uncontroverted to the extent this refers to the February 2019 community action against violence event described in Plaintiffs' response *supra* to DSOF ¶ 179.

182.    No specific harm could be identified by Progeny's 30(b)(6) designee. Exhibit 36, Atkins Dep., 92:7-11.

**RESPONSE:** Controverted as this statement mischaracterizes Progeny's testimony. The cited portion of the Progeny 30(b)(6) deposition does not address any specific harm.

---

[110] Doc. 205-36, Progeny 30(b)(6) Dep. 73:17–74:8; Doc 207-43, Atkins Decl. ¶¶ 11-12; Doc. 207-48, Progeny's Resp. to Def.'s Interrog. No. 14.

183.    Progeny does not allege that any arrests of their members was unlawful. Exhibit 36, Atkins Dep., 96:25:97:11.

**RESPONSE:** Controverted as this statement mischaracterizes Progeny's testimony. Progeny's

30(b)(6) representative testified that she believed the arrests in question were pretextual in nature

or based on a lack of criminal activity.[111]

184.    There is no evidence that any Plaintiff or Progeny member was unlawfully arrested.

**RESPONSE:** Controverted to the extent this statement fails to cite to any evidence, in

contravention of Summary Judgment Guideline No. 10.

185.    When asked questions about the information provided in the response to interrogatories, Progeny's 30(b)(6) designee could not supply details to allow Defendant to identify any officer, date, time, or location involved in the purported instances. Exhibit 36, Atkins Dep., 97:12-103:18.

**RESPONSE:** Controverted as this statement mischaracterizes Progeny's testimony. Progeny's

30(b)(6) representative testified that she could not recall details of one specific instance listed in

Progeny's interrogatory response regarding one Progeny Youth Leader being pulled over, because

the Youth Leader calls her every time he is pulled over, and he has been pulled over multiple times.

Progeny's representative could not recall the details of this one instance because it happens so

often.[112]

186.    In response to Defendant's request for specific information to support Plaintiff's accusation that "Progeny members and youth leaders have been harassed by WPD officers on numerous occasions," none of the examples Plaintiff provided include a time of day, location, or officer involved in the alleged incident for Defendant to further investigate. Exhibit 37, Progeny Response to Interrogatories, #9.

**RESPONSE:** Controverted to the extent the source cited provides examples which contain

locations and time of day.

187.    In response to Defendant's request for specific information to support Plaintiff's accusation that "Progeny members and youth leaders have been harassed by WPD officers on

---

[111] Doc. 205-36, Progeny 30(b)(6) Dep. 96:2– 97:11.
[112] *Id.* at 97:12–100:21.

numerous occasions," eight examples listed eyewitnesses who were promised to be identified later but were not; the remaining three were witnessed by Marquetta Atkins, who could not provide specific information when asked in the deposition. Exhibit 37, Progeny Response to Interrogatories, #9; Exhibit 36, Atkins Dep., 97:12-103:10.

**RESPONSE:** Controverted to the extent this statement misstates Progeny's response to Interrogatory No. 9. Progeny's response did not "promise[]" to identify witnesses later; rather, Progeny stated that it would supplement its response with witnesses' identities if possible. Progeny produced documents providing the location and names of witnesses.[113] Further controverted to the extent this statement suggests Ms. Atkins was unable to provide information about three other incidents described in Progeny's interrogatory response. Ms. Atkins provided information to the extent she was able to recall it, and further testified that she could not recall the details of one instance because Progeny staff and Youth Leaders are stopped by the police so often.[114]

188.    In response to Defendant's request for specific information to support Plaintiff's accusation that "Progeny members and youth leaders have been harassed by WPD officers on numerous occasions," the dates provided were vague, such as "various dates throughout 2017" or "somewhere between May and August of 2022," preventing Defendant from being able to investigate the allegation. Exhibit 37, Progeny Response to Interrogatories, #9.

**RESPONSE:** Controverted to the extent that this statement misstates Progeny's response to Interrogatory No. 9. Progeny provided examples of specific dates of instances of harassment, as well as the identities of Progeny members and Youth Leaders involved. Any "vague" dates are a reflection of the long history of harassment these individuals have experienced.[115]

189.    Plaintiff provided a total of eleven instances of members and/or youth leaders harassed by WPD: eight were for one person, N.M., who is not included as one of the four Progeny staff and members allegedly "subjected to increased surveillance, reputational harm, and other negative consequences[.]:" *Id.*; Doc. 196, Pre Trial Order, § 3.a,vi,a,

**RESPONSE:** Controverted to the extent this statement asserts that N.M. is not one of the four

---

[113] *See, e.g.*, Doc. 207-45, Facebook Messages; Doc. 207-46, Progeny Staff Text Messages, at 1.
[114] Doc. 205-36, Progeny 30(b)(6) Dep. 97:12–103:10.
[115] *See, e.g., id.* at 98:12-16.

Progeny staff and members designated in the Gang Database. A.M. and N.M. are the same person: N. is the shortened version or nickname for A.M.'s formal first name.[116]

190.    Of the individually identified Progeny staff and members, only one (D.B.W.) is included in Plaintiff's response to Defendant's interrogatory seeking specific information, and that one individual is only one of the eleven instances vaguely described. *Id.*

**RESPONSE:** Controverted. Plaintiffs incorporate their objections and response *supra* to DSOF ¶ 189.

191.    There is no evidence that any of the instances of harassment identified by Progeny violated the Fourth Amendment or any statute.

**RESPONSE:** Controverted as this statement consists of improper legal arguments and conclusions, in contravention of Summary Judgment Guideline No. 6, and further fails to cite to any evidence, in contravention of Summary Judgment Guideline No. 10.

### PLAINTIFFS' ADDITIONAL STATEMENT OF UNCONTROVERTED FACTS

1.    Plaintiffs incorporate all stipulated facts pled in the Pretrial Order (Doc. 196).

2.    Plaintiffs incorporate all statements of fact cited in their Memorandum in Support of Plaintiffs' Motion for Summary Judgment (Doc. 207).

3.    Each Plaintiff has experienced harm as the result of being designated in the Gang Database.[117] Each Plaintiff fears or anticipates future harm as the result of designation in the Gang Database, and has altered their behavior accordingly out of a desire to avoid continued renewal in the Gang Database, violating any conditions of release, and further negative interactions with the WPD.[118]

---

[116] *See* Doc. 208-3, Selected Gang Database Entries, at WICHITA 024375 (noting that A.M.'s Facebook page uses the name N.M.); Doc. 207-44, Plf. Progeny's Resp. to Interrog. No. 16 (listing names and dates of birth for all four Progeny staff and members in the Gang Database); Doc. 205-36, Progeny 30(b)(6) Dep. 97:12-25.

[117] Doc. 207-32, Cooper Decl. ¶¶ 6-12, 16; Doc. 207-35, Levy Decl. ¶¶ 5, 7; Doc. 207-34, M. Costello Decl. ¶¶ 6-11, 13, 15, 17-18, 20; Doc. 207-33, E. Costello Decl. ¶¶ 6-12, 15; Doc. 207-43, Atkins Decl. ¶¶ 6-14, 16-19; *see also* PSOF ¶¶ 75, 85-92, 99-1109, 118-125, 131-134, 136, 139-140, 146-150, 154-157, 165-168.

[118] Doc. 207-32, Cooper Decl. ¶¶ 10-11, 14-15, 17; Doc. 207-35, Levy Decl. ¶ 8; Doc. 207-34, M. Costello Decl. ¶¶ 17-20; Doc. 207-33, E. Costello Decl. ¶¶ 9, 13-15; Doc. 207-43, Atkins Decl. ¶¶ 6-10, 15-16, 19.

