## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PROGENY, a program of Destination Innovations, Inc.,
CHRISTOPHER COOPER, ELBERT COSTELLO,
MARTEL COSTELLO, and JEREMY LEVY, JR.,
on behalf of themselves and others similarly situated,

Plaintiffs,

vs.                                                      Case No. 6:21-cv-01100-EFM-ADM

CITY OF WICHITA, KANSAS,

Defendant.

---

### Response to Plaintiffs' Motion for Summary Judgment, Doc. 207

Defendant opposes plaintiffs' motion for summary judgment.

### I. Response to Plaintiffs' Statement of Facts (PSOF)

The majority of Plaintiffs' Statements of Fact should be disregarded. The PSOF is replete with legal arguments, rhetoric, conclusions, and facts not supported by the cited record or admissible evidence. Many do not contain a concise statement of a material fact supported by a citation, with particularity, to the record that establishes a fact. This is contrary to D.Kan. Rule 56.1(a), the argument should be disregarded, and the court should not consider the argument as a "fact" under Rule 56 or D.Kan. Rule 56.1.

Below, Defendant also refers to Defendant's Statement of Facts (DSOF) from Doc. 205.

*1. Plaintiffs incorporate all stipulated facts pled in the Pretrial Order (Doc. 196)*

Response: PSOF ¶ 1. Uncontroverted.

*2. The WPD Gang/Felony Assault Unit (the "Gang Unit") consists of officers, detectives, and supervisors. This includes (1) twelve detectives working primarily on gang and felony assault crimes, three detectives working primarily as liaisons to task forces with federal agencies, and multiple gang intelligence officers; (2) a*

*Violent Crime Community* Response *Team ("VCCRT") comprised of a sergeant, six officers, and a community service officer; and (3) a Juvenile Intervention Unit that includes two officers.*

Response: PSOF ¶ 2. Uncontroverted

*3.      The officers in the Gang Unit are responsible for designating citizens as gang members; adding them to the Master Gang Database and Gang List pursuant to Policy 527; and "monitor[ing] documented gang members and associates for any violations of their parole, probation/parole, bond, pretrial restrictions and report[ing] this to the proper supervising authority with the intent of removing the offender from the community" in accordance with Policy 527.6*

Response: PSOF ¶ 3 Uncontroverted. There are two Gang Intelligence Officers within the

Gang/Felony Assault Unit who evaluate a nomination to the gang list.

*4.      Officers of color are, and historically have been, underrepresented in the Gang Unit, VCCRT, and other WPD units or divisions responsible for implementing Policy 527, including in leadership.7*

Response: PSOF ¶ 4 Uncontroverted but immaterial to the Plaintiffs' motion.

**B.      K.S.A. 21-6313, Policy 527, and the Mechanics of the Gang Database**

*5.      K.S.A. 21-6313 is based on a WPD policy that would eventually become Policy 527 and was authored by former WPD Gang Unit Lieutenant and current Sedgwick County Sheriff Jeff Easter. During the process of enacting the gang legislation Easter drafted, some Kansas state senators voiced concerns that the proposed statute was "intrusive" and "overreaching." 8*

Response: PSOF ¶ 5. Uncontroverted.

*6.      Some WPD personnel refer to the Gang Database as the Master Gang List or simply the "database" or "gang list," and these terms are used interchangeably in WPD documents.9*

Response: PSOF ¶ 6 is controverted. While occasional misstatements occur, the Master Gang List

is a report of active criminal street gang members and associates, while the Gang Database is a

repository for intelligence information pertaining to current or former gang membership.

*7.      The WPD only reviews Policy 527 every 24 months because it is considered a non- "critical" policy. Policy 527 last underwent review in August 2019. The WPD has refused to revise the policy during the pendency of this lawsuit.10*

Response: PSOF ¶ 7. Uncontroverted but incomplete and misleading: only use of force policies are reviewed annually. Baird dep. 25:16-23.

### Adding People to the Gang Database

*8.       WPD officers have wide discretion as to whether to nominate an individual who meets one or more of the criteria for inclusion in the Gang Database.11 Some WPD personnel nominate more individuals for inclusion in the Gang Database than other WPD personnel.12*

Response: PSOF ¶ 8. Uncontroverted but misleading. Nomination to the gang list is distinct from inclusion on the gang list. *See* PTO Stip. 23. Inclusion in the database is not based solely on an officer's nomination. The Gang Intelligence Officers conduct additional research before adding the individual to the database. *See* DSOF ¶¶ 32-52. Ex. 13 does not support this statement and is speculative testimony that inconsistencies result. *See* DSOF ¶¶ 34-37 and 44.

*9.       A person need not be convicted of, charged with, accused of, or suspected of participation in any criminal act in order to be designated as a criminal street gang member and included in the Gang Database.13*

Response: PSOF ¶ 9. Controverted in part. By statute, the membership designated is belonging to a criminal street gang, as defined in K.S.A. 21-6313(a). Further, Defendant objects to Ex. 15 as irrelevant to this statement. *See* DSOF ¶11.

*10.       The WPD has included individuals in the Gang Database who have never been accused of, charged with, or convicted of any criminal act.14 There have been individual identified in the Gang Database who did not meet the criteria for criminal street gang membership or criminal street gang associateship under K.S.A. 21-6313 and Policy 527.15*

Response: PSOF ¶ 10 Uncontroverted. However, the information is audited annually and errors are corrected anytime one is found. *See* Response to PSOF 35. *See also* DSOF ¶ 51.

### Active, Inactive, and Associate Designations within the Gang Database

*11.       Under Policy 527, the WPD shifts an individual's status in the Gang Database from "active" to "inactive" if, after three years, "there is no documented activity."16*

Response: PSOF ¶ 11 Uncontroverted.

> 12.     WPD personnel have renewed individuals' "active" status in the Gang Database for an additional three years based on a single instance of the individual wearing clothing of a certain color or sports team.17 WPD personnel have also maintained or renewed individuals' "active" status for an additional three years based on a single observation of them at a family funeral attended by others the WPD had designated as gang members,18 or an individual's statement or the officer's belief that members of the individual's family are in gangs.19

Response: PSOF ¶ 12. Uncontroverted in part. Defendant agrees an individual may be renewed for continuing to display affiliation with a specific gang. Controverted that persons are maintained or renewed based upon "an individual's statement or the officer's belief that members of the individual's family are in gangs." Plaintiffs' citation in footnote 19 does not support this statement as required by Fed. R. Civ P. 56(c)(1). In WICHITA 052433, the individual was renewed for arrests, posting photos of himself on social media in colors using hand signs and gang terminology. In WICHITA 053640, the individual was added as an associate when his brother admitted both were gang members and officers had several recent contacts with them both.

> 13.     WPD personnel have also renewed individuals in the Gang Database for being the victim of a crime—for example, suffering domestic violence by someone in the Database, or being shot by people in the Database—while around others also designated as gang members.20

Response: PSOF ¶ 13 is controverted. The record cited by the Plaintiff does not support the statement as required by Fed. R. Civ P. 56(c)(1). In WICHITA 023199, the individual was renewed because they were shot by rival gang member at a party. In WICHITA 052165, the individual was renewed for associating with another documented gang member.

> 14.     WPD personnel have renewed individuals' designations as active gang members based on arrests for person crimes unrelated to gang activity, such as domestic violence battery.21

Response: PSOF ¶ 14 is uncontroverted, however, plaintiffs' examples do not support this statement, as required by Fed. R. Civ P. 56(c)(1). In WICHITA 054643, officers list multiple

reasons for the renewal, including child endangerment and eluding officers. In WICHITA 098933, two gang members were dating each other's ex-girlfriends and children were involved. Documentation included firearm possession violations, PFA violations, running someone off the road, gang tattoos, and recordings of "gang talk."

> 15.   If a person identified as having a gang-related tattoo manages to become *"inactive" in the Gang Database, that person can meet one of the K.S.A. 21-6313 criteria required for reactivation as an "active" gang associate or gang member if they do not attempt to remove or conceal an existing tattoo that was originally used to justify adding them to the Gang Database.*[22]

Response: PSOF ¶ 17 is uncontroverted as a finding from a task force, not testimony from the WPD.

### C.   *Racial Disparities in the Makeup of the Gang Database*

> 16.   *A robust body of social science research shows that people designated by law enforcement as gang members on gang lists nationwide are overwhelmingly Black or Latino.*[23]

Response: PSOF ¶ 16. Objection and controverted. The record cited by the Plaintiff does not support the statement, as required by Fed. R. Civ P. 56(c)(1). Dr. Muniz' testimony of what research shows is both inadmissible hearsay and lacks foundation. Muniz is unaware of a validated scientific research or study that determined the percentage of individuals involved in gang activity by ethnicity or race. Doc. 207-13, Muniz dep., 60:2-15. Further, Muniz is only able to testify that, in proportion to the population, there is a disproportionate designation of black persons, but cannot testify as to if that comparison is the appropriate one to make to determine that WPD's database disproportionately designated people. Id., 61:24-62:6.

> 17.   *One out of every 34 African American Wichita residents is in the Gang Database.*[24]

Response: PSOF ¶ 17. Immaterial and objection. It is uncontroverted as to the finding from a task force but the assertion is unsupported by the cited testimony. *Doc.* 207-21, the Racial Justice Task

Force Report, is inadmissible hearsay, and the citation to Doc. 207-7 is simply having the City's

30(b)(6) witness read from the report. The statement, even if accepted as true, is immaterial.

> *18.     The Gang Database contains a disproportionate number of persons of color in relation to the population of the City of Wichita.25 According to 2020 Census data, the City of Wichita population is 67.9% White alone, not Hispanic or Latino; 7.5% Black; and 14.1% Hispanic or Latino. The Sedgwick County population is 64.2% White alone, not Hispanic or Latino; 8.9% Black; and 15.8% Hispanic or Latino.26*

Response: PSOF ¶ 18. Uncontroverted as a comparison to the population as a whole. There is no

evidence that non-minority gangs or gang members are underrepresented in the database or on the

list.

> *19.     In the spring of 2021, Deputy Chief Jose Salcido informed WPD leadership that Black and Latinx individuals were overrepresented in the Gang Database.27 The City admitted that it had no information to contest the accuracy of a Racial Justice Task Force report's demographic statistics confirming overrepresentation—a task force that the City itself commissioned.28*

Response: PSOF ¶ 19. Converted in part. The content of Ex. 9 speaks for itself, but its accuracy is

not confirmed by WPD's 30(b)(6) designee. Further, Ex. 7 does not support the statement alleged.

> *20.     Though it is aware that Black individuals are heavily overrepresented in the Gang Database, the WPD has taken no action in* Response *to that information,29 has not done any research into why minorities make up the majority of the Gang Database, and has no plans to do so.30*

Response: PSOF ¶ 20. Controverted. The authority cited does not support the statements made.

> **D.     Use and Dissemination of Gang Database Information**

> *21.     The WPD Gang Unit instructs non-Gang Unit personnel in how to search for and identify an individual's gang status by name through its Niche electronic search system.31*

Response: PSOF ¶ 21. Uncontroverted but immaterial.

> *22.     Information including the names, photos, purported addresses, dates of birth and Social Security numbers of persons the WPD designated as gang members or associates was published in a "Gang Activity Informational Bulletin" that was publicly disseminated in October 2011.32 A citizen who had two sons and her home address listed in the bulletin complained to the WPD due to fear for her*

*family's safety. The complainant noted that the WPD put "people's lives in danger" by creating and sharing the list, and that information in the bulletin could cause individuals or their families to be targets of violence or lose Section 8 housing. Interviewing Sergeant Matt Moore acknowledged these dangers, stated that the list appeared to have been made public through the process of communicating with other law enforcement agencies, and that once the information had been disclosed, it could not be recovered.33 After reviewing the incident, the WPD determined that no policy was violated and that it would not conduct an internal investigation of the leak.34 As of 2022, the WPD continued to publish bulletins with the names, photos, and dates of birth of gang designees and even non-designated gang suspects.35*

Response: PSOF ¶ 22. Controverted. Ex 28 verifies the source of the leaked bulletin was outside the WPD—it was an employee from the jail. *See* WICHIT 056945. The leaked bulletin, WICHITA 079849-51, included confidential information regarding a local gang. There is, however, no evidence of WPD personnel sharing confidential information without criminal consequences resulting. DSOF ¶ 28-29. PSOF ¶ 22 is also immaterial. The referenced document was a Gang Activity Bulletin which clearly stated it was for Law Enforcement Use Only. There is no evidence the unauthorized disclosure of the bulletin was by a WPD employee or authorized by the WPD.

*23.    Policy 527 requires WPD personnel to include gang designation information in arrest affidavits for person felonies, even when the alleged crime is not gang-related.36 WPD personnel also ascertain and document in charging affidavits whether individuals are designated as gang members or associates in the Gang Database.37 As a result, all WPD personnel (including approximately 700 commissioned officers or employees) conducting arrests must have access to and use of the information in the Gang Database.38*

Response: PSOF ¶ 23. Controverted in part. Policy 527 speaks for itself. Ex. 4 directly contradicts the testimony provided: there is no access to the Gang Database outside of the Gang/Felony Assault Unit's Gang Intelligence Officers. *See* DSOF ¶¶ 56-57.

*24.    Similarly, WPD personnel have disclosed information from Gang Database entries in WPD trainings given to all commissioned officers and shared it with school resource officers present in Wichita schools.39*

Response: PSOF ¶ 24. Controverted in part. Information shared in training is law enforcement-only, and the information shared here with school resource officers (i.e., law enforcement officers)

concerned shots fired between two vehicles at a local Wichita high school.

> 25.    WPD personnel regularly share individuals' gang designations with other municipal, county, state, and federal law enforcement officers and agencies.40 For example, the WPD shares its Gang Database information with the Sedgwick County District Attorney's Office. Prosecutors can then seek the enhanced $50,000 minimum bail for those the WPD deems gang members or associates.41 Historically, WPD personnel have identified some designated gang members in the National Crime Information Center database, which links "criminal (and authorized noncriminal) justice agencies located in the 50 states, the District of Columbia, U.S. territories and possessions, and select foreign countries to facilitate the cooperative sharing of criminal justice information."42

Response: PSOF ¶ 25. Controverted in part. Upon request, WPD Gang Intelligence Officers collaborate with other law enforcement agencies (LEA) and share intelligence regarding an individual's status. MOUs are in place before any documents are shared between the WPD and another LEA. Ex. 36. The statement in Ex. 2 is misrepresented; Beard clarifies that the error identified was not a WPD error. Ex. 15 is not the Master Gang List - it is a list of incarcerated individuals and their confirmed gang status for classification purposes at the county jail. *See* Doc. 205-2, Easter dep. I, 26:18-27:23. WPD includes an individual's gang status on an affidavit, but the District Attorney's office determines what amount to request the judge set as the bail amount. *See* Ex. 15 - the decision to ask for $75K or more is made by the Assistant District Attorney, not the WPD. Objection to Ex. 33, ¶ 8 - this allegation is vague, lacks the necessary foundation, and is conclusory. No names, dates, or charges are provided to enable Defendant to contest this statement with particularity. It is a new allegation being made, is outside the scope of the facts previously alleged, and should be disregarded. WPD formally entered information into NCIC but no longer does. Pretrial Order Stip. ¶ 48. The historic inclusion of gang identification in NCIC is immaterial.

> 26.    The WPD likewise shares its Gang Database information with the Kansas Department of Corrections ("KDOC"). KDOC may impose enhanced prison or jail conditions and courts may impose stricter parole and probation terms on those in the Gang Database.43

Response: PSOF ¶ 26. Controverted in part. The WPD provides intelligence to the KDOC upon request, but does not know the operations of KDOC, nor does the WPD make the decisions regarding conditions or terms for those in custody at KDOC. Objection to Ex. 26 – The Sheriff's testimony is not competent to state the operations of KDOC.

> 27.     At one point, the Sedgwick County Sheriff's Office had direct access to the WPD Gang Database.44 Even today, intelligence corporals in the Sheriff's Office have direct access to the Gang Database or can at least access information about the Gang Database.45

Response: PSOF ¶ 27. Controverted as unsupported by the cited record. While the Sheriff's Office once had access, it no longer does. The Gang Database is accessible only to WPD Gang Intelligence Officers. DSOF ¶¶ 35, 57. Sheriff Easter was unsure of the current access his staff have and the Sheriff's Office (and other agencies) does not have direct access to the Gang Database, or Master Gang List. *See* Doc. 205-16, Bartel dep., 121:24-122:24; Doc. 206-6, Declaration of Jess Bernard, ¶ 8.

> 28.     At various points, WPD officers have disclosed Gang Database information to the public. A WPD officer once publicly disclosed a printed copy of the Gang List when he left it on the trunk of his WPD squad car, and the news media ultimately obtained a copy.46 In another event, a gang bulletin containing names of gang members and their respective gangs was publicly posted at a barbershop in Wichita. WPD personnel pulled this information from the Gang Database and circulated it to outside law enforcement personnel. Someone within law enforcement forwarded it to an unauthorized person who then printed and posted the bulletin.47

Response: PSOF ¶ 28. Controverted as unsupported by the cited record. There is no admissible evidence of public disclosure of confidential information by authorized WPD personnel. The known unauthorized disclosure (Nicholson) resulted in criminal charges. The testimony cited is inadmissible hearsay, lacks foundation, is vague, and conclusory, representing unverified rumors only. See DSOF ¶¶ 28-29.

> 29.     Media also apparently have access to Gang Database information. In 2021, the Wichita Eagle published an article identifying Plaintiff Elbert Costello as a

*"documented gang member."48*

Response: PSOF ¶ 29. Controverted. There is no evidence to support the Wichita Eagle obtained

information from the WPD; in contrast, the article cites the probation officer for the disclosure.

*See* Ex. 38 p. 3. Further, a retraction was later printed.

> 30.    *Former WPD Captain Wendell Nicholson was charged with and*
> *subsequently received diversion for crimes where the underlying facts included at*
> *least 22 instances of publicly sharing information derived from the Gang Database,*
> *including identifying individuals listed in the Database and their alleged gang*
> *affiliations. This occurred during Capt. Nicholson's employment with the WPD.49*

Response: PSOF ¶ 30. Controverted in part. There is no evidence to support the disclosed

information was from the Gang Database. Further, only a handful of disclosures were gang-related;

the majority of the illegally disclosed information pertained to shooting investigations.

