# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

PROGENY, a program of Destination )
Innovations, Inc., CHRISTOPHER )
COOPER, ELBERT COSTELLO, )
MARTEL COSTELLO, and JEREMY )
LEVY, JR., on behalf of themselves and )
others similarly situated, )
                             )
             Plaintiffs, )
                             )
     vs. )**CASE NO.**
                             ) 6:21-cv-01100-EFM-ADM
CITY OF WICHITA, KANSAS, )
                             )
             Defendants. )
_____ )

## DEPOSITION OF
## DR. ANA MUNIZ

**DATE:**           Friday, May 19, 2023

**REPORTER:**     Dalia R. Smith, CSR No. 8486

**LOCATION:**     5 Park Plaza
                      Suite 1600
                      Irvine, California 92614



## HINES REPORTERS

**INTERNATIONAL TOWER**
**888 S. FIGUEROA STREET, SUITE 940, LOS ANGELES, CALIFORNIA 90017**

**866.432.4300; 213.688.7887**

**WWW.HINESREPORTERS.COM**

Case 6:21-cv-01100-EFM    Document 218-2    Filed 10/20/23    Page 2 of 10

Progeny, et al. vs. City of Wichita, KS                    Deposition of Dr. Ana Muñiz

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF KANSAS

3

4    PROGENY, a program of Destination ) Case No.:
     Innovations, Inc., CHRISTOPHER    ) 6:21-cv-01100-EFM-ADM
5    COOPER, ELBERT COSTELLO, MARTEL   )
     COSTELLO, and JEREMY LEVY, JR.,   )
6    on behalf of themselves and       )
     others similarly situated,        )
7                                      )
     Plaintiffs,                       )
8                                      )
             vs.                       )
9                                      )
     CITY OF WICHITA, KANSAS,          )
10                                     )
     Defendant.                        )
11   _____)

12

13            DEPOSITION OF DR. ANA MUNIZ

14

15

16

17   5 Park Plaza, Suite 1600
     Irvine, California 92614

18

19

20   FRIDAY, MAY 19, 2023

21

22

23

24   DALIA R. SMITH,
     Certified Shorthand Reporter No. 8486

25

Progeny, et al. vs. City of Wichita, KS                                    Deposition of Dr. Ana Muñiz

**Page 26**

1  when we see those similar policies.
2  Q.  Okay.  Well, thank you.  I did mention that you
3  indicated you were an expert on LA gang policies.  That
4  is not my assessment.
5  MR. BAEHR:  Objection to form to the extent that was
6  a question or not a question.
7  BY MR. BRANSON:
8  Q.  You've authored four opinions in this case.
9  Your first opinion you indicate that gang designations
10  are overinclusive and inconsistent.
11  Doctor, tell me in your review of the Wichita
12  Police Department gang list did you identify anybody on
13  that list that should not be listed?
14  MR. BAEHR:  Objection to form.
15  THE WITNESS:  I did not see the list, so I was not
16  able to identify if someone was legitimately on or not on
17  that list.  There were Wichita Police Department officers
18  who in their depositions said that they had found people
19  on the list that they believed did not fit the
20  criteria.
21  BY MR. BRANSON:
22  Q.  You're referring to a statement by Chad Beard?
23  A.  Let me make absolutely sure.  Yes.
24  Q.  Okay.  Doctor, your testimony was that you've
25  not seen the Wichita Police Department gang list and

**Page 27**

1  you're unable to make a determination whether or not
2  somebody was legitimately or not on the list, right?
3  MR. BAEHR:  Objection to form.
4  THE WITNESS:  Whether an individual, yes.
5  BY MR. BRANSON:
6  Q.  So your answer to me suggests that somebody
7  could be legitimately on that list.
8  MR. BAEHR:  Objection to form.
9  BY MR. BRANSON:
10  Q.  Is that fair?
11  A.  That someone could -- I have no way to assess
12  that.
13  Q.  So it's your testimony here today that you have
14  no way to assess whether or not somebody is legitimately
15  listed as a gang member on the Wichita Police
16  Department's gang list?
17  A.  I have no way to assess it with the information
18  that I've been given right now.  So I may be able to
19  assess it if I was given the names and backgrounds of
20  people on that list, and also given a breakdown of the
21  criteria by which their membership was designated.
22  Q.  Doctor, in your Opinion 1 you indicate that it's
23  your opinion that the Wichita Police Department's gang
24  list is inconsistent.
25  What do you mean by that?

