

Kevin McKenna

December 1, 2022

Progeny, et al.

vs.

City of Wichita, Kansas

```
 1        IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF KANSAS
 3
 4   PROGENY, a program of Destination    )
 5   Innovations, Inc., CHRISTOPHER       )
 6   COOPER, ELBERT COSTELLO, MARTEL      )
 7   COSTELLO, and JEREMY LEVY,JR., on    )
 8   behalf of themselves and others      ) Case No.
 9   similarly situated,                  ) 6:21-CV-01100-
10       Plaintiffs,                      ) EFM-ADM
11   vs                                   )
12   CITY OF WICHITA, KANSAS,             )
13       Defendant.                       )
14   _____)
15             VIDEOTAPED DEPOSITION OF
16                  KEVIN MCKENNA
17                 December 1, 2022
18                    8:31 a.m.
19
20                    Taken at:
21              Joseph, Hollander & Craft
22                  500 North Market
23                   Wichita, Kansas
24
25   Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR

                                                    1
```

```
 1   APPEARANCES:
 2      On behalf of the Plaintiffs:
 3         Mr. Jordan C. Baehr
 4         Mr. Paul M. Vogel
 5         Mr. Thomas J. Sullivan
 6         Shook, Hardy & Bacon, LLP
 7         2555 Grand Boulevard
 8         Kansas City, Missouri 64108
 9         (816)474-6550
10         Fax: (816)421-5547
11         jbaehr@shb.com
12         pvogel@shb.com
13         tsullivan@shb.com
14
15      On behalf of the Defendant:
16         Mr. Charles E. Branson
17         Fisher, Patterson, Sayler & Smith, LLP
18         3550 S.W. 5th Street
19         Topeka, Kansas 66606
20         (785)232-7761
21         Fax: (785)232-6604
22         cbranson@fpsslaw.com
23
24      On behalf of Kansas Appleseed Center for Law
25      and Justice, Inc. (By Zoom)

                                                    2
```

```
 1   Ms. Teresa A. Woody
 2   211 E. 8th Street, Suite 3
 3   Lawrence, Kansas 66044
 4   (785)251-8160
 5   twoody@kansasappleseed.org

                                                    3
```

```
 1
 2             TRANSCRIPT INDEX
 3   APPEARANCES.................................  2
 4   INDEX OF EXHIBITS...........................  5
 5
 6   EXAMINATION OF KEVIN MCKENNA:
 7   BY MR. BAEHR................................  6
 8
 9
10
11
12
13
14
15
16
17
18
19   REPORTER'S CERTIFICATE...................... 237
20
21   EXHIBIT CUSTODY
22   EXHIBITS RETAINED BY COURT REPORTER
23
24
25
                                                    4
```

**Page 33**

1 to involved a gang member or potential gang
2 activity?
3      A.  As a patrol officer I would say
4 probably about 60 percent.  We are not dispatched
5 by Dispatch to calls.  We respond to -- we tell
6 Dispatch that we're going to go to that drive-by or
7 to that so we aren't taking 9-1-1 calls.
8      Q.  Okay.
9      A.  We will respond to the calls that we
10 need to respond to.
11      Q.  And so do you make a determination
12 based on a signal that's sent out by other officers
13 whether you should respond to a given call or not
14 as a patrol officer?
15      A.  You would -- there's no signal, there's
16 nothing like that, but there's calls that you would
17 obviously respond to no matter what.  A shooting
18 call, that's what you are there for.  You know that
19 shooting is going to come to the Gang Unit or the
20 Felony Assault Unit is what it's called also and so
21 we would respond to that call, right?  It doesn't
22 matter who it is; we're going to it.  But there was
23 also times where you would respond to a drive-by
24 call and my partner and I would go out there and
25 get the initial report and contact the team and

**Page 34**

1 say, no, you guys aren't needed out here; we can
2 take care of this out here by ourselves so they can
3 be ready for the next call in the city.
4      Q.  Okay, and just to clarify, you said you
5 weren't dispatched to particular calls, correct --
6      A.  Correct.
7      Q.  -- by a centralized dispatcher; right?
8      A.  Correct.
9      Q.  So how do you become aware of incidents
10 that you might or might not respond to?
11      A.  Well, we're in a patrol car.  Like
12 we're in a patrol car that has a radio and
13 dispatch, connected to Dispatch and we have a
14 computer in our car that has what is called CAD.
15      Q.  Some of the questions that I ask may
16 seem silly to be questions that maybe because I
17 don't know or maybe just because I'm trying to
18 clarify and get an explanation on the record.  But
19 you would receive calls from other officers when
20 you were on patrol and that was your source of
21 information about incidents that you might respond
22 to, right, like they would call and say we have a
23 drive-by shooting or --
24      A.  No, no.
25      Q.  Okay.

