

# PohlmanUSA
## Court Reporting and Litigation Services

Chad Beard

December 19, 2022

Progeny, et al.
vs.
City Of Wichita, Kansas

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PROGENY, A PROGRAM OF )
DESTINATION INNOVATION )
INC., CHRISTOPHER )
COOPER, ELBERT )
COSTELLO, MARTEL ) Case No.
COSTELLO, AND JEREMY ) 6:21-cv-01100-EFM-ADM
LEVY, JR., ON BEHALF )
OF THEMSELVES AND )
OTHERS SIMILARLY )
SITUATED, )
                                )
            Plaintiffs, )
                                )
   vs. )
                                )
CITY OF WICHITA, )
KANSAS, )
                                )
            Defendant. )
_____)

VIDEO DEPOSITION OF CHAD BEARD

The video deposition of CHAD BEARD, taken before
Nancy L. Rambo, RPR, CSR, at the law office of
Joseph, Hollander & Craft, Wichita, Kansas, on
the 19th day of December, 2022, commencing at
8:35 a.m.

Page 34

1  card that you turned in?
2  A  They may have, I don't -- I don't remember that.
3  Q  That -- that's not something you remember
4     commonly happening?
5  A  No.
6  Q  Okay. So when you -- when -- I take it that you
7     had to apply to be an officer in the gang unit;
8     is that correct?
9  A  Yes.
10 Q  And how did you -- how did you apply?
11 A  Submitted an officer's report.
12 Q  And what's that?
13 A  It's just a memo stating to the supervisor of
14    the unit that I was interested in the position.
15 Q  And do you recall who that was at the time?
16 A  Lieutenant John Speer.
17 Q  Okay. And what made you interested in becoming
18    a officer in the gang unit?
19 A  I'd always had an interest with the gang
20    activity. Part of that came through studying at
21    WSU, but I've always had an interest to that. I
22    grew up here in Wichita in the 1990s, there was
23    a lot of gang activity going on, it was in the
24    news every day, and the news back then was very
25    specific and identified different gangs and

Page 35

1  street sets and -- and I thought I could be good
2  at that.
3  Q  Okay. You said you were interested because of
4     some of the things that you'd studied about it,
5     where did you study about it?
6  A  At WSU, there was -- the classes that I took,
7     they -- there was -- the books and -- and then,
8     of course, teachers talked about gangs.
9  Q  Okay. What -- as -- as a gang officer or an
10    officer in the gang unit, how did your
11    responsibilities differ from a patrol officer?
12 A  So we were not subject to normal 911 calls.
13    Again, we're still officers, but we didn't have
14    to answer a call load, we weren't restricted to
15    a beat or a bureau. Again, it was more -- it
16    wasn't about making traffic stops and -- and
17    arrests or how many reports you wrote; it was
18    about gathering and -- and disseminating
19    information on -- on active gang members and
20    then documenting and maintaining the database
21    and making sure our intelligence was up to date
22    in reference to ongoing feuds, et cetera.
23 Q  Okay. So you said that you would gather and
24    disseminate information, how did you gather
25    information?

Page 36

1  A  So a lot of that was being on the street, it was
2     real time, responding to calls where we would
3     recognize individuals, go in and -- and speaking
4     with them. Obviously major incidents,
5     shootings, drive-bys, we would respond to those,
6     we would interact or talk to, debrief victims,
7     witnesses, you know, identifying that this is a,
8     you know, gang-motivated incident. Then
9     obviously we would, you know -- there is a
10    portion of gang suppression that goes with that,
11    interacting with gang members that I've
12    arrested, and just gathering that real-time
13    intelligence or information from them on the
14    street.
15 Q  When -- when you say gang suppression, what do
16    you mean by that?
17 A  Again, we would -- those individuals that were
18    involved in criminal activity, we would focus on
19    them, guys that were -- we knew that were either
20    selling drugs or involved in shootings or shots
21    fired or carrying guns, those were our -- our
22    primary focus.
23 Q  Okay. And you were trying to get those guys off
24    the street, right?
25 A  Correct.

