

**PohlmanUSA®**
Court Reporting and Litigation Services

---

Jose Salcido

December 15, 2022

---

Progeny, et al.

vs.

City of Wichita, Kansas

```
             IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF KANSAS


PROGENY, A PROGRAM OF     )
DESTINATION INNOVATION    )
INC., CHRISTOPHER         )
COOPER, ELBERT            )
COSTELLO, MARTEL          )  Case No.
COSTELLO, AND JEREMY      )  6:21-cv-01100-EFM-ADM
LEVY, JR., ON BEHALF      )
OF THEMSELVES AND         )
OTHERS SIMILARLY          )
SITUATED,                 )
                          )
         Plaintiffs,      )
                          )
    vs.                   )
                          )
CITY OF WICHITA,          )
KANSAS,                   )
                          )
         Defendant.       )
_____)


             VIDEO DEPOSITION OF JOSE SALCIDO


The video deposition of JOSE SALCIDO, taken before
Nancy L. Rambo, RPR, CSR, at the law office of
Joseph, Hollander & Craft, Wichita, Kansas, on
the 15th day of December, 2022, commencing at
8:33 a.m.
```

Page 118

1  thing, because they have to read the reports
2  like -- they don't say, well, this guy committed
3  a crime; they actually have to read as to, you
4  know, what makes this, like, specifically a
5  gang -- gang eligible crime, I guess.
6  Q  Is there any department policy for doing the
7     audit?
8  A  I am sure there is, I -- or an SOP, if I
9     remember right.
10 Q  And if there were an SOP or a policy, where
11    would I find it?
12 A  It would be -- it would be on the investigations
13    floor, I'm sure.
14 Q  And where -- where is this --
15 A  Probably the captain, Captain Cory should have
16    it.
17 Q  So you think -- you think --
18 A  Either that or it's -- it's on -- it's the
19    computer.
20 Q  So is this something you've actually seen?
21 A  I might have, I see so many, though.
22 Q  Yeah.
23 A  I don't specifically recall this one.
24 Q  Do you -- do you know whether such a policy
25    or -- or something exists?

Page 119

1  A  I know there is but I -- I -- I just have not --
2     I don't recall seeing it recently.
3  Q  Have you ever -- has anybody in the department
4     ever studied the audit process that other police
5     departments use?
6  A  I think Bartel had made a push to bring in like
7     a -- like a -- like a, what do you call that, a
8     technical -- a technical team to assess our --
9     our things, but I don't know if that's done or
10    in the process of.
11 Q  When you say made a push to bring in a technical
12    team, what do you mean?
13 A  It's like a -- a public safety partnership from
14    BJA, they -- sometimes if you want them to
15    assess how you match best practice, they -- they
16    bring a team in to kind of give you an
17    assessment to say you -- you are in accordance
18    with accepted best practices or -- or you're
19    not.  They -- they kind of give you a road map
20    to get -- to get there.  And I think last time I
21    talked, Bartel had actually started that, and I
22    think Beard picked it up, but I don't know if
23    that's in suspense or -- or if they're actually
24    coming.
25 Q  And why did they want to do that?

Page 120

1  A  Just to make sure that we are doing -- doing
2     best practice.  I would -- I tell you, I -- I --
3     I absolutely have a lot of confidence that when
4     this -- this -- the officers get to doing an
5     audit the way we expect it, I think they are
6     very good at doing it.  I have -- I have no
7     concerns.
8  Q  But you never benchmarked it, right?
9  A  No, never benchmarked it.
10 Q  You've never had it -- you never had that
11    reviewed by anybody from --
12 A  No.
13 Q  -- outside the department?
14 A  No, and I think that's a push for this, to have
15    somebody come in.
16 Q  Because they wanted to make -- I mean,
17    presumably they wanted to make sure that it was
18    being done correctly?
19 A  Yes.
20       MR. BRANSON:  Objection, vague.
21 BY MR. SULLIVAN:
22 Q  Before doing an audit, how much experience do
23    these -- do the police off -- the two police
24    officers you've told me about do they typically
25    have working with gang -- working in the gang

Page 121

1     unit?
2  A  Typically, we draw those officers from community
3     response team, so they would have -- they would
4     have enforced on gang members quite -- quite --
5     quite a lot, more than just a regular patrol
6     officer.  So they would have probably had some
7     training on -- on -- and I can't tell you this
8     for sure, but I am -- I know my guys when they
9     worked for me that they were very informed of
10    what constitutes a gang member, how to add
11    the -- the -- the bail -- the bond wording to
12    the -- to the -- to the booking.
13 Q  Now you're really talking about the statute,
14    right?
15 A  Yes.
16 Q  The criteria in the statute?
17 A  Yes.
18 Q  But it -- have they had any training -- and that
19    training was informal, correct?
20 A  Some -- some training that they put in
21    voluntary -- voluntary; they'll put in to go to,
22    like, a gang conference, and they'll get quite a
23    bit of training there.
24 Q  But, I mean, in terms of actually doing an
25    audit?

