# EXHIBIT 96



**Pohlman**USA®

## Court Reporting and Litigation Services

Gordon Ramsay

February 28, 2023

Progeny, et al.

vs.

City of Wichita, Kansas

                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF KANSAS


PROGENY,                          )
a Program of Destination          )
Innovations Inc.,                 )
CHRISTOPHER COOPER,               )
ELBERT COSTELLO,                  )
MARTEL COSTELLO, and              )
JEREMY LEVY, JR.,                 )
on behalf of themselves and       )
others similarly situated,        )
                                  )
                 Plaintiffs,      )
                                  )
vs.                               ) Case No.
                                  ) 6:21-cv-01100-EFM-ADM
                                  )
CITY OF WICHITA, KANSAS,          )
                                  )
                 Defendant.       )


        VIDEOCONFERENCE DEPOSITION OF GORDON RAMSAY
             TAKEN ON BEHALF OF THE PLAINTIFFS
                   FEBRUARY 28, 2023


        VIDEOCONFERENCE DEPOSITION OF GORDON RAMSAY,
produced, sworn, and examined on the 28th day of
February 2023, between the hours of nine o'clock in
the forenoon and six o'clock in the evening of that
date, before KARA D. INCE, a Certified Court Reporter
within and for the State of Kansas, in a certain cause
now pending IN THE UNITED STATES DISTRICT COURT, FOR
THE DISTRICT OF KANSAS, wherein PROGENY, a Program of
Destination Innovations Inc., CHRISTOPHER COOPER,
ELBERT COSTELLO, MARTEL COSTELLO, and JEREMY LEVY,
JR., on behalf of themselves and others similarly
situated are the Plaintiffs and CITY OF WICHITA,
KANSAS, is the Defendant.

```
1                    TABLE OF CONTENTS

2    EXAMINATION

3    Questions by Ms. Woody                          6

4

5    EXHIBITS:

6    Exhibit No. 5  Kansas Statue 21-6313            91

7    Exhibit No. 6  Wichita PD Policy 527            72

8    Exhibit No. 8  Letter dated 11/21/2022         110

9

10   Reporter's Note:  Original exhibits were attached to
     the original transcript.
11

12   CERTIFICATE OF REPORTER                        118

13   ERRATA SHEET                                   119

14   SIGNATURE PAGE                                 121

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        APPEARANCES

 2
        For the Plaintiffs:
 3
        MR. THOMAS J. SULLIVAN
 4      MR. PAUL M. VOGEL
        SHOOK, HARDY & BACON, LLP
 5      2555 Grand Boulevard
        Kansas City, Missouri 64108
 6      tsullivan@shb.com
        pvogel@shb.com
 7      (816) 474-6550

 8      For Kansas Appleseed Center for Law and Justice,
        Inc.:
 9
        MS. TERESA A. WOODY
10      KANSAS APPLESEED
        211 East 8th Street, Suite D
11      Lawrence, Kansas 66044
        twoody@kansasappleseed.org
12      (785) 274-8311

13      For American Civil Liberties Union Foundation of
        Kansas:
14
        MS. SHARON BRETT
15      MS. KUNYA CHING
        ACLU of Kansas
16      6701 West 64th Street, Suite 210
        Overland Park, Kansas 66202
17      sbrett@aclukansas.org
        kching@aclukansas.org
18      (913) 490-4100

19      For the Defendant:

20      MR. CHARLES E. BRANSON
        FISHER PATTERSON SAYLER & SMITH, LLP
21      3550 Southwest 5th Street
        Topeka, Kansas 66606
22      cbranson@fpsslaw.com
        (785) 232-7761
23

24

25
```

```
 1                  APPEARANCES (continued)

 2        The Court Reporter:

 3        Ms. Kara D. Ince, RPR, CCR
          Kansas CCR No. #1766
 4        Pohlman Court Reporting and Litigation Services
          10 South Broadway, Suite 1400
 5        St. Louis, Missouri 63102
          (877) 421-0099
 6
          The Videographer:
 7
          Leah Gullet
 8        Pohlman Court Reporting and Litigation Services
          10 South Broadway, Suite 1400
 9        St. Louis, Missouri 63102
          (877) 421-0099
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    owned rental property and the -- a tenant sued about

2    not getting the deposit back.

3        Q.   Okay.  Any other -- any other cases that

4    you recall?

5        A.   No, not that I recall.  I think that was

6    it.

7        Q.   I know that there was a letter sent on

8    your behalf by James Thompson in November of -- of

9    last year with respect to issues with the Wichita

10   Police Department.  You're aware of that?

