# EXHIBIT 97



**Pohlman**USA®

Court Reporting and
Litigation Services

---

Jose Salcido

December 15, 2022

---

Progeny, et al.

vs.

City of Wichita, Kansas

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PROGENY, A PROGRAM OF          )
DESTINATION INNOVATION         )
INC., CHRISTOPHER              )
COOPER, ELBERT                 )
COSTELLO, MARTEL               )    Case No.
COSTELLO, AND JEREMY           )    6:21-cv-01100-EFM-ADM
LEVY, JR., ON BEHALF           )
OF THEMSELVES AND              )
OTHERS SIMILARLY               )
SITUATED,                      )
                              )
              Plaintiffs,      )
                              )
     vs.                       )
                              )
CITY OF WICHITA,               )
KANSAS,                        )
                              )
              Defendant.       )
_____ )


VIDEO DEPOSITION OF JOSE SALCIDO


The video deposition of JOSE SALCIDO, taken before
Nancy L. Rambo, RPR, CSR, at the law office of
Joseph, Hollander & Craft, Wichita, Kansas, on
the 15th day of December, 2022, commencing at
8:33 a.m.

```
 1                    APPEARANCES:

 2
    For Plaintiffs:
 3     SHOOK, HARDY & BACON LLP
       2001 Market Street, Suite 3000
 4     Philadelphia, Pennsylvania  19103
       By Mr. Thomas Sullivan
 5

 6     SHOOK, HARDY & BACON LLP
       2555 Grand Boulevard
 7     Kansas City, Missouri 64108
       By Mr. Jordan C. Baehr - (Zoom Videoconference)
 8     By Mr. Paul M. Vogel - (Zoom Videoconference)

 9
       KANSAS APPLESEED CENTER FOR LAW AND JUSTICE
10     211 East 8th Street, Suite D
       Lawrence, Kansas 66044
11     By Ms. Teresa A. Woody - (Zoom Videoconference)

12
       AMERICAN CIVIL LIBERTIES UNION
13     P.O. Box 917
       Mission, Kansas  66201
14     By Ms. Sharon Brett
       By Ms. Kunyu Ching - (Zoom Videoconference)
15

16
    For Defendant:
17     FISHER PATTERSON SAYLER & SMITH
       3550 SW 5th Street
18     Topeka, Kansas 66606
       By Mr. Charles E. Branson
19     By Mr. David R. Cooper (Zoom Videoconference)

20

21  Also present:  Mike Zarich, Videographer

22

23

24

25
```

```
 1                      INDEX OF EXAMINATION
     JOSE SALCIDO
 2                      DIRECT  CROSS  REDIRECT  RECROSS

 3   by Mr. Sullivan.....5...............311

 4   by Mr. Branson............308...............318

 5

 6   Signature of Witness..................323

 7   Certificate of Reporter...............324

 8

 9                          EXHIBITS
     EXHIBIT
10   NUMBER              DESCRIPTION              PAGE

11   Number 11           Wichita Police           112
                         Department Organizational
12                       Chart

13   Number 12           Wichita Police Gang Unit 139
                         2003 Basic Gang Manual
14
                         Number 13    Gang Offenders         152
15                       (Nomination/Flagging)
                         Workflow (Patrol
16                       Policy 527)

17   Number 14           Kansas Office of         151
                         Revisor of Statutes
18                       21-6313

19   Number 15           Wichita Police           224
                         Department Policy
20                       Manual, Policy 527,
                         Gang Offenders
21
     Number 16           Email Correspondence     255
22                       Dated January 13, 2016

23   Number 17           Email Correspondence     262
                         Dated March 1, 2017
24

25
```

```
 1                              EXHIBITS
      EXHIBIT
 2    NUMBER              DESCRIPTION                PAGE

 3    Number 19          Email String Dated         273
                         July 23, 2019
 4
      Number 20          Correspondence Dated       286
 5                       September 19, 2022

 6    Number 21          Individuals that have      291
                         been assigned to the
 7                       Gang/Felony Assault
                         Section/VCCRT
 8

 9    (Exhibits attached to transcript.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   Q   Not be put on the gang list?

2   A   I can tell you that's why we have two officers

3        up there looking at, hey, this is -- this is --

4        this is -- this is a gang member and this is

5        not 'cause they're looking at -- at the totality

6        of the nomination.

7   Q   Do you know what the error rate is in --

8   A   Oh, no.

9   Q   Have you done any independent analysis of --

10   A   No.

11   Q   -- the error rate?

12   A   No, we have not.

13   Q   So there's been no -- no audit of the accuracy

14        of the nomination procedure?

15   A   No.

16   Q   Okay.  So you would agree with me, though, that

17        if somebody -- if -- if a person gets nominated

18        to -- to the list based on faulty criteria,

19        right, there's -- there's no way after that

20        point to sort it out until the audit process?

21              MR. BRANSON:  Object to form.

22   A   I -- I -- you know, without me actually being in

23        the room, like, I don't think I -- I -- I can

24        agree with you or disagree with you because I

25        can -- I can tell you that -- that I -- I think

