# Exhibit A



**Pohlman**USA®

## Court Reporting and Litigation Services

---

Robert Mateo

August 4, 2023

---

Progeny, et al.

vs.

City of Wichita, Kansas

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


PROGENY,
a program of Destination
Innovations Inc.,
CHRISTOPHER COOPER,
ELBERT COSTELLO,
MARTEL COSTELLO, and                Case No.
JEREMY LEVY, JR.,                   6:21-cv-01100-EFM-ADM
on behalf of themselves
and others similarly
situated,

            Plaintiffs,

v.

CITY OF WICHITA, KANSAS,

Defendant.
_____/



VIDEOTAPED DEPOSITION OF
ROBERT MATEO

Taken on behalf of the Plaintiffs



        DATE TAKEN:     August 4, 2023
        TIME:           10:02 a.m. - 1:01 p.m.
        PLACE:          Shook, Hardy & Bacon
                        100 N. Tampa Street
                        Suite 2900
                        Tampa, Florida 33602




        Stenographically Reported by:

        Lisa Gropper, RPR, FPR-C

1       **A    I was retained in June, I believe.  I think**
2   **the original contact was the month prior, but I could be**
3   **off by a couple of weeks.**
4       Q    And -- and so you think you were contacted
5   maybe in May of 2023?
6       **A    Yes.**
7       Q    Okay.  And then retained in -- in June --
8       **A    Yes.**
9       Q    -- correct?
10      **A    Yes.**
11      Q    And what did -- what were -- what were you --
12  what's your understanding of what you were retained to
13  do in this case?
14      **A    My understanding was to examine an opinion**
15  **provided by the Plaintiffs' expert and render my own**
16  **opinion.**
17      Q    Okay.  And what did you -- what subjects did
18  you -- were you asked to render an opinion on?
19      **A    On the overinclusiveness and improper use of**
20  **the Wichita Police Department's Master Gang List.**
21      Q    And did you review the Complaint in this case?
22      **A    I reviewed a record provide -- or an order**
23  **provide -- prepared by Judge Melgren prior to reading**
24  **the Complaint.  I did briefly read the Complaint, but I**
25  **felt that the -- the order reflected more of my opinion,**

1   **provided me with more information to generate my**

2   **opinion.**

3      Q    Okay.  So you're relying more on

4   Judge Melgren's order on the motion to dismiss than the

5   Complaint, correct?

6      **A    Yes.**

7      Q    And what counts of Plaintiffs' Complaints are

8   your opinions pertinent to in this matter?

9      **A    I'm not -- I'm not fully familiar with the**

10  **specific counts.**

11     Q    Okay.  Do you understand what the claims are

12  in this case?  What's your understanding of what this

13  case is about?

14     **A    They're -- I believe I captured them briefly**

15  **in -- in my report, if I did it correctly, extracting**

16  **them from the order.**

17     Q    Okay.  But tell me -- tell me what your

18  understanding is.

19     **A    Plaintiffs assert that they've obtained some**

20  **harm by being on the Master Gang List.**

21     Q    And are Plaintiffs seeking damages in this

22  case?

23     **A    I'm not familiar with all of what they're**

24  **seeking.**

25     Q    So you don't know if they're asking for

1  damages at all?

2      **A      In speaking with Mr. Branson, I understand**

3  **that they're not asking for monetary damages, if I'm**

4  **correct.**

5      Q    Okay.  Do you understand what relief they are

6  asking for?

7      **A      No, ma'am, not fully.**

8      Q    Okay.  So your testimony is basically, as you

9  understand it, just to address whether or not you think

10  they were damaged; is that correct?

11      **A      No, ma'am.  My opinion is reflecting the use**

12  **of the Wichita -- I may use it collectively, the gang**

13  **list or the gang database --**

14      Q    Okay.

15      **A      -- or the Master Gang List.**

16      Q    Okay.  So if you use any of those, we're

17  referring to the same thing, which is the database the

18  City of Wichita, Wichita Police Department, maintains

19  with respect to alleged gang members; is that right?

20      **A      Yes, ma'am, that's correct.**

21      Q    You said you spoke with Mr. Branson.  Have you

22  spoken with anyone else in this case about your expert

23  opinion?

24      **A      I spoke to Officer Cale Carson by telephone.**

25  **I've -- my -- my reasoning for calling him was to ask**

1    him a question about training and what kind of training

2    they had received.

3         Q    And why did you call Mr. Carson specifically?

4         A    I had asked Mr. Branson for someone that I

5    could contact for my question --

6         Q    And he --

7         A    -- and --

8         Q    He suggested you call Mr. Carson?

9         A    Yes, ma'am.

10        Q    When did you have that conversation with

11   Mr. Carson?

12        A    I believe that was July 23rd or July 24th.

13        Q    And --

14        A    I'm pretty sure it was July 23rd.

15        Q    And tell me -- just tell me what you remember

16   about the conversation with Mr. Carson.

17        A    My question to Mr. Carson was whether he had

18   ever received training on 28 Code of Federal Regulation

19   and Part 23.

20        Q    Okay.  And why were you asking him that

21   question?

22        A    Because I was referring to 28 CFR Part 23 in

23   my opinion.

24        Q    And were you asking him specifically about any

25   particular part of 28 CFR 23?

1       **A      No, ma'am.**

2       Q     Just generally was he familiar with it?

3       **A      Yes, ma'am.**

4       Q     And what did he say?

5       **A      He had just attended training online back I**

6  **believe previous January which included the topic of 28**

7  **CFR Part 23.**

8       Q     And was that his entire familiarity with

9  the -- with the regulation?

10      **A      That was the training that he told me he**

11 **attended.  I wouldn't be familiar with all of the**

12 **training that he has attended.**

13      Q     Okay.  With respect to what that training was,

14 did he explain to you what the -- what the -- what was

15 contained in that training about 28 CFR 23?

16      **A      It was the overview and explanation of 28 CFR**

17 **Part 23.**

18      Q     Can you explain that to me?

19      **A      What do you mean?**

20      Q     What is the -- what's an overview of twenty --

21 28 CFR 23?

22      **A      It -- it provided what the words were in 28**

23 **CFR Part 23 so that officers could understand the**

24 **meaning behind it.**

25      Q     Okay.  And -- and he had -- so he had been --

1   he had been to a training where they discussed the

2   wording of 28 CFR 23.  Was there anything additional

3   that he -- that he said that he understood or learned

4   from that training?

5       A   No, ma'am.

6       Q   And how did that then figure into your opinion

7   as you -- as you set it out in your report?

8       A   So as I reviewed the policies and procedures

9   provided by the Wichita Police Department, I found that

10  they were consistent with 28 CFR Part 23.

11      Q   And why is that important?

12      A   28 CFR Part 23 provides for the use of

13  criminal intelligence databases.

14      Q   Okay.  Is that something that -- is 28 CFR 23

15  reflected anywhere in any of the documents maintained by

16  the Wichita Police Department?

17      A   I do not recall seeing them in the documents

18  that I -- seeing it in the documents that I reviewed.

19      Q   And other than your conversation with

20  Mr. Carson, did anyone tell you that that was an

21  important part of their policy?

22      A   I wouldn't want to speculate on what the

23  Wichita Police Department finds important --

24      Q   No.

25      A   -- so I wouldn't feel comfortable saying that.

1   go back and make sure I got the answer to it.

2          With respect to your -- forming your opinion,

3   you spoke with Mr. Branson and you spoke with

4   Mr. Carson; is that correct?

5       A   **Yes, ma'am.**

6       Q   And did you speak with anyone else from the

7   Wichita Police Department at any time?

8       A   **No, ma'am.**

9       Q   You also reviewed it looks like a large number

10  of documents in this case; is that right?

11      A   **Yes, ma'am.**

12      Q   And how were those documents -- were those

13  documents provided to you by someone from the Wichita

14  Police Department or counsel for the Wichita Police

15  Department?

16      A   **They were provided by counsel.**

17      Q   And were all of them provided at one time?

18      A   **No, ma'am.**

19      Q   Okay.  Which one -- which ones were provided

20  first?

21      A   **Dr. Muiz' opinion and documents that she had**

22  **reviewed.**

23      Q   Okay.  So initially you received Dr. Muiz'

24  report and the attachments that she had provided to the

25  Defendant, correct?

1       Q      Did you -- were you then provided with other

2    documents later?

