# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

PROGENY, a program of Destination )
Innovations, Inc., CHRISTOPHER )
COOPER, ELBERT COSTELLO, )
MARTEL COSTELLO, and JEREMY )
LEVY, JR., on behalf of themselves and )
others similarly situated, )
                                                   Plaintiffs, )
      vs. ) **CASE NO.**
                                ) 6:21-cv-01100-EFM-ADM
CITY OF WICHITA, KANSAS, )
                                 Defendants. )

## DEPOSITION OF
DR. ANA MUNIZ

**DATE:**        Friday, May 19, 2023

**REPORTER:**    Dalia R. Smith, CSR No. 8486

**LOCATION:**    5 Park Plaza
                      Suite 1600
                      Irvine, California 92614



## HINES REPORTERS

**INTERNATIONAL TOWER**
**888 S. FIGUEROA STREET, SUITE 940, LOS ANGELES, CALIFORNIA 90017**

866.432.4300; 213.688.7887

WWW.HINESREPORTERS.COM

Case 6:21-cv-01100-EFM   Document 242-1   Filed 03/15/24   Page 2 of 8

Progeny, et al. vs. City of Wichita, KS                                    Deposition of Dr. Ana Muñiz

**Page 2**

Deposition of DR. ANA MUNIZ, called as a witness by the Defendants, before DALIA R. SMITH, Certified Shorthand Reporter for the State of California, with principal office in the State of California, County of Irvine, commencing at 10:00 a.m., Friday, May 19, 2023 at 5 Park Plaza, Suite 1600. Irvin, California 92614.

* * *

APPEARANCE OF COUNSEL:

For the Plaintiffs PROGENY, CHRISTOPHER COOPER, ELBERT COSTELLO, MARTEL COSTELLO, JEREMY LEVY, JR.:
  SHOOK HARDY & BACON, LLP
  JORDAN C. BAEHR, ESQ.
  2555 Grand Boulevard
  Kansas, Missouri 64108
  816.474.6550
  816.421.5547 Fax
  jbaehr@shb.com

KANSAS APPLESEED CENTER FOR LAW AND JUSTICE, INC.
  BY: TERESA A. WOODY, ESQ.
  211 E. 8th Street, Suite D
  Lawrence, Kansas 66044
  785.251.8160
  twoody@kansasappleseed.org.

For the Defendant CITY OF WICHITA, KANSAS
  FISHER, PATTERSON, SAYLER & SMITH, LLP
  BY: CHARLES E. BRANSON, ESQ.
  3550 SW 5th Street
  Topeka, Kansas 66606
  785.232.7761
  785.232.6604 Fax
  cbranson@fpsslaw.com

Also Present:
  Manoela Saldanha - UCLA
       (via Zoom)

**Page 3**

### I N D E X

| | |
|---|---|
| Examination | Page |
| By Mr. Branson | 4 |

### E-X-H-I-B-I-T-S

| Defendant's Exhibits | | Page |
|---|---|---|
| Exhibit 1 | Expert Report of Dr. Ana Muniz | 16 |

**Page 4**

 FRIDAY, MAY 19, 2023, IRVINE, CALIFORNIA
                        -0-
                    10:00 a.m.

                    ANA MUNIZ,
called as a witness by and on behalf of the Defendants, having been first duly sworn by the court reporter, was examined and testified as follows:
                    EXAMINATION
BY MR. BRANSON:
    Q.  Good morning, Doctor.  Could you please state your name for the record.
    A.  My name is Ana Muniz.
    Q.  And how would you prefer that I address you this morning?
    A.  Professor.  Doctor is fine.
    Q.  Okay.  Thank you.  And, Doctor, can you tell me what your current address of employment is.
    A.  My current address of my employment?
    Q.  Sure, that's fine.
    A.  Is that what you said?
    Q.  Yes.
    A.  2301 Social Ecology II in Irvine, California.
    Q.  And what is your position?
    A.  I'm an assistant professor.  I was just awarded

