**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| PROGENY, a program of Destination Innovations, Inc., CHRISTOPHER COOPER, ELBERT COSTELLO, MARTEL COSTELLO, and JEREMY LEVY, JR., on behalf of themselves and others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 6:21-cv-01100-EFM-ADM |
| v. | ) ) | |
| CITY OF WICHITA, KANSAS, | ) ) | |
| Defendant. | ) | |

**EXPERT REPORT OF DR. ANA MUÑIZ**

I, ANA MUÑIZ, declare:

## 1 Introduction

### 1.1 Qualifications and Personal Experience

My name is Dr. Ana Muñiz. I am currently employed by the University of California, Irvine, as an Assistant Professor of Criminology, Law and Society. My areas of expertise include policing; gang profiling and enforcement; local, state, and federal gang databases; federal intelligence gathering; immigration enforcement; digital surveillance; and the intersection of these topics with race. I earned a Ph.D. from the Department of Sociology at the University of California, Los Angeles, in 2012. I have previously submitted opinions and have been qualified as an expert on gang enforcement in the cases of *Rodriguez v. City of Los Angeles*, No. CV11-01135 DMG(JEMx) (C.D. Cal.) and *Youth Justice Coalition et al v. City of Los Angeles et al*, No. 2:16cv07932 (C.D. Cal.). I have previously submitted expert declarations in removal cases involving gang designation, including three cases before the Los Angeles Immigration Court, two cases before the San Francisco Immigration Court, and one case before the Otero Immigration Court in New Mexico. I have provided expert consulting services to U.S. Congressional and California legislative offices in the areas of gang and immigration databases.

My research examines gang profiling, intelligence gathering, surveillance, and enforcement by local and federal law enforcement. Through qualitative analysis of primary documents, observations, and interviews, and quantitative analysis of statistical data, I examine the methods used by law enforcement to categorize individuals as gang-involved, gang-affiliated, or gang-associated during field operations, interviews, booking procedures, and jail intakes. I also study law enforcement information collection, maintenance, and sharing practices at the local, state, and federal levels. Additionally, I examine how gang designation affects community

participation; criminal justice and immigration trajectory; and access to education, employment, and health care.

My academic research has been published in esteemed peer-reviewed academic journals, law reviews, and in two peer-reviewed academic books, one with Rutgers University Press in 2015 and another with the University of California Press in 2022.

I have advised undergraduate and graduate student researchers on similar research methods and substantive areas. I have been invited to speak at various professional conferences and interviewed by multiple media outlets on my areas of expertise. My full curriculum vitae with a listing of professional presentations and publications is included in Appendix A.

## 1.2 Compensation

I am being compensated at a rate of $175.00 per hour for written work; $175.00 per hour for consultation; and $250.00 per hour for testimony preparation and presentation. My compensation is not contingent on the results of my analysis or the outcome of this litigation.

## 2 Background, Allegations, and Assignment

## 2.1 Factual Background

The Wichita Police Department ("WPD") maintains a list of persons its staff believe meet these definitions—the "Gang List"—as described in WPD Policy 527. The WPD defines a "criminal street gang member" as a person who meets three of the following ten statutory criteria based on K.S.A. § 21-6313:

(A) Is identified as a criminal street gang member by a parent or guardian;
(B) Is identified as a criminal street gang member by a state, county or city law enforcement officer or correctional officer or documented reliable informant;
(C) Is identified as a criminal street gang member by an informant of previously untested reliability and such identification is corroborated by independent information;
(D) Frequents a particular criminal street gang's area;
(E) Adopts such gang's style of dress, color, use of hand signs or tattoos;
(F) Associates with known criminal street gang members;
(G) Has been arrested more than once in the company of identified criminal street gang members for offenses which are consistent with usual criminal street gang activity;
(H) Is identified as a criminal street gang member by physical evidence including, but not limited to, photographs or other documentation;
(I) Has been stopped in the company of known criminal street gang members two or more times; or
(J) Has participated in or undergone activities self-identified or identified by a reliable informant as a criminal street gang initiation ritual.[1]

---

[1] K.S.A. § 21-6313.

Additionally, the WPD may document an individual as a gang member, without any other justification, if they admit to criminal street gang membership.[2]

The WPD defines a "criminal street gang associate" as a person who (1) admits to criminal street gang association; or (2) meets two or more of the statutory criteria for criminal street gang membership (A-J).[3]

According to these criteria, an individual does not have to be convicted of or even charged with criminal violations in order to be designated as a gang member or associate and added to the Gang List. Officers can designate an individual as a gang member or associate without speaking with them, instead relying solely on visual observations including those gleaned from social media.[4]

If added, the person will remain on either "active" or "associate" status for at least three years past the last date that person was reported to meet any gang designation criteria.  With a few exceptions, anyone designated a criminal street gang member on the Gang List arrested for a person felony is subject to a minimum bail of $50,000 under K.S.A. § 21-6316.  In addition, gang designees are routinely subject to "gang conditions" for probation/parole or bond, including generally prohibitions on activity meeting the gang designation criteria.  Under Policy 527, WPD staff monitor documented gang members and associates for any violations of their probation/parole, bond, and pretrial restrictions.

While an individual is included on the Gang List, if WPD staff report additional conduct by the person meeting any of the gang criteria, the person will continue to be designated "active" on the Gang List for at least another three years.  A person may remain "active" on the gang list for longer than three years, even without any new documented conduct meeting the criteria, if the WPD staff fail to timely audit and remove the individual.  Once a person is added to the Gang List, they are never removed.  At best, if a person is timely audited and the WPD determines there have been no reports of conduct meeting the criteria within the previous three years, the person will be designated "inactive" and remain on the list.  Policy 527 does not provide for a person added to the Gang List to be notified of their addition, nor given any opportunity to challenge their gang designation, at any time.

## 2.2 Allegations

Plaintiffs in this case allege that they have been wrongly added to or kept on the Gang List as "members" or "associates" in violation of the First and Fourteenth Amendments to the U.S. Constitution.

## 2.3 Questions Addressed and Materials Reviewed

I have been asked by counsel representing the Plaintiffs in this case to review data, documents Defendant produced in this litigation, and deposition testimony, and to provide my expert opinions regarding:

---

[2] K.S.A. § 21-6313.

[3] K.S.A. § 21-6313.

[4] Ana Muñiz. 2022. "Gang Phantasmagoria: How Racialized Gang Allegations Haunt Immigration Legal Work." *Critical Criminology* 30:159-175, p. 161.

