**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

PROGENY, a program of Destination
Innovations, Inc., CHRISTOPHER COOPER,
ELBERT COSTELLO, MARTEL
COSTELLO, and JEREMY LEVY, JR., on
behalf of themselves and others similarly
situated,

|  |  |  |
|---|---|---|
| | *Plaintiffs*, | Case No. 6:21-cv-01100-EFM-ADM |

v.

CITY OF WICHITA, KANSAS,

|  |  |
|---|---|
| | *Defendant*. |

---

**JOINT MOTION FOR FINAL APPROVAL OF
<u>CLASS ACTION SETTLEMENT AND MEMORANDUM OF LAW IN SUPPORT</u>**

Plaintiffs Progeny, Christopher Cooper, Elbert Costello, Martel Costello, and Jeremy Levy, Jr. and Defendant the City of Wichita, Kansas ("the City") jointly seek final approval of their Settlement Agreement. Since the Court granted preliminary approval on May 17, 2024, the Parties have worked diligently to implement the Notice Plan and finalize the details of the settlement. The Court should now grant full and final approval of this class action settlement.

## INTRODUCTION

For more than three years, the Parties have vigorously litigated the constitutionality of K.S.A. § 21-6313 *et seq.* and the Wichita Police Department's ("WPD") policies and practices that implement K.S.A. § 21-6313 *et seq.*, including through the use of a database and/or list of individuals the WPD has designated as gang members or associates (the "Gang Database" or "Gang List"). Plaintiffs assert that the Gang List/Database and other policies and practices memorialized in WPD Policy 527 violate the Class's First and Fourteenth Amendment rights to procedural due process and freedom of expression and association. Doc. 1. This settlement provides a complete, class-wide resolution to that dispute. The Settlement Agreement represents substantial, enforceable commitments by the City to remedy the issues that Plaintiffs filed suit to address.

## STATEMENT OF FACTS

### I.    Litigation Background

The Court is familiar with the history of this suit, thus the Parties will not recount that history here. The Parties' pre-suit investigation, vigorous motions practice, discovery efforts (including production of nearly 140,000 documents and 25 depositions), and extensive negotiations with two mediators over 18 months during this suit's 3.5-year lifespan are discussed in the Joint Motion for Preliminary Approval. Doc. 254 at 2–4; *see also* Decl. of Kunyu Ching in

Supp. of Joint Mot. for Final Approval ("Ching Decl.") ¶¶ 3-5.

## II.    Summary of the Proposed Settlement

The Settlement Agreement resolves all claims brought on behalf of the Class in exchange for detailed actions to be taken by the City. Ex. A, Part XVI. The Agreement preserves Plaintiffs' right to facially challenge the constitutionality of K.S.A. § 21-6313 *et seq.* against other entities. *Id.* ¶ 5; *see also id.* Part XIII. The Agreement contemplates dismissal of the pending claims with the Court retaining jurisdiction for purposes of enforcing the Agreement's terms and conformance with Rules 23(e), 41(a), and 65(d). *See id.* Part XVI–XVII.

The Settlement Agreement addresses the issues raised in the Complaint by obligating the City to implement revisions to existing WPD policies and practices and to enact new policies and practices that:

(1) narrow and clarify the criteria the WPD can use to add a person to the Gang List/Database, *see id.* Part II, ¶¶ 1–2;

(2) provide procedures for juveniles who meet the revised criteria for inclusion to avoid inclusion through negotiated intervention agreements, *id.* Part II, ¶ 3;

(3) reduce the minimum number of years a gang designee must remain on the Gang List/Database from three (3) to two (2), *id.* Part I;

(4) eliminate the "inactive" and "associate" categories from the Gang List/Database and remove all individuals presently so designated from the List/Database, *id.* Part VIII;

(5) require notice to all future gang designees of their designation, the basis therefor, and procedures to review and/or appeal such designation, *id.* Part III;

(6) establish procedures for gang designees to review the supporting documentation and/or appeal their designations, *id.* Parts IV–VI;

(7) prescribe steps to be taken promptly and annually thereafter to audit the Gang List/Database for consistency with revised policies and practices, and publish results thereof, *id.* Part VII; and

(8) train WPD personally on the revised policies and practices, *id.* Part IX.

In addition, the Settlement Agreement provides for the immediate review of the named Plaintiffs' gang designations consistent with the revised criteria, a biannual review of the City's actions to implement the Settlement Agreement's terms by a jointly selected Special Master for a period of three years, and the payment of an agreed sum for attorneys' fees and costs incurred in prosecuting this action. *See id.* Parts X–XII.