## ARGUMENT

### I.    Defendant Admits the Critical Facts Underlying Plaintiffs' Claims.

Defendant urges this Court to disregard the abundant and uncontroverted record evidence

that K.S.A. 21-6313 *et seq.* and Policy 527 violate the U.S. Constitution and to instead engage in

improper credibility determinations and draw impermissible inferences. As an initial matter, it

bears noting that Defendant's Motion not only contains a dearth of references to the evidentiary

record, it is also rife with admissions confirming the essential elements of Plaintiffs' claims:

- Nothing but the expansive, undefined criteria of K.S.A. 21-6313 informs Wichita residents of what conduct results in gang designation and its consequent legal liabilities and harms.[119]

- In reality, the WPD adds individuals to the Gang Database based on an incalculable combination of statutory criteria plus unwritten and inconsistent "context" and "circumstances" that vary with each officer's experience, impressions, discretion, and biases.[120]

- As a result, the specific actual conduct which may result in gang designation are unknown and indiscernible to members of the public.[121]

- At the same time, individuals may be and regularly are designated or renewed as active gang members for innocuous and even constitutionally protected conduct, such as moving freely within Wichita, adopting expressive tattoos or dress, and maintaining intimate associations including with family members.[122]

- Individuals added to the Gang Database are given no notice or opportunity to challenge their designation.[123] Once designated in the Gang Database, an individual is never removed.[124]

- The WPD regularly shares Gang Database information with other government and law enforcement agencies (including prosecutors for use in criminal proceedings) and have disclosed such information to the public at large.[125]

---

[119] *See* Doc. 205 at 42–44; DSOF ¶¶ 45-46; *supra* PR-DSOF ¶ 10.

[120] *See* Doc. 205 at 39–44; *supra* PR-DSOF ¶¶ 2, 33-34, 39-40, 51, 58.

[121] *See* Doc. 205 at 41–44, 52; *supra* PR-DSOF ¶¶ 41, 44.

[122] *See* Doc. 205 at 41–44, 52; DSOF ¶¶ 45-46; *supra* PR-DSOF ¶¶ 41, 44.

[123] *See* Doc. 205 at 33 ("A person included or listed will, often, never know they were identified or listed as a gang member or associate."); PR-DSOF ¶¶ 53, 95, 108, 112, 130, 149; PTO Stip. ¶¶ 28-30, 36, 38.

[124] *See* DSOF ¶¶ 16, 24; PR-DSOF ¶¶ 19, 24, 26, 48, 52-53, 56; PTO Stip. ¶ 38.

[125] *See* Doc. 205 at 63; DSOF ¶¶ 25, 31; PR-DSOF ¶¶ 25-27, 30.

- Designated individuals arrested for any person felony are subject to a presumptive mandatory minimum bail of $50,000 that does not apply to non-gang designees.[126]

- Plaintiffs, and many similarly situated Wichita residents, have been subjected to severe limitations on their freedom of movement, expression, and association in the form of conditions of release expressly tied to their gang designations *and* the WPD's designation of others based on vague and overbroad criteria and without notice.[127]

- Gang designation carries with it the inherent stigma of implied criminality.[128]

These admissions alone are sufficient to warrant summary judgment in favor of Plaintiffs. At the very least, these admissions are sufficient to preclude summary judgment for Defendant.

## II.    K.S.A. 21-6313 and Policy 527 Are Vague and Overbroad, on Their Face and as Applied to Plaintiffs.

Defendant rightly admits K.S.A. 21-6313 and Policy 527 must "meet the challenge that [they are] unconstitutionally vague,"[129] i.e., they must "provide people of *ordinary intelligence* a reasonable opportunity to understand what conduct [they] prohibit[]," and must *not* "authorize[] or even encourage[] arbitrary and discriminatory enforcement."[130] K.S.A. 21-6313 and Policy 527 fail both prongs of this test.

### A.    The text of K.S.A. 21-6313 and Policy 527 fail to give a person of ordinary intelligence notice of what conduct they prohibit.

As incorporated into Policy 527, K.S.A. 21-6313(b) sets forth the criteria that WPD personnel use to designate individuals as gang members and associates in its Gang Database. Though a person need not commit or even be suspected of any crime to be included in the Gang Database,[131] Defendant admits that references to criminal activity in K.S.A. 21-6313 necessarily—

---

[126] *See* Doc. 205 at 63–64; DSOF ¶ 12; PR-DSOF ¶ 10.
[127] *See* Doc. 205 at 47, 50; DSOF ¶¶ 81-83, 92, 116; ¶¶ PR-DSOF ¶¶ 10, 81-83, 85, 137.
[128] *See* Doc. 205 at 39, 41; DSOF ¶¶ 11-12; PR-DSOF ¶¶ 11-12.
[129] Doc. 205 at 39 (citing Mem. & Order, Doc. 28, at 22).
[130] *Hill v. Colorado*, 530 U.S. 730, 732 (2000) (emphasis added); *see also Chicago v. Morales*, 527 U.S. 41, 56–57 (1999); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *Dodger's Bar & Grill, Inc. v. Johnson Cnty. Bd. of Cnty. Comm'rs*, 32 F.3d 1436, 1443 (10th Cir. 1994).
[131] PR-DSOF ¶ 11; PSOF ¶ 9-10; *see also* Doc. 205 at 67 ("Being a gang member is not a crime. Inclusion on the Gang List does not satisfy the element for any criminal offense.").

if falsely—connect designated individuals with criminal activity.[132]

Record evidence firmly establishes that the criteria the WPD uses to label "criminal street gang members" and "associates" are subjective, discretionary, and subject to interpretation. PSOF ¶¶ 35, 52. The criteria are so broad as to encompass most residents of Wichita. The criteria are so vague that when pressed on the meaning of individual criteria, WPD officers consistently disclaim understanding. *See, e.g.*, PSOF ¶¶ 48-52, 71-74, 77-79. A person seeking to avoid meeting criteria and being designated as a gang member has no discernable way of doing so. PSOF ¶¶ 51, 78.

Beyond conclusory statements, Defendant does not dispute that persons of ordinary intelligence cannot understand what conduct places them at risk of gang designation under K.S.A. 21-6313.[133] Instead, addressing only four of the ten criteria at issue, Defendant argues that: (1) specialized training and experience provide *WPD officers* with notice of what conduct warrants gang designation under the statute and policy, and (2) gang membership criteria must be "viewed in context."[134] To the extent these contentions are at all material, they undermine Defendant's own arguments.

Even if true—which it demonstrably is not—the suggestion that WPD officers themselves know what the statute's criteria mean is immaterial to the question of whether *ordinary citizens* subject to the law can understand and conform their conduct to it.[135] Defendant admits that the

---

[132] DSOF ¶ 11; *see also infra* Section IV.B.1.

[133] Defendant insists repeatedly in its Motion that "[n]either Policy 527 nor K.S.A. 21-6313 prohibit any conduct," arguably suggesting that K.S.A. 21-6313 need not be understandable to a person of ordinary intelligence. *See, e.g.*, Doc. 205 at 27. But any such argument is foreclosed by Defendant's concession that the law must answer Plaintiff's vagueness challenge. Doc. 205 at 39. Moreover, any earnest argument that a law does not prohibit conduct because citizens are still "free" to violate it—and face the consequences—would be absurd. *See, e.g.*, Doc. 205 at 32. Few, if any, penal or proscriptive statutes include the word "prohibit." Such statutes—like K.S.A. 21-6313—define conduct that may lead to state-imposed consequences. Where, as here, a person of ordinary intelligence cannot understand what conduct so as to avoid the consequences, the law is impermissibly vague.

[134] Doc. 205 at 41–44.

[135] *See City of Chicago v. Morales*, 527 U.S. 41, 58 (1999) ("The purpose of the fair notice requirement is to enable the ordinary citizen to conform his or her conduct to the law.").

"gang areas" referenced in the criteria are not documented and change over time.[136] With respect to purported gang dress, colors, and hand signs, Defendant asserts: "Trained officers know what to look for."[137] And regarding informant reports of gang affiliation, Defendant claims "WPD Officers are trained to understand the distinctions between a reliable informant and an informant of untested reliability."[138] These contentions have no bearing on an ordinary person's understanding—or ability to avoid—the criteria for gang membership.

On the contrary, the fact that specialized training and experience are necessary for WPD officers to understand the gang criteria underscores that the criteria's meaning and contours are not evident to an ordinary citizen. Likewise, Defendant's repeated emphasis on the importance of context in WPD officers' interpretations of the criteria disproves its claim of statutory clarity. Allusions to undefined geographic locations,[139] inscrutable invocations of "reliable" evidence,[140] and innocent interactions with purported gang members[141] are quintessential fodder for findings of unconstitutional vagueness. Defendant's representations regarding specialized training and the importance of context suggest that even an untrained WPD officer of ordinary intelligence cannot be expected to understand such imprecise terms, a suggestion confirmed by WPD testimony. PSOF ¶¶ 35, 52. The statute and policy are unconstitutionally vague for failing to give persons of ordinary intelligence notice of the conduct that may result in gang designation.

---

[136] Doc. 205 at 42–44; *see also* PSOF ¶¶ 48-54.