> 31.    *On at least one occasion, a former WPD Gang Unit officer shared*
> *information with Section 8 housing authority employee Angela Cox about*
> *purported gang members living and hanging out at a residence on East Kensington,*
> *leading to the initiation of eviction proceedings against those individuals. 50 This*
> *approach is consistent with gang suppression strategies contained in Kansas Law*
> *Enforcement Training Center training materials. 51*

Response: PSOF ¶ 31. Controverted in part and immaterial. Officer Watson worked with

community resources regarding gang activity (including criminal acts) occurring in the particular

neighborhood. Any tenant may be evicted for engaging in illegal activity on the premises in

Kansas. The first sentence of PSOF ¶ 31 is not supported by the cited record. Doc. 208-10 is Officer

D. Watson's performance appraisal noting the following:

> In May, Officer Watson recognized increased gang activity at …. Members of a
> Crip gang were living and hanging out at this residence and were feuding with
> members of a Blood gang. On numerous occasions, rival gang members would
> drive past and point guns at the occupants of the house. Officer Watson worked
> with the Gang Unit and the 45 Beat Team to increase police presence in the area,
> but the problems continued. Officer Watson contacted Angela Cox with Section 8
> housing who started the eviction process based on Officer Watson's information
> about gang activity."

PSOF ¶ 31 does not involve disclosure of the Gang List or information from the Gang List—but

rather notes a Community Policing Officer working with community members to address gang activity, including conduct constituting aggravated assault. Objection to Ex. 42. This is not a training material used at KLETC and does not support the statement made.

> *32.      The disclosure of law enforcement gang designations can carry significant social stigma, including being negatively viewed by one's community, social rejection, and loss of employment opportunities, in addition to legal consequences including ineligibility for certain forms of immigration relief, and the imposition of restrictive probation and parole conditions.52*

Response: PSOF ¶ 32. Controverted and Objection to the use of plaintiffs' expert opinion to create a fact. There is no independent evidence cited to support this allegation. More importantly, this expert could not opine on any individual members of WPD's gang list having incurred a negative stigma as a result of being on the list. Exhibit 2, Muniz dep., 47:23-48:2. This included anyone that WPD listed as a gang member being limited on access to jobs or housing or participation in community life or family life. *Id*. at 55:6-22.

### E.      WPD Officers' Inconsistent and Unverified Application of K.S.A. 21-6313 and Policy 527

> *33.      After completing the police academy, most officers do not receive additional training on how to identify potential gang members under Policy 527.53 The WPD does not require Gang Unit officers to review the criteria for gang membership after graduating Academy and prior to joining the Gang Unit,54 and officers assigned to the Gang Unit do not receive any gang-unit specific training.55*

Response: PSOF ¶ 33. Controverted. Ex. 11 is a question to the officer regarding training to complete a TOPS card, not identification of potential criminal street gang members. WPD Officers receive two hours annually. DSOF ¶ 32. Objection to Ex. 14 - misrepresents the testimony and does not support the statement. Testimony concerned the officer's duties as a patrol officer, and he is certain he received training following the Academy. Exhibit 3, Inkelaar dep., 94:11-15. Further, he was not a gang intelligence officer; he completed a rotation through the Gang/Felony Assault Unit, but he was never a Gang Intelligence Officer making those decisions. *Id*. at 96:9-97:2. Gang

Intelligence Officers, on the other hand, receive a plethora of continuous training that is on-the-job, as well as training at conferences. Exhibit 4, McKenna dep., 35:7-36:3; 204:18-207:2; Exhibit 5, Beard dep., 113:9-24; Exhibit 6, Hemmert dep., 135:18-136:14; Exhibit 7, Salcido dep., 121:2-23; 214:18-215:2. *See also* DSOF ¶¶ 19, 37.

> 34.    *K.S.A. 21-6313 and Policy 527 do not limit officers' discretion in nominating an individual for inclusion in the Gang Database.56 Furthermore, K.S.A. 21-6313 and Policy 527 allow gang intelligence officers to add individuals directly to the Gang Database without review by any other WPD personnel.57*

Response: PSOF ¶ 34. Controverted in part. While nominations are not limited, Gang Intelligence Officers vet the nominations prior to inclusion. Doc. 205-6, Bernard Declaration, *see also* Doc. 205-5, Policy 527 § 1.B.1 ("The information will be researched by a member of the Gang/Felony Assault Section or VCCRT. … . The individual will be added to the Master Gang List if they meet the criteria defined in K.S.A. 21-6313."). Further, Gang Intelligence Officers use their experience, as well as discussions with other GIOs, to determine if an individual would be documented. *See* DSOF ¶¶ 32-47.

> 35.    *As a result, each officer applies the statutory criteria differently.58 Former Capt. Nicholson testified that the criteria are "subjective sorts of things."59 Deputy Chief Salcido likewise affirmed that there were several aspects of K.S.A. 21-6313 that are subjective, and understandings could vary between officers.60 Former WPD Sergeant Sage Hemmert stated that application of K.S.A. 21-6313's criteria depends on "context" and admitted that WPD officers can interpret the criteria differently.61 At least one officer admits to relying on their personal judgment and not the language of the statutory criteria in determining whether individuals meet the criteria for gang membership.62*

Response: PSOF ¶ 35. Controverted. Testimony demonstrated the care and detail WPD officers extend when reviewing the statutory criteria and reviewing each other's work. *See e.g.*, Doc. 205-3, McKenna dep., 153:21-155:10. Further, the annual audit requires a subsequent review of every entry by peer officers. Doc. 205-17, Gilmore dep., 98:15-25; Doc. 205-8, Beard dep., 88:15-89:4, 90:8-11. This is because WPD officers understand accuracy is important. Doc., 205-13, Speer dep.,

56:25-57:12 Additionally, Gang Intelligence Officers know more about these gangs and their relationships with each other more than other officers, even between other LEAs. Exhibit 4, McKenna dep., 212:9-17. These observations are researched and reviewed and made in the context of the whole situation. Ex. 36; *see also* Doc. 205-3, McKenna dep., 164:9-16. Deputy Chief Salcido stated mistakes are "very improbable." Exhibit 7, Salcido dep., 316:11-318:4.

> 36.    Even if an individual meets three criteria for gang membership under K.S.A. 21- 6313, a gang intelligence officer might exercise their discretion and choose not to add them to the Gang Database, or may add them as an associate instead of a member.63 For example, Det. Kevin McKenna would not designate a lawyer who represents gang members while wearing a blue tie.64

Response: PSOF ¶ 36 Controverted in part. See Response to PSOF 35. Ex 11 demonstrates the contextual reasons WPD Gang Intelligence Officers review the criteria listed in K.S.A. 21-6313(b) - there has to be a criminal street gang an individual is identified as associating with or being a member of under K.S.A. 21-6313(a) first. This fact continues to ignore the testimony of this consideration.

> 37.    Some gang intelligence officers are not necessarily concerned with whether an individual is truly a gang member when adding them to the Gang Database, but rather only with whether they meet the criteria set out in Policy 527 and K.S.A. 21-6313.65

Response: PSOF ¶ 37. Controverted. This statement misrepresents the testimony provided. Ex. 11, Officer McKenna explained an individual may be included whether or not the leadership of the gang recognized them as a true member because officers do not verify membership with each gang's leader. Ex 43 is one slide of a presentation that trains: "Proper documentation = accurate information" and states "don't make assumptions ... distribution of inaccurate information enhances the problem." - a direct conflict with the statement this exhibit is purported to support.

> 38.    Some WPD officers believe that strictly applying the criteria stated in K.S.A. 21- 6313 and Policy 527 is not enough to reliably identify individuals as gang members; they prefer additional context and evidence to make that determination. But other officers add individuals to the Gang Database and even testify to a

*defendant's gang status in criminal proceedings based on nothing more than meeting the express criteria in K.S.A. 21-6313 and Policy 527.66*

Response: PSOF ¶ 38 Controverted. The authority cited by plaintiffs does not affirm the contention that some officers do not believe the criteria are enough to reliably identify individuals, nor does it support that other officers add or testify to a criminal defendant's gang inclusion ""based on nothing more than" criteria. All determinations are made in the context of K.S.A. 21-6313(a), are vetted, and audited routinely. *See* Responses to PSOF 34-36.

> *39.    WPD officers can add individuals to the Gang Database or renew their status based solely on social media postings.67 The WPD does not monitor Gang Unit officers' use of social media for Gang Database purposes, nor does the WPD verify the social media evidence officers collect as purported proof of gang affiliation.68 The WPD permits Gang Unit officers to create fake social media accounts to monitor individuals' social media activity, which Deputy Chief Salcido confirmed officers use to justify additions and renewals to the Gang Database.69*

Response: PSOF ¶ 39. Controverted in part. Social media expressions of gang affiliation are used to renew an individual's inclusion on the Master Gang List. PTO Stip. 41. This information is downloaded and retained to verify the determination, Doc. 205-8, Beard dep., 149:3-7; and is only one part of what officers review, Exhibit 5, Beard dep., 64:3-13 (clarifying earlier testimony: "I know you said just social media, but, again, I would have to say that we would look at cases and several other things. So when I say that I just added people based on social media alone, that might be incorrect...I would definitely look up cases [.]"). Further, WPD supervisors are notified of fake accounts set up for investigatory purposes, WICHITA 060401, *see also* Doc. 207-16, Salcido dep., 306:21-307:18; and the annual audit provides a routine review of all designations. *See* Responses to PSOF 35. Objection to Ex. 44: this presentation is on street gang graffiti and tagging and does not support the statement plaintiffs purport.

> *40.    Gang Unit personnel have counted a single instance of an individual using a gang hand sign/handshake on social media as a self-admission of gang membership.70 Gang Unit personnel have also counted a single observation of an individual purportedly using gang signs on social media as satisfying at least two*

*separate criteria for renewing and re-designating a previously inactive gang member as an active gang associate.71*

Response: PSOF ¶ 40. Controverted. The authority cited by plaintiffs does not support this contention. In WICHITA 053640, the entry on 09/28/2020 referencing Facebook is a photo of an individual conducting a Latin king crown/hand sign handshake with another active Latin king member; this was not a "self-admit" as plaintiffs' statement alleged; the only self-admit entry was made on 9/28/2008 but does not reference Facebook. Further, WICHITA 053918 was not a "single observation. " The Facebook story video documented an individual's display of four separate gang hand signs.

*41.    The WPD's Gang Database policies are notably similar to the policies of other law enforcement agencies, including the Los Angeles Police Department, where inaccurate and falsified gang designations were internally investigated and publicly disclosed, leading to reforms in the database policies.72*

Response: PSOF ¶ 41. Controverted. The authority cited by plaintiffs and accessible to Defendant does not support this contention. The articles cited by plaintiffs contain broken links and/or are behind paywalls and inaccessible to Defendant. Plaintiffs provide no documented evidence to support how or where LAPD policies are like those of the WPD. The plaintiffs' expert did not review gang entries from WPD to compare to the LAPD, Exhibit 2, Muniz dep., 26:15; 28:17-18; and did not consider other events that caused CalGang database problems, such as officer misconduct. *Id*. at 42:24-43:11.

*42.    The fact that the criteria are poorly defined also makes it difficult for individual citizens to avoid meeting those criteria unknowingly and unintentionally.73*

Response: PSOF ¶ 42. Controverted. The authority cited by plaintiffs does not support this contention. Muniz testifies her opinion is that the words are vague and overbroad but does not opine as to the difficulty of "individual citizens to avoid meeting those criteria unknowingly and unintentionally." Further, the criteria in the statute are not vague when officers consistently apply

their training and experience in context. Exhibit 8, Mateo dep., 106:24-110:25. *See* DSOF ¶¶ 19, 32-47, 48-52.

> *43.     There are individuals designated as gang members or associates in the Gang Database who maintain that they are not, or have never been, a member of a criminal street gang or an "associate" of a criminal street gang.74 Former Capt. Nicholson agreed that as written, the policy and statute can "lead to incorrectly identifying people in the community as gang members."75*

Response: PSOF ¶ 43. Uncontroverted but immaterial. That the Plaintiffs and others profess they are not and were never gang members or associates, there is no dispute that objective evidence led the WPD to identify them as such. *See* DSOF ¶¶ 19, 32-47, 48-52.

> *44.     There are WPD personnel who themselves meet two or more criteria of criminal street gang membership or associateship—including the "Three-Percenters," a criminal militia group whose members have been indicted and convicted for organized federal criminal activity— yet they are not designated as criminal street gang members or associates in the Gang Database.76 And WPD personnel are aware of individuals who meet three or more criteria of criminal street gang membership but are not designated as criminal street gang members in the Gang Database.77*

Response: PSOF ¶ 44. Controverted. *See* Defendant's response to PSOF ¶¶ 9, 36. The record cited by the Plaintiff does not support the statement as required by Fed. R. Civ P. 56(c)(1). The authority cited by plaintiffs in Ex. 18 does not support this contention. Salcido testified his dress "could have" looked like gang colors "to the untrained eye" 58:11-14; he speculated an officer followed him "because he thought I looked like a gang member" but then admits "I don't know who that officer was," 58:18-20 and has no evidence this was true. Salcido makes no mention of a criminal militia or "Three-Percenters" to support this statement. The record cited by the Plaintiff in Ex. 49 also does not support the statement. No evidence referenced by footnote 77 supports the statement regarding WPD's discretion to omit persons who meet criteria but in context do not fit the definition for inclusion. Objection to Ex. 50, a press release from the US Attorney's Office is irrelevant to the statement it is used to support. Objection to Ex. 51, Overview printed from a

website with a banner across the top making it difficult to read is unrelated to the statement it is used to support. Objection to Ex. 11, testimony by McKenna describes being unable to add an inactive gang member and does not support statement; second reference is McKenna's response of "I don't know" when he is asked if Three-Percenters operate in Kansas; this is also irrelevant to the statement it is used to support.

### Self-Admission

45.     Under K.S.A. 21-6313, information from a parent or guardian, a confidential informant, or another law enforcement agency or correctional facility could qualify as evidence of gang membership.78 However, there is "no . . . set standard" for what constitutes a documented reliable informant.79

Response: PSOF ¶ 45. Uncontroverted that the statute permits information from other individuals to be considered as meeting criteria for inclusion. The record cited by the Plaintiff in Ex. 3 does not support the statement as required by Fed. R. Civ P. 56(c)(1): Bartel's statement in full says "I haven't been in the Gang Unit for about a year and I don't have all that stuff committed to memory" before they ask him to verify what the statute says. Ex. 3, Bartel dep., 131:4-6. The record cited by the Plaintiff in Ex. 52 also does not support the statement as required by Fed. R. Civ P. 56(c)(1) and misrepresents the testimony.

46.     Deputy Chief Salcido acknowledged that there is no requirement that a gang intelligence officer review body camera video footage to verify a purported self-admission. He was unable to point to any specific instance in which that actually happened.80

Response: PSOF ¶ 46. Controverted. Gang Intelligence Officers are required to research information reported on a TOPS card, see Doc. 205-5, Policy 527 § 1.B.1, and all information on the Master Gang List annually during the audit. Further, plaintiffs' questions during this testimony are objected to as leading, calling for speculation, and argumentative. Testimony demonstrated in practice, officers do review the AXON video for self-admitting gang members or associates. *See* DSOF 44.

*47.    Some WPD officers mark the "self-admit" criterion as satisfied based not on a direct admission to the officer, but rather on other interactions that they overheard.81 Other officers require an admission made directly to the officer by the individual themselves in order to mark an individual as a self-admit.82 WPD officers have considered (1) being in the presence of others in the Database, (2) being arrested with others in the Database, (3) stating that one "has hung out with [gang] members in the past," and (4) having a tattoo of the as a self-admission.83 A single video showing a person throwing hand signs may also be counted as a self-admission or satisfying two separate criteria for gang associateship.84*

Response: PSOF ¶ 47. Controverted in part. If an officer is a witness to an individual's statement of self-admitting gang membership, it can be validated even if that officer wasn't directly being addressed. "Some WPD officers" does not mean the Gang Intelligence officers who actually maintain the database. The testimony cited is misleading, in Exs. 2 and 36 the witnesses were not asked specifically to differentiate between these situations. WICHITA 053925 is an obvious clerical error and no evidence supports the contention that WPD officers routinely mark "self-admit" as the reason for inclusion when three or more other factors are present. See also Response to PSOF 40 [WICHITA 053918 was not a "single observation." The Facebook story video documented an individual's display of four separate gang hand signs.] And K.S.A. 21-6313 does require three or more criteria to be met, not that a single photo or instance displaying multiple criteria be counted only once. PTO Stip. 25.

### *"Frequenting" a "Criminal Street Gang Area"*

*48.    Policy 527 does not define "particular criminal street gang's area," nor does it establish criteria for determining what constitutes a "particular street gang's area," as used in K.S.A. 21-6313(b)(2)(D) and applied by the WPD in designating individuals as gang members or associates in its Gang Database.85 Officers interpret and apply that criterion based on their individual knowledge and experience.86 The WPD has no documented criteria or guidelines for what constitutes a gang area or location.87*

Response: PSOF ¶ 48. Controverted in part. Officers understand the various neighborhoods in Wichita and learn where gang areas are, when they move, and where they move. This intelligence is shared among officers and between agencies. Wichita gangs do not indefinitely "claim" a

specific area—meaning there are no permanently defined borders. Rather, there are areas that are considered gang conflict areas that the officers learn from their training and intelligence sharing/gathering. Doc. 206-17, Salcido dep., 205:16-206:01. Officers use training, and experience, in addition to collaboration/intelligence sharing with other officers and LEAs. Ex. 7, Beard 30(b)(6) dep., 116:17-22, listing: multiple resources, including police cases, personal knowledge, informants, interviews, 911 calls, complaints, Crime Stoppers tips, to establish a gang location. *See also* DSOF ¶ 37

There were neighborhoods with gang members and particular gang houses and most of the beat officers knew where those were. "[M]ost beat officers knew that. We knew it from neighborhood members who wanted us to do something about them in their neighborhood and that's generally how we got the information." Ex. 22, Easter dep. vol. II, 55:21-56:17.

A statutory definition of a gang area is impractical because they change from city to city and over time. Doc. 205-2, Easter dep. vol. II, 54:21-55:20. The testimony cited in Ex. 7 is inadmissible speculation.

Objection to Ex. 14, used in footnotes 85, and 86. The citation is inaccurate, Defendant cannot discern what testimony is being referenced.

> 49. *Individuals may only learn that the WPD considers certain areas of the city or businesses to be "gang areas" when they are prohibited from frequenting those areas or businesses as a condition of probation or parole.*[88]

Response: PSOF ¶ 49. Objection and controverted as unsupported by the cited record. Whether conditions of probation or parole restrict frequenting a given area is not evidence the WPD considers the given area a "gang area." The cited testimony in Ex. 2 makes clear that (1) the conditions are set by probation/parole officers and not the WPD and (2) the prohibition is being present without a legitimate reason. Ex. 2, Beard dep., 244:11-245:6. Probationers/parolees are provided details as to the areas they are prohibited from frequenting by their probation/parole

officers. *See e.g.*, BATES Wichita 047485-515 (documenting probationers' signature on restriction and on the map they were provided showing the prohibited areas).