**Page 28**

1  A.  That it's possible, for example, and this is
2  also stated by officers, by Wichita Police Department
3  officers in their depositions, that it would be possible
4  because the criteria are vague and overly broad for one
5  officer to make one assessment looking at the same person
6  and the same evidence and a different officer to make a
7  different assessment.  Also because these are very
8  discretionary, it's possible for an officer to see that
9  somebody might fit these criteria and yet choose not to
10  put them on the list.  To see that they meet the criteria
11  for membership and yet choose to put them on the list as
12  an associate instead of a full member.
13  Q.  You say it's possible, but have you identified
14  any inconsistencies in Wichita Police Department's gang
15  list?
16  MR. BAEHR:  Objection to form.
17  THE WITNESS:  Again, I haven't seen the actual gang
18  list.
19  BY MR. BRANSON:
20  Q.  I'll repeat my question.  Have you identified
21  any inconsistencies within the Wichita Police Department
22  gang list?
23  A.  And I'll repeat the answer that I have not
24  actually seen the gang list.
25  Q.  So your answer is no?

**Page 29**

1  A.  My answer is I have not seen the gang list.
2  Q.  You also indicate that the gang list is
3  overinclusive.  That the Wichita Police Department's gang
4  list is overinclusive.
5  Can you tell me what you mean by that.
6  A.  Well, when we look at these criteria they allow
7  for overinclusivity.  So we see these criteria which as I
8  mentioned many people could fit.  I could fit.  And so my
9  research has taught me that when we see criteria like
10  this that are vague and overly broad, that they're likely
11  to capture people who are not involved in gang activity.
12  Q.  What evidence of overinclusion do you have to
13  support your opinion about the Wichita Police
14  Department's gang list?
15  A.  The evidence is looking at the policy.  Because
16  the policy structure is the practice, and enables that
17  use of discretion in overinclusion.
18  Q.  So it's your opinion that because the policy
19  allows for discretion then it has to automatically have
20  people over include people?
21  A.  It enables that overinclusion.  And if we
22  compare it to evidence we've seen with departments using
23  remarkably similar criteria we have had evidence of that
24  overinclusion.
25  Q.  What evidence do you have that the Wichita

Progeny, et al. vs. City of Wichita, KS                                    Deposition of Dr. Ana Muñiz

BY MR. BRANSON:

Q. Did you make any analysis if those gang databases that you conducted research on had the same policies and procedures and audit processes that the Wichita gang database does?

A. I did look at those to see if those departments had the auditing processes. So, for example, the CalGang database has a consistent audit process. To my knowledge I haven't seen evidence that WPD has provided regular and consistent audits.

Q. Are you aware of any audit process that the WPD employs?

A. I know that they claim to have an audit process. But I wasn't provided, for example, like purging numbers or dates on which audits were done and how many people were found to be and accurately on the database and purged.

Q. Were you provided the audit process itself?

A. Let me just be sure. Let me look at this opinion. I can't recall specifically if those -- I would need to look at these documents again to recall specifically if there was mention of an audit procedure in particular.

Q. In your report you discuss your perceived problems with the LAPD's CalGang database and entry of

Page 42

inaccurate information. We've already established that you have not reviewed the individual gang entries in the Wichita Police Department gang database.

Do you have any opinion whether or not the problems that plague the CalGang database such as officer misconduct in entering information that you describe on page nine has occurred on Wichita Police Department gang's database?

MR. BAEHR: Objection to form.

THE WITNESS: I was not given information about officer conduct by -- officer misconduct by the WPD.

BY MR. BRANSON:

Q. Doctor, on page 12 of your report you indicate, "Under the Wichita Police Department's policy the lack of due process protections concerning how information is added to and maintained in the gang list makes it incredibly difficult for an individual to correct inaccurate information in the gang list or have their information removed from the gang list."

What due process protections are you speaking of?

MR. BAEHR: Objection to form.

THE WITNESS: So one of those would be the fact that there is not a compulsory notification procedure, and not a clear appeal procedure for all people who have been

Page 43

added to the gang list.