**Page 35**

1      A.  We work just as patrol officers do.
2 We're out on the streets.  We are in a patrol car,
3 we're wearing a police uniform.  We're expected to
4 be out there and assist with those calls.  The same
5 call that that patrol officer is dispatched to we
6 hear that on our radio and we will advise Dispatch
7 274 I'll be in route to that or with your call sign
8 and tell them we'll be in route over there.
9      Q.  Okay, and so you estimate that of the
10 calls that you responded to approximately
11 60 percent involved gang members or potential gang
12 activity?
13      A.  Yes, sir.
14      Q.  And then as a detective is it your
15 testimony that 30 to 35 percent of the cases that
16 you investigate involve gang members or gang
17 activity?
18      A.  Yes, sir.
19      Q.  Why is the number or that proportion
20 lower for you as a detective than it was as a
21 patrol officer?
22      A.  Well, because as a patrol officer you
23 are working Friday nights, you are working Saturday
24 nights.  You are going to every hot call in the
25 city so you are out there more frequently and you

**Page 36**

1 are going from scene to scene, which is case to
2 case to case, right, and so as a detective -- we
3 have 14 detectives so you don't get assigned every
4 case and so I don't take every case that comes into
5 the Gang Unit.  So your percentage will drop
6 because you don't get every case from the weekend.
7 It's distributed throughout the Gang Unit or the
8 Felony Assault Unit.  So that's when you start
9 getting the cases that are a citizen that got beat
10 up outside of Pump House and is a victim of an
11 aggravated battery and you start getting those
12 cases that have nothing to do with gang-related
13 stuff.
14      Q.  Would those have been cases that you
15 wouldn't have responded to as a patrol officer?
16      A.  Yes.
17      Q.  So is it your testimony that in a given
18 weekend 60 percent of the calls that are sent out
19 ultimately end up involving a gang member or gang
20 activity?
21      A.  No, no, no.
22      Q.  Just that after you have or as you are
23 on patrol and you are selecting which calls to
24 respond to and targeting ones that would
25 potentially involve either gang activity, gang

9 (Pages 33 to 36)

**Page 161**

1  them to decide whether a person who meets the
2  strict express criteria of the statute should be
3  added to the gang database?
4     A.  Yes.
5     Q.  Okay.  So there may be gang
6  intelligence officers who would put someone into
7  the gang database as a gang associate based
8  strictly on seeing someone sitting at a table with
9  other people listed on the gang list and wearing a
10 Washington Nationals jersey?
11       MR. BRANSON: Object to form.
12    A.  Possibly, yes.
13    Q.  (By Mr. Baehr) Okay. In your personal
14 view, such an individual might not be affiliated
15 with a gang; is that true?
16    A.  Correct.
17    Q.  And you personally would not interpret
18 the simple fact of someone sitting at a table with
19 other people on the gang list and wearing a
20 Washington Nationals jersey as behavior intended to
21 claim membership in the gang.
22    A.  No.  I'm telling you that I would not
23 immediately go enter them into the gang database
24 and flag them as an associate.  Okay.  That's what
25 I'm telling you.

**Page 162**

1     Q.  I understand.  You would need to see
2  something more; correct?
3     A.  Correct.
4     Q.  And some of that something more isn't
5  necessarily listed in Policy 527 or the statute;
6  right?
7     A.  Correct.
8     Q.  Okay.  So there may be -- there may be
9  indicia of gang membership that you, as a gang
10 intelligence officer, would find important to
11 determining whether someone is appropriate for
12 inclusion in the gang database that aren't listed
13 in the policy or in the statute.
14       MR. BRANSON: Object to form.
15    A.  Correct.
16    Q.  (By Mr. Baehr) Okay. On the other hand,
17 a different officer could view it differently; is
18 that right?
19    A.  Always.
20    Q.  There could be an officer whose
21 approach to applying Policy 527 and the statute is
22 just to tick the boxes if the person is observed
23 meeting those criteria and enter them in the
24 database; is that right?
25    A.  Yes, sir.