Page 37

1  Q  Okay. When you say you disseminated
2     information, what did you -- what did you do to
3     disseminate information, what kind of
4     information were you disseminating?
5  A  Again, mostly it was reference to the feuds that
6     were going on between rival gangs. So whether
7     it be a bulletin that was sent out by an email
8     or we would maintain a PowerPoint or, you know,
9     kind of an ongoing this feud happened, this was
10    the next incident, this is -- you know, that
11    kind of thing, a running total, or tally, I
12    guess, of the incidents. If we -- sometimes we
13    would go to squads and -- and verbally tell the
14    officers what's going on. But most of the time
15    it was bulletins and keeping that information so
16    that we could provide it to the detectives when
17    a major incident happened.
18 Q  And who would get those bulletins?
19 A  Off -- anybody within the department, mostly
20    commissioned personnel.
21 Q  So anybody with -- police officers, all the
22    police officers in the WPD?
23 A  Correct.
24 Q  Okay. As -- as a gang officer, did you still
25    fill out TOPS cards?

Page 62

1  primary criteria, other than self-admit, be
2  association and colors?
3  A  It started to shift because social media became
4  very popular.
5  Q  So when did social media become a -- a big part
6  of criteria?
7  A  I can't remember when Bebo and some of that
8  stuff came in, but it was right towards the end
9  of my time as a gang intelligence officer, if I
10  remember correctly, so, you know, 2006, 2007,
11  then 2008, and then 2009 it really started to
12  kind of take off, I think. And then definitely
13  '9, '10, '11, '12, and then to -- to present.
14  Q  Okay. So 2009 to -- around 2009, '12 and then
15  through present --
16  A  Yes.
17  Q  -- it became a big tool?
18  A  Yes.
19  Q  And how did the gang unit use social media?
20  A  Again, things were posted or put on their -- on
21  their pages. That included, you know, wearing
22  the colors, using the terms, the slang, the --
23  they would have pictures of their -- you know,
24  flashing the gang signs, pictures with other
25  members, wearing the attire, jewelry, they'd

Page 63

1  make videos. Again, all that essentially
2  verifying the information that they were gang
3  members.
4  Q  And when you say verifying, did you have to have
5  some other information other than social media
6  to enter into the gang database?
7  A  No, I'm just -- I was talking about in reference
8  to, like, a TOPS card, if you had gotten one.
9  Q  Gotcha.
10  A  If that makes -- we also look at their cases, we
11  would -- you know, if they self-admitted, we
12  would still go check their cases and we would
13  look for social media. You know, if they had
14  been in prison, we would probably reach out
15  to -- to KDOC and see if they had any
16  documentation. There was more gathering
17  everything that you possibly could have before
18  you put them in there, if that makes sense.
19  Q  Okay. Were people ever put there solely on --
20  on things that were seen in social media?
21  A  Yes.
22  Q  How often did that happen?
23  A  I -- I don't know, I mean, I --
24  Q  Was that a common thing?
25  A  I don't know if it was common, but I know I did

Page 64

1  it several times.
2  Q  Okay.
3  A  And, again, I know you said just social media,
4  but, again, I would -- I would have to say that
5  we would look at cases and -- and several other
6  things. So when I say that I just added people
7  based on social media alone, that might be
8  incorrect, I guess. I want to say that I would
9  definitely look up cases and then I would list
10  cases and -- and other information, but a lot of
11  strong evidence would come from social media
12  that you could identify somebody based on just
13  what you found on social media.
14  Q  Okay. And you -- you say -- you said repeatedly
15  you'd look at -- you'd look at cases?
16  A  Uh-huh.
17  Q  Explain that to me.
18  A  Sure. So we would go back and look at all of
19  their previous cases from the -- from the
20  beginning of time that we could find, and on
21  those cases, we would look to see what kind of
22  cases they were, was it a drive-by, was it a
23  shooting, was it carrying a firearm, was it a
24  fight at a school? And a lot of times we'd have
25  to read those reports to find specifics,