31 (Pages 118 to 121)

| | Page 214 | | Page 216 |
|---|---|---|---|
| 1 | our guys are -- are -- are very well trained in | 1 | said, where -- is there specific -- is there |
| 2 | discerning who -- who -- who fits the criteria | 2 | training specific for -- for Wichita in terms of |
| 3 | and should be on the list and who doesn't and -- | 3 | the application of these criteria? |
| 4 | and not. | 4 | A   You know, right off the top of my head, I |
| 5 | BY MR. SULLIVAN: | 5 | couldn't give you, like, the correct answer, I |
| 6 | Q   I want to ask you about that 'cause earlier -- I | 6 | just don't know.  You know, when you depose Chad |
| 7 | think earlier you told me it can be, I think the | 7 | Beard, I'm sure he can give you a good answer on |
| 8 | word you used was -- or I think what you were | 8 | that. |
| 9 | saying is it can be very hard to the untrained | 9 | Q   Have you -- have you participated in any |
| 10 | eye -- | 10 | training in the WPD that are specific to |
| 11 | A   Correct. | 11 | application of the criteria in 21-6313? |
| 12 | Q   -- to determine who might be a gang member, who | 12 | A   Typically, when something changes with the law |
| 13 | isn't a gang member? | 13 | or it's modified in some way, we do a training |
| 14 | A   Correct. | 14 | bulletin too, but I -- I don't recall one being |
| 15 | Q   And it can be hard to distinguish between a gang | 15 | on the -- done on the gang criteria, no. |
| 16 | member and an associate -- | 16 | Q   Okay.  The next -- the next box is complete TOPS |
| 17 | A   Right. | 17 | card. |
| 18 | Q   -- right?  What -- what is -- is there -- how | 18 | A   Uh-huh. |
| 19 | many hours a year does the gang unit spend | 19 | Q   So is that done after the nomination or before |
| 20 | training as to these par -- particular criteria? | 20 | the nomination? |
| 21 | A   Well, it just -- it just will depend.  Sometimes | 21 | A   So it says nomination procedure, right -- |
| 22 | we have enough budget to send them to train for, | 22 | Q   Yeah. |
| 23 | like, a week when there's a conference nearby or | 23 | A   -- then the same officer completes the TOP card |
| 24 | when they come to town, and then there's the | 24 | and routes it to the gang section, or the |
| 25 | required 40 hours of in-service, some of it | 25 | gang/felony assault section. |

| | Page 215 | | Page 217 |
|---|---|---|---|
| 1 | might include gang.  It just depends and varies | 1 | Q   Okay.  And so this is, I guess, maybe a little |
| 2 | from officer to officer. | 2 | bit about what we've been talking about, under |
| 3 | Q   But as to these specific criteria in 21-6313, | 3 | gang section, it says, information will be |
| 4 | how many hours do they spend training as to | 4 | researched by a detective in the gang section or |
| 5 | those applications? | 5 | by a gang officer, right? |
| 6 | A   Every officer or just the gang audit officers? | 6 | A   Yeah. |
| 7 | Q   Let's start with every officer and then let's | 7 | Q   And what -- what does that mean, researched? |
| 8 | talk about the gang audit. | 8 | A   Well, basically when -- when a nomination comes |
| 9 | A   They're -- they're probably -- they probably | 9 | in, the -- it could be done by a detective to |
| 10 | received initial training in the academy, and | 10 | look at criminal history, meaning they would |
| 11 | then past that, if they're passionate about the | 11 | call if -- if this gang member had -- had been a |
| 12 | gang stuff, they -- they might kind of review it | 12 | same gang, 'cause this gang -- the gang in |
| 13 | on their own and know it and know what the state | 13 | Wichita -- some gangs in Wichita are present in |
| 14 | stat says.  The other -- the gang unit officers, | 14 | Garden City, the detective would call the gang |
| 15 | I think they get more training specifically on | 15 | unit in Garden City to see how much -- how much |
| 16 | this than anybody else, but I -- I don't know | 16 | of that was gang motivated or related, kind of |
| 17 | how often that occurs. | 17 | obtain information from them.  And then |
| 18 | Q   And where are those training -- are there | 18 | sometimes, maybe in partnership with the -- with |
| 19 | training documents somewhere? | 19 | the officer because the offi -- the gang officer |
| 20 | A   There would be -- you know, if they attended any | 20 | would get ahold of a detective and say, hey, you |
| 21 | kind of gang training, it -- it -- they would | 21 | worked a case on this guy who was just |
| 22 | get hours, and so that would be part of the | 22 | nominated, can you tell me about that, and so I |
| 23 | training records. | 23 | guess that's how it would -- how it would go. |
| 24 | Q   What about -- what about within the WPD itself, | 24 | Q   Now, respectfully, you -- you keep telling me it |
| 25 | because it's in a unique area as you've already | 25 | would, it would, it would, right? |