11       A.   Yes.

12       Q.   And is Mr. Thompson currently representing

13   you in that matter?

14       A.   No.

15       Q.   Okay.  And is that matter resolved as far

16   as you're -- you're concerned?

17       A.   Correct.

18       Q.   Okay.

19       A.   From my perspective, yeah.

20       Q.   From your perspective.  So you don't

21   intend to file -- you don't intend to file a lawsuit

22   against the City of Wichita and the Wichita Police

23   Department?

24       A.   Correct.

25       Q.   Okay.  And initially when that -- when

1    that right to sue was issued, was that something

2    that you were considering doing?

3        A.    Yes.

4        Q.    And why were you considering that action

5    at that time?

6        A.    **Because I felt that the way the City was**

7    **representing, particularly the manager was**

8    **representing the incident was wrong.**

9        Q.    And do you still feel that way?

10       A.    **I do.**

11       Q.    So that your -- your deciding not to

12   pursue claims doesn't have anything to do with the

13   merits of what you thought, it just has to do with

14   personal reasons; is that correct?

15       A.    **Yes.**

16       Q.    But you stand by everything that

17   Mr. Thompson said in that letter?

18       A.    **Yes, I do.**

19       Q.    Mr. Ramsay, I'm going to switch gears here

20   for a second and ask you a little bit about your

21   background.  Can you start off with what -- your

22   post-high school education?

23       A.    **Sure.  University of Minnesota, double**

24   **major in criminology and sociology, and then**

25   **graduate degree, master's degree, in management from**

1  exactly what he said along those lines.  But

2  something --

3      Q.   Did --

4      A.   -- something like that.

5      Q.   Did he tell you why Mr. Layton had wanted

6  them -- some kind of discipline against deputy

7  chiefs?

8      A.   Well, I -- I can't remember if it was said

9  or unsaid, but related to the SWAT texting case.

10     Q.   Okay.  And that's the case where you

11  believe Mr. Bezruki facilitated a lighter discipline

12  than you thought leadership believed was

13  appropriate?

14     A.   That's the case.  Correct.

15          MS. WOODY:  Could we put up Exhibit 8,

16  please.

17          (Deposition Exhibit No. 8 was marked for

18  identification.)

19  BY MS. WOODY:

20     Q.   Mr. Ramsay, this is the letter that

21  Mr. Thompson wrote on your behalf, which was

22  initially a -- a notice, and I just want to take a

23  look at a couple of page -- a couple of entries on

24  that page and just ask you some questions about

25  facts about that.  If you could turn that to page 2

1    and take a look at the second paragraph there.  It

2    says, "The beliefs and attitudes expressed by a

3    small cabal of some SWAT members and officers are

4    inconsistent with the principles necessary for

5    proper 21st Century policing."

6              Do you see that?

7    A.    Yes.

8        Q.    Is -- is -- is -- are the -- is the cabal

9    of some SWAT members and officers, is -- is -- are

10   they the folks that you were referring to as the

11   good ole boys?

12   A.    Not necessarily, no.

13       Q.    So what was -- what was it about these

14   SWAT members and some officers that had -- what

15   attitudes did they hold that you thought were

16   inconsistent with 21st Century proper policing?

17   A.    Yeah, and this was written by a group of

18   us and I wasn't -- I'm not totally sure what they --

19   specifically who they were talking about, or what

20   they were, but I think it revolved around, you know,

21   some of the -- some of those texts.

22       Q.    So because there were a number of folks on

23   the SWAT who were on the -- part of the SWAT teams

24   that were involved in that text -- that texting

25   scandal; correct?

1          A.    Yes.

2          Q.    Okay.  Then if you'll turn over -- just a

3    second.  I'm sorry.  If you'll turn over to page 3

4    and take a look at the end of that second paragraph.

5    It talks there about -- it says, "Because of the

6    changes made by Chief Ramsay while he was there, the

7    texting case was brought before the citizen review

8    board, an entity Chief Ramsay pushed to be created.