```
 1              our guys are -- are -- are very well trained in
 2              discerning who -- who -- who fits the criteria
 3              and should be on the list and who doesn't and --
 4              and not.
 5      BY MR. SULLIVAN:
 6      Q    I want to ask you about that 'cause earlier -- I
 7           think earlier you told me it can be, I think the
 8           word you used was -- or I think what you were
 9           saying is it can be very hard to the untrained
10           eye --
11      A    Correct.
12      Q    -- to determine who might be a gang member, who
13           isn't a gang member?
14      A    Correct.
15      Q    And it can be hard to distinguish between a gang
16           member and an associate --
17      A    Right.
18      Q    -- right?  What -- what is -- is there -- how
19           many hours a year does the gang unit spend
20           training as to these par -- particular criteria?
21      A    Well, it just -- it just will depend.  Sometimes
22           we have enough budget to send them to train for,
23           like, a week when there's a conference nearby or
24           when they come to town, and then there's the
25           required 40 hours of in-service, some of it
```

1     might include gang.  It just depends and varies

2     from officer to officer.

3  Q  But as to these specific criteria in 21-6313,

4     how many hours do they spend training as to

5     those applications?

6  A  Every officer or just the gang audit officers?

7  Q  Let's start with every officer and then let's

8     talk about the gang audit.

9  A  They're -- they're probably -- they probably

10    received initial training in the academy, and

11    then past that, if they're passionate about the

12    gang stuff, they -- they might kind of review it

13    on their own and know it and know what the state

14    stat says.  The other -- the gang unit officers,

15    I think they get more training specifically on

16    this than anybody else, but I -- I don't know

17    how often that occurs.

18 Q  And where are those training -- are there

19    training documents somewhere?

20 A  There would be -- you know, if they attended any

21    kind of gang training, it -- it -- they would

22    get hours, and so that would be part of the

23    training records.

24 Q  What about -- what about within the WPD itself,

25    because it's in a unique area as you've already

1       said, where -- is there specific -- is there

2       training specific for -- for Wichita in terms of

3       the application of these criteria?

4    A  You know, right off the top of my head, I

5       couldn't give you, like, the correct answer, I

6       just don't know.  You know, when you depose Chad

7       Beard, I'm sure he can give you a good answer on

8       that.

9    Q  Have you -- have you participated in any

10      training in the WPD that are specific to

11      application of the criteria in 21-6313?

12   A  Typically, when something changes with the law

13      or it's modified in some way, we do a training

14      bulletin too, but I -- I don't recall one being

15      on the -- done on the gang criteria, no.

16   Q  Okay.  The next -- the next box is complete TOPS

17      card.

18   A  Uh-huh.

19   Q  So is that done after the nomination or before

20      the nomination?

21   A  So it says nomination procedure, right --

22   Q  Yeah.

23   A  -- then the same officer completes the TOP card

24      and routes it to the gang section, or the

25      gang/felony assault section.

```
 1   Q    And, you know, I think we -- we certainly
 2        appreciate the -- the sentiments that you just
 3        shared about -- about that willingness, and I
 4        do -- I want to follow up on some of that, okay?
 5   A    Yes.
 6   Q    This -- the next document we're going to take a
 7        look at is -- it's been premarked -- it's been
 8        marked in another deposition, Parker-Givens
 9        Exhibit 1, designated confidential, Wichita
10        055482.  Tell me what this is, sir.
11   A    This is -- when I walked into the -- to talk to
12        the chief, I kind of was -- was -- I -- I kind
13        of was looking around the country and -- and
14        doing research, I'm always looking at
15        contemporary policing issues, and I know that
16        due process was a huge thing around the country
17        as an issue.  And I can't quite tell you what
18        cities this was -- this was the deal, but this
19        is -- this was part of the -- part of the vision
20        we already talked about.
21   Q    And the email, this is dated September 24, 2021,
22        right?
23   A    Yes.
24   Q    But you had already -- you had already begun
25        some work --
```

```
1    Q    And you had been doing -- you had been studying

2         this issue, right?

3    A    Yes.

4    Q    You'd been studying -- and tell me, you said you

5         were -- you were going around the country, what

6         were you looking -- you were looking at due

7         process issues, right?

8    A    Correct.

9    Q    What kind of due process issues were you --

10   A    Specifically on the -- on the -- on the gang --

11        gang list throughout the country, I think

12        there's some cases that made it up to the

13        courts.