3       **A      I was provided with additional depositions to**

4    **review, yes.**

5       Q      Okay.  And was that something that you asked

6    for?

7       **A      I don't know if I specifically asked for them**

8    **because obviously I didn't know that they existed, but I**

9    **know in conversations with counsel he provided them for**

10   **further review.**

11      Q      Okay.  And do you recall what depositions

12   those were?

13      **A      Some were full versions of the ones that I had**

14   **reviewed from Dr. Muiz.  I don't remember every**

15   **particular person's name in the depositions that were**

16   **provided to me.  There were several.**

17      Q      And with respect to those depositions that

18   were provided to you at a later date, was there anything

19   in those depositions that you found particularly

20   important with respect to the formulation of your

21   opinion?

22      **A      I recall finding a conversation in the**

23   **depositions about officers being provided training on a**

24   **regular basis.**

25      Q      Okay.  And do you recall whose deposition that

1     **A     Yes.  All of the -- all of the attachments**
2  **were provided by counsel.**
3     Q     Okay.  You have -- you've also in your opinion
4  rendered specific statements about the plaintiffs, the
5  named plaintiffs in this lawsuit; is that right?
6     **A     Yes, ma'am.**
7     Q     And what did you review with respect to their
8  claims?
9     **A     Again, the judge, Judge Melgren's order.**
10    Q     Okay.  Did you -- and that -- did you review
11  anything else with respect to their claims?
12    **A     No, ma'am.**
13    Q     So you didn't read their depositions?
14    **A     Don't believe I have their depositions.**
15    Q     Did you read the interrogatory answers they
16  provided to discovery?
17    **A     Again, I don't believe I have their**
18  **depositions.**
19    Q     Did you look at any of their gang files as
20  maintained by the Wichita Police Department?
21    **A     No, ma'am.**
22    Q     So all of your opinions about the named
23  plaintiffs is based solely on the information that you
24  saw in Judge Melgren's order; is that correct?
25    **A     Correct, because my opinion was regarding the**

1  database, the use of the database.

2      Q    Okay.  So when you say the use of the

3  database, what do you mean?

4      A    Does it -- does it appear, based on my review,

5  that the Wichita Police Department is following their

6  own policy.  Are they -- are they -- are they training

7  the officers on how to identify gang members, how to

8  fill out the proper documentation and provide it so that

9  that documentation can be vetted by a gang officer or a

10  member of the -- the VCCRT, I believe.

11          And again that will be another -- eventually

12  as we go along I will probably lump them into the gang

13  unit --

14      Q    Okay.

15      A    -- if you will.  So if I say gang unit, I'm --

16  I'm referring to them.

17      Q    Okay.  Because -- because the name of it has

18  changed over time, correct?

19      A    Yes.

20      Q    Okay.  Of all the materials that you reviewed,

21  were there any that were of particular importance to

22  your opinions?

23      A    I don't think any one was of particular

24  importance.  Collectively, they're all important.

25      Q    Okay.  But are there any that were more

1   informative to your opinion than others?

2       A    I don't recall any one that was, no, ma'am.

3       Q    Were the training materials important?

4       A    Yes, ma'am.

5       Q    Were they -- did you rely on the training

6   materials with respect to some of your opinions?

7       A    Yes, ma'am.

8       Q    And what -- what part did the training

9   materials play in you formulating your opinions?

10      A    There were numerous PowerPoint presentations

11  that I reviewed that were very consistent in their

12  description of how to identify criminal gang members

13  and, you know, symbolism, apparel, clothing that are

14  preferred by members in -- in that area.

15           There was another document that I noted that

16  was from Kansas University, I believe.  It appeared to

17  be a guideline, and within that document it even went as

18  far as to say, you know, don't get stuck on just one

19  thing, and I'm -- I'm paraphrasing.

20      Q    Uh-huh.

21      A    Don't get stuck on just one thing.  Look

22  further into someone if you're identifying them as a

23  gang member.

24      Q    Okay.  And is it your -- is it your opinion

25  that all of the individuals in this -- in the -- all of

1   the named plaintiffs, the individual named plaintiffs,

2   are accurately reflected as gang members?

3       **A   Well, if the officers are following the**

4   **training provided, they would rely on Kansas statute and**

5   **Wichita policy to gather that information and provide it**

6   **to again the gang unit for vetting, if it's someone**

7   **outside of that office that's gathering that**

8   **information, and submit it for vetting so that it could**

9   **be reviewed for accuracy.**

10      Q   Do you have any opinions as to whether the

11  Wichita Police Department is consistent with best

12  practices for gang -- for gang databases?

13      **A   From the review of the training and the review**

14  **of the policy, it appears they have created a system**

15  **that they follow in order to identify criminal gang**

16  **members.**

17      Q   Do you have an understanding of what best

18  practices are for those kinds of databases?

19      **A   So the individual agency would have to decide**

20  **what their best practice would be.   I wouldn't speculate**

21  **for them.**

22      Q   So you're not aware of any practice --

23          I noted that you're involved in statewide and

24  national gang -- gang inspector --

25      **A   Associations.**

1      Q    -- associations.

2      **A    Yes, ma'am.**

3      Q    And within -- within those associations, are

4   there any -- any best practices set out for gang -- for

5   members to look at as to whether or not their -- their

6   own policies are in compliance?

7      **A    No, ma'am.  The investigator associations**

8   **are --**

9         **We'll start with the state investigator**

10  **associations.  They're there to provide training for law**

11  **enforcement officers within their region or -- or state**

12  **where they operate.  Of course any officer from any**

13  **state is welcome to attend training for those**

14  **associations.**

15        **At the National Alliance, we are more of a**

16  **collective of those state and regional gang**

17  **investigators associations.  We don't generate best**

18  **practices for other states.  We leave that for the**

19  **individual agencies to do that on their own.  They are**

20  **the ones that would determine what their own best**

21  **practice would be.**

22     Q    So your opinions with respect to the Wichita

23  Police Department's gang database or gang list is that

24  they've created their own best practices; is that right?

25     **A    Yes, ma'am.**

1       Q    And so you're just looking to see if their

2   policies are consistent with their own best practices?

3       **A    If they are following their own policies.  I**

4   **suspect collectively their policy, their SOP, their**

5   **process in vetting are their best practice, so I believe**

6   **from what I've reviewed in the training materials and in**

7   **the policy they are.**

8       Q    And did you -- you didn't interview anyone at

9   the WPD, any of the officers, to talk to them about

10  their actual practices; is that right?

11      **A    No, ma'am.**

12      Q    And you didn't look at any of the gang files;

13  is that correct?

14      **A    That is correct, I did not.**

15      Q    So your -- you don't have any opinion as to

16  whether their actual practices, what the -- what the

17  police officers actually do, is consistent with their

18  policy; is that correct?

19           MR. BRANSON:  Object to form.

20      **A    That would be again a -- a service of**

21  **personnel which the Wichita Police Department would have**

22  **to decide on.  I wouldn't feel good speculating on that.**

23  BY MS. WOODY:

24      Q    Okay.  All right.  So you can't sit here today

25  and say in general the officers of the Wichita Police

1    Department actually followed the policy?  You can't say

2    that?

3         **A    Again, that --**

4              MR. BRANSON:  Object to form.

5              THE STENOGRAPHER:  Repeat the answer.

6         **A    Again, that would be a personnel issue and not**

7    **a utilization of the policy and the SOP for entering**

8    **gang members onto the gang list.**

9    BY MS. WOODY:

10        Q    Okay.  So that's -- you're just talking about

11   whether the policies they have, the written policies

12   they have, are following their own best practices; is

13   that right?

14        **A    When you couple the officers' training and the**

15   **addressing of the policy and the vetting process that**

16   **takes place, all of these things are checks and balances**

17   **for the officers to follow best practices to identify**

18   **gang members.**

19        Q    Okay.  But your understanding of -- of that is

20   based solely on the policies about what they're supposed

21   to do, the policies about vetting.  You didn't actually

22   go in and do any checks to see if individual officers

23   actually followed those policies?