**Page 5**

tenure, so I'll be starting an associate professor position on June 30th.
    Q.  Okay.  Congratulations.
    A.  Thank you.
    Q.  How long have you been at the University?
    A.  I've been at the University since June 2016.
    Q.  And I have your CV, but can you just briefly for the record explain or talk about what your area of study is.
    A.  My area of expertise broadly is policing.  And so under that I include various jurisdictions of policing.  Federal law enforcement, including immigration enforcement.  And also I have a specific focus on municipal or local law enforcement agencies.  So Local police.  And I study through ethnographic observation, also through interviews, archival research, and a bit through statistical research how officers carry out their duties in the field and the effects of those practices.
    Q.  And do you find that those -- how officers carry out duties in the field vary from jurisdiction to jurisdiction?
    A.  They can.  And there are some overarching patterns as well.
    Q.  Okay.  Just housekeeping.  Have you ever done a deposition before?

Case 6:21-cv-01100-EFM Document 242-1 Filed 03/15/24 Page 3 of 8

Progeny, et al. vs. City of Wichita, KS                              Deposition of Dr. Ana Muñiz

A. I have.

Q. How many times?

A. One.

Q. One. What was that matter?

A. That was a gang enforcement case. It was a case specifically around gang injunctions with the Los Angeles Police Department.

Q. Is that the Youth Justice Coalition versus City of Los Angeles?

A. No. That's Rodriguez.

Q. So you had a deposition in the Rodriguez case?

A. Yes.

Q. All right. Your report you provided in this case indicates that you have been qualified as an expert on gang enforcement in the Rodriguez case and Youth Justice Coalition case; is that right?

A. Yes.

Q. What do you mean when you say you've been qualified as an expert?

A. My expert report was submitted, but it went to -- it was settled before any further steps were taken.

Q. Okay. You have testified in court?

A. No.

Q. All right. Your report also indicates that you've also given some expert declarations in removal

Page 6

cases.

A. Yes.

Q. Explain that to me. What does that involve?

A. It involves review of documents. Attorneys will ask me to review a case and give my opinion on the gang designation in those cases and the processes of gang enforcement. So I review varius documents and then write an opinion. And at times it is possible to get called into immigration court.

Q. Okay. What's the nature of the opinions that you write in those types of cases? What are you being asked to opine on?

A. I'm being asked to opine on whether there were -- the process of designating someone a gang member and if there were possible errors in that process, or if it's possible that their designation of someone as a gang member was erroneous.

Q. What process do you go through to determine whether or not somebody has been put on this list in error?

A. I look at -- so first I look at the policies. So the overarching policies. The policies that that law enforcement agency has for determining whether someone is a gang member or not. So that would be the first criteria. And then I look at their procedures for

Page 7

applying that criteria. And then I also bring in my expertise around observing officers in the past, actually applying that criteria.

Q. When you say observing officers in the past, what officers are you observing?

A. So in the past I've done field work observing the Los Angeles Police Department, the Inglewood Police Department. And those are -- those are the two law enforcement agencies that I have done ethnographic observation on. In person ethnographic information on.

Q. I'm sorry, you said LA Police Department?

A. Yes, LAPD and Englewood.

Q. Englewood. Thank you. For the cases that you were asked to give an expert opinion on regarding removal, did you actually observe those officers?

A. No.

Q. It appears from your CV that you've done a lot of research on the Los Angeles CalGang?

A. Yes.

Q. Is that the, probably the anchor of your research?

MR. BAEHR: Objection to form.

BY MR. BRANSON:

Q. You can go ahead and answer it.

A. That has been one of the main focuses of my

Page 8

research, has been the Los Angeles Police Department and particularly the use of CalGang. However, I have done research on databases that are interoperable with CalGang. So that includes databases in Nevada, Arizona, Baltimore, Washington DC, Washington State. I've also done extensive research on federal gang databases. So while CalGang constitutes the main focus, I've done research on databases that are similar or interconnected with CalGang.

Q. Okay. You said interoperable.

A. Uh-huh.

Q. You're not suggesting those databases connect with CalGang?

A. Some of them do.

Q. Some of them do?

A. Yes.

Q. Okay. I have some questions for you. Just interesting your experience here. You provided a declaration for the Youth Justice Coalition versus City of Los Angeles case.