1. The policies and procedures used by the Wichita Police Department (WPD) to determine gang designation and to place gang-designated individuals on the WPD's Gang List.

2. The impact on individuals of placement on the WPD's Gang List.

3. The policies and procedures used by the WPD to remove individuals from the Gang List.

Plaintiffs requested from Defendant the production of records to assist in the analysis of the above questions. The analysis in this report is based on the following materials and available to me as of this date.

- Wichita Police Department Policy Manual, Policy 527 Gang Offenders ("Policy 527")
- K.S.A. § 21-6313
- Audit Checklist
- SOP for Entries into the Gang Database
- City of Wichita Police Department juvenile notification letter
- Instructions for New Gang Intel Form
- Gang Intelligence Study Guide
- Deposition of Chad Beard, December 19, 2022, and exhibits
- Deposition of Jose Salcido, December 15, 2022, and exhibits
- Deposition of Sage Hemmert, December 7, 2022, and exhibits
- Deposition of Jeffrey S. Gilmore, December 6, 2022
- Deposition of Wendell Nicholson, December 2, 2022
- Deposition of David Inkelaar, December 2, 2022, and exhibits
- Deposition of Robert Thatcher, December 1, 2022
- Deposition of Kevin McKenna, December 1, 2022, and exhibits
- Deposition of Wanda Parker-Givens, October 12, 2022, and exhibits
- WICHITA 080167–68
- WICHITA 080311–13
- WICHITA 080535
- WICHITA 080625
- WICHITA 093274
- WICHITA 095378
- WICHITA 097702
- WICHITA 098116
- WICHITA 101434
- WICHITA 101684
- WICHITA 104645
- WICHITA 105928–29
- WICHITA 106040
- WICHITA 108529–31
- WICHITA 108633–34

- WICHITA 110034–35
- WICHITA 110994–96
- WICHITA 121147
- WICHITA 120587–89
- Analysis of data compiled in WICHITA 47401-443

I reserve the right to supplement my report if new information is produced in this case.

## 3 Summary of Anticipated Testimony/Issues

The 10-point criteria (A-J) used by the WPD to designate gang members under Policy 527 are vague and therefore allot officers on the ground broad discretion, leading to inconsistent and overinclusive designation practices. The WPD's policies and procedures for entering and maintaining information in the Master Gang List are remarkably similar to other gang lists (also called gang databases) used in other jurisdictions that suffer from widespread errors and unjustifiable entries. Placement on the Gang List can have profound, lasting, and far-reaching negative effects on an individual's life. These effects are enabled by the lack of a consistent notification and appeal policy and aggravated by inter-agency information sharing. The WPD disproportionately designates Black men as gang members and associates. As a result, Black people and Black communities disproportionately experience the negative consequences of being on the Gang List. In the remainder of this section, I provide a summary of my opinions. In Section 4, I provide the basis for each opinion. .

### 3.1 Opinion 1: Gang Designations Are Overinclusive and Inconsistent

An analysis of WPD policies and procedures indicates that they are likely to lead to overinclusive and inconsistent gang designation practices leaving too much to the discretion of individual officers. The 10-point criteria (A-J) used by the WPD to designate gang members under Policy 527 are vague and therefore allot officers on the ground broad discretion, leading to inconsistent and overinclusive designation practices. Specifically, criteria concerning the style of dress, colors, tattoos, and gang areas are not clearly defined. Because the criteria are so vague, WPD officers can argue that a broad range of dress styles, tattoos, and virtually any color of clothing is indicative of gang membership. Similarly, WPD officers can claim that nearly any geographic area of Wichita could be a 'gang area.' Consequently, individuals are unable to alter their behavior to avoid violating the criteria. WPD policies are also likely to result in the unjustifiable designation of certain non-gang-involved individuals as gang associates.

### 3.2 Opinion 2: Gang Lists Are Overinclusive and Lack Due Process Protections

As a result of the WPD's subjective and inconsistent gang designation practices, the WPD's Gang List is overinclusive and unreliable, and its practices lack adequate due process protections. WPD policies do not provide for an appeal and removal process for people added to

the WPD Gang List. For adults added to the Gang List, there is no compulsory notification, appeal, or removal process. It is unclear if the WPD's practice offers compulsory notification for juveniles added to the list, and there are no express appeal/removal opportunities for juveniles added to the Gang List. Once an individual is added to the Gang List, increased surveillance by the WPD may increase the likelihood that individuals will remain on the Gang List, even if they are not involved in gang activity. Even individuals who are inaccurately put on the Gang List are not fully removed; rather, they are moved from "active" to "inactive" status. As a result, there are inadequate opportunities to contest and correct inaccurate information on the Gang List.

### 3.3 Opinion 3: Inclusion on a Gang List Has Negative Consequences

Evidence indicates that placement on the Gang List can have profound, lasting, and far-reaching effects on an individual's criminal justice involvement; employment, educational, and housing prospects; participation in community and family life; and options for immigration relief. These effects can come both from established processes that explicitly exclude gang members or associates from access to institutions or benefits as well as from more informal effects, namely the stigma attached to being perceived as a gang member or associate. Because the WPD does not practice compulsory notification, individuals may remain on the Gang List for long periods of time, unaware that they have been designated as a gang member or associate. Individuals may not learn they are on the Gang List until they experience these negative consequences. The negative consequences for people on the Gang List are aggravated when the WPD shares information from the Gang List with other law enforcement and non-law enforcement entities in other jurisdictions. Consequently, placement on the Gang List may result in long-term stigma.

### 3.4 Opinion 4: Gang Designations Are Racially Biased

The WPD disproportionately designates Black men as gang members and associates. Other law enforcement agencies with policies and procedures that are similar to the WPD's also disproportionately and unjustifiably designate Black men as gang members and associates. Black people and other people of color thus disproportionately experience the negative consequences of being on a gang list. The ambiguity around gang designation (i.e., the vague and overbroad criteria, and uncertainty as to who has been designated due to lack of notification) means that entire geographic and racial communities experience the effects of racialized designation, not just people on the Gang List.

### 4 Analysis

### 4.1 Basis of Opinion 1:

### Evidence that Gang Designations are Overinclusive and Inconsistent

The criteria the WPD uses to designate gang members and associates under Policy 527 are vague and facilitate overinclusive designation. Many people could satisfy the Policy 527 criteria;

in certain contexts, I would satisfy the criteria for gang association. The vagueness of the criteria grants officers on the ground significant and broad discretion in determining what constitutes an indication of gang membership or association, leading to overly broad and unreliable designation practices.