Pursuant to the Settlement Agreement, the City will revise Policy 527, which prescribes the process for listing and maintaining individuals as gang designees on the Gang List/Database and incorporates the criteria set forth in K.S.A. § 21-6313(b) for designation. The revised policy continues to require an individual to either self-admit to gang membership or meet at least three enumerated criteria to be included in the Gang List/Database. Unlike the existing policy, however, the revised policy will require that any nomination due to self-admission be supported by a signed, sworn affidavit from the nominating official. *Id.* Part II.1.a. In particular, the specific policy reforms regarding the application of the statutory criteria are summarized as follows:

| Previous criteria<br>Per K.S.A. § 21-6313(b)(2) | Revised criteria<br>Per Settlement Agreement Part II.2 |
|---|---|
| (A) Is identified as a criminal street gang member by a parent or guardian; | a. A parent or guardian provides a documented statement to Sedgwick County or City of Wichita law enforcement personnel that the person is 13 years of age or older and is a member of a particularly named criminal street gang. |
| (B) is identified as a criminal street gang member by a state, county or city law enforcement officer or correctional officer or documented reliable informant; | b. The person is identified as a criminal street gang member by a federal, state, county, or city law enforcement officer or correctional officer or documented reliable informant and such identification is corroborated by independent information. For purposes of this criteria, "independent information" must concern activity within 3 years prior to the individual's nomination to the Gang Database, and must be of the type described in criteria (a) or (c)-(g) of this Policy. The same information may not be used to satisfy more than one criteria for inclusion in the WPD Gang Database. |

3

| | |
|---|---|
| (C) is identified as a criminal street gang member by an informant of previously untested reliability and such identification is corroborated by independent information; | [This provision is eliminated] |
| (D) frequents a particular criminal street gang's area; | c. The person is observed in a business or residence two or more times in six months that has a prior documented pattern of gang violence or activity, and there is no good faith basis for the person to be at that business or residence, such as to purchase goods or services, attend school, for employment purposes, or to participate in recreational activities, unless such activities are organized for the purpose of engaging in criminal street gang activity; |
| (E) adopts such gang's style of dress, color, use of hand signs or tattoos; | d. The person adopts two or more of the following as observed in person by a Sedgwick County or City of Wichita law enforcement officer, or as documented by physical evidence including but not limited to photographs, social media posts, or other documents: (1) a particular color of attire, (2) attire with gang insignia, (3) the use of hand signs, or (4) particular tattoos, and the nominating officer can articulate a reasonable basis for the belief that the particular display is associated with membership in a criminal street gang; |
| (F) associates with known criminal street gang members; | [This provision is eliminated] |
| (G) has been arrested more than once in the company of identified criminal street gang members for offenses which are consistent with usual criminal street gang activity; | e. The person has been arrested more than once in the company of individuals presently listed as criminal street gang members in the WPD Gang Database; |
| (H) is identified as a criminal street gang member by physical evidence including, but not limited to, photographs or other documentation; | [This provision is eliminated] |
| (I) has been stopped in the company of known criminal street gang members two or more times; | g. The person has been observed in the company of known criminal street gang members two or more times while participating in criminal street gang activity. The observing Sedgwick County or City of Wichita officer must articulate a reasonable basis for their belief that each the person was observed participating in criminal street gang activity. There is a presumption that presence at or engagement in the following activities does not constitute criminal street gang activity for purposes of this criteria: funerals, |

|  | weddings, family celebrations, large public gatherings for entertainment purposes, educational functions, and religious or political gatherings. |
|---|---|
| (J) has participated in or undergone activities self-identified or identified by a reliable informant as a criminal street gang initiation ritual; | f. The person has participated in or undergone activities self-identified or identified by a reliable informant to be part of a gang initiation ritual; |

These revisions are intended to clarify the types of conduct that may result in gang designation so that citizens may reasonably anticipate and avoid designation (or in the case of individuals already designated, avoid renewal). The revisions are also intended to tie gang designations more closely to criminal activity, reduce the possibility of designation due to constitutionally protected expressive and associative conduct, and focus the use of the Gang List/Database on conduct implicating public safety. The Settlement Agreement further provides for elimination of the "inactive" and "associate" categories from the Gang List/Database, and that all individuals currently identified as "inactive" or "associates" will be removed from the database within 90 days of the Agreement's effective date. *See id.* Part VIII. Collectively, these provisions directly address the vagueness, overbreadth, and First Amendment concerns underlying Plaintiffs' claims on behalf of the class.

Further policy revisions set forth in the Settlement Agreement establish procedures providing individuals included in the Gang List/Database with notice of and an opportunity to challenge such inclusion. *See id.* Part III–V. Under Part III, each individual added to the Gang List/Database (or if a minor, the parent or guardian of such individual) will be informed of their inclusion, the criteria used for the designation and any renewals, the date(s) of initial identification and any renewals, a copy of Policy 527 (as revised), instructions for reviewing supporting documentation, instructions and forms for appealing designation, and gang prevention literature. *See id.* Part III. For adults, this information will be provided via written notification to their last

known address. *Id.* Part III.2. For minors, a WPD Gang/Felony Assault Section supervisor will attempt to contact the minor's parent or guardian directly. *Id.* Part III.1. The WPD shall document all efforts to provide notice to or regarding designated individuals.