[137] Doc. 205 at 44. *But see* PSOF ¶ 95 (gang unit officers mistook gathering of Black fraternity members wearing common colors for gang party).

[138] Doc. 205 at 43. *But see* PSOF ¶ 45 (per WPD Gang Unit detective, there is "no . . . set standard" for what constitutes a documented reliable informant).

[139] *See Connally v. Gen. Const. Co.*, 269 U.S. 385, 395 (1926) (finding references to "neighborhood" and "locality" impermissibly vague because "[b]oth terms are elastic and, dependent upon circumstances, may be equally satisfied by areas measured by rods or by miles.").

[140] *See Kolender v. Lawson*, 461 U.S. 352, 359 (1983) (finding statute requiring identification that is "credible and reliable" in the judgment of inquiring police officers void for vagueness).

[141] *See City of Chicago*, 527 U.S. at 63 (finding void for vagueness statute under which "[f]riends, relatives, teachers, counselors, or even total strangers might unwittingly engage in forbidden [conduct] if they happen to engage in idle conversation with a gang member").

**B.**    **This same vagueness authorizes and encourages arbitrary discriminatory enforcement by WPD officers.**

K.S.A. 21-6313 and Policy 527 are also impermissibly vague because they authorize and encourage discriminatory enforcement. It is undisputed that WPD officers interpret and apply the statutory gang membership criteria differently. Training aside, Defendant does not and cannot cite evidence suggesting that WPD officers apply the criteria consistently in making gang designations. WPD witness testimony and Gang Database entries themselves foreclose any such contention. *See* PR-DSOF ¶ 2.

Further, Defendant's focus on the importance of "context" and "experience" in making designations—factors unique to each officer and situation—highlights the variable nature of the criteria. Decades of Supreme Court precedent make clear that police officers necessarily exercising personal judgment in applying the law is evidence of unconstitutional vagueness—not against it. Such unfettered discretion is the hallmark of a legal scheme that impermissibly "entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat."[142] "Statutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections"; and "[w]here inherently vague statutory language permits such selective law enforcement, there is a denial of due process."[143]

Record evidence demonstrates that WPD officers have the discretion to interpret Policy 527 as they see fit. PSOF ¶¶ 33-44. "Of course, the power to be lenient also is the power to discriminate,"[144] and these judgment- and context-based distinctions are precisely what makes a

---

[142] *Kolender*, 461 U.S. at 360.

[143] *Smith v. Goguen*, 415 U.S. 566, 575–76 (1974).

[144] *McCleskey v. Kemp*, 481 U.S. 279, 312 (1987) (internal quotes and cites omitted).

law impermissibly vague for authorizing arbitrary enforcement.[145] The Supreme Court has long noted the constitutional dangers of such an approach:

> Those generally implicated by the imprecise terms of the [law]—poor people, nonconformists, dissenters, idlers—may be required to comport themselves according to the life style deemed appropriate by the [city] police and the courts. Where, as here, there are no standards governing the exercise of the discretion granted by the [law], the scheme permits and encourages an arbitrary and discriminatory enforcement of the law. It furnishes a convenient tool for "harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure."[146]

Such are the precise pitfalls of K.S.A. 21-6313 and Policy 527. They are impermissibly vague and should be overturned.

###    C.    K.S.A. 21-6313 and Policy 527's impermissible limitations are substantial when compared with any legitimate sweep.

Finally, K.S.A. 21-6313 and Policy 527 are unconstitutionally overbroad because the scope of the conduct limited is substantial when compared with any legitimate use. Defendant does not rebut or deny that K.S.A. 21-6313's gang criteria encompass a wide range of constitutionally protected conduct, including the First Amendment rights to freedom of expression and association and the Fourteenth Amendment rights to free movement, presence in public,[147] and to form and maintain intimate human relationships, including with family.[148] Instead, Defendant urges this Court to improperly weigh credibility and disregard Plaintiffs' uncontroverted testimony regarding the limitations on these freedoms they have personally experienced as a result of their gang designations, and the threat thereof. Such an approach is impermissible on summary judgment, and the Court should decline Defendant's invitation to err.[149]

---

[145] *Cf. Smith*, 415 U.S. at 575–76 (law unconstitutionally vague where identical conduct would result in application or leniency, depending on actor and context).
[146] *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972) (quoting *Thornhill v. State of Alabama*, 310 U.S. 88, 98 (1940)).
[147] *Morales*, 527 U.S. at 52; *see also* Plfs. Mem. in Supp. of Plfs.' Mot. for Summ. J., Doc. 207, at 46–47, 61–62.
[148] *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984); *see also* Doc. 207 at 46–47, 64–65.
[149] *See Scott*, 550 U.S. at 378; *Logan*, 159 F.R.D. at 50.

Moreover, Defendant fails to describe any legitimate use or purpose of K.S.A. 21-6313 and Policy 527 that might so outweigh their constitutional infringements as to make those restrictions insubstantial. The closest Defendant comes to identifying a legitimate sweep is to falsely state that the statute and policy provide "*that if you engage in criminal activity and* meet the criteria in K.S.A. 21-6313(b) or (c) you could be identified as a criminal street gang member or associate."[150] This added prerequisite that a gang designee have engaged in criminal activity is made out of whole cloth. It appears nowhere in the statute or policy, and is readily disproved by the WPD's own practice of designating gang members without even suspicion of criminal conduct.[151] PSOF ¶¶ 9-10. Defendant's deceptive claim that criminal activity is required for designation—while duplicitously insisting that "[g]ang membership is not a crime"[152]—belies the tenuous connection between K.S.A. 21-6313's vastly over-inclusive criteria and any legitimate effort to combat criminal activity. The statute and policy are facially overbroad and should be invalidated.[153]

### D.    K.S.A. 21-6313 and Policy 527 are unconstitutionally vague as applied to Plaintiffs.

K.S.A. 21-6313 and Policy 527 are also vague as applied to Plaintiffs. As set forth more fully in Plaintiffs' Memorandum in Support of their Motion for Summary Judgment, Plaintiffs have remained unaware of how to avoid renewal (and have been unable to do so) for years—and in Mr. E. Costello's case, decades.[154] As revealed and confirmed through discovery, the conduct

---

[150] Doc. 205 at 39.

[151] PR-DSOF ¶ 11; PSOF ¶¶ 9-10. Individuals are subjected to the detrimental consequences of gang designation if they are merely *arrested* for a criminal offense—regardless of whether or not they are guilty of the crime. *See* K.S.A. 21-6316; PSOF ¶ 85. This is especially problematic for those whom the WPD actively surveils due to their designation, who may be wrongfully arrested yet still subject to the mandatory $50,000 bail. It is even more problematic for those on probation and subject to gang conditions. Those individuals can be arrested and have their probation revoked for a violation that is not criminal in nature, such as breaking curfew, and based only on a preponderance of the evidence— far less than the "beyond a reasonable doubt" standard for conviction. PSOF ¶ 87; PR-DSOF ¶ 121; *see also* PSOF ¶ 91; Doc. 207-25, Decl. of Jorge De Hoyos ¶¶ 10-11; Doc. 207-19, Decl. of Mark Hartman ¶¶ 8, 10; Doc. 207-26, Decl. of Sonya Strickland ¶¶ 9, 11; Doc. 207-24, Decl. of Bach Hang ¶¶ 9, 11.

[152] Doc. 205 at 32.

[153] *Cf. Morales*, 527 U.S. at 52 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).

[154] Doc. 207 at 53–57.

for which the WPD added and renewed Plaintiffs' gang statuses demonstrates the unconstitutional vagueness of K.S.A. 21-6313 and Policy 527. *See, e.g.*, PSOF ¶¶ 114, 117, 154, 164. These are not activities that a person of ordinary intelligence would anticipate leading to designation or renewal as a gang member or associate.[155]

Defendant makes no attempt to rebut or even address this evidence, instead arguing at length that Plaintiffs have not been harmed by their incorrect designation as gang members.[156] Once again, these arguments consist of unsupported credibility and character attacks (and amount to a reiteration of Defendant's standing challenge) while failing to address Plaintiffs' inability to understand or avoid the conduct for which they have been designated and renewed in the Gang Database for years. Thus, Defendant offers no substantive argument or evidence that any person of ordinary intelligence—nor Plaintiffs specifically—can understand and avoid the conduct K.S.A. 21-6313 and Policy 527 encompass. The statute and policy are impermissibly vague, and summary judgment on this claim in favor of Defendant must be denied.