> 50.     *WPD officers routinely surveil places they believe to be associated with gangs, even purported gang members'      .89 The WPD adds individuals to the Gang Database merely because officers witnesses them "hanging out" at those locations.90 However, WPD officers acknowledge that street gangs are no longer associated with specific geographic locations.91*

Response: PSOF ¶ 50. Controverted in part. Defendant agrees the duties of Gang Intelligence Officer include watching locations where criminal activity may occur. Defendant agrees associating with other gang members is a criterion for consideration to validate a gang member or associate. The cited record does not support the assertion that WPD adds individuals to the Gang Database merely because officers witness them "hanging out" at a given location. Gilmore testified individuals may be documented for "being with documented gang members, clothing, hanging out at gang hang outs, committing gang crimes." Ex. 8, Gilmore dep., 51:13-15. Ex. 44, WICHITA 085578 is a single slide from a PowerPoint presentation on gang graffiti and street tagging and does not support the statement made. Ex. 11, McKenna explained that, given the advent of the internet and social media, an individual no longer must be from an area to claim gang affiliation with that area. *See also* Def's responses to PSOF 48.

> 51.     *At least one WPD officer admits that there is no way to avoid going into a potential "gang area" for purposes of avoiding inclusion in the Gang Database, and many officers are unable to define what "gang area" means.92*

Response: Objection. PSOF ¶ 51 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 51 is Controverted. The record cited by the Plaintiff at Ex. 14 does not support the statement as required by Fed. R. Civ P. 56(c)(1): Inkelaar testified that he uses his knowledge of the neighborhoods in combination with his past experiences. Ex. 52 is the testimony of a non-gang intelligence officer, so is irrelevant to this statement. Ex. 36, Hemmert states only that he would

look more into a TOPS report that stated an individual claimed a specific territory. *See* Responses

to PSOF 48.

> 52.    Likewise, WPD officers differ in their interpretation of what "frequenting"
> a gang area under K.S.A. 21-6313(b)(2)(D) means.93 Deputy Chief Salcido
> believes "frequent" means to "linger there for many days . . . four or five, six . . .
> or more." To his knowledge, the WPD does not provide a standard definition for
> "frequents" and there is no training or instructions given to auditors on its
> meaning. He describes "frequents" as "subjective" and "open to interpretation"
> and therefore different officers could view it differently.94

Response: Objection. PSOF ¶ 52 should be disregarded—it is improper argument and not a concise

statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 52

is Controverted. "Frequents" is commonly understood and used in its common usage. The record

cited, Ex. 14, does not support the statement as required by Rule 56(c)(1).: Inkelaar's testimony is

mischaracterized: he said an officer's interpretation could differ, not that they do differ. Ex. 18,

Salcido said he was not trained as a Gang Intelligence Officer, then explained what "frequents"

means and did not give a specific number. The cited record does not support the assertion or

inference that WPD officers are unable to understand the term "frequents" in its common usage or

that errors in the Master Gang List result from differing interpretations.

> 53.    The WPD admits that a Gang Unit officer could apply the "frequents a
> particular street gang's area" criterion to identify a person as a gang member or
> associate because the WPD has identified their family member's house as a
> "criminal street gang area."95

Response: PSOF ¶ 53. Objection. PSOF ¶ 53 should be disregarded—it is improper argument and

not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a).

PSOF ¶ 53 Controverted in part. The record cited, Ex. 55, does not support the statement.

WICHITA 121147 is an email describing 19 criminal cases against one person residing at a

location amounting to a nuisance "due to the number of violent crimes that have occurred at the

house due to gang activity." Also, meeting a criterion under K.S.A. 21-6313(b) is distinct from

violating a probation/parole condition to refrain from frequenting without a legitimate reason. *See* Response to PSOF 49. Plaintiffs cite to no evidence to support an inference that WPD officers are unable to understand the term in its common usage or that errors in the Master Gang List result from differing interpretations.

> *54.     The "frequenting" a gang area criterion in Policy 527 applies even to visiting family members. There is no written exception to allow someone to visit a family member at one of these residences when applying the criteria in K.S.A. 21-6313.96 People designated as gang members are subject to restrictions on associating with family members who are also designated as gang members, which could result in them being unable to live with family members.97*

Response: PSOF ¶ 54. Objection. PSOF ¶ 54 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 54 is Controverted in part. As with PSOF ¶ 53, Plaintiffs conflate criteria for gang identification with probation/parole conditions. Defendant agrees that associating with non-immediate family members is a potential justification for inclusion on the Master Gang List as a member or associate. *See* DSOF 41. Defendant agrees being with felons (related or not) could violate conditions of probation/parole. Controvert as to Ex. 2: Beard did not say is common for large families to live together. Exhibits 32, 23, 30, 33, and 31 do not support the statement. The violations of record include a curfew violation (not a gang condition or being in the presence of another person gang member). However, the declarations do not specify a single violation attributable to a family member, choice of residence, or a lack of understanding of the conditions of probation/parole. Further, there is no foundation to assume a condition was a result of being on the Gang List, as opposed to a condition placed on other probationers, including curfews and prohibition of association with felons. *See* DSOF ¶ 41.

### F.     No Notice of Inclusion in Gang Database

> *55.     The WPD does not provide notice to any adult designated as a gang member or gang associate of their inclusion in the Gang Database,98 nor do they notify*

*adults when the WPD renews their inclusion in the Database, or moves them from inactive to active.99*

Response: PSOF ¶ 55. Uncontroverted.

> *56.     Policy 527 only requires that officers attempt to notify the parents or guardians of juveniles when the WPD adds the juvenile to the Gang Database.100 The WPD's attempts are demonstrably unsuccessful, managing to notify no more than 50% of juveniles (or the parents or guardians thereof).101*

Response: PSOF ¶ 56. Uncontroverted in part. Policy 527 requires WPD officers to attempt contact with a juvenile's guardian, and WPD has improved the process; when the initial process of sending certified mail reflected a low acceptance rate, officers began making phone calls and physically visiting the homes to attempt contact. Exhibit 5, Beard dep., 107:4-15; 139:10-23. Current practice is for gang officers and juvenile intervention unit officers to visit the for personal contact and only use phone attempts when multiple visits to home and school have been unsuccessful. *Id*., 139:24-140:15; Ex. 7, Beard 30b6 dep., 24:9-12. *See also* DSOF ¶¶ 59-61.

Objection, the remainder of PSOF ¶ 56 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a).

> *57.     Failure to notify individuals designated as gang members and associates in the Gang Database creates inaccuracies. For this very reason, other U.S. law enforcement departments with similar gang databases do have notification and removal processes.102*

Response: PSOF ¶ 57. Objection. PSOF ¶ 57 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a).

Response: PSOF ¶ 57 is controverted. The cited record does not support the statement as required by Fed. R. Civ P. 56(c)(1). There is no evidence to support the notion a notification process prevents inaccuracies, or that inaccuracies are caused by a failure to notify adults of their inclusion or renewal. Further, the annual audit process protects against inaccuracies, *See* Response to PSOF

35. *See also*, Exhibit 8, Mateo dep., 103:19-24, opining the process WPD has in place for vetting and audit provides a check and balances process to reduce or eliminate inaccuracies. *See* DSOF ¶ 53.

### No Opportunity to Challenge Inclusion in the Gang Database

*58.    The WPD does not afford individuals added to or included in the Gang Database as gang members or associates with an opportunity to challenge their inclusion.103*

Response: PSOF ¶ 58. Controverted. While no policy requires a person to be provided an opportunity to challenge, (PTO Stip. 36), in practice, any individual may request a meeting with the WPD to learn the reasons for their inclusion and present information to rebut the designation. DSOF ¶ 53.  Further, all individuals are provided an opportunity to challenge their designation prior to the imposition of any consequence: to a judge setting bail/bond and prior to the conditions of probation/parole imposed. Ex. 31, a declaration by a public defender, ¶ 8 is inaccurate; any criminal defendant can challenge the designation to the judge making the determination to impose sanctions as a consequence of the evidence presented by the WPD to the court. K.S.A. 22-2802 requires an individualized assessment by the magistrate with respect to the availability of bail, release prior to trial, the conditions of release, the amount of an appearance bond, and whether to require cash bond or personal recognizance. Ex. 14 does not support the statement, Inkelaar testified about his personal opinion, not what the WPD does or does not do in policy or practice.

*59.    The City recognizes that there should be a procedural application for removal from the Gang Database, but no such procedure exists.104*

Response: PSOF ¶ 59. Uncontroverted but immaterial.

*60.    In 2021, Deputy Chief Salcido proposed revisions to Policy 527 that would create a new process for providing notice to those added to the Gang Database and allowing individuals to petition for removal from the Gang Database.105 However, Lt. Jason Bartel, the Gang Unit commander at the time, was opposed to making the changes and argued to Deputy Chief Salcido that his proposed changes could not be made because those changes would require additional resources and because of*

*this lawsuit.106 The City of Wichita and the Fraternal Order of Police also reacted with hostility and resentment toward Deputy Chief Salcido's recommendations, and his recommendations were ultimately never adopted.107 Even now, the WPD has no plans to change its policies to address these due process problems.108*

Response: PSOF ¶ 60. Objection. PSOF ¶ 60 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 60 is controverted in part. While Salcido suggested revisions, the remainder of this statement is inaccurate and not supported by the cited record. Ex. 18 is Salcido's deposition, not an email, and is inadmissible hearsay, and does not support the statement that the review was for the intent to remove anyone. Ex. 10 footnote 106 is also inadmissible hearsay. Ex. 18 reflects Salcido talking to Ms. Johnson about serving on a board but does not support the statement made. Ex. 22 is plaintiffs' attorney reading a document aloud and does not include any testimony from Ramsay. Ex. 57 is not a right-to-sue letter; it is the K.S.A. 12-105b notice required to be sent 120 days prior to filing a suit and contains only allegations and plaintiffs' demands. Ex. 9 is an email from Salcido outlining his proposal and does not include a reaction. Plaintiffs cite no evidence to support the contention the City or the FOP reacted with hostility. The statement misrepresents the testimony from Ex. 108. The 30(b)(6) designee states the WPD was aware of Salcido's concerns and the community board was not formed because of the pending lawsuit.

*61.    Under the WPD's current practices, individuals included in the Gang Database who have not had any documented gang activity in three years are changed to "inactive" status, but they are not removed from the Database. Deputy Chief Salcido has never heard of anyone "completely dropping off the list and not being inactive," and the only time he had heard of someone being "removed" from the Master Gang List was when the WPD misattributed something to the incorrect person due to similar names.109*

Response: PSOF ¶ 61. Objection. PSOF ¶ 61 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 61 is immaterial. Only the gang intelligence officers have access to view the information

in the Gang Database. DSOF ¶ 57. The historical information in the database—criminal intelligence—is necessary to effectively investigate, solve and/or prevent crimes in the present. DSOF ¶ 55. Once inactive (i.e., removed from the Master Gang List), a person must again meet criteria (self-admit or meet the required multiple statutory criteria) before again being included on the Master Gang List. DSOF 58;  Doc. 205-5, Policy 527, § I.E.1. Access to view information on inactive members is restricted even further than access to the Master Gang List. DSOF ¶ 56.

### Insufficient Audit Process

> 62.     The WPD claims to engage in a yearly audit process that begins with examining the Master Gang List and then revising the Gang Database accordingly to mark active gang members and associates as inactive, incarcerated, or deceased.110 However, the WPD's standard operating procedure on the audit process does not provide any guidance on how to apply the statutory criteria .111

Response: PSOF ¶ 62 is controverted in part. The WPD performs an annual audit and reviews active criminal street gang members in the Master Gang List to verify inclusion. *See* Response to PSOF 34-36. The audit SOP directs that "Each person in the Gang Database will be researched to see if they continue to meet the criteria of gang member, associate, incarcerated, or deceased." There is a checklist for the audit process. Ex. 2, Beard dep., 42:10-12, pp. 81-82, 85-86, 87-90.

> 63.     Deputy Chief Salcido repeatedly acknowledged the lack of any methodology in the audit,112 which is unusual even when compared to the audit processes of other U.S. law enforcement agency gang databases.113

Response: PSOF ¶ 63 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 63 is controverted. The cited record does not support the statement. Ex. 18 states the Gang Intelligence Officers are very good at vetting individuals for inclusion. There is no mention of the audit or a "repeated acknowledgment." Ex. 13 does not reflect the statement made; Muniz testified she could not find she was provided information pertaining to the audit process, nor did Muniz testify that the methodology used was "unusual." Further, Muniz did not review gang entries from WPD to

compare to the other agencies. Muniz dep., 26:15; 28:17-18, see also, Exhibit 8, Mateo dep., 103:19-24, opining the process WPD has in place for vetting and audit provides a check and balances process to reduce or eliminate inaccuracies. *See also* DSOF ¶¶ 48-51.

> *64.    The WPD's yearly audit does not include a determination on whether the gangs in the Gang Database continue to meet the criteria of K.S.A. 21-6313 for eligibility as a "criminal street gang."114 Some gangs listed in the Gang Database may no longer meet the criteria for a "criminal street gang" under K.S.A. 21-6313.115*

Response: PSOF ¶ 64 is controverted in part. Footnote 114 is overinclusive in discussing the 2006 audit and does not pertain to this statement. Footnote 115 does not support the statement and misrepresents the testimony. Ex. 7, Beard stated there could be inactive gangs in the Gang Database because the Database includes historical and inactive members/associates/gangs for research purposes. Beard clarified that gangs no longer meeting criteria would likewise be marked inactive. The Master Gang List, which is the information audited annually, reflects only active information, *See* Response to PSOF 2.

> *65.    The criteria for designating someone as a member of a criminal street gang target expressive conduct. For example, "clothing" is a prominent criterion for documenting people as gang members or associates.116*

Response: PSOF ¶ 65. Objection. PSOF ¶ 65 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 65 is controverted. The criteria do not "target" anything specific. Ex. 8 does not support the statement mischaracterizes the content. Gilmore did not speak about "expressive conduct" at all and explained that the 75% who didn't self-admit gang membership were listed for "being with documented gang members; clothing, hanging out at gang hang outs, committing gang crimes."

> *66. Almost any color can be a gang color for meeting state criteria. According to one officer, this includes North Carolina blue, dark blue, red, green, black, brown, yellow, and orange.117 Others have considered blue, red, green, black, brown, yellow, and orange, and the color combinations of red/brown, black/grey/white, grey/white, tan/brown, black/gold/red, red/white, black/silver/grey, orange/grey,*

*and navy blue/black to be associated with criminal street gangs.118*

Response: PSOF ¶ 66 is uncontroverted, but immaterial. Identification based on dress utilizes multiple factors at the same time: colors, specific sports teams, and how the attire is worn. Doc. 205-09, Hemmert dep., 46:18-47:11. Trained officers know what to look for and follow up with questions to verify gang identification based on their observations. Doc. 205-17, Gilmore dep., 45:19-46:5. The dress is, like all criteria, viewed in context. Doc. 205-09, Hemmert dep., 183:3-24; Doc. 205-10, Inkelaar dep., 105:16-106:14; Doc. 207-16, Salcido dep., 183:18-184:14; Doc. 205-18, Thatcher dep., 97:9-98:1.

> 67. *WPD personnel have considered clothing and tattoos related to the following sports teams and locations as associated with criminal street gangs: the Kansas City Chiefs, Denver Broncos, Dallas Cowboys, Pittsburgh Steelers, Oakland/Las Vegas Raiders, New York Jets, Boston Red Sox, Seattle Mariners, Washington Nationals, Montreal Expos, Philadelphia Phillies, Atlanta Braves, Oakland Athletics, Los Angeles Angels, Kansas City Royals, St. Louis Cardinals, St. Louis Blues, Chicago Bulls, North Carolina Tar Heels, Notre Dame Fighting Irish, Kansas, Nebraska, Miami, Tampa Bay, Cincinnati, and Green Bay. WPD personnel associate clothing and/or tattoos for some of these teams with multiple different gangs, including rival gangs.119*

Response: PSOF ¶ 67 is uncontroverted, but immaterial. *See* Response to PSOF 66. Ex. 60 does not support the statement.

> 68. *WPD personnel have considered at least the numbers 5, 9, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 26, 28, 29, 54, 60, 77, 79, 88, 90, 113, and 666; the phrases "Kansas," "Family First," "Dawg," "Players," "Ralph Lauren," "Brown Pride," "Viet Pride," and "Viet Love"; and the symbols of a five-point star, a six-point star, a pitchfork, a crown, a dragon, a heart with wings, devil horns, devil tails, a Playboy bunny, an anarchy symbol, and pointing to the right or to the left to be associated with criminal street gangs. WPD personnel associate many of these numbers, phrases and symbols with multiple different gangs.120*

Response: PSOF ¶ 68 is uncontroverted, but immaterial. *See* Responses to PSOF 66-67 - all of the information reviewed is muti-factored and in context.

> 69. *The WPD trains its officers to consider certain types of tattoos to be "gang-related." These include tattoos expressing statements of support for individuals ("RIP"), ethnic identities (map of Vietnam, "Laos pride"), neighborhoods or*

*locations ("Kansas," intersection of 15th and Hillside, and 19th St.), and political opinions ("anti-police" or listing "law enforcement" as rivals of white supremacists).121*

Response: PSOF ¶ 69. Uncontroverted, but the cited record does not support the statement. WICHITA 088467 and 088515 contain no information related to this statement. Ex. 44 is unrelated to tattoos; it is part of a PowerPoint presentation on gang graffiti and street tagging. Ex. 16, WICHITA 053925 is an entry into the database by a Gang Intelligence Officer and does not support this statement related to the training of officers.

> *70.    If three individuals wear common colors or symbols, and one of them commits a crime, that would be sufficient for the WPD to consider all three to be a gang in Wichita.122 WPD has identified new purported criminal street gangs based on clothing, hand signs, and social media postings without reference to any criminal activity.123*

Response: PSOF ¶ 70. Objection. PSOF ¶ 70 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 70 is controverted. This statement is overbroad and has no foundation. Ex. 2 does not support the statement as required by Fed. R. Civ P. 56(c)(1). Beard explained how the WPD follows the statute to identify potential gangs as a group of three or more individuals, with a common sign, color, or symbol, who are involved in some form of criminal activity to be a "gang." There is no testimony that if only one of the three members was involved in criminal activity, then the gang moniker would attach to the other two individuals. The second statement is incomplete; Ex. 28 reflects a Gang Bulletin notifying other law enforcement agencies about a new subset or hybrid gang, which by definition under K.S.A. 21-6313(a) includes criminal activity. Bulletins are used to disseminate information to other law enforcement officers about a major criminal incident under investigation. *See* Exhibit 5, Beard dep., 37:1-17; Ex.7, Beard 30(b)(6) dep., 144:16-24; Exhibit 9, Beard 30(b)(6) dep., 182:20-183:3 (explaining the purpose of a bulletin).