BY MR. BRANSON:

Q. Any other basis for making -- or having the opinion that there's a lack of due process protections?

A. Well, upfront the criteria being overinclusive, there -- you know, those are vague. And so I think there's some issues there. But as far as information that's already in the database, it's difficult, which I think is what you're referring to here, correcting inaccurate information. If people are not informed that they've been added to the database they cannot challenge or correct that information.

Q. You used the term due process protections. Are you drawing a legal conclusion in your opinion?

MR. BAEHR: Objection to form.

THE WITNESS: I am not.

BY MR. BRANSON:

Q. Then what is the significance of a due process protection?

A. Can you repeat that question.

Q. Well, I'm trying to understand. If you're not making a legal conclusion what -- by stating an opinion that Wichita Police Department's gang database lacks due process protections, I'm trying to understand what exactly you mean by due process protections.

Page 44

A. I'm referring to the procedures that would allow people to learn if they're in the database and to correct that information so that it does not affect them negatively down the line.

Q. Okay. These are procedures that you believe are inadequate within the Wichita Police Department gang database?

A. The procedures that I reviewed I did not see a notification and removal process which, yeah, opens up this gang list to inaccurate information.

Q. Do you have an opinion whether or not individuals listed on the gang database are entitled to notice or opportunity for removal?

MR. BAEHR: Objection to form.

THE WITNESS: Do I believe an individual is entitled to know if they're on this gang database?

BY MR. BRANSON:

Q. Correct.

A. I think that when you have a notification -- when you have no notification process, process for appeal, process for removal, that it enables the database to hold inaccurate information. There are other departments who have similar gang lists, similar gang databases, and do have notification and removal processes for this very reason.

Page 45

H I N E S   R E P O R T E R S                              12 (42 - 45)

Case 6:21-cv-01100-EFM    Document 218-2    Filed 10/20/23    Page 5 of 10

Progeny, et al. vs. City of Wichita, KS                    Deposition of Dr. Ana Muñiz

1    Q.  Doctor, you talk about certain stigmas attaching

2  to people that are listed on the -- listed on a gang

3  database.

4        What is the basis of your opinion that there's a

5  stigma that attaches?

6    A.  My review of research in the field, and also my

7  own research over the course of about 15 years.

8    Q.  And tell me what you mean by stigma attaches.

9    A.  Well, a stigma -- a stigma is something that

10  when someone has a label they are negatively viewed.  So

11  that can be through official processes.  For example, I

12  did an extensive amount of research that demonstrated

13  that people who have been designated gang members or

14  associates are ineligible for certain aspects of

15  immigration relief.  But that stigma can also be more

16  informal.  So it can result in, for example, if someone

17  in -- if a community is aware that someone has been

18  designated a gang member, they may look more negatively

19  upon that person.  May reject them socially.  It's also

20  possible that an employer would look at them negatively

21  and deny them housing opportunity -- I mean, I'm sorry --

22  employment opportunities, for example.

23    Q.  Are you aware of anybody listed on the Wichita

24  Police Department's gang list that's been denied

25  employment or housing opportunities?

1    A.  I was not given documents that would allow me to

2    review that and state that and opine on that.

3    Q.  Doctor, a stigma implies the person is aware

4    that they are on the list.

5    MR. BAEHR:  Objection to form.

6    THE WITNESS:  Not necessarily, no.

7    BY MR. BRANSON:

8    Q.  Okay.  Explain.  How would a person have a

9    stigma if they were not aware that they were on the

10   list?

11   A.  So a stigma is how other people view that

12   person.  So, for example, if that information is shared

13   with another agency that might come up during an

14   employment background check, an employer could stigmatize

15   someone who has been alleged to be a gang member or

16   associate and treat them differently.  Deny them a job,

17   for example.

18   MR. BRANSON:  Okay.  We've been going about an

19   hour.

20   MR. BAEHR:  Yeah, I was going to see if you --

21   MR. BRANSON:  Yeah.

22   MR. BAEHR:  I didn't want to interrupt, but if it's

23   a good place, let's take a break.

24   MR. BRANSON:  No, no.  Interrupt any time.

25       Doctor, any time you need a break during this --

1  thing that qualifies people for these gang conditions.

2  BY MR. BRANSON:

3      Q.  You go on and indicate that your perceived

4  negative consequences may also include that it limits

5  access to jobs and housing.