**Page 163**

1     Q.  I know we have been going awhile.  I
2  think this is a good time for a break so let's go
3  off the record.
4        VIDEOGRAPHER: The time is 12:17 p.m..
5  We are off the record.
6        (Whereupon a recess was taken from
7  12:17 p.m. to 12:30 p.m.)
8        VIDEOGRAPHER: The time is 12:30 p.m.
9  and we're back on the record.
10    Q.  (By Mr. Baehr) All right.  When we went
11 off we were talking about, I think sort of how you
12 applied Policy 527 and the statute as an officer or
13 as a detective if you observed someone in the
14 community who might meet some of the criteria; is
15 that right?
16    A.  Yes, sir.
17    Q.  Okay.  Part of your role as a gang
18 intelligence officer was to review TOPS cards
19 submitted by other officers; is that correct?
20    A.  Yes, sir.
21    Q.  And other officers might apply Policy
22 527 differently than you would; right?
23    A.  Yes, sir.
24    Q.  They might submit a TOPS card for
25 someone that you would not have submitted a TOPS

**Page 164**

1  card for?
2     A.  Yes, sir.
3     Q.  And they might submit it based on a
4  person meeting the strict criteria of Policy 527
5  without indicia that you would consider important
6  to identifying if that person was involved in gang
7  lifestyle?
8     A.  Yes, sir.
9     Q.  And so part of your job was to review
10 the TOPS card and decide whether to actually add
11 that individual to the database; correct?
12    A.  Yes, sir.
13    Q.  And you would conduct additional
14 research to determine whether you should add that
15 individual to the database; is that right?
16    A.  Yes, sir.
17    Q.  Did you ever add individuals to the
18 database based purely on the information in the
19 TOPS card?
20    A.  Yes.
21    Q.  What would determine whether you added
22 an individual to the database based purely on the
23 TOPS card versus conducting additional research?
24    A.  Like self-admits, that when they
25 self-admit to being in a gang that would be an easy

```
 1   that person met in order to be added to the
 2   database?
 3           MR. BRANSON: I object to the form?
 4       A.  Yes.
 5       Q.  (By Mr. Baehr) So they don't -- would
 6   an officer ever submit a TOPS card that only
 7   indicated one criteria had been met?
 8       A.  No.  Officers can make cards -- I mean,
 9   they are young officers.  They don't always know
10   what they are doing so we've seen cards that they
11   don't meet that, but that's our job.  We're the
12   gatekeeper of the database is to insure that it's
13   correct.
14       Q.  Okay. So some officers might submit a
15   card that only indicates one criteria had been met?
16       A.  It wouldn't surprise me.
17       Q.  Okay, and in that case would you just
18   like take that card off your desk and say well,
19   they don't -- that doesn't meet the requirement
20   so --
21       A.  No.  That TOPS card gets scanned in and
22   gets filed away like any other card would.
23       Q.  Would you conduct additional research
24   into that individual in order to find if they met
25   more criteria?
                                                201
```

```
 1       Q.  Is it true that an officer might submit
 2   a card identifying that an individual met three
 3   criteria of inclusion in the database under Policy
 4   5257 and you would review that card and determine
 5   well, maybe they did meet those criteria
 6   technically but I don't think that they should be
 7   added to the gang database as a gang member?
 8       A.  As an active gang member, yes.
 9       Q.  Okay.  Can you add an individual to the
10   gang database as an inactive member?
11       A.  No.  You would add them as an
12   associate.
13       Q.  Okay.
14       A.  So instead of an active member you
15   would add them as an associate member.
16       Q.  Okay. So let's --
17       A.  Even though they meet three they are an
18   associate.
19       Q.  Okay.  Why would you add them as an
20   associate if they technically met three of the
21   criteria?
22       A.  Back to The Chosen Few.  Let's say
23   you're property -- in the motorcycle culture that
24   refer to women as property of.  So I don't mean
25   derogatory, but your property of is wearing a
                                                203
```

```
 1       A.  Yes.
 2       Q.  Okay. So there could be an instance
 3   where an officer submitted a TOPS card, only
 4   indicated that one criteria had been met, but then
 5   you would conduct research specifically into that
 6   person looking for other criteria that they had met
 7   and then add that person to the database?
 8       A.  Yes.
 9       Q.  Okay.  Likewise, an officer could
10   submit a card that indicated three or more criteria
11   had been met and you would conduct research into
12   that person and you might find these criteria
13   haven't in fact been met?
14       A.  Correct.
15       Q.  An officer might -- and in that case
16   you wouldn't add that person to the gang database;
17   right?
18       A.  Yes, sir.
19       Q.  An officer might submit a card that
20   identified two criteria for inclusion into the
21   database and you would conduct additional research
22   and you might find that they met six criteria and
23   they should be added to the database as a member,
24   not just as an associate; is that right?
25       A.  Yes, sir.
                                                202
```

```
 1   support shirt, says Support your Local 36 on it.
 2   She's inside the clubhouse.  She's seen with
 3   members, right, and then let's say that she's
 4   contacted also.  So what do you have there, and you
 5   have multiple accounts on social media where she's
 6   inside the clubhouse; she's adopted a style in
 7   dress and she's been contacted multiple times with
 8   members but we know she can't be a member of the
 9   Chosen Few.  She's a female and so she's an
10   associate.
11       Q.  So in that case you would know based on
12   her gender that she shouldn't be included as a
13   member of that database?
14       A.  Yes.
15       Q.  If that same person with those same
16   criteria were a man, would you add them as a member
17   to the database?
18       A.  He would still be an associate.
19       Q.  Why is that?
20       A.  Because in motorcycle culture there's
21   three or there's actually four ranks.  So the
22   lowest, the lowest person in that club is the
23   females.  The motorcycles mean more than the
24   females do.  They call them old ladies, they call
25   them sheep, they call them property of.  A bandito
                                                204
```