Page 65

1  details, such as like a fight at school was
2  often started because of, you know, there was
3  flashing of hand signs or, you know, they were
4  identifying themselves as gang members before.
5  So -- and then additionally who those
6  individuals were associating with on a regular
7  basis. If they're listed with other members on
8  a regular basis, we would document or -- or note
9  that in the narrative.
10  Q  Okay. And when you say -- would that show up in
11  cases, or would that just show up on the -- in
12  the gang database itself?
13  A  What we put in the narrative?
14  Q  When you say who they were associating with,
15  what were you looking at to get that
16  information?
17  A  The cases should list the names of those people
18  that they were associating with.
19  Q  Would those be co-defendants necessarily in
20  cases? I mean, I guess I'm not understanding?
21  A  So -- they could be co-defendants, I guess, I
22  mean, but -- so as an example, if we had a
23  incident where officers contacted several
24  members of the Crips and they documented that
25  they had contact with A, B and C, D, or

17 (Pages 62 to 65)

Page 110

1  where does it fall?
2  A  I think it's -- and, again, I don't -- I don't
3     want to speak out of -- I think we're able to
4     make -- contact maybe half, I mean, you know --
5  Q  Okay.
6  A  -- that seems about accurate, I mean, they --
7     they -- they make about half progress with that.
8  Q  Okay. And they would have that idea better?
9  A  Yes, yeah, the gang intelligence officers or
10    Officer Watson and Officer Avendano.
11 Q  Okay. And then we've talked about Sergeant
12    Cooper had those folks, and then I said your
13    other sergeant, and, I'm sorry, remind me of his
14    name.
15 A  Aaron Moses.
16 Q  And Aaron Moses was in charge of detectives?
17 A  Yes.
18 Q  And you've listed those folks for me?
19 A  Yes.
20 Q  And that's for both the gangs and felony
21    assaults, right?
22 A  Yes.
23 Q  Within the -- within the gang and felony assault
24    unit, how much of the activity would you say, in
25    percentage, is directed toward gangs versus

Page 111

1  everyday felony assaults?
2  A  It's maybe 10 percent. 90 percent's on just
3     felony assaults.
4  Q  Okay.
5  A  Again, it's more of the name that says
6     gang/felony assault section. It's -- we don't
7     get every single gang case.
8  Q  When you say that, what do you mean?
9  A  So if there's a domestic violence felony that's
10    committed by a gang member, it still goes to
11    domestic violence.
12 Q  Does that ever get put into somebody's gang
13    record or gang card?
14 A  It could, yes.
15 Q  And why would that go on a gang card?
16 A  Well, it -- it -- it would if it's a -- a person
17    felony, so a -- a person felony or person
18    misdemeanor arrest will -- will keep you in --
19    in the gang database.
20 Q  And that's regardless of whether that's a gang
21    crime, correct?
22 A  Correct, yes.
23 Q  So what would otherwise be, for -- for lack of a
24    better term, an ordinary felony assault would --
25    would actually be used to keep you on the gang

Page 112

1  list if you had that in your record?
2  A  Yes.
3  Q  So that has nothing to do with the criteria,
4     correct?
5  A  It's not specifically listed, but it's a gang
6     activity in the state statute.
7  Q  Well, it's -- it's -- it's an activity that
8     would -- that would be -- would be a felony or
9     misdemeanor person crime, correct?
10 A  Yes.
11 Q  And if you weren't on the gang list, that
12    wouldn't be gang related, correct?
13 A  Yes.
14 Q  I want to flip back real quickly to your --
15    finish up your educational background.
16 A  Uh-huh.
17 Q  You said you had -- in 1998, you left Wichita
18    State, not quite had your bachelor's degree?
19 A  Uh-huh.
20 Q  And then at some point you went back?
21 A  Yes.
22 Q  Okay. When was that?
23 A  I think I graduated in 2011, I -- it was over a
24    period of time, I just went back, took classes
25    as I could.