Page 314

1     otherwise secret, right?
2  A  Yeah, if -- unless the officer tells them that
3     you're on the gang list, they don't know.
4  Q  So there's a -- there's a secret list and unless
5     you have the oppor -- unless you're arrested,
6     you don't have the opportunity currently to
7     challenge whether you're actually a gang member
8     or not, do you?
9        MR. BRANSON: Object to form.
10 A  The -- the -- I guess you can -- you can
11    challenge it when you get a hearing before a
12    judge, but there's no process in place to
13    challenge it before that.
14 BY MR. SULLIVAN:
15 Q  You got to go get yourself arrested --
16 A  Yeah.
17 Q  -- right?
18 A  Yeah.
19 Q  And that -- and this is part of what we've been
20    talking about, there's no determination of the
21    accuracy of the -- there's no -- strike that.
22    There's no -- there's no determination as to
23    whether the assignment of whether somebody is a
24    gang member or a gang associate is accurate,
25    there's no analysis of that?

Page 315

1        MR. BRANSON: Object to form.
2  A  I think when the officers get the -- the -- the
3     reports, or whatever, they determine that this
4     is enough or not, but it's -- it's -- there's no
5     independent outside verification, other than
6     when you get arrested you have the opportunity
7     to challenge your -- your gang status in court.
8  BY MR. SULLIVAN:
9  Q  Yes, and -- and -- but this -- and this is one
10    of the insights that your program, your vision
11    had built in it, right, is the opportunity to
12    come to a panel and present your case, present
13    your facts and the reasons you shouldn't be on
14    it, correct?
15       MR. BRANSON: Object to form.
16 A  There would have been an opportunity for you to
17    state your case as to why you don't think you
18    should be on the list and -- and then maybe
19    present testimony to this panel, you know, and
20    we would -- we would think about what -- you
21    know, if we -- if we thought that you should be
22    there, we'd say, okay, fine, you're going to
23    stay here, but if you want off this list, let's
24    enter into an agreement.
25 BY MR. SULLIVAN:

Page 316

1  Q  And -- and there would be no need for something
2     like that unless the possibility existed that
3     the initial determination was in error, correct?
4        MR. BRANSON: Object to form.
5  A  That's -- that's -- that's too much packaged in
6     that -- in that question.
7  BY MR. SULLIVAN:
8  Q  You -- you -- you acknowledge that there
9     could -- could be a mistake in terms of putting
10    somebody on the gang list, don't you?
11 A  You know, trusting my -- my -- my -- my guys and
12    my gals who work in the unit, I would say that
13    it's -- it would be very improbable for a mis --
14    for somebody to mistakenly end up on the list.
15    What I had in mind was to allow the -- some
16    people off the list by doing these things and --
17    and to even challenge it, to say, hey, why
18    should I be, and then maybe -- maybe an
19    explanation, and once we explained and
20    clarified, then they would get it that, yeah,
21    this is why I'm on the list.
22 Q  But it's not impossible to make a mistake, is
23    it?
24       MR. BRANSON: Object to form.
25 A  Yeah, that -- yeah, that -- that's -- I don't