9    But for Chief Ramsay's tenure and his push for

10   transparency, it is unlikely the public would ever

11   have known about the texting matter."

12          Do you see that?

13          A.    Yes.

14          Q.    And so you're the person who pushed to

15   have the citizen review board created?

16          A.    Yes.

17          Q.    Why did you -- why did you think that was

18   appropriate or necessary?

19          A.    Well, one, is that discipline -- the city

20   manager does not agree with employee discipline

21   being public.  I came from a world in Minnesota

22   where public employee discipline was public and I

23   thought it was beneficial.  And in Wichita, it

24   hemmed -- it caused me issue after issue that I

25   couldn't tell people when there was discipline that

1  **was administered because the manager didn't believe**

2  **it was public.  He wanted to keep it private.  And**

3  **this was a way to show people in a transparent way**

4  **what we were doing to hold officers who engaged in**

5  **this conduct accountable.**

6       Q.    And so is the citizen review board able

7  to -- to -- to review any disciplinary -- any

8  disciplinary measures?

9       A.    **They see every -- every case, every**

10  **complaint.**

11       Q.    Okay.  So this is when the texting issue

12  became public, because it came to the citizens

13  review board and -- and then it became -- it came

14  out into the open; is that right?

15       A.    **That's how it evolved, yes.**

16       Q.    And, then, in the next paragraph there it

17  talks about your -- what you already testified to

18  here today about your repeated attempts to get the

19  city manager Layton to keep the HR manager Bezruki

20  out of police discipline.  You see that?

21       A.    **I do.**

22       Q.    And -- and you agree with that?

23       A.    **Yes.**

24       Q.    Take a look at page 5, if you would.

25  That's 5 and 6.  It's down at the bottom where it --

1    it says "gang list" there.  Do you see that?

2         **A.    Yes.**

3         Q.    And there it says that -- I'm -- I'm just

4    going to read that whole paragraph.

5              "The gang list is predominantly

6    compromised of people of color, especially

7    African-American and Latino men.  Chief Ramsay and

8    his executive staff recognize the immense problems

9    with the gang list, especially regarding racial

10   issues, the lack of transparency, and the

11   unregulated placement of individuals on the list.

12   Chief Ramsay and the deputy chiefs implemented

13   notification for parents of children placed on the

14   list and added intervention for juveniles in 2016

15   and 2017.  Chief Ramsay and the executive staff also

16   wanted to employ a due process procedure to remove

17   adults from the list.  Deputy Chief Salcido proposed

18   a five-member panel compromised of three officers

19   and two citizens, with the citizens being a member

20   of the African-American community and the other from

21   the Latino community, since both groups are

22   overrepresented on the gang list.  The City of

23   Wichita and the FOP reacted with hostility and

24   resentment toward these recommendations."

25              Do you see that?

1      A.    I do.

2      Q.    And when it says there that the City of

3  Wichita and the FOP reacted with hostility and

4  resentment, who was acting with hostility and

5  resentment toward these proposed changes?

6      A.    Well, that would -- Deputy Chief Salcido

7  would be able to speak better to that than me.

8      Q.    Okay.  Did you recall anybody from the FOP

9  or the City being negative about these changes to

10  the gang list?

11      A.    I remember Deputy Chief Salcido talking

12  about it and I'd have to talk to him to -- to

13  refresh my memory.

14      Q.    So he was the one who -- who had direct

15  communications with people who were hostile toward

16  changes to the gang list?

17      A.    Yes.

18      Q.    But -- and you recall him telling you

19  about that but just not what?

20      A.    I remember him talking about it, yes.

21      Q.    Okay.  Mr. Ramsay, as -- as you sit here

22  today, do you still think that the changes that were

23  proposed to the gang list are a good idea?

24      A.    I do, yes.

25          MS. WOODY:  Mr. Ramsay, I don't think I