14   Q    Like due process issues like the notice and

15        the panel and --

16             (Reporter requests clarification

17              of the witness.)

18   A    To challenge the -- the inclusion on the list.

19   BY MR. SULLIVAN:

20   Q    Okay.  And just so the record's clear, like due

21        process is usually, like, the notice issue,

22        right?

23   A    Yes.

24   Q    The panel, right?

25   A    Right.
```

1   Q   Being -- the fact that you should be able to

2       challenge --

3   A   Yeah.

4   Q   -- right?  Anything else?

5   A   Most importantly the resources that were needed,

6       you know what I mean, because you can invest --

7       you can invest in incarceration or you can

8       invest in prevention and off-ramping and working

9       with the, you know, with, like, the DA's office.

10      We've been talking about this for years, me and

11      the -- the district attorney on how we could --

12      we could -- we could -- we could take referrals

13      in lieu of prosecution, that type of thing, and

14      something we just batted around in conversation

15      but never ...

16  Q   You mentioned that you had looked at, I think

17      you said some other sources and stuff?  Did you

18      say -- you say you have been looking at sources

19      or states?

20  A   States, like states or cases that were, like,

21      online or I never -- you know I don't have

22      access to it, like -- like -- like -- like a

23      court, like case dockets, or whatever, but I was

24      kind of looking at, like, public information

25      on -- on what -- what -- what -- what was

1    becoming a theme around the country that, hey,

2    there's -- there's -- there's overrepresentation

3    here by Brown and -- and Black kids.

4  Q  And you don't remember any of the -- the

5     specifics, you just kind of remember --

6  A  Other than it seemed to be the same theme --

7  Q  Yeah.

8  A  -- throughout the country.

9  Q  Were there particular states that you looked to

10    as models when you were thinking about these

11    things?

12 A  I don't remember, I don't remember if -- if I

13    was or not.  And I -- I even thought about

14    surveying the major city chiefs to see what they

15    could give me, but I never did that.

16 Q  And this is part, I take it, of what you talked

17    about earlier today which is, like, your

18    emphasis on quality and objectivity too, right?

19 A  Correct.

20 Q  So the -- the first concept that you identify

21    here in -- in the new beginning document, and

22    this is Bates labeled Wichita 055483, is the

23    five-person panel --

24 A  Correct.

25 Q  -- right?  Any -- where did you get the

1   Q    They're immense problems?

2                MR. BRANSON:  Object to form.

3   **A    To me, it was problematic --**

4   BY MR. SULLIVAN:

5   Q    Yeah.

6   **A    -- yes.**

7   Q    And it references the due process procedure that

8        you wanted to implement, right?

9   **A    Correct.**

10  Q    And you were -- you -- the letter talks about

11       executive staff, but you were -- you were -- and

12       you were part of this executive staff, right?

13  **A    Correct.**

14  Q    And it says, Deputy Chief Salcido proposed a

15       five-member panel comprised of three officers

16       and two citizens, with the citizens being a

17       member of the African American community and the

18       other from the Latino community since both

19       groups are overrepresented on the gang list --

20  **A    Correct.**

21  Q    -- right?  And the letter goes on to say that

22       the City of Wichita and the FOP reacted with

23       hostility and resentment towards these

24       recommendations?

25  **A    It was my perception that -- that they were.**

```
 1              Like I -- like I said before, I -- I don't know
 2              if it was because we were beating them at every
 3              arbitration or because I was trying to implement
 4              change, you know, but my perception was that
 5              they -- they were -- they were pushing actively
 6              against me.
 7     Q    And they were -- they were pushing actively
 8          against some of the concrete recommendations
 9          that you had made to fix the Policy 527, right?
10                   MR. BRANSON:  Object to form.
11     A    Not necessarily the policy but the way we did
12          business.  You know, the other thing is I wanted
13          to have night detectives to -- to kind of deal
14          with the violent crime, and they filed a
15          grievance over that; it didn't -- I mean, it
16          was -- it ended with the chief and I was done.
17     BY MR. SULLIVAN:
18     Q    They didn't want your -- the -- the new
19          beginnings, the docu -- the document with new
20          beginnings, they didn't -- they were opposed to
21          that sort of stuff?
22     A    I can't tell you --
23                   MR. BRANSON:  Object to form.
24     A    I can't tell you I know specifically for sure,
25          but I suspected that -- that maybe that -- that
```

1          was -- that him, the president of the FOP and

2          the lieutenant were talking, and -- and so

3          that's why I said, you know what, Chad, you

4          probably need to go to the field, I need to get

5          somebody in here that would manage this unit a

6          little better.

7    BY MR. SULLIVAN:

8    Q    And you felt that they were interfering with it?

9    A    I -- my perception is that they were.  You know,

10         can I tell you specifically that I have

11         firsthand knowledge?  Just based on all the --

12         all the little petty grievances, I thought that

13         they're -- they're -- they're fighting me on

14         this.

15   Q    Did you hear -- hear or observe them do anything

16         in response to that that was a proposed

17         constructive modification to it or an

18         alternative approach that would have

19         accomplished the same things that you had in

20         mind?

21   A    I didn't -- I didn't -- I didn't have any of

22         that, you know, not from them I didn't.

23   Q    So they weren't even -- they weren't even trying

24         to meet your -- your -- your new vision on its

25         own terms at all?