24        **A    Correct, I did not.**

25        Q    Okay.  Have you done anything since you put

```
1        mean, to the extent that you can remember what your
2        experiences are with those, you can answer that
3        question.
4        A    So we do have a process in place where we make
5   sure that the person that's being entered into that
6   system meets state statute.  Florida Statute 874 is the
7   statute that governs criminal gang members in Florida,
8   and the criteria is very similar to what the state of
9   Kansas utilizes.  It's -- with -- with differences of
10  course because they're two different states.  And
11  provided someone meets the criteria under Florida state
12  statute, then they can be entered into a database that
13  is maintained within our intelligence unit, and it is a
14  confidential database.
15       Q    And when you say confidential, explain that to
16  me.
17       A    It's -- we don't generate lists and hand them
18  out to anybody.  You have to be a law enforcement
19  officer with a need to know.
20       Q    Okay.  Law enforcement officer with a need to
21  know, does that mean that not everybody in the Polk
22  County Sheriff's Office can access that database?
23       A    Correct.  Only members of the intelligence
24  units -- unit can access that database.
25       Q    Okay.  And -- and you say with -- so those are
```

```
 1   the folks that -- with a need to know, the people in the
 2   intelligence department?
 3        A    No, ma'am.  A detective working a homicide
 4   might have the need to know during an investigation, and
 5   they would be provided with that information.
 6        Q    Okay.  So it's on a -- it's on a case-by-case
 7   basis?
 8        A    Yes.
 9        Q    Okay.  And you said that there's a vetting
10   process before people can be entered into the Polk
11   County database.  Explain the vetting process to me.
12        A    Again, the information, supporting
13   documentation that is provided, is reviewed for accuracy
14   and compliance with state statute.
15        Q    And how is it reviewed for accuracy?
16        A    If you're submitting someone as a gang member
17   and they're throwing up a hand sign, if that hand sign
18   isn't consistent with the gang that they're identifying,
19   then that person doesn't get entered in as that gang
20   member because it's not consistent.
21        Q    Okay.  Give me an example of something that
22   wouldn't pass muster as you just discussed.  How would
23   that be reflected?
24        A    May I have a moment to think of an anecdote?
25        Q    Sure.
```

1  arrested me for a crime but I'm not a gang member?  Do

2  they have a way to then appeal that designation?

3      **A**    **They can certainly call and we'll discuss it.**

4  **It's happened in the past.**

5      Q    And what's happened with some of those calls?

6      **A**    **Some folks were removed and some were not.**

7      Q    Okay.  So you actually had people who called

8  and said, Look, here's the evidence I'm not a gang

9  member, and you agreed and took them off the list?

10     **A**    **The one that I recall actually aged out, if**

11  **you will.**

12     Q    And when you say aged out, what do you mean by

13  that?

14     **A**    **Their -- their clock had extended past five**

15  **years, so they were removed.**

16     Q    Okay.  Does the Polk County Sheriff's Office

17  do any kind of audit of the gang list?

18     **A**    **Yes.**

19     Q    And -- and how does that audit work?

20     **A**    **I'm not familiar with the exact process**

21  **because I'm not part of it.  I know that the**

22  **intelligence unit -- the database has a built-in clock**

23  **for tolling, and the folks that take care of that are**

24  **notified that someone is reaching the end of their**

25  **limit, if you will, and whoever was the original owner**

1              **I think that pretty much covers it.**

2      Q     Okay.  And what is the -- what is the Florida

3    Gang Investigators Association?  What is that?

4      **A     It's a nonprofit organization that provides**

5    **training to law enforcement officers, many folks within**

6    **the criminal justice discipline, on many topics, not**

7    **just gangs, but interview and interrogation, prevention,**

8    **intervention, you know, those types of things.  That's**

9    **what we -- that's what we do.  We -- we put on training.**

10     Q     Okay.  And primarily within the state of

11   Florida?

12     **A     Yes.**

13     Q     Okay.  And when you talked about training, you

14   say it's -- it's not just -- it's not just related to

15   gang identification; it's -- it's also related to other

16   forms of investigation?

17     **A     Yes.**

18     Q     With respect to the training on -- on --

19            Well, do you offer training on gang databases?

20     **A     We -- we mention it in the basic class.  It's**

21   **not very in-depth for gang databases because again every**

22   **agency is going to have their own best practices for how**

23   **they want to do it.**

24     Q     Okay.  With respect to the trainings then,

25   what's the point of the trainings?

```
 1      A    We provide gang identification training; we

 2   provide -- if you're -- we provide interview and

 3   interrogation training, and occasionally we put an

 4   emphasis on interviewing gang members, because that has

 5   its own nuances.  We have a variety of training.

 6      Q    So do any though -- do any of those trainings

 7   involve evaluation of what member groups are doing?

 8      A    I don't understand valuation.

 9      Q    Evaluation.  So --

10      A    Evaluation.

11      Q    Yeah, evaluation.

12      A    You mean current trends?

13      Q    Well, I'm talking about, do you say, Hey, what

14   are you doing here, and they submit to you what they're

15   doing, and then you -- you evaluate that as to whether

16   that's appropriate or not?

17      A    It's a pretty vague question for me.

18      Q    Okay.  Let me try to rephrase it.

19           With respect to -- you have various -- I take

20   it you have various statewide -- state organizations

21   that belong to the Florida Gang Investigators

22   Association, correct?

23      A    Yes, Department of -- if you mean, by state

24   organizations, Department of Corrections, that sort of

25   thing.
```

1        **A       We do.   We -- I don't know -- I don't want to**

2   **say we lobby for gang statutes, but in March when the**

3   **hill is in session, our members go up there.   They're**

4   **encouraged to visit with their state representatives**

5   **and -- and congress folks, introduce themselves to those**

6   **people as being a point of contact for them within their**

7   **state.**

8        Q       Uh-huh.

9        **A       Yes.   So they're -- they're -- we're there as**

10  **a collective nationally, but the individuals go see**

11  **their state representatives and introduce them as a**

12  **point of contact for their own states.**

13       Q       And does the organization have model

14  legislation, model statute language that they, you know,

15  try to get states to adopt?

16       **A       No, ma'am.**

17       Q       When you -- does the national organization --

18  when legislation does come up, do they weigh in on

19  whether that legislation around gangs is good or bad or

20  needs to be changed?

21       **A       We do -- that's the letter-writing, and we**

22  **either support it or we don't.   If -- I have an**

23  **executive director that is a retired prosecutor.   He may**

24  **write a letter and include some suggested language.   But**

25  **outside of that, no, we do not engage in actually**

1   **writing legislation.**

2       Q    Okay.  What -- what things do you look for in

3   legislation that -- that you would support?

4       **A    Stronger support for law enforcement officers**

5   **around the country in identifying gang members utilizing**

6   **different techniques in capturing that criminal**

7   **intelligence, things of that nature.**

8       Q    What kind of techniques?

9       **A    Databases just in support of maintaining the**

10  **criminal intelligence.**

11      Q    So -- so that organization really supports the

12  creation and maintenance of gang databases throughout

13  the country?

14      **A    I would say yes.**

15      Q    Did you make any attempt to compare what's

16  done in Polk County with what's done in Wichita?

17      **A    No, ma'am.**

18      Q    You said you -- you reviewed Dr. Muiz's

19  report, correct?

20      **A    Yes, ma'am.**

21      Q    And what were your concerns or the things in

22  that report that you thought you didn't agree with?

23      **A    They're A through D in my report, the**

24  **assertion that it's overinclusive, vague type -- those**

25  **types of -- those types of her opinion assertions.**

1      Q    Okay.  So that's -- all of your disagreements

2  with her -- with her report are contained in your own

3  report, correct?

4      **A    Yes, ma'am.**

5      Q    There's nothing else that you -- that you

6  disagreed with that you didn't include in the report?

7      **A    I was asked to opine on her Opinion 1.**

8      Q    Okay.  Are you -- are you familiar with

9  Dr. Muiz?

10     **A    No, ma'am.**

11     Q    Have you -- before you looked at the report,

12  had you ever heard of her?

13     **A    No, ma'am.**

14     Q    Had you ever read any of her works?

15     **A    No, ma'am.**

16     Q    Any of her books?

17     **A    No, ma'am.**

18     Q    Have you ever done yourself any academic

19  research on gang databases?

20     **A    No, ma'am.**

21     Q    So you -- have you ever had any experience

22  evaluating gang activity in the state of Kansas?