A. Yes.

Q. Do you remember that declaration?

A. I don't recall details of it.

Q. Okay. Can you tell me about that case a little bit.

Page 9

Case 6:21-cv-01100-EFM   Document 242-1   Filed 03/15/24   Page 4 of 8

Progeny, et al. vs. City of Wichita, KS                                      Deposition of Dr. Ana Muñiz

**Page 10**

A. That was a case my -- the only thing I can recall is I believe that was a case also regarding gang injunctions.

Q. Okay.

A. And it was challenging some aspects of constitutionality. But my memory of that case is very little.

Q. What's a gang injunction?

A. A gang injunction is a restraining order essentially. A nuisance of abatement lawsuit that is served either by a district attorney or a city attorney on a geographical area that's considered a gang area and then people are added to that restraining order. Police officers have the discretion to determine those names which are added. And then once somebody's name is added to that order they have restrictions on their behavior. So in the past there's been restrictions. There's been curfews, for example. They're not allowed to associate with other people in public. And there's a whole other list of restrictions on their behavior.

Q. Did that involve the affected person having to be actually served with an injunction?

A. It does, yes. And served could mean throwing it at somebody when they walk away, which I saw done.

Q. Okay. Any reason that's not valid service?

**Page 11**

MR. BAEHR: Objection to form.

THE WITNESS: I don't know if it's -- I can't comment on if it's valid service or not.

BY MR. BRANSON:

Q. Okay. And my understanding, if somebody is found in violation of the injunction orders they could be prosecuted through contempt?

A. I'm not sure what the specific charge is, but they can be prosecuted --

Q. Okay.

A. -- in a civil --

Q. Can they serve jail time?

A. I believe there can ultimately be jail time, but I'm not completely certain.

Q. What tools did you use to conduct your analysis in the Youth Justice Coalition case?

A. I can't -- I can't with certainty say what I did because I don't recall well enough that opinion.

Q. Do you recall if you used observations?

A. I reviewed documents, but I don't -- if you could be more specific about if I used observations.

Q. Did you go into the subject area and interview people?

A. I don't -- I wouldn't have done that for, like for that specific case, but my opinion would have been

**Page 12**

based on my research which included observations in that area and other areas.

Q. You said observations in that area. What area are you talking about?

A. I believe -- again, it's hard -- I don't recall the specific details of these cases, but I know one concerned the Echo Park area, for example. And so I would have pulled observations from that area.

Q. Did you actually go and visit the Echo Park area?

MR. BAEHR: Objection to form.

THE WITNESS: Do you mean in the course of my research at some point or for that specific case?

BY MR. BRANSON:

Q. Pardon. Bad question. During the course of your research did you go and visit that Echo Park area?

A. Yes, I did years of observations in that area.

Q. Tell me about that.

A. Well, I'm an ethnographer, so I -- central part of my research project is going and actually observing people as they do things. So I've done ethnographies of police officers. So observing how they particularly do gang designation. And have done some participant observation with people who have been designated as gang members to see how that disrupts their lives.

**Page 13**

Q. Do you feel that helps inform your work?

A. Yes.

MR. BAEHR: Objection to form.

BY MR. BRANSON:

Q. Does your observations help you form your opinions?

MR. BAEHR: Objection to form.

THE WITNESS: Yes, it is one part of things that form my opinion.

BY MR. BRANSON:

Q. Did you do any extended interviews or surveys in Echo Park neighborhood as part of your research?

A. I don't recall if I did surveys in that area. I did do interviews in particularly what's called field interviews in the course of ethnography. So that is where you don't necessarily set up an interview like this where you sit down with someone, but where as you're walking and people are going about their tasks you're asking them questions and doing interviews in the course of other actions.

BY MR. BRANSON:

Q. During your research did you ever encounter anybody that belonged to a criminal street gang?

MR. BAEHR: Objection to form.