Specifically, policies that designate individuals based on colors of dress, style, and tattoos can lead to overinclusion. For example, the WPD does not define a "gang's style of dress, color, use of hand signs or tattoos." In a deposition, Lieutenant Jeffrey S. Gilmore states that he has considered all of the following colors to be gang colors: North Carolina blue, dark blue, red, green, black, brown, yellow, and orange.[5]

In my own research, I have found that police officers consider widely worn apparel, such as sports team logos and red or blue t-shirts, to be indicative of gang affiliation. In the course of my fieldwork in the Echo Park neighborhood of Los Angeles—a neighborhood the Los Angeles Police Department (LAPD) identified as a gang area—I found that officers used the following criteria related to the style of dress, colors, and tattoos as justification for designating an individual as a gang member or associate: a diamond symbol; Duke Blue Devils logo; Aztec warrior symbols; 90026 zip code; Los Angeles Dodgers logo; Rhino logo from Mark Ecko gear; Mickey's Malt Liquor hornet; anything with the letter B, including but not limited to the Boston Bruins, Brooklyn Dodgers, and UCLA Bruins; a frog; the color green; the color blue; and the letter E.[6] Officers contended that "good people in the neighborhood" would not wear Ecko clothing or a shirt with a frog on it.[7] However, it is reasonable that non-gang members may unknowingly enter a 'gang area' wearing any number of these common and widely-worn clothing items, and that officers may mistakenly interpret them as gang symbols or colors. The same could be said for the broad list of colors and styles of dress that the WPD contends is indicative of gang affiliation.

Former WPD Captain Wendell Nicholson describes how the broad nature of the 'gang colors' criterion can lead to overinclusion. Captain Wendell recounts an incident when officers misidentified a Black fraternity party as a gang party and identified their gang colors as crimson and cream, which are the official colors of the Kappa Alpha Psi fraternity.[8] If officers such as Captain Wendell had not informed the Gang Unit officers that the party was a fraternity party, which many non-gang-involved community members attended, the Gang Unit officers could have intervened in the party and, using the 'gang colors' criterion and two additional A-J criteria, designated everyone present as a gang member or, using only one additional A-J criteria, designated everyone present as a gang associate.

Because the WPD provides no specific guidance to the public on what constitutes a "gang's style of dress," individuals are unable to alter their own style of dress to avoid designation.

---

[5] "Deposition of Jeffrey S. Gilmore," December 6, 2022, p. 144-145.

[6] Ana Muñiz.2015. *Police, Power, and the Production of Racial Boundaries.* New Brunswick: Rutgers University Press, p. 87.

[7] Muñiz, *Police, Power, and the Production of Racial Boundaries*, p. 87.

[8] "Deposition of Wendell Nicholson," December 2, 2022, p. 147-149.

Additionally, they are unable to stay away from others who wear the "gang's style of dress" in order to avoid being designated as an associate.

The WPD criterion concerning tattoos may also lead to overly inclusive designation in two primary ways. First, in my experience, officers can consider tattoos of common symbols or widespread cultural symbolism (e.g., Aztec calendars, Virgin de Guadalupe tattoos) to be gang tattoos. While some active gang members may have such tattoos, many people who are not gang members have them as well. WPD policies and procedures do not account for innocuous non-gang related tattoos and thus may capture non-members as well as active members. Second, the assessment of tattoos may not reflect current gang involvement but rather past gang involvement. In my fieldwork, I encountered several former gang members who still had gang tattoos but had not had the opportunity or means to have them removed. While in some areas there are programs that offer free or low-cost tattoo removal, these services are limited and not available to everyone. Thus, former gang members may not be able to remove their tattoos due to prohibitive costs, and police may continue to inaccurately document them as active gang members as a result.

The policies and procedures for identifying a "gang area" are similarly deficient. The WPD does not define what exactly constitutes a "criminal street gang's area." In a deposition, Lieutenant Chad Beard names several bars and restaurants that officers regularly surveil but clarifies that there does not exist a consolidated list of "gang areas." Lieutenant Beard mentions that an alleged gang member's or associate's mother's or grandmother's house could be considered a gang hangout, but it is left to the discretion of individual officers to decide whether a location constitutes a gang area.[9]

Many non-gang-involved citizens likely patronize the bars and restaurants that the WPD has internally defined—but not communicated to the general public—to be gang areas. Because the WPD does not define and publicly communicate its definition of a "gang area," individuals are unable to circumvent these areas. It is also reasonable that non-gang-involved citizens may patronize these businesses while unwittingly wearing attire or sporting tattoos that the WPD could discretionarily designate as gang-related.

Policies that designate individuals based on association also lead to overinclusion. My own research and other research in the field repeatedly finds that gang associates are often designated as such for merely living in the same area as alleged gang members, being a family member of an alleged gang member, or being seen with an alleged gang member.[10] Consequently, progressively

---

[9] "Deposition of Chad Beard," December 19, 2022, p. 44-45, 79, 207; *see also* WICHITA 121147 (describing a grandmother who had been the victim of multiple shootings due to her grandson's gang activity—so much activity that the WPD served the grandmother with an official city notice that, because of the amount of violent crime occurring at the house due to gang activity, she was in violation of the city's nuisance ordinance).

[10] Victor M. Flores. 2022. "Challenging Guilt by Association: Rethinking Youths' First Amendment Right to Associate and Their Protection from Gang Databases." *Cornell Law Review* 107(3):847-894, p. 850; K. Babe Howell. 2011. "Fear Itself: The Impact of Allegations of Gang Affiliation on Pre-Trial Detention." *St. Thomas Law Review* 23(4):620-660, p. 624,637.

larger groups of uninvolved friends, family members, housemates, and neighbors can find themselves unjustifiably swept up in gang enforcement operations. The categorization of a designated gang member's or associate's mother's or grandmother's house as a gang location, as discussed above, would likely expose non-gang involved family members, neighbors, and friends to a gang associate designation. Clearly, it is difficult for people living in proximate spaces, such as family, neighbors, and housemates, to avoid one another. Individuals who are not gang-involved will likely be designated as associates simply for being in proximity to documented gang members.

During my fieldwork in Los Angeles in 2018, for example, I encountered the case of a woman whose application for an immigration status change was in jeopardy because, in 2007, the LAPD documented her as the girlfriend, and therefore an associate, of a gang member. However, her boyfriend at the time was unaware that the LAPD had documented him as a gang member. It was only at the point at which she applied for an immigration status change 10 years later that she was informed of her status as a gang associate and of her now ex-boyfriend's status as a gang member. The WPD's gang association criteria and lack of compulsory notification could easily put someone in a similar position.