Under the Settlement Agreement, any individual (and the parent or guardian of a minor) will have the opportunity to review their own status in the Gang List/Database. *See* Doc. 254-1, Part IV.1. The Agreement sets forth detailed procedures for requesting such review, including an initial template review request form for citizens to submit. *Id.* Part IV.2, App'x B. The WPD shall provide a written response within 30 days of receipt of the request. For designated individuals, the response shall include the criteria used for the designation and any renewals, the date(s) of initial identification and any renewals, a copy of Policy 527 (as revised), instructions for reviewing supporting documentation, instructions and forms for appealing designation, and gang prevention literature. *See id.* Part IV.4–6. Any individual included in the Gang List/Database may also request to review WPD documentation supporting their inclusion. *See id.* Part IV.7–9.

The Settlement Agreement additionally provides each designated individual with an opportunity to appeal their inclusion in the Gang List/Database once every 18 months. *See* Doc. 254-1, Part V. A Gang Review Ombudsperson ("GRO") shall review any information submitted by the listed individual seeking removal from the Gang List/Database and WPD documentation supporting designation, and then issue a written decision. *Id.* Part V.1, 5–11. The Settlement Agreement sets forth detailed eligibility requirements for GROs, each of whom will serve a two-year term. The Parties shall agree upon the first GRO, and the Wichita City Council shall select all subsequent GROs. *Id.* Part V.2–4, Part VI. In addition to the notification and gang status review communications described above, instructions and forms for appealing Gang List/Database inclusion will be posted on the WPD website. *Id.* Part V.4, 13, *see also id.* App'x A. Collectively,

the notification, review, and appeal procedures directly address the procedural due process concerns underlying Plaintiffs' claims on behalf of the Class.

The Settlement Agreement provides for a three-year period of oversight by Special Master Judge Paul Gurney, who mediated the Parties' final settlement meeting and assisted in finalizing the settlement terms. Ex. A, Part XI. Every six months, Special Master Gurney will review extensive documentation bearing on the City's continued compliance with the Agreement. *Id.* Part XI.2–7. Special Master Gurney will report the results of his review, including any compliance deficiencies, to the Parties, who shall meet with the Special Master to discuss any corrective action plan needed to remedy any deficiencies. *See id.* Part XI.10. In the event that the Parties cannot agree on a sufficient corrective action plan, Plaintiffs may elect to pursue enforcement of the Settlement Agreement with the Court. *See id.* Part XI.13.

Last, the Settlement Agreement provides that the City will pay Plaintiffs' counsel $550,000 in attorneys' fees and costs. *See id.* Part XII. This sum is significantly less than the fees and costs incurred over the three-plus years that Plaintiffs have litigated this case—which, at the time of the final mediation in March 2024, exceeded $2.5 million. Ching Decl. ¶ 10. In the interest of resolving this matter favorably for the Parties, including all Class members, a conservative estimated minimum of 1,250 hours spent by Plaintiffs' counsel on this matter have been considered *pro bono publico*. These fees and costs have only increased since that time, including the cost of the March 2024 mediation and hours simultaneously spent on trial preparation efforts, plus hours and costs incurred seeking preliminary and final approval, finalizing settlement details, and providing adequate notice to the Class. *Id.*

## III.    Preliminary Approval and Class Notice

The Parties sought preliminary approval of the Settlement Agreement on May 9, 2024,

which the Court granted on May 17, 2024. Docs. 254, 256. In its order, the Court approved both the form and manner of the Parties' proposed notice of settlement ("the Notice Plan"). Doc. 256 at 7–10. The Parties have now fully implemented the Notice Plan. Docs. 258, 259, 260. The Notice, the Settlement Agreement, and other case information were made available on the ACLU of Kansas, Kansas Appleseed, Progeny, and City of Wichita websites. Plaintiffs have also (1) mailed the Notice to incarcerated Class members; (2) posted about the settlement on social media; (3) published the Notice in local newspapers; (4) posted the Notice in public spaces throughout Wichita; and (5) successfully obtained government agency and bar association cooperation in circulating the Notice. Ching Decl. ¶¶ 12-23. Plaintiffs also went beyond the requirements of the Notice Plan by: (6) posting the Notice in additional public spaces not specified in the Court's order; (7) issuing a press release; (8) purchasing Google ads; (9) running radio ads, and (10) purchasing digital ads on local media websites. *Id.*