### III.    K.S.A. 21-6313 and Policy 527 Deprive Plaintiffs of Liberty Interests Without Due Process of Law.

Defendant concedes that it provides no notice to the individuals it permanently brands as gang members and associates in its Gang Database.[157] Likewise, Defendant concedes that no WPD policy requires that any person included in the WPD Gang Database be provided an opportunity to challenge their designation as a gang member or gang associate—much less a meaningful one.[158] Accordingly, Defendant's arguments for summary judgment on Plaintiffs' procedural due process claims rest entirely on the assertion that the WPD's gang designations do not implicate a protected

---

[155] *Cf. Morales*, 527 U.S. at 62–63 (finding law impermissibly vague where it applied to "everyone in the city," required "no harmful purpose," and applied to potentially unwitting conduct such as "idle conversation").
[156] *See* Doc. 205 at 44–56.
[157] *See id.* at 33 ("A person included or listed will, often, never know they were identified or listed as a gang member or associate.").
[158] *See* PTO Stip. ¶ 36.

liberty interest, and that the harms Plaintiffs complain of are imposed by others, not the WPD.[159]

These arguments fail for related reasons. The WPD's designations of Plaintiffs and others harm their reputations and significantly alter their legal statuses as a matter of state law, satisfying both prongs of the "stigma-plus" doctrine.[160] On one hand, the WPD's gang designations alter designees' legal status by curtailing the precise criminal procedures (e.g., the setting of bail and determination of release conditions) that apply to otherwise similarly situated, but non-designated, individuals. On the other hand, the later involvement of courts, corrections officers, and other state actors cannot absolve Defendant of—nor constitutionally remedy—the complete lack of any process in the WPD's arbitrary, discretionary decision-making. Were that not true, the Constitution could place no limits on police conduct in criminal cases because judges, not police, are the ultimate arbiter of punishment—an absurd proposition. Indeed, the procedural flaws in the WPD's designations are compounded—not cured—by the subsequent procedural limitations they precipitate, and such improper designations are but-for causes of the harmful outcomes Plaintiffs and those like them experience. Moreover, the evidentiary record shows that, in reality, the WPD continues to influence criminal and post-release proceedings involving those it has designated gang members and associates long after making such designations. As such, the WPD's conduct with respect to its Gang Database significantly infringes Plaintiffs' liberty interests, triggering due process protections that are entirely absent here.

### A.    WPD's inaccurate gang designations harm Plaintiffs' reputations.

To obtain relief for due process violations under the stigma-plus doctrine, Plaintiffs first must show that "the government made a statement about him or her that is sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she asserts is

---

[159] *See* Doc. 205 at 56–64.
[160] *See* Doc. 28 at 24–25 (citing *Gwinn v. Awmiller*, 354 F.3d 1211, 1216 (10th Cir. 2004)).

false."[161] There is no dispute gang designations may be and have been proved false, and Plaintiffs have provided record testimony that their designations are false. PSOF ¶¶ 43, 115, 129, 144, 162. As this Court noted in its Order on Defendant's Motion to Dismiss (Doc. 28), "designation as a gang member inescapably implies that a person is involved, at least in some capacity, with criminal activity, which is generally recognized as defamatory *per se* under relevant state law."[162] Defendant concedes this stigmatizing false association, stating that "[t]he definition of a street gang member […] necessarily includes criminal activity"[163] and "[t]he definitions from K.S.A. 21-6313 are referenced elsewhere in the statute [*sic*] . . . all under the umbrella of criminal activity."[164] Defendant even proceeds to fabricate a requirement that to be designated, an individual must "engage in criminal activity *and* meet the criteria in K.S.A. 21-6313(b) or (c)."[165] No such requirement exists in statute or WPD policy.

Likewise, Defendant admits that it shares Gang Database information "with other law enforcement agencies and detention/correction facilities," state and federal alike.[166] Such intra- and inter-governmental sharing of a stigmatizing label is sufficiently public to harm Plaintiffs' reputations.[167] Moreover, Defendant admits it also shares Gang Database information for any other

---

[161] *Id.*

[162] *Id.* at 25 (citing *Paul v. Davis*, 424 U.S. 693, 697 (1976)); *see also id.* n.88 ("Criminal street gang[s]," under K.S.A 21-6313(a)(4), engage in lawbreaking by definition. It requires no great logical leap to conclude that their members would be associated with such lawbreaking.").

[163] DSOF ¶ 11; Doc. 205 at 41. The statutory definition of criminal street gang member, of course, does not necessarily include criminal activity. *See* PR-DSOF ¶ 11. But the references to criminal activity elsewhere in K.S.A. 21-6313 and related statutes, and the label "criminal street gang member" itself inescapably connotes involvement in criminal activity.

[164] DSOF ¶ 12. Omitted statements reference other statutes.

[165] Doc. 205 at 39 (emphasis added).

[166] DSOF ¶ 31; *see also* Doc. 205-6, Decl. of Jess Bernard ¶ 14; Doc. 205-15, MOU with U.S. Probation Office (providing for bi-annual download of the full WPD Gang Database by the U.S. Probation Office).

[167] *See Medrano v. Salazar*, 2020 WL 589537, at *6 n.3 (W.D. Tex. 2020); *see also Pedrote-Salinas v. Johnson*, 2018 WL 2320934, at *5 (N.D. Ill. 2018) (holding defendants sufficiently publicized plaintiffs' inclusion in a gang database when they shared the information with immigration officials); *Larry v. Lawler*, 605 F.2d 954, 959 (7th Cir. 1978) (finding sharing of stigmatizing label with federal agencies on a need to know basis sufficiently public); *Castillo v. Cnty. of Los Angeles*, 959 F. Supp. 2d 1255, 1261 (C.D. Cal. 2013) (finding plaintiff's inclusion in Child Welfare Services Case Management System sufficiently public where information in the database was not publicly available but was available to governmental entities and agencies).

reason it deems a "law enforcement purpose[]"[168]—a purported exception that swallows any limitations on publication that the WPD may claim exist. Regardless, record evidence and public sources make clear that the WPD shares individuals' gang designations publicly with media outlets and housing authorities, as well as through gang bulletins, officer leaks, and sheer carelessness. PSOF ¶¶ 28-31; PR-DSOF ¶ 27. This Court, like others, has recognized that such statements of gang affiliation work sufficient reputational harm to meet prong one of stigma-plus.[169]

### B.    Gang designation alters Plaintiffs' legal status as a matter of state law.

Record evidence further demonstrates that each Plaintiff has "experienced some governmentally imposed burden that significantly altered his or her status as a matter of state law," satisfying the second stigma-plus prong.[170] Under Supreme Court jurisprudence, a status warranting due process may stem from myriad state law rights, entitlements, benefits, "rules or understandings."[171] Whether such status has been altered "often boils down to a question of whether the plaintiff is restricted from doing something significant, because of the government's defamation, that he or she could otherwise do 'in common with the rest of the citizenry.'"[172]

### 1.    Gang designation limits Plaintiffs' expression, association, free movement, and employment.

Here, record evidence firmly establishes that WPD gang designations have "the effect of restricting Plaintiffs' ability to do significant things that they otherwise have the right to do freely."[173] As detailed in Plaintiffs' Memorandum in Support of their Motion for Summary Judgment, Plaintiffs have experienced significant curtailment of their associative and expressive

---

[168] DSOF ¶¶ 27, 31; *see also* Doc. 205-6, Bernard Decl. ¶¶ 13-14.

[169] *See* Doc. 28 at 25 (citing *Pedrote-Salinas*, 2018 WL 2320934, at *5; *Medrano*, 2020 WL 589537, at *6).

[170] Doc. 28 at 25 (citing *Gwinn*, 354 F.3d at 1216) (internal quotation marks omitted).

[171] *See Paul*, 424 U.S. at 697 (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).

[172] Doc. 28 at 26 (citing *Paul*, 424 U.S. at 697).

[173] *Id.* at 27.

rights,[174] and they reasonably fear continued gang status renewal, harassment and surveillance, and potential criminal prosecution or detention for themselves and their loved ones, should they continuously engage in such activities. PSOF ¶¶ 158-159. That these fears are reasonable—and these restrictions real—is underscored by the fact that former WPD Deputy Chief Wanda Parker-Givens reports avoiding activities she would "otherwise have the right to do freely," including visiting or being seen with her own family members, for fear of gang designation.[175] PSOF ¶ 80.