> *71.    No policy or authority defines or limits the number or variety of "style[s]*

*of dress," "color[s]," "hand signs," or "tattoos," as used in K.S.A. 21-6313(b)(2)(E), that WPD personnel may consider to be associated with criminal street gangs when designating persons as criminal street gang members or associates.124*

Response: PSOF ¶ 71. Objection. PSOF ¶ 71 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 71 is controverted as unsupported by the cited record. Ex. 52 does address policy or authority under the statute. Rather, a detective states he was trained to look for certain things for gang identification and the witness states "not a lot of people deck all out like that anymore."

*72.    The WPD does not make available to the general public any list or other documented designation of the styles of dress, colors, hand signs, or tattoos that it considers to be affiliated with gang membership or association.125 And even one article of clothing of a sufficient color could meet WPD's standard for wearing particular clothing/dress associated with a gang.126*

Response: PSOF ¶ 72. Controverted in part. The statement does not accurately reflect the deposition testimony cited in Ex. 7. Beard states, while there was no official "list" of known "gang hangouts" or gang-associated places, gang officers "knew" a place was a gang hangout based on their experience on and knowledge from the gang unit. Ex 18 again misrepresents what was stated: Salcido states that a black hat alone "would be an identifier" that could get a person put on the gang list but goes on to clarify he doubts "anybody would just put [him] on a list cause [he] was wearing that hat." 185:7-8. And even in this event when a WPD officer stopped Salcido, "[the officer] didn't stop to ask me if I was in a gang." 185:12-13. The statement again ignores testimony involving the context of the clothing or color. *See also* Def's response to PSOF 35, 36, 63, 66.

*73.    At least one WPD officer admitted that the criteria for identifying a particular style of dress as indicative of gang status is outdated, broad, and unclear. Det. Thatcher acknowledged that many gang members no longer adhere to specific dress styles.127*

Response: PSOF ¶ 73 is controverted in part. Det. Thatcher noted that many gang members today do not dress "all decked out" in one gang color anymore. Ex 52. Det. Thatcher did not say using

dress style to identify gang members is outdated. *See also* Def's response to PSOF 35, 36, 63, 66.

> 74.    *Deputy Chief Salcido acknowledged that he himself could have been considered an associate because he had friends in a peer group and football teammates who were gang members. As a youth, a WPD officer once thought Deputy Chief Salcido was a gang member based on how he was dressed.128*

Response: PSOF ¶ 74 is controverted in part. The authority cited by plaintiffs in Ex. 18 does not

support this contention. Salcido testified his dress "could have" looked like gang colors "to the

untrained eye" 58:11-14; he speculated an officer followed him "because he thought I looked like

a gang member" but doesn't know who that officer was, 58:18-20 and he was not stopped or

questioned.

> 75.    *Likewise, the WPD renewed one individual in the Gang Database for "wearing a navy blue hoodie" when arrested for traffic charges.129 And the WPD renewed Progeny Youth Leader A.M. in the Gang Database for wearing a Phillies hat to the Wichita East High School graduation.130 The WPD renewed another individual in the Gang Database for posting Facebook photos of himself wearing "gang colors and a Seattle Mariners hat with an 'S'."131Associational Limitations*

Response: PSOF ¶ 75 is controverted because the evidence cited is mischaracterized and

incomplete. In Ex 16, WICHITA 006000, E.V. self-admitted to being Sur 13 prior to his renewal

for wearing their colors and being arrested in March of 2012. WICHITA 024375 identified A.M.

as an associate of the Pirus when he appeared in a YouTube rap video where he was dressed in

red, wearing the Phillies hat, flashing Blood gang hand signs, and holding a rifle on May 5, 2017.

A.M. also appeared in this video with other known Blood/Piru gang members. A week after this

entry was made, A.M. was associated with the Pirus, on May 12, 2017, he attended the WEHS

graduation wearing the same Phillies hat. WICHITA 51765 documents a self-admitted Sur 13 gang

member, several instances where he appeared with other documented Sur 13 members and

continued to dress in gang colors and known affiliated sports teams, such as the Seattle Mariners.

> 76.    *The WPD primarily uses individuals' social relationships with purported gang members or associates to add or renew those individuals' status in the Gang Database.132 The Gang Database entries and TOPS cards for the individual*

*Plaintiffs and Progeny staff reveal a strong focus on their relationships with others.133*

Response: PSOF ¶ 76. Objection. PSOF ¶ 76 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 76 is controverted it is unsupported by the cited record. Ex. 44 is a slide from a presentation about Wichita street gang graffiti and tagging and is taken out of context and does not support the first sentence. The documents referenced to support the second sentence are incomplete. Ex 16 consists of 84 pages of material for which there is no citation with particularity. Defendants cannot identify what information plaintiffs believe supports this statement. Ex. 62 contains TOPS cards, not gang database entries. The TOPS cards are reports from WPD officers to the Gang Intelligence Officers on suspected gang identification that require further investigation and vetting. WICHITA 024371-72 notes that A.M. was first identified as a Piru Blood after appearing in a Blood Gang rap video, wearing red, a Phillies cap, and flashing Blood hand signs in the video. There are notes within these two pages about A.M.'s connections and relationships with other verified Bloods, but the full picture reflects more than his "relationships." WICHITA 024419 is a TOPS card noting D.B. is wearing blue and grey, and that he was arrested and booked for possession of marijuana with intent to distribute, possession of a firearm by a felon, and outstanding warrants, along with another gang member. This does not evidence a "strong focus on their relationships with others." Finally, WICHITA 024423 is a note that D.B. hangs out with another gang member every day at school.

77.    *The definition of the phrase "associates with known criminal street gang members" in K.S.A. 21-6313 depends entirely on the situation at hand and what information is available to the officer.134 There is no WPD document or policy that defines what it means to "associate" with another person in the Gang Database.135 Lt. Jeffrey Gilmore, for example, interprets "association" to mean "hanging out with," being "in cars with," or being "friends" with others in the Database.*

Response: PSOF ¶ 77. Objection. PSOF ¶ 77 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 77 is controverted as the cited testimony is taken out of context and cherry-picks from the broader discussion occurring in the deposition. Gang Intelligence officers receive extensive training and have experience and collaborate when making assessments. *See* Response to PSOF 33, 42, 48, 62, 66.

> 78.    *Neither K.S.A. 21-6313 nor Policy 527 identify the number or nature of interactions a person must have with a known gang member to meet the definition of "associating."*136

Response: PSOF ¶ 78 is uncontroverted but immaterial.

> 79.    *K.S.A. 21-6313's criterion of being "in the company of a gang member" could be met by virtue of being a family member, neighbor, or friend of a purported gang member.*137 *People can satisfy the K.S.A. 21-6313 criterion "by accident" or by "coincidence," such as in the case where "your brother is a gang member, your father is a gang member, or your grandfather is a gang member. It happens."*138

Response: PSOF ¶ 79. Objection. PSOF ¶ 79 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). Response: PSOF ¶ 79 is controverted in part as it does incorrectly reflect the cited testimony cited. In Ex. 22, Ramsay testified as to the "concerns within the department" that he addressed. In Ex. 8, Gilmore said that one way to meet one of the criteria to be hanging out with family who are documented gang members. Gilmore pointed out, however, that to be flagged as a gang associate in the database a person has to meet three criteria not just one. Requiring three criteria is a "way to make sure that someone doesn't get mistakenly identified as a gang member just because they are hanging out with their cousin or their brother that's a gang member because they have to meet two or more of those criteria as well." Ex. 8, Gilmore dep., 141:17-22. Further, immediate family is not considered for meeting criteria for gang membership. *See* DSOF ¶ 41.

*80.     Former Deputy Chief Wanda Parker-Givens testified that she has never been to the homes of her niece or nephew because she fears being associated with them. She also fears giving rides to children that she coaches due to possible association and placement in the Gang Database.139 Former Deputy Chief Parker-Givens also told former Chief Ramsay that she was worried about being seen with a family member listed in the Gang Database.140*

Response: PSOF ¶ 80 is controverted in part. The statement inaccurately reflects the testimony. In. Ex. 37, Parker-Givens said she was afraid of having to explain to a peer why she was taking a certain kid home because she wanted "to keep [her] personal life and [her] professional life separate." PSOF 80 also incorrectly says Parker-Givens stated that she was afraid to see her family because of the potential to get put on the gang list. Rather, she testified to having never been to her niece's or nephew's house and goes on to say that she is "okay" with that. 63:10-16. The sentence cited by footnote 140 is accurate as to what Chief Ramsay testified Parker-Givens told him.

*81.     Former Capt. Nicholson also testified that people in the community are afraid to ride in a vehicle with their own family members because of the potential for being included in the Gang Database as a result.141*

Response: PSOF ¶ 81 is controverted as unsupported by admissible evidence and because it does not accurately reflect the testimony provided. Nicholson testified that he "feels as though" members of the community are afraid to ride with their own family members for fear of "possibly having to deal with the police department" - not inclusion in the Gang Database.

*82.     WPD officers also track and surveil the social and recreational activities of certain members of the Wichita community to bolster inclusion of those individuals in the Gang Database. For example, the WPD uses social media as an investigative tool to find further purported proof of gang affiliation.142 If a purported gang member does not have social media, the WPD might look at the person's girlfriend's account.143*

Response: PSOF ¶ 82. Objection. PSOF ¶ 82 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a).

Response: PSOF ¶ 82 is also controverted in part. The record cited by the Plaintiff in both exhibits do not support the statement. Ex. 34 states the WPD would look to other associated social media

accounts for person of interest, that could include a girlfriend or other known gang member who posted about the person of interest. Ex. 65 does not support this statement and is irrelevant here. Testimony by Layton reflects a meeting with City Council Member Johnson where "social media representation" was discussed or mentioned but he does not remember specifics.

> *83.     The WPD also documents the names of all individuals who attend certain concerts in the Gang Database and police reports.144*

Response: PSOF ¶ 83 is controverted. The record cited by the Plaintiff in these cites do not support the statement that "WPD also documents the names of all individuals who attend certain concerts". In Ex. 36, Hemmert notes that it was "possible" that a WPD officer would have made a list of people at a certain concert "if the concert catered to one particular gang." Ex 16, WICHITA 023978 documents two instances where E. Costello attended a concert attended by several other documented Blood gang members. Ex 16, WICHITA 024146 documents two instances where M. Costello attended a concert attended by several other documented Blood gang members. WICHITA 053214 documents one instance where an individual attended a concert attended by several other documented Blood gang members. And Ex. 15, WICHITA 096006-07 - Statement incorrectly reflects the cited VCCRT report. The VCCRT report only lists known gang members who attended a concert. No evidence supports the statement that WPD documents all individuals who attend certain concerns in any location.

> *84.     The WPD regularly surveils funerals and uses officers' observations to add or renew individuals in the Gang Database.145 Officers frequently rely on the presence of other purported gang members as evidence of gang affiliation, but the WPD has also renewed individuals for merely attending the funeral of a purported gang member, with no other alleged members' presence noted.146*

Response: PSOF ¶ 84. Objection. PSOF ¶ 84 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 84 is controverted in part. Defendant admits to having a presence at funerals of known

gang members to provide safety from rival gang members and to gather intelligence on individuals associating with the deceased and their families. *See* Doc. 205-269, Decl. Carson, Doc. 205-26, Def's Ex. 26. In Ex. 52, there is testimony of citizens requesting a WPD presence because of concerns of violence at the gathering and the main goal was maintaining safety. The record cited by the Plaintiff at Ex. 16 does not support the statement. WICHITA 053496 documents several other documented Blood gang members in attendance at a funeral in 2018 for a deceased documented gang member. WICHITA 053609 documents two funerals -one in 2018 and one in 2020 - at which several other documents gang members attended, and both were for deceased documented gang members. WICHITA 030074 documents a reactivation in 2017 for dress, tattoos, hand signs, physical evidence, and association with known members; WICHITA 053214 documents observation at two funerals in 2019 and 2020 along with several other documented gang members in attendance at each funeral, both of which were for documented gang members. WICHITA 095675 notes nine gang members in attendance at a Crip funeral where the information gathered was to be used to update the gang database and "passed on to probation/parole supervision."

### H.   *Impact of Inclusion in Gang Database*

*85.     Pursuant to K.S.A. 21-6316, if an individual designated as a criminal street gang member or associate in the Gang Database is arrested for a person felony, that individual is subject to an enhanced default minimum of $50,000 cash or surety bail. This default minimum applies regardless of the nature of the felony or whether it is alleged to be gang-related.147*

Response: PSOF ¶ 85 Controverted in part as incomplete. K.S.A. 21-6316 provides for $50,000 cash or surety bond, "unless the court determines on the record that the defendant is not likely to reoffend, an appropriate intensive pre-trial supervision program is available, and the defendant agrees to comply with the mandate of such pre-trial supervision." The WPD does not control the judge's decision or discretion and only the judge may decide what bail is appropriate in each

individual case.

> 86.    *Evidence of purported gang membership may be introduced against a designated individual even when not directly relevant to the charged offense.148*

Response: Objection. PSOF ¶ 86 is not supported by competent evidence and lacks foundation and the cited record is inadmissible hearsay, speculation and opinion without factual foundation. It is speculation to assert what evidence may be relevant to a charged offense and what evidence is admissible.

> 87.    *When a person in the Gang Database is sentenced to probation or released on parole or pre-trial, they must abide by additional special conditions ("gang conditions"), including early curfews, staying away from certain people or places, and other restrictions on associative and expressive conduct.149 Gang conditions can be imposed even if the charged offense or the facts of the case have little or nothing to do with gang activity.150*

Response: PSOF ¶ 84. Objection. PSOF ¶ 84 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 87 is controverted. The cited record does not support the statement. WPD does not determine conditions of sentencing; there is no evidence that all gang members documented incur the conditions listed in this statement. Further, Ex 15 at WICHITA 095050 is only a request from the Department of Corrections to verify gang info posted by a known gang member and does not support the statement. Ex. 66 reflects only the conditions imposed and makes no mention of the underlying cause. The last sentence is not supported by competent evidence. The declarations are speculation, hearsay, and inadmissible opinion.

> 88.    *The WPD plays an active role in determining gang conditions of release and their application to individuals, collaborating closely with other government agencies and even drafting policies for them.151 Other agencies rely heavily on the WPD's determination that someone is a gang member when imposing and enforcing these conditions.152*

Response: PSOF ¶ 88. Objection. PSOF ¶ 88 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a).

PSOF ¶ 88 is controverted. WPD does not determine bail/bond amounts or probation/parole conditions. *See* DSOF 2.d. The cited record does not support the statement. Ex. 67 is a Sedgwick County request for confirmation on who from a list of persons is an associate gang member as opposed to a documented gang member. There is no evidence to support the allegation that the WPD drafts policies for any other agency. WICHITA 047454-55 are Sedgwick County Dept. of Corrections Supervision Agreement Gang Conditions blank forms and do not include anything to support the PSOF 88.

> *89.    Gang conditions have included "mapping" individuals listed as gang members, i.e., prohibiting them from entering large geographic zones at certain times of the day.153 The Sedgwick County Department of Corrections ("SCDOC") instituted this program in 2019 with input from the WPD, and both agencies collaborated in the program's function.154 The City paused the mapping program in mid-2022, in large part because of this lawsuit.155*

Response: PSOF ¶ 89. Objection. PSOF ¶ 89 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 89 is controverted in part. The cited record does not support the statement. Ex. 53 does not contain WICHITA 079679, 079680, 047444, and 047449 as referenced.

Mapping locations, chosen by the probation or parole officer, are relevant to where the offense occurred and require an individual to avoid those areas during certain times of the day. The "mapping" referenced here was a program that began in 2019 or 2020 and was discontinued in April of 2022. Exhibit 5, Beard dep., 253:22-255:9; Ex. 7, Beard 30b6 dep., 190:10-19. Beard explained the mapping project was an effort to assist the Sedgwick County Community Corrections officers in enforcing conditions of probation/parole imposed by a judge. Ex. 7, Beard 30b6 dep., 186:8-22. The program mapped less than 15 people in total. *Id*., 187:3-5. It was discontinued, not paused, because it was not effective, not because of this lawsuit. Exhibit 5, Beard dep., 253:22-255:9; Ex. 7, Beard 30b6 dep., 190:10-19. See also Response to PSOF 49.

*90.    The WPD created a specialty unit, initially called the TOPS Unit, specifically to monitor people in the Gang Database who were subject to parole and probation conditions.156 The goal was—and remains to this day—to "absolutely" put people in the Gang Database back behind bars if they are found to violate any probation or parole conditions, even those wholly unrelated to gang activity, such as having a drink or not meeting curfew.157 Those who have been designated as gang members or associates and subjected to gang conditions have found it difficult to comply with the gang conditions, particularly those that prevent them from associating with friends and family. Complying with the associational restrictions is especially difficult because a person may not know—and may never find out— whether they have been included in the Gang Database, thus those around them who are subject to gang conditions can unknowingly violate those conditions.158*

Response: PSOF ¶ 90. Objection. PSOF ¶ 90 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 90 is controverted in part. The TOPS unit was specifically gang-focused upon its creation, but there is no testimony that the goal was or is to "absolutely" put people from the gang database in jail. Sheriff Easter agreed that "absolutely" one of the motivations for restrictive probation/parole by the County was to put gang members behind bars. Ex. 6, Easter dep. vol. I, 48:12-18. Ex. 15, WICHITA 095378 is an email from an Assistant District Attorney saying he is "trying to get [Costello] to prison." This has nothing to do with the WPD's goals in creating the TOPS Unit. Similarly. in WICHITA 096577, an officer noted that it "would be nice to get [D.B.] revoked if possible[,]" and that Briceno had been seen by the officer drinking in a bar with other known gang members. Again, these examples do not support the statement.

*91.    Those who have been designated as gang members or associates and subjected to gang conditions have found it difficult to comply with the gang conditions, particularly those that prevent them from associating with friends and family. Complying with the associational restrictions is especially difficult because a person may not know—and may never find out—whether they have been included in the Gang Database, thus those around them who are subject to gang conditions can unknowingly violate those conditions.158*

Response: PSOF ¶ 91. Objection. PSOF ¶ 91 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a).