6          Were you provided any information with regard to

7  the Wichita Police Department's gang policy that people

8  have been limited on their access to jobs and housing?

9      A.  I was not given specific named cases to review.

10     Q.  You also opine that they may suffer reduced

11 participation in community and family life.

12         Were you provided any specific information to

13 opine about the Wichita Police Department's affect on

14 reduced participation in community and family life?

15     A.  That opinion was based on that in places where

16 there are criteria for gang designation that are very

17 similar to the Wichita Police Department's, that that was

18 an affect that gang-designated people experienced.

19     Q.  Okay.  Again, nothing specific to Wichita Police

20 Department's gang list?

21     A.  I was not given access to named people on the

22 gang list.

23     Q.  You also go on and talk about "disrupted

24 educational opportunities and narrowed option for

25 immigration relief."

**Progeny, et al. vs. City of Wichita, KS**                    **Deposition of Dr. Ana Muñiz**

1   BY MR. BRANSON:

2       Q.   Are you aware of any validated scientific

3   research or studies that have determined the percentage

4   of the Black population that is involved in gang

5   activity?

6       A.   No, I can't recall right now a specific study.

7       Q.   Do you recall a study that involves Caucasians?

8       A.   I cannot recall a specific study right now that

9   determines the percentage of Caucasians that are involved

10  in gangs.

11      Q.   Are you aware of a study that involves Asians?

12      A.   No, I can't recall a specific study right now.

13      Q.   Are you aware of a study that involves

14  Latinos?

15      A.   No, I personally can't recall that right now.

16  It may very well exist.

17      Q.   I understand.  I figured that was your answer.

18  I just needed to get my categories.

19           You indicate that the Wichita Police

20  Department's demographic data disproportionately

21  designates black men as gang members and associates.

22           What data are you referring to?

23      A.   This is data that I was provided by plaintiff's

24  attorneys which they, I believe, were provided with by

25  the Wichita Police Department that were racial breakdowns

**H I N E S   R E P O R T E R S**                                    **60**

```
 1   of people on the gang list.

 2        Q.   Okay.  You indicate that the Wichita Police

 3   Department's demographic data demonstrates that the

 4   Wichita Police Department disproportionately designates

 5   black men as gang members and associates.

 6             What is the disproportionality related to?

 7        A.   Can you specify related to, what you mean by

 8   that?

 9        Q.   No, I can't because that's my question to you.

10   What's -- it's disproportionate to what?

11        A.   To percent- --

12        MR. BAEHR:  Objection to form.

13        THE WITNESS:  To percentage of the population.

14   BY MR. BRANSON:

15        Q.   Are you aware of any studies that identify --

16   well, I think you've already answered.  That you're not

17   aware of any studies that identify what proportion of the

18   Black population, for example, is involved in gang

19   activity.

20        A.   I can't recall a specific study right now.

21        Q.   But without recalling a specific study you still

22   believe that Wichita Police Department's gang database

23   disproportionately designates people?

24        A.   In proportion to the population there is a

25   disproportionate designation of Black people.
```

**Progeny, et al. vs. City of Wichita, KS**                    **Deposition of Dr. Ana Muñiz**

1        Q.   You make that comparison.   Do you have an

2    opinion that that's the appropriate comparison to make

3    for disproportionality studies?

4        A.   I'm not an expert in disproportionality studies

5    so I would need to -- I would need to review that

6    methodology in particular.

7        Q.   You go on to state, "Gang enforcement efforts

8    frequently target racial minority groups while

9    overlooking other dangerous groups with similar

10   characteristics such as white supremacist groups or law

11   enforcement gangs."

12            What are you referring to when you say law

13   enforcement gangs?

14       A.   So there are -- there have been proven to be

15   groups within law enforcement agencies who, for example,

16   fit this criteria.   So have matching tattoos, engage in

17   criminal activity.   Have hierarchies in which people move

18   up the hierarchy in the group by committing certain

19   criminal activities.   So they would fit this definition

20   of a gang.   However, those groups, those law enforcement

21   gangs are rarely by law enforcement identified as such.

22       Q.   So if I understand correctly, you're stating

23   that there are criminal gangs operating within

24   established law enforcement agencies?

25       A.   Other research has established that.