51 (Pages 201 to 204)

**Page 205**

1  will have -- I saw a picture yesterday of a bandito
2  female that says PBOL across her back, Proud
3  Bandito Old Lady. That's what it says, right. So
4  -- and then at the bottom she had little tabs that
5  said 2017, 2018, 2019, like she's getting rockers
6  for every year. So the question of why would you
7  not make that guy an active member. Well, in
8  motorcycle culture, when it comes to males, you are
9  either three things; you are a hang around, you are
10 a prospect, or you are a fully patched member. So
11 your hang around is just an guy that going to be
12 hanging out here. He might be interested in
13 joining the club but he's just here for a good
14 time. He gets to do whatever -- he's not forced to
15 do anything. Prospecting is totally different.
16 Now you are going to start earning your patch. Now
17 you have got to do this stuff. You have got to
18 carry this particular thing. You have to have your
19 prospect bag ready to go. You are expected to do
20 all sorts of grunt work and it is a process, like
21 in the Hell's Angel's, you have to prospect for one
22 year. Their bylaws, you have to be a prospect for
23 a year. In the Chosen Few, man, they put people in
24 in 60 days it seems like, and motorcycle culture
25 has changed so much in the last 20 years that now

**Page 206**

1  when you see constant evolution of clubs, but why
2  is that guy not a patch member? Why he not an
3  active Chosen Few team member? Because he's not
4  wearing that cut. I wouldn't even make him an
5  active member as he is a prospect and he's going
6  through the prospect phase. He has not earned that
7  insignia on that center patch yet so he is not an
8  active member.
9      Q. Okay, and so a hang around or a
10 prospect or an active member might all meet the
11 criteria under Policy 527 to be added as an active
12 member but you would treat them differently?
13     A. Yeah, because you're talking about
14 national rules now, not Wichita rules. You're
15 talking about national rules where we even sanction
16 what shirts you can buy. You can buy a brotherhood
17 shirt if you are a patched member or you can buy a
18 supporter shirt. You have to prove you are a
19 brother; you have to. They won't sell it to you.
20 And so that is why we don't make them an active
21 member because they aren't an active member. They
22 have not met the club's criteria to earn that patch
23 yet.
24     Q. And you know that based on your
25 knowledge of particular motorcycle gangs and their

**Page 207**

1  rules; right?
2      A. Correct.
3      Q. So irrespective of how many of the
4  criteria they meet under the Policy 527, you would
5  apply the additional criteria based on your
6  knowledge of the rules of that motorcycle gang to
7  determine whether to add them as a member or as an
8  associate?
9      A. Correct.
10     Q. And so the criteria themselves, the
11 criteria of Policy 527 don't a hundred percent
12 accurately describe whether somebody is an active
13 gang member of a street gang or not.
14         MR. BRANSON: Object to form.
15     A. Yeah. I mean, it matters how you apply
16 it to motorcycle culture. I mean, it's not
17 designed for motorcycle culture.
18     Q. (By Mr. Baehr) Policy 527 isn't
19 designed for motorcycle culture; is that what
20 you're saying?
21     A. Well, yeah. Motorcycle culture is
22 totally different. If a bandito got killed tonight
23 in Wichita I can guarantee you you could watch the
24 toll gate down there at the turnpike and there
25 would be a bunch of banditos showing up; tonight

**Page 208**

1  there would be. If a Piru got killed tonight in
2  Wichita I can guarantee that Pirus from Oklahoma
3  aren't going to care.
4      Q. Okay.
5      A. So it's different in that culture.
6  It's all about brotherhood.
7      Q. Someone who had -- are there
8  individuals in WPD who have less knowledge in
9  motorcycle culture than you do?
10     A. Yeah.
11     Q. Are there gang intelligence officers
12 who have less knowledge of motorcycle culture than
13 you do?
14     A. Yes.
15     Q. Are there gang intelligence officers
16 who could review a TOPS card, submit it for a
17 prospect, see that that person met multiple, three
18 or more criteria under the policy and add them to
19 the gang database as a gang member?
20     A. I wish it was that way, but I
21 consistently get questions in reference to
22 motorcycle gang stuff because they want to insure
23 that they are correct.
24     Q. Okay, so --
25     A. And the reason behind that is