Page 113

1  Q  Okay.
2  A  So I could finish up, get that ...
3  Q  So you have a degree now, what's your degree in?
4  A  Criminal justice.
5  Q  Okay. And that's a BS or BA?
6  A  Bachelor's, yeah.
7  Q  Okay.
8  A  BS.
9  Q  Okay. Other than that, have you had any other
10    kind of specialized training?
11 A  Yes.
12 Q  Okay.
13 A  Yeah.
14 Q  And -- and what's that?
15 A  So I've attended multiple conferences. Again, a
16    lot of my -- the experience for Wichita has come
17    from being in the field, I've conducted probably
18    hundreds, hundreds and hundreds of interviews
19    with -- with gang members, I've conducted
20    debriefs with them, I've worked gang-related
21    crimes where they're both victims and witnesses,
22    others, gang-motivated crimes involving gang
23    members. Again, I've been to numerous
24    conferences and trainings as part of that. I've
25    also provided training to the recruit officers,

29 (Pages 110 to 113)

Page 146

1  A  I've always used a White female.
2  Q  Okay.
3  A  I know other guys have other races and -- and
4     males and females.
5  Q  Okay. And have you ever had any, you know,
6     discussions or messages or anything like that
7     while you were covert on Facebook?
8  A  Like messages, what ...
9  Q  Have you ever -- have you ever -- you said you
10    usually just look?
11 A  Yes.
12 Q  Have you yourself ever actually got into a
13    discussion with somebody on Facebook?
14 A  I -- I remember one time, and it wasn't even
15    on -- it was on a different account that I've
16    closed out.
17 Q  Uh-huh.
18 A  I think I asked him where he was at.
19 Q  Okay.
20 A  And he -- I don't even think he responded and
21    so ...
22 Q  Yeah.
23 A  Okay. I -- I really don't ever talk to them on
24    that.
25 Q  So are there any standard operating procedures

Page 147

1     about how to, you know, do your undercover
2     surveillance on Facebook?
3  A  Again, a lot of it's -- comes down to the --
4     well, a lot of it comes down to how well the
5     officer knows the -- the social media platform
6     that he's using and what -- what's available to
7     him and what's not, you know, how effectively
8     they can -- they can use that. So a lot of
9     that, I'm sure a Millennial can do a lot more
10    stuff on -- on social media than I ever could.
11        But I think there's been courses that have
12    been offered. I went to a training course on
13    social media investigations when it first was
14    pretty -- pretty, I guess, intense or when it
15    was first really popular. And then I've
16    provided training at a couple of conferences on
17    how to use social media for further -- to
18    further their intelligence gathering, whether
19    that's for gang documentation or just in --
20    today a lot of it actually picks the violence
21    and the -- and the stuff that these guys are
22    involved in, it's not just gang documentation.
23 Q  So when it started out, was it mostly gang
24    documentation?
25 A  A lot of it was, yes.

Page 148

1  Q  And I think you said back then any of the --
2     anybody in the gang unit could create a fake
3     account and go on, and that really wasn't
4     monitored in any way by the department?
5  A  No. No, it wasn't monitored; yes, they could
6     create a account.
7  Q  Sorry, that was a compound question --
8  A  It's all right.
9  Q  -- good for you. Appreciate the clarification.
10 A  You're welcome.
11 Q  So -- so there wasn't really -- so there
12    wasn't -- there weren't really standard
13    operating procedures; is that right?
14 A  Yes.
15 Q  And I take it that we talked about sometimes
16    people would get identified solely for what was
17    seen on social media, correct?
18 A  Yes.
19 Q  And that was at the -- the individual officer's
20    discretion?
21 A  Are you talking about gang intelligence
22    officers?
23 Q  Yes.
24 A  Okay. Yes, it would be based on their
25    experience, what they were seeing, but they also

Page 149

1     could talk amongst the four of them or even ask
2     me if they had a question, I mean, so it
3     wasn't -- but, yes, it was primarily if they
4     were seeing what they were doing, they were
5     pulling that information off and then -- then
6     they could use that if they're going to document
7     somebody.
8  Q  Okay. And so that would be documented in that
9     person's gang intelligence card as, you know,
10    saw him on Facebook, this, this, this, and that
11    would be why it was added to the list?
12 A  Yes.
13 Q  Okay. And I think you said it's not used so
14    much for gang identification anymore; is that
15    right?
16 A  No, it -- it is but there is a lot of other
17    activity that goes on social media that has
18    become prevalent; like I said, sales of drugs
19    and -- and gun trafficking is much more common
20    now, prostitution. We didn't really see that
21    stuff before, a lot of it -- when it first came
22    popular, it was just representing their gang
23    and -- and that kind of stuff; now it's turned
24    into how they can make additional money or, you
25    know, sales or -- or whatever, there's a lot