Page 317

1     think -- you know, we're human beings and
2     there's -- there's room for error.
3  BY MR. SULLIVAN:
4  Q  And there's -- there's -- you've talked about
5     some of the subjective judgments involved in it
6     today, correct?
7  A  There's got to be a little subjectivity to it,
8     but yeah.
9  Q  Yeah. And -- and you started off today, I mean,
10    you talked about the importance of data and --
11    and measuring things in a scientific way, right?
12 A  Correct.
13 Q  And assessing all of the facts?
14 A  Uh-huh.
15 Q  And the reason you wanted to do that, part of
16    your vision, sir, right, was to make sure that
17    better judgments and more accurate judgments
18    were being made, right?
19       MR. BRANSON: Object to form.
20 A  Well, the more data you have, the better
21    decisions you can make.
22 BY MR. SULLIVAN:
23 Q  And that would include accuracy, would be a
24    component of that?
25 A  I think it would be very important to be

Page 318

1  accurate, but, again, I -- I can -- I can
2  testify -- I can testify and tell you that I do
3  have full faith in -- in what the -- the two
4  officers up there are doing.
5  Q  Okay. I don't have any further questions.
6
7              RECROSS EXAMINATION
8  BY MR. BRANSON:
9  Q  You talked about --
10            MR. SULLIVAN: Unless in response to
11     Charles' questions.
12            MR. BRANSON: Noted.
13 BY MR. BRANSON:
14 Q  You were just asked questions about your vision
15    and -- and necessity of -- of your vision for
16    getting people off of the gang list. Do you
17    believe the gang data -- database has a valid,
18    functioning purpose?
19 A  Yeah, it's -- it's extremely useful for -- for
20    us because it -- it -- it allows me to use my
21    resources better when it comes to the gang
22    violence or community violence or group
23    violence, because I don't want to -- I don't
24    want to send officers to deal with the problem
25    that -- that does not have -- you know, I want

Page 319

1  to maximize what we do.
2  Q  Does the gang database allow you to solve
3     crimes?
4  A  Yes.
5  Q  Is the gang database what you would consider an
6     enforcement tool?
7  A  I think it -- it's a -- it's a tool that
8     provides us information to make better
9     enforcement, and I'll give you -- I'll give you
10    an example. I probably shouldn't but I'll give
11    you an example. An example would be there's a
12    lot of things that happen today that are rooted
13    in the historical record of the gang list.
14    There was a fight maybe three years ago at South
15    High that is relevant to what happens today.
16    Without the gang list and the information
17    contained inside the database, I would not have
18    a frame of reference to -- to -- to deal with
19    that.
20 Q  Okay. And would that potentially help you solve
21    a crime?
22 A  Solve a crime and prevent further crimes from
23    happening.
24 Q  You talked about off-ramping people, giving
25    people alternatives to being on the gang

Page 320

1  database.
2  A  Uh-huh.
3  Q  Is -- is that an alternative to traditional law
4     enforcement?
5  A  No, I think it -- it complements it --
6     complements it basically because it's a whole
7     community approach, and I'm talking not just
8     the -- the law enforcement community, attorneys,
9     judges, us, but actually community partners that
10    can provide services.
11 Q  Okay.
12 A  And I think it's -- it's -- it's a way we should
13    be doing law enforcement in this century.
14 Q  Was your vision of new beginnings an effort to
15    fix a problem or to increase public safety?
16 A  To increase public safety and -- and make it
17    more just.
18 Q  No further questions.
19            MR. SULLIVAN: I don't have any
20    questions.
21            THE VIDEOGRAPHER: Okay. We'll go
22    off the record at 4:37 p.m.
23        (Video stopped.)
24            THE REPORTER: Okay. Before
25    everybody leaves, can I get orders on the

Page 321

1  record?
2            MR. BRANSON: Digital -- or e-tran.
3            MR. SULLIVAN: Can we get an
4     expedited rough? And I don't know what
5     other orders we have.
6            MS. BRETT: I think you're just
7     getting a copy.
8            MR. SULLIVAN: Okay. Then whatever
9     we had ordered before, I guess.
10           MS. BRETT: Okay.
11           THE REPORTER: Sharon, are you part
12    and parcel with him?
13           MS. BRETT: Yes.
14           THE REPORTER: Okay. And then is
15    that the same with --
16           MS. BRETT: Appleseed, yeah.
17           THE REPORTER: Teresa?
18           MS. BRETT: Yeah.
19           THE REPORTER: Okay. All right.
20           MR. BRANSON: I had offered with
21    other folks that were with the City to
22    coordinate their read and signs.
23           THE REPORTER: Okay.
24           MR. BRANSON: So -- just so we can
25    try to get them turned around faster. So

81 (Pages 318 to 321)