```
 1    A    No.

 2                   MR. BRANSON:  Object to form.

 3    A    I don't think we ever -- we ever kind of had it

 4         out that way; I just -- I just thought that they

 5         were fighting me actively with this.

 6    BY MR. SULLIVAN:

 7    Q    So was it your impression that for them that was

 8         basic -- the stuff in that -- in that document,

 9         in the new beginnings document is essentially a

10         nonstarter?

11                   MR. BRANSON:  Object to form.

12    A    I thought that there was a little cabal up there

13         that was actively working against this.

14    BY MR. SULLIVAN:

15    Q    And what was the -- what is the racial profile

16         of the -- the people in this cabal?

17    A    Maybe -- maybe -- maybe three or four White

18         males and an Asian male, which is the president

19         of the FOP.

20    Q    Okay.  And that -- that -- their hostility had

21         started even before the time of that -- that

22         document, right?

23    A    I think --

24                   MR. BRANSON:  Object to form --

25                      (Reporter requests clarification
```

```
 1                        of Mr. Branson.)

 2               MR. BRANSON:  -- who's they, their?

 3  BY MR. SULLIVAN:

 4   Q   So the forces of the cabal and the hostility --

 5   A   I -- I think it all started when -- when their

 6       ability to short-circuit discipline with Bezruki

 7       went -- that -- that ability to -- to bypass the

 8       normal channels and -- and get good deals from

 9       Bezruki, when that was threatened via the ethics

10       complaint.  But it also started when they tried

11       to interfere with the officer-involved shooting,

12       and we had good evidence of that.

13   Q   And tell -- what was -- what was that situation,

14       the officer-involved shooting?

15   A   So we had five officers shoot their guns, we --

16       we were doing a -- we were looking into that.

17       Out on the scene, they were actually pulling

18       officers, the union members were pulling

19       officers and indicating that -- that they

20       were -- that they were being recorded, and

21       pretty much they tried to push their way into

22       the interview rooms when we're doing the

23       criminal interviews and -- 'cause they said

24       that -- that's a union -- that's a union -- that

25       should be a union protected thing, and I
```

1       absolutely said, if you don't like it, file a

2       PERA, a PERA and we can fight that later, you're

3       not going in there.

4           They -- they think -- they thought that

5       attorney-client privilege extended to the union

6       based on the fact that they were paying for the

7       officers' attorney, something that DA Bennett

8       violently disagreed with them on and he says

9       they're not protected by attorney-client, but

10      they made that argument.

11   Q   But the -- the -- some -- some of the things, I

12      mean, you had talked -- when we talked about

13      that new beginnings document --

14   A   Uh-huh.

15   Q   -- right, you had started to have a lot of those

16      thoughts well before that time even?

17   A   Oh, you know, the minute I ended up up there, I

18      was like that's something I need to -- to kind

19      of start to fix.  But, again, there was so many

20      problems in investigations that I needed to

21      handle before I tackled this one.

22   Q   Yeah, but did -- when you had the -- did you

23      anticipate that you were going to get the

24      resistance that you did from the FOP and the

25      City even back then?

1    A    I didn't -- I didn't -- I didn't anticipate

2         that.  I mean, it -- it -- it really surprised

3         me that -- that they'd be that --

4    Q    And when did you first start to feel that?

5    A    As soon -- as soon as I moved Chad Beard back to

6         the field and they got the new lieutenant that I

7         wanted in there, that's when -- that's when

8         the -- the hostile work environment claims made

9         it to the City -- City Council Member Frye, to

10        the chief, you know, and then the -- the little

11        petty things here and there that they were --

12        they were hitting me with.  So that kept me very

13        occupied dealing with that and a little less

14        over here.

15   Q    And that was before 2021, wasn't it?

16   A    Yeah, it started in 2020, like late 2020.

17   Q    Okay.  So it started -- that stuff started even

18        before we had filed our complaint?

19   A    Oh, way before that --

20   Q    Okay.

21   A    -- yeah.

22   Q    I may come -- come back to some of this, but I

23        got a couple of quick things.  What are -- are

24        you familiar with the term III's?

25   A    Yes.