23     **A    No, ma'am.**

24     Q    Or in Wichita?

25     **A    No, ma'am.**

Page 51

```
 1      A    Again, I would have to go back and look at my
 2  testimony to answer that.
 3      Q    Do you --
 4      A    I don't -- I don't recall constitutionality --
 5      Q    Okay.
 6      A    -- discussion but.
 7      Q    Do you -- as you're -- in giving your opinion
 8  in any of these cases, did you talk to the
 9  constitutionality of a gang database or statute or
10  anything like that?
11      A    No, ma'am.
12      Q    So you're not an expert on the
13  constitutionality of gang criteria, for instance?
14      A    No, ma'am.
15      Q    And you're not an expert on the
16  constitutionality of gang statutes?
17      A    No, ma'am.
18      Q    Okay.  You're not -- and you're not giving an
19  opinion in this case as to whether the -- the Kansas
20  state statute is constitutional or not, correct?
21      A    No, ma'am.  I'm only opining on the use of the
22  database as it relates to their policies.
23      Q    Okay.  And you're not giving any opinions on
24  the constitutionality of Policy 527 used by the Wichita
25  Police Department; is that right?
```

1      **A     Correct.**

2      Q     And you're not giving any opinions as to

3   whether the way the officers, the Wichita police

4   officers, apply the policies, whether that's

5   constitutional or not?

6      **A     Not as to its constitutionality, no.**

7      Q     Okay.  Have you ever given any expert witness

8   in the 1983 case?

9      **A     This will be my first time.**

10     Q     Okay.  And have you ever given any opinions in

11   any of your expert testimony where you're evaluating

12   gang databases or gang statutes or anything like that?

13     **A     Evaluating, no, ma'am.**

14     Q     Okay.  All right.  Let's go then back to this

15   list of expert testimony.

16           In 2010 and '11, State of Florida vs. Daniel

17   Barajas?

18     **A     Yes.**

19     Q     What was the nature of that testimony?

20     **A     That was an investigation where -- it was**

21   **initiated on a YouTube video where subjects that were**

22   **later identified as members of the West Side 7 - it was**

23   **a local gang of ours - were -- baiting fighting dogs**

24   **would be the criminal charge, where they're in a**

25   **swimming pool, two pit bulls chained together getting**

1    **mad at each other, and one of them was bleeding from the**

2    **tongue.   Don't know if it was because of the baiting**

3    **part, but it was clear that they were bleeding from the**

4    **tongue.   That initiated that investigation, resulting in**

5    **multiple arrests, including Mr. Barajas.**

6         Q    And what was the nature of your testimony with

7    respect Mr. Barajas?

8         **A    His identification as a member of the -- of**

9    **that criminal gang and his involvement.**

10        Q    Okay.  And -- so you were basically opining as

11   to whether he in particular was a member of this gang?

12        **A    Yes, in that -- in that trial, yes.**

13        Q    Okay.  Then with respect to 2015, State of

14   Florida vs. Jamie Fenley, what was the nature of your

15   testimony there?

16        **A    That was a sentencing hearing, and I testified**

17   **as to his membership as a white supremacist.**

18        Q    Okay.  And again that was with respect to this

19   particular individual's membership in a -- in a

20   particular gang, correct?

21        **A    Yes, ma'am.  He -- he was actually identified**

22   **as a member of the Gangster Disciples when they asked me**

23   **to look into the -- when they asked me to look into him,**

24   **and I learned that he was not a Gangster Disciple, that**

25   **he was actually a white supremacist.**

1     Q    Okay.  Then with -- in 2018 we have State of

2  Florida vs. Joseph Gomes-Brandon.

3     **A    Yes, ma'am.**

4     Q    Or Gomez-Brandon.  I'm not sure --

5     **A    I think it's Gomes.**

6     Q    Gomes-Brandon.

7          What was the nature of your testimony there?

8     **A    At deposition, I identified Mr. Gomes-Brandon**

9  **as a member of the Rollin 20s Bloods.**

10         THE STENOGRAPHER:  The what?

11         THE WITNESS:  Rollin 20s Bloods.

12  BY MS. WOODY:

13    Q    And again that was -- that was specific

14  testimony about the membership of Mr. Gomes-Brandon in a

15  particular gang?

16    **A    Yes, ma'am.**

17    Q    State of Florida vs. Aaron Delaune, 2020.

18    **A    He was a member of the Kinfolk Motorcycle**

19  **Club.  He was a one-percenter that shot at a car with**

20  **a -- a couple and their two nine-year-old children.**

21  **He -- I -- my testimony was in relation to his**

22  **membership and involvement with the Kinfolk Motorcycle**

23  **gang.**

24    Q    Okay.  2020, United States President's

25  Commission on Law Enforcement and the Administration of

```
 1        A    Yes, ma'am.

 2        Q    Okay.  And did you do anything to vet any of

 3   that reporting to see if it was accurate?

 4        A    Not -- not substantially, no.

 5        Q    Okay.  So you were just talking about trends

 6   based on what you had read about in the media across the

 7   country?

 8        A    And what I was seeing myself and having

 9   conversations with other colleagues.

10        Q    Okay.  State of Florida vs. Ramon Turner in

11   2022, what was the nature of that testimony?

12        A    I think that one was about text messages and

13   coded language or slang terminology.

14        Q    Explain that to me.

15        A    So as part of my regular work I monitor

16   criminal gang activity via social media, via jail mail.

17   We -- our -- all of our mail now for the inmates is

18   electronic.  They have a version of an email system that

19   they utilize.  Part of what I do is monitor their

20   communications in order to identify if there's another

21   inmate that might be in harm's way because of snitching,

22   whatever the case may be, and they utilize coded

23   language to do that.  So I take the time to learn what

24   the coded messages mean and learn the -- the slang

25   terminology, and there's a prosecutor at the State
```

 1    Attorney's Office that will ask me a question and say,

 2    Hey, what does X mean, and if I respond with what

 3    appears to be the proper answer, then I'd get a subpoena

 4    and I have to go testify about what those things mean.

 5        Q    So you're testifying again in a -- in a

 6    criminal trial of Mr. Turner?

 7        A    Yes.

 8        Q    Okay.  How about 2023 State of Florida vs.

 9    Xavier Ulysse?

10        A    That is a -- that was a bond hearing.

11    Mr. Ulysse had been identified as a member of the Sex

12    Money Murder Bloods.

13        Q    And you were testifying with respect to what

14    his bond should be?

15        A    No, ma'am.  I was testifying about his

16    activity within the -- he was requesting a bond, and the

17    state called me to testify about his activity within the

18    gang.

19        Q    And that was for the purposes, I assume, of

20    either not getting a bond or having a higher bond set;

21    is that right?

22        A    I was -- the judge is going to set the bond or

23    not set the bond.  I don't -- I don't do that.  I just

24    testify and answer the questions.

25        Q    I understand, but when -- but when the -- when

```
 1   the prosecutor's office subpoenaed you or called you, I
 2   take it they were concerned that the bond either
 3   wouldn't be high enough or that he would be able to bond
 4   out; is that right?
 5        A    It was a bond hearing, so I -- I presume so.
 6        Q    Okay.  And you were testifying on behalf of --
 7   at the -- at the prosecutor's request?
 8        A    Yes, ma'am.
 9        Q    Okay.  2023, State of Florida vs. Tyrese
10   Crews.
11        A    Same.
12        Q    Bond hearing?
13        A    Yes, ma'am, for -- it was the same case.  So
14   this was a -- the completion of a case that we worked a
15   long-term investigation on.
16        Q    Okay.
17        A    It would be the same for James Roundtree as
18   well.
19        Q    Okay.  So in -- in 2023, State of Florida vs.
20   James Roundtree, that is the same case.
21             And I see they all have the same case numbers
22   now.
23        A    Yes, ma'am.
24        Q    Okay.  Great.  And again that was a bond
25   hearing for him?
```

1      **A      Yes -- yes, ma'am.**

2      Q      All right.   State of Florida vs. Julian Bird.

3      **A      That was another that was not a gang case.**

4  **That was another case where I was asked to review text**

5  **messages.**

6      Q      Okay.   But -- but not a gang case?

7      **A      No, ma'am.**

8      Q      And again that was for a particular

9  individual, prosecution of a particular individual?

10      **A      Yes, ma'am.**

11      Q      So with respect to your expert testimony,

12  leaving aside the testimony to the grand -- in the grand

13  jury task force and the testimony on the President's

14  Commission, all of the other expert testimony you have

15  given has been with respect to an individual who's

16  charged with a crime in that criminal case, correct?

17      **A      Yes.**

18      Q      And -- and none of the testimony then I take

19  it has anything to do with the appropriateness of the

20  gang database or of the state statute or anything like

21  that?