THE WITNESS: I encountered people who had been

Case 6:21-cv-01100-EFM   Document 242-1   Filed 03/15/24   Page 5 of 8

Progeny, et al. vs. City of Wichita, KS                                    Deposition of Dr. Ana Muñiz

**Page 14**

designated as gang members by police.
BY MR. BRANSON:
Q. Did you ever form an opinion that somebody that you encountered was probably more likely than not a criminal street gang member?
A. I wouldn't -- I wouldn't make that designation. I'm not somebody who designates somebody or not.
Q. Have you in your work formed a definition of a criminal street gang?
A. My own definition, no.
Q. Do you believe criminal street gangs exist?
MR. BAEHR: Objection to form.
THE WITNESS: So my research is not to assess whether gangs exist, what their structure is, to assess whether an individual is a gang member. My research assesses how police define those things. So how they define gang membership, how they define a gang, and how they designate people as gang members.
BY MR. BRANSON:
Q. I'm going to press you on the question a little bit here. Do you, based upon your research, believe, have an opinion, that criminal street gangs exist in the United States?
MR. BAEHR: Objection to form.
THE WITNESS: So a central part of my research is,

**Page 15**

that I have found, is that the definitions are -- often of a criminal street gang are vague and often inadequate, and they can differ. So one of my main forms of critique is that the definition of this is often vague and inconsistent and, therefore, actually difficult to determine what a criminal street gang is.
So you would need to provide me with some more specific definition that I could then assess if I think there are structures that fit that definition in this country.
BY MR. BRANSON:
Q. Okay. In your work in the Echo Park neighborhood, during your research did the Los Angeles Police Department have a definition of a criminal street gang?
A. They did have a definition of a criminal street gang.
Q. Using that definition of a criminal street gang did you encounter anybody you believed fit that definition?
A. I would need to be reminded of what that definition -- that specific definition is.
Q. Well, hang on here just a second.
MR. BAEHR: I'll just take a moment to say if you could pause just a minute after he asks his question it

**Page 16**

will give me an opportunity to object if I'm going to object so that it's clear on the record.
BY MR. BRANSON:
Q. Let's go ahead and mark your report.
Hey, Teresa.
We can go off the record for this.
(Off the record)
BY MR. BRANSON:
Q. Doctor, I've handed you what's been marked as Exhibit 1 for purposes of this deposition.
Do you recognize that as a copy of your expert report in this case?
(Exhibit No. 1 marked for identification)
A. I haven't looked through the whole thing, so I can't say for sure.
Q. Please go ahead.
A. It looks --
MR. BAEHR: It looks to me like the last depo before Spear was Ramsey. And the highest number exhibit in that is eight. That seems a little low to me, but.
MR. BRANSON: Oh, it's eight?
MR. BAEHR: That's the highest number used in that exhibit, but it could be that it wasn't a new exhibit. It was eight from a previous number.
MS. WOODY: What number was that, Jordan?

**Page 17**

MR. BAEHR: Ramsey dep, and number eight.
MS. WOODY: No, that's not it because I just used -- I mean, I don't reintroduce them.
MR. BAEHR: That was just a previous -- gotcha.
MS. WOODY: Yeah. I'll find out what it is.
MR. BAEHR: Okay.
THE WITNESS: Yes, it appears to be my opinion.
BY MR. BRANSON:
Q. Okay. And that is signed by you and dated October 28, 2023?
A. Yes.
Q. I'm going to have more specific questions about your report here in a minute. But if you turn to page 10 of your report, and it looks like footnote 22.
A. Yes.
Q. If you review those for me. And I believe they go to the next page also.
A. Yes.
Q. Does that refresh your recollection what the criteria is to be designated as a gang member under the CalGang database?
A. Yes. So to clarify, because originally you were asking me about if gangs exist. So gangs, criminal street gangs. But now you're asking me about criminal street gang members.