In addition to facilitating overinclusive designation practices, WPD policies and procedures can lead to inconsistent designation. The criteria are vague such that one officer could reasonably make a different assessment than another officer. Officer Kevin McKenna notes that even in cases where an individual satisfies the criteria of active gang membership, an officer may discretionarily decide not to add them to the Gang List or alternately, may decide to add them to the Gang List as an associate, rather than an active member.[11] Similarly, Detective David Inkelaar testified that two officers could look at the same individual and one conclude that the person meets the gang membership criteria, while the other concludes the opposite.[12]

## 4.2 Basis of Opinion 2

### Evidence that Gang Lists Are Overinclusive and Lack Due Process Protections

The Master Gang List database is a digital repository in which the WPD maintains information on alleged gang members and associates in the City of Wichita. Individuals on the Gang List are "flagged" as gang members or associates if they meet the criteria requirements.

WPD officers may document alleged gang members and associates on Field Interview (FI) Cards, also referred to as Targeted Offender Program (TOPS) cards, to be later entered into the Gang List.[13] Some officers may also choose to forgo FI Cards and enter information directly into

---

[11] "Deposition of Kevin McKenna," December 1, 2022, p. 152-153, 203-204.

[12] "Deposition of David Inkelaar," December 2, 2022, p. 112-113.

[13] At some point in time, WPD also used "Targeted Offender Program" (TOPS) cards, which are similar to Field Interview Cards. See "Deposition of Chad Beard," December 19, 2022, p. 30-31.

the Gang List.[14] Officers use FI Cards at their discretion to document interactions with civilians in the course of their work. On FI Cards, officers document a broad range of intelligence information that is not directly related to criminal events, including information on the subject's friends, family, housing status, scars, and social media handles.[15]

> WPD procedure states:
>
> Any state, county, or city law enforcement officer or correctional officer may nominate a person to be added to the Master Gang List by routing the nominee's personal information to the Gang/Felony Assault Section through the departmental mail or electronic submission.[16]

A member of the Gang/Felony Assault section reviews the submission and determines if the individual meets the criteria. If that Gang Unit officer determines that individuals meet the criteria, they are added to the Gang List.

Research repeatedly demonstrates that gang lists often contain inaccurate information and unjustifiable entries. For example, a 2015 audit by the California State Auditor's Office of CalGang found that, of a random sample of 100 individuals listed in CalGang, law enforcement did not provide adequate support for entering 13 of those individuals into CalGang.[17] The audit also found 42 individuals listed in CalGang as younger than one year of age at the time of entry, 28 of whom were listed for "admitting to being gang members."[18] The audit found that 250 individuals were not scheduled to be purged from CalGang until 100 years in the future.[19]

Additionally, a 2020 investigation uncovered that LAPD officers had fabricated information in order to ensure that individuals met the requisite criteria to be entered into CalGang.[20] As a result, California's attorney general barred police from using CalGang records generated by the LAPD, which constituted a quarter of all CalGang records.[21] The criteria for inclusion in CalGang are nearly identical to those used for the WPD's Gang List.[22]

---

[14] "Deposition of Chad Beard," December 19, 2022, pg. 61.

[15] Yves Van Gennip, Blake Hunter, Raymond Ahn, Peter Elliott, Kyle Luh, Megan Halvorson, Shannon Reid, Matthew Valasik, James Wo, George E. Tita, Andrea L. Bertozzi, and Jeffrey P. Brantingham. 2013. "Community Detection Using Spectral Clustering on Sparse Geosocial Data." *SIAM Journal on Applied Mathematics* 73(1):67–83, p. 69.

[16] Wichita Police Department Policy Manual, Policy 527 Gang Offenders.

[17] California State Auditor, *The CalGang Criminal Intelligence System*, p. 32.

[18] California State Auditor, *The CalGang Criminal Intelligence System*, p. 3.

[19] California State Auditor, *The CalGang Criminal Intelligence System*, p. 3.

[20] Puente and Winton, "LAPD's Data-Driven Culture under Scrutiny Amid Scandal Over Fake Gang Identifications."

[21] Anita Chabria, Kevin Rector, and Cindy Chang. "California Bars Police from Using LAPD Records in Gang Database: Critics Want It Axed." *Los Angeles Times* July 14, 2020; Email communication with CalGang Unit, California Department of Justice, Justice Data & Investigative Services Bureau, March 15, 2023.

[22] For an officer to enter an individual into CalGang, they must fit two of the following criteria: (1) Subject has admitted to being a gang member; (2) Subject has been seen associating with documented gang members; (3) Subject is known to have gang tattoos; (4) Subject has been seen frequenting gang areas; (5) Subject has been seen wearing gang dress; (6) In-custody classification interview (admission of gang membership during a custody

I conducted an analysis of the gang database maintained by US Immigration and Customs Enforcement (ICE), ICEGangs, and found that over 66 percent of entries were not justified with any criteria.[23] As with CalGang, the ICEGangs criteria are nearly identical to those used by the WPD.[24]

As another example, the Ramsey County, Minnesota Sheriff's Department shut down its gang database in 2011 after an audit found the gang designation practices to be overly inclusive.[25] Specifically, the audit states, "[…] the criteria may allow for too much discretion to be used in regards to who is allowed to identify gang members […] the criteria may ensnare individuals who are not involved in gang activity."[26] Again, as with California and the ICE database, the Minnesota gang criteria closely tracked those applied by the WPD.[27]

In Illinois, the Cook County Board of Commissioners dismantled the sheriff's regional gang database in 2019 after investigations uncovered widespread errors.[28]

Notably, officers who entered information into CalGang, ICEGangs, and the Minnesota Criminal Gang Pointer File used policies and procedures for gang designation that are nearly

---

classification interview is the one exception to the two-criteria requirement); (7) Subject has been arrested for offenses consistent with usual gang activity; (8) Subject has been seen displaying gang symbols and/or hand signs; (9) Subject has been identified as a gang member by a reliable informant/source; (10) Subject has been identified as a gang member by an untested informant/source. Law enforcement can enter an individual into CalGang as a gang affiliate if they affiliate with a documented gang member. See California State Auditor, *The CalGang Criminal Intelligence System*, p. 15.

[23] Ana Muñiz. 2022. *Borderland Circuitry: Immigration Surveillance in the United States and Beyond*. Berkeley: University of California Press, p. 49.