These notification efforts proved successful. The press release and settlement information on the ACLU of Kansas website received 2,902 and 2,662 views, respectively. *Id.* ¶¶ 12-13. As of July 31, 2024, the ACLU of Kansas's Facebook posts had been viewed 42,455 times and received 1,687 clicks , and its Google ad was viewed 6,500 times and received 130 clicks. *Id.* ¶¶ 14, 20. Prior to and through July 27, 2024, Class Counsel received comments from 19 affected individuals (attached as **Exhibit B**). *Id.* ¶ 24. Prior to and through August 2, 2024, Class Counsel received requests to appear at the final approval hearing from the following individuals: Marquetta Atkins-Woods, Sherida Price, Amoneo Gutierrez, Heidi Louis, Steven Louis, Caesar Louis, Jamion Wimbley, and Silky Dempsey. *Id.* ¶ 25; Ex. B at 1, 38, 40, 56; Ex. C.

## IV.    Objections to the Settlement Agreement

Of the 19 individuals who submitted comments, only seven appear to outright object. Ex.

B at 1, 31, 34–37, 38–39, 44–46, 57.

*Sherida Price*.  On June 10, 2024, Ms. Price submitted her opposition based on "the impact [the Gang List] has had on [her] life, my family members['] lives, and others." *Id.* at 1. She "was associated with gang members" in 2014 and has faced ongoing harassment by law enforcement as a result. *Id.* at 1–12.

*Harvey Lee Ross*. On July 1, 2024, Mr. Ross mailed his statement, which does not expressly state that he opposes the Settlement Agreement but suggests that "[t]here needs to be more demand[ed] in the Settlement." *Id.* at 31. He requests "to be removed completely from the Gang file," "for WPD to admit they violated [his] Constitutional Rights," and "an apology." *Id.*

*Heidi Louis*. On July 17, 2024, Ms. Louis, who is not a Class member, submitted her objection stating the settlement is "woefully inadequate in what it demands from Wichita and the WPD." *Id.* at 38. She explains that because of a Wichita Eagle article, her husband "is forever labeled a dangerous gang member which carries all kinds of connotations and very real consequences," including straining her family relationships and threatening her career. *Id.* at 38–39. Ms. Louis identifies two perceived shortcomings of the settlement. First, she asserts that her husband cannot challenge his gang designation "while incarcerated" but instead must rely on his attorney, a process she considers "unethical and a gatekeep to justice." *Id.* at 39. Second, she asserts that "the mere payment of court costs" and "an inadequate rewrite of an inherently racist and prejudicial policy . . . is nothing more than a slap on the wrist." *Id.*

*Steven Louis*.  On July 8, 2024, through his wife Heidi Louis, Steven Louis submitted his objection. He opposes the settlement because "[t]he city's only consequence is having to pay legal funds of $550,000, which is paltry when compared to the amount of money that individuals have spent in defending themselves against charges stemming from inclusion in the gang database." *Id.*

at 35. He argues "[t]he entire gang list should be nullified rather than just augmented." *Id.* at 37.

*Caesar Louis*.   On July 17, 2024, through his sister-in-law Heidi Louis, Caesar Louis submitted his objection, stating "I don't think what the ACLU is asking for from the WPD is enough." *Id.*  at 38. Specifically, Mr. Louis argues that the Settlement Agreement should provide retroactive relief for those impacted by the Gang List. *Id.*

*Ryan McDougle*. Mr. McDougle submitted statements on July 15 and 23, 2024, which do not expressly state that he opposes the Settlement Agreement. *Id.* at 44–46. He believes the Court should "hear more evidence from the gang members of what has and still goes on today with out being retaliated against" and that "gang members according to the degree of discrimination each individual went through should be compensated." *Id.*

*Stacy Henderson and Jorge Romero*.   On July 27, 2024, Stacy Henderson and Jorge Ramero submitted a joint objection, stating: "I object to the settlement for one big factor and that the city is not taking ownership and admitting they did anything wrong." *Id.* at 57.

## **ARGUMENT**

As a matter of public policy, the law favors and encourages settlements. *Amoco Prod. Co. v. Fed. Power Comm'n*, 465 F.2d 1350, 1354–55 (10th Cir. 1972). This is particularly true in the context of class actions and other complex cases, where substantial judicial resources can be conserved by avoiding protracted litigation. *See, e.g.*, *Geiger v. Sisters of Charity of Leavenworth Health Sys., Inc.*, No. 14-2378, 2015 WL 4523806, at *2 (D. Kan. July 27, 2015).

**I.    The Court's Order Granting Class Certification Should Not Be Disturbed.**

In its order granting class certification, the Court found that the proposed class satisfied the requirements of numerosity, commonality, typicality, and adequacy and certified the following Rule 23(b)(2) class: "All living persons included in the Wichita Police Department's Gang List or

Gang Database[] as an Active or Inactive Gang Member or Gang Associate." Doc. 212 at 9. The Court further appointed Plaintiffs' counsel as Class Counsel. *Id.* at 17–18. The Parties have negotiated and approved the Settlement Agreement in light of the Court's ruling, and for the purposes of settlement, they agree that the requirements of Rule 23(a) and (b)(2) are met and that certification was proper for all the reasons described in the Court's order.