Plaintiffs' testimony regarding the restrictions imposed on them due to their gang designations is uncontroverted, and at the very least sufficient to survive summary judgment on the question of whether they face potential liberty deprivations that trigger due process.

### 2. Gang designation alters Plaintiffs' rights regarding bail.

Defendant itself recites a litany of criminal procedural rights afforded to "the rest of the citizenry" that are denied or significantly diminished for WPD-designated gang members and associates by operation of K.S.A. 21-6313 and 21-6316.[176] For example, Defendant cites the guarantee against excessive bail enshrined in Kansas's Constitution, including the right to "an individualized determination whether the detainee poses a risk to himself or others."[177] But Defendant ignores that K.S.A. 21-6316 provides a different, mandatory bail rule that rule sharply curtails the factors a magistrate setting bail may consider—and the posture in which they may consider them—in cases involving gang designees. Bail for a designated criminal street gang member arrested for a person felony "shall" be set at $50,000, and the person "shall not" be

---

[174] *See id.* at 61–65; *see also* PR-DSOF ¶¶ 81-82, 85, 92, 97-98, 100, 116, 120-121, 137, 144.

[175] *See also* PSOF ¶ 81 (former Captain Nicholson reported similar sentiments among community members). Defendant's newfound claim that the WPD does not use immediate family members to satisfy the "associating with" criterion is simply not plausible. If that were true, then there would be no need for WPD officers to note immediate familial relationships in the Gang Database at all. Yet the Gang Database contains numerous such notations, revealing the value the WPD places on that information. PR-DSOF ¶ 41.

[176] *See* Doc. 205 at 33–37.

[177] *Id.* at 33–34 (citing *State v. Cuchy*, 19 P.3d 152, 158 (Kan. 2001)).

released on their own recognizance.[178] The only exception requires that "an appropriate intensive pre-trial supervision program" be available—a factor not individualized to the arrestee, and over which the arrestee has no control.[179] These circumscribed considerations and distinct process established for cases involving designated gang members is precisely the type of alteration of legal status that necessitates due process protections.[180]

In addition, the practical consequence of mandatory minimum bail for gang designees is that many individuals will experience prolonged detention without ever being convicted, simply by virtue of their inclusion in the Gang Database. *See generally* PSOF ¶ 85. As a result, many defendants who have never been (and may never be) convicted of any crime languish in jail for months or years as a direct result of their WPD-imposed gang status.[181] Such pretrial detention implicates the most fundamental of interests—liberty itself—at the heart of the Due Process Clause.[182] By directly influencing the minimum presumed bail and limiting the factors for consideration in setting bail, K.S.A. 21-6313, K.S.A. 21-6316, and the WPD's Gang Database policies and practices alter designees' legal status in ways that significantly infringe their rights.

### 3. Gang designation alters Plaintiffs' status in other criminal and civil contexts.

In addition to altered bail eligibility, gang designation imposes a host of additional status alterations for designees facing criminal charges, including eligibility for drug court or diversion,

---

[178] K.S.A. 21-6316.

[179] Of note, K.S.A. 21-6316's mandatory bail rule for gang designees omits precisely the kind of "individualized determination whether the detainee poses a risk to himself or others" that Defendant insists is required, and thus arguably violates the Kansas Constitution under the authority Defendant cites. *See Cuchy*, 19 P.3d at 158.

[180] Doc. 207-25, De Hoyos Decl. ¶¶ 10-12; Doc. 207-19, Hartman Decl. ¶¶ 8-11; Doc. 207-23, Decl. of J. Houston Bales ¶¶ 9-12; Doc. 207-26, Strickland Decl. ¶¶ 9-12; Doc. 207-24, Hang Decl. ¶¶ 9-12.

[181] *See* Doc. 207-25, De Hoyos Decl. ¶ 8; Doc. 207-19, Hartman Decl. ¶ 6; Doc. 207-23, Bales Decl. ¶¶ 7-8; Doc. 207-26, Strickland Decl. ¶ 7; Doc. 207-24, Hang Decl. ¶ 7; PR-DSOF ¶¶ 69-71; PSOF ¶¶ 118-119, 121 (Plaintiff Cooper was jailed for a year due to inability to post $50,000 bond, after which he pled guilty to obstruction of justice and was released on probation with gang conditions).

[182] *See United States v. Salerno*, 481 U.S. 739, 755 (1987).

restrictions on public housing, and special gang conditions of probation—all of which further contribute to the stigma and harm associated with gang designation.[183] PSOF ¶¶ 22, 31, 32, 87, 92.

### C.    Ex post processes by other state actors do not satisfy due process.

Under stigma-plus, Plaintiffs' liberties are threatened—and due process required—when the government makes false, reputation-damaging statements that alter their legal statuses. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are *essential*."[184] Such notice and opportunity for hearing must <u>*precede*</u> the deprivation—here, the stigmatizing statement.[185] Accordingly, the WPD must provide notice of and opportunity to challenge its gang designations at the time the designation is made or proposed. Ex post hearings in other contexts in which the consequences of the WPD's designation come to fruition are insufficient.[186] This is especially true where, as here, unwitting conduct may result in designees' renewal or the designation of friends and family, and the WPD shares its designations with others through various back channels, with designees oblivious of the consequences. *See, e.g.*, PSOF ¶¶ 31, 92; Bernard Decl. (Doc. 205-6) ¶¶ 13-14.

Furthermore, Defendant's insistence that other state actors including courts, prisoner review boards, and corrections officers impose harms subsequent to the WPD's false gang designations is of no avail. It is the WPD's discretionary, unchecked, and unreliable designations—systematically disclosed through arrest affidavits and direct sharing of Gang Database contents—which precipitate downstream harms including increased bail, enhanced

---

[183] Doc. 207 at 60–65.

[184] *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) (emphasis added); *see also* Doc. 28 at 27.

[185] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case. . . . [T]his rule has been settled for some time now.") (internal quotations omitted); *see also* Doc. 28 at 27.

[186] *Cf. Morales*, 527 U.S. at 60 ("The Constitution does not permit a legislature to 'set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.'") (quoting *United States v. Reese*, 92 U.S. 214, 221 (1875)).

release conditions, ineligibility for diversion, and more. Moreover, WPD documents show that the WPD is in fact actively involved in determining gang conditions of release and their application to individuals, collaborating closely with other government agencies and even drafting their policies. PSOF ¶¶ 88-90. Other agencies rely heavily on the WPD's determination that someone is a gang member in imposing and enforcing these conditions. *Id.* The Court should not entertain Defendant's proposal to ignore the uncontroverted record and instead infer without evidence that the WPD's deliberately imparted designations have no effect on the significant liberty deprivations that designees face. Any such inference would be improper on summary judgment and wholly unsupported by evidence or reason. The abundant record evidence here dictates denial of Defendant's request for summary judgment on Plaintiff's due process claims.

## IV.    K.S.A. 21-6313 and Policy 527 Directly Prohibit and Impermissibly Chill Plaintiffs' First Amendment Freedoms.

Defendant's arguments concerning Plaintiffs' First Amendment claims reveal a fundamental misapprehension of Plaintiffs' claims, the facts, and the applicable law. They are therefore insufficient to merit summary judgment in Defendant's favor.

### A.    Plaintiffs' First Amendment expressive conduct claims are not limited to symbolic speech.

Defendant proceeds under the mistaken belief that Plaintiffs' First Amendment expressive conduct claims involve only symbolic speech.[187] But the facts show that the WPD's violations of Plaintiffs' First Amendment expressive rights go far beyond clothing of a certain color or sports team.[188] Rather, the WPD's enforcement of K.S.A. 21-6313 through Policy 527 targets and

---

[187] Doc. 205 at 65–66 (citing Doc. 28, at 35). *Contra* Pretrial Order, Doc. 196, at 42 ("[T]he WPD's designation of individuals as gang members and associates . . . based on clothing, gestures, *speech, and tattoos* punishes plaintiffs and others for engaging in activity protected by the First Amendment. . . . [D]esignation based on clothing, gestures, *speech, and tattoos* unconstitutionally deters plaintiffs from engaging in activity protected by the First Amendment." (emphases added)).

[188] The WPD considers and trains its officers to view clothing representing certain sports teams as evidence of gang affiliation, even geographically proximate teams such as the Kansas City Chief or Royals. PSOF ¶¶ 65-68. WPD

punishes written expression in the form of tattoos and social media posts and through pretrial, probation, or parole gang conditions of release in a content-discriminatory manner.