PSOF ¶ 91 is controverted as unsupported by admissible. Declarations by counsel are both hearsay, speculation, and inadmissible opinion. The declarations lack foundation, are conclusory, and fail to provide sufficient particularity to permit Defendant to be able to controvert the statement with particularity.

> 92. *Designation in the Database carries consequences beyond probation and parole conditions. For example, a criminal defendant who is otherwise eligible for deferred prosecution under the Sedgwick County Drug Court Program, or other diversion programs, is disqualified if that defendant has a current gang affiliation under Kansas law.159 Councilmember Brandon Johnson spoke of a former gang member who tried to enter a contract with artists for an event, and law enforcement encouraged the artists to break the contract because they believed he was a gang member and would cause trouble.160 Councilmember Johnson also testified that he knew someone on the Gang List who had been denied housing because the WPD interfered with the landlord negotiations.161*

Response: PSOF ¶ 92. Objection. PSOF ¶ 92 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 92 is controverted. There is no admissible evidence to support the statement. The cited testimony is hearsay, lacks foundation, and fails to provide sufficient particularity to permit Defendant to be able to controvert the statement with particularity.

### *Minority*

> 93. *Former Deputy Chief Parker-Givens testified that as an African American female who coached and attended church in the community, she was concerned that simply being seenwith one of her nieces or nephews in the wrong zip code could lead to her being placed in the Gang Database and cause issues for her career.162*

Response: PSOF ¶ 93 is controverted in part but immaterial. The witness stated she feared an "association" would cause a "lack of trust within my own peers." Objection, statement is not competent evidence to establish a fact.

> 94. *Councilmember Johnson has friends who are in the Gang Database and whom the WPD has pulled over for no apparent reason,163 and has personally witnessed law enforcement harassing individuals at places like the QuikTrip on 13th and Oliver for supposedly being gang members when they were not.164*

Response: Objection. The record cited for PSOF ¶94 is inadmissible hearsay and testimony that lacks foundation. PSOF ¶ 94 is controverted. Councilmember Johnson said he had friends who were gang members, not that he knew they were included in the WPD's Gang Database. There is insufficient foundation to state the basis for the stop. In Ex. 69, 66:21-67:4, Johnson relays what other people have reported to him, which is hearsay and lacks knowledge. Finally, Ex. 70 documented a traffic violation of two individuals who failed to stop near a QuikTrip on South Hillside and does not support the statement.

> 95.    *The Gang Unit once mistook a historically Black fraternity (Kappa Alpha Psi) as a gang because the fraternity's colors are crimson and cream. The Gang Unit believed that the fraternity's planned gathering was a gang party. Fraternity members attending the event included respected members of the community, including medical doctors. Former Capt. Nicholson had to explain the differences between Bloods and the fraternity to the Gang Unit.165*

Response: PSOF ¶ 95 is controverted in part. The testimony surrounded emails sent out regarding investigating a potential gang party that turned out to be a fraternity party. There is no evidence to support the statement that any Gang Intelligence Officer mistook an individual fraternity member as a gang member, incorrectly documented a gang member, misidentified an organization as a gang under K.S.A. 21-6313(a), or had any information regarding who or why the gathering occurred.

### *Impact on Progeny*

> 96.    *Progeny is a putative class representative in this class action suit.166*

Response: PSOF ¶ 96 is uncontroverted.

> 97.    *A small executive staff and team of Youth Leaders run Progeny. Progeny works with and employs individuals in the Gang Database, and its members have suffered harms from inclusion in the Gang Database. Progeny staff members and Youth Leaders are either listed themselves or have family members and friends who are listed in the Gang Database.167*

Response: PSOF ¶ 97 is controverted in part. The documentation cited to does not reflect harms

occurred as a result of members' inclusion on WPD's Gang Database, nor does it indicate individuals are incorrectly identified as criminal street gang members or associates.

> 98.     *Progeny staff and Youth Leaders have been included in the Gang Database based on their clothing color, use of hand signs, social media activity, and "association" with others.168 The four Progeny staff added to the Gang Database are not active gang members.169*

Response: PSOF ¶ 98 is converted in part. There are multiple, bona fide bases for the individuals on WPD's Master Gang List. Ex 16, WICHITA 024374-76 documents the member's appearance in rap video with gang colors and flashing gang hand signs as well as photos of member throwing up hand signs while wearing gang-associated colors; WICHITA 024424-26 documents a member's association with other gang members; throwing up gang hand signs; etc.; WICHITA 047528-30 documents a member's self-admission, association with other gang members, wearing recognized gang-associated clothing. Ex. 71 lacks foundation, is inadmissible, and does not refute the documented intelligence evidenced in Ex. 16.

> 99.     *Progeny staff member D.B.W. has been subjected to pretextual stops based on the identity of his companions.170 Progeny Youth Leader D.B.'s inclusion in the Gang Database has been based at least in part on the identity of his companions, including school friends.171 Progeny Youth Leader A.M. has been subjected to pretextual stops, and the WPD monitors his social media.172 Progeny Youth Leader K.C. was added to the Gang Database as a juvenile, but the WPD's apparent single attempt to notify her parent of that fact via certified mail was unsuccessful.173 At least as recently as October 21, 2019, the WPD provided information to SCDOC that D.B., K.C., and A.M. were gang members.174*

Response: PSOF ¶ 99. Objection. PSOF ¶ 99 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 99 is controverted in part. The statement reflects multiple subparts that are inaccurate and incomplete. Ex. 62, WICHITA 047524-27 documents the individuals were stopped for passenger failure to wear seat belt and no tag light. No traffic violation citation was issued. This is not evidence of a pretextual stop. Ex. 62, WICHITA 024419-23 documents a car stop for a bad tag.

This is not evidence of a pretextual stop.

Ex. 62, WICHITA 024371-73 documents reasons for associate gang designation, including rap video titled "playing tuff" wearing red clothing, Phillies hat, flashing Blood gang signs, holding a rifle, associating with other documented Blood gang members, and a Facebook page where he wears red and lists other Blood gang members as friends, and provides his street name. Ex. 73 is a screenshot of Facebook messages exchanged when the individual was being pulled over for having an unregistered gun - none of this evidence supports the statement that the member is subjected to pretextual stops or that WPD "monitors his social media." Ex. 74 is an email that does not mention that the attempt to contact O.K.'s parents was unsuccessful, nor is this evidence to support the statement made. Ex. 76 are screenshots of text messages, not "Juvenile Notification List" purported by plaintiff. Ex. 15 reflects information shared between WPD and the Sedgwick County Probation Office, per an MOU.

> *100.    Progeny members and staff have experienced repeated harassment by WPD officers, including being pulled over while on their way to school or work and questioned about gang activity.175 As recently as August 2023, a WPD patrol car followed a Progeny staff member driving from the Progeny office to his destination, changing lanes twice when he did. The following morning, the same staff member awoke to find a WPD patrol car parked outside his home.176*

Response: PSOF ¶ 100. Objection. PSOF ¶ 100 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 100 is controverted. In Ex. 73, plaintiffs fail to include specifics sufficient to permit Defendant to address the assertion with any particularity. Ex. 15, the Night Gang VCT Notes document a protective sweep conducted "due to the violent history of the occupants" and provide valid reasons for the stops. Ex. 29 documents a traffic stop was initiated because of a cracked windshield. Ex. 76, fails to provide any specific details to support the assertion of "harassment." One response is "I wonder who called the police on him" - and bond was set to

$100K, but bail bondsman only required $2,500 - all outside of the scope of WPD and unrelated to the statement made here. Ex. 77 is a Facebook post on Progeny's page of an ACLU advertisement - this is irrelevant to the statements made. Ex. 73 are Facebook messages between two individuals discussing a member's vehicle stop because someone called in "suspicious characters" and a gun was found in the vehicle—and they had a gun with them. This is not evidence of harassment or being questioned about gang activity. Likewise, Atkins declaration lacks foundation, is hearsay, and is inadmissible.

> 101.    The WPD has requested that Progeny hold an event for Youth Leaders to meet with new officers, but the event did not take place because Youth Leaders did not feel comfortable with the possibility of being profiled when around police.177

Response: PSOF ¶ 101 is uncontroverted but immaterial. However, the documentation does not support this statement. Ex. 79 is testimony concerning a community event where "too much WPD" attended and participants were alleged to be "afraid." The cited does not support the statement.

> 102.    Because Progeny members and Youth Leaders are in the Gang Database, they are subject to enhanced criminal charges and consequences, including the admission of highly prejudicial Gang Database information as evidence in criminal proceedings.178

Response: Objection. PSOF ¶ 102 should be disregarded as it does not contain a concise statement of a material fact as to which no genuine issues exist but, rather, improperly is an argument that fails to support the assertions with a citation, with particularity, to the record that establishes the fact contrary to D.Kan. Rule 56.1(a). PSOF ¶ 102 is controverted as unsupported by admissible evidence. Any alleged harms are not from the Gang List or because of Policy 527. They are imposed only after probable cause has led to an arrest, a charge, conviction, sentencing, and/or a judge has imposed conditions on post-release. Due process is afforded throughout. *See also* Responses to PSOF 32, 85-92.

> 103.    Because Progeny members and Youth Leaders are in the Gang Database, attendance at Progeny events where others also in the Gang Database may be

*present risks violating probation or parole conditions and could subject Progeny members and staff to an enhanced bail of over $50,000, even if the offense is not gang related.179*

Response: Objection. PSOF ¶ 103 should be disregarded as it does not contain a concise statement of a material fact as to which no genuine issues exist but, rather, improperly is an argument that fails to support the assertions with a citation, with particularity, to the record that establishes the fact contrary to D.Kan. Rule 56.1(a). PSOF ¶ 103 is also speculation as to whether others might violate conditions of probation or parole. *See* Doc. 205, Def's Motion for Summary Judgment, § C.2.

*104.    Progeny achieves its goals by hosting town halls, educating and working with Kansas state government officials, providing feedback to local and state leaders regarding policy priorities, organizing youth and community leaders around juvenile justice reform, and publishing written reports and other documents that translate youths' insights and needs into calls for government action.180 Progeny and its members are restricted from achieving these goals through organizing, conducting, and attending peaceable assemblies because doing so creates grounds for the WPD to add or renew Progeny members and event attendees in the Gang Database, and to harass, detain, search, and surveil them pursuant to K.S.A. 21-6313 and Policy 527.181 Progeny has altered the way in which it approaches its protests and events.182*

Response: Objection. PSOF ¶ 104 should be disregarded as it does not contain a concise statement of a material fact as to which no genuine issues exist but, rather, improperly is an argument that fails to support the assertions with a citation, with particularity, to the record that establishes the fact contrary to D.Kan. Rule 56.1(a). PSOF ¶ 104 is controverted in part. Defendant does not controvert Progeny's mission or how they attempt to achieve it. Defendant does not prevent Progeny from acting in any manner. Atkin's declaration is a sham affidavit that should be disregarded. The declaration lacks foundation, is vague, and is conclusory without supporting factual basis. Progeny is not prohibited from organizing or conducting assemblies—it continues to hold regular meetings, as attested by Atkins at deposition. Doc. 205-36, Atkins dep., 32:23-25. Attendance is consistent compared to pre-pandemic times. *Id.*, 33:5-9. Progeny hosts special

gatherings for the community. *Id.*, 61:15-19. During deposition, Atkins noted both events listed on

Progeny's website and several during deposition, the Executive Director noted several additional

events to those listed on their website in addition to those listed on their website. *Id.*, 73:20-21.

> *105.    For example, in April 2021, Progeny planned to hold a protest at an event where Governor Laura Kelly would be present. The WPD contacted Progeny before it had a chance to protest at the event, and Progeny cancelled the protest. That same day, a WPD officer stationed himself outside the building where Progeny was holding a meeting. Progeny staff had to go outside to confront the officer stationed to ask him to leave. This caused an interruption in Progeny's activities, diverted staff time and attention, intimidated attendees, and caused stress and discomfort to staff and attendees.183*

Response: Objection. PSOF ¶ 105 should be disregarded as it does not contain a concise statement

of a material fact as to which no genuine issues exist but, rather, improperly is an argument that

fails to support the assertions with a citation, with particularity, to the record that establishes the

fact contrary to D.Kan. Rule 56.1(a). PSOF ¶ 105 is controverted as unsupported by admissible

evidence. Atkins' declaration is a sham affidavit that should be disregarded as conflicting with her

testimony. Laura Kelly was not expected to be present. *Id.*, 92:19-93:25. Further, Ex. 78, No. 14

indicates a WPD officer was outside of the Kansas Collaborative Marketplace and Resource Club,

not Progeny. The alleged "police intimidation," consisted of one patrol car parked across the street.

The WPD officer did not leave the vehicle or engage with anyone until Atkins approached him.

*Id.*, 94:16-96:1. It is also unclear how people who did not attend the event were somehow

intimidated by the single patrol car parked across the street. *Id.*, 73:21-74:3.

> *106.    As another example, in February 2019, Progeny attempted to hold an event for community action against violence, but many young individuals would not come into the event due to the number of police vehicles they saw outside and because of the number of police officers attending the meeting, in part because of the youths' fear of being added to the Gang Database.184 Because of the police presence outside of and attendance at the event, some people could not determine whether Progeny was connected to or collaborating with the police or other law enforcement, including with respect to the Gang Database. This confusion dissuaded people from attending or signing up to be a part of Progeny. 185*

Response: Objection. PSOF ¶ 106 should be disregarded as it does not contain a concise statement

of a material fact as to which no genuine issues exists but, rather, improperly is argument that fails

to support the assertions with a citation, with particularity, to the record that establishes the fact

contrary to D.Kan. Rule 56.1(a). PSOF ¶ 106 is controverted as unsupported by admissible

evidence. There is no competent evidence from any attendee or would-be attendee that they did

not attend for the reasons claimed. Atkins' declaration lacks foundation, is inadmissible hearsay

and speculation, and is inadmissible opinion. Ex. 78, No. 14 is inadmissible, conclusory, and lacks

foundation and cannot be raised now for the first time following the close of discovery.

> *107.     K.S.A. 21-6313 and Policy 527 also strongly discourage Progeny from holding in- person meetings of any kind. Most individuals have no way of knowing whether they are included in the Gang Database, or whether others affiliated with Progeny are. Meeting in large groups or even one-on-one puts Progeny members at risk of causing each other to be designated as gang members or associates by the WPD.186*

Response: PSOF ¶ 107. Objection. PSOF ¶ 107 should be disregarded—it is improper argument

and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule

56.1(a). PSOF ¶ 107 is controverted as unsupported by admissible evidence. Defendant does not

prevent Progeny from doing anything. The alleged risks of protestors being arrested or photos of

participants having public exposure exists without regard to the WPD or a gang list. Atkins'

declaration lacks foundation, is inadmissible hearsay and speculation, and is inadmissible opinion.

Further, Progeny testified it has not been prohibited from continuing to hold events, and can

provide no specifics otherwise. Doc. 205-36, Atkins dep., 99:19-100:21; *see also* Response to

PSOF 102.

> *108.     For individuals whose inclusion in the Gang Database is known or who have in the past been directly involved in street gang activity, K.S.A. 21-6313 and Policy 527 effectively forbid Progeny from providing services or support to such persons. Interaction of any kind with such individuals carries the risk of life-long gang member or associate designation and the many accompanying legal consequences of that designation.187*

Response: PSOF ¶ 108. Objection. PSOF ¶ 108 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 108 is controverted. The evidence cited does not the support statement. The statement (limited to "individuals whose inclusion is known ...or who have been directly involved") contradicts ¶ 7 that "many do not know if they are on the [Master Gang] list or not". Progeny attempts to state the reason it is oppressed is out of members' fear of being added, but it does not provide support that there is no "life-long" designation, *See* Response to PSOF 57 re: annual audit and inactivation process. There is also no competent evidence the alleged fear prevents Progeny from providing individual or group services or support. Atkins' declaration lacks foundation, is inadmissible hearsay and speculation, and is inadmissible opinion. *See also* Responses to PSOF 32, 76, 77, 79, 79, 85, 88, 89, 90, 91, 92.

> *109.    WPD officers continue to target and scrutinize Progeny's lawful associational activities. In August 2023, Progeny hosted a juvenile probation focus group meeting, during which a Progeny staff member observed a WPD officer across the street from Progeny's offices using binoculars to surveil the meeting.188*

Response: PSOF ¶ 109. Objection. PSOF ¶ 109 should be disregarded—it is improper argument and not a concise statement of a material fact as to which no genuine issue exists. D.Kan. Rule 56.1(a). PSOF ¶ 109 is controverted as unsupported by the cited record or admissible evidence. Atkins' declaration lacks foundation, is inadmissible hearsay and speculation, and is inadmissible opinion. Atkins' declaration does is not evidence that WPD targets Progeny, scrutinizes Progeny or in any way disrupts or prevents Progeny events or Progeny activities.

### K.    Chris Cooper's Inclusion in the Gang Database

> *110.    Chris Cooper is a 28-year-old Black resident of Wichita, Kansas. He is a putative class representative in this class action suit. He has suffered various harms as a result of his inclusion in the Gang Database.189*

Response: PSOF ¶ 110 is controverted in part. Defendant denies Cooper has suffered harms. *See*

DSOF ¶¶ 62-96.

> *111.   In 2014, Mr. Cooper was a college student at Highland Community College.190 He had received an athletic scholarship to K-State and was preparing to transfer there.191*

Response: PSOF ¶ 111 is controverted in part. The cited record does not support the statement. Defendant agrees Cooper attended Highland Community College during the fall of 2013. There is no evidence to support an offer, acceptance, or existence of an athletic scholarship from Kansas State University to Plaintiff Cooper. Cooper testified he "just talked to the coach. He was looking at picking me up"—not that there was ever an offer of a scholarship. Cooper dep., 37:2-8. Cooper cannot remember the coach's name, 37:9-11, it was not a head coach able to make decisions for awarding scholarships, 38:4-8, and Cooper hadn't applied or been accepted for admittance to Kansas State University. 38:14-24. Further, plaintiffs produce no evidence of a scholarship being offered. Ex. 81 reflects Plaintiff Cooper's response to being asked for specifics relating to this allegation; his answer states he was "recruited by K-State to transfer and join the K-State football team starting in the fall of 2014" but does not list a scholarship was offered to him. See DSOF ¶¶ 62-24, 73-75.

> *112.    While on summer break from school, Mr. Cooper attended a party, at which an altercation and shooting occurred. Mr. Cooper ran to his car to leave the party. Unbeknownst to Mr. Cooper, one of the individuals riding in Mr. Cooper's car as he drove away had been involved in the shooting.192*

Response: PSOF ¶ 112 is controverted in part. Defendant agrees Cooper attended a party, a shooting occurred, and he left the party with an individual involved in the shooting. The record cited does not support the balance of the statement. Ex. 45 does not state Plaintiff Cooper "ran to his car." His deposition testimony, Ex. 80 says only "just going to a party. Got crazy after and had to go to jail….People started fighting. Guy shot." Cooper is unable to remember any other details. Cooper dep. 18:10-20:8. He admits to attending the party with co-defendant Dametrius Williams.