**Page 209**

1  motorcycle culture just evolved in Wichita in 2018.
2  Before that we only had two major clubs in the
3  state and there was a famous case in Wichita of a
4  homicide that was in 2001, but that's why
5  everything gets fact checked through me on
6  motorcycle stuff. I have an e-mail from yesterday
7  in reference to a motorcycle question. So those
8  guys are very cautious of what they do with
9  motorcycle stuff but they also want to learn at the
10 same time.
11     Q.  So are you saying that the review
12 process is somewhat different for motorcycle gangs
13 because of their particular street in Wichita?
14     A.  Yeah, and they want to insure that it's
15 correct and so they will ask me questions about it
16 but at the same time they want to learn about it.
17     Q.  And so just to be clear, the review
18 process for someone who is submitted to a gang
19 intelligence officer as a potential member of the
20 Mongols would be different than the review process
21 for someone who was submitted for potential
22 inclusion in the gang database as a Piru?
23     A.  It's the same process. It's just that
24 with the motorcycle stuff they want to ask the
25 local expert, as if we would ask Chad Beard should

**Page 210**

1  we make this a criminal street gang and so what
2  they are wanting to do.
3      Q.  So the review policy is the same for
4  someone being submitted as a Mongols or as aPiru?
5      A.  Yes.
6      Q.  But the actual practice of how that
7  card gets reviewed is different from someone
8  submitted as a Mongols versus a Piru?
9      A.  Yeah.  It would not be uncommon for
10 them to ask me questions about is this guy or even
11 what does this patch mean and they may flag them as
12 active but they just want to inquire about what
13 this means for their entry in the gang database.
14     Q.  So someone submitted as member of the
15 Viet Boys?
16     A.  It's V-I-E-T, and Boyz is B-O-Y-Z and I
17 don't know how you learn about them but that's from
18 the 90s.
19     Q.  Are there still members in Wichita?
20     A.  Most of the them are in prison.
21     Q.  Okay. Are some of them not in prison?
22     A.  No.  I think we have less than 30
23 active Asian gang members.  Most of the them are in
24 prison serving life for murders.
25     Q.  If an individual was submitted on a

**Page 211**

1  TOPS card for potential inclusion into the gang
2  database as a member of the Viet Boyz, would there
3  be a particular person that you would expect that
4  reviewing gang intelligence officer to go and check
5  with?
6      A.  Yes.
7      Q.  Who would that person be?
8      A.  Chad Beard.
9      Q.  Is that because he has a particular
10 history with the Viet Boyz?
11     A.  He is extremely knowledgeable about it,
12 but Asian gang violence in Wichita is always
13 connected to one another.  The massive shooting
14 that happened in 2007 done by the Bucklow Killers
15 where they shot 12 people at a wake, that was
16 retaliation for the Indian Center homicide from six
17 years before that.  So that's why you would go to
18 Chad Beard in reference to that because it's a long
19 history of violence.
20     Q.  Okay. If somebody was submitted for
21 potential inclusion in the gang database as a
22 member of Sur 13 would the reviewing gang
23 intelligence officer, as a matter of practice,
24 check with anyone else before adding that person to
25 the gang database?

**Page 212**

1      A.  No, because it's a very well
2  established gang that officers can recognize as Sur
3  13 members.  They deal with them, they debrief
4  them.  They talk to them.  They have seen it.  But
5  then again, they don't do that with Viet Boyz.
6  They don't do that with Outlaw Motorcycle Guys,
7  like the club Outlaws and so that's why they
8  reference other individuals for their knowledge.
9      Q.  Are there gangs, whether motorcycle
10 gangs, nonmotorcycle gangs or any gangs under the
11 Wichita Police Policy 527 that Gang Unit officers
12 and detectives know more about than others?
13     A.  Yeah.
14     Q.  There are some gangs for which WPD
15 simply has a larger body of intelligence with
16 regard to how those gangs operate than others?
17     A.  Yes.
18     Q.  Okay, and you cited the example of
19 motorcycle gangs and particular bylaws which
20 actually prescribe whether a person is a hang
21 around, a prospect or an active member irrespective
22 of how many criteria they meet under Policy 527;
23 right?
24     A.  Yes, sir.
25     Q.  And you are familiar with those due to