38 (Pages 146 to 149)

Page 250

1  MR. BRANSON: Object to form.
2  A  I don't really know how to answer that. I mean,
3     I've seen houses that have lots of people in
4     them, and I've been to houses that only have one
5     person in there, so I -- I mean ...
6  BY MS. WOODY:
7  Q  So if this person was living in a place that
8     their cousins were also living --
9  A  Right.
10 Q  -- and their cousins had been designated on the
11    gang list, the very fact that they were staying
12    in their house would be a violation of probation
13    conditions, correct?
14    MR. BRANSON: Object to form.
15 A  According to this, yes.
16 BY MS. WOODY:
17 Q  Okay. And then on number 17, it says, I will
18    remain out of the restricted zones as indicated
19    below and outlined in the attached mapping zone
20    form, if required now or in the future. The
21    only exception is Monday through Friday 6:00 to
22    9:00 -- 6:00 a.m. to 9:30. You see that?
23 A  Yes.
24 Q  And then it's checked central zone, right?
25 A  Yes.

Page 251

1  Q  And so if we look back at that map, is that map
2     saying you can't go into this area between the
3     hours of 9:30 at night and 6:00 a.m. in the
4     morning?
5  A  Yes.
6     MR. BRANSON: Object to form.
7  BY MS. WOODY:
8  Q  Okay. And if you look down on the first page
9     again, it says -- it says commencing 8/13/20.
10    You see that?
11 A  Yes.
12 Q  Through 7/21/22, correct?
13 A  Yes.
14 Q  And is that the -- do you understand that to be
15    the period of time that that person is on --
16    subject to these conditions?
17 A  It could be, I -- I -- I don't know, I don't
18    fill this form out.
19 Q  Okay. That'd be something for corrections -- or
20    for Sedgwick County to answer?
21 A  Yes.
22 Q  All right. Take a look at Exhibit 30 and it's
23    for a defendant named Isaiah Carter. Do you see
24    that?
25 A  Yes.

Page 252

1  Q  Do you know Mr. Carter?
2  A  I think he's -- he's identified as a gang member
3     in the database, I'm not sure what gang.
4  Q  Okay. And it looks like, it says, being in this
5     zone can automatically violate the defendant's
6     probation. Do you see that?
7  A  Yes.
8  Q  And can you identify this zone, does this mean
9     anything to you?
10 A  This -- I mean, looking at the -- it looks like
11    it's South Broadway from -- from Waterman all
12    the way down to 47th Street.
13 Q  Okay. And then if you look at the next page,
14    that's an additional area --
15 A  Yes.
16 Q  -- correct? And this one, I'm sorry, this one
17    on this page is called north mapping zone. Do
18    you see that?
19 A  Yes.
20 Q  And the first one is south mapping zone, you see
21    that?
22 A  Yes.
23 Q  So Mr. Carter will be in violation of his
24    probation if he is in either south or north
25    mapping zone, is that what you understand?

Page 253

1     MR. BRANSON: Object to form.
2  A  According to this form, yes.
3  BY MS. WOODY:
4  Q  Okay.
5     MS. WOODY: Could you mark this one
6     for me?
7     (Deposition Exhibit Number 31
8     Marked for Identification.)
9  BY MS. WOODY:
10 Q  Lieutenant Beard, I've handed you what's been
11    marked Deposition Exhibit 31, which is Wichita
12    079863.
13 A  Yes.
14 Q  And it's entitled up at the top, WPD/County
15    Corrections Gang Mapping. Do you see this?
16 A  Yes.
17 Q  Is this a document that you've seen before?
18 A  I think I may have seen this actually in, like,
19    a -- a digital copy, like an email or something.
20 Q  Okay.
21 A  Not an actual hard copy.
22 Q  And what do you understand this to be?
23 A  This is a project that Officer Byers was working
24    on; he was working with community corrections in
25    reference to the drug mapping program, and he