22      **A      No, ma'am.**

23      Q      Have you ever been to Kansas?

24      **A      I have.**

25      Q      Where in Kansas have you been?

```
 1        A    I don't recall.

 2        Q    How about in Manhattan, Kansas?  What were you

 3   teaching there?

 4        A    Same, same class.

 5        Q    Okay.

 6        A    Just for a different audience.

 7        Q    Okay.  And do you recall who attended that --

 8        A    No, ma'am.

 9        Q    -- presentation?

10        A    I do not.

11        Q    And do you recall if anybody from the Wichita

12   Police Department was there?

13        A    I do not.

14        Q    Okay.  Any other times that you've visited

15   Kansas?

16        A    I don't recall any other time.  I think that's

17   it.

18        Q    Okay.  And do you recall ever have given any

19   training to the Wichita Police Department?

20        A    Specifically, no.

21        Q    Okay.  Have you ever done any studies on the

22   effect of gang databases on communities?

23        A    No, ma'am.

24        Q    So in your -- in your experience, the only

25   database that your -- that you've actually worked within
```

```
 1    is the one in Polk County; is that correct?

 2        A    Yes, ma'am.

 3        Q    So you haven't worked with anyone -- other

 4    gang databases in Florida?

 5        A    No, ma'am, I have not touched another database

 6    in Florida.

 7        Q    Okay.  All right.  And have you touched a gang

 8    database anywhere else?

 9        A    No, ma'am.

10        Q    Okay.  So your -- your experience that you

11    draw from to base your opinions on is based on your own

12    experience in Polk County?

13        A    The review of the documents provided, the

14    review of the policy and the training that I reviewed,

15    coupled with my own experience as a 28-year law

16    enforcement officer.

17        Q    Okay.  In -- in Florida?

18        A    Yes, ma'am.

19             MS. WOODY:  All right.  Let's take a break for

20        a minute.

21             MR. BRANSON:  Okay.

22             MS. WOODY:  Let me find the ladies' room.

23             THE VIDEOGRAPHER:  We're off the video record

24        at approximately 11:08 a.m.

25             (Recess taken.)
```

1      Q    Okay.  You've never been certified as an

2   expert in the constitutionality, for instance, of state

3   statutes that -- that relate to gangs?

4      **A    That's correct.**

5      Q    And you've never been designated or accepted

6   as an expert about the constitutionality of any gang

7   database policies?

8      **A    Was that a -- I didn't hear the --**

9      Q    Yeah.

10     **A    -- question.**

11     Q    Let me -- let me ask it again.

12          I take it that you have never been designated

13   or accepted as an expert with respect to the

14   constitutionality of any gang database policy?

15     **A    That's correct.**

16     Q    And you haven't been accepted as an expert

17   with the -- with respect to the application of any gang

18   database, correct?

19     **A    Correct.**

20     Q    Okay.  Let's turn over to Page 9 of your

21   report.

22     **A    Yes, ma'am.**

23     Q    And that's where your actual opinions start;

24   isn't that correct?

25     **A    Yes, ma'am.**

1      **A    I thought this didn't say Mateo 2.**

2      Q    Now I handed it to you.  Yeah, sorry about

3   that.

4           Now I've handed you --

5           And you're going to need this.  You might want

6   to keep that.

7           Now I've handed you what's been marked Mateo

8   deposition Exhibit No. 2, and tell me what that is.

9      **A    That is the SOP for Entries into the Gang Data**

10  **Base.**

11     Q    And is that the document that you were

12  referring to that you reviewed and relied on in forming

13  your opinions?

14     **A    One of them, yes.**

15     Q    Okay.  And then I've also handed you what's

16  been marked previously Exhibit 6 in this lawsuit.

17     **A    Yes.**

18     Q    And can you identify that for me.

19     **A    That is the Wichita Police Department Policy**

20  **527.**

21     Q    So is that the other document that you

22  reviewed and based your opinion on?

23     **A    One of them, yes.**

24     Q    Okay.  Other than these two documents, what

25  other documents have you based your opinions on?

Page 70

```
 1        A     The training documents, the Kansas University

 2   outline documents, the depositions that I reviewed.

 3        Q     Okay.  When you were talking about policies on

 4   Page 9 of your expert report, these are the policies and

 5   procedures that you're referring to?

 6        A     Yes, ma'am.

 7        Q     And I'm -- and let me make it more clear.  The

 8   policies and procedures that you're referring to are

 9   Mateo deposition 2, which is the Standard Operating

10   Procedures for Entries into the Gang Data Base, and

11   Policy 527, correct?

12        A     Yes.

13        Q     Do you know when -- when -- when the SOPs were

14   created?

15        A     I do not know when they were created.

16        Q     So you don't know what year those came into

17   effect?

18        A     No, ma'am.

19        Q     Okay.  How about Policy 527?  Do you know when

20   that came into effect?

21        A     No, ma'am.  I see a revision date, but I don't

22   know when it was created.

23        Q     And the revision date is 6/20 -- it's

24   9/26/2019, correct?

25        A     Yes, ma'am.
```

```
 1        Q    Do you believe that this is the most recent --
 2   the most recent form of this policy?
 3        A    I have no reason not to believe that.
 4        Q    Okay.  And with respect to the standard
 5   operating procedures in Mateo No. 2, if you'll look with
 6   me, there are -- in some instances, they're --
 7   they're -- the document has --
 8             Like look on the second page of that if you
 9   will.
10        A    Sure.
11        Q    There's -- there's writing that's in black and
12   then there's writing that's in red, and was that the --
13   was that the case in the policy that you examined?
14        A    I don't recall.
15        Q    Do you -- do you know what the difference is
16   between those -- between the things that are in red and
17   the things that are in black?
18        A    No, ma'am, I do not.
19        Q    Do you know if this is the current policy
20   that's actually in place at the Wichita Police
21   Department?
22        A    I have no reason to believe otherwise.
23        Q    Okay.  But you can't say for sure that it is?
24        A    Correct.
25        Q    And you can't say for sure that those things
```

1   in red are actually part of the current policy?

2         **A    I cannot.**

3         Q    Okay.  Okay.  You take -- you take -- you

4   disagree with the assertion that the majority of Wichita

5   citizens, including most judges, lawyers, clergy, union

6   members and other professional and social service

7   providers, could be discretionally designated as a gang

8   member associate and added to the gang list.  Do you see

9   that?

10        **A    Yes, ma'am.**

11        Q    And you say this fundamentally changes the --

12  the definition of a criminal street gang as defined by

13  KSA 20-6313, correct?

14        **A    Yes, ma'am.**

15        Q    But the -- but the -- and that's the

16  definition of a gang, correct?

17        **A    Yes, ma'am.  It -- it resides in there, yes.**

18        Q    Okay.  But there's nothing in there -- there's

19  nothing in either -- in the policy or the SOP that says

20  that the person who's being added to the gang list

21  has -- has been charged with a crime, correct?

22        **A    Correct.**

23        Q    Or that they --

24             So -- so an individual who's not charged with

25  a crime could be added to the gang database as a gang

```
 1   member; it's -- even if there -- if there isn't any
 2   criminal activity?
 3        A    Correct.
 4        Q    So I guess --
 5             That's it.
 6             So you're talking about, in this one, in your
 7   assertion here, your disagreement.  You're saying that's
 8   the definition of a -- that what these people are doing
 9   don't fit the definition of a -- of a gang, correct?
10        A    Correct.
11        Q    But people can be added to the gang list
12   without reference to whether they've actually engaged in
13   any criminal activity that's gang-related?
14        A    Correct.
15        Q    Okay.  And you say in paragraph 3 of your
16   opinion there at the end that WPD officers received two
17   8-hour in-service trainings, including on gangs, to
18   obtain updates and refreshers on gang identification
19   according to Captain Christian Cory's deposition,
20   correct?
21        A    Yes.
22        Q    Are you -- and have you done any examination
23   of the training materials that are supposedly provided
24   in those -- in those two annual trainings?
25        A    I reviewed several training files.  I don't
```

1    know if they were the ones specific to those 8-hour

2    trainings, but they all were very consistent in their

3    gang training.

4         Q    Okay.  So you can't say sitting here today

5    that you've actually seen training materials that

6    contain gang training that were presented to individuals

7    twice a year?

8         A    I can't say that I haven't either, because I

9    might have reviewed it and not realized that it was one

10   of the ones that was provided in the 8-hour training.