Case 6:21-cv-01100-EFM   Document 242-1   Filed 03/15/24   Page 6 of 8

Progeny, et al. vs. City of Wichita, KS                                    Deposition of Dr. Ana Muñiz

**Page 22**

1 look at my time log.
2  Q. Have you invoiced the plaintiff's attorney for
3 your work here on this case?
4  A. I have.
5  Q. Do you know how much you have billed to date?
6  A. I don't know. I would need to look at those
7 invoices.
8  Q. Did you consult with any other experts in
9 creating your report?
10  A. I did not.
11  Q. Have you asked any of your peers to review your
12 report?
13  A. No.
14  Q. Did you speak with any of the named plaintiffs
15 in this case?
16  A. I did not. I read their experiences in the
17 complaint.
18  Q. Have you interviewed any witnesses?
19  A. No.
20  Q. Doctor, have you ever been to Wichita?
21  A. No.
22  Q. Have you ever been to Kansas?
23  A. I have.
24  Q. Doctor, I want to ask you about your
25 understanding of the Wichita Police Department's gang

**Page 23**

1 database.
2  Based upon your review of the materials in this
3 case what is your understanding how a person ends up on a
4 gang list.
5  A. I review it in my report, but my understanding
6 is that there are -- there's a, they call it a master
7 gang list. And I was just trying to get the specific
8 language. Is just that any state, county, or city law
9 enforcement officer or correctional officer can nominate
10 a person to be added to the master gang list. And so
11 that is sent to the felony assault and gang section. And
12 an officer, to my understanding from reading their
13 procedures, then reviews it. And if they feel like -- if
14 they believe someone meets the criteria and they approve
15 of that nomination then they are entered into the gang
16 list.
17  Q. Okay. Are you aware of any different levels
18 that they can be entered into the gang list?
19  A. They can be flagged as active or inactive. They
20 can also be, as I understand it, designated as gang
21 members or gang associates.
22  Q. Do you have an understanding what the
23 distinction is between active and inactive?
24  A. Active. So someone is flagged as active if
25 they, an active gang member, if they meet three of those

**Page 24**

1 10 criteria. And then they are kept as active for three
2 years. And that three years is renewed if they meet
3 various criteria. And if they don't meet that criteria
4 then they are put on an inactive status.
5  Q. Do you make any distinction in your report
6 between gang database and gang list?
7  A. I specified here, I believe, that I'm using the
8 language of gang list. But in the documents, what I saw,
9 is it tends to be used interchangeably. So for clarity I
10 went with gang list.
11  Q. For use in your report then what is your
12 definition of a gang -- of the Wichita Police
13 Department's gang list? What does it encompass?
14  A. That it's a digital repository in which the WPD
15 maintains information on alleged gang members and
16 associates and flags them as active or inactive.
17  Q. Do you have an understanding what happens when
18 somebody is inactive?
19  MR. BAEHR: Objection to form.
20  THE WITNESS: I believe there are some consequences
21 that then are not applicable to them, but I'm not
22 completely sure. So I believe things like the higher
23 bond would not apply to someone who is inactive. But I'm
24 not completely sure.
25 / / / / /

**Page 25**

1 BY MR. BRANSON:
2  Q. Page five of your report you state under
3 Opinion 1 that you did an analysis of Wichita Police
4 Department's policies and procedures.
5  Can you tell me what that analysis is. Can you
6 describe it for me.
7  A. Yes. So I read over the policies and procedures
8 that are listed in the previous sections, such as the
9 policies manual, their audit checklists, their procedures
10 for entries into database. Looked at the juvenile
11 notification letter. The gang intel form, the gang
12 intelligent study guide. Later the training which you
13 referred to. And then I assessed and compared those to
14 other departments.
15  Q. How did you assess and compare those to other
16 departments? Tell me what that means.
17  A. That means I looked at how similar or different
18 they were from the criteria used by other departments.
19  Q. And how does that inform your opinion?
20  A. It informed my opinion, for example, because I,
21 as you mentioned, I'm an expert on the LAPD, for example.
22 And so Wichita's policies are remarkably similar to the
23 Los Angeles Police Department's policies. And so when we
24 see similar policies, those structured behavior, and
25 there tends to be similar patterns between departments

Case 6:21-cv-01100-EFM   Document 242-1   Filed 03/15/24   Page 7 of 8

Progeny, et al. vs. City of Wichita, KS                                          Deposition of Dr. Ana Muñiz