[24] For an officer to enter an individual into ICEGangs, they had fit at least two of the following criteria: (1) Has gang-related tattoos; (2) Associates with other gang members; (3) Frequents notorious gang areas; (4) Displays gang signs or symbols; (5) Has been arrested with other gang members on two or more occasions; (6) Has been identified as a gang member in written or electronic correspondence; (7) Has been seen wearing gang-style clothing; (8) Has been identified as a gang member through documented reasonable suspicion; (9) Has been identified as a gang member by a reliable source, untested informant, jail staff, or prison staff. Individuals could also be entered into ICEGangs if they had convictions at the federal or state level that imposed punishment or civil consequences for gang-related activity or if they admitted membership to a law enforcement officer. ICEGangs users entered individuals as gang "associates" if they socialized with active gang members. See Julie L. Myers, *US Immigration and Customs Enforcement ICE Police System (IPS), Directive: ICE Gang Member Identification Criteria*, August 4, 2006, p. 2–3; Muñiz, *Borderland Circuity*, p. 48.

[25] Chao Xiong, "Ramsey County's GangNet Database Goes Dark Monday." *Star Tribune* August 14, 2011.

[26] Uzodima F. Aba-Onu, Nekima Levy-Pounds, Joanna Salmen, and Artika Tyner. 2010. "Evaluation of Gang Databases in Minnesota and Recommendations for Change." *Information & Communications Technology Law* 19(3):223–254, p. 231.

[27] For an officer to enter an individual into the Minnesota Criminal Gang Pointer File, they had to fit at least three of the following criteria: (1) Subject admits to being a gang member; (2) Is observed to associate on a regular basis with known gang members; (3) Has tattoos indicating gang membership; (4) Wears gang symbols to identify with a specific gang; (5) Is in a photograph with known gang members and/or using gang-related hand signs; (6) Name is on gang document, hit list, or gang-related graffiti; (7) Is identified as a gang member by a reliable source; (8) Arrested in the company of identified gang members or associates; (9) Corresponds with known gang members or writes and/or receives correspondence about gang activity; (10) writes about gang (graffiti) on walls, books and paper. See Aba-Onu et al. "Evaluation of Gang Databases in Minnesota and Recommendations for Change," p. 225.

[28] Mick Dumke, "Cook County Takes Steps to Erase Its Regional Gang Database." *ProPublica* February 20, 2019.

identical to those used by the WPD. In addition, Gang Unit Lieutenant Chad Beard, who has been with the Gang Unit over twenty years, testified in his deposition that individuals who were not gang members have been included in the gang database.[29]

Under the WPD's Policy, the lack of due process protections concerning how information is added to and maintained in the Gang List makes it incredibly difficult for an individual to correct inaccurate information in the Gang List or have their information removed from the Gang List. Once an individual is placed on the WPD's Gang List, removal can prove difficult, first because they are likely unaware that they are on the Gang List. Adults placed on the Gang List are not notified of their designation as a gang member or associate. Adults placed on the Gang List are not informed of the criteria on which the designation rests and are not provided with an avenue to contest or appeal the designation. Because there is no compulsory notification for adults added to the Gang List, an individual can be on the Gang List and not know it.[30] Further, there is no process for actually "removing" an individual from the Gang List—once on the Gang List, an individual remains either "active" or "inactive."

Concerning juveniles added to the Gang List, WPD procedure states:

When a juvenile meets the *Criminal Street Gang Member* or *Associate* criteria found in K.S.A. 21-6313 a supervisor from the Gang/Felony Assault Section will attempt to contact the parent and/or guardian of the juvenile. The parent and/or guardian will be told how the juvenile met the gang criteria and will be informed of intervention options and resources.[31]

While WPD procedure states that an "attempt will be made to contact the parent and/or guardian of the juvenile," it is unclear if the parent/guardian notification is compulsory. The procedure also calls for only an attempt at contact, not successful contact. As currently drafted, a WPD officer's phone call that does not ultimately connect with a live person on the other end would satisfy this purported notification procedure. Furthermore, the procedure states that the parent/guardian "will be informed of intervention options and resources," but even then there is no process for an appeal or actual removal option.

WPD policies do not provide an appeal and removal process for anyone added to the WPD Gang List. Because gang databases often contain unreliable information, a consistent and guaranteed right for alleged gang members and associates to view the evidence against them and pursue a reasonable avenue to appeal is vital.

Individuals on the WPD Gang List can be moved from "active" to "inactive" status "if after three years there is no documented activity." However, individuals will remain listed as "active" and the three-year clock will start over under any of the following circumstances:

---

[29] "Deposition of Chad Beard," December 19,2022, pp. 219-220;
[30] "Deposition of Chad Beard," December 19, 2022, p. 135.
[31] Wichita Police Department Policy Manual, Policy 527 Gang Offenders.

(A) Documentation of criminal street gang member or associate criteria.

(B) Person is involved in Criminal Street Gang Activity or a Gang Related Incident as defined by K.S.A 21-6313.

(C) Documented wearing gang's style of dress, colors, or has new gang tattoos.

(D) Documented on police case with other gang member(s) of same set, or if gang member(s) of a different set, documentation must be shown as to why the contact is significant.

(E) Contact with other documented gang members who are "family members" to be used as meeting criteria K.S.A. 21-6313 to continue flagging will be at the discretion of the Gang Intel Officers.[32]

Additionally, an individual who is arrested for certain crimes will also have their three-year clock start over from the date of the arrest, even if the arrest does not ultimately lead to their conviction.[33]

When individuals do meet the three-year time limit for purging, they are not completely removed from the Gang List but rather are marked as "inactive." In other words, once designated, the status of gang-affiliated is in a sense permanent, essentially a lifetime stigma; the only change concerns whether an alleged gang member or associate is "active" or "inactive." Even individuals whom the WPD finds were erroneously added to the Gang List are not completely removed but rather have their status changed from "active" to "inactive."[34]

Once an individual is on the Gang List and categorized as "active," moving to "inactive" status can be difficult, as placement on the Gang List increases surveillance by law enforcement, thus facilitating further law enforcement contact. When an individual's active status is set to expire soon, the WPD instructs its officers to go through Facebook and other social media platforms, often through covert accounts,[35] to look for evidence that could justify maintaining that individual on "active" status:

> If you haven't found anything that will start their time over, look at their Facebook. This is especially important if they will go inactive before the next audit. Typically we will view Facebook and gather intelligence regularly during the year, it is not a large part of the audit. Only go to Facebook if you don't have anything else, otherwise you will be very slow.[36]

In a deposition, Lieutenant Beard specifies that officers may look at photographs on social media for evidence that an individual has a new tattoo and that this would meet the criteria to start the three-year clock over.[37] Thus, WPD officers are instructed to attempt to keep individuals on

---

[32] SOP for Entries into the Gang Database, under "Flagging in the WPD Gang Database."
[33] "Deposition of Chad Beard," December 19, 2022, p. 154.
[34] "Deposition of Chad Beard," December 19, 2022, p. 220-221.
[35] "Deposition of Chad Beard," December 19, 2022, p. 143.
[36] SOP for Entries into the Gang Database, under "Flagging in the WPD Gang Database."
[37] "Deposition of Chad Beard," December 19, 2022, p. 152.

the Gang List and tagged as active even in cases where officers have not had problematic contact with the individuals or received reports about the individuals engaging in gang activity. This practice is likely to result in the inaccurate tagging of individuals as "active" who may no longer be involved in gangs (if they ever were).