"Class action settlements are premised upon the validity of the underlying class certification." *In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1261 (10th Cir. 2004). Here, the Court's certification of the above class is valid and should remain in effect for purposes of settlement approval. Since that order issued, there has been no change in circumstance that would alter the Court's thorough and well-reasoned analysis.

## II.     The Notice Plan Effectuated by the Parties is the Best Notice Practicable and was Ultimately Successful.

Rule 23(c)(2) provides "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." These notice requirements are designed to satisfy due process by providing unnamed class members the right to notice of certification and settlement, and a right to be heard. *Tennille v. W. Union Co.*, 785 F.3d 422, 436 (10th Cir. 2015). For each settlement, notice "must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* Class members' procedural rights are satisfied so long as "the best notice practicable under the circumstances [is given] including individual notice to all members who can be identified through reasonable effort." *In re Integra Realty Resources, Inc.*, 262 F.3d 1089, 1110 (10th Cir. 2001).

The Court should find the Parties effectuated notice in the best practicable manner. As the Court already found, the Notice's substance meets Rule 23's requirements. Not only is it written

in "plain, easily understood language" to inform class members of the nature of the action, the class definition, and the claims, but it contains the necessary information to apprise Class members of this suit and their options. Doc. 256 at 7. The Notice provides Class members with instructions on accessing the entirety of the Settlement Agreement, informs them of how to submit comments in support of or in objection to the Settlement Agreement's terms and requests to appear at the final fairness hearing, and specifies the date, time, and place of the final fairness hearing. *Id.*

In addition, the Court should now find that the Notice Plan, which was carried out pursuant to the Court's order, was reasonably calculated to apprise all potential Class members of the settlement. The Parties' notice efforts were extensive and multi-faceted. Following preliminary approval, Class Counsel issued a joint press release announcing the Court's order on May 30, 2024, sharing the class notice, and explaining class members' options. Ching Decl. ¶ 12. This press release was provided to media outlets who previously reported on this case, including the Wichita Eagle, the Kansas Reflector, KWCH, and Unavision. *Id.* That same day, the ACLU of Kansas posted the Long Form Notice, the Settlement Agreement, and other relevant information on its website, and Kansas Appleseed and Progeny followed suit the next day. *Id.* ¶ 13.

On May 31, 2024, the ACLU of Kansas took out a quarter-page print advertisement as well as a digital advertisement for the Wichita Eagle, both consisting of the Short Form Notice. *Id.* ¶ 15. These advertisements ran again on June 16, June 30, and July 14, 2024. *Id.* The ACLU of Kansas also purchased a 30-day digital advertisement consisting of the Short Form Notice on the Wichita Community Voice website beginning on June 1, 2024, as well as printing the Notice in the June 7 and June 21 issues. *Id.*

Throughout the notice period, Plaintiffs published numerous social media posts regarding the Settlement Agreement. *Id.* ¶ 14. The ACLU of Kansas posted six times on its Facebook,

Instagram, Twitter/X, and LinkedIn accounts. *Id.* In addition, Kansas Appleseed posted five times on its Facebook and Instagram accounts and Progeny posted thrice on its Facebook and Instagram accounts. *Id.* Each social media post directed viewers to visit their websites for additional information. In addition, the ACLU of Kansas spent $350 to boost its posts' visibility to Facebook and Instagram users located in the counties comprising the Wichita metropolitan area. *Id.* These social media efforts proved successful, and as of July 31, 2024, the ACLU of Kansas's posts had been viewed 42,455 times and received 1,687 clicks. *Id.*

Plaintiffs ensured that the Notice was displayed in locations across Wichita believed to be frequented by potential Class members. Between June 4 and June 12, 2024, ACLU of Kansas and Kansas Appleseed staff members posted paper copies of the Notice at or near Sedgwick County Juvenile Courthouse, six Wichita Public Library locations, seven Wichita Community and Recreation Centers, two locations in Old Town, Progeny's office, and at a local bar, store, barber shop, and a local boxing club. *Id.* ¶¶ 16, 23. In addition, with the assistance of government agencies, copies of the Short Form Notice were also posted at the Sedgwick County BIDS Office, the Federal Public Defender's office, and Sedgwick County Courthouse courtrooms handling criminal or juvenile matters. *Id.* ¶ 18. KDOC Secretary Zmuda represented that the Notice would be sent to all residents electronically via assigned tablets. *Id.* The Notice was also shared on the Kansas Association of Criminal Defense Lawyers email listserv. *Id.*