Rather than repeat the myriad record evidence demonstrating how K.S.A. 21-6313 and WPD Policy 527 implicate expressive speech, Plaintiffs incorporate by reference their arguments set forth in their Memorandum in Support of their Motion for Summary Judgment.[189] As noted therein, inclusion in the Gang Database directly results in the imposition of gang conditions of release, which further prohibits individuals in the Database from engaging in similar forms of expressive speech through their clothing, tattoos, and social media.[190] Defendant cannot prevail on summary judgment by ignoring the wealth of evidence demonstrating that the WPD punishes written statements directly in tattoos and social media posts and indirectly through gang conditions. This precise sort of content discrimination is per se unconstitutional.[191]

### B.    K.S.A. 21-6313 and Policy 527 directly prohibit and chill Plaintiffs' First Amendment right to association.

Defendant appears to challenge only Plaintiffs' chilling effect claim (Count VII) as it pertains to associative conduct; its motion is silent on Plaintiffs' claim of direct prohibition (Count VI) of their First Amendment right to association.[192] Defendant argues that Plaintiffs have only claimed a "subjective chill" inadequate for injunctive relief for two reasons: (1) K.S.A. 21-6313

---

officers also view a veritable rainbow of colors as gang-related, and WPD officers have testified that they consider essentially _all_ colors as possible evidence of gang affiliation. _Id._ ¶ 66. Likewise, WPD trains officers to deem written statements—e.g., "anti-police" tattoos or expressions of ethnic pride—as gang-related based on content. _Id._ ¶ 69.

[189] Doc. 207 at 68–70 (setting forth the ways in which WPD's application of K.S.A. 21-6313 and Policy 527 target a broad swath of content-based speech).

[190] _Id._ at 70–71.

[191] _Reed v. Town of Gilbert, Ariz._, 576 U.S. 155, 163 (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional . . . ."). Defendant studiously avoids engaging in any substantive First Amendment analysis in its motion, but a straightforward application of First Amendment law leads to the inescapable conclusion that the WPD's Gang Database practices and policies are unconstitutional. Doc. 207 at 68–79.

[192] _See_ Doc. 205 at 66–68 (addressing only Plaintiffs' chilling effect claim as to associative conduct, not Plaintiffs' direct prohibition claim). Plaintiffs' claim for direct prohibition of their right to association must therefore proceed to trial unless the Court grants summary judgment in favor of Plaintiffs.

and Policy 527 do not criminalize or punish any particular conduct, and (2) Plaintiffs' harms are speculative and their ability to associate is not restricted.[193] Defendant is wrong on both counts.

> **1.    K.S.A. 21-6313 and Policy 527 are proscriptive and punitive both on their face and as applied, resulting in negative consequences for Plaintiffs and all class members.**

Defendant asserts throughout its motion that "[n]either Policy 527 nor K.S.A. 21-6313 prohibit any conduct" or impose any punishment, and therefore cannot chill Plaintiffs' exercise of their First Amendment rights.[194] This argument is based on the faulty premise that the Gang Database plays no role elsewhere in the Kansas Criminal Code.

First, Defendant's own professed undisputed facts are wholly incompatible with its legal argument. As Defendant painstakingly recounts, K.S.A. 21-6313 is listed under Chapter 21 ("Crimes and Punishments"), Article 63 ("Crimes Against The Public Safety") of the Kansas Statutes Annotated, and Defendant contends the statute's "definition of a street gang member . . . necessarily includes criminal activity." DSOF ¶¶ 8-11. Indeed, as Defendant itself concedes, K.S.A. 21-6313's definitions are used elsewhere in various other statutes criminalizing specific acts, "all under the blanket of criminal behavior." *Id.* ¶ 12. These other statutes include K.S.A. 21-6328 (the Kansas RICO Act), which incorporates K.S.A. 21-6313's definitions for its own definitions of "covered person" and "enterprise."[195] *Id.* Being designated a "criminal street gang member" or involved in a "criminal street gang" is therefore sufficient to meet the elements of a "covered person" or "enterprise" necessary to support any offense described in the Kansas RICO Act.[196] By Defendant's own admission, then, its claim that "[i]nclusion on the Gang List does not

---

[193] *Id.*
[194] *Id.* at 31–33, 38–39, 66–67.
[195] K.S.A. 21-6328(b)(1), (d).
[196] *See, e.g.*, K.S.A. 21-6329(a)(1).

satisfy the element for any criminal offense" is patently false.[197] Defendant's argument the definitions in K.S.A. 21-6313 do not proscribe conduct—even though those definitions are used throughout other statutes enumerating criminal offenses—is nonsensical and a deliberate distraction from the mountain of evidence that supports Plaintiffs' claims.[198]

Second, even if the Court were to accept Defendant's flawed argument that K.S.A. 21-6313 and Policy 527 do not expressly prohibit or proscribe specific behavior, Defendant's cited cases make clear that the threat of prosecution through explicit prohibition is not the only manner in which the government can chill First Amendment rights—"other consequences" also suffice to establish chilling.[199] The undisputed facts demonstrate that the WPD's policies and practices result in punishment[200] or other consequences for Gang Database designees.[201] Defendant's conduct in operating and maintaining the Gang Database is necessary and sufficient to set these downstream consequences into motion, none of which would occur without the WPD's designation of individuals in the first instance. These "other consequences flowing from the statute's

---

[197] Doc. 205 at 67. Indeed, a Progeny staff member was charged alongside other purported gang members with violating the Kansas RICO Act, and as a result, the WPD renewed his active status for yet another three years. Doc. 208-3, Selected Gang Database Entries, at WICHITA 024425.

[198] Defendant's motion contains internal contradiction that is fatal to summary judgment in its favor: either K.S.A. 21-6313's statutory definitions and Policy 527's application thereof are criminal in nature and therefore result in prohibition and punishment of protected conduct—warranting immediate injunctive relief, *see supra* Section III.B—or the statute and policy have no real consequences and therefore cannot be said to support any compelling state interest, in public safety or otherwise. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641–42 (1994) (content-based regulation of speech is subject to strict scrutiny); *City of Dallas v. Stanglin*, 490 U.S. 19, 23 (1989) (rational basis scrutiny applies unless the law at issue impinges upon constitutionally protected rights, such as First Amendment right of association); *see also* Doc. 205 at 26; Doc. 207 at 77–79. The law cannot be both trivial and necessary.

[199] *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004) ("The chilling effect, to amount to an injury, must arise from an objectively justified fear of *real consequences*, which can be satisfied by showing a credible threat of prosecution *or other consequences* following from the statute's enforcement." (emphases added)); *see also Laird v. Tatum*, 408 U.S. 1, 14 (1972) (requiring "specific present objective harm or a threat of specific future harm" but not limiting that harm to prosecution); *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003) ("Plaintiffs may have standing even if they have never been prosecuted or actively threatened with prosecution.").

[200] Punishment, Black's Law Dictionary (11th ed. 2019) (defining "punishment" as "[a] sanction—such as a fine, penalty, confinement, *or loss of property, right, or privilege*—assessed against a person who has violated the law" (emphasis added)).

[201] *See supra* Section III.B; *see also* PSOF ¶¶ 85-92.

enforcement"[202] are more than enough to demonstrate a "specific present objective harm or a threat of specific future harm."[203] Drawing all inferences in Plaintiffs' favor, as the Court must, the only sensible conclusion is Defendant cannot prevail on the chilling effect claim at summary judgment.

### 2. The WPD's application of K.S.A. 21-6313 via Policy 527 has and continues to affect Plaintiffs' ability to freely associate for First Amendment purposes.

Defendant contends that Plaintiffs' First Amendment right to association cannot be chilled because their harms are merely "perceived" based on "speculation and conjecture."[204] But as with all of Defendant's other arguments, the undisputed facts prove otherwise.

#### i. The WPD has violated the individual Plaintiffs' right to association.

The WPD relies extensively on social relationships as a basis for designating individuals as gang members or associates. PSOF ¶¶ 76-84. The Gang Database entries for individual Plaintiffs and Progeny staff members show the WPD's intense focus on their social relationships, even on one occasion renewing the Costellos—father and son—for the sin of attending a concert together. PSOF ¶¶ 98-99, 114, 116, 128, 130, 137, 139, 144, 150, 153, 156. Mr. E. Costello's Gang Database record entries mostly concern his social life and interactions with others. PSOF ¶¶ 150, 152. The WPD also targets individuals' associative conduct by regularly surveilling funerals and using those observations to add or renew individuals in the Gang Database.[205] Funerals often include religious services in religious venues, as Elbert Costello Jr.'s funeral did. Such assembly and exercise of religion are quintessential First Amendment activities.[206]

---

[202] *D.L.S.*, 374 F.3d at 975.