*Id*. at 18:24.

Cooper was arrested in 2014 for being an accessory to the June 21, 2014, murder of Juan Otano and for the crime of discharge of a firearm at an occupied vehicle. Exhibit 10, WICHITA 13-20 - 14C040366 (4) Cooper Arrest Report & Affidavit. In a recorded interview, Cooper admitted the following to detectives: (1) Cooper drove Dametrius William (the shooter) to a party along with two other black males, (2) after arriving Cooper and his passengers met a group of black males and went into the party where an argument started, (3) Cooper lied, saying he left the party just before the shooting, (4) after being shown video of the event, Cooper admitted to waiting in the car while Williams fired five shots while standing outside the car with one hand on top of the car (with one shot killing Juan Otano), (5) the shooter/Williams ran a distance and Cooper backed his vehicle to allow the shooter to get into his vehicle, and (6) Cooper then drove the shooter/Williams and the other two black males away from the scene of the shooting. *Id. See* Doc. 205-26, Declaration of Cale Carson, ¶¶ 3-7.

> *113.    In the next few days, Mr. Cooper was arrested and charged with first-degree murder. Mr. Cooper had no criminal history prior to this event.193*

Response: PSOF ¶ 113 is uncontroverted.

> *114.    At his arrest, Mr. Cooper learned for the first time that he had been included in the Gang Database and had been designated an "active" gang associate since 2015, when he was 18 years old.194 The WPD added (and later renewed) Mr. Cooper to the Gang Database based on his clothing and his Facebook activity, including photos of him with family members and friends.195*

Response: PSOF ¶ 114 is controverted in part as unsupported by the cited record and as incomplete and misleading. The cited record does support Plaintiff Cooper was unaware of his status as a gang member prior to his arrest and charge of first-degree murder in 2014. Further, the WPD's contemporaneous documentation of Plaintiff Cooper's ample gang-related associations, criminal activity, and expressions justify his inclusion and retention on the Master Gang List. *See* Ex. 195,

WICHITA 023919. *See* Doc. 205-26, Carson Decl., at pp. 1-9.

> *115.    Mr. Cooper has never been and is not currently involved in or associated with a criminal street gang in Wichita or anywhere else.196*

Response: PSOF ¶ 115 is controverted. See Doc. 205-26, Carson Decl., at pp. 1-9, summarizing the documentation of Cooper's criminal street gang activity. *See also* Response to PSOF 112, *supra*, detailing Cooper's role as the getaway driver from a first-degree murder where the shooter/Williams was a documented Blood gang member.

> *116.    The WPD has cited Mr. Cooper's photographs with family members— including his uncle, Elbert Costello, and his cousin, Martel Costello—and attendance of his cousin's funeral as reasons to extend his three-year active period in the Gang Database.197*

Response: PSOF ¶ 116 is controverted as incomplete. These justifications are in addition to other documented criminal street gang members, criminal activity, flashing gang hand signs, and wearing gang attire. There is no entry where Plaintiff Cooper was validated or extended for associating only with family members. *See* Ex. 16, WICHITA 023919.

> *117.    On one occasion, the WPD renewed Mr. Cooper's active status for attending a wake for his one-month-old niece, who had died earlier that day.198 WPD officers were surveilling the wake, and at some point during the wake, someone shot at the house and its attached closed garage, hitting Mr. Cooper in the leg.199*

Response: PSOF ¶ 117 is controverted as unsupported by the cited record and incomplete. There is no evidence to indicate that WPD officers were surveilling the "wake." WPD was notified of a shooting and arrived to find Plaintiff Cooper with other documented gang members in a garage, listening to music, and drinking beer, Doc. 205-20, Cooper dep., 66:16-67:24, without knowledge of the reason for the officers' arrival. Additionally, the suspects in the shooting were believed to be rival gang members. Ex. 16, WICHITA 023919.   Cooper speculates WPD officers were surveilling the funeral that occurred the weekend after the shooting, not the wake itself. Doc. 205-20, Cooper dep., 71:9-24. There is no evidence of WPD surveillance and Cooper was told this

occurred but did not witness it himself.

Ex. 16, WICHITA 023919 does describe a large Blood party, but there is no mention of it being a wake. There is no mention of associating with other gang members at a funeral—the reason provided for extending Cooper on the Master Gang List. The evidence does not support this contention.

> *118.    When Mr. Cooper was arrested, his bail was set at $50,000 because he was in the Gang Database. Mr. Cooper remained in jail because he and his family could not afford bail.200*

Response: PSOF ¶ 118 controverted in part. It is agreed that Cooper was arrested, bail was set at $50,000 and he could not afford to pay the bail. However, Cooper is not competent to testify as to why the judge determined to set bail at $50,000. It is speculative to assume it was because of his status as an active gang member rather than the first-degree murder charge. *See* DSOF ¶¶ 66-71.

> *119.    Eventually, the prosecution offered Mr. Cooper a plea deal: he could plead to obstruction of justice and accept probation. Ultimately, believing he had no choice, Mr. Cooper accepted the plea. At that point, he had been detained pretrial in jail for a year.201*

Response: PSOF ¶ 119 is uncontroverted but immaterial to plaintiffs' motion.

> *120.    Mr. Cooper lost his scholarship to K-State and has never been able to go back to college.202*

Response: PSOF ¶ 120 is controverted. *See* Response to PSOF 111. There is no evidence that Plaintiff Cooper ever had a scholarship to K-State, or that he is prevented from attending college. The evidence cited states the ankle monitor made it hard for him to run in track (Ex. 80) (which had since been removed, see PSOF 121 that he completed probation conditions); and he could not run in track meets outside of Wichita. *See also* DSOF ¶¶ 72-78.

> *121.    Following his release, Mr. Cooper was placed on strict probation with gang conditions. He had a 6 p.m. curfew for over a year. He had to live away from his family because some of them were in the Gang Database. Mr. Cooper's enhanced probation conditions forced him to move away from and cease contact with members of his family. Despite these hard conditions, Mr. Cooper completed his*

*probation without any violations.203*

Response: PSOF ¶ 121 is controverted in part. Defendant agrees Cooper had probation conditions

that included a curfew and prohibition from associating with other felons and/or gang members.

Cooper testified he "assumed" he was to stop associating with family members because he was

told they, too, were on the gang list. Ex. 80, Cooper dep., 53:10. Further, the family with whom

Cooper could not associate was Elbert and Martel Costello—who were also both felons. *See* DSOF

¶¶ 114, 133. Cooper is not competent to testify to if these restrictions are "strict" and that they

would not have been imposed if he were not an active criminal street gang member. *See also* DSOF

¶¶ 83-85, 92-93.

> 122. *Mr. Cooper experiences continuous surveillance and harassment by the WPD. He has been stopped repeatedly for traffic infractions, almost always for failure to signal within 100 feet of an intersection.204 When officers approach his car, they already know his name and treat him like a criminal. These pretextual stops ceased after he began driving a car registered to a family member.205*

Response: PSOF ¶ 122 is controverted as unsupported by the cited record. Ex, 18, No. 10 does not

support this statement. Cooper states he was pulled over 5-6 times since 2013 and did not testify

they were "almost always for failure to signal within 100 feet of an intersection." Nor does he

mention driving a family member's vehicle. In Ex. 80, Cooper testified he's been pulled over

"maybe two" times before graduation from high school (Cooper dep., 43:15-18), and "a few" after

graduation and before his arrest in 2014, (Id., 43:19-24). Exhibit 45 is not Plaintiff Cooper's

deposition testimony. *See also* DSOF ¶¶ 86 - 90, 94.

> 123. *When Mr. Cooper was employed at Metro PCS, he was unable to participate in profitable sales events, including flyering events at certain locations such as the mall, certain neighborhoods and parks, and the annual Riverfest due to his inclusion in the Gang Database and the potential presence of gang members at those locations.206 Even when working in Metro PCS storefront locations, Mr. Cooper risked violating probation terms due to potential interactions with customers or police over which he had no control.207*

Response: PSOF ¶ 123 is controverted in part. Defendant agrees Cooper experienced limitations

in his associations as a condition of his probation, but there is no evidence to support these conditions were imposed as a result of his status as an active criminal street gang member on the Gang List. Cooper is not competent to testify as to why the judge imposed these conditions on his release. *See* DSOF ¶¶ 81-85.

> 124.   Due to those experiences, since that time Mr. Cooper has avoided retail and sales jobs where he would have to interact with the public and has instead been limited to warehouse employment.208

Response: PSOF ¶ 124 is controverted in part. There is no evidence that Cooper is restricted to "warehouse employment." *See* DSOF ¶¶ 79-85.

> 125.   Mr. Cooper applied for a job with Spirit Aerospace that would have been a promotion in position and salary. He believed that he was going to be offered the job, but after a background check, he was turned down. Mr. Cooper believes that he was turned down because the background check identified him as an active gang member.209

Response: PSOF ¶ 125 is controverted in part. Defendant agrees Plaintiff Cooper testified he applied for employment with Spirit Aerospace. Cooper only speculates as to why he didn't get the job. In Ex. 80, Cooper testified that he assumed it was because he was on the "gang file" and that he applied after pleading guilty to a felony. Cooper's Interrogatory Answer, Ex. 81, states only "…he was denied employment at Spirit Aerospace following a background check." Cooper is not competent to testify regarding the information available to an employer when running a background check, or the reasons Spirit Aerospace did not offer him employment. There is no evidence to support his belief that he was going to be offered the job. *See* DSOF ¶¶ 79-80.

### L.   *Martel Costello's Inclusion in the Gang Database*

> 126.   Martel Costello is a 27-year-old Black resident of Wichita, Kansas. He is a putative class representative in this litigation. He has suffered various harms as a result of his inclusion on the Gang Database.210

Response: PSOF ¶ 126 is controverted. There is no evidence M. Costello suffered harms as a result of his status as an active criminal street gang member in on the gang list. *See* DSOF ¶ 129.

*127.    Until June 28, 2023, Mr. Costello was incarcerated in the Ellsworth Correctional Facility due to a probation violation. He was convicted of a marijuana offense and possession of firearms (his aunt's gun).211*

Response: PSOF ¶ 127 is controverted but immaterial. Ex. 83, M. Costello's interrogatory answer, lists these as separate events: "In 2017, plaintiff was charged with possession of a firearm and possession of marijuana in Case #17-c-028722. In April 2018, plaintiff was charged with firearm possession for his aunt's gun, which was not on his person. In June 2019 plaintiff was charged with paraphernalia possession. In August 2019, plaintiff was sentenced to prison for probation violations related to attending his brother's funeral." In Ex. 82, M. Costello testified that he was pulled over in 2016 "with some marijuana and a firearm." 29:24-30:6. He also testified about a different firearm violation following the shooting at the "wake" on April 20, 2018. M. Costello dep., 50:9-51:1; 51:5-6. *See also* DSOF ¶¶ 114, 117-21.

*128.    Mr. Costello learned he was on the Gang List for the first time when he was charged with these crimes.212 The WPD added Mr. Costello to the Gang Database based on his clothing and his Facebook activity, including photos of him with friends.213*

Response: PSOF ¶ 128 is controverted in part as incomplete. The documentation of M. Costello's gang activity includes the use of gang-specific terms, the display of hand signs known to be used by the gang, wearing colors known to be associated with the gang, being arrested with another known gang member for drug possession, and multiple instances of associations with other members of the same gang. Ex. 16, WICHITA 024147. *See* Doc. 205-26, Declaration of Cale Carson, ¶¶ 13-20.

*129.    Mr. Costello has never been involved in any gang activity and was never told why he was placed on the Gang List in the first place.214*

Response: PSOF ¶ 129 is controverted. *See* Ex. 16, WICHITA 024146, 024147 for documented gang activity since 2011. *See also* response to PSOF 128; and Doc. 205-26, Declaration of Cale Carson, ¶¶ 13-20, and DSOF ¶ 127 (M. Costello designated himself as a Pirus gang associate on

an intake form he signed upon his entry into the Ellsworth Correctional Facility on Feb. 22, 2021, and admitted the form contained his handwriting and signature. Doc. 205-25, M. Costello dep., 45:8-46:17.

> 130.   In 2016, Mr. Costello's active status was renewed for another three years simply because WPD personnel observed him at a concert with his father and two others, all of whom the WPD believed were gang members.215

Response: PSOF ¶ 130 is controverted as incomplete. In 2016, Plaintiff M. Costello was renewed because of two instances: one was a concert on June 6, 2016, which he attended with other documented members of the same gang; a second reason (omitted from Plaintiffs' statement) was for being at a club with multiple other gang members the same night a rival gang member was shot at the club, resulting in a criminal investigation. Ex. 16, WICHITA 024146. *See also* Doc. 205-26, Declaration of Cale Carson, ¶ 16.

> 131.   Due to his status on the Gang List, Mr. Costello's bond amounts were set very high. His mother had to place her home as collateral in order to bond him out of jail.216

Response: PSOF ¶ 131 is controverted as inadmissible speculation and unsupported by the evidence. M. Costello is not competent to testify as to why the judge set bond amounts, nor that they were "very high." *See* DSOF ¶ 114, 126.

> 132.   Mr. Costello was released pre-trial and eventually sentenced to probation.217 While on probation, he was forced to abide by certain special conditions, due to his designation as a gang member. These conditions included not having any contact with any other known gang members, abiding by a strict curfew, and more.218

Response: PSOF ¶ 132 is controverted in part. Defendant agrees M. Costello experienced limitations in his associations as a condition of his probation. There is no evidence to support that these conditions were imposed as a result of his status as an active criminal street gang member. Ex. 82 (testifying that "other people" told him they were gang conditions, but there was no official judicial determination that the curfew was set because of his gang associations, at 41:7-23).

Further, M. Costello is not competent to testify as to why the judge imposed these conditions on

his release, Ex. 47. *See also* DSOF ¶¶ 116-21 (M. Costello testified the sanctions for his parole

violations were not for violations of "gang conditions" ¶120).

> *133.    While on pretrial release and probation, WPD officers repeatedly harassed Mr.Costello by subjecting him to multiple traffic stops and searches.219*

Response: PSOF ¶ 133 is controverted. Ex. 82 documents Plaintiff M. Costello was pulled over

for a bad tag, Ex. 84, his interrogatory answer, states he was pulled over but can't remember dates,

officer, or the reasons. *See also* DSOF ¶¶ 124-26.

> *134.    The WPD's harassment of Mr. Costello included invasive searches of his residence, where WPD officers destroyed his property and threw his possessions on the floor.220 During one such search, WPD officers removed red clothing items from Mr. Costello's closet and laid it out on his bed in the shape of a person lying down, resembling the outline of a victim's body. Mr. Costello interpreted this to constitute a threat that the WPD intended to cause him physical harm.221*

Response: PSOF ¶ 134 is controverted. There is no evidence WPD threatened Plaintiff M. Costello.

Rather, Costello interpreted his clothes being laid out as a threat. Ex. 82, 52:8-13. The search

occurred when WPD officers responded to a shooting and was warranted to look in a closet to

discover a firearm that Plaintiff M. Costello was prohibited from possessing. *Id.*, at 51:2-9. *See*

DSOF ¶¶ 122-23, 129, 131.

> *135.    After experiencing this increased harassment and surveillance, Mr. Costello was returned to jail on several occasions due to alleged probation violations.222*

Response: PSOF ¶ 135 is controverted. M. Costello falsified hours while on work-release program,

possessed drug paraphernalia, consumed alcohol, missed curfew multiple times, and failed to obey

the law. Ex. 82. *See also* DSOF ¶¶ 117-21, 126-27, 129.

> *136.    According to the police, Mr. Costello once violated his probation because he was out past curfew by less than ten minutes.223 Mr. Costello received 90 days of house arrest for violating curfew.224*

Response: PSOF ¶ 136 is uncontroverted but immaterial to plaintiffs' motion. *See* Response to

PSOF 135.

> 137.   Mr. Costello incurred an additional probation violation for attending a wake at his home for his niece, who died earlier that day.225 Mr. Costello was on house arrest at the time.226 WPD officers were surveilling the wake, and at some point during the wake, someone shot at the house.227 Mr. Costello was charged with possession of a firearm, and although that charge lacked evidentiary support and was later dismissed, he was still found to have violated the terms of his probation.228

Response: PSOF ¶ 137 is controverted. *See* Response to PSOF 117. There were no charges filed because of the drive-by shooting on April 20, 2018, at the "wake." M. Costello dep., 50:9-51:1. The surveillance by WPD occurred at a different event at a different time. Further, M. Costello testified only that he was told WPD were "in the bushes watching for us" but he did not personally observe an officer—*i.e.*, lacks personal knowledge. M. Costello testified only that he was charged with possession of a firearm and the charges were later dismissed, his testimony does not reflect it was "for lack of evidentiary support." *See* DSOF ¶¶ 122.

> 138.   In 2018, the Sedgwick County District Attorney's Office contacted the WPD, stating that "we're trying to get [Mr. Costello] to prison" and requesting that the WPD provide "gang sheets" for two individuals as evidence that Mr. Costello violated "a bunch of gang conditions by associating with known gang members." Lt. Gilmore responded to the prosecutor: "I will make sure you have them." One of the two individuals was Christopher Cooper, Mr. Costello's cousin.229

Response: PSOF ¶ 138 is uncontroverted but immaterial to plaintiffs' claims.

> 139.   Mr. Costello's recent incarceration resulted from violating his probation prohibition on contacts with certain family members by attending his brother's funeral.230 Police informed Mr. Costello that he had violated his probation because he was around gang members at his brother's funeral.231 Even though Mr. Costello had been released from jail on bond to attend, the WPD nevertheless renewed him for attending. Despite "hav[ing] not received any information about potential violence or related activity occurring," the WPD sent five officers "for intelligence gathering purposes" to monitor the funeral and informed ATF and FBI agents.232

Response: PSOF ¶ 139 is controverted. Ex. 15 is an email exchange that states only that M. Costello would attend and Elbert Costello, Sr., requested no gang colors be worn. There is no

documentation to support the suggestion probation was violated by attending. In Ex. 82 Costello

testified WPD officers informed him upon his arrest in August of 2019 that it was because he was

"around gang members at the time of the funeral." M. Costello dep., 56:4-7. *See also* Response to

PSOF 84, explaining Defendant admits to having a presence at funerals of known gang members

to provide safety from rival gang members and to gather intelligence on individuals associating

with the deceased and their families. See Doc. 205-26, Declaration of Cale Carson.