64 (Pages 250 to 253)

Page 254

1  had contacted corrections about implementing a
2  gang mapping program. And so he had set up
3  these meetings with them and got this set up.
4  And his request for us was just to let them know
5  who was documented as a gang member and if they
6  would, you know, be applicable for this -- this
7  project that he's working on.
8  Q   And -- and explain the project to me, if you
9      can.
10 A   Well, my understanding from -- from Officer
11     Byers was that they would keep gang members out
12     of certain locations in reference to their
13     probation or parole, and my understanding was
14     those locations were either chosen by -- well,
15     they were chosen by the probation or parole
16     officer. I thought it had to do with where the
17     offense occurred, and that's why they were
18     mapped out of a certain location because that's
19     where the offense occurred and that's why there
20     was different ones. And then they would -- they
21     would have to stay out of those certain areas.
22     This was a new program, and I think there was
23     only, like, 10, maybe 15 people that ever got
24     put on this program.
25 Q   When -- when was this program started?

Page 255

1  A   Well, he started the drug program before then,
2      but I think it was sometime in 2019, 2020.
3  Q   Okay. And is it still in effect?
4  A   No.
5  Q   You said -- so it was in effect for a while and
6      then it --
7  A   Yes.
8  Q   -- stopped?
9  A   Yeah.
10 Q   Okay. Let's take a quick break.
11         THE VIDEOGRAPHER: Go off the record
12     at 2:43 p.m.
13         (Thereupon, a recess was taken;
14     whereupon, the following was had.)
15         THE VIDEOGRAPHER: Okay. We're back
16     on the record at 2:51 p.m.
17 BY MS. WOODY:
18 Q   Lieutenant Beard, I want to talk about another
19     area where -- where you have some experience,
20     and that is in gang-related testimony, okay?
21 A   Yes.
22 Q   So can you explain to me what gang-related
23     testimony is?
24 A   So often gang testimony comes in because of --
25     to explain the inexplicable is one of the -- to

Page 256

1  explain motive as to why an individual would --
2  most of my experience is from -- is from
3  homicides or shootings, why somebody would do
4  the -- commit the crime because of it's gang
5  motivated, gang related based on ongoing feuds
6  between rival gangs.
7  Q   So you would have an instance where a crime had
8      been committed and there didn't appear to your
9      average juror, for instance, to be a reason why
10     that happened, correct?
11 A   Correct.
12 Q   So gang-related testimony would be allowed in
13     that case to say, well, there was an ongoing
14     feud between, say, the Crips and the Bloods and
15     this guy's a Blood and the guy who got shot was
16     a Crip and that's because of all these other
17     things that have been going on, correct?
18 A   Yes.
19 Q   And in that gang-related testimony, are you
20     allowed to introduce historical information
21     about the gangs?
22 A   Yes.
23 Q   And are you allowed to introduce instances of
24     violence where the defendant was not involved?
25 A   Yes.

Page 257

1  Q   And then using your -- your expertise, I think
2      you said you're allowed to some degree to
3      speculate; is that correct?
4  A   I'm allowed to give my opinion.
5  Q   Okay. And -- and -- and your opinion is based
6      oftentimes on this historical information that
7      you've testified to; is that right?
8  A   That's part of it, the historical information,
9      and then usually whatever occurred with that
10     specific incident.
11 Q   Okay. And so you give your opinion that the --
12     that the motive for the shooting was because of
13     a gang feud, for instance; is that right?
14 A   Yes.
15 Q   And that is evidence that if the person were not
16     on the gang list would not ever be admissible;
17     is that right?
18         MR. BRANSON: Object to form.
19 A   I'm sorry, could you -- could you say that
20     again?
21 BY MS. WOODY:
22 Q   Sure. That's evidence that if the person wasn't
23     on a gang list would not be admissible?
24         MR. BRANSON: Object to form.
25 A   If they weren't on the gang list? I wouldn't

65 (Pages 254 to 257)