11        Q    Okay.  But you couldn't put your hands on

12   something to me right now and say here's the things

13   that -- here are the two trainings a year that are given

14   to -- to officers?

15        A    Correct.

16        Q    And what officers were those given to?

17        A    My understanding is all of them.

18        Q    So that's your understanding, that it's all of

19   them?

20        A    Yes.

21        Q    Okay.  And you say that the trainings

22   include -- including on gangs to obtain updates and

23   refreshers.  So does the training cover other things as

24   well?

25        A    I believe it does, yes.

1    different officers can apply the criteria differently?

2        A    I'm not aware of that testimony, no.

3        Q    If -- if you were aware of that testimony,

4    would that alter or change any of your opinions?

5        A    No, ma'am.

6        Q    Why not?

7        A    Because of the checks and balances that are in

8    place for the entry into the gang database.

9            I understand that an officer is observing

10   different criteria before them, and that goes towards

11   the nomination process, but Mr. Beard, you know,

12   asserted that that happens, but when it gets to the --

13   the review process, anything that would be inconsistent

14   is stopped at that point.

15       Q    Okay.  But -- but that -- but I think we just

16   talked about the fact that the review process is based

17   on the documentation that's submitted with a nomination,

18   correct?

19       A    Yes.

20       Q    So if an -- one officer says I see these guys

21   hanging out -- I see this guy hanging out on a porch

22   with a couple of guys that I believe are, you know --

23   let's use Bloods.

24       A    Okay.

25       Q    A couple of guys who are Bloods, so I'm going

```
 1    to use that as one of the criteria he's associating with

 2    known gang members, and so I ping that.  And -- and

 3    then -- and another guy says, Well, he's just sitting on

 4    the porch; he's not doing anything, so I'm not going to

 5    put that -- I'm not going to -- I'm going to let -- give

 6    that one a pass.  So that's inconsistent, correct?

 7                MR. BRANSON:  Object to form.

 8         A    I would say that that would be an individual

 9    asserting their opinion, if you will, on whether or not

10    to document that --

11    BY MS. WOODY:

12         Q    Right.

13         A    -- based -- and not follow what their training

14    was.

15         Q    Okay.  And so they're using discretion as

16    opposed to following their training?

17         A    Yes.

18         Q    Okay.  And is it your -- is it your opinion

19    that anytime somebody is seen with other gang members

20    that should be documented?

21         A    I believe it can be documented, but I would --

22    I wouldn't have -- take too much umbrage with --

23    understanding the context of the togetherness.  If it's

24    a birthday party, that might be a different story.

25         Q    Sure.  So -- and I think that's something one
```

1   **someone is selected to go and work in, again a generic**

2   **term, a gang unit, most everyone that I'm aware of goes**

3   **through additional training, further advanced training**

4   **for identification and investigation purposes of**

5   **criminal gangs.**

6       Q    And you're basing that on your own experience

7   in Florida?

8       **A    As well as conversations with colleagues**

9   **around the country.**

10      Q    Okay.  But you haven't had any particular

11  comments -- conversations with colleagues in Kansas

12  about that?

13      **A    Correct.**

14      Q    And you haven't actually -- you haven't

15  actually observed any of the training in person with

16  respect to what the Wichita Police Department does?

17      **A    No.  Correct.  You're right.**

18      Q    Okay.  And you haven't actually confirmed at

19  all the police officers actually received that training,

20  correct?

21      **A    Correct.**

22      Q    And you -- you haven't -- you don't recall

23  looking at any of the testimony where police officers

24  said they actually did employ it differently in

25  different situations?

1   who's actually done the vetting process, correct?

2       **A    I'm not sure if Officer Carson does that or**

3   **not, but we didn't talk about thoroughness of the**

4   **vetting process during our conversation.**

5       Q    And do you know what happens to individuals

6   who are found to have, in your words, aged out of the --

7   in Wichita?  What happens to them?

8       **A    According to the policy, after the three years**

9   **of inactivity, they're deactivated from the Master Gang**

10  **List and they're removed from eJustice.**

11      Q    And they're designated as inactive, correct?

12      **A    Yes, ma'am.  That's the word in the policy.**

13      Q    And does the WPD continue to maintain file --

14  a file of those people who are inactive?

15      **A    I believe they do.  I'm -- I'm not a hundred**

16  **percent positive.**

17      Q    Okay.  So they just take them off eJustice and

18  they designate them as inactive and remove them from

19  eJustice; is that right?

20      **A    That's my understanding of the policy.**

21      Q    Okay.  Is that different from what you do in

22  Polk County?

23      **A    It is, because if we're looking at criminal**

24  **intelligence and the five-year tolling has transpired**

25  **and there's nothing new, then they are purged from our**

1    **system.**

2         Q    They're actually purged from the system?

3         **A    Yes.**

4         Q    Not just called inactive?

5         **A    Correct.**

6         Q    Okay.  With respect to the last paragraph of

7    your first opinion on Page 11 --

8              I know that's kind of convoluted.  Let's just

9    say it's the second paragraph in the middle of the page

10   on -- on Page 11.  Do you see that, where it says --

11   starts "On July 23"?

12        **A    Yes, ma'am.**

13        Q    Okay.  And that is where you were talking to

14   Officer Carson about 28 CFR 23, correct?

15        **A    Yes, ma'am.**

16        Q    And -- and his -- I believe, if I understand

17   it correctly, he told you that in January of 2023 there

18   had been -- he had been in a training where 28 CFR 23

19   was mentioned; is that right?

20        **A    Yes.**

21        Q    But there wasn't anything else within any of

22   the documents that you reviewed or policies that you

23   reviewed that discussed 28 CFR 23; is that right?

24        **A    Not that I saw.**

25        Q    And so your second opinion, A2, is that WPD's

1    that goes out every day?

2         A    No, ma'am.

3         Q    And are -- and do you know that that eJustice

4    report lists people who've been added to the gang

5    database?

6         A    No, ma'am.

7         Q    And are you aware that that eJustice report

8    goes out to over 700 people?

9         A    No, ma'am.

10        Q    And that is all of the officers, plus other

11   employees of the Wichita Police Department?

12        A    I am not aware of that.

13        Q    And if that's all true, would that change

14   your -- your opinion as to whether or not the

15   application of the Wichita Police Department's gang --

16   gang database is in compliance with 28 CFR 23?

17             MR. BRANSON:  Object to form.

18        A    I would continue my current opinion.  I'm

19   not -- I don't know who the civilian employees are, and

20   I'm familiar that civilian employees that work within

21   the intelligence units or records units would have

22   access to that information.

23   BY MS. WOODY:

24        Q    And are you aware that there have been

25   multiple times when the gang list or persons on the gang

1  list have been identified to -- to people in the

2  community --

3      **A    I am not aware of that.**

4      Q    -- who are not police officers or employees of

5  the police department?

6      **A    I am not aware of those instances.**

7      Q    And are you aware that -- did you -- did you

8  read anything about Captain Nicholson -- or Deputy --

9  I'm sorry, Deputy Chief Nicholson?

10     **A    The name doesn't ring a bell.**

11     Q    Okay.  And are you aware that just recently

12 Deputy Chief Nicholson, who was a current deputy chief

13 of the Wichita Police Department, was indicted for

14 releasing gang-related information among other things to

15 the community?

16     **A    No, I wasn't aware of that.**

17     Q    Okay.  And were you aware that there were

18 instances where the police -- the Wichita Police

19 Department gave information to landlords about people

20 being in a gang to -- to promote the eviction of those

21 individuals?

22     **A    In the documents provided to me, I did not**

23 **find any of that information.**

24     Q    And are you aware that -- that in some

25 instances where members of the community were trying to

1   put together a charitable event, the Wichita Police

2   Department -- at a roller rink, the Wichita Police

3   Department contacted the individuals at the roller rink

4   and asked them to cancel that charitable event because

5   people who are organizing it were on the gang list?

6       **A     I have no information of -- of any of that.**

7       Q     Would you regard those kinds of -- if those

8   things happened, would you regard those as breaches of

9   the confidentiality?

10          MR. BRANSON:  Object to form.  Incomplete

11          hypothetical.  Incomplete facts.

12      **A     I don't have any information in what you've**

13  **provided me that -- or what has been provided to me that**

14  **the members of the Wichita Police Department, for**

15  **example, the rollerskating rink, identified any specific**

16  **individuals that were gang members.  They just said that**

17  **there were members of gangs that would be there.**

18  BY MS. WOODY:

19      Q     So you think it's okay --

20          Well, they knew who the organizers were,

21  right?