1  Police Department's gang list has been overinclusive?
2      **A. I reviewed the policy. And the policy is vague**
3  **and overly broad and would allow for that**
4  **overinclusion.**
5      Q. Doctor, your testimony is that it would allow.
6      Do you have any evidence that it has allowed
7  overinclusion?
8      MR. BAEHR: Objection to form.
9      THE WITNESS: You know, in the complaint, for
10 example, reading the stories of the plaintiffs there
11 seemed to be overinclusion in those cases. But, again,
12 this -- you know, this policy is very similar to other
13 places where there has been demonstrable overinclusion.
14 BY MR. BRANSON:
15     Q. So you've indicated that the stories of the
16 plaintiffs contained in the complaint helped inform your
17 opinion; is that correct?
18     **A. Yes.**
19     Q. Are you passing on the credibility of that
20 information?
21     MR. BAEHR: Objection to form.
22     THE WITNESS: Can you -- I don't think I understand
23 that question.
24 BY MR. BRANSON:
25     Q. Are you making a credibility determination about

Page 30

1  the information provided in the complaint by the
2  plaintiffs?
3      **A. No.**
4      Q. So you don't know whether that information is
5  true or not?
6      **A. I can't -- I can't make that assessment, no.**
7      Q. Doctor, you indicate in your opinion that
8  Wichita Police Department officers can argue that a broad
9  range of dress, styles, tattoos, and virtually any color
10 of clothing is indicative of gang membership.
11     Do you have -- have you been provided any
12 evidence that that has, in fact, occurred in the Wichita
13 Police Department's gang list?
14     MR. BAEHR: Objection to form.
15     THE WITNESS: I have not seen individual -- like I
16 was not given access to individual FI cards or individual
17 entries into that database. So I was not able to assess
18 that in particular.
19 BY MR. BRANSON:
20     Q. Doctor, I'm just trying to make sure I
21 understand your testimony and your opinion in this case.
22     It appears that your opinion is based solely on
23 your experiences with errors and other databases.
24     MR. BAEHR: Objection to form.
25 /////

Page 31

1  BY MR. BRANSON:
2      Q. And --
3      MR. BAEHR: Is there a question?
4  BY MR. BRANSON:
5      Q. -- that your opinions are based upon your review
6  of errors and other databases and your review of Wichita
7  Police Department's policies and procedures; is that
8  correct?
9      **A. My review was based on my knowledge of previous**
10 **research in the field, the breadth of my own previous**
11 **research, this list of Wichita Police Department's**
12 **policies and procedures. This list of depositions. This**
13 **other list of documents that were mainly emails that**
14 **demonstrated information-sharing, and then my review of**
15 **the training in the complaint.**
16     Q. Doctor, am I correct that you're not offering an
17 opinion about whether or not there's anybody on the gang
18 list inappropriately?
19     MR. BAEHR: Objection to form.
20     THE WITNESS: An individual, a specific individual?
21 BY MR. BRANSON:
22     Q. Yes.
23     **A. Can you repeat that question.**
24     Q. Can you identify any specific individual that
25 you believe after your research analysis and review of

Page 32

1  these material does not belong in the gang list?
2      **A. I was not given access to, like I said, names or**
3  **evidence of specific people on the gang list and their**
4  **information.**
5      Q. So, therefore, you cannot identify anybody; is
6  that correct?
7      **A. I was not given the materials to --**
8      MR. BAEHR: Objection to form.
9      THE WITNESS: -- assess individual -- the
10 appropriateness of a named individual's designation.
11 BY MR. BRANSON:
12     Q. Doctor, I appreciate that. We're going to beat
13 around this bush all day long if we have to.
14     **A. That's fine.**
15     Q. I'm just asking you to answer the question.
16     Have you identified anybody that you believe is
17 incorrectly listed on this Wichita gang list?
18     MR. BAEHR: Object to form.
19     THE WITNESS: And I'm telling you I was not given
20 materials to review that would allow me to do that.
21 BY MR. BRANSON:
22     Q. So if you haven't been given materials,
23 therefore, you cannot make that determination?
24     MR. BAEHR: Objection to form. It's asked and
25 answered several times at this point.