## 4.3 Basis of Opinion 3

## Evidence that Inclusion on a Gang List Has Negative Consequences

Placement on a gang list can have profound and lasting effects, including but not limited to: enhanced bail,[38] longer periods of incarceration,[39] more restrictive probation and parole requirements,[40] limited access to jobs or housing,[41] reduced participation in community and family life,[42] disrupted educational opportunities,[43] and narrowed options for immigration relief.[44] These effects can come both from established processes that explicitly exclude gang members or associates from access to institutions or benefits (such as background checks for immigration status changes) as well as from more informal effects, namely the stigma attached to being an alleged gang member or associate.

Where there is no compulsory notification for adults who are added to a gang list and no standardized policy for appeal and removal, and where it is relatively easy for officers to renew an individual's active status, individuals may remain on a gang list for decades, sometimes without their knowledge, suffering negative effects as a result. Individuals may only discover that they are on a gang list once significant consequences occur. For example, in my own research, I encountered a Latino man in his 20s who did not know he had been designated as a gang member and added to a gang database until, after suffering a gunshot wound, he was denied victim's compensation as a result of his designation. This same issue plagues the WPD's current Gang List policy and practice.

Placement on a gang list can make individuals more vulnerable to pretextual stops, surveillance, and increasingly volatile interactions with law enforcement. When an officer runs the

---

[38] See generally, K. Babe Howell. 2019. "Fear Itself: The Impact of Allegations of Gang Affiliation on PreTrial Detention." *St. Thomas Law Review* 23(4):620-660.

[39] See generally, Rebecca J. Marston. 2019. "Guilt by Alt-Association: A Review of Enhanced Punishment for Suspected Gang Members." *University of Michigan Journal of Law Reform* 52:923-935.

[40] For a discussion of "gang conditions" see "Deposition of Sage Hemmert," December 7, 2022, p. 85-86.

[41] See generally, Jasmine Johnson. 2020. "Gang Databases: Race and the Constitutional Failures of Contemporary Gang Policing in New York City." *St. John's Law Review* 94(4):1033-1060; City of Chicago Office of Inspector General. 2019. *Review of The Chicago Police Department's "Gang Database,"* p. 29-30.

[42] See generally, Ana Muñiz. 2015. *Police, Power, and the Production of Racial Boundaries*. New Brunswick: Rutgers University Press.

[43] See generally, James B. Jacobs. 2009. "Gang databases: Context and Questions." *Criminology and Public Policy* 8(4):705-710.

[44] See generally, Sean Garcia-Leys, Meigan Thompson, and Christyn Richardson. Mislabeled: Allegations of Gang Membership and Their Immigration Consequences. Irvine: University of California Irvine School of Law, p. 1.

license plate or identification of an individual on the Gang List, they receive an alert (for the WPD, this is a "Signal 33") notifying the officer that the individual is a designated gang member or associate.[45] Previous research has found that police officers in gang units tend to approach alleged gang members in an aggressive, dehumanizing, and combative manner.[46] An officer's prior knowledge that they are approaching someone listed on the gang database may escalate the encounter. Even if the encounter with police is not volatile, the person subjected to an unjustified stop may find it humiliating and degrading.

Gang designation can transform mundane and necessary daily tasks into acts of risk-taking that cause psychological distress. I have found that gang-designated individuals are reluctant to engage in common behaviors like going to the grocery store. Gang designation also disrupts community and family relationships that may be a key source of material and social support, particularly in resource-deprived low-income communities.

Gang designation also disrupts an individual's right to access public space. Because alleged gang members and associates are subject to enhanced law enforcement surveillance in public spaces, I have found that gang designation pushes people into private spaces, such as private residences, in an attempt to avoid law enforcement harassment and unwitting engagement in innocuous behaviors that police officers may consider indicative of gang involvement (for example, socializing with others whom the individual may or may not be aware are considered by law enforcement to be gang members or associates). Consequently, gang-designated individuals become subject to de-facto house arrest and are often precluded from important community events, family gatherings, and funerals.

The negative consequences of being on a gang list are more widespread if the information is shared with other law enforcement agencies and non-law enforcement entities. Information can be shared regularly through interoperable databases and information-sharing agreements as well as through ad-hoc task forces and joint enforcement operations. When information is shared with other municipal and state law enforcement agencies, the negative consequences outlined throughout this opinion follow alleged gang members and associates to other jurisdictions. The WPD does appear to share information with external agencies, including but not limited to the Kansas Bureau of Investigation ("KBI"); Kansas Department of Corrections ("KDOC"); Sedgwick County Sheriff's Office; Sedgwick County District Attorney's Office; Sedgwick County Department of Corrections; Wichita Unified School District 259 ("USD 259"); Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"); Federal Bureau of Investigations ("FBI"); United States Marshals Service; U.S. Immigrations and Customs Enforcement ("ICE"); U.S. Attorney's Office ("USAO"); Texas Department of Criminal Justice; Oklahoma City Police Department; St. George, Utah Police Department, and numerous other county and municipal law enforcement

---

[45] "Deposition of Kevin McKenna," December 1, 2022, p. 100-102.