Plaintiffs mailed the Long Form Notice, the Settlement Agreement, and other relevant documents to all incarcerated class members whose locations could be ascertained on June 17 and 18, 2024. *Id.* ¶ 19. Notice was sent to 366 Class members identified by the City as incarcerated and whose whereabouts at KDOC, Kansas county, out-of-state, or federal detention facilities could be ascertained after reasonable efforts. *Id.*

Finally, Plaintiffs provided additional notice not required in the Notice Plan. On June 11, 2024, the ACLU of Kansas purchased Google keyword search advertisements informing the public of the settlement. *Id.* ¶ 20. This, too, proved to be an effective way to reach potential Class members: as of July 31, 2024, the ad had been viewed 6,500 times and received 130 clicks. *Id.* Plaintiffs also purchased radio ads to run on three Wichita-area stations and digital banner ads on the KWCH website that ran through the month of July. *Id.* ¶¶ 21-22.

The Court should find that the Notice Plan—which it preliminarily approved, and the Parties more than fully effected—was the best and most practicable plan given the circumstances.

### III.    The Objections to the Settlement are Not Sufficient to Deny Final Approval.

When assessing a settlement, the Court's role "is not to determine whether the proposed settlement has achieved perfection," but rather "is limited to determining whether the Settlement is fair, reasonable, and adequate." *Hapka v. CareCentrix, Inc.*, No. 2:16-CV-02372-KGG, 2018 WL 1871449, at *4 (D. Kan. Feb. 15, 2018). "It is true that something could always be added to every class action settlement to make it more favorable to class members, but that is not the standard by which class action settlements should be measured." *Id.*

Of the more than twenty individuals submitting comments, only seven appeared to object. None of these objections offers *legally* sufficient reasons to deny final approval. For one, none identifies why the proposed settlement is not fair, reasonable, or adequate under the relevant legal standard. *In re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672, 685 (D. Colo. 2014) (overruling objections that do "not explain why the Settlement is unfair or indicate how a better result may have been achieved"). Instead, objectors criticize the Settlement Agreement for not achieving perfection—i.e., not providing their personalized or preferred form of relief. But "[t]he test is whether the settlement is adequate and reasonable and not whether a better settlement is conceivable." *Williams*

*Foods, Inc. v. Eastman Chem. Co.*, No. 99C16680, 2001 WL 1298887, at *2 (D. Kan. Aug. 8, 2001). As discussed below, the extensive policy changes were carefully crafted to address the constitutional violations Plaintiffs raised. *See infra* Section IV. To the extent there are any objections to the City's payment of litigation fees and costs, those objections are that the amount is too low compared to what individual objectors paid to defend their criminal cases, or compared to the extensive havoc that Gang List/Database has wreaked on their lives. It is true that the Settlement Agreement's payment is but a small fraction of Plaintiffs' actual attorneys' fees and costs. However, from its inception, this suit concerned claims for a specific form of equitable relief only; the settlement does not preclude any Class member from suing for money damages or otherwise seeking post-conviction relief.

Ultimately, the objections do not account for the substantial risks associated with proceeding to trial or the likelihood of achieving a better result for the Class. Furthermore, the small number of objectors compared to the size of the class—5,507 individuals as of May 2022, Doc. 234 at 8—weighs in favor of granting final approval. *See, e.g.*, *In re Lifelock, Inc. Marketing and Sales Pracs. Litig.*, No. 08-1977-MHM, 2010 WL 3715138, *6 (D. Ariz. 2010) (relatively few objections and requests for exclusion support approval). The Court should therefore overrule the objections.

## IV.    The Settlement is Fair, Reasonable, and Adequate and Merits Final Approval.

Pursuant to Rule 23(e), any "settlement, compromise or dismissal of certified class claims" requires court approval. *Bailes v. Lineage Logistics, LLC*, No. 15-2457-DDC-TJJ, 2017 WL 4758927, at *2 (D. Kan. Oct. 20, 2017). To approve a settlement, the court must find it to be "fair, reasonable and adequate." Fed. R. Civ. P. 23(e)(2). This determination usually involves a two-step process. In the Tenth Circuit, courts consider the following factors to determine whether a

proposed settlement is fair, reasonable, and adequate:

(1) whether the proposed settlement was fairly and honestly negotiated;

(2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;

(3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and

(4) the judgment of the parties that the settlement is fair and reasonable.

*Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002).

This analysis, however, does not require that courts "conduct a foray into the wilderness in search of evidence that might undermine the conclusion that the settlement is fair." *Gottlieb v. Wiles*, 11 F.3d 1004, 1015 (10th Cir. 1993). Instead, the court "must independently analyze the evidence before it" and "not rely solely upon the assertions of the proponents." *Id.* The settlement's proponents carry the burden of providing sufficient evidence to enable the court to conclude that the settlement is fair. *Id.*

Here, the Court has already preliminarily found the Settlement Agreement to be fair, reasonable, and adequate. Doc. 256. Now, pursuant to Rule 23(e), the Parties respectfully request the Court fully approve the Settlement Agreement and enter the proposed Final Approval Order.