[203] *Laird*, 408 U.S. at 14; *see also id.* at 12–13 ("[G]overnmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights.").

[204] Doc. 205 at 67.

[205] Doc. 207 at 74–75; PSOF ¶¶ 84, 116-117, 137-139, 153 (describing the WPD's renewal of Mr. Cooper and the Costellos for attending the funerals of Elbert Costello Jr. and others).

[206] *Roberts*, 468 U.S. at 618; *Stanglin*, 490 U.S. at 25 ("[T]he right of expressive association extends to groups organized to engage in speech that does not pertain directly to politics.").

Additionally, as noted above,[207] the WPD is deeply involved in drafting and determining the application of gang conditions of release alongside other agencies, and these conditions explicitly prohibit numerous associative behaviors. PSOF ¶ 87-88. The associational restrictions pose particular hardships for criminal defendants, and compliance is even more difficult due to the WPD's failure to notify individuals of their designations, resulting in defendants unknowingly violating their gang conditions by engaging in normal, everyday interactions. PSOF ¶ 91. Finally, the gang conditions prohibiting an individual from attending court hearings not only prevents them from expressing support for friends or family who are parties to the proceedings, but also from exercising their First Amendment right to access open courts as a member of the public.[208] Defendant has not put forth sufficient undisputed facts for the Court grant it summary judgment.

ii. *The WPD has hindered Progeny's ability to engage in First Amendment assembly and protest.*

Defendant's argument that the Gang Database does not implicate Progeny's First Amendment rights is likewise unavailing. First Amendment activities are the backbone of Progeny's work, and that work is deeply affected by the WPD's Gang Database practices.[209] The WPD's inclusion of Progeny staff and members in the Gang Database hinders Progeny's ability to fulfill its mission of helping Wichita youth involved in the criminal justice system. PSOF ¶¶ 97-100, 102-107. Moreover, the WPD's designation and harassment of Progeny staff and members directly restricts their associative and expressive conduct.[210] Not only do the WPD's policies and practices change the way in which Progeny approaches protest or assembly, they have prevented

---

[207] *Supra* Section III.C.

[208] *See, e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 523 (2004) (citing *Press-Enter. Co. v. Superior Court of Cal., Cnty. of Riverside*, 478 U.S. 1, 8–15 (1986)).

[209] *See* Doc. 207 at 72–74; PTO Stip. ¶¶ 56-57; PSOF ¶¶ 97-100, 102-107.

[210] For example, whenever Progeny wishes to engage in protest or assembly, it must discuss with participants the potential consequences of arrest, such as violating probation conditions or being renewed or reactivated in the Gang Database. See PSOF ¶¶ 103-104, 107. Progeny and the individual must assess whether the individual's participation is worth such risk, limiting both the individual and Progeny's ability to protest. *See id.*

Progeny from engaging in First Amendment activities altogether.[211] As a result, Progeny and its members are forced to choose between fulfilling their mission via peaceable assemblies and attempting to mitigate the risks of potential gang designation with all the legal and personal consequences that entails. PSOF ¶¶ 104, 107.

Defendant insists that Progeny is not chilled because it still manages to hold *some* meetings, despite the possibility that its members and attendees may be designated or renewed.[212] Defendant assumes—without providing any support—that so long as Progeny can operate in some way, the WPD is free to trample on Progeny's First Amendment rights. But Progeny need not be totally and permanently deprived of all First Amendment activities in order to prevail on its claim.[213] As the Supreme Court has stated, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[214] Summary judgment for Defendant is therefore improper.

> ### iii. *Plaintiffs have provided evidence that their right to association has been chilled.*

The evidence shows that Plaintiffs have an objectively reasonable fear of being added or renewed in the Gang Database based on their associations with others, and that they have curtailed exercising their First Amendment rights accordingly.[215] Plaintiffs have demonstrated much more than a mere claim of "subjective" chill; they have provided evidence of the concrete consequences of the WPD's unconstitutional actions that forestalls summary judgment for Defendant.

---

[211] Doc. 207 at 73–74.

[212] Doc. 205 at 68.

[213] *See, e.g.*, *Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir. 2005) ("Speech can be chilled even when not completely silenced."); *Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001) ("[I]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity . . . ." (quoting *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999))); *United States v. Vazquez*, 145 F.3d 74, 81 (2d Cir. 1998) (abortion protestor's "persistence in protesting does not mean that she did not suffer a sufficiently concrete injury to challenge the government's action").

[214] *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

[215] *See* Doc. 207 at 79–81; PSOF ¶¶ 102-109, 121, 141, 158-159, 168.

Defendant cannot dispute that it surveils individuals and groups that include designated gang members for the specific purpose of designating new gang members and associates, renewing existing designees, documenting expressive and associative conduct, and endeavoring to revoke probation and parole based on violations of gang conditions of release. Additionally, Defendant cannot dispute that a justified fear of WPD presence, surveillance, harassment, gang designation, and efforts to revoke those on pretrial release, probation, or parole have deterred Progeny from engaging in protected First Amendment activities. Nor can Defendant dispute that fear of the WPD's unconstitutional applications of K.S.A. 21-6313 has impeded Progeny from more effectively carrying out its mission by discouraging community members from associating with Progeny and attending its events, including a planned rally against community violence.

On a final note, Defendant's assertion that "the 'harms' claimed are the consequences of criminal activity and an interaction with the criminal justice system" is particularly offensive.[216] Not only is this statement objectively false—indeed, no criminal act or even intent is necessary in order for the WPD to designate someone, *see* PSOF ¶¶ 9-10—it belittles the deprivations Plaintiffs and so many others have endured as a direct result of the WPD's unconstitutional actions. Defendant is not the arbiter of the legitimacy of Plaintiffs' fears concerning the consequences of Gang Database designation. Many of these harms and consequences occur well in advance—or in the absence—of any verdict or judgment in a criminal case,[217] and Defendant's clear disdain for the precept of "innocent until proven guilty" speaks volumes about its contempt for not just Plaintiffs, but the citizens of Wichita and the Constitution itself.

In sum, the wealth of evidence demonstrates that there are genuine disputes of material facts that preclude summary judgment for Defendant on Plaintiffs' First Amendment claims.

---

[216] Doc. 205 at 67.

[217] *See, e.g.*, *supra* n.150.

V.    **Named Plaintiffs and the Certified Class Have Standing.**

Almost the entirety of Defendant's brief is dedicated to attacking Plaintiffs' standing, challenging each of the three criteria necessary to demonstrate standing.[218] But the facts show what this Court has already addressed: that Plaintiffs' real injuries can be traced to Defendant's maintenance and use of the Gang Database, and that a favorable decision by the Court can redress Plaintiffs' grievances. Summary judgment should therefore be denied.

A.    **Plaintiffs have suffered injuries in fact sufficient to confer Article III standing.**

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."[219] A particularized injury affects plaintiffs in a personal or individual way.[220] Here, Plaintiffs and the certified class they represent[221] have suffered a pattern of ongoing injuries because of K.S.A. 21-6313 and Policy 527. Front and center among these injuries is Defendant's continued infringement of their constitutional rights through the WPD's maintenance and use of the Gang Database.

The particularized harms that Plaintiffs and class members have suffered are described at length above and in Plaintiffs' Memorandum in Support of their Motion for Summary Judgment.[222] Beyond these specific harms, the vagueness and overbreadth of K.S.A. 21-6313 and Policy 527 inflict a constitutional injury on all Plaintiffs and the certified class.[223] Intangible harms—such as

---

[218] *Spokeo v. Robins*, 578 U. S. 330, 338 (2016) ("The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.")

[219] *Id.* at 339 (internal quotation marks omitted).

[220] *Spokeo*, 578 U. S. at 339 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560  n.1 (1992)).

[221] Mem. & Order, Doc. 212.

[222] PR-DSOF ¶¶ 62-152; *supra* Plfs. Add'l Stmt. of Uncontroverted Facts ¶ 3; Doc. 207 at 53–56 (void for vagueness as applied to Plaintiffs), 60–65 (stigma plus); 70, 72–76 (First Amendment), 79–81 (chilling effect); *see also* PSOF ¶¶ 96-168 (detailing harms each Plaintiff has incurred as a result of being designed a "gang member" by Defendant).