> *140.    In anticipation of his release from prison, Mr. Costello participated in
> Ellsworth's work release program, which allowed him to leave the prison and
> relocate to Wichita to perform maintenance and roadwork for the City of
> Wichita.233 While on a lunch break during his shift for the City, Mr. Costello
> stopped at a convenience store to microwave his food, which is permitted.234 A
> WPD officer confronted him, stating that he "knew" Mr. Costello and calling him
> by his first name. When Mr. Costello attempted to leave, the WPD officer told him
> to stop and indicated that he knew Mr. Costello was working for the City.235 The
> WPD officer made statements that Mr. Costello understood to be warnings that the
> WPD would be watching him when he was released.236*

Response: PSOF ¶ 140 is controverted in part. It is admitted M. Costello testified to an exchange

between himself and an unidentified WPD Officer while on a lunch break during work release.

Plaintiff M. Costello testified the officer told him "I see you work for the City...I hope you staying

out of trouble" to which Plaintiff M. Costello responded "I'm doing the same thing you doing,

keeping the streets clean" and then went on about his day. Ex. 82, M. Costello dep., 53:24-54:2.

There is no evidence the officer made M. Costello stop or communicated a warning to him.

Costello is not competent to testify as to the officer's intent. *See also* DSOF ¶128, 131.

> *141.    All of these experiences cause Mr. Costello to fear that WPD officers will
> harass or intimidate him in the future, including by approaching him out of the blue
> now that he has been released.237*

Response: PSOF ¶ 141 is uncontroverted but immaterial to plaintiffs' motion. The statement is not

supported by Costello's deposition, Ex. 82. *See* Response to PSOF 140.

### M.    Elbert Costello's Inclusion in the Gang Database

*142.    Elbert Costello is a 47-year-old Black resident of Wichita, Kansas. He is a putative class representative in this litigation. He is currently listed as an "active" gang member in the WPD Gang Database and has suffered various harms as a result.238*

Response: PSOF ¶ 142 is controverted. There is no evidence Plaintiff E. Costello suffered harms as a result of his status as an active criminal street gang member in WPD's Master Gang List. *See* DSOF ¶ 148.

*143.    WPD added Mr. Costello to the Database in 1997, when Mr. Costello was 22.239*

Response: PSOF ¶ 143 is uncontroverted.

*144.    Mr. Costello is not a member of a criminal street gang in Wichita or anywhere else.240 Mr. Costello has relatives who were involved with gangs, and he believes he was designated as gang member because of his association with them.241*

Response: PSOF ¶ 144 is controverted in part. It is admitted E. Costello has relatives who are involved in criminal street gangs, and that his various associations with them are some of the bases for his own status as an active criminal street gang member. *See* DSOF ¶ 135 and Doc. 205-26, Declaration of Cale Carson, ¶¶ 8-12.

*145.    Nonetheless, WPD officers believed Mr. Costello to be affiliated with a gang, and WPD officers have repeatedly suspected Mr. Costello of committing gang-related crimes.242*

Response: PSOF ¶ 145 is uncontroverted.

*146.    In 2011, following a search of his home, Mr. Costello was charged with possession with intent to distribute. He accepted a plea of possession of paraphernalia and received one year of probation. Because of the burden of the gang conditions imposed on him, Mr. Costello was repeatedly found to have violated his probation, ultimately spending six months in jail and enduring probation restrictions for approximately three years.243*

Response: PSOF ¶ 146 is controverted in part. It is admitted E. Costello was charged with possession and intent to distribute and that his probation was extended for violations. *See* DSOF ¶¶ 136-37, 140-45.

*147.    Both during and following his probation and parole, Mr. Costello was subjected to increased surveillance and harassment by WPD officers.244 Mr. Costello was—and continues to be—routinely stopped by the WPD for minor traffic violations. WPD officers routinely pull Mr. Costello over for infractions such as "not signaling within 100 feet," and then subject Mr. Costello to invasive questioning.245*

Response: PSOF ¶ 147 is controverted. The evidence cited does not support this statement. Further, E. Costello testified that can't remember the last time he was stopped and that it was at least four years ago. *See* DSOF ¶¶ 138-39.

*148.    While Mr. Costello was on probation, the police would search his car anytime he was stopped because he was on the Gang List and subject to special gang conditions of release.246*

Response: PSOF ¶ 148 is controverted. *See* DSOF ¶¶ 137, 148-50. Further, Plaintiff E. Costello is not competent to testify as to why he was stopped, and his personal belief as to why he was stopped is irrelevant to the determination of the legality of the stop.

*149.    Mr. Costello also avoids visiting certain businesses or establishments in his community—including gas stations—that he believes the WPD sees as "gang hangouts."247*

Response: PSOF ¶ 149 is controverted because the evidence cited does not support the statement. Ex. 86, No. 14 states, "upon his plea agreement…his parole and probation officers told him that he was prohibited from visiting certain businesses or establishments due to his placement on the Gang List" and he was provided that list. The specific list was provided by the probation/parole corrections officers; not WPD. Further, this statement does not support PSOF 149 that E. Costello believes WPD sees certain establishments as "gang hangouts."

*150.    The Gang Database record for Mr. Costello includes dozens of entries pertaining to his actions over the last 25 years. The majority of those entries concern photos of him on Facebook or notations of him socially interacting with others on the Gang List. Each instance has led to Mr. Costello being "renewed" in the Gang Database for an additional three years as an "active gang member."248 For example, Mr. Costello's active status was once renewed for another three years because WPD personnel observed him at a concert with his son Martel Costello and two others, all of whom the WPD believed were gang members.249*

Response: PSOF ¶ 150 is controverted in part. The WPD's documented justification for E. Costello's status and continued renewal as an active criminal street gang member includes his associations, but the reasons are more than mere "social interactions." The documentation records tattoos, display of colors and sports teams known to be affiliated with a specific gang, being present at multiple shootings by and of rival gang members, and conducting known gang-specific handshakes—in addition to committing crimes with other documented gang members. The documents cited show more than simple social interactions with family members. The concert mentioned included "multiple known gang members" and a shooting. *See* Doc. 205-26, Declaration of Cale Carson, ¶¶ 8-12.

> *151.   Mr. Costello's Gang Database entry also contains notes about his tattoos that the WPD believes are gang-related.250*

Response: PSOF ¶ 151 is uncontroverted. *See* Response to PSOF 150.

> *152.   Mr. Costello's Gang Database entry also contains several notes about his presence at various night clubs, despite the WPD's knowledge that he works as a concert promoter who works out of clubs.251*

Response: PSOF ¶ 152 is controverted in part. Multiple entries include E. Costello's attendance at clubs, however, there is only one mention that he "stated that he is in the business of promoting local rap artists[.]"

> *153.   Mr. Costello's Gang Database entry notes his attendance at five different funerals, leading the WPD to renew him for attending with other purported gang members present.252 Mr. Costello was also renewed for attending his grandniece's wake when a drive-by shooting occurred, although he was not present during the shooting.253*

Response: PSOF ¶ 153 is controverted in part. See responses to PSOF 84 and 117. The shooting on April 21, 2018, on S. Yale reports E. Costello was present. (see WICHITA 023978 - E. Costello's database entries) but does not say at what point he attended. The entry also indicates his presence at a gang member's funeral on June 23, 2017, to extend his designation.

154.    The WPD has also renewed Mr. Costello's three-year "active" period simply for wearing "gang colors." Mr. Costello's Gang Database entry contains a January 16, 2021 notation that an officer observed Mr. Costello in a photo on social media wearing a red Philadelphia Phillies baseball cap.254 The photo was taken at a funeral for Mr. Costello's childhood friend.255 Because the color red is associated with a gang, the WPD deemed this a gang-related activity and extended Mr. Costello's period of "active" gang membership until January 2, 2024.256 Similarly, in 2015, the WPD extended Mr. Costello's "active" period for another three years simply because he "posted a photo of himself wearing gang colors," despite noting in the same entry that he "ha[d] no new gang cases."257

Response: PSOF ¶ 154 is controverted. Costello was observed in a photo with other gang members. Ex. 16. Documents that E. Costello was wearing a Phillies hat (a known signifier of a Piru member) while standing in a group of known Pirus (5 active Pirus, 2 inactive Pirus, and 2 Bloods).

155.    Under the terms of his probation, Mr. Costello was forbidden from wearing certain clothing colors and from visiting certain places because of his inclusion in the Gang Database.258

Response: PSOF ¶ 155 is controverted in part. Ex. 85 does not support this statement. E. Costello testified restrictions were due to his drug paraphernalia conviction where he got a year's worth of probation but does not mention inclusion on the gang database. See DSOF ¶¶ 136-37 (admitting these conditions are not set by the WPD and he has no evidence to indicate these conditions were higher because of his gang affiliation).

156.    Mr. Costello received six months of jail time for violating the terms of his probation. On one occasion, the WPD found that Mr. Costello violated the terms of his probation by interacting with friends. Mr. Costello neither knew nor believed that his friends were affiliated with gangs. On another occasion, a probation officer threatened to impose additional sanctions on Mr. Costello for wearing a shirt with red writing on it.259

Response: PSOF ¶ 156 is controverted in part because it misstates the testimony. It is admitted E. Costello violated probation and served jail time. There is no evidence that this violation was for "being around gang members," only E. Costello's testimony that he thinks that was the reason. Ex. 85, E. Costello dep., 47:6-7. Further, there is no evidence in the record of the reasons for the actions of the probation/parole officer, nor are they relevant to the plaintiffs' motion. See DSOF ¶ 136,

(Costello admits that conditions are not enforced by the WPD).

> 157.   *Several years ago, Mr. Costello and his friend organized a community Christmas party for a family in need at a skating rink. The WPD informed the skating rink that gang members would be in attendance, and the skating rink cancelled the event.260*

Response: PSOF ¶ 157 is controverted in part because it misstates the testimony. It is admitted E. Costello testified he attempted to organize a Christmas party at a skating rink. His testimony as to what the WPD allegedly told the manager of the skating rink is inadmissible hearsay. Further, this statement is not material or relevant to the plaintiffs' motion. *See* DSOF ¶ 148 (Costello's inability to provide any documentation of these allegations).

> 158.   *Mr. Costello fears additional harassment and punishment if he attends social and family gatherings—such as barbecues, family dinners, or funerals—with his family or friends.261 He has avoided interacting with lifelong friends because he knows that associating with others on the Gang List will renew his own status as an active gang member on the Gang List and can result in others potentially being classified as gang members or associates.262*

Response: PSOF ¶ 158 is controverted. E. Costello alleges he's been extended as an active criminal street gang member for these same associations he denies. *See e.g.*, PSOF 147. *See also* DSOF ¶ 138 (can't remember the last time he was stopped by the police, but it's been over four years ago).

> 159.   *Mr. Costello also fears that the WPD will perceive his certain clothing, tattoos, or social media activity as gang-related and renew his active status on that basis.*

Response: Defendant objects to PSOF ¶ 159 as inadmissible speculation there is no citation to record evidence to support this statement.

### N.   *Jeremy Levy's Inclusion in the Gang Database*

> 160.   *Jeremy Levy is a 24-year-old Black male from Wichita. He is a putative class representative in this class action suit. He has suffered various harms as a result of his inclusion in the Gang Database. 263*

Response: PSOF ¶ 160 is controverted. There is no evidence Levy suffered harms as a result of his status as an active criminal street gang member in WPD's Master Gang List. *See* DSOF ¶ 111.

*161.    Mr. Levy is incarcerated at the Hutchison Correctional Facility until at least 2042 following a 2017 conviction of first-degree felony murder, when he was 18 years old.264*

Response: PSOF ¶ 161 is uncontroverted but immaterial to plaintiffs' motion.

*162.    Mr. Levy is not, nor has he ever been, a member or associate of a criminal street gang in Wichita or elsewhere.265*

Response: PSOF ¶ 162 is controverted. *See* Doc. 205-26, Declaration of Cale Carson, ¶¶ 21-24.

*163.    Mr. Levy's Gang Database nomination card indicates that Officer Hemmert believed Mr. Levy satisfied the criteria of being contacted with other gang members, being arrested with other gang members, and being identified by a confidential informant.266 Mr. Levy's Gang Database entry indicates that the confidential informant who purportedly initially identified him as a gang member belonged to a rival gang of the gang Mr. Levy supposedly belonged to.267*

Response: PSOF ¶ 163 is controverted in part. It is admitted Levy was nominated for review by Officer Hemmert for the reasons stated. Ex 16, WICHITA 024322 does not identify the informant as a rival gang member. The entry notes Levy has been named as a "suspect in several incidents involving the Folk vs Blood feud[.]" The second sentence in PSOF 163 is unsupported by the evidence and is pure conjecture.

*164.    In 2017, Mr. Levy was the victim of a drive-by shooting by unknown suspects. The WPD renewed Mr. Levy's three-year "active" period based on this incident—even though he was the victim—because "this is thought to be involved in the ongoing feud" between two gangs.268*

Response: PSOF ¶ 164 is uncontroverted and immaterial to the plaintiffs' motion.

*165.    Due to his inclusion on the Gang List, the prosecutor was allowed to introduce evidence at trial of Mr. Levy's alleged gang status and multiple alleged "gang incidents" of an alleged "gang feud" for over six months prior to the alleged incident in which Mr. Levy was charged.269*

Defendant Objects to PSOF ¶ 165 Levy's deposition and declaration are not competent evidence to assert either the nature, context, or basis for admission of the evidence admitted at his murder trial. PSOF ¶ 165 is controverted in part. Mr. Levy's alleged gang status was introduced in the form of testimony by the WPD. Levy dep., 25:16-19, but he was able to challenge and appeal the

decision to allow it. *See* DSOF ¶¶ 102-06, explaining Levy's challenge and subsequent holding by the Kansas Supreme Court that the testimony was properly admitted.

The investigation of Levy's shooting reflected that Levy himself admitted to witnesses that he was "beefing" with the other participant in the shooting—Keandre Summers. Exhibit 11, Affidavit WICHITA 005392-005393 - 17C041050 (13). The evidence was that an ongoing feud, or "beef," existed between the Blood and Folk gangs, Levy was identified as a "main player" on the Folk side. The WPD had evidence that Levy was present at several shootings and was a participant in some of the shooting. *See State of Kansas v. Jeremy D. Levy*, 313 Kan. 232, 485 P.3d 605 (2021).

> *166.   Mr. Levy did not participate in the alleged 13 gang feud events the prosecution introduced, and maintains that the incident for which he was charged was not gang-related.270*

Uncontroverted but immaterial. *See* DSOF ¶ 106 (Kansas Supreme Court held there was significant evidence "that gang membership or activity [was] related to the crime charged.").

> *167.   Inclusion on the Gang List caused Mr. Levy to be denied employment before his incarceration.271*

Response: PSOF ¶ 167 is controverted. Plaintiff Levy is not competent to testify as to why an employer did or did not choose to employ him, and he testified that he didn't know why he didn't get the job. Ex. 88, Levy dep., 33:21-23. The speculation is inadmissible. And Levy only speculates his inclusion on the Master Gang List is the reason he was not a successful applicant.

> *168.   When Mr. Levy is released on parole, he will be subject to highly restrictive supervision conditions that will prevent him from associating with his family and friends.272*

Response: PSOF ¶ 168 is controverted as inadmissible speculation and the cited record does not support the statement.

## II. Defendant's Statement of Additional Facts

Defendant incorporates by reference the Defendant's Statement of Facts in Doc. 205, ¶¶ 1-191, and adds the following:

192. Plaintiffs' expert witness, Anna Muniz, provided no evidence or testimony to support her statement that the policies of the Los Angeles Police Department are similar to those of the WPD. Muniz dep., *seriatim*.

193. Muniz did not review entries from the WPD's gang database. Exhibit 2, Muniz dep., 26:11-27:24; 28:17-18.

194. Muniz did not take into consideration other events that affected CalGang database problems—such as officer misconduct—when forming her opinions. *Id*. at 42:24-43:11.

195. Muniz did not consult with any other experts in creating the report, *id*. at 22:8-10; and her report was not peer-reviewed. *Id*. at 22:11-13.

196. Muniz could not opine on any individual members of WPD's gang list having incurred a negative stigma as a result of being on the list. *Id*. at 47:23-48:2. This included anyone that WPD listed as a gang member being limited on access to jobs or housing or participation in community life or family life. *Id*. at 55:6-22.

197. WPD officers download and preserve photos, videos, and conversations captured from social media sites to verify initial or continued gang membership or affiliation. Exhibit 5, Beard dep., 149:3-12.

198. WPD officers inform their supervisors when they set up a fake account for investigatory purposes. Exhibit 12, Notification of UC Social Media Acct.

199. The statute is not vague when officers consistently apply their training and experience in context. Exhibit 8, Mateo dep., 106:24-110:25.

200. Though Wichita doesn't have gangs that "claim" a specific area—meaning there are

no defined borders—there are areas that are considered gang conflict areas that the officers learn from their training and intelligence sharing/gathering. Doc. 207-18, Salcido dep., 205:16-206:01.

201.    Sheriff Easter testified that most of the beat officers knew the neighborhoods and houses where particular gang members spent time. "To be honest with you most beat officers knew that. We knew it from neighborhood members who wanted us to do something about them in their neighborhood and that's generally how we got the information." Doc. 205-02, Easter dep. vol. II, 55:21-56:17. He also attested to Wichita having known areas where gang members hang out and would have frequent criminal gang activity. *Id*., at 54:21-55:20.

202.    Mapping locations are chosen by the probation or parole office and relate to where an offense occurred. They require an individual to avoid those designated areas during certain times of the day. The program to include gang members in mapping began in 2019 or 2020 and was discontinued in April of 2022 because it was ineffective. Doc. 207-02, Beard dep., 253:22-255:9; Doc. 207-07, Beard 30b6 dep., 190:10-19. In total, the program mapped less than 15 individuals. *Id*.

203.    WPD's 30b6 designee explained the mapping project was an effort to assist the Sedgwick County Community Corrections officers in enforcing conditions of probation/parole imposed by a judge. Doc. 207-07, Beard 30b6 dep., 186:8-22. The program mapped less than 15 people in total. *Id*., 187:3-5. It was discontinued because it was not effective. Doc. 207-02, Beard dep., 253:22-255:9; Doc. 207-07, Beard 30b6 dep., 190:10-19.

204.    Each probationer is put on notice describing the areas and times of day they are prohibited from being in a specific area. Each sign-off to acknowledge receipt of the description of the restriction and the map showing prohibited areas. See e.g. Doc. 207, Exhibit 53, BATES Wichita 047485-515.