22          MR. BRANSON:  Object to form.

23      **A     I -- I don't know.**

24  BY MS. WOODY:

25      Q     Yeah.  Well, it was being organized by certain

1    the -- the audit process at the WPD complies with

2    this -- with this -- this requirement?

3        **A    I know through reading the documents that,**

4    **when the audit is conducted, they do update the**

5    **information in the screen and they update notes within**

6    **the system itself.**

7        Q    Do you know that they don't actually have an

8    audit trail?

9        **A    I -- I don't know what they consider an audit**

10   **trail.**

11       Q    What do you consider an audit trail?

12       **A    If you have an up-to-date computer system,**

13   **usually there's an audit trail built in that records who**

14   **does what within the system.**

15       Q    Okay.  And would it record people who were --

16   whose status was changed within the system?

17       **A    Yes.**

18       Q    Okay.  So if there's no -- if there's nothing

19   that maintains the changes from audit to audit, is that

20   compliant with this -- with this requirement?

21           MR. BRANSON:  Object to form.

22       **A    I would say that their manual entries within**

23   **the individual files that are reviewed would be a form**

24   **of an audit trail.**

25

1   BY MS. WOODY:

2       Q    Okay.  What if those manual entries aren't

3   recorded?

4       **A    I wouldn't -- that's a personnel issue.  I**

5   **wouldn't want to speculate on WPD's personnel issues.**

6       Q    Okay.  And are you aware of any requirement

7   that there be a record made indicating who has been

8   given information, the release of the information, and

9   the date of each dissemination outside the project?

10      **A    That would be a dissemination log.**

11      Q    Yes.

12      **A    And your question on it is?**

13      Q    Are you aware if there's one kept at the

14  Wichita Police Department?

15      **A    I do not know.**

16      Q    Okay.  And nobody provided that to you in any

17  documentation?

18      **A    I do not recall seeing one.**

19      Q    Okay.  All right.  Take a look on Page 4 if

20  you will, at section (h).  Do you see that?

21      **A    Yes.**

22      Q    It says, "All projects shall adopt procedures

23  to assure that all information which is retained by a

24  project has relevancy and importance.  Such procedures

25  shall provide for the periodic review of information and

1   the destruction of any information which is misleading,

2   obsolete or otherwise unreliable, and shall require that

3   any recipient agencies be advised of such changes which

4   involve errors or corrections.  All information retained

5   as a result of this review must reflect the name of the

6   reviewer, the date of the review, and explanation of

7   decision to retain.  Information retained in the system

8   must be reviewed and validated for continuing compliance

9   with system submission before the expiration of its

10  retention period, which in no event shall be longer than

11  five years."  Do you see that?

12       **A    Yes.**

13       Q    So does the Wichita Police Department actually

14  purge information from its database?

15       **A    It comes out of eJustice.  I don't know if**

16  **Wichita Police Department considers that their purge.**

17  **That would be a question for Wichita PD.**

18       Q    Okay.  And do you know if they -- if when

19  they -- if they -- when they designate somebody

20  inactive, if they actually continue to keep that

21  person's records within the police department?

22       **A    I don't know how -- what their retention**

23  **period is for that.**

24       Q    And do you know if they're required to retain

25  the name of the reviewer or the date of the review and

```
1    an explanation to -- of the decision to retain the
2    information?
3         A    I believe that is part of the audit.
4         Q    Okay.  And have you seen that?
5         A    I saw examples of it.  They may have been real
6    world examples, but I don't know.
7         Q    Okay.  And you said that -- I think one of
8    your opinions was, well, they're exceeding what's
9    required by the CFR because they have a look-back period
10   of three years instead of five, right?
11        A    Yes.
12        Q    But you didn't necessarily see that all of
13   these other particular requirements of the CFR 28 -- 28
14   CFR 23 were actually complied with?
15        A    I don't know if they are -- I haven't reviewed
16   anything that agrees with that.
17        Q    Okay.  And you haven't reviewed anything that
18   shows they do it or they don't do it, right?
19        A    Correct.
20        Q    Okay.  And Opinion 3 on Page 12 --
21             I'm sorry, it's -- I think it's 1(A)(3).  It
22   says, "Nominating officers do not have discretion to add
23   to WPD's Master Gang List."  Do you see that?
24        A    Yes.
25        Q    And we've already talked about the fact that
```

```
 1   even if it's just a personal benefit to them -- to them

 2   personally, it can still be called criminal street gang

 3   activity?

 4       A    And that's where we go back to the vetting

 5   process when that TOPS card or when that nomination

 6   comes in.

 7       Q    Okay.

 8       A    And if it's no longer called a TOPS card, if

 9   you can -- correct me whenever you feel like it.

10       Q    That's good enough.  I think we all know

11   what -- what -- we all understand TOPS card or whatever

12   they have used subsequent to it.

13            Okay.  Now, if you go back up to --

14            And that's -- that's a little different from

15   the Polk County definition of criminal street gang

16   activity, isn't it?

17       A    I'd have to -- it's been a while since I read

18   that particular paragraph, but I'd have to go back and

19   read it.

20       Q    I believe it says that the criminal activity

21   has to be in support of the gang --

22       A    In furtherance of.

23       Q    In furtherance of actual gang activity or

24   benefiting the gang itself, that kind of thing.  Does

25   that ring a bell?
```

```
 1        A     Yes, ma'am.

 2        Q     Okay.  So that's different from this?

 3        A     Yes.

 4        Q     Okay.

 5        A     In its wording, yes.

 6        Q     Yes.  All right.

 7              Okay.  Number (H) -- I'm sorry, we were going

 8    back to (2)(H), the criteria.  It says, "Is identified

 9    as a criminal street gang member by physical evidence,

10    including but not limited to photographs or other

11    documentation."  Do you see that?

12        A     Yes.

13        Q     What's that mean?

14        A     So that would be I believe an opinion that

15    would need to be rendered by the District Attorney's or

16    State Attorney's Office - I don't know what they're

17    called in Kansas - to what they would accept as physical

18    evidence.  Some items that might be could be bandannas,

19    beads, photographs, things of that nature.

20        Q     Okay.  But none of that's spelled out as to

21    exactly what that is in the statute; is that correct?

22        A     Correct.

23        Q     Okay.  And you don't find any of those --

24    anything within that statute to be vague?

25        A     No, ma'am, because they usually come with
```

1       **A     I read that in the statute, that the judge has**
2    **the discretion to do that.**
3       Q     But there's a presumption that he does apply
4    it, correct?
5       **A     I believe that is correct.**
6       Q     Okay.  And you don't -- you can't tell me what
7    Mr. Cooper's prior criminal history was at the time he
8    was charged with this incident?
9       **A     No, ma'am, I do not know what his criminal**
10   **history was before the first degree murder arrest.**
11      Q     So did he have any -- did he have any criminal
12   history prior to this?
13      **A     I don't know.**
14            MR. BRANSON:  Object to form.
15   BY MS. WOODY:
16      Q     And you said that -- that there's -- he
17   accepted a plea agreement.  Do you see that there?
18      **A     Yes, ma'am.**
19      Q     Do you know what plea agreement was offered to
20   him?
21      **A     I do not know all the specifics.**
22      Q     Do you know that, because he was listed on the
23   gang list, he was threatened that somebody would come in
24   and testify if he went to trial that he was a gang
25   member and go through a bunch of incidents that he

1    wasn't involved in?

2              MR. BRANSON:  Object to form.

3         **A    No, ma'am, I wasn't provided any documentation**

4    **that pointed that out.**

5    BY MS. WOODY:

6         Q    Are you aware that individuals sometimes take

7    plea agreements because they are concerned that if they

8    go to trial their punishment will be more severe even if

9    they do not believe they committed the crime?

10        **A    I wouldn't speculate as to why someone takes a**

11   **plea agreement.**

12        Q    Do you know how long Mr. Cooper sat in -- in

13   jail --

14        **A    No, ma'am.**

15        Q    -- because he couldn't pay the bond?

16        **A    No, ma'am.**

17        Q    Do you know if he was a college student before

18   this?