Page 33

Case 6:21-cv-01100-EFM   Document 242-1   Filed 03/15/24   Page 8 of 8

Progeny, et al. vs. City of Wichita, KS                                              Deposition of Dr. Ana Muñiz

**Page 54**

1  something under the control of the Wichita Police
2  Department?
3     A.  **It is my understanding that these gang**
4  **conditions, one way in which someone would qualify for**
5  **them or they would be applied would be by virtue of their**
6  **designation as a gang member or associate by the Wichita**
7  **Police Department.**
8     Q.  Do you have any understanding of who imposes
9  those conditions?
10    MR. BAEHR:  Objection to form.
11    THE WITNESS:  The Sedgwick county probation gang
12 conditions?
13 BY MR. BRANSON:
14    Q.  Yes.
15    A.  **Can you specify a little what you mean by**
16 **imposes.**
17    Q.  Well, who imposes those conditions on the
18 convicted person?
19    A.  **I can't say for sure.**
20    Q.  Do you have any evidence that the Wichita Police
21 Department then imposes those conditions?
22    MR. BAEHR:  Objection to form.
23    THE WITNESS:  I understand that the Wichita Police
24 Department designates individuals as gang members and
25 associates, and that may -- that designation may be one

**Page 55**

1  thing that qualifies people for these gang conditions.
2  BY MR. BRANSON:
3     Q.  You go on and indicate that your perceived
4  negative consequences may also include that it limits
5  access to jobs and housing.
6         Were you provided any information with regard to
7  the Wichita Police Department's gang policy that people
8  have been limited on their access to jobs and housing?
9     A.  **I was not given specific named cases to review.**
10    Q.  You also opine that they may suffer reduced
11 participation in community and family life.
12        Were you provided any specific information to
13 opine about the Wichita Police Department's affect on
14 reduced participation in community and family life?
15    A.  **That opinion was based on that in places where**
16 **there are criteria for gang designation that are very**
17 **similar to the Wichita Police Department's, that that was**
18 **an affect that gang-designated people experienced.**
19    Q.  Okay.  Again, nothing specific to Wichita Police
20 Department's gang list?
21    A.  **I was not given access to named people on the**
22 **gang list.**
23    Q.  You also go on and talk about "disrupted
24 educational opportunities and narrowed option for
25 immigration relief."

**Page 56**

1     Were you provided any information that would
2  allow you to opine about the effects of the Wichita
3  Police Department's gang list on those items?
4     MR. BAEHR:  Objection to form.
5     THE WITNESS:  Well, for example, I was provided with
6  a document that demonstrated that information on the
7  WPD's gang list may be shared with federal agencies who
8  engage in immigration enforcement.  So in that case if
9  someone has been designated and that information is
10 shared it would have an impact, a possible impact, on
11 their immigration case.
12 BY MR. BRANSON:
13    Q.  So it would have a possible impact?
14    A.  Yes.
15    Q.  Again, do you have any examples of that with
16 regard to the Wichita Police Department's gang
17 database?
18    A.  **I was not given access to specific named cases**
19 **of people on the database.**
20    Q.  Doctor, on page 14 you talk about your
21 experience or your research where you encountered a
22 Latino man in his 20s who was denied victim compensation
23 as a result of his designation.
24       You go on to opine that this same issue plagues
25 Wichita Police Department's current gang list policy and

**Page 57**

1  practice.
2         Tell me everything you rely on to make that
3  statement.
4     MR. BAEHR:  Objection to form.
5     THE WITNESS:  So the WPD does not have a compulsory
6  notification, appeal, or removal process.  And so this
7  was research in Los Angeles at the time before they had a
8  notification process.  They do have a notification
9  requirement now.
10       So in a very similar situation where there is a
11 gang list with similar criteria to be added with no
12 notification, appeal, or removal process, I encountered
13 this man and others who were not aware they had been
14 designated as gang members until something happened that
15 was often catastrophic and they suffered negative effects
16 as a result.  So in this case this young man suffered a
17 gunshot wound and was informed that he would not be
18 receiving victim's compensation because he has been
19 designated a gang member and added to the gang database.
20 BY MR. BRANSON:
21    Q.  Okay.  So this same issue that you refer to is
22 the fact that there's no notification, and not fact that
23 there's been somebody denied victim compensation?
24    A.  **Yes, it is not the fact that someone is denied**
25 **victim compensation, but that the same issues that would**