[46] K. Babe Howell. 2019. "Prosecutorial Misconduct: Mass Gang Indictments and Inflammatory Statements." Penn State Dickinson Law Review 123(3):691-712, p. 709.

agencies throughout Kansas.[47] Sharing information from the WPD Gang List with federal immigration agencies may result in denial of affirmative status changes, detention, solitary confinement in detention, and expedited deportation.[48] The sharing of WPD Gang List information with other state and federal agencies that conduct background checks can compromise an individual's employment and housing prospects. This is particularly concerning since employment opportunities and family relationships are key factors that experts cite as most helpful in facilitating a gang-involved individual's exit from a gang.[49]

The effects of placement on a gang list continue into the arrest, adjudication, sentencing, incarceration, and post-incarceration stages. Designation as a gang member or associate on the WPD Gang List can result in a bond of $50,000 or more.[50] Speaking to the practice of pre-trial incarceration as a result of gang designation, respected legal scholar K. Babe Howell notes: "The practice of requesting bail based on an allegation that a defendant is affiliated with a gang is deeply problematic for several reasons[,]" including the fact that "information underlying this claim is based on law enforcement gang databases which include non-gang members and are compiled without any requirement of criminal conduct or actual gang membership […]" and "imposing high bail leading to pre-trial detention exacerbates existing racial disparities in the criminal justice system because the gang label is affixed predominantly to young men of color […]"[51] Furthermore, there is evidence that excessive bail leading to pre-trial incarceration pressures defendants to accept plea deals in which they plead guilty in order to obtain release, furthering their entrenchment in the criminal justice system.[52]

Upon conviction, gang-designated individuals may be subject to gang enhancements, which can result in ten additional years of incarceration.[53] In carceral settings, gang-designated individuals are more likely to be placed in solitary confinement.[54] Upon release, formerly

---

[47] *See, e.g.*, WICHITA 080167–68 (ATF); WICHITA 080311–13 (Sedgwick County Division of Corrections); WICHITA 080625 (Sedgwick County Department of Corrections); WICHITA 093274 (FBI); WICHITA 095378 (Sedgwick County District Attorney's Office); WICHITA 097702 (USD 259); WICHITA 098116 (U.S. Marshals Service); WICHITA 101434 (USAO); WICHITA 101684 (FBI); WICHITA 104645 (Sedgwick County Department of Corrections); WICHITA 105928–29 (Sedgwick County Sheriff's Office); WICHITA 106040 (Texas Department of Criminal Justice); WICHITA 108633–34 (ICE); WICHITA 110034–35 (KDOC); WICHITA 110994–96 (Oklahoma City Police Department); WICHITA 108529–31 (St. George Police Department) WICHITA 080535 (KBI and others).

[48] See generally, Ana Muñiz. 2022. "Gang Phantasmagoria: How Racialized Gang Allegations Haunt Immigration Legal Work." *Critical Criminology* 30:159-175.

[49] David C. Pyrooz and Scott H. Decker. 2011. "Motives and Methods for Leaving the Gang: Understanding the Process of Gang Desistance." *Journal of Criminal Justice* 39:417-425, p. 421-422.

[50] Gang Intelligence Study Guide under "When do I include the 'Gang Phraseology' in my arrest affidavit?"; *see also* WICHITA 120587–89.

[51] Howell,  "Fear Itself", p. 621.

[52] Howell, "Fear Itself, p. 623.

[53] Erin R. Yoshino. 2008. "California's Criminal Gang Enhancements: Lessons from Interviews with Practitioners." *Southern California Review of Law and Social Justice* 18:117-152.

[54] David Lovell, Rebecca Tublitz, Keramet Reiter, Kelsi Chesnut, and Natalie Pifer. 2020. "Opening the Black Box of Solitary Confinement Through Researcher-Practitioner Collaboration: A Longitudinal Analysis of Prisoner and Solitary Populations in Washington state, 2002–2017." *Justice Quarterly* 37(7):1303-1321, p. 1316.

incarcerated individuals with gang designations have to contend with the stigma of both their gang designation and their status as formerly incarcerated. WPD procedures provide that when an individual on the Gang List is incarcerated, the three-year flagging period starts over, seemingly without regard for whether the individual was actually incarcerated for a gang-related crime or engaged in gang activity while incarcerated.[55] Placement on a gang list inhibits post-incarceration reintegration by restricting employment opportunities, marking formerly incarcerated alleged gang members and associates with a stigmatized status, and increasing vulnerability to law enforcement surveillance and consequently, re-incarceration.

The Sedgwick County probation gang conditions are particularly egregious. Under these conditions, certain individuals on probation or parole who are on the Gang List can be banished from "mapping zones" during certain hours.[56] Besides the geographical banishment, the gang conditions are quite severe and include prohibitions against riding in a car with more than one person (with exceptions for parents, siblings, and children), and prohibitions against possessing sharp instruments or bats. As exemplified in Exhibit 30 to the deposition of Lieutenant Chad Beard, the excluded areas can be quite large.[57] The gang conditions and mapping zone exclusions function similarly to civil gang injunctions wherein named defendants alleged to be gang members are restricted from entering certain geographic areas and have their activities restricted in the form of curfews, prohibitions against public gatherings, and other limitations.

I found that similar gang restrictions caused significant damage to communities and individuals in Los Angeles. For example, a community member in South Los Angeles commented on curfews, geographical restrictions, and prohibitions on public association:

> Many youngsters have been chased out of the community and city. They have to be more alone and get by themselves because they are arrested with family or in groups. They have had to move away. I see a lot of people in my community harassed […] People get violated or pulled over on their way to work and get there late, get in trouble or fired. Police mess with people that are not gang involved but they throw in the towel after so much harassment and say, "Well I might as well represent if I'm going to get treated like it." […] People can't keep jobs. It doesn't look good to employers or professors when you have that kind of contact with the system.[58]

Other residents asserted that they could not ride with their friends in the same car to go to the store, could not have Thanksgiving dinner with family, or pick up their children from school without being questioned or cited by police.[59]

---

[55] "SOP for Entries into the Gang Database," under "Flagging in the WPD Gang Database."
[56] Chad Beard Deposition Exhibits 29 and 30.
[57] Excluded areas include the "North Mapping Zone" and "South Mapping Zone."
[58] Muñiz, *Police, Power, and the Production of Racial Boundaries*, p. 88.
[59] Muñiz, *Police, Power, and the Production of Racial Boundaries*, p. 90-91.

In areas with gang conditions, it is common for teachers to send students home in staggered waves to avoid violating prohibitions on association.[60] Throughout my research, I have found that youth of color in heavily policed neighborhoods agonized over the uncertainty as to whether they had been labeled and the consequences for those around them. They worried they had been designated, that they could pass the designation on to family or friends, and they panicked about immigration applications and job opportunities falling through.

### 4.4 Basis of Opinion 4

### Evidence that Gang Designations Are Racially Biased

My research and other research have repeatedly found that gang profiling is highly racialized. The overwhelming majority of people listed on gang databases are Black and/or Latino and live in low-income neighborhoods.[61] The geographic areas that police target disproportionately for gang policing overlay and reinforce longstanding patterns of racial and socioeconomic segregation.