**A. The Settlement Agreement Was Fairly and Honestly Negotiated.**

As the Court has already found, there is "no reason to believe that the parties did not fairly and honestly negotiate the proposed settlement." Doc. 256 at 5. This is because "nothing in the Settlement Agreement, the parties' briefing, or the history of this case suggests impropriety or dishonesty." *Id.* at 6. Nor does the Settlement Agreement "preferentially favor the named Plaintiffs." *Id.* The Court therefore concluded that the Settlement Agreement was "the product of serious, informed, non-collusive negotiations." *Id.* There is no reason to suggest that the Court's findings should be disturbed.

16

As the Parties have argued, their well-informed, serious, non-collusive negotiations weigh in favor of finding that the Settlement Agreement is fair, reasonable, and adequate. *See, e.g.*, *Ogden v. Figgins*, No. 2:16-cv-02268, 2017 WL 5068906, at *2 (D. Kan. Nov. 3, 2017) ("The record demonstrates that the Agreement is the result of cooperative, good-faith, and arms'-length negotiation by skilled counsel who are familiar with litigating civil rights claims. The Agreement was reached following both parties' deliberate consideration of the action's merits and uncertainties and a balancing of Plaintiffs' constitutional rights with Defendant's legitimate security interests in operating the jail."); *In re Toys R Us Antitrust Litig.*, 191 F.R.D. 347, 352 (E.D.N.Y. 2000). This factor weighs in favor of final approval..

## B. Serious Questions of Law and Fact Exist.

"Although it is not the role of the Court at this stage of the litigation [(when seeking settlement approval)] to evaluate the merits, it is clear that the parties could reasonably conclude that there are serious questions of law and fact that exist such that they could significantly impact this case if it were litigated." *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693–94 (D. Colo. 2006) (citation omitted). The same is true here. The Court has already found that "[s]uch questions place the ultimate outcome of the litigation in doubt." Doc. 256 at 6. And while litigating a class action case always carries some risk, here, the Court has already considered the bulk of the parties' evidence and arguments at summary judgment and determined that questions of material fact remain. *See* Doc. 234 at 25–26. Though the Parties believe in the merits of their positions, both acknowledge that the precise factual and legal questions presented here have not been squarely addressed by controlling precedent. *Cf. Ogden*, 2017 WL 5068906, at *2 ("The unresolved nature of this legal issue undermines any certainty regarding the outcome of this litigation."). The exact requirements of the constitutional vagueness and overbreadth doctrines, procedural due process,

and the First Amendment as to chilling activity are inherently complex. The remaining existence of serious questions of law and fact here favors settlement "because settlement creates a certainty of some recovery, and eliminates doubt, meaning the possibility of no recovery after long and expensive litigation." *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 625 F. Supp. 2d 1133, 1138 (D. Colo. 2009). Accordingly, this factor weighs in favor of final approval.

**C.  The Value of Immediate Recovery Outweighs the Mere Possibility of Relief.**

Next, "the court must consider . . . 'whether the value of an immediate recovery outweighs the possibility of future relief after protracted and expensive litigation.'" *In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1261 (D. Kan. 2006) (citation omitted). "The value of the settlement must be weighed against 'the possibility of some greater relief at a later time, taking into consideration the additional risks and costs that go hand in hand with protracted litigation.'" *Id.*

Here, the Settlement Agreement represents substantial, enforceable commitments by the City to remedy the very issues that Plaintiffs filed suit to address. For this reason, the Court has already found that "the value of an immediate recovery heavily outweighs the mere possibility of future relief." Doc. 256 at 6. As a component of this injunctive relief, the City has agreed to specific policy and practice revisions that narrow and clarify gang designation criteria, focus those criteria on conduct implicating public safety, and provide each Class member with notice and an opportunity to challenge their designation. *See* Doc. 254-1, Part II–VI. The City has also agreed to eliminate the "inactive" and "associate" categories from the Gang List/Database, which by itself will remove about 3,517 of the at least 5,245 individuals currently included—granting prompt and complete relief to more than two-thirds of Class members. *See id.* at Part VIII. These provisions represent significant relief assured to the Class members under the Agreement.

Absent settlement, the Parties would need to engage in significant additional trial

preparation, including: *Daubert* briefing; preparation of and objections to exhibit and witness lists; designations and counter-designations of, and objections to, deposition testimony; coordination of and preparation for witness testimony, including service of subpoenas as needed; drafting and arguing motions in limine; and trial briefs—followed by trial, post-trial submissions, and the possibility of appeal. This work would take a significant additional amount of attorney time and judicial resources, and threaten to substantially delay or potentially deny altogether any ultimate relief. Plainly put, there is no guarantee of success at trial, and even if there were, there is no guarantee of policy changes as robust and immediate as the Settlement Agreement provides.