[223] *See* Doc. 212 at 12 ("At a bare minimum, Plaintiffs' first proposed question necessitates an answer common to every one of Plaintiffs' proposed class members. Indeed, it is difficult to conceive of a more generally applicable

reputational harms and infringement of constitutional rights—can be sufficiently concrete.[224] Being labeled a gang member or associate injures one's reputation, particularly where there are no due process protections,[225] and individuals are unable to fully conform their conduct to avoid continued scrutiny and inclusion in the Database. Punishing individual Plaintiffs and imposing legal consequences on them for expressing themselves through tattoos, clothing, hand signs, and associational gatherings impermissibly targets the content of their speech.

As for Progeny, Defendant's sole argument is that Progeny cannot demonstrate that "K.S.A. 21-6313 or WPD Policy 527 prevents [it] from holding any type of event."[226] But as explained more fully above, this argument misses the mark, as Progeny need only show that it plans to engage in a constitutionally protected activity barred by the law and for which its members would be credibly punished or subjected to other consequences for their participation.[227] K.S.A. 23-6313 and Policy 527 directly infringe on Progeny's ability to gather and to organize, which is central to fulfilling its mission. Progeny cannot meet without risking its members and event attendees being added or renewed in the Gang Database, which the Court has already determined is an actual, rather than hypothetical, injury.[228] Progeny has shown with specific facts and evidence that this risk is palpable and that it is the foremost consideration when planning many events.[229]

---

question than whether a statute—here, K.S.A. § 21-6313—is unconstitutionally vague. Unconstitutionally vague statutes by their very nature impart the same injury to all persons.").

[224] *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021).

[225] Doc. 28 at 25 ("In particular, the Court is persuaded that designation as a gang member inescapably implies that a person is involved, at least in some capacity, with criminal activity, which is generally recognized as defamatory *per se* under relevant state law."); *see also Paul*, 424 U.S. at 697 ("Imputing criminal behavior to an individual is generally considered defamatory per se.").

[226] Doc. 205 at 31.

[227] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014); *D.L.S.*, 374 F.3d at 975; *Laird*, 408 U.S. at 14; *Ward*, 321 F.3d at 1267.

[228] Doc. 28 at 18.

[229] *See* Doc. 207 at 72–74, 80; *see also supra* Sections IV.B.2.ii-iii (Progeny's First Amendment rights are implicated by their members' inclusion in the Gang Database).

These injuries are continuous and ongoing. Once labeled a gang member, that designation remains forever—gang members remain "gang members" regardless of whether they are "active" or "inactive." *See* PTO Stip. ¶ 38. Once designated, the threat of accompanying legal and personal consequences attaches, and the harm persists unabated. Plaintiffs and the class they represent have suffered ongoing, concrete, particularized, and imminent harms sufficient for Article III standing.

### B.    Plaintiffs' injuries are traceable to Defendant's actions.

Defendant contends that Plaintiffs lack standing because, in essence, Defendant has done no wrong. Defendant looks to blame everyone else in the criminal justice system for the harms Plaintiffs allege, ignoring its own discretionary role in labeling Plaintiffs and class members as gang members—the underlying source of all Plaintiffs' injuries. However, standing only requires that the alleged harms can be *traced back* to Defendant, not that Defendant itself performed a particular harmful action. As the Supreme Court has stated, "the 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court."[230]

Other agencies explicitly and directly rely on WPD's determination that an individual is a "gang member" in imposing the consequences of that designation. For instance, Policy 527 requires WPD officers to identify whether a person is designated in the Gang Database in an arrest affidavit for a person felony, which prosecutors rely on for seeking the enhanced bond under K.S.A. 21-6316. PTO Stip. ¶ 46; *see also* PSOF ¶¶ 23, 25.

In cases of both pre-trial release and post-conviction confinement and gang conditions, the harms Plaintiffs experienced are unquestionably traceable to Defendant. A plethora of documents

---

[230] *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976) (emphasis omitted).

shows that the Sedgwick County District Attorney's Office, the Sedgwick County Department of Corrections, and the Kansas Department of Corrections all directly rely on the Gang Database in determining the conditions to be imposed. PSOF ¶¶ 25-27, 88. Swaths of emails reveal that the WPD shares Gang Database information directly with the District Attorney's Office for enhancing individuals' bonds, and with correctional agencies to facilitate stricter parole and probation terms. *Id.* Other agencies also rely heavily on the WPD's determination of whether someone is a gang member. PSOF ¶¶ 27, 88. Not only does the WPD provide the necessary information, they also assist in drafting other agencies' policies on gang conditions. PSOF ¶ 88. The WPD then aggressively enforces those gang conditions. Indeed, Policy 527 tasks Gang Unit officers with "monitor[ing] documented gang members and associates for any violations of their parole, probation/parole, bond, and pretrial restrictions" and "immediately report[ing] this to the proper supervising authority with the intent of removing the offender from the community."[231] PSOF ¶ 3.

All of these injuries can be traced directly back to Defendant's use and maintenance of the Gang Database.[232] The second prong of the standing inquiry is therefore satisfied.

### C.    A decision in Plaintiffs' favor would redress their grievances.

Granting Plaintiffs' requested declaratory and injunctive relief would redress their grievances: it would ensure that Defendant could no longer enforce an unconstitutionally vague and overbroad statute and policy in a manner that violates Plaintiffs' First and Fourteenth Amendment rights. The Court already concluded as much in rejecting much of Defendant's

---

[231] The WPD has even gone so far as to create a specialty unit for monitoring purported gang members for probation or parole violations with the goal of returning these individuals back to jail. PSOF ¶ 90.

[232] Defendant does not argue that Progeny's harms described above are not fairly traceable to the WPD's actions. In denying Defendant's Motion to Dismiss on this point, the Court found that the risk of Progeny staff and members being added to or renewed in the Gang Database for assembling would be a violation of Progeny's First Amendment rights, and this injury is fairly traceable to Defendant's conduct because it maintains and uses the Gang Database under the color of law. Doc. 28 at 18. The same remains true at summary judgment.

Motion to Dismiss, which raised identical standing arguments as its Motion for Summary Judgment.[233] Nothing has changed since then. The Court should again reject this recycled argument and find that Plaintiffs have met the third prong of the standing inquiry.

In all, Plaintiffs have demonstrated that they possess Article III standing to pursue their claims. Defendant's arguments otherwise should be overruled.

## CONCLUSION

Defendant demands the Court ignore abundant record evidence, summary judgment principles, and the law. For all the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion for Summary Judgment.

Date: October 20, 2023

Respectfully submitted,

SHOOK, HARDY & BACON LLP

/s/ Jordan C. Baehr
Jordan C. Baehr KS #27213
Thomas J. Sullivan (admitted *pro hac vice*)
Mitchell F. Engel KS #78766
Paul M. Vogel KSD #79022
2555 Grand Boulevard
Kansas City, MO 64108
Phone: (816) 474-6550
tsullivan@shb.com
mengel@shb.com
jbaehr@shb.com
pvogel@shb.com

KANSAS APPLESEED CENTER FOR
LAW AND JUSTICE, INC.

/s/ Teresa A. Woody
Teresa A. Woody KS #16949
211 E. 8th Street, Suite D

---

[233] *See* Doc. 28 at 1 ("Finally, it is immediately clear that the third element of standing is also met for the individual, named Plaintiffs. Their injuries can be redressed by a favorable decision here, as injunctive and declaratory relief could remove them from the Gang List and dismantle it, along with the statutes and policies that give life to the list.").

Lawrence, KS 66044
Phone: (785) 251-8160
twoody@kansasappleseed.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF KANSAS

/s/ Sharon Brett
Sharon Brett KS #28696
Karen Leve KS #29580
Kunyu Ching KS #29807
10561 Barkley St. Ste 500
Overland Park, KS 66212
Phone: (913) 490-4100
sbrett@aclukansas.org
kleve@aclukansas.org
kching@aclukansas.org

ATTORNEYS FOR PLAINTIFFS,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of October 2023, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which will send notifications of such

filing to the e-mail addresses of all counsel of record.

/s/ Jordan C. Baehr
Jordan C. Baehr KS #27213
2555 Grand Boulevard
Kansas City, MO 64108
Phone: (816) 474-6550
jbaehr@shb.com