205. The Club that Plaintiff E. Costello purported to work at was known as a place where members of the Bloods criminal street gang would hang out. Doc. 207, Exhibit 36.

206. The concert E. Costello, M. Costello, and D. Hubbard were attending was the same Rich The Factor concert held at Club Bounce, a known Blood club. Doc. 207, Exhibit 16, WICHITA 024146.

207. ECF 207, Exhibit 16, WICHITA 053645 and 030074 put both documented gang members at the same funeral for Bernie Ornelas (a known gang member of NSG), so there is no merit to the claim that these persons were renewed for attending a funeral where "no other alleged members" were present. Doc. 207, PSOF ¶ 84.

208. There is no evidence that attending an event hosted by Progeny led to an individual having been added to, or had time extended on, the Gang List.

209. There is no evidence that attendance at any of their hosted events decreased as a result of the WPD's gang database or Master Gang List. Rather, the Executive Director testified their attendance numbers routinely vary. *See* DSOF ¶¶ 168-74.

### III. Argument and Authorities

Plaintiffs' motion should be denied. The undisputed material facts do not show plaintiffs are entitled to judgment on any claim or issue. As more fully set forth in Defendant's Brief, Doc. 205, Defendant is entitled to judgment on all of Plaintiffs' claims.

**A.** **Plaintiffs lack Article III standing. The Court lacks subject matter jurisdiction.**

Plaintiffs have not (1) suffered an injury in fact, (2) that is fairly traceable to attributable to K.S.A. 21-6313 or WPD Policy 527, and (3) that is likely to be redressed by a favorable judicial decision by this Court. Defendant incorporates by reference the arguments in §§ IV.A and IV.E of Defendant's Brief, Doc. 205, 28-38, 68.

**B.**     **Neither WPD Policy 527 nor K.S.A. 21-6313 are void for vagueness, facially or as applied.**

Neither Policy 527 nor K.S.A. 21-6313 prohibit any conduct and do not impinge on First Amendment freedoms or liberty interest. No plaintiff—nor any other person—has been charged with being a criminal street gang member or associate. Rather:

1.     Plaintiff Cooper was charged with first-degree murder in 2014; Cooper was then convicted and sentenced for obstructing justice in 2016;

2.     Plaintiff Levy was charged and convicted of first-degree murder that occurred in 2017;

3.     Plaintiff M. Costello was convicted of criminal damage to property in 2012, intimidation of a witness in 2013, and in 2017 for multiple felonies committed in 2016 and 2017; and

4.     Plaintiff E. Costello was convicted of manslaughter in 1997.

Plaintiffs' arguments ignore the context, plain language, and standards within the statute and policy. Inherent to the definition of a criminal street gang (and, thus, a criminal street gang member or associate) is (1) an organization, association or group with (2) a primary activity of committing person felony and/or misdemeanor crimes or felony drug crimes that (3) has a common name, sign or symbol, (4) with members that individually or collectively commit two or more person felonies and/or misdemeanors or felony drug crimes. K.S.A. 21-6313(a)(1)-(4).

Policy 527 and K.S.A. 21-6313 do not define a crime and do not prohibit or restrict any conduct. K.S.A. 21-6314 defines the crime of "recruiting criminal street gang membership" and where membership requires commission of a crime or submission to a sexual or physical assault. K.S.A. 21-6315 defines the crime of "criminal street gang intimidation" as the threatening injury to person or property with the intent of deterring withdrawal from a criminal street gang or retaliating for withdrawal.

The policy and statute at issue here do not prohibit any conduct by Plaintiffs or any other

person. Policy 527 and K.S.A. 21-6313 do not define a crime and does not prohibit or restrict any conduct. Identification as a criminal street gang member (or associate) or inclusion on Gang List or in the database is not a cognizable injury.

There is no prohibition or punishment under either Policy 527 or K.S.A. 21-6313 for membership in a criminal street gang—likewise there is no crime, prohibition, restriction or punishment for being identified as a criminal street gang member or associate. There is no enforcement action and no deprivation of liberty (*i.e.*, stop, arrest, conviction, sentence, etc.) for any person merely because one is a criminal street gang member or associate—or is identified as one.

The definition of a criminal street gang member or associate, K.S.A. 21-6313(b)(1) (self-admission), or 21-6313(b)(2)(A)-(J) (criteria) all require a criminal street gang (as defined in subsection (a)) and admitted membership or objective indicia of membership or association. That said, however, whether any plaintiff *is or is not* a criminal street gang member or associate is immaterial. The WPD had objective information to identify each Plaintiff as a criminal street gang member or associate. And that identification did not and does not (1) deprive any Plaintiff or class member of a liberty interest, (2) deprive any Plaintiff or class member of any right of speech and/or expression, or right of association, or (3) prohibit any expression, speech or association by any Plaintiff or class member.

Defendant incorporates by reference the argument in § IV.B of Defendant's Brief, Doc. 205, 38-56.

### 1.     WPD Policy 527 and K.S.A. 21-6313 are not facially vague.

Defendant incorporates by reference the argument in § IV.B of Defendant's Brief, Doc. 205, 39-44.

> **2.      WPD Policy 527 and K.S.A. 21-6313 are not vague as applied.**

Defendant incorporates by reference the argument in § IV.B of Defendant's Brief, Doc.

205, 44-56.

**C.      Plaintiffs' procedural due process claim fails. The WPD's gang list and gang database do not significantly alter a state-recognized right.**

Section 1983 requires the deprivation of a federal right.

For plaintiffs—whether their designations as gang members is true or false is a material element of their claim. Defendant disputes Plaintiffs' contentions that they are not, and have never been gang members and has presented objective evidence supporting their designation as gang members. Summary judgment for plaintiff is precluded on that basis alone.

Without regard to the accuracy of the designation, no Plaintiff acquires any new, or altered, "legal status" from being identified as a gang member or associate by the WPD. Controlling Tenth Circuit precedent, *Al-Turki v. Tomsic,* makes clear that Plaintiffs' stigma-plus claim requires change in legal status from the alleged defamation. *Al-Turki v. Tomsic*, 926 F.3d 610, 617 (10th Cir. 2019). The requisite "change in status must be 'significant[].'" *Id.* (alteration in original) (quoting *Paul v. Davis*, 424 U.S. at 711).

Plaintiffs argue designation (or identification) as a gang member is defamatory per se. Doc. 207, 58 (citing Doc. 28, at 25 (citing *Paul v. Davis*, 424 U.S. 693, 697 (1976)). The assertion overlooks the requirement that defamation requires publication. Defamation requires (1) false and defamatory words; (2) communicated (i.e., published) to a third party; where that publication and (3) causes harm to the reputation of the person defamed. *Batt v. Globe Eng'g Co.*, 13 Kan.App.2d 500, 504, 774 P.2d 371 (1989). Publication by the defendant is an essential element for defamation. *McCauley v. Raytheon Travel Air Co.*, 152 F.Supp.2d 1267, 1276 (D.Kan. 2001). *Paul v. Davis* involved the distribution (*i.e.*, publication) of flyers with names, mug shots, and identification of

the plaintiff as an "active shoplifter" to about 800 merchants. 424 U.S. at 695.

The WPD Gang List is not published and only Gang Intelligence Officers have access to the Gang Database. The disclosure of information from the list or database is limited to authorized law enforcement purposes to law enforcement agencies. Probable cause affidavits are not public records. K.S.A. 22-2302(b). Plaintiffs do not, and cannot, identify a single instance where the WPD published their identification as a gang member where that publication caused harm to the reputation of that individual Plaintiff. Plaintiffs speculate that they had bail or conditions of release, probation and/or parole imposed because the WPD informed the court and prosecutor of the WPD's identification of specific arrested persons as a gang member or associate. Plaintiffs cannot present evidence their reputations were harmed by identification as a gang member versus the serious felony crimes with which they were charged—first degree murder, manslaughter, intimidation of a witness and possession of drug paraphernalia.

Without regard to Plaintiffs' inability to establish the defamation element as a matter of law, none of the impacts or harms identified by Plaintiffs constitute a governmentally imposed burden that significantly altered his status as a matter of state law. WPD's identification of Plaintiffs or others as gang members or associates does not significantly alter their status as a matter of state law and does not violate their preexisting rights. Persons who have no law enforcement or criminal justice encounters (*i.e.*, are not stopped, not arrested, not charged) are unaffected by being identified as a gang member or associate. All persons are subject to lawful surveillance by law enforcement officers without regard to whether the person is identified as a gang member or associate. All persons are subject to being stopped based on reasonable suspicion or probable cause to believe the person has or is committing an offense or infraction without regard to whether the person is identified as a gang member or associate.

Further, all persons arrested for a crime are to be presented to a magistrate and are entitled to reasonable bail for non-capital offenses (*see* Kan. Const. Bill of Rights, § 9 and *State v. Cuchy*, 270 Kan. 763, 19 P.3d 152 (2001)) based on an individualized determination by a magistrate who "shall fix the terms and conditions of the appearance bond upon which the defendant may be released," K.S.A. 22-2901(3)—*i.e.*, the court determines conditions of pretrial release. These rights and procedures apply without regard to whether the defendant is identified as a gang member or associate. Persons violating conditions of pretrial release are subject to having the release revoked or the conditions of release modified without regard to whether the person is identified as a gang member or associate.

Convicted persons are subject to sentence—to confinement or post-conviction supervision without regard to whether the person is identified as a gang member or associate. Persons violating conditions of post-conviction supervision (whether community corrections, parole, probation, postrelease supervision, etc.) may have their parole or probation revoked or the conditions of release modified without regard to whether the person is identified as a gang member or associate. Convicted persons who are confined to jail or a correctional facility are subject to conditions imposed by the court or the secretary of corrections without regard to whether the person is identified as a gang member or associate.

The impacts or harms claimed by Plaintiffs are the pre-existing rights and consequences of being arrested and charged with a crime. There is no deprivation of liberty without due process— a hearing and the opportunity to challenge the evidence—throughout the process from first appearance to release from sentence. These rights and consequences are, at every step of the criminal process, accompanied by the myriad of due process protections afforded by the constitution and the code of criminal procedure. No Plaintiff or class member acquires any "legal

status" from being identified as a gang member or associate. The lack of a significant change in legal status from identification as a gang member or associate under Policy 527 or K.S.A. 21-6313 precludes Plaintiffs' procedural due process claim.

Plaintiffs cite the several following cases for the proposition that designation in the database is sufficient alteration of legal status for a stigma-plus claim. Doc. 207, at 60 n315. In *Gwinn v. Awmiller*, 354 F.3d 1211, 1223-24 (10th Cir. 2004), the court agreed that extensive and onerous registration duties imposed by Connecticut's sex offender statute were sufficient to implicate a liberty interest. In *Brown v. Montoya*, 662 F.3d 1152, 1168 (10th Cir. 2011), the court again held that the burdens imposed by being required to register as a sex offender both within prison and later as a condition of parole implicated a liberty interest. In *Castillo v. Cnty. of Los Angeles*, 959 F. Supp. 2d 1255, 1261 (C.D. Cal. 2013), the district court held state-wide database ("available to a broad range of third parties for a variety of purposes,' including pre-employment background checks) listing names of child abuse perpetrators implicated a liberty interest because such databases were integral to the ability, under California law, to be licensed, volunteer to work with children, and to child custody. The district court in *Hall v. Marshall*, 479 F.Supp.2d 304, 314 (E.D.N.Y. 2007) held a pre-sentence report implicated a liberty interest where the content of the report could result ineligibility for parole. In *Latif v. Holder*, 28 F. Supp. 3d. 1134, 1150 (D. Or. 2014), the district court held placement on the No-Fly List implicated a liberty interest by barring plaintiffs from travel.

These cases cited by Plaintiffs do not apply here. The gang list and database, which are not made public, do not impose any burden on Plaintiffs—they are not required to do anything. Identification on the list or in the database does not restrict movement, travel, or association. There is no evidence of any unlawful surveillance, stop or arrest. Identification does not enhance

punishment or sentencing following conviction. Under K.S.A. 21-6804(k), gang membership is not the relevant factor for sentencing, rather there must be proof of specific intent to promote, further, or assist criminal conduct by gang members.

The Plaintiffs' respective declarations and testimony, expressing their belief and speculation that gang designation "altered" the decisions made in their respective criminal prosecutions is inadmissible speculation and lacks foundation.

Levy was convicted of first-degree where the evidence was that Levy himself said he was "beefing" with the other participant in the gang-feud motivated shooting for which he was convicted. The "love triangle" between Levy, DeAdrian Johnson, and a 17-year-old female was part of a larger, long-standing feud between the Folks and the Bloods. *State v. Levy*, 313 Kan. 232, 238–39, 485 P.3d 605 (2021). The Kansas Supreme Court held the evidence of the "long-standing feud between warring gang factions in Wichita" which frequently broke into months of violent retaliation against one another, gave explanation to the motivation for the strip mall shooting— whereas the claimed "love triangle"—by itself—would not explain the animosity that motivated Levy's participation in the shooting. 313 Kan. at 239. Levy's arrest and conviction were a result of his guilt for felony murder—established beyond a reasonable doubt—not because of his gang designation by WPD.

Cooper was the getaway driver from the scene of a first-degree murder. He was arrested and detained on charges of first-degree murder and discharge of a firearm into an occupied vehicle. After a year, Cooper elected to accept a plea to a lesser charge. His charges and detention were because of the severity of the crime, not because of his gang designation by WPD.

### E. Costello

Elbert Costello was unaware he was included on the gang database until after he was

arrested and convicted of manslaughter in Saline County, Kansas in 1997.  He was sentenced to 51 months in prison.  There is no evidence that WPD shared any information with the Salina Police Department, court or prosecutors.  In fact, it was the Salina Police department that informed WPD that Costello was a suspected gang member.  DSOF ¶ 133-135, Doc. 205-26, Carson Decl., ¶ 8.

### M. Costello

Martel Costello self admits that he is, at the least, an 'associate' of the Pirus gang.  M. Costello was convicted of criminal damage to property in 2012, intimidation of a witness in 2013, and in 2017 for multiple felonies committed in 2016 and 2017. He did not become aware that he was listed on the gang list until his arrest in 2016. DSOF ¶¶ 114-115, 127

The conditions of probation and post-conviction sentencing were not imposed by the WPD or because of their gang designation by the WPD.

The gang list and database, and Policy 527 do not restrict employment for anyone. Employers cannot access the list or database and the WPD does not disclose the list or database to employers.

The gang list and database do not limit housing options for anyone. Disqualification from Section 8 Housing is addressed in 24 C.F.R. § 960.204 (denial of admission for criminal activity or drug abuse by household members), gang membership and gang designation are not included. Rather the bases for disqualification include: drug-related criminal activity, engaging in illegal use of a drug, conviction for methamphetamine production, and being required to register as a sex offender. *Id*.; *see also* 24 C.F.R. § 982.553 (denial of admission and termination of assistance for criminals and alcohol abusers). Further, there is a notice and hearing requirement before the termination of public housing. 24 C.F.R. § 982.555. Informal hearing for participant. There is no evidence that any plaintiff, or any other person was denied housing because of gang designation

by the WPD.

Defendant incorporates by reference the argument in § IV.C of Defendant's Brief, Doc. 205, 56-64. Plaintiffs' motion for summary judgment should be denied. Because Policy 527 and K.S.A. 21-6313 do not deprive any person of a protected right, no procedural due process is required for the maintenance of WPD's gang list or database in addition to that provided by the code of criminal procedure. Moreover, the Plaintiffs' interest in additional or different due process connected to designation on the gang list, if not non-existent, is minimal. None of the consequences of which Plaintiffs complain occur without the due process protections afforded by the code of criminal procedure—when bail and conditions of release, parole, probation and sentencing occur. *See, e. g.*, *Goldberg v. Kelly*, 397 U.S. 254, 263-271 (1970) (process due balances three factors: (1) private interest affected by government action, (2) risk of erroneous deprivation of that interest through existing procedures, and (3) government interest in the burdens of additional or substitute procedures); and *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976) (same).

**D.     Plaintiff's rights of association and expression are not violated by Policy 527 or K.S.A. 21-6313.**

Policy 527 and K.S.A. 21-6313 do not regulate speech or association. To the extent K.S.A. 21-6313 regulates anything, it provides the definitions for the subsequent three statutes—K.S.A. 21-6314 through 21-6316. Those statutes do not regulate speech or association either. No person is subject to any regulation, penalty, arrest, prosecution, or sentence based on (1) any tattoo they may have (or had), (2) clothing they wear (or wore), (3) non-criminal communication on social media,[1] (4) association a given person, group or place.

K.S.A. 21-6313 and WPD Policy 527 do not preclude Plaintiffs from attending funerals, concerts, sporting events, or other events. They do not preclude Plaintiffs from associating with

---

[1] Criminal threats may be subject to prosecution. K.S.A. 21-5415.

their families, with other gang members, or anyone else. Plaintiffs are free to meet and associate where and with whom they please. Progeny can, has, and continues to hold meetings and events without restriction by K.S.A. 21-6313 and WPD Policy 527.

Police presence in a public place at a public event is not "harassment." The WPD has not prevented, interfered with, or otherwise disrupted a meeting or event sponsored by Progeny.

Policy 517 and K.S.A. 21-6313 impose no sanction, the Gang List and database are not a sanction. Plaintiffs' First Amendment claims require "[t]he threat of sanctions may deter" the exercise of First Amendment freedoms as well as "the actual application of sanctions." *NAACP v. Button*, 371 U.S. 415, 433 (1963). The "prohibitions" described by Plaintiffs amount to a claim of a "subjective" chill and are inadequate to state a claim under the First Amendment. *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972); *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003).

Defendant incorporates by reference the argument in § IV.D of Defendant's Brief, Doc. 205, 64-66.

## IV. Conclusion

For the foregoing reasons and those in Defendant's Brief, Doc. 205, the Court should find Plaintiffs' are entitled to no relief and their motion for summary judgment should be denied.

**Fisher, Patterson, Sayler & Smith, LLP**
3550 S.W. 5th Street
Topeka, Kansas 66606
Tel: (785) 232-7761 | Fax: (785) 232-6604
dcooper@fpsslaw.com |
cbranson@fpsslaw.com

**s/David R. Cooper**
David R. Cooper                    #16690
Charles E. Branson                 #17376
**Attorneys for Defendant**

Jennifer L. Magaña, #15519
City Attorney
Sharon L. Dickgrafe, #14071
Chief Deputy City Attorney
City Hall-13th Floor
455 North Main
Wichita, Kansas 67202
P: (316) 268-4681 | F: (316) 268-4335
sdickgrafe@wichita.gov
**Attorneys for City of Wichita**

**Certificate of Service**

On October 20, 2023, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

**s/David R. Cooper**