19        **A    No, ma'am.**

20        Q    Okay.  So you're just basing that just on the

21   bare things that were in quotations in -- in Judge

22   Melgren's order?

23        **A    Yes, ma'am.**

24        Q    Okay.  With respect to the probation

25   conditions, have you looked at the probation conditions

1  that are assigned to individuals, the gang conditions?

2      **A     No, ma'am.**

3      Q     So you're not aware of what those are?

4      **A     No.**

5      Q     And you're not aware of whether they are more

6  onerous than typical probation or parole conditions?

7      **A     The document stated special gang-related**

8  **conditions, so I suspect that they are more restrictive.**

9      Q     But you don't know what they are?

10     **A     No, ma'am, not specifically.**

11     Q     So you can't sit here today and say whether

12 that's a harm to Mr. Cooper or not because you don't

13 even know what they are?

14     **A     I don't know what they are, so I wouldn't be**

15 **able to speculate on that.**

16     Q     Okay.  You say on the next -- top of the next

17 page that, based on your training and experience,

18 Mr. Cooper's issues could have been addressed before

19 accepting the plea agreement.  Do you see that?

20     **A     Yes, ma'am.**

21     Q     How?

22     **A     Through his counsel.**

23     Q     Okay.  And how would his counsel have

24 addressed that?

25     **A     If they have an objection to what's going to**

1   **be presented at court, I would leave that discretion to**

2   **his attorney.**

3       Q    And you don't know whether that was or was not

4   done in his case?

5       **A    I don't know if the attorney brought it up.  I**

6   **do not.**

7       Q    Okay.  Let's look at Mr. Elbert Costello.

8            And again everything you're basing your

9   opinion on as to whether or not he was harmed is just

10  the language that was in Judge Melgren's order on the

11  motion to dismiss?

12      **A    Yes.**

13      Q    Okay.  It says there, "Most recently, Elbert

14  was renewed because he appeared in a social media photo

15  wearing a red Philadelphia Phillies baseball cap and

16  because the color red is associated with a gang."  Do

17  you see there?

18      **A    Yes, ma'am.**

19      Q    See that?

20      **A    Yes, ma'am.**

21      Q    Are you -- is it your opinion that one social

22  media photo where he was wearing a Phillies hat would be

23  sufficient to extend his active designation on the gang

24  list?

25           MR. BRANSON:  Object to form.

1      **A     I wouldn't --**

2              MR. BRANSON:  Object to form.

3      **A     I wouldn't answer as to constitutional.  I**

4    **would leave the appropriateness decision to the Wichita**

5    **Police Department.**

6    BY MR. BRANSON:

7      Q     Okay.  Is that something that you do in Polk

8    County?

9      **A     It is.**

10     Q     You take one -- one additional instance and

11   add on to the person's listing on the gang list?

12     **A     If they're in the -- if they're in -- listed**

13   **as a gang member and they are current and I find**

14   **additional --**

15             **Now, the application of criteria in Florida is**

16   **different than in Kansas.  So in Florida, yes, I would**

17   **be allowed to do that.**

18     Q     Because in Florida it only requires one

19   criteria, correct?

20     **A     To be an associate --**

21     Q     Okay.

22     **A     -- yes.**

23     Q     And two criteria to be a gang member?

24     **A     Yes, ma'am.**

25     Q     Okay.  And you're saying that you think the

1   fact that he's wearing a Philadelphia Phillies hat is an

2   indicia that he is a member of the Bloods?

3          MR. BRANSON:  Object to form.

4     **A    Am I saying that, because he's wearing that**

5   **hat, he's a member of the bloods?  That is not what I'm**

6   **trying to say here.**

7   BY MS. WOODY:

8      Q    Okay.  All right.  And do you know that

9   Mr. Costello has been identified as an active gang

10  member to members of the Wichita media?

11    **A    No, ma'am, I'm not.**

12     Q    And are you aware that there was an article

13  published after he attended a funeral where he was

14  identified as a known gang member attending the funeral

15  in the Wichita press?

16    **A    I am not aware of that.**

17     Q    And if Mr. Costello isn't a gang member, isn't

18  an active gang member, and he has been identified to

19  members of the public, the Wichita public at large,

20  through the media as a gang member, that would be a harm

21  to him, correct?

22          MR. BRANSON:  Object to form.

23    **A    I don't have all of his background**

24  **information, so I wouldn't be able to speculate.**

25

1  BY MS. WOODY:

2      Q    Well, how long has he been on the gang list?

3      **A    I have no idea.**

4      Q    How old is he?

5      **A    I don't know.**

6      Q    Okay.  So you -- you just don't have any idea

7  whether him being identified in the media as a gang

8  member, which, you know, certainly isn't confidential,

9  whether that would be a harm to him?

10     **A    I --**

11          MR. BRANSON:  Object to form.

12     **A    Again, I don't -- I don't know anything about**

13  **him.  I don't know his background.**

14  BY MS. WOODY:

15     Q    Let's take a look at Mr. Martel Costello.  You

16  say that, "Because he was arrested for drug and firearm

17  offenses --"

18          THE STENOGRAPHER:  I'm sorry, drug and...?

19          MS. WOODY:  Firearm, excuse me, offenses.

20  BY MS. WOODY:

21     Q    "-- ultimately entered a plea of guilty and

22  was placed on probation with the condition he did not

23  associate with anyone else in the gang list, he violated

24  that condition and was incarcerated."  Do you see that?

25     **A    Yes, ma'am.**

1      Q    How did he violate that -- how did he violate

2  that condition?

3      **A    I don't know.**

4      Q    Do you -- if he was attending his brother's

5  funeral and that was sufficient for him -- for the

6  violation of the probation, would you consider that

7  appropriate?

8      **A    That would be a --**

9           MR. BRANSON:  Object to form.

10     **A    That would be an application process to be**

11  **considered by the Wichita Police Department.**

12  BY MS. WOODY:

13     Q    And you don't have any opinion on whether that

14  would be appropriate or constitutional?

15     **A    No, ma'am.**

16     Q    And let's look at Jeremy Levy.  It says there

17  that Mr. Levy believes he was added to the gang list

18  when he was 13 years old because he was in the company

19  of a cousin who was already on the gang list.  Do you

20  see that?

21     **A    Yes, ma'am.**

22     Q    And again that's -- all of this information is

23  taken from the judge's order, correct?

24     **A    Yes, ma'am.**

25     Q    Now, let me ask you, when you -- when you --

1    Q    Okay.  Did you include incidents about the
2  gang that had nothing to do with him?
3    **A    No, ma'am.**
4    Q    Okay.  Are you aware that in Mr. Levy's trial
5  they introduced evidence of a bunch of different gang
6  incidences where he was not present?
7    **A    I know that gang information was introduced at**
8  **the trial.  I don't know what that information was.**
9    Q    Okay.  So you, sitting here today without
10  knowing what that information was, you can't say whether
11  he was harmed by that or not?
12    **A    No, ma'am, I wouldn't be able to make that**
13  **speculation.**
14    Q    Okay.  And with respect to -- to Progeny, what
15  is Progeny?
16    **A    My understanding is they're a nonprofit**
17  **organization in Kansas that is out there to assist the**
18  **youth in the community as a whole.**
19    Q    And you -- again, you didn't -- you didn't
20  read the deposition of the Progeny representative who
21  was deposed, correct?
22    **A    Do you recall the name?**
23    Q    It's Marquetta, I believe, Atkins.
24         MR. BRANSON:  Markeeta (phonetic) Atkins.
25         MS. WOODY:  Marketta (phonetic).  I always say

1       Marquetta.

2   BY MS. WOODY:

3       Q    Marquetta Atkins.

4       **A    No, ma'am.  That name is not familiar to me.**

5       Q    And did you review any of the discovery

6   responses provided by Progeny?

7       **A    No, ma'am.**

8       Q    Including their budget and information like

9   that?

10      **A    No, ma'am.**

11      Q    And they've alleged that they had to divert

12  resources from other work.  Did you -- do you have any

13  basis to say that they didn't?

14      **A    No, ma'am.**

15      Q    So you can't say whether they were harmed or

16  not, correct?

17      **A    No, ma'am, I cannot speculate on that.**

18          MS. WOODY:  Okay.  Why don't you give me about

19      10 minutes to just look over this other stuff and

20      make sure I don't have anything else, and we're

21      about to be done.

22          MR. BRANSON:  All right.

23          THE WITNESS:  Yes, ma'am.

24          THE VIDEOGRAPHER:  We're off the video record

25      at 12:56 p.m.