While the criteria used by the WPD for designating individuals as gang members or associates are so broad as to encompass a large range of people, they do not affect all people equally. The WPD's demographic data demonstrates that the WPD disproportionately designates Black men as gang members and associates. While Black people constitute 10.9% of the greater Wichita area, 60% percent of people on the Gang List are Black. The disproportionate number of Black people on the Gang List occurs even in areas of Wichita where the Black community is in the minority; for instance, according to the WPD's own demographic data, the Wichita 67220 zip code is only about 25% Black, but over 83% (203 out of a total of 243) of people on the Gang List from that zip code are Black[62].

Gang enforcement efforts frequently target racial minority groups while overlooking other dangerous groups with similar characteristics such as white supremacist groups or law

---

[60] Muñiz, *Police, Power, and the Production of Racial Boundaries*, p. 90.

[61] See generally, Ana Muñiz. 2015. *Police, Power, and the Production of Racial Boundaries*. New Brunswick: Rutgers University Press; Ana Muñiz. 2022. *Borderland Circuitry: Immigration Surveillance in the United States and Beyond*. Berkeley: University of California Press; Jasmine Johnson. 2020. "Gang Databases: Race and the Constitutional Failures of Contemporary Gang Policing in New York City." *St. John's Law Review* 94(4):1033-1060; Rebecca A. Hufstader. 2015. "Immigration Reliance on Gang Databases: Unchecked Discretion and Undesirable Consequences." *New York University Law Review* 90:671-709. In Chicago, 95% of individuals designated as gang members during identified as Black, African American, and Latinx. See City of Chicago Office of Inspector General. "*Review of The Chicago Police Department's Gang Database*," p. 4; Danny McDonald, "Concerned Over Bias, Boston Councilors Want to Probe City's Gang Database." *The Boston Globe* November 4, 2020; An 2015 audit found that 85.4% of people in the CalGang Database were Black and Latino, see California State Auditor, The CalGang Criminal Intelligence System, p. 12.

[62] Analysis of data compiled in WICHITA 47401-443.

enforcement gangs.[63] This racial disproportionality is the result of the breadth and vagueness of gang designation criteria combined with implicit racial bias wherein Black people and other racial minorities are assumed to be more violent and criminally inclined. Implicit bias is demonstrably widespread throughout American society and is amplified within police departments.[64]

Consequently, law enforcement officers can use gang allegations against Black people and other racial minorities as a way to facilitate enhanced surveillance and punishment when there is not enough evidence to actually charge them with a crime. In this way, gang profiling is racially coded and serves as a legalized form of racial profiling. This pattern reaches its most extreme form in, for example, attempts by the Salt Lake District Attorney to charge Black Lives Matter protesters as gang members in 2020, and Phoenix authorities' designation of Black Lives Matter protesters as gang members in 2021 under the rationalization that protesters wore the same color (black t-shirts), shouted the same slogans, and associated in a group of more than three people.[65]

Gang designation is so grounded in racial bias that even police officers of color alter their behavior to avoid being targeted. Former WPD Deputy Chief Wanda Parker-Givens, for example, states that because she is African American and because she has family in certain geographical areas, she is at risk for meeting the criteria for gang association. Deputy Chief Parker-Givens has gone so far as to avoid seeing her own family, a difficult choice faced by people—particularly non-white people—who live in neighborhoods police deem to be "gang areas."[66] Specifically, Deputy Chief Parker-Givens states in a deposition: "I've never been to my niece's house, my nephew's house and they are grown. They are 30's, late 20's, no, and they have never been to my house."[67]

The significant negative consequences of placement on the WPD's Gang List combined with the racial disproportionality in the makeup of the Gang List places an unequal burden on Black people and other people of color. The ambiguity around gang designation (i.e. the vague and overbroad criteria, uncertainty as to who has been designated due to lack of notification, and the association provision) means that entire geographic and racial communities, not just people on the Gang List, can feel the effects of racialized designation. Community antagonism against the police, as a result of perceived racism in police practices, can undermine public safety by causing

---

[63] Jordan B. Woods. 2012. "Systemic Racial Bias and RICO's Application to Criminal Street and Prison Gangs." *Michigan Journal of Race & Law* 17:303-358; Shannon E. Reid and Matthew Valasik. 2020. *Alt-Right Gangs: A Hazy Shade of White*. Berkeley: University of California Press.

[64] L. Song Richardson. 2017. "Implicit Racial Bias and Racial Anxiety: Implications for Stops and Frisks." *Ohio State Journal of Criminal Law* 15(1):73-88; L. Song Richardson. 2015. "Police Racial Violence: Lessons from Social Psychology." *Fordham Law Review* 83(6):2961-2976.

[65] Lindsay Whitehurst. "Utah Protesters Face Charges with Potential Life Sentence." *The Washington Post* August 6, 2020; Dave Biscobing. "'Prime for Abuse': Lack of Oversight Lets Phoenix Police Add Protesters to Gang Database." *ABC15 Arizona* May 24, 2021.

[66] "Deposition of Wanda Parker-Givens," October 12, 2022, p. 58-59, 62-63.

[67] "Deposition of Wanda Parker-Givens," October 12, 2022, p. 63.

residents to be less willing to approach the police for assistance and cooperate with police on investigations.[68]

## 5 Summary and Conclusion

**Based on my own research, my extensive knowledge of research in this field, and my review of the documents available in this case, it is my opinion that the gang designation process employed by the WPD is vague and overbroad and consequently, leads to unjustifiable and racially biased designation practices. The WPD's Gang List is largely absent of oversight and accountability mechanisms and has significant negative consequences for those listed on it as gang members and associates.**

I reserve the right to amend this report if additional information becomes available to me.

_____                DATE:_April 28, 2023

Ana Muñiz, Ph.D.

---

[68] Susan McNeeley and Garrett Grothoff. 2016. "A Multilevel Examination of the Relationship Between Racial Tension and Attitudes Toward the Police." *American Journal of Criminal Justice* 41:383–401, p. 387; Rod K. Brunson. 2007. "'Police Don't Like Black People': African-American Young Men's Accumulated Police Experiences. *Criminology & Public Policy* 6(1):71-101, p. 92-93; Kristina Murphy and Adrian Cherney. 2012. "Understanding Cooperation with Police in a Diverse Society." *British Journal of Criminology* 52:181-201, p. 181-183.