In the context of this case, the value of immediate relief is immense. The Settlement Agreement promises prompt injunctive relief for all Class members, and the primary desired outcome—removal from the Gang List/Database—for the majority of Class members. If Plaintiffs were to proceed to trial, there is, of course, no guarantee when or if any relief would be obtained. Importantly, the Settlement Agreement and the process by which it was negotiated has allowed the Parties and their counsel to craft relief that carefully balances Class members' constitutional rights (and their own interests in privacy and public safety, among other things) with the City's responsibility for law enforcement (and its own interest in respecting the constitutional rights of its citizens, among other things). In other words, even if Plaintiffs were to prevail on their claims at trial, there is no certainty that any resulting remedy would be preferable, more beneficial, or more practically accessible to the Class than the terms set forth in the Settlement Agreement. For these reasons, the value of immediate, certain, and specific recovery far outweighs the mere possibility of unknown future relief, and thus this factor weighs in favor of final approval.

**D.  The Parties Believe the Settlement Agreement Is Fair and Reasonable.**

"When a settlement is reached by experienced counsel after negotiations in an adversarial

setting, there is an initial presumption that the settlement is fair and reasonable." *Marcus v. Dep't of Revenue*, 209 F. Supp. 2d 1179, 1182 (D. Kan. 2002). "Counsels' judgment as to the fairness of the agreement is entitled to considerable weight." *Id.* at 1183 (citation omitted). "[A]bsent evidence of fraud or overreaching, courts consistently have refused to act as Monday morning quarterbacks in evaluating the judgment of counsel." *Id.* (alteration in original).

Here, Plaintiffs' counsel possess extensive experience in complex civil litigation, including class actions to enforce constitutional policing practices and protect civil liberties. *Cf.* Doc. 212 at 18. Based on that experience and the specific facts of this case, Plaintiffs' counsel have concluded that the Settlement Agreement is of significant benefit to the Class and represents a fair, reasonable, and adequate compromise of Class members' claims. Ching Decl. ¶ 11; *cf.* Ex. B at 56. Counsel for the Parties—seasoned plaintiffs' class action and defense attorneys, respectively—have fully evaluated the Settlement Agreement, weighed the strengths, weaknesses, and risks of each side's position, and concluded the Settlement Agreement is fair and reasonable. Thus, this factor favors final approval.

Because all relevant factors weigh in favor, the Court should grant final approval.

## V.    CONCLUSION

For the foregoing reasons, the Parties respectfully request that the Court grant full and final approval of the class action settlement and enter the proposed Final Approval Order, attached as **Exhibit D**.

Date: August 16, 2024

Respectfully submitted,

**SHOOK, HARDY & BACON LLP**
*/s/ Mitchell F. Engel*
Thomas J. Sullivan (admitted pro hac vice)
Mitchell F. Engel KS #78766
Paul M. Vogel KSD #79022
Charles C. Eblen, KS #77940
2555 Grand Boulevard
Kansas City, MO 64108
Phone: (816) 474-6550
tsullivan@shb.com
mengel@shb.com
pvogel@shb.com
ceblen@shb.com

**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF KANSAS**
*/s/ Kunyu Ching*
Kunyu Ching KS #29807
Karen Leve KS #29580
10561 Barkley St. Ste 500
Overland Park, KS 66212
Phone: (913) 490-4100
kching@aclukansas.org
kleve@aclukansas.org

**KANSAS APPLESEED CENTER FOR
LAW AND JUSTICE, INC.**
*/s/ Teresa A. Woody*
Teresa A. Woody KS #16949
211 E. 8th Street, Suite D
 Lawrence, KS 66044
Phone: (785) 251-8160
twoody@kansasappleseed.org

**Attorneys for Plaintiffs and the Class**

**FISHER,  PATTERSON,  SAYLER  &
SMITH, LLP**
3550 S.W. 5th
Topeka, Kansas 66606

Tel: (785) 232-7761 | Fax: (785) 232-6604
dcooper@fpsslaw.com | cbranson@fpsslaw.com
*/s/ Charles Branson*
David R. Cooper #16690
Charles E. Branson #17376

**Attorneys for Defendant**


Jennifer L. Magaña, #15519
City Attorney
Sharon L. Dickgrafe, #14071
Chief Deputy City Attorney
City Hall-13th Floor
455 North Main
Wichita, Kansas 67202
P: (316) 268-4681 | F: (316) 268-4335
sdickgrafe@wichita.gov

**Attorneys for City of Wichita**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the Clerk of the Court on August 16, 2024, to be served by the operation of the Court's CM/ECF electronic filing system upon all parties.

*/s/Mitchell F. Engel*